**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, and TASMIN ETTEFAGH,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff William C. Theodore ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a securities class action on behalf of all investors who purchased or otherwise acquired PureCycle Technologies, Inc. ("PureCycle" or the "Company") (formerly known as Roth CH Acquisition I Co. ("Roth Acquisition") securities between November 16, 2020 and May 5, 2021, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      According to its website, PureCycle has a "ground-breaking, patented recycling process, developed and licensed by Procter & Gamble . . . and commercialized by PureCycle, [that] separates color, order and other contaminants from plastic waste feedstock to transform it into Ultra-Pure Recycled Polypropylene ('UPRP') resin with virgin-like properties."[1] PureCycle shares trade on the NASDAQ stock exchange under the ticker "PCT." The Company is headquartered in Orlando, Florida.

3.      On November 16, 2020, PureCycle issued a press release announcing plans to become a publicly traded company via a merger with Roth Acquisition. Roth Acquisition was setup as a special purpose acquisition company (commonly referred to as a SPAC). Roth Acquisition's shares traded on the NASDAQ stock exchange under the ticker symbol "ROCH."

4.      On March 18, 2021, PureCycle and Roth Acquisition announced that their anticipated business combination had been completed after having been approved by Roth Acquisition's stockholders at a special meeting held on March 16, 2021. Shares of PureCycle also began trading on NASDAQ under the ticker symbol PCT on March 18, 2021. During the Class Period, shares of ROCH/PCT stock traded as high as $35.75 each.

5.      Before the markets opened on May 6, 2021, analyst Hindenburg Research published a scathing report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street." In this report, as alleged in greater detail *infra*, Hindenburg wrote: (1) Hindenburg "spoke with multiple former employees of" Defendant Otworth's and other PureCycle executives' former companies "who said PureCycle's executives based their financial projections on 'wild ass guessing', brought companies public far too early, and had deceived investors"; (2) unlike most "leading plastics companies [who] publish peer

_____

[1] *See* https://ir.purecycletech.com/ (last visited on May 7, 2021).

reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process"; (3) "multiple competitors and industry experts . . . explained that PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question"; (4) "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art"; (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale"; and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

6.     On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. This represents a one-day drop of approximately 40%.

7.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the technology PureCycle licensed from Procter & Gamble is not proven and presents serious issues even at lab scale; (ii) the challenges posed by the availability and competition for the raw materials necessary to commercialize the licensed technology are significant; (iii) PureCycle's financial projections are baseless; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**JURISDICTION AND VENUE**

8.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

12.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13.     Plaintiff William C. Theodore acquired and held shares of PureCycle at artificially inflated prices during the class period, and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

14.     Defendant PureCycle Technologies, Inc. purports to commercialize a purification recycling technology, originally developed by The Procter & Gamble Company, for restoring waste polypropylene into resin with near-virgin characteristics. PureCycle shares trade on the

NASDAQ stock exchange under the ticker "PCT." The Company's headquarters are located at 5950 Hazeltine National Drive, Suite 650, Orlando, Florida 33822, and the Company is incorporated under the laws of the State of Delaware.

15.     Defendant Michael Otworth is PureCycle's Chief Executive Officer and Chairman of the Board of Directors.

16.     Defendant Tasmin Ettefagh is PureCycle's Chief Sustainability Officer

17.     Collectively, Defendants Otworth and Ettefagh are referred to throughout this complaint as the "Individual Defendants."

18.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

19.     Roth Acquisition was incorporated in Delaware on February 13, 2019 as a SPAC. On May 4, 2020, Roth Acquisition consummated its IPO, of 7.5 million shares generating gross proceeds to Roth Acquisition of $75 million.

