## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

WILLIAM C. THEODORE,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

PURECYCLE TECHNOLOGIES,
INC., MICHAEL OTWORTH,
MICHAEL E. DEE, DAVID
BRENNER, BYRON ROTH and
TASMIN ETTEFAGH,

Defendants.

Case No. 6:21-cv-809-PGB-GJK

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

**DEMAND FOR A JURY TRIAL**

Co-Lead Plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs"),

individually and on behalf of all others similarly situated, by Plaintiffs' undersigned

attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the

following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts,

and information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through Plaintiffs' attorneys, which included, among

other things, a review of the Defendants' public documents, conference calls and

announcements made by Defendants, United States ("U.S.") Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and

regarding PureCycle Technologies, Inc. ("PureCycle" or the "Company") (formerly

known as Roth CH Acquisition I Co. ("Roth Acquisition"), analyst reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a securities fraud class action on behalf of all investors who purchased or otherwise acquired PureCycle Technologies, Inc. ("PureCycle" or the "Company") (formerly known as Roth CH Acquisition I Co. ("Roth Acquisition") securities between November 16, 2020 and May 5, 2021, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.     Through November 2020, PureCycle's predecessor, Roth CH Acquisition I "ROCH"), was a publicly traded special purpose acquisition company ("SPAC") formed in 2019 for the express purpose of effecting a merger, stock exchange, acquisition, reorganization, or similar business combination with one or more businesses. As a SPAC in search of a business to acquire, ROCH had no ongoing business operations.

3.     Founded in April 2015, PureCycle provides recycling services. The Company is developing a plastic purification recycling technology originally developed and patented by The Procter & Gamble Company ("P&G"). The

2

Company claims its process recycles waste polypropylene into resin with "near-virgin" characteristics. The Company calls its resin ultra-pure recycled polypropylene ("UPRP"), and states that it can take used plastic feedstock and remove color, odor, and other contaminants, creating UPRP that has nearly identical properties and applicability for reuse as virgin polypropylene. Through its global license with P&G, the Company claims to have the only patented, solvent-based purification recycling technology available for this process. If the technology works, a royalty-based license is to be paid by PureCycle to P&G on a semi-annual basis.

4.     Polypropylene is used in a wide array of consumer facing and industrial products. The properties of polypropylene that provide desirable commercial benefits (such as strength, toughness, and elasticity) make it difficult to recycle. While polypropylene represents 28% of the world's polymer demand, only approximately 1% of polypropylene is recycled now, compared to 20% of polyethylene terephthalate, another common type of plastic.

5.     PureCycle launched a $300 million bond and debt offering in 2020 that it said would help finance the Company's first production plant in Ironton, Ohio. The Company has said that production will begin in the Ironton plant in 2022, with 2023 listed as the full capacity date, and the Company stated that it planned to have five plants operational by 2023.

6.     The Class Period starts with the November 16, 2020 announcement that PureCycle would list its common stock on the NASDAQ through a reverse merger with the ROCH SPAC. At that time, the Company claimed that PureCycle was then modeling for its revenues to hit $8 million in 2022 as its first plant in Ironton came on line. Revenues would then ramp up significantly to $224 million in 2023 with the first five plants coming on line.  By 2024, PureCycle said it was modeling to hit $800 million in revenues, with EBITDA margins of over 50%.[1] The price of PureCycle common stock (then still trading as ROCH) spiraled up as the Company made additional statements about the merger, which its shareholders approved at a special meeting held virtually on March 16, 2021, and the resulting Company's combined business. Shares of PureCycle also began trading on NASDAQ under the ticker symbol PCT on March 18, 2021. During the Class Period, ROCH/PCT stock traded as high as $35.75 a share.

7.     Despite the lack of any current production and revenue since its inception, the company has a current market valuation of $3.1 billion, and an enterprise value of ~$2.8 billion, owing to the $308 million in cash it raised through its SPAC and PIPE rounds.

8.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business. Specifically, Defendants

---

[1] EBITDA" is earnings before interest, taxes, depreciation and amortization.

made false and/or misleading statements and/or failed to disclose: (a) that the management team bringing PureCycle public had previously brought six other failed businesses public only to have each implode thereafter; (b) that the management team bringing PureCycle public had characterized rank speculation as financial projections to investors in the past; (c) that the primary motivation of the management team bringing PureCycle public was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares; (d) that PureCycle faces higher competition for high quality feedstock than it has led investors to believe, materially undermining the management team's financial projections; (e) that PureCycle's patent is nowhere as cogent or valuable as it has led investors to believe, and the technology underlying its business operations is unproven and presents serious issues even at lab scale; (f) that, in reality, the Company's flammable pressurized process is not yet functional, especially at scale, and is dangerous; (g) that the Company purports to be advancing to commercial production scale despite still having operational issues at a lab scale; and (h) that as a result of the foregoing, Defendants' positive statements during the Class Period about the Company's business performance, financial and operational metrics, and financial prospects were false and misleading and/or lacked a reasonable basis.

9.      Before the markets opened on May 6, 2021, analyst Hindenburg Research published a detailed scathing report on PureCycle entitled "PureCycle: The

Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street"
(the "Report"). In the Report, supported by multiple former employees and industry
experts, Hindenburg revealed that the management team bringing PureCycle public
had: (a) previously brought six other businesses public only to have each implode
thereafter, "resulting in 2 bankruptcies, 3 delistings, and 1 acquisition after a ~95%
decline[,]" with "[o]ver $760 million in public shareholder capital [being]
incinerated in the process"; (b) "based their financial projections" in those other
failed companies on "'wild ass guessing,' [bringing] companies public far too early,
and [having] deceived investors"; and (c) only brought PureCycle public in order to
permit that same spurious management team to "collectively position[] themselves
to clear ~$90 million in cash and tradable shares before the company generates a
single dime in revenue." The Report cited industry experts who explained that
despite the Company's rosy projections, "PureCycle faces steep competition for high
quality feedstock, and called the company's financial projections into question." The
Report included the account of a "30-year expert on polymers, with a background in
advanced plastics recycling" who stated that PureCycle's "patent is 'indirect,'
'vague' and 'regurgitation' of prior art" and "referred to the company's flammable
pressurized process as a 'bomb' and warned about the company foraging ahead to
commercial scale despite still having issues at a lab scale." Indeed, unlike most
"leading plastics companies [who] publish peer reviewed studies that detail their

advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process." The Report concludes that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

10.     On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to a May 6, 2021 closing price of $14.83 per share (trading intraday as low as $13.55), representing a one-day drop of approximately 40% per share on unusually high trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

11.     PureCycle's May 6, 2021 press release, issued in response to the Report, fails to challenge, much less negate, *any* of the Report's specific underlying factual allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders."

