**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

|  |  |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER, BYRON ROTH and TASMIN ETTEFAGH, <br><br> Defendants. | Case No. 6:21-cv-809-PGB-GJK |

**Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint**

Co-Lead Plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, respectfully submit this opposition to Defendants' PureCycle Technologies, Inc. ("PureCycle"), Michael Otworth, Michael Dee, David Brenner, and Tasmin Ettefagh (collectively, "Defendants") Motion to Dismiss the Consolidated Amended Class Action Complaint ("Complaint").

**Preliminary Statement**

PureCycle has one operation--- developing and commercializing a process initially developed and licensed by Procter & Gamble for recycling polypropylene, a common plastic that top scientists and chemical companies have found impossible to

effectively or economically recycle since its invention in 1951.  Defendants, however, issued misstatements throughout the Class Period that their recycling process can successfully and cost effectively convert waste polypropylene into virgin polypropylene resin, when in reality (as multiple industry experts have attested), the technology underlying the process is unproven and presents serious issues even at lab scale, the flammable pressurized process is not yet functional—especially at scale— and is dangerous, the Company faces obstacles to obtaining the quantity and quality of feedstock it needs to perform its process, the economics of conducting the process at commercial scale are cost prohibitive, and the patent underlying the technology is based on prior discoveries that never reached commercial scale.  Defendants further touted their management team as "experienced" without revealing that they have no background in plastics recycling, previously brought six other early stage companies public that imploded and have a history of issuing baseless financial projections.

The inference that Defendants issued their statements with scienter is certainly *at least as compelling as any opposing inference* as the Supreme Court requires, though Defendants have not proffered any alternative inference.  Throughout the Class Period, and since the time of its existence, PureCycle produced nothing and earned no revenue.  Their only operation is the polypropylene recycling process they licensed from P&G.  The only reasonable inference is that Defendants had undivided focus on the viability and scalability of their only operation.  Moreover,  Defendants had every incentive to bring PureCycle public despite the undisclosed deficiencies in its recycling process; Defendants Otworth (PureCycle CEO) and Dee (PureCycle CFO) received

2

exorbitant salaries and compensation of $7 million simply for effectuating the reverse merger. Moreover, Defendants each also spoke repeatedly and comprehensively regarding the recycling process, the sufficiency and quality of the feedstock they needed, and the supposed experience of their management team. Having put themselves forth as knowledgeable regarding the details of these topics, they cannot know credibly claim ignorance (particularly as to their own backgrounds).

Loss causation is also adequately pled. The Complaint alleges that PureCycle stock fell 40% on unusually heavy trading volume in response to a May 5, 2021 Hindenburg Research report revealing the fraud, thus satisfying Rule 8's minimal pleading requirement. Hindenburg describes its process as "uncovering hard-to-find information from atypical sources" and based its analysis of PureCycle (not previously done by any other market participant) on various public sources but also on information not previously available to the public, including interviews with named industry experts as well as former employees of PureCycle executives' previous failed companies. With the elements of the §§10(b) and 20(a) claims adequately pled, Defendants' motion must fail.

### Statement of Facts[1]

PureCycle began trading on the NASDAQ on March 18, 2021 following a reverse merger with Roth CH Acquisition I co. ("ROCH"), a SPAC. ¶ 28. SPACs are shell companies set up for the sole purpose of raising money through an IPO to

---

[1] All ¶ __ references are to the Complaint filed on September 28, 2021. (ECF No. 90).

eventually acquire another company. *Id.* A SPAC has no commercial operations, makes no products and does not sell anything. *Id.* In fact, the SPAC's only assets are typically the money raised in its own IPO. *Id.* Going public through a SPAC is quicker, has lower associated costs and fewer extensive financial disclosure requirements than a traditional IPO. *Id.* Roth Capital Partners, LLC and Craig-Hallum Capital Group LLC, the sole underwriters in the ROCH IPO, received almost 2 million shares in PureCycle for slightly more than a penny per share (worth $48 million) through their sponsorship of the SPAC deal. ¶ 27. Defendant Bryon Roth ("Roth") is the CEO and Chairman of Roth Capital, which largely operates in the murky world of small cap and microcap banking. ¶ 30. Prior to taking on SPAC mergers like this one, Roth was well known for his role in facilitating numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion for China-based clients from 2003 to 2012. *Id.* Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division. *Id.* Roth Capital's FINRA BrokerCheck report shows 15 regulatory sanctions and 12 arbitrations, including a violation of Regulation M, enacted to prevent market manipulation. *Id.*

PureCycle's sole purpose is to commercialize a process for recycling polypropylene, a common plastic used in everything from carpets to shampoo caps to fishing nets. ¶ 31. Within the world of plastics recycling, polypropylene is particularly uneconomical. *Id.* It represents 28% of the world's plastic, yet only approximately 0.8% of it is recycled today because a sizable amount of polypropylene requires expensive sorting and cleaning due to its use in food packaging. *Id.* It is also commonly

