**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 6:21-cv-809-PGB-GJK |
| PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER, BYRON ROTH and TASMIN ETTEFAGH, | |
| Defendants. | |

**Lead Plaintiffs' Memorandum of Law in Opposition to Defendant Byron Roth's Motion to Dismiss Consolidated Amended Class Action Complaint**

Co-Lead Plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, respectfully submit this opposition to Defendant Byron Roth's ("Roth") Motion to Dismiss the Consolidated Amended Class Action Complaint ("Complaint").[1]

**Preliminary Statement**

Defendant Roth is no stranger to bringing questionable companies public via reverse merger and then slapping "buy" ratings on their stocks and collecting lucrative

---

[1] Contemporaneously herewith, Plaintiffs submit a memorandum of law in opposition to PureCycle Technologies, Inc ("PureCycle"), Michael Otworth, Michael E. Dee, David Brenner, and Tasmin Ettefagh' motion to dismiss.  Collectively with Roth, they are referred to herein as "Defendants."

compensation.  Indeed, Roth Capital, led by CEO and Chairman Defendant Roth, has a FINRA BrokerCheck report showing 15 regulatory sanctions and 12 arbitrations, including a violation of Regulation M, enacted to prevent market manipulation.  Most recently, Defendant Roth brought PureCycle Technologies Inc. ("PureCycle") public via a special purpose acquisition company ("SPAC") transaction with Roth CH Acquisition I Co., following which Roth Capital issued a "buy rating" on the Company (the only other "buy" rating coming from the other sponsor of the transaction).  PureCycle, which had no production or revenue from inception and throughout the Class Period, has only one business purpose – to commercialize a plastic purification recycling technology originally developed and patented by Procter & Gamble, yet curiously the Company is run by a  management team *with no prior experience in plastics recycling.*  The Complaint alleges that, unbeknownst to investors, Defendant Roth issued misleading statements on three separate occasions falsely portraying PureCycle's recycling technology as "proven" to convert polypropylene plastic into virgin polypropylene plastic suitable for use in food grade products.

In support of his Motion, Defendant Roth proffers mischaracterizations of the Complaint, conclusory arguments, and misstatements of fact that cannot form a basis for dismissal as to either falsity or scienter, both of which are adequately alleged.  As early as page one of his Motion, Defendant Roth mischaracterizes the Complaint as only challenging statements regarding "hopes for monetizing a license" and "revenue projections," falsely claims Plaintiffs did not do an independent investigation though the Complaint explicitly states otherwise, and inaccurately argues that only two

2

statements are ascribed to Defendant Roth though multiple statements are attributed to Defendant Roth on three separate dates. These and Defendant Roth's remaining baseless assertions and misstatements of law are addressed fully below. Bereft of any meaningful challenge to the claim against him, Defendant Roth's motion must fail.

## Statement of Facts[2]

PureCycle began trading on the NASDAQ on March 18, 2021 following a reverse merger with Roth CH Acquisition I co. ("ROCH"), a SPAC. ¶ 28. SPACs are shell companies set up for the sole purpose of raising money through an IPO to eventually acquire another company. *Id.* A SPAC has no commercial operations, makes no products and does not sell anything. *Id.* In fact, the SPAC's only assets are typically the money raised in its own IPO. *Id.* Going public through a SPAC is quicker, has lower associated costs and fewer extensive financial disclosure requirements than a traditional IPO. *Id.* Roth Capital Partners, LLC and Craig-Hallum Capital Group LLC, the sole underwriters in the ROCH IPO, received almost 2 million shares in PureCycle for slightly more than a penny per share (worth $48 million) through their sponsorship of the SPAC deal. ¶ 27. Defendant Bryon Roth ("Roth") is the CEO and Chairman of Roth Capital, which largely operates in the murky world of small cap and microcap banking. ¶ 30. Prior to taking on SPAC mergers like this one, Roth was well known for his role in facilitating numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion for China-based clients from

---

[2] All ¶ __ references are to the Complaint filed on September 28, 2021. (ECF No. 90).

