# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**WILLIAM C. THEODORE,
ERSTE ASSET MANAGEMENT
GMBH and DAVID
TENNENBAUM,**

             **Plaintiffs,**

**v.**                                   **Case No: 6:21-cv-809-PGB-GJK**

**PURECYCLE TECHNOLOGIES,
INC., MICHAEL OTWORTH,
TASMIN ETTEFAGH, MICHAEL
E. DEE, DAVID BRENNER and
BYRON ROTH,**

             **Defendants.**
_____/

## <u>ORDER</u>

This cause comes before the Court on the following filings:

1.    Defendants PureCycle Technologies, Inc. ("**PureCycle Inc.**"), Michael Otworth, Tasmin Ettefagh, Michael E. Dee, and David Brenner's (collectively, the "**PureCycle Defendants**") Motion to Dismiss (Doc. 93 (the "**PureCycle Motion**")), Plaintiffs' response (Doc. 104), and PureCycle Defendants' reply thereto (Doc. 109); and

2.    Defendant Byron Roth's Motion to Dismiss (Doc. 95 (the "**Roth Motion**")), Plaintiffs' response (Doc. 105), and Defendant Roth's reply thereto (Doc. 110).

Upon consideration, the PureCycle Motion and the Roth Motion are due to be granted in part.

## I.   BACKGROUND

This case arises from the drop in PureCycle Inc.'s stock prices after the publication of a third-party research report. Founded in 2015, PureCycle Inc. is a recycling services company that focuses on recycling the waste from a certain type of plastic, polypropylene, into an ultra-pure recycled resin, using technology licensed from the Procter & Gamble Company ("**P&G**"). (Doc. 90, ¶ 3). PureCycle Inc.'s stock began trading publicly on the NASDAQ Exchange on March 18, 2021, as the result of its reverse merger with Roth CH Acquisition I Company ("**ROCH**"), a publicly traded special purpose acquisition company. (*Id.* ¶¶ 2–4). The players responsible for bringing PureCycle Inc. public include: Defendant Michael Otworth, the Chairman of the Board of Directors and Chief Executive Officer ("**CEO**") of PureCycle Inc.; Defendant Michael Dee, the Chief Financial Officer (**"CFO"**) of PureCycle Inc.; Defendant David Brenner, the Chief Commercial Officer ("**CCO**") of PureCycle Inc.; Defendant Tasmin Ettefagh, the Chief Sustainability Officer ("**CSO**") of PureCycle Inc.; and Defendant Byron Roth,[1] the Chairman and CEO of ROCH. (*Id.* ¶¶ 20–24).

From November 16, 2020 to May 5, 2021, Plaintiffs allege Defendants made false and misleading statements in: (1) PureCycle Inc.'s November 16, 2020 Press

---

[1]   Defendant Roth is also the CEO and Chairman of Roth Capital, one of the investment banks that was an underwriter for the ROCH-PureCycle Inc. merger. (Doc. 90, ¶¶ 27, 29–30).

Release (the "**November Press Release**"); (2) Defendants' November 16, 2020 Investor Presentation[2] (the "**Investor Presentation**"); (3) PureCycle Inc.'s Form S-4 Registration Statement, filed November 20, 2020 with the SEC (the "**Registration Statement**"); (4) PureCycle Inc.'s Form 424(b)(3) Prospectus, filed February 12, 2021 with the SEC (the "**Prospectus**"); (5) PureCycle Inc.'s March 18, 2021 Press Release (the "**March Press Release**"); and (6) PureCycle Inc.'s April 21, 2021 Press Release (the "**April Press Release**"). (*Id.* ¶¶ 21–32).

On May 6, 2021, Hindenberg Research, a short seller[3] in PureCycle Inc., released a report, titled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored By The Worst Of Wall Street" (the "**Hindenberg Report**"). (*Id.* ¶ 58). After anonymously interviewing multiple former employees from PureCycle Defendants' former companies, the general manager of an industry competitor, and a polymer expert, the Hindenberg Report revealed that: (1) PureCycle Inc.'s purported experienced management team previously caused six businesses to fail, had previously characterized rank speculation as financial projections to investors, and was only motivated to bring PureCycle Inc. public in order to obtain large

---

[2]     On the same day, ROCH filed a Form 8-K, disclosing the slides from the presentation, and a Schedule 14A, disclosing the transcript of the presentation, to the Securities and Exchange Commission ("**SEC**"). (Docs. 93-3, 93-4).

[3]     *Short Seller*, MERRIAM-WEBSTER (2022), https://www.merriam-webster.com/dictionary/short-seller ("One who makes a short sale."); *Short Sale,* BLACK'S LAW DICTIONARY (10th ed. 2014) ("A sale of a security that the seller does not own or has not contracted for at the time of the sale, and that the seller must borrow to make delivery; such a sale is usually made when the seller expects the security's price to drop. If the price does drop, the seller can make a profit on the difference between the price of shares sold and the lower price of the shares bought to pay back the borrowed shares.").

bonuses of cash and tradable stock; (2) PureCycle Inc. faced much higher competition for high quality feedstock, a necessary input in the recycling process, than it had led investors to believe; (3) PureCycle Inc.'s patent is nowhere as valuable as it had led investors to believe as the patented process was not yet functional and was incapable of being scaled for commercial production as it had claimed. (*Id.* ¶ 57). Thus, Defendants' false and misleading statements were revealed and caused PureCycle Inc.'s stock prices to fall from $24.59 to $14.83, approximately a 40% drop in one day. (*Id.* ¶¶ 33–49).

Five days after the Hindenberg Report was published, Plaintiffs initiated this class action for violations of federal securities law and then filed the Amended Class Action Complaint ("**Complaint**") on September 27, 2021. (Docs. 1, 90). In the Complaint, Plaintiffs, individually and on behalf of all others similarly situated, allege: (1) a violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereafter ("**Count I**"); and (2) a violation of § 20(a) of the Securities Exchange Act ("**Count II**"). (Doc. 90). PureCycle Defendants and Defendant Roth now move to dismiss, and the matter is ripe for review. (Docs. 93, 95).

## II.   STANDARD OF REVIEW FOR A SECURITIES FRAUD CLAIM

To survive a motion to dismiss, a claim brought under the Securities and Exchange Act of 1934 must satisfy: "(1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2)"; "(2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b)"; and "(3) the additional pleading requirements in the Private Securities Litigation Reform Act of 1995

("**PSLRA**")." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016).

First, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions and recitation of a claim's elements are properly disregarded, and courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). In sum, courts must (1) reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 679.

Second, for a complaint alleging fraud or mistake, such as a securities fraud claim, "a party must state with particularity the circumstances constituting fraud

or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint set forth: (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*In re Galectin*, 843 F.3d at 1269. "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

Finally, the PSLRA imposes additional pleading requirements for securities fraud actions. For a complaint alleging that the defendant "made an untrue statement of a material fact" or "omitted to state a material fact" making the statements misleading, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief," it must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, to properly allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind" "with respect to each act or omission." 15 U.S.C. § 78u-4(b)(2)(A); *see Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016–18 (11th Cir. 2004) (holding that a district court may aggregate all facts and circumstances in

the complaint to determine whether scienter was properly alleged for *each* defendant with respect to *each* alleged violation). If these requirements are not met, "the court shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).

