## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER, BYRON ROTH and TASMIN ETTEFAGH, <br><br> Defendants. | Case No. 6:21-cv-809-PGB-GJK <br><br> **CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR A JURY TRIAL** |

Co-Lead Plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PureCycle Technologies, Inc. ("PureCycle" or the "Company") (formerly known as Roth CH Acquisition I Co. ("ROCH"), analyst reports and advisories about the Company, and

1

information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all investors who purchased or otherwise acquired PureCycle securities between November 16, 2020 and November 10, 2021, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      PureCycle's predecessor, Roth CH Acquisition I Co. ("ROCH"), was a publicly traded blank-check special purpose acquisition company ("SPAC") formed in 2019 for the express purpose of effecting a merger, stock exchange, acquisition, reorganization, or similar business combination with one or more businesses. As a SPAC in search of a business to acquire, ROCH had no ongoing business operations. Its sole underwriters were Roth Capital and Craig-Hallum Capital. Byron Roth, a notoriously key figure in the Chinese reverse merger scandals that abounded between 2003 and 2012, is the Chairman and CEO of both ROCH and Roth Capital. ROCH acquired PureCycle via a "de-SPAC"[1] transaction, a type of reverse merger.

3.      PureCycle, founded in April 2015, has never earned any revenue and has one operation: developing and commercializing a process initially developed and licensed by Procter & Gamble (P&G) for recycling polypropylene, a common plastic

---

[1] A "de-SPAC" transaction is a merger between a SPAC, a buying entity, and a target private business.

that top scientists and chemical companies have found impossible to effectively or economically recycle since its invention in 1951.  Polypropylene is used in a wide array of consumer facing and industrial products. The properties of polypropylene that provide desirable commercial benefits (such as strength, toughness, and elasticity) make it difficult to recycle. While polypropylene represents 28% of the world's polymer demand, only approximately 1% of polypropylene is recycled now, compared to 20% of polyethylene terephthalate, another common type of plastic.

4.     Defendants issued misstatements throughout the Class Period representing that PureCycle's recycling process can successfully and cost effectively convert waste polypropylene feedstock into virgin polypropylene resin called ultra-pure recycled polypropylene ("UPRP"), and can remove color, odor, and other contaminants thus creating UPRP that has nearly identical properties and applicability for reuse as virgin polypropylene.  Defendants claimed that PureCycle's polypropylene recycling process had been validated by unnamed third parties and further represented that the technology is the only patented, solvent-based purification recycling technology available for this process.

5.     In other words, Defendants claimed to have achieved what had historically proven impossible.

6.     In reality, the technology underlying the process is unproven and presents serious issues even at lab scale, the flammable pressurized process it uses is not yet functional—especially at scale—and is dangerous, the Company currently faces obstacles to obtaining the quantity and quality of feedstock it needs to perform its

process cost-effectively, the economics of conducting the process at commercial scale are cost prohibitive, and the patent underlying the technology is based on prior discoveries (almost three decades old) that never reached commercial scale.

7.      Defendants further touted their management team as having "broad experience" in many areas including plastics manufacturing, plant development, and technology, detailing their "proven track record" and many years of  "leading and scaling early stage companies," though in reality the PureCycle management team that brought the Company public had no background in plastics recycling and previously brought six other early stage companies public that imploded, eviscerating over $760 million in public shareholder capital. Defendants' laudatory statements regarding the experience of PureCycle's management team took on particular significance given that the management team was bringing a new company public to develop a purportedly revolutionary process that had proven impossible to accomplish.

8.      Moreover, unbeknownst to the investing public, the ROCH and PureCycle Defendants' primary motivation in bringing PureCycle public was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares. This background would have been highly material to investors when choosing to invest in a new company like PureCycle, which was reliant solely (as with the other six failed business brought public by this management team) on one key product.

9.      Before the markets opened on May 6, 2021, analyst Hindenburg Research published a detailed scathing report authored by Nate Anderson, on

PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street" (the "Report"). In the "About us" page on Hindenburg's website, Hindenburg describes its process as "uncovering hard-to-find information from atypical sources."[2]  The Report is based on various public sources but also on information not previously available to the public, including interviews with named industry experts as well as former employees of the PureCycle executives' previous failed companies.  The analyses contained in the Report had not previously been done by any other market participant.

10.     In the Report, supported by multiple former employees and industry experts, Hindenburg revealed that the management team bringing PureCycle public had: (a) previously brought six other businesses public only to have each implode thereafter, "resulting in 2 bankruptcies, 3 delistings, and 1 acquisition after a ~95% decline[,]" with "[o]ver $760 million in public shareholder capital [being] incinerated in the process;" (b) "based their financial projections" in those other failed companies on "'wild ass guessing,' [bringing] companies public far too early, and [having] deceived investors"; and (c) only brought PureCycle public in order to permit that same spurious management team to "collectively position[] themselves to clear ~$90 million in cash and tradable shares before the company generates a single dime in revenue." The Report cited industry experts who explained that despite the Company's rosy projections, "PureCycle faces steep competition for high quality

---

[2] *See* *https://hindenburgresearch.com/about-us/*

feedstock, and called the company's financial projections into question." The Report included the account of a "30-year expert on polymers, with a background in advanced plastics recycling" who stated that PureCycle's "patent is 'indirect,' 'vague' and 'regurgitation' of prior art" and "referred to the company's flammable pressurized process as a 'bomb' and warned about the company foraging ahead to commercial scale despite still having issues at a lab scale." Indeed, unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process." The Report concludes that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

11.     The Report makes clear that it is based on "accurate and reliable sources" and that its sources "are not insiders or connected persons of the stock covered herein."

12.     On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to a May 6, 2021 closing price of $14.83 per share (trading intraday as low as $13.55), representing a one-day drop of approximately 40% per share on unusually high trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

13.     PureCycle's May 6, 2021 press release, issued in response to the Report, fails to challenge, much less negate, *any* of the Report's specific underlying factual

allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders."

