**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLIAM C. THEODORE,
individually and on behalf of all
others similarly situated,

      Plaintiffs,                         Case No. 6:21-cv-00809-PGB-DAB

      v.

PURECYCLE TECHNOLOGIES, INC.,
MICHAEL OTWORTH, MICHAEL E.
DEE, DAVID BRENNER, BYRON
ROTH and TASMIN ETTEFAGH,

      Defendants.

_____/

**MOTION OF DEFENDANT BYRON ROTH TO STRIKE ALLEGATIONS**
**IN THE CONSOLIDATED SECOND AMENDED COMPLAINT AND**
**INCORPORATED MEMORANDUM OF LAW**

Pursuant to Fed. R. Civ. P. 12(f) ("Rule 12(f)"), defendant Byron Roth

("Mr. Roth") hereby moves this Court to strike (the "Motion") certain allegations

asserted by co-lead plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs") in

their Consolidated Second Amended Complaint ("SAC").  The Motion is supported

by the attached Exhibit A.

**I.**      **PRELIMINARY STATEMENT**

In this securities fraud case involving PureCycle Technologies, Inc.

("PureCycle"), the Court dismissed Plaintiffs' Consolidated Amended Class Action

Complaint ("CAC") for failure to meet Rule 9(b)'s heightened pleading standards

and for "fail[ing] to meeting the high pleading standard for scienter."  (Dkt. 112 at

30.)  Rather than address those deficiencies, Plaintiffs attempt to bolster their

meritless allegations against Mr. Roth (who is neither an officer nor a director of

1

LA 52694180

PureCycle) by gratuitously maligning his character, and citing to irrelevant and decades-old unrelated transactions.  As such, and pursuant to Rule 12(f), Mr. Roth respectfully requests that the Court strike such improper allegations.

## II.    ALLEGATIONS OF THE COMPLAINT

Plaintiffs bring suit on behalf of a putative class of investors in PureCycle who were allegedly misled by statements that PureCycle made about its hopes for monetizing a license to a unique and patented recycling technology.  (SAC ¶¶ 1, 3, 4, 14, 85.)  Plaintiffs allege that PureCycle's predecessor was Roth CH Acquisition I Co. ("ROCH"), a publicly traded special purpose acquisition company formed in 2019 "for the express purpose of effecting a merger, stock, exchange, acquisition, reorganization, or similar business combination with one or more businesses."  (*Id.* ¶ 2.)  Although Mr. Roth was the Chairman and CEO of ROCH prior to its merger with PureCycle, Plaintiffs do *not* allege that Mr. Roth had or has any management involvement with PureCycle after the merger closed on March 17, 2021 (and indeed, he does not).  (*See id.* ¶¶ 22, 26.)  The SAC, like the CAC, does not name ROCH as a defendant.

Instead, Plaintiffs' allegations in the SAC relevant to Mr. Roth focus on irrelevant, unrelated transactions that Roth Capital Partners, LLC (referred to simply as Roth Capital in the SAC) was allegedly involved in decades ago.  (*See id.* ¶¶ 2, 34, 70, 92.)  Specifically, Plaintiffs allege that Mr. Roth was "a notoriously key figure in the Chinese reverse merger scandals that abounded between 2003 and 2012" (*id.* ¶ 2) because he "facilitate[ed] numerous suspect reverse mergers involving Chinese

2

companies" that "had wildly misstated their operations, profits, and assets in disclosures to U.S. investors" (*id.* ¶ 34). Although the SAC does not allege that *Mr. Roth* had any involvement in or knowledge of these misstatements, Plaintiffs allege that Mr. Roth "slapped glowing 'Buy' ratings" on the stocks of those Chinese companies through Roth Capital to "drive the price up, and then cash out" before the stocks later went public and plummeted in value. (*Id.* ¶ 34; *see also id.* ¶ 92.) Plaintiffs further allege that Mr. Roth's involvement in the Chinese scandals was featured in a documentary discussed in *Vanity Fair*. (*See id.* ¶ 34; Mot. Ex. A (*Vanity Fair* article).) However, nowhere in the *Vanity Fair* article does it mention Mr. Roth or Roth Capital.

