**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLIAM C. THEODORE,
individually and on behalf of all
others similarly situated,

       Plaintiffs,                         Case No. 6:21-cv-00809-PGB-DAB

      v.

PCT TECHNOLOGIES, INC.,
MICHAEL OTWORTH, MICHAEL E.
DEE, DAVID BRENNER, BYRON
ROTH and TASMIN ETTEFAGH,

       Defendants.

_____/

## MOTION OF DEFENDANT BYRON ROTH TO DISMISS THE CONSOLIDATED SECOND AMENDED COMPLAINT

Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), defendant Byron Roth ("Mr. Roth") hereby moves this Court for an order dismissing the Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 113 ("SAC")) filed by co-lead plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs") in its entirety, and submits the following memorandum of law in support thereof.

## I.    PRELIMINARY STATEMENT

On August 4, 2022, this Court dismissed Plaintiffs' Consolidated Amended Class Action Complaint ("CAC"), finding that the CAC "fail[s] to precisely plead what statements or omissions were made in which documents or oral representations" in violation of Rule 9(b) pleading standards necessary for a securities fraud claim and also "fails to meet the high pleading standard for scienter."

(ECF No. 112 ("Order") at 30.) The SAC fails to remedy the defects in the CAC and, like its predecessor, must be dismissed.

The SAC, like the CAC, purports to bring a "securities *fraud* class action" (SAC ¶ 1; CAC ¶ 1 (emphasis added)) on behalf of all investors who acquired PureCycle Technologies, Inc. ("PCT") securities between November 16, 2020, and November 10, 2021, inclusive (the "Class Period") for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). Instead of addressing the deficiencies of the CAC, Plaintiffs attempt to bolster their meritless allegations against Mr. Roth by gratuitously maligning his character, citing to irrelevant, unrelated, and decades-old transactions, and misrepresenting the viability of PCT's technology and the results of an investigative subpoena issued by the SEC. But baseless invective is no substitute for well-pleaded allegations of falsity or scienter. Indeed, Plaintiffs' Section 10(b) claims still fail because Plaintiffs fail to allege with particularity how any statements or omissions by Mr. Roth were materially false or misleading and fail to sufficiently allege scienter against Mr. Roth. And because Plaintiffs fail to state a primary violation under Section 10(b), Plaintiffs' Section 20(a) also fails as a matter of law.

Plaintiffs have also constructed a new theory of liability and now add purported *negligence*-based claims for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9. Plaintiffs' new claims still sound in fraud and must be dismissed for the same reasons the CAC was dismissed. The SAC must therefore be dismissed in its entirety.

## II.    BACKGROUND

### A.    The Parties

Founded in 2015, PCT is developing a plastic purification recycling technology originally developed and patented by The Procter & Gamble Company ("P&G"). (SAC ¶ 3.) The technology recycles waste polypropylene into resin, referred to as ultra-pure recycled polypropylene ("UPRP"). (*Id.* ¶ 4.)

Plaintiffs allege that PCT's predecessor was Roth CH Acquisition I Co. ("ROCH"), a publicly traded special purpose acquisition company formed in 2019. (*Id.* ¶ 2.) Plaintiffs do ***not*** allege that Mr. Roth had any management involvement with PCT after the merger closed on March 17, 2021. (*See id.* ¶¶ 22, 26.) The SAC does not name ROCH or Roth Capital as a defendant.

Instead, the allegations relating to Mr. Roth focus on irrelevant, unrelated transactions Mr. Roth allegedly was involved in years ago. (*Id.* ¶¶ 2, 34, 70, 92.) Plaintiffs continue also to conflate Mr. Roth with Roth Capital, alleging that Mr. Roth's "FINRA BrokerCheck report shows 16 regulatory sanctions and 12 arbitrations." (*Id.* ¶ 92.)[1] Regardless, these allegations are irrelevant and should be stricken, as Mr. Roth argues in his concurrently filed Motion to Strike.

---

[1] Not only is this allegation irrelevant, but it is demonstrably false. Mr. Roth's individual BrokerCheck report lists ***zero*** disclosures. *See* https://brokercheck.finra.org/individual/summary/1768553.

**B.    Allegations of the SAC**

    **1.    Statements Attributable to Mr. Roth**

Plaintiffs' CAC failed in large part because Plaintiffs' claims arose out of "a plethora of statements from six sources each made by a different sampling of Defendants" from which it at times is impossible to discern "what statements are at issue, who made these statements, and, sometimes, what is the proper source of the statement." (Order at 8.) For this reason, the CAC failed to plead with particularity the statements or omissions at issue as required by Rule 9(b).

