**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

WILLIAM C. THEODORE,
individually and on behalf of all others
similarly situated,

      Plaintiffs,

      v.

PURECYCLE TECHNOLOGIES,
INC., MICHAEL OTWORTH,
MICHAEL E. DEE, DAVID
BRENNER, BYRON ROTH and
TASMIN ETTEFAGH,

      Defendants.

Case No. 6:21-cv-809-PGB-GJK

**<u>Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Second Amended Class Action Complaint</u>**

Co-Lead Plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, respectfully submit this opposition to Defendants' PureCycle Technologies, Inc. ("PureCycle"), Michael Otworth, Michael Dee, David Brenner, and Tasmin Ettefagh (collectively, "Defendants") Motion to Dismiss ("Motion") the Consolidated Second Amended Class Action Complaint ("SAC").

**<u>Preliminary Statement</u>**

PureCycle has never earned any revenue and has *only* product --- a process for recycling polypropylene, a common plastic that top scientists and chemical companies have found impossible to effectively or economically recycle since its invention in

1951. Defendants, however, issued false and misleading statements throughout the Class Period claiming that they had achieved the impossible.  Pursuant to §§10(b) and 14(a) of the Securities Exchange Act of 1934, the SAC alleges that Defendants made false and misleading statements regarding PureCycle's recycling process and its management team's experience that this Court has already ruled are actionable.[1] Specifically, Defendants represented in proxy statements, a registration statement, and in press releases, that their recycling process is "proven" to convert waste polypropylene (called feedstock) into virgin polypropylene resin more cost effectively than manufacturing virgin polypropylene traditionally, and utilizing a broader range of feedstock than traditional recycling, when in reality (as multiple industry experts have attested), the technology underlying the process is unproven and presents serious issues even at lab scale, the economics of conducting the process at commercial scale are cost prohibitive, and the process cannot cost effectively utilize a broader range of feedstock than traditional recycling.  Defendants further touted the PureCycle management team-- which claimed to have solved the previously unsolvable polypropylene recycling problem-- as having "broad experience across plastics," decades of experience scaling early stage companies, in public markets, and leading transformational projects, though they in fact had *no background* in plastics recycling and previously brought six other early-stage companies public that imploded causing substantial investor losses.  The Court held that such statements, which contain

---

[1] *See* Order, filed on August 4, 2022 ("Order"). ECF No. 112.  The SAC no longer includes statements regarding PureCycle's "future business plans," that this Court deemed inactionable. *See* Order at 27.

2

"verifiable facts," "are not puffery and may be challenged as fraudulent or misleading statements." Order at 21-22. Moreover, the Court held that "the Complaint has sufficiently alleged falsity with its reliance on the Hindenburg Report" issued on May 6, 2021 ("Report"), which revealed Defendants' fraud for the first time. Order at 24.

Though the §14(a) claim does not require scienter, the SAC sufficiently alleges scienter pursuant to §10(b). *First*, as the Court agreed, Defendants cannot credibly disclaim knowledge of their own backgrounds and thus knew when issuing their statements that they had no plastics recycling experience and had an abominable track record bringing early-stage companies public and eviscerating hundreds of millions in shareholder capital. *Second*, though they issued a press release in response to the Report, Defendants *did not actually challenge much less negate any of the underlying allegations*. Just a few months later, Defendants revealed that the SEC had issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company" pertaining to "among other things, statements made in connection with PCT's technology, financial projections, key supply agreements, and management." This investigation, along with Defendants' failure to meaningfully challenge the Report, further support the inference of scienter. *Third,* Defendants' statements comparing PureCycle's process with traditional methods evince that they had undertaken such a comparison and thus would have known that the process could not utilize a broader range of feedstock or run more cost efficiently. If they did not undertake such an analysis than they had no basis for their statements and were reckless. *Fourth*, for the entirety of its existence,

PureCycle earned no revenue and had one focus--the polypropylene recycling process. The only reasonable inference is that Defendants had undivided focus on the viability and scalability of their only operation. *Fifth*, Defendants had every incentive to bring PureCycle public despite the undisclosed deficiencies in its recycling process; Defendants Otworth and Dee received exorbitant salaries and compensation of $8 million simply for effectuating the reverse merger.[2]

Defendants do not dispute this Court's prior ruling that loss causation is adequately pled as to the §10(b) claim and have provided no reason why this Court should not apply that ruling to the §14(a) claim. Instead, they argue without any logic or legal support, that because the truth came to light several months following the merger, that somehow negates loss causation. With the elements of the §§10(b), 14(a), and 20(a) claims adequately pled, Defendants' Motion must fail.

