**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER, BYRON ROTH and TASMIN ETTEFAGH,<br><br>  Defendants. | Case No. 6:21-cv-809-PGB-GJK |

### <u>Lead Plaintiffs' Memorandum of Law in Opposition to Defendant Byron Roth's Motion to Dismiss Consolidated Second Amended Complaint</u>

Plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, respectfully submit this opposition to Defendant Byron Roth's ("Roth") Motion to Dismiss ("Motion") the Consolidated Second Amended Complaint ("SAC").

### <u>Preliminary Statement</u>

PureCycle Technologies Inc. ("PureCycle") has never earned revenue and has *only* one operation --- a process for recycling polypropylene, a common plastic that scientists have found impossible to recycle since its invention in 1951. PureCycle has the dubious honor of being merely one in a long line of questionable reverse mergers Defendant Roth has brought public, while misleading investors regarding the

underlying business, only to slap a "buy" rating on the stock and collect millions in compensation, leaving innocent investors to suffer the consequences. The SAC alleges that Defendant Roth issued misleading statements in two proxy statements, a registration statement, and a press release, that PureCycle's process is "proven" to convert waste polypropylene into virgin polypropylene more cost effectively than manufacturing virgin polypropylene and can use a broader range of feedstock than traditional recycling, though in reality the technology is unproven and presents serious issues at lab scale, the economics of conducting the process at commercial scale are cost prohibitive, and the process cannot cost effectively utilize a broader range of feedstock than traditional recycling. Defendant Roth also touted the PureCycle management team as having "broad experience across plastics," decades of experience scaling early stage companies, in public markets, and leading transformational projects, though they had *no background* in plastics recycling and previously brought six other companies public that imploded causing substantial investor losses. The Court already held that such statements, which contain "verifiable facts," "are not puffery and may be challenged as fraudulent or misleading statements." Order at 21-22. The Court also held that "the Complaint has sufficiently alleged falsity with its reliance on the Hindenburg Report" ("Report"), the corrective disclosure. Order at 24.

Though the §14(a) claim does not require scienter, the SAC sufficiently alleges scienter pursuant to §10(b). Defendant Roth's own statements convey that he did diligence to assure that PureCycle would be a "compelling growth company," had access to information regarding PureCycle's only operation in accordance with the

2

Merger Agreement he co-signed with Defendant Otworth, issued statements comparing PureCycle's technology with traditional methods of manufacturing and recycling which he only could have done had he indeed undertaken the comparison, had a history of bringing dubious companies public via reverse merger for his own personal gain, and had motive to consummate the PureCycle deal to obtain millions of dollars' worth of "founder's shares." Holistically, these allegations suffice to establish Defendant Roth's scienter for the § 10(b) claim.

Defendant Roth does not challenge loss causation, or the § 20(a) claim, and only challenges the § 14(a) claim by arguing § 10(b) is not sufficiently pled.

Defendant Roth's Motion should therefore be denied.

### Statement of Facts[1]

PureCycle went public via a reverse merger with Roth CH Acquisition I ("ROCH"), a SPAC. ¶ 31. SPACs are shell companies set up for the sole purpose of raising money through an IPO to eventually acquire another company. *Id.* Going public through a SPAC is quicker, has lower associated costs and fewer extensive financial disclosure requirements than a traditional IPO. *Id.* Roth Capital Partners, LLC ("Roth Cap") and Craig-Hallum Capital Group LLC were the sole underwriters in the ROCH IPO. ¶ 32. Defendant Roth is not only CEO and Chairman of ROCH but also the CEO and Chairman of Roth Cap, which largely operates in the murky world of small cap and microcap banking. ¶ 33. Defendant Roth owns 75% of Roth

---

[1] All ¶ __ references are to the SAC filed on August 18, 2022. (ECF No. 113).

