# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**WILLIAM C. THEODORE,
ERSTE ASSET MANAGEMENT
GMBH and DAVID
TENNENBAUM,**

          **Plaintiffs,**

**v.**                                    **Case No: 6:21-cv-809-PGB-RMN**

**PURECYCLE TECHNOLOGIES,
INC., MICHAEL OTWORTH,
TASMIN ETTEFAGH, MICHAEL
E. DEE, DAVID BRENNER and
BYRON ROTH,**

          **Defendants.**

_____/

## ORDER

This cause comes before the Court on the following filings:

1.    Defendants PureCycle Technologies, Inc. ("**PureCycle Inc.**"), Michael Otworth, Tasmin Ettefagh, Michael E. Dee, and David Brenner's (collectively, the "**PureCycle Defendants**") Motion to Dismiss (Doc. 116 (the "**PureCycle Motion**")), Plaintiffs' response (Doc. 122), and PureCycle Defendants' reply thereto (Doc. 135);

2.    Defendant Byron Roth's ("**Defendant Roth**") Motion to Dismiss (Doc. 118 ("**Defendant Roth's Motion to Dismiss**")) and Plaintiffs' response (Doc. 124); and

3.    Defendant Roth's Motion to Strike, (Doc. 117) Plaintiffs' response (Doc. 123), and Defendant Byron Roth's reply thereto (Doc. 134).

Upon due consideration, the PureCycle Motion is granted in part and denied in part while both of Defendant Roth's Motions are denied.

## I.    BACKGROUND[1]

This case arises from the drop in PureCycle Inc.'s stock prices after the publication of a third-party research report. Founded in 2015, PureCycle Inc. is a recycling services company that focuses on recycling the waste from a certain type of plastic, polypropylene, into an ultra-pure recycled resin, using technology licensed from the Procter & Gamble Company ("**P&G**"). (Doc. 113, ¶ 3). PureCycle Inc.'s stock began trading publicly on the NASDAQ Exchange on March 18, 2021, as the result of its reverse merger with Roth CH Acquisition I Company ("**ROCH**"), a publicly traded special purpose acquisition company. (*Id.* ¶ 22). The players responsible for taking PureCycle Inc. public include Defendant Michael Otworth, the Chairman of the Board of Directors and Chief Executive Officer of PureCycle Inc.; Defendant Michael Dee, the Chief Financial Officer of PureCycle Inc.; Defendant David Brenner, the Chief Commercial Officer of PureCycle Inc.; Defendant Tasmin Ettefagh, the Chief Sustainability Officer of PureCycle Inc.; and Defendant Roth,[2] the Chairman and CEO of ROCH. (*Id.* ¶¶ 23–27).

---

[1]    This account of the facts comes from the Plaintiffs' Second Amended Complaint. (Doc. 113). The Court accepts these factual allegations as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

[2]    Defendant Roth is also the CEO and Chairman of Roth Capital, one of the investment banks that was an underwriter for the ROCH-PureCycle Inc. merger. (Doc. 113, ¶¶ 32, 33).

From November 16, 2020 to May 5, 2021, Plaintiffs allege that Defendants made false and misleading statements in: (1) PureCycle Inc.'s November 16, 2020 Press Release (the "**November Press Release**"); (2) Defendants' November 16, 2020 Investor Presentation[3] (the "**Investor Presentation**"); (3) PureCycle Inc.'s Form S-4 Registration Statement, filed November 20, 2020 with the SEC and signed by Defendant Roth (the "**Registration Statement**"); (4) PureCycle Inc.'s Form 424(b)(3) Prospectus, filed February 12, 2021 with the SEC (the "**Prospectus**"); (5) PureCycle Inc.'s March 18, 2021 Press Release (the "**March Press Release**"); and (6) PureCycle Inc.'s April 21, 2021 Press Release (the "**April Press Release**"). (*Id.* ¶¶ 53–73).

Defendant Roth stated the following individually in a November 16, 2020 press release: "We searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks." (*Id.* ¶ 91). Defendant Roth signed the Form S-4 filed with the SEC as well as both the original and amended proxy statements filed on November 16, 2020 and February 12, 2021, respectively. (*Id.* ¶¶ 63, 67). The amended proxy statement referenced "[PureCycle Inc.'s] unique

---

[3] On the same day, ROCH filed a Form 8-K, disclosing the slides from the presentation, and a Schedule 14A, disclosing the transcript of the presentation, to the Securities and Exchange Commission (**"SEC"**). (Docs. 93-3, 93-4). Moreover, Plaintiffs allege that, in the video portion of the Investor presentation, Defendants Otworth, Dee, and Brenner each individually touted their respective experience once again. (Doc. 113, ¶ 61). Plaintiffs also allege that Defendant Otworth specifically made a statement that customers can use their resin interchangeably with virgin resin, alluding to their equal quality. (*Id.* ¶ 60).

patented process" and its "purification process and resulting product quality" that was "tested and validated by [Proctor & Gamble], prospective customers and third party engineering specialists" as significant factors leading to ROCH's decision to engage in the SPAC transaction with PureCycle. (*Id.* ¶ 67). Plaintiffs allege that Defendants misleadingly told investors, both in the proxy statements and in other filings throughout the Class Period, that it had accomplished what was considered previously impossible in the plastic recycling world. (*Id.* ¶ 39).

