# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated, | Case No. 6:21-cv-809-PGB-GJK |
| Plaintiffs, | |
| v. | **CLASS ACTION** |
| PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER, BYRON ROTH and TASMIN ETTEFAGH, | |
| Defendants. | |

**EXPERT REPORT OF MATTHEW D. CAIN, PH.D.**

**November 30, 2023**

Table of Contents

1    Qualifications and Compensation ..................................................................................... 1
2    Summary of Opinions ...................................................................................................... 2
3    Case Background ............................................................................................................. 4
    3.1    Overview of the Company and Allegations ................................................................ 4
    3.2    Bases for Opinions on Market Efficiency .................................................................. 6
4    Evaluation of market efficiency factors for PureCycle Common Stock............................ 10
    4.1    *Cammer* Factor 1: Average Weekly Trading Volume................................................ 10
    4.2    *Cammer* Factor 2: Analyst Coverage ......................................................................11
    4.3    *Cammer* Factor 3: Market Makers......................................................................... 13
    4.4    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ............................................... 16
    4.5    *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and
    Stock Prices............................................................................................................... 17
    4.6    Additional Factor 1: Market Capitalization .............................................................. 24
    4.7    Additional Factor 2: Bid-Ask Spread ...................................................................... 25
    4.8    Additional Factor 3: Public Float............................................................................. 26
    4.9    Additional Factor 4: Institutional Ownership ........................................................... 27
    4.10    Additional Factor 5: Autocorrelation...................................................................... 28
    4.11    Additional Factor 6: Options Trading ..................................................................... 29
5    Market Efficiency for Warrants and Options ................................................................... 29
    5.1    Overview of Warrants and Options........................................................................... 29
    5.2    Cause and Effect Between PureCycle Common Stock and Warrant Prices ................. 32
    5.3    Cause and Effect Between PureCycle Common Stock and Option Prices ................... 34
6    Ability to Calculate Damages on a Class-Wide Basis ...................................................... 35
7    Conclusion ................................................................................................................... 39
Appendix A ........................................................................................................................ 40
Appendix B ........................................................................................................................ 46
Exhibit 1............................................................................................................................. 50
Exhibit 2............................................................................................................................. 51
Exhibit 3............................................................................................................................. 52
Exhibit 4............................................................................................................................. 53
Exhibit 5............................................................................................................................. 54
Exhibit 6............................................................................................................................. 55
Exhibit 7............................................................................................................................. 56
Exhibit 8............................................................................................................................. 57
Exhibit 9............................................................................................................................. 58
Exhibit 10a ......................................................................................................................... 59
Exhibit 10b......................................................................................................................... 60
Exhibit 11 ........................................................................................................................... 65

# 1    QUALIFICATIONS AND COMPENSATION

1.    I hold a Ph.D. in Finance and I am a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. I have been engaged in academic research for approximately two decades and continue to publish in law reviews and peer-reviewed academic journals across these disciplines. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. Similarly, I was a fellow with the Harvard Law School Program on Corporate Governance from 2018 through 2019, where I participated in research seminars and related activities.

2.    I worked at the U.S. Securities and Exchange Commission ("SEC") as a Financial Economist between 2014 and 2018. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

3.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

4.    In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached to this Report as **Appendix A**.

5.    I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis. My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony. My analyses and testimony have been accepted by courts on numerous occasions.[1]

6.    I bill my time at a rate of $950 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case. My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention. I am being assisted by staff at Fideres Partners LLP, who have performed work under my direction. I have no financial or other interest in Fideres Partners' billings in this matter.

## 2    SUMMARY OF OPINIONS

7.    I have been asked by counsel for the Court-appointed Lead Plaintiffs in this matter to determine whether the market for the Common Stock of PureCycle Technologies, Inc. ("PureCycle" or the "Company"), which completed a business combination with Roth CH Acquisition I Co. ("ROCH") whereby PureCycle began trading on the NASDAQ under the ticker symbol "PCT" on March 18, 2021, was efficient during the period from November 16, 2020 to

---

[1] *See, e.g.*: *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.); *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.); *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.); *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.); *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.).

November 10, 2021, inclusive (the "Class Period").[2] I was also asked to assess whether the value impact of any alleged misstatements or omissions would be reflected in the price of PureCycle's Warrants and Options.[3]

8.    In addition, I have been asked to opine on whether the calculation of §10(b) damages on a class-wide basis in this matter for investors of PureCycle Common Stock, Warrants, and Options during the Class Period is subject to a common methodology, and to describe a method by which §14(a) damages can be calculated for Class members.

9.    The materials I have considered in forming my opinions are summarized in **Appendix B**.

10.  Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for shares of PureCycle's Common Stock was efficient throughout the course of the Class Period. I also conclude that the value impact of any alleged misstatements or omissions would be reflected in PureCycle's Warrants and Options prices because their pricing is derivative of and dependent upon PureCycle's Common Stock prices.

11.  I have also formed the opinion that Common Stock, Warrants, and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology.

12. The remainder of my report is organized as follows: **Section 3** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section 4** presents my analyses of the market efficiency factors during the Class Period. **Section 5** discusses the market efficiency of Warrants and Options in relation to the market efficiency of Common Stock. **Section 6** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section 7** summarizes my conclusions.

---

[2] I understand the Defendants to be PureCycle Technologies, Inc., Michael Othworth, Michael E. Dee, David Brenner, and Byron Roth (collectively, the "Defendants"). Source: Consolidated Second Amended Class Action Complaint For Violations Of The Federal Securities Laws, *Theodore v. Purecycle Technologies, Inc.* (S.D. Florida) (the "Complaint").

[3] Publicly traded securities of PureCycle during the Class Period included Common Stock, Warrants and Options.

## 3  CASE BACKGROUND

### 3.1  Overview of the Company and Allegations

13.  ROCH was a publicly traded blank check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. Following the closing of its IPO on May 4, 2020, ROCH's common stock and warrants both traded on the NASDAQ under the symbols "ROCH" and "ROCHW," respectively, whereas the ROCH Units consisting of common stock and warrants traded under the symbol "ROCHU." On November 16, 2020, ROCH and PureCycle issued a press release announcing a plan to bring PureCycle public via a merger with ROCH.[4] The business combination was completed on March 17, 2021, resulting in the public listing of PureCycle Common Stock, Warrants, and Units consisting of Common Stock and Warrants under the new trading symbols "PCT," "PCTTW," and "PCTTU," respectively, on the NASDAQ on March 18, 2021.[5] The press release described PureCycle as "a leading innovator in polypropylene recycling."[6] It further stated that PureCycle "holds a global license to commercialize the only patented solvent-based purification recycling technology for restoring waste polypropylene into virgin-like resin."[7] The press release continued, "PureCycle intends to build new recycling production facilities globally, with the goal of having 30 commercial lines operational by 2030 and 50 by 2035."[8]

14.  Plaintiffs allege that throughout the Class Period, Defendants made false and misleading statements (a) touting management's "broad experience across plastics manufacturing" and "scaling early stage companies," though in reality, PureCycle management had no prior experience in plastics recycling and had previously brought six other "early stage" companies public that subsequently imploded; and (b) touting its "breakthrough" recycling process as the only "economically-viable," "cost effective," "proven," "validated" process to recycle waste

---

[4] Complaint ¶22

[5] *Ibid*

[6] PureCycle, Form 8-K, Nov. 20, 2020. Available at:
   https://www.sec.gov/Archives/edgar/data/1830033/000110465920128027/tm2034179-1_s4.htm

[7] *Ibid*

[8] *Ibid*

polypropylene into virgin-like resin, which uses a "broader range of feedstock than traditional recycling" and is more cost effective than traditional methods of manufacturing polypropylene, though in reality, the process is unproven, faces insurmountable obstacles at lab scale, requires feedstock of the highest quality with minimal contamination, the economics of conducting the process at commercial scale are cost prohibitive, and PureCycle's supposedly "revolutionary" process is based on an old prior patent that never reached commercial scale.[9]

15. The Complaint alleges that a partial revelation of the truth occurred before markets opened on May 6, 2021, when Hindenburg Research published a report on PureCycle exposing significant flaws in PureCycle's polypropylene recycling process and revealing that the company's purportedly experienced management team previously caused six companies to fail, had no relevant experience in plastics or recycling, and had strong motivations to complete the business combination with ROCH to earn exorbitant compensation.[10] The Complaint also alleges that the relevant truth was further revealed after hours on November 10, 2021 via a press release, where PureCycle announced that the SEC had issued an investigative subpoena to Defendant Otworth "requesting testimony in connection with a non-public, fact finding investigation of the Company" pertaining to "among other things, statements made in connection with PCT's technology, financial projections, key supply agreements, and management."[11] As a result of PureCycle's alleged wrongful acts and material omissions of fact, investors allegedly traded PureCycle's Common Stock, Warrants, and Options at artificially inflated or deflated prices during the Class Period.[12]

16. Plaintiffs further allege that Defendants violated §14(a) of the Exchange Act when they prepared proxy statements with material misrepresentations and omissions, which they issued to solicit shareholder approval from holders of ROCH Common Stock on November 16, 2020, and February 12, 2021, for the March 16, 2021 business combination vote.[13]

---

[9] Complaint ¶¶54-74

[10] Complaint ¶¶75-76

[11] Complaint ¶85

[12] Complaint ¶101

[13] Complaint ¶¶117-130

17.  **Exhibit 1** graphs the closing stock price and trading volume for PureCycle's Common Stock shares throughout the Class Period.

### 3.2    Bases for Opinions on Market Efficiency

18.  I understand that Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance solely in connection with their Section 10(b) claim, positing that shareholders relied on the alleged misrepresentations or material omissions of fact made by Defendants through their incorporation into stock prices in an open and well-developed market. If a market is efficient, then all purchasers of the stock are induced into reliance on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. The fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to Section 10(b) claims, and was adopted by the U.S. Supreme Court in its *Basic* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[14]

19.  This theory was also reaffirmed by the Supreme Court *in Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[15]

---

[14] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[15] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

20. Economic research and literature support the concept of market efficiency. For example, Nobel Prize winner Eugene Fama has observed that "[T]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[16] More recently, Professor Fama reiterated that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[17] Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are *more* efficient than previously recognized."[18] Academic research thus provides ample support for the concept of market efficiency of public exchange-traded securities. At the same time, I understand that for these purposes, the Supreme Court has indicated that certain academic debates about "the precise *degree* to which stock prices accurately reflect public information are … largely beside the point" and that the fact that a stock price "may be inaccurate does not detract from the fact that false statements affect it, and cause loss, which is all that *Basic* requires." Instead, it instructs that the fraud-on-the-market presumption is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[19]

21. Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and the Nasdaq Stock Market ("NASDAQ"), should be granted a presumption of efficiency for virtually all securities traded on them.[20] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges. The fact that PureCycle's Common Stock, Warrants, and

---

[16] Eugene F. Fama, 1970, Efficient Capital Markets: A Review of Theory and Empirical Work, Journal of Finance 25, at 383, 416.

