**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA**

WILLIAM C. THEODORE,
individually and on behalf of all others
similarly situated,

                              Plaintiffs,

              v.

PURECYCLE TECHNOLOGIES,
INC., MICHAEL OTWORTH,
MICHAEL E. DEE, DAVID
BRENNER, and BYRON ROTH,

                              Defendants.

Case No. 6:21-cv-809-PGB-RMN

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LEAD
PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION AND
APPOINTMENT AS CLASS REPRESENTATIVES**

PureCycle Technologies, Inc. ("PCT"), Michael Otworth, Michael Dee, David

Brenner and Byron Roth ("Defendants"), respectfully submit this memorandum of law

in opposition to Lead Plaintiffs Robert and Mariusz Ciecko's ("Plaintiffs") Amended

Motion for Class Certification, appointment of Plaintiffs as class representatives and

Pomerantz LLP as lead counsel. [Doc. 179] ("Motion" or "Mot.").

**PRELIMINARY STATEMENT**

Plaintiffs seek certification of § 10(b) claims for a "Class Period" from

November 16, 2020 to November 10, 2021. [Doc. 179 at 2-3]. But Plaintiffs fail to

"affirmatively demonstrate" they are entitled to class certification under Rule 23.

To start, Plaintiffs fail to recognize that separate and distinct companies existed

before and after the de-SPAC transaction. The de-SPAC combined two entities—(i)

1

PureCycle Technologies, LLC ("PureCycle LLC"), a private operating company, and (ii) ROTH CH Acquisition I Co. ("ROCH"), a public special purpose acquisition company ("SPAC") with no business operations—into publicly traded PCT. Plaintiffs primarily challenge statements made *by* PureCycle LLC and/or ROCH *prior* to the de-SPAC. But discovery confirmed that Plaintiffs never purchased shares in PureCycle LLC or ROCH before the de-SPAC was approved on March 16, 2021. Thus, Plaintiffs lack standing to challenge alleged misstatements made by PureCycle LLC or ROCH and their claims are not typical of investors in that period. *Infra* § I.

In an attempt to show Rule 23(b)(3)'s predominance, Plaintiffs seek to invoke the presumption of reliance in *Basic v. Levinson*, 485 U.S. 224 (1988). To do so, Plaintiffs must—but fail—to establish the market was efficient *throughout* the Class Period. Plaintiffs' expert, Dr. Matthew Cain, notes glaring distinctions before and after the de-SPAC, but nevertheless concludes that the market was efficient. Cain Report ("Cain") [Doc. 163-1]. As shown in Dr. René Stulz's Report, Ex. 1 ("Stulz"),[1] Dr. Cain's conclusions do not hold true when applied to the pre-de-SPAC entity ROCH— which is not surprising given that it was a SPAC with no operations. Individual issues predominate and the Pre-de-SPAC Period should be excluded from any Class.

In addition, Defendants have rebutted any presumption of reliance by demonstrating a lack of price impact when the alleged misrepresentations were made, and when they were purportedly "corrected" by subsequent disclosures. The first such

---

[1] Unless otherwise noted, references to "Ex. _" are to the exhibits attached to Declaration.

disclosure, the short seller Hindenburg Report, was not corrective as it consisted of the author's mischaracterization of public information, along with interviews of individuals with no connection to Defendants. Plaintiffs also rely on PCT's voluntary disclosure of an SEC investigation, but that disclosure did not correct any alleged misstatement, and the investigation was closed with no further action.

Individual issues also predominate because Plaintiffs cannot invoke the *Affiliated Ute* presumption as their claims are based on alleged misrepresentations (not pure omissions), and because Plaintiffs fail to articulate a damages methodology that is consistent with their theory of liability. Finally, Plaintiffs fail to demonstrate typicality or adequacy. As demonstrated below, Plaintiffs' Motion should be denied.

## FACTUAL BACKGROUND

PCT recycles waste from a certain type of plastic, polypropylene, into an ultra-pure recycled form, using technology PureCycle LLC licensed from The Procter & Gamble Company ("P&G"). [Doc. 113 ¶¶ 3, 31] (Second Amended Complaint, "SAC"). Otworth, Dee, and Brenner were officers of PureCycle LLC and later PCT, [*Id.* ¶¶ 20-24]; Roth was ROCH's Chairman and CEO but never employed by PureCycle LLC or PCT. [*Id.* ¶ 2; Doc. 118 at 3].

PCT began trading on the NASDAQ on March 18, 2021, following the business combination between PureCycle LLC and ROCH. [Doc. 113 ¶¶ 1-3, 50-51]. The prospective de-SPAC had been announced on November 16, 2020 and approved on March 16, 2021. [*Id.* ¶¶1-3, 50-51, 53, 73]. All but one of the alleged misrepresentations

was made before the de-SPAC. *Id*. ¶¶ 73-74 (Ex. 2, PCT, Apr. 21, 2021 Press Release).[2]

R. Ciecko first purchased ROCH on March 17, 2021, *because* he was researching new ticker symbols. He alerted M. Ciecko, who purchased PCT.[3]

On May 6, 2021, short seller Hindenburg Research ("Hindenburg"), published a "Report" criticizing PCT's recycling process, management's experience and SPACs in general. Ex. 3, Rep. 9-15. The Report achieved Hindenburg's desired outcome: PCT stock fell from $24.59 to $14.83 before it *recovered* in seven weeks.[4] On November 10, 2021, PCT voluntarily disclosed the SEC had commenced a fact-finding investigation regarding PCT, Ex. 4, PCT, Form 10-Q (Nov. 10, 2021). Six months later, the investigation was closed without further action. Ex. 5, PCT, Form 8-K (Apr. 26, 2022).

## ARGUMENT

For a class to be certified, Plaintiffs must "affirmatively demonstrate [their] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of

---

[2] The other alleged misstatements include: (i) PureCycle LLC, Press Rel. (Nov. 16, 2020), ROCH, Form 8-K (Nov. 16, 2020), ROCH, Schedule 14A (Nov. 16, 2020), [Doc. 113 ¶¶ 53-62]; Exs. 6-8; (ii) ROCH, Form S-4 (Nov. 20, 2020); [Doc. 113 ¶¶ 63-66]; Ex. 9; (iii) ROCH, Schedule 14A (Feb. 12, 2021); [Doc. 113 ¶¶ 67-72]; Ex. 10, ("Solicitation Materials").

[3] Ex. 11, R. Ciecko Dep. 57:21-62:15; Ex. 12, M. Ciecko Dep. 35:14-36:5; *see infra* fn. 5. The change of the stock symbol from ROCH to PCT after the merger vote was a mere formality by the time of R. Ciecko's first purchase. Ex. 13, PureCycle LLC, Prospectus (Form 424(b)(3)) (Feb. 21, 2021) at 63. Indeed, his ROCH shares were converted to PCT shares the next day. Ex. 14.

[4] Ex. 15, PCT Stock Price, Yahoo Finance, *available at* https://tinyurl.com/28d8dnx7 (stock recovered to $25.14, exceeding May 5, 2021, closing price, on June 23, 2021). The Report confirmed that Hindenburg held a short position in PCT as of May 6, 2021. Ex. 3, Rep. 1, 18.

Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Courts must conduct a rigorous analysis to confirm Rule 23 has been satisfied, which frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

## I.    Plaintiffs Lack Standing to Represent a Section 10(b) Class Challenging Pre-de-SPAC Statements.

"[I]t is well-settled that prior to the certification of a class, . . . the district court must determine that ***at least one*** named class representative has Article III standing to raise each class subclaim." *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("analysis of class certification must begin with the issue of standing"). Plaintiffs must "have bought or sold the security *about which* a misstatement was made in order to have standing to sue under Section 10(b)." *In re CarLotz, Inc. Sec. Litig.*, 2023 WL 2744064, at *4 (S.D.N.Y. Mar. 31, 2023) (quoting *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 86 (2d Cir. 2022)). All but one of the alleged misrepresentations were made prior to the de-SPAC by ROCH and/or PureCycle LLC—a private, *separate* company from PCT—but Plaintiffs never purchased PureCycle LLC stock or ROCH stock prior to the de-SPAC (and ROCH is not a defendant).[5] Thus, Plaintiffs lack standing to bring a § 10(b) claim based on pre-merger statements. *CarLotz*, 2023 WL 2744064, at *4 (failure to buy "securities about which the misstatements were made" "forecloses

---

[5] After April 21, 2021, M. Ciecko purchased 38 shares of PCT stock and R. Ciecko purchased PCT options. Ex. 14, Pls' Trading Records at 5, 9-21; [Doc.34-3 at 4]. M. Ciecko and R. Ciecko's standing for the § 10(b) claim is only with respect to a single alleged misrepresentation in April 2021.

Plaintiffs' challenge to any statements" made pre-merger); *Kusnier v. Virgin Galactic Holdings, Inc.*, 2023 WL 8750398, at *8 (E.D.N.Y. Dec. 19, 2023) (purchasers in post-de-SPAC company lacked standing to challenge pre-de-SPAC statements).

## II.    Plaintiffs Cannot Satisfy the Rule 23(b)(3) Predominance Requirement.

In order to meet Rule 23(b)(3)'s requirement that common issues predominate over individual issues, plaintiffs often attempt to invoke the "fraud on the market" presumption of reliance. To do so, plaintiffs must show the alleged misrepresentations were public, material, the market was efficient, and plaintiffs traded after the misrepresentations and before the correction. *Halliburton*, 573 U.S. at 268 (citing *Basic*, 485 U.S. 224); *see also Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1254 (11th Cir. 2014).

### A.    Plaintiffs Cannot Establish That the Market for PureCycle's Securities Was Efficient Throughout the Class Period.

Plaintiffs' expert, Dr. Cain, sets forth a flawed analysis; thus, Plaintiffs cannot establish the market for ROCH and PCT securities was efficient *throughout* the Class Period. Ex. 1, Stulz ¶¶ 21-25, 66-151; *Halliburton*, 573. U.S. at 276.

#### 1.    Dr. Cain Condenses the Pre-de-SPAC and Post-de-SPAC Periods, Obscuring Significant Differences Between the Two.

In concluding that the market was efficient, Dr. Cain analyzes the *full* Class Period and fails to adequately consider significant differences during two separate subperiods: (1) November 16, 2020 to March 17, 2021, when ROCH was a blank check company without an operating entity (trading as ROCH) and PureCycle LLC was a separate, private company ("Pre-de-SPAC Period"); and (2) March 18, 2021 to

November 10, 2021, after the business combination between PureCycle LLC and ROCH, and ROCH became a publicly traded company, trading as PCT ("Post-de-SPAC Period"). Ex. 1, Stulz ¶¶ 21, 72-78 (citing Ex. 16, Dr. Cain's deposition).

As Dr. Stulz explains, ROCH's lack of assets and operations Pre-de-SPAC differentiates it from PCT common stock Post-de-SPAC. Ex. 1, Stulz ¶¶ 73-75. And similar to all SPAC stock, ROCH behaved like a fixed income investment—investors' money was held until the de-SPAC, when the stock would be redeemed for its original value plus interest. *Id.* ¶ 75. Post-de-SPAC, former ROCH stockholders (now PCT stockholders) no longer had the right to redeem their shares; instead, PCT's value corresponded to the present value of cash flow generated by operations. *Id.*[6]

### 2. Dr. Cain Fails to Provide Reliable Evidence of a Cause-and-Effect Relationship Between PureCycle News and Stock Price.

Dr. Cain's cause-and-effect analysis does not support a finding that ROCH traded in an efficient market in the Pre-de-SPAC Period. [Doc. 163-1 ¶¶ 49, 56-58]. *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (class shortened where plaintiff failed to show market efficient during portion of class period); *In re SCOR Holding (Switz.) AG Litig.,* 537 F. Supp. 2d 556, 574 (S.D.N.Y. 2008) (same).

*First,* Dr. Cain employs no objective criteria for choosing his event dates, defining "News Days" as the announcement of the de-SPAC, closing of the de-SPAC, and earnings. [Doc. 163-1 ¶ 47]; Ex. 1, Stulz ¶ 91, n.185. He does not adequately

---

[6] ROCH went public and announced its target in an unusual trading environment—the number of SPAC IPOs increased more than tenfold between 2019 and 2021, Ex. 1, Stulz Ex. 7; *id.* ¶ 76.

explain why he (i) only includes four of the 142 trading days during the Class Period which he classifies as "*with news*," *id.* ¶ 94 (Dr. Cain's backup data), and (ii) does not consistently include days where 8-Ks or press releases were issued, as he has done in other cases. *Id.* ¶ 92. When all days "with news" are included, Dr. Cain cannot demonstrate a cause-and-effect relationship for the Pre-de-SPAC Period. *Id.* ¶ 95.

*Second*, Dr. Cain abandons the approach he has used in other cases involving SPACs,[7] and includes data from *before* the Class Period in his event study regression analysis, thus reporting distorted results. He does not adequately explain why data from before November 16, 2020 is representative of the period after that date. [Doc. 163-1 ¶ 54]. As Dr. Stulz demonstrates: (i) ROCH's common stock remained around $10 from July 14, 2020 through November 16, 2020 (when the de-SPAC was announced)—unsurprising, given that ROCH was a SPAC with a $10 stock redemption price, Ex.1, Stulz ¶ 84; (ii) ROCH's stock price volatility *prior* to November 16, 2020 is *one-seventh* of the volatility of returns during the Pre-de-SPAC Period; *id.* ¶ 85, and (iii) Dr. Cain is missing price data on 37% of data he uses pre-announcement. *Id.* ¶ 87, n.173.[8] By relying on pre-announcement data, where ROCH traded near $10, the statistical significance of any subsequent residual returns is artificially exaggerated. *Id.* ¶¶ 83-89. Dr. Cain finds "statistically significant" residual returns of ROCH's

---

[7] Tellingly, in four prior matters involving SPACs, Dr. Cain did not use data from before the SPAC target was announced. Ex. 1, Stulz ¶ 90. Dr. Cain also deviates by using all available trading data for November 17-23, 2020 and after that, data from prior 60 trading days. [Doc. 163-1 ¶ 54].

