# EXHIBIT 11

# In the Matter Of:

## William C. Theodore vs PureCycle Technologies

6:21-cv-809-PGB-GJK

## ROBERT CIECKO

*December 07, 2023*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

WILLIAM C. THEODORE,               )
Individually and On Behalf         )
of All Other Similarly             )
Situated,                          )
                                   )
                Plaintiffs,        )
                                   )
        vs.                        ) Case No.
                                   ) 6:21-cv-809-
PURECYCLE TECHNOLOGIES,            ) PGB-GJK
INC., MICHAEL OTWORTH,             )
MICHAEL E. DEE, DAVID              )
BRENNER, BYRON ROTH, and           )
TASMIN ETTEFAGH,                   )
                                   )
                Defendants.        )

        The videotaped deposition of ROBERT CIECKO, called as a witness for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before VICTORIA C. CHRISTIANSEN, a Certified Shorthand Reporter of the State of Illinois, CSR No. 84-3192, at Suite 3400, 35 West Wacker Drive, Chicago, Illinois, on the 7th day of December, A.D. 2023, at 9:09 a.m.



PRESENT:


        POMERANTZ LLP,
        (600 Third Avenue,
        New York, New York 10016,
        646-581-9973), by:
        MS. TAMAR A. WEINRIB,
        taweinrib@pomlaw.com,

                appeared on behalf of the Plaintiffs and
                the Deponent;



        DECHERT LLP,
        (Three Bryant Park,
        1095 Avenue of the Americas,
        New York, New York 10036,
        212-698-3500), by:
        MS. HAYOUNG PARK,
        hayoung.park@dechert.com,


                    -and-


        DECHERT LLP,
        (35 West Wacker Drive, Suite 3400,
        Chicago, Illinois 60601,
        312-646-5800), by:
        MS. JONI S. JACOBSEN,
        joni.jacobsen@dechert.com,

                appeared on behalf of Defendants
                PureCycle Technologies, Inc., Michael
                Otworth, Michael E. Dee and David
                Brenner;



ROBERT CIECKO                                              December 07, 2023
William C. Theodore vs PureCycle Technologies                              3

PRESENT (Continued):


        DLA PIPER,
        (2000 Avenue of the Stars,
        Suite 400, North Tower,
        Los Angeles, California 90063,
        310-595-3141), by:
        MR. JOHN R. "JAKE" LOFTUS,
        jake.loftus@dlapiper.com,

                appeared on behalf of Defendant Byron
                Roth.


VIDEOTAPED BY:  JOSEPH SALINAS, Legal Videographer,
                Esquire Deposition Solutions;


REPORTED BY:  VICTORIA C. CHRISTIANSEN, RPR, CRR,
              Illinois CSR No. 84-3192.



THE VIDEOGRAPHER:  This is Tape No. 1 to the videotaped deposition of Robert Ciecko in the matter of Theodore vs. PureCycle Technologies, Inc., Otworth, Dee, Brenner, Roth and Ettefagh being heard before the United States District Court, Middle District of Florida, Orlando Division, Case No. 6:21-cv-809-PGB-RMN.

This deposition is being held at 35 West Wacker, Chicago, Illinois 60603 on December 7, 2023.  The time is now 9:09 a.m.

My name is Joseph Salinas.  I am the videographer.  The court reporter is Vicki Christiansen.

Will counsel please introduce yourselves and affiliations and the witness will be sworn in.

MS. WEINRIB:  Tamar Weinrib for the witness, Robert Ciecko, and on behalf of the plaintiffs in the class.

MS. PARK:  Hayoung Park on behalf of Defendants PureCycle Technologies, Inc., Michael Otworth, Michael Dee and David Brenner from the law firm Dechert LLP, and with me today is Joni Jacobsen also from Dechert.

MR. LOFTUS:  John, also known as Jake, Loftus



from DLA Piper on behalf of Defendant Byron Roth.

(WHEREUPON, the witness was duly sworn.)

ROBERT CIECKO, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. PARK:

Q.   Good morning.  Would you state your name for the record.

A.   Good morning.  My name is Robert Ciecko.

Q.   My -- sorry.  My name is Hayoung Park. Again, I am with the Dechert law firm.  Today I'm here with my colleague, Joni Jacobsen, and we represent PureCycle Technologies, Inc., Michael Otworth, Michael Dee and David Brenner, and as you've heard, Mr. Loftus is representing Defendant Byron Roth.

So I want to be respectful of your time, so let me just go over a few ground rules so that, you know, the deposition --

A.   Very well.

Q.   -- runs smoothly.

As you know, the deposition is being



video-recorded and transcribed --

A.    Yes.

Q.    -- so it will be important that we don't talk over each other.  So I will do my best to not talk over you, and I will ask you to just let me finish my questions and I will ask you to just take a breath before you respond.

In addition, because this deposition's being transcribed, it will be important that you provide verbal answers to my questions, so "yes" or "no" will be better than "uh-huh" or nodding or shaking your head.

A.    Okay.

Q.    And if you have any difficulty understanding my questions or if you need me to repeat it, just let me know.  I'm happy to do so.  If you don't ask me to repeat my question, I will assume that you understood my question.

And if you need a break for any reason, just let me know.  Once I've had a chance to get a response to any pending questions or if I had a chance to like wrap up any lingering questions, I'm happy to take a break.

Also, lastly, your counsel may object to



certain questions that I ask, but unless she instructs you to not answer, I will need you to answer the question.

A.    I understand.

Q.    Thank you.  Do you understand that your testimony here today is under oath and, therefore, subject to penalty of perjury?

A.    Yes.

Q.    Is there any reason that you would be unable to testify truthfully and accurately today?

A.    No.

Q.    So you're not under any influ- --

A.    No there is no reason.

Q.    No reason?  Okay.  Have you ever been deposed or testified under oath before?

A.    Yes.

Q.    How many times?

A.    Once.

Q.    When was that?

A.    In 2007.

Q.    What case was that in?

A.    It was in the earth moving equipment manufacturing arena with one of my employers.  I was just doing a deposition on the defense side,



and I don't think I should or could tell more because the court -- it was settled out of court, and I remember they instructed us not to share too much of the information, but I can definitely say it was Case New Holland, my employer back then, and I was the plant manager of the facility.

Q.    So it sounds like it was related to employment issues?

A.    No.

Q.    No.

A.    It was related to performance of the equipment.

Q.    Not related to purchase or sale of securities?

A.    Absolutely not.

Q.    Were you a party to the litigation?

A.    No.  Just a witness.

Q.    And you said it was settled?

A.    To the best of my knowledge, yes, because corporate legal instructed us.  As far as I remember, that's -- that's what they told us.

Q.    And that -- and this was the only time you have been deposed?

A.    Yes, this was the only time.



Q.    Thank you.  Have you been a plaintiff in any other lawsuit or arbitration?

A.    Never.

Q.    Have you been a defendant?

A.    Never.

Q.    Do you remember commencing an action against Dave Messini?

A.    No.  I do not know that name.

Q.    Oh, you don't.  Have you been involved in any class action before?

A.    No.

Q.    So this is your first time --

A.    Yes.

Q.    -- being involved?

A.    Yes.

Q.    You're represented by counsel today, correct?

A.    Yes.

Q.    Did you do anything to prepare for your deposition today?

A.    I -- I reviewed the documents as a class representative.

Q.    Which documents did you review?

A.    Complaint, the com- -- briefs of the



PureCycle Technologies class action -- action lawsuit, interrogatories, responded -- responses to it.  Some -- some titles I don't recall, but it was -- as a class representative just -- I was always following up on the documents that were sent to me, so I just briefly reviewed it.

Q.    And did any of them refresh your recollection?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Not much.  Honestly, this is a lot of pure legal jargon that nothing jumped at me at all, no.

BY MS. PARK:

Q.    Did you meet with counsel to prepare for the deposition?

A.    Yes.

Q.    How many times?

A.    Once.

Q.    Who did you meet with?

A.    I met with Tamar and Ethan.

Q.    Was this in person?

A.    No, in video.



Q.    When was this?

A.    Two days ago.

Q.    And how long was this preparation session for?

A.    Approximately one and a half hours.

Q.    The documents that you re- -- that you said you reviewed, did you review them with your counsel or was --

MS. WEINRIB:  Objection to the form of the question.  You're asking about a privileged meeting, and he will not testify to the content of anything --

MS. PARK:  I'm not asking about the content.

MS. WEINRIB:  -- reviewed and discussed in the meeting.

MS. PARK:  I'm not asking --

MS. WEINRIB:  You can ask -- you can ask what he reviewed in preparation for the deposition, which he also already answered.  He answered with regard to meeting with counsel and how long.  You're not entitled to ask him about what occurred during that meeting.

MS. PARK:  Let me rephrase.

BY MS. PARK:



Q.    Did you review the documents on your own?

A.    Documents prior to this meeting?

Q.    So you told me you --

A.    Yes.

Q.    -- reviewed documents in preparation --

A.    Yes, I read them -- yes, I read them on my own.

Q.    Without counsel present?

MS. WEINRIB:  Objection to the form of the question.

We've already been through this.  He's not going to testify to anything that occurred during meetings with counsel.  He answered you about what he reviewed, he answered that he reviewed them on his own.  I think that's sufficient.

MS. PARK:  I'll move on.

BY MS. PARK:

Q.    Did you speak with anyone other than counsel in prepar- -- in preparing for this deposition?

A.    No.

Q.    So you did not speak with your brother,



ROBERT CIECKO                                    December 07, 2023
William C. Theodore vs PureCycle Technologies                    13

either?

MS. WEINRIB:  Objection, asked and answered.

BY THE WITNESS:

A.    The preparation included my brother because he's -- he will make his own deposition, so we -- we were both there during the prep.  He doesn't have his own separate.

BY MS. PARK:

Q.    So aside from preparing for your deposition, did you just generally discuss the deposition with anyone other than your counsel?

A.    No.

MS. WEINRIB:  Objection to the form of the question.

Just give me a minute.

THE WITNESS:  Sorry.

MS. WEINRIB:  That's okay.

BY MS. PARK:

Q.    Where did you attend college?

A.    Can you be more specific?  What degree, or do you want me to just mention --

Q.    What school did you attend for undergraduate degree?

A.    Undergraduate degree, Wayne State



University in Detroit, Michigan.

Q.   And when did you grad- -- like what are the years you attended?

A.   I attended from 19- -- 1984 to 1990.

Q.   So what degree did you graduate with?

A.   Elec- -- I studied electrical computer engineering.  The -- my -- my diploma says BSEE, bachelor of science in electrical engineering.

Q.   During your time at Wayne State University, did you take any finance or accounting courses?

A.   No.

Q.   Did you take any investment courses during your time there?

A.   No.

Q.   Do you have any other degrees since you graduated from Wayne State University?

A.   Yes.

Q.   What is it?

A.   It's executive MBA from Wichita State University, Kansas, also WSU but a completely different location and different university.

Q.   Is an executive master of business administra- -- administration degree the equivalent



of like an MBA?

A.    Yes.  It's EMBA.  That's what --

Q.    Okay.

A.    -- the diploma says.

Q.    And when did you attend the Wichita State University for the EMBA?

A.    2015 to 2017.

Q.    So you graduated in 2017?

A.    Yes.

Q.    So during those two years, did you take any finance or accounting courses?

A.    Most of them.

Q.    Most of them.

A.    And also investment.

Q.    And investment courses.

Aside from what you -- the courses you took during your EMBA course, do you have any other formal training or education in securities training -- trading?

A.    In securities trading, absolutely not. I...

Q.    What about investments?

MS. WEINRIB:  Objection to the form of the question.



BY MS. PARK:

Q.    Do you have any formal training or education aside from your EMBA relating to investment?

A.    Can you clarify "formal"?

Q.    Any additional degree or do you have any -- or do you have any professional licenses or certifications?

A.    Okay.  In investment arena?

Q.    Investment, yes.

A.    Not -- not related to electrical engineering?

Q.    Let's talk about investment first.

A.    Okay.  Investments first, so no, no professional certifications.  I did take more finance and accounting courses when I was studying MBA at the University of Michigan in 1990 to 1991. I did not finish that MBA because Ford Motor Company, my employer then, sent me to Europe for ten years, so...

Q.    So you were -- so this MBA that you did not complete, you were attending the school while you were employed --

A.    Yes.



Q.    -- at -- okay.

A.    Very similar like executive MBA.  I took that when I was employed, too.

Q.    All right.  And during that one year you attended the MBA program, you also took finance, accounting and investment courses?

A.    Only, yes, yes.

Q.    So you don't have any license or certifications relating to investments.

Do you have any other license or certifications?

A.    A Professional --

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I -- in electrical engineering, yes, Professional Engineer Part 1 in 1990-91.  The rest of them is informal.

BY MS. PARK:

Q.    What is your understanding of "informal"?

A.    An example, I took the lean manufacturing course in Stuttgart in Porsche for lean logistics.  That was just a company-paid



ROBERT CIECKO                                      December 07, 2023
William C. Theodore vs PureCycle Technologies                    18

course, but I'll leave it up to you to judge whether it's formal or informal.  A similar thing when my mentor for lean manufacturing, Professor Yamashina, took me to Japan for one month.  I visited Toyota facilities.  It was lots of education.  There was classes in English about the lean manufacturing.  I'd say that was informal.

Q.    Understood.

A.    So courses like this.  Every single year over my last 30 years I -- I had an encounter of informal education.  That's just part of my profession.

Q.    The informal education we just talked about, they're all relating to your electrical engineering background?

A.    Only originally.  Later it was more of the manufacturing of new model program -- new model program introductions of -- of the vehicles.

I spent 20 years with Ford Motor Company, lean manufacturing practices, how to move the material, how to optimize the assembly lines, how to set up the new plant, how to create the really lean, efficient factory.

Q.    So based on your --



A.    I -- I spent my entire career in manufacturing.

Q.    Based on your understanding of informal training or education as you described it, do you have any informal training or education in securities trading?

A.    No, no.

Q.    Do you have any informal training or education in investments?

A.    No.

Q.    Let's discuss the jobs you've had starting with your time in college in chronological order.

So what was the first job you had since college or at the time you were graduating from college?

A.    During college time?

Q.    If you had a job during college, can we start with that?

A.    Yes, yes.  It was a co-op -- oh, I'm sorry.  First it was -- the first summer it was the Michigan Chrome & Chemical Company in Detroit.  I was loading drums in a shipping dock.

Q.    And when was this?



A.    In 1984, summer of 1984.

Q.    And what was your job after that?

A.    After that, the next job was Ford Motor Company.  I was on a co-op program.  That's why it took me six years to finish the college because on the third year of electrical engineering curriculum, I spent one semester working for Ford Motor Company in Dearborn, Michigan and then the subsequent semester I would take up studies, on and on and off.  So until I graduated, Ford Motor Company was my first employer.

Q.    So what are the years you worked at Ford Motor Company?

A.    Since 198- -- from January 1989.

Q.    Until?

A.    Until January of 2007.

Q.    And why did you leave Ford -- Ford Motor Company?

A.    I took the early retirement.  It was really Mulally's CEO from Boeing back then from Wichita who came to Ford, and he decided that there is 35% too many management ranks, salaried ranks, closed 17 plants, and it was initially only offered to people over 55, but there was no takers, so they



ROBERT CIECKO                                         December 07, 2023
William C. Theodore vs PureCycle Technologies                       21

opened it up to everybody.

Q.    So what was your next job after you left Ford Motor Company?

A.    After I left Ford Motor Company, I took the job with Case New Holland.

Q.    When did you work at Case New Holland?

A.    I worked in Case New Holland from January of 2007 to give or take November or December of 2010.

Q.    And what kind of business is Case New Holland?

A.    Earth moving equipment, tractor loader backhoes, tractors.  I worked on the earth moving side.  They also have an agricultural, harvesters equipment.  John Deere competitor and Caterpillar competitor.

Q.    What positions did you hold there?

A.    I was the director of operations, plant manager.

I assume you're asking me for CNH because you then asked for Ford.

Q.    I'm sorry.  You said C&H?

A.    CNH, Case New Holland.

Q.    Oh.



A.    I assume that's the question you asked me each positions?

Q.    Yes.  Sorry.

A.    Okay.  Yes, yes, yes.

Q.    I'm sorry.  So what were your -- what were your responsibilities as a director at CNH?

A.    It was to -- my -- my other title was site leader, so I -- I provided the leadership to 500 hourly and about 100 salaried people.  The entire side in -- was manufacturing side purchased in 1936 by Case, and my job was to preside over the production of Case New Holland products, predominantly tractor loader backhoe, commonly known as a TLB, Case TLB, also New Holland tractor loader backhoe and also Case landscaper, it's just a tractor with a bucket on the front but no backhoe on the back, very similar product, and also rough-terrain forklifts used outside in the lumber industry, for example.

So we were manufacturing these units and selling to the sister company.  That is -- that -- does that answer your question or --

Q.    Yes.  So with the productions-related work you did at CNH, were there any like new



products that you worked on?

A.    Yes.

Q.    Were there any risks associated with those product launches?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Risks associated with product launches? When you -- when you produce the tractor, you -- you have -- there -- there is a risk in the research and development phase, when you conceptualize something.  Once you eliminate all the risks via we call this FA analysis, failure mode analysis -- once you eliminate all the risks, I'll put it this way, then you go to industrialization.

Then we know already the product is capable because all research and development has been done, the prove-up concepts, there are proving grounds.  When they test those products, they absolutely spend thousands of hours moving earth, doing all sorts of tests trying to break the equipment pretty much, and once you -- you've done that, then you have industrialization phase and you



ROBERT CIECKO                                             December 07, 2023
William C. Theodore vs PureCycle Technologies                          24

can multiply then, decide whether I'm going to make the product in one facility, second, existing, new.

So my job was to accept what the management said, "Robert, this is the product we are going to work," and generally it was just the next model of the tractor loader backhoe.  We -- we did not switch to combines or tractors.  You know, high-powered 4-by-4 high-horsepower tractors, they were made in Racine, Wisconsin, so it was usually, just like at Ford, another model introduction.

Q.   You slightly touched on this when you were just explaining, but what -- what specifically was your role with regards to the product launch related work?

A.   So product launch related work, my responsibility was that when we had the in- -- I was responsible for the industrialization part.  I was not the research and development director or vice president or engineer.  We had engineering department, but once they indicated that they are ready for the industrialization, the first phase is called preproduction.  It's usually limited number of tractors.  We produce them, and my -- my job then is to make sure that the facility is ready for



it.

The way you approach is it you -- my job was to oversee the four elements of this process. Number one is man-hour.  When we say "4M," the first M is -- stands for men.  That means you have to make sure that your -- your employees are ready for this product, so you -- you draw up the training plans, you do the gap analysis, you see how many jobs are changing.  You know, putting a tire is still putting a tire.  Is the torque the same or different?

So you create a gap analysis for each job and then you apply the proper training or retraining.  If it's a -- so that's -- that's the first M.  You -- you also expose the supervision, leaders, supervisors, managers to the new product so they understand what are the differences versus the old one.  So that's the first M.

The second M is machine.  Machine, what we refer to is it's the facilities and tooling, so do I have a new screwdriver?  Do I have a new power tool?  Do I have a new power tool that controls -- that takes the measurements of a torque and retains it for certain amount of time?  For example, do we



have new hoists?  Do we -- do we have new welding robots?  If they do, who is going to purchase them?  Who is going to do the dual safety check area; in other words, make sure that the -- that the robot when it operates that it doesn't encroach on any areas where humans are opposite.  So that's the second M.

The third M is material flow, how do we slice and dice the entire process.  So you -- you have about 2,000 parts you build a tractor with -- tractor loader backhoe with.  How do I divide this?  Which parts are classified as the most expensive and, therefore, they have to be delivered just in time, just in sequence?

They usually tend also to be very bulky, like engines or large tires, so you have to prepare the material flow different than small hardware, for example, than just the typ- -- typical combine system when you exchange.  So you -- you set up the material.

And the fourth M is methods.  In other words, how do I -- what are the procedures that we are going to use?  What procedures are changing?  In other words, standard operating procedure, I



ROBERT CIECKO                                        December 07, 2023
William C. Theodore vs PureCycle Technologies                      27

grab the nut, I grab the bracket, I use the tool, I -- I screw it on.  By the way, here's the work element sheet.

So I'm describing the process that my team has done, but at the end, I was responsible that the 4M is executed on time and that we can sell the -- the amount of tractors that marketing has asked -- sales and marketing has asked for and they tested the market and they know we can sell.

So we could talk about it much longer, but that's in a nutshell my -- my responsibilities running the auto program at Case New Holland.

Q.    So why did you leave Case New Holland?

A.    It was my decision not to go back to Europe.  Management -- let me put it this way.  I speak several languages, among them is German, Russian and Italian, and the company knew about it, and they said, "Robert, we have a -- a new joint venture in Kazakhstan."  I did not see this as a -- a good career move for me and my young children. We just came back from Europe after working for Ford ten years there in four different countries, so it was time to have children see where their grandparents live, Detroit and Chicago area, and --



and we -- I -- I just declined.

It was -- our Italian management made it very clear that if I say no to the CEO, Sergio Marchionne, that my career may be not as -- may be sidetracked.  It was -- it was plain.  It wasn't spoken plainly, but I understood that my time with CNH will be -- is -- is really finished, so I -- I decided to join the consulting company.

Q.    What is the consulting company called that you joined after CNH?

A.    It was Product Development Services in Burlington, Iowa, and it was actually earth moving consulting on the tractors, bulldozers, excavators, and it was set up by one of the retired vice presidents from Case New Holland.

Q.    And when did you work at Product Development Services?

A.    From 2010 to 2012.  Yes, 2012 July. July 2012.

I've done such a good job that one of my -- my customer that I was, AGCO Corporation, they convinced PDS to release me, and they hired me full time as a vice president of manufacturing.

Q.    At PDS?



A.    No, no.  At AGCO.  Sorry.

Q.    Oh, AGCO.

A.    So while I -- while I was working at AG- -- at PDS, PDS sent me to one of the clients named AGCO, A-G-C-O, a John Deere competitor, and they -- they flat-out say, "What would it take to -- for you to take over these operations?  We don't want you to consult.  You -- you simply know too much.  You could -- you could handle this site."  It was 365 acres, 6 plants, 1200 people, 400 professionals, so it was much more serious side than the Case New Holland, more like automotive plants.

So I -- I joined AGCO in August 2012 with the consent from PDS.  They -- they had -- they had enough business with AGCO that they didn't worry about losing Robert.

Q.    I want to quickly go back to PDS.

So during your time there, was your work more -- because it was a consulting firm, was your work more consultant -- consulting related?

A.    Yes.

MS. WEINRIB:  Objection to the form of the question.



BY THE WITNESS:

A.    So an example, AGCO, an agriculture company, came to PDS and said, "Look, we -- we having a problem with a launch.  We -- we have -- we have our backs against the wall as far as the time because the new emission regulations dictate that we change engines on our harvesting combines. Can you help us to reduce the timing to introduce that product and -- and then can you help us to execute that launch?  In other words, just don't give us a -- also just a formula but be with us and instruct us how do you move the material," the things I just explained to you, how -- how do you really effectively launch something, and because the agricultural equipment is very similar to earth moving, that was -- it was very easy for me.

BY MS. PARK:

Q.    So Product Development Ser- -- you mentioned Product Development Services.  Your LinkedIn actually shows that during that time you worked at Ciecko & Associates.

Was -- is that the same -- is that the same time as Product Development Services?

A.    Okay.  That -- it's the very same job.



What it -- what I did is I set up my own LLC.  I was not an employee of PDS.  The aforementioned vice president of CNH who retired set up his own LLC, Product Development Services.  I was one of the contractors because it was not a full time.

When we had the job for a manufacturing guy like me, he offered me a job, and I had my own LLC.  If it was a research and development, he reached out to research and development people.  When it was a marketing item, he had another guys from marketing.  So I was handling for him only manufacturing, indus- -- industrialization phase of the new model program launch.

Q.    When did you establish this LLC?

A.    After I left CNH, 20- -- I think it was 2010 summer.

When -- when I -- when I joined Rick -- when I joined PDS, he made it clear that this is just a contractor and not employee-to-employer relationship right from the beginning, so I said, "Okay, Rick, I get it.  It's best that I just also get the LLC, limited liability company," so I -- I did this.  I had no employees.  I was the only one.



Q.    Is the LLC still in existence?

A.    It's -- it's not.  When I called Secretary of -- in Iowa, I asked them, "How do I close it?"  They say just, "If you don't generate any income, you don't pay any dues, we'll close you automatically.  Don't worry about it," so I don't believe so.

Q.    Do you recall when it was closed?

A.    When I made that call?  I don't recall. I didn't -- I don't recall.  I'm not going to speculate.  But it was only registered in the State of Iowa.

Q.    Did you hold any position of your own LLC?

A.    Yes.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    The way -- the LLCs makes you do -- set up it, I think it was president.  As I said, I was the only person, so I was the housekeeper and I was the engineer and manager and everything else.

BY MS. PARK:

Q.    So other than those two separate



entities, it sounds like your work at your own LLC was really related to your contracting work at --

A.    For P- --

Q.    -- PDS.

A.    Yes.  Product Development Services, yes.

Q.    And after PDS you worked for the client -- how do you say it?  AGCO or --

A.    AGCO.

Q.    AGCO?

A.    AGCO, yes.  AGCO.  AGCO has hired me as a full-time employee, vice president of manufacturing, and I aforementioned already that was the Hesston, Kansas site.

Q.    Are you still employed there?

A.    No.  I have -- I took early retirement last year, September of 2022.

Q.    And as vice president of manufacturing at AGCO, what were your responsibilities?

A.    So I was at AGCO for five years, the vice -- for five years I was the vice president of manufacturing.  My responsibilities were to again provide leadership to this complex site.  It included mach- -- steel decoiling, machining, robotic welding, manual welding, painting and



assembly of agricultural products.  Not earth moving; this time it was agricultural.  It was hay balers, round, square -- round baler, small square baler, large square baler, swather or tractor that was used for cutting hay -- it's called a swather; it doesn't have a transmission -- and planters. One of the plants had the planters, the other one had the combine -- harvesting combines for wheat, corn, soybeans.

It was 1600 people, and there as a vice president, I had to set more of the policies.  So part of the responsibilities was of course to hit the numbers, as we call.  In other words, "Here's your production schedule.  You must produce what marketing requires and -- and sales."

The other one is you -- I was given specific tasks at create better organizational culture and a site culture, and the way they measured this was to reduce the turnover because the salaried turnover was 20%, hourly turnover was 12% and some people called it almost revolving door, and they said, "That's one of the -- one of the reasons, Robert, that you -- you're being brought here.  You have to -- you have to create



more of a Standard & Poor's 500 company global approach, make sure that the culture is set up, it still resonates with the local community."

It had only 1,000 people population.  We were drawing employees -- employment from surrounding areas, so part of it was the human resource related responsibilities.

Typical manufacturing site.  You -- you run the, you know, production meetings, you run your cost meetings, you run your delivery meetings, schedules, you -- you run the -- I mentioned human -- human resource.

Q.    You mentioned you started working at AGCO after PDS, but when did you start working there?

A.    So in 2010 when Rick asked me to help with -- with the product launch, this was 2010.  I didn't start there.  I was just preparing some documents remotely for the new model program launch, procedures -- standard -- standard operating process sheets, but -- I worked for Rick, but AGCO was one of the two customers.

There was -- so AGCO right away from the beginning was one of our customers that I was



exposed to, and I had to go to Jackson, Minnesota facility for the transfer of the French-made tractor in Beauvais, a suburb of Paris, and we transferred the tractor to Minnesota because it was sold in the United States, but when the farmers ordered the tractor, it took just six months to fulfill the order and another six months to make it and then to ship it.

So we what we call reshored that process -- product to the United States, so I was preparing some -- some help how to industrialize that -- that product in Jackson facility.

That was my first exposure to AGCO. AGCO has multiple facilities throughout the world, but the ones I was only exposed to back then was Jackson, Minnesota and subsequently Hesston, Kansas.

Q.    And you mentioned Rick.

Is that someone from CNS?

A.    Rick is the person is -- who owned -- who was the president of PDS.

Q.    Oh.

A.    That's the retired CNH vice president who set up the Product Development Services.



Q.    And you mentioned earlier you were VP of manufacturing for five years.

A.    Correct.

Q.    So what other position did you hold -- hold at AGCO?

A.    Five -- after five years I was offered the position of vice president of new model program introductions, and my job was to -- to industrialize first global harvesting combine for AGCO.

So what it means is that they had Helmut -- they had the -- Helmut was from Volkswagen.  He was the research and development senior VP.  Helmut -- so they brought the people from -- from automotive industry, and they said, "Guys, we want to do what Mercedes does."  When Mercedes makes the Class C, they design only once in Stuttgart, but then it -- it produces in Stuttgart but it also makes another plant in China, makes another plant in South America, another one in South Africa, another one in Birmingham, Alabama.  So that's the industrialization portion.

So they said, "Look, we have 16 different combines globally.  How -- it costs us a



lot.  The process is -- is not -- not most efficient.  Can you design --" they -- they asked research and development to design a combine, and then they turned to me and said, "Robert, can you make sure that we industrialize it, in other words, that we -- that we set up exactly the same process, the same facility, same bill of process, same material flow in Breganze, Italy --" that's where I was sent first -- "then Santa Rosa, Brazil and then Hesston, Kansas."

So the combine industrialization job took us five years until we launched two plants and a third plant in Hesston is -- they're preparing that product now.  So that was -- my responsibility as VP of new model programs is to industrialize the harvester.

Q.    And was that the position you held when you took early retirement last fall?

A.    Yes.

Q.    When did you first learn about this lawsuit?

A.    Can you be more specific?  Do you mean when did I -- no, I'm not sure if I --

Q.    When did you first hear about Theodore



v. PureCycle, this case?

A.    So you know I own the PCT stock.

Q.    Yes.

A.    Okay.  The day of the -- I may mispronounce it -- Hindenburg report, when -- when the report came out, maybe a day after I have -- when I -- when I was still reading that research -- seeing that Hindenburg report, I have noticed the notices of potential class lawsuits for fraud securities.  I -- that was when I found out about the potential lawsuit.

So I'm not sure if I answered you the right way, but that's how -- when the word "lawsuit" is used, this is where I saw first time the potential notices from different legal firms that there may be a potential lawsuit.

So -- so that was the day after or day of -- I think it was day after the report.  Roughly I think it was May 6 or May 7 of 2021, if I don't -- if I remember right.

Q.    So you said this is from seeing a notice?

MS. WEINRIB:  Objection to the form of the question.



ROBERT CIECKO                                          December 07, 2023
William C. Theodore vs PureCycle Technologies                         40

BY MS. PARK:

Q.    You mentioned that you saw a notice of a class action lawsuit?

A.    No.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    That was not the lawsuit but only a potential.  It was the different legal firms saying, "If you invested in PCT, you may be eligible for a class action lawsuit.  It may involve you."  Don't quote me on the wording, but this is where the day after the report, the first time I saw the word "PCT" and potential fraud securities lawsuit.

BY MS. PARK:

Q.    Do you recall who issued the notice?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    It -- it was multiple legal entities. In fact, it was more than ten.  When you -- all you had to do is do the Google search "PCT," and then -- then you saw the first news on the day was



just a -- the number of -- of different legal firms.

BY MS. PARK:

Q.    Did you do a Google search to find the notice?

MS. WEINRIB:  Objection to the form of the question.  What notice?

BY MS. PARK:

Q.    The notice you just talked about.

MS. WEINRIB:  You're mischaracterizing his testimony.

BY THE WITNESS:

A.    So --

BY MS. PARK:

Q.    Did you see -- did you see any press releases regarding a potential class lawsuit, as you just described?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    No, I did not.

BY MS. PARK:

Q.    You did not see press releases -- releases, so what did you -- what is it that you



saw the day after the Hindenburg report that you just told me?

MS. WEINRIB: Objection to the form of the question.

BY THE WITNESS:

A.    When I Googled "PCT," obviously I -- I was still a shareholder.  I -- I saw that again over and over Hindenburg report and some further comments about it.

I do remember checking if it was not a hoax.  I researched the Hindenburg company, I was not aware of this before, and I found out that it is a legitimate company, and then the next day when I Googled "PCT," I saw the -- the notices that there may be potential fraud securities involved in it.

I don't remember -- it was Google search engine, but that's -- that's all I remember.  This is how I got in -- front saw the name potential fraud securities and PCT.  I did not Google for any other names, just the ticker symbol of the stock -- of the company.

BY MS. PARK:

Q.    Who did you contact after seeing that



notice?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I contacted the very first one that -- that I know -- saw, and it was Bronstein, Gewirtz & Grossman.  That was the -- that was the firm.

BY MS. PARK:

Q.    Did you contact Pomerantz?

MS. WEINRIB:  Objection to the form of the question.

Do you want to narrow that down to timeframe?

BY MS. PARK:

Q.    At the time you reached out to Bronstein law firm.

A.    At the time I reached out to the BGG, as I called, Bronstein, Gewirtz & Grossman, no.

Q.    Did the -- no, strike that.

When did you get in contact with Pom- -- the Pomerantz law firm?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:



800.211.DEPO (3376)
EsquireSolutions.com

A.    I did not contact Pomerantz.  It was the firm -- Bronstein, Gewirtz & Grossman has advised me that it was -- they advised me that they will actually -- when they described the process, they dis- -- they -- they told me they will turn me over to the much larger law firm that is more specialized in such cases, and subsequently they introduced me to Pomerantz.

BY MS. PARK:

Q.    Can you describe for me in your own words what this litigation is about?

A.    Fraud securities.  The simplest thing, 14(a) and 10(b), but if you -- is that enough or would you like me to elaborate or -- I'm not sure what you -- what -- what is the exact question?

Q.    We can get into more detail.

Have you read from beginning to end the original complaint that was filed by William Theodore on May 11, 2021?

A.    May 11, 2021.  I honestly don't recall now.  I don't want to say yes or no.  I just don't -- I'm not sure if I -- if I under- -- I -- if I remember the document, no.

Q.    So you don't recall whether you read it



or not?

A.    No, I definitely read all the documents. Once -- once I agreed to be a class representative, every document that was passed was made available, whether it was a complaint or brief or any other correspondence -- not the correspondence, the documents, yes, I read them.  I read -- that is part of my responsibilities to represent the class, make sure that I follow up on every document.

Q.    But you do not recall whether this original complaint filed by --

A.    I don't recall the date.

MS. WEINRIB:  Just let her finish the question.

THE WITNESS:  I'm sorry.

MS. WEINRIB:  That's okay.

BY MS. PARK:

Q.    Whether -- so you don't recall whether this original complaint filed by Mr. Theodore was included in the documents that you received?

A.    I --

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:



A.    I remember reading complaint for sure and I remember several back and forth with the complaint.

BY MS. PARK:

Q.    Which complaints have you read?

A.    I've read the documents titled "Complaint," but those -- those were related to -- to both PCT and also to the -- I'm sorry.  I forgot the -- the previous company that was part of the SPAC.

Q.    Roth CH?

A.    Roth, yes.

Q.    Do you recall if you read another complaint filed by David Tennenbaum?

A.    I don't recall Tennenbaum, but as I said, any complaints presented by Pomerantz, I've read them.

Q.    When did you decide that you were interested in getting involved in this lawsuit?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I decided this after the -- reading the Hindenburg report.  I remember being very





ROBERT CIECKO                                    December 07, 2023
William C. Theodore vs PureCycle Technologies                  47

frustrated, and I've -- I've done quite a bit of research I felt, but I felt almost cheated, so I -- all of a sudden that -- that report disclosed certain facts that -- that bothered me.

So that was definitely the day of the report or the day after, you know, one -- the day of the report for sure and the day after it solidified my decision.

BY MS. PARK:

Q.    Do you know what a class action is?

A.    Yes.

Q.    Can you describe it for me?

A.    It's -- it's the action on the behalf of investors like me.  It's a -- it's a group of people who invested -- in this case invested in -- in this company and have a very similar position, interests.

Q.    Are you aware that this case is a putative class action?

A.    Punitive class action?

Q.    Putative.

A.    Putative.  I'm sorry.  I do not know that word.

Q.    Do you understand that this -- this case



is brought as a class action?

A.   Yes.

Q.   Do you know what the class period in this case is?

A.   I don't recall without looking at the document.

Q.   The other lead plaintiff in this case is your brother, correct?

A.   Yes.

Q.   Did you discuss with your brother regarding whether to become co-lead plaintiffs?

A.   I've told him that I will be one, so the answer is yes, I told him that I -- I'm going for it, and he said, "Me, too -- in that case, me, too."  That's...

Q.   Did you discuss anything else with your brother about your decision to become co- -- co-lead plaintiffs?

A.   No.

MS. WEINRIB:  Objection to the form of the question.

THE WITNESS:  Sorry.

MS. WEINRIB:  That's okay.  I'm just going to instruct you to only answer about conversations you



had that did not involve counsel.

BY MS. PARK:

Q.    Sorry.  I -- I missed the answer.

MS. WEINRIB:  You can go ahead and answer.

BY THE WITNESS:

A.    So the answer is no.

BY MS. PARK:

Q.    How much time did you spend in connection with this case before you filed your motion to intervene and when you were appointed co-lead plaintiff with your brother?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Can I -- I'm not sure if I understand from -- if you'd ask me dates -- I just don't understand all the legal terms.

So if you tell me how much time did I spend between May 6 and -- you know, May 6 of 2020 between 12 months, I would probably be able to answer that better, but I'm not sure if I understand the frame -- timeframe --

BY MS. PARK:

Q.    Let me --



A.    -- you're asking me for.

Q.    Okay.  Let me -- let me rephrase my question.  I'll change the timeframe.

How much time did you spend in connection with this case between when you saw the notice as you described on or about May 2021 and when you were appointed as co-lead plaintiff in July of 2021?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    It was 10, 16 hours.  It's -- it's hard to say sometimes because I -- I just don't recall all the time how much really.  You -- you read something, but you don't time yourself.  I -- I did not -- I was not prepared that I would have to time myself every time I read the documents or think about it in a quiet time.

So that's my best estimate.

BY MS. PARK:

Q.    So you mentioned earlier that the BGG law firm introduced you to the Pomerantz law firm.

Since the introduction, did Pomerantz contact you or did you contact them?



ROBERT CIECKO                                          December 07, 2023
William C. Theodore vs PureCycle Technologies                       51

        MS. WEINRIB:  Objection to the form of the

question.

              And again, I'll instruct you not to

reveal the content of any conversations you had

with counsel with regard to this litigation.

BY MS. PARK:

        Q.    You can still answer whether -- who

initiated the contact.

        A.    It was the BGG, Bronstein.  Pomerantz

did not call me personally.  It was -- I was

introduced via Bronstein, Gewirtz & Grossman.

        Q.    And when was the introduction again?

        A.    Oh, I don't remember.  I would have to

check the first note correspondence I received.

No, I don't remember now.  Yeah, I don't want to

give you any wrong even month.  I -- I just don't

remember that one.

        Q.    Do you recall when you began speaking to

the Pomerantz law firm after that introduction?

        MS. WEINRIB:  Objection to the form of the

question.

              And again, don't reveal any content of

conversations with counsel.

BY THE WITNESS:



A.    It -- all I can say it was -- it was always Tamar -- Tamar that we spoke, but I don't -- I do not really honestly -- I didn't know I have to remember those dates.  I -- I'm sorry.  I don't want to mislead you.

BY MS. PARK:

Q.    Anyone else other than Tamar that you spoke to at the firm -- at the Pomerantz firm?

A.    There might be during the introduction maybe some other person, partner introduced, but I -- at the moment, I want to say probably not or maybe just one more person as a just "Hello, I'm such and such person."

MS. PARK:  Okay.  Let's take a quick break.

THE VIDEOGRAPHER:  Going off the record at 10:14 a.m.

(WHEREUPON, the deposition was recessed from 10:14 to 10:28 a.m.)

THE VIDEOGRAPHER:  Going on the record at 10:28 a.m.

BY MS. PARK:

Q.    Had you heard of the Pomerantz firm before BGG introduced you to them?

A.    I had not.



Q.    Why did you choose Pomerantz as your counsel in this case?

MS. WEINRIB:  Objection to the form of the question, mischaracterizes testimony.

You can answer the question.

BY THE WITNESS:

A.    They sounded professional.  They explained to me --

MS. WEINRIB:  Don't reveal any content of conversations between you and counsel --

THE WITNESS:  Okay.

MS. WEINRIB:  -- about this litigation.

THE WITNESS:  Thank you.

BY THE WITNESS:

A.    They were very professional.  I was impressed.

BY MS. PARK:

Q.    Do you have a written engagement letter with the Pomerantz firm?

A.    I'm sorry.  What letter?

Q.    Do you have a written engagement letter?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:



A.    What is engagement letter?

MS. PARK:  Can you mark this as Exhibit 1.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 1, for identification.)

BY THE WITNESS:

A.    Oh, yes, yes.  Thank you.

BY MS. PARK:

Q.    When did you sign this letter?

A.    As soon as I received it, but -- I don't mean this to be a vague answer.  September 30, 2021.

Q.    Did you negotiate the 33.3% contingency fee arrangement?

MS. WEINRIB:  Objection to the form of the question.

And again, don't reveal the contents of conversations with counsel.

BY THE WITNESS:

A.    I'm sorry.  You --

BY MS. PARK:

Q.    Oh, my question was whether you negotiated --

A.    No.



Q.    -- the fee.

Did you authorize the Pomerantz firm to file a motion on your behalf to be appointed as lead plaintiff?

A.    Yes.

Q.    Before you decided to get involved in this lawsuit, what, if anything, did you know about Roth CH?

A.    Nothing at all.

Q.    Before you decided to get involved in the lawsuit, what did you know about PureCycle?

MS. WEINRIB:  Objection to the form of the question.

You can answer.

BY THE WITNESS:

A.    Before I decided to take a lawsuit you said, right?

BY MS. PARK:

Q.    Before you decided to become involved in the lawsuit.

A.    Not -- not before I invested or during the establishing of my position?

Q.    So for now let's talk about before you became involved in the lawsuit.  Not specifically



before you invested, but --

A.     So that's difficult because I got in- --
I decided I -- first I -- the chronology -- I just
want to make sure you understand, I found out about
PCT, I did my own due diligence, then I invested,
then report came out, and my -- all what I thought
was that the investment -- the report completely
changed my mind, and after reading report, I
decided to -- to participate.  How much did I know?
It's hard for me to answer without bringing it up,
the entire process of how much information I was
gathering.

So yes, I knew about -- I'm not sure --
you know, I knew -- I -- I went to their website,
but now I'm describing already almost the other
sites.  I was gathering information.  I knew what
the company wants to do or what they're doing,
what -- what business they are in.  I knew and
liked the fact that they wanted to multiply and
industrialize the process.  This was music to my
ears because I'm involved in industrialized -- or
was involved the entire career in industrializing
some proven process, eliminating the risk and then
just multiplying it like a cookie cutter.  So yes,



I was -- I -- I honed in on that.

I also recall having -- seeing a huge edge of Procter & Gamble IP, intellectual property patent, so they -- they -- I believed that they have -- they -- they have the process, they -- they have a team and they will just turn them out like cookies.

So anything associated with this process, yes, I -- the moment I -- I decided to invest -- I was again using a Google search. It was quite a bit of information. You -- from -- one thing leads to the other, and then -- then I was able to gather the -- more and more information, but we could operate for hours and I could describe. That's -- I guess it's not the place and point.

Does that answer your question or --

Q.    Yes.  I want to explore more.  Let's actually disregard my time period that I was trying to break up.

So when did you first learn about PureCycle, the company?

A.    It's in March 2021.

Q.    How did you first hear about PureCycle?



ROBERT CIECKO                                      December 07, 2023
William C. Theodore vs PureCycle Technologies                    58

A.    I've heard about it by researching new ticker symbols.  That's a habit of mine that dates back to Peter Lynch's book about investing in the things you know, whether it's your wife's clothing, whether it's -- it's something else, and I followed that process through my career.  I -- I liked the mattress I was sleeping on when I lived in Kentucky, it was Tempur-Pedics, and following that advice, I found out TPX, the newly -- a new IPO.  I was successful.

And then Investor Business Daily, I subscribe to that newspaper.  Bill O'Neil, the founder, also was saying look at the -- look at the new ticker symbols.

So it's a habit.  So I found out by just -- by researching on one of the weekends, as I always do, PCT.  At that moment I didn't -- didn't know that this is the -- the SPAC PCT new ticker and I started investigating using Google.

So that was my first moment when I discovered the PCT ticker, and then the whole story went from there.

Q.    So you mentioned using Google, but what specifically did you investigate about PureCycle?



ROBERT CIECKO                                        December 07, 2023
William C. Theodore vs PureCycle Technologies                      59

A.    Okay.  Once -- once I had the P- -- I went to their site.  I Googled several articles. I -- I remember stumbling over -- when you typed in "PCT," there was an Hedgeye Investment free -- free access to Hedgeye Investment maybe March 17, I read about it maybe May 21.  It was already recorded and they mentioned what they called garbage stocks, but they were very positive on that -- when they say "garbage stocks," they meant recycling.

So it was a catchy thing, but they said that there is a -- there is an environment -- ESG environment dictated by environment sustainability and governance movement.  A lot of states are getting -- are forcing people to recycle a lot more, so this is a new environment now to look at that, for example, garbage stocks, and they mentioned several, but they -- they mentioned PCT.

So that's -- that's -- I only knew that one because -- because that's what I was Googling, so they mentioned the -- the same thing I've already told you, the -- they mentioned the Procter & Gamble, so then when I -- then I went and looked at it.  That -- that -- that was -- that was a true statement, Procter & Gamble IP property.



And that's -- so Hedgeye -- Hedgeye kind of opened up my eyes a little that this is part of the industry.  It's not a single stock, but it's a -- there is a recycling industry, and that's -- I don't really recall -- you know, once you Google, there are so many things.  Sometimes search engines shows you related stories as long as you -- they see "PCT."  Like I saw some filings or notices of filings.  That's when I found out about the ticker, about the 21st of -- this is the ROCH.  I think the ticker symbol changed, so then I -- then I discovered that.

I did some subsequent research the day after that showed me that -- that the first plant is there.  I actually -- that was the website.  Actually PCT, when they had the little clip of Ironwood [sic], if I remember, Ohio facility, I lived in Michigan, Detroit, so I actually more or less even knew where it is, but they -- there were some blogs, people mentioning that, too, but that was -- that was not really -- it's irrelevant.

So day after day I -- I started learning and putting the facts together, hmm, they have a -- they have a patent, they -- they are



industrializing the technology, it is the right time, ESG, as I mentioned, recycling environmentally correct, you know, to get rid of the garbage, so it -- it started checking quite a few boxes for me.

But the biggest thing for me was the IP, that they have really a patent, and then industrialization.  That's something I do, and it was -- I felt very confident that, wow, if you industrialize already, that means you've -- you've got everything ironed out, you are going to industrialization.

They did mention even going to Germany, that -- going to Georgia, so there was -- on the -- on the PCT site that they -- they have intentions of multiplying this process, and again, it was -- that message agreed with what -- the other articles or information I was finding out.

So it -- it wasn't one time but it was over the course of a week, and of course once I committed myself with the first shares, I -- I kept on reading more and more, and I thought I have had another TPX mattress company.

Sorry.  That was very long.



Q.    No, that was very helpful.

Did you start investing after this week or so of research?

A.    I established the first position after the first -- after I discovered the ticket -- the ticker, I invested right away, but a small amount -- I don't remember, several hundred shares -- and once I stumbled on more and more articles and once I more -- started reading more, I said, "Wow, I'm actually -- I believe that I have the perfect timing.  The ticker -- ticker is just changed."  I -- I thought I'm actually onto something.

So I kept on reading more and then establishing my position.  I usually take -- you know, I call it sacrificing some soldiers. Sometimes I -- I take a small position and see how the -- also stock behaves from the technical point of view.

So I do fundamental analysis and then I do technical analysis, how do the charts look like, and it all looked very -- very, very -- I didn't see any red flags, so I kept on establishing my position like I usually do.  You know, every day I



look sometimes for stock to go down a little and I buy a little more, but that's -- that's just the technicality, how I establish my positions.

Q.    Can you explain the difference between, as you describe it, fundamental analysis and technical analysis?

A.    Oh, yes.

Q.    Can you explain to me?

A.    Yes.  Fundamental analysis is you may -- you have to under- -- you may -- what I do is I -- I look at the industry first, does that industry -- where is it at in the cyclical -- is this, you know, manufacturing of cars?  That's an old industry.

So I like to understand what industry am I investing at, first of all.  Is it a fossil fuel company and does -- is it the energy company, first of all?  And there are subcategories.  Like I said, energy could be fossil fuels, renewables and so forth.

So I -- I do look at first and make sure I understand where -- where is it at, fundamentals. How large is the overall market?  Not the specific company, but the large.  So that's a piece of the



ROBERT CIECKO                                    December 07, 2023
William C. Theodore vs PureCycle Technologies                 64

fundamental information I usually look at.

I -- I definitely look at the expansion potentials, growth potentials, what is the -- what is this industry being projected to be at five, ten years?  So -- so that's -- that's fundamental analysis.

When we talk -- part of the fundamental analysis but in the short term, I also look -- like I've mentioned to you, I look at the Investor Business Daily.  They -- they seg- -- they segregate entire US economy to 197 industry groups, so I -- and then -- and they force rank them by where -- the group of the stocks from that group. Let's say if it's a Caterpillar, John Deere, AGCO, they -- they track them and they say, "These stocks are --" it's called rate -- rate of change, so if they're moving up, they -- they rank them number one, number two, so how much have the stocks have these -- these equities went up in a month, in a year, and they force them from the top to bottom. In other words, where the professionals invest, the large funds, whoever, they rank them 1, 2, 3, 4 and so forth.

So if you see that -- if I like -- if I



see the industry I'm interested in, I look then where do they rank at this time this year?  Is this something that the large funds, insurance companies, whatever -- you -- you cannot see it, but they -- they just give you the line, this is the one that the financial elephants are investing in it, and -- and you can see if -- if that means that the capital flows are going into these industries, that's -- that gives me a good moment to say, "Okay.  Now let's look at the technical analysis."

Technical analysis is truly charts, graphs.  I use MarketSmith.  It's the charting software that allows me to look at the daily, weekly, monthly closes.  It gives me -- it even detects the potential patterns, but I don't usually trust them.  I do this myself, Fibonacci retracement, Bollinger events.  I'm not going into get into details, but I do -- it's -- it's -- I've been -- I've learned quite a bit how to analyze this on my own over the course since 1989.  I've invested in stocks since 1989, and from that time it's just -- I -- I grew my technical skill analysis.



Q.    Which industries are you most interested in?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    That depends on the year, the quarter. If you'd ask me now, it's definitely technology stocks, you know, Magnificent -- Magnificent 7, QQQS.  That's the ETF, you know, for the largest seven companies.

So you have to follow where the financial flows, and I don't get married to any specific sector.  I'd rather follow the money of the large professionals, where they invest.  That's why the Investor Business Daily, Wall Street Journal, you know, any -- a few other -- other pieces of information, you -- you have to spend an hour a day at least.  But I do follow it, I like it, and I don't have a preference just because I like this industry or that.  No, it's -- it's all about the -- at the end return on your investment.

So over the years, they change, my preferences.

BY MS. PARK:



ROBERT CIECKO                                        December 07, 2023
William C. Theodore vs PureCycle Technologies                    67

Q.    What was your preferred indus- --
industry in 2021?

MS. WEINRIB:  Objection to the form of the
question.  The entire year?

BY MS. PARK:

Q.    The first half of 2021.

A.    Okay.  None.

Q.    None?

A.    No, none, and what I did, I did mostly
trading futures of the indexes like Standard &
Poor's 500, NASDAQ.  I also trade cattle,
agricultural futures.

But the reason I'm saying none 2021, it
was still -- I deemed it too risky.  The daily
movements were so volatile that if you wanted to
buy a John Deere, you could be an innocent
bystander.  The entire Standard & Poor's 500 lost a
thous- -- a hundred points, Dow a thousand.  I knew
John Deere went down for no reason.

So knowing technical analysis and
knowing also how the -- the capital flows go, I was
shying away from most of the equities.  I was just
looking for the good opportunities, but I could not
find too many.



ROBERT CIECKO                                      December 07, 2023
William C. Theodore vs PureCycle Technologies                    68

This was -- this was very difficult, 2020 and '21, COVID time and then recovery. Nothing worked like -- like it's supposed to as far as the graphs, analytical.  You had to be very cautious.  It reminded me of 2008.

Q.    So you mention in the Hedgeye investment -- was it investment --

A.    It was an investment seminar or something.  Some free access where -- when they mentioned those, you know, garbage stocks, recycling, yes.

Q.    Did you invest in any other garbage stocks?

A.    No, I did not at all.

Q.    Other than the P&G IP that you mentioned and the indus- -- industrialization, what about PCT stood out to you that made you invest it from those garbage stocks as you learned?

A.    The patent.

MS. WEINRIB:  Objection to the form of the question.

You can go ahead.

BY THE WITNESS:

A.    The patent.  They -- the difference was



they bought the patent.  They -- so this was big.
I've mentioned the industrialization and the fact
that they can produce this near-virgin material for
less money than the virgin material.

That's how they -- I remember that --
that they -- whether -- whether it's true or not,
that's -- that's how they -- how -- how the guys
mentioned that during the investment, that they
say, "Look, they -- they -- they can really do
this."

So IP, industrialization, those were the
two major edges where I normally shy away because
you don't -- it's hard to invest for me to a
company who doesn't have any income, so then --
then I just look at those -- what is my edge as an
individual investor?

BY MS. PARK:

Q.    You mentioned reviewing PureCycle's
website, you reviewed articles.

Did you follow any analysts?

MS. WEINRIB:  Objection to the form of the
question.

BY THE WITNESS:

A.    If I followed analysts -- if I



ROBERT CIECKO                                         December 07, 2023
William C. Theodore vs PureCycle Technologies                    70

remembered, no, no, I did not follow analysts, but I want to say I could not find any, I don't think, so -- I'm not sure, but the answer is no, I did not follow any analysts, but just because I did not find any, if that helps.

BY MS. PARK:

Q.    Did you read any of PureCycle's public disclosures?

A.    Yes.

Q.    Did you read any of the -- any of PureCycle's risks in those public disclosures?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I recall on the website a statement, some -- some -- so the answer is yes.

BY MS. PARK:

Q.    Did you read PureCycle's public -- sorry.  Strike that.

Did you read PureCycle's press releases?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I read the press release about the ROCH



to PCT transition, that was a big release, yes, and several subsequent, but I'm not sure if it's relevant.  Even after I sold the stock, I -- for a certain period, I was still checking on them, but I -- I never invested any more.

BY MS. PARK:

Q.   Which risks do you recall reading about PureCycle?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.   It was more general statement that, you know, it -- it referred to investing -- risks associated with investing, with -- it was some legal disclosures, and when -- when -- when I went to sec.gov and looked at some of the documents there, that was pretty much the same jargon.

So I'm sorry for being vague, but if you go there, you will see it exactly.  I recall there were -- there were risks for -- stated.

BY MS. PARK:

Q.   Did you do any research into Roth CH?

MS. WEINRIB:  Objection to the form of the question.  When?



BY MS. PARK:

Q.    As you were doing research into PureCycle.

A.    I --

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I did not investigate ROCH.  It was -- I was interested in the PureCycle technol- -- PCT, their technology and their industrialization.  So the answer is no.

BY MS. PARK:

Q.    Do you personally know any current or former PureCycle employees?

A.    I do not.

MS. WEINRIB:  Objection to the form of the question.

THE WITNESS:  Sorry.

MS. WEINRIB:  That's okay.  Go ahead.

BY THE WITNESS:

A.    I do not, I do not.  I never did.

BY MS. PARK:

Q.    Do you personally know any current or former PureCycle officers or directors?



A.    No.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I do not.

BY MS. PARK:

Q.    Have you ever communicated with any current or former PureCycle employees, officers or directors?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Not at all.  Not in any form.

BY MS. PARK:

Q.    What is a lead plaintiff?

A.    Lead plaintiff?  I hope to be me. That's -- that's the person who -- lead plaintiff is the person who wants to represent the class in a class action lawsuit.

For me, this -- the difference between lead plaintiff and a -- and a class representative, it's almost the same, but you may actually as a -- as a lawyer disagree.  I think one comes before the other, like chicken and the egg, but I hope



that's -- that answers your question.

Lead plaintiff wants to be, correct me if I'm wrong, the class representative.

Q.    Right.  And you are seeking to have the court certify two proposed classes?

A.    Yes.

Q.    And you're currently moving to represent the two classes in this action?

A.    Yes.

Q.    Who are in the classes of people you represent or you seek to represent?

A.    I'm sorry?

Q.    Who are in the classes of people you are seeking to represent?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I don't know any other investors personally.

BY MS. PARK:

Q.    I'll rephra- -- rephrase my question.

How is the class defined?

MS. WEINRIB:  Objection to the form of the question.



BY THE WITNESS:

A.    If you're asking me for legal definition, how is the class defined, I'm not the best person to -- it's -- it's a group of people who have similar interest, who invested in the same security, who -- who are exposed to the same -- what I believe the same lack of information, and I -- yeah, I'll -- that's about it for now.

BY MS. PARK:

Q.    And when you say "invest in the same security," what -- what are you referring to?

A.    I'm referring to PCT Technologies.  I'm referring to the fact that when I read the Hindenburg report, I see that there -- there were some things dis- -- not disclosed, namely the management experience and -- in this technology but also their track record.  This was a huge surprise.

The other -- the other one was the Procter & Gamble patent seemed to be very simple, very safe, just industrialize it.  This is why they bought this from such a huge conglomerate.

So that's how I felt.  That's how I believe how the investors who invested in PCT also feel.



Q.    Do you know whether the definition of the class changed over the course of this case?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I do remember -- so the answer is I know.

BY MS. PARK:

Q.    Do you know why it was changed?

MS. WEINRIB:  Objection to the form of the question.

And don't answer to the extent you're revealing communications with counsel.

BY MS. PARK:

Q.    Is there nothing to answer other than something without revealing?

MS. WEINRIB:  Again, objection to the form of the question.

And do not reveal anything that your answer would be based on communications with counsel --

BY THE WITNESS:

A.    I --

MS. WEINRIB:  -- to the extent your answer is



based on that.

BY THE WITNESS:

    A.   In that case, I -- I have nothing else to say.

BY MS. PARK:

    Q.   So you're following the advice of your counsel?

    A.   Yes.

    THE WITNESS:  Bless you.

BY MS. PARK:

    Q.   Do you know if the class includes people who purchased PureCycle stock?

    MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

    A.   The answer is I -- I'm sorry.  Can you repeat the question?

BY MS. PARK:

    Q.   Does the class that you seek to represent include people who purchased PureCycle stock?

    A.   Yes.

    MS. WEINRIB:  Objection to the form of the question.



BY MS. PARK:

Q.    Does the class include people who purchased PureCycle's bonds?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    As to stock, I will say yes.  The bonds I am not sure of.

BY MS. PARK:

Q.    Do you believe you're an adequate class representative?

A.    Yes, I do.

Q.    Can you explain why?

A.    Because I -- I'm an individual investor, I never seeked any -- I never, ever had any registered investment advisor or any -- any other financial advisors -- advisor, so I represent more of an average Robert purchasing the stock.

I -- I believe I represent also a group of people -- because nowadays information is so readily available, we individual investors, we do do our own in- -- in- -- due diligence, like I did. Of course we don't have as much resources as Hindenburg had or there's no way you can compare



yourself to the -- to the professional research firms.

So that's what -- that's what the main reason is.  Yes, I -- I did my own due diligence, fundamental analysis, technical analysis as much as I could.  I invested based on the information provided in the documents both on the sec.gov and on their very own website, and I believe there was more people like me, and -- and personally I felt cheated after this report, so I -- I want to be -- I want to represent that group of people.

Q.    Do you believe your claims are typical of the class you are representing?

A.    Yes.

Q.    Why?

A.    It's -- because of the timing.  You -- one is you -- people -- I -- I believe that everyone else was on the -- in the same boat. You -- it's relatively short timing.  Here is the PCT stock, people invest, they see a press release, they do their own due diligence -- due diligence, and just -- just a short period later, you know, two -- two months later you -- you discover that -- that your own assumptions are not quite correct



because you are not limited to the information -- you were limited to the information that later other, you know, report, aforementioned Hindenburg report, disclosed, so I believe that that's -- that's how many other investors will -- will feel, as well.

And I purchased the stock, as probably many other investors, you know, in -- in small chunks. I did not bend the wrench on it, but I was expecting -- I was expecting really that -- doing my own homework that -- that I will not be blindsided by some -- some other things that were not disclosed.

Q. You said you felt cheated after reading the Hindenburg report.

A. Yes.

Q. Do you know what a short seller is?

A. Yes.

Q. What are the incentives of a short seller?

A. The incen- --

MS. WEINRIB: Objection to the form of the question.

BY THE WITNESS:



A.    So incentive of a short seller is -- is opposite of the -- of the person who invests from the long side.  In other words, you -- you sell -- in layman's terms, you sell the stock first, you buy it back lat- -- buy it back later.  You reverse two transactions.  If you go long, you purchase, then you sell.

A short seller, you borrow the -- to be more technical, you borrow the shares from the -- your broker, he -- allows you to have the -- a short position, then you -- as a short seller, your -- your objective is for the stock to go down, not go up, and if that happens and it meets your criteria, you -- you cover your position by purchasing the shares back and you -- you practically close your position except you sell first, you buy later.  If you're long, you do the opposite.

BY MS. PARK:

Q.    After reading the Hindenburg report, did you do any research or investigation to validate the assertions in the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question.



BY THE WITNESS:

A.    I Googled a lot more to look for the other people's opinions, whether it was remarks -- you know, blogs or just the remarks to this, but what struck me is that the -- the people were saying, "Look, no wonder.  There is no peer-to-peer references."  No one knew these people.  No one -- then what -- what really bothered me, I tried to see that -- the previous ventures of Michael Ortworth, the CEO, that he was involved.  They -- they were failures.

So I just wanted to see if this is really a true statement, and I do recall going on the Google and searching a little more, and I could stumble over some other, yes.  The facts were -- there was definitely true -- what I believe true statements.  There were definitely heavy statements by the Hindenburg report where other bloggers or other people when I Googled, they -- they opened up my eyes.

So yes, I -- first I wanted -- I didn't want to believe it, but that was only the first day, and then when I researched the Hindenburg -- Hindenburg, I never knew about this company, but



I -- I've learned what they do, yes, and...

BY MS. PARK:

Q.    Is Hindenburg a short seller?

A.    They engage in that activity.  Yes, they -- they find -- to my knowledge, what I started reading, yes, they -- they looked at any inconsistencies, they looked at any fraud, and they go after these companies sometimes mercilessly, and this is -- their intent is to profit.

They -- they have -- my understanding when I read, they have a huge group of people doing this, but I -- I know they -- let me put it this way.  I know they engage in short selling and they disclosed it.  They disclosed that they have a position.  I do not know whether they also invest long.  That -- that I never -- as I said, I never knew they existed until the day of when I saw my PCT stock plummet and I go to the news and I see what happened.

Q.    So you saw your PureCycle stock go down and then you saw the Hindenburg report?

A.    I always -- in the morning I check the prices of all my positions, so I -- I noticed that the stock went down, and only then I said, "Well,



what --" then I said to myself, "What happened?"
I -- I go to -- of course, you click on the news
and you see the report, but that's -- that's my
very -- typical cadence.  I -- I check the prices
in the morning.

Q.    Did Hindenburg have an incentive for the
PureCycle stock to go down?

MS. WEINRIB:  Objection to the form of the
question.

BY THE WITNESS:

A.    I never talked to them.  I cannot
speculate.  I only focused on what hurt me, and
that was this new information that I did not have
previously that -- Michael Ortworth's track record
with the company and also the additional risk
associated with this entire process.

BY MS. PARK:

Q.    You said you tried to verify the facts
in the Hindenburg report by reading other bloggers,
is that correct?

A.    I'm sorry.  When you Google and you type
in again "PCT," after the Hindenburg report, there
was so many different articles.

When I say "bloggers," it's articles.



When I refer to "bloggers," it was more --

sometimes people comment on these articles, so I

read these comments.  I'm sorry.  I guess blog is

something that I'm -- I don't know.

          So there -- there were people commenting

on it, sometimes referring to the different

articles or different things.

     Q.    Did you review anything other than those

articles and comments on the articles?

     MS. WEINRIB:  Objection to the form of the

question.

BY THE WITNESS:

     A.    Yes.  Even the -- whether it was Wall

Street or IBD or any other newspapers, you know,

electronic subscription, they started mentioning

that Hindenburg report included PCT.

          Again, it was all driven by the PCT

ticker.  When I Googled for the first two days or

so or three, you know, it was -- it was almost a

mixture of anger and disbelief.  So yeah, you --

you went every morning and you just wanted to just

see more -- more articles, more articles.

BY MS. PARK:

     Q.    Anything you didn't mention other than



ROBERT CIECKO                                        December 07, 2023
William C. Theodore vs PureCycle Technologies                      86

Wall Street or IBD?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    There must have been, there must have been, but, I'm sorry, what I -- what I recall, there was just so many things, but at that moment, I was just -- just to put it politely, frustrated.

So I don't -- I don't recall exactly, you know, reading.  That did not change my fact that the facts changed and I decided to -- after -- after -- after reading the Hindenburg report, I decided to limit my exposure, so I started selling. Better safe than sorry if you don't know all the facts.

That was always my rule.  When the new facts present, I am not in a position to judge is this correct or not, but I first had to do something also to protect myself, and then on the second and third day, yes, I -- I believed Hindenburg.  I still believe Hindenburg is -- is correct.

BY MS. PARK:

Q.    Do you believe you owe any duties to the



ROBERT CIECKO                                    December 07, 2023
William C. Theodore vs PureCycle Technologies                  87

members of the proposed classes?

A.    Yes.  I think we -- as a class, I think this should be -- this matter should be clarified through the courts because I -- I believe people ought to have some impartial entity like a judge deciding whether this is -- whether there was a wrongdoing or not.  I believe there was.  I believe this is -- this is -- this is definitely not okay.

Q.    My question was slightly different.

Do you believe you owe any duties once you become class representative?

A.    Oh, yes.  Just to be -- just like giving the reins of running the site, you -- you owe it to -- to the rest of the investors to do this to the best of your knowledge, to be diligent and to represent all the investors to the best of my abilities and follow up on events and documents.

Q.    How do you obtain information about this lawsuit?

MS. WEINRIB:  Objection to the form of the question.

Do not answer to the extent it involves communications or correspondence with counsel.

BY THE WITNESS:



A.    Then, I'm sorry, I don't know how to answer this question.  I'm -- I'll -- I'll definitely take the advice from my counsel.

BY MS. PARK:

Q.    Without revealing any privileged conversations, how often do you speak with your counsel in this case?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    How often?  It varies.  It varies on the flow of the legal proceedings.  If there is a complaint and then there is -- what's the proper word for the complaint?  When the other side has the -- I am blank now.  The response to the complaint, for example, if the other side takes two, three weeks, then there is -- then there is nothing.  If -- if the other side responds, the counsel contacts me and then --

MS. WEINRIB:  I object -- I just want to make clear again do not reveal the content of any communications that we have had during the course of this litigation.

THE WITNESS:  Thank you.



BY THE WITNESS:

A.    So it depends -- it all depends on how quickly the legal proceedings move between the sides.

BY MS. PARK:

Q.    And are you made aware of developments in this litigation?

A.    Yes.

MS. WEINRIB:  Objection to the form of the question.  Again -- that's okay.

THE WITNESS:  Sorry.

MS. WEINRIB:  Just again instructing you only to answer to the extent you are not revealing privileged communications with counsel.

BY MS. PARK:

Q.    Are you consulted on strategy?

MS. WEINRIB:  Objection to the form of the question.

Do not answer to the extent they are seeking privileged communications between you and counsel about this litigation, so I instruct you not to answer the question.

BY MS. PARK:

Q.    What are the major categories of tasks



ROBERT CIECKO                                         December 07, 2023
William C. Theodore vs PureCycle Technologies                       90

that you've performed in this case?

    MS. WEINRIB:  Objection to the form of the question.

         And once again, you can only answer to the extent you are not revealing privileged communications with counsel.

BY THE WITNESS:

    A.    My task is to represent the class and to make sure that their interests are represented properly.

BY MS. PARK:

    Q.    My question was actually:  What have you done to represent the class in terms of tasks that you have done, but I can be more speci- -- specific.

         Have you read -- have you reviewed documents filed in this case?

    MS. WEINRIB:  Objection to the form of the question.

         You can answer.

BY THE WITNESS:

    A.    Yes.

BY MS. PARK:

    Q.    What documents have you reviewed?



A.    I think we've mentioned it before, but briefs, complaints, responses to the complaints, in- -- interrogatories, deposition requests.

There may be more.  There may be -- there may be several more.  I just don't recall all the titles now.

Q.    When you say "responses," does that re- -- does that include the motions to dismiss filed by defendants?

A.    Yes, I recall that.

Q.    Did you review the motion to dismiss opposition brief prepared by your lawyers?

A.    One more time?

Q.    Did you review the opposition brief prepared by your lawyer which was in opposition to the defendants' --

A.    Yes.

Q.    -- motion to dismiss?

Did you review defendants' motion for reconsideration?

A.    Yes.

Q.    And did you review the opposition brief to that prepared by your lawyers?

A.    Yes, although now I'm slightly confused



about the nomenclature, but yes, yes.

Q.    I was referring to defendants' motion to dismiss and then your counsel's opposition to it, which was my first set of questions, and then defendants' motion for reconsideration and then your counsel's opposition --

A.    Yes.

Q.    -- to -- okay.

A.    Thank you.

Q.    Without revealing any privileged communication with your counsel, have you provided any input to the documents that your counsel drafted?

MS. WEINRIB:  Objection to the form of the question.

You can only reveal whether you provided input, not what that input was.

BY THE WITNESS:

A.    Not from the legal point of view, just clarifying --

MS. WEINRIB:  Again, don't reveal any --

BY MS. PARK:

Q.    So did you provide input?

A.    The answer is yes.



Q.    What do you allege that PureCycle did wrong?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Number -- number one -- number one is dis- -- not disclosing the corporate suite's lack of experience with this specific process and their poor -- it could be a different word, poor track record with previous ventures.

Number two is the -- not disclosing all the risks and magnitude of risks associated with the polypropylene recycling process.

That's it.

BY MS. PARK:

Q.    What risks regarding the polypropylene process should PureCycle have disclosed?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I'm not a chemist.  I am not -- I don't think I'm qualified to answer this except for what the Hindenburg report articulated in a much better way than I could, but apparently there were risks



not disclosed.  It -- it wasn't just the purchasing the patent and industrializing it right away with minimum risk.

BY MS. PARK:

    Q.    And what do you allege that PureCycle failed to disclose?

    MS. WEINRIB:  Objection to the form of the question, asked and answered.

BY THE WITNESS:

    A.    I -- I think I've mentioned -- maybe I don't understand the question.  I think I already mentioned number one is the corporate suite lack of experience in this -- with this -- with this specific technology and their track record.

        Number two is the magnitude of risks associated with this process.  Namely I recall is the purification process.  It -- it sounded like, "Oh, we'll just take a bunch of plastic bottles, cut them up --" I'm sorry, this is a little facetious, but -- "and we'll make a near-virgin product without the sweat, and by the way, it'll be cheaper than the -- than the virgin material."

        So that's in the layman's or my investment eyes.  Why I read the reports, that's



how I interpret it, that there was a definitely difference between this and now that we -- discovering that this is actually -- this has to be much -- that the recycling material has to be super pure -- I'm using vague terms; I understand that, but super pure, it has to be done with this or this.  There's a bunch of disclaimers in this report.  Again, I'm not a chemist, but there's definitely serious inconsistencies.

This is not just cutting up the bottles, recycling them and the process is not as -- as cut clear as described.

BY MS. PARK:

Q.    Who is Michael Otworth?

A.    CEO of PCT.

Q.    What do you allege that he did wrong?

MS. WEINRIB:  Objection to the form of the question, asked and answered.

You can answer.

BY THE WITNESS:

A.    Yes.  I think he assembled the wrong team.  They did not know as much and they did not disclose it to the public.  Again, I repeat the track record of his corporate suite and his -- his



previous history.  As a CEO, the buck stops with you.

Number two, as a CEO, he -- he should I think ensure that his team does the full disclosure of this process and the risks associated with it and not sugarcoat it.

BY MS. PARK:

Q.    Who is Michael Dee?

A.    Michael Dee is the -- one of the corporate suite directors.  Now without looking at documents, I think he was either CFO but definitely part of the corporate suite of PCT.

Q.    And what do you allege that Mr. Dee did wrong?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    He was a part of the corporate suite. The decisions are made always by the CEO, CFO. He -- he -- it's a group resp- -- responsibility.

These guys -- he as the CFO had to make sure that not only correct financial statements but I think that there is no any risk -- impending risk or risks that could -- that could derail that



financial -- that -- that financial future.

So to me, I -- I don't want to single out one or the other.  Here's the CEO, here's the CFO, how they structure internally, I'm -- I wasn't part of their boardroom meetings, I cannot tell, you know, the -- the more intricacies how they operate, but in my terms, they are the corporate suite.  They are responsible.

BY MS. PARK:

Q.    Who is David Brenner?

A.    That's the third name I recall, but I -- I don't remember his function.  He's definitely one member of the corporate suite.

Q.    And what do you allege that he did wrong?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Carbon copy what I just said about the CFO.

BY MS. PARK:

Q.    Who is Byron Roth?

A.    Byron Roth is the -- the R- -- help me out, ROCH, that ticker, that's the -- or that's


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

the -- the person who established or was CH, I think his title is also CEO, but he's a CEO of the Roth -- Roth, Byron, yes, he -- he is the head of the RO- -- ROCH, as I remember.

Q.    And what are you alleging that he did wrong?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    The part of the transition, definitely he had to be involved in it.  He -- the nature of the -- of the way I understand the nature of the SPAC business, he -- he had to be involved. He -- he definitely had the influence who the CEO of PCT will be and -- and how much of the disclosures they're going to make.

He definitely must have known when he chose them how much -- how many failures they had before and how much experience they had with this technology.

MS. PARK:  Can we take a short break, five, ten minutes?

THE VIDEOGRAPHER:  Going off the record at 11:30 a.m.



(WHEREUPON, the deposition was

recessed from 11:30 to 11:47 a.m.)

THE VIDEOGRAPHER:  Going on the record at 11:47 a.m.

BY MS. PARK:

Q.    Did you track PureCycle's stock price after the Hindenburg report was issued?

A.    Yes.

Q.    Are you aware that the -- that PureCycle's stock price recovered above its pre-Hindenburg report price of $24.59 to $25.57 as of June 24, 2021?

A.    Yes.

Q.    Have you reviewed the document requests that defendants served you with?

A.    I'm sorry?

Q.    Have you reviewed the document requests that defendants served you with?

A.    Yes.

Q.    Were you asked to search for documents responsive to PureCycle defendants' document requests?

MS. WEINRIB:  Objection to the form of the question.



You can answer insofar as you're not revealing communications with counsel.

BY THE WITNESS:

A.    I'm not sure -- I don't understand the question.

BY MS. PARK:

Q.    The document requests ask you to produce documents.  I am asking whether you were asked to search for documents --

MS. WEINRIB:  Objection --

BY MS. PARK:

Q.    -- in response to the requests.

MS. WEINRIB:  And objection to the form of the question.

You can answer to the extent you are informing them on the record of what you did or did not do, but you cannot communicate to them anything regarding the content of your correspondence or communications with counsel.

BY THE WITNESS:

A.    So short -- short answer -- short answer would be yes.

BY MS. PARK:

Q.    When was that request made?



MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

    A.    I don't want to give you the wrong date. I don't remember.  I'm sorry.

BY MS. PARK:

    Q.    What were you asked to search for?

    MS. WEINRIB:  Objection to the form of the question.

        Again, I instruct you not to answer insofar as you're revealing communications with counsel.

BY THE WITNESS:

    A.    My stock market transactions.

BY MS. PARK:

    Q.    Is that it?

    A.    I -- I think so.  Mostly it was -- yeah, it was stock market transactions and -- you know, it was whether I had the ROC- --

    MS. WEINRIB:  I just want to make clear again that you're only to answer what you searched for, not communications or instructions from counsel.

    THE WITNESS:  Thank you.

BY THE WITNESS:



A.    I was asked for stock market transactions, but to be more specific, for both ROCH and PCT stock market transactions.

That's what I should answer.

BY MS. PARK:

Q.    And to clarify, in my question I said "PureCycle defendants," but I will refer to -- when I'm discussing these document requests and document collection efforts, I am going to refer to defendants including Defendant Byron Roth.

A.    Yes.

Q.    Will -- is your answer the same with respect to Defendant Byron Roth -- Byron Roth?

A.    Yes.  I assumed.

Q.    Okay.

A.    That's why I wanted to make sure that when I said I was asked for the stock market records, it also included RCOH [sic].

MS. WEINRIB:  And just to clarify, you mean asked by the requests, not asked by counsel, because you're not revealing communications with counsel --

THE WITNESS:  Correct.

MS. WEINRIB:  -- today, correct?



THE WITNESS:  Correct.

MS. WEINRIB:  To make sure that the record's clear.

BY MS. PARK:

Q.    My -- sorry.  Strike that.

And you actually searched for the stock market transactions?

A.    Yes.

Q.    Did anyone assist you searching for those transactions?

A.    No.  It's a very simple thing.  It's electronic, so I could retrieve the -- the dates when I purchased the stock and when I sold.

Q.    So you --

A.    I did that myself.

Q.    Sorry.

A.    I did this on my own.

Q.    So you were trading from an online platform?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Yes.

MS. WEINRIB:  Is that a question or -- or a



statement?  I'm --

BY MS. PARK:

        Q.    Did you retrieve it from an online platform?

        MS. WEINRIB:  Objection to the form of the question.

                But you can answer.

BY THE WITNESS:

        A.    Initially I just took my own documents, but that -- it took me too long to go statement by statement.  Then I went online and I ran the query, and it -- I was able to -- to get this much faster way.

                So first I attempted to do this manually and then I did this electronically.

BY MS. PARK:

        Q.    When you say "statements," are they hard copy statements?

        A.    No.  Electronic, electronic.

        Q.    Where were these electronic statements?

        A.    At my broker servers.

        Q.    Who is your broker?

        A.    TD Ameritrade.

        Q.    Did you provide any of those statements



to your counsel?

A.    Right at the very beginning, yes.  This is where I submitted every single transaction to the -- right at the very beginning.  This was the first thing.

Q.    You just said you submitted every single transaction, but my question was whether you submitted --

A.    No, I submitted this as one document, a list of all transactions from my two accounts, date purchased, date sold, ROCH, PCT, so that's what I submitted.

Q.    From your two accounts?

A.    TD Ameritrade, I -- yes, I had two accounts, one more conservative than the other, but it -- it's the same broker.

Q.    So you did not provide the statements you were referring to earlier to counsel?

MS. WEINRIB:  Objection to the form of the question, mischaracterizes testimony.

BY THE WITNESS:

A.    So I provided the statements originally with the hard copies.  It was just fragmented, and I remember discussed -- discus- -- now I'm talking



about what --

MS. WEINRIB:  No discussions with counsel.

THE WITNESS:  Yes.

BY THE WITNESS:

A.    It was very complicated, so I submitted electronic statement of every single trade I made from my TD Ameritrade platform to the counsel.

MS. PARK:  Can you mark this?  It's not stapled.  Can you mark this for the record.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 2, for identification.)

THE WITNESS:  Thank you.

BY MS. PARK:

Q.    Is this what you provided to your counsel?

A.    Yes.

Q.    Is this the same thing as the statements you were referring to earlier?

A.    Yes, yes, except this is much more organized, you know, by date because it's -- when you do it electronically, it's much easier, but yes, that's exactly the same.

When I tried to do the statement by



statement, it was just very cumbersome.  It involved multiple months, so...

Q.    So there are statements by month?

MS. WEINRIB:  Objection to the form of the question.  Is it a question?

BY MS. PARK:

Q.    So are there statements per month, monthly statements?

A.    Yes, because if you see, transactions are done through March, April and end of May.

Q.    Did you provide those monthly statements to counsel?

A.    I provided -- now, when you say "counsel," do you also include the Bronstein, Gewirtz & Grossman?

Q.    Including them.

A.    Yes, yes, because that was done initially.  So I did provide some statements.

Q.    So you provided the monthly statements to the BGG firm?

A.    Yes.

Q.    Did you provide the same state- -- monthly statements to the Pomerantz firm?

A.    I believe it was forwarded.



MS. WEINRIB:  Objection.

Don't reveal any communications --

THE WITNESS:  Okay.

MS. WEINRIB:  -- with counsel.

BY THE WITNESS:

A.    I provided every single transaction I have.  You see here, those are all my trades, and I provided every single trade.

BY MS. PARK:

Q.    You said those statements are available online.

Do you receive any of them by e-mail?

A.    No.  It doesn't work this way. TD Ameritrade was bought by Charles Schwab, but they retained the same thing.  You just get notification that you have a statement, and then you have to go and retrieve them electronically on your own, and if you want, you can print the hard copies and -- and so on and on.

But if you see the number of trades I made, it was very cumbersome and confusing, so I consolidated all the trades with an electronic query from, to, from a first trade to the last, and that -- that is I believe much, much clearer.



Q.    Do you have any hard copies of those statements?

MS. WEINRIB:  Objection to the form of the question, asked and answered numerous times.

BY THE WITNESS:

A.    I had some, but they were not complete, and this is why I did the electronic query.

BY MS. PARK:

Q.    Did you search your computer for any responsive documents to the document requests served by defendants?

A.    Sorry.  Did I search what?

Q.    Your computer.

A.    For?

Q.    Any documents that might be responsive to defendants' requests for documents.

A.    That might be responsive?

Q.    To the document requests that defendants served on you.

A.    I'm not sure I understand the question. What -- what are we talking search and documents?

Q.    You recall you said you reviewed the document requests that defendants served on you.

A.    Yes.



Q.    And you are required to produce responsive documents to that -- to those requests --

A.    Yes.

Q.    -- correct?

A.    They --

Q.    Did you search your computers to see if you had any documents that were responsive?

A.    That's what I'm getting hung up.  I don't understand the question.  Why would I search my computer?  It's -- it is on my computer.

I don't understand the nature of the question.  Why would I search my computer?

Q.    For any files on your computer that might be responsive to the document requests.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I'm still confused.

BY MS. PARK:

Q.    We can skip --

A.    I don't know what you want.

Q.    Earlier you said you did a lot of research regarding PureCycle.



Do you have any files regarding your research, whether electronic or hard copy, regarding PureCycle?

A.    When you -- when you Google, unless you print it, then the answer is most of it no.

Q.    Were there some that you printed?

A.    No, I did not print any, but I jot down the information handwritten.

Q.    So you have notes regarding --

A.    Key facts.

Q.    -- this research?

A.    I do.  Handwriting, scribbled, shorthand sometimes, but yes.

Q.    Did you provide those notes to your counsel?

A.    Yes.

Q.    Did you save any of the research regarding PureCycle onto your computer?

A.    No.  That was internet search, and quite a bit was also PCT website.  So no, I did not print any pages of it.

Q.    Are there any responsive documents that you found that you did not provide to counsel?

MS. WEINRIB:  Objection to the form of the



question.

BY THE WITNESS:

A.    Can you say it one more time?  I don't --

BY MS. PARK:

Q.    So are there any documents that you found to be responsive to the document requests but you did not give it to -- give them to your counsel?

A.    If you mean by -- if you -- if you say "responsive" by rel- -- meaning relevant, no, no, I didn't.  I did not have any other documents that I did not provide.

Is this what you were asking?

Q.    Yes.  Were there any documents that you were not able to locate in response to defendants' document requests?

A.    Originally my statements.  That's why I offered that I could print them out, but this was the much better document at the end.  It's just the format.

Q.    Do you know how many pages of documents your lawyers produced in response to doc- -- defendants' document requests?



ROBERT CIECKO                                          December 07, 2023
William C. Theodore vs PureCycle Technologies                        113

A.    Definitely not.  I'm not counting -- I'm sorry, I'm not counting the pages.  No, no.

MS. WEINRIB:  Objection to the form of the question.  I just want to make sure he understands what you were asking.  Maybe you can clarify.

BY THE WITNESS:

A.    Yeah, please do.  I don't understand why does it matter how many pages does the document have?

BY MS. PARK:

Q.    I was just asking if you knew how many pages were produced to us defendants by your counsel.

A.    No.  I did not pay attention to the number of pages, no.  Rather for completeness, here's the letterhead, this is what it's about, and usually at the end there is a, you know, conclusion, signature, so whatever -- you can tell that this is the full document.  So I always wanted to make sure I see the full document when I scroll, but pages, no, no.

Q.    Did you authorize any third parties to provide documents to your counsel for produc- -- production to defendants?



A.    No.

MS. PARK:  Can you mark this as an exhibit.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 3, for identification.)

BY MS. PARK:

Q.    Have you seen this document before?

A.    Yes.

Q.    Did you review the response before it was served on defendants?

A.    Yes.

Q.    Did you provide any input to your counsel regarding the responses?

MS. WEINRIB:  Objection to the form of the question.

Do not reveal any communications with counsel.  You can answer whether you provided input, not what that input was.

BY THE WITNESS:

A.    I provided input.

BY MS. PARK:

Q.    So I'd like to turn your attention to your response to Request No. 8, which is on Page -- 11 is where the request starts and -- I'm sorry.



ROBERT CIECKO                                           December 07, 2023
William C. Theodore vs PureCycle Technologies                        115

Oh, and the response is on Page 12.

A.    The response to No. 8?

Q.    Yes.

MS. WEINRIB:  You can read the request first so it's in context.

MS. PARK:  I have no problem with that.

(WHEREUPON, there was a short interruption.)

BY THE WITNESS:

A.    Okay.

BY MS. PARK:

Q.    So you'll see on Page 11 that the request asks for all documents that support alleged assertions as stated in complaint Paragraph 10.

Do you see that?

A.    No, I'm sorry.  You're back on Page 11?

Q.    Yes, at the bottom.

A.    Request No. 8?

Q.    It asks for all documents that support alleged assertions as stated in complaint Paragraph 10.

A.    Yes.

Q.    So I would like to turn your attention to the second amended complaint, which I will mark



as an exhibit.

                    (WHEREUPON, a certain document was

                    marked R. Ciecko Deposition Exhibit

                    No. 4, for identification.)

BY MS. PARK:

     Q.    If you'd turn to Paragraph 10 which

starts on Page 5, you can take a moment to read the

whole paragraph.

     A.    First of all, what is the difference

between Exhibit 3 and 4?

     Q.    Exhibit 3 and 4?

     A.    Yes --

     Q.    So --

     A.    -- those two documents.

     Q.    -- Exhibit 3 is your response and

objections to defendants' requests for production

of documents.

     A.    Oh, I see.

     Q.    And Exhibit 4 is the second amended

complaint that was filed in the case.

     A.    Yes, that's the word I missed before

when you asked me, you know, "What documents have

you seen?"  I've seen the complaints, I've seen

also the amended complaints, so yes, but that's



ROBERT CIECKO                                    December 07, 2023
William C. Theodore vs PureCycle Technologies                117

irrelevant.

Let me -- let me then read --

Q.    Go to --

A.    You said number -- page number?

Q.    Page 5, Paragraph 10.

A.    Okay.

(WHEREUPON, there was a short interruption.)

BY THE WITNESS:

A.    Okay.  Your question is just regarding 10?

BY MS. PARK:

Q.    Yes.

A.    Not 11, 12 or 13?

Q.    We're going to focus on Paragraph 10.

A.    Okay.

Q.    So I want to direct your attention to the first part of the first sentence which states, "In the Report, supported by multiple former employees and industry experts, Hindenburg revealed that the management team bringing PureCycle public had:  (a) previously brought six other businesses public only to have each implode thereafter, 'resulting in 2 bankruptcies, 3 delistings, and 1



acquisition after a 95% decline,' with 'over $760 million in public shareholder capital [being] incinerated in the process.'"  I'm going to stop there.

Do you know who at PureCycle's management team brought which six companies public?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I do not remember a hundred percent, but to me, it was irrelevant.  This was the information that was brand new to me, that there were -- and I don't even care if it's two bankruptcies, three delinquencies.  Even if it was only one or two, it's one or two too many.

But I don't recall now which names.  I believe it was named in the same report.  You don't -- we don't see all of this, but I believe it was Michael Ortworth.  That's just my belief at the moment.  That's how I remember, to the best of my knowledge, and I recall this -- this was part of the Hindenburg report, yes, definitely.

BY MS. PARK:

Q.    Do you have any facts to support that



the -- strike that.

Do you have any facts to support that any of the named defendants in this case were at any of the six companies that allegedly imploded?

MS. WEINRIB:  Objection to the form of the question.

And you can only answer insofar as you're not revealing communications with counsel or any work product shown to you by counsel.

BY THE WITNESS:

A.    Okay.  So one more time the question? The same question?

BY MS. PARK:

Q.    Do you have any facts to support that any of the named defendants in this case were at any of these six companies that allegedly imploded, according to the Hindenburg report?

MS. WEINRIB:  And again I'll object to the question.

And I'll instruct you only to answer insofar as you're able to do so without revealing communications with counsel or any work product shown to you by counsel, and if you are unable to, then you should not answer the question.



BY THE WITNESS:

A.    I'm unable to answer.

BY MS. PARK:

Q.    Do you have any documents to support that any of the individual defendants in this case were at any of the six companies that allegedly imploded, according to the Hindenburg report?

MS. WEINRIB:  Same objection.

And again, I'll instruct you only to answer insofar as you are not revealing communications with counsel or work product shown to you by counsel.  If you can answer without revealing either of those two things, then you can; otherwise, I instruct you not to answer the question.

BY THE WITNESS:

A.    I will follow counsel's advice.

MS. PARK:  I'll reserve my rights on that issue.

BY MS. PARK:

Q.    So to your knowledge, is the only basis for this statement in the second amended complaint the Hindenburg report?

MS. WEINRIB:  Objection to the form of the



question.

Again, I'll instruct you only to answer insofar as you're able to do so without revealing communications with counsel or any work product shown to you by counsel.

BY THE WITNESS:

A.    I am not able to answer that question.

BY MS. PARK:

Q.    Let's continue with Paragraph 10.  So we ended just before (b), so management had based their financial projections in those other failed companies on wild ass guessing bringing companies public far too early and having deceived investors.

What is the basis for your assertion -- this assertion in the second amended complaint?

MS. WEINRIB:  Objection to the form of the question.

And again, I'll instruct you to only answer insofar as you're able to do so without revealing communications with counsel pertaining to this litigation or work product in this litigation.

BY THE WITNESS:

A.    I will follow my counsel.  I -- I cannot answer that.



BY MS. PARK:

Q.    Did you speak with anyone at these previous six other companies?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    No.

BY MS. PARK:

Q.    Do you know if your attorneys spoke to anyone at these six companies?

MS. WEINRIB:  Objection to the form of the question.

I instruct you not to answer the question as it is seeking privileged communications with counsel and/or work product.

BY THE WITNESS:

A.    I will definitely listen to my counsel.

BY MS. PARK:

Q.    So to your knowledge, is the only basis for this statement the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question.  You're mischaracterizing testimony.

And again, I'll instruct you only to answer insofar as you're able to do so without



revealing attorney/client communications or

attorney work product.

BY THE WITNESS:

    A.    I'm not able to answer that question,

then.

BY MS. PARK:

    Q.    So if we skip to the next sentence in

that paragraph, it says, "The Report cited industry

experts who explained that despite the Company's

rosy projections, 'PureCycle faces steep

competition for high quality feedstock, and called

the company's financial projections into

question.'"

        What are the names of the industry

experts?

    MS. WEINRIB:  Objection to the form of the

question.

        And again, only answer insofar as you're

able to do so without revealing attorney/client

communications or attorney work product.

BY THE WITNESS:

    A.    I can't answer that question, then.

BY MS. PARK:

    Q.    Do you know the name of the industry



experts?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Personally, I do not know the name.

BY MS. PARK:

Q.    Were you told the name of the industry experts?

MS. WEINRIB:  Objection to the form of the question.

I'll instruct you not to answer as they are seeking privileged communications with counsel.

MS. PARK:  I reserve all rights regarding this issue.

BY MS. PARK:

Q.    What is the basis for this industry -- the industry experts' opinion regarding competition for high-quality feedstock?

MS. WEINRIB:  Objection to the form of the question.

I'll instruct you to answer only insofar as you're able to do so without revealing attorney/client communications or attorney work product.



BY THE WITNESS:

A.    I'm not able to answer that question.

BY MS. PARK:

Q.    What is the basis for the industry experts' opinions regarding -- regarding the company's financial projections?

MS. WEINRIB:  Objection to the form of the question.

You can answer insofar as you're able to do so without revealing attorney/client communications or attorney work product.

BY THE WITNESS:

A.    I'm not able to answer that question.

BY MS. PARK:

Q.    Are you aware of any documents that might support the allegations in the sentence we just read?

MS. WEINRIB:  Objection to the form of the question.

You can answer only insofar as you're not revealing attorney/client communications or attorney work product in this case.

BY THE WITNESS:

A.    I'm not able to answer that question.



BY MS. PARK:

Q.    To your knowledge, is the only basis for the statement that we read the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question to the extent you understand the question, and I'll instruct you to answer only insofar as you're able to do so without revealing attorney/client communications or attorney work product.

BY THE WITNESS:

A.    I'm not able to answer that question.

BY MS. PARK:

Q.    Moving on to next sentence in Paragraph 10, it states that "The Report included the account of a '30-year expert on polymers, with a background in advanced plastics recycling,' who stated that PureCycle's 'patent is "indirect," "vague" and "regurgitation" of prior art' and 'referred to the company's flammable pressurized process as a "bomb" and warned about the company foraging ahead to commercial scale despite still having issues at a lab scale.'"

Do you know who this 30-year expert on polymers is?



A.    No.

Q.    What is the basis for this purported expert's assertion?

MS. WEINRIB:  Objection to the form of the question.

You can answer only insofar as you are able to do so without revealing attorney/client communications or attorney work product in this case.

BY THE WITNESS:

A.    I can't answer that question, then.

BY MS. PARK:

Q.    Are you aware of any documents that might support these allegations in this sentence that I just read?

MS. WEINRIB:  Objection to the form of the question.

You can only answer insofar as you're able to do so without revealing attorney/client communications or attorney work product in this case.

BY THE WITNESS:

A.    I'm not able to answer that question, then.



BY MS. PARK:

Q.    To your knowledge, is the only basis for this statement the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question.

You can answer only insofar as you're able to do so without revealing attorney/client communications or attorney work product in this case.

BY THE WITNESS:

A.    I'm not able to answer that question.

MS. PARK:  I reserve all rights regarding the privileged issues raised regarding Paragraph 10 and the discussions we just had.

BY MS. PARK:

Q.    I would like to turn back to Exhibit 3. This is your responses and objections to the document requests.  Let's go to Request No. 7, which is on Page No. 11.

In Request No. 7 it asks for "Documents sufficient to demonstrate the identity of any PureCycle or Prior Companies' employees you communicated with prior to the filing of the Complaint, including those individuals Included or



referenced in the Hindenburg Report."

You can take time to review the response, if you'd like.

(WHEREUPON, there was a short interruption.)

BY THE WITNESS:

A.    Okay.

BY MS. PARK:

Q.    So the prior companies here is defined as any company that the lead plaintiffs allege the defendants were previously -- previously involved with, which includes ChromaVision Medical Systems, eMerge Interactive, Inc., AgCert International Limited, TyraTech, Inc., PetroAlgae and XL TechGroup, Inc.

Your response directs defendants to look at plaintiffs' initial disclosures, and counsel recently served amended initial disclosures, so let's take a look at that.

MS. PARK:  Can you mark this as an exhibit.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 5, for identification.)

THE WITNESS:  Thank you.



BY MS. PARK:

Q. So starting on Page 4 and continuing on to Page 7 -- the top of Page 7, there is a long list of people.

Do you know who any of these people are?

A. Yes. We already covered the names on the top.

Q. Do you know all the people listed?

A. I recall --

MS. WEINRIB: Objection to the form of the question. Listed on what page?

BY MS. PARK:

Q. Listed on Pages 4, 5, 6 and 7.

A. Oh, I'm sorry. I was looking only at 4.

The answer is no, not all of them.

Q. Out of the people listed on Pages 4 through 7, for those whose employer is not identified, do you know where they are employed?

A. No.

Q. Do you know if any of the people listed on Pages 4 through 7 were quoted in the Hindenburg report?

A. No.

Q. Have you been in contact with any of the



people listed between Pages 4 and 7?

A.    No, I was not.

THE WITNESS:  Could we take a short bio break just for several minutes?

MS. PARK:  Sure.

THE VIDEOGRAPHER:  Going off the record at 12:26 p.m.

(WHEREUPON, the deposition was recessed for lunch from 12:26 to 1:24.)

THE VIDEOGRAPHER:  Going on the record at 1:24 p.m.

BY MS. PARK:

Q.    I just want to go back quickly to the -- your collection -- document collection efforts in this litigation in response to defendants' document requests.

Can you tell me what you did to fulfill your obligations to produce responsive documents to defendants?

A.    Okay.  It was fairly easy for me because I went -- I was confused when you asked me did I search my computer.  I had nothing on my computer. I never stored anything on my computer.  I use it



pretty much just for e-mails and trading, but I do not store anything, but I did for the record produce that -- remember I mentioned the one page of my scribbled shorthand that I had?  That is the document that you just see the copy of that I produced on the 9/17/2023.

So that's -- I searched, I found it.  It was in my -- it's -- it's my personal notebook, but -- when I have good stocks idea or anything else, I use it.

Q.    Do you have --

A.    So that's the document.

Q.    So you say you searched the notebook.
Do you have the notebook with you?

A.    No.

Q.    When did you search that notebook?

A.    9/6/2023.  September 6, 2023.

Q.    And after you searched your notebook and found these notes, did you produce it or did you give it to your counsel?

A.    Yes, I -- I e-mailed it to my counsel. And it's very shorthand, maybe misleading to you because there is just -- a lot -- I jotted down the most important facts for me why should I be buying



it.  So it's all ideas for long, but they don't pertain to PCT, all of them.  Some statements are very general, like China stopped receiving garbage three years ago or there is -- market for garbage stocks is 27 billion.  I -- I did not put it in, I just wrote "27 billion," so market cap.

So you may be confused, you know, what is he talking about or whatever, but -- but that's the -- that's the only document I -- I had produced and that's the only document I found and that's the only document I really jotted down when I had ideas.

Q.   Why wasn't this document produced to defendants until today?

MS. WEINRIB:  Objection to the form of the question.

You can answer insofar as you know and insofar as it doesn't reveal communications with counsel.

BY THE WITNESS:

A.   I don't know why it wasn't produced.  I just remember when I produced it.

BY MS. PARK:

Q.   You mean when you produced it to



counsel?

A.    Yes, yes, and I told you the date, and they are definitely e-mailed -- that's the -- that's the date of the e-mail.

Q.    Was it your understanding at the time you produced it to counsel that it was produced to defendants?

A.    I --

MS. WEINRIB:  Objec- -- objection to the form of the question.

You can only answer insofar as the understanding doesn't come from counsel.

BY MS. PARK:

Q.    I'm asking for your understanding.

A.    I did not think about it that way, but yes, I -- when I produced it, I thought this is an evidence, so it may be used.  Maybe, you know, I -- I definitely had something, so I had to show, absolutely.  That's what the documents asked for.

Q.    What is your understanding of what defendants' document requests -- strike that.

You mentioned earlier there was nothing on your computer, correct?

A.    Correct.



Q.    Did you ever download the Hindenburg report?

A.    No.  Actually, I used the iPhone to read it.  I was at work.  As I mentioned, I check the prices and I was at work and I read it off my iPhone.

Q.    Did you download the Hindenburg report to your phone?

A.    No.

Q.    When you -- when you want to review the Hindenburg report, do you always go online to review it?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I don't know.  It's not what I did.  I used the phone to read it.

BY MS. PARK:

Q.    So how do you review -- how do you search for the Hindenburg report when you want to review it?

A.    You type in --

MS. WEINRIB:  Objection to the form of the question.



BY THE WITNESS:

A.    I typed in "PCT," and it showed up right away on May 6 right under the price.  I can demonstrate you how to do it today.  I can type in on the stocks -- Apple stocks, PCT, and you can see a bunch of the articles about PCT.

So this is how I stumbled over the -- right away that day the Hindenburg report.

BY MS. PARK:

Q.    Have you reviewed the Hindenburg report since the first time you read it?

MS. WEINRIB:  Objection to the form of the question.

You can answer insofar as it does not involve communications or work product with counsel.

BY THE WITNESS:

A.    I read it again the next day.

BY MS. PARK:

Q.    Have you read it since then?

MS. WEINRIB:  Same objection.

BY THE WITNESS:

A.    No, I -- it was enough for me to read it twice.  You -- I'm sure you're referring to PCT



Hindenburg report.

BY MS. PARK:

Q.    Yes.

A.    Yes.

Q.    The Hin- -- the Hindenburg report regarding PureCycle.

A.    Yes, ma'am, yes.  That is correct, what I said.

Q.    Did you communicate with your brother regarding the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question.  Timeframe?

BY MS. PARK:

Q.    On or about May 2021.

A.    The day of the stock -- I don't have it on the front of my calendar, but the day of the stock launch, 2/14, actually my brother called me, and he says, "Robert, do you see what's going on?" And I see, oh, and then he said, "There is a report that might be a hoax," and I said, "I see the report on my phone.  Let me read it," and that was -- that's what -- he -- he was a little bit faster than me.

Q.    How do you communicate with your brother



regarding -- strike that.

How do you communicate with your brother?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    It depends on the subject.

BY MS. PARK:

Q.    How do you --

A.    Can you be more specific?

Q.    Yes.  How do you communicate with your brother regarding PureCycle securities, which includes any securities traded under the ROCH and PCT ticker symbols?

A.    Okay.  We talked on the phone.  I commute 45 miles -- or commuted during that time 45 miles.  I live in Kansas, so it's an easy ride. With the bluetooth, I just call, and he used to live in Michigan, not in Arizona, so he was one hour behind me, so we talked.

And, in fact, I can add any financial matters we talk on the phone.  When I'm asked to be more specific, the only time we would text is when my sister and my brother talk about mom or dad, but



I never text my mom, dad or my brother.

So we have a group chat with my sister when we talk about the parents -- aging parents, but with -- with any financials, no, we -- we talk. I'm a talker, and besides, it's -- it's easier. I'm busy during the day, so...

Q.    So you don't communicate with your brother regarding PureCycle securities, as I defined earlier, through text?

A.    No, and I can expand it to say even not any other equities.  We don't text each other about financial things whatsoever.

Q.    Have you communicated with anyone else regarding PureCycle securities using text messages between November 16, 2020 and November 10, 2021?

A.    No.

Q.    Have you communicated with your brother regarding PureCycle securities using e-mail between November 16, 2020 and November 10, 2021?

A.    No.

Q.    Have you communicated with anyone else regarding PureCycle securities between November 16, 2020 and November 10, 2021?

A.    Other than counsel?



Q.    Other than counsel.

A.    No.

Q.    How did you confirm that you had no e-mails regarding PureCycle securities that were not privileged?

A.    Simply if I type in my counsel's name, I can see all the PCT.  I -- I don't -- that -- that's about it.  That's -- that's -- that's the one way to do it, but I have no -- anyone else to talk about PCT.  Even my brother, he did not make a huge deal because he had only several hundred shares.

Q.    Have you searched for "PureCycle" or "PCT" in your e-mails?

A.    Yes.  "PCT," yes.

Q.    And were there e-mails in response?

A.    No, other than with counsel.

Q.    How did you confirm that you had no texts with your brother regarding PureCycle securities that you may not remember?

A.    That's easy.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:



A.    That's easy.  We just -- we do not text about any subjects other than when it's three-way with my sister, both parents.  I always talk to my brother.  That's our decompression time after work. I drive home, he's already either driving or at home, and that's -- that's simple.

There is nothing to look for because we -- we don't text about -- I think financial things are too serious to text about.  It could be misinterpreted very easily even by a family member, so it's -- when we talk finance, we -- we talk.

BY MS. PARK:

Q.    So you did not search for your text messages at all?

A.    I'm -- I'm not sure how I can find a text message when I don't have like all texts to my brother.

Q.    Without limiting it to your brother, you did not search your text messages regarding PureCycle securities to produce documents to defendants in this litigation?

MS. WEINRIB:  Objection to the form of the question.  He's already made clear he did not ever text about PureCycle.



MS. PARK:  My question is different.

BY MS. PARK:

Q.    Did you search for your text messages?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I did not search for text messages because I'm positive that there was no one else but my brother to contact already.  We established that.  I only talked to my brother about PCT and no one else, so who would I text?  The short answer is no.

BY MS. PARK:

Q.    And other than searching for your counsel's name and "PCT" or "PureCycle," as you mentioned, did you search your e-mail accounts for responsive documents?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I searched for documents several times when I needed the -- when I was reviewing them. Those were the doc- --

BY MS. PARK:



Q.    What were the --

A.    Those were the documents that counsel sent me.  So those I have, and I several times searched.

When a new document comes in like this -- I do not remember already what you called Exhibit 1 or 2 sometimes, so yeah, when I search, I -- I can find them, but the only documents I have is the documents pertaining to the class action.

Q.    I'll just be a little more specific with my question.

My question was whether you searched your e-mails to see if you had any documents that will be responsive to defendants' document requests and that you will produce to defendants in this litigation.

MS. WEINRIB:  Objection to the form of the question.

And just to clarify, she means documents that are not communications with counsel, if you -- if there were any other documents to search for regarding PureCycle.

BY THE WITNESS:

A.    No.



BY MS. PARK:

Q.    Other than the notebook you searched for, did you search for any other hard copy documents?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    As I mentioned before, the monthly statements of the accounts, that's -- that's the ones that I looked for originally.

BY MS. PARK:

Q.    And you iden- -- you found those monthly statements in hard copy?

A.    Some of them, and this is when we had a conversation with --

MS. WEINRIB:  Objection.  Not --

THE WITNESS:  Sorry.

MS. WEINRIB:  Not objection to you but just a reminder not to reveal communications with counsel.

BY THE WITNESS:

A.    Yes, it was original contact with the counsel where I asked about the --

MS. WEINRIB:  Okay.  Once again --

BY THE WITNESS:



A.    Now we're getting into -- I cannot answer this question.

MS. PARK:  I disagree with your position on privilege.

BY MS. PARK:

Q.    But the hard copy statements that you found, did you provide them to your counsel?

A.    Yes, those that I found, ultimately I produced this (indicating) because this is a full account of everything.  It was -- it was difficult to -- to gather the information this way from the statements.

Q.    To clarify, these documents are not -- to clarify, you were just showing me Exhibit 2, correct?

A.    Yes.

Q.    Those are not the hard copy statements you were referring to earlier that you searched and found.

MS. WEINRIB:  Is that -- is that a question?

MS. PARK:  That's a question.

MS. WEINRIB:  Well, can you rephrase it as a question?

BY MS. PARK:



Case 6:21-cv-00809-PGB-RMN Document 183-12 Filed 01/23/24 Page 148 of 439
PageID 7632

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
146

Q. Exhibit 2 that you just showed me, those -- are those different from the hard copy statements that you searched for and found?

A. A hundred percent correct. The statements -- original statements had TD Ameritrade account number, information with all my trades, my cattle trades, my gold trades, my currency trading. Nothing to do with PCT. And among them, there was PCT, so because of the mumbo-jumbo in the stuff, I produced the -- only PCT trades. Nothing to hide really.

MS. PARK: I will turn it over to Mr. Loftus -- Loftus for questioning, but I'll reserve all my rights for any follow-up questions.

EXAMINATION
BY MR. LOFTUS:

Q. Okay. Mr. Ciecko --

A. Yes, sir.

Q. -- to reintroduce myself, I'm John, sometimes known as Jake, Loftus. I represent Byron Roth, and this is my opportunity to ask you some questions, okay?

A. Yes, sir.

Q. And --



A.    Would you rather go by Jake or John today?

Q.    Any port in a storm.  Whatever makes you comfortable.

You have a habit, as do many witnesses, to answer anticipating the question, so if I may ask you to wait until I --

A.    Yes.

Q.    -- complete my question before you respond.

A.    Yes, sir.

Q.    All right.  It helps our court reporter and makes for a cleaner record.

A.    Absolutely, absolutely.

Q.    All right.  And there were some good examples right there.  You're anticipating what I'm going to say, so do your best to wait until I'm done --

A.    Yes.

Q.    -- and then provide your answer.

A.    Thank you.

Q.    Okay.

A.    Sorry.

Q.    All right.  I want to go back to some of



the questions put to you this morning about when you first learned about PureCycle Technologies, and -- and to orient you, we see from the records that you've produced that your first transactions were in mid-March 2021.

Do you recall that?

A.    Yes, I do.  I -- I believe my first purchase, without looking even at this, is yeah, mid-March, mid-March.

Q.    So using that date, when did you first become aware of PureCycle as an investment opportunity?

MS. WEINRIB:  Objection to the form of the question, asked and answered.

You can answer the question.

BY THE WITNESS:

A.    Yes, yes.  I think it was around March 18 when I pur- -- purchased the first hundred shares of ROCH and I wanted to know where the stock price will go, and I started to search.

So the day when I stumbled over PCT ticker and they still traded under ROCH, and whatever they -- I found Googling is that they are changing the name.



So around mid-March, that is correct.

BY MR. LOFTUS:

Q.   All right.  So you certainly weren't aware of PureCycle Technologies back in February 2021?

A.   That is --

MS. WEINRIB:  Objection to the form of the question.

Go ahead.

BY THE WITNESS:

A.   That is -- that is correct.

BY MR. LOFTUS:

Q.   All right.  And where -- what was the specific publication that you reviewed to learn about new companies and new symbols that were coming to market?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.   I usually used Investor Business Daily or Wall Street Journal where they had the upcoming IPOs, and I consciously say "IPOs" because that's what I was looking for.  I was not looking for a SPAC, I was not looking -- sometimes on the IBD,



when you type in "gold," it will -- right away

you'll get the offer to purchase the physical gold,

cookies, whatever.

So when I typed in when I was looking

for the new ticker symbols, I stumbled over

ticker -- new ticker symbols, but when I -- when I

investigated PCT, first my impression was, "This --

this is a new ticker symbol.  Okay.  Let's look at

it."

Almost subconsciously I was looking for

IPOs.  Then I see, oh, ROCH is going to change to

PCT, whatever the announcement.  What was it?  Was

it on a -- still on the IBD search or was it one of

those pop-ups when I say, "Here, here's the list,"

I -- I honestly don't know, but this is the -- my

weekly -- weekend search of new symbols.

BY MR. LOFTUS:

     Q.    All right.  Yes or no, were you a

subscriber to Investor Business Daily --

     A.    Yes.

     Q.    -- as of March 2021?

     A.    I've been for ten years.  Yes.

     Q.    Were you a subscriber to The Wall Street

Journal as March 2021?



A.    Yes.  As a student.

Q.    All right.  And the symbol ROCH, do you understand that that's a symbol for Roth CH Acquisition I Co.?

A.    Yes.  ROCH.

Q.    ROCH?

A.    The one I traded initially, yes.

Q.    Yes.  And you said "traded."  By the way, Mr. --

A.    I'm sorry.  Purchased.

Q.    But let me ask you, Mr. Ciecko, just as -- for my understanding:  Do you consider yourself more of a -- a trader than an investor?

A.    It depends on the circumstances.  No, I -- I -- I have positions that I keep long term over 12 months and I trade.  This meant to be a long term.

Q.    What --

A.    Like TPX.

Q.    What percentage of your purchases in 2021 were short term versus long term?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:



A.    20- -- 2020 and 2021 there was hardly any until I stumbled over the PCT.  Markets were too volatile.  This was not an investment environment, so I traded and held positions from several days, several hours, especially when it comes to cattle trading, gold trading, everything else.  This is mostly driven technically, technical trading.  You have to see and respect the price.

BY MR. LOFTUS:

Q.    So cattle and gold you trade on the futures market, correct?

A.    Using the same platform as -- it -- those are futures, but I also do ETFs, GLD, COW. "COW" is the ETF for the cattle.

So depending on how much risk I want to take, I -- I make my own decisions.

Q.    Got it.  So the ETF -- the gold ETF, the cattle, but do you also do futures trading directly in gold and -- and cattle and cotton and others?

A.    On my --

MS. WEINRIB:  Objection to the form of the question.

You can answer.

BY THE WITNESS:



A.    Yes.  I trade metals, I trade foreign currencies, I trade fixed income, bonds.  You -- you name it.  I traded Eladian, I traded on the futures corn, wheat, soybeans, oats.  Plenty.

BY MR. LOFTUS:

Q.    I understand.  And you traded these through one or more of your accounts in TD Ameritrade, correct?

A.    Yes.  Always.

Q.    And that's an online brokerage service, correct?

A.    Correct, currently owned by Schwab.

Q.    Where you personally placed the orders in one by one, correct?

A.    Always.

Q.    Right.  Do you take advantage of any of the Schwab traders for discussion purposes in connection with any of your transactions --

A.    No.

Q.    -- yes or no?

MS. WEINRIB:  Objection to the form of the question.

You can answer.

BY THE WITNESS:



A.    It's -- actually, Schwab just took them over after just a year ago, so it's irrelevant question.  Schwab wasn't there, but I -- I can explain you how the way TD Ameritrade --

BY MR. LOFTUS:

Q.    You don't need to.

A.    Okay.

Q.    And I'm not trying to be rude by cutting you off.

A.    No.

Q.    I'm trying to --

A.    I just did this, too, so --

Q.    So we're trying to deal with --

A.    Yes.

Q.    You know, we're all trying to catch flights.  Okay.

A.    Yes.

Q.    How many accounts did -- did you have at TD Ameritrade as of March 2021?

A.    Accounts with my name and other joint persons, so I had total four accounts, two -- one with me and my wife, second one with me and my wife, one with my son and one with my daughter. They're all -- I only trade them.  The kids, they



just --

Q.    Are each of those four accounts that you just identified for us accounts that were open in March 2021?

A.    Yes, curr- -- my -- my daughter's account, she was a minor.  It's closed since then, but -- when she turned 21 recently, so back then I had four accounts, yes.

Q.    Are -- are those joint accounts?

A.    Yes.

Q.    Okay.  Did each one of those four accounts purchase PureCycle stock?

A.    I am positive about two of mine and one, my son's.  This is the -- in Exhibit No. 2 that you -- that you presented and I recognize it, it spells out the name Claudius and then it's the second account and the third account I combined.

I do not recall buying anything for Chloe.  If I did, it would have been 5 or 10 shares, but I don't recall.  So you have the three accounts that I traded PCT on the front of you.

Q.    All right.  Let me try to make this a little bit easier, Mr. Ciecko.

A.    Yes.



Q.    And we will mark as exhibit number, which I think is 6?

MS. WEINRIB:  6.

BY MR. LOFTUS:

Q.    It's a document that had been filed before the court as an exhibit and it's got a file date of July 12, 2021, and it's a total of five pages.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 6, for identification.)

MS. WEINRIB:  Thank you.

BY THE WITNESS:

A.    Robert Ciecko, Claudius, Robert Ciecko, Robert Ciecko.  Okay.

BY MR. LOFTUS:

Q.    Do you recognize this document, Mr. Ciecko?

A.    It's slightly different format, but yes.

Q.    Did you prepare this document?

A.    It's slightly different format.  I -- to the best of my knowledge, yes, because I recognize my calls.  I had the two trades of calls.  Yeah, those are my transactions, if you ask.



Q.    Stay with me, Mr. Ciecko.  My question is much simpler, and it's this.

A.    Yes.

Q.    Did you prepare what's marked as Exhibit 6?

A.    The format is different.

Q.    Say again?

A.    The for- -- format -- the formatting is different.  I prepared this (indicating).

Q.    Stay with me on Exhibit 6.  We're -- but is it possible that your lawyers prepared this chart for submission or filing with the court?

MS. WEINRIB:  Objection to the form of the question.

You can answer insofar as you know and insofar as you're not revealing communications with counsel.

BY THE WITNESS:

A.    I would assume it's possible.

BY MR. LOFTUS:

Q.    But either way, Mr. Ciecko, the data that is in Exhibit 6 was provided by you such that this could be prepared summarizing the transactions at issue?



A.    Yes.  I recognize the data a hundred percent.

Q.    All right.  Let's look at what the -- the Page 1 of 4 reads.

A.    1 of 4.  Yes.

Q.    And do you see it's got "Robert Ciecko" and then it lists Accounts 1, 2, 3 and 4?

A.    I'm sorry.  Where?

Q.    If you look here, Mr. Ciecko (indicating) --

A.    Uh-huh.

Q.    -- it says, "Account 1, 2, 3, 4."

A.    Yes.

Q.    And, in fact, did you make PureCycle purchases in four separate accounts at TD Ameritrade --

A.    Okay.

Q.    -- yes or no?

A.    It appears yes.

Q.    All right.

A.    I see that this -- this 105 must be Chloe's account, so that would be my daughter's. That's --

Q.    All right.  Stop -- stop right there.



What's -- what's 105?

MS. WEINRIB:  Let him finish if he feels like he needs to make a complete answer.

BY THE WITNESS:

A.    I just a moment ago said that I traded for Claudius -- that I had four accounts and I traded on my two, and on my joint account with my son, that's the 400 shares, I'm positive.  Chloe, I thought it was only 5, but I guess it's 105.  I -- just by share -- the amount of shares, that is my daughter's and my joint account.

So I recognize it, yes.

BY MR. LOFTUS:

Q.    That's a joint account with right of survivorship?

A.    Yes.

Q.    And you have trading authorization over those two accounts?

A.    Actually, she's a minor.  She was a minor.  Now she's 21, so we just concerted that account.  But yes --

Q.    All right.

A.    -- it was exactly what you described.

Q.    Whose Social Security number attached to



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 162 of 439
PageID 7646

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023

160

Account No. 4?

A.    I believe my daughter's.

MS. WEINRIB:  Well, to be clear, just look at the --

BY THE WITNESS:

A.    Or --

MS. WEINRIB:  Make sure you're talking about the right account.

BY THE WITNESS:

A.    105?  I'm not a hundred percent sure, but if minor -- now you make me doubt because I know for sure that this was the joint account and I was the guardian and I was authorized to trade.

I don't know if it was my Social Security or hers.  When she turned 21, she set up the joint account with me, and now for sure it's her Social Security.

BY MR. LOFTUS:

Q.    Did you -- how did you treat -- in -- in the account for your daughter, how did you treat the gains and losses in that account for tax purposes?

MS. WEINRIB:  Objection --

BY THE WITNESS:



A.    Short term --

MS. WEINRIB:  Wait.  Objection to the form of the question.

Go ahead and answer.

BY THE WITNESS:

A.    Everything on PCT was short term because I held only two months.

BY MR. LOFTUS:

Q.    Whose returns were they reported on?

A.    That was hers, but I think we did not have enough income of more than $600.  She was not working.  There was no even tax return filed for her.

Q.    Let's talk about the -- and, I'm sorry, can you spell her name for the record?

A.    C-h-l-o-e.

Q.    And the same surname, I assume?

A.    Yes, Ciecko.

Q.    All right.  And the account with your son, can you tell us his name?

A.    Claudius.

Q.    Why don't you spell that just so we're clear.

A.    C-l-i--- I'm sorry.



Q.    C-l-a-  --

A.    C-l-a-u-d-i-u-s.

Q.    All right.  And is it also the case that the joint account with Claudius Ciecko was under his Social Security number?

A.    Without -- without checking, I -- I believe so, but I would have to verify it, and it's very easy.

Q.    All right.  Let's talk about Accounts 1 and 2.

A.    Yes.

Q.    Do I understand that those are joint accounts with your wife?

A.    Yes.

Q.    What's your wife's name?

A.    Teresa without an H, T-e-r-e-s-a.

Q.    All right.  And do you file a joint return with your wife?

A.    Yes.

Q.    All right.  Why are there two separate accounts for you and your wife?

A.    No, they're both joint accounts. Everything we own, either car or a house, is always joint account.  We don't have it separate.



Q.    I understand.  That would be the same on my end.

A.    Yes, sir.

Q.    My question is just a little different.

Why is there an Account 1 joint account with your wife and Account 2, another joint with with your wife?

A.    Because one, this is the way we like our investments.  Some portion is -- it's easier for us to see one is a conservative and the other one is main.  That's how I nickname them, and it's pretty much what it is.  It's the nature of investment.

So some of the accounts I -- that we tend to keep the holdings longer, we put them into the conservative account.  The main is where some -- a lot -- frequency is a lot less and it's driven on a technical analysis mostly.  So those are for our own convenience, no -- nothing else.

Q.    Okay.  Which one of these, if you can tell, Account 1 or 2, is the conservative and which is the main?

A.    I can't tell.  I -- I cannot tell now from the -- the account number.  The last -- I remember the last four of my main account, but of



course I don't -- here are the TD Ameritrade accounts here, so I can't tell you which one.

Q.    All right.  Mr. Ciecko -- but do I understand correctly that the main account is more active than the conservative account?

A.    Under the normal circumstances, yes.  We tend to in one account keep the holdings longer. It's just the way -- and the -- and the main account and conservative account, the main account has -- also has access to Forex currency trading, conservative does not.

Q.    Are both of these accounts maintained on margin?

A.    I have margin, but it's only because I -- if you sell sort, you must have a margin.

So the answer is yes --

Q.    Do you --

A.    -- they both have margin.

Q.    Do you in fact sell securities short?

MS. WEINRIB:  Objection to the form of the question.  Specific timeframe?

BY MR. LOFTUS:

Q.    Let's just start generally.

A.    Yes, generally I do, but it's mostly



indexes or futures.  In fact, when I do future trading, it is -- you probably know that about 60, 70% of trading is done by computers.  Algorithms kick in at 8:30 New York -- Eastern time, and they establish the baseline.  If the -- if I see the -- and the London is still open, so if European flows and New York flows go below that line, that's a signal to me that the big money is moving down and I'm shorting, yes.  If I see that the price is going up above that line, I'm out and I'm long.  If I see it above, it's long.  It's all driven by the price.

What I described to you, the same applies to QQQS.  I don't trade -- you know, short Apple, Microsoft, Facebook or anything.  I'd rather just go and I buy QQQ and I buy or sell short QQQ. It depends on the market.  It's called 30-second, 3-minute market opening range.  You can -- you can pick your choice.  But to me, market dictates to me who do I -- do I follow longs or do I follow shorts?

So long answer, in general.

Q.   Okay.  In 2021, did you short any stocks, yes or no?



A.    Equities -- in what timeframe?  Just the year?

Q.    In the year of 2021.

A.    I'm sure I shorted a few equities, but it was probably 5% of my activity.  Mostly it was futures again trading, when I go short that I can get out in a split second and out.

But the answer is yes, few -- few equities, but very little.

Q.    All right.  Now, Mr. Ciecko, if I understood your testimony correctly, I believe you testified that the main account relies more on technical analysis, is that correct?

A.    Yes.

Q.    And do you perform or -- strike that.

Do you prepare your own charts for purposes of technical analysis?

A.    I don't prepare my own charts.  I use the software.

Q.    And tell us again what the name of that software is?

A.    MarketSmith.

Q.    And is that a software that is available through TD -- TD Ameritrade or a software that you



downloaded separately?

    MS. WEINRIB:  Objection to form.

BY THE WITNESS:

    A.    It is available from Investor Business
Daily.  If you subscribe to Investor Business
Daily, you have option to subscribe to MarketSmith.

        MarketSmith is a software that can
charge you a minute, 5 minutes, 15 minutes.  It can
put the 5 -- 50-day moving average, hundred-day
moving average, 200-day moving average, 14, 21,
whatever you wish.  It's --

BY MR. LOFTUS:

    Q.    What --

    A.    It's a product of -- in association with
Investor Business Daily.

    Q.    What type of subscription did you have
to MarketSmith in March, April and May 2021?

    MS. WEINRIB:  Objection to the form of the
question.

        Assuming you had the same subscription
all three months.

BY THE WITNESS:

    A.    Same subjection for ten years.  I --

BY MR. LOFTUS:



Q.    What is it?

A.    It's the only subscription you can have. You -- you just see the charts. You either don't get them, or if you want to see the charts, they -- you pay them the annual subscription, and then you're able to type in any ticker symbol and see the stock price. But it's only for equities.

Q.    I understand. Now, with this software, MarketSmith --

A.    Yes.

Q.    -- are you able to manipulate the data for purposes of creating a chart that you would find useful for transacting in a security?

MS. WEINRIB: Objection to the form of the question.

BY THE WITNESS:

A.    Repeat the question? I'm not sure if I --

BY MR. LOFTUS:

Q.    Are you able to basically create your own chart through the MarketSmith software for purposes of your use in transacting in securities?

A.    No. That's only user -- that's the end-user. I can type in the ticker, but I cannot



create any charts on my own.

Q.    Can you, for example, do a 30-day moving average on -- on MarketSmith?

A.    I think you have a pull-down menu and you can pick 14, 21, 50, 200 for sure.  I'm not aware that you can monkey around with much -- too much than that.

Q.    Can you chart support and resistance levels in a given security?

MS. WEINRIB:  Objection to the form.

BY THE WITNESS:

A.    There is some indicators like stochastic indicator that can show you when the security is overbought or oversold, but those are -- you cannot get the Bollinger bands, you cannot get the Fibonacci retracement.  That -- that comes on TD Ameritrade.  I -- I have it right there on my trading platform.  Why would I use the MarketSmith?

BY MR. LOFTUS:

Q.    Even --

A.    I'm not aware.

Q.    So you -- there's other information and data available through TD Am- -- TD Ameritrade that allows you to do technical analysis of your stock



positions, correct?

A.    Technical analysis?  I use the technical analysis to know when to buy and when to sell, if this is what you mean.

Q.    Yeah.

A.    There I can draw up my own lines, I can draw up my support line, I can draw up Fibonacci retracement.

There is over 300 studies that you can apply to your screen configuration either way you want it.  You can see everything in 5-minute also cycle increments, 15.

So the software will show you the current picture, but it asks you do you want to see an hourly bar or daily bar or monthly bar?  It's -- by the way, when you do the analysis, you go for all timeframes.  You just don't have one favorite.

Q.    Mr. Ciecko, did you use any of these technical tools, meaning the tools for technical analysis, in connection with any of your transactions in PureCycle?

A.    Yes.

Q.    Are you able to save any of that analysis on your computer?



A.    Not unless I print the screen or I would print, but it's worthless because it's changing besides.

PCT history was not -- next to nothing, it was only a few bars, so I was using only the 5-minute, 10-minute.  In order to establish my position over the week, I was trying to buy on the down days, so then I added to my position and then I added to my position, and eventually I said, "Okay.  That's -- that's enough.  I have my full position."

Q.    All right.  Did -- did you use those tools for technical analysis for PureCycle transactions in each of the four accounts?

A.    Yes.  I only used it once.  The knowledge is there.

For example, PCT opening range, the very first day, the day low and day high, that's -- that's called opening range.  That stays for life of a stock.

Q.    Uh-huh.

A.    So this is very important.  You draw those two lines, and you -- you're in -- you either remember them or you look every day and you see the



first bar and the top and the bottom.  I could run -- draw the line on the screen top and bottom.

Q.   All right.  Now, if we look back at what's marked as Exhibit 6, we see some long call options in PureCycle in Account 1.

Do you see that?  Just yes or no.

A.   Just a second because sometimes I trade variable call spreads, which is very similar, but this one is the call option and the call option, yes.  Those are --

Q.   Well --

A.   -- the long call options, yes.

Q.   -- isn't this a spread?  Is this a calendar spread of some sort?

A.   No, sir.

Q.   These are just straight call options --

A.   Yes.

Q.   -- correct?

A.   They are straight -- straight call options with different expiry dates, if I remember -- if I see, yeah, yeah.

Q.   Well, you can see they're different because --

A.   Yes, they are definitely -- one is



November, one is June.  That's where I was bullish on the stock.

This is what -- it's called deep in the money call option because at the time of the purchase, the PCT stock was above 22-1/2.  It was in the 28, maybe 26, but I picked purposely about 15, 20% lower strike price so I had the cushion up to 20% or so, and I was anticipating the price appreciation again for the long term like November. I was hoping then that I can sell it with a profit.

Q.   So for purposes of the class action compliant that's on file, does it include potential class members who transacted in options?

A.   I would believe so.

Q.   Does it state that in the complaint, to your knowledge?

A.   I don't recall.

Q.   Okay.  Now, do you view this as a risk-oriented position; that is, going what is a deep in the money call option?

MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.   Do you think that's a risk-oriented



transaction?

A.    Yes.

Q.    Given the fact that it is -- do you think it's riskier than holding the stock long, for example?

A.    No.

Q.    Okay.  Now, the fact that -- that you're buying options --

A.    Absolutely no.

Q.    That's fine.

-- (continuing) does that help tell us that Account 1 is probably the main account versus the conservative account?

A.    No.

Q.    So it could have been in either?  That's not helping us?

A.    It could have been in either --

Q.    It's not helping us to narrow down Account 1 versus 2 in terms of which was conservative versus --

A.    No, but remember, those are my nicknames, and normally I put other equities.  PCT was a brand-new company, so I wanted to keep some PCT long term and some short term.



Q.    Meaning you had some PureCycle in one account for trading purposes and some in another account to hold long term, correct?

A.    Correct, but it -- it was -- it was both short term because I liquidated every two -- after two months.  I barely established my position.  And if you would see the transactions, sometimes I would sell a little when it reached my upper band, improve it, when it's down I bought it.  I -- I was just establishing the position.

Q.    Mr. Ciecko --

A.    I wasn't short selling any of this. There's no short sale here.

Q.    Mr. Ciecko, so are you able to tell us -- well, first of all, when you say "long term," how do you define a long-term holding?

A.    12 months or over.

Q.    So for purposes of what you can treat as a long-term capital gain is how you treat long term, correct?

A.    Yes, and beyond.  The stock like PCT has no income, so I knew that industrialization of process will take a while, several years going forward.



So yes, I -- I saw -- I truly intended -- this is why I bought them for kids' even accounts.  I knew that one day ten years from now they'll handsomely benefit because I found a good long-term position.

Q.    So, Mr. Ciecko, that's a good point.

So at the time you made your first purchase of PureCycle securities, you knew it had no revenue, correct?

A.    Yes.

Q.    And you knew it would be several years before any revenue was achieved by the company, correct?

A.    Correct.

Q.    And you understood, even aside from revenue, it would be seven years -- several years beyond that before the company was profitable, correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    They promised a fourth or fifth plant by 2024, if I remember right, so I knew that it's -- it's going to take several years, but I -- I could



not answer you -- I did not expect the profits from the earnings, I was expecting the profits from appreciation of a stock like any typical new ticker symbol.

BY MR. LOFTUS:

Q.    Now, when you testify they promised the fourth or fifth plant four or five years out --

A.    Sorry.  I shouldn't say promised. They -- there was talk about multiple generation -- generating -- industrialization in multiple plants. We have a No. 2 plant -- No. 1 is already, No. 2 is in the plans.

In fact, on the PCT website, there was an executive from manufacturing, a male, who explained the digitalization of the industrialization process.  It's something -- I'm familiar with industrialization, so I recall him quoting or saying that it's a digital layout, a digital process, it's easily repeatable in different multiple locations.

Q.    But you understood, Mr. Ciecko, for that to be achieved, the company would need to overcome a number of operational hurdles, correct?

MS. WEINRIB:  Objection to the form of the



question --

BY THE WITNESS:

A.    I do not know --

MS. WEINRIB:  -- mischaracterizing testimony.

BY THE WITNESS:

A.    I do not know the -- this -- this industry enough to -- to deduce.  I knew that they are -- in fact, I was encouraged that they got already product from Procter & Gamble, that they're industrializing it, investing capital investment im- -- implying or indicating, yes, this will be Plant No. 2 and 3 and -- and beyond.

BY MR. LOFTUS:

Q.    Well, Mr. Ciecko, you testified this morning in response to counsel's questions that you thought PureCycle had an edge, it had an intellectual process, it had a team and it could turn out product like cookies.

Do you recall that testimony this morning?  I may have --

A.    Yes.

Q.    -- paraphrased a bit.

A.    Yes.

Q.    But --



MS. WEINRIB:  Objection to the form of the question, mischaracterizing testimony.

BY MR. LOFTUS:

Q.   Oh, I haven't mischaracterized your testimony, have I, Mr. Ciecko?  We're -- you understand that's what you testified to, correct?

MS. WEINRIB:  Objection to the form of the question.

But you can go ahead and answer.

BY THE WITNESS:

A.   I'm not sure where you're going with this, sir, but yes, I made that statement --

BY MR. LOFTUS:

Q.   That's all --

A.   -- because --

Q.   That's all I want from you right now.

A.   Okay.

MS. WEINRIB:  Well, if he has more to say, you should let him complete his answer.

BY MR. LOFTUS:

Q.   Now, Mr. Ciecko, you understood that -- that was no guarantee that this technologeable [sic] was scaleable to a commercial level.

You understood that?



A.     No.

MS. WEINRIB:  Objection to the form of the question, assuming testimony that he hasn't given yet.

BY THE WITNESS:

A.    On the contrary --

MS. WEINRIB:  You haven't established foundation.

BY THE WITNESS:

A.    On the contrary, I did not assume.  I trusted the name of a Procter & Gamble patent. They paid for the patent and they said, "We're already industrializing this -- this now."

I only anticipated a short ramp-up, get the Plant 1, 2 and 3 and whatever as many, but I did not anticipate that they have so much risk as described in the Hindenburg report.  I do not know that technology.

BY MR. LOFTUS:

Q.    Given the fact that --

A.    So part of my edge -- I apologize.  Part of my edge that I described was I said, "Ah-ha, there is no risk because they have a patented technology from Procter & Gamble.  Ah-ha, they had



a market -- garbage market that is being pushed by the states and govern- -- and the govern- -- ESG flow," so that was only attractive to me.

I did not trade any SPACs-- trade any SPAC companies because usually they have too much risk.  Here I saw my edge that I see risk elimination, risk elimination, looks good on paper.

BY MR. LOFTUS:

Q.    A couple things, Mr. Ciecko.

Did I hear you just testify there was no risk in connection with PureCycle's business?

MS. WEINRIB:  Objection to the form of the question, mischaracterizes testimony.

BY THE WITNESS:

A.    No, I -- absolutely not.  What I'm -- what I'm trying to say is -- there is risk that you can drop dead today and you have a heart attack. There is always a risk, but what I saw is the -- I was under impression that PCT has purchased a proven patent and then they industrializing this process without any major risks.

There is always some -- some risk with -- with everything, as I said, but the Procter & Gamble name and the IP, intellectual property,



gave me assurance that there was no indications from PureCycle that this is really, really risky.

BY MR. LOFTUS:

Q.    Have you invested in any other SPAC or SPAC-related transaction?

A.    No, sir, no SPACs.

Q.    Okay.

A.    They have too much risk normally because you don't know -- I don't know the industry, I don't know what's going on.

On this one, I -- I thought I see Procter & Gamble, I see a -- it -- it looked initially very good to me as an investor.

Q.    By the way, was the -- does -- the patent that we're talking about, do you know if it was approved by the US Patent Office?  Yes or no.

A.    No, I do not know.

Q.    Okay.  Would that be important to you as a consideration of whether this was a legitimate patent or not?

A.    It -- it would be important to me if this would be a legitimate patent, yes.

Q.    Okay.  Now, you -- you had mentioned in testimony this morning that you would go onto the



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 185 of 439
PageID 7669
ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023

183

sec.gov website.

Did I hear that correctly?

A.    Yes.

Q.    And that's the website that's maintained by the Securities and Exchange Commission, correct?

A.    Yes.  That was for the ROCH ticker. PCT, I don't think I even found anything.  As far as I know, I remember ROCH.

Q.    All right.  And that's through the EDGAR system?

A.    Yes.

Q.    Do you understand that?

A.    Yes.

Q.    E-D-G-A-R.

A.    That is correct.

Q.    And when you went -- and, by the way, did you go onto this EDGAR system sponsored by the SEC in this March 2021 time period before you made your first purchase?

A.    Oh, sir, first purchase, definitely not. Not with a hundred shares, I would -- I would not. Shortly after, but I -- I do not recall if it was done right at the same day.  I -- I cannot recall the date, but it was when I was establishing the



position.

Q.    I understand.  So can we perhaps agree that you would have reviewed the -- the EDGAR website at some point in March 2021?

A.    Yes.

Q.    And when you went on, I take it you plugged in the ROCH symbol, correct?

A.    I think so.  I think I tried even both, but somehow sticks in my mind the ROCH.

Q.    What did you review?

A.    There was several documents.  I don't recall the titles.  I was looking for 10-K or something like this, what I typically look with the established companies, but I think it was something regarding acquisition -- some disclosures about the acquisition or transfer of the one company to the other.  SPAC jargon.

Q.    As of March 1, 2021, did you know how a SPAC works?

A.    No.

Q.    Did you even know what a SPAC was --

A.    I --

Q.    -- in March 2021?

A.    Yes, I've heard about, special purpose



acquisition companies, but I -- I -- I never bought them.

Q.    Aside from whether you bought them -- and I think we've established --

A.    Yes, yes.

Q.    -- that you haven't --

A.    So I understood what the acronym means. I understood vaguely that the -- that there is a -- the transfer of the assets from one company to the other, very often I saw, you know, announcement management changes, so forth, but it's minimal.

Q.    Do you understand that the SPAC comes public without any operations of its own as a commercial business but then looks for a company to merge with?

A.    Yes.

Q.    Okay.  You understood that in March 2021, correct?

A.    Yes, I had general understanding and, frankly, I didn't care because again PCT was the technology.  IP -- I was focusing more on PCT.  I really had little interest with R- -- with Roth.

Q.    All right.  Now, Mr. Ciecko, do you likewise -- strike that.



800.211.DEPO (3376)
EsquireSolutions.com

In March 2021 did you understand that for the SPAC to merge with another company that it must be put to a shareholder vote?

A.    Yes.

Q.    Okay.

A.    Yes.  For the people who own the stock.

Q.    Yes.

A.    Yes.

Q.    Now, do you understand in this case you seek to certify two classes of investors?

A.    Yes.

Q.    One relates to the 10(b) claim and the other relates to the 14(a) claim.

A.    Yes.

Q.    Do you understand that?

A.    Yes, I understand that.

Q.    What's your understanding of the 14(a) claim?

A.    14(a) I would apply to the Roth because if I -- if I remember right, 14(a) pertains to transactions and disclosing all the issues during the SPAC process.

Q.    That's your understanding of the 14(a) claim.



Anything more?

A.    No.  I'm not a lawyer, I'm not a finance professional, so...

Q.    Do you believe that there was any fraud tied to the facts underlying the 14(a) claim?

A.    Now or at the end of -- at the time of investment?

Q.    No, no.  Tell me what you think now.

A.    Now I think there was a lack of disclosures.  I -- I think there was a fraud, yes, otherwise I wouldn't be here.

Q.    Is it your understanding that the 14(a) claim is only asserted against Mr. Roth?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Yes, my understanding is it's -- it's for him, yes.

BY MR. LOFTUS:

Q.    Okay.  Is it a fraud-based claim?

MS. WEINRIB:  Objection to the form of the question, asked and answered.

BY THE WITNESS:

A.    My understanding, it's a securities



fraud issue.

BY MR. LOFTUS:

Q.    Okay.  Do you believe that you personally have standing to assert that 14(a) claim?

A.    Yes, otherwise I would not waste my day on my current endeavor.

Q.    Okay.

A.    I'm a busy man.

Q.    All right.  You're retired, no?

A.    Not really.  I have assumed the -- I set up my -- another LLC as a consultant and I designed my own niche.

I cater to Japanese companies.  I worked at Ford Motor Company in Germany for six months.  I was delegated to Mazda.  Ford owned 35% of Mazda, and myself and my Japanese counterpart had to come up with certain -- certain objectives.

But the point is I've learned the Japanese corporate culture, so right now I'm a consultant to Kubota earth moving company, and it's a great project because it brings jobs to US. We're moving products from China and Japan and placing them in Kansas.



On top of it, I'm heading the construction of the brand-new automotive-style paint system just like Mercedes-Benz building in Birmingham, Alabama.  Also, we -- we building the paint facility for -- for them, and I'm also handling the IT technology process at Friesel [phonetic] manufacturing execution system because that's where they -- also -- I've also worked with IT at Ford.

Q.   All right.  I probably should have stopped at -- at you're a busy man, okay?  So it sounds like you are.

A.   Yes, I have my own LLC, I have no employees, but I have contractors working for me, and we all helping to create jobs now in Kansas.

Q.   Okay.  In March 2021 -- let's say March and April --

A.   Yes.

Q.   -- we're still in the pandemic, correct?

A.   Yes.

Q.   Were you going to the office every day?

A.   Very often.  We were exempt. Agricultural industry was exempt, and we all worked.  So you -- you had to be at work because



hourly people came, their supervisors came.  So yes, we -- we were very often there.

What I mean "often," three out of five days.  Sometimes you could work if you had remote tasks, but we were fully operational because we were exempt.  We had to produce -- food had to be still purchased and we were supporting farmers, farm equipment.

Q.   All right.  Where would you place your trades in March 2021, meaning would you do it from home?  Would you log on at work and place trades?  How did that process work in March 2021?

MS. WEINRIB:  Objection to the -- objection to the form of the question.

You can go ahead and answer.

BY THE WITNESS:

A.   I -- I never trade at work, no.  My -- my company would not even allow probably to install it.  It didn't cross my mind because it would be unethical.  First of all, you're on a company clock.

So I placed my trades either at home or on my phone.  TD Ameritrade has the phone app that you can see the same account and make the purchases



whenever you're free, lunchtime, break, whatever.

BY MR. LOFTUS:

Q.    Okay.

A.    Now, when I was at home, yes, I -- I had a computer and I could then enter the trades any given time I wanted.

Q.    Got it.  All right.  Let's mark as Exhibit 7 a -- certainly a long document that's double-sided but over 400 pages, and it has -- on the cover page it says, "Exhibit 6, PureCycle Form 424(b)(3) Prospectus, February 12, 2021."

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 7, for identification.)

MS. WEINRIB:  A little light reading.

THE COURT REPORTER:  Hold on one second.

THE WITNESS:  Okay.

BY MR. LOFTUS:

Q.    Mr. Ciecko, just to start here, if you look down at the first or second page --

A.    Yes.

Q.    -- you can see at the -- the bottom there's a footer --

A.    Yes.



Q.    -- that indicates, you know, "sec.gov/Archives/edgar," et cetera.

Do you see that?

A.    Yes.

Q.    And I'll represent to you that this is a document that was pulled from the SEC EDGAR website.

A.    In fact, I -- I recall that document, but I just don't -- prospectus -- I remember prospectus is there.  It's -- it's there, yes.

Q.    Yeah, it's definitely there.

A.    Yes, absolutely.

Q.    So -- so my question, a little more specifically, is -- is whether you reviewed this document at any time in March 2021.

A.    I'm not hundred percent sure, but I want to say yes because of the "prospectus" name.  I remember I looked -- whether it was this date, sir, but I saw pros- -- yes, I -- I saw the prospectus.

There was very few files, by the way, there, and I -- I believe so.  I believe this was the document I looked at.

Q.    When you say "very few files," do you mean there were very few files on SEC EDGAR for



Roth CH Acquisition I Co. when you logged on in March 2021?

A.    Correct, which for -- for that year, for 2- -- you know, when I looked for that year, I think I seen only one or maybe two, unless I did some filtering, but I -- I remember for that year, I looked at the -- I looked for the information.  I recall prospectus.  Maybe there was something else, but I -- for some reason, I don't -- when -- when you open Exxon or Caterpillar, you see a lot more.  That's what I mean.

Q.    Okay.  Well, first of all, let me ask you that.

Do you understand for -- for a SPAC the reporting obligations are different from, say, a Caterpillar --

A.    No, sir.

Q.    -- or a Exxon or a Microsoft or whatever?

A.    No.

Q.    All right.  Turn down, please, to what's marked with 8/427 in the lower right-hand corner. I want you on Page 8 of this 427-page document. Here's where I am, just so you -- so you can see,



Mr. Ciecko (indicating).

A.   Oh.

Q.   That's how we'll --

A.   So this is 8 --

Q.   Yes.

A.   -- out of 427, yes.

Q.   And do you see a table of contents --

A.   Yes.

Q.   -- that -- that lists going onto the next page various topics that are covered in this prospectus?

A.   Yes, I do, and I recognize this document now because the third line says, "Cautionary Statement on Forward-Looking Statements."

Q.   All right.  So let's go down to what you recognize under the cautionary statement on forward-looking statements, and that's Page 14 of 427, and do you see an intro paragraph with respect to forward-looking statements?

A.   Yes.  That's -- that's pretty much standard, yes.

Q.   All right.  It's -- it's standard, but it's important, right, Mr. Ciecko?

A.   Yes.



MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.    And -- and are you still affil- -- affiliated or doing any work with AGCO at this point?

A.    No.

Q.    All right.  Is "AGCO" short for, I don't know, agriculture company?

A.    No.  That's just a loose acronym, but no, AGCO is just AGCO, A-G-C-O.  That's how Bob Ratliff named it 27 years ago.

Q.    All right.  Is it public?

A.    Yes.

Q.    Okay.  And I take it they make disclosures about the risk of their business?

A.    Yes.

Q.    Have you ever reviewed any of those disclosures?

A.    No.

Q.    All right.

A.    I wouldn't be surprised if it's the same one, though, because I see when I check John Deere, you know, the aforementioned Caterpillar, very



similar.

When I testified this morning when I saw a lot of the, you know, lawyer jargon, that's what I saw.  That -- that's -- that's exactly what I remember reading this, but nothing jumped out at me out of this whole prospect except Procter & Gamble in a positive meaning of that.  I said, "Ah-ha, they have in- -- they have the intellectual property."

Q.    Mr. Ciecko, I want you to try to focus just on my questions, and it will help us get through this a little better.

A.    Yes.

Q.    So I had -- I want to stay with this exhibit, but for a moment I want to --

A.    Okay.

Q.    -- go back to AGCO.

A.    Yes.

Q.    Did you ever re- -- reveal -- I'm sorry.

Did you ever review any of AGCO's annual reports?

A.    No, sir.

Q.    All right.  Now, certainly part of AGCO's success depended on the introduction of new



products, right?

　　MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

　　A.　　Part of the -- part, yes.  It was how effectively you introduced them.  Every single year you had to update -- upgrade the products.  We did not have new products, but we had to refresh them very often.

BY MR. LOFTUS:

　　Q.　　So -- so I'm reading from an AGCO annual report, the forward-looking statements --

　　A.　　Yes.

　　Q.　　-- and it says, "Our success depends on the introduction of new products which requires substantial expenditures and may not be well received in the marketplace."

　　　　Do you agree with that statement?

　　A.　　Yes.

　　Q.　　And the fact that a new product at AGCO may not have been well received or, frankly, may have failed in the testing process doesn't mean that the company is somehow liable for fraud, does it?



MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.    Yes or no.

A.    Oh, it's not a yes or no answer -- question.  Would you mind repeating this at least?

Q.    If a -- if a new product that's brought to market isn't well received by the customers and it turns out to be a very unprofitable venture, does that mean that AGCO is somehow liable for fraud?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    That depends.  If during the -- the development product, we knew about something and we didn't disclose and we says, "Oh, it's hunky-dory, produce it --" it never happened.  Every single year we turned out, and the farmers are getting the product that they need to, but what I just said is most important.  If we would know something, we would disclose.

BY MR. LOFTUS:

Q.    My point's a little different,



Mr. Ciecko, and it's this:  The mere fact that --
that a business plan doesn't play out as
anticipated, that fact alone --

A.    Okay.

Q.    -- does not lead you to a finding of
fraud, does it?

MS. WEINRIB:  Objection to the form of the
question.

Are you asking for a legal conclusion or
his opinion?

BY THE WITNESS:

A.    I was about to say I'm not a lawyer,
but --

BY MR. LOFTUS:

Q.    I'm just asking for your opinion.

A.    -- from my opinion, no, it's -- it's --
at that point it would not be a fraud.

Q.    Let's go back to what we've marked as
Exhibit --

MS. PARK:  7.

BY MR. LOFTUS:

Q.    -- 7, and --

A.    Page 7?

Q.    Yeah.



A.    Okay.

Q.    And I want you to go to the same page on the cautionary statement on forward-looking statements.

A.    Yes.

MS. WEINRIB:  Page 14.

BY THE WITNESS:

A.    Page 14.

BY MR. LOFTUS:

Q.    Yeah, 14 of 427.

A.    Okay.

Q.    And if you look down in the second paragraph under the cautionary statement --

A.    "The forward-looking statements are based on the current expectations"?

Q.    Yeah, and I'm near the end, a couple of lines up.  "These risks and uncertainties include, but are not limited to, those factors described in 'Risk Factors' those discussed and identified in public filings made with the SEC by ROCH and ParentCo and the following," and then there's a list of risks.  "PCT's ability to meet, and to continue to meet, applicable regulatory requirements for the use of PCT -- PCT's UPRP in



food grade applications."

Did you understand that that was a risk of investing in PureCycle Technologies?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I saw -- I read this, so I read.  Did I understand?  I think so.  I -- I understand what I read.

Again, without knowing their process, it is just -- I don't think I can answer this yes or no very -- if you asked me did I read this, yes. Do I understand their process and what are the risks?  I do not know their prod- -- product or risk associated with it.  I'm relying that they say, "Look, we -- we're making this statement, and it's true."

BY MR. LOFTUS:

Q.    If you look down a few more bullet points to the --

A.    Yes, sir.

Q.    -- fourth bullet point, "PCT's ability to scale and build Plant 1 in a timely and cost-effective manner," did you understand that



that was a risk that PureCycle may not have been able to complete a build-out of the plant in a timely and cost-effective manner?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Launching products myself, I know there is always a risk and I -- I understood -- I understood this statement.  This is -- this is not my problem.

BY MR. LOFTUS:

Q.    Yeah, I don't know what that means, that that's not your problem.

A.    So I'm saying I agree that I -- I agree that -- with this statement here.  PCT's ability to scale and build Plant 1 in a timely and cost-effective manner, yes, I understand that statement.

Q.    Let's go down to Page 39 of 427, please.

A.    39?

Q.    Please.

A.    Yes, sir.

Q.    And you'll see on Page 39 and 40 a summary of the risk factors.



Are you with me?

A.    No.  39, which bullet point --

Q.    So let me make sure --

A.    -- in the summary of risk factors?

Q.    -- you're in the right 39.

Are you in the 39 in the lower right-hand corner?

A.    Yes.  It's titled "Summary of Risk Factors."

Q.    Yes.  Did you review these two pages of Exhibit 7 in or about March 2021?

A.    I read them and -- I read them. COVID-19 I remember.  Yes, I -- I read them.

Q.    And do you recall reading that PureCycle is an early commercial stage emerging growth company with no revenue and may never achieve or sustain profitability?

A.    Yes.

Q.    All right.  So you understood that when you invested your money in PureCycle, you were at risk -- this was not an established Microsoft, for example?

MS. WEINRIB:  Objection to the form of the question.



BY THE WITNESS:

A.    I understood.

BY MR. LOFTUS:

Q.    All right.  Now, the second bullet point says PureCycle's business is not diversified.

You knew that at the time of your investments, as well, correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I'm not sure.  The only thing I knew is that they going with this.  Do they have any other products lined up?  I don't -- I -- I was not -- I did not see anything about any other products.

BY MR. LOFTUS:

Q.    I mean, Mr. Ciecko --

A.    Yes.

Q.    -- this isn't a hard question.

You understood the sole business of PureCycle was to recycle polypropylene, correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    That is not yes or -- answer because



it -- unless you understand this process, it's like you would ask, "Can Ford make only trucks?  Also, did you know that they can make cars?"

I don't know whether the business plan only was going for this niche -- this niche or this niche or this niche.  I knew they -- they wanted to convert the plastic, but I cannot -- I am not an expert in it.

BY MR. LOFTUS:

Q.   No one says you're an expert --

A.   Yes.

Q.   -- but you did your own research into the company before investing, correct?

A.   I -- I -- yes, it's -- that -- that is correct.

Q.   All right.  Let's go down to --

A.   As an individual investor.  I did not have an army of analysts or -- doing the -- you know, what normally the -- the professional investment houses do.

Q.   Let's go down to the ninth bullet point on this page, please.

A.   Yes.  One, two, three, four, five, six, seven, eight, nine, there are no guarantees that



the technology is scaleable to commercial scale operation.

Q.   Is that a risk that you understood at the time of your investments in March 2021?

A.   I understood this statement.

Q.   Now, do you recall that Hindenburg in its report took issue as to whether the lab tests had performed such that it was sufficient to scale to commercial operation?  Do you remember that?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.   Actually, I don't.  Maybe because now it's two years later, it's a selective memory, but what I do remember Hindenburg saying is that the facts were omitted that we should know as investors, especially individual investors.

BY MR. LOFTUS:

Q.   Did you know at the time of your investment that this may never get to the point of scaling to --

A.   I did not know.

Q.   -- commercial scale operation?

MS. WEINRIB:  Objection to the form of the



question.

BY THE WITNESS:

A.    How could I know?  They are in this business and they -- they only saying, "Look, we are doing this, and by the way, those are the risks."  I understood this statement yes, there is a risk.

BY MR. LOFTUS:

Q.    I want to make sure we're not talking past one another here, Mr. Ciecko.

A.    Yes.

Q.    Did you understand that a risk of this business and the construction of the recycling facilities was such that it may never get to commercial scale operation?  Did you understand there was a risk, yes or no?

MS. WEINRIB:  Objection to the form of the question, already asked and answered.

BY THE WITNESS:

A.    Just to reiterate, never crossed my mind that it will not a build a single plant that will work.  That's not how it was presented.

BY MR. LOFTUS:

Q.    Well -- well, tell me how it's not



presented that way.

A.    Okay.

Q.    Stay with me.  My question --

A.    Yes, sir.

Q.    "There is no guarantee the technology is scalable to commercial scale operation."

Do you think, Mr. Ciecko, that somehow that's an ambiguous statement?

MS. WEINRIB:  Objection to the form of the question, argumentative, and also this has been asked and answered numerous times.

BY MR. LOFTUS:

Q.    You can still answer.

MS. WEINRIB:  You can go ahead and answer.

BY THE WITNESS:

A.    I don't know how to answer it any other way I already answered it since the morning.

BY MR. LOFTUS:

Q.    Were you -- but I'm -- it wasn't since the morning because I'm now asking you this question in the afternoon.

Did you understand that a risk of this business was such that it might not be scalable to a commercial scale operation, yes or no?



MS. WEINRIB:  Objection to the form of the question.

You can answer.

BY THE WITNESS:

A.    I don't know how to answer it because it's -- I know this -- what this sentence means and I know this is part of prospectus, but I also remember Hindenburg's claims saying this was -- the -- the risks were substantially higher than what they disclosed.

BY MR. LOFTUS:

Q.    Do you --

A.    It's a fact of --

Q.    Mr. Ciecko --

A.    Yes, yes.

Q.    -- do you know whether Hindenburg had access to the actual technology?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I don't know.

BY MR. LOFTUS:

Q.    Do you know whether Hindenburg visited the Ironton facility?



A.    No.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    No clue.

BY MR. LOFTUS:

Q.    Do you know whether Hindenburg interviewed any PureCycle employees?

A.    No, I did not.

THE WITNESS:  Sorry.

MS. WEINRIB:  That's okay.

BY MR. LOFTUS:

Q.    Do you know whether they interviewed any former PureCycle employees?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    No, I don't have that knowledge.

BY MR. LOFTUS:

Q.    Have you spoken with anyone at Hindenburg at any time?

MS. WEINRIB:  Objection to the form of the question.

You can only answer insofar as you're



not revealing any communications or work products

that involve attorneys.

BY THE WITNESS:

    A.    I did not contact Hindenburg.

BY MR. LOFTUS:

    Q.    Now --

    A.    Never talked to them.

    Q.    -- in this same document, Mr. Ciecko,

let's go down to what's marked 41 out of 427.

    A.    Yes.  41, two more pages.

    Q.    Now, here the risk factors are explained

in detailed narrative format, do you see that, over

several pages?

    MS. WEINRIB:  Objection to the form of the

question.

BY THE WITNESS:

    A.    "PCT is an early commercial stage --

in -- PCT is an early commercial stage emerging

growth company revenue with no revenue, and may

never achieve or sustain profitability.  PCT is not

diversified --"

    Q.    Mr. Ciecko, when you read like that, the

reporter will try to take it down --

    A.    I'm sorry.



Q.    -- so try to either review it to yourself, or if you think there's something we need to hear on the record, that's fine, but -- but that's going to be really hard for the reporter.

A.    Okay.  I understand what these statements are.

Q.    My next question is:  Did you review the risk factors that are reflected on Page 41 of 427 through 50 of 427?  That's just a yes or no.  Did you review them in March 2021?

A.    Yes.

Q.    Okay.  By the way, did -- did you tell your brother about PureCycle?

A.    Yes.

Q.    Did you recommend that he make an investment?

A.    Yes.

Q.    Did you -- strike that.

Do you know whether he viewed this document we're looking at, this prospectus that's marked as Exhibit 7?

A.    I can't --

MS. WEINRIB:  Objection to the form of the question.



BY THE WITNESS:

A.    I can't make that statement.

BY MR. LOFTUS:

Q.    My -- my question was:  Do you know whether he --

A.    No.

Q.    -- did?

A.    I do not know whether he did this or not.

Q.    Okay.  Did -- did you in sum and substance call your brother and say, "Hey, I found a -- a good recycling company," or garbage company, as you would refer to it.  "I think you ought to go in with me"?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    This was not a part of -- the conversation didn't go this way.  I said, "Mariusz, I think I -- I have a unique startup company that potentially may -- we may may profit off it.  As usual, do your own homework.  You do your own homework.  I'm just telling you that I am seriously interested in this company," and I told him about



the Procter & Gamble patent, I have told him about -- a few facts about the garbage industry size, the 27 billion that I -- that I've heard of, and I told him about the industrialization, that "This is not going to be one plant but quite a few plants.  They have plants.  The rest of it, do your homework as usual."  We just don't purchase anything because his brother said so.

BY MR. LOFTUS:

Q.    You're the older brother, right?

A.    Yes.

Q.    All right.  So when you say "as usual," is it the case that you typically refer companies to your brother but then caution him that he should do his own homework?

A.    Not typically.  If I recall, the last 24 -- -3 years, it was Exxon and PCT.

Q.    Okay.

A.    Two instances.

Q.    Do you know whether your brother did any independent research before he made his first investment?

A.    Yes.

MS. WEINRIB:  Objection to the form of the



question.

I assume you mean first investment in PureCycle?

MR. LOFTUS:  Yeah.

BY THE WITNESS:

A.    Yes, I recall him calling me or -- or me calling him, and he says, "Robert, in fact, I was able to Google the physical picture of an Ironwood facility."  He says, "I know where it is.  It's in Iowa," and I said, "Yes --" sorry, I don't -- Ohio, not too far from Michigan, Detroit where we lived.

So he did the research because I remember he told me that there is a picture somewhere -- again Googled, that there was a picture of the Ironwood facility, and it was the pilot plant.

BY MR. LOFTUS:

Q.    Now, does your brother likewise use any technical analysis for purposes of his trades?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I do not --

MS. WEINRIB:  Only answer if you know.



BY THE WITNESS:

A.    I do not know.

BY MR. LOFTUS:

Q.    Did you share any of the results of your technical analysis of PureCycle with your brother?

A.    No, I didn't.

Q.    Did you discuss each and every one of your buys and sells with your brother?

A.    No, I didn't.

Q.    How many did you discuss with your brother, if any?

A.    We had total maybe -- single digits, but let's just say for safety factor eight to nine conversations over the entire period.

He -- as far as I remember, he made only one purchase, and much smaller than mine, maybe two, but it was considerably less than my position. And again, him being busy, he -- he did his own homework.  I even didn't ask him how many did he buy until -- until the Hindenburg report.  I recall then I asked him, you know, "How many shares do you have?"

So that's the extent.

Q.    So let me just --



A.    Eight to nine conversations.

Q.    Mr. Ciecko, when I look at these risk factors --

A.    Yes.

Q.    -- the ones we've just been looking at, there's certainly a -- a lot of risks with respect to what is a startup business, right?

MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.    I mean, you would agree with that, wouldn't you, Mr. Ciecko?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    It's less than typically when I looked at IPOs, and I still shy away.  I reiterate I will -- I loved the patent, I loved the industrialization, I -- every -- nothing gave me the red flag signal to shy away from this. Normally I -- I just don't have enough information, whether it's IPO or young companies, and I don't invest in them.  Here I thought I found another TPX.



ROBERT CIECKO                                            December 07, 2023
William C. Theodore vs PureCycle Technologies                        218

BY MR. LOFTUS:

Q.    Who owns the patent at this point, do you know?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I do not know.

BY MR. LOFTUS:

Q.    You were testifying this morning that PureCycle bought the patent.

Is that under- -- how you understood what happened?

A.    That's how it was -- it's my -- that's my understanding when I saw the websi- -- PCT website and also disclosures here that they -- I believe it says they purchased the patent, but --

Q.    Didn't they license the patent, Mr. Ciecko?

A.    It could be, could be.  They were in the possession.  They -- they had competitive advantage.  This is how I wrote it down.  I remember to myself competitive advantage for several years at least because they -- they cannot duplicate this -- no one can just duplicate what



P&- -- very quickly what Proct- -- Procter & Gamble would do, otherwise why would they pay that patent? That's just --

Q.    Well --

A.    That's -- that's -- usually you buy the patent to protect yourself that the competition cannot duplicate your process.

So I knew they have competitive advantage.  Company B -- Garbage Company B could not go to P&G and say, "We'd like to have the same patent, please."  I -- I didn't -- at least this was my mind.  I saw the edge, they've got the goods and they're protected.

Q.    Let's mark as Exhibit 8 a PureCycle press release dated November 16, 2020.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 8, for identification.)

THE WITNESS:  Are these ours to keep?

BY MR. LOFTUS:

Q.    Those are for the reporter.  You may see a sticker down in the lower right-hand corner.  The reporter takes them and makes them part of the transcript.



MS. WEINRIB:  I'll be keeping these, though.

THE WITNESS:  Okay.  I don't have to take these home with me?

MS. WEINRIB:  Oh, no.

THE WITNESS:  Okay.  Just -- thank you.

BY MR. LOFTUS:

Q.    Don't worry.  We won't weigh down your bag.

All right.  So the question is, Mr. Ciecko, whether you recognize the document that's been marked as Exhibit 8, and it's dated November 16, 2020.

A.    Without reading all of this, I want to say yes.  I recall that header, "Roth CH Acquisition to Combine With PureCycle," but give me the moment.  Let me just make sure.

Oh, yes, "One Goal:  A Pure Planet."  I remember that.  I'm fairly certain.  I don't want to waste your time reading four pages, but --

Q.    So --

A.    -- I recognize the front.

Q.    All right.  So perhaps my question wasn't as articulate as it -- as it could have been.



When did you review this document that's marked as Exhibit 8?

A.   Oh, I don't remember, sir.

Q.   Did you review it at any point before -- strike that.

Did you review it at any time in March 2021?

A.   Let me answer this way:  I definitely reviewed it before Hindenburg report.  As I was establishing my positions, I kept on reading, reading, reading, and shortly after I still kept on reading.

I don't recall now, but I can tell you I read this before Hindenburg report.  Is that okay as an answer?

Q.   And why are you so certain that you reviewed it before the Hindenburg report?

A.   Because after Hindenburg report, I did not go to the SEC EDGAR, I did not review anything. I was not in the mood to review any more of this. I knew facts changed and, therefore, I -- I'm forced to be out and protect my capital.  That's --

MS. WEINRIB:  Objection -- go ahead.

BY MR. LOFTUS:



Q.    So -- so tell me how you came to review what's marked as Exhibit 8.  Where did you see it?

MS. WEINRIB:  Objection to the form of the question.  And I just want to clarify that he's limiting his answers to his own review prior to the litigation and not communications or work product involving counsel.

BY MR. LOFTUS:

Q.    Well, let's -- let's focus in on your counsel's comments here.

Is it -- is it the case -- case that you're not certain, Mr. Ciecko, whether the first time you saw this was in connection with the litigation?

A.    No.

MS. WEINRIB:  Objection to the form of the question, mischaracterizes his testimony.

BY THE WITNESS:

A.    What I meant is that I recognize -- I'm a pretty visual person.  I remember "One Goal One Planet."  Whether it was on their website, whether it was EDGAR, whether it was somewhere else, I don't recall it, but I know it was before Hindenburg bec- -- report because afterwards I was



ROBERT CIECKO                                                December 07, 2023
William C. Theodore vs PureCycle Technologies                            223

not interested in any more of any documents from PCT.

BY MR. LOFTUS:

Q.    Did you in any way rely on this document in connection with your investments?

A.    To a certain degree.  It confirmed that they have the patent from Procter & Gamble, it's -- it said about PureCycle.  I've seen that information in other form and fashion on EDGAR, and so that's why I am not sure where have I seen it, but I recognize this.

It did not give me any additional warnings or it did not entice me to invest any more.

Q.    And you certainly weren't following PureCycle back in November 2020.

A.    No, sir.

MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.    And you weren't following Roth Acquisition I Co. back in November 2020.

A.    No.

MS. WEINRIB:  Objection to the form of the



question.

BY THE WITNESS:

A.    No, I did not follow either PCT or Roth prior to mid-March of 2021.

BY MR. LOFTUS:

Q.    All right.  I'd like to stay focused on this for a moment.  Let's go to your amended responses and objections to Defendant Byron Roth's first set of interrogatories, and we'll mark those as Exhibit 9.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 9, for identification.)

MS. WEINRIB:  Thank you.

BY MR. LOFTUS:

Q.    Take a quick moment here, Mr. Ciecko, and tell me if you recognize this document.

A.    Yes, that's one of the recent ones, so I do recognize the front page.  Just a second.

(WHEREUPON, there was a short interruption.)

BY THE WITNESS:

A.    Yes, this was -- I recognize it.

BY MR. LOFTUS:



Q.    Did you review this before it was served on the defendant?

A.    Yes, that was part of the documents I had to review.

Q.    When did you review it?

A.    This -- not too -- not too distant past.

Q.    I mean, a week ago?  A month ago?  A couple days ago?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    No, it was definitely in December when I was getting ready, but before that, I believe it was near that date of October 13.

BY MR. LOFTUS:

Q.    All right.  Now, do you recall -- if we look here, Mr. Ciecko, down on Page 20 --

A.    Yes.

Q.    -- do you see it has a -- a date of December 4, 2023?

A.    Yes.

Q.    So have you reviewed this in the last --

A.    That I reviewed --

Q.    -- you know, week or so?



ROBERT CIECKO                                           December 07, 2023
William C. Theodore vs PureCycle Technologies                        226

A.    So this is not the document I thought about because there was a couple objections back and forth.  Whether they were -- again, what's the response to the complaint, briefs, interrogatories, I'm already getting a bit confused.  There was several back and forths.

So this one is the latest.  This one is the latest we reviewed.

Q.    All right.  Now, Mr. Ciecko, I want to --

A.    Yes.

Q.    -- stay focused on this for a moment, but you do understand as the lead plaintiff --

A.    Yes.

Q.    -- you have fiduciary obligations, correct?

A.    Yes.

Q.    What does it mean to have a fiduciary obligation in the context of you serving as a lead plaintiff?

A.    Fiduciary responsibility in English I believe means that you represent not your own interests but you have responsibility to represent your class, your -- whatever group of people



you're -- if you are IA, it's clients.

So that's how I understand it.

Q.    And you understand you have an obligation to make full disclosure as required in court filings, interrogatory responses --

A.    Yes.

Q.    -- and so forth?

A.    Yes.

Q.    All right.  Now, in what we've marked as Exhibit --

MS. PARK:  9.

BY MR. LOFTUS:

Q.    -- 9, the interrogatory -- amended responses to interrogatories, I want you to turn down to Page 17 and Interrogatory No. 21.

A.    Yes.

Q.    And this asks, "At any time on or before May 5, 2021, did You review the November 16, 2020 press release referenced in Paragraphs 53-55 of the Complaint," and I'll represent to you that the complaint in those paragraphs represents what we've marked as Exhibit 8, the November 16, 2020 press release.

Your response on 18, subject to various



objections, says, "Plaintiff responds that he reviewed all PureCycle press releases and ROCH press releases regarding PureCycle at or around the time of issuance."

Do you see that?

A.    Yes.

Q.    Now, that's a response that you verified as being correct and accurate, but it isn't, is it?

MS. WEINRIB:  Objection to the form of the question, argumentative and mischaracterizes testimony.  That's not what he said.

BY THE WITNESS:

A.    Times of issuance, if I misunderstood this -- what I'm saying is I've seen this document. I have definitely reviewed this.  If I'm not -- timing-wise, as I've said, I -- I'm not sure.  I told you if you want to do better, I know it was well before the -- the Hindenburg report for sure, but I -- I cannot -- honestly I don't recall the date, no.

BY MR. LOFTUS:

Q.    So --

A.    It's been a long day.  I apologize for this, but I remember this heading.  Let's put it



this way.  I do remember this heading.  I reviewed this.

Q.    Let's -- let's -- Mr. Ciecko --

A.    Yes.

Q.    -- let's make sure we're on the same page here.

You understand that Exhibit 8, the press release, was issued on November 16, 2020?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Exhibit 8.  This is Exhibit 8 (indicating)?  Yes.

BY MR. LOFTUS:

Q.    Right.  The press release was issued on November 16 --

A.    Yes.

Q.    -- 2020, correct?

A.    Yes.

Q.    You did not review this press release in 2020, did you?

MS. WEINRIB:  Objection to the form of the question, mischaracterizes testimony.  That's not what he said.



BY THE WITNESS:

A.    I could not review this on 2020.  I was not aware of the PCT or ROCH.

BY MR. LOFTUS:

Q.    Fair enough.  I appreciate that.

So I'm back to the interrogatory response.  It says, "Plaintiff responds that he reviewed all PureCycle press releases and ROCH press releases regarding PureCycle at or around the time of issuance."

A.    Of what document?

Q.    Go back to the prior page, which is the actual interrogatory, and it refers to the November 16, 2020 press release.  Now, this may just be a simple mistake, but I'm hoping you can clarify it for us.

A.    Oh, I see -- I see what you mean.  I reviewed everything I could see once I took that responsibility.

Q.    No, no, Mr. Ciec- -- Mr. Ciecko, my question's much simpler.

A.    Yes.

Q.    Maybe I'm not understanding the interrogatory response, maybe the interrogatory



response is just wrong, maybe it's something in the middle, but the -- the response asked when did you review the November 16, 2020 release; that is, did you review it at any point before May 5?  Your response says that you reviewed all PureCycle press releases and ROCH press releases regarding PureCycle at or around the time of issuance.

Do you see that?

A.    Yes.

Q.    Is this response correct?

MS. WEINRIB:  Objection to the form of the question.

Do you understand the question?

BY THE WITNESS:

A.    I understand, and it's not -- this -- this is a very -- if you're implying, sir, that -- that you understand that this PureCycle release was reviewed by me at the time of issuance of PureCycle report dated November 16, 2020, this is not correct.  I could not.  I -- I must have --

BY MR. LOFTUS:

Q.    I'm with you, Mr. Ciecko --

A.    Yes.

Q.    -- but let's just see if we can reach a



landing on this --

A.    Yes.

Q.    -- and move on.

Is the interrogatory response simply misstated?

A.    I think I missed myself the understanding of this.  I understand that I had to review this, I did review this, but at the time of issuance, I misunderstood that this had -- the issuance of this.

I was thinking about the either complaint or the -- the return of the complaint or this proposal from the defense and so forth, so I -- yes, that's -- that's my answer.  This is -- this is -- this has to be corrected.

Q.    All right.

A.    It -- it wasn't, you know, the day after.  How would I know?

Q.    All right.  We -- we're in sync on that.

A.    We're in sync.

Q.    Okay.

A.    Absolutely.

Q.    All right.  Before I move on to the next topic, I do want to return briefly to the



prospectus that was marked as Exhibit 7.

A.    Yes.

Q.    And -- and let me ask you to now turn down to Page 42 of 427, and I want you to look at the risk disclosure at the top of the page which has the heading in -- in bold-faced print, "The License Agreement sets forth certain performance and pricing targets which, if missed, could result in a termination or conversion of the license granted under the License Agreement."

Do you see that?

A.    Is this the first or second thick font bold?  I -- I don't see this.  So is it the first paragraph or second?

Q.    The first paragraph.

A.    First paragraph.

Q.    And you're on 42 of 427, correct?

A.    Yes.

Q.    And what does your top disclosure read?

A.    "The License Agreement --"

Q.    "Sets forth"?

A.    Yes.

Q.    That's the one I want you to focus on.

A.    Okay.



Q.     Just take a look at that for a moment.

(WHEREUPON, there was a short

interruption.)

BY THE WITNESS:

A.     Okay.

BY MR. LOFTUS:

Q.     All right.  Now, if I recall your testimony from not too long ago, you did review these risk disclosures in this exhibit, correct?

A.     Yes.

Q.     And you reviewed them in March 2021, correct?

A.     Yes, but that's where you stopped me by -- when you said "yes or no."

When I reviewed, I did not read letter to the letter.  I saw here is the fat portions, okay?  Here is the early commercial stage, emerging growth company with no revenue and may never be achieved or sustained profitability.  I read 1, 2, okay?

Next, PCT -- I -- no, I -- I reviewed, but the process of reviewing, that means -- does not reading word for word because some of it is legal jargon that I would not be able to decipher.



I see what the Procter & Gamble does. They protect themselves and say, "Hey, if -- if something doesn't work and if that's true, we -- we --" I don't want to -- I'm not a lawyer, so I don't want to use "we not liable," but I see that, yeah, "we will cancel this, do this."  I -- I've seen that they stating risks.

Q.   So -- so --

A.   That's what I saw in reviewing, "Here is the risk, here is the risk."

Q.   But, Mr. Ciecko, you have an engineering background, right?

A.   Yes.

Q.   Now, you're not exactly, as you described earlier, the average Robert, correct?  In terms of comparing yourself to other investors, most investors don't have an electrical engineering background, do they?

MS. WEINRIB:  Objection to the form of the question, misstates testimony, seeking a legal conclusion.

BY THE WITNESS:

A.   I do not know who invests, lawyers, doctors.  I do not really know by name any other



investor other than my brother.

BY MR. LOFTUS:

Q.    Fair enough, but insofar as your ability to review things that are non-legal -- that is, the -- the description of the recycling process and risks about scalability and risks about the quality of the feedstock and so forth -- would you agree that you're better equipped than some with an engineering background to better appreciate the risks of this business?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I have to split this to two sections.

Scalability, yes, I understand because that's like a -- scalability is very similar to my expertise and experience as an engineer working for Ford, AGCO, Case New Holland.  The first portion, an electrical engineer cannot tell you anything about cutting these things up and producing.

BY MR. LOFTUS:

Q.    With respect to this disclosure on the license agreement -- first of all, does this refresh -- refresh your recollection that the



intellectual property was not sold to PCT but, rather, was licensed is PCT?

A.    Absolutely.  That's my bad wording. They had -- sometimes I said they had -- they bought, no, you're absolutely right.

Q.    And did you understand --

A.    I understand.

Q.    Did you understand that pursuant to this particular disclosure that the license in effect could be forfeited -- forfeited if certain performance and pricing targets were not met?

MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.    Did you understand that in March 2021?

A.    To answer to the best of my ability, I recall these statements.  I -- did I understand that it's about the risk?  Yes.  The degree of risk or how would that really work, what would constitute Phase 2 failure or -- or missing, I didn't know the variables, what did they agree. You know, what constitutes -- what triggers this agreement?  No, that portion I did not understand.

I just understood, yes, there is risks



associated with it.  They put in certain measures

to protect themselves, but you cannot deduce from

this whether -- what triggers even this.  It's very

vague.

BY MR. LOFTUS:

        Q.   All right.  Let's switch gears for a

moment --

        A.   Yes.

        Q.   -- go through your trading, and then

let's take a break, all right?

        A.   Yes, sir.

        Q.   Okay.  Let's go back to what's marked as

Exhibit 2.

        A.   Okay.  2, yes.

        Q.   All right.  Exhibit 2 should be the

record of your transactions in PureCycle.

        A.   No.  Exhibit 2 is --

        Q.   No, there's -- look for the Exhibit 2

with the yellow in the right-hand corner.

        A.   Yeah, yeah, yeah.  Okay, yes.

        Q.   All right.  Now, as I understand it,

Mr. Ciecko, you receive on a monthly basis a

traditional monthly account statement from

TD Ameritrade, correct?



A.    Correct.

Q.    Is it -- do you get an e-mail that says, "Your account statement is now ready for your review," or something akin to that?

A.    Yes.

Q.    It doesn't come as a hard copy in the mail?

A.    No.

Q.    But you receive it and you can download it and print it if -- if you'd like?

A.    Yes, if I'd like.

Q.    All right.  Now, I think you testified that when you started to go through the statements and isolate PureCycle, it was -- it was just too difficult, it was respectively too cumbersome, is that right?

A.    Yes.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Yes.

BY MR. LOFTUS:

Q.    And is that because there's so much activity that it would be hard to isolate just the



PureCycle transactions and print them?

    MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

    A.   So two things.  I didn't have all hard copies, but I could download.

        Number two, I had other transactions in my futures, Forex, that I did not think that has anything to do with this, and I didn't -- either I would wipe it out and do this, but at the end, if I -- I'm not going to say it all, but at the end it was much easier to produce this.

        But if this is a hard jobs number, I don't understand really what -- what is the big deal because this is the whole list of my transactions.

BY MR. LOFTUS:

    Q.   All right.  So, Mr. Ciecko --

    A.   Yes.

    Q.   -- the way you prepared Exhibit 2 --

    A.   Yes.

    Q.   -- is by going into your online accounts --

    A.   Yes.

Q.    -- and then downloading pursuant to a PCT filter transactions for each account?

A.    It's not statements, but the -- the TD Ameritrade has the thinkorswim trading platform. That's -- that's what --

Q.    I understand.

A.    That's what it's called.  The trading platform itself allows you to type in the from, to and then you put the ticker symbol, and this is how I generated them.

So it gave me every single trade -- I could even choose every single cancelled trade, not filled trade, but I just chose transactions only. So you filter, "Show me transactions only."  I don't want to know open orders, and then I created this list, and I verified this against one or two statements, and I say, "Where is my biggest purchase?"  1,000-some shares that one day or -- that's why I said yes --

BY MR. LOFTUS:

Q.    I --

A.    -- it agrees.

Q.    I understand Mr. Ciecko, but I want you --



A.    Yes.

Q.    -- to try to answer my questions yes and no where you can so we can get through this questioning.

A.    Okay.

Q.    So most of your buy orders are done with limit orders, correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I cannot tell you this.

BY MR. LOFTUS:

Q.    Well, let's just see if you can.  Let's go --

A.    No, but what I'm saying is we -- we would have to look here, but I -- I cannot tell you.  If you already see the answer, so what is the question?

Q.    Go to the -- the -- what's marked as 11 in the middle of the page.  There's a Bates stamp number of 11.

A.    On the first page?

Q.    That's three pages down.

A.    Three pages down.  At what date?



Q.    Well, just, for example, if you look on March 30 -- March 26 through March 30, do you see that those are all buys with limit orders?

A.    Yes.

MS. WEINRIB:  I don't know that you're on the same page.  Are you?

BY THE WITNESS:

A.    This whole thing shows either day order or limit -- limit order.  Yes, that's a -- that's a standard limit order unless you change and do the market order, but I -- I see all limit orders, so yes.

BY MR. LOFTUS:

Q.    All right.  So with a limit order, you have placed an order with Ameritrade basically communicating that you want to buy at or below the limit order price, correct?

A.    Yes.  I didn't want to get suckered if you don't do this and say, "Market --" thinly traded companies can execute your order way high. It happened to me on a number of occasions.

Q.    Did -- did you view PureCycle as a thinly traded company in March 2021, yes or no?

MS. WEINRIB:  Objection to the form --



BY THE WITNESS:

A.    No.

MS. WEINRIB:  -- of the question.

BY THE WITNESS:

A.    No.  That's a standard -- that's a standard -- limit order is a standard on -- on Ameritrade --

BY MR. LOFTUS:

Q.    All right.

A.    -- unless I change to something else.

Q.    But I was intrigued by some of your testimony a moment ago.  What you testified to was you've only provided us with the -- is the executed orders, so I take the converse of that to mean that there's many limit orders that you placed that are reflected in your records that did not get executed, is that correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    If I wanted to buy something --

BY MR. LOFTUS:

Q.    Mr. Ciecko, listen to my question.

The --



MS. WEINRIB:  He's trying to answer it.

MR. LOFTUS:  That's not going to get us there.

MS. WEINRIB:  You have to let him --

MR. LOFTUS:  If you want to get home tonight, you ought to let me try to focus him in on this.

MS. WEINRIB:  I just want to make sure the record's clear.

BY MR. LOFTUS:

Q.    Mr. Ciecko, here's what I want you to focus on.

A.    Yes.

Q.    From PureCycle -- when you were buying the stock in say March and April 2021, do you have records of orders for PureCycle buy transactions that were not executed, yes or no?

A.    I am not hundred percent sure.  What I'm sure is that if I cancelled the order, I would have the record that I wanted to buy something and it did not hit my price, it traded higher than that, so I said, "I'm not going to buy it."

That cancel order is a cancel order, it's never executed, and normally TD Ameritrade removes these orders on daily basis.  They said, "This is -- this is incomplete."  At the end of the



day, they just wipe out unless it's a good until cancel order.

So if it's a day order, then it is -- will be there.  I'm not sure if -- two years later now if I would want to go back there and say, "Show me cancelled orders," for what?  I'm -- I'm not sure where you're getting with this because they're not executed orders.  Sometimes I wanted to get a good price.

As I was explaining -- please be patient -- I was establishing a position over one week, so I wanted to get the best price.  Sometimes I even sold at the higher and I waited for the lower price, and it never materialized, but I hit the limit.  I said that's -- that's more or less my liquidity -- net worth liquidity limit.  I'm just not going to buy any more.  Once I established position, it was fine.

So I'm not sure where are we going with this?

Q.   So, Mr. Ciecko, a couple things.

One, so I take it those -- those orders you've just discussed, the limit orders, maybe they're GTC, maybe they're -- they're day -- day



orders, but they're put in pursuant to your technical analysis?

A.    No.    That is pursuant to my willingness to establish the position with a stock, and if I didn't buy yesterday a hundred, I want to put that order tomorrow and I say, "Okay.  I'm going to enter this order again, and hopefully it will hit," and it eventually hit over the one week.  Every -- every what -- what I wanted to establish, I accomplished it, but sometimes it took a couple tries.

Q.    I --

A.    I wasn't to be a sucker and pay a lot more.

Q.    But -- I understand, but some of those transactions, Mr. Ciecko, looking for support and resistance and different trends, you're -- you've mapped that out pursuant to some of your technical analysis?

A.    Once --

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Once, and then I had my price and I



said, "This is the price I'm willing to pay," and that's what I was trying to do.

BY MR. LOFTUS:

Q.    All right.  So, Mr. Ciecko, you may not appreciate why we think something is relevant --

A.    Yes.

Q.    -- and I'm not trying to be rude, but that's --

A.    Yes.

Q.    -- just not within your province.

A.    Okay.

Q.    So let me say this to you and your counsel.  We want all of these records preserved, and we think the document requests as framed call for all of this information with respect to transactions in PureCycle, whether executed or not executed.

To the extent there's any ambiguity about that, then we'll re-serve another request, but I at least want it made clear that no records should be destroyed, deleted or in some way put in such a place that they can't be produced.

Now, I understand your testimony, you're not sure whether they'll -- they'll be available,



but -- but that's it.  It's just a statement.  You don't need to say anything.

MS. WEINRIB:  Before you say anything, I disagree with your position as stated on the record.  We object to the relevance of what you are seeking.  We will take it under advisement and we will meet and confer about this following the deposition.

MR. LOFTUS:  That's fine, but I want the statement to be clear.  You may dispute the relevance, and of course for discovery purposes, relevance is a different standard, but I just want to be perfectly clear that none of these records should be deleted, dismissed, you know, otherwise removed.  I want that to be clear.

MS. WEINRIB:  Your statement is noted on the record.

BY MR. LOFTUS:

Q.    Okay, all right.  So we're back, Mr. Ciecko, on -- we're still on Exhibit 2 here --

A.    Yes.

Q.    -- and I'm on the third page which has an 11 in the middle of the page.

Do you see that?



A.    No, no, because mine -- mine is loose.
It's not stapled, so I'm not sure anymore.  If you
don't mind, how does the page look like?  You know,
the --

Q.    I'll tell you what.  If you hand it over
to me, I'll get to that.

A.    Yes, sir.

Q.    How's that?  Give me -- give me the
first one, too.

A.    Oh, yeah.

(WHEREUPON, there was a short
interruption.)

BY MR. LOFTUS:

Q.    Well, you'd rather be lucky than good.
They're in the right order.  You had them right.

A.    So you --

Q.    Go down to what has 11 in the middle of
the page on the bottom.

A.    The first page?

Q.    Look for 11 -- no, go to the next page.

A.    What is 11?  Oh, right here
(indicating).  Okay.

Q.    Yeah, that's how I'll refer to the --

A.    I see it.



Q.   -- full document.

All right.  So on this page, let's go down to the lower portion of the page --

A.   Yes.

Q.   -- and do you see a number of buy transactions on March 26 through March 30, 2021?

A.   On what date?  There's --

Q.   From -- from -- look at the bottom of the page which shows -- the lower half of the page --

A.   Yes.

Q.   -- shows largely buy transactions, correct?

A.   Yes.  Oh, and I see some cancelled here.

Q.   All right.  Now, do you see -- it's -- it's a number of different orders, right?

A.   I'm sorry?

Q.   There's probably, I don't know, 30 different orders here, correct?

A.   Not quite.  I can't tell.  You know why?  Because when I want to buy a hundred shares, they only show how they fill, and if you specify, "I'll take order at any -- any increments," then they will just go and buy 5 shares, 10 shares.  They



executing the ord- -- this is execution of orders.

I do not know whether I -- from the number, I know I did not ask to buy 27 shares. This must have been a fill quantity, but I asked for -- usually I trade in hundreds for the stock of this price, so when I ask for a hundred to 2, they execute it piece by piece by piece by piece.

Q.    I understand.  So, Mr. Ciecko --

A.    And the time shows even.  See the time? 14:47, in -- in one min- -- in one second, they just split this to so many.

Q.    So -- so, Mr. Ciecko, that was -- really my next question is whether this is one order that's reflecting multiple executions or whether in fact you're putting in these orders separately, and I think your testimony established that as a matter of practice, you normally trade in hundred-share increments, is that correct?

A.    Yes, just --

Q.    That's all I --

A.    -- for math purposes.

Q.    All right.  Now, if we look at the transactions on, say, March 29, all right --

A.    Okay.



MS. WEINRIB:  The same page.

BY MR. LOFTUS:

Q.    -- do you see a number -- on that same Page 11 --

A.    Yes.

Q.    -- a number of buy -- at least what were called buy transactions that go from the 29th at 10:12 through 10:20.

First of all, what time is being used here?  Is this Eastern time?

A.    I don't really know.  I think it's Central.  It should have been mine, but I don't know how the TD Ameritrade takes it.  I -- I don't really --

Q.    All right.

A.    I never really paid attention to this.

Q.    All right.  We then see --

A.    I believe it's Central.

Q.    We then see limit orders in the -- in the third column from the right.

A.    Yes.

Q.    We then see indications of "Day."

Does that mean that the limit order is only good for that trade day?



A.    Yes.  It's a day order.

Q.    All right.

A.    It's not good until cancel, otherwise you would see "GTC."

Q.    All right.  And then I see maybe three, four -- four -- five cancels.

Do you see that?

A.    On that day?

Q.    On the 29th.

A.    Yes.  I see one, two, three on the 29th only.  Beg your pardon.  One more.  Yes, yes, you're correct.

Q.    All right.  And tell me about the process of how that worked at the time.  Why would you cancel orders?

MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.    Or was it the case they just weren't and they were cancelled?

A.    No, sir.  They cannot cancel my order.  That's illegal.

So I must have cancelled it either because I was -- did not get my hit and I was going



to a meeting or whatever else and I just didn't

want to have that order anymore.  It did not

execute in my desired timeframe.

That's my own speculation because I had

to cancel it, and usually when I -- like today when

I walk away, I'm making sure -- I make sure that

I -- I have no positions because I have no way

to -- to react to them.

So for whatever reason I did this, I

really have no idea now two years later why did I

cancel, but I -- I do -- either I cancelled because

I didn't like the price or I didn't like the

timeframe.

Q.   Okay.

A.   If the price went up too far for my

order and I say, "Oh, maybe I will settle

sometimes," and I try to chase but not too much and

I say, "Okay.  Instead of a dollar, I will raise my

order 50 cents.  Maybe it will dip."

This is all about establishing the

position in the best price possible.

Q.   Okay.

A.   That is all.

Q.   Did you cancel due to some type of



market news about PureCycle?

A.    No.

MS. WEINRIB:  Objection to the form of the question.

THE WITNESS:  Sorry.

BY MR. LOFTUS:

Q.    Now, if you look, you'll see there's various buys --

A.    Yes.

Q.    -- on March 30, correct?  Just confirm that there were buys that are filled.

A.    Yes.

Q.    And those are likewise entered as limit orders, correct?

A.    Filled March -- no, just a second.  3rd? No, some of them is market order.  That means I was there and I clicked because I liked the price. When it says "MKT," that is actually the market order.

Q.    So --

A.    Like if --

Q.    Just a minute, Mr. Ciecko.  I think you're wrong.  I'm looking at March 30, and every buy execution I see is a limit order.  Buys.  Focus



solely on the buys.

A.    Oh, I'm sorry.  Here buy and -- and where are you at?  Okay.  30th, buy, limit orders, yes.

Q.    All right.

A.    Yes.

Q.    Okay.  Now go up to --

A.    Yes.

Q.    These -- these lines aren't numbered, but so it goes.

A.    Yes.

Q.    And do you see that those buy orders -- first of all, when it says "Filled" and there's a time, it says, "8:43," "8:50," "8:51."

Do you see that?

A.    Are we on the date?

Q.    March 30, the buy orders.

A.    March 30, 9:39?

Q.    No, I see --

A.    What timestamp?

Q.    Do you see a time for the buys ranging from 8:43 to 8:51?

A.    Yes.

Q.    Are those times of execution?



A.    Yes.

Q.    All right.  Now, do you see the sell orders on the 30th --

A.    Yes.

Q.    -- above that?

A.    Yes.

Q.    All right.  And do you see that the -- the sells are within an hour in some cases and maybe an hour and, you know, ten minutes in others?

A.    Yes.

Q.    And on -- I see for the sells, it says "STP" and "MKT," so are these stop orders or are they just market orders?

A.    Stop orders.

Q.    All right.

A.    It's -- it's a stop order, but once it hits the stop price, it turns to market order.  In other words --

Q.    So it's not a stop limit; it's just a stop loss?

A.    It's -- no, it's called stop market.  In other words, when it hits the stop, it's -- it's two digits you have to enter.  You said if it hits a certain limit like 23.38, at that moment I'm not



int- -- no longer interested what price I get, I want to get out.  It's a market order.  Then it turns it automatically to market order.

Q.   Perfect.  Now, on the 30th was there some type of -- of market news within the hour and ten minutes or so of your purchase that prompted you to enter these sell orders?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.   I'm certain no because I was building the position.  So I -- either I trade -- I don't recall now, but I had no news other than -- the only reason for selling was I didn't like either -- I didn't like something, but it's mostly technical oriented.

It's hard for me two years from now to say why did I -- let's just -- let's just take a look at those.  Like you said, 8:51, I paid 23.11 and I sell -- I sold them at the -- at best 83 maybe 70 cents, and then I bought more -- or hold on a second.  Do I see anymore buys?  Maybe -- maybe I just saw that I have too much.

I was trying to get about -- the right



amount, so it doesn't -- I'm speculating. I'm sorry. I -- I know it's technically driven. No news for sure. I was -- I was establishing the position, trimming to the right size.

This is towards the end of my position of -- if I remember right, the top was 5,000 shares, and I didn't want to go over it, so I -- I -- definitely I did not do this for, you know, any related news.

BY MR. LOFTUS:

Q. All right. Let's try something that maybe --

A. Yes.

Q. -- will be simple for us, and let's go through the pages of this exhibit.

A. Yes.

Q. And let's go to the first page.

A. Yes.

Q. This page is in a different format from the others.

What -- what is the first page? What is this?

A. This is -- this is Roth trades, so I think this is separate, or is it not? Let me just



take a look.

Third account, so this is mine because the Claudius's was first, second and third were mine, so cash -- just a second.  Oh, no.  Just a second.

This -- this seems to be -- now I am certain -- not so hundred percent certain, but it has only 105 shares.  I think that's my daughter's.  That's the least account.  That's the -- that's the account of my -- probably my daughter.

So when I look at this, I'm now beginning to believe that I showed you all four accounts because we have Claudius and here's Chloe.  She -- she had only that one transaction.

Q.    All right.  Staying on the first page here of Exhibit --

A.    Yeah.  Again, I'm speculating, but I recognize 105 shares.

Q.    All right.  It says, "Third account ROCH trade-Account Statement[76]."

What does the "76" mean?

A.    I don't know.

Q.    Is it the last two digits of the account number?



A.    It could be, but I don't remember.  My daughter's account, it's not -- definitely not my main account.

Q.    All right.  So it -- does it -- does it reflect a purchase of ROCH on March 17?

A.    Correct.  That's where I bought also I believe for my son you will see and for myself --

Q.    All right.

A.    -- and for daughter -- for my daughter. That was my very first trade on 3/17, yes.

Q.    When you made that transaction --

A.    Yes.

Q.    -- placed that order, what was your understanding of the status of the ROCH/PureCycle combination?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    My understanding was that they already -- I -- I knew that they going to PCT ticker symbol.

BY MR. LOFTUS:

Q.    So did you in effect think that notwithstanding the symbol being ROCH that you were



buying PureCycle stock?

    MS. WEINRIB:  Objection to the form of the question, misstates testimony.

BY THE WITNESS:

    A.    Not completely.  I -- actually, the reason for buying it, I wanted to front-run it a little bit before we see the new ticker -- ticker and the people will start -- I thought that people would just jack up the price.

            So I knew I'm buying ROCH, I knew the price number, and this was after my initial investigation of the tickers.  To me it didn't matter if they going to be -- I already knew about the impending transaction from one to the other.

BY MR. LOFTUS:

    Q.    Did you know that the -- the pending transaction required a shareholder vote for approval?

    A.    I read that on the EDGAR.

    Q.    Did you understand when that vote for shareholder approval took place?

    A.    I don't recall.

    Q.    Did you participate --

    A.    And I didn't -- no, and I didn't really



care.

Q.    Did --

A.    I never vote.

Q.    Let me just --

A.    I'm sorry.  That's what I meant.

Q.    But let me ask the question just so we have a --

A.    Yes.

Q.    -- a clear record.

Did you participate in the special meeting of shareholders for purposes of vot- -- voting on the agreement and plan of merger between ROCH and PureCycle?

MS. WEINRIB:  Objection to the form of the question.

You can answer if you recall.

BY MR. LOFTUS:

Q.    It's a very simple question.  Did you participate?

A.    In the voting?

Q.    Yeah.

A.    No.

Q.    Did you attend the special meeting of shareholders?



A.    No.

Q.    Were you eligible to vote?

A.    Yes, yeah.  I had the stock shares.

Q.    When was the special meeting of --

A.    I don't recall.  I -- as I said, I had no intentions with a hundred shares to vote yet.

Q.    Okay.  And is that why you're seeking at least in part to certify a class of 14(a) members, because you were eligible to vote --

A.    That's --

Q.    -- in connection with the merger?

A.    That's the key.  I had the stock.  There may be another doctor, lawyer who bought the stock maybe a week or 20.  I'm representing the class.  I own the stock.  Do I have to vote?  I don't believe so, but I have rights.

Q.    Okay.  I'll tell you what.  Let's look at one -- something here quickly.

All right.  I'll tell you what.  We'll come back to it after a break.  Let's stay with these documents.

Okay.  So -- so this third account you believe -- by the way, on this first page of Exhibit 2, does this reflect activity in just one



of the accounts, just the third account?

A.    Yes, sir.  This page, that I am positive is Chloe.  Why?

Q.    Okay.

A.    Because this (indicating) says, "Claudius."  The last page, 20 -- 20, this is all my son's transactions.

Q.    All right.  When you say -- got it.

Where it says "Claudius" that you pointed out on Page 20 --

A.    Yes.

Q.    -- something is redacted to the left of "Claudius."

What -- what is it?

A.    I do not know.  "Account statement for --" I'm guessing it says --

MS. WEINRIB:  Objection to the question.  To the extent that something was redacted that belongs on a privilege log or some other log, it will produced, but to the extent it's redacted, it's redacted because you're not entitled to the information.

BY MR. LOFTUS:

Q.    Well, based on your experience -- you



were the one who downloaded the material in this
Exhibit 2, correct?

A.    Yes.

Q.    And without -- and respecting your
counsel's comments, without disclosing the -- the
specific information that's under this redaction,
can you tell us in general what you believe it
might be?  An account number?  Another name?

A.    I have no idea.  I can definitely say
this account is mine and Claudius's.  I bought --
if you see the time almost, first shares bought of
Roth, 3/17, 14:49 -- you've got my curiosity now
because --

Q.    Well, but, Mr. Ciecko, with all respect,
that's not why we're here.  We've got to use our
time wisely.

A.    Very -- very well.

Q.    I'll let you --

A.    Very well.

Q.    -- follow up on that curiosity later.

A.    Yes, sir.

Q.    Let's go back to now the second page of
Exhibit 2.

A.    Yes.



Q.    So -- all right.  We're now on what's marked with 10 in the middle of the page, the footer --

A.    Yes.

Q.    -- and again we see a whiteout or -- yeah, a whiteout at the top of the page.

Do you see that?

A.    Yes.

Q.    All right.  And then it says, "Main Account," all right?

A.    That's a nickname.

Q.    I understand.

A.    Yes.

Q.    As I understand it, that's -- there's the conservative account and the main account which is a joint account with your wife, right?

A.    They're both joint accounts.

Q.    All right.

A.    There's no difference between accounts other than the name "conservative" and -- and "main" as nicknames.

Q.    Well, there is a difference.

Isn't one more aggressive than the other in terms of how it's traded?



A.   It -- yes, for the -- again, for the long term.  We never crossed that bridge on this because I was out in two months, so --

Q.   Well, by the way, when you say "for the long term," we just looked at trades that were done on a -- you know, bought one day, sold the next, I mean, so you were doing short-term trading in PureCycle.

A.   No.

MS. WEINRIB:  Objection to the form of the question, misstates his testimony.  He said he was building a position many times.

BY THE WITNESS:

A.   Completely, completely disagree.  Now we're really starting at the beginning.

I -- I already stated, as my counsel, I was building up position.

BY MR. LOFTUS:

Q.   By selling?

A.   Sorry?

MS. WEINRIB:  Objection --

BY MR. LOFTUS:

Q.   By selling?

MS. WEINRIB:  Objection to the form of the



question, misstates his testimony.

BY THE WITNESS:

        A.    I've already in- -- you asked me, sir,
yourself how that technical analysis is applied.  I
told you I could draw the line up and above.  When
I saw that stock reaching a certain daily limit --
upward limit, I saw this as an opportunity to sell
and then bought it a little lower, but I was
establishing position.

             If you see here, there is no proof
that -- I wanted to go for 60, 30 cents profit?
That's -- that's illogical.  With a hundred shares,
that will be 25 bucks.  What would I -- back then
you still had to pay commission.

BY MR. LOFTUS:

        Q.    I don't know.  Let's go back --

        A.    So this is -- I was not trading just for
fun.  It was to establish the best position I
could, and then if you saw, the activity ceased on
my kids' account, on mine.  I was waiting.  Of
course then I was waiting for the -- for the June
news or May.

        Q.    All right.  So now I'm on the second
page --



A.    Yes.

Q.    -- and up at the top it says, "PCT trades second account - Account Statement[97]."

A.    Yes.

Q.    So again, just on the off chance it might jog your recollection, does that "97" mean anything to you, perhaps the last two digits of the account number?  Just yes or no.

A.    No, I don't think that's --

Q.    Okay.

A.    The 97, it might be -- I'm not sure. No.  The answer is I cannot answer this.

Q.    And does this Page 10, referring to the footer --

A.    Yes.

Q.    -- reflect just executed trades?

A.    Yes, because it says "bought, bought, bought, bought, bought," at the bottom it's "sold, sold, sold," but --

Q.    Okay.

A.    -- there is no -- there is no cancelled, so I must have filtered this correctly.

I never intended to confuse people and show the cancelled transactions because again,



that's not consumed.  There is no filing to SEC.

TD Ameritrade wipes it out after a day sometimes,

but it's -- it's irrelevant.  It's -- it's just a

tool to establish the positions, so --

Q.    When -- when --

A.    -- here I only -- only bought and sold,

yes, sir.

Q.    When -- when you trade securities and in

PureCycle, for example --

A.    Yes.

Q.    -- if you -- if you buy and sell, do you

do first in/first out, last in/last out, last

in/first out, I mean, or do you designate each

trade and match up a sell with a particular buy?

MS. WEINRIB:  Objection to the form of the

question.

BY THE WITNESS:

A.    I understand the question, and

TD Ameritrade does it for you for income tax

purposes.  So they always go first in/first out.

You have no choice.

BY MR. LOFTUS:

Q.    Okay.

A.    That is how they report to the IRS and



this is how you fill out the income tax.  Once you click -- click the "PCT" again, the -- all transactions are there.  I just have to verify they have timestamps and everything else.

Q.    Down to Page 12 with the footer, if you would, please --

A.    Yes.

Q.    -- now, in the lower half of the page, we -- we've got what -- what appears to be a slightly different format.  It says, "Account Trade History filtered by PCT," and then we've got position -- "Pos Effect, To Close to Open."

What does that column tell us?

A.    Just a second.  Position effect.

So this -- this tells me whether I put the trades to close or -- so stock sell.  On 5/6 you see I sold -- it indicates minus 1338, and it's a position to close.  That means it's not short because I could establish position minus 1338 to open.  This would indicate that I was a short seller.

But this one, when you see "To Close," that means I had -- I had already shares and I just closed the position.



Q.    I -- I understand.  Thank you for that --

A.    Yes.

Q.    -- explanation.

A.    Yes.

Q.    All right.  And then when we look in the column to the far right, "Order Type," it reflects whether we have a limit or a stop order that was cancelled --

A.    Yes, sir.

Q.    -- correct?

Okay, all right.  Let's go down to the footer with 15 in the middle of the page.

A.    Okay.

Q.    And do you see --

A.    Yes.

Q.    -- maybe six entries down or so several orders placed to open your long call positions?

A.    Bought one PCT call, bought, bought, bought.  Yes, those are options.

Q.    I understand.  And you're long the calls on PureCycle, correct?

A.    Yes.  I was bullish.

Q.    All right.  And you're doing a



combination with June expiration and November expiration, correct?

A. Yes.

Q. And so, for example, on the -- on the first position, if you buy one -- let's see here.

A. One contract, which is 100 shares of PCT.

Q. Each contract is a hundred shares --

A. Yes.

Q. -- correct?

A. Correct.

Q. And then you've got -- so did you buy 21 contracts?

A. It sounds about right, but -- yes, 3, 4, 7. If we add them up, yes.

Q. All right. And it's -- with a strike of 22.5, correct?

A. Yes.

Q. And the price is 7.31, correct? At 7.31?

A. Yes, yes, 7.31. That was -- yes.

Q. All right. So for you to make money on this position, the stock has to at least trade up to roughly $30 a share, correct?



MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Actually 29.81.

BY MR. LOFTUS:

Q.    I was trying to round up, but that's right?

A.    Yes.

Q.    You add up the -- the --

A.    Yes.

Q.    -- 7.31 plus 22.5?

A.    That's my breakeven.

Q.    That's your breakeven?

A.    Yes.

Q.    All right.  Now, why did you suddenly decide to go long calls when at least up until this point in time you'd be long stock?

A.    Okay.  That's somewhat before -- I wanted to explain it a little better, but I'll be happy to do this now.

So I have reached my net worth limit.  Whether it was 5, 6% of liquid net worth, I said I'm not buying any more stock.  With options, if you take that one contract and you pay $7.31, it is



your total risk.  You cannot lose more.

So this is why I turned to options.  I do -- if you ask me why did I want to buy on this, again, not news related, I'm -- I -- I don't want to speculate.  Maybe I liked the trend of the stock.

Analytically, I make those decisions sometimes, but I had to respect my limits, so I -- I only then turned twice to options and I said, "Okay.  Let's -- let's do the options.  This is a limited risk.  I'm not risking thousands of dollars."

This is only a price of an option because in effect I don't own the stock.  You probably know that until you exer- -- exercise the right at the -- at the -- on the settled date or you sell -- sell it shortly for profit, but that doesn't mean that -- that that price at the moment of purchase was -- usually 7.31 is intrinsic value at some kind of a time and here is the base.  This is how much the stock is worth.  So whether the stock was then 27 or 26, I had to pay for time, a certain benefit.

Q.   All right.



A.    So I was -- I know that what -- they were deep in the money calls.  Whether it was 10 or 15%, I cannot comment.

Q.    Very good.  Let's look at -- back at one document, and then we'll take a quick break --

A.    Yes.

Q.    -- Mr. Ciecko.

Let's leave Exhibit 2 behind.  Can I ask you to return to Exhibit 7, please, the prospectus?

A.    Yes.  This one right here (indicating)?

Q.    Yes, please.

A.    Okay.

Q.    Okay.  And I'd like you to look down at what's marked with 63 of 427 on the lower right-hand corner.

A.    63.  Yes.

Q.    And if you'll look -- first of all, I think we've established that this document is dated February 12, 2021.

A.    Yes.

Q.    All right.  And I will represent that this is a document from the SEC EDGAR website, okay?

A.    (Nodding.)



Q.    All right.  So the top of the page, 63, says, "The ROCH Special Meeting."

Do you see that?

A.    Yes.

Q.    And this special meeting was -- was set to approve the agreement and plan of merger between ROCH and PureCycle.

Did you understand that?

A.    Yes.

Q.    Okay.  Now let's go down --

A.    I understand.

Q.    Let's go down to the last bold-faced heading on Page 63 of 427.  It says, "Record Date; Who is Entitled to Vote."

Are you with me?

A.    Yes.

Q.    And it says, "ROCH has fixed the close of business on February 12, 2021, as the record date for determining those ROCH stockholders entitled to notice of and to vote at the Special Meeting."

A.    Okay.

Q.    So do you understand as you look at this, Mr. Ciecko, that in fact you did not have a



right to vote at the special meeting for approval of the merger?

        MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

        A.   Reading this now, it appears so, but again, I do not know the legal jargon, the exclusions.  But I guess I understand the statement.  As I said, I -- I did not vote.  It appears as though like I may be -- not even be eligible to vote.

BY MR. LOFTUS:

        Q.   Let me tell you, Mr. Ciecko, there's probably not a lot we can agree -- agree on, but I'll agree with you on this.

             You didn't vote, okay?  We -- we agree on that, right?

        A.   Absolutely.

        Q.   And I think we can also agree on that you had no right to vote with respect to this merger.

        MS. WEINRIB:  Objection to the form of the question.  You're asking him for a legal conclusion.



MR. LOFTUS:  I'm not asking --

BY MR. LOFTUS:

Q.    I'm asking your understanding of what this -- this prospectus states right here on Pages 63 and 64.

A.    I'm not a lawyer.

Q.    You don't have to be a lawyer.

MS. WEINRIB:  Objection to the form of the question.

You can only answer insofar as you know the answer.  Don't guess or speculate as to whether you --

BY THE WITNESS:

A.    I'm not going to speculate.  I'm not going to speculate.  There is another statement here I would have to read, understand.  It -- just -- just picking the one sentence, I -- I don't want to drag myself into something that may not be correct --

BY MR. LOFTUS:

Q.    Let me --

A.    -- so --

Q.    Let me ask you this, Mr. Ciecko:  Up until this moment --



A.    Yes.

Q.    -- right now --

A.    Yes.

Q.    -- have you believed this entire time from the -- the point when you first became involved in this lawsuit --

A.    Yes.

Q.    -- that you had the right -- that you had the right to vote at the special meeting of shareholders?

MS. WEINRIB:  Objection to the form of the question.

You can answer the question insofar as you have your own understanding that is not related to communications with counsel or any work product prepared by counsel.

BY THE WITNESS:

A.    So my understanding is when you own shares, you have a right to vote.

As far as the legalities and timing, I cannot comment.  I do not understand all legalities involved with this.

BY MR. LOFTUS:

Q.    Mr. Ciecko, let's go to the top of Page



63.

A.    Yes.

Q.    And do you see where it says, "General"?
Again, the same page, 63.

A.    Yes.

Q.    Tell me when you're there.

A.    63?  Okay.

Q.    All right.  And do you see where it says
"General" bold faced?

A.    At Page 63?

Q.    Yes.

A.    I don't have a bold face at all.

Q.    Are you in 63 of 427 in the -- otherwise
it's Page 40 --

A.    It's 63.

Q.    Go to Page 40 if you're using that page.

A.    Yes, yes, yes.  I apologize.  63 on
the -- okay.  Here, absolutely.

Q.    All right.  Now look at "General" at the
top of the page.

A.    Yes.

Q.    It says, "ROCH is furnishing this proxy
statement/prospectus to the ROCH stockholders as
part of the solicitation of proxies by the Board



for use at the Special Meeting of ROCH stockholders to be held on March 16, 2021 and at any adjournment or postponement thereof."

Do you see that?

A.    Yes.

Q.    All right.  So this tells us that the special meeting of ROCH stockholders was on March 16, 2021, correct?

A.    Yes.

Q.    And if we look back at your records reflected by Exhibit 2, you didn't become a shareholder at ROCH until March 17, 2021, correct?

A.    That is correct.

Q.    So can we now agree that you did not have a right to either participate in the special meeting or certainly to vote at the special meeting?

MS. WEINRIB:  Objection to the form of the question.

You can answer as long as you're not speculating or guessing.

BY THE WITNESS:

A.    I would be speculating.  I would definitely need the counsel to make sure what you



just said, sir -- nothing personal -- that this is really correct and there is no -- any other loopholes or anything else.

I cannot -- I cannot -- I -- I cannot say anything without being consciously aware that I'm speculating.

Q.   Let's --

A.   I'm sure we could clarify it at a later date.

MR. LOFTUS:  Mr. Ciecko, spoiler alert, there's nothing to clarify.

Let's take a break.

THE WITNESS:  Okay.  Let's take a break.

MS. WEINRIB:  Objection to the last comments on the record before we break.  Thank you.

THE VIDEOGRAPHER:  Going off the record at 3:55 p.m.

(WHEREUPON, the deposition was recessed from 3:55 to 4:06 p.m.)

THE VIDEOGRAPHER:  Going on the record at 4:06 p.m.

MR. LOFTUS:  Let's mark as Exhibit 10 "Lead Plaintiff's Motion for Class Certification, Appointment of Class Representatives and



Appointment of Class Counsel."

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 10, for identification.)

THE WITNESS:  Thank you.

BY MR. LOFTUS:

Q.    Mr. Ciecko, this motion was filed on your and your brother's behalf on November 30, 2023.

Do you recognize this document?

A.    Yes.

Q.    Did you review this document before it was filed with the court?

A.    Yes.

Q.    Did you approve this document for filing before the court?

A.    Yes.

Q.    All right.  Now, Mr. Ciecko, I'd like you to turn down to Page 2, and do you see in the lower portion of the page it reads, "Plaintiffs seek certification of two classes, each of which satisfies the Rule 23 certification requirements"?

Do you see that?

A.    Yes, I'm here.



Q.   And the first class is a Section 10(b) class, and that's "All persons or entities that purchased or otherwise acquired PureCycle Technologies, Inc. between November 16, 2020 and November 10, 2021, inclusive, and," probably a typo, were "damaged thereby."

Do you see that?

A.   Yes.

Q.   And then there's a second class called the Section 14(a) class.

Do you see that?

A.   Yes.

Q.   And it says, "All persons and entities that held shares of Roth CH Acquisition I Corp ('ROCH') common stock as of November 16, 2020 or February 12, 2021 and were entitled to vote at the special meeting of stockholders held on March 16, 2021."

Do you see that?

A.   Yes.

Q.   Now, that's what your counsel filed on your behalf on November 30, 2023.  You've confirmed in your testimony from a mom- -- moment ago that you authorized this filing.  You wouldn't file any



statement with the court that you knew or believed to be incorrect.

Is that true?

A.    Yes.

Q.    And so with this information now before you, do you see that in fact the Section 14(a) class consists of individuals or entities that held shares of ROCH either as of November 16, 2020 or February 12, 2021?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    It appears -- if this is -- again, with all the legal expertise, if this is the only prerequisite, then definitely this -- this appears to be an omission.

BY MR. LOFTUS:

Q.    Because it then reads -- and also it tells us that the meeting -- "entitled to vote at the special meeting of stockholders held on March 16, 2021."

Do you see that?

A.    Yes.

Q.    And, in fact, this information in 14(a)



corresponds with the prospectus we reviewed that's marked as Exhibit 7, correct?

A.   Correct.

Q.   And if we read back in this Exhibit 10 on Page 3, it says, "Plaintiffs are members of each class."

Do you see that?

A.   Still on -- still on that Page 3?

Q.   So if you're up here with me, Mr. Ciecko --

A.   Yes.

Q.   -- right after "March 16 --"

A.   Yes.

Q.   -- "2021" --

A.   Yes, yes, yes.

Q.   -- it says, "Plaintiffs are members of each class."

Do you see that?

A.   Yes.

Q.   Now, we know, just to make this questioning a little more efficient, that your brother didn't purchase shares until March 26, 2021 or so.

Do you recall that?



A.    Yes.

Q.    And so will you agree with me that neither you nor your brother are members of the 14(a) class?

MS. WEINRIB:  Objection to the form of the question.

Only answer insofar as you are not speculating and only answer insofar as you are not revealing communications with counsel or an attorney work product.

BY THE WITNESS:

A.    I don't think I have sufficient information to -- not to speculate.  I don't want to say it appears so.  I'm not going to speculate off of the counsel's advice.

BY MR. LOFTUS:

Q.    Well, your -- your testimony really shouldn't be reflective of your counsel's objection on the record.

This -- this is a pretty clear statement that's reflected by Exhibit 7, the prospectus, and as effectively repeated in your motion for class certification, Exhibit 10, and it indicates that you need to be a stockholder of ROCH on one of two



dates.

Is -- do you have any trouble comprehending that principle?

MS. WEINRIB:  Objection to the form of that question.

BY THE WITNESS:

A.    If this is the only principle, then it appears that this is correct, what you just said. I just do not know if this is the only principle to be considered with this.

BY MR. LOFTUS:

Q.    Are --

A.    On the surface it appears so.

Q.    All right.  Are you aware of any other document in this case that you reviewed that you believe gave you a right to participate in the shareholder meeting on March 16, 2021?

MS. WEINRIB:  Objection to the form of the question.

And only answer insofar as you are not revealing communications with counsel or any attorney work product.

BY THE WITNESS:

A.    I cannot be certain that there is



800.211.DEPO (3376)
EsquireSolutions.com

nothing else in any documents that -- that we have talked about today.

BY MR. LOFTUS:

Q.    Let me ask you this --

A.    Yes.

Q.    -- Mr. Ciecko.

Do you recall that the original iteration of the complaint that you reviewed only had a 10(b) claim and not a 14(a) claim?

A.    Yes.

Q.    And do you recall that the 14(a) claim was only added by amendment at some later point?

A.    At some point, yes.  I just don't know when.

Q.    Before that 14(a) complaint was added to one of the amended complaints, did you --

A.    To the best of my memory --

Q.    You've got to -- you've got to wait until I ask the question.

Before that 14(a) claim was included in one of the amended complaints, did you do anything to determine whether you would be a member of the class for that claim?

MS. WEINRIB:  Objection to the form of the



question.

And I instruct you not to answer if it will -- if you can only answer by revealing communications with counsel or any attorney work product.

BY THE WITNESS:

A.    Based on the statement, I cannot make a comment.

BY MR. LOFTUS:

Q.    But certainly you didn't do anything independent of a discussion with counsel to determine whether you would be a member of the 14(a) class, is that correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Independently, I did not make any decisions to decide whether I am in this position or not.

BY MR. LOFTUS:

Q.    Let's go down to Page 10 in this Exhibit 10, and in the first complete paragraph --

A.    "Until March 17, 2021"?

Q.    Yeah, the -- there's referenced what



I'll call three forms of PureCycle securities.  One is PureCycle common stock trades that trade under the symbol PCT.

Do you see that?

A.    "Under the ticker symbol 'PCT,' the warrants to purchase --"

Q.    Yeah, I'm sorry.

A.    That section?

Q.    Yeah, it's --

A.    Yes.

Q.    -- ticker symbol --

A.    Yes.

Q.    -- not stock, but -- but there's a ticker symbol for just the common stock -- stock, which is PCT, correct?

A.    Yes.

Q.    Then there's "warrants to purchase its common stock under the ticker symbol 'PTTW.'"

Do you see that?

A.    Yeah, I see that.

Q.    Did you ever purchase any warrants under the ticker symbol PTTW?

A.    I have not.

Q.    To your knowledge, did your brother



purchase any warrants under the symbol PTTW?

A.    To my knowledge, he did not.

Q.    And then there's a third category, "units comprised of PCT common stock and warrants trading on the NASDAQ under the ticker symbol 'PCTTU.'"

A.    I see that.

Q.    Did you purchase any PCT-related securities with the ticker symbol PCTTU?

A.    I did not.

Q.    Do you know if your brother purchased any securities with the ticker symbol PCTTU?

A.    To my knowledge, not.

Q.    Okay.

MS. WEINRIB:  Do you know what the run time is?

THE VIDEOGRAPHER:  We're at 5 hours and 30 minutes.

MS. WEINRIB:  Thank you.

BY MR. LOFTUS:

Q.    All right.  I'm at Page 12 now and I'm in that first full paragraph that begins with, "Here, the proposed Class Representatives."

A.    Yes.



Q.    And if you'll look down six lines up, it says, "All members of the 14(a) Class, including the proposed Class Representatives --" which is you and your brother, correct?

A.    Yes.

Q.    -- (continuing) "held shares of ROCH common stock as of November 16, 2020 or February 12, 2021."

That is not correct, correct?

A.    It appears to be consistent with the two other dates.  They all align, but I -- to my non-legal knowledge, I see at least consistency that yes, we have -- we have established the same pattern.

Q.    But -- but just on that very simple point, Mr. Ciecko, neither you nor your brother owned ROCH common stock as of November 16, 2020 or February 12, 2021.

A.    In that period, we did not, that is correct.

Q.    Okay.  And -- and just to be clear, Mr. Ciecko, I -- I don't want the record to have any ambiguity, did you own any shares of ROCH common stock as of November 16, 2020?



A.    Not at all.

Q.    Do you know whether your brother owned shares of ROCH common stock as of November 16, 2020?

A.    To my best knowledge, no.

Q.    Did you own shares of ROCH common stock as of February 12, 2021?

A.    No, I did not.

Q.    Do you know if your brother owned shares of ROCH common stock as of February 12, 2021?

A.    To the best -- to the best of my knowledge, no.

Q.    Did your brother ever tell you that he participated in the special meeting of stockholders on March 16, 2021?

A.    No, he never -- never -- he never -- this conversation never brought up, no.  He didn't ever tell me.

Q.    Okay, all right.  Let's go to Page 7 of this motion --

A.    All right.

Q.    -- Mr. Ciecko.  On the bottom of the page, it -- it begins in the new paragraph, "Then, on November 10, 2021, Defendants revealed that on



September 30, 2021 the SEC issued an investigative subpoena to Defendant Otworth 'requesting testimony in connection with a non-public, fact finding investigation of the company.'"

Did you see that?

A.    Yes.

Q.    Were you aware of that SEC investigative subpoena by any means other than counsel, meaning did you see it online, in a public filing or anything akin to that?

A.    I don't recall.  I don't recall knowing that ahead of the time.

Q.    Do you know what the status is of the SEC's investigation related to PureCycle?

A.    Not a hundred percent sure.

Q.    Have you ever learned that the SEC closed the investigation without action?

MS. WEINRIB:  Objection to the form of the question.

You can only answer insofar as you're not revealing communications with counsel or any attorney work product.

MR. LOFTUS:  Well, look, this is a fact.  It's not legal advice; it's -- it's a fact.  I mean,



it --

    MS. WEINRIB:  If it was a fact discussed with counsel in the course of litigation, it's a privileged communication, and he will not testify about it.

BY MR. LOFTUS:

    Q.   All right.  So --

    A.   That's correct.

    Q.   So let me show you something, Mr. Ciecko, and it's just some pages -- some isolated pages from a 10-Q, and I just copied a couple of pages so I wouldn't have to kill too many trees.

    A.   Yes.

    Q.   Well, I guess we already killed them anyway, so let's go with the long version.

    Let's mark this as Exhibit 11, and this is a Form 10-Q for the quarterly period ended September 30, 2021.

          (WHEREUPON, discussion between attorneys was had off the record.)

BY MR. LOFTUS:

    Q.   Actually, I'm going to go back to -- to my document, so let's mark as -- Exhibit 11 are we



up to -- isolated pages for the Form 10-Q for the

quarterly period ended March 31, 2022.

                    (WHEREUPON, a certain document was

                    marked R. Ciecko Deposition Exhibit

                    No. 11, for identification.)

        THE WITNESS:  Thank you.

BY MR. LOFTUS:

        Q.    Now, Mr. Ciecko, just in general,

your complaint is based on allegations of

misrepresentation and omissions, correct?

        A.    It's based on the not full -- if you

mean -- if that equals to not disclosing all the

facts, then I believe that they were not disclosed.

        Q.    And so you've presented to the court a

complaint that says there were various omissions

and in some cases alleged misrepresentations about

PureCycle, correct?

        A.    Okay, correct.

        Q.    And you agree it's important to -- to

give the court complete information that's at your

disposal with respect to your allegations?

        A.    Correct.

        Q.    So let me ask you to look at what's

marked as Exhibit 11, and you know a 10-Q is a



quarterly --

A.    Yes --

Q.    -- report, correct?

A.    -- report for the publicly held companies.

Q.    And so I want you to look down on the second page of this exhibit which says "27" on the footer.

A.    Yes.

Q.    And do you see a heading that's bold-faced that says, "Regulatory Investigations"?

A.    Yes.

Q.    And it says, "On or around September 30, 2021, the SEC issued an investigative subpoena to PCT's Chief Executive Officer requesting testimony in connection with a non-public, fact-finding investigation of the Company."

Do you see that?

A.    Yes.

Q.    Well, let me just ask you first, Mr. Ciecko, as a -- a general question about your understanding.

Do you believe the fact that the SEC opened a non-public, fact-finding investigation of



PureCycle by itself means that there was wrongdoing

at the company?

    MS. WEINRIB:  Objection to the form of the

question.

BY THE WITNESS:

    A.    Would you mind repeating the question?

I'm not -- do I believe if SEC --

BY MR. LOFTUS:

    Q.    The -- the mere fact that the SEC opened

a non-public, fact-finding investigation of

PureCycle necessarily means that there was some

misconduct at the company.

    MS. WEINRIB:  Objection to the form of the

question.  You're asking about his personal belief?

    MR. LOFTUS:  Yes.

BY THE WITNESS:

    A.    My personal belief is I have no clue

what this includes, why would they start, why would

they finish.  I -- I do not know how they are

governed.

BY MR. LOFTUS:

    Q.    Right, but I just want to know:  When

you -- when you learned that there was an SEC

investigation related to PureCycle, did that



trigger in your mind that -- some thought that

something must be wrong there?

A.   Again, it's not related to PCT.  I've --

I've read in The Wall Street Journal, Investor

Business Daily many times SEC doing many things for

different reasons, so I -- I don't really opinion.

This is completely out of my league.

Q.   So the SEC investigation was of no

consequence to you when you learned about it, is

that correct?

MS. WEINRIB:  Objection to the form of the

question, mischaracterizes his testimony.

BY THE WITNESS:

A.   I'm confused.

BY MR. LOFTUS:

Q.   I mean, did it mean anything to you

when you learned that the SEC had commenced a

non-public, fact-finding investigation?

A.   Okay.

MS. WEINRIB:  Objection to the form of the

question.

BY THE WITNESS:

A.   As I said -- stated before, I am not

sure what are the exact rules of open, close, did



they find something but they closed it anyhow.  I cannot speculate.  Absolutely not.  I have no means of saying -- it -- it does not give me -- it doesn't give me any meaning.

BY MR. LOFTUS:

Q.    All right.  In Exhibit 11, let's read on.  It says, "On April 26, 2022, the Company received correspondence from the SEC notifying the Company that the SEC concluded the SEC's non-public, fact-finding investigation without further action at this time."

Do you see that?

A.    Yes.

Q.    Do you think it would be important to bring that to the attention to the court?

MS. WEINRIB:  Objection to the form of the question.  This is beyond his purview.  This is not what he's here to testify about.  I don't understand the point of this.

MR. LOFTUS:  Are you instructing the witness not to answer?

MS. WEINRIB:  Are you going to ask a relevant question?

You can answer the question insofar as



it doesn't reveal attorney/client communications or

work product.

BY THE WITNESS:

    A.    I don't feel qualified to -- to me

it's -- again, I do not understand the rationale

and SEC rules for opening something, not opening

anything, not disclosing or disclosing what they

found.  I'm not in a position to comment on

SEC-related questions whatsoever.

BY MR. LOFTUS:

    Q.    Mr. -- but you know that this is part of

the allegations in your complaint about the SEC

investigation.

        Do you know that?

    A.    Yes.

    MS. WEINRIB:  Objection to the form of the

question.

        And again, you can answer insofar as

you're not revealing anything that you communicated

to counsel about or any attorney work product.

BY THE WITNESS:

    A.    In that instance, I -- I cannot make the

statement.

BY MR. LOFTUS:



Q.    All right.  We'll come back to that in a moment, but let's -- let's go back to the -- Exhibit 10, the motion for appointment of class representative, and let me ask you to turn now to Page 13.

A.    Page 13 of Exhibit 10?

Q.    Please.

A.    Okay.

Q.    And there's -- in the second full paragraph, it reads, "Moreover, Plaintiffs."

A.    Yes.

Q.    Do you see that?

And then it continues that "Plaintiffs have participated in motions for appointment as Lead Plaintiffs, reviewed and authorized the filing of two amended complaints, reviewed the briefing on four motions to dismiss, a motion to strike, and a motion for reconsideration."  Let's stop there.

So you reviewed the motion for reconsideration that the defendants filed after the court issued its order on the motion -- motions to dismiss.

Is that true?

A.    True, the basis of the -- yes, yes.



Q.    All right.  And do you recall from reviewing the motion for reconsideration that the defendants pointed out to the court, among other things, that the SEC investigation referenced in the complaint had been terminated without further action?  Do you recall seeing that in the motion for reconsideration?

A.    Yes, yes.

Q.    All right.  Now --

A.    I believe so, but...

Q.    Did that mean anything to you at the time?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Same statement as before.  It did not mean to me what did the SEC -- SEC has done or why did they do this.  It was -- it was beyond my comprehension.

BY MR. LOFTUS:

Q.    Now, you subscribe to The Wall Street Journal, correct?

A.    Yes.

Q.    And do you recall reading an article in



or about early February 2022 stating that the US Department of Justice had commenced an investigation of prominent short-selling investment and research firms?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    No, I -- I'm not aware of this article.

BY MR. LOFTUS:

Q.    Sep- --

A.    I do not recall.  I never read it.

Q.    Separate and apart from any article --

A.    Yes.

Q.    -- have you learned at any time that the DOJ --

A.    Uh-huh.

Q.    -- had commenced an investigation of prominent short-selling investment and research firms, including Hindenburg Research?

A.    No, I --

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I have not.



BY MR. LOFTUS:

Q.    You're -- you're not aware of that?

A.    No, I was not aware of that.

Q.    Does the -- assuming what I'm telling you is true, would that cause you to have any concerns about any of the bias in the Hindenburg research?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Absolutely not.

BY MR. LOFTUS:

Q.    Okay.  Now, you understand that the -- the Hindenburg report is a -- is a short biased research piece, correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I understand that they are involved in short-selling activities, but none -- in my op- -- in my le- -- non-legal opinion, if they would be doing something wrong, they would not exist already.  They must have the resources to do -- present the facts.



It's my speculation, but I'm -- I'm going to focus again on the things that I've seen in their report.  There was a lack of disclosure on the track record, on the risks, and what bothered me is day two, three, four, five, I did not see anyone denying it from PCT.  This was enough for me to say something is wrong --

BY MR. LOFTUS:

Q.   Now --

A.   -- so --

Q.   I'm sorry.  Now, are you aware that there was a PureCycle earnings call in mid-May 2021 following the release of the PureCycle report?

A.   I'm aware that they started reporting on a quarterly basis --

Q.   Have you --

A.   -- but I did not listen in those -- no, I did -- I did not listen in.

Q.   Are you aware that companies often file and publish a transcript of the earnings call?

A.   Yes.

Q.   Okay.  Have you looked at any of the transcripts of the PureCycle's -- PureCycle's earning calls from let's say May 2021?



A.    After I liquidated my position, I had no interest to read anything about PCT.

Q.    Okay.  So you've basically made up your mind --

A.    But re- --

Q.    -- at this point in time that something happened and you believed that you were cheated, correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    It's not a fact that I was cheated but I was denied the full information.

BY MR. LOFTUS:

Q.    Now --

A.    That was my belief.

Q.    Now, that full information -- do you recall the Hindenburg Research report encourages people to do their own due diligence?

A.    Yes.

MS. WEINRIB:  Objection to the form of the question.

THE WITNESS:  Sorry.

BY MR. LOFTUS:



Q.    And was -- was there anything in that report that wasn't otherwise available to the public --

MS. WEINRIB:  Objection to the form --

BY MR. LOFTUS:

Q.    -- to your knowledge?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I'm sorry.  I don't -- repeat the que- -- repeat this again.

BY MR. LOFTUS:

Q.    Was there anything in the Hindenburg report from May 6, 2021 that wasn't otherwise available publicly?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    There -- at least one item.  I noticed the Hindenburg reported was peer-to-peer opinions. They claimed that there is no -- I'm sorry.  I'm not going to misquote the Hindenburg, but they -- to the tune that they -- they -- they questioned why there is no peer-to-peer opinions of the staff



and the process if it's so great.

This is more or less what they put it in.  I'm --

BY MR. LOFTUS:

Q.    Well, did -- did any of the materials --

A.    I -- as a public person, I didn't see this anywhere.  I didn't see where could I get the CEO's track record and the previous mishaps and the risks we already talked.

Q.    So were you familiar with that notion of a -- of a peer-reviewed report in connection with a new patented technology as of March 2021?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I've only heard about this report -- about this peer-to-peer process from Hindenburg report.

BY MR. LOFTUS:

Q.    So you -- before the Hindenburg report, you'd never heard of the notion of a peer-to-peer review process for a new technology, is that correct?

MS. WEINRIB:  Objection to the form of the



question.

BY THE WITNESS:

    A.    I've heard the term, but it was in a medical industry.

BY MR. LOFTUS:

    Q.    All right.  Now, Hindenburg's report didn't say that the fact that there wasn't a peer-to-peer review meant by itself that somehow the technology was deficient.

    MS. WEINRIB:  Objection to the form --

BY MR. LOFTUS:

    Q.    Am I correct?

    MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

    A.    I'm not sure if I understand the question.

BY MR. LOFTUS:

    Q.    Well, the -- the fact that there wasn't a peer-to-peer review didn't mean by itself that the technology wasn't viable according to Hindenberg, is that right?

    MS. WEINRIB:  Objection to the form of the question.



BY THE WITNESS:

A.    This was just one of the items Hindenburg pointed out that it was -- that they believed is -- there was something wrong.

BY MR. LOFTUS:

Q.    Right, but do you recall --

A.    In my non-professional opinion, this was another red flag why -- why they bringing this up and why we don't see anything --

Q.    Did Hin- --

A.    -- disclosed prior.

Q.    I'm sorry.  Did Hindenberg state in its report that every single new technology undergoes some type of peer-to-peer review?

A.    No, I --

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I don't believe they make such a statement.

BY MR. LOFTUS:

Q.    Right.  It says -- in fact, do you recall the report said that many leading plastics companies publish peer-reviewed studies?



MS. WEINRIB:  Objection to the form of the question.  He doesn't have the report in front of him.

BY MR. LOFTUS:

Q.    Do you recall that being in the report, Mr. Ciecko?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    Honestly, at this moment after two years, I remember only those things that bothered me the most.  So that -- that little statement, no -- I'm sorry, no, it's -- that disclosure I do not recall.

BY MR. LOFTUS:

Q.    If I asked you this earlier, I apologize, but what's the current status of the company, do you know?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    The company still exists because the ticker exists, but I don't have any interest of following up the company anymore.  I have -- in



pure language, I don't care really what they do.
I -- I'm completely over it.  If -- any trades I
make, it's past.  Now I'm focusing on the future --

BY MR. LOFTUS:

Q.    The --

A.    -- as an investor.

Q.    The focus of my question is a little
different, though, Mr. Ciecko.

Are -- are you completely indifferent to
whether this technology works and they can produce
recycled pellets for commercial purposes?

MS. WEINRIB:  Objection to the form of the
question.

BY THE WITNESS:

A.    I -- I feel still so scarred that I
really don't have any -- I'm neutral.  I'm neutral
on this -- the subject.

BY MR. LOFTUS:

Q.    Hmm.

A.    Whether they will do it, it's great for
environment, if they don't do, it's too bad for the
environment, but I -- I don't -- I don't know what
else to tell you.  It's -- again, I'm not a super
expert.  I don't know how much, you know, of a



800.211.DEPO (3376)
EsquireSolutions.com

climate will it save or impact.  I -- I have a feeling it helps, but I'm speculating, and I'll stop here.

Q.    All right.  Mr. Ciecko, let's go back to the consolidated second amended class action complaint, and it's marked as Exhibit 4.

A.    Okay.

Q.    And you reviewed and approved this document for filing, correct?

A.    Correct.  That's -- that's the whole document?  Yes, yes, correct.

Q.    All right.  And let's go down to Page 7 of Exhibit 4.

A.    Okay.

Q.    And Paragraph 14 makes reference to the SEC investigative subpoena.

Do you see that?

A.    Yes.

Q.    And this complaint was filed on August 18, 2022.

Now, as I -- I showed you, the PCT Form 10-Q which was filed in -- in May 2022 reported that the investigation had been concluded without further action at the time, so the -- according to



the regulatory filings by PCT, the SEC had already concluded the investigation by the time this complaint was filed in August, but I take it you didn't know that, did you?

MS. WEINRIB:  Objection to the form of the question, mischaracterizes testimony.

BY THE WITNESS:

A.    Without revealing the conversations with counsel, I cannot answer this question.

BY MR. LOFTUS:

Q.    Do you think it's fair to present to the court the -- the fact that an investigation was opened without also telling the court that it was closed without action?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I'm not sure if you're talking fairness or -- or legalities or --

BY MR. LOFTUS:

Q.    Let's just go with fairness.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:



A.    It's only fair that the court hears everything, but every -- every item -- every little detail, that's -- that's all I can say.

BY MR. LOFTUS:

Q.    Let's go down to Page 9, please, Mr. Ciecko.  In Paragraph 22 about midway down we see another reference to the March 16, 2021 shareholder approval of the merger and the March 17, 2021 closing of the merger.

Do you see that?

A.    Yes.

Q.    Okay.  And you approved that for inclusion in this complaint with filing, correct?

A.    Correct.

Q.    Okay, all right.  Let's go down now to Page 13 --

A.    Page 13.

Q.    -- and in the -- the portion of Page 13 that's part of Paragraph 34 that continues from the prior Page 12, and -- and it's talking about Chinese reverse mergers and so forth, and then it says, "Unwary investors suffered monumental losses --" there probably should be a period there -- "Roth's FINRA BrokerCheck report currently



shows 16 regulatory sanctions and 12 arbitrations

and violations of Securities and Exchange Act 34

Reg M."

        Now, "Roth" is defined as Byron Roth in

this complaint, right?

        A.    Yes.

        Q.    I'll -- I'll represent that to you, and

we can even find it, if you'd like.

        A.    This is all about Byron Roth, yes.

        Q.    Now, in -- in --

        MS. WEINRIB:  Objection to the form of the

question and to the characterization of the

complaint.

        You can go ahead and ask your question

now.

BY MR. LOFTUS:

        Q.    Let's go back to Page 9 of the complaint

first --

        A.    Okay.

        Q.    -- and Paragraph 26.

        A.    Paragraph 26.

        Q.    Do you see that Defendant Byron Roth is

defined for -- for future reference as just "Roth"?

        A.    Yes.



Q.    Meaning that's how people do things sometimes so they don't have to write out a full name --

A.    Right.

Q.    -- or term, correct?

A.    Correct.

Q.    All right.  So when you approved this for filing -- and I'm back to Page 13 -- did you understand that Byron Roth's FINRA BrokerCheck reported these regulatory sanctions and arbitrations?

MS. WEINRIB:  Objection to the form of the question.

You can answer your own understanding, but you cannot reveal communications with counsel or attorney work product, and also the document speaks for itself.

MR. LOFTUS:  Well, it does speak for itself, and that's the problem.

BY MR. LOFTUS:

Q.    So that's my -- my --

MS. WEINRIB:  Objection to counsel's comments, but you can ask an actual question now.

BY MR. LOFTUS:



Q.    Well, Mr. Ciecko -- Ciecko, I -- that's what I'm getting at.

I mean, when -- when you approved this, did you understand that this complaint was telling the court that Byron Roth's FINRA BrokerCheck reported regulatory sanctions and arbitrations and SEC violations?

A.    I believe that Byron Roth is the person we addressing.

Q.    Yeah.

A.    Not Roth company.

Q.    Are -- are you -- have you ever looked at Byron Roth's FINRA BrokerCheck?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    BrokerCheck?

BY MR. LOFTUS:

Q.    Are you aware that the FINRA BrokerCheck that's referenced in this Paragraph 34 at Page 13 is available on a website to the public?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:



A.    I wasn't avail- -- I wasn't aware -- I'm not aware that it's available to the public -- every single public person.

BY MR. LOFTUS:

Q.    I'll represent to you, Mr. Ciecko, that it is and that if you review it for Byron Roth, he has no disclosable events; he doesn't have regulatory sanctions, arbitrations, violations.

MS. WEINRIB:  Objection to your testimony which is also false and inaccurate and disputes facts in the record.  If there's an actual question, then please ask it.

BY MR. LOFTUS:

Q.    Well, the question was:  Are you aware --

MS. WEINRIB:  You're asking him if he's aware of information that's not true.

BY MR. LOFTUS:

Q.    Here, I have -- I have Mr. Roth's BrokerCheck report.

MS. WEINRIB:  Are -- are you entering this into this evidence as an exhibit?

MR. LOFTUS:  Well, no, I'm not going to mark my iPad.  That seems a little aggressive.



MS. WEINRIB:  Well, I agree.

BY MR. LOFTUS:

Q.    But I will show you --

MS. WEINRIB:  Well, no, no.  If this is not in evidence and it's not reflected in the record, then this is -- then you -- you're not asking him a question based on this.  If you want to give me a copy of this and mark it as an exhibit, then you can ask questions.

MR. LOFTUS:  Well, let's just make this easier.  I'm a little concerned that you're accusing me of saying something that's not truthful on the record, and I have the publicly available report for Byron Roth and you're somehow suggesting that I'm lying to your client, and that's a little disturbing.

MS. WEINRIB:  You're misrepresenting because you know that it is in the complaint as well as in all the briefing on the motion to dismiss and the court order that Byron Roth controls Roth Capital and that he is therefore by the court order considered equivalent.  He controls the entity, and the court already agreed with this.

You're mischaracterizing and



misrepresenting things in your questioning to the

witness.  If you want to ask a question, it has to

be based on accurate information and it has to be

based on facts that are before him in the record or

entered into evidence.

BY MR. LOFTUS:

    Q.    So I disagree with your counsel's

interpretation of the court's ruling, but we need

not argue about this because it is what it is.

          I submit that the court in no way, shape

or form took that broad a position with respect to

Byron and Roth Capital, but just to round up, it is

in fact the case, Mr. Ciecko, that you've never

personally reviewed Byron Roth's FINRA BrokerCheck

report.  Let's just see if we can round up on that

point.

    A.    No, I did not.

    Q.    Okay.  Are you aware that there's a

separate BrokerCheck report for Roth Capital

Partners LLC?

    A.    No, I am not, and after your exchange,

I'm completely confused on this subject.

    Q.    Okay.  And -- and just to -- to round

up, Mr. Ciecko, on some of these allegations, in



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 329 of 439
PageID 7813
ROBERT CIECKO
William C. Theodore vs PureCycle Technologies
December 07, 2023
327

the same document, let's go to Exhibit 4, Par- --
Page 43, Paragraph 119.

A.    Okay.

Q.    And again we can see that same reference under Count III for 14(a) that it's be- -- on behalf of all shareholders who held Roth CH Acquisition I Corp common stock as of November 16, 2020 or February 12, 2021 and were entitled to vote at the special meeting of stockholders held on March 16, 2021.  That's part of the filing you approved back in August 2022.

A.    Yes.

MS. WEINRIB:  Objection to the form of the question.  That was a statement.

BY MR. LOFTUS:

Q.    All right.  Now, if we go down to Page 47, Paragraph 137, the -- the allegation of -- you know, related to a 14(a) claim is that solicitations were made for purposes of the vote based on false information.

Do you understand that?

A.    No.  Would you mind repeating it?

Q.    That allegations that relate to the 14(a) claim --



A.    Yes.

Q.    -- basically state in an abbreviated form that misrepresentations and omissions were made to shareholders who were entitled to vote at the special meeting.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    So what is the question?  If I do agree with that --

BY MR. LOFTUS:

Q.    Yeah, you don't -- put that down for a moment.

A.    Yes.

Q.    Do you understand that the 14(a) claim --

A.    Yes.

Q.    -- that people who were eligible to vote at the special meeting --

A.    Yes.

Q.    -- they were solicited to make that vote and were misled?  Do you understand that's the thrust of the report?

A.    Mis- --



Q.    Misled, given allegedly false information.

A.    Regarding what?

Q.    The merger between ROCH and the business of PureCycle and the viability of the technology and whether it would work and so forth.

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I believe they were not told the whole truth.

BY MR. LOFTUS:

Q.    All right.  So let's go back now to 47 -- Page 47, Paragraph 137.

First of all, you were not solicited to vote one way or another at the special meeting, correct?

A.    I was not.

MS. WEINRIB:  Objection to the form of the question.

MR. LOFTUS:  Did you get the witness's answer?

BY MR. LOFTUS:

Q.    It says, "Plaintiffs and other members of the Class eligible to vote on the Merger



Agreement were misled by Defendants' false and misleading statements and omissions."

Now, you weren't eligible to vote on the merger agreement, correct?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    If the statements here are correct, then it appears so, but again, I've seen the consistency so far.  I --

BY MR. LOFTUS:

Q.    And --

A.    I'm not denying I purchased the stock on the 17th.  If that's the break or make rule, then I -- then I understand that -- the breakpoint.  I just don't know if this is the only classifying point, anything else.

Q.    And that being the case, Mr. Ciecko, assuming there's nothing else, then certainly you weren't misled in connection with any vote on whether to approve the merger, correct?

MS. WEINRIB:  Objection -- objection to the form of the question.  I'm assuming you're asking for his opinion and not for a legal conclusion.



MR. LOFTUS:  Yeah, that's all.

BY THE WITNESS:

A.    I wasn't there, so I could not be misled.

BY MR. LOFTUS:

Q.    All right.  Let's mark as exhibit next handwritten notes that were produced during the lunch break and they are Bates stamped CIECKO001939.

(WHEREUPON, a certain document was marked R. Ciecko Deposition Exhibit No. 12, for identification.)

BY MR. LOFTUS:

Q.    Okay.  Mr. Ciecko, these were notes that were produced to us during the lunch hour.

Are these the notes that you referenced in your testimony this morning?

A.    Yes, I did.

Q.    Is all of the handwriting yours?

A.    Yes.

Q.    When were the notes made?

A.    During the week of my stock accumulation.

Q.    Was that the week of March 17?



A.    Starting on the 17th.

Q.    All right.

A.    Yes, I recognize some of the facts that I've heard on March 17 or gathered on March 17.

Q.    All right.  This looks like some type of diary or DayTimer.

Is that what this page is from?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    It's not a diary.  It's, rather, my personal scratch book where I put my personal things to do.  Sometimes even as a trader you put your own feelings, how you feel to -- to analyze later but also idea generation, and -- and I jotted down -- once I started looking at PCT, I started -- every time I gathered some information which I felt is relevant, I -- I jotted down very quickly.

For example, "27 billion market cap," it's not PCT's market cap.

BY MR. LOFTUS:

Q.    Let's talk about that right now.

A.    So it's just an example.  That's my shorthand of information that I was jotting down.



Q.    Wasn't that roughly PureCycle's market cap in the March 2021 timeframe?

MS. WEINRIB:  Objection to the form of the question.

BY MR. LOFTUS:

Q.    When you say "27 billion," is that -- are you saying 27 billion or 2.7?

A.    No, 27.

Q.    Well, but --

A.    Oh, sorry, 2 -- 2 -- it looks like almost 2, but I thought that when I've heard someone making a -- talk about the garbage market, I understood China stopped receiving garbage, and then PureCycle Technologies, they mentioned garbage, but I was not interested in other garbage stocks, and I thought that the whole market is worth 27 billion market cap.  That was my understanding.

Q.    All right.  Let's take a look at these notes.

So were these notes --

A.    Well, 2.7 -- if I look at this, it says 2.7 now, 14 billion is projected EBTA.

Okay.  2.7 market.  I even -- yes,



that's -- it's been two years, but yeah, I guess it's 2.7 market cap, PureCycle.  Okay.

Q.    All right.  Now, were these notes taken over the course of several days, in one sitting?  What's your recollection?

A.    No, it's -- it's a few -- because I see -- I see my -- I marked also how my -- how many stocks -- how much stocks I bought and which costs and I added, but this section here, I wrote it down once, but it was based on my collection of the items between March 17 and March 29.

Q.    Why red ink and blue ink?  Just the pen available at the time?

A.    Pen available.  I have -- I use them to -- to mark things up and then I just -- it's no significance.  Color is no significance.  Like on the stock trading --

Q.    All right.

A.    -- this was just pen available on that date.

Q.    I -- I understand.  Now, the -- the first line says, "3 years ago --" does that say "China stopped receiving garbage"?

A.    Yes.



Q.    All right.

A.    Yes.  That was one of the -- for people who talked about garbage and the ESG trends in the United States that because China will not accept, somebody will have to accept that garbage, and then there is a, you know, ESG-friendly environment for the companies who recycle things and the states will mandate even more -- it more.

Q.    All right.

A.    That's how I recall it.

Q.    Okay.  And then if we go down it says -- down the page something "14 P 2020" and then EBITDA or "EBTA," actually, E-B-T-A.  What does that say?

A.    Oh.

Q.    Read -- just read it for us.

A.    That's 14 billion --

Q.    Oh.

A.    -- versus 2.7.  This -- this, if I remember my shorthand, was -- some other garbage stock was valued at 14 billion and the PCT was only 2.7.

Q.    Got it.

A.    So in that -- that -- someone was making -- wherever it was, they were making the



case that look, PCT has potential to be a lot

higher price if they can be -- be on par with the

peers.

Q.    Okay.

A.    So that's referred to some -- some other

potential.

Q.    Okay.

A.    That's -- that's how I gauge potential.

Wow, it's a four-bagger.  Maybe it can go even four

if -- if they will give the price valuation as to

the other garbage stocks.

Q.    Got it.  All right.  Then there's a line

just -- just read it for us.  It says, "In June,"

arrow, and then -- then what does it say?  "Be

weighted"?  Just -- just read it for us.  "In

June --"

A.    "Reweighted into the --"

Q.    Oh, "reweighted"?

A.    "-- benchmarks."

You know, S&P 500, every six months they

drop some stocks and they add some stocks, so does

Russell, so PCT was to join -- I made that note

that PCT is going to be part of the Russell 2000,

if I remember right; therefore, there will be



companies who will have to buy it just like they buy John Deere, Caterpillar.  Whether you like it or not, if you buy the SPY EFT, they have to just buy a certain percentage.

So this was another positive actually sign that, hey, people will have to be buying it blindly if -- if they are going to incorporate PCT into Russell 2000 because the weighting has to be there.

Q.    Okay.

A.    What weighting, I don't know, but that was another positive cue for me.

Q.    Okay.  Then it says towards the -- the bottom portion right-hand side of the page, "Bike," B-i-k-e --

A.    No, that was bought 1,000 shares at 22.70.

Q.    Oh, I got it.  Okay.

A.    And then I said -- you know, that sign equal and greater 27.8- -- 85, I indicated this is my average -- you know, it's average price I paid for the stock.

Q.    Okay.

A.    That's the indication.



Q.    All right.  Give -- give me a moment here, Mr. Ciecko.

A.    Yes.

(WHEREUPON, there was a short interruption.)

BY MR. LOFTUS:

Q.    Okay.  Are you familiar with Leidos, L-e-i-d-o-s?

A.    Actually, I've heard this name recently on the AI discussion by President Biden.  I read an article that President Biden has approved -- approved the -- let's see.  There was legislature regarding the artificial intelligence that the government should really monitor it, and in that article I also found out that there was several consulting companies who will help the government, and I believe that's the name, but I'm not a hundred percent sure.

That's the -- so that's the extent I know Leidos.  Nothing else.

Q.    So do you have any understanding as to whether Leidos is a global leader in engineering services in science and technology?

MS. WEINRIB:  Objection to the form of the



question.

BY THE WITNESS:

A.    No, I don't.  As I said, I just found out about this a couple weeks ago in this article with AI, if that's the same company.  It's ticker symbol LDOS.  That's how I remember companies, by ticker symbols.

BY MR. LOFTUS:

Q.    Okay.  And do you have -- I think the answer is obvious, but I'll just ask the question.

Do you have any understanding as to whether Leidos was involved as a construction monitor of the Ironton, Ohio facility?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    No, I don't have any idea if they were or not.

BY MR. LOFTUS:

Q.    All right.  You didn't see that in any of the public filings you reviewed --

MS. WEINRIB:  Objection --

BY MR. LOFTUS:

Q.    -- yes or no?



MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I don't recall.

MS. WEINRIB:  To the best of your recollection.

BY THE WITNESS:

A.    To the best of my recollection, I don't recall that name.  As I said, this is the first time I -- I see it now, but again, it's been a long day.

BY MR. LOFTUS:

Q.    It has been, so thanks for putting up with us here.  We're -- we're about to liberate you.

A.    No, I -- I understand.

MR. LOFTUS:  If you can give us a couple minutes, we're right down on the five-yard line here.

THE WITNESS:  Okay.

MS. WEINRIB:  I will have some questions, as well.

MR. LOFTUS:  Okay.

THE VIDEOGRAPHER:  Going off the record at



5:04 p.m.

          (WHEREUPON, the deposition was

          recessed from 5:04 to 5:13 p.m.)

   THE VIDEOGRAPHER:  Going on the record at 5:13 p.m.

BY MR. LOFTUS:

   Q.   Just briefly, Mr. Ciecko, a couple of questions.

     Did you realize that the Hindenburg report represents just Hindenburg's opinions?

   MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

   A.   I understood that this is a report and, in fact, in order for me to determine whether this was hoax or not, I -- as I said, I read the PCT report, but the day or day after, I also Googled "Hindenburg" and I saw a few other reports, so I understood their approach, how detailed they are and what -- what they did.

     So I understand it's a report.

BY MR. LOFTUS:

   Q.   Aside from understanding it's a report, did you understand that it's Hindenburg's opinion



as to PureCycle and its technology?

MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

A.    I understood that this is their opinion. The report is the outcome of their opinion.

BY MR. LOFTUS:

Q.    I understand, but there's -- do you recall a disclosure that said, "This report represents our opinion and we encourage every reader to do their own due diligence"?

A.    Yes.

Q.    Do you recall --

MS. WEINRIB:  Objection to the form of the question.

Now you can answer.

BY THE WITNESS:

A.    I'm sorry.  I -- I understand that this is -- this -- this report is the opinion.  This is why I was curious what -- to see more of their reports on other companies and what was the impact on the price and what was the end game.

BY MR. LOFTUS:

Q.    Final question:  Were you aware that



Time Magazine praised PureCycle's patented technology as one of the Top 100 inventions of the year back a few years ago?

        MS. WEINRIB:  Objection to the form of the question.

BY THE WITNESS:

        A.    I have not.

        MR. LOFTUS:  Okay.  That's all I have.

        MS. PARK:  I have no further questions.

        MS. WEINRIB:  I have a few questions.

                        EXAMINATION

BY MS. WEINRIB:

        Q.    Mr. Ciecko, I know you know who I am, but I'll state it again for the record.  My name is Tamar Weinrib.  I'm from Pomerantz LLP, as you know.

        It's been a very long day.  You've been questioned comprehensively about the documents in front of you and about other matters.  I won't take up much more of your time.

        You testified earlier today that during the course of this litigation, you may have had communications with other counsel at Pomerantz LLP aside from me, is that correct?



A.    Yes.

Q.    Without revealing the nature or content of any of those communications, do you recall the name Jeremy Lieberman?

A.    Yes.

Q.    Is that one of the attorneys you had communications with?  And again, do not reveal the content or the nature of those communications.

A.    Yes.

Q.    Okay.  You also testified earlier that you reviewed SEC filings pertaining to ROCH.

Is that accurate?

A.    Correct, yes.

Q.    After the ticker symbol switched from ROCH to PCT -- let me rephrase that.

After the merger of ROCH and PCT, did you also review SEC filings that PureCycle filed?

A.    Yes.

Q.    When you made your investment decisions with regard to PureCycle securities, did you base those decisions on publicly available information?

A.    Yes.

Q.    At the time of your investment decisions, had you known the allegations of the



Hindenburg report of May 2021, would you have still transacted in PureCycle securities?

A.    No.

MR. LOFTUS:  Objection, foundation, speculation.

BY MS. WEINRIB:

Q.    You can answer the question.

A.    I would not.  Definitely not.

Q.    You referred also in testimony earlier today -- when you were talking about your reasons for investing in PureCycle, you referred to its, quote, "proven process" and that it, quote, "got everything ironed out."

Do you recall that testimony?

A.    Yes.

Q.    If you had known at the time of your investment in PureCycle securities that the process was not proven or that they had not gotten everything ironed out, would you have still made your investments in PureCycle?

MR. LOFTUS:  Objection, foundation, incomplete hypothetical, speculation.

BY MS. WEINRIB:

Q.    You can answer.



A.    I would not.

Q.    You also testified earlier today to knowing that Hindenburg is a short seller, is that correct?

A.    Correct.

Q.    You also testified earlier today to looking into whether Hindenburg was a credible entity, is that correct?

A.    I'm sorry.  Would you mind repeating that?

Q.    Sure.  You testified earlier today that you looked into Hindenburg's credibility following the issuance of the Hindenburg report that we've been talking about, is that correct?

A.    Yes, correct.

Q.    Did your knowledge that Hindenburg is a short seller impact your view of whether Hindenburg is credible?

A.    No, it did not.

Q.    You were questioned previously by Mr. Loftus with regard to whether Hindenburg's report is Hindenburg's opinion.

Do you recall those questions and your testimony in that regard?



A.    Yes.

Q.    Is it your understanding that to the extent the Hindenburg report consists of opinions that those opinions are based on facts also set forth in the report?

MR. LOFTUS:  Objection, foundation, speculation.

BY MS. WEINRIB:

Q.    Is that your understanding?

A.    Yes.

Q.    I'm going to turn your attention back to Exhibit 7, which again was the prospectus filed on February 12, 2021.

Do you recall testifying earlier that you reviewed and relied upon this document in making your investment decisions?

A.    Yes.

Q.    Do you recall being shown various risk factors that were listed in this document by Mr. Loftus?

A.    Just today?

Q.    Yes.

A.    Yes, yes.

Q.    And you testified to the fact that you



read this document, including those risk factors, at the time or near the time of its issuance or -- let me -- let me rephrase that.

When you made your investment decision to institute your position in -- in ROCH and thereafter PureCycle, you had already read this document in addition to the risk factors contained therein.

Is that accurate?

A.    Yes.

Q.    Okay.  And did you understand those risk factors to be presented as potential risks or risks that had already materialized?

A.    Not materialized.  Potential.

MR. LOFTUS:  Let me just object that the document speaks for itself.

MS. WEINRIB:  Agreed.  It does.

BY MS. WEINRIB:

Q.    You also testified earlier that there were four separate accounts in which you transacted in PureCycle securities, is that correct?

A.    That is correct.

Q.    And did you have complete authorization and control over the trades that were instituted in



ROBERT CIECKO                                        December 07, 2023
William C. Theodore vs PureCycle Technologies                     349

those four accounts on -- in PureCycle securities?

A.    Yes, and I made them myself.

Q.    Did anybody else trade in that account aside from you -- in any of those four accounts aside from you?

A.    No, no one does in my family.  That's just me.

Q.    You also testified that there were monthly account statements that reflected your transactions through TD Ameritrade, is that correct?

A.    Yes.

Q.    Is there any information about your transactions in PureCycle that appeared on those monthly statements that does not also appear in what I believe was marked as Exhibit 2?  And feel free to take a close look at the exhibit.

A.    No.  In other words, they are identical. If -- if you take the individual statements and put it back together, I don't have a reason beyond my -- any doubt that the Ameritrade will -- you know, query would not work.

Q.    And you in fact generated this report using TD Ameritrade --



A.    Yes.

Q.    -- correct?

A.    Correct.

Q.    And just to confirm, you testified earlier today that other than documents reflecting your transactions in PureCycle securities and the handwritten document that you testified to earlier, you did not have any other relevant documents responsive to the discovery requests that were served upon you by any defendant in this action.

Is that --

A.    No, I didn't.

Q.    Is that accurate?

A.    Absolutely.

Q.    Earlier you were shown the second amended complaint and you were asked about the FINRA BrokerCheck of Defendant Byron Roth.

Do you recall those questions and answers?

A.    Yes.  That was John's iPad.

Q.    And do you recall being shown two separate paragraphs in the complaint that talk about Defendant Roth, one defining him as a party and one which I believe was Paragraph 34?  And you



can -- you can turn to the exhibit if you want.

A.    We just reviewed this, so yes, yes.

Q.    Okay.  Let me also turn your attention
to Paragraph 33 in the second amended complaint.

A.    In the Exhibit --

Q.    Exhibit 4.

A.    -- 4?

Q.    And just to be clear --

A.    Yes.

Q.    -- you testified earlier that you
reviewed this document prior to its filing and
approved and authorized its filing, is that
correct?

A.    Yes, I did.

Q.    Okay.

A.    Are we on the page --

Q.    Page 12, Paragraph 33.

Can you read into the record what
Paragraph 33 states?

A.    "Defendant Roth is not only the Chairman
of the Board of Directors and CEO -- CEO of Roth
Acquisition, he's also the CEO and Chairman of Roth
Capital, an investment bank based in Newport Beach,
California that largely operates in the murky world



of small cap and microcap banking.  Defendant Roth

owns 75% or more of Roth Capital through CR

Financial Holdings, Inc."

Q.    Is it your understanding that Defendant

Roth has control over Roth Capital?

MR. LOFTUS:  Objection, leading.

BY MS. WEINRIB:

Q.    Is that your understanding?

A.    Yes.

Q.    Is that what this paragraph conveys?

A.    Yes.

Q.    You also were asked earlier about

whether the court has a right to know all relevant

information --

A.    Yes.

Q.    -- and complete information.

A.    Yes.

Q.    So you would agree that the information

that should be presented to the court with regard

to this action should be relevant to this action,

is that correct?

A.    Correct, absolutely.

Q.    And just to reiterate again, you

testified multiple times today that prior to making



your investment decision and instituting your first

transaction in ROCH, you read and relied upon

Exhibit 7, is that correct?

A.    Yes.

Q.    And when you --

MR. LOFTUS:  Objection, mischaracterizes the

evidence.

BY MS. WEINRIB:

Q.    In what way did it mischaracterize your

testimony?  Can you -- I -- I want the record to be

clear.

Did you rely upon Exhibit 7 prior to

investing in ROCH?

A.    The prospectus?

Q.    Yes, the prospectus.

A.    Yes.

Q.    You did.  And you testified to that

earlier, as well, is that correct?

A.    Yes.

Q.    Was it your understanding when you

instituted your first position in ROCH that ROCH

would merge with PureCycle upon shareholder

approval?

A.    Yes.  It's -- it's in there.



Q.    And was it your understanding that following shareholder approval, your shares of ROCH would become shares of PCT?

A.    Yes.  When it happened, yes.

Q.    And is it your understanding that the Section 14(a) claim in this case is -- concerns misrepresentations in Exhibit 7 that you testified to relying upon before instituting your position?

A.    Yes.

MS. WEINRIB:  I have nothing further.

MR. LOFTUS:  Just give me one second.

(WHEREUPON, there was a short interruption.)

FURTHER EXAMINATION

BY MR. LOFTUS:

Q.    So if I've -- just briefly, Mr. Ciecko, I'm -- I'm looking at the transcript of your testimony from earlier, and I asked with respect to the prospectus marked as Exhibit 7, "So my question a little more specifically is whether you reviewed this document at any time in March 2021," Answer, "I'm not a hundred percent sure, but I want to say yes because of the prospectus name.  I remember I looked -- whether it was this date, sir, but I



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 357 of 439
PageID 7841
ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
355

saw -- yes, I saw the prospectus.  There was every few files by the way there, and I -- I believe so.  I believe this was the document I looked at."

I mean, the fact is, Mr. Ciecko, you don't recall exactly when in March 2021 you reviewed Exhibit 7, is that correct?

MS. WEINRIB:  Objection, mischaracterizes his testimony.  He said on the record that he reviewed it before he invested.

BY THE WITNESS:

A.    If we're talking about the ROCH --

BY MR. LOFTUS:

Q.    Uh-huh.

A.    -- I mentioned it to you I vividly remember very few files, and I reviewed that at -- right at the first purchase of the shares or maybe the day before.

What I was not clear -- I vividly remember when you asked me about the PCT, I knew that the Hi- -- it was done before Hindenburg report, but I don't recall exact date, whether it was first or second week on the PCT report, but I may be confusing other reports.

This one, this one I recall, and that's



what I -- to the best of my knowledge, that's --

that's what I meant by saying there was only very

few items on the SEC, and it was easy to spot,

prospectus.

        MR. LOFTUS:  All right.  Let's leave it there.

The transcript is what it is.  All right.

        THE WITNESS:  Yes.

        MR. LOFTUS:  Very good.  Thank you,

Mr. Ciecko.

        MS. WEINRIB:  Thank you.

        THE WITNESS:  Thank you.

        THE VIDEOGRAPHER:  Going off the record at

5:29 p.m.

                FURTHER DEPONENT SAITH NOT.


                (TIME NOTED:  5:29 P.M.)



REPORTER'S CERTIFICATE

I, VICTORIA C. CHRISTIANSEN, a Certified Shorthand Reporter of the State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.



The witness has requested a review pursuant to Rule 30(e)(1).

IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 11th day of December, 2023.



VICTORIA C. CHRISTIANSEN,

Certified Shorthand Reporter.

C.S.R. Certificate No. 84-3192.

ROBERT CIECKO                                        December 07, 2023
William C. Theodore vs PureCycle Technologies                    359

                        I N D E X


WITNESS                                    EXAMINATION

ROBERT CIECKO

        By Ms. Park.......................5

        By Mr. Loftus................146, 354

        By Ms. Weinrib.................343


                    E X H I B I T S

NUMBER                              MARKED FOR ID

R. Ciecko

 Exhibit No. 1                          54

 Exhibit No. 2                          106

 Exhibit No. 3                          114

 Exhibit No. 4                          116

 Exhibit No. 5                          129

 Exhibit No. 6                          156

 Exhibit No. 7                          191

 Exhibit No. 8                          219

 Exhibit No. 9                          224

 Exhibit No. 10                         286

 Exhibit No. 11                         300

 Exhibit No. 12                         331



DEPOSITION ERRATA SHEET


Our Assignment Number: J10635599

Case Caption: William C. Theodore, et al., vs.

PureCycle Technologies, et al.


DECLARATION UNDER PENALTY OF PERJURY


I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20___.


_____

ROBERT CIECKO



                     DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

          ROBERT CIECKO



DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

        ROBERT CIECKO



**Exhibits**

10635599 Robert. Ciecko. EXHIBIT1
54:2,4,5
143:7
359:12

10635599 Robert. Ciecko. EXHIBIT2
106:11,12
145:14
146:1
155:14
238:13,15,17,18
240:20
249:20
265:24
267:2,23
278:8
284:11
349:16
359:13

10635599 Robert. Ciecko. EXHIBIT3
114:4,5
116:10,11,15
128:16
359:14

10635599 Robert. Ciecko. EXHIBIT4
116:3,4,19 318:6,13 327:1
351:6

359:15

10635599 Robert. Ciecko. EXHIBIT5
129:22,23
359:16

10635599 Robert. Ciecko. EXHIBIT6
156:10,11
157:4,5,10,22
172:4
191:10
359:17

10635599 Robert. Ciecko. EXHIBIT7
191:8,13,14 203:11
212:21
233:1
278:9
289:2
290:21
347:12
353:3,12
354:7,19
355:6
359:18

10635599 Robert. Ciecko. EXHIBIT8
219:14,17,18
220:11
221:2
222:2
227:22
229:7,12
359:19

10635599 Robert. Ciecko. EXHIBIT9
224:10,12,13
359:20

10635599 Robert. Ciecko. EXHIBIT10
285:22
286:3,4
289:4
290:23
293:21,22
306:3,6
359:21

10635599 Robert. Ciecko. EXHIBIT11
299:17,24
300:4,5,24 304:6
359:22

10635599 Robert. Ciecko. EXHIBIT12
331:11,12
359:23

**$**

$24.59
99:11

$25.57
99:11

$30
275:24

$600
161:11

$7.31
276:24

$760
118:1

**(**

(a)
117:22

(b)
121:10

**-**

-3
214:17

**1**

1
4:1 17:17
54:2,5
64:22
117:24
143:7
158:4,5,7,12
162:9
163:5,20
172:5
174:12,19
177:11
180:15
184:18
201:23
202:16
234:19

1,000
35:4
337:16

1,000-some
241:18

**10**

10
50:12
115:14,21
116:6
117:5,11,15 121:9
126:14
128:13
139:15,19,23
155:19
251:24
268:2
271:13
278:2
285:22
286:4
287:5
289:4
290:23
293:21,22
297:24
306:3,6

10(b)
44:13
186:12
287:1
292:9

10-K
184:12

10-minute
171:6

10-Q
299:11,18
300:1,24
318:22

100
22:9
275:6
343:2

105
158:21
159:1,9
160:10



ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

261:8,18

**10:12**
253:8

**10:14**
52:16,18

**10:20**
253:8

**10:28**
52:18,20

**11**
44:19,20
114:24
115:12,16
117:14
128:19
242:19,21
249:23
250:17,
20,21
253:4
299:17,24
300:5,24
304:6

**119**
327:2

**11:30**
98:24
99:2

**11:47**
99:2,4

**12**
49:20
115:1
117:14
151:16
156:7
175:17
191:11
273:5
278:19
279:18
287:16
288:9

295:21
296:8,18
297:7,10
320:20
321:1
327:8
331:12
347:13
351:17

**12%**
34:21

**1200**
29:10

**12:26**
131:7,9

**13**
117:14
225:14
306:5,6
320:16,
17,18
322:8
323:20

**1338**
273:17,19

**137**
327:17
329:14

**14**
167:10
169:5
194:17
200:6,8,
10 318:15
333:23
335:12,
16,20

**14(a)**
44:13
186:13,
17,19,20,
23 187:5,
12 188:4

265:8
287:10
288:6,24
290:4
292:9,11,
15,20
293:13
296:2
327:5,18,
24 328:15
354:6

**14:47**
252:10

**14:49**
267:12

**15**
167:8
170:12
173:7
274:13

**15%**
278:3

**16**
37:23
50:12
139:15,
19,22
219:15
220:12
227:18,22
229:8,16
230:14
231:3,19
284:2,8
287:4,15,
17 288:8,
21 289:12
291:17
296:7,17,
24 297:3,
15 320:7
321:1
327:7,10

**1600**

34:10

**17**
20:23
59:5
227:15
262:5
284:12
293:23
320:9
331:24
332:4
334:11

**17th**
330:14
332:1

**18**
148:18
227:24
318:20

**19-**
14:4

**1936**
22:11

**197**
64:11

**198-**
20:14

**1984**
14:4 20:1

**1989**
20:14
65:21,22

**1990**
14:4
16:17

**1990-91**
17:17

**1991**
16:17

**1:24**
131:10,11

—————————

**2**

—————————

**2**
64:22
106:12
117:24
143:7
145:14
146:1
155:14
158:7,12
162:10
163:6,20
174:19
177:11
178:12
180:15
234:19
237:20
238:13,
14,15,17,
18 240:20
249:20
252:6
265:24
267:2,23
278:8
284:11
286:19
333:10,11
349:16

**2,000**
26:10

**2-**
193:4

**2.7**
333:7,22,
23,24
334:2
335:18,21

**2/14**
137:17

**20**



18:19
225:17
265:14
266:6,10

**20%**
34:20
173:7,8

**20-**
31:15
152:1

**200**
169:5

**200-day**
167:10

**2000**
336:23
337:8

**2007**
7:20
20:16
21:8

**2008**
68:5

**2010**
21:9
28:18
31:16
35:16,17

**2012**
28:18,19
29:14

**2015**
15:7

**2017**
15:7,8

**2020**
49:19
68:2
139:15,
19,23
152:1

219:15
220:12
223:16,22
227:18,22
229:8,18,
21 230:2,
14 231:3,
19 287:4,
15 288:8
296:7,18,
24 297:4
327:8
335:12

**2021**
39:19
44:19,20
50:6,8
54:12
57:23
67:2,6,13
99:12
137:14
139:15,
19,23
148:5
149:5
150:21,24
151:21
152:1
154:19
155:4
156:7
165:23
166:3
167:17
183:18
184:4,18,
23 185:18
186:1
189:16
190:10,12
191:11
192:15
193:2
203:11
206:4

212:10
221:7
224:4
227:18
234:11
237:15
243:23
245:13
251:6
278:19
279:18
284:2,8,
12 287:5,
16,18
288:9,21
289:14,22
291:17
293:23
296:8,18
297:7,10,
15,24
298:1
299:19
301:14
310:12,24
312:14
313:12
320:7,9
327:8,10
333:2
345:1
347:13
354:21
355:5

**2022**
33:16
300:2
304:7
308:1
318:20,22
327:11

**2023**
4:10
132:17
225:20
286:9

287:22

**2024**
176:23

**21**
59:6 68:2
155:7
159:20
160:15
167:10
169:5
227:15
275:12

**21st**
60:10

**22**
320:6

**22-1/2**
173:5

**22.5**
275:17
276:11

**22.70**
337:17

**23**
286:22

**23.11**
259:19

**23.38**
258:24

**24**
99:12
214:17

**25**
270:13

**26**
173:6
243:2
251:6
277:22
289:22
304:7

321:20,21

**27**
133:5,6
195:12
214:3
252:3
277:22
301:7
332:19
333:6,7,
8,17

**27.8-**
337:20

**28**
173:6

**29**
252:23
334:11

**29.81**
276:4

**29th**
253:7
254:9,10

---

**3**

---

**3**
64:22
114:5
116:10,
11,15
117:24
128:16
158:7,12
178:12
180:15
275:14
289:5,8
334:22

**3-minute**
165:18

**3/17**


ESQUIRE
DEPOSITION SOLUTIONS

Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 368 of 439
PageID 7852

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: 30..7

262:10
267:12

**30**
18:10
54:11
243:2
251:6,18
256:10,23
257:17,18
270:11
286:8
287:22
295:17
298:1
299:19
301:13

**30-day**
169:2

**30-second**
165:17

**30-year**
126:15,23

**300**
170:9

**30th**
257:3
258:3
259:4

**31**
300:2

**33**
351:4,17,
19

**33.3%**
54:13

**34**
320:19
321:2
323:20
350:24

**35**
4:8

**35%**
20:22
188:16

**365**
29:10

**39**
202:19,
20,23
203:2,5,6

**3:55**
285:17,19

**3rd**
256:15

───────

**4**

───────

**4**
64:22
116:4,10,
11,19
130:2,13,
14,16,21
131:1
158:4,5,
7,12
160:1
225:20
275:14
318:6,13
327:1
351:6,7

**4-by-4**
24:8

**40**
202:23
283:14,16

**400**
29:11
159:8
191:9

**41**
211:9,10

212:8

**42**
233:4,17

**424(b)(3)**
191:11

**427**
194:6,18
200:10
202:19
211:9
212:8,9
233:4,17
278:14
279:13
283:13

**427-page**
193:23

**43**
327:2

**45**
138:16

**47**
327:17
329:14

**4:06**
285:19,20

**4M**
25:4 27:6

───────

**5**

───────

**5**
116:7
117:5
129:23
130:13
155:19
159:9
167:8,9
227:18
231:4
251:24

276:22
295:17

**5%**
166:5

**5,000**
260:6

**5-minute**
170:11
171:6

**5/6**
273:16

**50**
169:5
212:9
255:19

**50-day**
167:9

**500**
22:9 35:1
67:11,17
336:20

**53-55**
227:19

**55**
20:24

**5:04**
341:1,3

**5:13**
341:3,4

**5:29**
356:13,16

───────

**6**

───────

**6**
29:10
39:19
49:19
130:13
132:17

136:3
156:2,3,
11 157:5,
10,22
172:4
191:10
312:14

**6%**
276:22

**60**
165:2
270:11

**60603**
4:9

**63**
278:14,16
279:1,13
281:5
283:1,4,
7,10,13,
15,17

**64**
281:5

**6:21-cv-
809-pgb-rmn**
4:7

───────

**7**

───────

**7**
4:9 39:19
66:8
128:18,20
130:3,13,
17,21
131:1
191:8,14
199:20,
22,23
203:11
212:21
233:1
275:15



278:9
289:2
290:21
297:19
318:12
347:12
353:3,12
354:7,19
355:6

**7.31**
275:19,
20,21
276:11
277:19

**70**
259:21

**70%**
165:3

**75%**
352:2

**76**
261:21

_____

**8**
_____

**8**
114:23
115:2,18
193:23
194:4
219:14,18
220:11
221:2
222:2
227:22
229:7,12

**8/427**
193:22

**83**
259:20

**85**
337:20

**8:30**
165:4

**8:43**
257:14,22

**8:50**
257:14

**8:51**
257:14,22
259:19

_____

**9**
_____

**9**
224:10,13
227:11,13
320:5
321:17

**9/17/2023**
132:6

**9/6/2023**
132:17

**95%**
118:1

**97**
271:6,11

**9:09**
4:10

**9:39**
257:18

_____

**A**
_____

**A-G-C-O**
29:5
195:11

**a.m.**
4:10
52:16,18,
20 98:24
99:2,4

**abbreviated**
328:2

**abilities**
87:17

**ability**
200:22
201:22
202:15
236:3
237:16

**absolutely**
8:15
15:20
23:21
134:19
147:14
174:9
181:15
192:12
232:22
237:3,5
280:18
283:18
304:2
309:11
350:14
352:22

**accept**
24:3
335:4,5

**access**
59:5 68:9
164:10
209:17

**accomplishe
d**
247:10

**account**
126:14
145:10
146:6
155:6,17
158:12,22
159:7,11,

14,21
160:1,8,
12,16,20,
21 161:19
162:4,24
163:5,6,
15,20,23,
24 164:4,
5,7,9
166:12
172:5
174:12,
13,19
175:2,3
190:24
238:23
239:3
241:2
261:2,9,
10,19,23
262:2,3
265:22
266:1,15
267:8,10
268:10,
15,16
270:20
271:3,8
273:10
349:3,9

**accounting**
14:10
15:11
16:16
17:6

**accounts**
105:10,
13,15
142:16
144:9
153:7
154:18,
20,21
155:2,3,
8,9,12,21
158:7,15

159:6,18
162:9,13,
21,22
163:13
164:2,12
171:14
176:3
240:23
261:13
266:1
268:17,19
348:20
349:1,4

**accumulatio
n**
331:23

**accurate**
228:8
326:3
344:12
348:9
350:13

**accurately**
7:10

**accusing**
325:12

**achieve**
203:16
211:20

**achieved**
176:12
177:22
234:19

**acquired**
287:3

**acquisition**
118:1
151:4
184:15,16
185:1
193:1
220:15
223:22



287:14
327:7
351:22

**acres**
29:10

**acronym**
185:7
195:10

**Act**
321:2

**action**
9:6,10
10:1
40:3,11
47:10,13,
19,20
48:1
73:19
74:8
143:9
173:11
298:17
304:11
307:6
318:5,24
319:14
350:10
352:20

**active**
164:5

**activities**
309:20

**activity**
83:4
166:5
239:24
265:24
270:19

**actual**
209:17
230:13
322:23
324:11

**add**
138:21
275:15
276:9
336:21

**added**
171:8,9
292:12,15
334:9

**addition**
6:8 348:7

**additional**
16:6
84:15
223:12

**addressing**
323:9

**adequate**
78:10

**adjournment**
284:2

**administra-**
14:24

**administration**
14:24

**advanced**
126:16

**advantage**
153:16
218:21,22
219:9

**advice**
58:9 77:6
88:3
120:17
290:15
298:24

**advised**
44:2,3

**advisement**

249:6

**advisor**
78:16,17

**advisors**
78:17

**affil-**
195:4

**affiliated**
195:5

**affiliations**
4:15

**aforementioned**
31:2
33:12
80:3
195:24

**Africa**
37:21

**afternoon**
208:21

**AG-**
29:4

**Agcert**
129:13

**AGCO**
28:21
29:1,2,5,
14,16
30:2
33:7,8,9,
10,18,19
35:14,22,
23 36:13,
14 37:5,
10 64:14
195:5,8,
11 196:17
197:11,20
198:10
236:18

**AGCO's**
196:20,24

**aggressive**
268:23
324:24

**aging**
139:3

**agree**
184:2
197:18
202:14
217:11
236:7
237:21
280:14,
15,16,19
284:14
290:2
300:19
325:1
328:9
352:18

**agreed**
45:3
61:17
325:23
348:17

**agreement**
233:7,10,
20 236:23
237:23
264:12
279:6
330:1,4

**agrees**
241:22

**agricultural**
21:14
30:15
34:1,2
67:12
189:23

**agriculture**
30:2
195:9

**Ah-ha**
180:22,24
196:7

**ahead**
49:4
68:22
72:19
126:20
149:9
161:4
179:9
190:15
208:14
221:23
298:12
321:14

**AI**
338:10
339:5

**akin**
239:4
298:10

**Alabama**
37:22
189:4

**alert**
285:10

**Algorithms**
165:3

**align**
296:11

**allegation**
327:17

**allegations**
125:16
127:14
300:9,21
305:12
326:24



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 371 of 439
PageID 7855

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: allege..arbitrations

327:23
344:24

**allege**
93:1 94:5
95:16
96:13
97:14
129:10

**alleged**
115:13,20
300:16

**allegedly**
119:4,16
120:6
329:1

**alleging**
98:5

**Am-**
169:23

**ambiguity**
248:18
296:23

**ambiguous**
208:8

**amended**
115:24
116:19,24
120:22
121:15
129:18
224:7
227:13
292:16,21
306:16
318:5
350:16
351:4

**amendment**
292:12

**America**
37:20

**Ameritrade**
104:23
105:14
106:7
108:14
146:5
153:8
154:4,19
158:16
164:1
166:24
169:17,23
190:23
238:24
241:4
243:15
244:7
245:22
253:13
272:2,19
349:10,
21,24

**amount**
25:24
27:7 62:7
159:10
260:1

**analysis**
23:13,14
25:8,12
62:20,21
63:5,6,9
64:6,8
65:11,12,
24 67:20
79:5
163:17
166:13,17
169:24
170:2,3,
16,20,24
171:13
215:19
216:5
247:2,19
270:4

**analysts**
69:20,24
70:1,4
205:18

**analytical**
68:4

**Analyticall
y**
277:7

**analyze**
65:20
332:14

**and/or**
122:15

**anger**
85:20

**announcemen
t**
150:12
185:10

**annual**
168:5
196:20
197:11

**answers**
6:10 74:1
222:5
350:19

**anticipate**
180:16

**anticipated**
180:14
199:3

**anticipatin
g**
147:6,16
173:8

**anymore**
250:2
255:2
259:22

316:24

**apologize**
180:21
228:23
283:17
316:17

**app**
190:23

**apparently**
93:24

**appeared**
349:14

**appears**
158:19
273:9
280:6,10
288:13,15
290:14
291:8,13
296:10
330:9

**Apple**
136:5
165:15

**applicable**
200:23

**application
s**
201:1

**applied**
270:4

**applies**
165:14

**apply**
25:13
170:10
186:19

**appointed**
49:10
50:7 55:3

**appointment**

285:24
286:1
306:3,14

**appreciatio
n**
173:9
177:3

**approach**
25:2 35:2
341:19

**approval**
263:18,21
280:1
320:8
353:23
354:2

**approve**
279:6
286:15
330:21

**approved**
182:16
318:8
320:12
322:7
323:3
327:11
338:11,12
351:12

**Approximate
ly**
11:5

**April**
107:10
167:17
189:17
245:13
304:7

**arbitration**
9:2

**arbitration
s**
321:1



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 372 of 439
PageID 7856

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: area..aware

322:11
323:6
324:8

**area**
26:3
27:24

**areas**
26:6  35:6

**arena**
7:23  16:9

**argue**
326:9

**argumentative**
208:10
228:10

**Arizona**
138:19

**army**
205:18

**arrangement**
54:14

**arrow**
336:14

**art'**
126:18

**article**
307:24
308:8,12
338:11,15
339:4

**articles**
59:2
61:17
62:9
69:19
84:23,24
85:2,7,9,
22  136:6

**articulate**
220:23

**articulated**
93:23

**artificial**
338:13

**asks**
115:13,19
128:20
170:14
227:17

**ass**
121:12

**assembled**
95:21

**assembly**
18:21
34:1

**assert**
188:4

**asserted**
187:13

**assertion**
121:14,15
127:3

**assertions**
81:22
115:14,20

**assets**
185:9

**assist**
103:9

**Associates**
30:21

**association**
167:14

**assume**
6:18
21:20
22:1
157:19
161:17

180:10
215:2

**assumed**
102:14
188:11

**assuming**
167:20
180:3
309:4
330:19,23

**assumptions**
79:24

**assurance**
182:1

**attached**
159:24

**attack**
181:17

**attempted**
104:14

**attend**
13:19,22
15:5
264:23

**attended**
14:3,4
17:5

**attending**
16:22

**attention**
113:14
114:22
115:23
117:17
253:16
304:15
347:11
351:3

**attorney**
123:2,20
124:23

125:11,22
126:8
127:8,20
128:8
290:10
291:22
293:4
298:22
305:20
322:16

**attorney/
client**
123:1,19
124:23
125:10,21
126:8
127:7,19
128:7
305:1

**attorneys**
122:9
211:2
299:21
344:6

**attractive**
181:3

**August**
29:14
318:19
319:3
327:11

**authorization**
159:17
348:23

**authorize**
55:2
113:22

**authorized**
160:13
287:24
306:15
351:12

**auto**
27:12

**automatically**
32:6
259:3

**automotive**
29:12
37:15

**automotive-
style**
189:2

**avail-**
324:1

**average**
78:18
167:9,10
169:3
235:15
337:21

**aware**
42:12
47:18
89:6  99:9
125:15
127:13
148:11
149:4
169:6,21
230:3
285:5
291:14
298:7
308:8
309:2,3
310:11,
14,19
323:19
324:1,2,
15,16
326:18
342:24



————————————

**B**

————————————

**B-I-K-E**
  337:15

**bachelor**
  14:8

**back**
  8:5  20:20
  22:17
  27:14,21
  29:18
  36:15
  46:2  58:3
  81:5,15
  115:16
  128:16
  131:14
  147:24
  149:4
  155:7
  172:3
  196:17
  199:18
  223:16,22
  226:2,6
  230:6,12
  238:12
  246:5
  249:19
  265:20
  267:22
  270:13,16
  278:4
  284:10
  289:4
  299:23
  306:1,2
  318:4
  321:17
  322:8
  327:11
  329:13
  343:3
  347:11

  349:20

**background**
  18:15
  126:15
  235:12,18
  236:9

**backhoe**
  22:13,15,
  16 24:6
  26:11

**backhoes**
  21:13

**backs**
  30:5

**bad**
  237:3
  317:21

**bag**
  220:8

**baler**
  34:3,4

**balers**
  34:3

**band**
  175:8

**bands**
  169:15

**bank**
  351:23

**banking**
  352:1

**bankruptcie
s**
  117:24
  118:13

**bar**
  170:15
  172:1

**barely**
  175:6

**bars**
  171:5

**base**
  277:20
  344:20

**based**
  18:24
  19:3
  76:20
  77:1  79:6
  121:10
  200:15
  266:24
  293:7
  300:9,11
  325:7
  326:3,4
  327:20
  334:10
  347:4
  351:23

**baseline**
  165:5

**basically**
  168:20
  243:15
  311:3
  328:2

**basis**
  120:21
  121:14
  122:19
  124:16
  125:4
  126:2
  127:2
  128:2
  238:22
  245:23
  306:24
  310:15

**Bates**
  242:20
  331:8

**be-**
  327:5

**Beach**
  351:23

**Beauvais**
  36:3

**bec-**
  222:24

**Beg**
  254:11

**began**
  51:18

**beginning**
  31:20
  35:24
  44:17
  105:2,4
  261:12
  269:15

**begins**
  295:22
  297:23

**behalf**
  4:17,19
  5:1  47:13
  55:3
  286:8
  287:22
  327:6

**behaves**
  62:18

**belief**
  118:19
  302:14,17
  311:16

**believed**
  57:4
  86:20
  282:4
  288:1
  311:7
  315:4

**belongs**
  266:18

**benchmarks**
  336:19

**bend**
  80:9

**benefit**
  176:4
  277:23

**BGG**
  43:17
  50:21
  51:9
  52:23
  107:20

**bias**
  309:6

**biased**
  309:14

**Biden**
  338:10,11

**big**
  69:1  71:1
  165:8
  240:14

**biggest**
  61:6
  241:17

**Bike**
  337:14

**bill**
  38:7
  58:12

**billion**
  133:5,6
  214:3
  332:19
  333:6,7,
  17,23
  335:16,20

**bio**



131:3

**Birmingham**
37:21
189:4

**bit**
47:1
57:11
65:20
111:20
137:22
155:23
178:22
226:5
263:7

**blank**
88:15

**Bless**
77:9

**blindly**
337:7

**blindsided**
80:12

**blog**
85:3

**bloggers**
82:18
84:19,24
85:1

**blogs**
60:20
82:4

**blue**
334:12

**bluetooth**
138:18

**Board**
283:24
351:21

**boardroom**
97:5

**boat**
79:18

**Bob**
195:11

**Boeing**
20:20

**bold**
233:13
283:9,12

**bold-faced**
233:6
279:12
301:11

**Bollinger**
65:18
169:15

**bomb**
126:19

**bonds**
78:3,7
153:2

**book**
58:3
332:12

**borrow**
81:8,9

**bothered**
47:4 82:8
310:4
316:11

**bottles**
94:18
95:10

**bottom**
64:20
115:17
172:1,2
191:22
250:18
251:8
271:18

297:22
337:14

**bought**
69:1
75:21
108:14
175:9
176:2
185:1,3
218:10
237:5
259:21
262:6
265:13
267:10,11
269:6
270:8
271:17,18
272:6
274:19,20
334:8
337:16

**boxes**
61:5

**bracket**
27:1

**brand**
118:12

**brand-new**
174:23
189:2

**Brazil**
38:9

**break**
6:19,23
23:22
52:14
57:20
98:21
131:3
191:1
238:10
265:20
278:5

285:12,
13,15
330:14
331:8

**breakeven**
276:12,13

**breakpoint**
330:15

**breath**
6:7

**Breganze**
38:8

**Brenner**
4:4,21
5:16
97:10

**bridge**
269:2

**briefing**
306:16
325:19

**briefly**
10:6
232:24
341:7
354:16

**briefs**
9:24 91:2
226:4

**bring**
304:15

**bringing**
56:10
117:21
121:12
315:8

**brings**
188:22

**broad**
326:11

**broker**
81:10
104:21,22
105:16

**brokerage**
153:10

**Brokercheck**
320:24
322:9
323:5,13,
17,19
324:20
326:14,19
350:17

**Bronstein**
43:6,15,
18 44:2
51:9,11
107:14

**brother**
12:24
13:4
48:8,10,
17 49:11
137:9,17,
24 138:3,
12,24
139:1,8,
17
140:10,19
141:4,17,
18 142:9,
10 212:13
213:11
214:8,10,
14,20
215:18
216:5,8,
11 236:1
289:22
290:3
294:24
295:11
296:4,16
297:2,9,



13

**brother's**
286:8

**brought**
34:24
37:14
48:1
117:22
118:6
198:7
297:17

**BSEE**
14:7

**buck**
96:1

**bucket**
22:16

**bucks**
270:13

**build**
26:10
201:23
202:16
207:21

**build-out**
202:2

**building**
189:3,4
259:11
269:12,17

**bulky**
26:15

**bulldozers**
28:13

**bullet**
201:19,22
203:2
204:4
205:21

**bullish**
173:1

274:23

**bunch**
94:18
95:7
136:6

**Burlington**
28:12

**business**
14:23
21:10
29:16
56:18
58:11
64:10
66:15
98:13
149:20
150:19
167:4,5,
15 181:11
185:14
195:16
199:2
204:5,19
205:4
207:4,13
208:23
217:7
236:10
279:18
303:5
329:4

**businesses**
117:22

**busy**
139:6
188:9
189:11
216:18

**buy**
63:2
67:16
81:5,17
165:16

170:3
171:7
216:20
219:5
242:6
243:16
244:21
245:14,
18,20
246:17
247:5
251:5,12,
21,24
252:3
253:6,7
256:24
257:2,3,
12,17
272:11,14
275:5,12
277:3
337:1,2,
3,4

**buying**
132:24
155:18
174:8
245:12
263:1,6,
10 276:23
337:6

**buys**
216:8
243:3
256:8,11,
24 257:1,
21 259:22

**Byron**
5:1,18
97:22,23
98:3
102:10,13
146:20
224:8
321:4,9,

22 322:9
323:5,8,
13 324:6
325:14,20
326:12,14
350:17

**bystander**
67:17

─────────

C

─────────

**C&h**
21:22

**C-H-L-O-E**
161:16

**C-L-A-**
162:1

**C-L-A-U-D-
I-U-S**
162:2

**C-L-I---**
161:24

**cadence**
84:4

**calendar**
137:16
172:14

**California**
351:24

**call**
23:13
32:9
34:13
36:9
51:10
62:16
138:18
172:4,8,
9,12,16,
19 173:4,
20 213:11
248:14

274:18,19
294:1
310:12,20

**called**
5:5 24:22
28:9 32:2
34:5,21
43:18
59:7
64:16
123:11
137:17
143:6
165:17
171:19
173:3
241:7
253:7
258:21
287:9

**calling**
215:6,7

**calls**
156:23
274:21
276:16
278:2
310:24

**cancel**
235:6
245:21
246:2
254:3,15,
21 255:5,
11,24

**cancelled**
241:12
245:17
246:6
251:14
254:20,23
255:11
271:21,24
274:9



**cancels**
254:6

**cap**
133:6
332:19,20
333:2,17
334:2
352:1

**capable**
23:18

**capital**
65:8
67:21
118:2
175:19
178:10
221:22
325:20
326:12,19
351:23
352:2,5

**car**
162:23

**Carbon**
97:19

**care**
118:13
185:20
264:1
317:1

**career**
19:1
27:20
28:4
56:22
58:6

**cars**
63:13
205:3

**case**
4:7 7:21
8:5 21:5,
6,7,10,23

22:11,12,
14,15
27:12,13
28:15
29:12
39:1
47:15,18,
24 48:4,
7,14 49:9
50:5 53:2
76:2 77:3
88:7
90:1,17
116:20
119:3,15
120:5
125:22
127:9,21
128:9
162:3
186:9
214:13
222:11
236:18
254:19
291:15
326:13
330:18
336:1
354:6

**cases**
44:7
258:8
300:16

**cash**
261:4

**catch**
154:15

**catchy**
59:10

**categories**
89:24

**category**
295:3

**cater**
188:14

**Caterpillar**
21:15
64:14
193:10,16
195:24
337:2

**cattle**
67:11
146:7
152:6,10,
14,18,19

**caution**
214:14

**cautionary**
194:13,16
200:3,13

**cautious**
68:5

**ceased**
270:19

**Central**
253:12,18

**cents**
255:19
259:21
270:11

**CEO**
20:20
28:3
82:10
95:15
96:1,3,19
97:3
98:2,14
351:21,22

**CEO's**
313:8

**certificati
on**
285:23

**certificati
ons**
16:8,15
17:9,11

**certify**
74:5
186:10
265:8

**cetera**
192:2

**CFO**
96:11,19,
21 97:4,
20

**CH**
46:11
55:8
71:22
98:1
151:3
193:1
220:14
287:14
327:6

**Chairman**
351:20,22

**chance**
6:20,22
271:5

**change**
30:7 50:3
64:16
66:22
86:10
150:11
243:10
244:10

**changed**
56:8
60:11
62:12

76:2,9
86:11
221:21

**changing**
25:9
26:23
148:24
171:2

**characteriz
ation**
321:12

**charge**
167:8

**Charles**
108:14

**chart**
157:12
168:12,21
169:8

**charting**
65:13

**charts**
62:21
65:12
166:16,18
168:3,4
169:1

**chase**
255:17

**chat**
139:2

**cheaper**
94:22

**cheated**
47:2
79:10
80:14
311:7,12

**check**
26:3
51:14



83:22
84:4
135:4
195:23

checking
42:10
61:4 71:4
162:6

Chemical
19:22

chemist
93:21
95:8

Chicago
4:9 27:24

chicken
73:24

Chief
301:15

children
27:20,23

China
37:19
133:3
188:23
333:13
334:23
335:4

Chinese
320:21

Chloe
155:19
159:8
261:13
266:3

Chloe's
158:22

choice
165:19
272:21

choose

53:1
241:12

chose
98:18
241:13

Christianse
n
4:13

Chromavisio
n
129:12

Chrome
19:22

chronologic
al
19:12

chronology
56:3

chunks
80:9

Ciec-
230:20

Ciecko
4:2,17
5:4,11
30:21
54:4
106:11
114:4
116:3
129:22
146:17
151:11
155:23
156:10,
14,15,18
157:1,21
158:6,10
161:18
162:4
164:3
166:10
170:18

175:11,14
176:6
177:21
178:14
179:5,21
181:9
185:23
191:13,19
194:1,23
196:10
199:1
204:16
207:10
208:7
209:14
211:8,22
217:2,12
218:18
219:17
220:10
222:12
224:12,16
225:17
226:9
229:3
230:20
231:22
235:11
238:22
240:18
241:23
244:23
245:9
246:21
247:16
248:4
249:20
252:8,12
256:22
267:14
278:7
279:24
280:13
281:23
282:24
285:10
286:3,7,

18 289:10
292:6
296:16,22
297:22
299:10
300:4,8
301:21
316:6
317:8
318:4
320:6
323:1
324:5
326:13,24
330:18
331:11,14
338:2
341:7
343:13
354:16
355:4
356:9

CIECKO00193
9
331:9

circumstanc
es
151:14
164:6

cited
123:8

claim
186:12,
13,18,24
187:5,13,
20 188:5
292:9,11,
20,23
327:18,24
328:16
354:6

claimed
312:21

claims

79:12
209:8

clarified
87:3

clarify
16:5
102:6,19
113:5
143:19
145:13,14
222:4
230:15
285:8,11

clarifying
92:20

class
4:18
9:10,21
10:1,4
37:17
39:9
40:3,11
41:16
45:3,8
47:10,19,
20 48:1,3
73:18,19,
21 74:3,
22 75:3
76:2
77:11,19
78:2,10
79:13
87:2,11
90:8,13
143:9
173:11,13
226:24
265:8,14
285:23,24
286:1
287:1,2,
9,10
288:7
289:6,17



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 378 of 439
PageID 7862

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: classes..communication

290:4,22
292:23
293:13
295:23
296:2,3
306:3
318:5
329:24

classes
18:6
74:5,8,
10,13
87:1
186:10
286:21

classified
26:12

classifying
330:16

Claudius
155:16
156:14
159:6
161:21
162:4
261:13
266:6,9,
13

Claudius's
261:3
267:10

cleaner
147:13

clear
28:3
31:18
88:21
95:12
101:20
103:3
141:23
160:3
161:23
245:7

248:20
249:10,
13,15
264:9
290:20
296:21
351:8
353:11
355:18

clearer
108:24

click
84:2
273:2

clicked
256:17

client
33:7
325:15

clients
29:4
227:1

climate
318:1

clip
60:16

clock
190:21

close
32:4,5
81:16
273:12,
16,18,22
279:17
303:24
349:17

closed
20:23
32:8
155:6
273:24
298:17

304:1
319:14

closes
65:15

closing
320:9

clothing
58:4

clue
210:5
302:17

CNH
21:20,23
22:6,24
28:7,10
31:3,15
36:23

CNS
36:19

co-
48:17

co-lead
48:11,18
49:11
50:7

co-op
19:20
20:4

colleague
5:14

collection
102:9
131:15
334:10

college
13:19
19:12,15,
16,17,18
20:5

Color
334:16

column
253:20
273:13
274:7

com-
9:24

combination
262:15
275:1

combine
26:18
34:8 37:9
38:3,11
220:15

combined
155:17

combines
24:7 30:7
34:8
37:24

comfortable
147:4

commenced
303:17
308:2,17

commencing
9:6

comment
85:2
278:3
282:21
293:8
305:8

commenting
85:5

comments
42:9
85:3,9
222:10
267:5
285:14
322:22

commercial
126:21
179:23
185:14
203:15
206:1,9,
23 207:15
208:6,24
211:17,18
234:17
317:11

commission
183:5
270:14

committed
61:21

common
287:15
294:2,14,
18 295:4
296:7,17,
24 297:3,
6,10
327:7

commonly
22:13

communicate
100:17
137:9,24
138:2,11
139:7

communicate
d
73:7
128:23
139:13,
17,21
305:19

communicati
ng
243:16

communicati
on



92:11
299:4

**communicati
ons**
76:13,20
87:23
88:22
89:14,20
90:6
100:2,19
101:11,22
102:21
108:2
114:16
119:8,22
120:11
121:4,20
122:14
123:1,20
124:12,23
125:11,21
126:8
127:8,20
128:8
133:18
136:15
143:20
144:19
157:16
211:1
222:6
282:15
290:9
291:21
293:4
298:21
305:1
322:15
343:23
344:3,7,8

**community**
35:3

**commute**
138:16

**commuted**
138:16

**companies**
65:4
66:10
83:8
118:6
119:4,16
120:6
121:12
122:3,10
129:9
149:15
181:5
184:14
185:1
188:14
214:13
217:22
243:20
301:5
310:19
315:24
335:7
337:1
338:16
339:6
342:21

**Companies'**
128:22

**company**
16:19
18:20
19:22
20:4,8,
11,13,18
21:3,4
22:21
27:17
28:8,9
30:3
31:22
35:1
42:11,13,
22 46:9

47:16
56:17
57:22
61:23
63:17,24
69:14
82:24
84:15
126:20
129:10
174:23
176:12,17
177:22
184:16
185:9,14
186:2
188:15,21
190:18,20
195:9
197:23
203:16
205:13
211:19
213:12,
20,24
219:9
234:18
243:23
301:17
302:2,12
304:7,9
316:18,
22,24
323:11
339:5

**company's**
123:9,12
125:6
126:19

**company-
paid**
17:24

**company.'**
298:4

**compare**
78:24

**comparing**
235:16

**competition**
123:11
124:17
219:6

**competitive**
218:20,22
219:8

**competitor**
21:15,16
29:5

**complaint**
9:24
44:18
45:5,11,
19 46:1,
3,7,14
88:13,14,
16
115:14,
20,24
116:20
120:22
121:15
128:24
173:15
226:4
227:20,21
232:12
292:8,15
300:9,15
305:12
307:5
318:6,19
319:3
320:13
321:5,13,
17 323:4
325:18
350:16,22
351:4

**complaints**
46:5,16
91:2
116:23,24
292:16,21
306:16

**complete**
16:22
109:6
147:9
159:3
179:19
202:2
293:22
300:20
348:23
352:16

**completely**
14:21
56:7
263:5
269:14
303:7
317:2,9
326:22

**completenes
s**
113:15

**complex**
33:22

**compliant**
173:12

**complicated**
106:5

**comprehendi
ng**
291:3

**comprehensi
on**
307:19

**comprehensi
vely**
343:18



comprised
  295:4

computer
  14:6
  109:9,13
  110:11,
  13,14
  111:18
  131:23,24
  134:23
  170:24
  191:5

computers
  110:7
  165:3

concepts
  23:19

conceptualize
  23:12

concerned
  325:11

concerns
  309:6
  354:6

concerted
  159:20

concluded
  304:9
  318:23
  319:2

conclusion
  113:18
  199:9
  235:21
  280:24
  330:24

confer
  249:7

confident
  61:9

configuration
  170:10

confirm
  140:3,18
  256:10
  350:4

confirmed
  223:6
  287:22

confuse
  271:23

confused
  91:24
  110:19
  131:22
  133:7
  226:5
  303:14
  326:22

confusing
  108:21
  355:23

conglomerate
  75:21

connection
  49:9 50:5
  153:18
  170:20
  181:11
  222:13
  223:5
  265:11
  298:3
  301:16
  313:11
  330:20

consciously
  149:22
  285:5

consent
  29:15

consequence
  303:9

conservative
  105:15
  163:10,
  15,20
  164:5,9,
  11
  174:13,20
  268:15,20

considerably
  216:17

consideration
  182:19

considered
  291:10
  325:22

consistency
  296:12
  330:9

consistent
  296:10

consists
  288:7
  347:3

consolidated
  108:22
  318:5

constitute
  237:20

constitutes
  237:22

construction
  189:2
  207:13
  339:12

consult
  29:8

consultant
  29:21
  188:12,21

consulted
  89:16

consulting
  28:8,9,13
  29:20,21
  338:16

consumed
  272:1

contact
  42:24
  43:9,20
  44:1
  50:24
  51:8
  130:24
  142:9
  144:21
  211:4

contacted
  43:5

contacts
  88:19

contained
  348:7

content
  11:11,13
  51:4,22
  53:9
  88:21
  100:18
  344:2,8

contents
  54:17
  194:7

context
  115:5
  226:19

contingency
  54:13

continue
  121:9
  200:23

continues
  306:13
  320:19

continuing
  130:2
  174:11
  296:6

contract
  275:6,8
  276:24

contracting
  33:2

contractor
  31:19

contractors
  31:5
  189:14

contracts
  275:13

contrary
  180:6,10

control
  348:24
  352:5

controls
  25:22
  325:20,22

convenience
  163:18

conversation
  144:15
  213:19
  297:17



**conversations**
48:24
51:4,23
53:10
54:18
88:6
216:14
217:1
319:8

**converse**
244:14

**conversion**
233:9

**convert**
205:7

**conveys**
352:10

**convinced**
28:22

**cookie**
56:24

**cookies**
57:7
150:3
178:18

**copied**
299:11

**copies**
105:23
108:19
109:1
240:6

**copy**
97:19
104:18
111:2
132:5
144:3,13
145:6,17
146:2
239:6

325:8

**corn**
34:9
153:4

**corner**
193:22
203:7
219:22
238:19
278:15

**Corp**
287:14
327:7

**corporate**
8:20 93:7
94:12
95:24
96:10,12,
18 97:7,
13 188:20

**Corporation**
28:21

**correct**
9:17 37:3
48:8 61:3
74:2
79:24
84:20
86:18,22
96:22
102:23,24
103:1
110:5
134:23,24
137:7
145:15
146:4
149:1,11
152:11
153:8,11,
12,14
166:13
170:1
172:18

175:3,4,
20 176:9,
13,14,18
177:23
179:6
183:5,15
184:7
185:18
189:19
193:3
204:7,20
205:13,15
226:16
228:8
229:18
231:10,20
233:17
234:9,12
235:15
238:24
239:1
242:7
243:17
244:17
251:13,19
252:18
254:12
256:10,14
262:6
267:2
274:11,22
275:2,10,
11,17,19,
24 281:19
284:8,12,
13 285:2
289:2,3
291:8
293:13
294:15
296:4,9,
20 299:8
300:10,
17,18,22
301:3
303:10
307:22

309:15
311:8
313:23
314:12
318:9,10,
11
320:13,14
322:5,6
329:17
330:4,8,
21 343:24
344:13
346:4,5,
8,14,15
348:21,22
349:11
350:2,3
351:13
352:21,22
353:3,18
355:6

**corrected**
232:15

**correctly**
164:4
166:11
183:2
271:22

**correspondence**
45:6
51:14
87:23
100:18
304:8

**corresponds**
289:1

**cost**
35:10

**cost-effective**
201:24
202:3,17

**costs**
37:24
334:8

**cotton**
152:19

**counsel**
4:14 6:24
9:16
10:16
11:8,20
12:9,14,
21 13:11
49:1
51:5,23
53:2,10
54:18
76:13,21
77:7
87:23
88:3,7,19
89:14,21
90:6
92:11,12
100:2,19
101:12,22
102:20,22
105:1,18
106:2,7,
16
107:12,14
108:4
111:15,23
112:9
113:13,23
114:13,17
119:8,9,
22,23
120:11,12
121:4,5,
20,23
122:15,17
124:12
129:17
132:20,21
133:19
134:1,6,



12 136:16
139:24
140:1,17
143:2,20
144:19,22
145:7
157:17
222:7
248:13
269:16
282:15,16
284:24
286:1
287:21
290:9
291:21
293:4,11
298:8,21
299:3
305:20
319:9
322:15
343:23

**counsel's**
92:3,6
120:17
140:6
142:15
178:15
222:10
267:5
290:15,18
322:22
326:7

**Count**
327:5

**counterpart**
188:17

**counting**
113:1,2

**countries**
27:22

**couple**
181:9

200:16
225:8
226:2
246:21
247:10
299:12
339:4
340:17
341:7

**courses**
14:11,13
15:11,15,
16 16:16
17:6 18:9

**court**
4:6,12
8:2 74:5
147:12
156:6
157:12
191:16
227:5
286:13,16
288:1
300:14,20
304:15
306:21
307:3
319:12,13
320:1
323:5
325:20,
21,23
326:10
352:13,19

**court's**
326:8

**courts**
87:4

**cover**
81:14
191:10

**covered**
130:6

194:10

**COVID**
68:2

**COVID-19**
203:13

**COW**
152:13,14

**CR**
352:2

**create**
18:22
25:12
34:17,24
168:20
169:1
189:15

**created**
241:15

**creating**
168:12

**credibility**
346:12

**credible**
346:7,18

**criteria**
81:14

**cross**
190:19

**crossed**
207:20
269:2

**cue**
337:12

**culture**
34:18
35:2
188:20

**cumbersome**
107:1
108:21

239:15

**curiosity**
267:12,20

**curious**
342:20

**curr-**
155:5

**currencies**
153:2

**currency**
146:7
164:10

**current**
72:13,23
73:8
170:14
188:7
200:15
316:17

**curriculum**
20:7

**cushion**
173:7

**customer**
28:21

**customers**
35:22,24
198:8

**cut**
94:19
95:11

**cutter**
56:24

**cutting**
34:5
95:10
154:8
236:20

**cycle**
170:12

**cyclical**
63:12

---

**D**

---

**dad**
138:24
139:1

**daily**
58:11
64:10
65:14
66:15
67:14
149:20
150:19
167:5,6,
15 170:15
245:23
270:6
303:5

**damaged**
287:6

**data**
157:21
158:1
168:11
169:23

**date**
45:12
101:4
105:10,11
106:21
134:2,4
148:10
156:7
183:24
192:18
225:14,19
228:20
242:24
251:7
257:16
277:16



279:13,19
285:9
334:20
354:24
355:21

**dated**
219:15
220:11
231:19
278:18

**dates**
49:16
52:4 58:2
103:12
172:20
291:1
296:11

**daughter**
154:23
160:20
261:10
262:9

**daughter's**
155:5
158:22
159:11
160:2
261:8
262:2

**Dave**
9:7

**David**
4:21 5:16
46:14
97:10

**day**
39:4,6,
17,18
40:13,24
42:1,13
47:5,6,7
60:13,22
62:24
66:18

82:23
83:17
86:20
136:8,18
137:15,16
139:6
148:21
171:18,24
176:3
183:23
188:6
189:21
228:23
232:17
241:18
243:8
246:1,3,
24
253:22,24
254:1,8
269:6
272:2
310:5
340:11
341:17
343:17
355:17

**days**
11:2
85:18
152:5
171:8
190:4
225:8
334:4

**Daytimer**
332:6

**dead**
181:17

**deal**
140:11
154:13
240:15

**Dearborn**

20:8

**deceived**
121:13

**December**
4:9 21:9
225:12,20

**Dechert**
4:22,23
5:13

**decide**
24:1
46:18
276:16
293:18

**decided**
20:21
28:8
46:23
55:6,10,
16,19
56:3,9
57:9
86:11,13

**deciding**
87:6

**decipher**
234:24

**decision**
27:14
47:8
48:17
348:4
353:1

**decisions**
96:19
152:16
277:7
293:18
344:19,
21,24
347:16

**decline,'**

118:1

**declined**
28:1

**decoiling**
33:23

**decompressi
on**
141:4

**deduce**
178:7
238:2

**Dee**
4:4,21
5:16
96:8,9,13

**deemed**
67:14

**deep**
173:3,20
278:2

**Deere**
21:15
29:5
64:14
67:16,19
195:23
337:2

**defendant**
5:1,17
9:4
102:10,13
224:8
225:2
298:2
321:22
350:10,
17,23
351:20
352:1,4

**defendants**
4:20 91:9
99:15,18

102:7,10
109:11,
18,23
113:12,24
114:10
119:3,15
120:5
129:11,16
131:20
133:14
134:7
141:21
143:15
297:24
306:20
307:3

**defendants'**
91:16,19
92:2,5
99:21
109:16
112:16,24
116:16
131:16
134:21
143:14
330:1

**defense**
7:24
232:13

**deficient**
314:9

**define**
175:16

**defined**
74:22
75:3
129:9
139:9
321:4,23

**defining**
350:23

**definition**
75:3 76:1



degree
13:20,23,
24 14:5,
24 16:6
223:6
237:18

degrees
14:16

delegated
188:16

deleted
248:21
249:14

delinquenci
es
118:14

delistings
117:24

delivered
26:13

delivery
35:10

demonstrate
128:21
136:4

denied
311:13

denying
310:6
330:13

department
24:20
308:2

depended
196:24

depending
152:15

depends
66:6 89:2
138:7

151:14
165:17
197:14
198:15

DEPONENT
356:14

deposed
7:15 8:23

deposition
4:2,8
5:21,24
7:24 9:20
10:17
11:18
12:22
13:5,10,
11 52:17
54:4 91:3
99:1
106:11
114:4
116:3
129:22
131:8
156:10
191:13
219:17
224:12
249:8
285:18
286:3
300:4
331:11
341:2

deposition'
s
6:8

derail
96:24

describe
44:10
47:12
57:15
63:5

describing
27:4
56:15

description
236:5

design
37:17
38:2,3

designate
272:13

designed
188:12

desired
255:3

destroyed
248:21

detail
44:16
320:3

detailed
211:12
341:19

details
65:19

detects
65:16

determine
292:22
293:12
341:15

determining
279:19

Detroit
14:1
19:22
27:24
60:18
215:11

development
23:11,18

24:18
28:11,17
30:18,19,
23 31:4,
8,9 33:5
36:24
37:13
38:3
198:16

developments
89:6

diary
332:6,11

dice
26:9

dictate
30:6

dictated
59:12

dictates
165:19

difference
63:4
68:24
73:20
95:2
116:9
268:19,22

differences
25:17

difficult
56:2 68:1
145:10
239:15

difficulty
6:14

digital
177:18,19

digitalizat
ion

177:15

digits
216:12
258:23
261:23
271:7

diligence
56:5
78:22
79:4,21
311:19
342:11

diligent
87:15

dip
255:19

diploma
14:7 15:4

direct
117:17

directly
152:18

director
21:18
22:6
24:18

directors
72:24
73:9
96:10
351:21

directs
129:16

dis-
44:5
75:15
93:7

disagree
73:23
145:3
249:4



269:14
326:7

**disbelief**
85:20

**disclaimers**
95:7

**disclosable**
324:7

**disclose**
94:6
95:23
198:17,22

**disclosed**
47:3
75:15
80:4,13
83:14
93:17
94:1
209:10
300:13
315:11

**disclosing**
93:7,11
186:21
267:5
300:12
305:7

**disclosure**
96:4
227:4
233:5,19
236:22
237:9
310:3
316:13
342:9

**disclosures**
70:8,11
71:15
98:16
129:17,18
184:15

187:10
195:16,19
218:15
234:9

**discover**
79:23

**discovered**
58:21
60:12
62:5

**discovering**
95:3

**discovery**
249:11
350:9

**discus-**
105:24

**discuss**
13:10
19:11
48:10,16
216:7,10

**discussed**
11:14
105:24
200:19
246:23
299:2

**discussing**
102:8

**discussion**
153:17
293:11
299:20
338:10

**discussions**
106:2
128:14

**dismiss**
91:8,11,
18 92:3
306:17,22

325:19

**dismissed**
249:14

**disposal**
300:21

**dispute**
249:10

**disputes**
324:10

**disregard**
57:19

**distant**
225:6

**District**
4:5,6

**disturbing**
325:16

**diversified**
204:5
211:21

**divide**
26:11

**Division**
4:7

**DLA**
5:1

**doc-**
112:23
142:23

**dock**
19:23

**doctor**
265:13

**doctors**
235:24

**document**
44:23
45:4,9
48:6 54:3

99:14,17,
21 100:7
102:8
105:9
106:10
109:10,
18,23
110:15
112:7,17,
20,24
113:8,19,
20 114:3,
7 116:2
128:18
129:21
131:15,16
132:5,12
133:9,10,
11,13
134:21
143:5,14
156:5,9,
17,20
191:8,12
192:6,8,
15,22
193:23
194:12
211:8
212:20
219:16
220:10
221:1
223:4
224:11,17
226:1
228:14
230:11
248:14
251:1
278:5,18,
22 286:2,
10,12,15
291:15
299:24
300:3
318:9,11

322:16
327:1
331:10
347:15,19
348:1,7,
16 350:7
351:11
354:21
355:3

**documents**
9:21,23
10:5 11:6
12:1,3,6
35:19
45:2,7,20
46:6
50:17
71:16
79:7
87:17
90:17,24
92:12
96:11
99:20
100:8,9
104:9
109:10,
15,16,21
110:2,8
111:22
112:6,12,
15,22
113:23
115:13,19
116:14,
17,22
120:4
125:15
127:13
128:20
131:19
134:19
141:20
142:17,21
143:2,8,
9,13,19,



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 386 of 439
PageID 7870

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: DOJ..efficient

144:4
145:13
184:11
223:1
225:3
265:21
292:1
343:18
350:5,8

**DOJ**
308:15

**dollar**
255:18

**dollars**
277:12

**door**
34:22

**double-sided**
191:9

**doubt**
160:11
349:21

**Dow**
67:18

**download**
135:1,7
239:9
240:6

**downloaded**
167:1
267:1

**downloading**
241:1

**drafted**
92:13

**drag**
281:18

**draw**
25:7
170:6,7

171:22
172:2
270:5

**drawing**
35:5

**drive**
141:5

**driven**
85:17
152:7
163:17
165:11
260:2

**driving**
141:5

**drop**
181:17
336:21

**drums**
19:23

**dual**
26:3

**due**
56:5
78:22
79:4,21
255:24
311:19
342:11

**dues**
32:5

**duly**
5:2,5

**duplicate**
218:24
219:7

**duties**
86:24
87:10

─────────

**E**

─────────

**E-B-T-A**
335:13

**E-D-G-A-R**
183:14

**e-mail**
108:12
134:4
139:18
142:16
239:2

**e-mailed**
132:21
134:3

**e-mails**
132:1
140:4,14,
16 143:13

**earlier**
37:1
50:21
105:18
106:19
110:23
134:22
139:9
145:18
235:15
316:16
343:21
344:10
345:9
346:2,6,
11 347:14
348:19
350:5,7,
15 351:10
352:12
353:18
354:18

**early**
20:19

33:15
38:18
121:13
203:15
211:17,18
234:17
308:1

**earning**
310:24

**earnings**
177:2
310:12,20

**ears**
56:21

**earth**
7:22
21:12,13
23:21
28:12
30:15
34:1
188:21

**easier**
106:22
139:5
155:23
163:9
240:12
325:11

**easily**
141:10
177:19

**Eastern**
165:4
253:10

**easy**
30:16
131:21
138:17
140:21
141:1
162:8
356:3

**EBITDA**
335:12

**EBTA**
333:23
335:13

**economy**
64:11

**EDGAR**
183:9,17
184:3
192:6,24
221:19
222:22
223:9
263:19
278:22

**edge**
57:3
69:15
178:16
180:21,22
181:6
219:12

**edges**
69:12

**education**
15:18
16:3
18:6,11,
13 19:4,
5,9

**effect**
237:9
262:23
273:12,14
277:14

**effectively**
30:14
197:6
290:22

**efficient**
18:23
38:2



289:21

**efforts**
102:9
131:15

**EFT**
337:3

**egg**
73:24

**elaborate**
44:14

**Eladian**
153:3

**Elec-**
14:6

**electrical**
14:6,8
16:11
17:16
18:14
20:6
235:17
236:19

**electronic**
85:15
103:12
104:19,20
106:6
108:22
109:7
111:2

**electronica
lly**
104:15
106:22
108:17

**element**
27:3

**elements**
25:3

**elephants**
65:6

**eligible**
40:11
265:2,9
280:11
328:18
329:24
330:3

**eliminate**
23:12,14

**eliminating**
56:23

**elimination**
181:7

**EMBA**
15:2,6,17
16:3

**emerge**
129:13

**emerging**
203:15
211:18
234:17

**emission**
30:6

**employed**
16:23
17:3
33:14
130:18

**employee**
31:2
33:11

**employee-
to-**
31:19

**employees**
25:6
31:23
35:5
72:14
73:8
117:20

128:22
189:14
210:8,14

**employer**
8:5 16:19
20:11
31:20
130:17

**employers**
7:23

**employment**
8:8 35:5

**encounter**
18:10

**encourage**
342:10

**encouraged**
178:8

**encourages**
311:18

**encroach**
26:5

**end**
27:5
44:17
66:21
107:10
112:20
113:17
163:2
187:6
200:16
240:10,11
245:24
260:5
342:22

**end-user**
168:24

**endeavor**
188:7

**ended**

121:10
299:18
300:2

**energy**
63:17,19

**engage**
83:4,13

**engagement**
53:18,21
54:1

**engine**
42:18

**engineer**
17:17
24:19
32:22
236:17,19

**engineering**
14:7,8
16:12
17:16
18:15
20:6
24:19
235:11,17
236:9
338:22

**engines**
26:16
30:7 60:6

**English**
18:6
226:21

**ensure**
96:4

**enter**
191:5
247:7
258:23
259:7

**entered**
256:13

326:5

**entering**
324:21

**entice**
223:13

**entire**
19:1
22:10
26:9
56:11,22
64:11
67:4,17
84:16
216:14
282:4

**entities**
33:1
40:21
287:2,13
288:7

**entitled**
11:21
266:21
279:14,20
287:16
288:19
327:8
328:4

**entity**
87:5
325:22
346:8

**entries**
274:17

**environment**
59:11,12,
15 152:4
317:21,22
335:6

**environment
ally**
61:3



equal
  337:20

equals
  300:12

equipment
  7:22 8:12
  21:12,15
  23:23
  30:15
  190:8

equipped
  236:8

equities
  64:19
  67:22
  139:11
  166:1,4,9
  168:7
  174:22

equivalent
  14:24
  325:22

ESG
  59:11
  61:2
  181:2
  335:3

ESG-
FRIENDLY
  335:6

establish
  31:14
  63:3
  165:5
  171:6
  247:4,9
  270:18
  272:4
  273:19

established
  62:4 98:1
  142:9
  175:6

180:7
184:14
185:4
203:21
246:17
252:16
278:18
296:13

establishin
g
  55:22
  62:15,23
  175:10
  183:24
  221:10
  246:11
  255:20
  260:3
  270:9

estimate
  50:19

ETF
  66:9
  152:14,17

ETFS
  152:13

Ethan
  10:22

Ettefagh
  4:4

Europe
  16:19
  27:15,21

European
  165:6

events
  65:18
  87:17
  324:7

eventually
  171:9
  247:8

evidence
  134:17
  324:22
  325:5
  326:5
  353:7

exact
  44:15
  303:24
  355:21

EXAMINATION
  5:7
  146:15
  343:11
  354:14

examined
  5:6

examples
  147:16

excavators
  28:13

exchange
  26:19
  183:5
  321:2
  326:21

exclusions
  280:8

execute
  30:10
  243:20
  252:7
  255:3

executed
  27:6
  244:13,17
  245:15,22
  246:8
  248:16,17
  271:16

executing
  252:1

execution
  189:7
  252:1
  256:24
  257:24

executions
  252:14

executive
  14:20,23
  17:2
  177:14
  301:15

exempt
  189:22,23
  190:6

exer-
  277:15

exercise
  277:15

exhibit
  54:2,4
  106:11
  114:2,4
  116:1,3,
  10,11,15,
  19 128:16
  129:20,22
  143:7
  145:14
  146:1
  155:14
  156:1,6,
  10 157:4,
  10,22
  172:4
  191:8,10,
  13 196:15
  199:19
  203:11
  212:21
  219:14,17
  220:11
  221:2
  222:2

224:10,12
227:10,22
229:7,12
233:1
234:9
238:13,
15,17,18
240:20
249:20
260:15
261:16
265:24
267:2,23
278:8,9
284:11
285:22
286:3
289:2,4
290:21,23
293:21
299:17,24
300:4,24
301:7
304:6
306:3,6
318:6,13
324:22
325:8
327:1
331:6,11
347:12
349:16,17
351:1,5,6
353:3,12
354:7,19
355:6

exist
  309:22

existed
  83:17

existence
  32:1

existing
  24:2



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 389 of 439
PageID 7873

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: exists..fairly

exists
316:22,23

expand
139:10

expansion
64:2

expect
177:1

expectations
200:15

expecting
80:10
177:2

expenditures
197:16

expensive
26:12

experience
75:16
93:8
94:13
98:19
236:17
266:24

expert
126:15,23
205:8,10
317:24

expert's
127:3

expertise
236:17
288:14

experts
117:20
123:9,15
124:1,8

experts'
124:17

125:5

expiration
275:1,2

expiry
172:20

explain
63:4,8
78:13
154:4
276:19

explained
30:13
53:8
123:9
177:15
211:11

explaining
24:12
246:10

explanation
274:4

explore
57:18

expose
25:15

exposed
36:1,15
75:6

exposure
36:13
86:13

extent
76:12,24
87:22
89:13,19
90:5
100:15
126:5
216:23
248:18
266:18,20
338:19

347:3

Exxon
193:10,18
214:17

eyes
60:2
82:20
94:24

———————

F

———————

FA
23:13

face
283:12

Facebook
165:15

faced
283:9

faces
123:10

facetious
94:20

facilities
18:5
25:20
36:14
207:14

facility
8:6 24:2,
24 36:2,
12 38:7
60:17
189:5
209:24
215:9,15
339:13

fact
40:22
56:19
69:2

75:13
86:10
138:21
158:14
164:19
165:1
174:3,7
177:13
178:8
180:20
192:8
197:20
199:1,3
209:13
215:7
252:15
279:24
288:6,24
298:3,23,
24 299:2
301:23
302:9
311:12
314:7,19
315:22
319:12
326:13
341:15
347:24
349:23
355:4

fact-
finding
301:16,24
302:10
303:18
304:10

factor
216:13

factors
200:18,19
202:24
203:4,9
211:11
212:8

217:3
347:19
348:1,7,
12

factory
18:23

facts
47:4
60:23
82:15
84:18
86:11,15,
17 111:10
118:24
119:2,14
132:24
187:5
206:16
214:2
221:21
300:13
309:24
324:11
326:4
332:3
347:4

failed
94:6
121:11
197:22

failure
23:13
237:20

failures
82:11
98:18

fair
230:5
236:3
319:11
320:1

fairly
131:21
220:18



| | | | | |
|---|---|---|---|---|
| **fairness** | 347:13 | **filed** | 252:4 | 143:8 |
| 319:18,21 | | 44:18 | 273:1 | 168:13 |
| | **fee** | 45:11,19 | | 304:1 |
| **fall** | 54:14 | 46:14 | **filled** | 321:8 |
| 38:18 | 55:1 | 49:9 | 241:13 | |
| | | 90:17 | 256:11,15 | **finding** |
| **false** | **feedstock** | 91:9 | 257:13 | 61:18 |
| 324:10 | 123:11 | 116:20 | | 199:5 |
| 327:20 | 124:18 | 156:5 | **filter** | 298:3 |
| 329:1 | 236:7 | 161:12 | 241:2,14 | |
| 330:1 | | 286:7,13 | | **fine** |
| | **feel** | 287:21 | **filtered** | 174:10 |
| **familiar** | 75:24 | 306:20 | 271:22 | 212:3 |
| 177:17 | 80:5 | 318:19,22 | 273:11 | 246:18 |
| 313:10 | 305:4 | 319:3 | | 249:9 |
| 338:7 | 317:15 | 344:17 | **filtering** | |
| | 332:14 | 347:12 | 193:6 | **finish** |
| **family** | 349:16 | | | 6:6 16:18 |
| 141:10 | | **files** | **Final** | 20:5 |
| 349:6 | **feeling** | 110:14 | 342:24 | 45:13 |
| | 318:2 | 111:1 | | 159:2 |
| **farm** | | 192:20, | **finance** | 302:19 |
| 190:8 | **feelings** | 23,24 | 14:10 | |
| | 332:14 | 355:2,15 | 15:11 | **finished** |
| **farmers** | | | 16:16 | 28:7 |
| 36:5 | **feels** | **filing** | 17:5 | |
| 190:7 | 159:2 | 128:23 | 141:11 | **FINRA** |
| 198:19 | | 157:12 | 187:2 | 320:24 |
| | **felt** | 272:1 | | 322:9 |
| **fashion** | 47:2 61:9 | 286:15 | **financial** | 323:5,13, |
| 223:9 | 75:22 | 287:24 | 65:6 | 19 326:14 |
| | 79:9 | 298:9 | 66:12 | 350:17 |
| **faster** | 80:14 | 306:15 | 78:17 | |
| 104:12 | 332:17 | 318:9 | 96:22 | **firm** |
| 137:23 | | 320:13 | 97:1 | 4:22 5:13 |
| | **Fibonacci** | 322:8 | 121:11 | 29:20 |
| **fat** | 65:17 | 327:10 | 123:12 | 43:7,16, |
| 234:16 | 169:16 | 351:11,12 | 125:6 | 21 44:2,6 |
| | 170:7 | | 138:21 | 50:22 |
| **favorite** | | **filings** | 139:12 | 51:19 |
| 170:17 | **fiduciary** | 60:8,9 | 141:8 | 52:8,22 |
| | 226:15, | 200:20 | 352:3 | 53:19 |
| **February** | 18,21 | 227:5 | | 55:2 |
| 149:4 | | 319:1 | **financials** | 107:20,23 |
| 191:11 | **file** | 339:21 | 139:4 | |
| 278:19 | 55:3 | 344:11,17 | | **firms** |
| 279:18 | 156:6 | | **find** | 39:15 |
| 287:16 | 162:17 | **fill** | 41:4 | 40:9 41:2 |
| 288:9 | 173:12 | 251:22 | 67:24 | 79:2 |
| 296:7,18 | 287:24 | | 70:2,5 | 308:4,19 |
| 297:7,10 | 310:19 | | 83:5 | |
| 308:1 | | | 141:15 | |
| 327:8 | | | | |



**five-yard**
340:18

**fixed**
153:2
279:17

**flag**
217:20
315:8

**flags**
62:23

**flammable**
126:19

**flat-out**
29:6

**flights**
154:16

**Florida**
4:6

**flow**
26:8,17
38:8
88:12
181:3

**flows**
65:8
66:12
67:21
165:6,7

**focus**
117:15
196:10
222:9
233:23
245:5,10
256:24
310:2
317:7

**focused**
84:12
224:6
226:12

**focusing**
185:21
317:3

**follow**
45:9
66:11,13,
18 69:20
70:1,4
87:17
120:17
121:23
165:20
224:3
267:20

**follow-up**
146:14

**font**
233:12

**food**
190:6
201:1

**footer**
191:23
268:3
271:14
273:5
274:13
301:8

**for-**
157:8

**foraging**
126:20

**force**
64:12,20

**forced**
221:22

**forcing**
59:14

**Ford**
16:18
18:19
20:3,7,

10,12,17,
21 21:3,
4,21
24:10
27:22
188:15,16
189:9
205:2
236:18

**foreign**
153:1

**Forex**
164:10
240:8

**forfeited**
237:10

**forgot**
46:8

**forklifts**
22:18

**form**
10:9 11:9
12:10
13:13
15:23
17:13
23:5
29:23
32:16
39:23
40:5,18
41:6,18
42:3
43:2,10,
22 45:22
46:20
48:20
49:12
50:9
51:1,20
53:3,22
54:15
55:12
66:3 67:3

68:20
69:21
70:12,21
71:9,23
72:5,16
73:2,10,
13 74:15,
23 76:3,
10,17
77:13,23
78:4
80:22
81:23
84:8
85:10
86:2
87:20
88:8
89:9,17
90:2,18
92:14
93:3,18
94:7
95:17
96:15
97:16
98:7
99:23
100:13
101:1,8
103:20
104:5
105:19
107:4
109:3
110:16
111:24
113:3
114:14
118:7
119:5
120:24
121:16
122:4,11,
21 123:16
124:2,9,
19 125:7,

18 126:4
127:4,16
128:4
130:10
133:15
134:9
135:13,23
136:12
137:11
138:4
140:22
141:22
142:4,18
143:17
144:5
148:13
149:7,17
151:22
152:21
153:21
157:13
161:2
164:20
167:2,18
168:14
169:10
173:21
176:19
177:24
179:1,7
180:2
181:12
187:14,21
190:14
191:10
195:1
197:2
198:1,12
199:7
201:4
202:4
203:23
204:8,21
206:10,24
207:17
208:9
209:1,18



210:2,15, 22 211:14
212:23
213:15
214:24
215:20
217:8,13
218:4
222:3,16
223:9,18, 24 225:9
228:9
229:9,22
231:11
235:19
236:11
237:12
239:18
240:2
242:8
243:24
244:18
247:21
254:16
256:3
259:8
262:16
263:2
264:14
269:10,24
272:15
276:1
280:3,22
281:8
282:11
284:18
288:10
290:5
291:4,18
292:24
293:14
298:18
299:18
300:1
302:3,13
303:11,20
304:16
305:16
307:13
308:5,21
309:8,16
311:9,21
312:4,7, 16
313:13,24
314:10, 13,23
315:16
316:1,7, 19 317:12
318:21
319:5,15, 22 321:11
322:12
323:14,22
326:11
327:13
328:3,6
329:7,19
330:5,23
332:8
333:3
338:24
339:14
340:1
341:11
342:2,14
343:4

**formal**
15:18
16:2,5
18:2

**format**
112:21
156:19,21
157:6,8
211:12
260:19
273:10

**formatting**
157:8

**forms**
294:1

**formula**
30:11

**forths**
226:6

**forward**
175:24

**forward- looking**
194:14, 17,19
197:12
200:3,14

**forwarded**
107:24

**fossil**
63:16,19

**found**
39:10
42:12
56:4
58:9,15
60:9
111:23
112:7
132:7,19
133:10
144:12
145:7,8, 19 146:3
148:23
176:4
183:7
213:11
217:23
305:8
338:15
339:3

**foundation**
180:8
345:4,21
347:6

**founder**
58:13

**four-bagger**
336:9

**fourth**
26:21
176:22
177:7
201:22

**fragmented**
105:23

**frame**
49:22

**framed**
248:14

**frankly**
185:20
197:21

**fraud**
39:9
40:14
42:15,20
44:12
83:7
187:4,10
188:1
197:23
198:11
199:6,17

**fraud-based**
187:20

**free**
59:4 68:9
191:1
349:17

**French-made**
36:2

**frequency**
163:16

**Friesel**
189:6

**front**
22:16
42:19
137:16
155:21
220:21
224:19
316:2
343:19

**front-run**
263:6

**frustrated**
47:1 86:8

**fuel**
63:16

**fuels**
63:19

**fulfill**
36:7
131:18

**full**
28:23
31:5 96:4
113:19,20
145:9
171:10
227:4
251:1
295:22
300:11
306:9
311:13,17
322:2

**full-time**
33:11

**fully**
190:5

**fun**
270:18

**function**
97:12



**fundamental**
62:20
63:5,9
64:1,5,7
79:5

**fundamental
s**
63:22

**funds**
64:22
65:3

**furnishing**
283:22

**future**
97:1
165:1
317:3
321:23

**futures**
67:10,12
152:11,
13,18
153:4
165:1
166:6
240:8

———————

**G**

———————

**gain**
175:19

**gains**
160:21

**Gamble**
57:3
59:22,24
75:19
178:9
180:11,24
181:24
182:12
196:6
214:1

219:1
223:7
235:1

**game**
342:22

**gap**
25:8,12

**garbage**
59:7,9,16
61:4
68:10,12,
18 133:3,
4 181:1
213:12
214:2
219:9
333:12,
13,15
334:23
335:3,5,
19 336:11

**gather**
57:13
145:11

**gathered**
332:4,17

**gathering**
56:12,16

**gauge**
336:8

**gave**
182:1
217:19
241:11
291:16

**gears**
238:6

**general**
71:12
133:3
165:22
185:19

267:7
283:3,9,
19 300:8
301:21

**generally**
13:10
24:5
164:23,24

**generate**
32:4

**generated**
241:10
349:23

**generating**
177:10

**generation**
177:9
332:15

**Georgia**
61:14

**German**
27:16

**Germany**
61:13
188:15

**Gewirtz**
43:6,18
44:2
51:11
107:15

**give**
13:15
21:8
30:11
51:16
65:5
101:4
112:8
132:20
220:15
223:12
250:8

300:20
304:3,4
325:7
336:10
338:1
340:17
354:11

**giving**
87:12

**GLD**
152:13

**global**
35:1 37:9
338:22

**globally**
37:24

**Goal**
220:17
222:20

**gold**
146:7
150:1,2
152:6,10,
17,19

**good**
5:9,11
27:20
28:20
65:9
67:23
132:9
147:15
176:5,6
181:7
182:13
213:12
246:1,9
250:14
253:24
254:3
278:4
356:8

**goods**

219:12

**Google**
40:23
41:4
42:17,20
57:10
58:19,23
60:5
82:14
84:21
111:4
215:8

**Googled**
42:6,14
59:2
82:2,19
85:18
215:14
341:17

**Googling**
59:19
148:23

**govern-**
181:2

**governance**
59:13

**governed**
302:20

**government**
338:14,16

**grab**
27:1

**grad-**
14:2

**grade**
201:1

**graduate**
14:5

**graduated**
14:17
15:8



Case 6:21-cv-00809-PGB-RMN   Document 183-12   Filed 01/23/24   Page 394 of 439
PageID 7878

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: graduating..Hi-

20:10

**graduating**
19:15

**grandparents**
27:24

**granted**
233:10

**graphs**
65:13
68:4

**great**
188:22
313:1
317:20

**greater**
337:20

**grew**
65:23

**Grossman**
43:7,18
44:2
51:11
107:15

**ground**
5:20

**grounds**
23:20

**group**
47:14
64:13
75:4
78:19
79:11
83:11
96:20
139:2
226:24

**groups**
64:11

**growth**

64:3
203:15
211:19
234:18

**GTC**
246:24
254:4

**guarantee**
179:22
208:5

**guarantees**
205:24

**guardian**
160:13

**guess**
57:15
85:3
159:9
280:8
281:11
299:15
334:1

**guessing**
121:12
266:16
284:21

**guy**
31:7

**guys**
31:10
37:16
69:7
96:21

_____

**H**
_____

**habit**
58:2,15
147:5

**half**
11:5  67:6
251:9

273:8

**hand**
250:5

**handle**
29:9

**handling**
31:11
189:6

**handsomely**
176:4

**handwriting**
111:12
331:19

**handwritten**
111:8
331:7
350:7

**happened**
83:19
84:1
198:18
218:12
243:21
311:7
354:4

**happy**
6:16,23
276:20

**hard**
50:12
56:10
69:13
104:17
105:23
108:18
109:1
111:2
144:3,13
145:6,17
146:2
204:18
212:4
239:6,24

240:5,13
259:17

**hardware**
26:17

**harvester**
38:16

**harvesters**
21:14

**harvesting**
30:7  34:8
37:9

**hay**
34:2,5

**Hayoung**
4:19  5:12

**head**
6:12  98:3

**header**
220:14

**heading**
189:1
228:24
229:1
233:6
279:13
301:10

**hear**
38:24
57:24
181:10
183:2
212:3

**heard**
4:5  5:17
52:22
58:1
184:24
214:3
313:16,21
314:3
332:4
333:11

338:9

**hears**
320:1

**heart**
181:17

**heavy**
82:17

**Hedgeye**
59:4,5
60:1  68:6

**held**
4:8  38:17
152:4
161:7
284:2
287:14,17
288:7,20
296:6
301:4
327:6,9

**Helmut**
37:12,14

**helpful**
62:1

**helping**
174:16,18
189:15

**helps**
70:5
147:12
318:2

**Hesston**
33:13
36:16
38:10,13

**hey**
213:11
235:2
337:6

**Hi-**
355:20



800.211.DEPO (3376)
EsquireSolutions.com

| | | | | |
|---|---|---|---|---|
| **hide** | 118:22 | **history** | 236:18 | 295:17 |
| 146:10 | 119:17 | 96:1 | **home** | **house** |
| **high** | 120:7,23 | 171:4 | 141:5,6 | 162:23 |
| 123:11 | 122:20 | 273:11 | 190:11,22 | **housekeeper** |
| 171:18 | 126:3 | **hit** | 191:4 | 32:21 |
| 243:20 | 128:3 | 34:12 | 220:3 | **houses** |
| **high-horsepower** | 129:1 | 245:19 | 245:4 | 205:20 |
| 24:8 | 130:21 | 246:14 | **homework** | **How's** |
| **high-powered** | 135:1,7, 11,20 | 247:7,8 | 80:11 | 250:8 |
| 24:8 | 136:8,10 | 254:24 | 213:22,23 | **huge** |
| **high-quality** | 137:1,5, 10 180:17 | **hits** | 214:7,15 | 57:2 |
| 124:18 | 206:6,15 | 258:17, 22,23 | 216:19 | 75:17,21 |
| **higher** | 209:16,23 | **hmm** | **honed** | 83:11 |
| 209:9 | 210:7,21 | 60:23 | 57:1 | 140:11 |
| 245:19 | 211:4 | 317:19 | **honestly** | **human** |
| 246:13 | 216:20 | **hoax** | 10:12 | 35:6,12 |
| 336:2 | 221:9,14, 17,18 | 42:11 | 44:20 | **humans** |
| **Hin-** | 222:24 | 137:20 | 52:3 | 26:6 |
| 137:5 | 228:18 | 341:16 | 150:15 | **hundred** |
| 315:10 | 308:19 | **hoists** | 228:19 | 62:7 |
| **Hindenberg** | 309:6,14 | 26:1 | 316:10 | 67:18 |
| 314:22 | 311:18 | **hold** | **hope** | 118:10 |
| 315:12 | 312:13, 20,22 | 21:17 | 73:16,24 | 140:11 |
| **Hindenburg** | 313:17,20 | 32:13 | **hoping** | 146:4 |
| 39:5,8 | 315:3 | 37:4,5 | 173:10 | 148:18 |
| 42:1,8,11 | 341:9,18 | 175:3 | 230:15 | 158:1 |
| 46:24 | 345:1 | 191:16 | **hour** | 160:10 |
| 75:14 | 346:3,7, 13,16,17 | 259:21 | 66:18 | 183:21 |
| 78:24 | 347:3 | **holding** | 138:20 | 192:16 |
| 80:3,15 | 355:20 | 174:4 | 258:8,9 | 245:16 |
| 81:20,22 | **Hindenburg's** | 175:16 | 259:5 | 247:5 |
| 82:18,23, 24 83:3, 21 84:6, 19,22 | 209:8 | **holdings** | 331:15 | 251:21 |
| 85:16 | 314:6 | 163:14 | **hourly** | 252:6 |
| 86:12,21 | 341:10,24 | 164:7 | 22:9 | 261:7 |
| 93:23 | 346:12, 21,22 | 352:3 | 34:20 | 265:6 |
| 99:7 | **hired** | **Holland** | 170:15 | 270:12 |
| 117:20 | 28:22 | 8:5 21:5, 6,7,11,23 | 190:1 | 275:8 |
| | 33:10 | 22:12,14 | **hours** | 298:15 |
| | | 27:12,13 | 11:5 | 338:18 |
| | | 28:15 | 23:21 | 354:22 |
| | | 29:12 | 50:12 | **hundred-day** |
| | | | 57:14 | 167:9 |
| | | | 152:5 | |



hundred-
share
  252:17

hundreds
  252:5

hung
  110:9

hunky-dory
  198:17

hurdles
  177:23

hurt
  84:12

hypothetica
l
  345:22

        I

IA
  227:1

IBD
  85:14
  86:1
  149:24
  150:13

idea
  132:9
  255:10
  267:9
  332:15
  339:17

ideas
  133:1,12

iden-
  144:12

identical
  349:18

identificat
ion

54:5
106:12
114:5
116:4
129:23
156:11
191:14
219:18
224:13
286:4
300:5
331:12

identified
  130:18
  155:3
  200:19

identity
  128:21

III
  327:5

illegal
  254:22

Illinois
  4:9

illogical
  270:12

im-
  178:11

impact
  318:1
  342:21
  346:17

impartial
  87:5

impending
  96:23
  263:14

implode
  117:23

imploded
  119:4,16

120:7

implying
  178:11
  231:16

important
  6:3,9
  132:24
  171:22
  182:18,21
  194:23
  198:21
  300:19
  304:14

impressed
  53:16

impression
  150:7
  181:19

improve
  175:9

in-
  24:16
  56:2
  78:22
  91:3
  196:8
  270:3

in/first
  272:12,
  13,20

in/last
  272:12

inaccurate
  324:10

incen-
  80:21

incentive
  81:1 84:6

incentives
  80:19

incinerated

118:3

include
  77:20
  78:2 91:8
  107:14
  173:12
  200:17

included
  13:4
  33:23
  45:20
  85:16
  102:18
  126:14
  128:24
  292:20

includes
  77:11
  129:12
  138:13
  302:18

including
  102:10
  107:16
  128:24
  296:2
  308:19
  348:1

inclusion
  320:13

inclusive
  287:5

income
  32:5
  69:14
  153:2
  161:11
  175:22
  272:19
  273:1

incomplete
  245:24
  345:21

inconsisten
cies
  83:7 95:9

incorporate
  337:7

incorrect
  288:2

increments
  170:12
  251:23
  252:18

independent
  214:21
  293:11

Independent
ly
  293:17

indexes
  67:10
  165:1

indicating
  145:9
  157:9
  158:10
  178:11
  194:1
  229:13
  250:22
  266:5
  278:10

indication
  337:24

indications
  182:1
  253:22

indicator
  169:13

indicators
  169:12

indifferent
  317:9



Case 6:21-cv-00809-PGB-RMN   Document 183-12   Filed 01/23/24   Page 397 of 439
PageID 7881

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: indirect..interested

**indirect**
126:17

**individual**
69:16
78:14,21
120:5
205:17
206:17
349:19

**individuals**
128:24
288:7

**indus-**
31:12
67:1
68:16

**industriali
zation**
23:16,24
24:17,21
31:12
37:22
38:11
61:8,12
68:16
69:2,11
72:10
175:22
177:10,
16,17
214:4
217:19

**industriali
ze**
36:11
37:9
38:5,15
56:20
61:10
75:20

**industriali
zed**
56:21

**industriali
zing**
56:22
61:1 94:2
178:10
180:13
181:20

**industries**
65:9 66:1

**industry**
22:19
37:15
60:3,4
63:11,14,
15 64:4,
11 65:1
66:20
67:2
117:20
123:8,14,
24 124:7,
16,17
125:4
178:7
182:9
189:23
214:2
314:4

**influ-**
7:12

**influence**
98:14

**informal**
17:18,21
18:2,7,
11,13
19:3,5,8

**information**
8:4
56:11,16
57:11,13
61:18
64:1
66:17

75:7
78:20
79:6
80:1,2
84:13
87:18
111:8
118:11
145:11
146:6
169:22
193:7
217:21
223:9
248:15
266:22
267:6
288:5,24
290:13
300:20
311:13,17
324:17
326:3
327:20
329:2
332:17,24
344:21
349:13
352:14,
16,18

**informing**
100:16

**initial**
129:17,18
263:11

**initially**
20:23
104:9
107:18
151:7
182:13

**initiated**
51:8

**ink**

334:12

**innocent**
67:16

**input**
92:12,17,
23
114:12,
18,20

**install**
190:18

**instance**
305:22

**instances**
214:19

**institute**
348:5

**instituted**
348:24
353:21

**instituting**
353:1
354:8

**instruct**
30:12
48:24
51:3
89:21
101:10
119:20
120:9,14
121:2,18
122:13,23
124:11,21
126:6
293:2

**instructed**
8:3,20

**instructing**
89:12
304:20

**instruction
s**
101:22

**instructs**
7:2

**insurance**
65:3

**int-**
259:1

**intellectua
l**
57:3
178:17
181:24
196:8
237:1

**intelligenc
e**
338:13

**intended**
176:2
271:23

**intent**
83:9

**intentions**
61:15
265:6

**Interactive**
129:13

**interest**
75:5
185:22
311:2
316:23

**interested**
46:19
65:1 66:1
72:9
213:24
223:1
259:1
333:15



interests
    47:17
    90:9
    226:23

internally
    97:4

International
    129:13

internet
    111:19

interpret
    95:1

interpretation
    326:8

interrogatories
    10:2 91:3
    224:9
    226:4
    227:14

interrogatory
    227:5,13,
    15 230:6,
    13,24
    232:4

interruption
    115:8
    117:8
    129:5
    224:21
    234:3
    250:12
    338:5
    354:13

intervene
    49:10

interviewed
    210:8,13

intricacies
    97:6

intrigued
    244:11

intrinsic
    277:19

intro
    194:18

introduce
    4:14 30:8

introduced
    44:8
    50:22
    51:11
    52:10,23
    197:6

introduction
    24:10
    50:23
    51:12,19
    52:9
    196:24
    197:15

introductions
    18:18
    37:8

inventions
    343:2

invest
    57:10
    64:21
    66:14
    68:12,17
    69:13
    75:10
    79:20
    83:15
    217:23
    223:13

invested

40:10
47:15
55:21
56:1,5
62:6
65:22
71:5
75:5,23
79:6
182:4
203:20
355:9

investigate
    58:24
    72:8

investigated
    150:7

investigating
    58:19

investigation
    81:21
    263:12
    298:4,14,
    17
    301:17,24
    302:10,24
    303:8,18
    304:10
    305:13
    307:4
    308:3,17
    318:23
    319:2,12

Investigations
    301:11

investigative
    298:1,7
    301:14
    318:16

investing
    58:3 62:2
    63:16
    65:6
    71:13,14
    178:10
    201:3
    205:13
    345:11
    353:13

investment
    14:13
    15:14,15
    16:4,9,
    10,13
    17:6 56:7
    59:4,5
    66:21
    68:7,8
    69:8
    78:16
    94:24
    148:11
    152:3
    163:12
    178:10
    187:7
    205:20
    206:20
    212:16
    214:22
    215:2
    308:3,18
    344:19,23
    345:17
    347:16
    348:4
    351:23
    353:1

investments
    15:22
    16:14
    17:9 19:9
    163:9
    204:7
    206:4

223:5
345:20

investor
    58:11
    64:9
    66:15
    69:16
    78:14
    149:20
    150:19
    151:13
    167:4,5,
    15 182:13
    205:17
    236:1
    303:4
    317:6

investors
    47:14
    74:18
    75:23
    78:21
    80:5,8
    87:14,16
    121:13
    186:10
    206:17
    235:16,17
    320:22

invests
    81:2
    235:23

involve
    40:12
    49:1
    136:15
    211:2

involved
    9:9,14
    42:15
    46:19
    55:6,10,
    19,24
    56:21,22



82:10
98:11,13
107:2
129:11
282:6,22
309:19
339:12

**involves**
87:22

**involving**
222:7

**Iowa**
28:12
32:3,12
215:10

**IP**
57:3
59:24
61:6
68:15
69:11
181:24
185:21

**ipad**
324:24
350:20

**iphone**
135:3,6

**IPO**
58:9
217:22

**IPOS**
149:22
150:11
217:17

**ironed**
61:11
345:13,19

**Ironton**
209:24
339:13

**Ironwood**
60:17
215:8,15

**irrelevant**
60:21
117:1
118:11
154:2
272:3

**IRS**
272:24

**isolate**
239:14,24

**isolated**
299:11
300:1

**issuance**
228:4,13
230:10
231:7,18
232:9,10
346:13
348:2

**issue**
120:19
124:14
157:24
188:1
206:7

**issued**
40:17
99:7
229:8,15
298:1
301:14
306:21

**issues**
8:8
126:21
128:13
186:21

**Italian**
27:17

28:2

**Italy**
38:8

**item**
31:10
312:19
320:2

**items**
315:2
334:11
356:3

**iteration**
292:8

———————

**J**

———————

**jack**
263:9

**Jackson**
36:1,12,
16

**Jacobsen**
4:23 5:14

**Jake**
4:24
146:20
147:1

**January**
20:14,16
21:8

**Japan**
18:4
188:23

**Japanese**
188:14,
17,20

**jargon**
10:13
71:17
184:17
196:3

234:24
280:7

**Jeremy**
344:4

**job**
19:14,18
20:2,3
21:2,5
22:11
24:3,23
25:2,13
28:20
30:24
31:6,7
37:8
38:11

**jobs**
19:11
25:9
188:22
189:15
240:13

**jog**
271:6

**John**
4:24
21:15
29:5
64:14
67:16,19
146:19
147:1
195:23
337:2

**John's**
350:20

**join**
28:8
336:22

**joined**
28:10
29:14
31:17,18

**joint**
27:18
154:20
155:9
159:7,11,
14
160:12,16
162:4,12,
17,22,24
163:5,6
268:16,17

**Joni**
4:22 5:14

**Joseph**
4:11

**jot**
111:7

**jotted**
132:23
133:11
332:15,18

**jotting**
332:24

**Journal**
66:16
149:21
150:24
303:4
307:22

**judge**
18:1
86:17
87:5

**July**
28:18,19
50:8
156:7

**jumped**
10:13
196:5

**June**
99:12



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 400 of 439
PageID 7884

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: Justice..league

173:1
270:21
275:1
336:13,16

**Justice**
308:2

---

**K**

---

**Kansas**
14:21
33:13
36:17
38:10
138:17
188:24
189:15

**Kazakhstan**
27:19

**keeping**
220:1

**Kentucky**
58:8

**key**
111:10
265:12

**kick**
165:4

**kids**
154:24

**kids'**
176:2
270:20

**kill**
299:12

**killed**
299:15

**kind**
21:10
60:1
277:20

**knew**
27:17
56:13,14,
16,18
59:18
60:19
67:18
82:7,24
83:17
113:11
175:22
176:3,8,
11,23
178:7
198:16
204:6,11
205:6
219:8
221:21
262:20
263:10,13
288:1
355:19

**knowing**
67:20,21
201:10
298:11
346:3

**knowledge**
8:19 83:5
87:15
118:21
120:21
122:19
126:2
128:2
156:22
171:16
173:16
210:18
294:24
295:2,13
296:12
297:5,12
312:6
346:16

356:1

**Kubota**
188:21

---

**L**

---

**L-E-I-D-O-S**
338:8

**lab**
126:22
206:7

**lack**
75:7 93:7
94:12
187:9
310:3

**landing**
232:1

**landscaper**
22:15

**language**
317:1

**languages**
27:16

**large**
26:16
34:4
63:23,24
64:22
65:3
66:14

**largely**
251:12
351:24

**larger**
44:6

**largest**
66:9

**lastly**
6:24

**lat-**
81:5

**latest**
226:7,8

**launch**
24:13,15
30:4,10,
14 31:13
35:17,20
137:17

**launched**
38:12

**launches**
23:4,8

**Launching**
202:7

**law**
4:21 5:13
43:16,21
44:6
50:22
51:19

**lawsuit**
9:2 10:2
38:21
39:11,14,
16 40:3,
8,11,15
41:16
46:19
55:7,11,
16,20,24
73:19
87:19
282:6

**lawsuits**
39:9

**lawyer**
73:23
91:15
187:2
196:3
199:12

235:4
265:13
281:6,7

**lawyers**
91:12,23
112:23
157:11
235:23

**layman's**
81:4
94:23

**layout**
177:18

**LDOS**
339:6

**le-**
309:21

**lead**
48:7 55:4
73:15,16,
17,21
74:2
129:10
199:5
226:13,19
285:22
306:15

**leader**
22:8
338:22

**leaders**
25:16

**leadership**
22:8
33:22

**leading**
315:23
352:6

**leads**
57:12

**league**



303:7

**lean**
17:22,24
18:3,7,
20,23

**learn**
38:20
57:21
149:14

**learned**
65:20
68:18
83:1
148:2
188:19
298:16
302:23
303:9,17
308:14

**learning**
60:22

**leave**
18:1
20:17
27:13
278:8
356:5

**left**
21:2,4
31:15
266:12

**legal**
8:20
10:13
39:15
40:9,21
41:1
49:17
71:15
75:2
88:12
89:3
92:19
199:9

234:24
235:20
280:7,23
288:14
298:24
330:24

**legalities**
282:20,21
319:19

**legislature**
338:12

**legitimate**
42:13
182:19,22

**Leidos**
338:7,20,
22 339:12

**letter**
53:18,20,
21 54:1,9
234:15,16

**letterhead**
113:16

**level**
179:23

**levels**
169:9

**liability**
31:22

**liable**
197:23
198:10
235:5

**liberate**
340:14

**license**
17:8,10
218:17
233:7,9,
10,20
236:23

237:9

**licensed**
237:2

**licenses**
16:7

**Lieberman**
344:4

**life**
171:19

**light**
191:15

**likewise**
185:24
215:18
256:13

**limit**
86:13
242:7
243:3,9,
10,11,14,
17 244:6,
15
246:15,
16,23
253:19,23
256:13,24
257:3
258:19,24
270:6,7
274:8
276:21

**limited**
24:22
31:22
80:1,2
129:14
200:18
277:11

**limiting**
141:18
222:5

**limits**

277:8

**lined**
204:13

**lines**
18:21
170:6
171:23
200:17
257:9
296:1

**lingering**
6:22

**Linkedin**
30:20

**liquid**
276:22

**liquidated**
175:5
311:1

**liquidity**
246:16

**list**
105:10
130:4
150:14
200:22
240:15
241:16

**listed**
130:8,11,
13,16,20
131:1
347:19

**listen**
122:17
244:23
310:17,18

**lists**
158:7
194:9

**litigation**

8:16
44:11
51:5
53:12
88:23
89:7,21
121:21
131:16
141:21
143:16
222:6,14
299:3
343:22

**live**
27:24
138:17,19

**lived**
58:7
60:18
215:11

**LLC**
31:1,4,8,
14,22
32:1,14
33:1
188:12
189:13
326:20

**LLCS**
32:19

**LLP**
4:22
343:15,23

**loader**
21:12
22:13,15
24:6
26:11

**loading**
19:23

**local**
35:3



**locate**
112:16

**location**
14:22

**locations**
177:20

**Loftus**
4:24 5:17
146:13, 16,20
149:2,12
150:17
152:9
153:5
154:5
156:4,16
157:20
159:13
160:18
161:8
164:22
167:12,24
168:19
169:19
173:23
177:5
178:13
179:3,13, 20 180:19
181:8
182:3
187:19
188:2
191:2,18
195:3
197:10
198:3,23
199:14,21
200:9
201:18
202:11
204:3,15
205:9
206:18
207:8,23

208:12,18
209:11,22
210:6,12, 19 211:5
213:3
214:9
215:4,17
216:3
217:10
218:1,8
219:20
220:6
221:24
222:8
223:3,20
224:5,15, 24 225:15
227:12
228:21
229:14
230:4
231:21
234:6
236:2,21
237:14
238:5
239:22
240:17
241:20
242:12
243:13
244:8,22
245:2,4,8
248:3
249:9,18
250:13
253:2
254:18
256:6
260:10
262:22
263:15
264:17
266:23
269:18,22
270:15
272:22

276:5
280:12
281:1,2, 20 282:23
285:10,22
286:6
288:17
290:16
291:11
292:3
293:9,20
295:20
298:23
299:6,22
300:7
302:8,15, 21 303:15
304:5,20
305:10,24
307:20
308:9
309:1,12
310:8
311:14,24
312:5,12
313:4,19
314:5,11, 18 315:5, 21 316:4, 15 317:4, 18
319:10,20
320:4
321:16
322:18, 20,24
323:18
324:4,13, 18,23
325:2,10
326:6
327:15
328:11
329:12, 21,22
330:11
331:1,5,

13 332:21
333:5
338:6
339:8,19, 23
340:12, 17,23
341:6,22
342:7,23
343:8
345:4,21
346:21
347:6,20
348:15
352:6
353:6
354:11,15
355:12
356:5,8

**log**
190:11
266:19

**logged**
193:1

**logistics**
17:24

**London**
165:6

**long**
11:3,20
60:7
61:24
81:3,6,17
83:16
104:10
130:3
133:1
151:15, 17,21
165:10, 11,22
172:4,12
173:9
174:4,24

175:3,15, 19 191:8
228:23
234:8
269:2,5
274:18,21
276:16,17
284:20
299:16
340:10
343:17

**long-term**
175:16,19
176:5

**longer**
27:10
163:14
164:7
259:1

**longs**
165:20

**looked**
59:23
62:22
71:16
83:6,7
144:10
182:12
192:18,22
193:4,7
217:16
269:5
310:22
323:12
346:12
354:24
355:3

**loopholes**
285:3

**loose**
195:10
250:1

**lose**
277:1



| | | | | |
|---|---|---|---|---|
| **losing** | **lumber** | 336:22 | 98:16 | 352:24 |
| 29:17 | 22:18 | 344:19 | 101:20 | |
| | | 345:19 | 102:16 | **male** |
| **loss** | **lunch** | 348:4 | 103:2 | 177:14 |
| 258:20 | 131:9 | 349:2 | 113:4,20 | |
| | 331:8,15 | | 140:10 | **man** |
| **losses** | | **Magazine** | 152:16 | 188:9 |
| 160:21 | **lunchtime** | 343:1 | 155:22 | 189:11 |
| 320:23 | 191:1 | | 158:14 | |
| | | **Magnificent** | 159:3 | **man-hour** |
| **lost** | **lying** | 66:8 | 160:7,11 | 25:4 |
| 67:17 | 325:15 | | 190:24 | |
| | | **magnitude** | 195:15 | **management** |
| **lot** | **Lynch's** | 93:12 | 203:3 | 20:22 |
| 10:12 | 58:3 | 94:15 | 205:2,3 | 24:4 |
| 38:1 | | | 207:9 | 27:15 |
| 59:13,14 | ——————— | **mail** | 212:15 | 28:2 |
| 82:2 | | 239:7 | 213:2 | 75:16 |
| 110:23 | **M** | | 220:16 | 117:21 |
| 132:23 | ——————— | **main** | 227:4 | 118:6 |
| 163:16 | | 79:3 | 229:5 | 121:10 |
| 193:10 | **mach-** | 163:11, | 245:6 | 185:11 |
| 196:3 | 33:23 | 15,21,24 | 255:6 | |
| 217:6 | | 164:4,8,9 | 275:22 | **manager** |
| 247:13 | **machine** | 166:12 | 277:7 | 8:6 21:19 |
| 280:14 | 25:19 | 174:12 | 284:24 | 32:22 |
| 336:1 | | 262:3 | 289:20 | |
| | **machining** | 268:9,15, | 293:7,17 | **managers** |
| **lots** | 33:23 | 21 | 305:22 | 25:16 |
| 18:5 | | | 315:19 | |
| | **made** | **maintained** | 317:3 | **mandate** |
| **loved** | 24:9 28:2 | 164:12 | 325:10 | 335:8 |
| 217:18 | 31:18 | 183:4 | 328:21 | |
| | 32:9 45:4 | | 330:14 | **manipulate** |
| **low** | 68:17 | **major** | | 168:11 |
| 171:18 | 89:6 | 69:12 | **makes** | |
| | 96:19 | 89:24 | 32:19 | **manner** |
| **lower** | 100:24 | 181:21 | 37:17,19, | 201:24 |
| 173:7 | 106:6 | | 20 147:3, | 202:3,17 |
| 193:22 | 108:21 | **make** | 13 219:23 | |
| 203:6 | 141:23 | 13:5 | 318:15 | **manual** |
| 219:22 | 176:7 | 24:1,24 | | 33:24 |
| 246:14 | 179:12 | 25:6 26:4 | **making** | |
| 251:3,9 | 183:18 | 35:2 36:7 | 201:16 | **manually** |
| 270:8 | 200:20 | 38:5 45:9 | 255:6 | 104:14 |
| 273:8 | 214:21 | 56:4 | 333:12 | |
| 278:14 | 216:15 | 63:21 | 335:24 | **manufacturi** |
| 286:20 | 248:20 | 88:20 | 347:16 | **ng** |
| | 262:11 | 90:9 | | 7:23 |
| **lucky** | 311:3 | 94:20 | | 17:23 |
| 250:14 | 327:19 | 96:21 | | 18:3,7, |
| | 328:4 | | | 17,20 |
| | 331:21 | | | 19:2 |



22:10,20
28:23
31:6,12
33:12,17,
21 35:8
37:2
63:13
177:14
189:7

**mapped**
247:18

**March**
57:23
59:5
107:10
148:17
150:21,24
154:19
155:4
167:17
183:18
184:4,18,
23 185:17
186:1
189:16
190:10,12
192:15
193:2
203:11
206:4
212:10
221:6
234:11
237:15
243:2,23
245:13
251:6
252:23
256:10,
15,23
257:17,18
262:5
284:2,7,
12 287:17
288:20
289:12,22

291:17
293:23
297:15
300:2
313:12
320:7,8
327:10
331:24
332:4
333:2
334:11
354:21
355:5

**Marchionne**
28:4

**margin**
164:13,
14,15,18

**Mariusz**
213:19

**mark**
54:2
106:8,9
114:2
115:24
129:20
156:1
191:7
219:14
224:9
285:22
299:17,24
324:23
325:8
331:6
334:15

**marked**
54:4
106:11
114:4
116:3
129:22
156:10
157:4

172:4
191:13
193:22
199:18
211:9
212:21
219:17
220:11
221:2
222:2
224:12
227:9,22
233:1
238:12
242:19
268:2
278:14
286:3
289:2
300:4,24
318:6
331:11
334:7
349:16
354:19

**market**
27:9
63:23
101:14,18
102:1,3,
17 103:7
133:4,6
149:16
152:11
165:17,
18,19
181:1
198:8
243:11,19
256:1,16,
18
258:13,
17,21
259:2,3,5
332:19,20
333:1,12,

16,17,24
334:2

**marketing**
27:7,8
31:10,11
34:15

**marketplace**
197:17

**Markets**
152:2

**Marketsmith**
65:13
166:22
167:6,7,
17 168:9,
21 169:3,
18

**married**
66:12

**master**
14:23

**match**
272:14

**material**
18:21
26:8,17,
20 30:12
38:8
69:3,4
94:22
95:4
267:1

**materialize
d**
246:14
348:13,14

**materials**
313:5

**math**
252:21

**matter**

4:3 87:3
113:8
252:16
263:13

**matters**
138:22
343:19

**mattress**
58:7
61:23

**Mazda**
188:16

**MBA**
14:20
15:1
16:17,18,
21 17:2,5

**meaning**
112:11
170:19
175:1
190:10
196:7
298:8
304:4
322:1

**means**
25:5
37:11
61:10
65:7
143:19
185:7
202:12
209:6
226:22
234:22
256:16
273:18,23
298:8
302:1,11
304:2

**meant**
59:9



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 405 of 439
PageID 7889

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: measured..minor

151:16
222:19
264:5
314:8
356:2

**measured**
34:19

**measurements**
25:23

**measures**
238:1

**medical**
129:12
314:4

**meet**
10:16,21
200:22,23
249:7

**meeting**
11:11,15,
20,22
12:3
255:1
264:11,23
265:4
279:2,5,
21 280:1
282:9
284:1,7,
16,17
287:17
288:19,20
291:17
297:14
327:9
328:5,19
329:16

**meetings**
12:14
35:9,10
97:5

**meets**

81:13

**member**
97:13
141:10
292:22
293:12

**members**
87:1
173:13
265:8
289:5,16
290:3
296:2
329:23

**memory**
206:14
292:17

**men**
25:5

**mention**
13:21
61:13
68:6
85:24

**mentioned**
30:19
35:11,13
36:18
37:1 40:2
50:21
58:23
59:7,17,
20,21
61:2 64:9
68:10,15
69:2,8,18
91:1
94:10,12
132:3
134:22
135:4
142:16
144:8
182:23

333:14
355:14

**mentioning**
60:20
85:15

**mentor**
18:3

**menu**
169:4

**Mercedes**
37:16,17

**Mercedes-benz**
189:3

**mercilessly**
83:8

**mere**
199:1
302:9

**merge**
185:15
186:2
353:22

**merger**
264:12
265:11
279:6
280:2,21
320:8,9
329:4,24
330:4,21
344:16

**mergers**
320:21

**message**
61:17
141:16

**messages**
139:14
141:14,19
142:3,7

**Messini**
9:7

**met**
10:22
237:11

**metals**
153:1

**methods**
26:21

**Michael**
4:20,21
5:15,16
82:9
84:14
95:14
96:8,9
118:19

**Michigan**
14:1
16:17
19:22
20:8
60:18
138:19
215:11

**microcap**
352:1

**Microsoft**
165:15
193:18
203:21

**mid-march**
148:5,9
149:1
224:4

**mid-may**
310:12

**middle**
4:6 231:2
242:20
249:23
250:17

268:2
274:13

**midway**
320:6

**miles**
138:16,17

**million**
118:2

**min-**
252:10

**mind**
56:8
184:9
190:19
198:6
207:20
219:12
250:3
302:6
303:1
311:4
327:22
346:9

**mine**
58:2
155:13
216:16
250:1
253:12
261:2,4
267:10
270:20

**minimal**
185:11

**minimum**
94:3

**Minnesota**
36:1,4,16

**minor**
155:6
159:19,20
160:11



| | | | | |
|---|---|---|---|---|
| **minus** | **mishaps** | **misstates** | 238:7 | 167:21 |
| 273:17,19 | 313:8 | 235:20 | 244:12 | 175:6,17 |
| | | 263:3 | 258:24 | 188:15 |
| **minute** | **misinterpre** | 269:11 | 277:18 | 269:3 |
| 13:15 | **ted** | 270:1 | 281:24 | 336:20 |
| 167:8 | 141:10 | | 287:23 | |
| 256:22 | | **mistake** | 306:2 | **monumental** |
| | **mislead** | 230:15 | 316:10 | 320:22 |
| **minutes** | 52:5 | | 328:13 | |
| 98:22 | | **misundersto** | 338:1 | **mood** |
| 131:4 | **misleading** | **od** | | 221:20 |
| 167:8 | 132:22 | 228:13 | **money** | |
| 258:9 | 330:2 | 232:9 | 66:13 | **morning** |
| 259:6 | | | 69:4 | 5:9,11 |
| 295:18 | **misled** | **mixture** | 165:8 | 83:22 |
| 340:18 | 328:22 | 85:20 | 173:4,20 | 84:5 |
| | 329:1 | | 203:20 | 85:21 |
| **Mis-** | 330:1,20 | **MKT** | 275:22 | 148:1 |
| 328:24 | 331:4 | 256:18 | 278:2 | 178:15,20 |
| | | 258:12 | | 182:24 |
| **mischaracte** | **mispronounc** | | **monitor** | 196:2 |
| **rize** | **e** | **mode** | 338:14 | 208:17,20 |
| 353:9 | 39:5 | 23:14 | 339:13 | 218:9 |
| | | | | 331:17 |
| **mischaracte** | **misquote** | **model** | **monkey** | |
| **rized** | 312:22 | 18:17 | 169:6 | **motion** |
| 179:4 | | 24:6,10 | | 49:10 |
| | **misrepresen** | 31:13 | **month** | 55:3 |
| **mischaracte** | **tation** | 35:19 | 18:4 | 91:11,18, |
| **rizes** | 300:10 | 37:7 | 51:16 | 19 92:2,5 |
| 53:4 | | 38:15 | 64:19 | 285:23 |
| 105:20 | **misrepresen** | | 107:3,7 | 286:7 |
| 181:13 | **tations** | **mom** | 225:7 | 290:22 |
| 222:17 | 300:16 | 138:24 | | 297:20 |
| 228:10 | 328:3 | 139:1 | **monthly** | 306:3,17, |
| 229:23 | 354:7 | | 65:15 | 18,19,21 |
| 303:12 | | **mom-** | 107:8,11, | 307:2,6 |
| 319:6 | **misrepresen** | 287:23 | 19,23 | 325:19 |
| 353:6 | **ting** | | 144:8,12 | |
| 355:7 | 325:17 | **moment** | 170:15 | **motions** |
| | 326:1 | 52:11 | 238:22,23 | 91:8 |
| **mischaracte** | | 57:9 | 349:9,15 | 306:14, |
| **rizing** | **missed** | 58:17,20 | | 17,21 |
| 41:10 | 49:3 | 65:9 86:7 | **months** | |
| 122:22 | 116:21 | 116:7 | 36:6,7 | **Motor** |
| 178:4 | 232:6 | 118:20 | 49:20 | 16:18 |
| 179:2 | 233:8 | 159:5 | 79:23 | 18:19 |
| 325:24 | | 196:15 | 107:2 | 20:3,8, |
| | **missing** | 220:16 | 151:16 | 10,13,17 |
| **misconduct** | 237:20 | 224:7,16 | 161:7 | 21:3,4 |
| 302:12 | | 226:12 | | |
| | **misstated** | 234:1 | | |
| | 232:5 | | | |



188:15

**move**
12:18
18:20
27:20
30:12
89:3
232:3,23

**movement**
59:13

**movements**
67:15

**moving**
7:22
21:12,13
23:21
28:12
30:16
34:2
64:17
74:7
126:13
165:8
167:9,10
169:2
188:21,23

**Mulally's**
20:20

**multiple**
36:14
40:21
107:2
117:19
177:9,10,
20 252:14
352:24

**multiply**
24:1
56:19

**multiplying**
56:24
61:16

**mumbo-jumbo**
146:9

**murky**
351:24

**music**
56:20

———————

**N**

———————

**named**
29:5
118:17
119:3,15
195:12

**names**
42:21
118:16
123:14
130:6

**narrative**
211:12

**narrow**
43:12
174:18

**NASDAQ**
67:11
295:5

**nature**
98:12
110:12
163:12
344:2,8

**near-virgin**
69:3
94:20

**necessarily**
302:11

**needed**
142:22

**negotiate**
54:13

**negotiated**
54:23

**net**
246:16
276:21,22

**neutral**
317:16

**newly**
58:9

**Newport**
351:23

**news**
40:24
83:18
84:2
256:1
259:5,13
260:3,9
270:22
277:4

**newspaper**
58:12

**newspapers**
85:14

**niche**
188:13
205:5,6

**nickname**
163:11
268:11

**nicknames**
174:22
268:21

**ninth**
205:21

**nodding**
6:11
278:24

**nomenclatur
e**
92:1

**non-legal**
236:4
296:12
309:21

**non-
professiona
l**
315:7

**non-public**
298:3
301:16,24
302:10
303:18
304:10

**normal**
164:6

**note**
51:14
336:22

**notebook**
132:8,13,
14,16,18
144:2

**noted**
249:16
356:16

**notes**
111:9,14
132:19
331:7,14,
16,21
333:20,21
334:3

**notice**
39:22
40:2,17
41:5,7,9
43:1 50:6
279:20

**noticed**
39:8
83:23
312:19

**notices**
39:9,15
42:14
60:8

**notificatio
n**
108:16

**notifying**
304:8

**notion**
313:10,21

**notwithstan
ding**
262:24

**November**
21:8
139:15,
19,22,23
173:1,9
219:15
220:12
223:16,22
227:18,22
229:8,16
230:13
231:3,19
275:1
286:8
287:4,5,
15,22
288:8
296:7,17,
24 297:3,
24 327:7

**nowadays**
78:20

**number**
24:22
25:4 41:1
64:17,18
93:6,11
94:12,15
96:3
108:20



ROBERT CIECKO                                                    December 07, 2023
William C. Theodore vs PureCycle Technologies          Index: numbered..objection

113:15
117:4
146:6
156:1
159:24
162:5
163:23
177:23
240:7,13
242:21
243:21
251:5,16
252:3
253:3,6
261:24
263:11
267:8
271:8

**numbered**
257:9

**numbers**
34:13

**numerous**
109:4
208:11

**nut**
27:1

**nutshell**
27:11

────────────

O

────────────

**O'NEIL**
58:12

**oath**
7:6,15

**oats**
153:4

**Objec-**
134:9

**object**
6:24

88:20
119:18
249:5
348:15

**objection**
10:9  11:9
12:10
13:2,13
15:23
17:13
23:5
29:23
32:16
39:23
40:5,18
41:6,18
42:3
43:2,10,
22  45:22
46:20
48:20
49:12
50:9
51:1,20
53:3,22
54:15
55:12
66:3  67:3
68:20
69:21
70:12,21
71:9,23
72:5,16
73:2,10
74:15,23
76:3,10,
17  77:13,
23  78:4
80:22
81:23
84:8
85:10
86:2
87:20
88:8
89:9,17

90:2,18
92:14
93:3,18
94:7
95:17
96:15
97:16
98:7
99:23
100:10,13
101:1,8
103:20
104:5
105:19
107:4
108:1
109:3
110:16
111:24
113:3
114:14
118:7
119:5
120:8,24
121:16
122:4,11,
21  123:16
124:2,9,
19  125:7,
18  126:4
127:4,16
128:4
130:10
133:15
134:9
135:13,23
136:12,21
137:11
138:4
140:22
141:22
142:4,18
143:17
144:5,16,
18  148:13
149:7,17
151:22

152:21
153:21
157:13
160:23
161:2
164:20
167:2,18
168:14
169:10
173:21
176:19
177:24
179:1,7
180:2
181:12
187:14,21
190:13
195:1
197:2
198:1,12
199:7
201:4
202:4
203:23
204:8,21
206:10,24
207:17
208:9
209:1,18
210:2,15,
22  211:14
212:23
213:15
214:24
215:20
217:8,13
218:4
221:23
222:3,16
223:18,24
225:9
228:9
229:9,22
231:11
235:19
236:11
237:12

239:18
240:2
242:8
243:24
244:18
247:21
254:16
256:3
259:8
262:16
263:2
264:14
266:17
269:10,
21,24
272:15
276:1
280:3,22
281:8
282:11
284:18
285:14
288:10
290:5,18
291:4,18
292:24
293:14
298:18
302:3,13
303:11,20
304:16
305:16
307:13
308:5,21
309:8,16
311:9,21
312:4,7,
16
313:13,24
314:10,
13,23
315:16
316:1,7,
19  317:12
319:5,15,
22  321:11
322:12,22



Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 409 of 439
PageID 7893

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: objections..orders

323:14,22
324:9
327:13
328:6
329:7,19
330:5,22
332:8
333:3
338:24
339:14,22
340:1
341:11
342:2,14
343:4
345:4,21
347:6
352:6
353:6
355:7

**objections**
116:16
128:17
224:8
226:2
228:1

**objective**
81:12

**objectives**
188:18

**obligation**
226:19
227:4

**obligations**
131:19
193:15
226:15

**obtain**
87:18

**obvious**
339:10

**occasions**
243:21

**occurred**
11:21
12:13

**October**
225:14

**offer**
150:2

**offered**
20:23
31:7 37:6
112:19

**office**
182:16
189:21

**Officer**
301:15

**officers**
72:24
73:8

**Ohio**
60:17
215:10
339:13

**older**
214:10

**omission**
288:16

**omissions**
300:10,15
328:3
330:2

**omitted**
206:16

**online**
103:18
104:3,11
108:11
135:11
153:10
240:22
298:9

**op-**
309:20

**open**
155:3
165:6
193:10
241:15
273:12,20
274:18
303:24

**opened**
21:1 60:2
82:19
301:24
302:9
319:13

**opening**
165:18
171:17,19
305:6

**operate**
57:14
97:7

**operates**
26:5
351:24

**operating**
26:24
35:21

**operation**
206:2,9,
23 207:15
208:6,24

**operational**
177:23
190:5

**operations**
21:18
29:7
185:13

**opinion**
124:17

199:10,
15,16
303:6
309:21
315:7
330:24
341:24
342:5,6,
10,19
346:22

**opinions**
82:3
125:5
312:20,24
341:10
347:3,4

**opportuniti
es**
67:23

**opportunity**
146:21
148:12
270:7

**opposite**
26:6
81:2,18

**opposition**
91:12,14,
15,22
92:3,6

**optimize**
18:21

**option**
167:6
172:9
173:4,20
277:13

**options**
172:5,12,
16,20
173:13
174:8
274:20

276:23
277:2,9,
10

**ord-**
252:1

**order**
19:13
36:7
171:6
243:8,9,
10,11,14,
15,17,20
244:6
245:17,21
246:2,3
247:6,7
250:15
251:23
252:13
253:23
254:1,21
255:2,16,
19
256:16,
19,24
258:16,17
259:2,3
262:13
274:7,8
306:21
325:20,21
341:15

**ordered**
36:6

**orders**
153:13
241:15
242:6,7
243:3,11
244:14,15
245:14,23
246:6,8,
22,23
247:1
251:16,19



800.211.DEPO (3376)
EsquireSolutions.com

Case 6:21-cv-00809-PGB-RMN    Document 183-12    Filed 01/23/24    Page 410 of 439
PageID 7894

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: organizational..Park

252:1,15
253:19
254:15
256:14
257:3,12,
17 258:3,
12,13,14
259:7
274:18

**organizatio
nal**
34:17

**organized**
106:21

**orient**
148:3

**oriented**
259:16

**original**
44:18
45:11,19
144:21
146:5
292:7

**originally**
18:16
105:22
112:18
144:10

**Orlando**
4:6

**Ortworth**
82:10
118:19

**Ortworth's**
84:14

**Otworth**
4:4,21
5:16
95:14
298:2

**outcome**
342:6

**overbought**
169:14

**overcome**
177:22

**oversee**
25:3

**oversold**
169:14

**owe**
86:24
87:10,13

**owned**
36:20
153:12
188:16
296:17
297:2,9

**owns**
218:2
352:2

──────────

**P**

──────────

**P&-**
219:1

**P&g**
68:15
219:10

**P-**
33:3  59:1

**p.m.**
131:7,12
285:17,
19,21
341:1,3,5
356:13,16

**pages**
111:21
112:22

113:2,8,
12,15,21
130:13,
16,21
131:1
156:8
191:9
203:10
211:10,13
220:19
242:23,24
260:15
281:4
299:10,
11,12
300:1

**paid**
180:12
253:16
259:19
337:21

**paint**
189:3,5

**painting**
33:24

**pandemic**
189:19

**paper**
181:7

**par**
336:2

**Par-**
327:1

**paragraph**
115:14,20
116:6,8
117:5,15
121:9
123:8
126:13
128:13
194:18
200:13

233:14,
15,16
293:22
295:22
297:23
306:10
318:15
320:6,19
321:20,21
323:20
327:2,17
329:14
350:24
351:4,17,
19 352:10

**paragraphs**
227:19,21
350:22

**paraphrased**
178:22

**pardon**
254:11

**Parentco**
200:21

**parents**
139:3
141:3

**Paris**
36:3

**Park**
4:19 5:8,
12 10:15
11:13,16,
23,24
12:18,19
13:8,18
16:1
17:19
30:17
32:23
40:1,16
41:3,8,
14,22
42:23

43:8,14
44:9
45:17
46:4 47:9
49:2,7,23
50:20
51:6
52:6,14,
21 53:17
54:2,8,21
55:18
66:24
67:5
69:17
70:6,17
71:6,21
72:1,12,
22 73:6,
14 74:20
75:9
76:8,14
77:5,10,
18 78:1,9
81:19
83:2
84:17
85:23
86:23
88:4
89:5,15,
23 90:11,
23 92:22
93:15
94:4
95:13
96:7
97:9,21
98:21
99:5
100:6,11,
23 101:6,
15 102:5
103:4
104:2,16
106:8,14
107:6
108:9



| | | | | |
|---|---|---|---|---|
| 109:8 | 64:7 | **past** | **PCT** | 214:17 |
| 110:20 | 96:12,18 | 207:10 | 39:2 | 218:14 |
| 112:5 | 97:5 | 225:6 | 40:10,14, | 223:2 |
| 113:10 | 98:10 | 317:3 | 23 42:6, | 224:3 |
| 114:2,6, | 117:18 | | 14,20 | 230:3 |
| 21 115:6, | 118:21 | **patent** | 46:8 56:5 | 234:21 |
| 11 116:5 | 180:21 | 57:4 | 58:17,18, | 237:1,2 |
| 117:12 | 196:23 | 60:24 | 21 59:4, | 241:2 |
| 118:23 | 197:5 | 61:7 | 17 60:8, | 262:20 |
| 119:13 | 209:7 | 68:19,24 | 16 61:15 | 271:2 |
| 120:3,18, | 213:18 | 69:1 | 68:16 | 273:2,11 |
| 20 121:8 | 219:23 | 75:19 | 71:1 72:9 | 274:19 |
| 122:1,8, | 225:3 | 94:2 | 75:12,23 | 275:7 |
| 18 123:6, | 265:8 | 126:17 | 79:20 | 294:3,5, |
| 23 124:6, | 283:24 | 180:11,12 | 83:18 | 15 295:4 |
| 13,15 | 305:11 | 181:20 | 84:22 | 303:3 |
| 125:3,14 | 320:19 | 182:15, | 85:16,17 | 310:6 |
| 126:1,12 | 327:10 | 16,20,22 | 95:15 | 311:2 |
| 127:12 | 336:23 | 214:1 | 96:12 | 318:21 |
| 128:1,12, | | 217:18 | 98:15 | 319:1 |
| 15 129:8, | **participate** | 218:2,10, | 102:3 | 332:16 |
| 20 130:1, | 56:9 | 16,17 | 105:11 | 335:20 |
| 12 131:5, | 263:23 | 219:2,6, | 111:20 | 336:1,22, |
| 13 133:23 | 264:10,19 | 11 223:7 | 133:2 | 23 337:7 |
| 134:13 | 284:15 | | 136:2,5, | 341:16 |
| 135:18 | 291:16 | **patented** | 6,24 | 344:15,16 |
| 136:9,19 | | 180:23 | 138:14 | 354:3 |
| 137:2,13 | **participate** | 313:12 | 140:7,10, | 355:19,22 |
| 138:8 | **d** | 343:1 | 14,15 | |
| 141:12 | 297:14 | | 142:10,15 | **PCT's** |
| 142:1,2, | 306:14 | **patient** | 146:8,9, | 200:22,24 |
| 13,24 | | 246:11 | 10 148:21 | 201:22 |
| 144:1,11 | **parties** | | 150:7,12 | 202:15 |
| 145:3,5, | 113:22 | **pattern** | 152:2 | 301:15 |
| 21,24 | | 296:14 | 155:21 | 332:20 |
| 146:12 | **partner** | | 161:6 | |
| 199:20 | 52:10 | **patterns** | 171:4,17 | **PCT-RELATED** |
| 227:11 | | 65:16 | 173:5 | 295:8 |
| 343:9 | **Partners** | | 174:22,24 | |
| | 326:20 | **pay** | 175:21 | **PCTTU** |
| **part** | | 32:5 | 177:13 | 295:9,12 |
| 17:17 | **parts** | 113:14 | 181:19 | |
| 18:11 | 26:10,12 | 168:5 | 183:7 | **PCTTU.'** |
| 24:17 | | 219:2 | 185:20,21 | 295:6 |
| 34:12 | **party** | 247:13 | 200:24 | |
| 35:6 45:8 | 8:16 | 248:1 | 211:17, | **PDS** |
| 46:9 60:2 | 350:23 | 270:14 | 18,20 | 28:22,24 |
| | | 276:24 | | 29:4,15, |
| | **passed** | 277:22 | | 18 30:3 |
| | 45:4 | | | |


ESQUIRE
DEPOSITION SOLUTIONS

31:2,18
33:4,6
35:14
36:21

**peer-reviewed**
313:11
315:24

**peer-to-peer**
82:6
312:20,24
313:17,21
314:8,20
315:14

**peers**
336:3

**pellets**
317:11

**pen**
334:12,14,19

**penalty**
7:7

**pending**
6:21
263:16

**people**
20:24
22:9
29:10
31:9
34:10,21
35:4
37:14
47:15
59:14
60:20
74:10,13
75:4
77:11,20
78:2,20
79:9,11,

17,20
82:5,7,19
83:11
85:2,5
87:4
130:4,5,8,16,20
131:1
186:6
190:1
226:24
263:8
271:23
311:19
322:1
328:18
335:2
337:6

**people's**
82:3

**percent**
118:10
146:4
158:2
160:10
192:16
245:16
261:7
298:15
338:18
354:22

**percentage**
151:20
337:4

**perfect**
62:11
259:4

**perfectly**
249:13

**perform**
166:15

**performance**
8:11
233:7

237:11

**performed**
90:1
206:8

**period**
48:3
57:19
71:4
79:22
183:18
216:14
296:19
299:18
300:2
320:23

**perjury**
7:7

**person**
10:23
32:21
36:20
52:10,12,13  73:17,18  75:4
81:2  98:1
222:20
313:6
323:8
324:3

**personal**
132:8
285:1
302:14,17
332:12

**personally**
51:10
72:13,23
74:19
79:9
124:5
153:13
188:4
326:14

**persons**
154:21
287:2,13

**pertain**
133:2

**pertaining**
121:20
143:9
344:11

**pertains**
186:20

**Peter**
58:3

**Petroalgae**
129:14

**phase**
23:11,24
24:21
31:12
237:20

**phone**
135:8,17
137:21
138:15,22
190:23

**phonetic**
189:7

**physical**
150:2
215:8

**pick**
165:19
169:5

**picked**
173:6

**picking**
281:17

**picture**
170:14
215:8,13,15

**piece**
63:24
252:7
309:15

**pieces**
66:17

**pilot**
215:16

**Piper**
5:1

**place**
57:15
190:9,11
248:22
263:21

**placing**
188:24

**plain**
28:5

**plainly**
28:6

**plaintiff**
9:1  48:7
49:11
50:7  55:4
73:15,16,17,21
74:2
226:13,20
228:1
230:7

**Plaintiff's**
285:23

**plaintiffs**
4:17
48:11,18
129:10
286:20
289:5,16
306:10,13,15
329:23



plaintiffs'
  129:17

plan
  199:2
  205:4
  264:12
  279:6

Planet
  220:17
  222:21

plans
  25:8
  177:12

plant
  8:6 18:22
  21:18
  37:19,20
  38:13
  60:14
  176:22
  177:7,11
  178:12
  180:15
  201:23
  202:2,16
  207:21
  214:5
  215:16

planters
  34:6,7

plants
  20:23
  29:10,13
  34:7
  38:12
  177:10
  214:6

plastic
  94:18
  205:7

plastics
  126:16
  315:23

platform
  103:19
  104:4
  106:7
  152:12
  169:18
  241:4,8

play
  199:2

Plenty
  153:4

plugged
  184:7

plummet
  83:18

point
  57:16
  62:18
  92:19
  176:6
  184:4
  188:19
  195:6
  199:17
  201:22
  203:2
  204:4
  205:21
  206:20
  218:2
  221:4
  231:4
  276:17
  282:5
  292:12,13
  296:16
  304:19
  311:6
  326:16
  330:17

point's
  198:24

pointed
  266:10

307:3
315:3

points
  67:18
  201:20

policies
  34:11

politely
  86:8

polymers
  126:15,24

polypropyle
ne
  93:13,16
  204:20

Pom-
  43:20

Pomerantz
  43:9,21
  44:1,8
  46:16
  50:22,23
  51:9,19
  52:8,22
  53:1,19
  55:2
  107:23
  343:15,23

poor
  93:9

Poor's
  35:1
  67:11,17

pop-ups
  150:14

population
  35:4

Porsche
  17:23

port
  147:3

portion
  37:22
  163:9
  236:18
  237:23
  251:3
  286:20
  320:18
  337:14

portions
  234:16

Pos
  273:12

position
  32:13
  37:4,7
  38:17
  47:16
  55:22
  62:4,15,
  17,24
  81:11,14,
  16 83:15
  86:17
  145:3
  171:7,8,
  9,11
  173:19
  175:6,10
  176:5
  184:1
  216:17
  246:11,18
  247:4
  249:4
  255:21
  259:12
  260:4,5
  269:12,17
  270:9,18
  273:12,
  14,18,19,
  24 275:5,
  23 293:18
  305:8

311:1
326:11
348:5
353:21
354:8

positions
  21:17
  22:2 63:3
  83:23
  151:15
  152:4
  170:1
  221:10
  255:7
  272:4
  274:18

positive
  59:8
  142:8
  155:13
  159:8
  196:7
  266:2
  337:5,12

possession
  218:20

postponemen
t
  284:3

potential
  39:9,11,
  15,16
  40:9,14
  41:16
  42:15,19
  65:16
  173:12
  336:1,6,8
  348:12,14

potentially
  213:21

potentials
  64:3



**power**
25:21,22

**practically**
81:16

**practice**
252:17

**practices**
18:20

**praised**
343:1

**pre-hindenburg**
99:11

**predominantly**
22:13

**preference**
66:19

**preferences**
66:23

**preferred**
67:1

**prep**
13:6

**prepar-**
12:21

**preparation**
11:3,18
12:6 13:4

**prepare**
9:19
10:16
26:16
156:20
157:4
166:16,18

**prepared**
50:16
91:12,15,
23 157:9,

11,23
240:20
282:16

**preparing**
12:21
13:9
35:18
36:11
38:13

**preproduction**
24:22

**prerequisite**
288:15

**present**
12:9
86:17
309:24
319:11

**presented**
46:16
155:15
207:22
208:1
300:14
348:12
352:19

**preserved**
248:13

**preside**
22:11

**president**
24:19
28:23
31:3
32:20
33:11,17,
20 34:11
36:21,23
37:7
338:10,11

**presidents**
28:15

**press**
41:15,23
70:20,24
79:20
219:15
227:19,22
228:2,3
229:7,15,
20 230:8,
9,14
231:5,6

**pressurized**
126:19

**pretty**
23:23
71:17
132:1
163:11
194:20
222:20
290:20

**previous**
46:9 82:9
93:10
96:1
122:3
313:8

**previously**
84:14
117:22
129:11
346:20

**price**
99:6,10,
11 136:3
148:20
152:8
165:9,12
168:7
173:7,8
243:17
245:19

246:9,12,
14 247:24
248:1
252:6
255:12,
15,21
256:17
258:17
259:1
263:9,11
275:19
277:13,18
336:2,10
337:21
342:22

**prices**
83:23
84:4
135:5

**pricing**
233:8
237:11

**principle**
291:3,7,9

**print**
108:18
111:5,7,
20 112:19
171:1,2
233:6
239:10
240:1

**printed**
111:6

**prior**
12:3
126:18
128:22,23
129:9
222:5
224:4
230:12
315:11
320:20

351:11
352:24
353:12

**privilege**
145:4
266:19

**privileged**
11:10
88:5
89:14,20
90:5
92:10
122:14
124:12
128:13
140:5
299:4

**problem**
30:4
115:6
202:10,13
322:19

**procedure**
26:24

**procedures**
26:22,23
35:20

**proceedings**
88:12
89:3

**process**
25:3 26:9
27:4
35:21
36:10
38:1,6,7
44:4
56:11,20,
23 57:5,9
58:6
61:16
84:16
93:8,13,
17 94:16,



17 95:11
96:5
126:19
175:23
177:16,19
178:17
181:21
186:22
189:6
190:12
197:22
201:10,13
205:1
219:7
234:22
236:5
254:14
313:1,17,
22
345:12,17

**process.'**
118:3

**Proct-**
219:1

**Procter**
57:3
59:22,24
75:19
178:9
180:11,24
181:23
182:12
196:6
214:1
219:1
223:7
235:1

**prod-**
201:14

**produc-**
113:23

**produce**
23:9
24:23

34:14
69:3
100:7
110:1
131:19
132:3,19
141:20
143:15
190:6
198:18
240:12
317:10

**produced**
112:23
113:12
132:6
133:9,13,
21,22,24
134:6,16
145:9
146:10
148:4
248:22
266:20
331:7,15

**produces**
37:18

**producing**
236:20

**product**
22:17
23:4,8,17
24:2,4,
13,15
25:7,16
28:11,16
30:9,18,
19,23
31:4 33:5
35:17
36:10,12,
24 38:14
94:21
119:9,22
120:11

121:4,21
122:15
123:2,20
124:24
125:11,22
126:9
127:8,20
128:8
136:15
167:14
178:9,18
197:20
198:7,16,
20 201:14
222:6
282:15
290:10
291:22
293:5
298:22
305:2,20
322:16

**production**
22:12
34:14
35:9
113:24
116:16

**productions
-related**
22:23

**products**
22:12
23:1,20
34:1
188:23
197:1,7,
8,15
202:7
204:13,14
211:1

**profession**
18:12

**professiona
l**
16:7,15
17:12,17
53:7,15
79:1
187:3
205:19

**professiona
ls**
29:11
64:21
66:14

**Professor**
18:3

**profit**
83:9
173:10
213:21
270:11
277:17

**profitabili
ty**
203:17
211:20
234:19

**profitable**
176:17

**profits**
177:1,2

**program**
17:5
18:17,18
20:4
27:12
31:13
35:19
37:7

**programs**
38:15

**project**
188:22

**projected**
64:4
333:23

**projections**
121:11
123:10,12
125:6

**prominent**
308:3,18

**promised**
176:22
177:6,8

**prompted**
259:6

**proof**
270:10

**proper**
25:13
88:13

**properly**
90:10

**property**
57:3
59:24
181:24
196:9
237:1

**proposal**
232:13

**proposed**
74:5 87:1
295:23
296:3

**pros-**
192:19

**prospect**
196:6

**prospectus**
191:11
192:9,10,
17,19



193:8
194:11
209:7
212:20
233:1
278:9
281:4
289:1
290:21
347:12
353:14,15
354:19,23
355:1
356:4

**protect**
86:19
219:6
221:22
235:2
238:2

**protected**
219:13

**prove-up**
23:19

**proven**
56:23
181:20
345:12,18

**provide**
6:10
33:22
92:23
104:24
105:17
107:11,
18,22
111:14,23
112:13
113:23
114:12
145:7
147:20

**provided**
22:8 79:7

92:11,16
105:22
106:15
107:13,19
108:6,8
114:17,20
157:22
244:13

**province**
248:10

**proving**
23:19

**proxies**
283:24

**proxy**
283:22

**PTTW**
294:22
295:1

**PTTW.'**
294:18

**public**
70:7,11,
18 95:23
117:21,23
118:2,6
121:13
185:13
195:13
200:20
298:9
312:3
313:6
323:21
324:2,3
339:21

**publication**
149:14

**publicly**
301:4
312:15
325:13
344:21

**publish**
310:20
315:24

**pull-down**
169:4

**pulled**
192:6

**Punitive**
47:20

**pur-**
148:18

**purchase**
8:13 26:2
81:6
148:8
150:2
155:12
173:5
176:8
183:19,20
214:7
216:16
241:18
259:6
262:5
277:19
289:22
294:6,17,
21 295:1,
8 355:16

**purchased**
22:10
77:12,20
78:3 80:7
103:13
105:11
148:18
151:10
181:19
190:7
218:16
287:3
295:11
330:13

**purchases**
151:20
158:15
190:24

**purchasing**
78:18
81:15
94:1

**pure**
10:13
95:5,6
220:17
317:1

**Purecycle**
4:3,20
5:15 10:1
39:1
55:11
57:22,24
58:24
71:8
72:3,9,
14,24
73:8
77:12,20
83:20
84:7
93:1,17
94:5
99:21
102:7
110:24
111:3,18
117:21
123:10
128:22
137:6
138:12
139:8,14,
18,22
140:4,13,
19
141:20,24
142:15
143:22

148:2,11
149:4
155:12
158:14
170:21
171:13
172:5
175:1
176:8
178:16
182:2
191:10
201:3
202:1
203:14,20
204:20
210:8,14
212:13
215:3
216:5
218:10
219:14
220:15
223:8,16
228:2,3
230:8,9
231:5,7,
17,18
238:16
239:14
240:1
243:22
245:12,14
248:16
256:1
263:1
264:13
269:8
272:9
274:22
279:7
287:3
294:1,2
298:14
300:17
302:1,11,
24



310:12,13
329:5
333:14
334:2
342:1
344:17,20
345:2,11,
17,20
348:6,21
349:1,14
350:6
353:22

**Purecycle's**
69:18
70:7,11,
18,20
78:3
99:6,10
118:5
126:17
181:11
204:5
310:23
333:1
343:1

**purificatio
n**
94:17

**purported**
127:2

**purpose**
184:24

**purposely**
173:6

**purposes**
153:17
160:22
166:17
168:12,22
173:11
175:2,18
215:19
249:11
252:21

264:11
272:20
317:11
327:19

**pursuant**
237:8
241:1
247:1,3,
18

**purview**
304:17

**pushed**
181:1

**put**
23:15
27:15
83:12
86:8
133:5
148:1
163:14
167:9
174:22
186:3
228:24
238:1
241:9
247:1,5
248:21
273:15
313:2
328:12
332:12,13
349:19

**putative**
47:19,21,
22

**putting**
25:9,10
60:23
252:15
340:13

———————
**Q**
———————

**QQQ**
165:16

**QQQS**
66:9
165:14

**qualified**
93:22
305:4

**quality**
123:11
236:6

**quantity**
252:4

**quarter**
66:6

**quarterly**
299:18
300:2
301:1
310:15

**que-**
312:11

**query**
104:11
108:23
109:7
349:22

**question**
6:17,18
7:3 10:10
11:10
12:11
13:14
15:24
17:14
22:1,22
23:6
29:24
32:17

39:24
40:6,19
41:7,19
42:4
43:3,11,
23 44:15
45:14,23
46:21
48:21
49:13
50:3,10
51:2,21
53:4,5,23
54:16,22
55:13
57:17
66:4 67:4
68:21
69:22
70:13,22
71:10,24
72:6,17
73:3,11
74:1,16,
21,24
76:4,11,
18 77:14,
17,24
78:5
80:23
81:24
84:9
85:11
86:3
87:9,21
88:2,9
89:10,18,
22 90:3,
12,19
92:15
93:4,19
94:8,11
95:18
96:16
97:17
98:8
99:24

100:5,14
101:2,9
102:6
103:21,24
104:6
105:7,20
107:5
109:4,20
110:10,
13,17
112:1
113:4
114:15
117:10
118:8
119:6,11,
12,19,24
120:15
121:1,7,
17 122:5,
12,14,22
123:4,17,
22 124:3,
10,20
125:2,8,
13,19,24
126:5,11
127:5,11,
17,23
128:5,11
130:11
133:16
134:10
135:14,24
136:13
137:12
138:5
140:23
141:23
142:1,5,
19
143:11,
12,18
144:6
145:2,20,
21,23
147:6,9



148:14,15
149:8,18
151:23
152:22
153:22
154:3
157:1,14
161:3
163:4
164:21
167:19
168:15,17
173:22
176:20
178:1
179:2,8
180:3
181:13
187:15,22
190:14
192:13
195:2
197:3
198:2,6,
13 199:8
201:5
202:5
203:24
204:9,18,
22 206:11
207:1,18
208:3,10,
21 209:2,
19 210:3,
16,23
211:15
212:7,24
213:4,16
215:1,21
217:9,14
218:5
220:9,22
222:4,17
223:19
224:1
225:10
228:10

229:10,23
231:12,13
235:20
236:12
237:13
239:19
240:3
242:9,18
244:3,19,
23 247:22
252:13
254:17
256:4
259:9
262:17
263:3
264:6,15,
18 266:17
269:11
270:1
272:16,18
276:2
280:4,23
281:9
282:12,13
284:19
288:11
290:6
291:5,19
292:19
293:1,15
298:19
301:21
302:4,6,
14
303:12,21
304:17,
23,24
305:17
307:14
308:6,22
309:9,17
311:10,22
312:8,17
313:14
314:1,14,
17,24

315:17
316:2,8,
20 317:7,
13 319:6,
9,16,23
321:12,14
322:13,23
323:15,23
324:12,14
325:7
326:2
327:14
328:7,9
329:8,20
330:6,23
332:9
333:4
339:1,10,
15 340:2
341:12
342:3,15,
24 343:5
345:7
354:19

**question's**
230:21

**question.'**
123:13

**questioned**
312:23
343:18
346:20

**questioning**
146:13
242:4
289:21
326:1

**questions**
6:6,10,
15,21,22
7:1 92:4
146:14,22
148:1
178:15

196:11
242:2
305:9
325:9
340:21
341:8
343:9,10
346:23
350:18

**quick**
52:14
224:16
278:5

**quickly**
29:18
89:3
131:14
219:1
265:18
332:18

**quiet**
50:18

**quote**
40:12
345:12

**quoted**
130:21

**quoting**
177:18

_____

R

_____

**R-**
97:23
185:22

**Racine**
24:9

**raise**
255:18

**raised**
128:13

**ramp-up**
180:14

**ran**
104:11

**range**
165:18
171:17,19

**ranging**
257:21

**rank**
64:12,17,
22 65:2

**ranks**
20:22

**rate**
64:16

**rationale**
305:5

**Ratliff**
195:12

**RCOH**
102:18

**re-**
11:6 91:8
196:19
311:5

**re-serve**
248:19

**reach**
231:24

**reached**
31:9
43:15,17
175:8
276:21

**reaching**
270:6

**react**
255:8



ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: read..record

| read | reader | 255:9 | 225:16 | 129:18 |
|---|---|---|---|---|

**read**
12:7
44:17,24
45:2,7
46:5,6,
13,17
50:14,17
59:5
70:7,10,
18,20,24
75:13
83:11
85:3
90:16
94:24
115:4
116:7
117:2
125:17
126:3
127:15
135:3,5,
17
136:11,
18,20,23
137:21
201:7,9,
12
203:12,13
211:22
221:14
233:19
234:15,19
263:19
281:16
289:4
303:4
304:6
308:11
311:2
335:15
336:13,15
338:10
341:16
348:1,6
351:18
353:2

**reader**
342:11

**readily**
78:21

**reading**
39:7
46:1,23
56:8
61:22
62:9,14
71:7
80:14
81:20
83:6
84:19
86:10,12
191:15
196:5
197:11
203:14
220:13,19
221:10,
11,12
234:23
280:6
307:24

**reads**
158:4
286:20
288:18
306:10

**ready**
24:21,24
25:6
225:13
239:3

**realize**
341:9

**reason**
6:19 7:9,
13,14
67:13,19
79:4
193:9

255:9
259:14
263:6
349:20

**reasons**
34:23
303:6
345:10

**recall**
10:3
32:8,9,10
40:17
44:20,24
45:10,12,
18 46:13,
15 48:5
50:13
51:18
57:2 60:5
70:15
71:7,19
82:13
86:6,9
91:5,10
94:16
97:11
109:22
118:16,21
130:9
148:6
155:18,20
173:17
177:17
178:19
183:22,23
184:12
192:8
193:8
203:14
206:6
214:16
215:6
216:20
220:14
221:13
222:23

225:16
228:19
234:7
237:17
259:13
263:22
264:16
265:5
289:24
292:7,11
298:11
307:1,6,
24 308:11
311:18
315:6,23
316:5,14
335:10
340:4,9
342:9,13
344:3
345:14
346:23
347:14,18
350:18,21
355:5,21,
24

**receive**
108:12
238:22
239:9

**received**
45:20
51:14
54:10
197:17,21
198:8
304:8

**receiving**
133:3
333:13
334:23

**recent**
224:18

**recently**

129:18
155:7
338:9

**recessed**
52:18
99:2
131:9
285:19
341:3

**recognize**
155:15
156:17,22
158:1
159:12
194:12,16
220:10,21
222:19
223:11
224:17,
19,23
261:18
286:10
332:3

**recollectio
n**
10:8
236:24
271:6
334:5
340:6,8

**recommend**
212:15

**reconsidera
tion**
91:20
92:5
306:18,20
307:2,7

**record**
5:10
52:15,19
75:17
84:14
93:10



94:14
95:24
98:23
99:3
100:16
106:9
131:6,11
132:2
147:13
161:15
212:3
238:16
245:18
249:5,17
264:9
279:13,18
285:15,
16,20
290:19
296:22
299:21
310:4
313:8
324:11
325:5,13
326:4
340:24
341:4
343:14
351:18
353:10
355:8
356:12

**record's**
103:2
245:7

**recorded**
59:6

**records**
102:18
148:3
244:16
245:14
248:13,20
249:13

284:10

**recovered**
99:10

**recovery**
68:2

**recycle**
59:14
204:20
335:7

**recycled**
317:11

**recycling**
59:9 60:4
61:2
68:11
93:13
95:4,11
207:13
213:12
236:5

**recycling,'**
126:16

**red**
62:23
217:20
315:8
334:12

**redacted**
266:12,
18,20,21

**redaction**
267:6

**reduce**
30:8
34:19

**refer**
25:20
85:1
102:7,9
213:13
214:13
250:23

**reference**
318:15
320:7
321:23
327:4

**referenced**
129:1
227:19
293:24
307:4
323:20
331:16

**references**
82:7

**referred**
71:13
126:18
336:5
345:9,11

**referring**
75:11,12,
13 85:6
92:2
105:18
106:19
136:24
145:18
271:13

**refers**
230:13

**reflect**
262:5
265:24
271:16

**reflected**
212:8
244:16
284:11
290:21
325:5
349:9

**reflecting**
252:14

350:5

**reflective**
290:18

**reflects**
274:7

**refresh**
10:7
197:8
236:24

**Reg**
321:3

**regard**
11:20
51:5
344:20
346:21,24
352:19

**registered**
32:11
78:16

**regulations**
30:6

**regulatory**
200:23
301:11
319:1
321:1
322:10
323:6
324:8

**regurgitati
on**
126:18

**reins**
87:13

**reintroduce**
146:19

**reiterate**
207:20
217:17
352:23

**rel-**
112:11

**relate**
327:23

**related**
8:7,11,13
16:11
24:14,15
29:21
33:2 35:7
46:7 60:7
260:9
277:4
282:14
298:14
302:24
303:3
327:18

**relates**
186:12,13

**relating**
16:3 17:9
18:14

**relationshi
p**
31:20

**release**
28:22
70:24
71:1
79:20
219:15
227:19,23
229:8,15,
20 230:14
231:3,17
310:13

**releases**
41:16,23,
24 70:20
228:2,3
230:8,9
231:6



800.211.DEPO (3376)
EsquireSolutions.com

ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

December 07, 2023
Index: relevance..representative

**relevance**
249:5,11,
12

**relevant**
71:3
112:11
248:5
304:22
332:18
350:8
352:13,20

**relied**
347:15
353:2

**relies**
166:12

**rely**
223:4
353:12

**relying**
201:15
354:8

**remarks**
82:3,4

**remember**
8:3,21
9:6 39:20
42:10,17,
18 44:23
46:1,2,24
51:13,15,
17 52:4
59:3
60:17
62:7 69:5
76:6
97:12
98:4
101:5
105:24
118:10,20
132:3
133:22
140:20

143:6
163:24
171:24
172:21
174:21
176:23
183:8
186:20
192:9,18
193:6
196:5
203:13
206:9,15
209:8
215:13
216:15
218:22
220:18
221:3
222:20
228:24
229:1
260:6
262:1
316:11
335:19
336:24
339:6
354:23
355:15,19

**remembered**
70:1

**reminded**
68:5

**reminder**
144:19

**remote**
190:4

**remotely**
35:19

**removed**
249:15

**removes**
245:23

**renewables**
63:19

**repeat**
6:16,17
77:17
95:23
168:17
312:10,11

**repeatable**
177:19

**repeated**
290:22

**repeating**
198:6
302:6
327:22
346:9

**rephra-**
74:21

**rephrase**
11:23
50:2
74:21
145:22
344:15
348:3

**report**
39:5,6,8,
18 40:13
42:1,8
46:24
47:3,6,7
56:6,7,8
75:14
79:10
80:3,4,15
81:20,22
82:18
83:21
84:3,19,
22 85:16
86:12
93:23
95:8

99:7,11
117:19
118:17,22
119:17
120:7,23
122:20
123:8
126:3,14
128:3
129:1
130:22
135:2,7,
11,20
136:8,10
137:1,5,
10,19,21
180:17
197:12
206:7
216:20
221:9,14,
17,18
222:24
228:18
231:19
272:24
301:3,4
309:14
310:3,13
311:18
312:2,14
313:11,
16,18,20
314:6
315:13,23
316:2,5
320:24
324:20
325:14
326:15,19
328:23
341:10,
14,17,21,
23 342:6,
9,19
345:1
346:13,22

347:3,5
349:23
355:21,22

**reported**
161:9
312:20
318:22
322:10
323:6

**reporter**
4:12
147:12
191:16
211:23
212:4
219:21,23

**reporting**
193:15
310:14

**reports**
94:24
196:21
341:18
342:21
355:23

**represent**
5:15 45:8
73:18
74:7,11,
14 77:20
78:17,19
79:11
87:16
90:8,13
146:20
192:5
226:22,23
227:20
278:21
321:7
324:5

**representat
ive**
9:22 10:4



800.211.DEPO (3376)
EsquireSolutions.com

45:3
73:21
74:3
78:11
87:11
306:4

**Representat ives**
285:24
295:23
296:3

**represented**
9:16 90:9

**representin g**
5:17
79:13
265:14

**represents**
227:21
341:10
342:10

**request**
100:24
114:23,24
115:4,13, 18
128:18,20
248:19

**requesting**
298:2
301:15

**requests**
91:3
99:14,17, 22 100:7, 12 102:8, 20
109:10, 16,18,23
110:3,15
112:7,17, 24 116:16
128:18

131:17
134:21
143:14
248:14
350:9

**required**
110:1
227:4
263:17

**requirement s**
200:24
286:22

**requires**
34:15
197:15

**research**
23:11,18
24:18
31:8,9
37:13
38:3 39:7
47:2
60:13
62:3
71:22
72:2 79:1
81:21
110:24
111:2,11, 17 205:12
214:21
215:12
308:4,18, 19 309:7, 15 311:18

**researched**
42:11
82:23

**researching**
58:1,16

**reserve**
120:18
124:13

128:12
146:14

**reshored**
36:9

**resistance**
169:8
247:17

**resonates**
35:3

**resource**
35:7,12

**resources**
78:23
309:23

**resp-**
96:20

**respect**
102:13
152:8
194:18
217:6
236:22
248:15
267:14
277:8
280:20
300:21
326:11
354:18

**respectful**
5:19

**respecting**
267:4

**respond**
6:7
147:10

**responded**
10:2

**responds**
88:18
228:1

230:7

**response**
6:21
88:15
100:12
112:16,23
114:9,23
115:1,2
116:15
129:3,16
131:16
140:16
178:15
226:4
227:24
228:7
230:7,24
231:1,2, 5,10
232:4

**responses**
10:2
91:2,7
114:13
128:17
224:8
227:5,14

**responsibil ities**
22:6
27:11
33:18,21
34:12
35:7 45:8

**responsibil ity**
24:16
38:14
96:20
226:21,23
230:19

**responsible**
24:17
27:5 97:8

**responsive**
99:21
109:10, 15,17
110:2,8, 15 111:22
112:7,11
131:19
142:17
143:14
350:9

**rest**
17:17
87:14
214:6

**result**
233:8

**resulting**
117:24

**results**
216:4

**retained**
108:15

**retains**
25:23

**retired**
28:14
31:3
36:23
188:10

**retirement**
20:19
33:15
38:18

**retracement**
65:18
169:16
170:8

**retraining**
25:14

**retrieve**
103:12



104:3
108:17

**return**
66:21
161:12
162:18
232:12,24
278:9

**returns**
161:9

**reveal**
51:4,22
53:9
54:17
76:19
88:21
92:16,21
108:2
114:16
133:18
144:19
196:19
305:1
322:15
344:7

**revealed**
117:20
297:24

**revealing**
76:13,16
88:5
89:13
90:5
92:10
100:2
101:11
102:21
119:8,21
120:10,13
121:3,20
123:1,19
124:22
125:10,21
126:7

127:7,19
128:7
157:16
211:1
290:9
291:21
293:3
298:21
305:19
319:8
344:2

**revenue**
176:9,12,
16 203:16
211:19
234:18

**reverse**
81:5
320:21

**review**
9:23 11:7
12:1 85:8
91:11,14,
19,22
114:9
129:2
135:10,
12,19,21
184:10
196:20
203:10
212:1,7,
10 221:1,
4,6,19,20
222:1,5
225:1,4,5
227:18
229:20
230:2
231:3,4
232:8
234:8
236:4
239:4
286:12

313:22
314:8,20
315:14
324:6
344:17

**reviewed**
9:21 10:6
11:7,14,
18 12:6,
15,16
69:19
90:16,24
99:14,17
109:22
136:10
149:14
184:3
192:14
195:18
221:9,17
225:22,23
226:8
228:2,15
229:1
230:8,18
231:5,18
234:11,
15,21
289:1
291:15
292:8
306:15,
16,19
318:8
326:14
339:21
344:11
347:15
351:2,11
354:20
355:6,8,
15

**reviewing**
69:18
142:22
234:22

235:9
307:2

**revolving**
34:21

**reweighted**
336:17,18

**Rick**
31:18,21
35:16,21
36:18,20

**rid**
61:3

**ride**
138:17

**right-hand**
193:22
203:7
219:22
238:19
278:15
337:14

**rights**
120:18
124:13
128:12
146:14
265:16

**risk**
23:10
56:23
84:15
94:3
96:23
152:15
180:16,23
181:6,7,
11,16,18,
22 182:8
195:16
200:19
201:2,15
202:1,8,
24 203:4,

8,21
206:3
207:7,12,
16 208:22
211:11
212:8
217:2
233:5
234:9
235:10
237:18
277:1,11
347:18
348:1,7,
11

**risk-oriented**
173:19,24

**riskier**
174:4

**risking**
277:11

**risks**
23:3,8,
13,15
70:11
71:7,13,
20 93:12,
16,24
94:15
96:5,24
181:21
200:17,22
201:14
207:6
209:9
217:6
235:7
236:6,10
237:24
310:4
313:9
348:12

**risky**



67:14
182:2

**RO-**
98:4

**Robert**
4:2,17
5:4,11
24:4
27:18
29:17
34:23
38:4
78:18
137:18
156:14,15
158:6
215:7
235:15

**robot**
26:4

**robotic**
33:24

**robots**
26:2

**ROC-**
101:19

**ROCH**
60:10
70:24
72:8
97:24
98:4
102:3
105:11
138:13
148:19,22
150:11
151:2,5,6
183:6,8
184:7,9
200:20
228:2
230:3,8
231:6

261:19
262:5,24
263:10
264:13
279:2,7,
17,19
283:22,23
284:1,7,
12 288:8
290:24
296:6,17,
23 297:3,
6,10
329:4
344:11,
15,16
348:5
353:2,13,
21 354:2
355:11

**ROCH'**
287:15

**ROCH/
PURECYCLE**
262:14

**role**
24:13

**Rosa**
38:9

**rosy**
123:10

**Roth**
4:4 5:1,
18 46:11,
12 55:8
71:22
97:22,23
98:3
102:10,13
146:21
151:3
185:22
186:19
187:13

193:1
220:14
223:21
224:3
260:23
267:12
287:14
321:4,9,
22,23
323:8,11
324:6
325:14,20
326:12,19
327:6
350:17,23
351:20,
21,22
352:1,2,5

**Roth's**
224:8
320:24
322:9
323:5,13
324:19
326:14

**rough-
terrain**
22:18

**roughly**
39:18
275:24
333:1

**round**
34:3
276:6
326:12,
15,23

**rude**
154:8
248:7

**rule**
86:16
286:22
330:14

**rules**
5:20
303:24
305:6

**ruling**
326:8

**run**
35:9,10,
11 172:2
295:15

**running**
27:12
87:13

**runs**
5:23

**Russell**
336:22,23
337:8

**Russian**
27:17

———————————
**S**
———————————

**S&p**
336:20

**sacrificing**
62:16

**safe**
75:20
86:14

**safety**
26:3
216:13

**SAITH**
356:14

**salaried**
20:22
22:9
34:20

**sale**

8:13
175:13

**sales**
27:8
34:15

**Salinas**
4:11

**sanctions**
321:1
322:10
323:6
324:8

**Santa**
38:9

**satisfies**
286:22

**save**
111:17
170:23
318:1

**scalability**
236:6,15,
16

**scalable**
208:6,23

**scale**
126:21
201:23
202:16
206:1,8,
23 207:15
208:6,24

**scale.'**
126:22

**scaleable**
179:23
206:1

**scaling**
206:21

**scarred**
317:15



**schedule**
34:14

**schedules**
35:11

**school**
13:22
16:22

**Schwab**
108:14
153:12,17
154:1,3

**science**
14:8
338:23

**scratch**
332:12

**screen**
170:10
171:1
172:2

**screw**
27:2

**screwdriver**
25:21

**scribbled**
111:12
132:4

**scroll**
113:20

**search**
40:23
41:4
42:17
57:10
60:6
99:20
100:9
101:7
109:9,12,
21 110:7,
10,13
111:19

131:23
132:16
135:20
141:13,19
142:3,7,
16 143:7,
21 144:3
148:20
150:13,16

**searched**
101:21
103:6
132:7,13,
18 140:13
142:21
143:4,12
144:2
145:18
146:3

**searching**
82:14
103:9
142:14

**SEC**
183:18
192:6,24
200:20
221:19
272:1
278:22
298:1,7,
16
301:14,23
302:7,9,
23 303:5,
8,17
304:8,9
305:6,12
307:4,17
318:16
319:1
323:7
344:11,17
356:3

**SEC's**
298:14
304:9

**SEC-RELATED**
305:9

**sec.gov**
71:16
79:7
183:1

**sec.gov/**
**archives/**
**edgar**
192:2

**Secretary**
32:3

**section**
287:1,10
288:6
294:8
334:9
354:6

**sections**
236:14

**sector**
66:13

**securities**
8:14
15:18,20
19:6
39:10
40:15
42:15,20
44:12
138:12,13
139:8,14,
18,22
140:4,20
141:20
164:19
168:22
176:8
183:5
187:24

272:8
294:1
295:9,12
321:2
344:20
345:2,17
348:21
349:1
350:6

**security**
75:6,11
159:24
160:15,17
162:5
168:13
169:9,13

**seek**
74:11
77:19
186:10
286:21

**seeked**
78:15

**seeking**
74:4,14
89:20
122:14
124:12
235:20
249:6
265:7

**seg-**
64:10

**segregate**
64:11

**selective**
206:14

**sell**
27:7,9
81:3,4,7,
16
164:15,19
165:16

170:3
173:10
175:8
258:2
259:7,20
270:7
272:11,14
273:16
277:17

**seller**
80:17,20
81:1,8,11
83:3
273:21
346:3,17

**selling**
22:21
83:13
86:13
175:12
259:14
269:19,23

**sells**
216:8
258:8,11

**semester**
20:7,9

**seminar**
68:8

**senior**
37:14

**sentence**
117:18
123:7
125:16
126:13
127:14
209:6
281:17

**Sep-**
308:10

**separate**
13:7



ROBERT CIECKO                                                    December 07, 2023
William C. Theodore vs PureCycle Technologies          Index: separately..shy

32:24
158:15
162:20,24
260:24
308:12
326:19
348:20
350:22

**separately**
167:1
252:15

**September**
33:16
54:11
132:17
298:1
299:19
301:13

**sequence**
26:14

**Ser-**
30:18

**Sergio**
28:3

**served**
99:15,18
109:11,
19,23
114:10
129:18
225:1
350:10

**servers**
104:21

**service**
153:10

**services**
28:11,17
30:19,23
31:4 33:5
36:24
338:23

**serving**
226:19

**session**
11:4

**set**
18:22
26:19
28:14
31:1,3
32:19
34:11
35:2
36:24
38:6 92:4
160:15
188:11
224:9
279:5
347:4

**sets**
233:7,21

**settle**
255:16

**settled**
8:2,18
277:16

**shaking**
6:12

**shape**
326:10

**share**
8:3
159:10
216:4
275:24

**shareholder**
42:7
118:2
186:3
263:17,21
284:12
291:17
320:8

353:22
354:2

**shareholders**
264:11,24
282:10
327:6
328:4

**shares**
61:21
62:8
81:9,15
140:12
148:19
155:20
159:8,10
183:21
216:21
241:18
251:21,24
252:3
260:7
261:8,18
265:3,6
267:11
270:12
273:23
275:6,8
282:19
287:14
288:8
289:22
296:6,23
297:3,6,9
337:16
354:2,3
355:16

**sheet**
27:3

**sheets**
35:21

**ship**
36:8

**shipping**

19:23

**short**
64:8
79:19,22
80:17,19
81:1,8,11
83:3,13
98:21
100:21
115:7
117:7
129:4
131:3
142:11
151:21
161:1,6
164:19
165:14,
16,23
166:6
174:24
175:5,12,
13 180:14
195:8
224:20
234:2
250:11
273:18,20
309:14
338:4
346:3,17
354:12

**short-selling**
308:3,18
309:20

**short-term**
269:7

**shorted**
166:4

**shorthand**
111:12
132:4,22
332:24

335:19

**shorting**
165:9

**shortly**
183:22
221:11
277:17

**shorts**
165:21

**show**
134:18
169:13
170:13
241:14
246:5
251:22
271:24
299:9
325:3

**showed**
60:14
136:2
146:1
261:12
318:21

**showing**
145:14

**shown**
119:9,23
120:11
121:5
347:18
350:15,21

**shows**
30:20
60:7
243:8
251:9,12
252:9
321:1

**shy**
69:12
217:17,20



shying
  67:22

sic
  60:17
  102:18
  179:23

side
  7:24
  21:14
  22:10
  29:11
  81:3
  88:14,16,
  18 337:14

sides
  89:4

sidetracked
  28:5

sign
  54:9
  337:6,19

signal
  165:8
  217:20

signature
  113:18

significanc
e
  334:16

similar
  17:2 18:2
  22:17
  30:15
  47:16
  75:5
  172:8
  196:1
  236:16

simple
  75:19
  103:11
  141:6

  230:15
  260:14
  264:18
  296:15

simpler
  157:2
  230:21

simplest
  44:12

simply
  29:8
  140:6
  232:4

single
  18:9 60:3
  97:2
  105:3,6
  106:6
  108:6,8
  197:6
  198:18
  207:21
  216:12
  241:11,12
  315:13
  324:3

sir
  146:18,23
  147:11
  163:3
  172:15
  179:12
  182:6
  183:20
  192:18
  193:17
  196:22
  201:21
  202:22
  208:4
  221:3
  223:17
  231:16
  238:11

  250:7
  254:21
  266:2
  267:21
  270:3
  272:7
  274:10
  285:1
  354:24

sister
  22:21
  138:24
  139:2
  141:3

site
  22:8
  29:10
  33:13,22
  34:18
  35:8 59:2
  61:15
  87:13

sites
  56:16

sitting
  334:4

size
  214:3
  260:4

skill
  65:23

skip
  110:21
  123:7

sleeping
  58:7

slice
  26:9

slightly
  24:11
  87:9
  91:24

  156:19,21
  273:10

small
  26:17
  34:3
  62:6,17
  80:8
  352:1

smaller
  216:16

smoothly
  5:23

Social
  159:24
  160:14,17
  162:5

software
  65:14
  166:19,
  21,23,24
  167:7
  168:8,21
  170:13

sold
  36:5 71:3
  103:13
  105:11
  237:1
  246:13
  259:20
  269:6
  271:18,19
  272:6
  273:17

soldiers
  62:16

sole
  204:19

solely
  257:1

solicitatio
n

  283:24

solicitatio
ns
  327:19

solicited
  328:21
  329:15

solidified
  47:8

son
  154:23
  159:8
  161:20
  262:7

son's
  155:14
  266:7

sort
  164:15
  172:14

sorts
  23:22

sounded
  53:7
  94:17

sounds
  8:7 33:1
  189:12
  275:14

South
  37:20,21

soybeans
  34:9
  153:4

SPAC
  46:10
  58:18
  98:13
  149:24
  181:5
  182:4



184:17,
19,21
185:12
186:2,22
193:14

**SPAC-RELATED**
182:5

**SPACS**
182:6

**SPACS--**
181:4

**speak**
12:20,24
27:16
88:6
122:2
322:18

**speaking**
51:18

**speaks**
322:17
348:16

**speci-**
90:14

**special**
184:24
264:10,23
265:4
279:2,5,
20 280:1
282:9
284:1,7,
15,16
287:17
288:20
297:14
327:9
328:5,19
329:16

**specialized**
44:7

**specific**
13:20
34:17
38:22
63:23
66:13
90:15
93:8
94:14
102:2
138:10,23
143:10
149:14
164:21
267:6

**specifically**
24:12
55:24
58:24
192:14
354:20

**speculate**
32:11
84:12
277:5
281:11,
14,15
290:13,14
304:2

**speculating**
260:1
261:17
284:21,23
285:6
290:8
318:2

**speculation**
255:4
310:1
345:5,22
347:7

**spell**
161:15,22

**spells**
155:16

**spend**
23:21
49:8,19
50:4
66:17

**spent**
18:19
19:1 20:7

**split**
166:7
236:14
252:11

**spoiler**
285:10

**spoke**
52:2,8
122:9

**spoken**
28:6
210:20

**sponsored**
183:17

**spot**
356:3

**spread**
172:13,14

**spreads**
172:8

**SPY**
337:3

**square**
34:3,4

**staff**
312:24

**stage**
203:15
211:17,18
234:17

**stamp**
242:20

**stamped**
331:8

**standard**
26:24
35:1,20
67:10,17
194:21,22
243:10
244:5,6
249:12

**standing**
188:4

**stands**
25:5

**stapled**
106:9
250:2

**start**
19:19
35:14,18
62:2
164:23
191:19
263:8
302:18

**started**
35:13
58:19
60:22
61:4 62:9
83:6
85:15
86:13
148:20
239:13
310:14
332:16

**starting**
19:12
130:2
269:15

332:1

**starts**
114:24
116:7

**startup**
213:20
217:7

**state**
5:9 13:24
14:9,17,
20 15:6
32:11
173:15
315:12
328:2
343:14

**state-**
107:22

**stated**
71:20
115:14,20
126:16
249:4
269:16
303:23

**statement**
59:24
70:15
71:12
82:13
104:1,10,
11 106:6,
24 107:1
108:16
120:22
122:20
126:3
128:3
179:12
194:14,16
197:18
200:3,13
201:16
202:9,15,



18 206:5 207:6 208:8 213:2 238:23 239:3 249:1,10, 16 266:15 280:9 281:15 288:1 290:20 293:7 305:23 307:16 315:20 316:12 327:14

**statement/ prospectus**
283:23

**Statement[ 76]**
261:20

**Statement[ 97]**
271:3

**statements**
82:17 96:22 104:17, 18,20,24 105:17,22 106:18 107:3,7, 8,11,18, 19,23 108:10 109:2 112:18 133:2 144:9,13 145:6,12, 17 146:3, 5 194:14,

17,19 197:12 200:4,14 212:6 237:17 239:13 241:3,17 330:2,8 349:9,15, 19

**states**
4:5 36:5, 10 59:13 117:18 126:14 181:2 281:4 335:4,7 351:19

**stating**
235:7 308:1

**status**
262:14 298:13 316:17

**stay**
157:1,10 196:14 208:3 224:6 226:12 265:20

**Staying**
261:15

**stays**
171:19

**steel**
33:23

**steep**
123:10

**sticker**
219:22

**sticks**
184:9

**stochastic**
169:12

**stock**
39:2 42:21 60:3 62:18 63:1 71:3 77:12,21 78:7,18 79:20 80:7 81:4,12 83:18,20, 24 84:7 99:6,10 101:14,18 102:1,3, 17 103:6, 13 137:15,17 148:19 155:12 168:7 169:24 171:20 173:2,5 174:4 175:21 177:3 186:6 245:13 247:4 252:5 263:1 265:3,12, 13,15 270:6 273:16 275:23 276:17,23 277:6,14, 21,22 287:15

294:2,13, 14,18 295:4 296:7,17, 24 297:3, 6,10 327:7 330:13 331:22 334:17 335:20 337:22

**stockholder**
290:24

**stockholder s**
279:19 283:23 284:1,7 287:17 288:20 297:14 327:9

**stocks**
59:7,9,16 64:13,15, 18 65:22 66:8 68:10,13, 18 132:9 133:5 136:5 165:24 333:16 334:8 336:11,21

**stood**
68:17

**stop**
118:3 158:24 258:12, 14,16,17, 19,20,21,

22 274:8 306:18 318:3

**stopped**
133:3 189:11 234:13 333:13 334:23

**stops**
96:1

**store**
132:2

**stored**
131:24

**stories**
60:7

**storm**
147:3

**story**
58:21

**STP**
258:12

**straight**
172:16,19

**strategy**
89:16

**Street**
66:15 85:14 86:1 149:21 150:23 303:4 307:21

**strike**
43:19 70:19 103:5 119:1 134:21



138:1
166:15
173:7
185:24
212:18
221:5
275:16
306:17

**struck**
82:5

**structure**
97:4

**student**
151:1

**studied**
14:6

**studies**
20:9
170:9
315:24

**studying**
16:16

**stuff**
146:9

**stumble**
82:15

**stumbled**
62:8
136:7
148:21
150:5
152:2

**stumbling**
59:3

**Stuttgart**
17:23
37:18,19

**subcategori
es**
63:18

**subconsciou
sly**
150:10

**subject**
7:7 138:7
227:24
317:17
326:22

**subjection**
167:23

**subjects**
141:2

**submission**
157:12

**submit**
326:10

**submitted**
105:3,6,
8,9,12
106:5

**subpoena**
298:2,8
301:14
318:16

**subscribe**
58:12
167:5,6
307:21

**subscriber**
150:19,23

**subscriptio
n**
85:15
167:16,20
168:2,5

**subsequent**
20:9
60:13
71:2

**subsequentl
y**

36:16
44:7

**substance**
213:11

**substantial**
197:16

**substantial
ly**
209:9

**suburb**
36:3

**success**
196:24
197:14

**successful**
58:10

**sucker**
247:13

**suckered**
243:18

**sudden**
47:3

**suddenly**
276:15

**suffered**
320:22

**sufficient**
12:17
128:21
206:8
290:12

**sugarcoat**
96:6

**suggesting**
325:14

**suite**
94:12
95:24
96:10,12,
18 97:8,

13

**suite's**
93:7

**sum**
213:10

**summarizing**
157:23

**summary**
202:24
203:4,8

**summer**
19:21
20:1
31:16

**super**
95:4,6
317:23

**supervision**
25:15

**supervisors**
25:16
190:1

**support**
115:13,19
118:24
119:2,14
120:4
125:16
127:14
169:8
170:7
247:16

**supported**
117:19

**supporting**
190:7

**supposed**
68:3

**surface**
291:13

**surname**
161:17

**surprise**
75:17

**surprised**
195:22

**surrounding**
35:6

**survivorshi
p**
159:15

**sustain**
203:17
211:20

**sustainabil
ity**
59:12

**sustained**
234:19

**swather**
34:4,5

**sweat**
94:21

**switch**
24:7
238:6

**switched**
344:14

**sworn**
4:15 5:3,
6

**symbol**
42:21
60:11
150:8
151:2,3
168:6
177:4
184:7
241:9
262:21,24



294:3,5,
11,14,18,
22 295:1,
5,9,12
339:6
344:14

**symbols**
58:2,14
138:14
149:15
150:5,6,
16 339:7

**sync**
232:19,20

**system**
26:19
183:10,17
189:3,7

**Systems**
129:12

─────────

**T**

─────────

**T-E-R-E-S-A**
162:16

**table**
194:7

**takers**
20:24

**takes**
25:23
88:16
219:23
253:13

**talk**
6:4,5
16:13
27:10
55:23
64:7
138:22,24
139:3,4

140:10
141:3,11
161:14
162:9
177:9
332:22
333:12
350:22

**talked**
18:13
41:9
84:11
138:15,20
142:10
211:7
292:2
313:9
335:3

**talker**
139:5

**talking**
105:24
109:21
133:8
160:7
182:15
207:9
319:18
320:20
345:10
346:14
355:11

**Tamar**
4:16
10:22
52:2,7
343:15

**Tape**
4:1

**targets**
233:8
237:11

**task**
90:8

**tasks**
34:17
89:24
90:13
190:5

**tax**
160:21
161:12
272:19
273:1

**TD**
104:23
105:14
106:7
108:14
146:5
153:8
154:4,19
158:16
164:1
166:24
169:17,23
190:23
238:24
241:4
245:22
253:13
272:2,19
349:10,24

**team**
27:5 57:6
95:22
96:4
117:21
118:6
178:17

**Techgroup**
129:15

**technical**
62:18,21
63:6
65:10,12,
23 67:20
79:5 81:9

152:7
163:17
166:13,17
169:24
170:2,19
171:13
215:19
216:5
247:2,18
259:15
270:4

**technicalit
y**
63:3

**technically**
152:7
260:2

**technol-**
72:9

**technologea
ble**
179:22

**Technologie
s**
4:3,20
5:15 10:1
75:12
148:2
149:4
201:3
287:4
333:14

**technology**
61:1 66:7
72:10
75:16
94:14
98:20
180:18,24
185:21
189:6
206:1
208:5
209:17

313:12,22
314:9,21
315:13
317:10
329:5
338:23
342:1
343:2

**telling**
213:23
309:4
319:13
323:4

**tells**
273:15
284:6
288:19

**Tempur-
pedics**
58:8

**ten**
16:20
27:22
40:22
64:4
98:22
150:22
167:23
176:3
258:9
259:6

**tend**
26:15
163:14
164:7

**Tennenbaum**
46:14,15

**Teresa**
162:16

**term**
64:8
151:15,
17,21



161:1,6
173:9
174:24
175:3,5,
15,20
269:2,5
314:3
322:5

**terminated**
307:5

**termination**
233:9

**terms**
49:17
81:4
90:13
95:5 97:7
174:19
235:16
268:24

**test**
23:20

**tested**
27:9

**testified**
5:6 7:15
166:12
178:14
179:6
196:2
239:12
244:12
343:21
344:10
346:2,6,
11 347:24
348:19
349:8
350:4,7
351:10
352:24
353:17
354:7

**testify**
7:10
11:11
12:13
177:6
181:10
299:4
304:18

**testifying**
218:9
347:14

**testimony**
7:6 41:11
53:4
105:20
122:22
166:11
178:4,19
179:2,5
180:3
181:13
182:24
222:17
228:11
229:23
234:8
235:20
244:12
248:23
252:16
263:3
269:11
270:1
287:23
290:17
298:2
301:15
303:12
319:6
324:9
331:17
345:9,14
346:24
353:10
354:18
355:8

**testing**
197:22

**tests**
23:22
206:7

**text**
138:23
139:1,9,
11,14
141:1,8,
9,13,16,
19,24
142:3,7,
11

**texts**
140:19
141:16

**Theodore**
4:3 38:24
44:19
45:19

**thereof**
284:3

**thick**
233:12

**thing**
18:2
44:12
57:12
59:10,20
61:6
103:11
105:5
106:18
108:15
204:11
243:8

**things**
30:13
58:4 60:6
75:15
80:12
85:7 86:7

120:13
139:12
141:9
181:9
236:4,20
240:5
246:21
303:5
307:4
310:2
316:11
322:1
326:1
332:13
334:15
335:7

**thinking**
232:11

**thinkorswim**
241:4

**thinly**
243:19,23

**thought**
56:6
61:22
62:12
134:16
159:9
178:16
182:11
217:23
226:1
263:8
303:1
333:11,16

**thous-**
67:18

**thousand**
67:18

**thousands**
23:21
277:11

**three-way**

141:2

**thrust**
328:23

**ticker**
42:21
58:2,14,
18,21
60:9,11
62:6,11
85:18
97:24
138:14
148:22
150:5,6,8
168:6,24
177:3
183:6
241:9
262:21
263:7
294:5,11,
14,18,22
295:5,9,
12 316:23
339:5,7
344:14

**tickers**
263:12

**ticket**
62:5

**tied**
187:5

**time**
4:10 5:19
8:22,24
9:12
14:9,14
19:12,15,
17 25:24
26:14
27:6,23
28:6,23
29:19
30:6,20,



ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

23 31:5
34:2
39:14
40:14
43:15,17
49:8,18
50:4,14,
15,16,17,
18 57:19
61:2,19
65:2,22
68:2
91:13
112:3
119:11
129:2
134:5
136:11
138:16,23
141:4
165:4
173:4
176:7
183:18
187:6
191:6
192:15
204:6
206:4,19
210:21
220:19
221:6
222:13
227:17
228:4
230:10
231:7,18
232:8
252:9
253:9,10
254:14
257:14,21
267:11,16
276:17
277:20,22
282:4
295:15

298:12
304:11
307:12
308:14
311:6
318:24
319:2
332:17
334:13
340:10
343:1,20
344:23
345:16
348:2
354:21
356:16

**timeframe**
43:13
49:22
50:3
137:12
164:21
166:1
255:3,13
333:2

**timeframes**
170:17

**timely**
201:23
202:3,16

**times**
7:17
10:19
109:4
142:21
143:3
208:11
228:13
257:24
269:12
303:5
352:24

**timestamp**
257:20

**timestamps**
273:4

**timing**
30:8
62:11
79:16,19
282:20

**timing-wise**
228:16

**tire**
25:10

**tires**
26:16

**title**
22:7 98:2

**titled**
46:6
203:8

**titles**
10:3 91:6
184:12

**TLB**
22:14

**today**
4:22 5:13
7:6,10
9:16,20
102:24
133:14
136:4
147:2
181:17
255:5
292:2
343:21
345:10
346:2,6,
11 347:21
350:5
352:24

**told**
8:21 12:4

42:2 44:5
48:12,13
59:21
124:7
134:2
213:24
214:1,4
215:13
228:17
270:5
329:10

**tomorrow**
247:6

**tonight**
245:4

**tool**
25:22
27:1
272:4

**tooling**
25:20

**tools**
170:19
171:13

**top**
64:20
130:3,7
172:1,2
189:1
233:5,19
260:6
268:6
271:2
279:1
282:24
283:20
343:2

**topic**
232:24

**topics**
194:10

**torque**
25:10,23

**total**
154:21
156:7
216:12
277:1

**touched**
24:11

**Toyota**
18:5

**TPX**
58:9
61:23
151:19
217:24

**track**
64:15
75:17
84:14
93:9
94:14
95:24
99:6
310:4
313:8

**tractor**
21:12
22:13,14,
16 23:9
24:6
26:10,11
34:4
36:3,4,6

**tractors**
21:13
24:7,8,23
27:7
28:13

**trade**
67:11
106:6
108:8,23
151:16
152:10
153:1,2



154:24
160:13
165:14
172:7
181:4
190:17
241:11, 12,13
252:5,17
253:24
259:12
262:10
272:8,14
273:10
275:23
294:2
349:3

**trade-account**
261:20

**traded**
138:13
148:22
151:7,8
152:4
153:3,6
155:21
159:5,7
243:20,23
245:19
268:24

**trader**
151:13
332:13

**traders**
153:17

**trades**
108:7,20, 22 146:6, 7,10
156:23
190:10, 11,22
191:5

215:19
260:23
269:5
271:3,16
273:16
294:2
317:2
348:24

**trading**
15:19,20
19:6
67:10
103:18
132:1
146:7
152:6,8, 18 159:17
164:10
165:2,3
166:6
169:18
175:2
238:9
241:4,7
269:7
270:17
295:5
334:17

**traditional**
238:23

**training**
15:18,19
16:2
19:4,5,8
25:8,13

**transacted**
173:13
345:2
348:20

**transacting**
168:13,22

**transaction**
105:3,7
108:6

174:1
182:5
261:14
262:11
263:14,17
353:2

**transactions**
81:6
101:14,18
102:2,3
103:7,10
105:10
107:9
148:4
153:18
156:24
157:23
170:21
171:14
175:7
186:21
238:16
240:1,7, 16 241:2, 13,14
245:14
247:16
248:16
251:6,12
252:23
253:7
266:7
271:24
273:3
349:10,14
350:6

**transcribed**
6:1,9

**transcript**
219:24
310:20
354:17
356:6

**transcripts**
310:23

**transfer**
36:2
184:16
185:9

**transferred**
36:4

**transition**
71:1
98:10

**transmission**
34:6

**treat**
160:19,20
175:18,19

**trees**
299:13

**trend**
277:5

**trends**
247:17
335:3

**trigger**
303:1

**triggers**
237:22
238:3

**trimming**
260:4

**trouble**
291:2

**trucks**
205:2

**true**
59:24
69:6
82:13,16
201:17

235:3
288:3
306:23,24
309:5
324:17

**trust**
65:17

**trusted**
180:11

**truth**
329:11

**truthful**
325:12

**truthfully**
7:10

**tune**
312:23

**turn**
44:5 57:6
114:22
115:23
116:6
128:16
146:12
178:18
193:21
227:14
233:3
286:19
306:4
347:11
351:1,3

**turned**
38:4
155:7
160:15
198:19
277:2,9

**turnover**
34:19,20

**turns**
198:9



258:17
259:3

typ-
  26:18

type
  84:21
  135:22
  136:4
  140:6
  150:1
  167:16
  168:6,24
  241:8
  255:24
  259:5
  274:7
  315:14
  332:5

typed
  59:3
  136:2
  150:4

typical
  26:18
  35:8
  79:12
  84:4
  177:3

typically
  184:13
  214:13,16
  217:16

typo
  287:6

Tyratech
  129:14

————————

          U

————————

uh-huh
  6:11
  158:11
  171:21

308:16
355:13

ultimately
  145:8

unable
  7:10
  119:23
  120:2

uncertainties
  200:17

under-
  44:22
  63:10
  218:11

undergoes
  315:13

undergraduate
  13:23,24

underlying
  187:5

understand
  7:4,5
  25:17
  47:24
  49:15,17,
  22 56:4
  63:15,22
  94:11
  95:5
  98:12
  100:4
  109:20
  110:10,12
  113:7
  126:5
  151:3
  153:6
  162:12
  163:1
  164:4
  168:8

179:6
183:12
184:2
185:12
186:1,9,
15,16
193:14
201:2,8,
13,24
202:17
205:1
207:12,15
208:22
212:5
226:13
227:2,3
229:7
231:13,
15,17
232:7
236:15
237:6,7,
8,15,17,
23 238:21
240:14
241:6,23
247:15
248:23
252:8
263:20
268:12,14
272:18
274:1,21
279:8,11,
23 280:8
281:16
282:21
304:19
305:5
309:13,19
314:16
322:9
323:4
327:21
328:15,22
330:15
334:21

340:16
341:21,24
342:8,18
348:11

understanding
  6:15
  17:20
  19:3
  83:10
  134:5,12,
  14,20
  151:12
  185:19
  186:17,23
  187:12,
  17,24
  218:14
  230:23
  232:7
  262:14,19
  281:3
  282:14,18
  301:22
  322:14
  333:18
  338:21
  339:11
  341:23
  347:2,9
  352:4,8
  353:20
  354:1,5

understands
  113:4

understood
  6:18 18:8
  28:6
  166:11
  176:15
  177:21
  179:21,24
  185:7,8,
  17 202:8,
  9 203:19

204:2,19
206:3,5
207:6
218:11
237:24
333:13
341:14,19
342:5

unethical
  190:20

unique
  213:20

United
  4:5 36:5,
  10 335:4

units
  22:20
  295:4

university
  14:1,10,
  17,21,22
  15:6
  16:17

unprofitable
  198:9

Unwary
  320:22

upcoming
  149:21

update
  197:7

upgrade
  197:7

upper
  175:8

UPRP
  200:24

upward
  270:7



user
168:23

usual
213:22
214:7,12

## V

vague
54:11
71:18
95:5
126:17
238:4

vaguely
185:8

validate
81:21

valuation
336:10

valued
335:20

variable
172:8

variables
237:21

varies
88:11

vehicles
18:18

venture
27:19
198:9

ventures
82:9
93:10

verbal
6:10

verified
228:7

241:16

verify
84:18
162:7
273:3

version
299:16

versus
25:17
151:21
174:12,
19,20
335:18

viability
329:5

viable
314:21

vice
24:19
28:14,23
31:3
33:11,17,
20 34:10
36:23
37:7

Vicki
4:12

video
10:24

video-
recorded
6:1

view
62:19
92:19
173:18
243:22
346:17

viewed
212:19

violations

321:2
323:7
324:8

virgin
69:4
94:22

visited
18:5
209:23

visual
222:20

vividly
355:14,18

volatile
67:15
152:3

Volkswagen
37:13

vot-
264:11

vote
186:3
263:17,20
264:3
265:2,6,
9,15
279:14,20
280:1,9,
11,16,20
282:9,19
284:16
287:16
288:19
327:8,19
328:4,18,
21
329:16,24
330:3,20

voting
264:12,20

VP
37:1,14

38:15

## W

Wacker
4:9

wait
147:7,17
161:2
292:18

waited
246:13

waiting
270:20,21

walk
255:6

wall
30:5
66:15
85:13
86:1
149:21
150:23
303:4
307:21

wanted
56:19
67:15
82:12,21
85:21
102:16
113:19
148:19
174:23
191:6
205:6
244:21
245:18
246:8,12
247:9
263:6
270:11
276:19

warned
126:20

warnings
223:13

warrants
294:6,17,
21 295:1,
4

waste
188:6
220:19

Wayne
13:24
14:9,17

websi-
218:14

website
56:14
60:15
69:19
70:15
79:8
111:20
177:13
183:1,4
184:4
192:7
218:15
222:21
278:22
323:21

week
61:20
62:2
171:7
225:7,24
246:12
247:8
265:14
331:22,24
355:22

weekend
150:16



ROBERT CIECKO
William C. Theodore vs PureCycle Technologies

**weekends**
  58:16

**weekly**
  65:15
  150:16

**weeks**
  88:17
  339:4

**weigh**
  220:7

**weighted**
  336:15

**weighting**
  337:8,11

**Weinrib**
  4:16 10:9
  11:9,14,
  17 12:10
  13:2,13,
  17 15:23
  17:13
  23:5
  29:23
  32:16
  39:23
  40:5,18
  41:6,10,
  18 42:3
  43:2,10,
  22 45:13,
  16,22
  46:20
  48:20,23
  49:4,12
  50:9
  51:1,20
  53:3,9,
  12,22
  54:15
  55:12
  66:3 67:3
  68:20
  69:21
  70:12,21

71:9,23
72:5,16,
19 73:2,
10 74:15,
23 76:3,
10,17,24
77:13,23
78:4
80:22
81:23
84:8
85:10
86:2
87:20
88:8,20
89:9,12,
17 90:2,
18 92:14,
21 93:3,
18 94:7
95:17
96:15
97:16
98:7
99:23
100:10,13
101:1,8,
20
102:19,24
103:2,20,
24 104:5
105:19
106:2
107:4
108:1,4
109:3
110:16
111:24
113:3
114:14
115:4
118:7
119:5,18
120:8,24
121:16
122:4,11,
21 123:16

124:2,9,
19 125:7,
18 126:4
127:4,16
128:4
130:10
133:15
134:9
135:13,23
136:12,21
137:11
138:4
140:22
141:22
142:4,18
143:17
144:5,16,
18,23
145:20,22
148:13
149:7,17
151:22
152:21
153:21
156:3,12
157:13
159:2
160:3,7,
23 161:2
164:20
167:2,18
168:14
169:10
173:21
176:19
177:24
178:4
179:1,7,
18 180:2,
7 181:12
187:14,21
190:13
191:15
195:1
197:2
198:1,12
199:7

200:6
201:4
202:4
203:23
204:8,21
206:10,24
207:17
208:9,14
209:1,18
210:2,11,
15,22
211:14
212:23
213:15
214:24
215:20,24
217:8,13
218:4
220:1,4
221:23
222:3,16
223:18,24
224:14
225:9
228:9
229:9,22
231:11
235:19
236:11
237:12
239:18
240:2
242:8
243:5,24
244:3,18
245:1,3,6
247:21
249:3,16
253:1
254:16
256:3
259:8
262:16
263:2
264:14
266:17
269:10,

21,24
272:15
276:1
280:3,22
281:8
282:11
284:18
285:14
288:10
290:5
291:4,18
292:24
293:14
295:15,19
298:18
299:2
302:3,13
303:11,20
304:16,22
305:16
307:13
308:5,21
309:8,16
311:9,21
312:4,7,
16
313:13,24
314:10,
13,23
315:16
316:1,7,
19 317:12
319:5,15,
22 321:11
322:12,22
323:14,22
324:9,16,
21 325:1,
4,17
327:13
328:6
329:7,19
330:5,22
332:8
333:3
338:24
339:14,22



340:1,5,
21 341:11
342:2,14
343:4,10,
12,15
345:6,23
347:8
348:17,18
352:7
353:8
354:10
355:7
356:10

**welding**
26:1
33:24

**West**
4:8

**whatsoever**
139:12
305:9

**wheat**
34:8
153:4

**whiteout**
268:5,6

**Wichita**
14:20
15:5
20:21

**wife**
154:22,23
162:13,
18,21
163:6,7
268:16

**wife's**
58:4
162:15

**wild**
121:12

**William**

44:18

**willingness**
247:3

**wipe**
240:10
246:1

**wipes**
272:2

**Wisconsin**
24:9

**wisely**
267:16

**witness's**
329:21

**witnesses**
147:5

**word**
39:13
40:14
47:23
88:14
93:9
116:21
234:23

**wording**
40:12
237:3

**words**
26:4,22,
24 30:10
34:13
38:5
44:11
64:21
81:3
258:18,22
349:18

**work**
21:6
22:24
24:5,14,
15 27:2

28:16
29:19,21
33:1,2
108:13
119:9,22
120:11
121:4,21
122:15
123:2,20
124:23
125:11,22
126:8
127:8,20
128:8
135:4,5
136:15
141:4
189:24
190:4,11,
12,17
195:5
207:22
211:1
222:6
235:3
237:19
282:15
290:10
291:22
293:4
298:22
305:2,20
322:16
329:6
349:22

**worked**
20:12
21:7,13
23:1
30:21
33:6
35:21
68:3
188:14
189:8,24
254:14

**working**
20:7
27:21
29:3
35:13,14
161:12
189:14
236:17

**works**
184:19
317:10

**world**
36:14
351:24

**worry**
29:17
32:6
220:7

**worth**
246:16
276:21,22
277:21
333:17

**worthless**
171:2

**wow**
61:9
62:10
336:9

**wrap**
6:22

**wrench**
80:9

**write**
322:2

**written**
53:18,21

**wrong**
51:16
74:3 93:2
95:16,21
96:14

97:15
98:6
101:4
231:1
256:23
303:2
309:22
310:7
315:4

**wrongdoing**
87:7
302:1

**wrote**
133:6
218:21
334:9

**WSU**
14:21

———————

**X**

———————

**XL**
129:15

———————

**Y**

———————

**Yamashina**
18:4

**year**
17:4 18:9
20:6
33:16
64:20
65:2 66:6
67:4
154:2
166:2,3
193:3,4,6
197:6
198:19
343:3

**years**
14:3



15:10
16:20
18:10,19
20:5,12
27:22
33:19,20
37:2,6
38:12
64:5
66:22
133:4
150:22
167:23
175:23
176:3,11,
16,24
177:7
195:12
206:14
214:17
218:23
246:4
255:10
259:17
316:11
334:1,22
343:3

**yellow**
238:19

**yesterday**
247:5

**York**
165:4,7

**young**
27:20
217:22

