# EXHIBIT 12

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

---------------------------------x
                                 :
WILLIAM C. THEODORE,             :
individually and on behalf of all :
others similarly situated,       :
                                 :
          Plaintiffs,       :CASE NO.:
                            :6:21-cv-809-PGB-RMN
     v.                     :
                            :
PURCECYCLE TECHNOLOGIES, INC.,    :
MICHAEL OTWORTH, MICHAEL E. DEE,  :
DAVID BRENNER, BYRON ROTH and    :
TASMIN ETTEFAGH,                 :
                                 :
          Defendants.       :
---------------------------------X

          VIDEOTAPED DEPOSITION OF
               MARIUSZ CIECKO

             December 12, 2023
                 9:30 a.m.

          One South Church Avenue
                Suite 1200
              Tucson, Arizona

REPORTED BY:  CORI A. BRICKEY, RPR
              Arizona CR No. 51030
              New Mexico CCR No. 576
              Utah CCR No. 12488247-7801

Esquire Deposition Solutions, LLC
3838 North Central Avenue, Suite 750
Phoenix, Arizona 85012
602-266-2221

Page 2

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS MARIUSZ CIECKO, ROBERT CIECKO,
and PROPOSED CLASS:

          BY:  TAMARA A. WEINRIB, ESQ.
          POMERANTZ LLP
          600 Third Avenue
          New York, New York 10016
          taweinrib@pomlaw.com

FOR THE PLAINTIFFS MARIUSZ CIECKO, ROBERT CIECKO,
and PROPOSED CLASS (REMOTE):

          BY:  EITAN KIMELMANN, ESQ.
          BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
          60 East 42nd Street, 46th Floor
          New York, New York 10165
          eitank@bgandg.com

FOR THE DEFENDANTS PURECYCLE, MICHAEL OTWORTH,
MICHAEL E. DEE, and DAVID BRENNER:

          BY:  NINA RIEGELSBERGER, ESQ.
          DECHERT LLP
          Three Bryant Park
          1095 Avenue of the Americas
          New York, New York 10036
          nina.riegelsberger@dechert.com

FOR THE DEFENDANTS PURECYCLE, MICHAEL OTWORTH,
MICHAEL E. DEE, and DAVID BRENNER:
          BY:  JONI S. JACOBSEN, ESQ.
          DECHERT LLP
          35 West Wacker Drive, Suite 3400
          Chicago, Illinois 60601
          joni.jacobsen@dechert.com

Page 3

APPEARANCES OF COUNSEL (cont'd...)

FOR THE DEFENDANT BYRON ROTH (REMOTE):

          BY:  JOHN R. "JAKE" LOFTUS, ESQ.
          DLA PIPER
          2000 Avenue of the Stars
          Suite 400 North Tower
          Los Angeles, California
          jake.loftus@dlapiper.com

ALSO PRESENT:  John Maniscalco, Videographer

Page 4

INDEX OF EXAMINATION
WITNESS:  MARIUSZ CIECKO

| EXAMINATION | PAGE |
|---|---|
| By Ms. Riegelsberger | 6 |
| By Mr. Loftus | 114 |
| By Ms. Weinrib | 174 |

INDEX TO EXHIBITS

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | List of Purchases and Sales | 30 |
| Exhibit 2 | Merrill Lynch Statement | 34 |
| Exhibit 3 | Hindenburg Report, 5/6/21 | 44 |
| Exhibit 4 | Letter of Engagement | 71 |
| Exhibit 5 | Lead Plaintiffs' Motion for Class Certification Appointment | 76 |
| Exhibit 6 | Consolidated Second Amended Class Action Complaint SEC | 85 |
| Exhibit 7 | Press Release | 91 |
| Exhibit 8 | ROCH Schedule 14(a), 11/16/20 | 93 |
| Exhibit 9 | PureCycle Form S-4 Statement, 11/20/20 | 93 |
| Exhibit 10 | PureCycle Form 424(b)(3) Prospectus, 2/12/21 | 94 |
| Exhibit 11 | ROCH Schedule 14(a) Proxy Statement, 2/12/21 | 95 |
| Exhibit 12 | Request for Production | 105 |
| Exhibit 13 | Plaintiffs' Amended Responses and Objections to Byron Roth's First Interrogatories | 152 |



Page 5

THE VIDEOGRAPHER:  Good morning.  We are on the record to begin the deposition of Mariusz Ciecko in the matter of William C. Theodore vs. PurceCycle Technologies, Inc., et al.  This case is venued in the United States District Court, Middle District of Florida.  The Case Number is 6:21-cv-809-PGB-RMN.

Today's date is December 12, 2023, and the time is 9:31.  This deposition is taking place at the offices of Regus located at One South Church Avenue, Tucson, Arizona.

Would counsel please identify yourselves and state whom you represent, and the reporter will swear in the witness.

MS. RIEGELSBERGER:  Nina Riegelsberger from Dechert LLP.  I represent PurceCycle Technologies, Incorporated, Michael Otworth, Michael E. Dee, and David Brenner.

MR. LOFTUS:  John Loftus.  I represent defendant Byron Roth.  I'm with DLA Piper.

MS. JACOBSON:  Joni Jacobson of Dechert on behalf of the PureCycle defendants.

MS. WEINRIB:  Tamara Weinrib from Pomerantz LLP, on behalf of plaintiff Mariusz Ciecko, plaintiff Robert Ceicko, and the proposed classes.

Page 6

MR. KIMELMANN:  Eitan Kimelmann from Bronstein, Gewirtz & Grossman on behalf of Mariusz Ciecko, Robert Ciecko, and the class.

M A R I U S Z  C I E C K O,
of lawful age, having been first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the case aforesaid, deposes and says in reply to oral interrogatories propounded as follows, to wit:

DIRECT EXAMINATION

BY MS. RIEGELSBERGER:

Q.  Thank you for joining this morning.  Will you please state your name for the record.

A.  Yes.  Mariusz Ciecko.

Q.  As I said before, my name is Nina Riegelsberger.  I'm with the law firm Dechert LLP, along with my colleague, Joni Jacobson.  We represent PurceCycle Technologies, Incorporated, Michael Otworth, Michael E. Dee, and David Brenner.  Also attending today's deposition is Jake Loftus from the law firm DLA Piper who represents Byron Roth.

I want to be respectful of your time, so let me go over a few ground rules that I think will help the day go by more smoothly.

As you can see, this deposition is being videorecorded and transcribed.  It will be important

Page 7

that we don't talk over each other today.  So I would ask that you let me finish my question and take a breath before you respond.  I'll do my best not to interrupt you while you respond as well.

In addition, because the deposition is being transcribed, it will be important that you provide verbal answers, yes or no, and not uh-huh or shaking your head or nodding.

If you have any difficulty understanding my question or if you need me to repeat it, please ask.  If you don't ask for me to repeat it, I will assume that you have understood the question.

Also, if you need to take a break for any reason, please let me know, and once I have had a chance to complete my question and receive the answer, we're happy to take a short break.

And your counsel may object to certain questions throughout today that I ask, but unless she instructs you not to answer the question, I will need you to answer the question.

Q.  Do you understand all of these?

A.  Yes, I do.

Q.  Wonderful.  So let's get started.

Do you understand that your testimony here today is under oath and, therefore, subject to the

Page 8

penalty of perjury?

A.  Yes.

Q.  Is there any reason that you would be unable to testify truthfully or accurately today?

A.  No.

Q.  Are you currently under the influence of any medications or other substances that would prevent you from testifying truthfully or accurately?

A.  No.

Q.  Have you ever been deposed or testified under oath before?

A.  No.

Q.  Have you ever been a plaintiff in any other lawsuit or arbitration?

A.  No.

Q.  Have you ever been a defendant in any other lawsuit or arbitration?

A.  No.

Q.  Have you ever lived in New Hampshire?

A.  No.

Q.  Have you ever been employed by Walmart?

A.  No.

Q.  So you've never been involved in any workplace discrimination lawsuits?

A.  Not that I'm aware of, no.



Page 9

Q.   Do you remember filing for Chapter 13 bankruptcy in the Eastern District of Michigan in Detroit in 1997?

A.   For my first loan?

Q.   Is that yes?

A.   I want to clarify is it Chapter 13 for what? For me?

Q.   Chapter 13 bankruptcy that you voluntarily filed in 1997.

A.   Correct.  Yes, I do.

Q.   What were the circumstances surrounding your decision to file for voluntary Chapter 13 bankruptcy?

MS. WEINRIB:  Objection to the form of question.  You can answer.

A.   It was my wife had a business, she got hurt during her business of performing a job and we lost the income of hers.  And therefore, we were not able to pay our regular bills, so we had no choice but to file Chapter 13.

Q.   And how was that filing resolved?

A.   It was successful.  It was executed.

Q.   Do you also remember filing for Chapter 7 bankruptcy in the Eastern District of Michigan, again in Detroit, this time in 2010?

MS. WEINRIB:  Objection to the form of

Page 10

question.

A.   Yes, I do.

Q.   What were the circumstances surrounding your decision to voluntarily file for Chapter 7 bankruptcy in 2010?

MS. WEINRIB:  Objection to the form of the question.  Go ahead and answer.

A.   So it was -- at that time frame, it was the real estate market conditions and our housing. Similar situation happened to me due to the income of my wife and myself.  At that time frame, we had no choice but to liquidate the house and, therefore, we filed the Chapter 7.

Q.   Have you ever been involved in a class action lawsuit before?

A.   No.

Q.   All right.  Are you represented by counsel today?

A.   Yes.

Q.   Did you do anything to prepare for your deposition today?

A.   Yes.  I reviewed the information that was communicated to us prior, yes.

Q.   What information is that?

MS. WEINRIB:  Objection to the form of

Page 11

the question.  You can only answer in so far as you're not revealing communications with counsel or attorney work product.  You can answer what you did on your own.  You can testify to the existence of any meetings.

A.   Yeah.  Basically, I had reviewed all the information that had been filed through the court litigation process.

Q.   How many times did you meet with counsel to prepare for today's deposition?

MS. WEINRIB:  Objection to the form of the question.  You can answer.

A.   Two times and a phone call, I believe, and one time in person today.

Q.   Did you review any documents?

MS. WEINRIB:  Objection to the form of the question.  Are you asking if he reviewed documents with counsel or on his own?

MS. RIEGELSBERGER:  On his own.

A.   Just as I stated before: reading the documents that was filed.

Q.   How long did you meet with counsel to prepare for today's deposition?

MS. WEINRIB:  Objection to the form of the question.  Are you referring to any particular

Page 12

meeting or in totality?

MS. RIEGELSBERGER:  In totality.

A.   Probably two times on the phone, and plus today was probably two hours, two-plus hours.

Q.   Was it just you and your counsel on each of those phone calls?

A.   It was also my brother was involved as well, co-plaintiff.

Q.   Did you speak with anybody other than counsel in preparation for your deposition with counsel not present?

A.   No.

Q.   Did you speak with your brother, Robert Ciecko, after his deposition?

A.   Yes.

MS. WEINRIB:  Without counsel.  They're asking without counsel.

A.   Yes.  He did call me after his deposition.  He just told me it was the time factor that he was involved.

Q.   What else was discussed on that phone call with Robert Ciecko without counsel?

A.   That was it.  He just said -- told me to prepare myself for lengthy deposition and make sure I bring some food with me.



Page 13

Q.  Did you discuss your deposition with anybody else other than counsel and other than your brother, Robert Ciecko?

A.  I did not.

Q.  I'd like to turn to your background.  We'll start with education.  Did you attend an undergraduate university?

A.  Yes, I did.

Q.  Where did you attend?

A.  Wayne State University.

Q.  And what dates did you attend Wayne State University for your education?

A.  '89 started it and graduated in 1995.

Q.  What degree did you graduate with in 1995?

A.  Electrical engineering.

Q.  Was that a bachelor of science?

A.  Bachelor's of science.

Q.  Did you take any finance or accounting courses during your undergraduate education?

A.  Not at this stage.

Q.  Did you take any investment courses during your undergraduate education?

A.  No.

Q.  Did you attend any other post-high school formal education other than undergraduate?

Page 14

A.  No.

Q.  Did you obtain a master's degree after your undergraduate education?

A.  Yes, I did.

Q.  Where did you obtain your master's degree?

A.  It was Wayne State University.

Q.  What degree did you graduate with?

A.  It was the bachelor of science in manufacturing engineering.

Q.  And that was a master's degree?

A.  That's correct.

Q.  And when did you graduate?

A.  '97.

Q.  Did you take any finance or accounting courses during your master's degree?

A.  No.

Q.  Did you take any investment courses during your master's degree?

A.  No.

Q.  Have you had any other formal training or education in securities trading?

A.  No.

MS. WEINRIB:  Objection -- well, okay.  Objection to the form of the question, but that's fine.  Go ahead.

Page 15

Q.  Have you had any other formal training or education in investment strategy other than your undergraduate degree and master's degree?

MS. WEINRIB:  Objection to the form of the question.  He didn't testify to any formal training.

Q.  Have you had any other formal training in investment strategy?

MS. WEINRIB:  Objection to the form of the question.

Q.  Please answer.

A.  No.

Q.  Have you had any informal training or education in securities trading or investments?

MS. WEINRIB:  Objection to the form of the question.

A.  No.

Q.  Do you hold any professional licenses or certifications related to investments?

A.  No.

Q.  I'd like to turn your attention to your employment history.  Following your undergraduate degree, where did you first -- what job did you hold?

A.  I started in the Chrysler Corporation.

Q.  Was that Diamler Chrysler SVC?

Page 16

A.  No.  It started as Chrysler and got merged to Diamler Chrysler.

Q.  And what time -- what year did you start at Chrysler Corporation?

A.  1996.

Q.  How did you get that job?

A.  Through placement services through Wayne State University.

Q.  What was the nature of the business that you were involved in at Chrysler corporation?

A.  I was the product engineer, since I got my engineering degree, so I was doing the product engineering work.

Q.  What responsibilities did you have as a product engineer at Chrysler Corporation?

A.  Initially, I started a rotational program for first two years.  So the objective was to rotate through different departments within the company to gain overall knowledge of the Chrysler Corporation.

Q.  And following that position, did you have any other positions at Chrysler Corporation?

A.  Yes.  My next assignment was I was a production -- maintenance production supervisor in one of our plants that we just recently opened up.  So that was my first position.



Page 17

Q.  And was this still at Chrysler Corporation, or was this as Diamler Chrysler?

A.  It happened during this venue.  It happened when Chrysler merged with Diamler Chrysler.

Q.  Do you recall what year you changed positions from project engineer to your second position?

A.  Yeah.  My project engineer, initially, was two-year rotations.  That's when I started my plant assignment, and I worked there for approximately two years in a plant.

Q.  And how long?  You said two years?

A.  Yes.

Q.  Following that position, did you hold any other positions at Diamler Chrysler?

A.  Yes.  My next position was in Auburn Hills, Michigan, which is the headquarters for Chrysler Corporation, Diamler Chrysler at that time frame.  And I was the product engineer responsible for the early prototypes for the powertrain engines to supply to our vehicle build configurations.

Q.  What are powertrain engine vehicles?

A.  Powertrain, when I'm referring to powertrain, I mean the engine itself that goes in the vehicle, and that's what I was responsible for the

Page 18

engine development and delivering to the vehicle build shops.

(court reporter clarification.)

Q.  When you say "engine development," was there a specific portion of the engine that you were focused on or the overall engine?

MS. WEINRIB:  Objection to the form of question.

A.  It's overall.  I was program management function, so I was working with the engineers who developed the technology, build the engines.  My job was coordination between delivery of those products into our vehicle for build configurations.

Q.  Following this position, did you hold any other positions at Diamler Chrysler?

A.  Yes.  I moved from that specific position for the -- at that time it was four-cylinder engines. Then I moved to similar job but doing on the six-cylinder engines in a different vehicle platform, similar responsibilities.

Q.  Do you recall what year you moved to the six-cylinder responsibilities?

A.  I don't recall the exact year.  I knew I was five years in the other previous position.

Q.  Was this -- did you move to this new

Page 19

position prior or after to the Fiat Chrysler merger?

A.  That was prior.

Q.  After the Fiat Chrysler merger, what positions did you hold at FCA?

A.  Yeah.  I mean, from that position, I still had another position which was planning and strategy for the powertrains as well, so responsibility for the engines.  And during that venue, that's when the FCA was formed by the acquisition of Fiat Chrysler merger.

Q.  What were your responsibilities in this position at FCA?

A.  At that position, I was responsible for advanced planning perspective of the powertrains and alignment to our vehicle 10-year plan.

Q.  How long did you hold that position?

A.  Roughly, seven years or so.

Q.  And what year did you leave that position?  Do you recall?

A.  I don't recall offhand.

Q.  Have you had any responsibilities relating to investments, internal financial projections, or public disclosures during your time at FCA, Diamler Chrysler, or Chrysler Corporation?

MS. WEINRIB:  Objection to the form of the question.

Page 20

A.  No.

Q.  After the FCA and Peugeot merger, which resulted in Stellantis in 2020, what position did you hold?

MS. WEINRIB:  Objection to the form of the question.

A.  Yeah.  I was in the -- prior to the merger, I was in planning and strategy group.  When the merger happened, I maintained same responsibility in planning with the new organization but the same position as I had before.

Q.  What responsibilities did you have in this planning position?

A.  Yeah.  Similar as I kind of described before.  It was responsibility of the powertrain, in this case engines, alignment with our vehicle configurations as intended by the vehicle brands.

Q.  And is this your current position?

A.  This is my still current position.

Q.  Do you now work in a remote work position, or are you still on site?

A.  Last year I moved from Michigan to Arizona, and I'm working 100 percent remote.

Q.  Can you please describe the nature of any advice that you have given relating to product launch



Page 21

strategies in your current position?

MS. WEINRIB: Objection to the form of the question.

A. I am not responsible for vehicle launches. I support propulsion engine launches, in lots of case working with engineers, although I am not responsible of executing the exact product. I am in early stages of product planning.

Q. And how many people report to you in your current position?

A. Currently, none.

Q. What are your usual hours for work in your current position?

A. I work in the Eastern Standard Time zone, so I get up early in the morning. So typically, I get up at 3:30 a.m. and work all the way to 3 p.m. local time.

Q. Given that those are roughly the same hours that the stock market is open, do you buy and sell stocks on your personal account while at work?

MS. WEINRIB: Objection to the form of the question.

A. No, I don't.

Q. We're going to transition to your knowledge of PureCycle and ROCH prior to your decision to invest

Page 22

in PureCycle.

When did you decide to invest in PurceCycle Technologies?