20.     PureCycle was formed as a Delaware limited liability company on September 15,

2015 as Advanced Resin Technologies, LLC. In November 2016, that entity changed its name to PureCycle Technologies LLC. According to its website, PureCycle has a "ground-breaking, patented recycling process, developed and licensed by Procter & Gamble . . . and commercialized by PureCycle, [that] separates color, order and other contaminants from plastic waste feedstock to transform it into Ultra-Pure Recycled Polypropylene ('UPRP') resin with virgin-like properties." PureCycle entered into a patent license agreement with Procter & Gamble on October 16, 2015.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

21.     The Class Period begins on November 16, 2020, when PureCycle announced that it would become a publicly traded company via an agreement and plan of merger with Roth Acquisition. In this release, PureCycle stated that it had "a revolutionary and proprietary cost-effective method to recycle waste polypropylene to virgin-like resin" that was "built on patented technology invented by Procter & Gamble, to be globally commercialized by PureCycle."

22.     In this November 16, 2020 release, PureCycle stated, in relevant part:

PureCycle Technologies LLC holds the exclusive global license to commercialize the only patented solvent-based purification recycling technology for restoring waste polypropylene into virgin-like resin. This process, developed by The Procter & Gamble Company ("P&G"), and commercialized by PureCycle, is both more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy[1]. PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene. PureCycle intends to obtain a Letter of No Objection from the U.S. Food and Drug Administration for its UPRP to be used in food grade applications.

Strong interest and broad global awareness of PureCycle has resulted in strategic investments and highly-attractive offtake agreements with notable groups including Aptar, BMW i Ventures, Closed Loop Partners, Glockner Enterprises, L'Oréal, Milliken & Company, P&G, Ravago, and Total. As a result of this strong demand, PureCycle has contracted pricing for its UPRP that is both de-linked from commodity pricing and at a premium to virgin polypropylene resin. Combined with abundant polypropylene waste feedstock, PureCycle expects to achieve EBITDA margins in excess of 50% from the Company's first seven plants in 2024.

The Company is building its first commercial-scale plant in Ironton, Ohio, which is expected to have nameplate capacity of approximately 107 million pounds per year when fully operational. Production is expected to commence in late 2022 with full capacity expected to be achieved in 2023. PureCycle raised approximately $250 million in a tax-exempt municipal bond offering in October 2020 to fund the construction of the Ironton facility. The Company has long term contracts for feedstock to supply the Ironton plant production and has entered into long term offtake agreements with leading global customers and Fortune 500 partners for all of the production of its UPRP from the Ironton facility.

PureCycle intends to build new recycling production facilities globally, with the goal of having 30 commercial lines operational by 2030 and 50 by 2035. In addition to PureCycle's first plant in Ironton, Ohio, the Company expects to announce its next location in Europe and to commence production in 2023 with a nameplate capacity of approximately 107 million pounds when fully operational. Additional expansion in the United States is expected to include five scaled up commercial lines capable of producing over 165 million pounds each of its UPRP. Pre-engineering for the design and installation of five commercial lines in a single "cluster" site is currently underway and will result in a combined capacity of over 825 million pounds annually in one location. Production from the Ironton, Europe, and cluster sites are expected to bring over 1.2 billion pounds of annual recycled polypropylene to the market in the next five years.

"This transaction represents a key milestone in PureCycle's mission to transform polypropylene into a recyclable and sustainable product," said Mike Otworth, CEO of PureCycle. "Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products, and we believe we are well-positioned to meet the consumer demand for recycled content as well as global sustainability mandates.[2] The proceeds of this transaction are intended to provide us with the balance sheet strength to accelerate the global rollout of our proven technology addressing the immense global problem associated with polypropylene waste. The current global challenges surrounding polypropylene waste are significant. Of the approximately 170 billion pounds of polypropylene waste produced annually, less than 1% is recycled today; the remainder largely ends up in landfills and the ocean, creating a massive environmental problem. We look forward to partnering with the Roth CH team on an efficient, accelerated path for a successful public listing."