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the PureCycle's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

17.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiffs, as set forth in their previously filed certifications, acquired the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant PureCycle Technologies, Inc. is headquartered in Orlando, Florida. Until March 17, 2021, the common stock of ROCH traded on the NASDAQ under the ticker symbol "ROCH," the warrants to purchase the common stock of ROCH traded on the NASDAQ under the ticker symbols "ROCHW," and the units comprised of ROCH common stock and warrants traded on the NASDAQ under the ticker symbol "ROCHU." Following the March 16, 2021 shareholder approval of the merger and the March 17, 2021 closing of the merger, PureCycle common stock trades on the NASDAQ under the ticker symbol "PCT," the warrants to purchase its common stock trade on the NASDAQ under the ticker symbol "PTTW," and units comprised of PCT common stock and warrants trade on the NASDAQ under the ticker symbol "PCTTU." As of March 8, 2021, there were more than 9.8 million shares of ROCH common stock issued and outstanding.

20.     Defendant Michael Otworth ("Otworth") is, and at all relevant times has been, the Chief Executive Officer ("CEO") of PureCycle and has served as the Chairman of the combined company's Board of Directors since completion of the merger.

21.     Defendant Michael E. Dee ("Dee") is, and at all relevant times has been, the Chief Financial Officer ("CFO") of PureCycle.

22.     Defendant David Brenner ("Brenner") is, and at all relevant times has been, the Chief Commercial Officer ("CCO") of PureCycle.

23.     Defendant Byron Roth ("Roth") was, prior to the merger, the Chairman and CEO of ROCH.

24.     Defendant Tasmin Ettefagh ("Ettefagh") is, and at all relevant times has been, Chief Sustainability Officer ("CSO") of PureCycle.

25.     Defendants Otworth, Dee, Brenner, Roth, and Ettefagh are sometimes referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of PureCycle securities during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PureCycle's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual

Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

26.     Defendant PureCycle and the Individual Defendants are sometimes referred to herein collectively as "Defendants."

27.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about PureCycle. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of PureCycle securities was a success, as it: (a) deceived the investing public regarding PureCycle's prospects and business; (b) artificially inflated the price of PureCycle securities; (c) permitted certain of PureCycle's senior executives and directors to collect $7 million in cash bonuses just for closing the SPAC deal, and set them up to receive an additional $40 million in compensation before any revenues are generated by the Company; (d) permitted the two investment banks who sponsored the ROCH SPAC, Roth Capital  and Craig Hallum Capital Group LLC ("Craig-Hallum"), to collectively receive approximately 2 million "founders" shares for a little more than a penny per share, worth approximately $48 million the day before the Report was issued; and (e) caused Plaintiff and other members of the Class to purchase PureCycle and/or ROCH securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

## Background

28.    A special purpose acquisitions company ("SPAC") is essentially a shell company set up by investors with the sole purpose of raising money through an IPO to eventually acquire another company.  A SPAC has no commercial operations, makes no products and does not sell anything. In fact, the SPAC's only assets are typically the money raised in its own IPO.  A company might choose to go public through a SPAC versus a traditional IPO because the process is quicker, with lower associated costs and fewer extensive financial disclosure requirements.

29.    Roth Acquisition was incorporated in Delaware on February 13, 2019 as a SPAC. On May 4, 2020, Roth Acquisition consummated its IPO, of 7.5 million shares generating gross proceeds to Roth Acquisition of $75 million. Roth Capital and Craig-Hallum were the sole underwriters in the ROCH IPO and received almost 2 million shares in PureCycle for slightly more than a penny per share through their sponsorship of the SPAC deal.

30.    Roth is the CEO and Chairman of Roth Capital, an investment bank based in Newport Beach, California that largely operates in the murky world of small cap and microcap banking. Prior to taking on SPAC mergers like this one, Roth was well known for his role in facilitating numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion for China-based clients from

2003 to 2012. Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division. Roth's FINRA BrokerCheck report shows 15 regulatory sanctions and 12 arbitrations, including a violation of Regulation M, enacted to prevent market manipulation.

31.   PureCycle was formed as a Delaware limited liability company on September 15, 2015 as Advanced Resin Technologies, LLC. In November 2016, that entity changed its name to PureCycle Technologies LLC. The Company seeks to commercialize a process for recycling polypropylene, a common plastic used in everything from carpets to shampoo caps to fishing nets. Within the world of plastics recycling, polypropylene has been particularly uneconomical. It represents 28% of the world's plastic, yet only approximately 0.8% of it is recycled today. This is because a sizable amount of polypropylene requires expensive sorting and cleaning due to its use in food packaging. It is also commonly found in products that use mixed plastics that can be difficult, if not impossible, to separate. These dynamics have rendered polypropylene recycling largely uneconomical despite the world's top scientists and major chemical companies seeking a recycling solution since the discovery of polypropylene in 1951.

32.   PureCycle's technology is based on a license it obtained from P&G in October 2015. P&G invented and developed the technology underlying PureCycle's entire business because polypropylene was the largest plastic type used by P&G, and

it has been notoriously difficult to recycle.  Nevertheless, P&G did not opt to develop the technology internally to reap the rewards of this supposedly revolutionary technology nor did P&G license the technology to a company with any relevant background in plastics or polycarbon.  Rather, P&G licensed the technology to PureCycle in October 2015, around the time of PureCycle's inception.  However, the management team that took PureCycle public has no apparent background in polypropylene recycling.