4

found in products that use mixed plastics that can be difficult, if not impossible, to separate. *Id. **The world's top scientists and major chemical companies have unsuccessfully sought a recycling solution since polypropylene's discovery in 1951***. *Id.*

Procter & Gamble ("P&G") invented and developed the technology underlying PureCycle's business. ¶ 32. Numerous factors, however, suggest the technology is not as great as Defendants touted throughout the Class Period. Even though polypropylene is the largest plastic type P&G uses, it did not opt to develop and commercialize this supposedly revolutionary technology itself, nor did P&G license the technology to a company with background in plastics or polycarbon. *Id.* Rather, P&G licensed the technology to PureCycle in October 2015, around the time of PureCycle's inception ***though the management team that took PureCycle public has no background in polypropylene recycling***. *Id.* Moreover, plastics companies typically publish peer reviewed studies detailing their advancements in the field. ¶ 33. Plaintiffs' investigation confirmed that no peer reviewed study mentions PureCycle's technology or patent. *Id.* Of over 900,000 results on Google Scholar, ScienceDirect, Elsevier, and Scopus relating to plastic recycling processes, ***none*** mentions PureCycle, its patents, or related technologies in a peer reviewed study. *Id.*

Additionally, prior to going public, PureCycle was owned and controlled by Innventure, which was founded by Otworth, Brenner, PureCycle's Chief Science Officer, and Director Dr. John Scott ("Scott"). ¶ 34. Innventure's management team takes credit for what it misleadingly characterizes as "six successful IPOs." Plaintiffs'

investigation confirmed that, in reality, and unknown to PureCycle's investors, each of these purportedly "successful IPOs" resulted in significant investors losses, involving massive accumulated deficits, delistings, and bankruptcies. *Id.*

Despite the lack of a proven technology, Defendants Otworth and Dee received sizeable salaries and collectively received $7,000,000 in cash bonuses due solely to the consummation of the SPAC transaction. ¶ 35. Defendant Dee also received 1.2 million in share grants when the SPAC transaction consummated, worth approximately $17 million as of the close of trading on September 24, 2021, but worth as high as approximately $40 million during the Class Period. ¶ 36.

### Materially False And Misleading Statements

The Class Period begins on November 16, 2020, when PureCycle announced that it would become a publicly traded company via an agreement and plan of merger with Roth Acquisition. ¶ 37. In this release, PureCycle stated that it had "a revolutionary and proprietary cost-effective method to recycle waste polypropylene to virgin-like resin" that was "built on patented technology invented by Procter & Gamble, to be globally commercialized by PureCycle." Defendants further represented that its polypropylene recycling process, "is both more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy. PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene." Throughout the Class Period, Defendants also touted their "abundant polypropylene waste feedstock," which Defendants concede is a

necessary input to its process, and emphasized their ability to use a "broad range" of feedstock as compared to other recycling processes. ¶¶ 38, 44, 45, 48. Referring to PureCycle's recycling process as "proven technology," Defendant Otworth stated. "Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products…" The press release also quoted Defendant Roth as stating, "We believe PureCycle's technology will be transformative in plastic recycling and help companies meet their sustainability goals." ¶ 39.

Finally, the November 16, 2020 press release touted PureCycle's "experienced management team," a refrain repeated consistently throughout the Class Period that did not reveal that their experience lies in bringing "early stage companies" public, issuing baseless projections, and then driving those companies into the ground. ¶ 40. *See also* ¶¶ 42, 46. Defendants also provided a link to a webinar, on which Defendants Otworth, Dee, and Brenner presented on the benefits of PureCycle's business metrics and financial prospects and filed the presentation slide deck with the SEC. ¶ 41. In the presentation, Defendants Otworth, Dee, and Brenner highlighted the purported value of the Company's technology and intellectual property rights, calling their process the "*only proven and economically-viable method of recycling polypropylene to virgin-quality*" and representing that "PureCycle's patented proprietary process technology *uniquely recycles PP back to virgin-quality*." ¶ 42. Defendants also promised that, "*[n]o other technologies can efficiently address Polypropylene Recycling at Scale*." *Id.*

On November 16, 2020, Defendants filed a preliminary proxy statement with the SEC on Schedule 14A, which they amended on February 12, 2021, to schedule the

virtual special meeting of shareholders on March 16, 2021. ¶ 44.  Like the November 16, 2020 press release, the proxy touted PureCycle's ***"ground-breaking patented recycling process***," claiming that it:

> separates color, odor and contaminants from plastic waste feedstock to transform it into ultra-pure recycled polypropylene. PCT's recycling service converts waste plastic into near-virgin plastic, fully closing the loop on the reuse of recycled plastics while making recycled polypropylene more accessible at scale to companies desiring to use a sustainable, recycled resin.