2003 to 2012. *Id.* Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division. *Id.* Roth Capital's FINRA BrokerCheck report shows 15 regulatory sanctions and 12 arbitrations, including a violation of Regulation M, enacted to prevent market manipulation. *Id.*

PureCycle's sole purpose is to commercialize a process for recycling polypropylene, a common plastic used in everything from carpets to shampoo caps to fishing nets. ¶ 31. Within the world of plastics recycling, polypropylene is particularly uneconomical. *Id.* It represents 28% of the world's plastic, yet only approximately 0.8% of it is recycled today because a sizable amount of polypropylene requires expensive sorting and cleaning due to its use in food packaging. *Id.* It is also commonly found in products that use mixed plastics that can be difficult, if not impossible, to separate. *Id. **The world's top scientists and major chemical companies have unsuccessfully sought a recycling solution since polypropylene's discovery in 1951**. Id.*

Procter & Gamble ("P&G") invented and developed the technology underlying PureCycle's business. ¶ 32. Numerous factors, however, suggest the technology is not as great as Defendants touted throughout the Class Period. Even though polypropylene is the largest plastic type P&G uses, it did not opt to develop and commercialize this supposedly revolutionary technology itself, nor did P&G license the technology to a company with background in plastics or polycarbon. *Id.* Rather, P&G licensed the technology to PureCycle in October 2015, around the time of PureCycle's inception though the management team that took PureCycle public has

no background in polypropylene recycling. *Id.* Moreover, plastics companies typically publish peer reviewed studies detailing their advancements in the field. ¶ 33.  Plaintiffs' investigation confirmed that no peer reviewed study mentions PureCycle's technology or patent. *Id.*  Of over 900,000 results on Google Scholar, ScienceDirect, Elsevier, and Scopus relating to plastic recycling processes, *none* mentions PureCycle, its patents, or related technologies in a peer reviewed study. *Id.*

Additionally, prior to going public, PureCycle was owned and controlled by Innventure, which was founded by Otworth, Brenner, PureCycle's Chief Science Officer, and Director Dr. John Scott ("Scott"). ¶ 34.  Innventure's management team takes credit for what it misleadingly characterizes as "six successful IPOs." Plaintiffs' investigation confirmed that, in reality, and unknown to PureCycle's investors, each of these purportedly "successful IPOs" resulted in significant investors losses, involving massive accumulated deficits, delistings, and bankruptcies. *Id.*

### Defendant Roth's Materially False and Misleading Statements

Throughout the Class Period Defendants issued detailed false and misleading statements to investors representing that PureCycle's polypropylene recycling process is "cost efficient" and "proven" to convert polypropylene into virgin like resin, that they had abundant quality feedstock to perform that process, and touting the experience of their management team.  However, they failed to disclose that the technology underlying its process is in fact unproven and presents serious issues even at lab scale, the flammable pressurized process is not yet functional—especially at scale—and is dangerous, the Company faces serious obstacles to obtaining the

quantity and quality of feedstock it needs as a necessary input to its process, and the "experienced" management team previously brought six companies public to line their own pockets while issuing financial projections based on rank speculation and then driving those companies to financial ruin—a pattern eerily similar to the one they followed bringing PureCycle public.

On the first day of the Class Period, November 16, 2020, PureCycle issued a press release announcing it would become a publicly traded company via an agreement and plan of merger with Roth Acquisition.  In that press release, which represents that PureCycle's recycling technology is more cost efficient and environmentally sustainable than other methods and is able to convert polypropylene into virgin polypropylene resin, ***Defendant Roth is quoted*** touting the process as  "transformative in plastic recycling." ¶¶ 38-39

Then, on November 20, 2020, Roth Acquisition and PureCycle filed a Registration Statement on Form S-4 with the SEC, ***signed by Defendant Roth***. ¶ 48.  In this Registration Statement, Defendants called PureCycle's recycling process a "proven technology" and represented that it "converts waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene." *Id.* The Registration Statement further stated that the "process utilizes a broad range of feedstocks including waste carpet, stadium cups and supersacks and produces virgin-quality UPRP pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products," and claimed it had been "validated by independent

technical consultants and many of PCT's strategic partners and initial customers," though not a single one is identified by name. *Id.*

On March 18, 2021, PureCycle announced that its business combination with Roth Acquisition was approved by Roth Acquisition's shareholders at a special meeting held on March 16, 2021, and that PureCycle's shares would begin trading under the ticker symbol PCT beginning the same day.[3] ¶ 51.  In that press release, Defendant Roth is quoted as stating, "PureCycle's revolutionary and proprietary technology to recycle waste polypropylene into virgin-like resin is not only transformative, but also beneficial to our planet. We are confident that PureCycle has the resources to deliver substantial value for all stakeholders." ¶ 54.