## III.   SECURITIES EXCHANGE ACT OF 1934 AND SECURITIES & EXCHANGE COMMISSION'S RULE 10b-5

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *In re Galectin*, 843 F.3d at 1270 (quoting *Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). The Supreme Court is clear that "[a]lthough section 10(b) does not create an express private cause of action, we have long recognized an implied cause of action to enforce the provision and its implementing regulation." *Haliburton*, 573 U.S. at 267. Therefore, to state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) causal connection between misrepresentation or omission and the loss, commonly called loss causation." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).

Additionally, under § 20(a) of the Securities Exchange Act of 1934, "[e]very person who, directly or indirectly, controls any person is [jointly and severally] liable" for a violation of securities law. 15 U.S.C. §78t(a). Known as "control person liability," it "is secondary only and cannot exist in the absence of a primary

violation." *In re Galectin*, 843 F.3d at 1276 (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004)). Therefore, to state a claim under § 20(a), "a plaintiff must allege: (1) a primary violation of federal securities law, and; (2) that the defendant exercised actual power or control over the primary violator." *Id.* (internal quotations omitted).

## IV.   DISCUSSION

In the PureCycle Motion and the Roth Motion, PureCycle Defendants and Defendant Roth argue that Plaintiffs have failed to allege three out of the six required elements to state a claim under § 10(b): (1) a material misleading statement or omission, (2) scienter, and (3) loss causation. (Doc. 93, pp. 6–27; Doc. 95, pp. 7–12). Additionally, PureCycle Defendants and Defendant Roth posit that because Plaintiffs cannot plead a § 10(b) claim, then Plaintiffs' claim under § 20(a) must necessarily fail. (Doc. 93, p. 27; Doc. 95, p. 12). The Court will address each argument in turn.

### A.   **False and Misleading Statements or Omissions**

As a preliminary matter, the Complaint is not the picture of clarity. The Complaint takes issue with a plethora of statements from six sources each made by a different sampling of Defendants. From this disorganized pleading wherein Plaintiffs block quote pages of documents, it is not easily distilled what statements are at issue, who made these statements, and, sometimes, what is the proper source of the statement. Given the Complaint fails to "precisely [plead] what statements or omissions were made in which documents or oral representations" with its

excessive block quoting and its intermittent incorrect identification of where statements were made, it fails to meet the standard of Rule 9(b) as required for a securities fraud claim and must be dismissed without prejudice.[4] FED. R. CIV. P. 9(b); *In re Galectin*, 843 F.3d at 1269.

Notwithstanding the state of the pleading, all the alleged false and misleading statements from the sources can be sorted into three categories: (1) statements about the PureCycle Inc. management team's experience ("**First Category**"), (2) statements about the value of the patent and the recycled polypropylene ("**Second Category**"), and (3) statements about PureCycle Inc.'s future production and financial projections ("**Third Category**"). Thus, the Court will continue its analysis of Plaintiffs' claims.

### 1. *Statements At Issue*

First, in the November Press Release, Plaintiffs allege that PureCycle Inc. stated, in relevant part:

- The Mission: Solving the Massive Environmental Problem Created by Plastic Waste in Landfills and Oceans, Enabling Partners to Meet Sustainability Goals [with] *a Revolutionary and Proprietary Cost-Effective Method to Recycle Waste Polypropylene to Virgin-like Resin Built on Patented Technology Invented By [P&G], to be Globally Commercialized by PureCycle [Inc.]*

---

4   Additionally, the Complaint states that "[t]he statements referenced above. . . [are] materially false and misleading when made because they failed to disclose the following adverse facts." (Doc. 90, ¶ 57). Thus, it appears that Plaintiffs are only pleading that the statements were misleading due to omissions and not directly false statements. However, Plaintiffs appear to be arguing in the alternative in their responses to the Motions to Dismiss. Upon repleader, Plaintiffs should be more cognizant in their pleading to specify what statements are being challenged and why.

- This process, developed by [P&G] and commercialized by PureCycle [Inc.], is both *more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy*.

- PureCycle [Inc.'s] Ultra-Pure Recycled Polypropylene has nearly identical properties and applicability for reuse as virgin polypropylene.

- *Combined with abundant polypropylene waste feedstock*, PureCycle [Inc.] expects to achieve EBITDA margins in excess of 50% from the Company's first seven plants in 2024.

- PureCycle [Inc.] is retaining its *experienced management team*, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has *over 23 years of experience leading and scaling early-stage companies*.

(*Id.* ¶¶ 38, 40; Doc. 93-2, pp. 2–3)[5] (emphasis added). In the same November Press Release, Defendant Michael Otworth, the CEO of PureCycle Inc., was quoted as saying:

- *Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products*, and *we believe we are well-positioned to meet the consumer demand* for recycled content as well as global sustainability mandates.

- The proceeds of this transaction are intended to provide us with the balance sheet strength to accelerate the global rollout of our *proven technology* addressing the immense global problem associated with polypropylene waste.

---

[5]   PureCycle Defendants attached the relevant documents to which Plaintiffs allege contain false and misleading statements. "In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). Given these statements are central to Plaintiffs' claim and the authenticity of the documents are not challenged, the Court will consider the attached exhibits in its analysis of the instant Motions to Dismiss.

(Doc. 90, ¶ 38; Doc. 93-2, p. 3) (emphasis added). Finally, Defendant Roth, Chairman and CEO of ROCH, stated:

- We searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks. *We believe PureCycle [Inc.'s] technology will be transformative in plastic recycling and help companies meet their sustainability goals.*

(Doc. 90, ¶ 39; Doc. 93-2, p. 3) (emphasis added).

Second, and on the same day as the November Press Release, a subset of PureCycle Inc.'s management team, Defendants Otworth, Brenner, and Dee, delivered a webinar presentation discussing their background and the viability of PureCycle Inc.'s business. (Doc. 90, ¶¶ 41–43). The Complaint only attaches the slides from the presentation, and it highlights three representations: (1) Defendants Otworth, Dee, and Brenner's supposed experience, (2) the purported value of PureCycle Inc.'s technology and intellectual property rights,[6] and (3) the financial projections for fiscal year 2024. (*Id.*). Confusingly, even though the Schedule 14A filing contains the exact transcript from the Investor Presentation,[7] the Complaint refers to it separately as "soliciting material," alleging Defendant Michael Otworth stated:

- [Demand for polypropylene] continues to grow, yet recycling rates aren't growing. *So what's really needed is a game changing, transformational technology that will drive higher utilization of recycled polypropylene and*

---

[6]  The presentation slide states that the patented technology is "[t]he only proven and economically-viable method of recycling polypropylene to virgin-quality" and "[n]o [o]ther [t]echnologies [c]an [e]fficiently [a]ddress [p]olypropylene [r]ecycling at [s]cale." (*Id.* ¶ 42).

[7]  *See supra* note 1.

> *that's our mission and that's what we will succeed in doing going forward.*
>
> - The slide demonstrates a bit of the difference between what mechanically recycled polypropylene is typically used for today and what our customers will be able to use our resin for. So you see, the black pellets, that's what and that's what recycled polypropylene often looks like today. You have all different colors that are ground up. And so, as we know, when you mix every color of the rainbow, you end up with black. And, you know, this type of dark colored resin is used for things like trash cans and battery casings. But it can't be used for applications where you need bright brand colors, where you need food-contact grade resin, and where you the typical types of products and packaging that represent premium products are rather inconsistent with so, you know, what you can make out of mechanically recycled plastic today. *We're changing that in a very dramatic way.* And so, as I said, customers can use our resin, they can use it interchangeably with virgin resin, and they can make, you know, the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today.