14.     Moreover, on November 10, 2021 after the market closed, Defendants revealed in PureCycle's 10-Q for the quarter ended September 30, 2021, that on September 30, 2021 the SEC issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company."  Defendants explained that, "the investigation pertains to, among other things, statements made in connection with PCT's technology, financial projections, key supply agreements, and management."  On this news, further validating the claims in the Hindenburg report, PureCycle's stock fell from its November 10, 2021 closing price of $11.50 per share to a November 11, 2021 closing price of $9.79 per share (trading as low as $8.77 intraday) representing a one-day drop of approximately 15% per share on unusually high trading volume of over 6 million shares, or more than 9.4 times the average volume over the preceding ten trading days.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the PureCycle's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The federal law claims asserted herein arise under §§ 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78n(a) and 78t(a), and Rule 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, 240,14a-9.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 1337, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b)-(c), as the Company has its principal executive offices located in this District and conducts substantial business here.

20.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

21.     Plaintiffs, as set forth in their previously filed certifications, acquired the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

22.   Defendant PureCycle Technologies, Inc. is headquartered in Orlando, Florida. Until March 17, 2021, the common stock of ROCH traded on the NASDAQ under the ticker symbol "ROCH," the warrants to purchase the common stock of ROCH traded on the NASDAQ under the ticker symbols "ROCHW," and the units comprised of ROCH common stock and warrants traded on the NASDAQ under the ticker symbol "ROCHU." Following the March 16, 2021 shareholder approval of the merger and the March 17, 2021 closing of the merger, PureCycle common stock trades on the NASDAQ under the ticker symbol "PCT," the warrants to purchase its common stock trade on the NASDAQ under the ticker symbol "PTTW," and units comprised of PCT common stock and warrants trade on the NASDAQ under the ticker symbol "PCTTU." As of March 8, 2021, there were more than 9.8 million shares of ROCH common stock issued and outstanding.

23.   Defendant Michael Otworth ("Otworth") is, and at all relevant times has been, the Chief Executive Officer ("CEO") of PureCycle and has served as the Chairman of the combined company's Board of Directors since completion of the merger.

24.   Defendant Michael E. Dee ("Dee") is, and at all relevant times has been, the Chief Financial Officer ("CFO") of PureCycle.

25.   Defendant David Brenner ("Brenner") is, and at all relevant times has been, the Chief Commercial Officer ("CCO") of PureCycle.

26.   Defendant Byron Roth ("Roth") was, prior to the merger, the Chairman and CEO of ROCH.

27.     Defendant Tasmin Ettefagh ("Ettefagh") is, and at all relevant times has been, Chief Sustainability Officer ("CSO") of PureCycle.

28.     Defendants Otworth, Dee, Brenner, Roth, and Ettefagh are sometimes referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of PureCycle securities during the Class Period. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PureCycle's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

29.     Defendant PureCycle and the Individual Defendants are sometimes referred to herein collectively as "Defendants."

30.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about PureCycle. Defendants' fraudulent scheme

and course of business that operated as a fraud or deceit on purchasers of PureCycle securities was a success, as it: (a) deceived the investing public regarding PureCycle's prospects and business; (b) artificially inflated the price of PureCycle securities; (c) permitted certain of PureCycle's senior executives and directors to collect $7 million in cash bonuses just for closing the SPAC deal, and set them up to receive an additional $40 million in compensation before any revenues are generated by the Company; (d) permitted the two investment banks who sponsored the ROCH SPAC, Roth Capital and Craig Hallum Capital Group LLC ("Craig-Hallum"), to collectively receive approximately 2 million "founders" shares for a little more than a penny per share, worth approximately $48 million the day before the Report was issued; and (e) caused Plaintiff and other members of the Class to purchase PureCycle and/or ROCH securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

### ROCH, Roth, and the PureCycle De-SPAC

31.     A special purpose acquisitions company ("SPAC") is a form of reverse merger.  It is a shell company set up for the sole purpose of raising money through an IPO to eventually acquire another company.  A SPAC has no commercial operations, makes no products and does not sell anything. In fact, the SPAC's only assets are typically the money raised in its own IPO.  A company might choose to go public through a SPAC versus a traditional IPO because the process is quicker, with lower associated costs and *fewer extensive financial disclosure requirements*.  The main difference

between a SPAC and a traditional reverse merger is that a SPAC shell company proactively seeks a target to acquire with the proceeds of its IPO.

32.     ROCH was incorporated in Delaware on February 13, 2019 as a SPAC and consummated its IPO on May 4, 2020 for gross proceeds of $75 million. The ROCH Prospectus filed on May 4, 2020 stated that its purpose is to enter into a "merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination" with a business that has "primary operations in the business services, consumer, healthcare, technology or wellness sectors." Roth Capital and Craig-Hallum were the sole underwriters in the ROCH IPO.

33.     Defendant Roth is not only the Chairman of the Board of Directors and CEO of Roth Acquisition, he is also the CEO and Chairman of Roth Capital, an investment bank based in Newport Beach, California that largely operates in the murky world of small cap and microcap banking. Defendant Roth owns 75% or more of Roth Capital through CR Financial Holdings Inc.

34.     Prior to taking on SPAC mergers, Defendant Roth was well known for his role in facilitating numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion for China-based clients from 2003 to 2012. Indeed, Defendant Roth was featured in a documentary called, "The China Hustle," detailing the nearly decades-long Chinese reverse merger scandal, which *Vanity Fair* called "the biggest financial scandal you've never heard of."  Defendant Roth regularly took Chinese companies public via reverse merger and then slapped glowing "Buy" ratings

on the stocks through Roth Capital's own research division.   Unbeknownst to the market, these Chinese companies had wildly misstated their operations, profits, and assets in disclosures to U.S. investors.   Roth would collect fees for bringing these companies public and then Roth Capital would hype the Chinese reverse merger stocks to its investors, drive the price up, and then cash out. The stocks of these companies that Roth brought public and touted, plummeted in value, with many delisted. Unwary investors suffered monumental losses   Roth's FINRA BrokerCheck report currently shows 16 regulatory sanctions and 12 arbitrations, including two violations of the Securities and Exchange Act of 1934 Regulation M, enacted to prevent market manipulation.