More troubling, Plaintiffs continue to conflate Mr. Roth with Roth Capital in alleging that Mr. Roth's "FINRA BrokerCheck report currently shows 16 regulatory sanctions and 12 arbitrations." (*Id.* ¶ 70, *see also id.* ¶ 92.) Not only is this allegation utterly irrelevant to Plaintiffs' claims, but it is demonstrably false and misleading. Mr. Roth's individual FINRA BrokerCheck report lists <u>zero</u> disclosures. *See* BrokerCheck by FINRA, https://brokercheck.finra.org/individual/summary/1768553 (last visited Sep. 9, 2022). Moreover, the FINRA BrokerCheck report for Roth Capital shows that 9 of the 12 arbitrations date back to the 1990s, the most recent arbitration dates back to 2005, and none of the arbitrations or regulatory matters are alleged to involve the Chinese reverse mergers discussed above (and indeed no such allegation could be made). Moreover, as clearly disclosed in the Roth Capital FINRA BrokerCheck

3

LA 52694180

report, the regulatory matters were made without any admission of liability.  *See*

BrokerCheck by FINRA at 19-50 (regulatory matters), 51-57 (arbitrations),

https://files.brokercheck.finra.org/firm/firm_15407.pdf (last visited Sep. 13, 2022).

Plaintiffs' brazen attempt to mislead this Court by suggesting the arbitrations and

regulatory matters are related to the China reverse mergers and by extension, to the

present dispute, must be rejected with all such allegations stricken from the SAC.

Accordingly, Mr. Roth respectfully requests that the Court grant the Motion

and strike the following bolded allegations in the SAC:

| Table of Allegations Regarding Mr. Roth | |
| --- | --- |
| PureCycle's predecessor, Roth CH Acquisition I Co. ("ROCH"), was a publicly traded blank-check special purpose acquisition company ("SPAC") formed in 2019 for the express purpose of effecting a merger, stock exchange, acquisition, reorganization, or similar business combination with one or more businesses. As a SPAC in search of a business to acquire, ROCH had no ongoing business operations. Its sole underwriters were Roth Capital and Craig-Hallum Capital. Byron Roth**, a notoriously key figure in the Chinese reverse merger scandals that abounded between 2003 and 2012,** is the Chairman and CEO of both ROCH and Roth Capital**.** ROCH acquired PureCycle via a "de-SPAC"[1] transaction, a type of reverse merger. | SAC ¶ 2 (emphasis added) |
| **Prior to taking on SPAC mergers, Defendant Roth was well known for his role in facilitating numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion for China-based clients from 2003 to 2012. Indeed, Defendant Roth was featured in a documentary called, "The China Hustle," detailing the nearly decades-long Chinese reverse merger scandal, which *Vanity Fair* called "the biggest financial scandal you've never heard of." Defendant Roth regularly took Chinese companies public via reverse merger and then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division. Unbeknownst to the market, these Chinese companies had wildly misstated their operations, profits, and assets in disclosures to U.S. investors. Roth would collect fees for bringing these companies public and then Roth Capital would hype the Chinese reverse merger stocks to its investors, drive the price up, and then cash out. The stocks of these companies that Roth brought public and touted,** | SAC ¶ 34 (emphasis added) |

LA 52694180

| | |
|---|---|
| **plummeted in value, with many delisted. Unwary investors suffered monumental losses. Roth's FINRA BrokerCheck report currently shows 16 regulatory sanctions and 12 arbitrations, including two violations of the Securities and Exchange Act of 1934 Regulation M, enacted to prevent market manipulation.** | |
| The foregoing statements in the February 12, 2021 Proxy Statement misled investors for the reasons stated in ¶¶ 54 and 66, and because the primary basis for the ROCH Board to recommend the SPAC transaction was to receive millions in founder's shares for little more than a penny a share on a stock on which they intended to immediately slap a buy rating (**as Roth did with numerous fraudulent Chinese reverse mergers previously)** to drive the share price up. | SAC ¶ 70 (emphasis added) |
| **Additionally, the PureCycle transaction is not the first company Defendant Roth took public only to immediately slap a "buy" rating on the stock through Roth Capital's own research division to inflate the value of Roth Capital's "founder's shares." Prior to effectuating the PureCycle SPAC reverse merger, Defendant Roth facilitated numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion. Defendant Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division, as he did here. Defendant Roth's FINRA BrokerCheck report shows 16 regulatory sanctions and 12 arbitrations, including two violations of Regulation M, enacted to prevent market manipulation.**[1] | SAC ¶ 92 (emphasis added) |