However, while the SAC attempts to clarify the source of the various statements, this "clarity" reveals that very few of the alleged statements at issue are attributable to Mr. Roth. Indeed, as detailed below, in many instances, Plaintiffs continue to rely on generalized attribution to "Defendants." The statements purportedly attributable to Mr. Roth in the SAC are as follows:

    **The November 16, 2020 Press Release (SAC ¶ 53)**:[2]  Plaintiffs rely on the ROCH and PCT announcement regarding the planned merger of the two companies. Plaintiffs allege that "Defendants Roth and Otworth are quoted in, and had control over, the contents of the press release." (Id.) However, the language the SAC actually quotes from the press release (relating to PCT's method) is: "both more cost-

---

[2] The November 16, 2020 press release, attached hereto as Exhibit 1, was referenced in paragraphs 55 and 91 of the SAC and is therefore subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint . . . as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *see also Bhatt v. Tech Data Corp.*, No. 17-cv-2185, 2018 WL 6504375, at *2 (M.D. Fla. Dec. 11, 2018) (same).

efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy. PCT's Ultra-Pure Recycled Polypropylene ('URP') has nearly identical properties and applicability for reuse as virgin polypropylene." (Ex. 1.) This language is from the press release, but it is not represented therein as a quote of Mr. Roth or Mr. Otworth.

Plaintiffs further identify statements made by "Defendants" in the November 2020 press release, regarding the experience of the PCT management team. (Id. ¶¶ 55-57.) The SAC is unclear as to whether such statements are attributed to Mr. Roth. But even if that were the intent, the statements about the PCT management team cannot be attributable to Mr. Roth. Plaintiffs rely on the assertion that the jointly-released press release was under the control of both parties. But the press release was just that: one released by two companies. It would not be reasonable to assume that Mr. Roth is the "maker" of the statements having to do with PCT, or, conversely, that any of the PCT defendants were responsible for the contents of statements having to do solely with ROCH. Similarly, any purported statements made in the webinar in which Mr. Roth is not alleged to have taken any part (including attending or presenting) cannot reasonably be attributed to Mr. Roth. (*Id.* ¶¶ 56, 58.)

**The November 16, 2020 Proxy Statement**: Plaintiffs appear to attribute these statements to Mr. Roth for the sole reason that he signed the Schedule 14A and the Agreement and Plan of Merger. However, the language excerpted in the SAC again

refers back to a presentation in which Mr. Roth had no role, and quotes or references statements by Mr. Otworth, Mr. Dee, and Mr. Brenner about their experience.

**The November 20, 2020 Registration Statement, Form S-4**:  Once again, Plaintiffs attribute statements regarding PCT's technology in this document to Mr. Roth on the sole basis that he signed the document. (Id. ¶ 63.)

**The February 12, 2021 Amended Proxy Statement**:  Here, Plaintiffs challenge statements describing the ROCH Board's reasons for approving the merger, referring only to generic statements about PCT's value proposition. (Id. ¶ 67.)

### 2.    Plaintiffs' Reliance on the Hindenburg Report

Plaintiffs allege that PCT's share price dropped on May 6, 2021, following the publication that same day of a "scathing report" by "analyst" Hindenburg Research (the "Hindenburg Report"). (*Id.* ¶ 9.) Hindenburg relies on alleged statements by undisclosed "former employees"—not of PCT but of other companies previously associated with "the management team bringing PCT public," which, again, does not include Mr. Roth. (SAC ¶¶ 9, 10.)[3]  These alleged former employees' companies had no connection to Mr. Roth, and Plaintiffs do not allege otherwise. (*See id.*)

### 3.    PCT's SEC Filings Refute Plaintiffs' Allegations

PCT's SEC filings *expressly disclosed* the very risks complained of in the Hindenburg Report regarding PCT's ability to meet its projected revenue targets,

---

[3] The Hindenburg Report, attached hereto as Exhibit 2, is incorporated by reference in the SAC and therefore is properly considered for purposes of this Motion. This Court can also take judicial notice of the securities filings. *See Tellabs, Inc.*, 551 U.S. at 322; *Bhatt*, 2018 WL 6504375, at *2.