## Statement of Facts[3]

PureCycle went public via a "de-SPAC" reverse merger with Roth CH Acquisition I Co. ("ROCH"), a SPAC. ¶ 31. SPACs are shell companies set up for the sole purpose of raising money through an IPO to eventually acquire another company. *Id.* A SPAC has no commercial operations, makes no products, and does not sell anything. *Id.* Going public through a SPAC is quicker, has lower associated costs and fewer extensive financial disclosure requirements than a traditional IPO. *Id.*

**PureCycle's Dubious Technology**: PureCycle, *which has never earned any*

---

[2] Additional allegations of scienter are set forth below, Section I.B.
[3] All ¶ __ references are to the SAC. (ECF No. 113).

*revenue and has no other products*, claims that its "ground-breaking patented recycling process," developed by Procter & Gamble ("P&G"), economically removes color, odor, and contaminants from plastic waste feedstock called polypropylene and turns it into near-virgin plastic--- a feat that has stymied scientists since 1951 and proven impossible. ¶ 37. Polypropylene is a common plastic used in consumer products, including food packaging. Though it represents 28% of the world's plastic, only 0.8% is recycled because it is uneconomical and difficult to remove odor, color, and other contaminants. ¶ 38. Defendants misled investors, both in the Proxy Statements (defined *infra*) and in other filings, claiming they had achieved the impossible. ¶ 39.

Despite this claim, PureCycle did not publish *a single peer reviewed study* regarding its "breakthrough" technology, though plastics companies typically publish such studies detailing their advancements. ¶ 41. Indeed, though Defendants describe the technology as "revolutionary" and "breakthrough," there is a patent dated August 3, 1993, which describes the exact method PureCycle purports to employ, involving varying temperatures or pressures of butane and propane in order to reclaim polypropylene. ¶ 43. This process, though conceived *three decades ago*, has never been successfully employed because it is uneconomical and hazardous—obstacles that Defendants concealed during the Class Period. For example, the solvents that the process utilizes—propane and butane-- are extremely flammable gasses that are held in a vessel under pressure and heated to a couple hundred degrees, *i.e.*, a bomb. *Id.*

Additionally, polypropylene is the largest plastic type P&G uses, yet it opted to license the technology to PureCycle *at the time of PureCycle's inception* though

5

PureCycle's management team had no background in polypropylene recycling, and despite the fact that developing the process internally would have provided P&G with a massive competitive advantage over its competitors (had it actually worked).

**Undisclosed Feedstock Hurdles**: Polypropylene waste feedstock is an essential component of PureCycle's recycling process. ¶ 44. However, as John Laymen, the senior P&G scientist who developed the technology ("Laymen"), explained, PureCycle can't use just any polypropylene feedstock. ¶ 45. The process removes a "fairly low" level of contamination, "less than 5%," so the feedstock needs to be at least 90% polypropylene because the lower the level of polypropylene in the feedstock, the less economical the process and the less likely the Company will generate any revenue. *Id.* The feedstock needs to be of exemplary purity, "of the right quality, and the right quantity." *Id.* Defendants did not reveal to investors that they could not, therefore, use a "broader range of feedstock than traditional recycling," as they claimed, and still conduct the process cost-effectively. ¶ 46. Moreover, Laymen confirmed that difficulty obtaining large quantities of *high-quality* feedstock (due to, *inter alia,* high competition) to support the process posed a significant risk to moving beyond lab scale to commercialization *Id*. Industry experts confirmed that there is *currently* insufficient supply of non-contaminated polypropylene scrap to support PureCycle's process and that there is huge demand for polypropylene feedstock. *Id.*

**PureCycle Management's Troubling "Experience"**: Defendants also duped investors regarding PureCycle management's background. Innventure, founded by

6

Otworth, Brenner, PureCycle's Chief Science Officer, and Director Dr. John Scott, owned and controlled PureCycle before it went public. ¶ 47. Innventure's management team takes credit for "six successful IPOs," which in reality involved significant investor losses, massive accumulated deficits, delistings, and bankruptcies. *Id.* Former employees of Innventure's prior IPOs described the management team as "deceiving" and perpetuating a "con" upon investors, characterized their projections and investor pitches as "wild ass guessing" and "not credible," and explained that Innventure took companies public prematurely, engaging in a "high stakes poker game." ¶ 48. *In other words, the Innventure executives brought six companies public, drove them into the ground, and then moved on to number seven—PureCycle. ¶ 49.* Yet, throughout the Class Period they touted their decades of "experience leading and scaling early stage companies," in "public markets," and "leading transformational projects." ¶¶ 55-56, 61, 71. Moreover, Defendants claimed to have "broad experience across plastics manufacturing" and told investors they had solved the most challenging problem in the world of plastics recycling, which had stumped scientists and industry experts for decades. *Id. In reality, they lacked any relevant experience in plastics recycling at all. Id.*