Cap. *Id.* Prior to taking on SPAC mergers, Roth was notorious for facilitating suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion from 2003 to 2012. ¶ 34.  Defendant Roth was even featured in a documentary called, "The China Hustle," detailing the nearly decades-long Chinese reverse merger scandal, which *Vanity Fair* called "the biggest financial scandal you've never heard of." *Id.* Defendant Roth took Chinese companies public via reverse merger and then slapped "Buy" ratings on the stocks through Roth Cap's own research division. *Id.* These Chinese companies had wildly misstated their operations, profits, and assets in U.S. disclosures. *Id.* Roth would collect fees for bringing these companies public and then Roth Cap would hype the stocks to its investors, drive the price up, and cash out. *Id.* The stocks would subsequently plummet, with many delisted, as the truth of their misstatements came to light. *Id.*  Unwary investors suffered monumental losses. *Id.*

Roth Cap's FINRA BrokerCheck report currently shows 16 regulatory sanctions and 12 arbitrations, including two violations of the Securities and Exchange Act of 1934 Regulation M, enacted to prevent market manipulation. *Id.*

From Chinese reverse mergers to SPACs, Roth's ROCH entered into an agreement and plan of merger on November 16, 2020 with PureCycle. ¶ 35. Roth Cap and Craig Hallum received almost 2 million "founder's shares" in PureCycle for a little more than a penny each for sponsoring the SPAC deal. ¶ 36. True to form, Roth Cap slapped a "buy" rating and $45 price target on the stock a week after a portion of its shares became eligible to dump. *Id.* Though in a typical IPO, the investment banks sponsoring a deal have to observe a "quiet period" for ten days following the IPO so

as not to unduly influence the stock price, this protective measure does not apply to SPAC transactions. *Id.* The resulting increase in PureCycle's stock price triggered an early share unlock for Roth. *Id.* Per the terms of its founder's shares, half became eligible for sale on April 16. *Id.* The rest of their shares became freely tradeable in September 2021, though the Company had yet to earn a single dollar in revenue. *Id.*

PureCycle's sole purpose is to commercialize a process for recycling polypropylene, which Procter & Gamble ("P&G") developed and licensed to PureCycle. ¶¶ 38, 42. Polypropylene represents 28% of the world's plastic yet only 0.8% is recycled because it is uneconomical and requires expensive sorting and cleaning due to its use in food packaging and its use in products with mixed plastics that can be difficult, if not impossible, to separate. *Id.* ***The world's top scientists and chemical companies have unsuccessfully sought a recycling solution since polypropylene's discovery in 1951***. ¶ 39. Defendants claimed they had achieved the impossible. *Id.*

Despite such lofty claims, there is not a single peer reviewed study detailing PureCycle's advancements in the field of plastics recycling. ¶ 41.  Moreover, though polypropylene is the largest plastic type P&G uses, it did not opt to develop the supposedly revolutionary technology internally, which would have given it a massive competitive advantage over other companies in the consumer products field. ¶ 42. Instead, P&G licensed the technology to PureCycle around the time of its inception though its management team had no background in plastics recycling. *Id.*  Moreover, while Defendants describe their process as "revolutionary," there is a patent dated

August 3, 1993 that describes the process PureCycle purports to employ, involving varying temperatures or pressures of butane and propane to reclaim polypropylene. ¶ 43[2]. Despite the existence of this patent for almost three decades, the process has never been successfully employed because it is uneconomical and involves significant hazards—obstacles that Defendants concealed. *Id.*   The solvents that PureCycle's process utilizes—propane and butane-- are extremely flammable gasses that are held in a vessel under pressure and heated to a couple hundred degrees, *i.e.*, a bomb. *Id.*

Polypropylene waste feedstock is an essential component of PureCycle's recycling process. ¶ 44. However, John Laymen, the senior P&G scientist who developed the technology ("Laymen") has explained PureCycle can't use just any feedstock. ¶ 45.  The process removes a "fairly low" level of contamination, "less than 5%," and feedstock needs to be at least 90% polypropylene because the lower the level of polypropylene in the feedstock, the less economical the process and the less likely the Company will generate any revenue. *Id.* The feedstock needs to be of exemplary purity, "of the right quality, and the right quantity." *Id.*  Defendants did not reveal that they could not, therefore, use a "broader range of feedstock than traditional recycling," as they claimed, and still conduct the process cost-effectively. ¶ 46.  Moreover, Laymen confirmed that difficulty obtaining large quantities of *high-quality* feedstock (due to, *inter alia,* high competition) to support the process posed a significant risk to moving