On May 6, 2021, Hindenberg Research, a short seller[4] in PureCycle Inc., released a report, titled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored By The Worst Of Wall Street" (the "**Hindenberg Report**"). (*Id.* ¶ 78). After anonymously interviewing multiple former employees from PureCycle Defendants' former companies, the general manager of an industry competitor, and a polymer expert, the Hindenberg Report revealed the following: (1) PureCycle Inc.'s purported experienced management team previously caused six businesses to fail, had previously characterized rank speculation as financial projections to investors, and was only motivated to bring PureCycle Inc. public in order to obtain large bonuses of cash and tradable stock; (2) PureCycle Inc. faced much higher competition for high quality feedstock, a necessary input in the recycling process,

---

[4]   *Short Seller*, MERRIAM-WEBSTER (2022), https://www.merriam-webster.com/dictionary/short-seller ("One who makes a short sale."); *Short Sale,* BLACK'S LAW DICTIONARY (10th ed. 2014) ("A sale of a security that the seller does not own or has not contracted for at the time of the sale, and that the seller must borrow to make delivery; such a sale is usually made when the seller expects the security's price to drop. If the price does drop, the seller can make a profit on the difference between the price of shares sold and the lower price of the shares bought to pay back the borrowed shares.").

than it had led investors to believe; (3) PureCycle Inc.'s patent is nowhere as valuable as it had led investors to believe as the patented process was not yet functional and was incapable of being scaled for commercial production as it had claimed; and (4) PureCycle Inc.'s licensed process could not be found in any peer-reviewed study. (*Id.* ¶ 10). Thus, Defendants' false and misleading statements were revealed and caused PureCycle Inc.'s stock price to fall from $24.59 to $14.83, approximately a 40% drop in one day. (*Id.* ¶ 12).

Plaintiffs allege that Defendants held a press conference on the same day but nevertheless failed to challenge, must less negate, any of the Report's specific underlying factual allegations. (*Id.* ¶ 31). Rather, Defendants stated that they "remain[ed] confident in [their] people, [their] technology, and [their] long term growth strategy" and that "[they] believe[d] Purecyle is well-positioned to continue executing on its strategy to drive long term growth and enhance value for shareholders." (*Id.*).

In early November, Defendants revealed in PureCycle Inc.'s disclosure for the most recent quarter that, on September 30, 2021, the Securities Enforcement Commission issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company." (*Id.* ¶ 85). Defendants revealed that "the investigation pertains to, among other things, statements in connection with [PureCycle Inc.'s] technology, financial projections, key supply agreements, and management." (*Id.*). PureCycle Inc.'s stock fell following each of these occurrences. (*Id.*).

Defendants Otworth and Dee received $5,000,000 and $3,000,000 for their role in completing the reverse merger transaction pursuant to their employment contracts. (*Id.* ¶ 88). Plaintiffs assert that the Merger Agreement—signed by Defendants Roth and Otworth—makes plain that ROCH (and therefore Defendant Roth) had "Access to Information," including the personnel, books, records, properties, financial statements, internal and external audit reports, regulatory reports, contracts, permits, commitments and any other reasonably requested documents and other information pertaining to PureCycle Inc. when Defendant Roth made his purported misstatements. (*Id.* ¶ 90).

Five days after the Hindenberg Report was published, Plaintiffs initiated this class action for violations of federal securities law and subsequently filed the Amended Class Action Complaint followed by the Second Amended Class Action Complaint ("**Complaint**") on September 27, 2021 and August 18, 2022, respectively. (Docs. 1, 90, 113).

Upon review of Defendants' initial Motions to Dismiss (Doc. 93, 95), this Court made several important determinations. First, the Court divided Defendants' allegedly false and misleading statements—which come from a variety of sources—into three distinct categories: 1) "statements about Pure[C]ycle Inc. management team's experience," 2) statements about the value of the patent and

the recycled polypropylene," and 3) "statements about PureCycle Inc.'s future production and financial projections."[5] (Doc. 112, p. 9).

The Court then found that Plaintiffs sufficiently alleged that the PureCycle Defendants and Defendant Roth were the makers of the false and misleading statements alleged. (*Id.* at p. 17). Next, the Court sifted through Defendants' various statements and determined which statements were material as opposed to mere puffery. (*Id.* at pp. 18–22). Third, the Court found that Plaintiffs correctly argued that the Hindenberg Report could be relied upon at this stage in the proceedings for purposes of showing falsity, one of the necessary elements for their claim. (*Id.* at p. 23). With respect to the safe harbor provision of the PSLRA, the Court determined that all statements in the third bucket concerning those about PureCycle Inc.'s future production and financial projections were protected and were thus not actionable in Plaintiff's fraud-based claims. (*Id.* at p. 27). Further, the Court rejected Defendants' argument that they did not have a duty to disclose certain facts, specifically Defendants' previous management experience, the performance issues at the relevant time regarding the patented recycling method including, but not limited to, how the production process was working at the lab scale. (*Id.* at pp. 28–30). These findings have not changed.

However, the Court ultimately dismissed Plaintiff's First Amended Complaint without prejudice because it found that Plaintiffs had not sufficiently

---

[5] The Court will not restate all of the individual statements for purposes of succinctness but rather will refer back to its prior Order and individually address each one as needed for purposes of ruling on the merits in this Order.

alleged scienter given their failure to plead which statements or omissions were made in which documents or representations, or, in the alternative, even considering the allegations as a whole. (*Id.* at p. 30). The Court did find, however, that Plaintiffs had adequately pled loss causation. (*Id.* at p. 40). Lastly, the Court dismissed Plaintiffs' § 20(a) claim because it was a derivative claim of their 10(b) claim and could therefore not survive on its own. (*Id.*).