[17] Eugene F. Fama, 1991, Efficient Capital Markets: II, Journal of Finance 46, at 1575, 1576.

[18] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, Review of Financial Studies 33, at 2071 (emphasis added).

[19] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) (quoting *Basic*).

[20] *See e.g., Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("*Cammer*"), citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, §8.6 (Aug.1988): "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

Options traded in such a well-developed market (Common Stock and Warrants under the trading symbols "PCT" and "PCTTW" on the NASDAQ, and prior to the business combination, under the trading symbols "ROCH" and "ROCHW" on the NASDAQ, respectively; Options on the Chicago Board Options Exchange) leads to a strong presumption of market efficiency.

22.   The district court in *Cammer v. Bloom* developed a widely-cited five-factor test to evaluate whether a market is efficient for the purposes of establishing the presumption of investor reliance articulated by the Supreme Court in Basic.[21] In another widely-cited opinion, the district court in *Krogman v. Sterritt* articulated several additional factors useful in evaluating market efficiency.[22] Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency. However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.

23.   In the following section, I discuss these factors and evaluate them in relation to PureCycle Common Stock. In doing so, I compare the various factors for PureCycle's Common Stock: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

24.   One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[23] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms) for a period of at least one year; these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask

---

[21] 711 F. Supp. 1264, 1292 (D.N.J. 1989).

[22] *Krogman v. Sterritt*, 202 F.R.D. 467, 477 (N.D. Tex. 2001).

[23] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage? Accounting Review 88, at 667-705 (the "MRK Study").

spread, and institutional ownership were all statistically significant at the 99% level.[24] The authors
of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the
> effects on firm performance and investor interest after a complete loss of analyst coverage
> for periods of at least one year. We find that analyst coverage adds value to a firm both
> because it reduces information asymmetries about the firm's future performance and
> because it maintains investor recognition for that firm's stock... Firms that lose all analyst
> coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes,
> and institutional presence but do not show a significant difference in subsequent
> performance relative to covered peers.[25]

25.    The authors describe these variables as reflective of investor interest: after losing analyst
coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask
spread, institutional holdings, and number of institutions, significantly worsen relative to
[analyst-]covered peers."[26] Therefore, I interpret the sample of MRK Covered firms as those
eliciting high investor interest and reflecting the common indicia of firms operating in efficient
markets. I then compare several of PureCycle's market efficiency factors to the firms in the MRK
Study to assess whether PureCycle's characteristics are consistent with firms operating in efficient
markets. As discussed *infra*, PureCycle's characteristics are consistent with the Covered firms in
the MRK Study that elicit high investor interest and thus reflect common indicia of efficient
markets.

26.    The following section presents my analyses and findings from the evaluation of various
market efficiency factors for PureCycle's Common Stock during the Class Period. As discussed
*infra*, my analyses and findings on the various market efficiency factors support a conclusion that
PureCycle Common Stock traded in an efficient market throughout the Class Period.

---

[24] MRK Study at 678, 681-682.

[25] MRK Study at 667.

[26] MRK Study at 681 (footnotes omitted).

## 4    EVALUATION OF MARKET EFFICIENCY FACTORS FOR PURECYCLE COMMON STOCK

### 4.1    *Cammer* Factor 1: Average Weekly Trading Volume

27.    Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market and was an important criterion for investment analysts in deciding which stocks to follow."[27]

28.    Stock trading volume refers to the extent to which a firm's equity is traded among investors during a given time period. The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[28]

29.    **Exhibit 2** graphs PureCycle's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[29] The average weekly trading volume of PureCycle's Common Stock was 8.68% of common shares outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court.[30] As a result, PureCycle's level of stock trading volume throughout the Class Period strongly

---

[27] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, Law and Contemporary Problems 63, at 108.

[28] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels, *supra*).

[29] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[30] The average weekly turnover of ROCH during the pre-business combination period of November 16, 2020 – March 17, 2021 was 17.11%.

supports the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

30.  I also note that the average weekly trading volume of PureCycle's Common Stock over the Class Period was 4.48 million shares. According to the authors in the MRK Study, the median weekly trading volume in the year prior to losing coverage for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[31] PureCycle's average weekly trading volume of 4.48 million shares during the Class Period significantly exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

### 4.2    *Cammer* Factor 2: Analyst Coverage

31.  An analyst is a financial professional, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry. Analysts typically participate in company conference calls and conferences, publish reports in which they may assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[32]

---

[31] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[32] *Cammer*, 711 F. Supp. at 1286.

32. Coverage of a company's stock by research analysts is also reflected by analyst participation in company conference calls, company-hosted "analyst day" conferences and presentations, and general industry conferences.

33. In **Exhibit 3**, I report the analyst coverage of PureCycle over the Class Period.[33] I identified a total of 23 reports issued by analysts at 7 separate firms.[34] PureCycle also hosted various earnings calls throughout the Class Period. The issued analyst reports and the call transcripts reflect participation by analysts from large and influential financial firms, such as Oppenheimer, Bank of America Securities, Cowen & Co., and Jefferies LLC.[35] This is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including Company news, financial performance, forecasts, and analyst commentary and recommendations.

34. This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[36] Charles M.C. Lee and Eric So documented that on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[37] PureCycle's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest. The analyst coverage of PureCycle during the Class Period supports the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

35. In addition to the analyst coverage documented above, investors could access information about PureCycle from a variety of other sources.[38] For example, I conducted a search of press and

---

[33] I obtained analyst reports covering PureCycle from Investext and Factiva. These statistics represent a lower bound of the analyst coverage of PureCycle because many analyst reports are provided directly to investors but are not captured by third-party data vendors such as Investext.

[34] ROCH was covered in 4 reports by 1 firm for the pre-business combination period of November 16, 2020 – March 17, 2021.

[35] Earnings call transcripts released throughout the Class Period were obtained from Bloomberg.

[36] MRK Study at 668.

[37] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, Journal of Financial Economics 124, at 336 (*see* Table 1, Panel B – "COV").

[38] Investors can also receive information from online research forums, such as SeekingAlpha, which offers both free and subscription-based research reports.

news articles about PureCycle using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Newswires, PR Newswire, Reuters, Investor's Business Daily, The Wall Street Journal, Globe Newswire, and numerous other outlets. This search identified at least 923 articles throughout the Class Period.[39] Moreover, PureCycle issued numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period.[40] Individual and institutional investors thus had access to publicly available information about PureCycle from a variety of sources during the Class Period. As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about PureCycle supports the conclusion that PureCycle's Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### 4.3  *Cammer* Factor 3: Market Makers

36.  The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[41] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[42]

---

[39] The articles were identified through a Factiva search including PureCycle's company tag, of all available sources.

[40] ROCH filed 37 forms with the SEC throughout the the pre-business combination period of November 16, 2020 – March 17, 2021. PureCycle filed 71 forms with the SEC during the remainder of the Class Period from March 18, 2021 – November 10, 2021.

[41] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[42] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, Journal of Corporate Law 19, at 291.

37. In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[43]

38. The *Cammer* court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. However, PureCycle's Common Stock traded on the NASDAQ throughout the Class Period. This type of large, national exchange reports volume, prices, bid-ask spreads, and other trading details which ensure that it remains well-developed, liquid, and efficient. The *Cammer* court thus stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[44]

---

[43] *Cammer*, 711 F. Supp. at 1293.

[44] *Cammer*, 711 F. Supp. at 1292.

39.  I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[45]) as being informationally efficient.[46] Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by supplying trading liquidity and informationally-efficient and informed trading.[47] Academic research has similarly found that institutional investors can facilitate trading liquidity.[48] As I

---

[45] The NYSE Market Model, NYSE, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." *See also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[46] *See*, *e.g.*: *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2012) ("One defendant in *Cammer* contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that 'the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.' But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker" (citations omitted); *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016), at 6: "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."; *Lumen v Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("It would be remarkable for a court to conclude NASDAQ is not an efficient market."); *see also In re Groupon, Inc. Securities Litigation,* 2015 WL 1043321, at *5 (N.D. Ill. 2015) ("Dr. Gompers, Defendants' expert, did not dispute Dr. Feinstein's conclusions that (1) the NASDAQ exchange—on which Groupon shares traded—was a well-developed exchange on which most company's stocks traded efficiently most of the time….")

[47] *See*, *e.g.*: *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[48] *See* MRK Study at 678 (Table 3). Authors reported that Sample firms had a median of 9 institutional investors while Covered firms had a median of 40 institutional investors; Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, Journal of Corporate Law 19, at p. 302.

---

15

discuss further in **Section 4.9** below, PureCycle's Common Stock was widely held by institutional investors throughout the Class Period (see **Exhibit 10b**).[49]

40.   As a result, PureCycle's public listing on the NASDAQ, a well-developed and established national exchange, satisfies the intent of this *Cammer* factor. Moreover, PureCycle had at least 78 market makers and brokers providing similar activity over the Class Period,[50] greatly exceeding the 10 market makers that the court in *Cammer* held "would justify a substantial presumption" of market efficiency. In summary, PureCycle easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venue, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for PureCycle's Common Stock throughout the Class Period.

### 4.4   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

41.   The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[51]

42.   Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Exchange Act, the registrant has filed all necessary filings with the SEC in a timely manner for a period of at least 12 months, the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or

---

[49] PureCycle Common Stock was held by at least 263 institutional investors at some point during the Class Period (*see* **Exhibit 10a** and **Exhibit 10b**). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 49.34% of shares outstanding on March 31, 2021, to a maximum of 67.47% of shares outstanding on September 30, 2021 according to data from Bloomberg and PureCycle's SEC Filings. These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in Bloomberg's coverage.

[50] Bloomberg "RANK" function.

[51] *Cammer*, 711 F. Supp. at 1287.

leases, the registrant has a public float of $75 million, as measured by the aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant.[52, 53] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

43.   As PureCycle went public in March 2021, it was technically not eligible for S-3 registration during the Class Period because it had not filed financial reports for a full 12 months on account of it being a private entity prior to the merger with ROCH. However, PureCycle's Common Stock public float far exceeded the required $75 million threshold during the Class Period,[54] and to the best of my knowledge, PureCycle and ROCH made all required filings with the SEC in a timely manner during the Class Period and satisfied the other S-3 eligibility requirements. I also note that the Company filed an S-3 form shortly after the end of the Class Period.[55] Thus, PureCycle satisfies this *Cammer* Factor during the Class Period. As a result, this factor supports the efficiency of the market for PureCycle Common Stock throughout the Class Period.