[8] Using a period of low volatility to evaluate statistical significance of returns in a period of high volatility leads to spurious statistical significance. Ex. 1, Stulz ¶ 87, n.173.

trading in Pre-de-SPAC Period that are smaller than residual returns during the rest of the Class Period, and predominantly in the first few months. *Id*. ¶¶ 87-88.

*Third*, Dr. Cain states that because PCT only issued "three earnings announcements" during the Class Period (and ROCH issued none), he "extended the analysis period by one year" after the Class Period through November 10, 2022. [Doc. 163-1 ¶ 48].[9] He does not show *why* the year **after** the Class Period provides insight regarding the Class Period itself, and thus cannot apply his conclusion in support of market efficiency from one period to another. Ex.1, Stulz ¶¶ 98-99.

*Fourth*, of the nine News Days Dr. Cain includes, only one (November 16, 2020), occurs before the de-SPAC. *Id.* ¶ 100. This day is not statistically significant using models Dr. Cain has used previously (*id.* ¶¶ 100-101) or the Stulz model (*id.* ¶ 169). Dr. Cain has no reliable evidence of cause-and-effect before the de-SPAC.

### 3. Based on the Improperly Aggregated Data, Dr. Cain Reaches Inaccurate Conclusions on Market Efficiency Benchmarks.

Dr. Cain's findings are also undercut because his analysis of certain factors actually point to market *inefficiency*, particularly during the Pre-de-SPAC Period.

*Analyst Coverage.* Dr. Cain cites an academic study ("MRK Study") which found that "on average, firms were covered by between 0.765 and 7.614 analysts" and states that "PureCycle's analyst coverage is consistent with the MRK Covered

---

[9] Dr. Cain claims PCT "hosted three earnings announcements during the Class Period," but the November 11, 2021 earnings call occurred after the Proposed Class Period. [Doc. 163-1 ¶ 48; Ex. 6].

firms."[10] [Doc. 163-1 ¶ 34]. But in the Pre-de-SPAC Period, ROCH was covered by *one firm*, [*id.* ¶ 33 n.34],[11] and in the first month of the Post-de-SPAC Period, the SPAC sponsors were the only firms "covering [PCT]," which Plaintiffs claim were unreliable. [Doc. 113 ¶¶ 36, 92-93]; Ex.1, Stulz ¶¶ 111-12. This is unlike the MRK Study or analyst coverage which courts have found indicative of market efficiency. *Cf. In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 671 (N.D. Ga. 2009) ("significant number of securities analysts" suggests disclosures are "'closely reviewed" by professionals).

 ***Market-makers and arbitrageurs.*** Dr. Cain focuses on the presence of market makers and institutional investors, without analyzing the conditions for their trading. But courts have criticized this approach: "the mere number of market makers" alone "has little to do with market efficiency." *Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005) (collecting cases). And Dr. Cain's conclusion that PCT's listing on the NASDAQ meets this factor is against the weight of case law. *See, e.g.*, *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 315 (5th Cir. 2005) (NASDAQ stock with 17 to 23 market makers did not show market efficiency during quiet period); *O'Neil v. Appel*, 165 F.R.D. 479, 501 (W.D. Mich. 1996) ("For NASDAQ stocks, a market maker is merely a brokerage house . . . This information, without more, is virtually meaningless.").

---

[10] Notably, the MRK study analyzed firms which lost coverage for more than one year, which is inapposite. Dr. Cain provides no reliable basis for why the Covered firms in the MRK study are a reasonable benchmark for his Cammer 5 analysis; he concedes the MRK study does not conclude that the market for Covered firms is efficient while the market for Non-Covered firms is inefficient. Ex. 1, Stulz ¶¶ 105-06, *id.* n.210 (citing Ex. 16, Cain Dep. 63:13-23).

[11] Dr. Cain fails to disclose the single firm covering ROCH Pre-de-SPAC is not a FINRA-registered equity analyst, but rather a wholesaler which gathers information "[u]sing algorithms" and artificial intelligence, and does not include information Dr. Cain notes is important. Ex. 1, Stulz ¶ 108.

Dr. Cain's analysis of market makers ignores potential constraints on the ability of investors to perform arbitrage functions (e.g., short selling), which is crucial for market efficiency. Ex.1, Stulz ¶¶ 114-16. When the cost of borrowing shares is high, arbitrageurs' ability to short the stock is constrained. *Id.* ¶¶ 115-19; *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 273-74 (D. Mass. 2006) (noting indirect evidence of constraints on short selling). The cost to short the stock reached 9% in the Pre-de-SPAC Period—well above the 6% level Dr. Cain has considered "extraordinarily high" in past research—signifying inefficiency. Ex.1, Stulz ¶ 116 n.237.

*Market Capitalization.* The MRK Study on which Dr. Cain relies found that Covered firms had a median market capitalization of $243.97 million. [Doc. 163-1 ¶ 64]. But Dr. Cain's report shows PCT did not reach this level until early-mid 2021, and was significantly lower beforehand. [Doc. 163-1 Ex. 9]. Data from the first three months of the Class Period do not support Dr. Cain's claim that ROCH/PCT's "market capitalization" is consistent with "an efficient market." Ex.1, Stulz ¶¶ 120-21.

*Bid-Ask Spread.* Dr. Cain analyzes the monthly average bid-ask spread and finds that it "fluctuated between 0.15% and 1.70% from October 2020 through August 2021, and averaged 0.64% over the Class Period." [Doc. 163-1 ¶ 67]. Because the *average* bid-ask spread was lower than the median value for Covered firms (per MRK, Non-covered firms (4.55%), MRK Covered firms (1.69%)), he finds this supports market efficiency "throughout the Class Period." *Id.* ¶ 68]. Dr. Stulz analyzed ROCH/PCT bid-ask spread using intraday data and found during the Pre-de-SPAC Period, the

median daily bid-ask spread was 3.4% and was as high as 7% on certain days—much closer to firms that lost analyst coverage, supporting inefficiency. Ex.1, Stulz ¶ 125.

*Institutional Investors.* While Dr. Cain asserts that "on average 263 institutions held the stock at some point during the Class Period," Exhibit 10a of his report shows that only 26 institutions did so in the fourth quarter of 2020. [Doc. 163-1 ¶ 72]; [Doc. 163-1 Ex. 10a]. This falls short of his MRK Covered firms "benchmark" and thus fails to support a finding of market efficiency during the Pre-de-SPAC Period.

*Autocorrelation.* As Cain concedes, evidence of autocorrelation "would imply market inefficiency because publicly available information about prior stock price movements would not be fully reflected in current stock prices." [Doc. 163-1 ¶ 73]. His report shows positive and statistically significant autocorrelation in both Q4 of 2020 and Q1 of 2021, supporting market inefficiency. *Id.*; Ex.1, Stulz ¶¶ 131-33.

*Options and Warrants.* PCT options only traded after April 7, 2021, Ex. 1, Stulz ¶ 135, thus for the Pre-de-SPAC Period, options trading cannot support the conclusion that ROCH stock traded in an efficient market. *Id.* Dr. Cain does not conduct an event study for the warrants or options, his options analysis is limited to about 4% of options traded, and he provides no support for why consistency in directional price movements is evidence of a "cause-and-effect" relationship. *Id.* ¶¶ 143-44, 147-49. His deficient analysis does not support market efficiency for options or warrants.