A. I received a call from my brother. On occasion we talk. We exchange different strategies. Anyway, he called me and he told me there was a PCT that just went IPO recently, and he told me to Google it, find out all about the information, and that's how I got the tip in terms of the PCT itself. It was approximately one week before I started investing I did my research on the PCT.

Q. So when did you first start investing in PCT?

A. I think my first -- it was end of March so it was roughly -- I'm trying to recall the exact dates. Yeah. I think it was end of March that I invested, initially, of PureCycle.

Q. So this call of your brother took place approximately the middle of March. What year?

A. 2021.

Q. So you first learned of PCT in the middle of March, the year 2021; is that correct?

A. Correct.

Q. So before the middle of March 2021, did you know anything about ROCH?

Page 23

A. No.

Q. Have you ever invested in a SPAC prior to March 2021?

A. No.

Q. Do you know what a SPAC is?

A. From my recent research, I do.

Q. But in before March 2021, you did not know what a SPAC was?

A. No.

Q. Do you know what a De-SPAC transaction is?

A. No.

Q. Prior to March 2021, did you know --

A. No.

Q. -- what a De-SPAC transaction is?

A. No.

Q. Before you decided to invest in PurceCycle Technologies, what if anything did you know about PureCycle?

A. Yeah. So initially, when my brother called me, he told me about PCT. Specifically, what he focused on and what he communicated to me was the patent. The patent relative to Procter & Gamble as the PCT obtained, and he told me that is something that I need to look into. So I did my research. Roughly, I took a week prior to purchasing

Page 24

my initial shares, and I focused on few multiple things in my research online.

(Reporter clarification.)

A. Multiple different items or things that I tried to consider when I, initially, was trying to buy it prior to my initial buy. Anyway, first financial estimations, which I was able to find online via my search. That was my first, number one, in terms of the financial investment of projections of the PCT. But based on that, I wanted to understand is how the projections made in terms of the profitability, so I focused on three things. One is the patent; the maturity of patent itself and the technology that PCT is claiming that would be able to recycle the recycled plastic material. Number 2 was about the capital investment associated with the plants because revenue was based extremely heavy on the plant implementation, so that was why I was digging that deep on the plant implementation and what's going to happen in what year. As well as the supply chain agreement of the recycled plastic to support all the plants' operational -- operations. In addition to that, I also was focused on



Page 25

the team. Who is going to run the PCT after the IPO? Which, through my research, I found out it was the similar team or same team that was managing PureCycle. It was touted that the team has lots of experience launching of the companies.

Q. I would like to focus prior to your phone call with Robert Ciecko in March 2021.

Did you know anything about PurceCycle Technologies prior to that phone call?

A. I did not.

Q. Prior to that phone call, did you personally know any current or former PureCycle employees, officers, or directors?

A. I did not.

Q. And since that phone call in March 2021, have you ever communicated with any current or former PureCycle employees, officers, or directors?

MS. WEINRIB: Objection to the form of the question. You can answer.

A. No.

Q. I'd like to turn back to your previous answer regarding your research.

A. Yes.

Q. Regarding the financial estimations that you found, what source did you find those financial

Page 26

estimations from?

MS. WEINRIB: Objection to the form of the question. You can answer.

A. I do not recall. I did lots of online searches I was getting information from. Majority of it I recall was relative to the press releases of the PCT, but I don't have exact document that I was referencing. I was doing lots of searches across the online.

Q. When you say you were conducting searches online, what do you mean by that?

A. Meaning, finding out relative information that was officially published. Obviously, referencing as many official documents as I could follow through online. That's why the PureCycle press releases was one of my main focused that I was focusing on at the time frame in terms of the validity of the information.

Q. How did you conduct those searches? Were they through Google or another search engine?

MS. WEINRIB: Objection to the form of the question.

A. Yeah. I used Google search.

Q. And what did you search in the search engine?

Page 27

MS. WEINRIB: Objection to the form of the question.

A. I mean, simply, PCT first, and whatever come up with PCT, then I start digging into different streams. PCT was my original, obviously, main search relative to the information.

Q. You mentioned earlier that you researched the patent maturity for PCT from Procter & Gamble.

How did you conduct that research into the patent maturity?

A. I don't think I mentioned that I researched Procter & Gamble. I read about Procter & Gamble having the license provide to the PCT, but I did not research anything prior to that. I only got information from my researches based on the PCT disclosure that the patent was purchased from Procter & Gamble with a significant development time frame.

Q. Are you aware that PurceCycle Technologies licensed the patent from Procter & Gamble?

A. Yes.

Q. Earlier, you mentioned you researched investments in the PureCycle plants.

A. Yes.

Q. How did you conduct that research?

A. Similar through especially after I found out

Page 28

that the revenue projections are based on pretty aggressive industrialization implementation in 2023, as far as as many as six plants to be operational. I was very focused on how can we accelerate that quickly with no industry having in this time frame.

So my focus was the first plant, which I found out was in Ohio was the plant in 2022. And after that, the idea was of a copy of the process and apply it to the other five plants that was touted at that time being operational by end of 2024.

Q. Do you recall what websites or documents you reviewed to learn about the PureCycle plant in Ohio?

A. I don't.

Q. You also mentioned you researched the supply chain of plastic being supplied to PureCycle for the recycling technology.

How did you research the supply chain?

A. I was not researching, necessarily, supply chain. I was referencing the comments made by PCT, I believe through the press conferences, that they have obtained the supply chain long-term agreements to support the production or the industrialization of their plants. That's what I was focused on to make sure there was a supply chain developed to support heavy industrialization as described.



Page 29

Q. Do you recall the date of the press conferences that you learned this information from?

MS. WEINRIB: Objection to the form of the question.

A. Most information I was doing online I believe is referencing November of 2020 press releases.

Q. But to be clear, you reviewed these press releases in March of 2021; correct?

A. That is correct.

Q. You also mentioned that you researched the management team of PurceCycle Technologies.

How did you research the management team?

A. Similar statement. I did not go in-depth of each individual. I was mostly concerned as after the merger who's going to run the company of PCT. Which, through my research, I found out is it still the management of PureCycle that is going to continue manage and execute PCT technologies after the merger.

Q. So aside from understanding it was going to be the same management team for PureCycle, LLC, to PurceCycle Technologies, did you research any of those individuals?

A. I did not do individual researches of each team member. The only thing I did is reference the

Page 30

information that was touted is that it was the same research with lots of experience.

Q. So the only documents you reviewed regarding the management team was the press releases from PurceCycle Technologies; is that correct?

MS. WEINRIB: Objection to the form of the question.

A. As best as I recall.

Q. And again, you read those press releases in March 2021?

A. That's correct.

Q. I'm going to ask you a few questions about the PurceCycle Technologies that you purchased and held. And to be clear, when I refer to PurceCycle Technologies, I mean any securities traded under either the ROCH or the PCT ticker symbols. I'll try to differentiate between certain questions, but please let me know if you would like me to clarify.

I'd like to turn to Tab 27, please.

(Whereupon, Exhibit 1 was marked for identification.)

Q. Do you recognize this document Exhibit 1?

MS. WEINRIB: You can take your time to look through the whole thing.

A. I think what this is, yes.

Page 31

Q. What is this document?

A. I believe these are the trades that my brother did.

Q. If I direct your attention to Page 6 of the document.

A. Which one is 6?

Q. On the top it says 6 and 7.

A. Okay.

Q. This is a certification that you signed; is that correct?

A. Yes.

Q. And this is your signature at the bottom of the page?

A. Yes.

Q. Do you recall the purpose of this certification?

A. Can you clarify which certification is in the litigation process?

Q. The certification was filed with your motion to be appointed lead plaintiff. Do you recall signing this certification for that purpose?

A. Yes. This is beginning of litigation. I'm trying to get a reference of the litigation process.

Q. If you see at the top there's a date at the top right?

Page 32

A. Okay. Yes, I see it.

Q. July 27, 2021.

A. That helps. Thank you.

Q. I'd like to direct your attention to Item Number 5 which states "The attached sheet lists all of my transactions in PureCycle Securities during the class period as specified in the complaint."

Did I read that correctly?

A. Yes.

Q. And you read Item 5 before signing this document?

A. Yes.

Q. On the next page, Page 7, shows your name on the top right corner; correct?

A. Yes.

Q. And it says "PurceCycle Technologies, Incorporated, PCT" on the top left corner?

A. Yes.

Q. And it also states in the middle top "List of purchases and sales"?

A. Yes.

Q. Did you prepare this list?

A. Those are my two transactions that I recognized that I made, yes.

Q. But my question is did you prepare this



Page 33

list?

MS. WEINRIB: Objection to the form of the question.

A. I did not create this list. I provided information for the list.

Q. Do you know who prepared this list?

A. I imagine that was my counsel.

Q. Did you check the accuracy of this list before you signed the certification on Page 6?

A. I checked my two transactions for accuracy, yes.

Q. Is this list a complete and accurate representation of all your purchases and sales in PureCycle Securities?

MS. WEINRIB: Objection to the form of the question.

A. I only see two purchases here listed.

Q. So is it not a complete and accurate list?

MS. WEINRIB: Objection to the form of the question. You're asking about two separate things in one question.

Q. Is this list a complete list of your -- all of your purchases and sales of PureCycle Securities?

MS. WEINRIB: Objection to the form of the question.

Page 34

A. It shows my two initial purchases.

Q. Are there any purchases missing on this list?

A. Looks like there's maybe one missing here that happened after 3/26.

Q. Are there any sales of PurceCycle Technologies missing from this list?

A. Yes.

Q. I'd like to turn your attention to Tab 52.

MS. RIEGELSBERGER: We'll mark this exhibit as Exhibit 2.

(Whereupon, Exhibit 2 was marked for identification.)

MR. KIMELMANN: I'm sorry. What is Exhibit 2?

MS. RIEGELSBERGER: Tab 52. It's the production Bate stamp Ciecko 001 through Ciecko 008.

Q. I'd like to direct your attention to the first page of Exhibit 2. There is a date March 25, 2021, at the top right corner; correct?

A. Yes.

Q. And is this the date that you first purchased PurceCycle Technologies Securities?

A. That's correct.

Q. And here, it states that you purchased 550

Page 35

shares at a price of $29; is that correct?

A. Correct.

Q. So why did you decide to make this first purchase on March 25, 2021?

MS. WEINRIB: Objection to the form of the question. Asked and answered.

A. Basically, it was based on my internal research based on the PCT. Based on the information that I had reviewed and all the aspects that supported is this is a sound, good investment for me at the time frame.

Q. Prior to making this purchase on March 25, 2021, had you ever invested in any other company that ROCH had an interest in?

A. No.

MS. WEINRIB: Objection to the form of the question.

Q. Had you ever invested in any other company that ROCH engaged in a De-SPAC transaction prior with to the date of purchase?

MS. WEINRIB: Objection to the form of the question.

A. No.

Q. On March 25, 2021, were you aware that there was a merger between ROCH and PCT in March 2021?

Page 36

A. Yes.

Q. How were you made aware of that merger?

A. Initially, through my brother mentioned to me, and a second time through my, obviously, research that I did prior to purchasing the first shares.

Q. Do you recall hearing anything about PureCycle Technologies prior to the merger between ROCH and PCT?

MS. WEINRIB: Objection to the form of the question.

A. I did not.

Q. Were you following ROCH stock prior to the merger in March 2021?

A. No.

Q. So looking again at your trading records, who was your brokerage account with?

A. My brokerage account is through Merrill Lynch.

Q. And were each of your purchases and sales in PureCycle Securities with Merrill Lynch?

A. Correct.

Q. Were each of these purchases and sales in PurceCycle Technologies made with one account at Merrill Lynch?

A. Yes.



MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
37–40

Page 37

Q. Is this account held solely by you, or is it a joint account?

A. Solely by me.

Q. And is this account held under your social security number?

A. Yes. This account is through my work through my Merrill Lynch. That's where my 401(k) is, so yes.

Q. Did you use any other brokerage firms or accounts to place any securities trades?

A. No.

Q. So after March 25, 2021, when you first purchased PureCycle Securities, did you monitor your investment?

A. Yes.

Q. How did you monitor your investment?

A. Check daily on the progress and, obviously, the performance of the stock market relative to the PCT.

Q. Approximately, what time each day did you check the progress of the stock market?

MS. WEINRIB: Objection to the form of the question.

A. Typically, after work.

Q. Would that be after the stock market closed

Page 38

every day?

A. Correct. At that time frame, I was still in Michigan, so I was finishing probably after 5 p.m., so that would be definitely after the stock market's closed.

Q. And how did you decide when to buy additional PureCycle Securities?

A. So my initial purchase and the secondary purchase was made at the same time. It's just a matter of how my funds got transferred. So I only got the first set of funds on the 25, that's when I executed. And the remaining funds got transferred, and I executed on 26, so it was a unified decision.

Q. So there was no separate decision to make a separate purchase on March 26, 2021?

A. No. It was a one-time decision. It was just a matter of how money got allocated.

Q. You also made a third purchase on May 6, 2021; is that correct?

A. Correct.

Q. And that's shown on page that's Bate-stamped Ciecko 0005; is that right?

A. Correct.

Q. What information -- before this purchase, did you review any additional materials about

Page 39

PureCycle?

A. Not from my initial research, no.

Q. Why did you decide to make this third purchase on May 6, 2021?

A. Yeah. Basically, I was reviewing my account, and at that time frame, this is my self-direct account. I noticed residual money funds leftover relative to my first two purchases prior dates. So at that time frame, I decided to purchase the remaining available cash allocated in that account. Knowing that the price went down to roughly $19, I made another purchase of 38 shares. It wasn't much, but I still decided to purchase at that time frame.

Q. So after you began buying and selling PureCycle Securities in March 2021, did you monitor PureCycle's performance as a company?

A. Just to clarify, I wasn't buying and selling. I was just buying on March 21.

Q. Thank you for that clarification. So after you began buying PureCycle Securities in 2021, did you monitor PureCycle's performance as a company?

A. Yes. As I mentioned before, I was checking it daily after work on the performance of the stock.

Q. What did you review?

Page 40

A. Typically, just the percentage, up or down. Any new articles that I seen at that time, I don't recall, but anything that might have been communicated, I might have read it.

Q. Who would have communicated any new articles to you?

A. Just myself just by following the PCT tick mark. Typically, attachments get assigned to the PCT, and the informative information comes up automatically. So I was scanning for that information to see if there was any new information.

Q. Would that be through searching PCT?

A. No. I don't believe I was doing any exhaustive searches after that after my initial purchase.

Q. Did you receive automatic notifications from a source to obtain that information?

MS. WEINRIB: Objection to the form of the question.

A. No. Typically, when I check the stock on the PCT, it comes with news information attached. So based on the -- well, the articles get attached to it. I would be able to read it, and any communication from PCT obviously comes up there as well.

Q. And you did read those articles that would



Case 6:21-cv-00809-PGB-RMN     Document 183-13     Filed 01/23/24     Page 12 of 47
PageID 7935

MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
41–44

Page 41

come up when you checked the PCT stock?

A. I remember scanning them. I don't know if I read them all.

Q. I'd like to direct your attention back to Exhibit 1. On Exhibit 1, do you see your purchase of PureCycle Securities from May 6, 2021?

MS. WEINRIB: Objection to the form of the question. We covered this already.

A. No. Doesn't seem like it's there.

Q. Before any of your purchases of PureCycle Securities, did you perform any independent analyses of PureCycle?

MS. WEINRIB: Objection to the form of the question.

A. I did not.

Q. This account that you have with Merrill Lynch that's shown on Exhibit 2, do you still own this account?

A. Yes, I do.

Q. Do you own any PureCycle Securities, sitting here today?

A. I do not.

Q. Have you ever received any management advice with respect to this account?

MS. WEINRIB: Objection to the form of

Page 42

the question.

Do you understand what she means by management advice?

A. Relative to helping me manage this account?

Q. Yes.

A. No.

Q. Have you ever retained a broker to give you advice for your Merrill Lynch account?

A. No.

Q. Have you ever received advice from anyone else regarding your Merrill Lynch account?

A. No.

Q. Is there any particular pattern to your trades of PureCycle Securities?

A. I'm not sure I understand the pattern. As I mentioned before, the IPO happened. What kept my interesting going is the specific patent of the PCT that was touted by PCT that got my interest, and that was my initial investment.

Q. And how did the PureCycle Securities fit in with your general investment strategy?

MS. WEINRIB: Objection to the form of the question.

A. Yeah. Typically, I'm a pretty conservative investor, so I keep my securities mostly in mutual

Page 43

funds. However, I do take a certain percentage, and I do the self-direct investment on occasion.

In this case, this was the instance for me based on my research it was a good, sound investment for me to make at that time frame.

Q. What were your expectations of the PureCycle Securities when you purchased them in March 2021?

A. My expectation was based on my research is the meeting the financial that PCT communicated and be able to get the growth from my initial purchase.

Q. And what was your expected return from your purchase of PurceCycle Technologies Securities?

MS. WEINRIB: Objection to the form of the question.

A. I don't think I had a number in mind.

Q. Since March 2021, have you spoken with anybody about PureCycle?

MS. WEINRIB: Objection to the form of the question.

A. I did not.

Q. Did you speak with your brother after March 2021 about PurceCycle Technologies?

A. Just as part of the litigation process.

Q. And not separately without counsel?

A. That's correct.

Page 44

Q. And there's nobody else that you spoke to regarding PureCycle Technologies Securities?

A. That's correct.

Q. I'd like to turn your attention -- are you aware of a report published by Hindenburg Research on May 6, 2021, discussing PurceCycle Technologies?

A. Yes, I am.

MS. RIEGELSBERGER: We'll mark this as Exhibit 3.

(Whereupon, Exhibit 3 was marked for identification.)

Q. Have you seen this document before?

A. I did.

Q. When did you first become aware of the Hindenburg report?

A. On May 6 at the end of the day, I noticed the stock -- PCT stock price went down on some kind of report. That was the first indication when I noticed the Hindenberg report was published.

Q. So your purchase of PureCycle Securities on May 6, 2021, occurred before you became aware of the Hindenberg report?

A. Correct. Actually, my last purchase was made on May 5 but with the open market on May 6, so my securities got bought at the beginning of the day.



Page 45

Q.  How did you first become aware of the Hindenberg report on May 6, 2021?

A.  Just checking my stock at the end of the day, I noticed a significant drop.  And only thing I read at the time was there's some kind of report.  I did not know about Hindenberg at the time frame.  I just noticed some kind of report was published that was somehow influencing the stock price of the PCT.