23.     On November 20, 2020, Roth Acquisition and PureCycle filed a Registration Statement on Form S-4 with the SEC. In this Registration Statement, the Company stated, in relevant part:

*Proprietary and Proven Technology Developed by Procter & Gamble*

PCT utilizes a proprietary purification process that converts waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene. The Technology was developed by P&G, and PCT has a global license from P&G. PCT's process utilizes a broad range of feedstocks including waste carpet, stadium cups and supersacks and produces virgin-quality UPRP pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products. This patented process was developed by P&G over the course of eight years and has been refined by PCT over the past five years with more than 350 laboratory tests and with over 1,000 pounds of UPRP produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019. In addition, PCT's purification process and UPRP quality have been validated by independent technical consultants and many of PCT's strategic partners and initial customers.

24.     On February 12, 2021, PureCycle filed a Proxy Statement for Special Meeting of

Stockholders of Roth Acquisition on Form 424B3 with the SEC. In this Proxy Statement, the

Company stated, in relevant part:

PureCycle Technologies LLC ("PCT") is commercializing a patented purification recycling technology (the "Technology"), originally developed by The Procter & Gamble Company ("P&G"), for restoring waste polypropylene into resin with near-virgin characteristics. We call this resin ultra-pure recycled polypropylene ("UPRP"), which has nearly identical properties and applicability for reuse as virgin polypropylene. PCT has a global license for the technology from P&G. We intend to build our first commercial-scale plant in Ironton, Ohio (referred to herein as "Plant 1" or the "Phase II Facility"), which is expected to have nameplate capacity of approximately 107 million pounds/year when fully operational. Production is expected to commence in late 2022 and the plant is expected to be fully operational in 2023. We have secured and contracted all of the feedstock and product offtake for this initial plant. Our goal is to create an important new segment of the global polypropylene market that will assist multinational entities in meeting their sustainability goals, provide consumers with polypropylene-based products that are sustainable, and reduce overall polypropylene waste in the world's landfills and oceans.

PCT intends to build new recycling production facilities globally, with the goal of having approximately 30 commercial lines operational by 2030 and approximately 50 by 2035. In addition to our first plant in Ironton, Ohio, we currently expect the next plants to be located in the United States, followed by Europe. Additional expansion in the United States is expected to include a scaled up "cluster" site model. Pre-engineering for the design and installation of multiple commercial lines

in a single cluster site is currently underway and is expected to create efficiencies across the construction and permitting processes, as well as reduce average capital expenditures per plant and reduced overall operating costs. From this next wave of expansion PCT expects to produce approximately 1 billion pounds of annual recycled polypropylene by the end of 2024, which is less than 1% of the total annual projected demand for virgin and virgin parity resin.

PCT is regarded as a leader in polypropylene recycling and polymers sustainability. The Company's Feedstock Evaluation Unit ("FEU"), which has been operational since July of 2019, is a smaller scale replica of the commercial line currently under construction. The FEU was designed to simulate commercial production and validate for PCT's customers and suppliers the viability of our process, which has helped PCT secure 20+ year signed offtake agreements and supply agreements with blue chip partners and industry players. Since its commissioning, the FEU has successfully processed more than 145 feedstocks from the US and Europe and produced recycled polypropylene nearly identical to virgin polypropylene.

The Technology has been evaluated by third parties with a focus on the Technology's efficacy and commercial scalability. Certain of our strategic partners have conducted testing on PCT's UPRP. In these evaluations, PCT's UPRP compared favorably to virgin polypropylene in common Food & Beverage industry benchmarks for melt flow and mechanical properties, purity, and function (lift decay, hinge break, and impact resistance). Additionally, we have received recognition from multiple media outlets and plastics industry groups including Time Magazine, the American Chemistry Council, and the Plastics Industry Association.

25.     On March 18, 2021, PureCycle announced that its business combination with Roth Acquisition was approved by Roth Acquisition's shareholders at a special meeting held on March 16, 2021, and that PureCycle's shares would begin trading under the ticker symbol PCT beginning the same day.[2]

26.     In this release, Defendant Otworth stated that "[t]he consummation of this transaction represents yet another major milestone for PureCycle, demonstrating broad market validation of our value proposition . . . . Most importantly, we now have the increased capital

---

[2]  *See*  https://finance.yahoo.com/news/purecycle-technologies-completes-business-combination-124100921.html (last visited May 7, 2021).

market access to support the accelerated scaling required to revolutionize the transformation of waste propylene into sustainable products."