33.     Moreover, plastics companies typically publish peer reviewed studies detailing their advancements in the field.  Plaintiffs' investigation confirmed that no peer reviewed study mentions PureCycle's technology or patent. Of over 900,000 results on Google Scholar, ScienceDirect, Elsevier, and Scopus relating to plastic recycling processes, not a single one mentions PureCycle, its patents, or related technologies in a peer reviewed study.

**PureCycle Executives' Troubling History**

34.     Before PureCycle announced it was going public through the SPAC merger in November 2020, it was owned and controlled by Innventure, which describes its goal is working with multinational companies to "identify, grow and commercialize their proprietary IP while strategically partnering for success." Innventure was founded by Otworth, Brenner, PureCycle's Chief Science Officer, and Director Dr. John Scott ("Scott"). Innventure's management team takes credit

for what it misleadingly characterizes as "six successful IPOs." Plaintiffs' investigation confirmed that, in reality, and unknown to PureCycle's investors, (given Defendants' glowing representations and failure to mention the following in any disclosure to ROCH or PureCycle investors during the Class Period) each of these purportedly "successful IPOs" resulted in significant investors losses:

- ☐ **ChromaVision Medical Systems** ("ChromaVision") made imaging systems to detect cellular diseases. PureCycle's Scott served as Chairman of ChromaVision. ChromaVision amassed a $64.2 million accumulated deficit by end of year 2001 and received a notice of delisting in October 2004.

- ☐ **eMerge Interactive, Inc.** ("eMerge") was an online cattle auctioneer. PureCycle's Scott served as Chairman at eMerge, beginning in September 1994, before resigning in November 2001. eMerge amassed a $212.4 million accumulated deficit by the end of 2005. eMerge filed for Chapter 11 bankruptcy and was delisted in 2007.

- ☐ **AgCert International, Ltd.** ("AgCert") focused on reducing emissions from pig dung. Bill Haskell, CEO of PureCycle's parent, Innventure, acted as "representative" for his group's investment in AgCert and also served as the company's interim CEO in 2005 through at least 2007. AgCert amassed a €141.1 million accumulated deficit by mid-2007. The company delisted after "misjudging its carbon credit portfolio" in 2008 and filed for insolvency in 2012.

- ☐ **TyraTech, Inc.** ("TyraTech") was focused on developing insect control products. Brenner served as founding CEO at TyraTech until 2009. TyraTech went public during his tenure and amassed a $55.5 million accumulated deficit by his departure. TyraTech was acquired in 2018 for just $2.15 million after declining approximately 95% from its highs.

- ☐ **PetroAlgae** claimed to have found a way to economically turn algae into fuel. PureCycle's Scott served as CEO of PetroAlgae.

15

The zero-revenue company filed to go public in 2010. PetroAlgae amassed a $73.8 million accumulated deficit by 2010, and the company was delisted onto the OTC pink sheets by 2011. Scott resigned as Chairman in February 2012. The company changed its name in 2012 and ultimately had its securities registration revoked in 2017.

☐   ***XL TechGroup, Inc.*** ("XL TechGroup") was a venture capital/incubator company that preceded Innventure. PureCycle's Scott served as Co-Founder and CEO of XL TechGroup and Otworth held a C-level role at XL TechGroup. Bill Haskell, CEO of PureCycle's parent, Innventure, served as Co-Founder and President of XL TechGroup. The company went public in 2004, amassed a $189.6 million accumulated deficit, and its stock was delisted and cancelled in August 2008.

## Defendants' Exorbitant Compensation

35.   Defendants Otworth and Dee did not need to prove that PureCycle's technology worked before cashing in.   In addition to sizeable salaries, they collectively received $7,000,000 solely due to the successful consummation of the SPAC transaction. As the Form S-4 Roth filed with the SEC on November 20, 2020 stated:

> Mr. Otworth's New Employment Agreement provides that Mr. Otworth serves as the Chief Executive Officer of PCT and will be nominated to serve on PCT's Board of Directors as Chairman during his term as Chief Executive Officer. Mr. Otworth's base salary under his New Employment Agreement is $750,000, subject to increase as determined by the Board of Directors of PCT. Mr. Otworth is also entitled to a cash bonus equal to $5,000,000 in the event that a SPAC Transaction is successfully completed and Mr. Otworth remains continuously employed with PCT through the completion of the SPAC Transaction.

*** *** ***

Pursuant to the Dee Employment Agreement, upon the completion of a business combination of PCT with a company formed to raise capital through an initial public offering for the purpose of acquiring an existing company (such as the Business Combination) (a "SPAC Transaction"), Mr. Dee will become entitled to total cash payments of $3,000,000 [2] (the "Negotiated Payment"), payable in two installments during 2021. The Negotiated Payment represents a negotiated fee under the Bird Creek Agreement and reflects the significant contributions made by Mr. Dee with respect to the negotiation of financing transactions to

36.    Defendant Dee also received 1.2 million in share grants when the SPAC transaction between Roth and PureCycle consummated, worth approximately $17 million as of the close of trading on September 24, 2021, but worth as high as approximately $40 million during the Class Period.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

37.    The Class Period begins on November 16, 2020, when PureCycle announced that it would become a publicly traded company via an agreement and plan of merger with Roth Acquisition. In this release, PureCycle stated that it had "a revolutionary and proprietary cost-effective method to recycle waste polypropylene to virgin-like resin" that was "built on patented technology invented by Procter & Gamble, to be globally commercialized by PureCycle."

38.    In this November 16, 2020 release, PureCycle stated, in relevant part:

PureCycle Technologies LLC holds the exclusive global license to commercialize the only patented solvent-based purification recycling

_____

[2] Defendant Dee received $2 million in cash on the date that Roth officially acquired PureCycle and will receive the remaining $1 million in cash on December 31, 2021, per Defendant Dee's Executive Employment Agreement dated November 15, 2020.

technology for restoring waste polypropylene into virgin-like resin. This process, developed by The Procter & Gamble Company ("P&G"), and commercialized by PureCycle, is both more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy. PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene. PureCycle intends to obtain a Letter of No Objection from the U.S. Food and Drug Administration for its UPRP to be used in food grade applications.