Defendants continued to make similar representations about their process throughout the Class Period. *See, e.g.,* ¶¶ 47, 48, 49, 54, 55, 56. Defendants further assured investors that, "This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists, but tellingly did not identify a *single* customer or third party engineering specialist by name. ¶¶ 45, 48.

In the March 18, 2021 release announcing investor approval of the SPAC reverse merger and the commencement of PureCycle shares' trading that same day, Defendants Roth stated: "PureCycle's revolutionary and proprietary technology to recycle waste polypropylene into virgin-like resin is not only transformative, but also beneficial to our planet. We are confident that PureCycle has the resources to deliver substantial value for all stakeholders." ¶ 54.

Defendants' statements were materially false and misleading when made because they failed to disclose that the technology underlying PureCycle's recycling process is unproven and presents serious issues even at lab scale; the Company's flammable pressurized process is not yet functional, especially at scale, and is dangerous; the Company has operational issues at lab scale; they face sizable obstacles

to obtaining ample quality feedstock for their process to support their grandiose projections; management's "experience" does not involved plastics recycling but rather bringing six companies public that imploded and have a history of issuing financial projections based on rank speculation; and brought PureCycle public to collect millions of dollars just for effectuating the SPAC transaction.

## THE TRUTH EMERGES

Before the markets opened on May 6, 2021, analyst Hindenburg Research published a scathing report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street" (the "Report"). ¶ 58. The Report stated that: (1) Hindenburg "spoke with multiple former employees of" Defendant Otworth's and other PureCycle executives' former companies "who said PureCycle's executives based their financial projections on 'wild ass guessing,' brought companies public far too early, and had deceived investors," ¶¶ 64-66; (2) unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process;" (3) "multiple competitors and industry experts . . . explained that PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question;" (4) "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art;" (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging

9

ahead to commercial scale despite having issues at a lab scale;" and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences." ¶ 59.

Hindenburg noted "the company boldly projects $224 million of net revenue in FY2023, *which it then plans to grow nearly ten-fold* – to $2.3 billion by 2027." ¶ 60. Hindenburg wrote that PureCycle "put its aggressive projections through a bit of a torture session in order to justify its valuation. . . . In a corner of the plastics recycling world that has eluded economic sustainability for the world's top chemical companies, those numbers would put PureCycle's margins on par with some of the world's most profitable tech companies." *Id.*

Hindenburg further wrote that "the only two investment banks whose 'research' divisions cover PureCycle are Roth and Craig Hallum, the two sponsors of the deal. ¶ 61. Both have put 'Buy' ratings on the company, with price targets ranging from $45-48." Hindenburg noted that "Craig Hallum issued its 'Buy' rating and a $48 price target on March 18th, the very day PureCycle went public." However, two partners within Craig Hallum's research division received shares in the merger, which became eligible for sale on April 16th due to the elevated stock price. Then five days after Roth Acquisition's shares were unlocked for sale, the research department at Roth issued a "Buy" rating on PureCycle, assigning a $45 price target. As Hindenburg noted, "[t]he rest of Roth and Craig Hallum's founder's shares will become freely tradeable in

September 2021, well before any revenue is generated by [PureCycle]. Both firms stand to gain considerably regardless of how the company's plans work out." *Id.*

Hindenburg also tracked how *Defendant Otworth* and three other senior executives, Bill Haskell, *Rick Brenner*, and *John Scott*, have taken at least 6 companies public. ¶ 62. Hindenburg wrote: "[a]ll have failed. . . . of the 6 companies taken public by PureCycle Senior Executives, 2 went bankrupt, 3 were delisted, and 1 was acquired following a ~95% decline. Over $760 million in public shareholder capital was incinerated in the process." Hindenburg explained that prior to going public, PureCycle was owned and controlled by Innventure, a Florida-based startup founded by *Defendant Otworth*, PureCycle's Chief Science Officer and Director *John Scott*, and PureCycle Director *Rick Brenner*. ¶ 63.

Hindenburg also detailed how PureCycle's executive team received $7 million in cash bonuses simply for closing the SPAC deal, and will receive approximately $40 million in compensation before PureCycle generates any revenue. ¶ 67.

The Report also called the technology into question: "[o]ne might wonder, if the technology was a major breakthrough, as described in the company's presentation . . . why P&G didn't license it to a chemical company like Dow or well-established plastics or polycarbon companies rather than a team with a history of repeated failures and no specific polycarbon expertise? Or, why not develop the technology internally as a new income stream?" ¶ 68. The Report cited a written Q&A session with a P&G employee who "explained that a Global Business Development Director at P&G had a personal relationship with the team at PureCycle's patent company, Innventure, and

made the connection. . . . The P&G employee that bridged the deal appears to have later taken a senior position at PureCycle, now serving as VP of Commercial and Business Development." ¶ 69. Hindenburg wrote that its "analysis leads us to believe that P&G likely had a 'technology' that it saw no economic sense in commercializing itself, so it spun it off, providing a steady stream of positive PR for the plastic producing giant, showcasing its efforts to promote recycling." *Id.*