## THE TRUTH EMERGES

Before the markets opened on May 6, 2021, analyst Hindenburg Research published a scathing report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street" (the "Report"). ¶ 58.  The Report stated that: (1) Hindenburg "spoke with multiple former employees of" Defendant Otworth's and other PureCycle executives' former companies "who said PureCycle's executives based their financial projections on 'wild ass guessing,' brought companies public far too early, and had deceived investors," ¶¶ 64-66; (2) unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer

---

[3]    *See*  https://finance.yahoo.com/news/purecycle-technologies-completes-business-combination-124100921.html (last visited May 7, 2021).

reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process;" (3) "multiple competitors and industry experts . . . explained that PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question;" (4) "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art;" (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale;" and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences." ¶ 59.

Hindenburg noted "the company boldly projects $224 million of net revenue in FY2023, *which it then plans to grow nearly ten-fold* – to $2.3 billion by 2027." ¶ 60. Hindenburg wrote that PureCycle "put its aggressive projections through a bit of a torture session in order to justify its valuation. . . . In a corner of the plastics recycling world that has eluded economic sustainability for the world's top chemical companies, those numbers would put PureCycle's margins on par with some of the world's most profitable tech companies." *Id.*

Hindenburg further wrote that "the only two investment banks whose 'research' divisions cover PureCycle are Roth and Craig Hallum, the two sponsors of the deal. ¶ 61. Both have put 'Buy' ratings on the company, with price targets ranging from

$45-48." Hindenburg noted that "Craig Hallum issued its 'Buy' rating and a $48 price target on March 18th, the very day PureCycle went public." However, two partners within Craig Hallum's research division received shares in the merger, which became eligible for sale on April 16th due to the elevated stock price. Then five days after Roth Acquisition's shares were unlocked for sale, the research department at Roth issued a "Buy" rating on PureCycle, assigning a $45 price target. As Hindenburg noted, "[t]he rest of Roth and Craig Hallum's founder's shares will become freely tradeable in September 2021, well before any revenue is generated by [PureCycle]. Both firms stand to gain considerably regardless of how the company's plans work out." *Id.*

Hindenburg also tracked how **Defendant Otworth** and three other senior executives, Bill Haskell, **Rick Brenner**, and **John Scott**, have taken at least 6 companies public. ¶ 62. Hindenburg wrote: "[a]ll have failed. . . . of the 6 companies taken public by PureCycle Senior Executives, 2 went bankrupt, 3 were delisted, and 1 was acquired following a ~95% decline. Over $760 million in public shareholder capital was incinerated in the process." Hindenburg explained that prior to going public, PureCycle was owned and controlled by Innventure, a Florida-based startup founded by **Defendant Otworth**, PureCycle's Chief Science Officer and Director **John Scott**, and PureCycle Director **Rick Brenner**. ¶ 63.

Hindenburg also detailed how PureCycle's executive team received $7 million in cash bonuses simply for closing the SPAC deal, and will receive approximately $40 million in compensation before PureCycle generates any revenue. ¶ 67.

9

The Report also called the technology into question: "[o]ne might wonder, if the technology was a major breakthrough, as described in the company's presentation . . . why P&G didn't license it to a chemical company like Dow or well-established plastics or polycarbon companies rather than a team with a history of repeated failures and no specific polycarbon expertise? Or, why not develop the technology internally as a new income stream?" ¶ 68. The Report cited a written Q&A session with a P&G employee who "explained that a Global Business Development Director at P&G had a personal relationship with the team at PureCycle's patent company, Innventure, and made the connection. . . . The P&G employee that bridged the deal appears to have later taken a senior position at PureCycle, now serving as VP of Commercial and Business Development." ¶ 69.  Hindenburg wrote that its "analysis leads us to believe that P&G likely had a 'technology' that it saw no economic sense in commercializing itself, so it spun it off, providing a steady stream of positive PR for the plastic producing giant, showcasing its efforts to promote recycling." *Id.*

The Report also noted that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." ¶ 70.  Indeed, in a November 2020 interview, P&G's inventor of the technology explained: "I think the fact that you have to ensure you have feedstock coming in and I think *that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running*." *Id.*

Hindenburg also spoke with Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers who stated:

[t]he problem I see with chemical recycling – and I'm not an expert in this process but I am an expert in PP raw materials – *there is not enough non-contaminated PP scrap to support these processes.* So you're going to get a wide range of materials that have varying degrees of other resin contamination." He added that "[a]nd what's stated publicly by PureCycle themselves is that the facility *works well up to 5 percent contamination*. I've been buying PP scrap for 30 years and *I'm not aware of any PP scrap in volume that has any less than 5% contamination in the world*.