(*Id.* ¶ 47; Doc. 93-4, pp. 5–6) (emphasis added). The Complaint goes on to allege additional statements from the Schedule 14A that were misleading. (Doc. 90, ¶¶ 44–46). However, further complicating the issue, the following statements were made in the Registration Statement, not the Schedule 14A:

> - [PureCycle Inc.'s] *ground-breaking patented recycling process*, developed by [P&G] and licensed to [PureCycle Inc.], separates color, odor and contaminants from plastic waste feedstock to transform it into ultra-pure recycled polypropylene. [PureCycle Inc.'s] recycling service converts waste plastic into near-virgin plastic, fully closing the loop on the reuse of recycled plastics while making recycled polypropylene more accessible at scale to companies desiring to use a sustainable, recycled resin.
>
> - Strong Technology Representing Significant Innovation: *[PureCycle Inc.'s] unique, patented process* separates colors, odors and contaminants through a physical purification process (not involving chemical reactions),

allowing for a broader range of feedstock than traditional recycling. *This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists.*

- [PureCycle Inc.'s] Secured Significant Investment by Lenders and Satisfied Bond Investor Due Diligence: [PureCycle Inc.'s] Construction Indebtedness involve three levels of technology requirements: Public report regarding independent evaluation of technology; Scaling risk quantification; and Infrastructure evaluation.

- As well as meeting the following commercial requirements: *Proof of scale up; 20+ year feedstock agreements; and 20+ year offtake agreements.*

- Strong Management Team: *The [PureCycle Inc.] management team has broad experience across plastics manufacturing, plant development, technology, [research and development], sales, marketing, accounting and finance.* [PureCycle Inc.] Chief Executive Officer Mike Otworth has over *23 years' experience leading and scaling early stage companies,* holding multiple senior management positions with a proven track record of founding and capitalizing startups. Chief Financial Officer Michael Dee was a senior executive at Morgan Stanley and *has over 30 years of public markets*, corporate finance, and [merger and acquisition] experience. . . . Chief Commercial Officer David Brenner *brings over 15 years' experience leading transformational projects* in a range of industries and was a Senior Manager at Deloitte prior to joining [PureCycle Inc.]. . . . *Combined, the [PureCycle Inc.] executive team has over 100 years' experience leading operations and over 70 years operating equipment.*

(Doc. 90, ¶¶ 44–46; Doc. 93-5, pp. 4, 86) (emphasis added).

Now properly referring to the Registration Statement, the Complaint alleges

it was signed by Defendant Roth, wherein "Defendants stated, in relevant part":

> **Proprietary and Proven Technology Developed by [P&G].** [PureCycle Inc.] utilizes a proprietary purification process that converts waste polypropylene feedstock into [purified polypropylene] pellets with similar characteristics to

virgin polypropylene. The Technology was developed by P&G, and [PureCycle Inc.] has a global license from P&G. [PureCycle Inc.'s] process utilizes a broad range of feedstocks including waste carpet, stadium cups and supersacks and produces virgin-quality [purified polypropylene] pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products. This patented process was developed by P&G over the course of eight years and has been refined by [PureCycle Inc.] over the past five years with more than 350 laboratory tests and with over 1,000 pounds of [purified polypropylene] produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019. In addition, [PureCycle Inc.'s] purification process and [purified polypropylene] quality have been validated by independent technical consultants and many of [PureCycle Inc.'s] strategic partners and initial customers.

(Doc. 90, ¶ 48; Doc. 93-5, pp. 116–17).

The next source the Complaint alleges contains false and misleading statements is the Prospectus filed by PureCycle Inc. with the SEC. In the Prospectus, the Complaint alleges that:

- PureCycle Inc. "represented itself 'as a leader in polypropylene recycling and polymers sustainability.'"

- PureCycle Inc. made "repeated representations from its preliminary proxy statement and S-4 regarding the efficacy of the technology it licensed from P&G to restore waste polypropylene into resin with near-virgin characteristics."

(Doc. 90, ¶ 49; Doc. 93-6, p. 134).

Then, in the following March Press Release, where PureCycle Inc. announced the reverse merger had been approved by the shareholders and would begin trading on the NASDAQ, Plaintiffs allege that PureCycle Inc. stated, in relevant part:

- PureCycle Inc. "uses proprietary technology licensed from [P&G] to recycle waste polypropylene [] into virgin-like polypropylene for myriad applications. The company is at the intersection of an enabling technology meeting a compelling global need. . . ."

(Doc. 90, ¶¶ 51, 54). And then it further alleges that Defendant Otworth was quoted as saying:

- The consummation of this transaction represents yet another major milestone for PureCycle [Inc.], demonstrating broad market validation of our value proposition. . . . Most importantly, we now have the increased capital market access to support the accelerated scaling required to revolutionize the transformation of waste polypropylene into sustainable products.

- Over the last three months, *PureCycle [Inc.] has further developed its financial and manufacturing capabilities*. . . . This is now an execution game of PureCycle [Inc.] It's incumbent on us to pull forward the best most knowledgeable leaders to ensure that we realize the full potential of this technology.

(*Id.* ¶¶ 52–53). Additionally, it also contributes statements made by Defendant Roth:

- PureCycle [Inc.'s] *revolutionary and proprietary technology* to recycle waste polypropylene into virgin-like resin is not only transformative, but also beneficial to our planet. We are confident that PureCycle [Inc.] has the resources to deliver substantial value for all stakeholders.

(*Id.* ¶ 54).

Finally, the last source the Complaint alleges contains false and misleading statements is the April Press Release issued by PureCycle Inc., titled "PureCycle's Tasmin Ettefagh facilitates plastics industry dialogue about polypropylene recycling solutions in light of U.S. Plastics Pact: Ultra-[P]ure [R]ecycled

[P]olypropylene [M]anufacturer CSO [D]rives [N]arrative." (*Id.* ¶ 55). Specifically, in the April Press Release, PureCycle Inc. states:

- [Tasmin] Ettefagh [has] participated in two conferences leading up to Earth Day and moderated a panel discussion about advanced recycling technologies and how these may impact commitments made by the U.S. Plastics Pact.

- PureCycle [Inc.] uses *proprietary technology* licensed from [P&G] to recycle waste [polypropylene] into virgin-like polypropylene for myriad applications. The company is at the intersection of an enabling technology meeting a compelling global need: only 1% of the 170 billion pounds of [polypropylene] consumed last year was recycled as compared almost 20% for polyethylene terephthalate, according to the American Chemistry Council.

(*Id.* ¶¶ 55–56) (emphasis added). And Defendant Ettefagh is quoted as saying:

- PureCycle [Inc.] is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts.

- PureCycle [Inc.'s] proprietary recycling technology was developed by [P&G], and it's this type of top-down investment that's driving the circular economy.

(*Id.* ¶ 55).

Turning now to the instant Motions to Dismiss, PureCycle Defendants and Defendant Roth argue that the Complaint fails to allege any actionable false or misleading statements because: (1) the Complaint fails to specify who made or had ultimate control over the alleged false statements; (2) the alleged false statements are mere puffery; (3) the Hindenberg Report cannot be solely relied on to prove falsity; (4) the alleged false statements are protected under the Safe Harbor provision of the PSLRA; and (5) there was no duty to disclose the information that is alleged to be an omission. (Doc. 93, pp. 6–20; Doc. 95, pp. 7–10).