35.     From Chinese reverse mergers to SPACs, Roth's Roth CH Acquisition I SPAC entered into an agreement and plan of merger on November 16, 2020 with PureCycle.

36.     Roth Capital and Craig Hallum received almost 2 million  "founder's shares" in PureCycle for a little more than a penny each for sponsoring the SPAC deal. True to form, Roth acquired PureCycle through what is called a "de-SPAC" transaction and then slapped a "buy" rating and $45 price target on the stock a week after a portion of Roth's shares became eligible to dump.  Though in a typical IPO, the investment banks sponsoring a deal have to observe a "quiet period" for ten days following the IPO so as not to unduly influence the stock price,  this protective measure does not apply to SPAC transactions.  Indeed, Craig-Hallum issued a "buy" rating and $48 price target *the same day that PureCycle went public*.  The resulting increase in

PureCycle's stock price triggered an early share unlock for Craig-Hallum and Roth. Per the terms of their founder's shares, half became eligible for sale on April 16. The rest of their shares became freely tradeable in September 2021, though the Company has yet to earn a single dollar in revenue.

**PureCycle's Dubious Technology**

37.     PureCycle was formed as a Delaware limited liability company on September 15, 2015 as Advanced Resin Technologies, LLC., which then changed its name to PureCycle Technologies LLC In November 2016. The Company, ***which has never earned any revenue and has no other products***, claims that its "ground-breaking patented recycling process" economically removes color, odor, and contaminants from plastic waste feedstock called polypropylene and turns it into near-virgin plastic- -- a feat that the to date has stymied scientists and proven impossible.

38.     Polypropylene is a common plastic used in everything from food packaging to carpets to shampoo caps to fishing nets. Within the world of plastics recycling, polypropylene has been particularly uneconomical. It represents 28% of the world's plastic, yet only approximately 0.8% of it is recycled today. This is because a sizable amount of polypropylene requires expensive sorting and cleaning due to its use in food packaging. It's difficult and expensive to rid recycled polypropylene of the smell of the product it housed in its first life and the recycled material ends up black or gray. Moreover, it is commonly found in products that use mixed plastics that can be difficult, if not impossible, to separate.

39.     These dynamics have rendered polypropylene recycling largely uneconomical despite the world's top scientists and major chemical companies unsuccessfully seeking a recycling solution since the discovery of polypropylene in 1951.  Even PureCycle stated at the time of its acquisition that, "up to this point it's been impossible to recycle plastic into pure, virgin-like form."  As set forth below, Defendants misleadingly told investors, both in the Proxy Statements (filed on November 16, 2020 and February 12, 2021, amended) and in other filings throughout the Class Period, that it had accomplished the impossible.

40.     In SEC filings, the Company describes its two-step chemical recycling process as "Feed Pre-Processing" and the use of PureCycle's recycling technology for purification.  Step one, Feed Pre-Processing, involves collecting, soring, and preparing polypropylene waste, known as feedstock, for purification.  Step two, purification, involves a recycling process that uses a combination of solvent, temperature, and pressure to return the feedstock to near-virgin condition. The purification process purportedly puts the plastic through a physical extraction process using super critical fluids that both extract and filter out contaminants and purify the color, opacity, and odor of the plastic without changing the bonds of the polymer.

41.     Yet, despite its claims that it has successfully solved the unsolvable, there is not a single peer reviewed study detailing PureCycle's advancements in the field of plastics recycling.  Plastics companies typically publish peer reviewed studies detailing their advancements in the field.  Plaintiffs' investigation confirmed that no peer reviewed study mentions PureCycle's technology or patent. Of over 900,000 results on

Google Scholar, ScienceDirect, Elsevier, and Scopus relating to plastic recycling processes, not a single one mentions PureCycle, its patents, or related technologies in a peer reviewed study.

42.     PureCycle's technology is based on a license it obtained from P&G in October 2015. P&G invented and developed the technology underlying PureCycle's entire business because polypropylene was the largest plastic type used by P&G, and it has been notoriously difficult to recycle.  Nevertheless, P&G did not opt to develop the technology internally to reap the rewards of this supposedly revolutionary technology which would have given it a massive competitive advantage over other companies in the consumer products field, like Unilever.  Nor did P&G license the technology to a company with any relevant background in plastics or polycarbon. Rather, P&G licensed the technology to PureCycle in October 2015, *around the time of PureCycle's inception*.  As explained further below, the management team that took PureCycle public has no background in polypropylene recycling but does have extensive experience driving companies into the ground.

43.     Moreover, while Defendants describe PureCycle's process as "revolutionary" and "breakthrough," in reality, there is a patent dated August 3, 1993 (Patent No. 5,233,021), called "Recycling of Polymeric Materials from Carpets and Other Multi-Component Structures by Means of Supercritical Fluid Extraction." *See* https://patentimages.storage.googleapis.com/c8/2c/e0/4273c38c707b2e/US5233021.pdf. The patent describes a similar method to the one PureCycle purports to employ, involving varying temperatures or pressures of butane and propane in order to reclaim

polypropylene.  It is of no surprise that despite the existence of this patent for almost three decades, the process has never been successfully employed because it is uneconomical and involves significant hazards—prohibitive obstacles that Defendants concealed during the Class Period.  Specifically, the solvents that PureCycle's process utilizes—propane and butane-- are extremely flammable gasses that are held in a vessel under pressure and heated to a couple hundred degrees, *i.e.*, a bomb.

### PureCycle's Undisclosed Feedstock Hurdles

44.     Feedstock is an essential component of PureCycle's recycling process. Feedstock is a raw material that supplies or fuels a machine or industrial process.  For PureCycle's recycling technology the feedstock is polypropylene waste.   That feedstock is put through a purification process to turn it into (*i.e.,* recycle it into) a pure virgin like form.  However, PureCycle can't use just any polypropylene feedstock.