### III.    ARGUMENT

**A.    Legal Standard**

District courts have the authority to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f); *see also Arthurs v. Glob. TPA LLC*, No. 614CV1209ORL40TBS, 2015 WL 13652716, at *1 (M.D. Fla. Feb. 6, 2015) ("Parties employ motions to strike to clean up the pleadings, streamline litigation, and avoid unnecessary forays into

---

[1] Regulation M is not at issue in *any* respect in the SAC.

5

immaterial matters" (internal quotation marks omitted)); *Nguyen v. CTS Elecs. Mfg. Sols. Inc.*, 301 F.R.D. 337, 342 (N.D. Cal. 2014) ("Redundant matter is defined as including a needless repetition of allegations."); *Holmes v. Elec. Document Processing, Inc.*, 966 F. Supp. 2d 925, 938 (N.D. Cal. 2013) ("Scandalous material has been defined as allegations that cast a cruelly derogatory light on a party or person. [Citation.] Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded" (internal quotation marks omitted)).

"In evaluating a motion to strike, the court must treat all well-pleaded facts as admitted and cannot consider matters beyond the pleadings." *Gesell v. K-Mart Corp.*, No. 2:11-CV-130-FTM-36, 2011 WL 3628878, at *1 (M.D. Fla. Aug. 3, 2011), *report and recommendation adopted*, No. 2:11-CV-00130-FTM-36, 2011 WL 3628871 (M.D. Fla. Aug. 18, 2011). "The Court has broad discretion when considering a motion to strike." *Guarantee Ins. Co. v. Brand Mgmt. Serv., Inc.*, No. 12-61670-CIV, 2013 WL 4496510, at *2 (S.D. Fla. Aug. 22, 2013). A pleading allegation can be stricken if "the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Guididas v. Cmty. Nat'l Bank Corp.*, No. 8:11-CV-2545-T-30TBM, 2013 WL 230243, at *1 (M.D. Fla. Jan. 22, 2013); *see also Arias-Zeballos v. Tan*, No. 06 CIV. 1268 (GEL), 2006 WL 3075528, at *10 (S.D.N.Y. Oct. 26, 2006) (striking allegations that "have no conceivable relationship to the merits of any of the claims or counterclaims").

6

LA 52694180

**B.    The Court Should Strike Allegations Concerning Mr. Roth and the Chinese Scandals and FINRA BrokerCheck Report.**

The Court should strike allegations in the SAC concerning Mr. Roth and the Chinese reverse mergers from over ten years ago (*see* SAC ¶¶ 2, 34, 70, 92) and the FINRA BrokerCheck Report (*see id.* ¶¶ 34, 92), as specified in bold font in the table above, which collects the SAC's allegations at issue in this Motion (*see* infra II).  The Court should grant the Motion because such allegations are "redundant, immaterial, impertinent, [and/]or scandalous matter[s]."  Fed. R. Civ. P. 12(f).

Specifically, the Chinese reverse mergers involved irrelevant, unrelated transactions—having nothing to do with PureCycle—that occurred over a decade ago and the SAC does not allege that *Mr. Roth* personally had any involvement in or knowledge of "these Chinese companies['s][]wildly misstated [] operations, profits, and assets in disclosures to U.S. investors."  (SAC ¶ 34); *see Shinde v. Nithyananda Found.*, No. EDCV 13-0363 JGB SPX, 2013 WL 1953707, at *7-*8 (C.D. Cal. May 10, 2013) (striking allegations that reference an earlier (separate) action involving a different plaintiff but the same defendants and similar fraud allegations because such allegations were redundant and unduly prejudicial); *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 665 (7th Cir. 1992) (affirming district court's decision to strike scandalous allegations, which were devoid of any factual basis, that milk distributor intentionally caused or allowed to continue the outbreak of salmonella in order to consummate fraudulent scheme against route drivers).  The FINRA BrokerCheck report also does not disclose *any* misconduct by Mr. Roth.