including fierce competition for feedstock and challenges to scaling production of UPRP, along with a multitude of additional detailed risks associated with investing in PCT. (Ex. 3, at vii-viii, 16-38; Ex. 4, at vii-viii, 16-39.)[4]

Plaintiffs ignore that PCT's SEC filings include an independent report issued by Leidos Engineering dated October 2, 2020 ("Leidos Report"). PCT disclosed that "ROHC management conducted a due diligence call with Leidos, the independent engineering firm that evaluated the Technology . . . and produced an independent engineer's report . . . which set forth the results of Leidos's technical, environmental and economic review of the Project." (Ex. 6 at 61.) PCT advised investors that the "Leidos Report should be read in its entirety to understand the conclusions concerning the viability of the Technology to remove waste contaminants from waste polypropylene and the ability of the Phase II Facility to achieve certain performance and production levels and meet certain environmental permits." (*Id*.)

The Leidos Report concluded, among other things, that the Ironton facility "should be capable of" achieving commercial-scale production of UPRP, projecting "an annual UPRP production level of approximately 107,616,919 lb[s] during mature operations." (Ex. 7 at 48, 86.) In fact, far from Plaintiffs' absurd assertion that PCT's process is like creating a "bomb" (SAC ¶ 43), the Leidos Report concludes 18 times that PCT will be "capable" of achieving its goals.

---

[4] As noted above, this Court can also take judicial notice of PCT's securities filings.

In particular, in contrast with Plaintiffs' baseless assertions regarding PCT's purported "feedstock hurdles" (*id.* ¶ 44), the Leidos Report involved a review of the Company's five feedstock agreements and concluded that "the Company has allocated sufficient resources to provide processed feedstock for the purification portions of the Phase II facility to operate at the projected capacity." (Ex. 7 at 21.) The Leidos Report further attaches those five agreements, noting that: "Provided that the feedstock suppliers have sufficient quantities available and at the appropriate specifications in accordance with their respective contracts with the Company, the Company should have sufficient feedstock to support the design basis." (*Id.* at 61.)

Plaintiffs question PCT's ability to achieve "larger scale development." (SAC ¶ 81.) However, the independent Leidos Report concluded that, "operation at the refined process conditions is capable of generating product of comparable quality to that produced under the initial process conditions and capable of meeting color and opacity specifications in the product sales contracts." (Ex. 7 at 31.)

Additionally, while Plaintiffs cite to *Vanity Fair* as a distraction from the core issues of the SAC, in reality, reliable publications reporting on the Company and technology ***actually at issue*** here, refute Plaintiffs' assertions. For example, the November 30, 2020 Form S-1, (Ex. 9 at 50.), filed by the Company states:

> PCT is regarded as a leader in innovation in polymers, sustainability, and recycling by numerous non- government organizations ("NGOs"), trade associations, and a major media publication. Recognition of PCT's achievements include the American Chemistry Council's Innovation in Plastics Recycling award (2017), Time Magazine's "Best Innovations of 2019", and the 2020 Refocus Solar Institute Award for Leadership in Innovation awarded by the Plastics Association.

8

The SAC also contains new factual allegations regarding the Company's November 10 disclosure that the SEC issued an investigative subpoena to Mr. Otworth. (*Id.* ¶ 85.) Given Mr. Roth's current lack of involvement with PCT, this allegation adds nothing to Plaintiffs' allegations as to him. Further, what Plaintiffs fail to disclose is that the Company's 8-K filed with the SEC on April 26, 2022, reports the investigation as closed without further action. (Ex. 10 at X.)

Again, Plaintiffs' relentless focus on the Hindenburg Report over (i) the highly supportive comments of the highly credentialed inventor of the technology, (ii) the conclusions of a highly respected, independent engineering company, and (iii) the Company's SEC filings underscore the deficiencies of their allegations.

### 4. Plaintiffs' Omissions Relating to the Layman Interview

Plaintiffs misleadingly cite to a November 2020 transcript of a recorded interview with John Layman ("Layman"), R&D Director of Sustainable Materials Development for P&G, and the inventor of the technology used by PCT. (SAC ¶ 77.) As with the Hindenburg Report, Plaintiffs dismiss facts that do not suit their purpose and selectively quote the interview.