**Defendants' Exorbitant Compensation**: Despite their troubling history and the lack of a proven technology, Defendants Otworth and Dee received sizeable salaries and $5,000,000 and $3,000,000 in cash bonuses respectively *simply for consummating the SPAC transaction.* ¶ 51. Defendant Dee also received 1.2 million in share grants, worth approximately $17 million as of the close of trading on September 24, 2021, but worth as high as approximately $40 million during the Class Period. ¶ 52**.**

### Materially False and Misleading Statements

Defendants issued false and misleading statements touting the experience of PureCycle's management team and representing that its recycling process is "proven" to convert polypropylene into virgin like resin, can utilize a "broader range of feedstock than traditional recycling," and is more "cost efficient" than traditional manufacturing of virgin polypropylene. However, in reality, the "experienced" management team had no background in plastics recycling and previously brought six companies public to line their own pockets and then drove those companies to financial ruin, the technology underlying PureCycle's process is unproven and presents serious issues at lab scale, the flammable pressurized process is dangerous and not yet functional—especially at scale, the process cannot use a broader range of feedstock than traditional recycling but rather requires large quantities of high quality feedstock with minimal contamination (which is difficult to obtain particularly given the highly competitive market), and the process is not more cost efficient than traditional manufacturing of virgin polypropylene. Defendants' misleading statements appeared in a November 16, 2020 press release (and webinar linked therein) ("Nov. PR"), preliminary proxy statement ("14A"), a November 20, 2020 Registration Statement ("S-4"), a February 12, 2021 amended proxy statement ("Amended 14A") (with the 14A, the "Proxy Statements"), and an April 21, 2021 press release ("April PR"). ¶¶ 53-74.

**The Nov. PR and Webinar:** Defendants Roth and Otworth are quoted in, and had control over, the contents of the Nov. PR, which announced that PureCycle would go public via an agreement and plan of merger with ROCH ("Merger Agreement"). ¶

53. *Id.* In the Nov. PR, Defendants stated that PureCycle's "revolutionary" method to recycle waste polypropylene into virgin-like resin is "more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy" and that "PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene." *Id.* In the linked webinar, Defendants used illustrative charts to represent that PureCycle's process is, "the only proven and economically-viable method of recycling polypropylene to virgin-quality" and that "no other technologies can efficiently address polypropylene recycling at scale." ¶ 58. In both the Nov. PR and webinar, Defendants also touted the PureCycle's management team's decades of experience "scaling early stage companies," in "public markets," and "leading transformational projects." ¶¶ 55-56.

**The 14A**: The 14A filed the same day, included a transcript of a video presentation touting PureCycle's management's experience and stating that customers can use PureCycle's UPRP "interchangeably with virgin resin, and they can make… the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today." ¶¶ 60-61. Moreover, Defendants touted the recycling process as the key reason they recommended the merger, though in reality, the Individual Defendants' primary motivation was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares. ¶ 54.

**The S-4**: In the S-4, Defendants called the process "proven" to "convert[] waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin

polypropylene," claiming that lab tests, and unnamed "independent technical consultants and many of PCT's strategic partners and initial customers" had validated the process. ¶ 63.  The S-4 touted PureCycle's use of a "broader range of feedstock than traditional recycling" to make "virgin quality UPRP pellets that are clear, odorless and contaminant free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products." ¶¶ 65, 67.

**The Amended 14A**: The Amended 14A emphasized PureCycle's "unique patented process…allowing for a broader range of feedstock than traditional recycling…which have been tested and validated by P&G, prospective customers and third party engineering specialists," and significantly "reduced production costs as compared to virgin resin," as key factors on which the ROCH Board based its decision to recommend the merger. ¶¶ 67-69.  The Amended 14A also flaunted PureCycle's management's extensive experience, stating that they have "broad experience across plastics manufacturing" and describing decades of experience "scaling early stage companies," in "public markets," and "leading transformational projects." ¶ 71.