---

[2] Defendant Roth's discussion of the patent process is irrelevant. Roth Br. at 11-12. Roth never actually disputes that PureCycle's process is based on an old patent (a fact Defendants never disclosed) nor that the technology underlying that patent (which matches the description of PureCycle's supposedly revolutionary technology) never reached commercial scale because it is uneconomical and hazardous.

beyond lab scale to commercialization *Id*. Industry experts confirmed that there is *currently* insufficient supply of non-contaminated polypropylene scrap to support PureCycle's process and that there is huge demand for polypropylene feedstock. *Id.*[3]

## Defendant Roth's Materially False and Misleading Statements

Defendant Roth issued false and misleading statements representing that PureCycle's recycling process is "proven" to convert polypropylene into virgin like resin, can utilize a "broader range of feedstock than traditional recycling," is more "cost efficient" than traditional manufacturing of virgin polypropylene, and touting the experience of its management team. Roth also listed the foregoing as key factors in the ROCH Board's decision to recommend the deal. In reality, the technology is unproven and presents serious issues at lab scale, the flammable pressurized process is dangerous and not yet functional—especially at scale, the process requires large quantities of high quality feedstock with minimal contamination, the process is not more cost efficient than manufacturing of virgin polypropylene, and the "experienced" management team had no background in plastics recycling and previously brought six companies public to line their own pockets and then drove those companies to

---

[3] Based on the Report, the SAC alleges that P&G likely offloaded the technology given the many obstacles to commercialization, including problems at lab scale, the hazards involved, and the daunting task of obtaining the large quantities of high-quality feedstock. Roth challenges this allegation with a quote from Laymen's interview as to why P&G opted not to try commercializing the process on its own. Roth Br. at 10. That quote does not move the needle. It is unsurprising that Laymen would opt not to disparage the technology P&G had just licensed to PureCycle in an interview posted to PureCycle's website. Whether Laymen spoke truthfully or whether the Report's conclusion regarding P&G's motivations are accurate is a factual dispute that is not appropriately adjudicated at this juncture. In any event, Plaintiffs' claims do not hinge on P&G's motivations for licensing the technology to a -new company with no background in plastics recycling.

financial ruin. Moreover, ROCH's (*i.e.,* Roth's) primary motive in recommending the merger was to obtain millions in founder's shares just for consummating the deal and then drive the price of PureCycle's shares up.

On November 16, 2020, PureCycle and ROCH announced via press release that PureCycle would go public via an agreement and plan of merger with ROCH ("Merger Agreement"). ¶ 53. *Defendants Roth and Otworth are quoted in, and had control over, the contents of the press release.* *Id.* Therein, Defendants represented that PureCycle's polypropylene recycling process is "more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy. PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene." *Id.* In the press release and webinar slide presentation linked therein, Defendants also touted the PureCycle's management team's decades of experience "scaling early stage companies," in "public markets," and "leading transformational projects." ¶¶ 55-56. The same day, Defendants filed a preliminary proxy statement on Schedule 14A (later amended on February 12, 2021 ("Amended 14A"); together, the "Proxy Statements"), *which Defendant Roth signed*. ¶ 60. The 14A included the transcript of a presentation touting PureCycle's management's experience and further stating that customers can use PureCycle's UPRP "interchangeably with virgin resin, and they can make… the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today." *Id.*

Then, on November 20, 2020, ROCH and PureCycle filed a Registration

Statement on Form S-4 with the SEC ("S-4"), *signed by Defendant Roth*. ¶ 63.  Therein, Defendants called PureCycle's recycling process a "proven technology," represented that it "converts waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene," further claimed the process had been "validated by independent technical consultants and many of PCT's strategic partners and initial customers" (though not a single one is identified by name), and claimed that PureCycle could use a "broader range of feedstock" for its process. *Id.*

The Amended 14A, *also signed by Defendant Roth*, emphasized PureCycle's "unique patented process…allowing for a broader range of feedstock than traditional recycling… which have been tested and validated by P&G, prospective customers and third party engineering specialists," and significantly "reduced production costs as compared to virgin resin," as key factors on which the ROCH Board based its decision to recommend the SPAC transaction. ¶¶ 67-69.  The Amended 14A also flaunted PureCycle management's experience, stating that they have "broad experience across plastics manufacturing" and describing decades of experience "scaling early stage companies," in "public markets," and "leading transformational projects." ¶ 71.