In the Complaint, Plaintiffs, individually and on behalf of all others similarly situated, allege: (1) a violation of § 10(b) of the Securities Exchange Act and Rule 10(b)-5 promulgated thereafter ("**Count I**"); and (2) a violation of § 20(a) of the Securities Exchange Act ("**Count II**"); violation of § 14(a) of the Exchange Act and SEC Rule 14a-9 ("**Count III**"); and violation of § 20(a) of the Exchange Act in Connection with the Proxy Claims. ("**Count IV**"). (Doc. 113). The PureCycle Defendants and Defendant Roth now move to dismiss the Complaint and strike certain allegations therein (Docs. 116, 117, 118), and the matter is ripe for review after responsive briefing (Docs. 122, 123, 124, 134, 135).

## II.   STANDARD OF REVIEW FOR A SECURITIES FRAUD CLAIM

To survive a motion to dismiss, a fraud claim brought under the Securities and Exchange Act of 1934 must satisfy: "(1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2)"; "(2) the special fraud pleading requirements in Federal Rule of Civil Procedure 9(b)"; and "(3) the additional pleading requirements in the Private Securities Litigation Reform Act

of 1995 ("**PSLRA**")." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016).

First, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions and recitation of a claim's elements are properly disregarded, and courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). In sum, courts must (1) reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 679.

Second, for a complaint alleging fraud or mistake, such as a securities fraud claim, "a party must state with particularity the circumstances constituting fraud

or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

> While Rule 9(b) does not abrogate the concept of notice pleading, it plainly requires a complaint set forth: (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*In re Galectin*, 843 F.3d at 1269. "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

Finally, the PSLRA imposes additional pleading requirements for securities fraud actions. For a complaint alleging that the defendant "made an untrue statement of a material fact" or "omitted to state a material fact" making the statements misleading, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief," it must "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, to properly allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind" "with respect to each act or omission." 15 U.S.C. § 78u-4(b)(2)(A); *see Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1016–18 (11th Cir. 2004) (holding that a district court may aggregate all facts and circumstances in

the complaint to determine whether scienter was properly alleged for *each* defendant with respect to *each* alleged violation). If these requirements are not met, "the court shall . . . dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).

### III.   SECURITIES EXCHANGE ACT OF 1934 AND SECURITIES & EXCHANGE COMMISSION'S RULE 10b-5 & § 20(a)

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." *In re Galectin*, 843 F.3d at 1270 (quoting *Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). The Supreme Court is clear that "[a]lthough section 10(b) does not create an express private cause of action, we have long recognized an implied cause of action to enforce the provision and its implementing regulation." *Haliburton*, 573 U.S. at 267. Therefore, to state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege the following elements: "(1) material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) causal connection between misrepresentation or omission and the loss, commonly called loss causation." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).

Additionally, under § 20(a) of the Securities Exchange Act of 1934, "[e]very person who, directly or indirectly, controls any person is [jointly and severally] liable" for a violation of securities law. 15 U.S.C. § 78t(a). Known as "control person liability," it "is secondary only and cannot exist in the absence of a primary

violation." *In re Galectin*, 843 F.3d at 1276 (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004)). Therefore, to state a claim under § 20(a), "a plaintiff must allege: (1) a primary violation of federal securities law, and; (2) that the defendant exercised actual power or control over the primary violator." *Id.* (internal quotations omitted).

## IV.   DISCUSSION

### A.   Count One: Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

In the PureCycle Motion and the Defendant Roth Motion to Dismiss, the PureCycle Defendants and Defendant Roth maintain their previous arguments that Plaintiffs have again failed to plead their claims sufficiently. (Docs. 116, 118). Specifically, PureCycle Defendants argue that Plaintiffs have once again failed to plead material misrepresentations or omissions with scienter based on the following: 1) Plaintiffs fail to plead with particularity any securities fraud claim with respect to the recycling process; 2) Plaintiffs fail to plead scienter with particularity any securities fraud claim with respect to Defendants Otworth's Dee's or Brenner's experience; 3) Plaintiffs' § 14(a) claim fail for multiple reasons. (Doc. 116, pp. 7–24; Doc. 118, pp. 13–20). Additionally, the PureCycle Defendants and Defendant Roth posit that because Plaintiffs cannot plead a § 10(b) or § 14(a) claim, then Plaintiffs' claim under § 20(a) must necessarily fail. (Doc. 116, p. 7; Doc. 118, pp. 18–19).  The Court will address each argument in turn.

1.   *The Court's Prior Order*

In its previous Order, this Court went to extensive lengths to lay out precisely and specifically the extent to which Plaintiffs met their respective burdens for pleading their causes of action. (Doc. 112, pp. 8–30). For purposes of Plaintiffs' meeting their burden at this stage in the pleadings, this Court has determined that the only element remaining at issue in Plaintiffs' 10b-5 claim that required curing upon repleader was that of scienter. (*Id.*). The Court acknowledges, as Defendants point out, its request that Plaintiffs "be more cognizant in their pleading to specify what statements are being challenged and why." (*Id.* at p. 9). However, as Plaintiffs highlight, the Court also expressly held that Plaintiffs had met their burden of pleading who the makers of the actionable statements were, which statements or omissions were false and material, instances where Defendants had a duty to disclose certain information, and when loss causation was satisfied. (Doc. 112, pp. 8–40; Doc. 122, pp. 14–18). Defendants have failed to present any new argument that would cause the Court to reverse what it has already determined, nor does the Court find that Plaintiffs' Complaint is deficient relative to its previous complaints with regard to any of the aforementioned burdens. Accordingly, recognizing that Defendants may re-raise their objections at a later stage in the litigation, the Court maintains its previous rulings with respect to the aforementioned elements of Plaintiffs' 10b-5 claims. *Carvelli*, 934 F.3d at 1317 (laying out elements of a 10b-5 claim).