### 4.5   *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

44.   The fifth *Cammer* factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information. The *Cammer* court held:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[56]

45.   Likewise, the *Krogman* court held:

---

[52] https://www.sec.gov/files/forms-3.pdf.

[53] SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions."

[54] PureCycle's float averaged $1.00 billion over the full Class Period and $156.59 million for the pre-business combination period from November 16, 2020 – March 17, 2021.

[55] Apr. 29, 2022, available at:
https://www.sec.gov/Archives/edgar/data/1830033/000110465922053550/0001104659-22-053550-index.htm.

[56] *Cammer*, 711 F. Supp. at 1291.

> [I]n an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information.[57]

46. Below, I present an empirical analysis that demonstrates PureCycle's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer* and *Krogman*. I compare the behavior of PureCycle Common Stock on days when company-specific news is issued with its behavior on days when no such news is issued. This analysis demonstrates that PureCycle's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that PureCycle Common Stock traded in an efficient market throughout the Class Period.

47. To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed key dates pertaining to communications made by ROCH and/or PureCycle on the identification and status of the business combination. After completion of the business combination, I also considered an analysis of PureCycle's quarterly earnings announcements (collectively, with the business combination status announcements, the "News Days"). Such announcements are commonly studied by financial economists, both in litigation-related work and in academic papers. These announcements represent a potential opportunity for the public release of new value-relevant Company information to investors. One would not expect every earnings announcement to cause a significant stock price movement for a company[58] because investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information. However, the mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information, and other unanticipated company-specific news can cause company stock prices to move in an efficient market.

48. I also considered the fact that other types of news or information could be more or less relevant for a given company during certain time periods, as well as the length of the Class Period in this matter. Because PureCycle only hosted three earnings announcements during the Class

---

[57] *Krogman*, 202 F.R.D. at 477.

[58] *See* Boudoukh, Jacob, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence From Firm-Specific News, The Review of Financial Studies 32.3, at 1004; Ray Fair, 2002, Events That Shook the Market, Journal of Business 75, at 713, 714.

Period, I extended the analysis period by one year past the end of the Class Period to cover all earnings announcements between the start of the Class Period and November 10, 2022 (the "Analysis Window").

49.  I compared the stock returns and trading volume of PureCycle's Common Stock on News Days versus those metrics on trading days that contained little or no news during the Analysis Window (the "No News Trading Days").[59] The No News Trading Days provide a benchmark measurement of days in which relatively little Company-specific information was provided to the market. If PureCycle's stock prices tend to move more significantly following News Days than on the No News Trading Days, this would support a conclusion of market efficiency.[60]

50.  In order to study the stock price movements for PureCycle on different trading days, I performed an event study.[61] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control

---

[59] No News Trading Days were identified as dates with no Factiva headlines or SEC filings during the Analysis Window. This definition does not rule out the possibility of potential news on these days, but rather is intended to identify a baseline of trading days with an absence of the types of news identified in the "news days."

[60] Paul Ferrillo, Frederick Dunbar, and David Tabak, 2004, The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, St. John's Law Review 78, at 120-121; Miguel O. Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, Review of Quantitative Finance and Accounting 57. This approach been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.: In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.); *Bond v. Clover Health Investments, Corp., et al.,* Case No. 3:21-cv-00096 (M.D. Tenn.); *In re: QuantumScape Securities Class Action Litigation,* Case No. 3:21-cv-00058-WHO (N.D. Ca.).

[61] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 13.

events, and give rise to interesting theoretical work.[62]

51.  A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (*i.e.*, the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

52. Here, I performed an event study to evaluate whether PureCycle's Common Stock responded to information disclosed on the News Days. To conduct the event study, I deployed the methodologies described above that are well-established in academic literature and routinely applied and accepted in the context of securities fraud litigation.

53.  In order to isolate the impact of Company-specific news on PureCycle's stock price during the Class Period, I performed regression analyses to measure the relationship between PureCycle's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in PureCycle's industry. By modeling how PureCycle's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

54.  Because ROCH had only been listed for 55 days at the start of the Class Period, I constructed a regression model using all available trading data prior to each of November 17 – November 23, 2020, excluding any of the News Days.[63] For each trading day following November

---

[62] Eugene F. Fama, 1991, Efficient Capital Markets: II, Journal of Finance 46, at 1607.

[63] News Days are excluded from all regression Estimation Windows.

23, 2020, within the Analysis Window, I constructed a regression model using data from the prior 60 trading days ("Estimation Window"), excluding any News Days.[64] To study the relationship between PureCycle's stock price returns and overall market factors, I used the S&P 1500 Composite Total Return Index (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between PureCycle's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in PureCycle's particular industry, I used the S&P Small Cap 600 Materials Sector Total Return Index (the "Industry Index").[65]

55. I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Analysis Window.[66] As shown in **Exhibit 4**, the event study model revealed an evolving relation between the Company's daily returns and those of the overall stock market and industry throughout the Class Period. In other words, movements of the Market Index and the Industry Index help explain movements in PureCycle's stock price. This allowed me to predict the expected daily return of the Company on a date once I had controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

---

[64] *See* Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, at 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[65] In its SEC Form 10-K for the fiscal year ended December 31, 2022, PureCycle compared its performance to the S&P Small Cap 600 Materials Index. *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001830033/000183003323000024/pct-20221231.htm.

[66] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 35, at 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, Journal of Finance 50, at 1597.

56. Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of PureCycle's Common Stock, after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

57. Importantly, research has shown that in an efficient market, a security will exhibit some large price movements despite the absence of news and, conversely, there will be news announcements without large price movements.[67] For instance, a company may announce earnings that are in line with investor expectations; while such an announcement is clearly important to investors, it will not have altered the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information. Further, if a company's disclosure conceals important information, the effect of the concealment would generally not result in a significant stock price movement but would maintain the price at its then-current level. Accordingly, a generally accepted, peer-reviewed methodology accepted by numerous courts is to compare stock price behavior on a *group* of "News Days" to stock price behavior on a *group* of "No News Days."

58. To test for statistical significance, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the actual observation and the predicted movement. It is calculated by dividing the abnormal return by the standard deviation of the errors. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, an abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) approximately 5% of the time in the absence of new company-

---

[67] *See* Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence From Firm-Specific News, *Review of Financial Studies* 32, at 1004; Ray Fair, 2002, Events That Shook the Market, *Journal of Business* 75, at 713, 714.

specific information.[68] In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

59.  **Exhibit 6** reports the event study results of the 9 days that met the criteria I established for the identification of News Days during the Analysis Window. The columns list the market impact dates, closing stock price, log return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, the p-value, statistical significance of the stock movement, and a description of the earnings announcement on each date. Overall, 9 out of 9 PureCycle news announcements caused stock price movements that were statistically significant at the 95% level. I compare this rate with that on the No News Trading Days in the following exhibit.

60.  **Exhibit 7** summarizes the statistical comparison of PureCycle's Common Stock returns and trading volume following the 9 News Days versus these metrics as measured on the No News Trading Days. As shown in the exhibit, 100% of the 9 earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to 6.78% of the No News Trading Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at the 99% level. This provides strong evidence of a cause-and-effect relationship between information and PureCycle Common Stock price movements.

61.  This exhibit also shows that the average of the absolute value of abnormal returns following PureCycle's 9 News Days was 12.36%. This compares to an average of only 3.40% on the No News Trading Days. The difference between these two averages is statistically significant at the 99% level. This further supports a finding of a strong cause-and-effect relationship between information and PureCycle Common Stock price movements.

62.  Finally, this exhibit reports an average daily trading volume of 3.04 million shares for PureCycle Common Stock following News Days. This compares to an average daily trading

---

[68] David I. Tabak and Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19 (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

volume of 0.79 million shares on the No News Trading Days. The difference between these two values is statistically significant at the 99% level, providing further evidence of the cause-and-effect relationship between information and PureCycle Common Stock price movements.

63.  In summary, relative to other trading days, PureCycle's News Days caused a greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume. This finding establishes a clear cause-and-effect relationship between new Company-specific information and PureCycle Common Stock price movements. As a result, Cammer Factor 5 supports the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

## 4.6    Additional Factor 1: Market Capitalization

64.  I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[69] Moreover, the *Krogman* court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[70] As stated previously, the MRK Study found that firms lacking analyst coverage had other indicators of trading in less developed and efficient markets, including smaller market capitalizations. The median market capitalization of the MRK Sample firms was $27.91 million.[71] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[72] This study supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

---

[69] *Cammer*, 711 F. Supp. at 1287.

[70] *Krogman*, 202 F.R.D. at 478.

[71] MRK Study at 678 (Table 3).

[72] MRK Study at 678 (Table 3).

65. **Exhibit 8** reports PureCycle's market capitalization throughout the Class Period. This market capitalization averaged $1.46 billion over the Class Period.[73] PureCycle's market capitalization exceeded that of the MRK Sample firms and the MRK Covered firms, on an inflation-adjusted basis.[74] PureCycle's number of shares outstanding ranged from 117 million shares to 126 million shares after the business combination, with just under 10 million SPAC shares issued prior to the business combination.[75] Given that PureCycle's market capitalization was higher than that of both the MRK Sample firms and the MRK Covered firms, PureCycle's market capitalization on a stand-alone basis is strongly supportive of market efficiency. In addition, given PureCycle's shares outstanding available for trading, its sizeable float as discussed below, and the other factors analyzed herein, the market capitalization is consistent with the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### 4.7    Additional Factor 2: Bid-Ask Spread

66. The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[76] The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

---

[73] The market capitalization of PureCycle's Common Stock averaged $180.67 million for the pre-business combination period of November 16, 2020 – March 17, 2021.

[74] Source: U.S. Bureau of Labor Statistics, CPI Inflation Calculator, available at: https://www.bls.gov/data/inflation_calculator.htm (last visited August 1, 2023). $27.91 million in December 1996 represented approximately $48.91 million in November 2021; $243.97 million in December 1996 represented approximately $427.56 million in November 2021.

[75] Shares outstanding during the Class Period obtained from SEC Filings.

[76] *Krogman*, 202 F.R.D. at 478.