**B.    Defendants Have Rebutted Any Presumption of Reliance.**

Alternatively, Defendants have rebutted the *Basic* presumption by showing that "the alleged misrepresentation did not actually affect the stock's price—that is, that

12

the misrepresentation had no 'price impact.'" *Halliburton*, 573 U.S. at 263-64. Defendants may rebut the presumption "through direct as well as indirect price impact evidence," including evidence regarding materiality and that "disprove[s] loss causation." *Id.* at 265, 283; *see also Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021) ("*Goldman I*") (courts "should be open to *all* probative evidence [regarding price impact] . . . aided by a good dose of common sense").

### 1. Neither ROCH nor PCT Stock Price Was Impacted by the Alleged Misrepresentations.

Plaintiffs argue that the November 16, 2020 announcement of the de-SPAC transaction, and activity on three other alleged misrepresentation dates, "artificially inflated" "PureCycle securities during the Class Period." [Doc. 113 ¶ 28]. However, Dr. Stulz found that on *all four dates*, the residual price movements *were not* statistically significant—meaning the alleged misrepresentations did not impact the price of stock (for ROCH or PCT).[12] Ex. 1, Stulz ¶¶ 156-59. The purported statistical significance on November 16, 2020 is an artifact of Dr. Cain's poorly constructed model—which did not hold in Dr. Stulz's event study, *id.* ¶¶ 164-67, nor when applying several alternative estimation windows *which Dr. Cain has used in his other reports.*[13] *Id.* ¶ 168; [Doc. 163-1 Ex. 11]. Plaintiffs fail to explain how the next three alleged misrepresentations disclosed new information, thus they amount to repetition, which is consistent with a

---

[12] Dr. Cain claims options and warrants prices are "derivative" of PCT's stock. [Doc. 163-1 ¶ 10].

[13] While Dr. Cain testified that he commonly uses data from before the class period unless the class period starts on the date of an IPO, this assertion is not supported by the publicly available reports Cain has submitted in other cases—particularly the four cases involving SPACs. Ex. 1, Stulz ¶ 90.

lack of statistical significance on those days. Ex. 1, Stulz ¶¶ 172-76, 180-83, 186-89.[14]

Nor can Plaintiffs sidestep this lack of price impact by asserting an inflation maintenance theory. Under that theory, if a stock price is inflated due to false information in the market before a defendant speaks, and a defendant makes a misrepresentation confirming the false information, the defendant becomes responsible for the pre-existing inflation. *See FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011) (first use of theory) (stock price "inflated by 26.44 percent before and throughout the Class Period"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 99, 104 (2d Cir. 2017) (adopting theory at class certification) ("inflation" must "already [be] extant in a company's stock price").

Where, as here, there was no pre-existing inflation in ROCH stock, inflation maintenance cannot apply. *In re Finisar Corp. Sec. Litig.*, 2019 WL 2247750, *6 (N.D. Cal. May 24, 2019) (rejecting theory where no allegations stock price was inflated *before* alleged misrepresentation and price "remained relatively constant prior to the Class Period"). Prior to the November 16, 2020 announcement, ROCH was a SPAC with no operations, no potential target, and was trading around $10—which mirrors the redemption price. Ex. 1, Stulz ¶ 84. By definition, the ROCH stock was not inflated, which is consistent with the lack of any news linking ROCH to PureCycle LLC prior to the November 16, 2020 announcement of the de-SPAC, and Plaintiffs

---

[14] Dr. Cain's analysis shows a directional correlation between some warrants and options and stock prices; he fails to explain why that correlation proves anything. *Id.* ¶¶ 139-45. There is no evidence that the alleged misstatements inflated PCT's stock, options or warrants prices. *Id.* ¶ 257-58.

do not allege otherwise. *Id.* ¶ 153 & n.296, 297.

### 2.    Neither the SEC Investigation Nor the Hindenburg Report Revealed New, Corrective Information.

Any alleged presumption of reliance is also rebutted because the two alleged corrective disclosures—the Report and the disclosure of an SEC investigation—do not reveal new information which "corrects" Defendants' alleged fraud. Plaintiffs initially alleged the Report was the sole corrective disclosure, [Doc. 90 ¶¶ 58-76]. But in the SAC, they transparently attempted to extend the Class Period by asserting the voluntary disclosure of the SEC investigation (which was concluded without further action before the SAC was even filed) was also corrective. [Doc. 113 ¶ 85].

Definitionally, "[a] corrective disclosure reveals the falsity of a previous representation to the market" and thus must reveal new information. *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 862 (11th Cir. 2015); *FindWhat Inv. Grp.*, 658 F.3d at 1312 n.28 (corrective disclosure must reveal new information regarding "a previously concealed truth"); *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023) ("*Goldman II*") (decertifying class given mismatch between misrepresentation and "truth-revealing corrective disclosure"); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 487 (S.D.N.Y. 2011) (disclosure must contradict earlier misrepresentation, even if disclosure and misrepresentation concern same subject).

### a.    Disclosure of SEC Investigation Did Not Correct Any Alleged Misrepresentation and Class Should be Limited.

With respect to the newly added SEC investigation, the Eleventh Circuit is clear: "disclosure of an SEC investigation, standing alone and without any subsequent

disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything." *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *MacPhee v. MiMedx Grp., Inc.,* 73 F.4th 1220, 1247 (11th Cir. 2023). This is true "especially where, as in *Meyer* 'the SEC never issued any finding of wrongdoing or in any way indicated that the Company had violated the federal securities laws.'" *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 2190904, at *1 (M.D. Ga. May 10, 2018) (quotations omitted).

The November 10, 2021 voluntary disclosure simply notified investors the SEC had commenced a fact-finding investigation regarding PureCycle—it did not reveal new information that corrected any alleged misstatement. The entire disclosure stated:

> On or around September 30, 2021, the SEC issued an investigative subpoena to PCT's Chief Executive Officer requesting testimony in connection with a non-public fact-finding investigation of the Company. The investigation pertains to, among other things, statements made in connection with PCT's technology, financial projections, key supply agreements and management. PCT and its Chief Executive Officer intend to cooperate with the SEC's non-public fact-finding investigation without further action at this time.

Ex. 4, PCT, Form 10-Q (Nov. 10, 2021). Plaintiffs do not (and cannot) allege ROCH, PureCycle LLC, or PCT ever made any previous statement regarding the existence— or lack of—an SEC investigation. Instead, Plaintiffs claim—without support from the text—that this news "further validat[ed] the claims in the Hindenburg report," and as a result, "PureCycle's stock fell." [Doc. 113 ¶ 85]; *Sapssov*, 608 F. App'x at 863 (corrective disclosure "cannot be merely confirmatory"). But as *Meyer* explained, "stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added risk of future corrective

action. That does not mean that the investigations [reveal] a company's previous statements were false or fraudulent." 710 F.3d at 1201; *Durham v. Whitney Info. Network, Inc.,* 2009 WL 3783375, at \*20 (M.D. Fla. Nov. 10, 2009).[15] Thus, the Class Period must end by *at least* May 6, 2021 even assuming (as is not the case) that the Report was "corrective." *Loc. 703*, 762 F.3d at 1261 (directing district court to shorten class period to conform to facts); *LaGrasta v. First Union Sec., Inc.*, 2005 WL 1875469, \*13 (M.D. Fla. Aug. 8, 2005) (ending class period upon article exposing fraud; those who purchased after "are deemed to be aware"); § I.B.2.b (Report not corrective).[16]

As a corollary, because the Class Period must end by *at least* May 6, 2021, it cannot begin until January 14, 2021, due to the PSLRA's 90-day bounceback rule:

> [plaintiff's] damages . . . shall not exceed the difference between the purchase … price paid … and the mean trading price of that security during the 90-day period beginning on the date on which the [corrective disclosure] . . . is disseminated to the market.