Q.  When did you read the report?

A.  So I didn't actually read the report until that weekend, complete report.  So it was that weekend after the May 6.

Q.  Do you recall what day of the week May 6 was?

A.  I do not know.

Q.  But you read the report a few days after May 6?

A.  Correct.  I don't remember dates.  Let's say it's Tuesday, so I did not read the report until Saturday and Sunday on the weekend because, typically, I was just busy during the week.

Q.  Did you read the full report the weekend after May 6, 2021?

A.  I believe I did, yes.

Q.  Did you read or review any of the articles

Page 46

or SEC files cited in the Hindenburg report after the week after May 6, 2021?

A.  I did not.

Q.  What was your first impression of the Hindenberg report?

A.  On the May 6, as I mentioned as I did not go in any depth yet, so obviously, I have no recollection or even opinion made on May 6.

On the weekend when I read the report, it was really eye-opening to me some of the facts identified in the Hindenberg report relative to the details of the PCT, and particularly talking about the management team and ability of the patent maturity of the patent itself and ability to provide, if you want to say, recycled properties, recycled material to be able to sustain cost effectively the process as the PCT was claiming it does.

Q.  What about the management experience in the report struck you in reading it?

MS. WEINRIB:  Objection to the form of the question.

A.  It was eye-opening to me.  Number one -- there's two things that really got to my attention.  Number one is that the management team never had any past experience in the PurceCycle recycling

Page 47

process.  That, I did not know prior to buying it.  And it was very opening to me is that, suddenly, the company who is running the PureCycle technology does not have any background, extensive experience running similar company.

Q.  Which members of the management team did not have experience in plastics recycling?

A.  A believe all of them.  So Michael Otworth, obviously the CEO of PureCycle.  Based on the report, is that he started the PureCycle a few years back, but he did not have any experience of running any company in terms of the recycling process.  So was the CFO, I believe, and the CCO.

So I think all three members, Michael Dee, and escaping my name right now their name.  But anyway, all three members were touted as experienced senior managements that had experience, but Hindenberg report identified as they do not have that experience.

Q.  Are you aware of any other members of the management team at PurceCycle Technologies?

MS. WEINRIB:  Objection to the form of the question.

A.  Yeah.  There was one individual that escapes my name right now.  CCO Brenner.

Q.  Other than Michael Otworth, Michael Dee, and

Page 48

David Brenner, are you aware of any other members of the management team at PurceCycle Technologies?

A.  There was another individual cited, initially, through my research and through the report, chief sustainability officer.  But he wasn't listed, I think, in the recent publications, but there was another individual there.

Q.  Are you aware of whether the chief sustainability officer had any experience in plastics recycling?

A.  I believe that was the same theme, if I recall correctly, is that none of them had experience in the plastic recycling ability.

Q.  When you read the Hindenburg Research report, were you aware that Hindenberg Research is a short seller?

A.  When I read that on the weekend at that time frame, yes, I was actually informed after my brother told me.  Because he -- prior to the weekend, obviously, we had a conversation about the PCT, and he informed me that this is Hindenburg report is associated with a short selling.  But I would have no prior knowledge of that.

Q.  So this conversation with your brother happened between May 6 and the weekend after May 6; is



Case 6:21-cv-00809-PGB-RMN    Document 183-13    Filed 01/23/24    Page 14 of 47
PageID 7937

MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
49–52

Page 49

that right?

A. Absolutely, yes.

Q. Can you describe that conversation, please?

A. Yeah. So actually, I can vividly remember on the May 6 when the stock went down and when I noticed there was some kind of report at the time frame.

I called my brother that evening, and I asked him, I says, "Did you see the PCT stock? It went down on some kind of report." Originally, I felt this was a bogus report because I had no clue that that's what this was. And what he told me indicated to me is that he will, actually, research this next day and was going to call me back what he found out.

He called me back on May 7 with information that this is legit report/with the company. And that's when he informed me is that, yes, they're affiliated with short sales. But at that time frame, other that weekend at that time frame, that was ultimately the decision for me was at that time frame on May 7 was to sell.

Q. So you decided to sell your PureCycle Securities on May 7?

A. That's correct.

Q. And you decided to sell your PureCycle

Page 50

Securities on May 7 prior to reading the Hindenberg report?

A. That's correct. Yes.

Q. Can you describe for me what a short seller is?

A. I'll describe it the best way I understand it. The short seller invests in the stock market of the price when it goes down. That's when they sell the -- well, they position themself to have a short sale of the stock going down. And then they sell it at low, which at that time frame, they make profit.

Q. So you're aware that as a short seller, Hindenburg Research had an interest in the PureCycle Securities' price dropping?

MS. WEINRIB: Objection to the form of the question.

A. Perhaps. I don't know what they had in mind with the report.

Q. In order to make a profit, a short seller -- strike that.

In order to receive a return, a short seller needs the PureCycle Securities price to drop; is that right?

MS. WEINRIB: Objection to the form of the question.

Page 51

A. I believe that's how the process works, yes.

Q. Turning back to Exhibit 1 on the second page, which is the first page of the report, so the weekend after May 6 after you sold your PureCycle Securities, did you read the disclosure at the bottom of Page 1?

MS. JACOBSON: Of Exhibit 3.

Q. Oh, sorry. Of Exhibit 3.

A. We're talking Exhibit 3 now?

Q. Yes. Of exhibit 3, yes. I'm sorry.

A. Page 1, you said?

Q. First page of the report.

A. I believe as part of the report, I was reading this on the weekend, that's correct.

Q. Did you read the initial disclosure at the bottom of Page 1 after you sold your PureCycle Securities?

A. Yes, I believe I read that.

Q. So you were aware that this report, as it states, "This report represents our opinion"?

MS. WEINRIB: Objection to the form of the question.

A. I read that, yes.

Q. After reading the report after May 7, did you conduct any independent research to verify any of

Page 52

the opinions in the Hindenburg report?

A. I did not.

Q. After you first reviewed the Hindenburg report after May 7, 2021, did you ever read any of the links cited in the Hindenberg report?

A. I believe I did some of the links. That's correct.

Q. Approximately, when did you read those links?

A. Same time as I was mention reading the report which would be the weekend after I sold my positions.

Q. Do you recall which links you read?

A. I do not recall, no.

Q. So after May 7 -- after the weekend after May 6, 2021, whatever date those are, did you follow PureCycle's performance after reading the Hindenberg Research report?

A. I did not. After I sold my shares, I did not look and follow it.

Q. Sitting here today, are you aware that on April 25, 2023, PureCycle announced that it had reached mechanical completion of its first polypropylene plant?

MS. WEINRIB: Objection to the form of



Page 53

the question.

A.  I do not.  Since I wasn't following, I don't know that.

Q.  Sitting here today, are you aware that on June 20, 2023, PureCycle issued a press release announcing they had successfully commenced pellet production at their Ironton plant?

MS. WEINRIB:  Objection to the form of the question.

A.  I do not.

Q.  Are you aware, sitting here today, that on June 28, 2023, an independent construction monitor reviewing the construction and commission of PureCycle's plant in Ironton, Ohio, certified that PureCycle was producing recycled propylene at the Ironton facility?

MS. WEINRIB:  Objection to the form of the question.

A.  Not aware.

Q.  Learning this information sitting here today, do you believe that the company made false or misleading statements about the viability of the technology?

MS. WEINRIB:  Objection to the form of the question.

Page 54

You can answer in so far as you're not revealing communications with counsel or attorney work product.  If you have your own independent answer, you may answer the question.

A.  I mean, I only know the facts that you just mentioned right now.  But I have no clue how the product is made or is it following the initial publications or communication of the PCT or the IPO.  I don't know if they're making this product profitability.  I don't know if they're making this product based on the facts they made and profitability aspect.  So I don't know.

Q.  Are you aware that the defendants in this case submitted a motion for reconsideration in June of 2023?

A.  Yes.

Q.  Did you read that motion for reconsideration?

A.  Yes, I did.

Q.  Did you read the exhibits to that motion for reconsideration?

A.  I believe I did.

Q.  Are you aware that those exhibits included the information that I just stated?

A.  Yes, I saw it.

Page 55

Q.  So sitting here today, you are aware that PureCycle has been certified by an independent construction monitor as producing recycled polypropylene?

MS. WEINRIB:  Objection.  Are you asking him if he's aware those facts are true or if he's aware there are publications stating that those things occurred?  Because those are two very different things.

Q.  I'm asking if you're aware of those publications?

A.  I'm aware of only two publications based on the document that was presented as part of the litigation process.

Q.  And when did you read those documents?

A.  When it was published.

Q.  In June of 2023?

A.  Just to clarify, I did not read the individual documents.  The only information that I found what you just stated right now, I only found out through one of the litigation process in this document that you guys referring to.

Q.  When did you learn about that information in the process of this litigation?

MS. WEINRIB:  Objection to the form of

Page 56

the question.  Are you asking when he reviewed the document?

MS. RIEGELSBERGER:  Yes.  He said that he learned the information through the process of litigation.  I'm asking when he --

MS. WEINRIB:  So you're asking if he read the reconsideration papers?  I just want to make sure he understands your question so we have a clear record.

MS. RIEGELSBERGER:  Sure.  Yes.

A.  So as soon as the legal counsel shared the document with me, that was the first time I read the information.  That was the first time I noticed relative to the 2023 calendar events that you just mentioned.

Q.  Do you recall about what time of year you read those documents?

A.  What time of the year?  This was, obviously, just a few months ago.

Q.  Do you still believe that the assertions in the Hindenberg report are correct that PureCycle's technology is fundamentally flawed?

MS. WEINRIB:  Objection to the form of the question.  But you can answer it.

A.  I believe the Hindenberg report has raised



Page 57

major concerns relative to the manufacture of it or the PCT plan in terms of the executing their patented product. And I believe it's based on the factual information at that time frame that was presented and available. And yes, I still believe there is lots of information in the Hindenberg report was accurate.

MS. RIEGELSBERGER: Okay. I think we can take a quick break for a couple minutes.

THE VIDEOGRAPHER: We're going off the record. The time is 10:33.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 10:45.

BY MS. RIEGELSBERGER:

Q. Mr. Ciecko, I'd like to turn your attention to this lawsuit.

When did you first learn about a potential lawsuit against PureCycle or Byron Roth?

A. So the first time relative to the lawsuit is when we actually talked to the counsel in terms of this lawsuit. And prior to or during the information, we were informed as how the lawsuit --

MS. WEINRIB: Objection. I don't mean objection. I'm just saying I want to interrupt and say that you can talk about the circumstances, but you

Page 58

can't discuss communications with counsel.

A. Okay. So I learned about the lawsuit is when we communicated with potential counsel on the specific litigation of this lawsuit, and that's when they informed me there is going to be a formal complaint.

Q. When you say "we," to whom are you referring?

A. My brother and I.

Q. Did your brother have contact with potential counsel first?

MS. WEINRIB: Objection to the form of the question.

A. No. We did everything together.

Q. So how did you learn about a potential lawsuit against PurceCycle Technologies or Roth?

A. We found out online that there was lots of communication going on on the potential lawsuit implications of the PCT. So we start investigating it, and that's how we both learned about the potential lawsuit.

Q. How did you see the notices online?

A. It's just one of our tick marks through the normal search or just by coincidence. I don't remember, exactly.

Page 59

Q. Did you see a press release issued by a law firm regarding a potential lawsuit against PurceCycle Technologies or Byron Roth?

A. I don't recall.

Q. Do you recall what law firm published the notices that you did see?

MS. WEINRIB: Objection to the form of the question.

A. I don't recall all the names. There was lots of them that popped up that we seen communication.

Q. Is it correct that you and your brother, Robert Ciecko, contacted a law firm first?

MS. WEINRIB: Objection to the form of the question. First.

A. Yes. We eventually contacted the law firm, yes.

Q. And which law firm was that?

A. Bronstein.

Q. Is that Bronstein, Gewirtz & Grossman, LLC?

A. That's correct, yep.

Q. And what steps did you take to explore the possibility of becoming involved in a lawsuit against PureCycle Technologies and Byron Roth?

MS. WEINRIB: Objection to the form of

Page 60

the question.

A. Yeah. I mean, obviously, after we made the decision that we would like to follow the litigation process, we wanted to select the firm that has some experience associated with litigation, particularly security litigation. And we did a quick research in terms of all the potential candidates that we seen that were published on the news/communication via online search. And ultimately, we selected Bronstein.

Q. I want to be clear. When you say "we conducted research," did you physically type in searches into Google or a search engine, or did your brother, Robert Ciecko, do so?

A. Robert did most of the searching. I did myself, but he took definitely the lead on identifying all the potential litigation companies.

Q. And did he send you any links or articles regarding lawsuits?

A. No. All communication was done orally.

Q. And why did you decide to seek to be appointment lead plaintiff after you decided to become involved in the lawsuit suit?

A. Yeah. So after I sold my PCT, obviously with close to 50 percent loss when I purchased it and after the Hindenberg report was published, although



Page 61

with many facts that I was not aware of it. Obviously, Hindenberg did much more extensive research than I did, clearly.

And that brought to my attention is that right now, I believe I was misguided when I purchased the PCT without all the sufficient information. So at that time frame, with my loss of my funds, I was found cheated, so that's why I pursued litigation.

Q. Well, my question was why did you decide to pursue being lead plaintiff in this lawsuit?

A. Oh.

MS. WEINRIB: Objection to the form of the question. Asked and answered.

A. Yeah. I mean, ultimately, I wanted to contribute, obviously, as when I reached out to the litigation firm to contribute. At that time frame, I didn't know I was going to become the lead plaintiff, but I was willing to, obviously, pursue the litigation as a normal process.

Q. So whose idea was it for you to become lead plaintiff?

MS. WEINRIB: Objection to the form of the question.

You can answer in so far as you're not revealing communications with attorneys with regard to

Page 62

this litigation.

A. Yeah. I believe the idea is, number one, between my brother and I, we want to contribute to the litigation process. Ultimately, as part of the processes, we became the lead plaintiffs.

Q. Was it your brother's suggestion that you file a motion to become lead plaintiff, or was it your suggestion?

MS. WEINRIB: Objection to the form of the question.

A. I don't believe we had -- I don't think it was either Robert or mine. It was a joint decision.

Q. What steps did you take in order to become the lead plaintiff in this lawsuit?

MS. WEINRIB: Objection to the form of the question.

Again, you can answer only in so far as you're not revealing any attorney work product or communications with counsel pertaining to this litigation.

A. So can you repeat the question just to make sure I understand it?

Q. What steps did you take in order to become lead plaintiff in this litigation?

MS. WEINRIB: And I reiterate my former

Page 63

objection to the same question.

A. So basically, is our first step was, obviously, to contact the firm that was able to help us with the litigation. That was step one. Step two, obviously, work with that firm to identify is what actions or what we need to provide to become part of the litigation process. As part of that process itself, it led us to be the lead plaintiffs identified as process do of the litigation. We were willing to support the litigations as lead plaintiff.

Q. When you filed your motion to become lead plaintiff in July 2021, who was your counsel at that time?

A. It was -- all the initial discussions we were working through was Bronstein.

Q. When did you become connected with the law firm Pomerantz?

A. Once Bronstein initiated -- communicated to us they would start the litigation process, they communicated to us they would pick or select lead counsel. And at that time frame, they informed us that Pomerantz is going to be the lead counsel in the case.

Q. So Pomerantz's lead counsel in this case was not your decision?

Page 64

MS. WEINRIB: Objection to the form of the question. Mischaracterizes his testimony.

A. No.

Q. I'd like to get a sense of the extent of your knowledge and involvement in this case. Will you please describe in your own words what this litigation is about?

A. This litigation is about misleading, miscommunication information of the ideal of the PCT and communicating facts relative to the process and the management team that may not be completely true.

Q. Do you know William Theodore?

A. I do not know.

Q. Have you read, from beginning to end, the original complaint filed by William C. Theodore on May 11, 2021?

A. I believe so.

Q. How did you receive a copy of that complaint?

A. I believe it was shared, initially, from the counsel.

Q. Do you know David Tenenbaum?

A. I don't know him.

Q. Have you read the complaint he filed on May 11, 2021?



Page 65

A. I believe I read it as well.

Q. How did you receive a copy of that complaint?

A. Same thing, through the counsel.

Q. Do you know what a class action is?

A. Yeah. When there's more than one person, a group of people involved in the litigation process.

Q. Are you aware that this litigation is a putative class action?

A. I guess I'm not understanding the first word. I guess I'm not -- putative. Repeat the word.

Q. Putative.

A. Putative. I guess I'm not familiar with that word.

Q. Are you aware that this case is a proposed class action?

A. Yes.

Q. Prior to getting involved in this case, have you ever been involved in a securities class action lawsuit?

MS. WEINRIB: Objection to the form of the question. Covered at the beginning, but you can go ahead and answer.

A. No.

Q. Do you know what the class period is for

Page 66

this litigation?

A. I believe it was from November 2020 to March '21.

Q. The other lead plaintiff in this case is your brother, Mr. Robert Ciecko; is that correct?

A. Correct.

Q. I'd like to get a sense of how much time you've spent on this case and how that time varied over the life of the case so far.

First, let's focus on the period when you first heard of a potential lawsuit and saw the press releases relating to a potential lawsuit. What time in 2021 did that occur?

A. Well, that obviously occurred after I sale my PCT and after the Hindenberg report got published. So that was, roughly, in the June time frame of 2021.

Q. So in June 2021, how much time did you spend in preparation for this litigation?

A. So between initial research, I believe --

MS. WEINRIB: Objection to the form of the question.

Answer if you know. You don't have to speculate.

A. I don't recall, exactly. I mean we spent,

Page 67

basically, multiple different conversations we had with each other. I would say in the range of four to six hours. My best estimate.

Q. And you filed your motion to be appointed lead plaintiff in July 2021; is that correct?

A. Correct.

Q. In July 2021, how much time did you spend in preparation for that motion to be appointed lead plaintiff?

MS. WEINRIB: Objection to the form of the question.

You can answer if you recall.

A. Yeah. Once again, as I think -- it's hard to determine because it's in pieces. I would say probably in preparation of the entire process, probably very similar. Both four to six hours I believe is through the process.

Q. In July 2021, without counsel present, what did you discuss with your brother regarding this litigation?

A. Yeah. The only thing we discussed is, obviously, about litigation itself, which we decided together to do this. So we did it in conjunction with each other, obviously following the process.

MS. WEINRIB: And don't reveal any

Page 68

communications with Robert where you discussed communications with counsel.

THE WITNESS: Correct.

A. So yeah. It was just primarily basically in the early stages of selecting the firm that we want to go with. That was probably the biggest discussion point when we had relative to the entire process itself.

Once we selected the process, we started communicating with the counsel. Obviously, that was just done with the counsel at that time frame, but we did not have any ongoing regular conversations.