27.     Otworth further stated in this March 18, 2021 press release that: "[o]ver the last three months, PureCycle has further developed its financial and manufacturing capabilities. . . . This is now an execution game for PureCycle. It's incumbent on us to pull forward the best most knowledgeable leaders to ensure that we realize the full potential of this technology."

28.     Also in this March 18, 2021 release, PureCycle stated that it "uses proprietary technology licensed from Procter & Gamble to recycle waste polypropylene (PP) into virgin-like recycled PP for myriad applications. The company is at the intersection of an enabling technology meeting a compelling global need . . . ." The release also included a quote from Byron Roth, Chairman and CEO of Roth Acquisition: "PureCycle's revolutionary and proprietary technology to recycle waste polypropylene into virgin-like resin is not only transformative, but also beneficial to our planet. We are confident that PureCycle has the resources to deliver substantial value for all stakeholders."

29.     On April 21, 2021, PureCycle issued a press release entitled "PureCycle's Tasmin Ettefagh facilitates plastics industry dialogue about polypropylene recycling solutions in light of U.S. Plastics Pact: Ultra-pure recycle polypropylene manufacturer CSO drives narrative."[3] In this release, PureCycle announced that Defendant Ettefagh had participated in two conferences leading up to Earth Day and had "moderated a panel discussion about advanced recycling technologies and how these may impact commitments made by the U.S. Plastics Pact. In this release, Defendant Ettefagh stated "PureCycle is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts." She added that "PureCycle's proprietary

---

[3]     *See*     https://ir.purecycletech.com/news-events/press-releases/detail/9/purecycles-tasmin-ettefagh-facilitates-plastics-industry (last visited May 7, 2021).

recycling technology was developed by [Procter & Gamble], and it's this type of top-down investment that's driving the circular economy."

30.    This April 21, 2021 release continued:

PureCycle uses proprietary technology licensed from The Procter & Gamble Company (P&G) to recycle waste PP into virgin-like recycled PP for a myriad of applications. The company is the intersection of an enabling technology meeting a compelling global need: only approximately 1% of the 170 billion pounds of PP consumed last year was recycled as compared to almost 20% for polyethylene terephthalate (PET), according to the American Chemistry Council.

31.    The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As discussed below, the Defendants misled investors by misrepresenting and/or failing to disclose that: (i) the technology PureCycle licensed from Procter & Gamble is not proven and presents serious issues even at lab scale; (ii) the challenges posed by the availability and competition for the raw materials necessary to commercialize the licensed technology are significant; (iii) PureCycle's financial projections are baseless; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

32.    The statements described in ¶¶ 21-24, 26-30 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

**THE TRUTH EMERGES**

33.    Before the markets opened on May 6, 2021, analyst Hindenburg Research published a scathing report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street." In this report, as alleged in greater detail *infra*, Hindenburg wrote: (1) Hindenburg had "spoke[n] with multiple former employees of" Defendant Otworth's and other PureCycle executives' former companies "who said PureCycle's

executives based their financial projections on 'wild ass guessing', brought companies public far too early, and had deceived investors"; (2) unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process"; (3) "multiple competitors and industry experts . . . explained that PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question"; (4) "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art"; (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale"; and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

34.    Hindenburg noted that although PureCycle previously announced that it aimed to generate revenue from its "commercial scale production facility in late 2020," that in its latest company presentation, PureCycle "revised that target to late 2022, at the earliest, when it hopes to finish most of the commercial 'Phase II' portion of its plan and generate $8 million in revenue. . . . From there, the company boldly projects $224 million of net revenue in FY2023, **which it then plans to grow nearly ten-fold** – to $2.3 billion by 2027." (Emphasis in original). Hindenburg wrote that PureCycle "put its aggressive projections through a bit of a torture session in order to justify its valuation. . . . In a corner of the plastics recycling world that has eluded economic sustainability

for the world's top chemical companies, those numbers would put PureCycle's margins on par with some of the world's most profitable tech companies."