Strong interest and broad global awareness of PureCycle has resulted in strategic investments and highly-attractive offtake agreements with notable groups including Aptar, BMW i Ventures, Closed Loop Partners, Glockner Enterprises, L'Oréal, Milliken & Company, P&G, Ravago, and Total. As a result of this strong demand, PureCycle has contracted pricing for its UPRP that is both de-linked from commodity pricing and at a premium to virgin polypropylene resin. Combined with abundant polypropylene waste feedstock, PureCycle expects to achieve EBITDA margins in excess of 50% from the Company's first seven plants in 2024.

The Company is building its first commercial-scale plant in Ironton, Ohio, which is expected to have nameplate capacity of approximately 107 million pounds per year when fully operational. Production is expected to commence in late 2022 with full capacity expected to be achieved in 2023. PureCycle raised approximately $250 million in a tax-exempt municipal bond offering in October 2020 to fund the construction of the Ironton facility. The Company has long term contracts for feedstock to supply the Ironton plant production and has entered into long term offtake agreements with leading global customers and Fortune 500 partners for all of the production of its UPRP from the Ironton facility.

PureCycle intends to build new recycling production facilities globally, with the goal of having 30 commercial lines operational by 2030 and 50 by 2035. In addition to PureCycle's first plant in Ironton, Ohio, the Company expects to announce its next location in Europe and to commence production in 2023 with a nameplate capacity of approximately 107 million pounds when fully operational. Additional expansion in the United States is expected to include five scaled up

commercial lines capable of producing over 165 million pounds each of its UPRP. Pre-engineering for the design and installation of five commercial lines in a single "cluster" site is currently underway and will result in a combined capacity of over 825 million pounds annually in one location. Production from the Ironton, Europe, and cluster sites are expected to bring over 1.2 billion pounds of annual recycled polypropylene to the market in the next five years.

"This transaction represents a key milestone in PureCycle's mission to transform polypropylene into a recyclable and sustainable product," said Mike Otworth, CEO of PureCycle. "Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products, and we believe we are well-positioned to meet the consumer demand for recycled content as well as global sustainability mandates.[2] The proceeds of this transaction are intended to provide us with the balance sheet strength to accelerate the global rollout of our proven technology addressing the immense global problem associated with polypropylene waste. The current global challenges surrounding polypropylene waste are significant. Of the approximately 170 billion pounds of polypropylene waste produced annually, less than 1% is recycled today; the remainder largely ends up in landfills and the ocean, creating a massive environmental problem. We look forward to partnering with the Roth CH team on an efficient, accelerated path for a successful public listing."

39.    Continuing, the November 16, 2020 press release quoted Roth,

Chairman and CEO of ROCH, as stating:

> ***We searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks. We believe PureCycle's technology will be transformative in plastic recycling and help companies meet their sustainability goals.*** We look forward to sharing additional details on this exciting transaction in the coming months. We appreciate all of our shareholders and investors that have participated in the IPO and PIPE transactions. We look forward to a successful future together.

40. Finally, the November 16, 2020 press release touted the experience of PureCycle's management team, stating:

> PureCycle is retaining its ***experienced management team***, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has over 23 years of experience leading and ***scaling early-stage companies***. Mr. Brenner was PureCycle's first hire and has led PureCycle's commercial expansion over the last four years. Mr. Dee spent nearly three decades in public markets, corporate finance, private equity and M&A in senior roles at Morgan Stanley, Temasek Holdings and the Asian Infrastructure Investment Bank.

41. Defendants also provided a link to a webinar on which Defendants Otworth, Dee, and Brenner presented information regarding the benefits of PureCycle's business metrics and financial prospects, and filed a slide deck they produced for that presentation with the SEC. The slide presentation emphasized the purportedly experienced management team:



42.    In the presentation, Defendants Otworth, Dee, and Brenner also highlighted the purported value of the Company's technology and intellectual property rights, stating, in pertinent part:



*The only proven and economically-viable method of recycling polypropylene to virgin-quality*

| The Opportunity | Significant Progress and Achievements |
|---|---|
| Polypropylene (PP) is an untapped 170B+ lb annual global market | ✓ Seven years of R&D and $100M invested to date – on track to begin commercial sales in Q4 2022, 10 years after technology development |
| | ✓ Significant amount of capital raised to fund future plant construction – $250M municipal bond offering, $90 million in equity private placements, and up to $60M convertible notes complete; $250M PIPE expected to close by Q1 2021 |
| PP is extremely difficult to recycle, resulting in just 1% of PP recycled today[1] | ✓ Proprietary and unique technology obtained through license partnership with P&G |
| | ✓ Backing from blue-chip, global strategic investors and offtake partners (e.g., P&G, TOTAL, Milliken & Company, L'Oreal, Aptar, Ravago, Glockner Enterprises, Wasson Enterprise, and BMW i Ventures) |
| PureCycle's patented proprietary process technology uniquely recycles PP back to virgin-quality | ✓ 100% of Plant 1 required feedstock supply secured (3 years contracted, with successive 1-year renewable terms providing duration of 20 years) |
| | ✓ Offtake production volume secured for nearly 2x the annual output of Plant 1; premium pricing yields 50%+ EBITDA margins |

*No Other Technologies Can Efficiently Address Polypropylene Recycling at Scale*

43.    After detailing the construction and rollout of new factors, Defendants also provided strong financial guidance, stating, in pertinent part:

## Process Enables Highly Attractive Economics

*PureCycle expects consistent, replicable economics that are more profitable than commodity virgin polypropylene, resulting from lower feedstock than traditional production and premium pricing*

| | Plants 1 (107M LBS)[1] | Plant 2 (107M LBS)[1] | Future 5 Plant Clusters (165 LBS *5 = 825M LBS)[1] | |
|---|---|---|---|---|
| **Price / lb** | $0.90 | $1.00 | $1.00 | $1.50 *Recent LOIs at $2.00/lb* |
| Annual Gross Revenue | $97M | $107M | $825M | $1,238M |
| **Feedstock Cost / lb** | $0.16 | $0.16 | $0.14 | $0.14 |
| Annual Feedstock Cost | $18M | $18M | $119M | $119M |
| **Operating Costs / lb[2]** | $0.29 | $0.29 | $0.27 | $0.27 |
| Annual Operating Costs | $31M | $31M | $227M | $227M |
| **EBITDA / lb** | $0.45 | $0.55 | $0.58 | $1.08 |
| Annual Run-Rate EBITDA | $48M | $59M | $479M | $891M |
| **Unlevered FCF / lb[3]** | $0.42 | $0.52 | $0.56 | $1.06 |
| Annual Run-Rate UFCF | $45M | $55M | $465M | $877M |
| **Production Timing** | Oct 2022 | June 2023 | 2023/2024 | 2023/2024 |

## Financial Projections

*($ in millions, except net revenue / lb)*

| | | | | Projections | | | | |
|---|---|---|---|---|---|---|---|---|
| | FY 2020P | FY 2021P | FY 2022P | FY 2023P | FY 2024P | FY 2025P | FY 2026P | FY 2027P |
| Operational Plants | – | – | 1 | 5 | 7 | 10 | 14 | 18 |
| Installed Capacity (mm lbs) | – | – | 119 | 853 | 1,219 | 1,769 | 2,503 | 3,236 |
| Effective Utilization (at 90% uptime) | – | – | 10% | 33% | 86% | 69% | 75% | 80% |
| Production (mm lbs) | – | – | 11 | 255 | 890 | 1,152 | 1,752 | 2,412 |
| Net Revenue | – | – | $8 | $224 | $820 | $1,077 | $1,659 | $2,325 |
| Net Revenue / lb | – | – | $0.76 | $0.88 | $0.92 | $0.94 | $0.95 | $0.96 |
| Feedstock Cost | – | – | 1 | 36 | 131 | 170 | 255 | 312 |
| Other Variable Costs | – | – | 3 | 52 | 170 | 222 | 342 | 477 |
| Labor | – | – | 1 | 12 | 31 | 39 | 59 | 81 |
| Plant Overhead | – | – | 0 | 2 | 5 | 6 | 10 | 13 |
| Gross Margin | – | – | $3 | $121 | $484 | $639 | $993 | $1,442 |
| Gross Margin (%) | NM | NM | 33% | 54% | 59% | 59% | 60% | 62% |
| Plant SG&A | – | – | 0 | 4 | 13 | 16 | 25 | 34 |
| Rent | – | – | 0 | 1 | 3 | 4 | 5 | 7 |
| Corp Expense | 3 | 10 | 14 | 16 | 18 | 19 | 20 | 21 |
| EBITDA | ($3) | ($10) | ($12) | $100 | $450 | $601 | $943 | $1,380 |
| EBITDA Margin (%) | NM | NM | NM | 45% | 55% | 56% | 57% | 59% |
| D&A | – | – | 3 | 31 | 75 | 96 | 142 | 192 |
| EBIT | ($3) | ($10) | ($15) | $69 | $375 | $505 | $801 | $1,187 |
| Growth Capital Expenditures | $21 | $266 | $690 | $620 | $598 | $881 | $931 | $949 |
| Maintenance Capital Expenditures | $- | $- | $1 | $9 | $20 | $26 | $38 | $51 |

44.   On November 16, 2020, Defendants filed a preliminary proxy statement with the SEC on Schedule 14A, which they amended on February 12, 2021, to schedule the virtual special meeting of shareholders on March 16, 2021. Like the November 16, 2020 press release, the proxy touted the strength of the Company's business, technology, management, and intellectual property rights, stating, in pertinent part:

> **PCT's ground-breaking patented recycling process**, developed by Procter & Gamble and licensed to PCT, separates color, odor and contaminants from plastic waste feedstock **to transform it into ultra-pure recycled polypropylene. PCT's recycling service converts waste plastic into near-virgin plastic, fully closing the loop on the reuse of recycled plastics while making recycled polypropylene more accessible at scale to companies desiring to use a sustainable, recycled resin.**

45.   Describing the ROCH Board's reasons for approval of the business combination, the proxy stated:

> In particular, ROCH's Board considered the following positive factors, although not weighted or in any order of significance:
>
> - **Strong Technology Representing Significant Innovation**: PCT's unique, **patented process** separates colors, odors and contaminants through a physical purification process (not involving chemical reactions), **allowing for a broader range of feedstock than traditional recycling**. **This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists.**
>
> - **PCT Secured Significant Investment by Lenders and Satisfied Bond Investor Due Diligence:** PCT's Construction Indebtedness involve three levels of technology requirements:

- o Public report regarding *independent evaluation of technology*;

- o *Scaling risk quantification*; and

- o Infrastructure evaluation.

As well as meeting the following commercial requirements:

- o *Proof of scale up*;

- o *20+ year feedstock agreements*; and

- o *20+ year offtake agreements*.

46.    As with the Company's November 2020 press release, the proxy also

touted the apparent strength of PureCycle's management team, stating:

- *Strong Management Team:* The *PCT management team has broad experience across plastics manufacturing, plant development, technology, R&D*, sales, marketing, accounting and finance. PCT Chief Executive Officer Mike Otworth has over 23 years' experience *leading and scaling early stage companies*, holding multiple senior management positions with a *proven track record* of founding and capitalizing startups. Chief Financial Officer Michael Dee was a senior executive at Morgan Stanley and has over 30 years of public markets, corporate finance, and M&A experience. Chief Science Officer John Scott holds a dual Ph.D. in Physics and Astrophysics, authored over 60 academic papers, and was the CEO of the XL TechGroup, the precursor company of Innventure. Chief Commercial Officer David Brenner brings over 15 years' *experience leading transformational projects in a range of industries* and was a Senior Manager at Deloitte prior to joining PCT. Director of Technology Jason Vititoe holds two product patents in polystyrene and decades of engineering leadership experience working for Americas Styrenics and Dow Chemical Company. Senior Director of Operations Chris Talarek has over 20 years of operations leadership at BP Oil, P&G, and Timbertech. Combined, the PCT executive team has over 100 years' experience leading operations and over 70 years operating equipment.