The Report also noted that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." ¶ 70. Indeed, in a November 2020 interview, P&G's inventor of the technology explained: "I think the fact that you have to ensure you have feedstock coming in and I think *that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running*." *Id.*

Hindenburg also spoke with Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers who stated:

> [t]he problem I see with chemical recycling – and I'm not an expert in this process but I am an expert in PP raw materials – *there is not enough non-contaminated PP scrap to support these processes.* So you're going to get a wide range of materials that have varying degrees of other resin contamination." He added that "[a]nd what's stated publicly by PureCycle themselves is that the facility *works well up to 5 percent contamination*. I've been buying PP scrap for 30 years and *I'm not aware of any PP scrap in volume that has any less than 5% contamination in the world*.

¶ 71. Hindenburg also spoke with Richard Minges, a 10-year executive for Custom Polymers, who stated "it's more about the raw materials that can be secured." Belying

Defendants' assertions that their process is "cost effective" and "economically viable" he also explained that PureCycle is:

> stating that they're going to sell their resin for as much as $2 a pound, which is *a huge premium*. And the people that we have that are paying premium right now is because they only need a small amount and it's a marketing ploy and they want it secured. And if I go back to these same people and tell them I have a 10x as much and the price is going up to $2 then I don't know a single one who would pay. ¶ 72.

Hindenburg also wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that "*PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale*." ¶ 73. On the latter point, Hindenburg wrote that it consulted with a "30 year expert in polymers," who stated that "[t]here is no mention of the needed actual testing of the final product. ¶ 74. It is indirect and vague. The hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience." *Id.* The same expert stated, according to Hindenburg, that "[w]hile the n-butane & propane blends for solvent, heated and pressurized may extract a slightly higher concentration of PP per cycle pass than carbon dioxide and n-butane, it is still apparently very low. PureCycle doesn't disclose what these values are in the scaled-up testing." *Id.* He concluded: "[t]he permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. *I don't think the process could ever be cost efficient. The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough*." Hindenburg further detailed

that PureCycle's licensed technology presented issues at "lab scale," rendering larger scale development as even more problematic. *Id.*

On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. ¶ 75. This represents a one-day drop of approximately 40% on unusually heavy trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

PureCycle issued a press release in response to the Report the day of its publication, which fails to challenge, much less negate, ***any*** of the Report's specific underlying factual allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders." ¶ 76.

## ARGUMENT

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)[2]. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322

---

[2] Emphasis is added and citations are omitted throughout unless otherwise stated.

(2007). Courts also must draw all reasonable inferences in the plaintiff's favor.

*Twombly*, 550 U.S. at 555-56. A "complaint should not be dismissed for failure to state

a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." *In re Immucor Inc. Sec. Litig.*,

2006 U.S. Dist. LEXIS 72335, at *22 (N.D. Ga. Oct. 4, 2006).

## I.    PLAINTIFF ADEQUATELY ALLEGES A §10(B) CLAIM

To state a Securities Exchange Act of 1934 §10(b) claim, a plaintiff must allege:

"(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of

mind, (3) a connection with the purchase or sale of a security, (4) reliance, often

referred to in cases involving public securities markets (fraud-on-the-market cases) as

transaction causation; (5) economic loss; and (6) loss causation. *FindWhat Inv'r Grp. v.*

*FindWhat.com,* 658 F.3d 1282, 1295 (11th Cir. 2011).

### A. The Complaint Adequately Alleges Falsity

The Complaint alleges that Defendants issued false and misleading statements[3]

conveying that their polypropylene recycling process based on patented technology is

the only "economically-viable," "cost effective" and "proven" to recycle waste

polypropylene into virgin-like resin, touting their abundant supply and access to

quality feedstock, and touting their experienced management team. ¶¶ 37-57. The

---

[3] Defendants concede that the Complaint alleges PureCycle made the alleged misstatements but
ignores the allegations that not only directly quote the Individual Defendants by name (*see, e.g.,* ¶¶ 38,
41-43, 47, 52, 53, 55) but also state that Defendants each made (or caused to be made) the
misstatements at issue and had ultimate control over the contents of all of PureCycle's public filings
and presentations. ¶ 25. Defendants' arguments and cited authorities are thus misplaced and
inapposite. Def. Br. at 7.

Complaint adequately pleads the falsity of Defendants' statements (explained *supra*, at

8-9) through the Hindenburg Report and Plaintiffs' own investigation. *In re Eros Int'l*

*Plc Sec. Litig.*, 2021 U.S. Dist. LEXIS 76876, at *27 (D.N.J. Apr. 20, 2021) (short seller

report's findings and conclusions supported falsity).

Defendants argue that their misstatements are inactionable puffery or opinion.

Not so.  Statements conveying that a process is cost effective and proven to achieve its

purpose are not vague assertions of general optimism.  Defendants' statements

"represent tangible, verifiable" representations and therefore cannot constitute puffery.

*Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020); *Monroe Cnty.*

*Emps.' Ret. Sys. v. S. Co.*, 2018 U.S. Dist. LEXIS 54008, at *21 (N.D. Ga. Mar. 29,

2018), *order clarified*, 2018 U.S. Dist. LEXIS 59875 (N.D. Ga. Apr. 6, 2018) (statements

capable of objective verification are not puffery). "Furthermore, the fact that these

statements relate to a core aspect of  [the company's] business makes it even more

likely that a reasonable investor would assign weight to them." *In re Equifax Inc. Sec.*

*Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (company's statements concerning

data security not puffery where data security was a core aspect of business).  For that

reason, Defendants' laudatory statements regarding management's experience are

actionable as well because investors would place great weight on the experience of a

team bringing a new company public to develop a purportedly revolutionary process

that to date has proven impossible to accomplish.  Failing to explain that

management's "experience" amounted to lining their own pockets, issuing baseless

16

lofty projections, and then proceeding to lead the companies they brought public into financial ruin are facts on which investors would certainly "assign weight."[4]

### 1. Defendants Had a Duty to Disclose

Having voluntarily touted their "proven" propylene recycling process, their feedstock supply, and their "experienced" management team, Defendants incurred a duty to speak fully and truthfully on these topics. *FindWhat*, 658 F.3d at 1299 ("[A] duty to speak the full truth arises when a defendant undertakes to say anything."); *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007) (a duty to disclose all material information relating to a particular subject arises by voluntarily "touting" the subject to investors); *see also Finnerty v. Stiefel Lab'ys, Inc.*, 756 F.3d 1310, 1316 (11th Cir. 2014) (same); *In re Flowers Foods, Inc. Sec. Litig.*, 2018 U.S. Dist. LEXIS 48048, at **28-29 (M.D. Ga. Mar. 23, 2018)(same); *Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus.*, 2021 U.S. Dist. LEXIS 193109, at *44-45 (N.D. Ga. Sep. 29, 2021) (same).

That literal truths contextually surround certain of the misstatements, does not render the *misstatements* any less fraudulent. Def. Br. at 12-13. Indeed, Defendants strategically point to those literal truths in calling for dismissal, though the Complaint does not identify them as misleading (*e.g.,* that PureCycle licensed its process from P&G and that polypropylene is difficult to recycle), but do not credibly address false

---

[4] Nor can Defendants make a conclusory assertion that their statements are "opinions" without any argument or support.  Even assuming arguendo, these statements continued opinions (which they do not), Defendants—knowing their own professional backgrounds and intimately aware of the deficiencies to their recycling process—had no reasonable basis for those "opinions."  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 1328 (2015).

and misleading statements that PureCycle's process is "proven," "cost effective,"

converts polypropylene into virgin-like resin, that the Company has ample quality

feedstock supplies, and that management is experienced.

### a) The Report Establishes Falsity

Defendants are not protected from liability simply because a source of the

allegations is the Report. *In re Eros* , 2021 U.S. Dist. LEXIS 76876, at *27 (short seller

report's findings and conclusions supported falsity). Defendants ask the Court to not

only disregard the well accepted tenet that it must construe the complaint in the light

most favorable to the movant and accept all facts alleged as true[5], but to do the

complete opposite--- to assume the allegations are *untrue* simply because the Report is

a source. Courts have repeatedly rejected identical arguments, holding that plaintiffs

may rely on a short seller report as the basis for their allegations. *See, e.g., McIntire v.

China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) ("[T]he

Court must accept the factual allegations contained in the [short seller reports] as

sufficiently reliable as a factual source for Plaintiffs' allegations"); *In re China Educ. All.,

Inc. Sec. Litig.*, 2011 WL 4978483, at *4 (C.D. Cal. Oct. 11, 2011), at *4 (holding the

truth of short-seller report authored by an analyst firm is a factual dispute not ripe for

resolution on pleadings).[6]  Ignoring a majority of the factual underpinnings in the

Report, Defendants focus on statements from former employees of PureCycle

---

[5] *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994); *In re Sunbeam Sec. Litig.*, 89 F. Supp.
2d 1326, 1335 (S.D. Fla. 1999).
[6] *See also, Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012); *In re Longwei Petroleum
Inv. Holding Ltd. Sec. Litig.*, 2014 U.S. Dist. LEXIS 9689, at *9 (S.D.N.Y. Jan. 27, 2014).

management's previous failed companies.  The Report cites to these employees to establish Defendants' history of bringing companies public solely for their own short-term financial gain, their pattern of issuing grandiose baseless projections, and driving those companies into the ground.  That these quoted witnesses did not work at PureCycle or have access to PureCycle's documents, Def. Br. at 14, is therefore beside the point.  The relevant pattern of behavior they describe is highly instructive given the many other factors alleged in the Complaint supporting the claim that Defendants did the same with PureCycle, including *inter alia*: 1) P&G licensed its supposedly revolutionary technology to PureCycle, whose management has no relevant background in plastics recycling, rather than develop and market the technology itself; 2) management earned exorbitant compensation simply for consummating the SPAC transaction; and 3) management once again issued bold and baseless projections showing $224 million in net revenue by FY2023 and $2.3 billion by 2027, numbers rivaling the world's most profitable tech companies.  Defendants' suggestion that the *witnesses* are unreliable because *Hindenburg* "has an obvious motive to exaggerate the infirmities of the securities in which it speculates," Def. Br. at 14, ignores Hindenburg's assurance that the information in the Report only relies on sources "***who are not insiders or connected persons of the stock covered herein***." ¶ 58.