¶ 71. Hindenburg also spoke with Richard Minges, a 10-year executive for Custom Polymers, who stated "it's more about the raw materials that can be secured." Belying Defendants' assertions that their process is "cost effective" and "economically viable" he also explained that PureCycle is:

stating that they're going to sell their resin for as much as $2 a pound, which is *a huge premium*. And the people that we have that are paying premium right now is because they only need a small amount and it's a marketing ploy and they want it secured. And if I go back to these same people and tell them I have a 10x as much and the price is going up to $2 then I don't know a single one who would pay. ¶ 72.

Hindenburg also wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that "*PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale*." ¶ 73. On the latter point, Hindenburg wrote that it consulted with a "30 year expert in polymers," who stated that "[t]here is no mention of the needed actual testing of the final product. ¶ 74. It is indirect and vague. The hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience." *Id.* The same expert stated, according to Hindenburg, that "[w]hile the n-butane & propane blends for solvent, heated and pressurized may extract a slightly higher concentration of PP per cycle pass than

11

carbon dioxide and n-butane, it is still apparently very low. PureCycle doesn't disclose what these values are in the scaled-up testing." *Id.* He concluded: "[t]he permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. ***I don't think the process could ever be cost efficient. The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough***." Hindenburg further detailed that PureCycle's licensed technology presented issues at "lab scale," rendering larger scale development as even more problematic. *Id.*

On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. ¶ 75. This represents a one-day drop of approximately 40% on unusually heavy trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

PureCycle issued a press release in response to the Report the day of its publication, which fails to challenge, much less negate, *any* of the Report's specific underlying factual allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders." ¶ 76.

**ARGUMENT**

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)[4]. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Courts also must draw all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555-56. A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Immucor Inc. Sec. Litig.*, No. 1:05-cv-2276-WSD, 2006 U.S. Dist. LEXIS 72335, at *22 (N.D. Ga. Oct. 4, 2006).

**I.    PLAINTIFF ADEQUATELY ALLEGES A §10(B) CLAIM**

To state a Securities Exchange Act of 1934 §10(b) claim, a plaintiff must allege: "(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) 'loss causation.' *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011).

---

[4] Emphasis is added and citations are omitted throughout unless otherwise stated.

**A. The Complaint Adequately Alleges Falsity as to Defendant Roth**

The Complaint alleges that Defendant Roth made statements representing PureCycle's recycling process as a "transformative" and "proven technology" that recycles waste polypropylene into virgin polypropylene making it "suitable for use in … food grade consumer products." ¶¶ 38–39, 48, 54. Defendant Roth also made representations regarding the feedstock needed to perform the process and claimed the process had been validated by unnamed third parties. The Complaint further alleges that these statements misled investors because the technology underlying PureCycle's process is in fact unproven, is based on a patent that is not revolutionary but merely a regurgitation of prior art, and presents serious issues even at lab scale, the flammable pressurized process is not yet functional—especially at scale—and is dangerous, and the Company faces serious obstacles to obtaining the quantity and quality of feedstock it needs as a necessary input to its process. These allegations suffice to allege the falsity element of the §10(b) claim against Defendant Roth. *In re Altisource Portfolio Sols., S.A. Sec. Litig.*, No. 14-81156-CIV-WPD, 2015 U.S. Dist. LEXIS 180850, at *11 (S.D. Fla. Dec. 22, 2015) (citing *FindWhat*, 658 F.3d at 1305) (holding a statement is misleading if it "conveyed to the public a false impression").