2.    *"Maker" of Statements*

Even though the Complaint is not the most organized pleading, it sufficiently alleges that PureCycle Defendants and Defendant Roth "made" the alleged false and misleading statements. For a claim arising under § 10(b) and Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Further, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by [] the party to whom it is attributed." *Id.* at 142–43.

Here, the Complaint alleges that Defendants Otworth, Dee, Brenner, Roth, and Ettefagh "made, or caused to be made, false statements," and "because of their positions with the Company, [they] possessed the power and authority to control the contents" of the press releases, presentations, and SEC filings. (*Id.* ¶ 25). Further, the attributed statements made by Defendant Otworth in the presentation and the press releases, Defendant Roth in the November and March Press Releases, and Defendant Ettefagh in the April Press Release clearly meet the standard under *Janus*. 564 U.S. at 142–43; *cf. Jain v. Nexgen Memantine, Inc.*, No. 8:20-cv-2263, 2021 WL 1578542, at *6 (M.D. Fla. Apr. 22, 2021) (holding that the Complaint did not sufficiently plead the alleged false statements were made by defendants by only alleging both defendants attended the meeting and not what each said). Taken together, the Complaint sufficiently pleads that PureCycle

Defendants and Defendant Roth made the statements found in the press releases, presentation, and SEC filings.[8] *See Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1355 (S.D. Fla. 2015).

### 3. Materiality

"The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (quoting *SEC v. Carriba Air*, 681 F.2d 1318, 1323 (11th Cir. 1982). "Excessively vague, generalized and optimistic comments—the sorts of statements that constitute puffery—aren't those that a 'reasonable investor,' exercising due care, would view as moving the investment-decision needle." *Carvelli*, 934 F.3d at 1320. However, a statement that "represent[s] tangible, verifiable actions" taken by a company cannot be considered puffery. *Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020). Even if "a statement constitutes puffery[,]

---

[8] Citing to two cases, one from the Seventh Circuit and the other from the Northern District of California, PureCycle Defendants argue that Defendants Otworth, Dee, Brenner, and Ettefagh cannot be considered the "makers" of either the Registration Statement or the Prospectus because there was no allegation that any of them signed either filing. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 425–29 (7th Cir. 2015); *Hampton v. Aqua Metals, Inc.*, No. 17-cv-07142, 2020 WL 6710096, at *17 (N.D. Cal. Nov. 16, 2020). However, the Eleventh Circuit has not created such a technical requirement to properly plead control over a SEC filing, and this Court will not do so either.

Additionally, Defendant Roth argues that he should not be held liable for the statements made in the PureCycle Inc. March and April Press Releases as the merger between ROCH and PureCycle Inc. had already been completed and he no longer had any role in managing PureCycle Inc. (Doc. 95, p. 8). The Court agrees Defendant Roth cannot be consider a "maker" for the March and April Press Releases *in toto* as he no longer had any authority over the statements. *Janus*, 564 U.S. at 142. However, because Defendant Roth had ultimate authority over his own statements, he can be held liable for the statements attributed to him in the March Press Release. *Id.* at 142–43.

[it] doesn't absolve the reviewing court of the duty to consider the possibility [] that in context and in light of the 'total mix' of available information, a reasonable investor might nonetheless attach importance to the statement." *Carvelli*, 934 F.3d at 1320. Therefore, when considering a motion to dismiss, "a court shouldn't grant unless the alleged misrepresentations—puffery or otherwise—are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 1320–21 (internal quotations omitted).

Defendants argue that the First Category of statements are vague statements of puffery describing PureCycle Inc.'s management team as "experienced" and "seasoned" with a "proven track record." (Doc. 93, pp. 8–9; Doc. 95, pp. 9–10). Defendants then argue that the Second Category of statements are also puffery asserting that PureCycle Inc.'s patented recycling method is "revolutionary," "transformative," and "unique." (*Id.*). However, this argument distorts the case law. The mere use of words such as "experienced" or "transformative" does not change a statement from being objectively verifiable to one that is so vague and generalized that any reasonable investor would know it is mere puffery. If that was the case, then a savvy company could fraudulently induce investors into contributing capital without fear of retribution just by adding in a few vague and descriptive words to objectively false facts. Therefore, the Court must look at the statements holistically to determine whether there are "tangible, verifiable" facts included in the statements despite the use of any flowery language. *See id.* at 1320.

For example, taking two statements from the November Press Release that both describe PureCycle Inc.'s process as "cost-efficient," "sustainable," and/or "revolutionary," only one statement is puffery:

- The Mission: Solving the Massive Environmental Problem Created by Plastic Waste in Landfills and Oceans, Enabling Partners to Meet Sustainability Goals [with] *a Revolutionary and Proprietary Cost-Effective Method to Recycle Waste Polypropylene to Virgin-like Resin Built on Patented Technology Invented By [P&G], to be Globally Commercialized by PureCycle [Inc.]*

(Doc. 90 ¶ 37; Doc. 93-2, p. 2) (emphasis added). Describing PureCycle Inc.'s recycling process as "a revolutionary and proprietary cost-effective method to recycle waste polypropylene" was clearly meant to exaggerate and "puff" the innovativeness of the technology being utilized.[9] *See IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 857 (11th Cir. 2016)[10] (holding that statements characterizing a plan as "thoughtful," "effective,"

---

[9] To illustrate further, here are other statements from the Complaint that are puffery: "Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products, and we believe we are well-positioned to meet the consumer demand for recycled content as well as global sustainability mandates" (Doc. 90, ¶ 38); "The proceeds of this transaction are intended to provide us with the balance sheet strength to accelerate the global rollout of our proven technology addressing the immense global problem associated with polypropylene waste" (*Id.*); PureCycle Inc. "uses proprietary technology licensed from [P&G] to recycle waste polypropylene [] into virgin-like polypropylene for myriad applications. The company is at the intersection of an enabling technology meeting a compelling global need. . . ." (*Id.* ¶ 54); PureCycle Inc. "represented itself 'as a leader in polypropylene recycling and polymers sustainability'" (*Id.* ¶ 49); "PureCycle [Inc.'s] revolutionary and proprietary technology to recycle waste polypropylene into virgin-like resin is not only transformative, but also beneficial to our planet. We are confident that PureCycle [Inc.] has the resources to deliver substantial value for all stakeholders" (*Id.* ¶ 54); "PureCycle [Inc.] is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts" (*Id.* ¶ 55).

[10] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007).

and "optimal" were puffery). However, the following statement goes beyond just selling how remarkable the PureCycle Inc.'s patented recycling method is:

- This process, developed by [P&G] and commercialized by PureCycle [Inc.], is both *more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy.*

(Doc. 90, ¶ 38). The statement specifically compares PureCycle Inc.'s methodology to "the traditional manufacturing process" for polypropylene and states that it "utiliz[es] approximately 75% less energy." (*Id.*). By including a quantifiable comparison between the traditional manufacturing process and PureCycle Inc.'s process, it includes an objective and verifiable fact and cannot be considered puffery. *See Tung*, 454 F. Supp. at 1257 (holding that statements "represent[ing] tangible, verifiable actions" by the company were not puffery).

Likewise, the following list is illustrative—not exhaustive—of statements from the Complaint that are not puffery and may be challenged as fraudulent or misleading statements:

- PureCycle [Inc.] is retaining its experienced management team, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has *over 23 years of experience leading and scaling early-stage companies.*[11]

- And so, as I said, *customers can use our resin, they can use it interchangeably with virgin resin, and they can make, you know, the same brand colors with the same*

---

[11] The same logic described in the example above applies to the statements regarding the experience of PureCycle Inc.'s management team. By including verifiable facts, such as having "over 23 years of experience leading and scaling early-stage companies," this is no longer just "puffing" about an experienced management team but instead is providing context on why an investor should believe that the team is experienced.