45.     John Laymen, the senior scientist at P&G who developed the technology, explained in a recording posted to PureCycle's website on November 1, 2020    (https://purecycletech.com/2020/11/frequently-asked-questions-about-pcts-purification-technology/) that the quality of the feedstock is important to keeping the process economical.  Laymen explained that the process removes a "fairly low" level of contamination, "less than 5%," and further made clear that the feedstock needs to be at least 90% propylene because the lower the level of polypropylene in the feedstock, the less economical the process and the less likely the Company will generate any revenue.  The feedstock needs to be of exemplary purity, "of the right quality, and the right quantity."

46.     Defendants did not reveal to investors, either in the Proxy Statements or in any other SEC filing during the Class Period, that there is not enough quality feedstock to support its process and that there is high competition in the market for waste polypropylene, which negates any basis that PureCycle could generate meaningful revenue at the lofty projections they fed to investors or conduct their process such that it is more cost effective than manufacturing traditional polypropylene.  Indeed, Scott Saunders, general manager of KW Plastics and former Chairman of the Board of Association of Plastics Recyclers, who has 30 years of experience in plastics and who is an expert in polypropylene raw materials, has stated that there is not enough non-contaminated polypropylene scrap to support PureCycle's process because the average levels of contamination in post-consumer polypropylene is between 20-25% including residues in the container, paper labels, glue and other elements.  Moreover, Richard Minges of Custom Polymers, Inc., confirmed that the raw materials are of the utmost importance and that there is huge demand for post-consumer natural polypropylene (not yet recycled) is in high demand because packaging companies want this material so they can tell a "marketing story."

### Defendants Dupe Investors Regarding PureCycle Executives' "Experience"

47.     A company called Innventure, founded by Otworth, Brenner, PureCycle's Chief Science Officer, and Director Dr. John Scott ("Scott"), controlled PureCycle before the SPAC merger in November 2020. Innventure describes its goal as working with multinational companies to "identify, grow and commercialize their proprietary IP while strategically partnering for success." Innventure's management

team takes credit for what it falsely characterizes as "six successful IPOs." Plaintiffs'
investigation confirmed that, in reality, and unknown to PureCycle's investors, (given
Defendants' glowing representations and failure to mention the following in any
disclosure to ROCH or PureCycle investors during the Class Period) each of these
purportedly "successful IPOs" resulted in significant investors losses:

o <u>ChromaVision Medical Systems</u> ("ChromaVision") made imaging
systems to detect cellular diseases. PureCycle's Scott served as
Chairman of ChromaVision. ChromaVision amassed a $64.2 million
accumulated deficit by end of year 2001 and received a notice of
delisting in October 2004.

o <u>eMerge Interactive, Inc.</u> ("eMerge") was an online cattle auctioneer.
PureCycle's Scott served as Chairman at eMerge, beginning in
September 1994, before resigning in November 2001. eMerge amassed a
$212.4 million accumulated deficit by the end of 2005. eMerge filed for
Chapter 11 bankruptcy and was delisted in 2007.

o <u>AgCert International, Ltd.</u> ("AgCert") focused on reducing emissions
from pig dung. Bill Haskell, CEO of PureCycle's parent, Innventure,
acted as "representative" for his group's investment in AgCert and also
served as the company's interim CEO in 2005 through at least 2007.
AgCert amassed a €141.1 million accumulated deficit by mid-2007. The
company delisted after "misjudging its carbon credit portfolio" in 2008
and filed for insolvency in 2012.

o <u>TyraTech, Inc.</u> ("TyraTech") was focused on developing insect control
products. Brenner served as founding CEO at TyraTech until 2009.
TyraTech went public during his tenure and amassed a $55.5 million
accumulated deficit by his departure. TyraTech was acquired in 2018 for
just $2.15 million after declining approximately 95% from its highs.

o <u>PetroAlgae</u> claimed to have found a way to economically turn algae into
fuel. PureCycle's Scott served as CEO of PetroAlgae. The zero-revenue
company filed to go public in 2010. PetroAlgae amassed a $73.8 million
accumulated deficit by 2010, and the company was delisted onto the
OTC pink sheets by 2011. Scott resigned as Chairman in February 2012.
The company changed its name in 2012 and ultimately had its securities
registration revoked in 2017.

o <u>XL TechGroup, Inc.</u> ("XL TechGroup") was a venture capital/incubator company that preceded Innventure. PureCycle's Scott served as Co-Founder and CEO of XL TechGroup and Otworth held a C-level role at XL TechGroup. Bill Haskell, CEO of PureCycle's parent, Innventure, served as Co-Founder and President of XL TechGroup. The company went public in 2004, amassed a $189.6 million accumulated deficit, and its stock was delisted and cancelled in August 2008.

48.     Moreover, former employees of PetroAlgae, TyraTech and AgCert, have stated that the Innventure management team had been "deceiving" to and perpetuated a "con" upon investors, engaged in "wild ass guessing" with "too aggressive" sales projections, and took companies public prematurely with pitches that were "not credible" and which amounted to a "high stakes poker game."

*49.     In other words, the Innventure executives brought six companies public, drove them all into the ground, and then moved on to number seven—**PureCycle**.*

50.     While telling investors that they had succeeded where scientists and industry experts had all failed, and managed to develop a revolutionary solution to the most challenging problem in the world of plastics recycling, neither the Proxy Statements nor any other Class Period filing revealed that ***not a single member of the PureCycle management team that brought the Company public has relevant experience in polypropylene recycling.***

<u>**Defendants' Exorbitant Compensation**</u>

51.     Despite their troubling lack of experience in polypropylene recycling and checkered history bringing companies public that downward spiraled thereafter, Defendants Otworth and Dee did not need to prove that PureCycle's technology worked before cashing in.  In addition to sizeable salaries, they collectively received

$7,000,000 simply for consummating the SPAC transaction. Per the Form S-4 Roth filed with the SEC on November 20, 2020, Otworth and Dee received $5,000,000 and $3,000,000 respectively for completing the SPAC transaction pursuant to their employment agreements.