7

Accordingly, the aforementioned allegations should be stricken because they cause serious risk of prejudice to Mr. Roth by confusing the issues, imposing a burden on Mr. Roth to respond to numerous irrelevant and prejudicial allegations, and making it likely that a fact finder will draw unwarranted inferences against Mr. Roth, especially on the issue of scienter.  *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) (affirming district court's decision to strike certain counterclaim allegations regarding an earlier action where the allegations "created serious risks of prejudice . . ., delay, and confusion of the issues," "did not involve the parties to the [instant action]," "consisted of stale and barred charges that had already been extensively litigated and would have been burdensome for [the defendant] to answer," and had a "strong likelihood . . . lead[ing] to unwarranted and prejudicial inferences against [defendant]").

Based on the foregoing, the Court should strike Plaintiffs' allegations (*see* SAC ¶¶ 2, 34, 70, 92)—specified in bold text in the table above (*see* infra II)—as "redundant, immaterial, impertinent, [and/]or scandalous matter."  Fed. R. Civ. P. 12(f).

## IV.    CONCLUSION

For the foregoing reasons, Mr. Roth respectfully requests that this Motion be granted in its entirety.

8

## Local Rule 3.01(g) Certification

Undersigned counsel hereby certifies that, on September 12, 2022, counsel for Mr. Roth conferred with counsel for Plaintiffs, via email, regarding this Motion. Despite their good faith efforts to resolve the Motion, counsel for Plaintiffs indicated that Plaintiffs oppose the Motion.

Dated:  September 15, 2022

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

By:     /s/ *Brian C. Frontino*
                Brian C. Frontino

Brian C. Frontino (Fla. Bar No. 95200)
200 South Biscayne Boulevard, Suite 3100
Miami, Florida 33131
Telephone:  (305) 358-9900
Email: bfrontino@stroock.com

John R. Loftus (admitted *pro hac vice*)
Christine E. Ellice (admitted *pro hac vice*)
2029 Century Park East, Suite 1800
Los Angeles, California 90067
Telephone:  (310) 556-5800
Email: jloftus@stroock.com
             cellice@stroock.com

*Attorneys for Defendant Byron Roth*

9

LA 52694180

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2022, a copy of the foregoing was filed electronically with the Clerk of the Court by using the CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

/s/ *Brian C. Frontino*
Brian C. Frontino

LA 52694180

# EXHIBIT A

SCAM ARTISTS

# *The China Hustle* Unveils the Biggest Financial Scandal You've Never Heard Of

"There are no good guys in this story," says the doc's protagonist, Dan David. "Including me."

BY NICOLE SPERLING

MARCH 28, 2018



COURTESY OF MAGNOLIA PICTURES

an David, co-founder of GeoInvesting, is the first voice you hear in **Jed Rothstein's** new documentary *The China Hustle.* He's trying to define capitalism in modern terms. He's questioning the motives of industry titans. But most importantly, he's admitting his complicity in

D taking advantage of ignorant investors and fallible investment systems. "There are no good guys in this story," he says. "Including me."

David is as much of a protagonist as we get in *The China Hustle,* the Magnolia Pictures documentary that bows Friday offering an eye-opening look into an international scam that affected millions of people—though virtually no one's ever heard of it. It took place primarily after U.S. markets crashed in 2008 and continued until 2012, skimming some $14 billion from Americans' public pensions. This wasn't the plotting of an evil mastermind, but the machinations of a system with a faulty line of checks and balances—and a group that found a loophole that allowed them to make astounding amounts of money with little oversight.

The scam centers on a segment of third-tier investment banks that sought out Chinese companies —many commodity players that made paper, fertilizer, and various other goods. These companies wanted to trade on U.S. exchanges, but were not permitted to do so directly. That's when the banks came in, setting up "reverse mergers" with defunct American companies that still carry a symbol on the stock exchange. With little to no oversight, these companies could then begin trading in the U.S.—and offer American investors a direct way into the China gold rush.