Specifically, Hindenburg ponders why, "if the technology was a major breakthrough," P&G did not license it to a well-established company or develop it internally. (Ex. 2 at 11.) Hindenburg then selectively cites to Layman's interview, stating that Layman "explained that a Global Business Development Director at P&G had a personal relationship with the team at PCT's parent company, Innventure, and made the connection." (*Id.*) Hindenburg then leaps to the conclusion

9

that "P&G likely had a 'technology' that it saw no economic sense in commercializing itself, so it spun it off, providing a steady stream of positive PR for the plastic producing giant, showcasing its efforts to promote recycling," attributing a nefarious motive, without support, to Layman, P&G and PCT.

However, Layman's actual response to the question selectively cited by Hindenburg tells a decidedly different story:

> The second part of this question, **"Why didn't P&G want to commercialize this on their own, or on our own?"** This is not part of our core business. If you look at P&G today, we're not a vertically integrated supplier. We don't make our own plastics. We generally buy those and then partner with converters to actually make plastic articles for products or packaging. It really wasn't strategic to our business to get into this part of the space.
>
> As was mentioned in the previous question, the only reason we got into the technology development is because, really, there was no solution on the market that met our needs. Really, with our backs against the wall, we decided to develop that technology, knowing from day one that should we be successful, we would partner with someone externally to bring that technology to life, which obviously is what brings us to this recording today.

(Ex. 5 at 4.)[5] Expressly refuting Plaintiffs' claim that P&G saw no "economic sense" in the technology, Layman explained that P&G saw enough potential that it decided to partner with someone to "bring that technology to life." (*Id.*)

When further asked why P&G did not partner with an established company, Layman explained P&G was concerned that the product was "in conflict with [the] current business model" of "traditional existing polyolefin companies and producers,

---

[5] As noted above, the Layman interview, attached hereto as Exhibit 5, was referenced in paragraph 45 of the SAC and is therefore subject to judicial notice.

companies like Dow, Exxon and LyondellBasell," so P&G was "unsure how it would be received by, again, the likes of the traditional virgin plastic manufacturers."

Layman further commented on the success Innventure (later PCT) achieved with scaling the product:

> I think they've done a fantastic job scaling the what was a lab-scale technology, into now the pilot-scale feedstock evaluation unit, as well as the plans to build a commercial plant. I think Innventure brings the right level of experience, enthusiasm and passion to make this project successful, and we've been quite pleased about that.

(*Id.* at 5.) Again, the testimony from the ***inventor*** of the technology at issue seriously undermines Plaintiffs' faulty allegations regarding the viability of the "historically . . . impossible" technology and any purported "issues at lab scale." (SAC ¶¶ 5-6.)

### 5. Basic Principles of Patent Law Refute Plaintiffs' Allegations

The SAC is replete with allegations relating to the purported worth of the patent underlying PCT's process. (*See, e.g.*, SAC ¶ 6 (". . . the patent underlying the technology is based on prior discoveries (almost three decades old) that never reached commercial scale"); ¶ 41 ("Plaintiffs' investigation confirmed that no peer reviewed study mentions PCT's technology or patent."); and ¶ 43 ("[W]hile Defendants describe PCT's process as 'revolutionary' and 'breakthrough,' in reality there is a patent dated August 3, 1993 . . .").) However, these allegations, like much of the SAC, amount to nothing more than an attempt to substitute derision for substance. In reality, innovation is not measured by pure originality. To the contrary, it is well-settled that "[i[nventions usually rely upon building blocks long since uncovered, and claimed discoveries almost necessarily will be combinations of what,

11

in some sense, is already known." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401-02 (2007). Moreover, the mere age of a patent does not render it invalid. Before a patent is granted, it undergoes a thorough examination process where a patent examiner with relevant scientific or technical expertise reviews whether each proposed claim meets the patentability requirements, including whether it is novel and nonobvious over prior art. *See* 35 U.S.C. § 282 ("A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 96 (2011) ("Congress has set forth the prerequisites for issuance of a patent, which the PTO must evaluate in the examination process. To receive patent protection a claimed invention must, among other things, fall within one of the express categories of patentable subject matter, § 101, and be novel, § 102, and nonobvious, § 103.").

Plaintiffs' reliance on similar comments by Hindenburg carry no more weight. Plaintiffs allege that Hindenburg stated "'a 30-year expert on polymers . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation of prior art.'" (SAC ¶ 76.) However, conclusory expert assertions on patent invalidity are entitled to no evidentiary weight. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329

(Fed. Cir. 2001) (broad conclusory statements offered by experts are not evidence and not sufficient to establish a genuine issue of material fact).