**The April PR**: The April PR, entitled "PureCycle's Tasmin Ettefagh facilitates plastics industry dialogue about polypropylene recycling solutions in light of U.S. Plastics Pact: Ultra-pure recycle polypropylene manufacturer CSO drives narrative," reiterated that PureCycle's technology can "recycle waste PP into virgin-like recycled PP for a myriad of applications." ¶ 73.

### THE TRUTH EMERGES

On May 6, 2021, analyst Hindenburg Research published a scathing report on

PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street". ¶ 75. The Report concluded that, "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences." ¶ 76. Regarding PureCycle's recycling process, Hindenburg wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that "PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale." ¶ 80. Hindenburg revealed that it consulted with a "30 year expert in polymers," who stated that "[t]here is no mention of the needed actual testing of the final product," that it "is indirect and vague," and that "the hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience." ¶ 81. The same expert stated that, "[t]he permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. *I don't think the process could ever be cost efficient*. The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough." *Id.* He also made clear that "the flammability and hazards of this process cannot be understated" and that "taking propane and butane, heating them in a vessel to a couple hundred degrees and holding it under pressure at thousands of pounds per square inch, *is a bomb*." He went on to state that the "integrity of all of the vessels and equipment

11

must be flawless and maintained to be flawless. The specifications for equipment to do this is extreme and rightfully so. *Any incident would be catastrophic*." Hindenburg further detailed that PureCycle's process presented issues at "lab scale," rendering larger scale development even more problematic. *Id.*

The Report also revealed that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." ¶ 77. Indeed, Laymen warned: "I think the fact that you have to ensure you have feedstock coming in and I think that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running." *Id.* Hindenburg also interviewed Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers, an expert in PP raw materials, who confirmed that "there is not enough non-contaminated PP scrap to support [PureCycle's] processes," and stated that PureCycle's process requires feedstock with less than 5% contamination and that he's "not aware of any PP scrap in volume that has any less than 5% contamination in the world." ¶ 78. Hindenburg also spoke with Richard Minges, a 10-year executive for Custom Polymers, who further corroborated the difficulty in obtaining the quality and quantity of feedstock needed, stating "it's more about the raw materials that can be secured." ¶ 79.

Hindenburg also uncovered how Defendant Otworth and three other senior PureCycle executives, had taken at least 6 companies public, and then drove them into the ground, eviscerating $760 million in public shareholder capital. ¶ 82. Hindenburg interviewed multiple former employees of these companies who revealed that the

12

PureCycle management team had duped investors of these failed companies, stating, "they did con," brought companies public too early, engaged in "wild ass guessing," and went to market with a dossier that "was not credible." *Id.*

On this news, PureCycle's stock price fell from its May 5, 2021 closing price of $24.59 per share to May 6, 2021 closing price of $14.83, trading intraday as low as $13.55 per share. ¶ 83. This represents a one-day drop of approximately 40% on unusually heavy trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days. *Id.*

PureCycle issued a press release in response to the Report that day, which fails to challenge, much less negate, *any* of the Report's allegations, merely stating, "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders." ¶ 84.

Then, on November 10, 2021 after the market closed, Defendants revealed that on September 30, 2021, the SEC issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company." ¶ 85. Defendants explained that "the investigation pertains to, among other things, statements made in connection with PCT's technology, financial projections, key supply agreements, and management." *Id.* On this news, further validating the Report, PureCycle's stock fell from $11.50 per share to $9.79 per share (trading as low as $8.77 intraday), a one-day drop of 15% per share on unusually high trading volume of over 6 million shares. *Id.*

## ARGUMENT

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)[4]. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Courts also must draw all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555-56. A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Immucor Inc. Sec. Litig.*, 2006 WL 3000133, at *7 (N.D. Ga. Oct. 4, 2006).

## I.   THE SAC ADEQUATELY ALLEGES A §10(b) CLAIM

To state a §10(b) claim, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation. *FindWhat Inv'r Grp. v. FindWhat.com,* 658 F.3d 1282, 1295 (11th Cir. 2011).

### A. The SAC Adequately Alleges Falsity

The SAC alleges that Defendants made[5] false and misleading statements: 1)

---

[4] Emphasis is added and citations are omitted throughout unless otherwise stated.
[5] This Court has already held that Defendants "made" the "false and misleading statements...in the press releases, presentation, and SEC filings." Order at 17-18. The Court also ruled that Defendants

touting management's "broad experience across plastics manufacturing" and "scaling early stage companies," though in reality, PureCycle management had no prior experience in plastics recycling and had previously brought six other "early stage" companies public that subsequently imploded; and 2) touting its "breakthrough" recycling process as the only "economically-viable," "cost effective," "proven," "validated" process to recycle waste polypropylene into virgin-like resin, which uses a "broader range of feedstock than traditional recycling" and is more cost effective than traditional methods of manufacturing polypropylene, though in reality, the process is unproven, faces insurmountable obstacles at lab scale, requires feedstock of the highest quality with minimal contamination, the economics of conducting the process at commercial scale are cost prohibitive, and PureCycle's supposedly "revolutionary" process is based on an old prior patent that never reached commercial scale. ¶¶ 53-74.