### THE TRUTH EMERGES

On May 6, 2021, analyst Hindenburg Research published a scathing report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street". ¶ 75.  The Report concluded that, "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven

technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences." ¶ 76. Hindenburg wrote that it was "unable to find a single peer reviewed study in any scholarly journal citing PureCycle's licensed process," and that "PureCycle's licensed patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale." ¶ 80.  Hindenburg revealed that it consulted with a "30 year expert in polymers," who stated that "[t]here is no mention of the needed actual testing of the final product," that it "is indirect and vague," and that "the hazards are clearly minimized, which is typical when serious hazards are expected and read by someone without any prior knowledge or experience." ¶ 81.  He further stated, "[t]he permitting, engineering, and equipment would be very expensive and a challenge full scale. The plastic recovered may or may not be accepted or usable. *I don't think the process could ever be cost efficient*. The process is expensive, the test requirements and documentation is extensive, and the value of the product just isn't high enough." *Id.* He also made clear that "the flammability and hazards of this process cannot be understated" and that "taking propane and butane, heating them in a vessel to a couple hundred degrees and holding it under pressure at thousands of pounds per square inch, *is a bomb*." He went on to state that the "integrity of all of the vessels and equipment must be flawless and maintained to be flawless. The specifications for equipment to do this is extreme and rightfully so. *Any incident would be catastrophic*."  Hindenburg further detailed that PureCycle's process has issues at "lab scale," rendering larger scale development even more problematic. *Id.*

The Report also revealed that "[o]ne of the key challenges (and likely future

bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical." ¶ 77. Indeed, Laymen warned: "I think the fact that you have to ensure you have feedstock coming in and I think that'll be a bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the larger plants running." *Id.* Hindenburg also interviewed Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers, an expert in PP raw materials, who confirmed that "there is not enough non-contaminated PP scrap to support [PureCycle's] processes," and stated that PureCycle's process requires feedstock with less than 5% contamination and that he's "not aware of any PP scrap in volume that has any less than 5% contamination in the world." ¶ 78. Hindenburg also spoke with Richard Minges, a 10-year executive for Custom Polymers, who further corroborated the difficulty in obtaining the quality and quantity of feedstock needed, stating "it's more about the raw materials that can be secured." ¶ 79.

Hindenburg also uncovered how Defendant Otworth and three other senior PureCycle executives, had taken at least 6 companies public, and then drove them into the ground, eviscerating $760 million in public shareholder capital. ¶ 82. Hindenburg interviewed multiple former employees of these companies who revealed that the PureCycle management team had duped investors of these failed companies, stating, "they did con," brought companies public too early, engaged in "wild ass guessing," and went to market with a dossier that "was not credible." *Id.*

On this news, PureCycle's stock price fell from $24.59 per share to $14.83, representing a one-day drop of 40% on unusually heavy trading volume. ¶ 83.

PureCycle issued a press release in response to the Report the day of its publication, which fails to challenge, much less negate, *any* of the Report's specific underlying factual allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders." ¶ 84.

Then, on November 10, 2021, Defendants revealed that the SEC issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company." ¶ 85. Defendants explained that "the investigation pertains to, among other things, statements made in connection with PCT's technology, financial projections, key supply agreements, and management." *Id.* On this news, further validating the Report, PureCycle's stock fell from $11.50 per share to $9.79 per share (trading as low as $8.77 intraday), a one-day drop of 15% per share on unusually high trading volume of over 6 million shares. *Id.*

## ARGUMENT[4]

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)[5]. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts

---

[4] To the extent applicable, Plaintiffs incorporate all arguments asserted in the contemporaneously filed Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Second Amended Class Action Complaint ("Opp. Br.") herein. ECF No. 122.

[5] Emphasis is added and citations are omitted throughout unless otherwise stated.