2.     *Scienter*

Upon review of Plaintiffs' Complaint, the Court finds that Plaintiffs have made a plausible claim that all Defendants except for Defendant Ettefagh acted with scienter.

To properly plead scienter under Rule 9(b) and the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," such as "an intent to defraud or severe recklessness on the part of the defendant." *Carvelli*, 934 F.3d at 1318 (quoting first, 15 U.S.C. § 78u-4(b)(2)(A), and second, *FindWhat Inv. Grp.*, 658 F.3d at 1299). "Severe recklessness is limited to 'highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.'" *Bhatt v. Tech Data Corp.*, No. 17-cv-02185, 2018 WL 6504375, at *5 (M.D. Fla. Dec. 11, 2018) (quoting *Durgin v. Mon*, 415 F. App'x 161, 164, 166 (11th Cir. 2011))[6] (emphasis removed). A "strong inference" of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Carvelli*, 934 F.3d at 1318. Finally, "[a]lthough scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute." *Id.*

---

[6]    Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants. *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

When a defendant makes a statement or statements repeatedly, it can more strongly evince an inference that the defendant spoke with scienter. *See Carlucci v. Han*, 907 F. Supp. 2d 709, 732–33 (E.D. Va. 2012) (highlighting the fact that the defendant "repeatedly made the representation" despite any evidence contributed to the finding that he acted with the requisite scienter to implicate a 10b-5 claim); *see also S.E.C. v. Keating*, 10-cv-419, 2011 WL 1549429, at *3 (D. Utah Apr. 22, 2011) (noting the fact that defendant "*continued* to make reassurances to investors" when explaining its conclusion that defendant acted with a "high degree of scienter.") (emphasis added); *see also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, No. 15-cv-02393, 2016 WL 3981236, at *9 (D.S.C. July 25, 2016) (indicating that the "most powerful evidence of scienter is the content and context" of the implicated statements themselves and, accordingly, while the defendants' "repeated statements about core operations" of the business were by themselves insufficient, they were relevant to "holistic analysis" leading to a finding of scienter) (citations omitted); *see also In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1365 (N.D. Ga. 2002) ("Moreover, even if individual pieces of evidence would be insufficient to prove a point, the combination of more than one piece of evidence may prove it.").

In the Eleventh Circuit, a plaintiff may prove knowledge or severe recklessness "by providing evidence that defendants possessed knowledge of facts or access to information contradicting their public statements." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1233 (N.D. Ga. 2019) (collecting cases); *see also*

*In re Apache Corp.*, 21-cv-00575, 2022 WL 4277350, at *8 (S.D. Tex. Sept. 15, 2022), *report and recommendation adopted sub nom. Plymouth Cnty. Ret. Ass'n v. Apache Corp.*, 21-cv-00575, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022) (citing multiple cases indicating that access to certain information led to a finding of scienter). "While 'scienter cannot be inferred merely from a defendant's position,' scienter can be inferred when a defendant's position and responsibilities establish other particular facts probative of scienter. *In re Flowers Foods, Inc. Sec. Litig.*, No. 16-cv-222, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018) (citing *Thorpe v. Walter Inv. Mgmt., Corp.*, 111 F. Supp. 3d 1336, 1360 (S.D. Fla. 2015).

Other circumstances that can evince a strong inference of sufficient scienter include proof of motive, a demonstration of having benefited in a concrete and personal way from the alleged fraud, a showing of having engaged in deliberately illegal behavior, or evidence that a party failed to check information that they had a duty to monitor. *In re Mylan N.V. Sec. Litig.*, 16-cv-7926, 2018 WL 1595985, at *11 (S.D.N.Y. Mar. 28, 2018) (citations omitted).

Though not entirely sufficient by itself, a government investigation can also help to create an inference of scienter. *Thorpe*, 111 F. Supp. 3d at 1376 ("As a result, 'the government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter,' but will not, standing alone, support an inference of scienter.") (citation omitted). Fraudulent intent can be demonstrated with circumstantial evidence. *Id.* at 1373.

### i.   *Defendants Otworth, Brenner, and Dee*

Unlike the other elements of Plaintiffs' claim, this Court found in its previous Order that Plaintiffs' prior complaint was due to be dismissed because Plaintiffs did not adequately plead scienter. (Doc. 112, p. 30). For the reasons stated below, the Court finds that—unlike before—Plaintiffs have met the heightened pleading standard for scienter with respect to Defendants Otworth, Brenner, and Dee.

This time around, the Court finds that Plaintiffs have supplemented their Complaint in multiple respects that, when reviewed in tandem with one another, sufficiently plead scienter with respect to Defendants Otworth, Brenner, and Dee.