67. I analyzed the bid-ask spread of PureCycle's Common Stock during the Class Period. **Exhibit 9** reports the monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[77] This spread fluctuated between 0.15% and 1.70% from October 2020 through August 2021, and averaged 0.64% over the Class Period.[78,79]

68. By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%.[80] PureCycle's average bid-ask spread over the Class Period was lower than the median values of both the MRK Sample firms and the MRK Covered firms, indicating that investors could trade PureCycle's Common Stock at very low relative cost. As a result, PureCycle's bid-ask spread supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### 4.8    Additional Factor 3: Public Float

69. The *Krogman* court also considered the public float of a company in weighing market efficiency.[81] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

---

[77] I calculated the percent bid-ask spread using daily closing bid and ask quotes. Kee H. Chung and Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. Fin. Markets, 94, Table 2 (2014). This study compared data using end-of-day prices to intraday data and documented that the spreads were very similar. *See also*: Farshid Abdi and Angelo Ranaldo, 2017, A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices, *Review of Financial Studies* 30, at p. 4439: "An *approximation* of intraday bid-ask spreads with end-of-day quotes provides accurate measures and computational savings" (citations omitted).

[78] I also examined the dates from November 2020 and November 2021 that were part of the Class Period and report them in **Exhibit 9**. The Class Period dates from November 2020 had an average bid-ask spread of 0.52% and the Class Period dates from November 2021 had an average bid-ask spread of 0.19%. I noted, however, that neither of these figures was computed using a full month of data.

[79] The average bid-ask spread for PureCycle's Common Stock for the pre-business combination period of November 2020 – February 2021 was 1.36%.

[80] MRK Study at 678 (Table 3).

[81] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

70. **Exhibit 10a** reports the shares outstanding, public float, and shares held by insiders for PureCycle Common Stock during the Class Period. As shown in the exhibit, PureCycle insiders held less than 20% of the Common Stock throughout the Class Period (average = 16.11%).[82] Thus, approximately 83.89% of PureCycle's shares were held by institutions and other outside investors. This large degree of public float for PureCycle's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

## 4.9    Additional Factor 4: Institutional Ownership

71. Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

72. I also report the total institutional ownership of PureCycle's Common Stock in **Exhibit 10a**, which shows that on average 263 institutions held the stock at some point during the Class Period (a full list of institutional ownership can be seen in **Exhibit 10b**).[83] By comparison, the MRK Study found that the MRK Sample firms had a median of only 9 institutional investors while the MRK Covered firms had a median of 40 institutional investors.[84] PureCycle's institutional ownership base exceeds both of these levels.[85] Thus, the significant institutional ownership base for PureCycle Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

---

[82] Insider holdings of PureCycle Common Stock averaged 7.12% of shares outstanding in the pre-business combination period of Q4 2020.

[83] PureCycle Common Stock was held on average by 27 institutional investors in the pre-business combination period of Q4 2020.

[84] MRK Study at 678 (Table 3).

[85] The number of institutions is more relevant than the percentage of shares held by institutions, as the percentage may appear low despite significant institutional presence among firms with large numbers of shares outstanding. Nonetheless, I note that the Company's percentage of shares held by institutions throughout the Class Period exceeded that of other firms that have previously been found to trade in efficient markets. *See*, *e.g.*, *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 ("*Clover*"), with institutional investors holding on average 26.68% of shares outstanding during the respective class period.

## 4.10   Additional Factor 5: Autocorrelation

73.   Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. Autocorrelation is generally examined on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters and is large enough in magnitude that a trader could earn riskless profits after trading costs and slippage, this would imply market inefficiency because publicly available information about prior stock price movements would not be fully reflected in current stock prices.

74.   I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in PureCycle's Common Stock returns.[86] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[87] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

---

[86] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (**Section 4.5**).

[87] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, Journal of Finance 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, Journal of Financial Economics 6, at 95-101.

75. **Exhibit 11** presents the results from the autocorrelation test for PureCycle's Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period was not found to be statistically significant at the 95% level. Moreover, the portion of average abnormal return (in absolute value) over the Class Period that was attributable to autocorrelation did not exceed the average cost of trading PureCycle Common Stock over the Class Period.[88] Therefore, autocorrelation did not present an arbitrage opportunity for investors in PureCycle Common Stock during the Class Period. This finding supports the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

### 4.11  Additional Factor 6: Options Trading

76. Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[89] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading. According to Bloomberg, PureCycle's Common Stock had 166,403 call option contracts and 64,176 put option contracts traded during the Class Period. The presence of options trading supports the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

## 5  MARKET EFFICIENCY FOR WARRANTS AND OPTIONS

### 5.1  Overview of Warrants and Options

77. Options are derivative securities, a type of security whose value is dependent on the market price of an underlying security or asset.[90] In this case, during the Class Period, the pricing for the

---

[88] In order to generate profits exceeding the trading costs for PureCycle Common Stock (represented by the average monthly bid-ask spread), the Common Stock would have to exhibit an average daily abnormal return (in absolute value) of at least 4.55% (= |0.64%/0.14|), where 0.64% represents the average bid-ask spread over the Class Period and 0.14 is the autocorrelation coefficient over the Class Period. The average absolute abnormal return of PureCycle's Common Stock over the Class Period was 4.13%.

[89] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, Journal of Finance 53. *See also*: Stephen A. Ross, 1976, Options and Efficiency, Quarterly Journal of Economics 90.

[90] Option valuation models, such as the Black-Scholes model, depend directly on the current underlying stock price. See, for example: John Hull, *Options, Futures and Other Derivatives*, 7th Ed., Prentice Hall, 2009, pp. 201, 291.

PureCycle Options at issue was dependent on the market price of PureCycle Common Stock.

78.   A warrant is an option issued by a company or a financial institution, frequently pertaining to the company's own common stock. A warrant is essentially a call option that gives the warrant holder the right to purchase a share of the company's stock at a pre-determined price ("strike price") on or before a fixed date ("expiration" or "maturity" date).[91] In this case, during the Class Period, the pricing for the PureCycle Warrants at issue was dependent on the market price of PureCycle Common Stock.

79.   One major difference between call options and warrants is the exercise of a warrant requires the firm to issue a new share of stock, which increases the total shares outstanding. Exercise of a call option requires only that the writer of the call option deliver an existing share of stock to fulfill the obligation. Also, unlike call options, warrants result in a cash flow to the firm when the warrant holder pays the exercise price.[92]

80.   Options and Warrants are considered "derivative" securities because their value is derived primarily based on the value of the underlying asset (*i.e.*, the common stock). The value of an option or warrant is comprised of "intrinsic" and "time value." The intrinsic value of an option or warrant is its value if the holder had to immediately decide whether to exercise it or not. The intrinsic value is calculated as the current, or spot price of the stock ("$S$") minus the exercise, or strike ("$K$") price, when an option is in-the-money, or zero if the option is at or out-of-the-money, given by $\max(S - K, 0)$. The time value refers to the portion of an option's premium that is attributable to the amount of time remaining until option expiry. Time value arises from the possibility that the stock price will favorably increase or decrease by the expiration date.

81.   Prices for options and warrants are affected by six factors:

- The current (or spot) stock price, $S_0$;
- The strike price, $K$;

---

[91]   *See, e.g.*: "Stock Warrants," Dec. 13, 2022, *Corporate Finance Institute. Available at*: https://corporatefinanceinstitute.com/resources/derivatives/stock-warrants/. "Stock warrants are options issued by a company that trade on an exchange and give investors the right (but not obligation) to purchase company stock at a specific price within a specified time period. When an investor exercises a warrant, they purchase the stock, and the proceeds are a source of capital for the company."

[92]   *Ibid.*

- The time to expiration, $T$, also denoted as $T - t$ where $T$ is the expiration date and $t$ is the current date;
- The implied volatility of the underlying stock price, $\sigma$;
- The risk-free interest rate, $r$; and
- Expected dividends.

82. On any given date, the price of the PureCycle Warrants was primarily dependent on the magnitude of the difference between the fixed strike price of the warrant (or $11.50) and the variable price of the underlying PureCycle Common Stock In other words, when the price of the underlying security rises (falls), all else constant, in an efficient market it is expected that the price of the warrant will rise (fall). However, in general the prices of warrants are not expected to move by the same per-share dollar or percentage amount as the underlying stock price.

83. To understand the price movements of PureCycle Warrants relative to the PureCycle Common Stock, it is common to refer to the Warrant as being:

a) "in the money" ("ITM") if the $11.50 strike price of the Warrant is below the current PureCycle stock price (i.e., it has an intrinsic value greater than zero);

b) "at the money" ("ATM") if the $11.50 strike price of the Warrant is equal to the current PureCycle stock price; and

c) "out of the money" ("OTM") if the $11.50 strike price of the Warrant is above the current PureCycle stock price.

84. A wide body of academic literature has studied options pricing in relation to common stocks. For example, numerous studies have evaluated the potential for arbitrage profits to be earned from persistent mispricing opportunities between common stock and options prices, and have concluded that such opportunities do not persist in general due to the efficiency of option pricing.[93] Additionally, many studies have documented that option prices quickly begin to impound

---

[93] *See, for example*: Galai, Dan, 1977, Tests of Market Efficiency of the Chicago Board Options Exchange, *Journal of Business* 50; Klemkosky, Robert C. and Bruce G. Resnick, 1979, Put-Call Parity and Market Efficiency, *Journal of Finance* 34; Klemkosky, Robert C. and Bruce G. Resnick, 1980, An Ex-Ante Analysis of Put-Call Parity, *Journal of Financial Economics* 8; Whaley, Robert E., 1982, On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests, *Journal of Financial Economics* 19.

and reflect new information.[94] In summary, academic literature strongly supports the presumption that options prices quicky reflect value-relevant information that is also reflected in common stock prices.

85.  Moreover, I also understand that courts have presumed that when a market for common stock is found to be informationally efficient, reliance on misstatements or omissions can be presumed for the options, since their prices are derivative of the market prices for common stock.[95]

86.  As demonstrated above, PureCycle Common Stock satisfied each of the efficiency factors I evaluated. Because I have concluded that PureCycle Common Stock was priced efficiently and therefore reflected the value of the alleged misstatements and omissions, I also conclude that because options and warrants pricing is dependent on the stock price, the artificial inflation caused by any misrepresentations and omissions that affects the Common Stock price would translate into the value of derivative instruments such as PureCycle Options and Warrants. Nevertheless, in the following sections I also conduct a further analysis to demonstrate the cause-and-effect relationship between PureCycle's Common Stock price and PureCycle Options and Warrants prices throughout the Class Period.