15 U.S.C. § 78u-4(e)(1).[17] The mean trading price of PCT for the 90 days after May 6,

---

[15] Analyst commentary observed that the SEC investigation "created uncertainty, which was partly mitigated by due diligence conducted by various groups of stakeholders." Ex. 1, Stulz ¶ 251. In April 2022, the SEC closed its investigation without further action. Ex. 5, PCT, Form 8-K (Apr. 26, 2022).

[16] This is buttressed by Plaintiffs' own characterization of the Report as a disclosure that stood *uncorrected* in the market and hence complete in its "corrective" effects. Plaintiffs went out of their way to allege that PCT did not dispute the negative assertions in the Report that Plaintiffs claim were corrective. [Doc. 113 ¶¶ 13, 84]. The Court relied on these allegations in ruling that the SAC pleaded scienter. June 15, 2023 Order [Doc. 144 at 18 n.7] (Defendants' alleged "failure to push back against" Report made scienter "more compelling"). Plaintiffs are judicially estopped from and cannot "contradict" their previous position that the Report was fully corrective "when a court has adopted and relied on it." *Johnston v. Borders*, 325 F. Supp. 3d 1285, 1291 (M.D. Fla. 2018); *In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig.*, 247 F.R.D. 32, 39 (D.D.C. 2008) (ending class period on corrective disclosure, even though "additional information" later came to light).

[17] The "mean trading price" is the average of the trading price at the close of the market each day in the 90-day period. *Id*. § 78u-4(e)(3). The average of PCT's closing prices during the 90-day period between May 6, 2021 and August 4, 2021 is $18.08. *See* Ex. 17 at 6.

2021, is $18.08 per share, and the first day the stock traded over $18.08 was January 14, 2021. Thus, investors who purchased *prior to* January 14, 2021 were not damaged and cannot assert a § 10(b) claim. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (if "mean trading price" during the 90-day bounceback period is greater than plaintiff's purchase price then "plaintiff would recover nothing"); *Lumen v. Anderson*, 280 F.R.D. 451, 456 (W.D. Mo. 2012) (class definition must exclude investors who did not suffer damage). Where there is sufficient evidence and expert opinion, the bounceback should be applied at the class certification stage. *In re CV Sciences, Inc. Sec. Litig.*, 2019 WL 6718086, at *6 (D. Nev. Dec. 10, 2019).[18] Thus, if any Class is certified, it cannot begin any earlier than January 14, 2021.

### b.    Hindenburg Report Did Not Correct Previous Alleged Misstatements and Thus Could Not Have Impacted Price.

The Eleventh Circuit also held that a short seller's compilation of public or irrelevant information is not "corrective." *Meyer*, 710 F.3d at 1199. The Report's publication on May 6, 2021 does not correct any previous misstatements; it simply asserts the author's biased opinion—designed to drive down the stock price—based on (i) public information that already would have been incorporated into the stock price (assuming an efficient market), (ii) unsupported and biased opinions, and (iii) information from sources with no connection to PCT. In *Meyer*, a presentation by a prominent short-sale investor suggested company assets were overvalued and the stock

---

[18] While some courts have found that the bounceback rule is not an individualized issue, and hence not a basis to limit a class, others have confirmed that a class should not include persons who cannot have been damaged from a class. *See In re CV Sciences*, 2019 WL 6718086, at *6.

price decreased. 710 F.3d at 1193. The court explained:

> because the information used in the presentation had already been public for some time, the decline in the value of St. Joe's shares in the wake of the Einhorn Presentation was not due to the fact that the presentation was revelatory of any fraud, but was instead due to changed investor expectations after an investor who wielded great clout in the industry voiced a negative opinion about the Company.

*Id.* at 1200 (internal quotation omitted); *see also Steppacher v. Alfi, Inc.,* 2022 WL 1115049, at *5 (S.D. Fla. Apr. 13, 2022) ("publicly available information merely copied and restated in a short-seller report is insufficient to qualify as a corrective disclosure.") (citations omitted); *FindWhat Inv. Grp.*, 658 F.3d at 1312 n.28 ("corrective disclosure must reveal . . . new information."). Courts have refused to certify a class on this basis. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. at 487-88 (comment that Congress would examine rating agencies' conflicts did not "amount to a revelation . . . that Moody's had falsely stated it was independent"; it revealed no "hard fact" about the alleged fraud and thus was not corrective, and certification denied).

*Assertions in Hindenburg Report Were Gathered From Public Information.* While Plaintiffs allege that the purported "truth about PureCycle's misconduct was revealed" through the Report, [Doc. 113 ¶ 106], the Report reveals ***no new information*** concerning the alleged misstatements. Ex. 3, Rep. 1-2. Instead, the author gathers public information, adds his unsubstantiated opinion, and repackages it in a Report with extensive citations. *Id.* at 18 ("all information . . . has been obtained from public sources . . . and who are not insiders or connected persons"); [Doc. 113 ¶ 9] (Report based, in part, on "public sources"). *Cf. Meyer*, 710 F.3d 1198 (presentation confirmed

19

information was "'from publicly available sources'").[19]

Management Experience. The Report summarizes information gathered from public LinkedIn webpages, news articles, SEC filings, and other online sources, Ex. 3 Rep. 7-9, which "had been public before the first alleged misstatement date, and thus before the Proposed Class Period." Ex. 1, Stulz ¶¶ 222-24 (detailing public disclosures regarding AgCert, Chromavision Medical Systems, PetroAlgae and XL TechGroup). Management's prior experience in plastics was disclosed on November 20, 2020. *Id.*

Competition for Feedstock. Far from disclosing new information, the Report just recites information from PCT's *own website* which includes an interview with John Layman, R&D Director of Sustainable Materials Development at P&G, noting a key challenge is securing enough quality feedstock. Ex. 3, Rep. 7; Ex. 1, Stulz ¶ 227 (Layman notes potential "bottleneck" in obtaining enough quality feedstock). PureCycle LLC's and ROCH's SEC filings extensively warned investors of these issues,[20] and the issue was publicly discussed in industry forums. Ex. 1, Stulz ¶¶ 226-29.

Value of Patent and Ability to Scale. The Report states that "PureCycle's patents seem to rely heavily on prior discoveries that never ended up reaching commercial scale." Ex. 3, Rep. 14. But PCT's recycling processes "were disclosed in

---

[19] The Report challenges management's motive "to obtain large bonuses," but it merely "reflected public information that had been disclosed" in the Form S-4. Ex. 1, Stulz ¶ 225.