Q. And in July 2021, your counsel was still Bronstein; is that correct?

A. I believe somewhere in July. I don't remember the exact date. That's when it was announced that we would have lead counsel with Pomerantz.

Q. And in August 2021, you were appointed by the court as lead plaintiff in this case; is that right?

A. Correct.

Q. So after July 2021, how much time did you spend assisting with the first amended complaint?

MS. WEINRIB: Objection to the form of the question.



Page 69

A. When I say "assisted," I was able to review the document as initial draft and any comments feedback provided I provided to the counsel.

Q. And how much time did you spend doing so?

MS. WEINRIB: Objection to the form of the question.

You can answer if you recall.

A. Yeah. Once again, reading document I would say maybe two, three hours max.

Q. After the first amended complaint was filed, are you aware that there was a motion to dismiss filed by defendants?

A. Yes.

Q. During the motion to dismiss period, how much did your time -- strike that.

During the motion to dismiss the first amended complaint, how much time did you spend on this litigation?

MS. WEINRIB: Objection to the form of the question.

Do you understand what she means by during the motion to dismiss?

Do you want to give him a specific time frame? Are you asking from the filing of the motion to dismiss until the decision by the court? I'm not

Page 70

clear so I'm guessing he's not clear.

Q. Yeah. So the first amended complaint was filed on September 27, 2021; is that correct?

A. Yes, that's what I recall. Somewhere in that, yeah.

Q. And after the -- so between September 27, 2021 and August 4, 2022, which was the date that the court ruled on the first motion to dismiss, approximately, how much time did you spend on this litigation?

MS. WEINRIB: Objection to the form of the question.

You can answer if you recall.

A. Yeah. It was, once again, reviewing the motion responses. I remember reading this, reviewing it and providing feedback. So once again, probably three or four hours max.

Q. Are you aware that a second amended complaint was filed on August 18, 2022?

A. Yes.

Q. How much time did you spend assisting in the preparation of that second amended complaint?

MS. WEINRIB: Objection to the form of the question, but you can answer.

A. Similar as before. I was reading the draft

Page 71

paper just to make sure I understand it and provide any feedback to the counsel. So once again, roughly, three to four hours.

Q. Are you aware that the court ruled on the second motion to dismiss the second amended complaint in June of 2023?

A. Repeat that again.

Q. Are you aware that the court ruled on defendants' second motion to dismiss the second amended complaint in June of 2023?

A. Yes.

Q. Following June 20, 2023, about how much time have you spent during the discovery stage of this litigation on this case?

MS. WEINRIB: Objection to the form of the question. You're just limiting this to discovery?

MS. RIEGELSBERGER: Yes.

A. Just to discovery. Okay. Yeah. It was about three to four hours as well for that process.

MS. RIEGELSBERGER: I'd like to turn to Tab 56, please. We'll mark this as Exhibit 4. Tab 56 is a production made by lead plaintiffs to defendants, Bate-stamped Ciecko 00022.

(Whereupon, Exhibit 4 was marked for identification.)

Page 72

Q. Mr. Ciecko, have you seen this document before?

A. Yes, I did.

Q. When did you first see this document?

A. Around September of 2021.

Q. And if I direct your attention to Page 2 of the document Bate-stamped Ciecko 00023, is this your signature at the bottom of the page?

A. It looks like it, yes. Correct.

Q. When did you sign this agreement?

A. Let's see, yeah, around September 2021.

Q. Do you recall the date that you signed this agreement?

A. I don't recall the exact date, no.

Q. This document is your engagement letter with the law firm Pomerantz LLP; is that correct?

A. Yes.

Q. And did you read this full document before you signed it?

A. Yes.

Q. I'd like to direct your attention to Page 1, the last paragraph, which states "The litigation will be undertaken on a contingent fee basis."

Do you understand what that means?

A. Can you explain it to me?



Page 73

Q.   Is that a no?

A.   The bottom line is I think it means that nobody gets paid until the final resolution.

Q.   I'd like to direct your attention to Page 2 of the first full paragraph on Page 2.

A.   Okay.

Q.   Which states "In the event this litigation is successful, Pomerantz will seek reasonable fees to be determined by the court but will not request a fee in excess 33.3 percent, one third, of any settlement or judgment achieved."

Did you read this paragraph before signing it?

A.   I did.

Q.   Do you understand what this paragraph means?

A.   Yes.

Q.   Please explain so in your own words.

A.   It means that the lead counsel will not get any funding until -- or they will only get paid under determination of the award and up to the 33 percent of whatever the award is.

Q.   Is your fee arrangement with Pomerantz the same as the members of the rest of the proposed class?

MS. WEINRIB:  Objection to the form of the question.

Page 74

A.   I don't have any fee arrangements.

Q.   Did you negotiate with the Pomerantz law firm regarding any contingent fee percentage?

MS. WEINRIB:  Objection to the form of the question.

A.   No, I did not.

Q.   As of now, do you have any understanding with the Pomerantz law firm that is not written down?

MS. WEINRIB:  Objection to the form of the question.

A.   I guess I don't understand the question. What's the question?

Q.   Do you have any understanding or agreement with the Pomerantz law firm that is not included in this document?

MS. WEINRIB:  Objection to the form of the question.  Are you referring to a fee agreement?  I don't understand the question.

MS. RIEGELSBERGER:  Any understanding or agreement.

MS. WEINRIB:  Do you and the question?

A.   I have no agreements, so that's easy.  No.

Q.   And as of now, does your relationship with the Pomerantz law firm extend beyond your involvement in this litigation?

Page 75

A.   Only with this litigation.

Q.   I'd like to turn your attention to your role in this case.

Can you describe for me what a lead plaintiff is?

A.   Yes.  Lead plaintiff is involved in reviewing necessary litigation process documents, working closely with the counsel, and representing the larger class of similar individuals involved in that class.

Q.   And you are currently moving the court to certify two proposed classes in this lawsuit; is that correct?

A.   Correct.

Q.   There is a Section 10(b) Class; is that right?

A.   Correct.

Q.   And a Section 14(a) Class; is that right?

A.   Correct.

Q.   And you are currently moving the court to represent both of those classes in this litigation?

A.   Correct.

Q.   Can you describe for me who are in the class of people that you represent?

A.   Will be any individuals that invested in

Page 76

that period of time in the time frame that has been identified in the litigation process.

Q.   And what time frame is that?

MS. WEINRIB:  Objection to the form of the question.

A.   I believe once again from November of 2020, through -- I don't exactly -- March, I think, 2021.

Q.   Are you aware that Pomerantz filed a motion for class certification on your behalf on November 30, 2023?

A.   Yes, I am.

Q.   Did you read that motion before it was filed?

A.   Yes, I did.

MS. RIEGELSBERGER:  I'd like to mark this as an Exhibit 5.

(Whereupon, Exhibit 5 was marked for identification.)

Q.   Mr. Ciecko, do you recognize this document Exhibit 5?

A.   I do.

Q.   What is this document?

A.   This is the lead plaintiff motion for a appointment of class representative and appointment of class counsel.



Page 77

Q.  I'd like to direct your attention to Page 2 of the document.  The last paragraph on Page 2 states "Plaintiff seeks certification of two classes, each of which satisfies Rule 23 certification requirements."

Did I read that correctly?

A.  Yes.

Q.  The first class states "Section 10(b) Class.  All persons and entities that purchased or otherwise acquired PurceCycle Technologies, Incorporated, PureCycle Securities between November 16, 2020 and November 10, 2021, inclusive, and were damaged thereby."

Did I read that correctly?

A.  Correct.

Q.  So you stated earlier that you understand the class period is between November 2020 to March 2021; is that right?

MS. WEINRIB:  Objection to the form of the question.  He said to the best of his recollection, but you can go ahead.

A.  Correct.  I believe I stated that I did not know the end date.

Q.  And now here reading Page 2, the Section 10(b) Class definition, you see that the class period is November 16, 2020, to November 10, 2021?

Page 78

A.  Correct.

Q.  That second bullet point on Page 2 which extends to Page 3 states "The Section 14 Class.  All persons and entities that held shares of Roth CH Acquisition One Corp. (ROCH) common stock as of November 16, 2020, or February 12, 2021, and were entitled to vote at the special meeting of stock holders held on March 16, 2021."

Did I read that correctly?

A.  Yes.

Q.  Did you ever hold ROCH common stock?

A.  I did not.

Q.  So you were not an ROCH common stockholder on November 16, 2020?

MS. WEINRIB:  Objection to the form of the question.  Asked and answered.  You can answer.

A.  I did not.

Q.  And you did not hold ROCH common stock on February 12, 2021; is that correct?

A.  That's correct.

MS. WEINRIB:  Objection to the form of the question.  You can answer.

A.  That's correct.

Q.  And you were not entitled to vote at the special meeting of stock holders held on March 16,

Page 79

2021; is that correct?

A.  Correct.

Q.  And you were still asking the court to appoint you as a representative of both of these classes; is that right?

A.  Correct.

Q.  Do you believe that you're an adequate class representative of the Section 10(b) Class?

MS. WEINRIB:  Objection to the form of the question.  Are you asking for a legal conclusion?

MS. RIEGELSBERGER:  Just his personal opinion.

A.  10(b) yes.

Q.  Why is that?

A.  I fall in the time period that has been highlighted in terms of the buying securities in PCT.

Q.  Do you believe you're an adequate class representative of the Section 14(a) Class?

MS. WEINRIB:  Objection to the form of the question.  You're asking him for legal opinions.

Q.  I'm asking for your personal opinion.

MS. WEINRIB:  Of a legal matter.

Q.  Do you fall in the definition of the Section 14(a) Class?

MS. WEINRIB:  Objection to the form of

Page 80

the question.

A.  Yeah.  I don't know how to answer that one.  You have to defer to our counsel.

Q.  Did you purchase ROCH Securities at any time?

MS. WEINRIB:  Objection to the form of the question.  You've already asked this question multiple times.  I think we can move on.

Q.  Please answer the question.

A.  No.  I don't have any ROCH.

Q.  Do you believe your claims are typical of the Section 10(b) Class?

MS. WEINRIB:  Objection to the form of the question.  Again, you're asking him for legal conclusions.  He's not a lawyer.

Q.  Please answer the question.

A.  Yes.

Q.  Do you believe your claims are typical of the Section 14B Class?

MS. WEINRIB:  Objection to the form of the question.  Same objection.

A.  Yeah.

Q.  I'd like to turn your attention to Page 12 of Exhibit 5.  In the first full paragraph, the second to last sentence states "All members of the



Page 81

Section 14(a) Class, including the proposed class representatives, held shares of ROCH common stock as of November 16, 2020, or February 12, 2021, and were entitled to vote in the special meeting of the stock holders held on March 16, 2021."

Q.   Did I read that correctly?

A.   Yes.

Q.   Is that statement accurate?

MS. WEINRIB:  Objection to the form of the question.

A.   As you read it, that's correct, yes.

Q.   Is that statement saying "including the proposed class representatives" accurate?

MS. WEINRIB:  Objection to the form of the question.  You can answer to the best of your ability.

A.   Yes.

Q.   Let me clarify.  You are a proposed class representative for this case; is that right?

A.   Correct.  In both counts, that's correct.

Q.   And this statement says that you, as class representative, held shares of ROCH common stock as of November 16, 2020, or February 12, 2021.

A.   I think I answered already that I did not hold any stocks.

Page 82

Q.   Thank you.  So this statement is not accurate; is that right?

MS. WEINRIB:  Objection to the form of the question.  You can answer.

A.   The statement is correct.  I just did not held any stock in that time period.

Q.   So it's not true, then?

MS. WEINRIB:  Objection to the form of the question.

A.   Yeah.  I don't know how else to answer it except I did not hold any stock.

Q.   Did you review this statement prior to November 30, 2023?

A.   Did I read this document, you're saying?

Q.   This statement specifically that's quoted.

A.   Yes.  That's part of my document review, yes.

Q.   As a class representative, what if any duties or responsibilities do you have to the rest of the class?

A.   Follow the litigation process, review and provide feedback on any documents relative to the case, and consult with counsel.

Q.   Do you have a duty to ensure that all filings are accurate to the best of your knowledge?

Page 83

A.   Yes.

Q.   And what is your basis of your understanding of your duties and responsibilities --

MS. WEINRIB:  Objection to the form of the question.

Q.   -- as a class representative?

MS. WEINRIB:  Objection to the form of the question.

You can answer without revealing communications with counsel pertaining to this litigation.

A.   I mean, once again, it's just a matter of trying to review information for accuracy and provide information the best of your knowledge at that time frame and make sure you follow the litigation process.

Q.   How do you obtain information about this lawsuit?

A.   Through my counsel.

Q.   And how often do you speak with your counsel about this litigation?

A.   Obviously, varies by the nature of activity.

Q.   What are the major categories of tasks that you have done in regards to this litigation?

MS. WEINRIB:  Objection to the form of the question.  Again, you can answer, but don't reveal

Page 84

communications with counsel and don't reveal any attorney work product.

A.   In a nutshell, it was just reviewing all the documents that are filed via the process through initial review, and then review through the final drafts.  So it's just going through the process of verifying information is accurate as possible.

Q.   What documents have you reviewed?

A.   I believe I reviewed all the documents going through the litigation process.  So the first complaint motion; the second complaint motion; the motion for dismissal of the original one; then the motion for dismissal for the secondary; and obviously, our position from the counsel relative to the two motions; and then additional motion from the defendants relative to the reconsideration of the dismissal of the secondary motion.

Q.   Did you review any discovery documents?

A.   Yes.  Through the process of litigation with my counsel.

Q.   Which documents did you review?

A.   We have reviewed the documents based on the -- I might be forgetting the titles now.  But basically, litigation questions relative to the process of disclosing all the information during the



Page 85

process itself.

Q.   Is that all?

A.   Yeah.

MS. RIEGELSBERGER:  I'd like to mark this as Exhibit 6.

(Whereupon, Exhibit 6 was marked for identification.)

Q.   Mr. Ciecko, do you recognize this document?

A.   I do.

Q.   What is this document?

A.   Consolidated second amended class action complaint for violations of the federal securities laws.

Q.   If I could turn you to the last page of the document, it is dated August 18, 2022; is that correct?

A.   Yes.

Q.   Did you review this document before it was filed on August 18, 2022?

A.   I did.

Q.   Do you know if there are any material differences between this document and the first complaint filed by the lead plaintiffs in this case?

A.   They are similar.  Are you asking me all the details?  I don't know all the details between the

Page 86

first and second one.

Q.   Do you recall any differences between the second amended complaint and the first amended complaint, the first complaint filed?

MS. WEINRIB:  Objection to the form of the question.

A.   Yeah.  Once again, if you ask me legal questions here that I don't know all the details.

Q.   Are you aware that the second amended complaint added allegations regarding an SEC investigation?

A.   I believe it was there listed.  That's correct.

Q.   Are you aware that the second amended complaint added six months to the class period?

A.   Yes.  I did notice that.  That's correct.

Q.   Are you aware that the second amended complaint added a Section 14(a) claim?

A.   Yes.

Q.   In the second amended complaint, what do you allege that PureCycle did wrong?

A.   Basically, very similar to the first one is the misleading information that was published either through the press releases or at the time of the IPO in terms of the maturity of the patent itself, in

Page 87

terms of the manufacturability of the recyclable material, and relative to the experience of the team management that would be managing the PurceCycle Technologies.

Q.   Who is Michael Otworth?

A.   He's the CEO of PurceCycle Technologies.

Q.   Is he the current CEO of PurceCycle Technologies?

A.   Correct.

Q.   Is he a defendant in the lawsuit?

A.   Yes.

Q.   What do you allege that Michael Otworth did wrong?

MS. WEINRIB:  Objection to the form of the question.  Asked and answered.

A.   So basically, in terms of what information he disclosed during the press release and IPO in terms of the maturity of the patent, and the revenue projections based on that patent, and the maturity of the process itself in terms of the revenue generation.

Q.   Who is Michael E. Dee?

A.   CFO.

Q.   Is he the current CFO of PurceCycle Technologies?

A.   Best of my knowledge, yes.

Page 88

Q.   Is he a defendant in the lawsuit?

A.   Yes.

Q.   What do you allege that Michael E. Dee did wrong in the second amended complaint?

MS. WEINRIB:  Objection to the form of the question.  Asked and answered.

A.   Similar question, similar answer as I provided on the CEO.  Basically, providing information that is misleading based on the maturity of the patent and how this translated to the financial projections of the company.

Q.   And who is David Brenner?

A.   David Brenner is C -- he's a chief commercial officer.

Q.   Is he the current chief commercial officer at PurceCycle Technologies?

A.   Best of my knowledge, yes.

Q.   Is he a defendant in this lawsuit?

A.   Yes.

Q.   And what do you allege that David Brenner did wrong in the second amended complaint?

MS. WEINRIB:  Objection to the form of the question.  Asked and answered.

A.   Same story, basically, as in terms of just overall communication of the patent maturity of the



Case 6:21-cv-00809-PGB-RMN    Document 183-13    Filed 01/23/24    Page 24 of 47
PageID 7947

MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
89–92

Page 89

product, and ultimately, how it translates to the revenue of the generation of the PCT as they claimed in the initial release.

Q.  And who is Byron Roth?

A.  Byron Roth is the CEO and chairman of the Roth acquisition firm and Roth Capital, and basically, he was the partner that merged with PureCycle at the time of the IPO.

Q.  What time was the IPO?

MS. WEINRIB:  Objection to the form of the question.

A.  March 16, 2021.

Q.  And you're aware that this was a De-SPAC transaction and not an IPO?

MS. WEINRIB:  Objection to the form of the question.

A.  At that time frame, I did not know until I did my research later on.

Q.  When did you conduct that research?

MS. WEINRIB:  Objection to the form of the question.

A.  So basically, I did all my research prior to buying my stock, as I mentioned before, one week or so, one week and a half or so before I started purchasing my PCT stock.

Page 90

Q.  So you conducted this research after the merger between ROCH and PureCycle; is that right?

A.  That's correct.

Q.  And what are you alleging that Byron Roth did wrong in the second amended complaint?

MS. WEINRIB:  Objection to the form of the question.

A.  Yeah.  Very similar.  I'm pretty sure I read in the press releases in 2020 when Byron Roth was touting the mature process that was purchased license through Procter & Gamble and optimized through PCT. And highlighting that it was only the process in the industry that were going to be able to process recycled plastics through the PCT in a cost-effective way.  So touting the process.  That's what I remember.

Q.  Where did Byron Roth tout the recycling process for PurceCycle Technologies?

MS. WEINRIB:  Objection to the form of the question.  The documents speak for themselves.  Go ahead and answer.