35.     Hindenburg further wrote that "the only two investment banks whose 'research' divisions cover PureCycle are Roth and Craig Hallum, the two sponsors of the deal. Both have put 'Buy' ratings on the company, with price targets ranging from $45-48." Hindenburg noted that "Craig Hallum issued its 'Buy' rating and a $48 price target on March 18th, the very day PureCycle went public." (Emphasis omitted). However, Hindenburg pointed out, two partners within Craig Hallum's research division received shares of PureCycle in the merger, which became eligible for sale on April 16th due to the elevated stock price. Then five days after Roth Acquisition's shares were unlocked for sale, the research department at Roth issued a "Buy" rating on PureCycle, assigning a $45 price target. As Hindenburg noted, "[t]he rest of Roth and Craig Hallum's founder's shares will become freely tradeable in September 2021, well before any revenue is generated by [PureCycle]. Both firms stand to gain considerably regardless of how the company's plans work out."

36.     Hindenburg also tracked how Defendant Otworth and three other senior executives, Bill Haskell, Rick Brenner, and John Scott, have taken at least 6 companies public. Hindenburg wrote: "[a]ll have failed. . . .  Of the 6 companies taken public by PureCycle Senior Executives, 2 went bankrupt, 3 were delisted, and 1 was acquired following a ~95% decline. Over $760 million in public shareholder capital was incinerated in the process."

37.     Hindenburg detailed that before PureCycle announced that it was going public through Roth Acquisition in November 2020, it was owned and controlled by Innventure, a Florida-based startup founded by Defendant Otworth, PureCycle's Chief Science Officer and Director John Scott, and PureCycle Director Rick Brenner.

38.     Hindenburg wrote that it "connected with former employees of several of the failed public companies led by PureCycle's executive team referenced above." One former senior employee of one of these companies, PetroAlgae, said "I think they did con . . . that's a strong word but I think it's accurate. . . . I think because of the biofuel boom especially in algae they were forced into the same hype as all the other algae biofuels just to get funding. . . . I think it was deceiving to the investors and I couldn't have done that personally. But a lot of salespeople have that mentality where they overpromise and think they can make it happen. It just didn't at that time."

39.     Hindenburg also spoke with a former employee of AgCert, another company the PureCycle senior executives had taken public, who said that the company was "too aggressive" with forward sales projections: "[t]here was a lot of wild ass guessing going on there, and as a warning to investors: this is speculative you could lose all your money so jump in if you want."

40.     Hindenburg spoke with a former employee of Tyratech, another company that the PureCycle executives took public, who said that "the dossier that Tyratech went to market with was really not, I know now, it was not credible."

41.     In its report, Hindenburg also detailed how PureCycle's executive team received $7 million in cash bonuses simply for closing the SPAC deal with Roth Acquisition, and are slated to receive approximately $40 million in compensation before PureCycle generates any revenue. Indeed, Defendant Otworth himself, according to Hindenburg, collected $5 million in bonuses after the deal with Roth Acquisition closed.

42.     Hindenburg's report also called into question the technology that PureCycle has licensed from Procter and Gamble and has repeatedly lauded: "[o]ne might wonder, if the technology was a major breakthrough, as described in the company's presentation . . . why P&G

didn't license it to a chemical company like Dow or well-established plastics or polycarbon companies rather than a team with a history of repeated failures and no specific polycarbon expertise? Or, why not develop the technology internally as a new income stream?"

43.     Hindenburg cited a written Q&A session with a Procter & Gamble employee who was asked this question. That employee "explained that a Global Business Development Director at P&G had a personal relationship with the team at PureCycle's patent company, Innventure, and made the connection. . . . The P&G employee that bridged the deal appears to have later taken a senior position at PureCycle, now serving as VP of Commercial and Business Development." Hindenburg wrote that its "analysis leads us to believe that P&G likely had a 'technology' that it saw no economic sense in commercializing itself, so it spun it off, providing a steady stream of positive PR for the plastic producing giant, showcasing its efforts to promote recycling."