47.     Defendants also filed soliciting material with the 14A pursuant to §240.14a-12.  Therein, Defendant Otworth stated, in part:

 [Demand for polypropylene] continues to grow, yet recycling rates aren't growing. So what's really needed is a game changing, transformational technology that will drive higher utilization of recycled polypropylene and that's our mission and ***that's what we will succeed in doing going forward***.

***

The slide demonstrates a bit of the difference between what mechanically recycled polypropylene is typically used for today and ***what our customers will be able to use our resin for***. So you see, the black pellets, that's what and that's what recycled polypropylene often looks like today. You have all different colors that are ground up. And so, as we know, when you mix every color of the rainbow, you end up with black. And, you know, this type of dark colored resin is used for things like trash cans and battery casings. But it can't be used for applications where you need bright brand colors, where you need food-contact grade resin, and where you the typical types of products and packaging that represent premium products are rather inconsistent with so, you know, what you can make out of mechanically recycled plastic today. ***We're changing that in a very dramatic way. And so, as I said, customers can use our resin, they can use it interchangeably with virgin resin, and they can make, you know, the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today***.

48.     On November 20, 2020, Roth Acquisition and PureCycle filed a Registration Statement on Form S-4 with the SEC, signed by Defendant Roth. In this Registration Statement, Defendants stated, in relevant part:

***Proprietary and Proven Technology Developed by Procter & Gamble*** PCT utilizes a proprietary purification process that converts waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene. The Technology was developed by P&G, and PCT has a global license from P&G. PCT's process utilizes a broad range of feedstocks including waste carpet,

stadium cups and supersacks and produces virgin-quality UPRP pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products. This patented process was developed by P&G over the course of eight years and has been refined by PCT over the past five years with more than 350 laboratory tests and with over 1,000 pounds of UPRP produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019. In addition, PCT's purification process and UPRP quality have been validated by independent technical consultants and many of PCT's strategic partners and initial customers.

49.   On February 12, 2021, PureCycle filed a Proxy Statement for Special Meeting of Stockholders of Roth Acquisition on Form 424B3 with the SEC. In this Proxy Statement, the Company represented itself "as a leader in polypropylene recycling and polymers sustainability" and further repeated representations from its preliminary proxy statement and S-4 regarding the efficacy of the technology it licensed from P&G to restore waste polypropylene into resin with near-virgin characteristics.

50.   On March 16, 2021, shareholders approved the SPAC merger and related governance and financing terms by a large margin.

51.   On March 18, 2021, PureCycle announced that its business combination with Roth Acquisition was approved by Roth Acquisition's

shareholders at a special meeting held on March 16, 2021, and that PureCycle's

shares would begin trading under the ticker symbol PCT beginning the same day.[3]

52.   In this release, Defendant Otworth stated that "[t]he consummation of

this transaction represents yet another major milestone for PureCycle, demonstrating

broad market validation of our value proposition . . . . Most importantly, we now

have the increased capital market access to support the accelerated scaling required

to revolutionize the transformation of waste propylene into sustainable products."

53.   Otworth further stated in this March 18, 2021 press release that: "[o]ver

the last three months, PureCycle has further developed its financial and

manufacturing capabilities. . . . This is now an execution game for PureCycle. It's

incumbent on us to pull forward the best most knowledgeable leaders to ensure that

we realize the full potential of this technology."

54.   Also in this March 18, 2021 press release, PureCycle stated that it "uses

proprietary technology licensed from Procter & Gamble to recycle waste

polypropylene (PP) into virgin-like recycled PP for myriad applications. The

company is at the intersection of an enabling technology meeting a compelling

global need . . . ." The release also included a quote from Byron Roth, Chairman and

CEO of Roth Acquisition: "PureCycle's revolutionary and proprietary technology to

---

[3] *See* https://finance.yahoo.com/news/purecycle-technologies-completes-business-combination-124100921.html (last visited May 7, 2021).

recycle waste polypropylene into virgin-like resin is not only transformative, but also beneficial to our planet. We are confident that PureCycle has the resources to deliver substantial value for all stakeholders."

55.    On April 21, 2021, PureCycle issued a press release entitled "PureCycle's Tasmin Ettefagh facilitates plastics industry dialogue about polypropylene recycling solutions in light of U.S. Plastics Pact: Ultra-pure recycle polypropylene manufacturer CSO drives narrative."[4] In this release, PureCycle announced that Defendant Ettefagh had participated in two conferences leading up to Earth Day and had "moderated a panel discussion about advanced recycling technologies and how these may impact commitments made by the U.S. Plastics Pact. In this release, Defendant Ettefagh stated "PureCycle is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts." She added that "PureCycle's proprietary recycling technology was developed by [Procter & Gamble], and it's this type of top-down investment that's driving the circular economy."

56.    This April 21, 2021 release continued:

PureCycle uses proprietary technology licensed from The Procter & Gamble Company (P&G) to recycle waste PP into virgin-like recycled PP for a myriad of applications. The company is the intersection of an enabling technology meeting a compelling global need: only

---

[4] *See* https://ir.purecycletech.com/news-events/press-releases/detail/9/purecycles-tamsin-ettefagh-facilitates-plastics-industry (last visited May 7, 2021).

approximately 1% of the 170 billion pounds of PP consumed last year was recycled as compared to almost 20% for polyethylene terephthalate (PET), according to the American Chemistry Council.