### b)  Defendants Misled Investors Regarding Management Experience

The Complaint alleges that Defendants misled investors by touting PureCycle's management as "experienced," a characterization designed to encourage trust that the Company is in the right hands and that their collective "experience" is a plus.  ¶¶ 40,

42, 46. Defendants inexcusably failed to explain that this "experience" included previously bringing six other early stage companies public to collect exorbitant compensation, while issuing lofty projections based on nothing but rank speculation and ultimately leading to *financial ruin for all six companies*—including massive deficits, delistings, and bankruptcies. ¶¶ 9, 62. As explained above, Defendants' voluntary decision to tout management's experience to investors, particularly when discussing the benefits of the SPAC transaction, triggered a duty to disclose the disturbing nature of that experience.[7] Defendants argue wrongly that they had a right to make "positive statements" and "promote the strength of their management team." Def. Br. at 16. However, they did not have the right to convey management's experience as a "positive" or a "strength" when in reality, that experience was a negative and a detriment. The nature of *management's* experience would have been particularly meaningful to investors given that *management* took PureCycle public (like they did with six other companies previously) to market a technology that purported to accomplish a task that has stymied experts since 1951, *i.e.*, polypropylene recycling, for which they had *no relevant background experience*.[8]

---

[7] These affirmative statements also distinguish this case from those Defendants cite, Def. Br. at 17.

[8] Defendants' reliance on *In re Carnival Corp. Secs. Litig.,* to proffer a truth on the market defense not appropriately adjudicated on a 12(b)(6) motion, misses the mark. Def. Br. at 17, n7. The Report revealed management's history not only based on various compiled public sources (conducting an analysis that no other market participant had done previously) but also based on witness interviews *not previously available to the market*. In *Carnival,* the court found investors could not have been misled by defendant's statements that the cruise line did not have a "diagnosed case linked to [its] operation" because *that same day* the defendant "announced a voluntary suspension of voyages in response to the pandemic." *In re Carnival Corp. Sec. Litig.*, 2021 U.S. Dist. LEXIS 101651, at *43 (S.D. Fla. May 27, 2021). Defendants here *made no disclosure at all* about their "experience" bringing companies public for lavish compensation when then imploded and issuing stratospheric baseless projections.

Defendants' reliance on *IBEW* to argue they had no duty to disclose additional details about management compensation is misplaced. Def. Br. at 16. *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 855-57 (11th Cir. 2016). In *IBEW*, the Eleventh Circuit held that defendants did not mislead investors regarding a stock repurchase program by offering up one motive for the program but failing to reveal another because they accurately and adequately disclosed "the nature, scope, or mechanics of the stock repurchase transaction." *Id.* at 856. In relying on *IBEW*, Defendants conflate motive for acquiring an accurately disclosed debt with a complaint's allegation of motive to commit fraud.[9]  Here, Defendants did not issue accurate and adequate disclosures, as explained herein.

### c)  Defendants Misled Investors Regarding Their Recycling Process

Though hyping their polypropylene recycling process as "cost effective" and "proven" to convert polypropylene into virgin like resin (a feat that heretofore proved impossible to achieve), Defendants did not disclose their impediments to accumulating the necessary amounts *and quality* of feedstock they concede is a "a necessary input for the process," that the patent underlying the process is based on prior discoveries that never reached commercial scale, that they could not safely scale up the recycling process (a necessary precondition to achieving net revenues anywhere near the

---

[9] Regardless, the Complaint does not allege that Defendants failed to reveal the compensation they received for taking PureCycle public (Def. Br. at 15), but rather alleges these facts in support of the other falsity allegations, and to establish motive/scienter as set forth below.