As set forth above, the Complaint attributes statements to Defendant Roth which he made on November 16, 2020 (direct quote, ¶¶ 38-39), November 20, 2020 (signatory, ¶ 48), and March 18, 2021 (direct quote, ¶¶ 51, 54). Defendant Roth is therefore unquestionably the "maker" of these statements under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Defendant Roth's argument

that the claim against him is based on "group pleading" therefore belies the plain language of the allegations and fails as a matter of law.

### B. Defendant Roth's Misstatements are Actionable

Relying on conclusory assertions Defendant Roth argues that his alleged misstatements are either "quintessential puffery" and thus immaterial, forward looking and thus protected by the Safe Harbor, or "demonstrably true." Each of these arguments fail to pass muster.

Statements conveying that PureCycle's recycling process is "transformative" and "proven" to convert waste polypropylene into virgin polypropylene suitable for use in food grade products are not vague assertions of general optimism. Defendant Roth's statements "represent tangible, verifiable" representations and therefore cannot constitute puffery. *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 2018 U.S. Dist. Lexis 54008, at *21 (N.D. Ga. Mar. 29, 2018), *order clarified*, 2018 U.S. Dist. Lexis 59875 (N.D. Ga. Apr. 6, 2018) (statements capable of objective verification are not puffery). "Furthermore, the fact that these statements relate to a core aspect of ... [the company's] business makes it even more likely that a reasonable investor would assign weight to them." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (statements concerning data security not puffery where data security was a core aspect of business). Moreover, Defendant Roth proffers his puffery argument to challenge materiality; arguments regarding materiality are not an appropriate basis for dismissal. *Pub. Emps. Ret. Sys. of*

15

*Miss. v. Mohawk Indus*., No. 4:20-CV-00005-ELR, 2021 U.S. Dist. LEXIS 193109, at *34 (N.D. Ga. Sep. 29, 2021); *In re Immucor*, 2006 U.S. Dist. LEXIS 72335, at *34.

Moreover, Defendant Roth argues that his November 16, 2020 statements are forward looking. Context is important. Defendant Roth made his statements regarding PureCycle's "transformative" process in the middle of a press release representing that the process is *currently* cost effective and *currently* able to convert waste polypropylene into virgin polypropylene resin, ¶¶ 38-39. *In re Physician Corp. of America Securities Litigation*, 50 F. Supp. 2d 1304, 1318 (S.D. Fla. 1999) (DMM) ("The statutory safe harbor, created to allow for projections, does not protect defendants from liability based on "statements that misrepresent historical/hard or current facts.")(internal citation omitted). Moreover, Defendant Roth does not identify any meaningful cautionary language that accompanied his statements. *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1375 (S.D. Fla. 2001). Additionally, given the Complaint's allegations that none of the Defendants could have reasonably believed their statements, any forward-looking statements are still actionable. *In re PSS World Med., Inc. Sec. Litig.*, 250 F. Supp. 2d 1335 (M.D. Fla. 2002).

Next, Defendant Roth claims his November 20, 2020 statements regarding the "patented technology and the company's efforts to commercialize that technology" are "demonstrably true." However, what the Complaint alleges is misleading are the statements worded as guarantees that the technology works, and was in fact able *at the time* to "utilize[] a broad range of feedstocks," ¶ 48, and successfully convert waste

16

polypropylene into virgin polypropylene resin, when in reality (as multiple industry experts attested), the technology underlying the process is unproven and presents serious issues even at lab scale, the flammable pressurized process is not yet functional—especially at scale—and is dangerous, and the Company faces serious obstacles to obtaining the quantity and quality of feedstock it needs as a necessary input to its process. That certain surrounding statements, such as the fact that P&G developed the process and that PureCycle licensed the technology from P&G, are literally true, does not cancel out the remaining misleading statements contained in the press release. *FindWhat*, 658 F.3d at 1305 (citing *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc) (internal citation omitted); *accord Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir. 1986) ("Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises."); *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers.")).

Lastly, Defendant Roth does not challenge, and thus concedes, the falsity of his March 18, 2021 statements and thus waives any argument otherwise.

## C. The Complaint Adequately Alleges Scienter

A complaint pleads scienter by alleging facts that give rise to a strong inference of either recklessness or conscious misbehavior. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014). An inference is "strong" if it is "cogent and at

least as compelling as any opposing inference one could draw from the facts alleged."