> *appearance in the same degree of hygiene that that they expect from virgin resin today.*
>
> - [PureCycle Inc.'s] unique, patented process *separates colors, odors and contaminants through a physical purification process (not involving chemical reactions), allowing for a broader range of feedstock than traditional recycling. This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third-party engineering specialists.*
>
> - This patented process was developed by P&G over the course of eight years and has been refined by [PureCycle Inc.] over the past five years with *more than 350 laboratory tests and with over 1,000 pounds of [purified polypropylene] produced at the Feedstock Evaluation Unit* (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019.
>
> - In addition, *[PureCycle Inc.'s] purification process and [purified polypropylene] quality have been validated by independent technical consultants and many of [PureCycle Inc.'s] strategic partners and initial customers.*

(*Id.* ¶¶ 40, 44–48) (emphasis added).

### 4.   Falsity

PureCycle Defendants then argue that the Hindenberg Report cannot be used to show falsity because of its reliance on anonymous witnesses.[12] (Doc. 93,

---

[12] PureCycle Defendants also argue that the Hindenberg Report is unreliable as it has an obvious motive to exaggerate PureCycle Inc.'s flaws as it was produced by a short seller. (Doc. 93, pp. 14–15). First, all the cases cited in support of this argument are from the Southern District of New York and are not binding on this Court. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015). Second, the Court is unpersuaded that an improper motive negates all possibility that the Hindenberg Report is true and thus bars Plaintiffs' claims. While it would strengthen the Complaint to corroborate the allegations from the Hindenberg Report, it should by no means prevent the Complaint from surviving a motion to dismiss. *See* 15 U.S.C. § 78u-4(b)(1) (stating that a complaint must state "the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief," it must "state with particularity all facts on which that belief is formed.").

pp. 13–15). In response, Plaintiffs argue that the truth of a short-seller report, such as the Hindenberg Report, is not ripe for resolution at this stage in the proceedings. The Court agrees with Plaintiffs.

PureCycle Defendants conflate falsity with scienter.[13] In *Mizzaro v. Home Depot, Inc.*, the Eleventh Circuit, while discussing the pleading standard for scienter, stated that the Supreme Court "did not address [] how courts should go about evaluating allegations based on statements made by unidentified, confidential witnesses" and then applied the logic from a search-warrant analysis. 544 F.3d 1230, 1239–40 (11th Cir. 2008). The *Mizarro* court concluded, "we see no reason to adopt a *per se* rule that always requires a securities-fraud complaint to name the confidential source." *Id.* As will be discussed later, the pleading standard for scienter is very high—it requires a "cogent and compelling" inference. *Id.* at 1240. Thus, it follows that courts should be more vigilant in examining a complaint that relies heavily on anonymous witnesses because whether a defendant should have known that the statement is false turns on the basis of the anonymous witness's knowledge. *Id.* at 1239–40. However, at the pleading stage for whether a statement is false, a court is directed to accept well-pled allegations

---

[13] To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) causal connection between misrepresentation or omission and the loss, commonly called loss causation." *Carvelli*, 934 F.3d at 1317. The concept of falsity is incorporated within the first element—*i.e.* whether the alleged statement is a material misrepresentation or omission. *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 790 (11th Cir. 2010). However, scienter—*i.e.* whether the alleged statement was made with knowledge of its falsity—is a completely separate element. *Carvelli*, 934 F.3d at 1317.

as true. *Iqbal*, 556 U.S. at 679. Thus, whether the Hindenberg Report is true is a factual question that will be revealed later through discovery.

Further, while the Hindenberg Report does rely on several anonymous witnesses, that is not the full picture. The anonymous witnesses were discussing their previous experiences working for different companies that PureCycle Inc.'s executives had taken public. (Doc. 90, ¶¶ 64–66). However, the Hindenberg Report went on to discuss the viability of PureCycle Inc.'s patented technology and the availability of feedstock, a necessary input into the recycling process, with Scott Saunders, General Manager of KW Plastics, and Richard Minges, an executive for Custom Polymers. (*Id.* ¶¶ 71–74).

Taking these allegations together and assuming they are true, the Complaint has sufficiently alleged falsity with its reliance on the Hindenberg Report.

### 5.   *Safe Harbor of the PSLRA*

Next, PureCycle Defendants and Defendant Roth argue that statements within the Third Category regarding PureCycle Inc.'s future financial projections and business plans are protected under the PSLRA's safe harbor. (Doc. 93, pp. 9–12; Doc. 95, pp. 9–10). In response, Plaintiffs argue that the statements were made based on current facts and, thus, cannot be considered a forward-looking statement. (Doc. 104, pp. 23–24; Doc. 105, pp. 16–17).

In the PSLRA, Congress included a "safe harbor" provision, which "immunizes certain 'forward-looking' statements from liability," to "encourag[e] companies to share relevant information with the public." *Carvelli*, 934 F.3d at

1324. "A forward-looking statement is what it sounds like—a prediction, projection or plan." *Id.* However, the grammatical tense of the statement—present or future tense—is irrelevant; instead, it depends on whether the veracity of the statement could be determined by "present existing conditions." *Police & Fire Ret. Sys. of the City of Detroit v. Axogen, Inc.*, No. 8:19-cv-69, 2021 WL 1060182, at *2 (M.D. Fla. Mar. 19, 2021), *aff'd sub nom.*, *Einhorn v. Axogen, Inc.*, No. 21-11246, 2022 WL 3022297 (M.D. Fla. Aug. 1, 2022).

The PSLRA's safe harbor provision "provides three independent, alternative means of inoculating forward-looking statements: those that are (1) accompanied by meaningful cautionary language, (2) immaterial, or (3) made without actual knowledge of their falsity." *Carvelli*, 934 F.3d at 1326 (citing 15 U.S.C. § 78u-5(c)(1)). "The first prong 'requires courts to examine only the cautionary statement accompanying the forward-looking statement' and not 'the state of mind of the person making the statement.'" *Id.* (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999)). "The second prong provides safe harbor for immaterial statements, and the third prong gives a defendant protection when the plaintiff fails to prove that a forward-looking statement was made with actual knowledge that the statement was false or misleading." *Id.* (internal quotations omitted).

Here, the statements in the November Press Release and Investor Presentation relating to PureCycle Inc.'s plans for future production and profits, falling into Category Three, are forward-looking statements under the PSLRA's

safe harbor provision.[14] Plaintiff argues that since the expert in the Hindenberg Report stated that there was a current scarcity of feedstock, PureCycle Inc. will not be able to meet their upcoming goals for commercializing the patented process and increasing production. (Doc. 104, pp. 23–24). However, the availability of feedstock *in the future* cannot be determined by "present existing conditions." *Axogen, Inc.*, 2021 WL 1060182, at *2. While the current availability of feedstock may be informative for future availability, it is in no way dispositive to allow the court to test the veracity of these statements, properly making them forward-looking statements.[15]

Further, the statements in the November Press Release and the Investor presentation came with extensive and meaningful cautionary language and thus are protected under the provision. In particular, the November Press Release stated, "these forward-looking statements involve a number of risks, uncertainties or other assumptions" and then lists a great number of possible risks relating to: "[PureCycle Inc.'s] ability to scale and build the Ironton plant in a timely and cost-effective manner," "expectations regarding [PureCycle Inc.'s] strategies and future

---

[14] For the sake of clarity, the Court notes that this does not cover statements involving the current viability of the patented technology from the Second Category—*i.e.*, the technology is successful in laboratory tests and has been validated by technical consultants. The veracity of these statements can be determined by "present existing conditions." *Axogen, Inc.*, 2021 WL 1060182, at *2.