52.   Defendant Dee also received 1.2 million in share grants when the SPAC transaction between Roth and PureCycle consummated, worth approximately $17 million as of the close of trading on September 24, 2021, but worth as high as approximately $40 million during the Class Period.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

53.   The Class Period begins on November 16, 2020, when ROCH and PureCycle announced that PureCycle would become a publicly traded company via an agreement and plan of merger with ROCH. Defendants Roth and Otworth are quoted in, and had control over, the contents of the press release.  In the press release, Defendants represented that PureCycle's method to recycle waste polypropylene into virgin-like resin "is both more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy. PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene."

54.   The foregoing statements misled investors because in reality, the technology underlying the process is unproven and presents serious issues even at lab scale, the flammable pressurized process is not yet functional—especially at scale—

and is dangerous, the Company faces obstacles to obtaining the quantity and quality of feedstock it needs to perform its process, the economics of conducting the process at commercial scale are cost prohibitive, and the patent underlying the technology is based on prior discoveries that never reached commercial scale. Moreover, in touting polypropylene recycling process as the purportedly key attribute of the transaction, Defendants misled investors given that the Individual Defendants' primary motivation was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares.

55.     In the November 16, 2020 press release Defendants touted the experience of PureCycle's management team, stating:

> PureCycle is retaining its ***experienced management team***, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has over 23 years of experience leading and ***scaling early-stage companies***. Mr. Brenner was PureCycle's first hire and has led PureCycle's commercial expansion over the last four years. Mr. Dee spent nearly ***three decades*** in public markets, corporate finance, private equity and M&A in senior roles at Morgan Stanley, Temasek Holdings and the Asian Infrastructure Investment Bank.

56.     Defendants also provided a link to a webinar on which Defendants Otworth, Dee, and Brenner presented information regarding the benefits of PureCycle's business metrics and financial prospects, and filed a slide deck they produced for that presentation with the SEC. The slide presentation emphasized the purportedly experienced management team:

**Introducing The Presenters**

57. The foregoing statements willingly flaunting the PureCycle management team's collective experience misled investors because they failed to disclose that the management team bringing PureCycle public had previously brought six other failed businesses public only to have each implode thereafter and had no relevant experience with recycling polypropylene.

58. In the presentation, Defendants Otworth, Dee, and Brenner also highlighted the purported value of the Company's technology and intellectual property rights, stating, in pertinent part that PureCycle's process is, "the only proven and economically-viable method of recycling polypropylene to virgin-quality" and that "no other technologies can efficiently address polypropylene recycling at scale."

59. The foregoing statements misled investors for the reasons stated in ¶ 54.

60. On November 16, 2020, Defendants filed a preliminary proxy statement with the SEC on Schedule 14A, (later amended on February 12, 2021, *see infra*) to

schedule the virtual special meeting of shareholders on March 16, 2021. Defendant Roth signed the Schedule 14A.  The 14A also included the Agreement and Plan of Merger ("Merger Agreement") signed by Defendants Roth and Otworth.  The 14A included a transcript of a video presentation of the proposed transactions, a hyperlink to which was included in a ROCH press release on November 16, 2020.  In the presentation, Defendant Otworth stated, in relevant part:

> And so, as I said, customers can use our resin, they can use it interchangeably with virgin resin, and they can make, you know, the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today.

61.    In the presentation, Defendants Otworth, Dee, and Brenner each once again touted their respective experience.

62.    The foregoing statements in the November 16, 2020 Proxy Statement misled investors for the reasons stated in ¶¶ 54, 57.

63.    On November 20, 2020, ROCH and PureCycle filed a Registration Statement on Form S-4 with the SEC, signed by Defendant Roth. Therein Defendants called PureCycle's technology "proven" to "convert[] waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene." The Registration Statement went on to say, in relevant part, that:

> This patented process was developed by P&G over the course of eight years and has been refined by PCT over the past five years with more than 350 laboratory tests and with over 1,000 pounds of UPRP produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019. In addition, PCT's purification process and UPRP quality have been validated by independent technical consultants and many of PCT's strategic partners and initial customers.

64.   The foregoing statements misled investors for the reasons stated in ¶ 54.

65.   In the Registration Statement, Defendants also touted PureCycle's use of a "broader range of feedstock" to make "virgin-quality UPRP pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products."

66.   The foregoing statements misled investors for the reasons stated in ¶ 54. Moreover, Defendants' statements regarding PureCycle's current use of a "broader range of feedstock" to make virgin quality UPRP pellets misled investors because in reality, its process can only use polypropylene feedstock of high quality and remove less than 5% contamination for the process to be cost efficient, and Defendants further failed to disclose the insufficient volume of, and high competition for, high quality feedstock to currently power PureCycle's recycling process in a cost efficient manner.

67.   On February 12, 2021, ROCH and PureCycle both filed an amended Proxy Statement for Special Meeting of Stockholders of Roth Acquisition with the SEC, signed by Defendant Roth, and which included the Merger Agreement signed by Defendants Roth and Otworth.  Describing the ROCH Board's reasons for approval of the business combination, the Proxy emphasized the following as a significant factor on which the ROCH Board based its decision to recommend the SPAC transaction:

> ***Strong Technology Representing Significant Innovation***: PCT's unique, ***patented process*** separates colors, odors and contaminants through a physical purification process (not involving chemical reactions), ***allowing for a broader range of feedstock than traditional recycling***. *This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists.*

68.     The Proxy Statement also touted that the output of its recycling process, stating that "UPRP is interchangeable with virgin polypropylene…"

69.     The Proxy Statement further stated that the Company's process uses "significantly less energy and reduce[s] production costs as compared to virgin resin."