That all came crashing to a halt when a group of investors noticed that the profits these Chinese companies claimed were completely fabricated. The investors started short selling, profiting off the companies' eventual downfalls even as they provided evidence of the fraud, specifically video footage of rundown factories with little activity pretending to be massive conglomerates. The contrast between their claims and what they actually produced—as seen in Rothstein's documentary—was staggering.

*Vanity Fair* sat down with the filmmaker to discuss the movie, the challenges of turning complicated accounting structures into riveting storytelling, and the one former presidential candidate who walked out on him.



**WATCH**
**The Truth About China**

*Vanity Fair*: **How did Dan David become your way into this story?**

---

Get 1 year for just ~~$29.99~~ $15 + a free tote.
Get 1 year for just ~~$29.99~~ $15 + a free tote.

**Subscribe Now ▸**

---

*Jed Rothstein*: I had a real heart-to-heart with him about his role, and his background. A lot of people in finance are by nature sort of bottom-line people, just adding up the dollars and cents. Dan, I believe, has a moral dimension to what he does. And that was attractive to me from a storytelling standpoint. It's more accessible to follow someone who is doing something that has to do with fairness. He just didn't like being lied to. I was attracted to his drive to expose that problem and to look at the financial industry through this one scandal, and ask the broader question: can we have a financial system that is based on fair play?

**When you're making a doc about complex financial issues, what are the best tools to use?**

One is understanding what is taking place, and describing it in the simplest way that is also accurate. Two is slimming down the number of people that you're talking about. A repetition of the players involved is helpful. It's complicated stuff, and I think complexity is part of the opacity, which is part of the problem.

**Did you wish you had a clearer villain in this piece, rather than the blame being spread around as it is?**

The system is set up to allow this to happen. Some of the people in the film may not be sending me Christmas cards, but to blame one person is foolish. The fraudulent filings (from the Chinese companies) were illegal here, but not illegal in China. To me, now, especially as we see the Trump administration's desire to roll back regulations that would protect consumers in financial markets, I think it's a mistake. I'm not a financial regulator, but can't we demand a capitalist system with some degree of fairness?

**Tell me a bit about the risks the crews took to grab the footage of the companies in China. We see the two-year imprisonment of one of the investigators for his snooping. Were your crews ever in danger?**

Gathering information on these companies is, in many cases, not legal. So they had to do it from afar.

**What part is illegal?**

Criticizing companies can be illegal, depending on how you do it. For example, when we wanted them to film one of the companies, it was within this exclusion zone where they couldn't fly drones for weeks because there was a Party Congress going on. So they got it [through other means]. These guys often set up time-lapse surveillance. They also did profiling, where they would approach the factories directly and talk to the employees.

**So were these companies all doing *some* business, just at much lower levels than what was being reported?**

In some cases. And in some cases, they were really not doing much business at all. For some of them, the chairman would raid the bank account as his personal piggy bank. Or in some cases, sell the shares twice—sell the same parts of the company to different entities.

**Let's talk about retired general Wesley Clark, who walks out of your interview. What did you ask him that upset him so much?**

Clark was the chairman of one of these banks that was near the head of the pack. He was explaining his whole side of it, and then, in the course of explaining that, he decided that he didn't want to do it anymore and he left. I wish it were somebody I had less respect for, but I do think that company was problematic.

**This movie felt to me like a preamble for a bigger crisis that could come down the pike at any time. You reference the Chinese company Alibaba and Trump's calls for deregulation, but you stop there. What do you think will happen?**

A lot of the problems that allowed this gap between where the money can flow and how we regulate it have not been solved. I think the specific problem of these smaller mergers is probably exhausted. But there is a fear, in terms of what could be around the corner as our economies become more integrated. And Internet companies are more opaque. There are financial structures that are potentially problematic. And all of that is only exacerbated by this impending trade conflict we seem to be heading toward.

# Donald Trump Versus the Wind