Finally, it bears mention that several of the licensed P&G patents have been cited by other patents or patent applications.[6] Thus, the patents that Plaintiffs assail as obsolete are in fact being used to spur new innovation, all subject to examination by the USPTO.

## III.    ARGUMENT

### A.    Plaintiffs' Section 10(b) Claim Fails as a Matter of Law.

#### 1.    Section 10(b) Allegations Must Meet Heightened Pleading Standards.

Under the PSLRA, Plaintiffs' Section 10(b) claim must be dismissed if the SAC: (1) fails to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [fails to] state with particularity all facts on which that belief is formed;" *or* (2) fails to "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter "with respect to each act or omission alleged." 15 U.S.C. §§ 78u–4(b)(1)-(2) & (3)(A). Critically, "scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1269-70 (11th Cir. 2016).

---

[6] *See, e.g.* '259 Patent and '035 Patent cited by WO 2022/015529 (filed by Dow Global Technologies LLC) at https://patentscope.wipo.int/search/en/detail.jsf?docId=WO2022015529&_cid=P21-L7UZO5-97726-1; and '035 Patent cited by WO 2022/043396 (filed by Reventas Ltd.) at https://patentscope.wipo.int/search/en/detail.jsf?docId=WO2022043396.

The SAC fails to allege any facts that give rise to a strong inference that Mr. Roth acted with scienter and fails to allege with particularity any material misrepresentation or omission that Mr. Roth actually made. Any one of these failures, standing alone, is fatal to Plaintiffs' Section 10(b) claim. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).

### 2.    The SAC Fails to Sufficiently Plead Actionable Misstatements

As to the alleged falsity of the statements Plaintiffs attribute to Mr. Roth as misleading, identified in Section II B. 1, *supra*, Mr. Roth adopts the legal arguments of the other defendants. (*See* ECF No. 116, at Argument Sections I.A.1, and I.B.1.)[7]

### 3.    The SAC Fails to Allege That Mr. Roth Acted with Scienter

For purposes of Section 10(b), scienter requires a plaintiff to allege and prove that each defendant acted with an intent to defraud or severe recklessness with respect to each act or omission alleged. *See Carvelli*, 934 F.3d at 1318. Plaintiffs utterly fail to do so here as to Mr. Roth.

As the Court noted in the Order, controlling law requires a plaintiff to prove knowledge or severe recklessness "by providing evidence that defendants possessed knowledge of facts or access to information contradicting their public statements." (Order at 31, quoting *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1233 (N.D. Ga. 2019).) The Court found that Plaintiffs failed to do so in the CAC, instead only "stat[ing] the magic words" regarding Defendants' supposed access to or control of

---

[7] Mr. Roth adopts only those portions of the other defendants' motion expressly cited, which apply equally to Mr. Roth, and those pages have been counted for purposes of this motion's page limit.

information, but failing to do anything more. With respect to Mr. Roth, the Court found Plaintiffs' attempts to buttress their conclusory allegations by citing Roth Capital's "checkered history" and significant financial gain from the transaction to be insufficient. In particular, the Court noted the obvious shortcomings in Plaintiffs' citation to *Takaata v. Riot Blockchain, Inc.*, Civ. Action No. 18-02293, 2020 WL 2079375 (D.N.J. Apr. 30, 2020), because that case addressed "scheme liability," and had no bearing on the theory of fraudulent statement liability alleged by Plaintiffs.

Rather than address these concerns in the SAC, Plaintiffs double-down on these miscues and, in lieu of well-pleaded allegations of scienter, further malign Mr. Roth's professional history with additional allegations regarding Mr. Roth's and Roth Capital's BrokerCheck and Roth Capital's previous investments in Chinese companies, in all instances utterly blurring the lines between Mr. Roth, the individual, and Roth Capital, the company (and non-party to this action).

This Court has already found such allegations of past alleged impropriety to be insufficient. These impertinent allegations are not only misplaced, they should be stricken for the reasons set forth in Mr. Roth's concurrently filed Motion to Strike. Moreover, and critically, the allegations do nothing to show that Mr. Roth "possessed knowledge of facts or access to information contradicting [his] public statements." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d at 1233.

The other amendments Plaintiffs offer in an effort to repair the CAC's deficient allegations of scienter are either non-sequiturs, circular, insufficiently vague, or some combination thereof, as described below.