*As this Court has already ruled*, having chosen to speak regarding the foregoing topics, Defendants incurred a duty to speak fully and truthfully; the statements contain "verifiable facts" and are thus "not puffery and may be challenged as fraudulent or misleading statements;" and "the Complaint has sufficiently alleged falsity with its reliance on the Hindenburg Report." Order at 21-24, 29-30. *See also FindWhat*, 658 F.3d at 1299; *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007).

### a) Defendants Misled Investors Regarding Management's Experience

The SAC alleges that Defendants misled investors by touting PureCycle's

---

Otworth, Dee, Brenner, and Ettefagh had control over the misleading statements in PureCycle's SEC filings and are therefore "makers" of the statements in the S-4 and Proxy Statements. *Id.*

management as having "broad experience across plastics manufacturing"[6] and decades of experience in "public markets," "scaling early stage companies," and "leading transformational projects."  ¶¶ 7, 55-56, 61, 71.  This Court has already held that the foregoing statements are actionable because, "[b]y willingly flaunting the PureCycle management team's collective experience, the duty arose to speak truthfully about said experience." Order at 29.  "[T]he revelations from the Hindenburg Report about the PureCycle Inc. executives' six previously failed ventures 'would have been helpful to a reasonable investor assessing the quality and extent of this experience." *Id.* The Court also made clear that statements touting management's experience do not amount to puffery because they include "verifiable facts."  Order at 21, fn. 11. *See also Tung v. Dycom Indus., Inc.*, 454 F. Supp. 3d 1244, 1257 (S.D. Fla. 2020); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 2018 WL 1558577, at *7 (N.D. Ga. Mar. 29, 2018).[7]

### b)  Defendants Misled Investors Regarding Their Recycling Process

Though hyping their recycling process as "proven" and "validated" to convert polypropylene into virgin like resin, more "cost effective" than traditional

---

[6] The statement touting the PureCycle management team's "broad experience in plastics manufacturing" immediately preceded a recitation of Defendants Otworth, Dee, and Brenner's experience, belying Defendants' false assertion that they "never asserted" they had relevant plastics experience. Defs. Br. at 16; ¶ 71.  Defendants also mischaracterize the SAC as listing the "six successful IPOs" as one of the misleading statements. *Id.* The SAC makes no such assertion, rather alleging that Defendants' statements regarding their decades of experience in public markets, scaling early-stage companies, and leading transformational projects misled investors because, via Innventure, they had previously taken six early stage companies public that led to significant investor losses.  Any arguments Defendants proffer regarding their involvement in those six failed ventures, Defs.Br. at 17, are factual arguments that are inappropriate for adjudication at this stage, and which would require the Court not to "accept well-pled allegations as true." Order at 23-24, citing *Iqbal,* 556 U.S. at 679.

[7] Defendants repeat their truth-on-the-market defense, Defs. Br at 18, though already rejected by the Court and though the Report included previously *non-public* interviews with former employees of Innventure's failed companies that spoke about management's "experience." Order at 23, 39-40.

manufacturing of virgin polypropylene, and able to use a "broader range of feedstock than traditional recycling," Defendants did not disclose that that they could not safely scale up the flammable pressurized process, that it requires large quantities of high quality feedstock with minimal contamination—not the "broader range" Defendants touted, that the economics of conducting the process at commercial scale are prohibitive, and that the technology is based on a three-decades-old patent that never reached commercial scale. ***Indeed, the Court has already ruled that***, "[a]fter advertising the PureCycle Inc. method as 'more cost efficient and environmentally sustainable than the traditional manufacturing process' and stating it had been 'validated by technical consultants and many of [PureCycle Inc.'s] strategic partners,' ***Defendants had a duty to speak truthfully about how the process was working at lab scale***." Order at 30. "A reasonable investor would be interested to know the current problems facing the recycling method before the method may be scaled up for profitable production." Order at 30[8]. *See also SEC v. Merch. Cap., LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007).[9]

The Court further ruled that statements comparing PureCycle's method to traditional methods of recycling and manufacturing polypropylene, statements that its

---

[8] Defendants thus miss the point in arguing that they warned "[t]here is no guarantee the Technology is scalable to commercial-scale operation." Defs. Br. at 12. Regardless, generic warnings of "*potential*" risks are insufficient to warn of *actual* risks that have materialized. *Merch. Cap.,* 483 F.3d at 767, 769.