12

must "accept all factual allegations in the complaint as true" and must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Courts also must draw all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555-56. A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Immucor Inc. Sec. Litig.*, No. 1:05-cv-2276-WSD, 2006 WL 3000133, at *7 (N.D. Ga. Oct. 4, 2006).

## I.    THE SAC ADEQUATELY ALLEGES A §10(B) CLAIM

To state a §10(b) claim, a plaintiff must allege: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation. *FindWhat Inv'r Grp. v. FindWhat.com,* 658 F.3d 1282, 1295 (11th Cir. 2011).

### A. The SAC Adequately Alleges Defendant Roth "Made" Misstatements

The SAC alleges that Roth made false and misleading statements in four documents, the November 16, 2020 press release, the S-4, and the Proxy Statements, *see supra*. The Court already ruled that "Defendant Roth 'made' the alleged false and misleading statements" because he "'possessed the power and authority to control the contents' of the press release, presentations, and SEC filings." Order at 17, ¶ 25. *See Janus Cap. Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011). Indeed, ROCH is listed as the source of the November 16, 2020 press release, and Defendant Roth is quoted therein. ¶ 53. Roth also signed the Proxy Statements and S-4. ¶¶ 60, 63, 67.

13

*As this Court has already ruled*, having chosen to speak regarding the foregoing topics, Defendants incurred a duty to speak fully and truthfully regarding PureCycle's recycling process and management's background; the statements contain "verifiable facts" and are thus "not puffery and may be challenged as fraudulent or misleading statements;" and "the Complaint has sufficiently alleged falsity with its reliance on the Hindenburg Report." Order at 21-24, 29-30. *See also FindWhat*, 658 F.3d at 1299; *SEC v. Merch. Cap., LLC*, 483 F.3d 747, 770-71 (11th Cir. 2007).

### B. Defendant Roth's Misstatements are Actionable

Defendant Roth does not offer any falsity arguments in the "ARGUMENT" section of his brief, instead adopting those set forth in the PureCycle Motion, ECF No. 116. As such, Plaintiffs incorporate by reference all applicable arguments advanced in the contemporaneously filed Opp. Br. concerning falsity. However, Defendant Roth proffers mischaracterizations of both fact and law in the "BACKGROUND" Section of his brief to argue that his statements are inactionable, which are addressed herein.

Ignoring most of the Report, including statements by expert witnesses identified by name and experience, Defendant Roth challenges the SAC's "reliance on the Hindenburg Report" solely because it includes "statements by undisclosed 'former employees'" of companies with "no connection to Mr. Roth." Roth Br. at 6. The Court has already held that "while the Hindenberg Report does rely on several anonymous witnesses, that is not the full picture." Order at 24. Moreover, Defendant Roth does not dispute the Report's credibility, the fact that the former employees' statements (along with other parts of the Report) demonstrate the falsity of statements

regarding management's experience, and the fact that the Report establishes the falsity of his other misstatements concerning the recycling process. Whether Roth had any "connection" with the former employees' prior companies is therefore irrelevant.

Defendant Roth next claims that "SEC Filings Refute Plaintiffs' Allegations." Roth Br. at 6-9. Roth asks the Court to dissect fifty pages of generic risk factors to find those that he claims concern projected revenues (not at issue), competition for feedstock, challenges to scaling production, and other "risks associated with investing in PCT." Roth Br. at 6-7. Defendant Roth does not argue that any of the alleged misstatements are "forward looking" nor does he identify *a single risk factor* that would have warned investors of *current risks,* including that PureCycle management had no relevant experience in plastics recycling and had driven six prior early stage companies into the ground, that PureCycle's recycling process faced significant problems at lab scale, that the process could not utilize a "broader range of feedstock than traditional recycling," and that the process was not more cost-efficient that manufacturing virgin polypropylene traditionally. *See Maz Partners, LP v. First Choice Healthcare Sols., Inc.,* No. 6:19-cv-619-Orl-40LRH, 2020 WL 1072582, at \*5 (M.D. Fla. Feb. 14, 2020); *SEC v. Levin*, No. 1:12-cv-21917-UU, 2014 WL 11878357, at \*18 (S.D. Fla. Oct. 6, 2014).