For one, Plaintiffs aver with greater specificity, as compared to their previous complaint, the repeated instances wherein Defendants collectively *and* individually flaunted their past experience without disclosing their alleged prior business failings. (Doc. 113, ¶¶ 7, 55, 61). Unique to Plaintiffs' latest Complaint is the allegation that "[i]n the presentation, Defendants Otworth, Dee, and Brenner *each once again* touted their *respective* experience" to the SEC. (*Id.* ¶ 61) (emphasis added). Though slight, this shift in phrasing crucially helps the Plaintiffs over the hurdle of pleading scienter: pled in this manner and taken as true, Plaintiffs successfully demonstrate that each Defendant *individually* "acted with the required state of mind" by touting his *own* experience while omitting previous failures. *Phillips*, 374 F.3d at 1017. In other words, Plaintiffs eviscerate the potential inference that each Defendant spoke of one or all of the other Defendants' experience with a genuine lack of awareness. This could have served as a defense

to any of the Defendants' intent when speaking about the team's management experience as a whole. Rather, Plaintiffs create a much more compelling inference that Defendants spoke with the requisite intent to plausibly infer scienter because they surely each had an understanding of their own pasts and professional histories, individually speaking. Such a distinction is important and makes Plaintiffs' claim concerning scienter more plausible given that the standard for showing scienter is that intent is "at least as strong as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Moreover, upon repleader, Plaintiffs more precisely emphasize the repeated manner in which Defendants touted their experience, which, the Court finds, makes a material difference for purposes of pleading scienter. (Doc. 113, ¶ 61). In pleading that "Defendants Otworth, Dee, and Brenner, each *once again* touted their respective experience," Plaintiffs demonstrate a stronger inference of scienter. *(Id.)* (emphasis added). Like the *Carlucci* and *Keating* courts, this Court also finds it significant that the aforementioned Defendants made their statements multiple times, as this repetition makes it more likely that they intended to persuade others of their skill while omitting their past business failings.[7] *(Id.)*;

---

[7] Plaintiffs' repeated statements, in combination with their failure to push back against the findings contained in the Hindenberg Report with any particular fervor or specificity, is especially troubling in the Court's view. (Doc. 113, ¶ 3). In particular, the Court finds that it makes an inference of scienter more compelling because Defendants were both willing to bolster their own credibility but then remiss to defend it when it was attacked, making it more likely that they knew they had omitted information about their backgrounds inappropriately.

*Carlucci*, 907 F. Supp. 2d at 732–33; *Keating*, 2011 WL 1549429, at *3. Defendants' repeated statements thus counsel in favor of finding scienter here.

Additionally, in their Complaint, Plaintiffs capitalize on the SEC investigation into Defendants that ensued after their original complaint was filed. (Doc. 113, ¶ 85). While not dispositive in its own right, this Court agrees with the proposition set forth by the *Thorpe* court that the investigation "can be seen as one more piece of the puzzle" leading toward an inference of scienter. 111 F. Supp. 3d at 1376. In particular, the fact that "the investigation pertain[ed] to, among other things, statements in connection with [PureCycle's] technology, financial projections, key supply agreements, and management" catches the Court's attention. (Doc. 113, ¶ 85). Not only does the Court find it significant that this investigation was a multifaceted one, but it always takes note of the SEC's focus on the company's management itself, which means that the SEC too suspected that these Defendants in particular played a hand in potential wrongdoing. (*Id.*). All of these facts, when aggregated together, are sufficient to show a plausible claim for scienter.[8] 934 F.3d at 1318.

---

[8] These additional factual allegations in the Complaint complement the ones already previously alleged in Plaintiffs' First Amended Complaint and reiterated in this Complaint, including, but not limited to Defendant Otworth and Dee's substantial financial gain from consummating the merger, Defendant Otworth's access to internal company information, and Defendants' lack of relevant experience with polypropylene recycling. (Doc. 113, ¶¶ 87–90). The Court finds that these allegations exemplify the various ways that scienter can be shown such as "proof of motive, a demonstration of having benefited in a concrete and personal way from the alleged fraud, a showing of having engaged in deliberately illegal behavior, or evidence that a party failed to check information that they had a duty to monitor." *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *11.

Overall, the Court finds that Plaintiffs have now alleged all elements of their 10b-5 claims against the above defendants with enough specificity to survive Defendants Otworth, Brenner, and Dee's motions to dismiss.

### ii.    Defendant Ettefagh

While Plaintiffs have presented additional allegations in their Complaint to demonstrate scienter for the above Defendants, Plaintiffs fail to present additionally meaningful evidence against Defendant Ettefagh. Accordingly, their claim against her is due to be dismissed absent a plausible claim of scienter. *See Evans v. Alston*, No. CV118-067, 2018 WL 4924549, at *1 (S.D. Ga. Oct. 10, 2018) ("Plaintiff alleges no new facts showing his claims should not be dismissed. Therefore, even if the Court accepted his amendment, the second amended complaint would still be subject to dismissal for failing to state a claim.").

Upon review of Plaintiffs' First Amended Complaint and their present Complaint, the Court finds that the allegations against Defendant Ettefagh are substantially similar. (Docs. 90, 113). In both of their complaints, Plaintiffs rely entirely on Defendant Ettefagh's statements from the April 2021 Pure[C]ycle Inc. press release, wherein Defendant Ettefagh stated, among a few other things, that "Pure[C]ycle [Inc.] is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts." (Doc. 90, ¶ 55; Doc. 113, ¶ 73). While these statements may very well have been false and misleading as the Court has already ruled, the Court has not been presented with any additional evidence to alter its previous determination that Plaintiffs have not plausibly

alleged that Defendant Ettefagh acted with scienter.[9] (*See generally* Doc. 113; Doc. 112, p. 24). Accordingly, Plaintiffs' claims against Defendant Ettefagh are due to be dismissed.