## 5.2  Cause and Effect Between PureCycle Common Stock and Warrant Prices

87.  I test for a cause-and-effect relationship between PureCycle's Common Stock price and Warrant Price throughout the Class Period by examining whether the price changes in the Warrants are directionally consistent with what would typically be observed in an efficient market given PureCycle's stock price changes.  Specifically, holding all other Warrant pricing inputs constant, if the stock price increases by a large enough amount, Warrant prices typically are expected to increase (depending on the moneyness of the Warrant) and if the stock price declines by a large enough amount, Warrant prices typically are expected to decrease (depending on the moneyness of the Warrant). In order to avoid any potential bias introduced due to bid-ask bounce or due to

---

[94] *See, for example*: Patell, James M. and Mark A. Wolfson, 1981, The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices, *Journal of Accounting Research* 19; Manaster, Steven and Richard J. Rendleman, Jr., 1982, Option Prices as Predictors of Equilibrium Stock Prices, *Journal of Finance* 37; Anthony, Joseph H., 1988, The Interrelation of Stock and Options Market Trading-Volume Data, *Journal of Finance* 43.

[95] *See, e.g.*: *In re Priceline.com Inc. Securities Litigation*, No. 3:00CV01884(DJS); *In re Scientific-Atlanta, Inc. Securities Litigation*, No. 1:01-CV-1950-RWS; and *Fannie Mae Securities Litigation*, No. 04-1639 (RJL).

non-synchronous trading between the PureCycle Common Stock and Warrants, I use the mid-point of the bid and ask quotes as a proxy for price for both the Common Stock and the Warrants. I also indicate the moneyness of the Warrants on each trading day, defined as the ratio of the stock price to the Warrant strike price of $11.50. In percentage terms, the range of moneyness for the PureCycle Warrants during Class Period ranged from 90.17% to 281.83%.

88. In Table 1 below, during the Class Period, there were 24 dates when the absolute anormal stock price returns (i.e., magnitude of the stock price movement without regard to direction) were significant at the 95% level or greater according to the event study conducted in **Section 4.5**. Of these 24 days, there were 22 dates (or 91.67%) on which the stock and the Warrant prices changed in the same direction.[96] Additionally, 4 out of 5 out of the money Warrant returns were also directionally consistent on the dates with significant abnormal returns at the 95% level. This pattern is consistent with the expected price co-movements that tend to occur in efficient markets.

**Table 1**

| Date | Stock Price | | Stock Return | Warrant Price | | Warrant Return | Moneyness | ITM/ATM/OTM |
|---|---|---|---|---|---|---|---|---|
| 16-Nov-2020 | $ | 10.48 | 3.84% | $ | 1.93 | 46.43% | 91.13% | OTM |
| 25-Nov-2020 | $ | 10.67 | 2.37% | $ | 1.81 | 8.07% | 92.78% | OTM |
| 27-Nov-2020 | $ | 11.04 | 3.41% | $ | 2.10 | 15.14% | 96.00% | OTM |
| 01-Dec-2020 | $ | 11.46 | 2.70% | $ | 1.93 | -7.74% | 99.65% | OTM |
| 03-Dec-2020 | $ | 12.18 | 5.66% | $ | 2.28 | 12.14% | 105.87% | ITM |
| 04-Dec-2020 | $ | 12.81 | 5.05% | $ | 2.68 | 16.20% | 111.35% | ITM |
| 07-Dec-2020 | $ | 13.86 | 7.92% | $ | 2.68 | 0.19% | 120.52% | ITM |
| 09-Dec-2020 | $ | 14.78 | 5.03% | $ | 2.81 | 6.06% | 128.48% | ITM |
| 11-Dec-2020 | $ | 13.89 | -4.99% | $ | 2.76 | -5.81% | 120.78% | ITM |
| 21-Dec-2020 | $ | 15.27 | 6.39% | $ | 2.89 | 14.93% | 132.78% | ITM |
| 13-Jan-2021 | $ | 16.15 | 4.17% | $ | 3.85 | 0.00% | 140.43% | ITM |
| 21-Jan-2021 | $ | 18.42 | 7.32% | $ | 5.84 | 2.87% | 160.17% | ITM |
| 04-Feb-2021 | $ | 20.61 | 8.77% | $ | 7.49 | 19.40% | 179.17% | ITM |
| 05-Feb-2021 | $ | 24.06 | 15.48% | $ | 10.70 | 35.73% | 209.17% | ITM |
| 08-Feb-2021 | $ | 26.33 | 9.02% | $ | 13.00 | 19.47% | 228.91% | ITM |
| 22-Feb-2021 | $ | 24.33 | -10.63% | $ | 12.61 | -17.26% | 211.57% | ITM |
| 03-Mar-2021 | $ | 21.66 | -18.50% | $ | 10.30 | -28.89% | 188.30% | ITM |
| 18-Mar-2021 | $ | 31.95 | 9.34% | $ | 16.13 | 16.30% | 277.78% | ITM |
| 25-Mar-2021 | $ | 29.58 | -7.41% | $ | 17.31 | -12.22% | 257.22% | ITM |
| 06-May-2021 | $ | 14.87 | -50.11% | $ | 5.38 | -89.81% | 129.26% | ITM |
| 10-May-2021 | $ | 12.62 | -18.01% | $ | 4.22 | -31.11% | 109.70% | ITM |

[96] Note that this table contains all News Days during the Class Period which were identified in **Section 4.5** as all News Days were found to have significant abnormal returns at the 95% level.

| Date | Stock Price | | Stock Return | Warrant Price | | Warrant Return | Moneyness | ITM/ATM/OTM |
|---|---|---|---|---|---|---|---|---|
| 13-May-2021 | $ | 10.82 | -15.12% | $ | 3.87 | -19.35% | 94.04% | OTM |
| 17-May-2021 | $ | 13.84 | 11.07% | $ | 5.13 | 11.23% | 120.35% | ITM |
| 12-Aug-2021 | $ | 15.88 | 10.76% | $ | 6.60 | 12.76% | 138.04% | ITM |

89. Table 1 provides evidence that, on average, the Warrants' prices co-moved with the PureCycle Common Stock in a manner consistent with that expected in an efficient market during the Class Period.

### 5.3    Cause and Effect Between PureCycle Common Stock and Option Prices

90.  Similar to the analysis applied in **Section 5.2**, I also evaluated whether the Options prices tended to move in a directionally consistent manner with the underlying Common Stock price movements. All else equal, in an efficient market, one would expect call option prices to move in the same direction as underlying stock prices and put options prices to move in the opposite direction as the underlying stock prices. However, this prediction is stronger for options that are in-the-money, as out-of-the-money options may still expire worthless despite underlying stock price swings. Moreover, if the implied volatility of the underlying stock price changes at the same time as a large stock return, this volatility input to option pricing may result in a movement in the option price that differs from the prediction based only on the underlying stock price input.

91.  In Table 2, I report the stock log returns for any dates from my Cammer Factor 5 event studies which are statistically significant at the 95% level or better, as well as the corresponding Option log returns.[97] For each trading day, I report three different option series based on options that: a) have strike prices nearest the prior day's closing stock price, and b) are the nearest to expiration. As can be seen in Table 2, all 30 call and put option series experienced price movements that are consistent with the underlying stock price movements. This finding provides further support for the conclusion that the Options traded in an efficient market throughout the Class Period.

---

[97] Note that PureCycle Options commenced trading after the completion of business combination.

**Table 2**

| Date | Stock Return | Option Series | Call Option Return | Same Direction as Common? | Put Option Return | Opposite Direction as Common? |
|---|---|---|---|---|---|---|
| 06-May-2021 | -50.11% | $20.00 Strike, Expiring 5/21/2021 | -201.76% | Yes | 297.89% | Yes |
| 06-May-2021 | -50.11% | $22.50 Strike, Expiring 5/21/2021 | -205.23% | Yes | 223.77% | Yes |
| 06-May-2021 | -50.11% | $25.00 Strike, Expiring 5/21/2021 | -182.81% | Yes | 165.53% | Yes |
| 10-May-2021 | -18.01% | $12.50 Strike, Expiring 5/21/2021 | -96.14% | Yes | 69.31% | Yes |
| 10-May-2021 | -18.01% | $15.50 Strike, Expiring 5/21/2021 | -116.32% | Yes | 64.99% | Yes |
| 10-May-2021 | -18.01% | $17.50 Strike, Expiring 5/21/2021 | -144.04% | Yes | 46.23% | Yes |
| 13-May-2021 | -15.12% | $10.00 Strike, Expiring 5/21/2021 | -62.65% | Yes | 94.91% | Yes |
| 13-May-2021 | -15.12% | $12.50 Strike, Expiring 5/21/2021 | -86.75% | Yes | 70.42% | Yes |
| 13-May-2021 | -15.12% | $15.00 Strike, Expiring 5/21/2021 | -88.73% | Yes | 43.69% | Yes |
| 17-May-2021 | 11.07% | $10.00 Strike, Expiring 5/21/2021 | 36.21% | Yes | -132.18% | Yes |
| 17-May-2021 | 11.07% | $12.50 Strike, Expiring 5/21/2021 | 46.43% | Yes | -111.92% | Yes |
| 17-May-2021 | 11.07% | $15.00 Strike, Expiring 5/21/2021 | 5.72% | Yes | -62.86% | Yes |
| 12-Aug-2021 | 10.76% | $12.50 Strike, Expiring 8/20/2021 | 54.72% | Yes | -146.63% | Yes |
| 12-Aug-2021 | 10.76% | $15.00 Strike, Expiring 8/20/2021 | 72.70% | Yes | -108.09% | Yes |
| 12-Aug-2021 | 10.76% | $17.50 Strike, Expiring 8/20/2021 | 36.77% | Yes | -57.71% | Yes |

92. My finding of market efficiency for the PureCycle Common Stock, the commonly-held views by practitioners and courts regarding the efficiency of derivative securities flowing from the efficiency of common stock, and my additional analysis of the PureCycle Warrants and Options above, all support the conclusion that the artificial inflation in PureCycle's Common Stock Price that was caused by any alleged misrepresentations and omissions would also be reflected in the prices of PureCycle Warrants and Options throughout the Class Period.

## 6  ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

93. I have been asked by Counsel to evaluate whether per-share damages for purchasers or acquirers of PureCycle's Common Stock can be assessed for all Class members under §10(b) of the Exchange Act based upon a methodology common to all class members and consistent with Lead Plaintiff's theory of liability. The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the prices of PureCycle securities at the time of purchase minus the artificial inflation in the prices of PureCycle securities at the time of sale. If securities are not sold prior to the last corrective disclosure, then the difference

is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995
("PSLRA").[98] This limit on damages can also be applied class-wide. I understand that this out-of-
pocket methodology has been widely accepted for use across 10(b) matters.

94.  The claims administration process produces information necessary for the calculation of
damages for each Class member, including the purchase and sale information for the security. This
information is available from brokerage statements and other documentation of securities
transactions. Artificial inflation is quantified for each day of the Class Period and then damages
are calculated using the formula described above. As a result, the methodology for calculating
damages in §10(b) matters such as this is well-established and formulaic across all Class members.