[20] Risk disclosures include (i) barriers to obtaining feedstock, Ex. 13 at 41, 46-47; Ex. 9 at 41, 46-47, (ii) single facility and uncertainty with expansion, Ex. 13 at 43-44; Ex. 9 at 44, (iii) issues expanding to commercial scale, Ex. 13 at 45-46; Ex. 9 at 46, and (iv) potential inability to protect the licensed patent, Ex. 13 at 45; Ex. 9 at 45-46.

the Company's patents, which were publicly available." Ex. 1, Stulz ¶ 230. ROCH, PureCycle LLC and PCT repeatedly disclosed risks relating to scale, some of which have been overcome with the operational commercial facility. They also disclosed that PureCycle LLC had licensed the patent from P&G four to five years earlier (in 2015) but that there had not been commercial-scale operations to date. *Id*. ¶ 230 n.404.[21]

Lack of Peer-Review Studies. The Report states it was "unable to find a single peer reviewed study" of the licensed process, Ex. 3, Rep. 23, but Plaintiffs do not allege ROCH, PureCycle LLC or PCT ever stated otherwise and hence this allegation did not correct any alleged misrepresentation. Further, "peer-reviewed journals are publicly searchable through various publicly available databases." Ex. 1, Stulz ¶ 231. *Meyer,* 710 F.3d at 1198 (that "sources used in [Report] were already public is fatal").

***Report Does Not Correct Statements Made by PureCycle LLC, ROCH or PCT.*** The Report states that "PureCycle's Chairman/CEO and other [unnamed] associated executives collectively took 6 companies public prior to PureCycle. All have failed," Ex. 3, Rep. 1, but then concedes the statement about "the six IPOs" was ***not made by ROCH, PureCycle LLC, or PCT (or about them)***. Rather, it came from a separate company, Innventure in 2017—several years before any purported efficient market or the de-SPAC transaction, *id.* (citing Ex. 18, April 21, 2017 PRNewswire Article), a fact Plaintiffs concede. [Doc. 113 ¶ 47] ("Innventure team takes credit for . . . 'six successful IPOs'"). The Solicitation Materials do not tout any association between the

---

[21] The disclosed anticipated completion date was December, 2022. Ex. 13 at 107.

Individual Defendants and the previous IPOs. [*Id.* ¶¶ 55, 71].[22] Nothing in the Report purports to correct the statements Defendants actually made, as distinguished from Plaintiffs' textually unjustified "spin" on those statements. And while the Report gathers public information to conclude "[t]hese executives [referring to Messrs. Otworth, Haskell, Brenner and Scott] seem to have no background in polypropylene recycling," Ex. 3, Rep. 7, neither the Report nor the SAC allege PureCycle LLC, ROCH or PCT stated they did. [Doc. 113 ¶ 71] (quoting Proxy identifying two officers with plastics experience). The alleged misstatements are not corrected by this public information.[23]

*Anonymous Sources Have No Connection to PureCycle LLC or PCT*. The only non-public assertions in the Report are statements by purported experts in various scientific fields, as well as former employees of PetroAlgae, AgCert and TyraTech. Ex. 3, Rep.

---

[22] The Solicitation Materials reference Otworth's "experience leading and scaling early-stage companies" and "proven track record of founding and capitalizing start ups," Dee's "nearly 30 years of public markets, corporate finance, and M&A experience," and Brenner's "15 years' experience leading transformational projects in a range of industries." *See, e.g.,* Ex. 9 at 85. These general statements were not corrected by assertions in the Report.

[23] Alternatively (if Plaintiffs could assert a price maintenance theory, which they cannot, *supra* § II.B.1), price impact is rebutted because there is a mismatch between the general alleged misrepresentations and the specific assertions in the Report. *Goldman I*, 141 S. Ct. at 1961 (where there is a mismatch, typical price impact inference, "that the back-end price drop equals front-end inflation[,] starts to break down" and it is less likely that a specific disclosure corrects a generic misrepresentation); *Goldman II*, 77 F.4th at 80. *Compare* [Doc. 113 ¶ 63] *with* [*id.* ¶ 41] (alleged misstatement recycling process is "proven," not corrected by a lack of peer reviewed studies and (previously disclosed) challenges at scale); [*id.* ¶ 65] *with* [*id.* ¶ 66] (alleged misstatement that process is "cost efficient" and can use "broader range of feedstock," is not corrected by concerns with "insufficient supply"); [*id.* ¶ 71] *with* [*id.* ¶¶ 57, 72] (alleged misstatement regarding management's "experience leading and scaling" companies is not corrected by specific information regarding six unrelated Innventure companies); [*id.* ¶ 71] *with* [*id.* ¶ 7] (alleged misstatement *team* has "broad experience" in many areas, including plastics, is not corrected by Report noting CEO and two directors do not have plastics experience).

15-16, 23-25. The Report makes clear that *none* of these sources had access to Company-related information.[24] *Id.* 19 (no information is obtained from insiders); *see also id.* 11-12. *Cf. Meyer*, 710 F.3d at 1200 (source "was not an insider"). Thus, the "experts" merely asserted their unsubstantiated opinions, which "standing alone, cannot 'reveal[] to the market the falsity of a company's prior factual representations.'" *Meyer*, 710 F.3d at 1199. The employee sources were formerly employed by PetroAlgae, AgCert and TyraTech—and their assertions relate to *these three separate companies*, not PureCycle LLC, PCT or any alleged misstatement. Ex. 3, Rep. 8-9. Neither the Report nor Plaintiffs allege any Individual Defendant was ever employed by those companies, and thus never worked with these sources. That the presentation contained non-public information—which did not correct the alleged misrepresentations—is meaningless. *Meyer*, 710 F.3d at 1198 n.9 (admonishing "attempt to bootstrap").[25]

    ***Assertions Regarding Roth Are Unsupported Opinions and Not Corrective***. The Report's assertions regarding Roth and Roth Capital cannot be "corrective:" none of the alleged misrepresentations related to Roth or Roth Capital, and the assertions are based on public information. Ex. 3, Rep. 4-5 (New York Post, Wall Street Journal);

---

[24] The only Company affiliated expert they quote is the inventor of the technology John Layman, by way of his 2020 Interview available on PCT's own website. Ex. 1, Stulz ¶ 227.

[25] The opinion also is unsupported; it ignores the myriad business reasons a company may license a technology rather than develop it in house—many of which PCT or PureCycle LLC addressed in public materials the Report cites. Ex. 3, Rep. 17-18 (citing Laymen Interview). The anonymous quotes from a supposed polymers expert merely expresses his opinion that the patent is undifferentiated (based on comparisons to *other public patents and materials*) reveals an opinion, not any new truth.

*id.* 5 (FINRA rulings); *id.* (public documentary).

***Stock Price Decline Was Not Result of "Truth" Being Revealed***. Given the lack of inflationary increase following the alleged misrepresentations, Ex. 1, Stulz ¶¶ 156-59, the price declines following the alleged corrective disclosures are not reliable evidence of inflation dissipating. *Id.* ¶¶ 190-91, 202, 205, 238 (academic studies have found negative short seller report often results in sharp decline in company's share price). As in *Meyer*, the stock decline was not due to the alleged fraud being revealed, but was "instead due to 'changed investor expectations' after a[] [short seller] . . . voiced a negative opinion." *Meyer*, 710 F.3d at 1199-1200.