A.  Yeah.  I believe the comments and information I found out is through my initial research, and I believe it was referenced in the November 2020 press release, to the best of my knowledge.

Page 91

MS. RIEGELSBERGER:  I'm going to mark this as Exhibit 7.

(Whereupon, Exhibit 7 was marked for identification.)

Q.  Do you recognize this document that I just handed you, Exhibit 7?

A.  I'm not sure in entirety, but I see some the flaunt information that I remember reviewing.

Q.  What is this document?

A.  Well, it's a November 2020 acquisition -- PureCycle acquisition press release, it looks like.

Q.  When did you first see this document?

A.  Any documents that I reviewed was one week before my purchase of the PurceCycle Technologies.

Q.  Have you ever emailed yourself this document?

A.  No.

Q.  Have you ever downloaded this document?

A.  No.

Q.  Have you ever sent it or received it from your brother?

A.  No.

Q.  Have you ever sent or received it from any other person?

A.  No.

Page 92

Q.  What do you allege in this document is misleading?

MS. WEINRIB:  Objection to the form of the question.  Complaint speaks for itself.

A.  I mean, I'm not going to read the document again so I can't comment on what was misleading in the entire document at this moment.

Q.  Is there any specific sentence in this document that you believe is misleading?

MS. WEINRIB:  Do you want him to go into the complaint and read it to you?  I don't understand the purpose of this.  He has the complaint in front of him if you like to point him to specific portion.

MS. RIEGELSBERGER:  I'd like him to tell me what portion of this document is misleading.

MS. WEINRIB:  It's a memory test.

MS. RIEGELSBERGER:  It's a question.

A.  To truthfully tell you, I'd have to read the entire document and tell you my opinion after that.

Q.  From what you recall, what do you recall is misleading in the document?

MS. WEINRIB:  Objection to the form of the question.

A.  I don't think I can accurately tell you right now because I'll have to read the entire



Page 93

document.

MS. RIEGELSBERGER: All right. We'll mark this as Exhibit 8.

(Whereupon, Exhibit 8 marked for identification.)

Q. Mr. Ciecko, do you recognize this document?

A. Looks like the Schedule 14(a).

Q. Have you seen this document before?

A. Let's see. I don't recall.

Q. Have you ever read this document before?

MS. WEINRIB: Objection to the form of the question. He just said he doesn't recall.

Q. Please answer my question.

A. No.

Q. Thank you. We'll turn to Tab 39.

A. What Page?

Q. I'm getting you a different document.

MS. RIEGELSBERGER: I'm marking this document as Exhibit 9.

(Whereupon, Exhibit 9 was marked for identification.)

Q. Exhibit 9 is the PureCycle Form S-4 Registration Statement, dated November 20, 2022. Mr. Ciecko, do you recognize this document?

A. I see the document, yes. I know what S-4 is

Page 94

yeah.

Q. Do you recognize it?

MS. WEINRIB: Objection to the form of the question.

A. I am not familiar with this document.

Q. Have you ever seen this document before?

A. No.

MR. LOFTUS: For the record, I believe you may have misspoken. It's November 20, 2020; correct.

MS. RIEGELSBERGER: Yes. The document is dated November 20, 2020. I apologize.

Q. And to be clear, you've never seen this document before?

MS. WEINRIB: Objection to the form of the question.

A. No.

MS. RIEGELSBERGER: We're going to mark this as Exhibit 10. It's the PureCycle Form 424(b)(3) Prospectus, dated February 12, 2021.

(Whereupon, Exhibit 10 was marked for identification.)

Q. Mr. Ciecko, do you recognize this document?

A. I do not.

Q. Have you ever seen this document before?

Page 95

A. No.

MS. RIEGELSBERGER: And last one Number 41. This, we'll mark as Exhibit 11. It's the ROCH Schedule 14(a) Proxy Statement, dated February 12, 2021.

(Whereupon, Exhibit 11 was marked for identification.)

Q. Mr. Ciecko, do you recognize this document?

A. I do not.

Q. Have you ever seen this document before?

A. No.

Q. And you have not read this document before?

MS. WEINRIB: Objection to the form of the question. He said he's never seen it, so he's never read it.

A. No.

Q. Mr. Ciecko, I'd like to turn back to Exhibit 11. Will you please turn to the first page of the document?

A. Which page?

Q. Just the first page. Do you recognize the document from this first page?

A. I don't recognize that page.

Q. I'd like to turn back to Exhibit 10. Will you please flip to the first page of the document?

Page 96

A. Okay.

Q. Do you recognize this document from its first page?

A. No, I don't recognize that.

Q. And you still haven't seen this first page before?

MS. WEINRIB: Objection to the form of the question.

A. No, I did not.

Q. And we'll turn back to Exhibit 9. Will you please turn to the first page of the document? Do you recognize this first page of the document?

A. I do not.

Q. And you still have not seen this document before after looking at the first page?

MS. WEINRIB: Objection to the form of the question.

A. That's correct.

Q. I'd like to go back to Exhibit 8, please. Should have been a stapled one. Will you please turn to the first page of the document? Do you recognize this first page of the document?

A. I do not.

Q. So you have never seen this document after looking at its first page?



Page 97

MS. WEINRIB: Objection to the form of the question. You can answer.

A. Correct. I do not.

Q. Are you alleging in this case that PureCycle made any omissions to its investors?

MS. WEINRIB: Objection to the form of the question.

A. Omissions?

Q. Yes.

A. Not necessarily, no. Misleading maybe, right, but not omissions.

Q. And what type of relief are you seeking through this litigation?

A. I don't look for any relief.

Q. I'm sorry. Will you repeat that? I didn't hear you.

MS. WEINRIB: Objection to the form of the question, first of all, but then he can repeat it.

A. Clarify for me the relief definition of what you're asking me.

Q. What relief are you seeking from the court in this litigation?

MS. WEINRIB: Objection to the form of the question. What do you mean by "you"? Him personally?

Page 98

MS. RIEGELSBERGER: Him as lead plaintiff.

MS. WEINRIB: Still unclear. Objection to the form of the question.

Q. Will you please answer the question again for the record.

A. No relief. I'm not looking for any relief, I guess, if that's the question.

Q. Are you seeking any damages as lead plaintiff through this litigation?

MS. WEINRIB: Objection to the form of the question.

A. No.

Q. I'd like to turn back to Exhibit 6, please, the second amended complaint. I'd like to turn your attention to Paragraph 14?

A. What page?

Q. It's on Page 7. Please read Paragraph 14 to yourself.

A. Okay.

Q. Do you see that in Paragraph 14 it mentions that the SEC issued an investigative subpoena to defendant Otworth?

A. I see that, yes.

Q. What is your understanding of an SEC

Page 99

investigation?

MS. WEINRIB: Objection to the form of the question.

A. They issued an investigation of relative to whatever information at that time frame they had relative to, looks like, information that was communicated by the PCT.

Q. What is your understanding as to the reason why the SEC investigation began?

A. I'm assuming they had some kind of cause to investigate.

Q. Do you believe that the existence of an SEC investigation indicates wrongdoing by a company?

MS. WEINRIB: Objection to the form of the question, but go ahead.

A. SEC I believe has a responsibility to investigate it.

Q. Does that mean that the company has committed some wrongdoing?

MS. WEINRIB: Objection to the form of the question.

A. Well, no.

Q. When did you become aware of the SEC investigation into defendant Otworth?

A. Yeah. I did not know about this until my --

Page 100

actually, I didn't know about it when I did my initial research on this until later on through the process of the litigation.

Q. Do you recall, approximately, what month or year you learned about the SEC investigation into defendant Otworth?

MS. WEINRIB: Objection to the form of the question.

A. No. I don't recall the exact date.

Q. Are you aware that the SEC closed its investigation into defendant Otworth?

A. Yes. I'm aware that they closed it now, yeah.

Q. Are you aware that the SEC closed the investigation without any adverse findings or enforcement?

MS. WEINRIB: Objection to the form of the question.

A. I know they closed the investigation, yes.

Q. Are you aware that they closed the investigation without any adverse findings?

MS. WEINRIB: Objection to the form of the question. Mischaracterizes facts.

A. I believe they closed the investigation, yes.



Page 101

Q. Was there an action from the SEC against defendant Otworth?

A. Not to my knowledge.

Q. Was there an action from the SEC against PureCycle?

MS. WEINRIB: Objection to the form of the question.

A. Not to my knowledge.

Q. Are you aware that PureCycle disclosed that the SEC closed its investigation on April 26, 2022?

A. I do not know about that, no.

Q. So you were not aware that the SEC investigation was closed before the second amended complaint was filed?

MS. WEINRIB: Objection to the form of the question. Answer if you recall.

A. No. I don't recall.

Q. But you reviewed the second amended complaint before it was filed on August 18, 2022?

A. I reviewed the amended complaint, yes.

Q. And you reviewed Paragraph 14 which mentions the SEC investigation; is that right?

A. Correct.

Q. Do you believe that the fact that the SEC investigation should have been disclosed to the court

Page 102

in the second amended complaint?

MS. WEINRIB: Objection to the form of the question. SEC investigation was disclosed. He just read it.

A. Yeah. I mean, obviously, we read it so it's here.

Q. Disclosed to the --

A. This to the court because this is to the court.

Q. Do you believe the fact that the SEC investigation was closed should have been disclosed to the court in the second amended complaint?

MS. WEINRIB: Objection to the form of the question.

A. I don't know. I'm not a lawyer. I don't know how to write the complaint legally.

Q. Just a matter of personal opinion. If you're including that an SEC investigation was opened, and should you include the fact that that SEC investigation was also closed?

MS. WEINRIB: Objection to the form of the question.

A. Once again, I don't know how to legally write the document so I can't comment on that.

Q. But just to confirm, the SEC investigation

Page 103

was closed prior to the filing of the second amended complaint?

MS. WEINRIB: Objection to the form of the question. Asked and answered numerous times. You can answer.

A. Best of my knowledge, that's correct.

Q. Does the fact that the SEC investigation was closed impact your thoughts regarding the merits of this lawsuit?

A. No.

Q. I'd like to turn to the current status of this litigation.

Will you please describe for me what the current status of this litigation is?

MS. WEINRIB: Objection to the form of the question.

A. Yeah. Right now, we have the secondary motion that is filed that has been objected by the defenders. It has been ruled to dismiss. And now we're in a secondary -- or second reconsolidation of the motion back to the court.

Q. I'd like to clarify a couple of those things. So you said there was a second complaint filed; is that correct?

A. I'm saying a consolidated second amended

Page 104

action plan was filed.

Q. And you said an opposition was filed by the defendants; is that right?

A. Correct. So the defendant filed the motion to dismiss.

Q. And you said there was a ruling on the motion to dismiss?

A. Yes.

Q. And what stage of the litigation are we in now?

MS. WEINRIB: Objection to the form of the question. Go ahead and answer.

A. Yeah. I'm not a lawyer to tell you the truth, all the steps. But we are right now, obviously, getting through plaintiff witness information. As far as the litigation process itself, it's still in the judge's hands relative to the secondary motion -- or secondary repress by defendants to dismiss the motion, as I understand it.

Q. Are you referring to the motion for reconsideration?

A. Correct.

Q. And is that motion for reconsideration still pending?

A. To the best of my knowledge, yes.



MARIUSZ CIECKO                                          December 12, 2023
William C. Theodore vs PureCycle Technologies                    105–108

Page 105

MS. RIEGELSBERGER:  I think we're ready for a short break.

THE VIDEOGRAPHER:  We're going off the record.  The time is 11:47.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 11:58.

BY MS. RIEGELSBERGER:

Q.  Mr. Ciecko, are you aware that the defendants served you with document requests in this case?

A.  Yes.

Q.  Have you seen those document requests?

A.  I've seen the requests, yes.

MS. RIEGELSBERGER:  I'm going to mark this exhibit as Exhibit 12.  It is the request for production served on defendants (sic) Robert Ciecko and Mariusz Ciecko on 14, August 2023.

(Whereupon, Exhibit 12 was marked for identification.)

Q.  Mr. Ciecko, do you recognize this document?

A.  Yes, I do.

Q.  What is this document?

A.  Defendants first request for production of documents.

Page 106

Q.  When did you first receive this document?

A.  Roughly, August 14.

Q.  And how much time did you spend reviewing this document?

A.  I took a liberty to read it completely which took me about a half an hour or so.

Q.  And you're aware that this document requests documents from you?

A.  Correct.

Q.  Did you look for documents in response to these requests?

A.  Yes.  The documents that I provided already were the documents that I had.

Q.  How did you look for your documents in response to these requests?

A.  Well, since I did not save any documents anywhere, it was very easy because I didn't have any hard copies so I didn't document anything.  It was mostly through the online search.  The only documents I had we already disclosed relative to buying the shares and selling my shares in the positions.

Q.  I'd like to understand how you conducted this online search that you mentioned.  Was this on the Internet that you conducted a search?

MS. WEINRIB:  Objection to the form of

Page 107

the question.

A.  Yes, through Google online.

MS. WEINRIB:  I think there may be some confusion, and I just want to make sure we have a clear record.  I think he's answering you about his online research about PureCycle, not online research in response to the request.  If I'm wrong, please clarify, but I just want to make sure there's a clear record here.

A.  You're asking me is how did I do research relative to the documents --

Q.  How did you look for documents responsive to the requests outlined in Exhibit 12?

A.  I did not save any documents so, therefore, there was no documents to search.

Q.  You didn't save any hard copy statements from Merrill Lynch?

A.  Only what I provided.

Q.  Did you conduct any search of your computer for documents responsive to these requests?

A.  No.  Because I did not save any documents.

Q.  Do you have any email accounts?

A.  Of course.

Q.  How many email accounts do you have?

A.  Are you referring to personal accounts?

Page 108

Q.  In total.

A.  Two.

Q.  Did you search either of your email accounts for documents responsive to the requests in Exhibit 12?

MS. WEINRIB:  Objection to the form of the question.

A.  Yeah.  I did not because I did not save any documents in my email.

Q.  Do you communicate through text message?

A.  In general?

Q.  Yes.

A.  Sure.

Q.  Do you communicate through any other instant messaging applications?

A.  No.

Q.  Did you conduct any searches of your text messages for any communications responsive to the document request in Exhibit 12?

A.  I did not.

Q.  Have you ever communicated over email regarding PureCycle?

A.  Never.

Q.  Have you ever communicated over text regarding PureCycle or this litigation?

MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
109–112

Page 109

A. Never.

Q. And you stated that you collected documents in response to the request in Exhibit 12; is that right?

MS. WEINRIB: Objection to the form of the question.

A. Yes. I collected the documents that I represented. That's correct.

Q. Turning back to Exhibit 2, which are trade confirmations from your Merrill Lynch account.

A. Yeah.

Q. Are these the only documents that you found that were responsive to the requests in Exhibit 12?

A. That's correct.

Q. Are you aware of the existence of any other documents regarding PureCycle in your possession?

A. I am not.

Q. Are you aware of any documents regarding PureCycle that you did not save regarding PureCycle?

MS. WEINRIB: Objection to the form of the question.

A. No.

Q. Did you authorize any third parties to provide documents to your counsel for production to defendants?

Page 110

A. No.

Q. And that includes Merrill Lynch? You didn't authorize --

A. No.

Q. Did you search your Merrill Lynch account for any account statements regarding PurceCycle Technologies?

A. Yes. That's how I got the statements.

Q. Exhibit 2 are trade confirmations; is that right?

A. Yes.

Q. Does Merrill Lynch send you monthly account statements?

A. No.

Q. Does Merrill Lynch send you quarterly account statements?

A. No.

Q. Do they send an email notification alerting you that account statements are available online?

A. I don't even recall that because it's done through my one single account. No. I don't recall any communication Merrill Lynch specifically on a quarterly or annual statements.

Q. Have you ever gone online to your Merrill Lynch account to look for account statements?

Page 111

A. I occasionally go to Merrill Lynch and check my positions, yes.

Q. Have you seen an option on your online Merrill Lynch account for account statements?

A. I don't recall. I didn't look.

Q. You haven't looked for any account statements on your Merrill Lynch account; is that right?

A. Correct.

Q. Are you aware of any documents supporting your allegations in the second amended complaint that have not been produced to defendants?

MS. WEINRIB: Objection to the form of the question.

You can answer only in so far as you're answering about documents in your possession, independent of counsel sending you things, independent of attorney-client communications or attorney work product.

A. Yeah. The only documents I have is presented here to Merrill Lynch.

Q. Have you seen any documents supporting your allegations in the second amended complaint?

MS. WEINRIB: Objection to the form of the question.

Page 112

I instruct you not to answer unless you can do so without revealing communications with counsel or attorney work product.

Q. You do still need to provide an answer.

MS. WEINRIB: Only if he's able to do so without revealing privileged information which is what I instructed.

A. I can only repeat the only documents I have is Merrill Lynch documents. The rest of the account documents is presented by the litigation.

Q. My question is have you seen any -- is a yes-or-no question.

Have you seen any documents supporting your allegation? I'm not asking the source of the document or who provided them to you but whether or not you've seen them.

MS. WEINRIB: Do you understand the question?

A. I guess as a part of the documents that were presented part of the litigation, whatever was presented, yes, I did see them.

Q. Have you ever communicated with any prior employees of PureCycle?

A. No.

Q. Have you ever communicated with any prior



Case 6:21-cv-00809-PGB-RMN    Document 183-13    Filed 01/23/24    Page 30 of 47
PageID 7953

MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
113–116

Page 113

employees of any of the prior companies? And that's defined as Chromavision Medical Systems, Emerge Interactive, AGCert International, Limited, TyraTech, Incorporated, Petroalgae, and XL TechGroup, Incorporated?

MS. WEINRIB: Objection to the form of the question.

A. No.

Q. Have you ever communicated with any other person regarding PurceCycle Technologies?

MS. WEINRIB: Objection to the form of the question. Any other person aside from --

Q. Aside from counsel.

MS. WEINRIB: And aside from his brother, I'm assuming?

A. With my brother only.

Q. In what manner were those communications with your brother regarding PureCycle?

A. All our communications were done orally.

Q. Were those communications over the phone or in person?

A. Phone.

Q. Have you ever had any communication with any third party referenced in the Hindenberg report?

A. No.

Page 114

Q. Have you seen any documents related to this litigation that are not legal pleadings to support your allegation?

MS. WEINRIB: Objection to the form of the question.

You can answer in so far as you're not revealing attorney-client communications or attorney work product.

A. The only documents I've seen is a part of the litigation process.

Q. Are all of those documents you were referencing documents filed with the court?

MS. WEINRIB: Objection to the form of the question.