44.     Hindenburg also noted that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." Indeed, in a November 2020 interview, Procter & Gamble's inventor of the technology was asked about this potential bottleneck. He said: "I think the fact that you have to ensure you have feedstock coming in and I think that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running."

45.     Hindenburg also spoke with Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers. Mr. Saunders stated, per Hindenburg, that "[t]he problem I see with chemical recycling – and I'm not an expert in this process but I am an expert in PP raw materials – there is not enough non-contaminated PP scrap to support these processes. So you're going to get a wide range of materials that have varying degrees of other resin contamination." He added that "[a]nd what's stated publicly by PureCycle themselves is that the

facility works well up to 5 percent contamination. I've been buying PP scrap for 30 years and I'm not aware of any PP scrap in volume that has any less than 5% contamination in the world."

46.     Hindenburg also spoke with Richard Minges, a 10-year executive for Custom Polymers, who stated "it's more about the raw materials that can be secured." He continued that PureCycle is "stating that they're going to sell their resin for as much as $2 a pound, which is a huge premium. And the people that we have that are paying premium right now is because they only need a small amount and it's a marketing ploy and they want it secured. And if I go back to these same people and tell them I have a 10x as much and the price is going up to $2 then I don't know a single one who would pay."

47.     Hindenburg also wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that "PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale."

48.     On the latter point, Hindenburg wrote that it consulted with a "30 year expert in polymers," who stated that "[t]here is no mention of the needed actual testing of the final product. It is indirect and vague. The hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience." The same expert stated, according to Hindenburg, that "[w]hile the n-butane & propane blends for solvent, heated and pressurized may extract a slightly higher concentration of PP per cycle pass than carbon dioxide and n-butane, it is still apparently very low. PureCycle doesn't disclose what these values are in the scaled-up testing." He concluded: "[t]he permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. I don't think the process could ever be cost efficient. The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough."

Hindenburg further detailed that PureCycle's licensed technology presented issues at "lab scale," rendering larger scale development as even more problematic.

49.     On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. This represents a one-day drop of approximately 40%.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired PureCycle securities between November 16, 2020 and May 5, 2021, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

51.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of PureCycle stock were publicly traded during the Class Period on the NASDAQ stock exchange. Record owners and other members of the Class may be identified from records maintained by PureCycle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.   Whether Defendants violated the Exchange Act;

b.   Whether Defendants omitted and/or misrepresented material facts;

c.   Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.   Whether the price of the Company's stock was artificially inflated; and

f.   The extent of damage sustained by Class members and the appropriate measure of damages.

53.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

54.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

56.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

c.   The Company's common stock traded in efficient markets;

d.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.  Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

57.    At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

58.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

59.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

60.    On May 6, 2021, Hindenburg Research issued its report as detailed herein. On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. This represents a one-day drop of approximately 40%.

61.     These revelations contradicted statements and/or revealed omissions made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

**Count One**
**Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     During the Class Period, Defendant PureCycle and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

64.     Defendant PureCycle and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

65.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## Count Two
### Violation of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

66.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)      awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)      awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: May 11, 2021                    Respectfully submitted,

*/s/ Cullin A. O'Brien*
Cullin A. O'Brien (FL Bar No. 0597341)
**CULLIN O'BRIEN LAW, P.A.**
6541 NE 21st Way
Fort Lauderdale, FL 33308
(561) 676-6370 (phone)
(561) 320-0285 (fax)
cullin@cullinobrienlaw.com

*Local Counsel*

Jeffrey C. Block (*pro hac vice* forthcoming)
Jacob A. Walker (*pro hac vice* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 (phone)
(617) 507-6020 (fax)
jeff@blockleviton.com
jake@blockleviton.com

*Attorneys for Plaintiff and Proposed Lead Counsel*