57.     The statements referenced above in ¶¶ 37-56 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them as follows:

(a)     that the management team bringing PureCycle public had previously brought six other failed businesses public only to have each implode thereafter;

(b)     that the management team bringing PureCycle public had characterized rank speculation as financial projections to investors in the past;

(c)     that the primary motivation of the management team bringing PureCycle public was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares;

(d)     that PureCycle faces higher competition for high quality feedstock than it has led investors to believe, materially undermining the management team's financial projections;

(e)     that PureCycle's patent is nowhere as cogent or valuable as it has led investors to believe, and the technology underlying its business operations is unproven and presents serious issues even at lab scale;

(f)     that, in reality, the Company's flammable pressurized process is not yet functional, especially at scale, and is dangerous;

(g)     that the Company purports to be advancing to commercial production scale despite still having operational issues at a lab scale; and

(h)     that as a result of the foregoing, Defendants' positive statements during the Class Period about the Company's business performance, financial and operational metrics, and financial prospects were false and misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

58.     Before the markets opened on May 6, 2021, analyst Hindenburg Research published a scathing report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street" (the "Report"). Hindenburg made clear in the Report that, "To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer." As of the date of the Report's publication, Hindenburg was the only market participant that conducted the analysis contained therein.   Moreover, on its website, Hindenburg describes its process as, "uncovering hard-to-find information from atypical sources."

59.     In the Report, Hindenburg stated that: (1) Hindenburg "spoke with multiple former employees of" Defendant Otworth's and other PureCycle executives' former companies "who said PureCycle's executives based their financial projections on 'wild ass guessing', brought companies public far too early, and had deceived investors;" (2) unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process;" (3) "multiple competitors and industry experts . . . explained that PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question;" (4) "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art;" (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale;" and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

60. Hindenburg noted that although PureCycle previously announced that it aimed to generate revenue from its "commercial scale production facility in late 2020," that in its latest company presentation, PureCycle "revised that target to late 2022, at the earliest, when it hopes to finish most of the commercial 'Phase II' portion of its plan and generate $8 million in revenue. . . . From there, the company boldly projects $224 million of net revenue in FY2023, *which it then plans to grow nearly ten-fold* – to $2.3 billion by 2027." (Emphasis in original). Hindenburg wrote that PureCycle "put its aggressive projections through a bit of a torture session in order to justify its valuation. . . . In a corner of the plastics recycling world that has eluded economic sustainability for the world's top chemical companies, those numbers would put PureCycle's margins on par with some of the world's most profitable tech companies."

61. Hindenburg further wrote that "the only two investment banks whose 'research' divisions cover PureCycle are Roth and Craig Hallum, the two sponsors of the deal. Both have put 'Buy' ratings on the company, with price targets ranging from $45-48." Hindenburg noted that "Craig Hallum issued its 'Buy' rating and a $48 price target on March 18th, the very day PureCycle went public." (Emphasis omitted). However, Hindenburg pointed out, two partners within Craig Hallum's research division received shares of PureCycle in the merger, which became eligible for sale on April 16th due to the elevated stock price. Then five days after Roth

Acquisition's shares were unlocked for sale, the research department at Roth issued a "Buy" rating on PureCycle, assigning a $45 price target. As Hindenburg noted, "[t]he rest of Roth and Craig Hallum's founder's shares will become freely tradeable in September 2021, well before any revenue is generated by [PureCycle]. Both firms stand to gain considerably regardless of how the company's plans work out."

62.     Hindenburg also tracked how Defendant Otworth and three other senior executives, Bill Haskell, Rick Brenner, and John Scott, have taken at least 6 companies public. Hindenburg wrote: "[a]ll have failed. . . . Of the 6 companies taken public by PureCycle Senior Executives, 2 went bankrupt, 3 were delisted, and 1 was acquired following a ~95% decline. Over $760 million in public shareholder capital was incinerated in the process."

63.     Hindenburg detailed that before PureCycle announced that it was going public through Roth Acquisition in November 2020, it was owned and controlled by Innventure, a Florida-based startup founded by Defendant Otworth, PureCycle's Chief Science Officer and Director John Scott, and PureCycle Director Rick Brenner.

64.     Hindenburg wrote that it "connected with former employees of several of the failed public companies led by PureCycle's executive team referenced above." One former senior employee of one of these companies, PetroAlgae, said "I think they did con . . . that's a strong word but I think it's accurate. . . . I think because of

the biofuel boom especially in algae they were forced into the same hype as all the other algae biofuels just to get funding. . . . I think it was deceiving to the investors and I couldn't have done that personally. But a lot of salespeople have that mentality where they overpromise and think they can make it happen. It just didn't at that time."

65.     Hindenburg also spoke with a former employee of AgCert, another company the PureCycle senior executives had taken public, who said that the company was "too aggressive" with forward sales projections: "[t]here was a lot of wild ass guessing going on there, and as a warning to investors: this is speculative you could lose all your money so jump in if you want."

66.     Hindenburg spoke with a former employee of Tyratech, another company that the PureCycle executives took public, who said that "the dossier that Tyratech went to market with was really not, I know now, it was not credible."

67.     In the Report, Hindenburg also detailed how PureCycle's executive team received $7 million in cash bonuses simply for closing the SPAC deal with Roth Acquisition, and are slated to receive approximately $40 million in compensation before PureCycle generates any revenue. Indeed, Defendant Otworth himself, according to Hindenburg, collected $5 million in bonuses after the deal with Roth Acquisition closed.

68.     The Report also called into question the technology that PureCycle has licensed from Procter and Gamble and has repeatedly lauded: "[o]ne might wonder, if the technology was a major breakthrough, as described in the company's presentation . . . why P&G didn't license it to a chemical company like Dow or well-established plastics or polycarbon companies rather than a team with a history of repeated failures and no specific polycarbon expertise? Or, why not develop the technology internally as a new income stream?"

69.     The Report cited a written Q&A session with a Procter & Gamble employee who was asked this question. That employee "explained that a Global Business Development Director at P&G had a personal relationship with the team at PureCycle's patent company, Innventure, and made the connection. . . . The P&G employee that bridged the deal appears to have later taken a senior position at PureCycle, now serving as VP of Commercial and Business Development." Hindenburg wrote that its "analysis leads us to believe that P&G likely had a 'technology' that it saw no economic sense in commercializing itself, so it spun it off, providing a steady stream of positive PR for the plastic producing giant, showcasing its efforts to promote recycling."