excessive scale projected), and that the economics were cost prohibitive.[10] Defendants do not dispute that any of the foregoing is true but rather claim they issued sufficient "risk disclosures that put investors on notice of these issues." However, boilerplate warnings detailing "*potential*" risks are insufficient to put investors on notice of *actual* risks that have already materialized. *Merch. Cap.,* 483 F.3d at 767, 769. They further argue they had "no duty to disparage [PureCycle's] own competitive position in the market" for feedstock. Def. Br. at 19. Defendants claimed they had "abundant polypropylene waste feedstock, are able to utilize a broad range of feedstock and represented that they have "20+ year feedstock agreements." ¶¶ 38, 45, 48. In light of Defendants' voluntary decision to make these statements, they incurred an obligation to disclose the considerable obstacles they actually faced in acquiring the necessary amount and quality of feedstock to perform their only operation. Moreover, Plaintiffs are not tasked at this stage with identifying precisely "how this purported competition for feedstock has impacted PureCycle's financial results" to plead falsity as Defendants argue.[11] *See In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1259 (M.D. Fla. 2007) (where plaintiffs claimed defendants "materially overstated the [c]ompany's profits" during the relevant time period but did not allege a specific amount, the court "reject[ed] [the] argument . . . that a plaintiff may not sue for misrepresentation absent

---

[10] Curiously, though self-servingly claiming to have validated their process and product quality through customer and third-party engineering specialist testing, Defendants fail to identify a single customer or specialist by name. ¶¶ 45, 48.

[11] Regardless, materiality is not an appropriate basis for dismissal. *Mohawk Indus.*, 2021 U.S. Dist. LEXIS 193109, at *34; *In re Immucor*, 2006 U.S. Dist. LEXIS 72335, at *34 .

allegations that quantify the falsity to the penny."); *Mohawk Indus.*, 2021 U.S. Dist. LEXIS 193109, at *43-44 (N.D. Ga. Sep. 29, 2021)("an accurate accounting … is simply not required (and often simply not available) at the pleading stage.")

Defendants also inaccurately claim that the falsity allegations regarding the recycling process are based solely on "anonymous witnesses" though the Report identifies expert witnesses on these issues by name and experience. [12]  *See* ¶¶ 59-74.

### d) The Safe Harbor Does Not Immunize Defendants' Baseless Projections

The Safe Harbor does not absolve Defendants because they made their statements on the false premise that their polypropylene recycling process was *currently* proven, *currently* economically viable, *currently* supported by abundant quality feedstock, and *currently* successful in converting polypropylene to virgin food grade resin.  In other words, future assumptions based on assertions of current fact.  Given that those assertions of "current fact" regarding the "proven" nature of PureCycle's technology held no truth, Defendants had no basis for their lofty statements regarding the Company's gilded future. *FindWhat*, 658 F.3d at 1304 ("[s]tatements regarding future performance are actionable only if 'they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them.'")[13]

---

[12] Including *inter alia* P&G senior scientist, John Layman, General Manager of KW Plastics and Former Chairman of the Association of Plastics Recyclers, Scott Saunders, 10-year executive for customer polymers, Richard Minges, and VP of post-consumer operations at Talco Plastics in California, Ajit Perera.

[13] *See also Sunbeam*, 89 F.Supp.2d at 1339 ("[I]t would be imprudent to grant Defendants' motion to dismiss based upon the possibility that some of the alleged statements may be protected by the

Additionally, the Complaint does not allege that the factors identified in the Report "may undermine such projections," Def. Br. at 12, but rather that they negate any reasonable basis for such projections altogether. Indeed, former employees of Defendants' other failed companies demonstrate that the PureCycle management team has a history and pattern of issuing baseless projections based on "wild ass guessing" and "rank speculation." ¶¶ 8, 57, 59. These allegations combined with those setting forth concrete and certain impediments to the polypropylene recycling process, *i.e.*, securing enough high quality feedstock (a necessary input for the process, Def. Br. at 18) to make the process economical (an obstacle that four industry experts attested to, ¶¶ 70-72, 74) and their inability to scale their dangerous, flammable, pressurized – and as yet not functional—process (¶ 74), suffice to plead falsity.

## B. The Complaint Adequately Alleges Scienter

A complaint pleads scienter by alleging facts that give rise to a strong inference of either recklessness or conscious misbehavior. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014). An inference is "strong" if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Equifax*, 357 F. Supp. 3d at 1232. Because this inquiry examines "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," courts must

statutory safe harbor."); *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335 (M.D. Fla. 2002) ("Moreover, even if the Defendants can ultimately claim protection under the PSLRA's safe harbor for forward-looking statements, the Court finds that at this stage of the litigation the Plaintiffs have sufficiently alleged that the Defendants made the statements with "actual knowledge" that they were "false or misleading," in that Plaintiffs aver that the Defendants knew they were "cooking the books" in order to make such statements")(citing 15 U.S.C. 78u-5(c)(1)(B)); *Harris v. Ivax Corp*, 182 F.3d 799, 803 (11th Cir. July 27, 1999).

24

"consider the complaint in its entirety," and "not whether any individual allegation, scrutinized in isolation, meets that standard." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (*citing Tellabs,* 551 U.S. at 322-23). The inference "need not be irrefutable, *i.e.*, of the 'smoking -gun' genre, or even the 'most plausible of competing inferences,'" so long as it is as likely as any other inference. *Tellabs*, 551 U.S. at 324. Assessed holistically, the inference of scienter is at least as compelling as any opposing inference, though Defendants offer none.