*Equifax*, 357 F. Supp. 3d at 1232. Because this inquiry examines "whether all of the

facts alleged, taken collectively, give rise to a strong inference of scienter," courts must

"consider the complaint in its entirety," and "not whether any individual allegation,

scrutinized in isolation, meets that standard." *Mizzaro v. Home Depot, Inc.*, 544 F.3d

1230, 1238 (11th Cir. 2008) (citing *Tellabs*, 551 U.S. at 322-23). The inference "need

not be irrefutable, i.e., of the 'smoking -gun' genre, or even the 'most plausible of

competing inferences,'" so long as it is as likely as any other inference. *Tellabs*, 551

U.S. at 324.

Defendant Roth stated that "we searched for a business combination that would

not only be a compelling growth company but could also benefit from the relationships

and experience of our two growth investment banks." ¶ 39.  Defendant Roth could not

have made any assessment of whether PureCycle constituted a "compelling growth

company" without substantial due diligence into its only "product"—the

polypropylene recycling process.  As part of that diligence, Defendant Roth would

have had access to material information contradicting his public statements regarding

the process.  *Equifax*, 357 F. Supp. 3d at 1233. (allegations that defendants "possessed

knowledge of facts or access to information contradicting their public statements, so

as to prove that defendants knew or should have known that they were misrepresenting

material facts" are sufficient to plead scienter).

Defendant Roth's checkered history also contributes to the inference of scienter.

*See, e.g., Takata v. Riot Blockchain, Inc.,* No. CV 18-02293 (FLW), U.S. Dist. Lexis

75924, at *19 (D.N.J. Apr. 30, 2020) (pattern of improper conduct supports the inference of scienter)(collecting cases). Prior to effectuating the PureCycle SPAC merger, Defendant Roth facilitated numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion. Defendant Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division. Defendant Roth's FINRA BrokerCheck report shows 15 regulatory sanctions and 12 arbitrations, including a violation of Regulation M, enacted to prevent market manipulation. That is precisely what Defendant Roth did here, further contributing to the inference of scienter. Roth Capital and Craig-Hallum are the only two investment banks covering PureCycle, despite sponsoring the deal, and put "buy" ratings on the Company. Defendant <u>Roth</u>, as *the Chairman and CEO of* *<u>Roth</u> Capital*, cannot escape the scathing FINRA BrokerCheck report by bizarrely arguing that "Plaintiffs conflate Mr. Roth with Roth Capital."

Roth Capital, along with Craig-Hallum (the sole underwriters in the IPO), received approximately 2 million "founders" shares for a little more than a penny per share, worth approximately $48 million *the day before the Report was issued*, an amount they never would have collected had the SPAC transaction not consummated or had the market known the truth regarding PureCycle's recycling process. This exorbitant windfall, particularly in light of the timing, strongly supports an inference of scienter. *Tellabs*, 551 U.S. at 325 ("motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference."). *See also Equifax*, 357 F. Supp. 3d at 1232 n.280 (citing *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir.

19

2002) ("The plaintiff may combine various facts and circumstances indicating fraudulent intent—including those demonstrating motive and opportunity—to satisfy the scienter requirement." (internal alterations and quotations omitted)).[5]

### D. The Complaint Adequately Alleges A §20(a) Claim

The Complaint has successfully stated the Section 10(b) claim and, as such, the Section 20(a) claim, too, is successfully pled. *See, e.g., Equifax*, 357 F. Supp. 3d at 1252 (because the Complaint sufficiently alleges violations of Section 10(b), it also sufficiently alleges violations of Section 20(a)).

## CONCLUSION

Therefore, for the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendant Roth's motion in its entirety.[6]

Dated: December 28, 2021

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Tamar A. Weinrib*
Tamar A. Weinrib (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

*Lead Counsel for Plaintiffs*

---

[5] Defendant Roth states four times, with no argument at all, that Plaintiffs do not adequately plead loss causation. Given the lack of any argument in support of these conclusory assertions, Defendant Roth has not provided any basis for the Court to dismiss on loss causation grounds. In any event, Plaintiffs incorporate their arguments regarding loss causation set forth in the Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint, filed contemporaneously herewith. ECF No. 104.

[6] In the event the Court dismisses some or all of the claims alleged, Plaintiffs respectfully request leave to replead. *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1339 (M.D. Fla. 2002) (granting motion to dismiss, without prejudice to filing amended complaint).