[15] When an investor purchases any security or an executive launches a new company, they are hoping for the best outcome in the future—including availability of resources. However, unlike Marty McFly with his sports magazine that had all the future scores from *Back to the Future*, investors do not get to see into the future and pick the winner. Back to the Future (Universal Pictures 1985). Instead, these forward-looking statements are just projections that both company executives and investors hope come to fruition.

financial performance, including its future business plans, expansion plans or objectives," and "the possibility that [PureCycle Inc.] may be adversely affected by other economic, business, and or competitive factors." (Doc. 93-2, p. 5). Again, the Investor Presentation, wherein future manufacturing plans and projected profits were discussed, Defendants included another disclaimer regarding the specific risks including: "risks relating to the uncertainty of the projected financial information with respect to PureCycle [Inc.]," "risks related to the organic and inorganic growth of PureCycle [Inc.'s] business and the timing of the expected business milestones," and "the effects of competition on PureCycle [Inc.'s] future business." (Doc. 93-3, p. 21). These warnings regarding "the effects of competition" and the "timing of expected business milestones" were of a "similar significance" to the risks—future availability of feedstock, the construction of future production facilities, and the 2024 profit returns—that Plaintiffs are complaining about here. *See Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc.*, 572 F. App'x 713, 717 (11th Cir. 2014) (holding that cautionary language accompanying forward-looking statements satisfied the safe harbor provision when the disclosures were of "similar significance" to the risks Plaintiffs complained).

Accordingly, the statements from Category Three discussing PureCycle Inc.'s future business plans are protected under the PSLRA's safe harbor provision.[16]

---

[16] Defendant Roth also argues that his statements are "demonstrably true" and should be protected under the safe harbor provision as well. (Doc. 95, pp. 9–10). However, this argument is made prematurely. In the Roth Motion, he argues that "Plaintiffs make no

### 6.     *No Duty to Disclose*

PureCycle Defendants argue that they had no obligation to disclose the information that Plaintiff allege was omitted. (Doc. 93, pp. 12–20). In particular, PureCycle Defendants argue the alleged omissions about PureCycle's management team and its recycling process are not actionable. (*Id.).* Plaintiffs argue that by omitting information about PureCycle Inc.'s management team's past failures and the issue with the patented recycling method, Defendants' statements were misleading.[17] (Doc. 104, pp. 17–23).

When a party voluntarily undertakes to say anything relating to a particular subject, a duty arises to disclose all material information relating to the subject. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1298–99 (11th Cir. 2011) (collecting cases). Thus, it follows that the question courts must ask themselves is: would a reasonable investor have been interested in the omitted information, thus making the statement misleading without it? *See Merch. Cap., LLC*, 483 F.3d at 770.

---

attempt to explain with particularity how this statement is false or misleading," referring to a statement regarding PureCycle Inc.'s patented technology and its efforts to commercialize said technology from the Registration Statement. (*Id.* at p. 10). In the Complaint, Plaintiffs allege that the Hindenberg Report revealed that the patented technology does not *currently* work at the laboratory scale—exactly what the statement is discussing—and cannot be considered a forward-looking statement. (Doc. 90, ¶ 57). Therefore, Plaintiffs have sufficiently alleged the falsity of this statement under the PSLRA pleading standards. 15 U.S.C. § 78u-4(b)(1).

[17]  Plaintiffs also argue that Defendants should be liable for misstating the availability of feedstock. (*Id.* at pp. 17–18, 21–23). However, as discussed *supra*, these statements are protected under the safe harbor provision of the PSLRA, and, as such, the Court will not address this argument. *See supra* section IV.A.4.

First, a reasonable investor would be interested in PureCycle Defendants' previous management experience. In the variety of Press Releases and the Investor Presentation, PureCycle Defendants were "touting" Defendant Otworth's "over 23 years of experience leading and scaling early-stage companies," Defendant Dee's "nearly [three] decades of public markets, corporate finance, private equity and M&A experience," and Defendant Brenner's "10+ years of experience leading transformational projects across a wide range of industries." (Doc. 90, ¶¶ 40–41). By willingly flaunting the PureCycle Inc. management's team's collective experience, the duty arose to speak truthfully about said experience. The Court is not suggesting that PureCycle Inc. should be required to "characterize its management in [a] pejorative way," such as describing the team as "impulsive" or "incompetent." *Miyahira v. Vitacost.com, Inc.*, No. 10-806144-CIV, 2011 WL 13136262, at *13 (S.D. Fla. Dec. 8, 2011). Instead, the revelations from the Hindenberg Report about the PureCycle Inc. executives' six previously failed ventures "would have been helpful to a reasonable investor assessing the quality and extent of this experience." *Merch. Cap.*, 483 F.3d at 771 (stating that a defendant's previous bankruptcy relating to a failed business is a material omission).

Further, it seems reasonable that an investor would be interested to know the *current* performance issues regarding the patented recycling method. Here, the Hindenberg Report exposed the allegedly insurmountable problems with PureCycle Inc.'s recycling method at the lab scale stating: "the company's

flammable process [is like] a 'bomb'"; "while the n-butane [and] propane blends for solvent, heated and pressurized may extract a slightly higher concentration, it is still [] very low"; and "[t]he process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough" at lab scale. (Doc. 90, ¶¶ 59, 74). After advertising the PureCycle Inc. method as "more cost-efficient and environmentally sustainable than the traditional manufacturing process" and stating it had been "validated by technical consultants and many of [PureCycle Inc.'s] strategic partners," Defendants had a duty to speak truthfully about how the process was working on the lab scale. (*Id.* ¶¶ 38, 48). A reasonable investor would be interested to know the current problems facing the recycling method before the method may be scaled up for profitable production. *See id.* at 769–70 (holding that the omission of performance history of existing partnership was materially misleading).

Therefore, PureCycle Defendants had a duty to speak truthfully about their management experience and the current status of the patented recycling process after willingly discussing the topics in their advertisements to investors.

### B.   Scienter

For the reasons stated above, the Complaint is due to dismissed for its failure to precisely plead what statements or omissions were made in which documents or oral representations. Alternatively, even considering the allegations as a whole, the Complaint fails to meet the high pleading standard for scienter. To properly plead scienter under Rule 9(b) and the PSLRA, a complaint must "state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind," such as "an intent to defraud or severe recklessness on the part of the defendant." *Carvelli*, 934 F.3d at 1318 (quoting first, 15 U.S.C. § 78u-4(b)(2)(A) and second, *FindWhat Inv. Grp.*, 658 F.3d at 1299). "Severe recklessness is limited to 'highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.'" *Bhatt v. Tech Data Corp.*, No. 8:17-cv-02185, 2018 WL 6504375, at *5 (M.D. Fla. Dec. 11, 2018) (quoting *Durgin v. Mon*, 415 F. App'x 161, 164, 166 (11th Cir. 2011)) (emphasis removed). A "strong inference" of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Carvelli*, 934 F.3d at 1318. Finally, "[a]lthough scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute." *Id.*

In the Eleventh Circuit, a plaintiff may prove knowledge or severe recklessness "by providing evidence that defendants possessed knowledge of facts or access to information contradicting their public statements." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1233 (N.D. Ga. 2019) (collecting cases). While particular dates, places, times, or other details of the fraudulent activity "are not required per se," "their absence from the complaint may be indicative of the excessive generality of the allegations supporting scienter." *Id.* (citation omitted).