70.     The foregoing statements in the February 12, 2021 Proxy Statement misled investors for the reasons stated in ¶¶ 54 and 66, and because the primary basis for the ROCH Board to recommend the SPAC transaction was to receive millions in founder's shares for little more than a penny a share on a stock on which they intended to immediately slap a buy rating (as Roth did with numerous fraudulent Chinese reverse mergers previously) to drive the share price up.

71.     Moreover, the Proxy once again flaunted the extensive experience of PureCycle's management team, stating:

> **Strong Management Team:** The ***PCT management team has broad experience across plastics manufacturing, plant development, technology, R&D***, sales, marketing, accounting and finance. PCT Chief Executive Officer Mike Otworth has ***over 23 years' experience leading and scaling early stage companies***, holding multiple senior management positions with a ***proven track record*** of founding and capitalizing startups. Chief Financial Officer Michael Dee was a senior executive at Morgan Stanley and has ***over 30 years of public markets, corporate finance, and M&A experience***. Chief Science Officer John Scott ***holds a dual Ph.D. in Physics and Astrophysics, authored over 60 academic papers***, and was the CEO of the XL TechGroup, the precursor company of Innventure. Chief Commercial Officer David Brenner brings ***over 15 years' experience leading transformational projects in a range of industries*** and was a Senior Manager at Deloitte prior to joining PCT. Director of Technology Jason Vititoe holds two product patents in polystyrene and decades of engineering leadership experience working for Americas Styrenics and Dow Chemical Company. Senior Director of Operations Chris Talarek has over 20 years of operations leadership at BP Oil, P&G, and Timbertech. Combined, the PCT executive team has over

100 years' experience leading operations and over 70 years operating equipment.

72.     The foregoing statements misled investors for the reasons stated in ¶ 57.

73.     On April 21, 2021, a month after PureCycle announced that ROCH's shareholders had approved the PureCycle reverse merger with ROCH at a special meeting held on March 16, 2021, PureCycle issued a press release entitled "PureCycle's Tasmin Ettefagh facilitates plastics industry dialogue about polypropylene recycling solutions in light of U.S. Plastics Pact: Ultra-pure recycle polypropylene manufacturer CSO drives narrative."[3] In this press release, Defendant Ettefagh stated "PureCycle is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts." The press release further stated that its technology can "recycle waste PP into virgin-like recycled PP for a myriad of applications."

74.     The foregoing statements misled investors for the reasons stated in ¶ 54.

## **THE TRUTH EMERGES**

75.     Before the markets opened on May 6, 2021, analyst Hindenburg Research published a scathing report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street" (the "Report"). Hindenburg made clear in the Report that, "To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained

---

[3] *See* https://ir.purecycletech.com/news-events/press-releases/detail/9/purecycles-tamsin-ettefagh-facilitates-plastics-industry (last visited May 7, 2021).

from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer." As of the date of the Report's publication, Hindenburg was the only market participant that conducted the analysis contained therein.  Moreover, in the "About us" page on its website, Hindenburg describes its process as, "uncovering hard-to-find information from atypical sources."

76.     In the Report, Hindenburg stated that: (1) Hindenburg "spoke with multiple former employees of" Defendant Otworth's and other PureCycle executives' former companies "who said PureCycle's executives based their financial projections on 'wild ass guessing,' brought companies public far too early, and had "con[ned]" and deceived investors;" (2) unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process;" (3) "multiple competitors and industry experts . . . explained that PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question;" (4) "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art;" (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale;" and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich

themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

77.     Specifically, regarding feedstock, the Report revealed that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." Indeed, in a November 2020 interview, P&G's inventor of the technology was asked about this potential bottleneck. He said: "I think the fact that you have to ensure you have feedstock coming in and I think that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running."

78.     Hindenburg also spoke with Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers. The Report quotes Mr. Saunders as stating that:

> [t]he problem I see with chemical recycling – and I'm not an expert in this process but I am an expert in PP raw materials – there is not enough non-contaminated PP scrap to support these processes. So you're going to get a wide range of materials that have varying degrees of other resin contamination." He added that "[a]nd what's stated publicly by PureCycle themselves is that the facility works well up to 5 percent contamination. I've been buying PP scrap for 30 years and I'm not aware of any PP scrap in volume that has any less than 5% contamination in the world.

79.     Hindenburg also spoke with Richard Minges, a 10-year executive for Custom Polymers, who stated "it's more about the raw materials that can be secured." He continued that PureCycle is:

> stating that they're going to sell their resin for as much as $2 a pound, which is a huge premium. And the people that we have that are paying premium right now is because they only need a small amount and it's a

marketing ploy and they want it secured. And if I go back to these same people and tell them I have a 10x as much and the price is going up to $2 then I don't know a single one who would pay.

80.   Hindenburg also wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that "PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale."

81.   Regarding the actual process, Hindenburg revealed that it consulted with a "30 year expert in polymers," who stated that "[t]here is no mention of the needed actual testing of the final product. It is indirect and vague. The hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience." The same expert stated, according to Hindenburg, that "[w]hile the n-butane & propane blends for solvent, heated and pressurized may extract a slightly higher concentration of PP per cycle pass than carbon dioxide and n-butane, it is still apparently very low. PureCycle doesn't disclose what these values are in the scaled-up testing." He concluded: "[t]he permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. I don't think the process could ever be cost efficient. The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough." Hindenburg further detailed that PureCycle's licensed technology presented issues at "lab scale," rendering larger scale development as even more problematic.

82.     Hindenburg also tracked how Defendant Otworth and three other senior executives, Bill Haskell, Rick Brenner, and John Scott, have taken at least 6 companies public. Hindenburg wrote: "[a]ll have failed. . . . Of the 6 companies taken public by PureCycle Senior Executives, 2 went bankrupt, 3 were delisted, and 1 was acquired following a ~95% decline. Over $760 million in public shareholder capital was incinerated in the process."  Hindenburg interviewed former employees of these companies who revealed that the PureCycle management team had duped investors with regarding to these failed companies, stating, "they did con" (in the case of PetroAlgae,  the executives duped investors into the hype of algae biofuels during the biofuel boom), brought companies public too early, engaged in "wild ass guessing" (AgCert), and went to market with a dossier that "was not credible" (TyraTech).