15

First, in Paragraph 86 of the SAC, Plaintiffs allege that, because the purpose of the business was to commercialize a process for recycling polypropylene, "[e]ach of the Individual Defendants therefore had undivided focus on the development of, and impediments to successfully commercializing the polypropylene recycling process." Similarly, in Paragraph 90, Plaintiffs allege that the Merger Agreement, Section 5.2, makes clear that ROCH and "therefore Roth" had access to information including personnel, books, records, audit reports, etc. "when Roth issued his misstatements." These statements do not plead with particularity access to any specific piece of information that would render any alleged misstatement or omission false or materially misleading, but just generally ascribe knowledge on the basis of an assumed "focus" on the success of the Company and access to information. This fails to meet the particularity standard for pleading scienter and is no more than a re-packaged attempt to "merely rely on a defendant's position in the company without alleging with more specificity what information they had received" (Order at 32), which this Court already rejected as improper and insufficient.

Second, Plaintiffs allege that Mr. Roth is quoted as stating, "[w]e searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks." (SAC ¶ 91.) From there, Plaintiffs allege that Mr. Roth could not have made the assessment referenced in the statement without due diligence into the product and therefore, would have had access to material information contradicting his public statements. This is a non sequitur. Plaintiffs appear to rely on some

16

unstated presumption of a level of research undertaken by Mr. Roth based on a generic statement about the type of growth opportunity ROCH wanted. In essence, Plaintiffs assert that Mr. Roth could only make such a statement about searching for a business that would be a "compelling growth company" if he had personally verified whether the business was in fact a compelling growth company. Plaintiffs assert that this means Mr. Roth had access to information, but the SAC is silent as to any details about such information. This reasoning is circular and conclusory, and is no substitute for pleading with particularity what specific information Mr. Roth had that supposedly contradicted his statements.

Third, the allegation that Mr. Roth signed SEC filings on behalf of ROCH does not suffice to establish scienter. *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1330 (M.D. Fla. 2002) ("Defendants' mere . . . signatures on the Form 10-K do not raise a strong inference of scienter.").

Finally, Plaintiffs fail to allege that Mr. Roth personally obtained anything as a consequence of any of the alleged fraudulent statements, as Rule 9(b) requires. *See Galectin Therapeutics*, 843 F.3d at 1269.[8] Similarly, Plaintiffs assert that the proxy statements misled investors because "the primary basis for the ROCH board to recommend the SPAC transaction was to receive millions in founder's shares for

---

[8] Plaintiffs allege that "the two investment banks who sponsored the ROCH SPAC, Roth Capital and Craig Hallum Capital Group LLC" received "approximately 2 million 'founders' shares for a little more than a penny per share." (SAC ¶ 30.) Later in the SAC, Plaintiffs question Roth Capital's "buy" rating for the securities. (*Id.* ¶¶ 36, 70.) However, nowhere do Plaintiffs allege that Roth Capital (let alone Mr. Roth) sold any shares in this time period or any violation of the securities laws by virtue of the issuance of a Buy rating by Roth Capital. Accordingly, these allegations are plainly insufficient to raise a strong inference of scienter with respect to Mr. Roth personally.

little more than a penny a share on a stock on which they intended to immediately slap a buy rating (as Roth did with numerous fraudulent Chinese reverse mergers previously) to drive the share price up." (SAC ¶ 70.) However, "[s]everal Circuits including the Eleventh Circuit have held that allegations of severe recklessness are sufficient to allege scienter [for 10b-5 claims], whereas allegations merely of motive and opportunity are not." *In re Sportsline.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1163 (S.D. Fla. 2004). "[A]llegations of a motive to maintain stock price or enhance a Company's business prospects cannot support a strong inference of scienter." *Id.* at 1171; *see also Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004) (holding that allegations that defendants "desire to sell their Answerthink shares at inflated prices, maintain the value of their stock options, increase the size of their bonuses, and maintain the image of a 'high-growth' company to create the illusion that it was meeting analysts' expectations in order to attract a buyer" only amounted to allegations of motive and opportunity, which are insufficient to show scienter). As with the allegations concerning Mr. Roth's purported professional history, allegations that profit was the true purpose driving the PCT transaction cannot alone support a finding of scienter.