[9] Defendants cite a pre-Class Period engineer report (without requesting judicial notice), purportedly attached as an exhibit to an unidentified filing, to argue that "concerns about scalability are misplaced" because the engineer concluded that PureCycle's *not-yet-constructed* Phase II facility could potentially produce over 100 million pounds of UPRP. Defs. Br. at 13, fn 10. What Defendants omit is the context wherein the engineer qualifies that its conclusion **assumes** PureCycle resolves "outstanding design issues" and **assumes** the process uses feedstock with "minimum polypropylene content of at least 93.3 percent," *i.e.*, high quality feedstock with minimal contamination (consistent with Laymen's warning, ¶ 77.) Regardless, the "truth" of the report is not ripe for adjudication. *See* Order at 23.

resin can be used interchangeably with virgin resin, detailed descriptions of its "patented process," and statements that unnamed third parties tested and validated the technology, all include "objective and verifiable fact," are thus "not puffery and may be challenged as fraudulent or misleading statements." Order at 21-22.  Indeed, "the fact that these statements relate to a core aspect of [the company's] business makes it even more likely that a reasonable investor would assign weight to them." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019).

**Defendants do not dispute any of the foregoing in their Motion.**

### B.  The SAC Adequately Alleges Scienter

A complaint pleads scienter by alleging facts that give rise to a strong inference of either recklessness or conscious misbehavior. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014). An inference is "strong" if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Equifax*, 357 F. Supp. 3d at 1232. Because this inquiry examines "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," courts must "consider the complaint in its entirety," and "not whether any individual allegation, scrutinized in isolation, meets that standard." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). The inference "need not be irrefutable, *i.e.*, of the 'smoking -gun' genre, or even the 'most plausible of competing inferences,'" so long as it is as likely as any other inference. *Tellabs*, 551 U.S. at 324.  Assessed holistically, the inference of scienter is at least as compelling as any opposing inference.

18

The Court has already ruled that Defendants possessed the requisite state of mind as to statements regarding their experience because "the individual PureCycle Defendants have actual knowledge of their own experience." Order at 33, fn 18. Defendants argue "the SAC is devoid of any allegations" showing Defendants knew what happened with the six failed companies, Defs. Br. at 19, ignoring the SAC and the Court's ruling that Defendants _perpetrated the hardships that befell the six companies_.[10]

The SAC also alleges "specific facts" establishing an inference of scienter as to Defendants' recycling process statements.  Defendants made statements comparing PureCycle's process to traditional methods of polypropylene manufacturing (more cost efficient) and traditional methods of recycling (broader range of feedstock), ¶¶ 53, 65, 67, 69, conveying that they had indeed compared PureCycle's technology to traditional manufacturing and recycling methods, thus establishing scienter.  That Defendants should have known that the process could not in fact work cost-effectively using a "broader range of feedstock" is further demonstrated by Laymen's statements—_which Defendants posted to PureCycle's website on November 1, 2020--_ that the process requires large quantities of high quality feedstock with minimal contamination (further confirmed by the October 2020 engineer's report Defendants admit to knowing about, and which they improperly cite, in their Motion, _see supra_ at 17, fn 9), which is subject to fierce competition and difficult to obtain in bulk. ¶¶ 45-46.

---

[10] They also feebly rehash falsity arguments that they had no duty to disclose, which the Court already rejected, and factual disputes as to their involvement with those six companies which are not ripe for resolution, and which ignore that the Court must accept well-pled allegations as true. Defs. Br. at 19.

Defendants further claimed that their recycling process is "proven" and "validated" by unnamed third parties to convert waste polypropylene into virgin like resin though they knew of major problems with the method at lab scale. *See Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, No. 218CV356FTM29MR, 2019 WL 3343933, at \*6 (M.D. Fla. July 25, 2019). The SAC alleges that under the Merger Agreement, Defendant Otworth on behalf of PureCycle agreed to provide ROCH with "access to information," including information about its *only business*. ¶ 90. Defendants could not have given ROCH access if they did not have it themselves. *Pub. Emps. Ret. Sys. of Miss. v. Mohawk Indus.*, 564 F. Supp. 3d 1272, 1303 (N.D. Ga. 2021) (access to information demonstrates scienter); *In re Sensormatic Elecs. Corp. Sec. Litig.*, No. 018346CIV, 2002 WL 1352427, at \*6 (S.D. Fla. June 10, 2002).