Defendant Roth then selectively quotes a pre-Class Period engineer report to argue that "concerns about scalability are misplaced" because the engineer concluded that PureCycle's *not-yet-constructed* Phase II facility could potentially produce over 100 million pounds of UPRP. Roth Br. at 7. Defendant Roth conveniently omits the context; the engineer qualifies that its conclusion ***assumes*** PureCycle resolves

"outstanding design issues" and ***assumes*** the process uses feedstock with "minimum polypropylene content of at least 93.3 percent," *i.e.*, high quality feedstock with minimal contamination (consistent with Laymen's warning, ¶ 77.)    Moreover, ignoring the language he quotes from the report, Roth claims that it contradicts the SAC's allegations regarding "feedstock hurdles," because the Company had five feedstock agreements. Roth Br. at 8. However, as Roth concedes, the engineer made clear that PureCycle will have "sufficient feedstock to support the design basis" **ONLY IF**, "the feedstock suppliers have sufficient quantities available and at the appropriate specifications." *Id.* The engineer reaches no conclusion as to the suppliers' abilities to provide the appropriate quantity or quality of feedstock.    Regardless, the "truth" of this report is not ripe for adjudication at this stage. *See* Order at 23.[6]

### C. The SAC Adequately Alleges Defendant Roth's Scienter

A complaint pleads scienter by alleging facts that give rise to a strong inference of either recklessness or conscious misbehavior. *See Abrams v. MiMedx Grp., Inc.*, 37 F. Supp. 3d 1271, 1277 (N.D. Ga. 2014). An inference is "strong" if it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1232 (N.D. Ga. 2019). Because this inquiry examines "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," courts must "consider the complaint in its entirety," and "not whether any individual allegation, scrutinized in isolation, meets that standard."

---

[6] Other of Defendant Roth's mischaracterizations are addressed in the Statement of Facts *infra.*

*Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (citing *Tellabs*, 551 U.S. at 322-23). The inference "need not be irrefutable, i.e., of the 'smoking -gun' genre, or even the 'most plausible of competing inferences,'" so long as it is as likely as any other inference. *Tellabs*, 551 U.S. at 324.  The SAC meets this standard.

Defendant Roth stated that "we searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks." ¶ 91.  Defendant Roth could not have assessed whether PureCycle constituted a "compelling growth company" without due diligence into its only "product"—the polypropylene recycling process. *See* Order at 34, fn 19.  As part of that diligence, Roth would have had access to material information contradicting his public statements. *See Equifax*, 357 F. Supp. 3d at 1233 (allegations that defendants "possessed knowledge of facts or access to information contradicting their public statements, so as to prove that defendants knew or should have known that they were misrepresenting material facts" suffice to plead scienter).  Indeed, the SAC alleges that the Merger Agreement, which Defendants Roth and Otworth both signed, provided Roth with "Access to Information," which would have included information regarding *the functionality and scalability of its only operation*. ¶ 90.  Similarly, Roth issued statements comparing PureCycle's process with traditional methods, which he could not have done without having undertaken said comparison, thus further contributing to the inference of scienter.

Unable to dispute these facts, Defendant Roth instead asks this Court to make the *illogical* inference that Roth, as CEO and Chairman of ROCH and Roth Cap, did

not undertake any diligence to ensure an acquisition with PureCycle aligned with ROCH's stated objectives, to ensure PureCycle's management had relevant credentials, and to ensure that PureCycle's *only product* did not face troubling problems at lab scale and had in fact accomplished what had previously stymied scientists and experts in plastics recycling for decades (polypropylene recycling using a broader range of feedstock than traditional recycling and which is more cost efficient that traditional manufacturing of virgin polypropylene). Roth Br. at 16-17. This is not only belied by facts and logic but is certainly not an inference *equally as compelling (much less more compelling)* than the inference that Defendant Roth had done due diligence, with access to PureCycle's "information," before agreeing to acquire PureCycle.[7]

The SAC further alleges that PureCycle is not the first company Defendant Roth took public only to immediately slap a "buy" rating on the stock through Roth Cap's own research division to inflate the value of its "founder's shares." ¶ 92. Defendant Roth facilitated numerous suspect Chinese reverse mergers, raising $3.1 billion. Like with PureCycle, Defendant Roth took these companies public and slapped glowing "Buy" ratings on the stocks through Roth Cap's research division. Additionally, Roth Cap's FINRA BrokerCheck report shows 16 regulatory sanctions and 12 arbitrations, including two violations of Regulation M, enacted to prevent market manipulation. *Id. See* https://brokercheck.finra.org/firm/summary/15407. Roth, as **the Chairman**