### iii.    Defendant Byron Roth

Defendant Roth raises several arguments against the claim that he acted with scienter, which the Court finds unconvincing.[10] (Doc. 118). For example, Defendant Roth argues that Plaintiffs' assertions concerning the extent of Defendant Roth's "access to information" contradicting his public statements are not sufficiently particular, claiming that Plaintiffs fail to home in on any specific piece of information that would show how Defendant Roth misled investors either via a statement or omission. (*Id.* at p. 16). To cite a second instance, Defendant Roth argues that "the allegation that Mr. Roth signed SEC filings on behalf of ROCH does not suffice to establish scienter." (*Id.* at p. 17). Defendant Roth, however, makes these arguments in a piecemeal fashion and fails to account for the fact that scienter is a holistic inquiry: while Defendant Roth may be correct that

---

[9]    Plaintiffs do not allege that Defendant Ettefagh financially benefited specifically from the merger or that she touted her own personal experience despite past failed business ventures like they do the other Defendants. The additional allegation of an investigation alone is not enough, in the Court's view, to implicate Defendant Ettefagh without additional allegations specific to her conduct. Because the Court must "determine whether scienter was properly alleged for *each* defendant," it must dismiss the claims against Defendant Ettefagh. *Phillips*, 374 F.3d at *1016.

[10]    The Court is aware of Defendant Roth's other arguments for dismissing the claims against him; however, as previously stated, the Court has already ruled in favor of Plaintiffs in its prior Order (Doc. 90) with respect to the other elements of their fraud-based claims and need only resolve the issue of scienter for purposes of this Order. For the purposes of judicial efficiency, the Court will therefore not address Defendant Roth's other arguments concerning the merits of dismissal.

each issue he raises would not individually create an inference of scienter, he does not consider the cumulative effect of each allegation taken together, which is what the Court must assess to determine whether scienter is plausibly alleged. *KBC Asset Mgmt. NV*, 2016 WL 3981236, at *9. In its prior Order, the Court found that Plaintiffs' reliance on Defendant Roth's "checkered history," his financial motive to act fraudulently, and an emphasis on the "core operations" doctrine were not enough to show an inference of scienter without additional allegations of specific facts; the Court nonetheless made plain that each of these allegations could "bolster" such an inference. (Doc. 112, pp. 32–33).

Upon review of Plaintiffs' Complaint, the Court finds that Plaintiffs have alleged additional specific facts that collectively, along with the other context provided, amount to a plausible claim that Defendant Roth acted with scienter. Whereas in First Amended Complaint Plaintiffs only reference Defendant Roth's signing the S-4 form for the SEC, Plaintiffs here, in addition to the S-4, specifically allege that Defendant Roth himself signed the Schedule 14A (which contained the SPAC merger agreement), including the initial Proxy Statement and then later the amended Proxy Statement for Special Meeting of Stockholders of Roth Acquisition with the SEC. (Doc. 90, ¶ 48; Doc. 113, ¶¶ 60, 135). Building on these allegations, Plaintiffs newly further assert with particular detail that Defendant Roth had "'Access to Information,' including to the personnel, books, records, properties, financial statements, internal and external audit reports, regulatory reports, Contracts, Permits, commitments and any other reasonably requested documents

and other information of [PureCycle Inc.], when Roth issued his misstatements." (*Id.* ¶ 90).

Given these additional facts and Plaintiffs' prior, reiterated assertions concerning Defendant Roth's executive position at ROCH, his past dealings as well as his personal financial incentive to consummate a merger, the Court finds it plausible that Defendant Roth acted with the "severe reckless[ness]" that creates an inference of scienter.[11] 934 F.3d at 1318. Specifically, taken as true, Plaintiffs' allegations in this Complaint more elaborately specify the kinds of information that Defendant Roth had access to when he made his statements to the public as well as when he signed not only the first but also the amended proxy statement. (Doc. 113, ¶ 90). Plaintiffs' allegation this time around that Defendant Roth signed both proxy statements helps them move the needle: Defendant Roth's repeated signing shows an *ongoing* involvement with the SPAC merger over a period of several months, making it more likely—along with the types of information Plaintiffs allege he had access to—that he did not sufficiently pay attention to or care to investigate integral aspects of PureCycle Inc., even over the course of the several pivotal months in which the parties were consummating the merger. *Carlucci*, 907 F. Supp. 2d at 732–33; *Keating*, 2011 WL 1549429, at *3. The opportunity to access

---

[11]   The Court acknowledges but rejects Defendant Roth's additional argument that Plaintiffs have not shown that he "obtained anything as a consequence of any of the alleged fraudulent statements, as Rule 9(b) requires" since Defendant Roth indisputably profited from this transaction and thus benefited from the merger. (Doc. 118, p. 17).

such information, and the ongoing reluctance to do so, at minimum demonstrates a "recklessness" more reflective of scienter. 934 F.3d at 1318.

Even if the Court were to give Defendant Roth the benefit of the doubt that he was merely negligent when he first made the public statement that "[they] searched for a business combination that would . . . be a compelling growth company," the fact that he thereafter continued to ignore or disregard seemingly overt red flags raises the Court's eyebrows. (*Id.* ¶ 91). This distinction, as well as the amalgamation of other new factors more precisely detailed in the Complaint, engenders a more compelling inference of scienter. Thus, Plaintiffs have more thoroughly detailed their allegations such that discovery is warranted.[12] Accordingly, Defendant Roth's Motions are due to be denied.