95.  The quantification of artificial inflation is based upon a detailed loss causation analysis. I
have not been asked to perform a loss causation analysis at this time, and I understand that such
analysis often incorporates information produced during discovery. Nonetheless, the method
employed to calculate artificial inflation can be applied class-wide.

96.  Event studies are widely employed to calculate artificial inflation. Event studies measure
security price reactions to corrective disclosures which revealed the relevant truth that was
concealed by alleged material omissions of fact and/or misrepresentations.[99,100] To the extent that
reliable evidence is introduced to show that a material portion of the difference in the artificial
inflation between the purchase and sale of the securities may be attributed to non-fraud related
factors, the impact of such "confounding information" on the price of PureCycle's securities can
be determined on a common, class-wide basis using various accepted methodologies. The value
of any confounding information can then be subtracted from the price impact of corrective

---

[98] The PSLRA states: "in any private action arising under this chapter in which the plaintiff seeks to establish damages
by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference
between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the
mean trading price of that security during the 90-day period beginning on the date on which the information correcting
the misstatement or omission that is the basis for the action is disseminated to the market." *See* 15 U.S.C. §78u-4(e)(1).

[99] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this
report was not intended to quantify artificial inflation.

[100] I note that because event studies are capable of measuring artificial inflation via back-end price impact, this
methodology can back-cast artificial inflation throughout a given class period. This methodology is thus reliable in
cases involving allegedly inflation-creating misrepresentations as well as inflation-maintaining misrepresentations
with no front-end price impact.

disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process and will be based on the specific set of facts and circumstances in a given case.

97.  A loss causation analysis must also document how artificial inflation evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that inflation equaled a constant dollar amount above the correct security price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each price was inflated by a constant percentage amount above the correct security price over the Class Period. In other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual class member identities or circumstances.

98.  Damages relating to PureCycle's Options and Warrants can also be calculated in a similar manner utilizing the same techniques as described above. Once PureCycle Common Stock's artificial inflation is estimated, the embedded inflation contributing to a Warrant or Option's price can change based on a number of factors. These factors include, but are not limited to, the level of the stock price in relation to the strike price, time to maturity of the contract, and volatility of the underlying stock. One can employ various options pricing methodologies, such as the widely utilized Black-Scholes pricing model, to infer the damage quantum at the time of each Class member's purchase and sale. These models provide a way to value Options and Warrants as a function of the variables that influence option and warrant values: the strike price, time to expiration, risk-free interest rate, volatility of the underlying security, and the current market price of the underlying security. By changing the underlying price of the security in the equation to reflect the removal of the artificial inflation, one can assess how the value of the Option and Warrant would be impacted. Therefore, Options and Warrants damages in this matter can be

calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

99.   To summarize, I have not been asked to calculate damages or loss causation in this matter, and do not do so in this report. However, based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that Common Stock, Options, and Warrants §10(b) damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

100. I have also been asked by Counsel to evaluate whether per-share damages can be assessed under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a 9 promulgated thereunder (17 C.F.R. § 240.14a 9) using a common methodology for "all shareholders of PureCycle who held shares of Roth CH Acquisition I Corp. common stock as of November 16, 2020 or February 12, 2021 and were entitled to vote at the special meeting of stockholders held on March 16, 2021."[101]

101. According to the Complaint, "Plaintiffs and other members of the Class eligible to vote on the Merger Agreement, were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make a fully informed decision in voting on the Merger Agreement and were damaged as a direct and proximate result of the untrue statements and omissions".[102] The Complaint further alleges that "The false and misleading statements and omissions in the November 16, 2020 and February 12, 2021 Proxy Statements and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger Agreement."[]

102. It is my understanding that shareholders of PureCycle who held shares of ROCH Common Stock as of November 16, 2020 or February 12, 2021 (and were entitled to vote at the special meeting of stockholders held on March 16, 2021) were allegedly harmed in a common way when the alleged false and misleading statements in the Proxy precluded them from exercising their right to seek redemption of their shares of ROCH Common Stock prior to the business combination on

---

[101] Complaint ¶119.

[102] Complaint ¶126.

a fully informed basis. These shareholders were also allegedly induced to vote their shares and accept inadequate consideration in connection with the business combination.

103. Therefore, per share damages for the Section 14(a) claim can be calculated on a class-wide basis as the difference between the redemption value of ROCH shares and the valuation of PureCycle shares that the finder of fact may deem appropriate (for example PureCycle share prices minus artificial inflation).

104. To summarize, I have not been asked to calculate §10(b) or §14(a) damages in this matter. However, as described above, such damages calculations can be carried out formulaically across Class members.

## 7   CONCLUSION

105. In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that PureCycle's Common Stock traded in an efficient market throughout the Class Period. I also conclude that the value impact of any alleged misstatements or omissions would be reflected in PureCycle's Options and Warrants prices because their pricing is derivative of and dependent upon PureCycle's Common Stock prices. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

I declare under penalty of perjury that the foregoing is true and correct.

***RESPECTFULLY SUBMITTED***

Matthew D. Cain, Ph.D.

**APPENDIX A**

## Matthew D. Cain, Ph.D.                                November 2023

E-mail: mdcain@outlook.com                                              Homepage
Mobile: 574-485-8065                                                        SSRN

### Education

Ph.D., Finance, August 2007                     Purdue University, West Lafayette, IN
B.S., Finance, May 2001                         Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk
    Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN,
    2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B.
    Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon
    Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr.,
    and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven
    Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).


**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31: Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023

    LAW 251.52: Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

43

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

44

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

## APPENDIX B

### Works Considered

**Court Documents:**

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

*Bond v. Clover Health Investments, Corp., et al*., Case No. 3:21-cv-00096 (M.D. Tenn.).

*Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989).

*Fannie Mae Securities Litigation*, No. 04-1639 (RJL).

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

*Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016).

*In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).

*In re Groupon, Inc. Securities Litigation*, 2015 WL 1043321, at *5 (N.D. Ill. 2015)

*In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009).

*In re Priceline.com Inc. Securities Litigation*, No. 3:00CV01884(DJS).

*In re: QuantumScape Securities Class Action Litigation,* Case No. 3:21-cv-00058-WHO (N.D. Ca.)

*In re Scientific-Atlanta, Inc. Securities Litigation*, No. 1:01-CV-1950-RWS.

*In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.)

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

*Lumen v Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012)

*Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.)

*Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.)

*Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.)

*Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2012).

**Academic Literature:**

Abdi, Farshid and Angelo Ranaldo. A Simple Estimation of Bid-Ask Spreads from Daily Close, High, and Low Prices. *Review of Financial Studies* 30 (2017).

Anthony, Joseph H. The Interrelation of Stock and Options Market Trading-Volume Data. *The Journal of Finance* 43.4 (1988): 949-964.

46

Avramov, Doron, Tarun Chordia and Amit Goyal. Liquidity and Autocorrelations in Individual Stock Returns. *The Journal of Finance* 61.5 (2006): 2365-2394. Print.

Barber, Brad M., Paul A. Griffin and Baruch Lev. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. *Journal of Corporate Law* 19 (1993).

Boudoukh, Jacob, et al. "Information, trading, and volatility: Evidence from firm-specific news." *The Review of Financial Studies* 32.3 (2019): 992-1033.

Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier. Good News, Bad News, Volatility, and Betas. *The Journal of Finance* 50.5 (1995): 1575-1603.

Chung, Kee H. and Hao Zhang. A Simple Approximation of Intraday Spreads using Daily Data. *Journal of Financial Markets* 17 (2014): 94-120.

Fair, Ray C. "Events that shook the market." *The Journal of Business* 75.4 (2002): 713-731.

Fama, Eugene F. "Efficient capital markets: A review of theory and empirical work." *The journal of Finance* 25.2 (1970): 383-417.

Fama, Eugene F. "Efficient capital markets: II." *The journal of finance* 46.5 (1991): 1575-1617.

Fama, Eugene F. Market Efficiency, Long-Term Returns, and Behavioral Finance. *Journal of Financial Economics* 49.3 (1998): 283-306.

Ferrillo, Paul A., Frederick C. Dunbar, and David Tabak. "The less than efficient capital markets hypothesis: Requiring more proof from plaintiffs in fraud-on-the-market cases." . *John's L. Rev.* 78 (2004): 81.

Galai, Dan. Tests of Market Efficiency of the Chicago Board Options Exchange. *The Journal of Business* 50.2 (1977): 167-197.

Hou, Kewei, Chen Xue, and Lu Zhang, Replicating Anomalies, *Review of Financial Studies* 33 (2020).

Hull, John C. "Option, Futures and other Derivatives." (2009).

Jensen, Michael C. Some Anomalous Evidence Regarding Market Efficiency. *Journal of Financial Economics* 6.2-3 (1978): 95-101.

Klemkosky, Robert C., and Bruce G. Resnick. An Ex Ante Analysis of Put-Call Parity. *Journal of financial Economics* 8.4 (1980): 363-378.

Klemkosky, Robert C., and Bruce G. Resnick. Put-Call Parity and Market Efficiency. *The Journal of Finance* 34.5 (1979): 1141-1155.

Kumar, Raman, Atulya Sarin, and Kuldeep Shastri, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53 (1998).

Lee, Charles MC and Eric C. So. Uncovering Expected Returns: Information in Analyst Coverage Proxies. *Journal of Financial Economics* 124.2 (2017): 331-348.

MacKinlay, A. Craig. Event Studies in Economics and Finance. *Journal of Economic Literature* 35.1 (1997): 13-39.

Manaster, Steven, and Richard J. Rendleman Jr. Option Prices as Predictors of Equilibrium Stock Prices. *The Journal of Finance* 37.4 (1982): 1043-1057.

Mitchell, Mark L. and Jeffry M. Netter. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. *The Business Lawyer* (1994): 545-590.

Mola, Simona, P. Raghavendra Rau and Ajay Khorana. Is there Life After the Complete Loss of Analyst Coverage? *The Accounting Review* 88.2 (2013): 667-705.

Patell, James M., and Mark A. Wolfson. The Ex Ante and Ex Post Price Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices. *Journal of Accounting Research* (1981): 434-458.

Ross, Stephen A. Options and Efficiency. *The Quarterly Journal of Economics* 90.1 (1976): 75-89.

Tabak, David and Frederick Dunbar. Materiality and Magnitude: Event Studies in the Courtroom. *Litigation services handbook: The role of the financial expert* (2001): 19.1-19.22.

Thomas, Randall S. and James F. Cotter. Measuring Securities Market Efficiency in the Regulatory Setting. *Law and Contemporary Problems* 63.3 (2000): 105-122.