## C. Plaintiffs Cannot Invoke *Affiliated Ute* Presumption.

The SAC alleges misrepresentations—not omissions—thus, reliance may not be presumed under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972). *LaGrasta v. First Union Sec., Inc.*, 2005 WL 1875469, at *11 (rejecting *Affiliated Ute* in case "involving both alleged misrepresentations and omissions."); *Bacon v. Stiefel Lab'ys, Inc.,* 275 F.R.D. 681, 696 (S.D. Fla. 2011) (Eleventh Circuit "refuse[s] to extend the presumption to cases involving mixed allegations of omissions and misrepresentation"). Plaintiffs' claims are based on alleged misrepresentations, and at most, a misstatement rendered misleading as a result of an omission. [Doc. 113 ¶¶ 127-28, 139]; *see* [Doc. 179 at 5] ("Defendants issued false and misleading statements").[26]

---

[26] Indeed, the SAC does not contain any pure omission claim that is not tied to an alleged misstatement. [Doc. 113 ¶ 7] (management experience "omissions" mixed with alleged misstatements); [*id.* ¶¶ 44-46] (feedstock quality "omissions" mixed with alleged misstatements). Ex. 12, 97:4-11 ("Q: Are you alleging in this case that PureCycle made any omissions to its investors? . . .

Further, the "*Ute* presumption of reliance" is inapplicable as it "is triggered *only* when a relationship of *trust and confidence* exists between victim and deceiver creating a duty to disclose." *Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749, 756 (11th Cir. 1984) (emphasis added) (rejecting *Affiliated Ute* where stock purchases were "outcome of arms length business transactions"). Plaintiffs made their own investment decisions, and do not allege any relationship of trust with Defendants. *Fernau v. Enchante Beauty Prod., Inc.*, 847 F. App'x 612 (11th Cir. 2021). Ex. 11, 152:12-153:19, 73:7-13; Ex. 12, 41:23-42:12, 25:6-20, 112:22-24. The *Affiliated Ute* presumption is not available.

**D.      Plaintiffs Cannot Establish that Damages Can Be Measured on a Class-Wide Basis Consistent With Their Theory of Liability.**

Rule 23(b)(3) also requires that "any model supporting a plaintiff's damages case must be consistent with its liability case." *Comcast*, 569 U.S. at 35; *In re Facebook, Inc., PPC Advert. Litig.*, 282 F.R.D. 446, 456, 459 (N.D. Cal. 2012) (denying certification for failure to establish damages that can be calculated class-wide), *aff'd*, *Fox Test Prep v. Facebook, Inc.*, 588 F. App'x 733 (9th Cir. 2014); *Curtis v. Extra Space Storage, Inc.*, 2013 WL 6073448, at *4 (N.D. Cal. Nov. 18, 2013) (certification denied where plaintiff did not propose "reliable" method to compute class-wide damages).[27] Plaintiffs do not attempt to demonstrate a class-wide method to calculate damages that

---

A: No. Misleading maybe, right, but not omissions."); 176:10-18 ("the *statements we alleged to be misleading* [were] also misleading because they leave information out") (emphasis added).

[27] The Eleventh Circuit recognized that *Comcast* requires any "model supporting a plaintiff's damages case must be consistent with its liability case." *Carriuolo v. General Motors Co.*, 823 F.3d 977, 986-88 (11th Cir. 2016) (distinguishing *Comcast* because FDUTPA damages are measured per a formula).

25

is consistent with their theory of liability. [Doc. 179 at 22] ("Dr. Cain does not provide a full damages model"). Dr. Cain merely describes how he *may* calculate damages for the claims, but his description is so generic with so many open issues it is insufficient.

**Section 10(b) Claim Based on Common Stock**. For the § 10(b) claim, Dr. Cain indicates that he will use the so-called "out of pocket" method, which calculates damages as the "artificial inflation in the price of PureCycle securities at the time of purchase minus the artificial inflation . . . at the time of sale." [Doc. 163-1 ¶ 93]. But critically, this is only a *measure* of damages, and does not in and of itself describe a *methodology* for actually estimating damages. Ex. 1, Stulz ¶¶ 195-96.

Instead of articulating an appropriate methodology, Dr. Cain simply asserts that event studies *can* measure the reactions of securities' prices to corrective disclosures and back-cast artificial inflation. [Doc. 163-1 ¶¶ 93-96]. This raises the question of *how* Dr. Cain expects to derive a reliable measure of inflation throughout the Class Period that controls for the impact of confounding information unrelated to the alleged fraud. Dr. Cain's only answer is that this confounding information can be "determined . . . using *various accepted methodologies"* and lists three diverging alternatives. [*Id.* ¶¶ 95-97]; Ex. 1, Stulz ¶ 198. Dr. Cain offers no clarity on *which* approach would be appropriate for *this class* and how it would eliminate the impact of confounding information. Stulz ¶ 199; *see also In re POM Wonderful LLC*, 2014 WL 1225184, at *5 (C.D. Cal. Mar. 25, 2014) (damages model failed to account for potential confounding factors).

Also, given that there is no statistically significant increase in ROCH's or PCT's stock or warrants price on the first day of the Proposed Class Period or any of the other

26

alleged misstatement days, Ex. 1, Stulz ¶¶ 156-91, Dr. Cain must explain how he will estimate inflation in the early part of the Class Period that is consistent with market efficiency and Plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35 ("If the model does not even attempt to [measure damages attributable to the legal theory] it cannot possibly establish that damages are susceptible of measurement across the entire class"). For one method Dr. Cain proposes—constant dollar inflation—the result would be a *negative* calculated stock price. Ex. 1, Stulz ¶ 207. It strains reason to suggest a model leading to such a result bears any reasonable connection to Plaintiffs' theories. *Cf. In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *16-17 (S.D. Tex. Dec. 6, 2013) (constant dollar model overcompensated investors and thus inconsistent with theory).

Dr. Cain attempts, but fails, to adequately explain how he will isolate the impact of the "truth" allegedly revealed by the Report from the non-corrective information: public facts, opinions and speculation. Ex. 1, Stulz ¶¶ 240-42. As such, the model is not consistent with Plaintiffs' theory of liability.[28] The same is true for disentangling any drop in stock price caused by uncertainty surrounding the SEC Investigation, with any corrective information revealed. *Cf. Fox Test Prep*, 588 F. App'x at 734 (affirming denial of class certification where plaintiffs failed to establish uniform method for assessing their theory of liability); *see also Comcast*, 569 U.S. at 38 ("first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis

---

[28] Courts have noted that when "some of Defendants' alleged misrepresentations may not survive summary judgment, or may not be found meritorious at trial[,] *Comcast* suggests that a damages model which cannot accommodate variations in the liability findings may be grounds for decertification at a subsequent stage of the case." *In re BP*, 2013 WL 6388408, at *17 n.16.

of the economic impact of *that event*.").[29]

Dr. Cain's proposed methodology is not consistent with their theory of liability.