A. Based on my knowledge, yes.

MS. RIEGELSBERGER: I'd like to reserve all rights on the privilege issue that was discussed with these questions, and I think we're done with questioning. We'll turn over to Jake, and we'll reserve our right for any further questions.

Jake, if you would like to begin your questioning, I think we're ready.

MR. LOFTUS: I will.

CROSS-EXAMINATION

BY MR. LOFTUS:

Page 115

Q. Mr. Ciecko, can you hear me okay?

A. Yes, I can.

Q. Very good. As indicated, my name is Jake or John Loftus. I'm with DLA Piper, and I represent defendant Byron Roth, and this is my opportunity to ask you some questions.

And why don't we pick up with the confirms reflecting your transactions in PureCycle since those were some of the last documents that were put in front of you.

And initially, let me ask, Mr. Ciecko, I understand that this account is what's referred to as a salary employees savings plan; is that correct?

A. Yes. It's part of the overall savings plan. That's correct.

Q. And is it what might be considered part of a retirement account?

A. It's part of the 401(k) account.

Q. Is it funded with pretax money?

A. It is pretax money. That's correct. Pretax money. It's both. Depends my contributions and I contributed both ways.

Q. And do you direct all of the activity in this account?

A. One hundred percent.

Page 116

Q. So you, for example, don't have some type of mutual fund with a target date geared towards your retirement?

MS. WEINRIB: Objection to the form of the question. You can answer.

A. That's correct. I don't have the fund allocated on the maturity of my retirement date and so forth. Yeah, that's correct.

Q. And how active is -- strike that.

How active was this account in 2021? Meaning, can you estimate how many purchase transactions you made in 2021?

A. So just to be clear how the account works, so this is my 401 account, which it resides, obviously, within my 401(k) account within my company. This transaction that happened is the fund that Merrill Lynch allows me to transfer from my 401(k) to direct invest. When becomes direct invest, is then I have the opportunity to take those funds and purchase any stocks associated at my disclosure. So the direct account is what this is through Merrill Lynch is how I controlled and purchase the stocks. So now with that understanding, is how actively I buy stocks relative to my direct investment. In 2021 this was the only account, only



Page 117

stock purchase that I did.

Q.   Right.  What was the investment objective for the self-direct portion of your account at Merrill Lynch?

MS. WEINRIB:  Objection to the form of the question.

A.   Yeah.  Just like any investment.  You invest money in the market in a position to believe you are going to get some gains out of it.

Q.   Well, some people, for example, Mr. Ciecko, purchase a stock for a dividend or perhaps a quick capital increase or perhaps to hold long term for growth.  And you characterized how you viewed your purchase of PCT with those points in mind.

MS. WEINRIB:  Objection to the form of the question.

A.   Yeah.  I think I understand what you're going after now.  Yes.  I definitely bought the stock PCT in mind for the long-term growth.

Q.   And is that because you understood it would take some time for PureCycle to generate revenue from its business?

A.   My belief was investing in PureCycle is it was based on the information that I was able to research it.  That is has the specific patent to be

Page 118

able to manufacture the recycled plastics which made it in the position in the current environment to be very extremely competitive to the older traditional processes.  Therefore, it gave me position to believe that PCT has a growth potential that is worth it for me to invest.

Q.   Did you understand, when you made your purchases in March 2021, that PureCycle had no revenue?

A.   I understood they had no revenue.  That's correct.

Q.   Did you understand that once it hopefully achieved revenue, that there would be an even longer path to profitability?

MS. WEINRIB:  Objection to the form of the question.

A.   I referenced only the financial information that was disclosed in the press release and IPO about the profitability.

Q.   Let's talk about that for a moment.  I think you said you referenced the financial projections and the press release and then the IPO.

So is it your recollection that the press release from November 2020, had projections of future revenue?

Page 119

MS. WEINRIB:  Objection to the form of the question.  Mischaracterizes testimony.

A.   The best of my recollection is when I did the research prior of purchasing, I believe the information came from the press release.

Q.   Now, you used the term IPO several times throughout your testimony.  Just to make sure we're on the same page, that's a reference to initial public offering; correct?

A.   That's correct.  Referencing March 18, I think, of 2021.

Q.   And you've been investing for some 25 years; is that correct, Mr. Ciecko?

A.   That's correct.

Q.   Had you ever participated in the IPO market?

MS. WEINRIB:  Objection to the form of the question.

A.   No.

Q.   Well, let me hake it clear, Mr. Ciecko.  Let me be a bit clearer.

Have you ever participated in a stock as part of an initial public offering?

MS. WEINRIB:  Objection to the form of the question.

A.   No.

Page 120

Q.   When your brother presented PureCycle to you, did you understand that you'd be participating in an IPO?

MS. WEINRIB:  Objection to the form of the question.

A.   Yeah.  Just to clarify, I wasn't participating IPO.  I purchased stocks after the IPO.

Q.   When was the IPO with PureCycle?

A.   I believe it was on March 16, and then March 18 the public legal traded of the first PCT position of PCT in NASDAQ.

Q.   What happened on March -- first of all, we're talking March 16, 2021; correct?

A.   Correct.

Q.   What happened on March 16, 2021, in relation to the IPO?

A.   Well, I believe the merger happened between PureCycle and Roth acquisitions.

Q.   And that merger, in your mind, amounted to an IPO?

MS. WEINRIB:  Objection to the form of the question no.

A.   No.  I mean, I don't know if the merger was resulting of IPO.  I think I read before the March 16 somewhere in November 20 press release their intention



Page 121

to merge. So this was no surprise to me on March 16 of the actions of the Roth acquisitions and PureCycle merger.

Q. Did the merger that you testified to here require a vote of shareholders for approval?

A. You asking me?

Q. I am asking you.

A. The best to my knowledge, yes.

Q. Were you eligible to vote on the merger plan?

MS. WEINRIB: Objection to the form of the question. Asked and answered earlier, but you can go ahead.

A. No. Since I did not own any stock, I was not eligible.

Q. Did your brother tell you this was an IPO?

MS. WEINRIB: Objection to the form of the question.

A. He told me about the formation of the new company and listing on the NASDAQ, and that was the initial conversation I had with my brother.

Q. Did the words -- or rather the term IPO, was that a part of your discussion with your brother when he first broached the subject of PureCycle with you?

MS. WEINRIB: Objection to the form of

Page 122

the question. Answer if you recall.

A. Yeah. I don't recall IPO. The initial conversations we had about the PCT was definitely a patent between Procter & Gamble and the PCT. That was the point of initial discussions.

Q. I understand. Did your brother tell you that he expected that given that this was a new company that would be trading on the NASDAQ, he expected a quick increase in the price of the stock?

MS. WEINRIB: Objection to the form of the question.

A. No. He did not allude it to me at that time or anytime about potential of performance of PCT.

Q. Does your brother often recommend companies to you?

A. We are always discussing throughout the year different strategies that we do, both sides, myself and him. And sometimes I take his advice, sometimes I don't, but we regularly talk throughout the year relative to investments.

Q. What strategies, in general, do you and your brother discuss?

A. Yeah. I don't typically discuss strategies with him. He does his own thing. I do my own thing with the accounts. What we talk about is specific

Page 123

actions or items that are interest to both of us, and then that's what we talk about. But we don't talk about the overall strategy.

Q. So I note, Mr. Ciecko, your first purchase on March 25, 2021. Do you know if your brother made a purchase that same day?

A. No clue. We did not communicate ever about transactions how much I made and how much he made.

Q. Does your brother ever discuss the technical research that he does with respect to his transactions?

MS. WEINRIB: Objection to the form of the question.

A. He does not. He communicated to me that he found this through his research. He told me to do my own research, and that's exactly what I did.

Q. So let's focus on that for a moment. Well, we'll come back to that. Let's first go back to these confirms.

On the first page of this Exhibit 2, there's some information that's been removed. And I'm not suggesting that in a pejorative fashion, but I'd like to make sure I understand what's been redacted, as the lawyers say.

Do you see up in the right-hand corner

Page 124

there's an account number and then there's a blank to the right of it?

A. Yes.

Q. And then if you'll look in the lower left-hand corner, you'll likewise see a reference to an account number and there's a blank next to that. Do you see that?

A. Yes.

Q. Has any other information been whited-out on this document, to your knowledge?

A. Tell you the truth, is I'm not even know why this is blank. I didn't even know this did.

Q. What kind of order did you place to purchase PureCycle? Was it just a market order? A limit order? Any other type of order?

A. Yeah. It was just a normal market order. Typically, because Merrill Lynch because I work, I don't trade. So at the end of the day, I decide to buy the stock, and it does the order in the beginning of the transaction.

Q. Do you place it online? Do you call a broker? How do you place an order?

A. Online.

Q. So with respect to this first page of Exhibit 2, did you place an order for the purchase of



Page 125

550 shares?

A. Yes.

Q. And was there any significance to 550 as opposed to 500 versus, say, 600?

A. No. It was just based solely on my funds available.

Q. All right. Let's go down now a couple of pages to the next confirm reflecting a transaction on March 26, 2021. Do you see that?

A. Yes.

Q. And this order's for 590 shares. And what's the significance of the 590?

A. Same thing. Funds. All the funds that I moved from my 401(k) accounts to self-direct did not come in on the same day. Therefore, you see two different transactions because the funds became available within those two dates.

Q. I understand. You have to make a request for a transfer of funds from your 401(k) to this SESP account; correct?

A. To the self-direct account.

Q. The self-direct account. Fair enough.

A. That's correct.

Q. And let's now go down a couple other pages to what's marked with I think it's Ciecko 5. We now

Page 126

see a confirm for 38 shares; correct?

A. Correct.

Q. What time of day did you put this order in?

A. I put it on the end of May 5 for this order with the buy of 5/6 in the morning.

Q. So you are able to place an order after the close for execution on the open?

A. Correct. I can say buy it on the open market when the market opens up.

Q. So this order would have gone off first thing in the morning?

A. Correct.

Q. And do you receive any type of notification on execution? Meaning, contemporaneous notification.

A. Yeah. I believe is once the settle day, which is the 5/10 on this document gets completed, I do get notification from Merrill Lynch saying that the transaction has been completed or executed.

Q. so you place the order on May 5, which I'll represent is a Wednesday, and it was executed on May 6; correct?

A. Correct. The trade date was on May 6.

Q. But do you not receive some type of notice of execution on the day it's convening, in this case May 6?

Page 127

MS. WEINRIB: Objection to the form of the question.

A. No. Unfortunately, I don't get the notification until settle date which comes like two or three days after that the whole transaction has been completed.

Q. And what time of day was it that you noticed that there had been a decrease in the price of PureCycle?

A. Yeah. So basically, since I work all day long, I don't have much time to check stock markets, so I just take a quick look on my phone just for the tick mark just to see. I don't know exactly what time of the day. I just know during the day I noticed that PCT was significantly down on May 6.

Q. Did you do anything to try and cancel this buy order?

A. No.

Q. So help me out again, then. Mr. Ciecko, roughly, what time of day if you can estimate --

A. We lost you if you're talking.

Q. Yeah. We may have broken up.

To the best of your ability, did you notice the decline in the price of PureCycle?

A. Okay. We lost the middle portion. But I

Page 128

think if I repeat the question just to make sure I understand. If you're asking when did I notice PurceCycle Technologies start going down during May 6; correct?

Q. Yes.

A. My best answer is I really don't recall because during the workday, I checked it at some time. I don't know what time but during the market hours when I initially noticed that the PCT was coming down. So I don't know if it was 12, 1, whatever. I know it was afternoon for sure.

Q. -- 7, please.

THE WITNESS: Did you catch that?

MS. WEINRIB: No. He froze again.

MR. LOFTUS: Let's go off the record for a moment.

THE VIDEOGRAPHER: Sure. We're going off the record. The time is 12:29.

THE VIDEOGRAPHER: We're back on the record. The time is 12:30.

BY MR. LOFTUS:

Q. Mr. Ciecko, I was attempting to direct you to Ciecko 7, the Bate stamp in the document as part of Exhibit 2. Are you with me?

A. Yes.



MARIUSZ CIECKO                                    December 12, 2023
William C. Theodore vs PureCycle Technologies              129–132

Page 129

Q.  And this reflects a sale on May 7, 2021; correct?

A.  Correct.

Q.  Did you have any discussion with your brother at this time May 7 about this transaction?

A.  Yes.  Initial discussion with my brother was on the 5/6 after the decline of the stock.  I remember calling him that evening before I went to bed asking him did he see the performance of PCT on the May 6 after some kind of report was published of that knowledge at the time frame.

I did not know about the details of Hindenburg report.  And I asked him did he see.  At that time frame, I don't think he even saw it, so he said, "Let me check into it."  So he started reading it, and our biggest question was validity of the report itself.  What is this thing.

So we went to bed.  Robert did his own investigation, if you want to call it, on the 7.  We had further discussions that evening or afternoon on the 7.  What he confirmed to me orally is that that is the real report, that is legit company that published the report, and claims against obviously the PCT which now obviously reflected negatively on the PCT stock.

At that time frame, my position was roughly

Page 130

50 percent loss in PCT from my initial buy, and I believe I was the first one who suggested this I'm done.  I'm selling it.  I don't want this to lose the rest of my money.  So I said I'm selling it and that's exactly what I did.  I believe he followed the path on his own, but this was my decision to sell that day, so I executed.

Q.  What time of day was the discussion with your brother on May 7?

A.  I want to say it's after work as well.

Q.  What's after work?  Give us a time.

A.  Yeah.  I don't recall.  That's my issue.  I know he called me in the morning validating the report, that it's a real report.  I remember that call very vividly.  And at that time frame, I had to make a decision in terms of what to do and in terms of when to push the button, actually, on the transaction.  I believe I made the decision on the 7 myself and I pushed the button.

And later on at that time, I did talk to my brother again that evening telling him about my decision relative to selling.  But yeah, I made the decision probably a lot quicker.

Q.  Well, I'm trying to understand, Mr. Ciecko.  If you spoke to your brother after work, do you

Page 131

typically work till 5 p.m.?

A.  In the Eastern Standard Time zone, yes.

Q.  Were you in the Eastern Standard Time zone in --

A.  Correct.

Q.  Okay.  And so the market closes at what time?  4 p.m.?

A.  4 p.m., I believe, yep.

Q.  And so I'm just trying to understand if you spoke to your brother and then decided to sell -- I'm trying to get the chronology straight on that -- the market wouldn't have been closed?  No?

MS. WEINRIB:  Objection to the form of the question.

A.  Yeah.  By my best recollection was I know he called me in the morning with confirmation that the report was legit report, which that was our question on the May 6.  That occurred in the morning of the May 7.  By the end of the day, I made the decision.  I don't know exactly the period when was it when he called me.  But during the cycle of that day, I made a decision and approve to sell the order that day.

Q.  Do you have any records, Mr. Ciecko, that reflect the time of entry for your -- for the buy and the sells?

Page 132

MS. WEINRIB:  Objection to the form of the question.

A.  I do not.  I do not have the record of the entry buy or sell.  The only record I have is what's, obviously, I provided already is the trade date happened on the May 7.

Q.  So let's shift our focus a bit here, Mr. Ciecko.  Earlier, there was reference to the SEC.  You understand, I take it, that that's a reference to the securities and exchange commission; correct?

A.  That's my understanding, correct.

Q.  Are you aware that the SEC maintains a website of documents for the public to review on publicly traded companies?

A.  I was not aware.

Q.  You've never heard of something called SEC.edgar, E-D-G-A-R?

A.  No.

Q.  So I think it's fair to say, Mr. Ciecko, that you've never been on an SEC-sponsored website to review public filings for companies?

MS. WEINRIB:  Objection to the form of the question.

A.  True.  Correct.



MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
133–136

Page 133

Q. And in so far as PureCycle goes, did you ever review any document that you understood to be a publicly filed disclosure?

MS. WEINRIB: Objection to the form of the question. At any point in time, or are you specifying a specific time frame?

MR. LOFTUS: Fair enough.

Q. At any point before March 31, 2021.

A. So I might have. I don't know. Based on my week and a half search prior to purchasing the PCT stock, as I mentioned, I did online search. Did I trip over some document that was published somewhere. I cannot comment on it. But based on the recollections that you just indicated to me, specifically SEC documents, I do not recall.

Q. Well, let's do this, Mr. Ciecko. You were shown earlier documents that were marked Exhibits 8, 9, 10, and 11. So let's pull out 8.

A. Yep.

Q. And do you recognize, at least from the disclosure there, as a Schedule 14(a)?

A. Yeah. I see the document in here. If you're asking me am I aware of this document and did I ever read this document, the answer's no.

Q. I understand. And my question is a little

Page 134

different, which is this: Looking at the format of that document, before March 31, 2021, have you reviewed any document that looked in appearance as Exhibit 8 in reference to PureCycle?

MS. WEINRIB: Objection to the form of the question.

A. I would have to look through all the pages to adequately answer this question, but.

Q. But it doesn't look familiar to you; correct?

A. No.

Q. So I'm trying to understand, then, exactly what you saw in your research. We know you saw the press release; correct?

A. Correct.

Q. Aside from the press release, is there any other specific document you recall reviewing before March 31, 2021?

MS. WEINRIB: Objection to the form of the question. You can answer.

A. No. I don't recall any particular document. I did the broad online search through as many documents as I was able to find referencing PCT, and that's the research I based on, and I don't recall any specific document that I focused on.

Page 135

Q. Okay. Did you download any of these documents?

A. I did not.

Q. You were asked previously about the basis for your claims against Byron Roth. Do you recall that testimony?

A. You mean today?

Q. Yeah.

A. Yeah. I think we talked about two motions against Byron Roth and PureCycle.

Q. I understand. I'm focusing on Byron Roth for the moment.

A. Okay.

Q. And I'd just like to ask you generally, Mr. Ciecko, whether you have anything to add with respect to why you named Byron Roth in this litigation?

MS. WEINRIB: Objection to the form of the question.

A. I mean, Byron Roth was part of the merger between the PureCycle and Byron Roth acquisitions and Roth Capital, which that means he represented the voice in a previous communication prior to the merger in all the documentation that I read in basis my decision to buy PCT.

Page 136

Q. And what in particular did Byron Roth say or do that you believes gives you a right to some type of recovery against him?

MS. WEINRIB: Objection to the form of the question.

A. I'll reference the information that I believe I understood at the time frame of my research, which that Byron Roth communicated particularly about the PCT technology via the Procter & Gamble on recycling capability of raw plastic material. That's what sticks in my mind.

Q. And is it your testimony that Mr. Roth made misstatements about the PureCycle technology?

A. Yes. My understanding is that he touted the technology is production ready and it's only the production available for PCT.