70.     The Report also noted that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." Indeed, in a November 2020 interview,

Procter & Gamble's inventor of the technology was asked about this potential bottleneck. He said: "I think the fact that you have to ensure you have feedstock coming in and I think that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running."

71.     Hindenburg also spoke with Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers. The Report quotes Mr. Saunders as stating that:

> [t]he problem I see with chemical recycling – and I'm not an expert in this process but I am an expert in PP raw materials – there is not enough non-contaminated PP scrap to support these processes. So you're going to get a wide range of materials that have varying degrees of other resin contamination." He added that "[a]nd what's stated publicly by PureCycle themselves is that the facility works well up to 5 percent contamination. I've been buying PP scrap for 30 years and I'm not aware of any PP scrap in volume that has any less than 5% contamination in the world.

72.     Hindenburg also spoke with Richard Minges, a 10-year executive for Custom Polymers, who stated "it's more about the raw materials that can be secured." He continued that PureCycle is:

> stating that they're going to sell their resin for as much as $2 a pound, which is a huge premium. And the people that we have that are paying premium right now is because they only need a small amount and it's a marketing ploy and they want it secured. And if I go back to these same people and tell them I have a 10x as much and the price is going up to $2 then I don't know a single one who would pay.

73.     Hindenburg also wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that

"PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale."

74.    On the latter point, Hindenburg wrote that it consulted with a "30 year expert in polymers," who stated that "[t]here is no mention of the needed actual testing of the final product. It is indirect and vague. The hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience." The same expert stated, according to Hindenburg, that "[w]hile the n-butane & propane blends for solvent, heated and pressurized may extract a slightly higher concentration of PP per cycle pass than carbon dioxide and n-butane, it is still apparently very low. PureCycle doesn't disclose what these values are in the scaled-up testing." He concluded: "[t]he permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. I don't think the process could ever be cost efficient. The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough." Hindenburg further detailed that PureCycle's licensed technology presented issues at "lab scale," rendering larger scale development as even more problematic.

75.    On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as

low as $13.55 per share. This represents a one-day drop of approximately 40% on unusually heavy trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

76.     PureCycle's May 6, 2021 press release, issued in response to the Report, fails to challenge, much less negate, ***any*** of the Report's specific underlying factual allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders."

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all investors who purchased or otherwise acquired PureCycle Technologies, Inc. ("PureCycle" or the "Company") (formerly known as Roth CH Acquisition I Co. ("Roth Acquisition") securities between November 16, 2020 and May 5, 2021, inclusive, and who were damaged thereby ("Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of PureCycle stock were publicly traded during the Class Period on the NASDAQ stock exchange. Record owners and other members of the Class may be identified from records maintained by PureCycle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.  Whether Defendants violated the Exchange Act;

b.  Whether Defendants omitted and/or misrepresented material facts;

c.  Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.  Whether the price of the Company's stock was artificially inflated; and

     f.  The extent of damage sustained by Class members and the appropriate measure of damages.

80.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

81.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

82.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRESUMPTION OF RELIANCE

83.    Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for PureCycle securities was an efficient market at all relevant times by virtue of the following factors, among others:

    a.  the Company filed periodic public reports with the SEC;

    b.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    c.  The omissions and misrepresentations were material;

    d.  PureCycle securities met the requirements for listing and were listed and actively traded on NASDAQ, a highly efficient market;

    e.  PureCycle regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    f.  PureCycle was followed by securities analysts employed by brokerage firms who wrote reports which were distributed, publicly available, and entered the public marketplace;

    g.  The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock;

    h.  Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants; and

    i.  Plaintiffs and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

84.    As a result of the foregoing, the market for PureCycle securities promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all those who transacted in PureCycle securities during the Class Period suffered similar injury through their transactions in PureCycle securities at artificially inflated prices and a presumption of reliance applies.

85.    Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members purchased or acquired PureCycle securities between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiffs and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for PureCycle securities and are entitled to a presumption of reliance on

Defendants' materially false and misleading statements and omissions during the Class Period.

86.    Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## NO SAFE HARBOR

87.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

88.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## ADDITIONAL SCIENTER ALLEGATIONS

89.    As alleged herein, PureCycle and the Individual Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding PureCycle, their control over and/or receipt and/or modification of PureCycle's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning PureCycle, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

90.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of PureCycle publicly traded securities and operated as a fraud or deceit on purchasers of PureCycle publicly traded securities. As detailed above, when the truth about PureCycle's misconduct was revealed, the value of PureCycle publicly traded securities declined precipitously as the prior artificial inflation no longer propped up the price of the securities. The decline in the price of PureCycle publicly traded securities was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry

factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of PureCycle publicly traded securities and the subsequent significant decline in the value of PureCycle publicly traded securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

91.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of PureCycle's business, operations, and financial results as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of PureCycle publicly traded securities to be artificially inflated. Plaintiffs and other Class members purchased PureCycle publicly traded securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

92.     On May 6, 2021, Hindenburg Research issued its report as detailed herein. The authors made clear that, "To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from

public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer." Moreover, on its website Hindenburg describes its process as "uncovering hard-to-find information from atypical sources."

93.     Upon the publication of the Report, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. This represents a one-day drop of approximately 40%.

94.     These revelations contradicted statements and/or revealed omissions made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

## Count One

### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

95.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

96.     During the Class Period, Defendant PureCycle and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     Defendant PureCycle and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

98.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## <u>Count Two</u>

### <u>Violation of § 20(a) of the Exchange Act</u>
### <u>(Against the Individual Defendants)</u>

99.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

100.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiffs as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs' counsel as Lead Counsel;

(b)    awarding compensatory and punitive damages in favor of Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)     awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(a)     awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: September 28, 2021                  Respectfully submitted,

**POMERANTZ LLP**

By: /s/ Tamar A. Weinrib
Tamar A. Weinrib (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

*Lead Counsel for Plaintiffs*