PureCycle's *only business* is to commercialize a process for recycling polypropylene. ¶ 31. From inception and throughout the Class Period, it produced nothing and earned no revenue. Each of the Individual Defendants therefore had undivided focus on the development of, and impediments to successfully commercializing the polypropylene recycling process. Where a fraudulent scheme concerns a "core operation" of the corporate defendant there is a strong inference of scienter. See *Flowers Foods*, 2018 U.S. Dist. LEXIS 48048, at \*45-46. It is therefore appropriate to infer that Defendants each displayed recklessness in representing with certainty that their process was economically viable and proven to convert polypropylene plastic into virgin-like resin. *See also Mohawk Indus.*, 2021 U.S. Dist. LEXIS 193109, at \*60.

There can also be no credible dispute that Defendants had *actual knowledge* of the true nature their own management's experience. Moreover, each Defendants' "active participation in press releases, earnings calls, and SEC filings dealing with the issues" alleged in the Complaint, as well as "the nature, duration and extent of the

fraud alleged [*i.e.,* both before and throughout the Company's entire existence as a public company], would lead a reasonable person to conclude" that they "knew about the fraud or were at least severely reckless in not knowing about it." *Mohawk Indus.*, 2021 U.S. Dist. LEXIS 193109, at \*65-66 (citing *Ebix*, *Inc. Secs. Litig*, 898 F. Supp. 2d 1325, 1346-47 (N.D. Ga. 2012)). This type of fraud would not be hidden from the very executives that put themselves forth as knowledgeable on these topics, concerning the Company's only purpose and their purported experience to carry out that purpose, throughout the Class Period. *Ebix,* 898 F. Supp. 2d at 1347.

In describing each of these misrepresentations, the Complaint alleges that defendants omitted adverse facts known to them or at least recklessly disregarded by them and knew or recklessly disregarded that their misstatements would mislead investors. They did so to convince the market that they indeed had a proven, cost effective, polypropylene recycling process supported by abundant feedstock that would send its revenues into the stratosphere led by an "experienced" management team. Such allegations suffice to allege scienter. *See Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 2019 U.S. Dist. LEXIS 124134, at \*14 (M.D. Fla. July 25, 2019).   That is particularly so given the certainty and specificity with which Defendants each made their representations.  *See, e.g., City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (the specificity of defendants' comments regarding the company's operations was "strong circumstantial evidence" that defendants received specific information regarding the division at issue).

### C. The Complaint Adequately Alleges Loss Causation

Loss causation is subject to the less rigorous pleading requirement of Rule 8(a)(2) and is "not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The Complaint alleges that PureCycle's share price fell 40% on unusually heavy trading volume in response to the Report. ¶ 75. These allegations suffice to allege loss causation. *Mohawk Indus.*, 2021 U.S. Dist. LEXIS 193109, at **67-74. That the corrective disclosure here is a short seller report is not automatically fatal as Defendants incorrectly argue. Def. Br. at 26. Indeed, even *Meyer v. Greene,* which Defendants rely upon, concedes that there are instances in which short seller reports can qualify as corrective disclosures. 710 F.3d 1189, 1202 fn. 10. Moreover, the Report is not merely based on publicly available information. Indeed, Hindenburg, the only market participant to have done the analysis contained in the Report, describes its process as "uncovering hard-to-find information from atypical sources." ¶ 92. It is also based on information not previously available, *i.e.*, the author's interviews with former employees of Defendants' failed companies, the General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers, a 10-year executive for Custom Polymers, and a 30-year expert on polymers. *See, e.g., In re Health Ins. Innovations Sec. Litig.*, 2019 U.S. Dist. LEXIS 141591, at *102 (M.D. Fla. June 28, 2019) (finding loss causation where a Seeking Alpha short seller report served as the corrective disclosure because it related back to the actionable misstatement and revealed new information). In any event, Defendants proffer a truth on the market defense that is inappropriate at this stage. *In re Wells Fargo*

27

*& Co. Sec.* Litig., 2021 U.S. Dist. LEXIS 188666, at *72 (S.D.N.Y. Sep. 30, 2021) (holding that the "truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.")

## II.     THE COMPLAINT ADEQUATELY ALLEGES A §20(A) CLAIM

The Complaint has successfully stated the Section 10(b) claim and, as such, the Section 20(a) claim, too, is successfully pled. *See, e.g., Equifax*, 357 F. Supp. 3d at 1252 (because the Complaint sufficiently alleges violations of Section 10(b), it also sufficiently alleges violations of Section 20(a)).

## CONCLUSION

Therefore, for the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.[14]

Dated: December 28, 2021                 Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Tamar A. Weinrib*
Tamar A. Weinrib (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

*Lead Counsel for Plaintiffs*

---

[14] In the event the Court dismisses some or all of the claims alleged, Plaintiffs respectfully request leave to replead. *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1339 (M.D. Fla. 2002) (granting motion to dismiss, without prejudice to filing amended complaint).