This is instructive for the instant case. Plaintiffs state the magic words—that Defendants had control or access to information that would contradict their public

statements—but fail to do any more. (Doc. 90, ¶ 89). Attempting to buttress this conclusory allegation for the PureCycle Defendants, Plaintiffs point to Defendants Otworth, Dee, Brenner, and Ettefagh's executive positions in PureCycle Inc. (Doc. 104, pp. 25–26).

However, it is insufficient to merely rely on a defendant's position in the company without alleging with more specificity what information they had received. In cases where plaintiffs had sufficiently pled scienter based on a defendant's position, it was accompanied with an allegation that either an employee, government action, or report placed the executives on notice. *Compare Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr. v. Welbilt, Inc.*, No. 8:18-cv-3007, 2020 WL 905591, at *4 (M.D. Fla. Feb. 6, 2020) (stating that general allegations about a defendant's executive position, such as Chief Executive Officer or Chief Financial Officer, are insufficient to give rise to a strong inference of scienter), *with In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-cv-222, 2018 WL 1558558, at *13 (M.D. Ga. Mar. 23, 2018) (stating that specific allegations that an executive in a company had received warnings from the IRS and their own employees but ignored them may give rise to a strong inference of scienter). There is no such allegation in the Complaint to support such an inference for scienter.

Plaintiffs then rely on the "core operations" doctrine, arguing that since PureCycle Inc. only has one business focus, Defendants should have known about the issues with the feedstock or with scaling the patented method to commercial industry. However, the "core operations" doctrine is meant to bolster an inference

of scienter and not meant to absolve Plaintiffs from alleging any specific facts. *See Thorpe*, 111 F. Supp. 3d at 1376 ("[T]he Court finds that merely alleging that [it] is a core operation does not lead to a conclusion that [defendants] acted with scienter because the PLSRA requires more."); *In re Equifax*, 357 F. Supp. 3d at 1240 ("It is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question." (internal alterations omitted)).

Here, Plaintiffs are attempting to show scienter for each PureCycle Defendant by citing to inference upon inference without identifying any specific facts that support the inference. These conclusory allegations are exactly what the PSLRA's pleading standard for scienter is designed to avoid. *Tellabs*, 551 U.S. at 322 (stating that a court must balance the "PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims"). Given the generic and vague allegations, the Court finds that Plaintiffs have failed to show the inference of scienter for the individual PureCycle Defendants is "at least as strong as any opposing inference."[18] *Id.* at 326. Additionally, since PureCycle Inc. has no "mind of [its] own" and the Complaint

---

[18] As to any challenged statements involving the PureCycle Defendants' management experience, the Court, however, agrees with Plaintiffs that the individual PureCycle Defendants have actual knowledge of their own experience; but the Complaint is still deficient as to scienter for their statements given its excessive generality and must be fixed upon repleader. *See In re Equifax*, 357 F. Supp. 3d at 1233 (stating that plaintiffs may prove scienter "by providing evidence that defendants possessed knowledge of facts or access to information contradicting their public statements").

fails to plead scienter as to the individual PureCycle Defendants, it fails to plead scienter as to PureCycle Inc. as well. *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010) ("Corporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them.").

Finally, Plaintiffs cite to Roth Capital's "checkered history" and its significant financial gain from the transaction to help give rise to a "cogent" and "compelling" inference of scienter for Defendant Roth.[19] (Doc. 105, pp. 17–20). In support of their argument, Plaintiffs cite to *Takata v. Riot Blockchain, Inc.*, Civ. Action No. 18-02293, 2020 WL 2079375 (D.N.J. Apr. 30, 2020). In that case, the court found that alleging the defendant was the "primary strategist" for a fraudulent scheme, had been implicated in similar schemes at previous companies, and had received a large financial benefit from the scheme gave rise to a strong inference of scienter. *Id.* at *16. However, the case is distinguishable as the plaintiffs were proceeding under the theory of scheme liability, not the theory of fraudulent statement liability.[20] *Id.* at *5. While evidence of past schemes may lead

[19] Plaintiffs also argue that Defendant Roth's statement that "we searched for a business combination that would [] be a *compelling growth company*" shows scienter as substantial due diligence would have had to take place for him to be able to say this statement. (Doc. 105, p. 18) (emphasis added). However, this allegation of scienter does not appear in the Complaint, and Plaintiffs may not amend their Complaint in their response to a Motion to Dismiss. *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss.").

[20] "A scheme liability claim is different and separate from a nondisclosure claim. Because conduct itself can be deceptive, a defendant can be liable under § 10(b) and Rule 10b-5 for deceptive conduct absent a misstatement or omission." *IBEW*, 660 F. App'x at 858 (internal citation and quotations omitted).

to an inference of scienter for a similar scheme, the conclusion does not necessarily follow for a claim for false or misleading statements without additional allegations showing he knew or was reckless as to the veracity of the specified statements. Therefore, the Court is unpersuaded by the *Takata* logic in this case and finds that the Complaint fails to give rise to a strong inference that Defendant Roth acted with scienter.

Accordingly, Count I is also due to be dismissed for failing to plead scienter for any of Defendants with the specificity required for a securities fraud claim.

### C.   Loss Causation

For a § 10(b) claim, loss causation "requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." *FindWhat*, 658 F.3d at 1309.[21] While the plaintiff must show that the defendant's fraud proximately caused the alleged losses, "the plaintiff need not show that the defendant's misconduct was the 'sole and exclusive cause of his injury'"; rather, the plaintiff only has to demonstrate that "the defendant's act was a 'substantial' or

---

[21]   The Eleventh Circuit has not conclusively established "whether the PSLRA's heightened pleading standards apply to allegations of loss causation." *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 920 (11th Cir. 2020). Additionally, many district courts in the Circuit have applied the pleading standard under Rule 8(a)(2) for loss causation. *See, e.g.*, *In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325, 1347 (N.D. Ga. 2012); *In re Health Ins. Innovations Sec. Litig.*, No. 8:17-cv-2186, 2019 WL 3940842, at *29 (M.D. Fla. June 28, 2019); *Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1305 (N.D. Ga. 2021). As this is only at the pleading stage and there is no established rule within this Circuit, this Court will apply the traditional pleading standard under Rule 8(a)(2). *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) ("We concede that ordinary pleading rules are not meant to impose a great burden upon a plaintiff[,] . . . [b]ut it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and causal connection that the plaintiff has in mind." (internal citation omitted)).

significant contributing cause.'" *Id.* (quoting *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)).

For securities fraud cases, a common theory plaintiffs rely on for loss causation is called the "fraud on the market theory." The theory relies on the "efficient market hypothesis, which provides, in the words of the Supreme Court, that 'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.'" *FindWhat*, 658 F.3d at 1309–10 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988)). Under the efficient market theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and hence, any material representations." *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (internal quotations omitted).[22]

In a fraud-on-the-market case, "the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to plaintiff." *Sappsov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 862 (11th Cir. 2015) (quoting *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir.