83.     On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. This represents a one-day drop of approximately 40% on unusually heavy trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

84.     PureCycle's May 6, 2021 press release, issued in response to the Report, fails to challenge, much less negate, *any* of the Report's specific underlying factual allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders."

85.     Then, on November 10, 2021 after the market closed, Defendants revealed in PureCycle's 10-Q for the quarter ended September 30, 2021, that on September 30, 2021 the SEC issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company."   Defendants explained that, "the investigation pertains to, among other things, statements made in connection with PCT's technology, financial projections, key supply agreements, and management." On this news, further validating the claims in the Hindenburg report, PureCycle's stock fell from its November 10, 2021 closing price of $11.50 per share to a November 11, 2021 closing price of $9.79 per share (trading as low as $8.77 intraday) representing a one-day drop of approximately 15% per share on unusually high trading volume of over 6 million shares, or more than 9.4 times the average volume over the preceding ten trading days.

## ADDITIONAL SCIENTER ALLEGATIONS

86.     PureCycle's *only business* is to commercialize a process for recycling polypropylene.  From inception and throughout the Class Period, it produced nothing and earned no revenue.  Each of the Individual Defendants therefore had undivided focus on the development of, and impediments to successfully commercializing the polypropylene recycling process.

87.     Defendants Otworth, Dee and Brenner each had actual knowledge of their own experience prior to taking PureCycle public via the SPAC transaction and therefore knew that they had no relevant experience with polypropylene recycling and

had a deleterious track record of taking six other companies public and thereafter driving them into the ground.

88.     Despite their troubling lack of experience in polypropylene recycling and checkered history bringing companies public that downward spiraled thereafter, Defendants Otworth and Dee did not need to prove that PureCycle's technology worked before cashing in.  In addition to sizeable salaries, they collectively received $7,000,000 simply for consummating the SPAC transaction. Per the Form S-4 Roth filed with the SEC on November 20, 2020, Otworth and Dee received $5,000,000 and $3,000,000 respectively for completing the SPAC transaction pursuant to their employment agreements.

89.     Defendant Dee also received 1.2 million in share grants when the SPAC transaction between Roth and PureCycle consummated, worth approximately $17 million as of the close of trading on September 24, 2021, but worth as high as approximately $40 million during the Class Period.

90.     The Merger Agreement signed by Defendants Roth and Otworth, Section 5.2 in particular, makes clear that ROCH, and therefore Roth, had "Access to Information," including to the personnel, books, records, properties, financial statements, internal and external audit reports, regulatory reports, Contracts, Permits, commitments and any other reasonably requested documents and other information of [PureCycle]," when Roth issued his misstatements.

91.     Moreover, in the November 16, 2020 press release, Roth is quoted as stating, "***We searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks.***" Defendant Roth could not have made any assessment of whether PureCycle constituted a "compelling growth company" without substantial due diligence into its only "product"—the polypropylene recycling process.  As part of that diligence, Defendant Roth would have had access to material information contradicting his public statements.

92.     Additionally, the PureCycle transaction is not the first company Defendant Roth took public only to immediately slap a "buy" rating on the stock through Roth Capital's own research division to inflate the value of Roth Capital's "founder's shares."   Prior to effectuating the PureCycle SPAC reverse merger, Defendant Roth facilitated numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion.   Defendant Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division, as he did here.   Defendant Roth's FINRA BrokerCheck report shows 16 regulatory sanctions and 12 arbitrations, including two violations of Regulation M, enacted to prevent market manipulation. Roth Capital and Craig-Hallum are the only two investment banks covering PureCycle, despite sponsoring the deal, and put "buy" ratings on the Company.

93.     Roth Capital, along with Craig-Hallum (the sole underwriters in the IPO), received approximately 2 million "founders" shares for a little more than a penny per share, worth approximately $48 million *the day before the Report was issued*, an amount they never would have collected had the SPAC transaction not consummated or had the market known the truth regarding PureCycle's recycling process.

## CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all investors who purchased or otherwise acquired PureCycle Technologies, Inc. ("PureCycle" or the "Company") (formerly known as Roth CH Acquisition I Co. ("Roth Acquisition") securities between November 16, 2020 and May 5, 2021, inclusive, and who were damaged thereby ("Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants have or had a controlling interest.

95.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of PureCycle stock were publicly traded

during the Class Period on the NASDAQ stock exchange. Record owners and other members of the Class may be identified from records maintained by PureCycle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.   Whether Defendants violated the Exchange Act;

b.   Whether Defendants omitted and/or misrepresented material facts;

c.   Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.   Whether the price of the Company's stock was artificially inflated; and

f.   The extent of damage sustained by Class members and the appropriate measure of damages.

97.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

98.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

99.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRESUMPTION OF RELIANCE

100.   Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for PureCycle securities was an efficient market at all relevant times by virtue of the following factors, among others:

a.   the Company filed periodic public reports with the SEC;

b.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

c.   The omissions and misrepresentations were material;

d.   PureCycle securities met the requirements for listing and were listed and actively traded on NASDAQ, a highly efficient market;

e.   PureCycle regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.   PureCycle was followed by securities analysts employed by brokerage firms who wrote reports which were distributed, publicly available, and entered the public marketplace;

g.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock;

h.   Plaintiffs and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants; and

i.   Plaintiffs and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

101.   As a result of the foregoing, the market for PureCycle securities promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the securities. Under these

circumstances, all those who transacted in PureCycle securities during the Class Period suffered similar injury through their transactions in PureCycle securities at artificially inflated prices and a presumption of reliance applies.