### 4. The SAC's Failure to State a Primary Violation Under Section 10(b) Requires Dismissal of the Section 20(a) Claim.

Section 20(a) serves to hold certain "control persons" liable for a primary violation of the securities laws by an issuer of securities. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). If a plaintiff does not adequately plead a

18

primary violation, no liability may be imposed under Section 20(a). *See id.* Because Plaintiffs' Section 10(b) claim against PCT fails as a matter of law, so too does their Section 20(a) claim against Mr. Roth.

**B.      Plaintiffs' Newly-Asserted Section 14(a) Claims Fail as a Matter of Law.**

"To state a claim under section 14(a) of the Exchange Act and Rule 14a–9, a plaintiff must allege that the defendant prepared a proxy statement containing a material misstatement or omission that caused the plaintiff's injury." *Biver v. Nicholas Fin., Inc.*, No. 8:14-CV-250-T-33TGW, 2014 WL 2441891, at *4 (M.D. Fla. May 30, 2014).  Further, Plaintiffs' Section 14(a) claims must also meet the heightened pleading standards of the PSLRA. *In re The Home Depot, Inc. S'holder Derivative Litig.*, 223 F. Supp. 3d 1317, 1330 (N.D. Ga. 2016) (rejecting plaintiff's argument "that the PSLRA only applies when there are allegations of fraud" and finding that "[c]laims under Section 14(a) are also subject to the heightened pleading requirements of the [PSLRA]").

This is true even where plaintiffs disavow any reliance on fraud in asserting claims under Section 14(a). When that claim is grounded in the same intentional conduct that formed the basis of their fraud claims, heightened pleading standards apply. *Lee v. Frost*, No. 21-20885-CIV, 2021 WL 3912651, at *4 n.3 (S.D. Fla. Sept. 1, 2021) (citing to cases outside the 11th Circuit that applied Rule 9(b) to claims that were grounded in alleged fraudulent conduct, even where the plaintiff disclaimed reliance on a fraud theory); *see also Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000) (affirming district court's dismissal of Section 14(a) claim for failure to

19

meet Rule 9(b)'s heightened standard because the complaint clearly contained allegations of knowing and intentional misconduct that sounds in fraud, even though plaintiff asserts that Section 14(a) claim sounds in negligence).

Thus, "[w]hen taken together, Section 14(a), Rule 14–A–9 and the PSLRA require the Plaintiffs to specify with particularity: (1) omissions in the Proxy Statements that made other statements either false or misleading, (2) how those omissions were material, (3) each statement in the Proxy Statements that was made false or misleading, (4) the reason or reasons why the statement is misleading, and (5) how the omission caused the loss complained of." *Id.*; *see also Lee*, 2021 WL 3912651, at *11 (S.D. Fla. Sept. 1, 2021) (quoting *Stoneridge*, 552 U.S. at 165) (holding that the PSLRA imposes "heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act"). Therefore, Plaintiffs' Section 14(a) claims fail for the same reasons that the Section 10(b) claims do.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Roth respectfully requests that this Motion be granted and an order entered dismissing the SAC against Mr. Roth in its entirety, without further leave to amend.

## Local Rule 3.01(g) Certification

Undersigned counsel hereby certifies that, on September 12, 2022, counsel for

Mr. Roth conferred with counsel for Plaintiffs, via email, regarding this Motion.

Despite their good faith efforts to resolve the Motion, counsel for Plaintiffs indicated

that Plaintiffs oppose the Motion.

Dated:  September 15, 2022               Respectfully submitted,

                                         STROOCK & STROOCK & LAVAN LLP

                                         By:              */s/ Brian C. Frontino*
                                                          Brian C. Frontino

                                         Brian C. Frontino (Fla. Bar No. 95200)
                                         200 South Biscayne Boulevard, Suite 3100
                                         Miami, Florida 33131
                                         Telephone:  (305) 358-9900
                                         Email: bfrontino@stroock.com

                                         John R. Loftus (admitted *pro hac vice*)
                                         Christine E. Ellice (admitted *pro hac vice*)
                                         2029 Century Park East, Suite 1800
                                         Los Angeles, California 90067
                                         Telephone:  (310) 556-5800
                                         Email: jloftus@stroock.com
                                                   cellice@stroock.com

                                         *Attorneys for Defendant Byron Roth*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2022, a copy of the foregoing was filed electronically with the Clerk of the Court by using the CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

/s/ *Brian C. Frontino*
Brian C. Frontino