Additionally, the SAC alleges that it is common practice for plastics companies to publish peer reviewed studies detailing their advancements in the field. Yet, though claiming to have achieved a historic feat, Defendants did not publish a single peer reviewed study about PureCycle's process, further supporting the inference of scienter.

Moreover, Defendants did not challenge much less negate any of the underlying allegations in the press release they issued in response to the Report. Just a few months later, Defendants revealed that the SEC had issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company" pertaining to "among other things, statements made in connection with PCT's technology, financial projections, key supply agreements, and management." ¶¶ 14, 85. This investigation, and Defendants failure

to meaningfully challenge the Report, further support the inference of scienter. *See Eastwood Enters., LLC v. Farha*, No. 8:07-cv-1940-T-33EAJ, 2009 WL 3157668, at *4 (M.D. Fla. Sep. 28, 2009). Defendants do not address this allegation at all.

The core operations doctrine *bolsters* the inference of scienter.[11] *See In re Flowers Foods, Inc. Sec. Litig.,* No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018). PureCycle's *only business* is to commercialize a process for recycling polypropylene. ¶ 37. From inception and throughout the Class Period, it produced nothing and earned nothing; Defendants' – who stood at the helm of PureCycle-- thus had undivided focus on the development of their one operation. *Id.* The logical inference is that Defendants knew how their one process performed at lab scale before making the remarkable claim that PureCycle had solved the unsolvable, and before representing that their process used a "broader range of feedstock than traditional recycling" and is more cost efficient than traditional manufacturing methods.

The SAC further alleges that despite Defendants lack of relevant experience, checkered past bringing companies public, and the lack of a proven technology, Defendants Otworth and Dee received $5 million and $3 million respectively simply for consummating the merger. Defendant Dee also received 1.2 million in share grants, worth as high as approximately $40 million during the Class Period. Defendants Otworth and Dee's clear motive to complete a transaction, good or bad, contributes to the inference of scienter. *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F.

---

[11] The Court didn't "reject" this argument, Defs. Br. at 13, but rather held that it is "meant to bolster an inference of scienter." Order at 32-33.

Supp. 3d 1342, 1362 (N.D. Ga. 2018) (finding that "allegations of a personal financial motive may 'weigh heavily in favor of a scienter inference'").

## II. THE SAC ADEQUATELY ALLEGES A §14(a) CLAIM

To state a claim under §14(a) of the Exchange Act and Rule 14a-9, a plaintiff must allege that the defendant prepared a proxy statement containing a material misstatement or omission that caused the plaintiff's injury. *Biver v. Nicholas Fin., Inc.*, No. 8:14-cv-250-T-33TGW, 2014 WL 2441891, at *4 (M.D. Fla. May 30, 2014). *See* 15 U.S.C. §78n(a). Though the §14(a) claim does not sound in fraud, even under the heightened pleading standard of the Private Securities Litigation Reform Act, Plaintiffs have sufficiently alleged that Defendants filed negligently prepared Proxy Statements that contained material misstatements and omitted material information. ¶¶ 60-61, 67-69. The SAC identifies the Proxy Statements containing the misleading solicitations, identifies when Defendants disseminated the Proxy Statements, who signed and had control over the Proxy Statements, which particular statements were false and misleading, and why each was misleading when made. *Id.*

The SAC makes clear that Defendant Roth signed the Proxy Statements, which included the Merger Agreement signed by Defendants Roth and Otworth, and which included (in the 14A) misleading statements in the transcript of a video presentation attributed directly to Defendants Otworth, Dee, and Brenner. *Id.* Moreover, each of the Individual Defendants had control over the content of the Proxy Statements. *See* Order at 17-18. Additionally, Count Three in the SAC sets forth the basis for the §14(a) claim in **fourteen paragraphs**, including *inter alia*, that it is based on the false and

misleading statements in the Proxy Statements and documents incorporated therein (set forth in ¶¶ 60-61, 67-69), issued to solicit shareholder approval of the Merger Agreement, which were essential links in the accomplishment of the Merger Agreement, that investors were therefore denied the opportunity to make a fully informed decision when voting on the Merger Agreement and would have considered a full and accurate disclosure as significantly altering the total mix of information made available, and that the false and misleading statements in the Proxy Statements proximately caused foreseeable losses to Plaintiffs and other class members. ¶¶ 117-130. Defendants' baseless assertion that "it is near impossible to ascertain the basis for Plaintiffs' §14(a) claim," therefore strains credulity. Defs. Br. at 23.