---

[7] Moreover, by signing the Proxy Statements, Roth put himself forth as knowledgeable on the subjects therein and incurred a duty to ensure their accuracy. While Defendants argue that "mere" signatures do not suffice, Roth Br. at 17, the SAC contains other allegations of Roth's scienter. *See, e.g.,* ¶¶ 90-93.

***and CEO of <u>Roth</u> Cap***, a company that bears his name-- cannot credibly argue that "Plaintiffs continue also to conflate Mr. Roth with Roth Capital" and that the foregoing allegation is therefore "demonstrably false." Roth Br. at 3. Roth's egregious claim that this allegation is "demonstrably false" ignores Roth Cap's BrokerCheck report and cites solely to Defendant Roth's *individual* report. Roth Br. at 3, fn 1.

Defendant Roth argues that the Court already found allegations of his checkered past "insufficient." Roth Br. at 15.  While the Court distinguished *Takata v. Riot Blockchain, Inc.,* 2020 WL 2079375 (D.N.J. Apr. 30, 2020) because it involved scheme liability, the Court did not foreclose the possibility that past misconduct could contribute to the scienter inference with "additional allegations." Order at 34-35. Those additional allegations in the SAC, *e.g.*, ¶¶ 90-91, with allegations of Defendant Roth's checkered past, considered holistically, support the inference that he misled investors regarding the PureCycle SPAC, as with other reverse mergers, and issued a "buy" rating on the stock to drive up the value of the "founder's shares" Roth Cap received (worth approximately $48 million ***the day before the Report was issued***). *United States SEC v. Corp. Rels. Grp., Inc.*, 17 Fla. L. Weekly Fed. D 384 (U.S. M.D. Fla. 2003) (finding scienter where "Defendants' repeated pattern of purchasing the securities of fourteen companies over a two-year period followed by touting and sales at a tremendous profit shows repeated, willful activity.")  Roth Cap's exorbitant windfall, which it never would have collected had the SPAC transaction not consummated or had the market known the truth, strongly supports an inference of scienter particularly in light of the timing. *Tellabs*, 551 U.S. at 325 ("motive can be a relevant consideration,

and personal financial gain may weigh heavily in favor of a scienter inference."). *See also Equifax*, 357 F. Supp. 3d at 1232 n.280.[8]   Defendant Roth's argument that "Plaintiffs fail to allege that Mr. Roth personally obtained anything as a consequence of any of the alleged fraudulent statements," Roth Br. at 17, again trying to distance from Roth Cap, is another in a long line of arguments belied by fact and logic. *See In re Galectin Therapeutics*, *Inc. Sec. Litig*., 843 F.3d 1257, 1269 (11th Cir. 2016).

### D. The SAC Adequately Alleges a §14(a) Claim

Defendant Roth argues in a single statement that the "Section 14(a) claims fail for the same reasons that the Section 10(b) claims do."  For the reasons stated above and in the contemporaneously filed Opp. Br., the SAC adequately alleges a Section 14(a) claim against Defendant Roth (for which there is no scienter requirement).

### CONCLUSION

Therefore, for the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendant Roth's Motion in its entirety.

Dated: October 20, 2022                              Respectfully submitted,

                                                    **POMERANTZ LLP**

                                                    By: /s/ Tamar A. Weinrib
                                                    Tamar A. Weinrib (admitted *pro hac vice*)
                                                    600 Third Avenue, 20th Floor
                                                    New York, NY 10016
                                                    Telephone: (646) 581-9973
                                                    Facsimile: (917) 463-1044
                                                    taweinrib@pomlaw.com

---

[8] Defendant Roth argues that mere motive is insufficient to establish scienter, cherry picking a scienter allegation and asking this Court to view it in isolation contrary to *Tellabs.* 551 U.S. at 322-23.

*Lead Counsel for Plaintiffs*

21