## B.    Count Two: Violation of § 20(a) of the Exchange Act

Both parties dedicate very little attention to Plaintiffs' § 20(a) claim against the individual Defendants with respect to their underlying § 10(b) violation. While the Court dismisses the § 20(a) claims against Defendants Ettefagh for the reasons discussed below, the Court also finds that it is premature at this juncture to

---

[12] For the same reasons the Court denies Defendant Roth's Motion to Dismiss, the Court also rejects Defendant Roth's Motion to Strike. (Doc. 117). Taken as true, these allegations contribute to the cumulative effect of Plaintiffs' multifaceted approach to showing scienter. *KBC Asset Mgmt. NV*, 2016 WL 3981236, at *9. Moreover, the Court finds Plaintiffs' cited precedent to be persuasive: given that "a motion to strike is considered a drastic remedy, and such motions are usually denied unless the allegations have no possible relation to the controversy and may cause prejudice to a party," the Court finds that striking portions of the pleadings relating to Defendant Roth's professional history to be inappropriate at this juncture. *SEC v. Simmons*, No. 04-cv-2477, 2005 WL 8160336, at *1 (M.D. Fla. Sep. 7, 2005).

determine the merits of said liability against the other Defendants. Accordingly, the remaining § 20(a) claims are due to survive.

"To show control person liability under Section 20(a), a plaintiff must allege that: (1) the company violated § 10(b); (2) the defendant had the power to control the general affairs of the company; and (3) the defendant had the power to control the specific policy that resulted in the primary violation." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1252 (N.D. Ga. 2019) (citations omitted). Each defendant's conduct and position must be evaluated individually for purposes of establishing § 20(a) liability against that defendant. *Id*. In the Eleventh Circuit, only defendants of the "entity *primarily* liable at the time the entity violated the securities laws" can be held liable for § 20(a) liability. *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996) (emphasis added*). Whether a given defendant exercises control over the liable entity is a factual inquiry not appropriately resolved on the pleadings absent sufficient discovery. *See Marrari v. Med. Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1190 (S.D. Fla. 2005) (declining to determine at the motion to dismiss phase whether each defendant involved exercised the requisite amount of control over the implicated company to be held liable for control person liability because this is normally a factual inquiry more appropriately resolved later in the litigation). A defendant whose 10b-5 claims have been dismissed against him or her cannot be found liable for § 20(a) liability absent an additional predicate claim. *Id.*

Here, the Court finds that liability under § 20(a) for certain Defendants is less definitive than for others.

### 1.    *Defendant Ettefagh*

Here, the Court finds that liability under § 20(a) for certain Defendants is less definitive than for others. For instance, given the relationship between 10b-5 and § 20(a), the Court finds that Defendant Ettefagh cannot be held liable for § 20(a) liability because Plaintiffs do not bring said claim under any other anchor claim aside from the 10b-5 claim, which the Court has already found was implausibly pled as detailed above. *Id.*

### 2.    *Defendant Roth*

Next, the Court finds that the § 20(a) claim against Defendant Roth is due to survive but with accompanying reservations. While Defendant Roth may have played an integral role in the consummation of the merger between the two companies, it is not yet clear which entity should be considered "primarily" liable for purposes of establishing § 20(a) liability. *Id.* Is the primarily responsible entity PureCycle Inc. pre-merger? Or is ROCH, in actuality, the responsible entity? These questions will likely be better resolved during discovery. At this stage, however, the Court will not yet dismiss the claims against Defendant Roth.

### 3.    *Defendants Otworth, Dee, and Brenner*

Like the *Marrari* court, this Court also declines to dismiss the claims against Defendants Otworth, Dee, and Brenner until additional discovery ensues. *Id.* There, the court paid attention to the allegations that "[e]ach of the [i]ndividual

[d]efendants [was] alleged to have been either a director or principal of [the primarily liable entity]," which the court held was sufficient for the plaintiffs to survive a motion to dismiss. *Id*. In this case, Plaintiffs allege that these three Defendants were all integral members of the "management team" who "had direct and supervisory involvement in the day-to-day operations of ROCH and Pure[C]ycle [Inc.]" leading up to the merger in question. (Doc. 113, ¶¶ 7, 135). As Chief Executive Officer, Chief Financial Officer, and Chief Commercial Officer, respectively, these Defendants plausibly had control over the general affairs of Pure[C]ycle Inc. as required to establish § 20(a) liability. *Marrari*, 395 F. Supp. 2d at 1190.  Because it has not yet been shown that Defendants were not a part of the entity primarily responsible for liability or that one or none of them had control over the general affairs of the company, the Court will not dismiss Plaintiffs' claims at this stage. Of course, Defendants are welcome to re-raise any defenses to § 20(a) liability at a later juncture should they come across supporting evidence after discovery ensues.

### C.   Count Three: Violation of § 14(a) of the Exchange Act and SEC Rule 14a-9

Plaintiffs' § 14(a) claim against all Defendants except Defendant Ettefagh is due to survive.

To state a claim under § 14(a) of the Exchange Act and Rule 14a-9, Plaintiffs are required to allege that Defendants prepared a proxy statement containing a material misstatement or omission that caused Plaintiffs' injuries. *Biver v. Nocholas Fin., Inc.*, -cv-250, 2014 WL 2441891, at *4 (M.D. Fla. May 30, 2014); 15

U.S.C. § 78n(a). Courts are split as to whether § 14(a) claims are subject to heightened pleading standard. *See, e.g.*, *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) ("[W]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory.") (citations omitted); *but see Biver v. Nicholas Fin., Inc.*, 2014 WL 2441891, at *4 ("Although not requiring scienter, a section 14(a) claim requires an allegation that the defendant negligently drafted the proxy statement."). To sustain a private claim under § 14(a), a plaintiff must show "that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 796 (11th Cir. 2010) (citation omitted). "Actions brought under Section 14(a) that are based on material misrepresentations in proxy materials " 'should be sustained only when [they] challenge[ ] a transaction which was the subject of the proxy materials, such as approval of a merger agreement or the election of corporate directors.'" *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 238 (S.D.N.Y. 2009) (citations omitted).