Villanueva, O. Miguel, and Steven Feinstein. "Stock price reactivity to earnings announcements: the role of the Cammer/Krogman factors." *Review of Quantitative Finance and Accounting* 57.1 (2021): 203-234.

Whaley, Robert E. Valuation of American Call Options on Dividend-Paying Stocks: Empirical Tests. *Journal of Financial Economics* 10.1 (1982): 29-58.

**Data Sources:**

Bloomberg

Factiva

Investext

SEC Edgar

OptionMetrics

**Other:**

All other data and documents cited or referred to within this report

**EXHIBIT 1**



Data Source: Bloomberg

Note: From November 16, 2020, through March 16, 2021, price and volume data reflects ROCH. After closing of the business combination on March 17, 2021, price and volume data reflects PCT.

**EXHIBIT 2**



PureCycle Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding: 16-Nov-2020 to 10-Nov-2021

Data Sources: Bloomberg, SEC Edgar

Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on November 16, 2020, through November 10, 2021.The weekly trading volume for the week of November 5, 2021, has been scaled by a factor of 5/4 as the final week of the Class Period contained 4 trading days.

## EXHIBIT 3

**Summary of Research Analyst Coverage of PureCycle during the Class Period: 16-Nov-2020 to 10-Nov-2021**

| Analyst Name | Reports Issued During the Class Period |
|---|---|
| Roth Capital Partners, Inc. | 8 |
| Craig Hallum | 4 |
| BuySellSignals Research | 4 |
| Oppenheimer & Co., Inc. | 2 |
| Validea | 2 |
| ValuEngine, Inc | 2 |
| Cowen and Company | 1 |
| **Total** | **23** |

| Analyst Name | Earning Call Participation During the Class Period |
|---|---|
| Alembic Global Advisors | Q2 2021 – Q3 2021 |
| BofA Securities Inc, | Q2 2021 – Q3 2021 |
| Cowen and Co. LLC | Q3 2021 |
| Craig Hallum Capital Group | Q1 2021 – Q3 2021 |
| Jefferies LLC | Q3 2021 |
| Oppenheimer & Co. Inc, | Q1 2021 – Q3 2021 |
| Roth Capital Partners | Q1 2021 – Q3 2021 |
| Sage Asset Management | Q1 2021, Q3 2021 |
| Thomas Weisel Partners LLC | Q3 2021 |

Data Sources: Bloomberg, Investext

**EXHIBIT 4**



Coefficients From Fixed and Rolling Event Study Regression for PureCycle Common Stock: 16-Nov-2020 to 10-Nov-2022

Data Source: Bloomberg

Note: These results are based on a regression using all available trading days preceding each of November 16, 2020 – November 23, 2021, and using 60 trading days beginning on November 24, 2020. The regression model controls for a broad market index (S&P 1500 Total Return Index) and an industry index (S&P 600 Materials Sector Index). News Days as defined in **Section 4.5** have been excluded from the estimation.

**EXHIBIT 5**



Standard Deviation of Errors for Fixed and Rolling Event Study for PureCycle
Common Stock: 16-Nov-2020 to 10-Nov-2022

Data Source: Bloomberg

Note: These results are based on a regression using all available trading days preceding each of November 16, 2020 – November 23, 2021, and using 60 trading days beginning on November 24, 2020. The regression model controls for a broad market index (S&P 1500 Total Return Index) and an industry index (S&P 600 Materials Sector Index). News Days as defined in **Section 4.5** have been excluded from the estimation.

54

**EXHIBIT 6**

### Event Study Analysis of PureCycle News Days for PureCycle Common Stock

| Date | Closing Price | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | p-Value | Sig Level | Relevant News |
|---|---|---|---|---|---|---|---|---|
| 16-Nov-20 | $10.50 | 3.88% | 4.0% | $0.41 | 5.587 | 0.000 | *** | Roth CH Acquisition Co. Announces PureCycle as Business Combination Target |
| 18-Mar-21 | $32.69 | 12.32% | 15.7% | $4.91 | 3.000 | 0.004 | *** | PureCycle Technologies Begins Trading on the NASDAQ Following Business Combination with Roth CH Acquisition I Co. |
| 17-May-21 | $13.86 | 10.89% | 12.6% | $1.67 | 2.046 | 0.045 | ** | Q1 2021 PureCycle Technologies Inc Earnings Call |
| 12-Aug-21 | $15.94 | 11.14% | 12.0% | $1.82 | 2.030 | 0.047 | ** | Q2 2021 PureCycle Technologies Inc Earnings Call |
| 11-Nov-21 | $9.79 | -16.10% | -17.2% | -$1.81 | -4.203 | 0.000 | *** | Q3 2021 PureCycle Technologies Inc Earnings Call |
| 10-Mar-22 | $9.61 | 12.63% | 15.0% | $1.37 | 3.240 | 0.002 | *** | Q4 2021 PureCycle Technologies Inc Earnings Call |
| 12-May-22 | $7.21 | 13.33% | 12.8% | $0.86 | 2.306 | 0.025 | ** | Q1 2022 PureCycle Technologies Inc Earnings Call |
| 12-Aug-22 | $10.63 | 11.77% | 9.3% | $0.92 | 2.202 | 0.032 | ** | Q2 2022 PureCycle Technologies Inc Earnings Call |
| 10-Nov-22 | $6.84 | -4.85% | -12.7% | -$0.86 | -3.484 | 0.001 | *** | Q3 2022 PureCycle Technologies Inc Earnings Call |

Data Sources: Bloomberg, Factiva, SEC Edgar

Notes:
(1) Note: These results are based on a regression using all available trading days preceding each of November 16, 2020 – November 23, 2021 and using 60 trading days beginning on November 24, 2020. The regression model controls for a broad market index (S&P 1500 Total Return Index) and an industry index (S&P 600 Materials Sector Index). News Days as defined in **Section 4.5** have been excluded from the estimation.  All listed dates represent the market impact date of the specific news type.
(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**EXHIBIT 7**

**Comparison of Statistical Significance and Abnormal Returns for PureCycle News Days vs. No News Trading Days During the Analysis Window for PureCycle Common Stock**

| Statistic | News Days | No News Trading Days | p-Value of Difference |
|---|---|---|---|
| N | 9 | 236 | |
| Significant Days at 95% Confidence Level | 9 | 16 | |
| % Significant Days at 95% Confidence Level | 100.00% | 6.78% | 0.000 |
| Average Absolute Abnormal Return | 12.36% | 3.40% | 0.000 |
| Average Volume (Millions) | 3.04 | 0.79 | 0.004 |

Data Sources: Bloomberg, Factiva, SEC Edgar

Note: The nine News Days are listed in the previous exhibit. No News Dates were identified as dates with no Factiva headlines and no SEC filings during the Analysis Window. The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test. The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**EXHIBIT 8**



PureCycle Common Stock Market Capitalization 16-Nov-2020 to 10-Nov-2021

Average Market Capitalization over the Class Period: $1.46 Billion

Market Capitalization of Common Stock — — Average Market Capitalization Over the Class Period

Data Sources: Bloomberg, SEC Edgar

**EXHIBIT 9**



PureCycle Common Stock Average Monthly Bid-Ask Spread:
16-Nov-2020 to 10-Nov-2021

Data Source: Bloomberg

Notes:
(1) The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the closing bid and ask quotes.
(2) Note: November 2020 and November 2021 data are limited to the Class Period.

**EXHIBIT 10A**

## PureCycle Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings

| Date | Shares Outstanding | Total Institutions Owning Stock | Insider Holdings | Short Interest | Public Float | Insider Holdings as % of Shares Outstanding | Institutional Holdings | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 12/31/2020 | 9,828,000 | 26 | 700,000 | 120,542 | 9,248,542 | 7.12% | 5,611,718 | 57.10% | 60.68% |
| 03/31/2021 | 117,349,281 | 96 | 20,500,949 | 2,568,543 | 99,416,875 | 17.47% | 57,899,500 | 49.34% | 58.24% |
| 06/30/2021 | 117,349,281 | 130 | 20,913,809 | 11,063,003 | 107,498,475 | 17.82% | 74,557,083 | 63.53% | 69.36% |
| 09/30/2021 | 117,356,725 | 141 | 22,965,861 | 16,248,579 | 110,639,443 | 19.57% | 79,182,677 | 67.47% | 71.57% |
| 12/31/2021 | 125,025,204 | 165 | 23,209,038 | 12,421,554 | 114,237,720 | 18.56% | 82,830,271 | 66.25% | 72.51% |
| **Total Institutions over Class Period:** | | **263** | | | **Class Period Average:** | **16.11%** | | **60.74%** | **66.47%** |

Data Sources: Bloomberg, SEC Edgar

59

**EXHIBIT 10B**

## Institutions that Held PureCycle Common Stock at Some Point During the Class Period

| | | | |
|---|---|---|---|
| 1 | 1492 Capital Management LLC | 29 | BANK OF NEW YORK MELLON CORP/THE |
| 2 | 683 Capital Management LLC | 30 | Basso Capital Management LP |
| 3 | ACCELERATE FINANCIAL TECH INC | 31 | BEKA ASSET MANAGEMENT SGIIC SA |
| 4 | ACK Asset Management LLC | 32 | Berry Street Capital Management LLP |
| 5 | Advisor Group Holdings Inc | 33 | Betashares Capital Ltd |
| 6 | Aegon NV | 34 | BlackRock Inc |
| 7 | AllianceBernstein LP | 35 | Blackstone Inc |
| 8 | Allianz SE | 36 | Bluefin Capital Management LLC |
| 9 | Alpine Global Management LLC | 37 | Blueshift Asset Management LLC |
| 10 | American Agricultural Insurance Co | 38 | BNP Paribas SA |
| 11 | American Century Cos Inc | 39 | Boothbay Fund Management LLC |
| 12 | American Family Insurance Co | 40 | Brinker Capital LLC |
| 13 | American International Group Inc | 41 | Brookfield Corp |
| 14 | Ameritas Investment Partners Inc | 42 | Cambridge Investment Research Advisors Inc |
| 15 | Aperture Investors LLC | 43 | Caption Management LLC |
| 16 | Apollon Wealth Management LLC | 44 | Captrust Financial Advisors LLC |
| 17 | Appian Way Asset Management LP | 45 | Cartenna Capital LP |
| 18 | AQR Arbitrage LLC | 46 | Castle Creek Arbitrage LLC |
| 19 | AQR Capital Management LLC | 47 | Castleview Partners LLC |
| 20 | Ardsley Advisory Partners LP | 48 | Centaurus Financial Inc |
| 21 | Arizona State Retirement System | 49 | Cetera Financial Group Inc |
| 22 | Assicurazioni Generali SpA | 50 | Charles Schwab Corp/The |
| 23 | Atalan Capital Partners LP | 51 | Citadel Advisors LLC |
| 24 | Australia & New Zealand Banking Group Ltd | 52 | Citigroup Inc |
| 25 | Baldwin Brothers Inc | 53 | Claybrook Capital LLC |
| 26 | Balyasny Asset Management LP | 54 | Clearstead Trust LLC |
| 27 | Bank of America Corp | 55 | Collaborative Holdings Management LP |
| 28 | Bank of Montreal | 56 | Commonwealth Equity Services LLC |

| | | | |
|---|---|---|---|
| 57 | Consulting Group Advisory Services LLC | 88 | First Republic Investment Management Inc |
| 58 | Covalis Capital LLP | 89 | First Trust Capital Management LP |
| 59 | Covestor Ltd | 90 | FMR LLC |
| 60 | Cowen Inc | 91 | FNY Investment Advisers LLC |
| 61 | Credit Suisse Group AG | 92 | Focused Wealth Management Inc |
| 62 | Cruiser Capital Advisors LLC | 93 | Franklin Resources Inc |
| 63 | Cubist Systematic Strategies LLC | 94 | FSB Premier Wealth Management Inc |
| 64 | Cutler Group LP | 95 | Geode Capital Management LLC |
| 65 | CVI Holdings LLC | 96 | GGCP Inc |
| 66 | CWM LLC | 97 | Gilder Gagnon Howe & Co LLC |
| 67 | Danske Bank A/S | 98 | Goldman Sachs Group Inc/The |
| 68 | Dark Forest Capital Management LP | 99 | Group One Trading Lp/Chicago |
| 69 | DE Shaw & Co LP | 100 | Guggenheim Partners LLC |
| 70 | Deane Retirement Strategies Inc | 101 | GWM Advisors LLC |
| 71 | DekaBank Deutsche Girozentrale | 102 | Gyon Technologies Capital Management LP |
| 72 | Deutsche Bank AG | 103 | Hanwha Asset Management Co Ltd |
| 73 | Dunham & Associates Investment Counsel Inc | 104 | Harbert Fund Advisors Inc |
| 74 | Dynamic Advisor Solutions LLC | 105 | HAREL INS INV & FIN |
| 75 | Encompass Capital Advisors LLC | 106 | Hartford Financial Services Group Inc/The |
| 76 | Ensign Peak Advisors Inc | 107 | Harvard Management Co Inc |
| 77 | Equitable Holdings Inc | 108 | HighTower Advisors LLC |
| 78 | Ergoteles LLC | 109 | Hill City Capital LP |
| 79 | Erste Group Bank AG | 110 | Hirtle Callaghan & Co LLC |
| 80 | ETF Series Solutions | 111 | Horizons Investment Management Inc |
| 81 | ExodusPoint Capital Management LP | 112 | Howard Hughes Medical Institute |
| 82 | Exos Asset Management LLC | 113 | HRT Financial LP |
| 83 | Federated Hermes Inc | 114 | Hudson Bay Capital Management LP |
| 84 | FIL Ltd | 115 | Ibex Investors LLC |
| 85 | FINECO ASSET MANAGEMENT DAC | 116 | IFP Advisors Inc |
| 86 | First Horizon Advisors Inc | 117 | Independent Investors Inc |
| 87 | First National Bank of Omaha | 118 | INNVENTURE LLC |

| | | | |
|---|---|---|---|
| 119 | International Assets Investment Management LLC | 150 | Mercer Global Investments Management Ltd |
| 120 | Invesco Ltd | 151 | MetLife Inc |
| 121 | Ionic Capital Management LLC | 152 | MetLife Investment Management LLC |
| 122 | James Investment Research Inc | 153 | Millennium Management LLC/NY |
| 123 | Jane Street Group LLC | 154 | MissionSquare Investments |
| 124 | Janney Montgomery Scott LLC | 155 | MM Asset Management Inc |
| 125 | Janus Henderson Group PLC | 156 | Moneta Group Investment Advisors LLC |
| 126 | Jefferies Financial Group Inc | 157 | Moore Capital Management LP |
| 127 | JPMorgan Chase & Co | 158 | Morgan Stanley |
| 128 | Julius Baer Group Ltd | 159 | MUFG AMERICAS HOLDINGS CORP |
| 129 | Kingdon Capital Management LLC | 160 | National Bank of Canada |
| 130 | KJ Harrison & Partners Inc | 161 | Nationwide Fund Advisors |
| 131 | KLP Kapitalforvaltning AS | 162 | Nokota Management LP |
| 132 | Knights of Columbus Asset Advisors LLC | 163 | Nomura Holdings Inc |
| 133 | Koshinski Asset Management Inc | 164 | Northern Trust Corp |
| 134 | Legacy Advisors LLC | 165 | Olive Street Investment Advisers LLC |
| 135 | Legal & General Group PLC | 166 | Oppenheimer & Co Inc |
| 136 | LGT Fondsleitung AG/Liechtenstein | 167 | PanAgora Asset Management Inc |
| 137 | Lido Advisors LLC | 168 | Parallax Volatility Advisers LP |
| 138 | Listed Funds Trust | 169 | Patriot Financial Group Insurance Agency LLC |
| 139 | Lodge Hill Capital LLC | 170 | Peak Financial Advisors LLC |
| 140 | LPL Financial LLC | 171 | Penserra Capital Management LLC |
| 141 | M&T Bank Corp | 172 | Periscope Capital Inc |
| 142 | Magnetar Financial LLC | 173 | PIA-Leumi Fund Managers/Israel |
| 143 | MAGNETAR INVESTORS | 174 | PineBridge Investments LP |
| 144 | Man Group Ltd | 175 | PNC Financial Services Group Inc/The |
| 145 | Manatuck Hill Partners LLC | 176 | Point72 Asset Management LP |
| 146 | Manulife Financial Corp | 177 | Polar Asset Management Partners Inc |
| 147 | MARSHALL WACE | 178 | POWER CORP OF CANADA |
| 148 | Massachusetts Mutual Life Insurance Co | 179 | Prelude Capital Management LLC |
| 149 | Maven Securities Ltd | 180 | Principal Financial Group Inc |

| | | | |
|---|---|---|---|
| 181 | Private Advisor Group LLC/NJ | 212 | SHINHAN ASSET MANAGEMENT CO LTD |
| 182 | Private Capital Group LLC | 213 | SIG HOLDING LLC |
| 183 | ProFund Advisors LLC | 214 | Simplex Trading LLC |
| 184 | ProShare Advisors LLC | 215 | Solstein Capital LLC |
| 185 | Prudential Financial Inc | 216 | Spire Wealth Management LLC |
| 186 | PURE CROWN LLC | 217 | Squarepoint Ops LLC |
| 187 | Putnam Investments LLC | 218 | State of California |
| 188 | Quantbot Technologies LP | 219 | State of New York |
| 189 | RAIFFEISEN BANK INTERNATIONAL | 220 | State of Wisconsin Investment Board |
| 190 | Raymond James Financial Inc | 221 | State Street Corp |
| 191 | Recanati/Israel | 222 | Stifel Financial Corp |
| 192 | Renaissance Technologies LLC | 223 | STRS Ohio 80th Inc |
| 193 | Rhumbline Advisers LP | 224 | Sugarloaf Wealth Management LLC |
| 194 | RiverNorth Capital Management LLC | 225 | Sun Life Financial Inc |
| 195 | Rockbridge Towarzystwo Funduszy Inwestycyjnych SA | 226 | SWS Partners LLC |
| 196 | Roth Capital Partners LLC | 227 | Sylebra Capital Ltd |
| 197 | Rothschild Capital Partners LLC | 228 | Symmetry Peak Management LLC |
| 198 | Roubaix Capital LLC | 229 | T Rowe Price Group Inc |
| 199 | Royal Bank of Canada | 230 | Teacher Retirement System of Texas |
| 200 | Russell Investments Group Ltd | 231 | Teachers Insurance & Annuity Association of America |
| 201 | Saltoro Capital LP | 232 | Think Investments LP |
| 202 | Samlyn Capital LLC | 233 | Thompson Siegel & Walmsley LLC |
| 203 | Sargent Bickham Lagudis LLC | 234 | Tower Research Capital LLC |
| 204 | Schonfeld Strategic Advisors LLC | 235 | Tradition Wealth Management LLC |
| 205 | Schroders PLC | 236 | Tributary Capital Management LLC |
| 206 | Schweizerische Nationalbank | 237 | Tuttle Capital Management LLC |
| 207 | Scopus Asset Management LP | 238 | TwinBeech Capital LP |
| 208 | Sculptor Capital Management Inc | 239 | Two Sigma Investments LP |
| 209 | SEI Investments Co | 240 | Tyler-Stone Wealth Management LLC |
| 210 | SG Americas Securities LLC | 241 | UBS AG |
| 211 | Shay Capital LLC | 242 | US Bancorp |

| 243 | VALIC Co I | 254 | WE-INN LLC |
| 244 | Van Eck Associates Corp | 255 | Weiss Multi-Strategy Advisers LLC |
| 245 | Vanguard Group Inc/The | 256 | Wellington Management Group LLP |
| 246 | Verition Fund Management LLC | 257 | Wells Fargo & Co |
| 247 | Virginia Retirement System | 258 | Wexford Capital LP |
| 248 | Virtu Financial LLC | 259 | Wolverine Asset Management LLC |
| 249 | Voya Investment Management LLC | 260 | Wolverine Trading LLC |
| 250 | Walleye Trading LLC | 261 | Woodward Diversified Capital LLC |
| 251 | Wealth Effects LLC | 262 | Yong Rong HK Asset Management Ltd |
| 252 | Wealthcare Advisory Partners LLC | 263 | Zuercher Kantonalbank |
| 253 | Wealthsource Partners LLC | | |

Data Source: Bloomberg

**EXHIBIT 11**

**PureCycle Common Stock
Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day's Abnormal Return | t-Stat | p-Value |
|---|---|---|---|
| **Q4 2020** | 0.41 | 3.00 | 0.003 |
| **Q1 2021** | 0.39 | 2.98 | 0.003 |
| **Q2 2021** | 0.05 | 0.55 | 0.580 |
| **Q3 2021** | 0.03 | 0.18 | 0.856 |
| **Q4 2021** | 0.18 | 1.23 | 0.218 |
| **Full Class Period** | 0.14 | 1.81 | 0.070 |

Data Source: Bloomberg

Notes:

(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.

(2) For this calculation, I only considered days that are within the Class Period.