## III.    Plaintiffs Are Not Typical Or Adequate Under Rule 23(a).

### A.    Defenses Unique to Plaintiffs' Claims Render Them Atypical.

The Rule 23(a) typicality requirement ensures that a representative "possess[es] the same interest and [has] suffer[ed] the same injury as the class members." *Prado-Steiman*, 221 F.3d at 1279 (*quoting Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 156 (1982)). Typicality is defeated where "class representatives are subject to unique defenses" that could be central to the litigation." *Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668 (M.D. Fla. 2000).

As demonstrated, neither Plaintiff purchased stock in the Pre-de-SPAC PureCycle LLC entity (and ROCH is not named as a defendant) and thus they do not have standing to represent the § 10(b) Class with respect to statements made Pre-de-SPAC.[30] *Supra* § I. Further, Plaintiffs did not rely on all alleged misrepresentations—a unique defense rendering them atypical. *In re Safeguard Scis.*, 216 F.R.D. 577, 583 (E.D. Pa. 2003) (plaintiff "atypical and inadequate" where he was not "concerned, aware, [or] cared" about key issue); *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 499 (N.D. Ga. 2006). M. Ciecko could not identify any misstatements in the November 16, 2020 press release, Ex. 12, 91:10-14, 92:1-93:1, did not recall seeing any other

---

[29] Dr. Cain states that damages for warrants and options "can also be calculated in a similar manner utilizing the same techniques as described above." [Doc. 163-1 ¶ 98]. This suffers from the same flaws.

[30] The class definition should also exclude in and out traders who purchased and sold before the first corrective disclosure. *In re Flag Telecom*, 574 F.3d 29, 40 (2d Cir. 2009).

Solicitation Materials, *id.* 93:2-14 (Proxy), 93:22-94:17 (S-4); 94:18-95:17 (Amended Proxy and Prospectus), and failed to read all risk disclosures. *Id.* 138:14-139:7. R. Ciecko understood the technology may never be commercialized, Ex. 11, 206:19-207:7, and testified the November 16, 2020 press release "did not entice me to invest any more." *Id.* 114:22-9; 217:7-16; 214:15-21 (relied *only* "to a certain degree"); *id.* 66:6-24 ("it was irrelevant" who brought companies public).[31]

Nor is either Plaintiff representative of purchasers after May 6, 2021, assuming (as is not the case) a class can extend after that date. Both sold their PCT stock immediately after publication of the Report. Ex. 12, 49:4-50:3, 52:15-20; Ex. 11, 86:9-15, 311:1-2, 316:22-317:3. They also confirmed that the existence of an SEC investigation does not indicate Defendants committed wrongdoing, thus undercutting their own claim. Ex. 12, 99:12-100:3; Ex. 11, 290:10-15, 294:11-21, 294:23-295:6.

### B.      Plaintiffs Cannot Demonstrate They Are Adequate Representatives.

Rule 23(a)(4)'s adequacy requirement is not satisfied where named plaintiffs did not choose counsel, do not know what class they represent, or improperly acquiesced to counsel. *See Spinelli v. Cap. One Bank*, 265 F.R.D. 598, 614 (M.D. Fla. 2009); *Greenspan v. Brassler*, 78 F.R.D. 130, 134 (S.D.N.Y. 1978) (plaintiffs inadequate due to "limited personal knowledge of the facts"). Plaintiffs falsely testified they were entitled to represent the previously proposed § 14(a) class, but when pressed, conceded they

---

[31] Courts also refuse to certify classes where representative invested in a manner inconsistent with others in the class. *See Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1266-67 (S.D. Fla. 2021) (denying certification; plaintiff did not read SEC filings or hold stock more than a year). Ex. 11, 62:2-65:24, 75:22-24, 148:6-11 (he held "for several days, several hours" rather than long-term).

were not eligible. Ex. 11, 183:3-8; Ex. 12, 78:2-79:6, 121:9-15.[32] Nor did Plaintiffs choose Pomerantz as counsel or negotiate fees.[33]

Plaintiffs reviewed all filings, Ex. 11, 89:11-90:1; Ex. 12, 83:22-84:7, but conceded many contained false information. *Id.* 31:19-34:8 (inaccuracies in SAC, Mot., Mot. for Appoint. as Co-Plaintiffs, Resp. and Obj. to Roth's Interrog.). *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007, 1023 (N.D. Ill. 2017) (plaintiff "leaving it to the lawyers, with little regard for the truth and accuracy" of pleadings). Plaintiffs cannot prove they are adequate.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs' Amended Motion for Class Certification and Appointment as Class Representatives should be denied.

Dated: January 23, 2024

**DECHERT LLP**

By:    */s/ Joni S. Jacobsen*
David Kistenbroker (*admitted pro hac vice*)
Joni S. Jacobsen (*admitted pro hac vice*)
Radhe Patel
35 W. Wacker Drive, Suite 3400
Chicago, IL 60601
312-646-5800
david.kistenbroker@dechert.com
joni.jacobsen@dechert.com
radhe.patel@dechert.com

---

[32] Plaintiffs' decision to withdraw the § 14(a) Class does not erase that they allowed numerous pleadings to be filed with false information, and incorrectly believed they were entitled to represent both proposed classes. *Supra* § III.A.

[33] Ex. 12, 59:16-60:9, 63:18-23; 63:24-64:3 (confirming "Pomerantz's lead counsel in this case" was not their decision); 74:2-6. Ex. 11, 42:12:19; 54:13-24.

Nina S. Riegelsberger (*admitted pro hac vice*)
Hayoung Park (*admitted pro hac vice*)
Julia Markham-Cameron
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
212-698-3500
nina.riegelsberger@dechert.com
hayoung.park@dechert.com
julia.markham-cameron@dechert.com


STOVASH, CASE, SHAY &
PEARCE, P.A.

Amy S. Shay, Esquire
Florida Bar Number 0068871
ashay@scsplaw.com
The VUE at Lake Eola 220 N.
Rosalind Avenue
Orlando, Florida 32801
(407) 316-0393

*Counsel for Defendants PureCycle
Technologies, Inc., Michael Otworth,
Michael E. Dee, David Brenner*

DLA PIPER LLP (US)

*/s/ John R. Loftus*
John R. Loftus (*admitted pro hac vice*)
Christine E. Ellice (*admitted pro hac vice*)
2000 Avenue of the Stars Suite 400
North Tower Los Angeles, CA 90067
Telephone: (310) 595-3000
jake.loftus@dlapiper.com
christine.ellice@dlapiper.com

Amanda E. Reagan Florida Bar No.
92520 DLA PIPER LLP (US)

31

3111 W. Dr. Martin Luther King Jr.
Blvd. Tampa, Florida 33607-6233
Telephone: 813-229-2111
Fax: 813-229-1447
amy.reagan@dlapiper.com

*Counsel for Defendant Byron Roth*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2024, I electronically filed the foregoing with the
Clerk of the Court by using the CM/ECF system.


/s/ *Joni S. Jacobsen*
Joni S. Jacobsen (*admitted pro hac vice*)
DECHERT LLP
35 W. Wacker Drive, Suite 3400
Chicago, IL 60601
312-646-5800
joni.jacobsen@dechert.com