Q. When you say that he indicated the technology was production ready, what do you mean by that?

A. Meaning, it has been validated through some kind of testing either through Procter & Gamble or PCT, which I believe PCT claims that they have finalized the refinement of that patent technology. And my understanding through all my research is that Byron Roth has communicated that multiple times when I



Page 137

seen in is that technology is revolutionary and first in industry relative to that process of the recycled plastic material.

Q.  What is your status of the patent at issue?  Was it approved?  Has it been invalidated?  Has it been challenged?  Has it been changed?  Do you any understanding?

MS. WEINRIB:  Objection to the form of the question.

A.  My understanding of the patent is that PCT obtained it through a license agreement for Procter & Gamble and optimized the process for production.

Q.  Right.  But has there been some type of challenge to the patent as somehow being not legitimate or some type of regurgitation of prior art or something that would invalidate the patent?

MS. WEINRIB:  Objection to the form of the question.

A.  I mean, I can only read what I read from the online basis.  I am not the developer of the patent or the technology of this process, so I'm not inclined to comment on the technology since I'm not knowing what is the basis or even characteristics of the patent itself in terms of the processing.

The only thing I can state is what I read is

Page 138

that the technology is viable and is production ready and PCT is going to put it into production.  That's what I got.

Q.  Do you know if there were any risk disclosures about whether this technology could be constructed such that it would exist on a commercial scale?

MS. WEINRIB:  Objection to the form of the question.

A.  No.  I was not aware of any risks.  Quite complimentary, when I tried to research this, I find out is that PCT has a very high confidence that we're going to go to a commercial scale of this technology.

Q.  So is that to say, Mr. Ciecko, that you're not aware of any disclosures where there would be a risk about transitioning this to commercial scale?

MS. WEINRIB:  Objection to the form of the question.  Asked and answered.

A.  Yeah.  I am not aware of any risks that I read.

Q.  Would it be important to you if you knew that there were such risks disclosed about the ability transition to commercial scale?  The availability of feedstock and the quality of feedstock for recycling purposes, et cetera?

Page 139

Would that be important to you to know whether or not that was disclosed to investors?

MS. WEINRIB:  Objection to the form of the question.

A.  Absolutely.  I would definitely like to know the high risks associated with transitioning to commercial scale.

Q.  To your knowledge, did Mr. Roth, Byron Roth ever serve in any type of position with PurceCycle Technologies?

MS. WEINRIB:  Objection to the form of the question.  You can answer.

A.  Not to my knowledge.

Q.  You mentioned Roth Capital.  What role do you understand Roth Capital to play, if any, in connection with PureCycle?

A.  Only I believe -- my understanding is just Roth Capital.  That Roth Capital and Byron Roth also owns Roth Capital.  That's the only connection.

Q.  Have you heard of a company called Roth CH Acquisition I Co.?

A.  I believe, due to my research of it, that is the company that merged with PureCycle.

Q.  And that's the research you conducted in connection with your initial purchases in March 2021;

Page 140

correct?

A.  Correct.

Q.  What is a SPAC?  Do you know what that acronym stands for?  The letters?

MS. WEINRIB:  Objection to the form of the question.  This was covered this morning.

A.  Yeah.  I was not aware of SPAC at that time frame.  Actually, just recently I learned what SPAC is.

Q.  You said just recently.  How recently?

A.  Part of this litigation process when I actually first I read what SPAC is.

Q.  Was one of these companies we've been discussing the SPAC Roth Capital, Roth CH Acquisition I Co.?  What's your understanding?

MS. WEINRIB:  Objection to the form of the question.

A.  Based on my research, Byron Roth was the SPAC, I believe, as it gotten initiated or formed in 2019.

Q.  Did the SPAC have any commercial operations?

MS. WEINRIB:  Objection to the form of the question.  Time frame.

A.  To my knowledge, no.

Q.  Mr. Ciecko, I'd like to return, if I may, to



Page 141

the press release that was marked as an exhibit.

MS. RIEGELSBERGER: Exhibit 7.

MR. LOFTUS: Can you help me out?

MS. RIEGELSBERGER: It's Exhibit 7, Jake, Tab 37.

Q. Are you with me, Mr. Ciecko?

A. Yes.

Q. Can you do me a favor? Can you just hold that up to the camera for a moment so I can see it?

A. (Witness complies.)

Q. Perfect. Thank you. I just wanted to make sure I'm staring at the right version.

So Mr. Ciecko, do I understand that you reviewed this press release before your first purchase on March 25, 2021?

A. Best of my knowledge, yes.

Q. When you say best of your knowledge, I take it you can't be certain as you sit here two years later?

A. Correct. Because I did the online search, so I clicked on as many documents as I reviewed at that time frame. As I mentioned before, I did not download anything, so I presume it would be I read all this information online.

Q. By the way, Mr. Ciecko, have you heard of a

Page 142

company called Leidos, L-E-I-D-O-S?

A. No.

Q. If I told you that's a global engineering company, would that do anything to jog some type of recollection for you?

A. No. Still don't recall.

Q. Do you know whether any engineering company played any role in certifying PureCycle's technology process?

MS. WEINRIB: Objection to the form of the question.

A. I am not aware.

Q. Would that be important to you to know that a world-recognized engineering firm had certified part of PureCycle's recycling process?

MS. WEINRIB: Objection to the form of the question.

A. I would like to see a peer review done by PureCycle process from the environmental industry or cross-functional team upon the merger, which I don't think I was able to find anywhere.

Q. So is that to say, Mr. Ciecko, that you searched for a peer-review study before you made your first purchase?

MS. WEINRIB: Objection to the form of

Page 143

the question.

A. Correct.

Q. And you were unable to find one; correct?

A. Correct.

Q. Did that cause you any concern at the time?

A. At that time frame, I believe that PureCycle expertise and the communication in what they're communicating to the shareholders.

Q. In this Exhibit 7 the press release, let me ask you to go down, I don't know, five pages to what has a bold-faced heading on lower third of the page that reads "Forward-Looking Statement."

Do you see that?

A. Okay. I see the paragraph, yes.

Q. And do you recognize this as a disclaimer about some of the information and projections that are set forth in this press release?

MS. WEINRIB: Objection to the form of the question.

A. Yes. I believe a part of that information is what I read relative to the forward looking statements.

Q. And do you understand from reviewing the forward-looking statements disclosure, that the business of PureCycle involved a number of risks,

Page 144

uncertainties, and other assumptions that may cause actual results or performance to be materially different from those expressed or implied by the forward-looking statements?

MS. WEINRIB: Objection to the form of the question.

A. Yes. I am very familiar with the risks potentially associated with forward-looking statements. However, my decision was also based on the facts that was communicated that we have the technology available, ready for production, look under industrialization aggressiveness of PCT relative to industrializing this give me assurance also is that PCT has a high confidence of the process by industrializing six plants within the two years in the revenue of $800 million. That's what gave me the confidence.

Q. Fair enough, Mr. Ciecko. But high confidence doesn't equate to a guarantee, does it?

MS. WEINRIB: Objection to the form of the question.

Q. Yes or no, Mr. Ciecko?

MS. WEINRIB: Objection to the form of the question.

A. Of course, it doesn't give you guarantee.



Page 145

Q.  All right.  In this press release, let's look down to the second page, and I'd like you to look under the bold-face heading that reads "About PureCycle."

Do you see that?

A.  Okay.  I see the heading.

Q.  Yeah.  And in that first paragraph, it sates that "PurceCycle Technologies, LLC, holds the exclusive global license to commercialize the only patented sole-based purification recycled technology for restoring waste propylene into virgin-like resin."

Do you see that?

A.  Yes.

Q.  Is that something you reviewed at the time?

A.  Absolutely.

Q.  Is there anything that you, looking back on it now, that was false about that statement?

MS. WEINRIB:  Objection to the form of the question.  The complaint speaks for itself.

A.  Yeah.  Basically, I was looking for the statement to be true.  And by the communication that I found through PCT is they communicated that the process is robust and they're ready for production, so.

Q.  Well, just a moment, Mr. Ciecko.  When you

Page 146

say "ready for production," was any plant up and operational as of March 2021?

A.  No.  The first plant was, I believe, in 2022.  But I also found out is that the Procter & Gamble research this patent and does this technology for the past eight years, and the PCT additional five years touting $100 million of RND spent to industrialize that patent.

So when that communication came out, it came out with very high confidence the patent has been refined and ready for production.

Q.  Mr. Ciecko, you've been involved in the automotive business for, essentially, your entire professional career; correct?

A.  Correct.

Q.  And is it fair to say that in that business, there are various starts and stops with respect to new product?

MS. WEINRIB:  Objection to the form of the question.

A.  Product, yes.

Q.  And, in fact, hundreds of millions goes into RND with respect to the automotive business; correct?

A.  Correct.

Q.  And not all of it ends up with a successful

Page 147

marketable product at the end of the day; correct?

A.  Correct.  But I can add to that that we go through the process of innovation advanced engineering.  We validate and, if you want to say, certify the technology when it's ready for production.

So it doesn't happen by itself.  It goes through the innovation and advanced technology.  It gets buy-off by the, typically, CEO or technical chief officer.  And at that time frame, only at that time frame when we believe the technology is mature enough for production, it gets flipped over to production execution team.

Now, what you're referring is that even at that time frame, as we go through the maturity, yes, there are development risks associated with production.  But not relevant to the validity of the technology itself.  It's just to industrialization period.

Q.  So let me make sure I understand, Mr. Ciecko.  Is it your position in this litigation that the technology is entirely defective and will not result in recycled product?

MS. WEINRIB:  Objection to the form of the question.  Mischaracterizes his testimony.

A.  I'm not claiming that the process is

Page 148

defective.  I'm not expert of the process either.  The only thing I'm talking about is the level of industrialization of the technology at the time of the March 21 when it was disclosed as a mature process.

Q.  When you say "as a mature process," again you knew the Ironton facility was under construction; correct?

A.  I knew there was a plant for the first plant in 2022 that's correct.

Q.  By the way, did Hindenberg, to your knowledge, have access to the PureCycle technology?

MS. WEINRIB:  Objection to the form of the question.

A.  Yeah.  I have no clue how Hindenburg report collected the data.  The only thing I can reference is the data that he presented to everybody.

Q.  And you understand that was an opinion published by Hindenberg which had absolutely no access to the technology in question; correct?

MS. WEINRIB:  Objection to the form of the question.

A.  Yeah.  I believe it was opinion but also that opinion was based on the research date of facts.  So you can have opinion facts together, and I believe that's what the report did.  They gathered the



Page 149

facts and then gathered their opinion relative to those facts.

Q. Did Hindenburg visit the Ironton facility, if you know?

MS. WEINRIB: Objection to the form of the question.

A. Yeah, I'm not aware of it.

Q. Did Hindenberg interview any PureCycle employees?

MS. WEINRIB: Objection to the form of the question.

A. I am not aware of it.

Q. Did Hindenburg interview any ex-PureCycle employees?

MS. WEINRIB: Objection to the form of the question.

A. I am not aware of it.

Q. Are you familiar with a gentleman by the name of John Layman, L-A-Y-M-A-N?

A. I don't recall.

Q. In your effort to conduct online research, did you find any Q&A with the individual who actually invented the technology?

MS. WEINRIB: Objection to the form of the question.

Page 150

A. Yeah. I believe the only remark I remember reading it, it was from the Procter & Gamble, and maybe that's the gentleman you're referring. I don't recall his name. Procter & Gamble who developed the technology itself. And I believe the remark I remember he was talking about is the industrialization challenges associated with that technology based on the feedstocks being introduced to in terms of contamination level.

Q. And was that information that you reviewed before you first purchased it?

A. No. That information actually found out as part of the litigation process.

Q. Do you understand that that was information available for your review that was published before your first purchase?

MS. WEINRIB: Objection to the form of the question.

A. Based on information as maybe it was available, but I just did not see it.

Q. How much time in total did you spend with your online research before making your first purchase?

A. Yeah. I would say, roughly, it was basically a week or a week and a half. I don't

Page 151

remember, recall. Basically, from the time that Robert kind of told me to look into it. By the time the funds gets transferred from my account, I kind of did this in a parallel path. Study and transfer the funds, not knowing that I'm going to buy in that time frame. So I spent over a week, week-plus researching online.

Q. Perhaps my question wasn't as articulate as it could have been.

Can you give us a break down by hours? Did you spend two hours? Ten hours? Somewhere in between? More?

MS. WEINRIB: Objection to the form of the question. You can answer if you're able to.

A. My best recollection is most of my research was done on weekends. Once again I'm working all day so I typically don't spend much time on the weekdays. So the weekends, I spent two weekends looking through this information. On the average of every day, I'll give you a range. I'm not saying this occurred as much as I remember, but approximately between Saturday and Sunday, I put probably 4 hours, 8 hours. I would say around 8 to 10 hours total between the two weekends.

Q. Let's mark what's in the tabs as Exhibit --

Page 152

rather Tab 58, and it's your amended responses and objections to defendant Byron Roth's first set of interrogatories. Let's mark that as Exhibit 12.

THE COURT REPORTER: I believe next in line, Counsel, is 13.

(Whereupon, Exhibit 13 was marked for identification.)

Q. Are you with me, Mr. Ciecko?

A. I am. I'm just getting the document in my hands.

Q. I'm sorry. I didn't mean to jump the gun there.

A. Yep. I have it in my hand now.

Q. If you go down to the signature page of Page 21, you'll see a date of December 4, 2023. Do you see that?

A. Yes.

Q. And do you recognize this as amended responses and objections to Byron Roth's first set of interrogatories?

A. Yes.

Q. Did you review this before it was provided to my office?

A. Yes, I did.

Q. Do you recall that you signed the



Page 153

verification attesting to the correctness of these responses to the best of your ability?

A. I believe I did.

Q. And that was just in the past several days; correct?

A. Correct. That was just very recently I think, right?

Q. Yes.

A. Yep.

Q. Let me ask you to turn down to Page 10, please.

A. Okay.

Q. And I'd like you to focus on Interrogatory Number 10. And it reads "Identify and describe all facts you knew about PureCycle's polypropylene recycling technology by the time of the merger."

Now, you understand from your prior testimony that the merger was on March 16, 2021; correct?

A. Correct.

Q. And if we look at the response, there's some objections asserted by your counsel. It goes on to Page 11, and it reads in terms of the response "Subject to and without waiving any of the foregoing objections, plaintiff responds that the facts he knew

Page 154

about PureCycle's polypropylene recycling technology by the time of the merger came from PureCycle's website, PureCycle, and ROCH press releases, proxy statements, and other publicly available information originating from PureCycle and/or ROCH."

Now, I'll represent to you, Mr. Ciecko -- let me just ask the question roughly.

Do you understand that ROCH is a reference to the SPAC Roth CH Acquisition?

A. That's my understanding. That's what I understood.

Q. That's what you understood in the context as to these interrogatories; correct?

A. Correct.

Q. So taking these one at a time, what did you review on PureCycle's website?

A. So basically, is prior to purchasing my PCT, right.

Q. Okay. Go ahead.

A. I basically did my general search, obviously started with PCT and referencing any information to what showed up based on the research of the PCT, right. And from there, I went to multiple different sites and documents. So --

Q. Sorry. Go ahead.

Page 155

A. So I'm just saying -- I'm just trying to answer your question is what specifically I read on the PCT website. I don't recall, specifically.

Q. You said PureCycle and ROCH press releases purely. How many press releases did you review?

A. Once again, I believe what I saw was the two press releases that I've seen.

Q. What's the other one?

A. The November 1, right, and also I believe there was another one published in the early of 2021.

Q. And what did the press release say in early 2021?

MS. WEINRIB: Objection to the form of the question. If you recall, you can answer.

A. Once again is I don't -- I can't -- because it's not like I printed that specific document. It was part of my overall search that I was searching on an overall basis, so I don't recall specifically what one document communicated.

Q. Do you know whether it was a press release that was actually after the merger was announced that you're thinking of?

A. Well, since I did my research after the merger was announced, I assume that any documentation I found was prior and during and after the merger.

Page 156

Q. Well, I guess my question is a little different. You referred to two press releases: One from November 2020, which we've reviewed, and now you seem to be suggesting review of a second one in early 2021. Am I correct?

A. I think your question is was I aware of the press release and I said yes. And I said reviewing specifically the press release, I don't remember. I just recall that there was an additional press release early of 2021.

Q. In fairness, early 2021 I guess could extend to March. Do you know when the second press release you're mentioning in your testimony announced the merger between ROCH and PureCycle?

A. The best of my knowledge, I believe the November press release mentioned the intent for the merger between Roth acquisitions and PureCycle.

Q. Let me try it again. Do you know whether the other press release mentioned a completion of the merger?

A. I don't recall offhand.

Q. Let's go back to our interrogatory response here, Number 10, Page 11. It references proxy statements. What proxy statements did you review before your first purchase?



Page 157

A. Yeah. I did not review the proxy statements.

Q. Let's go down to Page 17, Interrogatory Number 21. Are you with me?

A. Yes.

Q. This interrogatory asks in so many words whether at any time before May 5, 2021, you reviewed the November 16, 2020 press release. Do you see that?

A. Yes, I see that.

Q. All right. Let's go to Page 18 and let's go to your response. And if we look first at the top of the page, we can confirm -- and you've certainly done so -- that the press release is dated November 16, 2020. That's the date that the release was issued; right?

A. Correct.

Q. If we go down to the response after the objections, it reads "Subject to and without waiving the foregoing objections, plaintiff responds that he reviewed all PureCycle press releases and ROCH press releases regarding PureCycle at or around the time of issuance."

Do you see that?

A. Yes.

Q. And that's not correct, is it?

Page 158

A. No. My statement is and I've been recalling that the first review of my press releases was roughly the week before my first purchase which was the March 25. That's where my awareness of the press releases were identified to me.

Q. And Mr. Ciecko, let me just ask. I mean, are you really monitoring these responses and the pleadings that carefully, or are you just trusting your counsel to handle all of this on your behalf?

MS. WEINRIB: Objection to the form of the question.

A. Let's put it this way: I do my best ability to review the documents for accuracy and, yes, I do review them on a regular basis and give my opinions when necessary.

Q. But you certainly didn't catch this particular interrogatory response at the time; correct?

MS. WEINRIB: Objection to the form of the question.

A. The way it was worded, that's correct, I did not catch it. That's the meaning of it.

Q. All right. Now, Mr. Ciecko, do you understand that you're -- the operative complaint, the consolidated second amended class action complaint has

Page 159

causes of action for 10(b) and 14(a). And there's two other ones, too, on the control, but the 10(b) and 14(a); is that your understanding?

A. Correct.

Q. What, to your understanding, is the difference, if any, between those two causes of action?

A. Yeah. I believe the first one refers just to as a misleading information referenced to the information that was published from PureCycle's perspective, and the second one is more pertaining to the proxy of the misleading information.

Q. By the way, Mr. Ciecko, did you review your brother's deposition transcript?

A. I'm trying to understand the question. You mean the same process I'm going through right now? Did I review what my brother did?

MS. WEINRIB: No. He's asking if you read the transcript of his deposition.

Q. So Mr. Ciecko, you understand that your testimony will be presented in a booklet form or either hard copy or electronically that will memorialize all counsels' questions, objections, and your responses. Do you understand that?

A. Sure.

Page 160

Q. And my question to you is whether you reviewed that transcript from your brother's testimony last week?

A. No.

Q. And in your discussion with your brother, did he talk to you at all about this issue with the proxy solicitation claim?

MS. WEINRIB: Objection to the form of the question.

Q. You can only answer in so far as you had communication with Robert that does not involve counsel.

A. Yeah. I mean, basically the quick answer is, no, I did not have any further discussion with Robert relative to the proxy.

Q. And do you understand that the 14(a) claim that relates to the proxy is on behalf of those who owned the stock either on November 16, 2020, or February 12, 2021?

MS. WEINRIB: Objection to the form of the question. This was already covered by your colleague this morning.

But you can go ahead and answer.

A. Yes. I understand the time period for what you just referenced. That's correct.



Case 6:21-cv-00809-PGB-RMN   Document 183-13   Filed 01/23/24   Page 42 of 47
PageID 7965

MARIUSZ CIECKO
William C. Theodore vs PureCycle Technologies

December 12, 2023
161–164

Page 161

Q.  All right.  And you will agree, Mr. Ciecko, that you weren't solicited by any of these defendants to vote one way or the other in connection with the merger agreement; correct?

MS. WEINRIB:  Objection to the form of the question.  You can answer.

A.  Correct.

Q.  So you will agree, in that respect, your claim is not typical of the other plaintiffs you seek to represent in this action; correct?

MS. WEINRIB:  Objection to the form of the question.  You're seeking a legal conclusion from a non-lawyer.

Q.  You can answer, Mr. Ciecko.

A.  Yeah.  Like I say, I don't know legally how to answer the question.

Q.  I don't want you to answer it legally.  So let's help more, if you will.  Let's go back to Exhibit 5, the motion for class certification.  Please pull that out, Mr. Ciecko.

A.  Okay.

Q.  You recognize this as the lead plaintiffs' motion for class certification; correct?

A.  Correct.

Q.  And I take it you reviewed and approved this

Page 162

for filing with the court; correct?

MS. WEINRIB:  Objection to the form of the question.  This entire line of questioning already took place this morning.  Are we covering any new ground here?  This has been asked and answered numerous times.

MR. LOFTUS:  Counsel, enough.  Please.  I have a right to cross-examine this witness.  I represent a separate party.  And unless you're prepared to instruct the witness not to answer, let's move forward.  We got, as best I can tell, about 40 minutes left, so let's do the best we can without the objections.

MS. WEINRIB:  He can answer, but it's a waste of time.  Go ahead.

A.  Can you repeat the question again?

Q.  You reviewed and approved this motion for class filing; correct?

A.  Correct.

Q.  And I just want to make sure I understand a couple points here.  If we look down at Page 2, we see the two classes that you seek to have certified; correct?

A.  Correct.

Q.  And you very clearly testified that you view

Page 163

yourself as a member of the class of purchasers for a 10(b) claim; correct?

A.  Correct.

Q.  You have no trouble understanding that concept; right?  That you put --

MS. WEINRIB:  Objection to the form of the question.

A.  I understand the relationship to 10(b), yes.

Q.  Right.  And you can see that you acquired PureCycle Securities between November 16, 2020 and November 10, 2021; correct?

A.  Correct.

Q.  Now, if we move to the 14(a) Class, it's similarly as quite clear in requiring members of that class to own stock as of November 16, 2020, or February 12, 2021; correct?

A.  Correct.

Q.  So just plain and simple, you're not a member of that class, are you?

MS. WEINRIB:  Objection to the form of the question.

A.  I did not own the ROCH stock at that time frame.

Q.  And similarly, you are, therefore, not a member of that class; correct?

Page 164

MS. WEINRIB:  Objection to the form of the question.  You're asking him a legal question.

Q.  I am asking you, Mr. Ciecko, to draw the same conclusion that you drew with respect to 10(b), that you are able to determine, based on your purchase within the specific dates of purchase for that claim, apply the same logic with respect to your purchases with the 14(a) claim?

MS. WEINRIB:  Objection to the form of the question.

Q.  That's all.

MS. WEINRIB:  Objection to the form of the question.  He's already answered your questions with regard to this as to when he held and didn't hold.

If you can answer his question, otherwise, without revealing communications with counsel, then you can go ahead and answer the question.

A.  As I said, I did not own the ROCH stock at that time frame.  Am I a member of that classification, I cannot comment because I don't have the legal knowledge to say if I am or not.

Q.  Let's go down in this same motion to Page 10.  And in the first full paragraph that begins with March 17, 2021, do you see that, Mr. Ciecko?



Page 165

A. Yes, I do.

Q. And if you read down about halfway through that paragraph, there's a reference to different ticker symbols to PureCycle-related securities. Do you see that?

A. Yes, I do.

Q. Simply as a formality, I want to confirm that the only security you owned was the common stock that traded under the symbol PCT?

A. Correct.

Q. You didn't own warrants, you didn't buy the common stock links to the warrants; correct?

MS. WEINRIB: Objection to the form of the question. Asked and answered.

A. Correct.

Q. And you never engaged in any options transactions in relation to PureCycle; correct?

MS. WEINRIB: Objection to the form of the question. Asked and answered.

A. Correct.

Q. Let's go down to Page 12, please. Now, in the first full paragraph that begins with "Here, the proposed class representatives satisfy, et cetera."

Do you see that?

A. Yes.

Page 166

Q. Further down in that same paragraph, it reads "All members of the 14(a) Class, including the proposed class representatives" --

And that's you and your brother; correct? You're the class representatives?

A. That's my understanding, correct.

Q. -- "including the proposed class representatives held shares of ROCH common stock as of November 16, 2020, or February 12, 2021."

I think you confirmed many times over that's not correct?

MS. WEINRIB: Objection to the form of the question, but you can answer.

A. Correct. I did not own the ROCH stock.

Q. And then it reads "were entitled to vote at the special meeting of stock holders held on March 16, 2021."

And you will agree that you were not entitled to vote at the special meeting of stock holders held on March 16, 2021; correct?

A. I would agree.

Q. So in that respect, Mr. Ciecko, whatever actions are attributed to defendants in connection with the proxy solicitation, it didn't impact you or your brother in the way it impacted investors who held

Page 167

a stock in relation to those two periods of time; correct?

MS. WEINRIB: Objection to the form of the question. Misrepresents facts and law.

But you can go ahead and answer to the best of your ability.

A. I mean, maybe it doesn't present to me. But I think you said me or my brother. I believe my brother, he held ROCH so maybe the statement is different.

Q. So let's just take your brother out of it. Let's just focus on you.

MS. WEINRIB: Objection to the form of the question. Do you understand the question?

A. I guess maybe I'm confused now.

Q. Fair enough. And the colloquy of counsel probably doesn't help.

So my question to you is is that whatever acts, misrepresentations are alleged as to as to defendants in connection with the proxy solicitation, it certainly didn't impact you in the way it impacted people who owned the stock in November 2020 or February 2021; correct?

MS. WEINRIB: Objection to the form of the question. Misrepresents facts and law.

Page 168

You can answer if you're able.

A. Yeah. I don't even know how to answer this one. Since I did not own the stock, which I communicated correctly multiple times, it does not impact me because I did not own the stock.

Q. And again, you weren't solicited to vote one way or the other with respect to the merger? Let's wrap it up.

A. Correct.

Q. All right. Let's put that topic behind us.

MR. LOFTUS: Let's take a short break. Let me go through my notes here. And Joni, can I ask you to give me a call?

MS. JACOBSON: Sure.

THE VIDEOGRAPHER: We're going off the record. The time is 1:25.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 1:32.

BY MR. LOFTUS:

Q. Mr. Ciecko, just a few more questions.

You testified earlier with respect to your transactions through Merrill Lynch that you would receive notice at the time of settlement of the trade. Do you recall that testimony?



Page 169

A. Correct.

Q. How did you receive that listing?

A. It typically goes to my email. I don't know if it goes through my work account or personal account, but either way I get an email notification.

Q. And what, to the best of your recollection, does the email convey upon execution? What does it tell you?

A. It conveys the execution if it was a buy or sell of the required -- the amount of the price and share market of the action.

Q. And is that a notice that's different from and in addition to the formal confirmation you receive?

A. No. I'm referring that is the formal confirmation I receive.

Q. So it's the actual confirmation that we reviewed earlier as I believe Exhibit 2, perhaps?

A. No. I would say it's just an email notification that a transaction has executed. This is actually the record of the transaction itself. But in the email itself doesn't even talk about the money or anything else. It's just your request for the execution has occurred.

Q. Do you still have the emails reflecting the

Page 170

execution of each buy and sell transaction in PureCycle?

A. I would have to -- I would have to look if they still exist in the system.

Q. We'll submit to your counsel, but we are going to make a request for those documents which we believe are responsive to the prior request, frankly, served by both parties. So we would ask you not to delete anything from your computer or what have you because we'd like to see those. Fair enough?

A. Yeah. Absolutely. There's nothing to hide. I was just talking about these documents actually reflects the details. The other one just doesn't give you any details. But yeah, I have no issue of going back to try to find them.

Q. All right. The other topic I'd like to follow up on briefly is with respect to the Hindenburg report. And can you tell me what you did to verify the credibility of Hindenburg?

MS. WEINRIB: Objection to the form of the question.

A. I don't think I did anything relative to validation or verification of the Hindenberg report. I read the documents, I read the position of Hindenberg report, as stated before, based on research

Page 171

events, but I don't think I did any additional research based on the Hindenberg report.

Q. Did you do anything to determine whether Hindenberg was a credible source of information?

MS. WEINRIB: Objection to the form of the question.

A. That was my discussion with my brother the first day when the document was published since I had zero knowledge about Hindenburg report at that time frame. That was the time that I discussed with my brother on May 6 at the end of the day, basically.

The next day, as I said, he called me and that was a discussion that we had on the phone relative that he did additional research. And he told me he verified it -- so he did it, not me -- in terms of validity of the Hindenberg report.

Q. What did he tell you about the validity of the Hindenberg report?

MS. WEINRIB: Objection to the form of the question.

A. I mean, he communicated to me that is a real company, real report. Because my initial question to him is this even real versus just a bogus something published it randomly. He verified to me, no, this is a real report, this is a real company that does the

Page 172

research. As I mentioned before, he talked about, obviously, the Hindenburg report in terms of some of the details to me. But as I mentioned, I did not read the report until the weekend by myself.

Q. Did you and your brother discuss in this time period, May 2021, that this was research published by a short seller?

A. Yeah. I did not know it until my brother indicated to me that this is the research for potential short sale representation.

Q. When you say "potential short sale," did you understand whether Hindenburg actually had a short position on, whether it was considering putting a short position on, or anything in between?

MS. WEINRIB: Objection to the form of the question.

A. Yeah. I had zero knowledge about Hindenberg position in PCT.

Q. But you did review the Hindenburg report; correct?

A. Yes. I did read the Hindenberg report that weekend after.

Q. Does the report itself disclose whether Hindenburg had a short position at the time and published the research?



Page 173

MS. WEINRIB: Objection to the form of the question.

A. Yeah. I don't recall. I don't know. I don't recall that information.

Q. Would that be important for you, as a source of information, to know that at the time Hindenburg published its report on PureCycle, it had a short position on it?

MS. WEINRIB: Objection to the form of the question.

A. Yeah. My opinion, no, because the facts are facts relative to the PCT. How they position themself, I don't think I care. I'm more focused on the facts of the report and what the actual report disclosed.

Q. You're not concerned about the bias of an entity publishing research that will drive down the price of a stock and allow the source of that report to make a substantial profit?

MS. WEINRIB: Objection to the form of the question. Argumentative. And he's already answered it.

A. Yeah. I mean the only thing I'm getting out of the report is trying to get as much exposure research that I did not have in my possession when I

Page 174

purchased it. That's the only source of information I got from Hindenburg report for myself.

Q. I'm sorry. I didn't mean to cut you off.

What additional research did you do, if any, after reviewing the Hindenberg report and before placing your sell order on your existing position?

A. So I put my sell order on May 7 before reading Hindenberg report in detail. The only thing I knew about when I decided to sell, was reference to my overall 50 percent -- almost 50 percent loss of my funds. And therefore, I made the decision before in detail of Hindenberg report on that weekend. So it was not related to the Hindenburg report content. It was related just on my position of the PCT in terms of the just overall loss of my shares.

Q. Very good.

MR. LOFTUS: That's all I have. Thank you for your time, Mr. Ciecko.

MS. WEINRIB: I have a few questions, Mr. Ciecko. I won't take up too much of your time.

CROSS-EXAMINATION

BY MS. WEINRIB:

Q. Earlier today Mr. Loftus asked you if you canceled your May 5 buy order of PCT common stock. Do you recall him asking you that question?

Page 175

A. Yes, I recall, yes.

Q. And if I recall correctly, you answered that you did not cancel?

A. That's correct.

Q. Why didn't you cancel the trade?

A. I have no means of canceling the trade. I don't know how to cancel the trade once its in process.

Q. Mr. Loftus also asked you about risk disclosures. Do you recall those questions and your answers?

A. Yes.

Q. And Mr. Loftus asked you if it would be important to you to know the risks going into an investment in a particular company; is that correct?

A. Correct.

Q. Would it also be important to you to know if those risks were potential risks or risks that had already materialized?

A. Absolutely. That would determine my position of how whether I purchase the stock or not.

Q. If you had known the facts indicated in the Hindenberg report that was published on May 6 before you invested in PureCycle Securities, would you have still purchased your shares?

Page 176

A. I would not.

MR. LOFTUS: Objection. Foundation. Hypothetical. Calls for speculation.

Q. Mr. Ciecko, do you know what this case is about?

A. Yes.

Q. And I think you testified to that earlier; correct?

A. Yes.

Q. You testified to the misrepresentations that are indicated in the complaint; correct?

A. Correct.

Q. Is it your understanding that the statements we alleged to be misleading or also misleading because they leave information out?

MR. LOFTUS: Objection. Leading.

Q. Is that your understanding?

A. Yes. That is my understanding.

Q. Just to clarify because this word was used a lot today. You used the word IPO many times in testimony throughout the day. Do you recall that?

A. Yes, I do.

Q. When you used the word IPO, what were you referring to?

A. I'm talking about referring of the merger



Page 177

between Roth acquisitions and PureCycle technology and listing that on the NASDAQ stock market.

Q. Did you understand that prior to that business combination that ROCH was a publicly traded stock?

A. Yes.

Q. Prior to the merger, was PureCycle publicly traded? You can answer if you know.

A. I don't know if it was actually publicly traded then.

Q. Following the merger, did ROCH's ticker symbol change?

A. Well, it stopped existing and everything got traded as a PCT symbol on the stock market.

Q. So after the merger --

A. After the merger.

Q. -- PureCycle was publicly traded and listed on the NASDAQ?

A. Yes.

Q. Much earlier in the day you were asked whether you, as lead plaintiff, were seeking any relief in this action; correct? Do you recall that?

A. Yes.

Q. Are you aware whether the class is seeking any relief in this action?

Page 178

A. Yes.

Q. And do you know where that relief is set forth?

A. Yeah. It's in Exhibit 6, actually referenced on Page 48 as a prayer of relief.

Q. And you understand that that prayer for relief is on behalf of the classes that are alleged in this access; is that correct?

A. Correct.

MS. WEINRIB: I have nothing further.

MS. RIEGELSBERGER: I have nothing further as well.

THE COURT REPORTER: Counsel, is there any transcript orders that you want to put on the record?

MS. RIEGELSBERGER: Yes. We'd like, as soon as possible, for the transcript. I believe it's one to two business days.

THE VIDEOGRAPHER: This concludes today's deposition. We're going off the record. The time is 1:44.

THE COURT REPORTER: Did you also want a same-day rough?

MS. RIEGELSBERGER: Yes.

THE COURT REPORTER: Ms. Weinrib, did

Page 179

you want the same and two-day expedite?

MS. WEINRIB: Yes.

Page 180

DEPOSITION SIGNATURE PAGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

WILLIAM C. THEODORE,                    :
individually and on behalf of all :
others similarly situated,         :
          Plaintiffs,        :CASE NO.:
                             :6:21-cv-809-PGB-RMN
     v.                      :
                             :
PURCECYCLE TECHNOLOGIES, INC.,     :
MICHAEL OTWORTH, MICHAEL E. DEE,  :
DAVID BRENNER, BYRON ROTH and     :
TASMIN ETTEFAGH,                  :
          Defendants.        :

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter, or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____    _____
MARIUSZ CIECKO                    Date



Page 181

DEPOSITION ERRATA SHEET

Page No.____Line No.____Change:_____

_____

Reason for change:_____

Page No.____Line No.____Change:_____

_____

Reason for change:_____

Page No.____Line No.____Change:_____

_____

Reason for change:_____

Page No.____Line No.____Change:_____

_____

Reason for change:_____

Page No.____Line No.____Change:_____

_____

Reason for change:_____

Page No.____Line No.____Change:_____

_____

Reason for change:_____

Page No.____Line No.____Change:_____

_____

Reason for change:_____

_____        _____

MARIUSZ CIECKO                           Date

Page 182

STATE OF ARIZONA    )
                    ) ss:  REPORTER'S CERTIFICATE
COUNTY OF PIMA      )

I, CORI BRICKEY, RPR, CR, do hereby certify that I am an Arizona Certified Reporter; that previous to the commencement of the examination, the witness was duly sworn to testify to the truth.

I further certify that this deposition was taken down in shorthand, and was thereafter reduced to typewritten form, and that the foregoing constitutes a true and accurate transcript, all done to the best of my skill and ability.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action, and that I have complied with the ethical obligations set forth in (J)(1)(g)(1) and (2).

I further certify that the Deponent requested an opportunity to review the foregoing deposition.

DATED at Tucson, Arizona, this 13th day of December, 2023.



CORI BRICKEY
Arizona Certified Reporter
Certificate No. 51030