---

[22] The fraud-on-the-market theory also establishes a presumption for reliance on the fraudulent statements, allowing Plaintiffs to "forego the onerous task of demonstrating individual reliance on a purported misstatement." *Id.* Here, Plaintiffs properly pled that there was a presumption of reliance based on the fraud-on-the-market theory, and Defendants do not challenge this presumption of reliance. (Doc. 90, ¶¶ 83–86; *see* Docs. 93, 95, 109, 110).

2012)). Therefore, a plaintiff may plead loss causation in a fraud-on-the-market case by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by a company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure . . . that caused at least a "substantial" amount of the price drop.

*FindWhat*, 658 F.3d at 1311–12. "Because a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory." *Sappsov*, 608 F. App'x at 863 (quoting *FindWhat*, 658 F.3d at 1311 n.28). "An adverse market reaction, however, does not establish the disclosure . . . constitutes a corrective disclosure; further allegations are required to establish that previous statements were 'false or fraudulent.'" *Sappsov*, 608 F. App'x at 863; *see also Meyer*, 710 F.3d at 1196 ("[T]he loss causation requirement ensures that the federal securities law do not become a system of investor insurance that reimburses investors for any decline in the value of their investments." (internal quotations omitted)).

PureCycle Defendants and Defendant Roth argue that Plaintiffs cannot plead loss causation under a "fraud on the market" theory because the Hindenberg Report, as a publication produced by a short seller, relies solely on publicly available information that was already reflected in the price of the stock in an efficient market and, thus, cannot be a "corrective disclosure." (Doc. 93, pp. 26–

27; Doc. 95, pp. 10–11 n.4). Plaintiffs argue in response that short seller reports, such as the Hindenberg Report, can qualify as a corrective disclosure to prove loss causation, and Defendants' reliance on the "truth on the market" defense[23] is misplaced at the motion to dismiss stage.[24] (Doc. 104, pp. 27–28).

Here, Plaintiffs assert that the almost 40% single-day decrease in the value of PureCycle Inc.'s stock was caused by the publication of the Hindenberg Report that very same day. (Doc. 90, ¶¶ 58, 75, 90). Further, the Complaint alleges that "[t]he timing and magnitude of the price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changing market conditions" and that their losses were a "direct result of Defendants' fraudulent scheme to artificially inflate the prices of PureCycle [Inc.'s stock]" that was revealed by the Hindenberg Report. (*Id.* ¶ 90). Viewing the Complaint in the light most favorable to Plaintiffs, it sufficiently alleges the stock priced dropped the same day as the Hindenburg Report was published and sufficiently eliminates other possible explanations for the drop in price. Therefore,

---

[23]  As "a corollary to the fraud-on-the-market theory," the truth on the market theory stands for the proposition that "an omission or a misrepresentation is immaterial if the information is already known to the market because the omission or misrepresentation cannot then defraud the market." *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1373 (S.D. Fla. 2001) (internal quotations omitted).

[24]  Additionally, Plaintiffs argue that Defendant Roth impermissibly argues that the Complaint fails to adequately plead loss causation without any legal argument. (Doc. 105, p. 20 n.5). However, Defendant Roth specifically incorporated PureCycle Defendants' argument regarding loss causation and included the length of PureCycle Defendants' loss causation section in the page limit calculation for his own motion to dismiss pursuant to the Court's Local Rules. (Doc. 95, pp. 10–11 n.4). As such, just as "Plaintiffs incorporate their arguments regarding loss causation" from their response to the PureCycle Motion (Doc. 105, p. 20 n.5), Defendant Roth may also incorporate PureCycle Defendants' loss causation argument as well.

the issue centers around whether the Hindenberg Report can be classified as a "corrective disclosure."

Given that loss causation is not subject to the heightened pleading standard set forth in the PSLRA, the Court finds that the Hindenberg Report meets the standard for a corrective disclosure at this stage in the litigation. Defendants argue that the Hindenberg Report merely "repackages" already-public information as the Hindenberg Report specifically discloses that the information "has been obtained from public sources we believe to be accurate and reliable." (Doc. 90, ¶¶ 58, 92; Doc. 93-1, p. 19).

However, Plaintiffs point to the Hindenberg Report's quotes from interviews with former employees of Defendants' failed companies, the Chairman of the Association of Plastics Recyclers, a 10-year executive for Custom Polymers, and a 30-year expert on polymers as evidence there was information not previously available on the market.[25]  (Doc. 90, ¶¶ 59, 64–66, 71–74; Doc. 104, p. 27). Finally, Plaintiffs allege that on the Hindenberg Report's website, it describes the analysis as "uncovering hard-to-find information from atypical sources."[26] (Doc. 90, ¶ 92;

---

[25] Misunderstanding Defendants' argument, Plaintiffs argue that Defendants improperly state that a short seller report can *never* be a corrective disclosure. (Doc. 104, p. 27). However, Defendants were merely arguing that *in this case* the short seller report fails to qualify as a corrective disclosure since it relies solely on publicly available information and does not disclose any new information. (Doc. 93, pp. 26–27). As such, the Court will limit its analysis to whether the Hindenberg Report disclosed new information to qualify as a corrective disclosure.

[26] Citing to a case from the Southern District of New York, Plaintiffs argue that Defendants' "truth on the market" defense is inappropriate at this stage. (Doc. 104, pp. 27–28) (citing *In re Wells Fargo & Co. Sec. Litig.*, 1:20-cv-04494, 2021 WL 4482102, at *21 (S.D.N.Y. Sept. 30, 2021)). First, it is only persuasive authority for this Court. Second, as Defendants correctly

*see* Doc. 93-1). Even though this description is nowhere to be found within the attached Hindenberg Report, accepting the allegations as true, Plaintiffs have sufficiently pled that the Hindenberg Report revealed new information from the interviews not previously available and "uncover[ed] hard-to-find information from atypical sources," allowing the Hindenberg Report to properly be considered a corrective disclosure at this stage in the proceedings.

### D.      Section 20(a)—Control Person Liability

Because Plaintiffs' claim under § 10(b) is due to be dismissed, Plaintiffs' claim under § 20(a) of the Securities Exchange Act must also be dismissed. A claim under § 20(a) is "secondary" and "cannot exist in the absence of a primary violation." *In re Galectin*, 843 F.3d at 1276. Accordingly, Count II is due to be dismissed without prejudice.

### V.      CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.      Defendants PureCycle Technologies, Inc., Michael Otworth, Tasmin Ettefagh, Michael E. Dee, and David Brenner's Motion to Dismiss (Doc. 93) is **GRANTED IN PART and DENIED IN PART.**

2.      Defendant Byron Roth's Motion to Dismiss (Doc. 95) is **GRANTED IN PART and DENIED IN PART**.

---

pointed out, *Wells Fargo* is inapposite to the issue at hand as it was discussing the separate element relating to the materiality of false statements—not loss causation. *Id.*

3.      Plaintiffs' Consolidated Amended Class Action Complaint (Doc. 90) is **DISMISSED WITHOUT PREJUDICE**.

4.      On or before August 18, 2022, Plaintiffs may file a Second Amended Complaint following the directives of this Order and Federal Rule of Civil Procedure 11. Failure to timely do so will result in the dismissal of this action without further notice.

**DONE AND ORDERED** in Orlando, Florida on August 4, 2022.


PAUL G. BYRON
UNITED STATES DISTRICT JUDGE


Copies furnished to:

Counsel of Record
Unrepresented Parties