102.   Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members purchased or acquired PureCycle securities between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiffs and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for PureCycle securities and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

103.   Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## NO SAFE HARBOR

104.   The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

105.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION AND ECONOMIC LOSS

106.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of PureCycle publicly traded securities and operated as a fraud or deceit on purchasers of PureCycle publicly traded securities. As detailed above, when the truth about PureCycle's misconduct was revealed, the value of PureCycle publicly traded securities declined precipitously as the prior artificial inflation no longer propped up the price of the securities. The decline in the price of PureCycle publicly traded securities was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of PureCycle publicly traded securities and the subsequent significant decline in the value of PureCycle publicly traded securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

107.   At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiffs and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of

PureCycle's business, operations, and financial results as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of PureCycle publicly traded securities to be artificially inflated. Plaintiffs and other Class members purchased PureCycle publicly traded securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

108.   On May 6, 2021, Hindenburg Research issued its report as detailed herein. The authors made clear that, "To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the stock covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer."  Moreover, on its website Hindenburg describes its process as "uncovering hard-to-find information from atypical sources."

109.   Upon the publication of the Report, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. This represents a one-day drop of approximately 40%.

110.   These revelations contradicted statements and/or revealed omissions made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

## Count One

### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

111.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

112.  During the Class Period, Defendant PureCycle and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

113.  Defendant PureCycle and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

114.  Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiffs and the Class would not have purchased the Company's common

stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## Count Two

### Violation of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

115.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

116.   The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## Count Three

### Violation of § 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against All Defendants)

117.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

118.   This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

119.   This claim is brought against all Defendants pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9), on behalf of all shareholders of PureCycle who held shares of Roth CH Acquisition I Corp. common stock as of November 16, 2020 or February 12, 2021 and were entitled to vote at the special meeting of stockholders held on March 16, 2021.

120.   Defendants' statements issued to solicit shareholder approval of the agreement and plan of merger dated November 16, 2020 by and among Roth Acquisition I Co., Roth CH Acquisition I Co. Parent Corp., Roth CH Merger Sub Corp., Roth CH Merger Sub LLC, and PureCycle Technologies LLC ("Merger Agreement"), including the November 16, 2020 and February 12, 2021 Proxy Statements and the documents incorporated therein, contained statements that, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

121.   Defendants named in this Count were required to, but did not accurately, update these statements between dissemination of these documents and the shareholder vote on March 16, 2021.

122.    Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and other proxy solicitation materials.

123.    By means of the Proxy Statement and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants sought to secure Plaintiffs' and other Class members' approval of the Merger Agreement and solicited proxies from Plaintiffs and other members of the Class.

124.    Each Defendant named in this Count acted negligently in making inaccurate statements of material facts, and/or omitting material facts required to be stated in order to make those statements not misleading. Defendants were required to ensure that the November 16, 2020 and February 12, 2021 Proxy Statements and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. These Defendants also acted negligently in failing to update the November 16, 2020 and February 12, 2021 Proxy Statements.

125.    The solicitations described herein were essential links in the accomplishment of the Merger Agreement.

126.    Plaintiffs and other members of the Class eligible to vote on the Merger Agreement, were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make  a fully informed decision in voting on the Merger Agreement and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

127.    The false and misleading statements and omissions in the November 16, 2020 and February 12, 2021 Proxy Statements and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger Agreement. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the November 16, 2020 and February 12, 2021 Proxy Statements, additional proxy solicitation materials, and in other information reasonably available to stockholders.

128.    The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

129.    This claim is brought within the applicable statute of limitations.

130.    By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a 9 promulgated thereunder, 17 C.F.R. § 240.14a 9.

## Count Four

### Violation of § 20(a) of the Exchange Act in Connection with the Proxy Claims
### (Against the Individual Defendants)

131.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except the allegations in those subsections specified to relate solely to Plaintiffs' claims under Section 10(b) and 20(a) of the Exchange Act.

132. This claim does not sound in fraud. For the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

133. This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

134. The Individual Defendants acted as controlling persons of ROCH and PureCycle within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of ROCH and PureCycle, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Companies' reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and  had the ability to prevent the issuance of the statements or cause the statements to be corrected.

135. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of ROCH and PureCycle and, therefore, had the power to control or influence the particular transaction giving rise to the securities

violations as alleged herein, and exercised the same. Defendant Roth also signed the November 16, 2020 and February 12, 2021 Proxy Statements and the Individual Defendants all solicited approval of the Merger Agreement.

136.   As set forth above, Defendants each violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

137.   The solicitations described herein were essential links in the accomplishment of the Merger Agreement. Plaintiffs and other members of the Class eligible to vote on the Merger Agreement were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the Merger Agreement and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

138.   The false and misleading statements and omissions in the November 16, 2020 and February 12, 2021 Proxy Statements and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger Agreement. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of

information made available in the November 16, 2020 and February 12, 2021 Proxy Statements, additional proxy solicitation materials, and in other information reasonably available to stockholders.

139.   The untrue statements and omissions as set forth above proximately caused foreseeable losses to Plaintiffs and other members of the Class.

140.   This claim is brought within the applicable statute of limitations.

141.   By reason of the foregoing, the Individual Defendants violated Section 20(a) of the  Exchange Act, 15 U.S.C. § 78t(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

(a)   determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiffs as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs' counsel as Lead Counsel;

(b)   awarding compensatory and punitive damages in favor of Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)   awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(a)    awarding Plaintiffs and the other Class members such other relief as this

Court may deem just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.


Dated: August 18, 2022                    Respectfully submitted,


                                          **POMERANTZ LLP**

                                          By: /s/ *Tamar A. Weinrib*
                                          Tamar A. Weinrib (admitted *pro hac vice*)
                                          600 Third Avenue, 20th Floor
                                          New York, NY 10016
                                          Telephone: (646) 581-9973
                                          Facsimile: (917) 463-1044
                                          taweinrib@pomlaw.com

                                          *Lead Counsel for Plaintiffs*