Challenging a claim that they insisted one paragraph prior they cannot "ascertain," and continuing to ignore the plain language of the SAC, Defendants argue in a single statement that "Plaintiffs still fail to identify any material misrepresentation or omission." *Id.* For the same reasons stated *supra* regarding Plaintiffs' §10(b) claims, Defendants are wrong: As the Court has already held, Plaintiffs have alleged numerous actionable false and misleading statements. Order at 21-24.

Moreover, §14(a) only requires allegations of negligence, not scienter. *Biver*, 2014 WL 244189, at *11. The SAC alleges that each Individual Defendant solicited and/or permitted use of their names in the Proxy Statements but did not exercise due care to ensure that the Proxy Statements fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. ¶¶ 122-24; *Brown v. Brewer*, No. CV 06-3731-GHK (SHx), 2010 WL 2472182, at *24-25 (C.D. Cal. June 17, 2010).

The SAC likewise alleges both transaction causation and loss causation, which are both subject to the Rule 8 pleading standard. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Edwards v. McDermott Int'l, Inc.*, No. 4:18-CV-4330, 2021 WL 1421603, at *6 (S.D. Tex. Apr. 13, 2021). First, the SAC states that the Proxy Statements, containing inaccurate statements and omitting material facts, served as "essential links" in the accomplishment of the Merger Agreement, and Defendants do not dispute that shareholder approval was required for the merger. ¶ 125. *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, No. 20-cv-9992 (PAC), 2021 WL 4443258, at *10 (S.D.N.Y. Sep. 27, 2021) (finding transaction causation for §14(a) claim where complaint alleged that proxy solicitations were essential link to the accomplishment of the transaction).  Second, the Court's prior ruling that Plaintiffs adequately pled loss causation as to the §10(b) claim should apply with equal force to the §14(a) claim.[12] The SAC states that Plaintiffs did not have the opportunity to make a fully informed decision in voting on the Merger Agreement and were damaged as a direct and proximate result of the untrue statements and omissions when the truth came to light in the Report. ¶¶ 126, 128. *See Edwards,* 2021 WL 1421603, at *6 (finding loss causation sufficiently pled for a 14(a) claim where complaint alleged that "the merger…and the misleading proxy materials that facilitated it, led to drastic drops in McDermott's stock price as the truth… became known").  Defendants provide no basis in either case law or logic for their two-sentence conclusory assertion that the SAC does not plead loss

---

[12] *See In re EQT Corp. Sec. Litig.,* 504 F. Supp. 3d 474, 501-03 (W.D. Pa. 2020); *In re AOL Time Warner Sec. & "ERISA" Litig.,* 381 F. Supp. 2d 192, 231-32 (S.D.N.Y. 2004).

24

causation for the § 14(a) simply because the corrective disclosure bringing the truth to light occurred "several months *after* the Merger." Defs. Br. at 24.[13]

### III.   THE SAC ADEQUATELY ALLEGES A §20(A) CLAIM

The SAC adequately alleges that the §§ 10(b) and 14(a) claims and, as such, the § 20(a) claim is successfully pled. *See Equifax*, 357 F. Supp. 3d at 1252; *Biver*, 2014 WL 2441891, at *5.

### <u>CONCLUSION</u>

Therefore, for the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.[14]

Dated: October 20, 2022                    Respectfully submitted,

                                          **POMERANTZ LLP**

                                          By: */s/ Tamar A. Weinrib*
                                          Tamar A. Weinrib (admitted *pro hac vice*)
                                          600 Third Avenue, 20th Floor
                                          New York, NY 10016
                                          Telephone: (646) 581-9973
                                          Facsimile: (917) 463-1044
                                          taweinrib@pomlaw.com

                                          *Lead Counsel for Plaintiffs*

---

[13] Moreover, Defendants' argument (with no documentary support) that the stock recovered post-Class Period is irrelevant and ignores well accepted precedent that post-Class Period recoveries do not negate loss causation. *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, 2016 WL 9413421, at *6 (S.D. Fla. June 29, 2016); *Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1276-77 (N.D. Ga. 2014).

[14] In the event the Court dismisses some or all of the claims alleged, Plaintiffs respectfully request leave to replead. *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1339 (M.D. Fla. 2002) (granting motion to dismiss, without prejudice to filing amended complaint).