   1.   *Defendants Otworth, Dee, Brenner and Roth*

   Because the Court has already found, as explained above, that Plaintiffs have made plausible claims concerning the aforementioned Defendants' scienter, the Court similarly finds that Plaintiffs' 14(a) claims against said Defendants are due to survive. Plaintiffs allege that "Defendants misleadingly told investors"

specifically in "both of the [p]roxy [s]tatements" that they had accomplished a previously impossible feat in plastics recycling in an effort to consummate the merger. (Doc. 113, ¶ 39). Among the other allegations already discussed earlier, Plaintiffs have sufficiently, in the Court's view, therefore demonstrated that Defendants' proxy statements are actionable under § 14(a).

Defendants' attempt to convince the Court that Plaintiffs' reliance on the Hindenberg Report, which was publicized after the merger had already been consummated, disrupts the causal connection necessary to plead their claim. (Doc. 116, p. 24). The Court is unpersuaded here. Having already ruled on the Hindenberg Report as having met "the standard for a corrective disclosure" for loss causation, the Court does not find that it has been presented with any evidence to change its course. (Doc. 112, p. 39).

> ### 2.   *Defendant Ettefagh*

The Court addresses the claim against Defendant Ettefagh separately because of its earlier determination that Plaintiffs have not sufficiently alleged that she acted with scienter.

The Court recognizes, as Defendants point out, that other federal courts throughout the nation differ on whether to apply the heightened pleading standard in this context. (Doc. 116, pp. 21–22). That said, the Court pays close attention to the reasoning of the *Biver* court. There, the Court found, "under either standard," that "Plaintiffs ha[d] alleged their claim under section 14(a) of the Exchange Act and Rule 14a-9 with sufficient particularity to survive a motion to dismiss" based

on allegations that defendants' failure to "include an analysis of the future potential of the [company's] stock" and description of certain analyses done "in a manner that fail[ed] to provide shareholders with sufficient information to make an informed decision" as to accept the merger. *Biver*, 2014 WL 2441891, at *5.

In their Complaint, Plaintiffs primarily refer to statements that Defendant Ettefagh made in a press conference that took place "a month *after* Pure[C]ycle [Inc.] announced that ROCH's shareholders had approved the PureCycle [Inc.] reverse merger with ROCH." (Doc. 113, ¶ 73) (emphasis added). While these statements may have been problematic, they could not possibly have served as an "essential link" to the transaction since they were made after the shareholder vote. *Edward J. Goodman Life Income Tr.*, 594 F.3d at 796. Accordingly, the Court cannot consider those statements in determining Defendant Ettefagh's purported negligence for this claim. Plaintiffs otherwise do not mention Defendant Ettefagh individually anywhere else in the Complaint. (*See* Doc. 113). Though Defendant Ettefagh, by virtue of her high-level position and involvement in the activity leading up to the merger vote, could have been implicated, Plaintiffs fail to allege with any degree of specificity that she personally contributed to misrepresentations or omissions in the proxy solicitation process. Like the *Biver* court, this Court, for purposes of analyzing the facts of this case alone, analyzes Plaintiffs' § 14(a) claims against Defendant Ettefagh and finds that the outcome remains the same under either standard. *Biver*, 2014 WL 2441891, at *5. Accordingly, the Court need not take a position on what the pleading standard for

this type of claim should be generally. In sum, Plaintiffs' § 14(a) claims against Defendant Ettefagh are due to be dismissed without prejudice.[13]

### D.    Count Four: Violation of § 20(a) of the Exchange Act and SEC Rule 14a-9 in Connection with Plaintiffs' § 14(a) Proxy Claims

Similar to their first § 20(a) claim, Plaintiffs' second § 20(a) claim is also due to survive.[14] It is improper for a court to dismiss multiple § 20(a) claims when a party or class has appropriately alleged both underlying primary violations and that individual defendants were control persons. *See Vaitkuviene v. Syneos Health, Inc.*, No. 18-cv-29, 2020 WL 5742714, at *18 (E.D.N.C. Aug. 7, 2020), *report and recommendation adopted in part, rejected in part*, No. 18-cv-29-FL, 2021 WL 3856452 (E.D.N.C. Aug. 30, 2021) ("As Lead Plaintiffs' primary violations are sufficient to withstand dismissal and Lead Plaintiffs have pled that the individual defendants were control persons, Defendants' motion to dismiss the Section 20(a) claims should be denied.").

Like the *Vaitkuviene* court, given that the Court has already found that Plaintiffs' § 14(a) claims are due to survive except against Defendant Ettefagh, the Court comes to the same conclusion with respect to their derivative § 20(a) claims. *Id.*

---

[13]   Because no claims against Defendant Ettefagh remain, she is due to be dismissed from the instant suit without prejudice. If later discovery produces evidence suggesting that Defendant Ettefagh may be re-joined in the suit, Plaintiffs may file an appropriate motion at a later time in the litigation.

[14]   This is so with respect to all Defendants named in Count IV with the exception of Defendant Ettefagh.

V.    **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.    The PureCycle Motion (Doc. 116) is **GRANTED IN PART and DENIED IN PART** as follows:

    a.  Plaintiffs' claims against Defendant Tasmin Ettefagh are **DISMISSED WITHOUT PREJUDICE**;

    b.  The PureCycle Motion is otherwise **DENIED**;

2.    Defendant Roth's Motion to Dismiss (Doc. 118) is **DENIED**;

3.    Defendant Roth's Motion to Strike (Doc. 117) is **DENIED**; and

4.    The Clerk of Court is **DIRECTED** to terminate Defendant Ettefagh only as a party.

**DONE AND ORDERED** in Orlando, Florida on June 15, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties