## Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

Case No. 6:21-cv-809-PGB-GJK

------------------------------------x

WILLIAM C. THEODORE,

individually and on behalf of

all others similarly situated,

　　　　　　Plaintiffs,

vs.

PURECYCLE TECHNOLOGIES, INC.,

MICHAEL OTWORTH, MICHAEL E. DEE,

DAVID BRENNER, BYRON ROTH

and TASMIN ETTEFAGH,

　　　　　　Defendants.

------------------------------------x

　　　　　　January 8, 2024

　　　Video-Recorded Deposition of

　　　　MATTHEW D. CAIN, PH.D.

Stenographically Reported By:

Mark Richman, CSR, CCR, RPR, CM

Job No. J10716380

## Page 2

　　　　　　Monday, January 8, 2024

　　　　　　9:20 A.M. EST

　　　Video-Recorded Deposition of

MATTHEW D. CAIN, PH.D., taken by defendants,

held at the offices of Dechert LLP, Three

Bryant Park, New York, New York, before Mark

Richman, Certified Shorthand Reporter,

Certified Court Reporter, Registered

Professional Reporter, and a Notary Public

within and for the State of New York.

## Page 3

A P P E A R A N C E S:

POMERANTZ LLP

Attorneys for Plaintiffs and the Witness

　　　600 3rd Avenue

　　　New York, NY 10016

BY:　　TAMAR A. WEINRIB, ESQ.

DECHERT LLP

Attorneys for Defendants PureCycle,

Michael Otwort, Michael Dee and

David Brenner

　　　35 W Wacker Drive, Suite 3400

　　　Chicago, IL 60601

　　　　　-

　　　Three Bryant Park

　　　New York, NY 10036

BY:　　JONI S. JACOBSEN, ESQ.

　　　JULIA MARKHAM-CAMERON, ESQ.

## Page 4

A P P E A R A N C E S:

DLA PIPER LLP (REMOTE VIA ZOOM

VIDEOCONFERENCE)

Attorneys for Defendant Byron Roth

　　　3203 Hanover Street, Suite 100

　　　Palo Alto, CA 94304

　　　　　-

　　　2000 Avenue of the Stars #400

　　　Los Angeles, CA 90067

BY:　　DAVID PRIEBE, ESQ.

　　　JOHN R. LOFTUS, ESQ.

ALSO PRESENT:

SILVIO FACCHIN, Videographer



Page 5

M. CAIN - 1.8.24

THE VIDEOGRAPHER:  This is the media label number 1 in the video recorded deposition of Dr. Matthew D. Cain in the matter of William C. Theodore versus PureCycle Technologies, Inc., et al.

This deposition is being taken in New York City, New York on January 8th, 2024.

My name is Silvio Facchin, I am a certified legal video specialist. The court reporter is Mark Richman, and we are both representing Esquire Deposition Solutions.

We are now going on the record, the time is 9:20 a.m.

If counsel would state their appearances for the record.

MS. WEINRIB:  Tamar Weinrib from Pomerantz LLC on behalf of plaintiffs and Dr. Cain.

MS. JACOBSEN:  Joni Jacobsen from Dechert LLP on behalf of defendant PureCycle as well as defendants

Page 6

M. CAIN - 1.8.24

Otwort, Dee and Brenner and I'm here with my colleague Julia Markham-Cameron.

MR. PRIEBE:  David Priebe, DLA Piper on behalf of defendant Byron Roth.

MR. LOFTUS:  John Loftus, likewise from DLA Piper, on behalf of defendant Byron Roth.

MS. JACOBSEN:  Great.

MATTHEW D. CAIN, Ph.D., having been called as a witness, having been first duly sworn by the Notary Public (Mark Richman), was examined and testified as follows:

EXAMINATION BY MS. JACOBSEN:

Q.   So I understand you've been deposed many times but just want to go through a few preliminaries.

Let me know if you don't understand a question and I will try to clarify it.  If you don't mention that you don't understand, I'll assume that you do.

Page 7

M. CAIN - 1.8.24

If you need a break, obviously please ask me, happy to take a break when you need it.  And I will ask that if you have any questions that are pending, that you answer those before we step out of the room.

If your counsel makes objections, you should still proceed to answer my question unless you're instructed not to answer on the basis of privilege.

Is there anything that would prevent you from answering my questions today?

A.   No.

Q.   Okay.  Did you meet with your lawyers to prepare for your deposition?

A.   Yes, I did.

Q.   How many times did you meet?

A.   I believe one time.

Q.   And who did you meet with?

A.   With Tamar Weinrib.

Q.   And did you review any documents in preparation for your deposition?

A.   Yes.

Page 8

M. CAIN - 1.8.24

Q.   And anything that you reviewed other than what's been cited in your report or in your appendix?

A.   No.

Q.   Okay.  And other than counsel, did you meet with anyone to prepare for today's deposition?

A.   No, I did not.

MS. WEINRIB:  Let's mark as Exhibit number 1 your report in this matter.

(Exhibit 1, Expert Report of Matthew D. Cain, Ph.D. was marked for identification.)

Q.   So if you don't mind turning to your Appendix A?

A.   Okay.

Q.   Great.  I think it will be easier to walk through your CV to go over your background.

So currently you are a senior fellow at the Berkeley Center for Law and Business; is that correct?

A.   Yes, it is.



Page 9

M. CAIN - 1.8.24

Q.   And what do you teach there?

A.   I teach currently two courses which are listed on page 42.  So one course is called Economic Expert Witnesses, Depositions and Testimony, and the other course is called Economics of Corporate and Securities Litigation.  Both of those courses are to law students in the law school.

Q.   And do you conduct research in your current position?

A.   Yes, I do.

Q.   And what's the nature of the research?

A.   It's a continuation of the academic research that I've been doing really since I started the Ph.D. program a little over 20 years ago.

Q.   Can you give me a little bit more about that?

A.   Sure.  So I conduct primarily empirical research which means it involves data analysis on topics that pertain to financial economics, as well

Page 10

M. CAIN - 1.8.24

as the intersection of finance and economics with law and accounting.

And so the topic areas that I research include mergers and acquisitions, contracting, valuation, corporate governance, shareholder voting or shareholder behavior, private equity disclosures, those types of topics, that I then publish in both law reviews as well as peer-reviewed academic journals like finance, accounting and economic journals.

Q.   And you were a visiting scholar at Vanderbilt in 2021 or 2022?

A.   Yes.

Q.   And what did you teach there?

A.   I did not teach anything during that time at Vanderbilt.

Q.   And did you conduct any research?

A.   I continued to work on research while I was there.

Q.   The same research you already described?

A.   Right.

Page 11

M. CAIN - 1.8.24

Q.   And then how about a senior visiting scholar at Berkeley from 2019 through 2021, did you teach any courses that are different than you teach now?

A.   Nothing different from what I mentioned previously.

I think that the first course that I taught at Berkeley was in 2020.  So there was, at the beginning of that period I did not teach anything and then I started teaching while I was a senior visiting scholar.

Q.   And then moving down, when you were a visiting research fellow at Harvard, did you teach any courses?

A.   No, I did not.

Q.   And was the research similar to what you've already described?

A.   Yes.

Q.   Okay.  And then let's move to your position as an advisor to Commissioner Robert Jackson, Jr. at the SEC in 2018.  What were your responsibilities there?

Page 12

M. CAIN - 1.8.24

A.   As you can probably infer by the title Advisor, I gave advice to Commissioner Jackson on issues that pertained to economic analysis generally.

So I started working at the SEC as a financial economist.  I also knew Professor Jackson before he became a commissioner.  We were working on academic research together.  And he asked me when he joined the Commission to fill one of his spots, which are reserved for counsel, but I'm not a lawyer, don't have a law degree so my title was Advisor instead of counsel.  And so I gave advice on any Commission-related issues that related to economic analysis.  So that included litigated proceedings that required a commissioner vote in order, in order to either institute proceedings or approve of certain outcomes.

I also gave advice on rule making or policy making directives to the



Page 13

M. CAIN - 1.8.24

extent that they interacted with economic analysis like cost-benefit analysis or reviewing analyses that other economists have provided or other commenters provided on those rule makings.

And I also conducted economic research for him that underlied speeches that he gave, so sometimes he would go out and give speeches based on novel or new economic analyses that we -- that I and his other staff conducted for the purpose of his speeches.

Q.   Did any of those analyses at that point in time relate to market efficiency?

A.   I would say broadly speaking, most of my research touches on aspects of market efficiency.  However, my research does not explicitly opine on market efficiency for the most part.  We can talk, I'm sure we'll talk more about that today.  But there's a lot of factors that we evaluate in market

Page 14

M. CAIN - 1.8.24

efficiency and do analysis and event studies and I do those types of analyses in my research, but I don't typically in my research opine on whether a market for a given company is efficient.

Q.   Okay.  And then moving on, you were an economic fellow at the SEC from 2014 to 2018, and what are your -- were your responsibilities in that position?

A.   Yes, so I was originally hired as an economic fellow, which is a temporary position and then at some point in the first couple of years transitioned over to a financial economist which is a permanent position.  But the responsibilities were the same, just more of a job title.

And those responsibilities were primarily related to economic analysis of enforcement, investigations, or settlement negotiations, or expert reports and testimony and potentially cases that would go all the way through trial or that might settle before trial.

Page 15

M. CAIN - 1.8.24

So it was typically working with the enforcement staff at some stage of investigation through resolution or closing out of an investigation of individual defendants or companies across a wide variety of cases that the SEC brings.

Q.   And would you prepare reports for investigations and enforcement actions?

A.   So there's, I would maybe categorize it as two categories.  One category would be internal memorandums that I would prepare that were nonpublic.  Those would be shared internally with enforcement staff and with the commissioners if I was working more on the investigation side of a case.

And then, alternately, if I was working more on the public-facing litigation side of a case, I would sometimes work on expert reports that if a case was settled those expert reports may not be public because a case might

Page 16

M. CAIN - 1.8.24

be settled before it was filed.  But if it continued to proceed through litigation, then the expert report would be publicly filed, you know, similarly to these types of cases.

Q.   And did you provide testimony in those cases?

A.   Sometimes I did, yes.

Q.   Do you recall the nature of -- let me strike that.

Do you recall any of your testimony being similar to the issues that you are -- issued your report on in this case?

A.   I think that similarly to what I said before, I was not explicitly asked to opine on whether the market was efficient for a given company in any SEC-related cases because that's not an element of proof typically that we encounter in those cases.

However, I did frequently carry out event studies and analysis of pricing, trading volume, options trading



Page 17

M. CAIN - 1.8.24
and institutional shareholder ownership or things, things of that nature that interact with the efficiency reports that I do now.

But I typically was not asked to opine on -- in fact, I don't think I was ever asked to opine on whether the market for a given company was efficient on any SEC cases.

Q. Okay. And then just moving on, we're almost done with this, you were an assistant professor of finance at University of Notre Dame from 2008 to 2014, and I understand, if you turn to page 43, are those the two courses that you taught at Notre Dame?

A. Yes, that's correct.

Q. And did you teach any other courses other than that?

A. No, I did not.

Q. And your research, did you conduct research while at Notre Dame?

A. Yes.

Q. And was it the same as what

Page 18

M. CAIN - 1.8.24
you've already described that you currently conduct?

A. Yes.

Q. Okay. And then lastly, you were visiting faculty at Krannert School of Management at Purdue. Did you teach courses at Purdue?

A. I did, yes. So --

Q. And --

A. Go ahead, sorry.

Q. What courses did you reach?

A. So I got my Ph.D. at Purdue and then in my fifth year I had finished my Ph.D. but I'd not yet gone on the job market so I spent a year as a visiting faculty member while I went on the job market to get an academic job.

So the visiting faculty member position was almost a continuation of the Ph.D. program.

So on 43, I list out the courses that I thought at, at Purdue, and I believe that as a Ph.D. student I taught Management 412, Financial Markets and

Page 19

M. CAIN - 1.8.24
Institutions, and then as a visiting faculty member, I believe that I taught that course again as a visiting faculty member. And I also taught an MBA level course on financial management. And I believe that that was also done as a visiting faculty member.

Q. And who retained you in this matter?

A. Pomerantz retained me through Fideres.

Q. And when were you retained?

A. I don't recall exactly, but I would estimate it would be somewhere around September or October of 2023.

Q. And do you have an engagement letter with Pomerantz that relates to this litigation?

A. No. I believe that the engagement was executed through Fideres.

Q. Do you know the identity of the plaintiffs in this matter?

A. I don't have everything memorized. I do know of an individual

Page 20

M. CAIN - 1.8.24
plaintiff, it's listed on the cover, William Theodore. I'd have to go back to the complaint to see if there are any other individual plaintiffs who are identified.

Q. Since being retained in this litigation, have you had any contact with current or former PureCycle employees, officers or directors?

A. No.

Q. And prior to being retained, any contact with any current or former PureCycle officers, directors or employees?

A. No.

Q. How about with Byron Roth, any, at any time have you had any interaction with Mr. Roth?

A. No, I have not.

Q. And anyone affiliated with Roth Capital?

A. No.

MS. WEINRIB: Objection to the form of the question.



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
21–24

Page 21

M. CAIN - 1.8.24

A.   I don't believe so.

Q.   Let's turn to Paragraph 7 of your report, which has the heading Summary of Opinions.

What were you asked to do, or what opinions were you asked to render in this case?

A.   I think basically I break it down into two or three, two or three questions I was asked. The first would be whether the market for PureCycle's stock was efficient during the class period. And then I think sort of a subpoint or a sub-question within that is also whether the alleged misstatements or omissions, whether the price impact of those would be reflected in the derivative securities like the options and the warrants.

Then I was also asked whether the calculation of damages can be carried out on a class-wide basis for the common stock, for the warrants, for the options, under Section 10(b) and

Page 22

M. CAIN - 1.8.24

separately under Section 14(a).

Q.   Anything else?

A.   No.

Q.   Okay. And then other than your report, did you assist in the preparation of any documents that have been filed in this case?

A.   No, I did not.

Q.   Including the motion for class certification?

MS. WEINRIB:  Objection to the form of the question.

A.   No, I don't believe, I don't believe so.

Q.   Okay. Let's talk about your prior testimony in other securities fraud cases.

So in Appendix A of your report, I believe starting on page 43, lists your Expert Witness Experience since 2015, correct?

A.   Yes, that's correct.

Q.   And I believe that Appendix A indicates you provided testimony in 22

Page 23

M. CAIN - 1.8.24

different matters.

Did you prepare reports in all of these?

A.   I think a couple of these might be declarations that are listed. But if you include those in the count, then I believe the answer would be yes to all of the bullet points on these pages.

Q.   In how many of these cases were you engaged by plaintiffs?

A.   I think for these cases that proceeded to the point of public disclosure, the majority of these would either be plaintiffs or on behalf of the Securities and Exchange Commission.

I know -- but not all of them.

So, for example, there's one on page 45, In re Banc of California Securities Litigation that was on behalf of defendants.

There's one on page 44, In re: Purdue Pharma, et al., that was more of a like a Chapter 11 type of case, so I wouldn't describe anyone as either

Page 24

M. CAIN - 1.8.24

plaintiffs or defendants in that case.

But yes, I think that covers it in terms of the cases that have proceeded to the point of public disclosure.

Q.   And for those cases that are listed, how many have you given an opinion on market efficiency?

A.   I think, let's take, I'll take a quick count.

Looks like about 16.

Q.   And other than the In re Banc of California which we'll discuss in a minute, were all of those on behalf of plaintiffs?

A.   I think, again, are you asking just about the market efficiency reports?

Q.   Yes.

A.   Yes, all of the market efficiency reports have been on behalf of plaintiffs.

Q.   Have you ever found that a market showed signs of inefficiency in those



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
25–28

Page 25

M. CAIN - 1.8.24

reports?

A.    In other cases, yes, but in these reports, these 16 reports, no, I opined that all of these markets were efficient.

Q.    And have you, in those 16 reports, did you ever find that certain subperiods that you were asked to analyze the market showed signs of inefficiency?

A.    I, to the best of my recollection in all 16 of these, I concluded that the market was efficient, both over the full class period, but also throughout the class period which would include any subperiods during the class.

Q.    And have you ever found that a security did not satisfy Cammer Factor 5 and still concluded that the market for that security was efficient?

A.    I don't believe that I've been faced with that situation.  But certainly within the 16 bullet points here, I think that these 16 efficiency

Page 26

M. CAIN - 1.8.24

reports, both the full basket of factors weighed in favor of efficiency as well as Cammer 5 weighed in favor of efficiency for these 16 reports.

Q.    And let's now turn to the In re Banc of California Securities Litigation.

Was that a securities case?

A.    Yes.

Q.    And what opinion were you asked to give in that case?

A.    I was asked to provide a rebuttal report to an expert report submitted on the plaintiff's side, I believe it was by Harvey Pitt.

Q.    And what was the nature of your opinion?

A.    My recollection is that I opined that Mr. Pitt had concluded that certain types of information would have been important for investors based on his professional experience and his professional expertise as a former chairman of the SEC.

Page 27

M. CAIN - 1.8.24

And my rebuttal opinions were along the lines of explaining that there are a variety of reliable and accepted analyses that an expert can carry out in order to reach an opinion about the importance or economic materiality of information to investors.  But that Mr. Pitt had not carried out those types of analyses.  Things like conducting an event study or looking at academic research or looking at analyst reports.

So that's, to the best of my recollection, that's the nature of the opinion that I gave in that case.

Q.    All right.  Looking at the experience listed in your Appendix A, we understand that you were engaged by Pomerantz in at least four of those cases, Berry Corp, CBL & Associates, Clover Health and Recro Pharma.

Are there any others that you were engaged by Pomerantz?

MS. WEINRIB:  Objection to the form of the question.

Page 28

M. CAIN - 1.8.24

You can answer.

A.    So you said, can you repeat the ones you said?

Q.    Sure.  Luis Torres v. Berry Corporation, CBL & Associates Properties Securities Litigation, Bond v. Clover Health, and John Alberici v. Recro Pharma.

A.    Okay.  It's possible that there may be some additional ones and I don't specifically track on the CV which firm retained me.

So some others that would be possible, but I'd have to go back and check, would include on page 44, Bar Mandalevy versus BofI Holding.

At the top of page 44, 2U, the number 2, the letter U.

And then at the top of page 43, Robert Lematta versus Casper Sleep.  And that's, it's it.

Again, I'm not representing that I was necessarily engaged by Pomerantz on those, but I'd want to go back and



Page 29

M. CAIN - 1.8.24

review those to refresh my recollection.

Q.   Understood.

We also see three instances where your testimony has been excluded on procedural, not substantive grounds, Liberty Mutual, Facebook and Toshiba.

Are there any other cases that you're aware of that where your testimony or report has been excluded?

MS. WEINRIB:  Objection to the form of the question.

A.   So I don't think I ever worked on anything involving Liberty Mutual.  Is that something listed on the CV here?

Q.   I thought that it was but let me double-check.

Avramides?  No?

A.   I think, I think I've been asked that question before.  I think it's possible that that case involved someone who either had a similar name to me or maybe the same name, but I don't believe that that's me.

Q.   Okay.  Good to know.

Page 30

M. CAIN - 1.8.24

A.   But I do recall that in Facebook the judge said that plaintiffs were not permitted to attach a declaration to a complaint, and so the judge would not consider the declaration because of that procedural, like you said, procedural grounds.

And then in Toshiba, that the judge said that plaintiffs were not permitted to file a reply report because it was past the cutoff for either discovery or that the schedule did not permit reply reports.

So again, like you said, both of those were procedural but not based on the content of the opinions.

Q.   And are you aware of any instances where your report has been excluded on substantive grounds?

A.   No, I'm not.

Q.   Let's turn to Exhibit B, or Appendix B of your report.

On page 46 you list Works Considered and it starts with court

Page 31

M. CAIN - 1.8.24

documents.  How were those documents selected?

A.   Basically I think everything that's listed under either Court Documents or Academic Literature are, that includes things that I've cited in the footnotes throughout the report.  So I don't believe that I listed, for example, in Footnote 2, for example, I list the actual complaint in this case.  I'm not sure that I included that in the court's documents.

But these would just be other cases that I've cited somewhere in the text of the report, as well, same for the academic literature.

Q.   And other than what is cited throughout your report in footnotes and what's listed in Appendix B, did you consider anything else in forming your opinions?

A.   I know that I also reviewed the motion to dismiss order in the case.  I'm not sure if that's listed, or listed

Page 32

M. CAIN - 1.8.24

or cited.

But other than the motion to dismiss order, I'm not aware of anything, anything beyond that.

Q.   Okay.  Did your report contain a complete statement of your opinions in this litigation?

A.   At this point in time, yes.

Q.   And does your report state all the bases for your opinions?

A.   Yes.

Q.   Have you reached any other conclusions regarding this litigation that are not contained in your report?

MS. WEINRIB:  Objection to the form of the question.

A.   No, not at this point in time.

Q.   Since November 30th, 2023, the date of your report, have you conducted any additional investigation or analysis of the issues in this case?

MS. WEINRIB:  Objection to the form of the question.

A.   No, I don't believe so.



Page 33

M. CAIN - 1.8.24

Q.   Okay, great.

Let's turn to Paragraph 13 of your report.

So Paragraph 13 has the heading in 3.1 the Overview of the Company and the Allegations.  And it states, quote, "ROCH was a publicly traded blank check company, also known as a special purpose acquisition company (SPAC)."

What is a publicly traded blank check company?

A.   Yes.  So like you just read, I refer to those as SPACs or, all caps S-P-A-C, SPACs, and those are entities that go out and raise capital from investors by typically conducting an initial public offering of stock which they typically price at $10 per share.  They also usually have warrants that frequently have an exercise price of $11.50 per share, and they will often start out with just units that represent one share of common stock and maybe one warrant or a fractional warrant.

Page 34

M. CAIN - 1.8.24

But again, typically it's $10 per share.  They will raise a certain amount of capital based on how many shares they sell to investors.  And then they have a fixed life, typically it's two years, to go out and try to identify private target company to take public.

If they get to the, close to the end of that two-year expiration of the SPAC and they've been unable to merge with a private company, then they're typically forced to return their capital to investors, so $10 plus, plus interest, unless the investors grant them an extension.

So investors could grant like a one-year extension to continue searching for a private target.

If a SPAC identifies a target and can get shareholder approval to merge with the private target, then that private target is now merged with the SPAC and is publicly traded once the business combination closes.

Page 35

M. CAIN - 1.8.24

In conjunction with the closing of the business combination, the SPACs also raise capital typically through a PIPE offering, P-I-P-E, which is private investment in public equity.  So they get additional capital to fund the merger.

Q.   Okay.  So in Paragraph 7 you indicate that PureCycle Technologies completed a business combination with Roth CH Acquisition 1 Co, ROCH.

So prior to this business combination, which I'll also refer to as a deSPAC transaction, ROCH was a publicly traded blank check company; is that correct?

A.   Yes.

Q.   Did it have any operations?

A.   What do you mean by "operations"?

Q.   Did it produce any products or services?

A.   I don't believe so.

Q.   And your opinion in this case focuses on the class period which starts

Page 36

M. CAIN - 1.8.24

in November, on November 16, 2020, correct?

A.   Yes.

Q.   And so what securities were you analyzing between November 16th, 2020 and the deSPAC transaction on March 17th, 2021?

A.   So it would be the common stock and the warrants which during that period I believe they were trading under a different symbol relative to the post-business combination.  So I believe that it was under symbol ROCH and ROCHW.  Whereas post-business combination, those were traded under new symbols of PCT and PCTTW, to the best of my knowledge.

Q.   And prior to the business combination, was PureCycle Technologies a publicly traded company?

A.   I believe it was not.

Q.   So if you look at Exhibit 1 of your report, it shows the trading price during the class period and it shows that the common stock closing price



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
37–40

Page 37

M. CAIN - 1.8.24

starting on November 16th, 2020, is that correct?

A. Yes.

Q. And did you consider the ROCH trading price history before this date in forming your opinions in this case?

A. That is part of the event study in Cammer 5. So there's an estimation period that starts a little bit before that. Let me look at exhibit here. So I think that it started a couple of months before November 16th, 2020 for the initial estimation of the event study.

Q. And do you recall what trading price the ROCH stock was trading at before November 16th, 2020?

A. My recollection, it was somewhere in the ball park of between $9 and $11 per share, but I don't have that data in front of me to be able to look at it.

Q. Okay. Let's turn back to Paragraph 13. Your report describes a SPAC as (Reading:) a publicly traded

Page 38

M. CAIN - 1.8.24

blank check company formed for the purpose of affecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business beginnings with one or more businesses.

A. Yes.

Q. In your opinion, could information regarding PureCycle Technologies have affected the ROCH stock before November 16th, 2020?

A. That's not a question that I've researched at this point in time.

Q. Have you studied SPACs in your academic research?

A. I co-authored a white paper on SPACs with some staff from a consulting firm called Global Economics Group, but we did not seek to get that published so I would not include it or count it in my published academic research.

So it is something that I've looked at, I've talked about it a little bit in the courses that I teach. But

Page 39

M. CAIN - 1.8.24

beyond those two things, I'd say that no, I've not explicitly conducted any peer-reviewed academic research on SPACs.

Q. And the paper that you mentioned, when did you prepare that?

A. Probably maybe, I would guess, about two years ago.

Q. And have you worked on any securities cases involving SPACs before?

A. Yes, I have.

Q. And what were those cases?

A. It's not something that I explicitly track in my CV. But some of those might include Romeo Power. It's possible that it included AdaptHealth. It may have, I think Clover Health was a, may have been a SPAC.

So I know I have worked on some, but, like I said, I don't explicitly track those on the bullet points here.

Q. You mentioned earlier that, regarding redemption options. Do you know if there was a redemption option

Page 40

M. CAIN - 1.8.24

for the ROCH common stock?

A. I believe there was, yes.

Q. And does the option to redeem shares prior to a deSPAC transaction provide downside protection for investors?

A. That's not a question that I've researched or formed an opinion on generally.

Q. Did you incorporate redemption or -- strike that.

Did you consider redemption options in your analysis for this case?

A. It's something I talk about in the Damages section under the 14(a) damages calculation which explains that damages could be calculated as the difference between the redemption price or redemption value of the common stock relative to some other value that the finder of fact could deem appropriate or which a subsequent report or analysis could evaluate.

Q. All right. Let's just discuss



Page 41

M. CAIN - 1.8.24

the allegations in this case for a minute.

How many alleged misrepresentation dates are there?

A.  I've not counted up the separate dates.  I know that there's multiple dates from my recollection of the complaint, including the initial announcement of, on day 1 of the class period, plus subsequent proxy statement dates which I think there are multiple proxies or amended proxies.

But beyond that, I'd have to go back and look at the complaint to try to categorize and count those up.

Q.  Fair enough.  Let's look at Paragraph 14 of your report.  This summarizes plaintiffs' allegations.

Is there anything that you would add to this summary of the allegations that you considered in forming your opinion?

MS. WEINRIB:  Objection to the form of the question.

Page 42

M. CAIN - 1.8.24

A.  So I would say I considered the full complaint as well as the motion to dismiss order when opining, specifically when opining about the damages methodologies.

But Paragraph 14 is just a very, very concise, high-level summary of plaintiffs' allegations and the motion to dismiss opinion.

Q.  I have one question about this paragraph.  In the third line, well, starting with A, you say "touting management's broad experience across plastics manufacturing and scale early-stage companies, though in reality, PureCycle management had no prior experience in plastics recycling and had previously brought six other early stage companies public that subsequently imploded."

My question relates to your reference to PureCycle management there.

Specifically, who are you referring to?

Page 43

M. CAIN - 1.8.24

A.  This is really just referring to the complaint.  So this, if you look at Footnote 9, it's complaint, Paragraphs 54 through 74.  So I think that that certainly includes the defendants in the case which my recollection is that that was, that includes the CEO and I believe the CFO and maybe the COO of PureCycle.

But I'd have to go back to the specific quotes that I've pulled out of the complaint here to look specifically into the other defendants to see how those are quoted within the complaint.

Q.  Okay.  Let's turn to Paragraph 10 of your report.  So I understand that this is a summary of your opinion, and it indicates that you have formed the opinion that (Reading:)  The market for shares of PureCycle's common stock was efficient throughout the course of the class period.

Is that accurate?

A.  Yes.

Q.  How do you define an "efficient

Page 44

M. CAIN - 1.8.24

market"?

A.  Yeah, so I would define an efficient market the way that Eugene Fama has defined it.  I believe that he does so, if you look at Footnote number 17, it references an academic study that he published in the Journal of Finance in 1991.

I believe that's one of many studies that gives a clear academic definition of an efficient market which I agree with.

And the way that I would define it, in conjunction with the academic literature, is that an efficient market is one in which all widely available public information is quickly priced into and reflected in the securities prices.  Up to the point where if someone attempts to trade on the basis of information that's already widely publicly available, there are no risk-free opportunities for them to profit on that information above and



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
45–48

Page 45

M. CAIN - 1.8.24

beyond the cost of trading on that information.

Q. And have you used this standard in your scholarly work?

MS. WEINRIB: Objection to the form of the question.

A. Yes, I think that's -- so I guess when we talk about scholarly work it's also important to recognize that there are different types of market efficiencies. So this definition refers to the semi-strong form of market efficiency. But there's also questions about strong form efficiency or, you know, I've done academic research on aspects of merger negotiations that relate to information that's not publicly available during the merger negotiations.

And so, I think my academic research touches on this question. But in general, that's the, I'd say in general that's the type of market efficiency that I have in mind when I

Page 46

M. CAIN - 1.8.24

either teach or conduct academic research.

Q. And would you apply that definition when you prepare expert reports in other cases?

MS. WEINRIB: Objection to the form of the question.

A. Yes. If I'm, if I'm carrying out a market efficiency report, that's the definition of market efficiency that I have in mind.

Q. And turning back to Paragraph 10, is it your conclusion that PureCycle common stock traded in an efficient market at all times during the class period?

A. Yes, it is.

Q. Do you have an opinion of whether the market for PureCycle stock was more efficient or less efficient at any time during the class period?

MS. WEINRIB: Objection to the form of the question.

A. I don't think that's part of the

Page 47

M. CAIN - 1.8.24

definition. In my mind, in my understanding of market efficiencies, either information is reflected or it is not reflected in the stock prices. So there's not really -- when I approach a market efficiency report, there's not really some sort of continuum of opining that it was more efficient or less efficient. It's really just coming back to the question of was information, was widely available public information reflected in stock prices at any point in time.

Q. And did your analysis evaluate efficiency for any subperiods within the class period?

A. I think that the analysis was conducted over the full class period, so it would include subperiods. But I don't explicitly break out certain subperiods.

But the conclusions, the analyses and the conclusions apply really to every day throughout the class period.

Page 48

M. CAIN - 1.8.24

Q. And so if PureCycle securities traded in an inefficient market for some period of time within the class period, would your opinions stay the same?

MS. WEINRIB: Objection to the form of the question.

A. Well, if I concluded that it was not traded efficiently during some period of the class period, then my conclusions would be different than what I've reached here.

Q. And is it possible that the market for a specific security could be efficient sometimes and inefficient at other times?

A. I do think that that is possible as a theoretical matter. Again, I don't think that it's possible here at any point during the class period. But for that reason, I'm not providing an opinion about the efficiency of PureCycle either before the class period or after the class period.

So if I study a class period,



Page 49

M. CAIN - 1.8.24

then my opinions about market efficiency apply to the class period.  They don't apply either before or after the class period.

Q.   And so if you performed your analysis using only data and information from 2022, would that allow you to conclude that the market for the same security was efficient in 2020?

A.   I don't know.  I've never done a report where I only looked at data that was outside of the period for which I was forming opinions.

Q.   And how about two separate companies?  So if you have two companies, A and B, and they have different business operations, would analysis on Company's B stock allow you to draw any inference regarding market efficiency for Company's A stock?

MS. WEINRIB:  Objection to the form of the question.

A.   I don't, I don't know.  It's not a question that I've really thought

Page 50

M. CAIN - 1.8.24

about.

Q.   So are there any specific features of SPACs that have factored into your analysis relating to efficiency in this case?

A.   Yes, I would say definitely.

Q.   What are those?

A.   Give me just a second to refresh my recollection so I can try to give you as complete of an answer as possible to that question.

So, so there are I think a couple of features of SPACs that I do consider when I carry out a market efficiency report on a SPAC and a deSPAC transaction.

One of those features is that the volatility of the SPAC shares before a business combination is announced and also before it's completed, that volatility tends to be lower, the stock prices tend to trade closer to $10 per share.  But once a business combination is completed, the volatility tends to

Page 51

M. CAIN - 1.8.24

increase.  So for that reason, I used a shorter estimation window of 60 trading days for my event studies.

Another factor that I considered was the analyst coverage for SPACs tends to begin once the business combination is completed.  So that was another factor that I considered when evaluating the analyst coverage factor for PureCycle.

And then also in conjunction with what I said about the pricing, also the trading volume may be lower in the pre-business combination period, the bid-ask spreads may be wider.  So that's, that's something I looked at.

So, for example, if we were to go through the exhibits, I graph out and I've got some footnotes throughout the report where I talk about not only the averages over the full class period but also the subperiod prior to the closing of the business combination.

So looking at either trading

Page 52

M. CAIN - 1.8.24

volume or market cap or bid-ask spreads, things like that.

Q.   We'll walk through those things in a few minutes.

Did you find that indicia of market efficiency were stronger after the deSPAC transaction?

MS. WEINRIB:  Objection to the form of the question.

A.   I think that my conclusion was that the indicia of market efficiency weighed in favor of -- or let me start over.

My conclusion is that the factors that I evaluated supported market efficiency of PureCycle both over the full class period as well as throughout the class period which includes the period prior to the closing of the business combination.

Like I explained earlier, when I evaluate market efficiency it really comes down to a question of whether or not information is reflected in stock



Page 53

M. CAIN - 1.8.24

prices. So it's not so much about whether a certain factor is stronger or weaker, but rather just a question of does this factor weigh in favor of market efficiency or does it not?

Q. In Paragraph 21 of your report you state that (Reading:) The fact that PureCycle traded on the NASDAQ prior to and following the business combination leads to a strong presumption of market efficiency.

Before conducting your analysis of the Cammer/Krogman factors, did you presume that the market for PureCycle stock was efficient for the entire class period?

A. I would say that I approached the evaluation of those factors the same way that I do in every case which is as an objective analysis carrying out those analyses the same way that I do across every case.

But I also explain in Paragraph 21 that some people have, I think, quite

Page 54

M. CAIN - 1.8.24

convincingly made the case that any securities that are traded on the New York Stock Exchange or the NASDAQ should have a presumption of market efficiency, and yet it's my understanding that, even though that may be something that does weigh in favor of market efficiency, that that is not the final say in terms of the question about market efficiency.

And as a result, I then continue on to carry out an analysis of those factors completely separate and independent from what I state in Paragraph 21.

Q. Okay. But in Paragraph 1 -- 21, you do state that (Reading:) The fact that PureCycle's common stocks, warrants and options traded in a well developed market -- and I'm skipping a little bit -- leads to a strong presumption of market efficiency.

MS. WEINRIB: Objection to the form of the question.

A. Yes, I do say that in Paragraph

Page 55

M. CAIN - 1.8.24

21.

Q. And did you presume the market for ROCH stock to be efficient in the pre-deSPAC period?

A. So again, like I said before, I did not approach my analysis of the factors with any sort of presumptions or forgone conclusions or opinions, but rather I carried out the analysis of each factor independently and objectively, the same way that I do in every case.

And so that includes every factor, it includes across the full class period and throughout the class period which would include the pre-business combination time period.

Q. Have you heard of limits to arbitrage?

A. Yes.

Q. And what does that mean?

A. I think that sometimes academics attempt to study -- well, let me back up.

Page 56

M. CAIN - 1.8.24

So I think academics talk about arbitrage in different ways. So there can be different meanings behind what academics mean when they talk about arbitrage and therefore what they mean when they talk about limits to arbitrage.

But I think that arbitrage refers to a risk-free opportunity to make a profit. So there's some sort of fundamental mispricing in the securities of a company that presents an investor with an ability to make a profit without any risk, and even after factoring in and considering all of the trading costs.

So the idea behind market efficiency is that we should not have persistent arbitrage opportunities that persist for a long period of time because if the market is efficient the investors should see that, they should quickly trade on those profit opportunities and thus eliminating those



Page 57

M. CAIN - 1.8.24

profit opportunities.

But if there are, back to your question, if there are limits to arbitrage, then there could be some sort of impediment or limit that prevents investors from, from doing so, from eliminating those opportunities.

Q. Did you look at whether there are any limits to arbitrage in this case?

A. Well, I think that that's what the efficiency factors are addressing, that type of question.

So I think the first thing I would point out is that if there is a limit to arbitrage, then it sort of implies that investors are unable to, if they see what they think is a mispricing, they're unable to actually profit from that type of mispricing.

So it's not actually clear that that would be a violation of market efficiency because investors cannot actually profitably trade after factoring in their trading costs.

Page 58

M. CAIN - 1.8.24

So it might mean, for example, that trading costs are high.

But back to your question, I think that the reason we look at a lot of these factors is because they are informative about this question of whether there are persistent mispricings in a security, for example.

So when we have more trading volume, then that's indicative that investors are much more quickly trading on new information and that the stock prices are updating to reflect that information and therefore there's no arbitrage opportunities, so trading volume, bid-ask spreads, how expensive or costly is it to trade in the stock, the presence of institutional investors who quickly identify any types of mispricing, trade on that profitably and thus pushing the prices to their correct values. Just market cap drawing people in, analyst coverage, disseminating information, I look at. Even though

Page 59

M. CAIN - 1.8.24

this isn't one of the Cammer or Krogman factors, I look at autocorrelation. Is there a persistent large amount of autocorrelation where you could just trade today based on yesterday's price or return and try to predict the movement based on that? Again, above and beyond your trading costs.

So, and I think I talk about, you know, I think I document short selling and options trading as well which can also be an element of that.

So I think the short answer to your -- I know that's a long answer. But the short answer to your question is yes, that's something that is sort of under the surface of these factors.

Q. I want to talk a little bit about the MRK Study that you reference in your report I believe at Paragraphs 24 to 25?

A. Okay.

Q. So is the MRK Study, my understanding is that it analyzes stocks that had coverage and then lost it. Is

Page 60

M. CAIN - 1.8.24

that accurate?

A. Correct. Yes, I believe that's correct.

Q. And so PureCycle securities never lost coverage either before or after the deSPAC transaction. So why is that report applicable?

A. Yes, so the reason that I reference this report in my efficiency studies is that some of the factors that the courts have articulated as being relevant to an analysis of market efficiency, like the Cammer and the Krogman factors, is that, for some of those factors the courts gave a, sort of like a testing benchmark or a testing threshold that we can point to when we evaluate a given company and the data on the company.

But for other factors, the court did not articulate any sort of brightline threshold to point to.

And I found the MRK Study to be helpful in that respect because this



Page 61

M. CAIN - 1.8.24

study demonstrates that many of these factors are correlated with each other.

So, for example, even if you were to just look at I think the abstract and introduction of the MRK Study, they explain that companies that have no analyst coverage tend to have less investor attention and interest. They tend to have smaller market caps, wider bid-ask spreads, less trading volume. Again, they don't have analyst coverage.

And the tables within this paper provide a nice reference point for some of these factors that don't have a brightline comparison to point to, which is really the difference between one sample of companies that really lack investor interest, and so that's really what we're talking about when we say we're concerned that a company may not be trading in an efficient market, versus other companies that do elicit significant interest from investors, which is what we're thinking about when

Page 62

M. CAIN - 1.8.24

we talk about companies that are trading in an efficient market.

Q.   And so in Paragraph 25 in the middle when you say "I interpret the sample of MRK covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets," what are you basing your interpretation on?

A.   Yes, so they talk about investor interest in their paper. So that comes from, that comes from the paper.

But again, when I give my interpretation about efficient markets, that's really pointing to the fact that the Cammer and the Krogman factors are looking at these same indicia as what the MRK Study is looking to, like analyst coverage, trading volume, market company, bid-ask spreads, institutional ownership, the same exact factors.

Q.   And in your opinion, does the MRK Study provide clear benchmarks for evaluating market efficiency?

Page 63

M. CAIN - 1.8.24

A.   I do think it provides reliable benchmarks. Obviously, they're not the only benchmarks. One could look at other academic studies to, to try to identify different benchmarks. But I do think the, these differences with these two samples in the MRK Study are, do represent a reliable benchmark in particular for the factors in which the Cammer or the Krogman factors did not articulate any benchmarks.

Q.   Does the MRK Study actually conclude that the MRK covered firms all traded in an efficient market during the entire period covered by that study?

A.   I don't think they use that language. I think that the language they use is more along the lines of investor interest in those companies.

But again, as an economist, that's really what we're talking about in terms of a market efficiency report.

Q.   And do the authors of the MRK Study conclude that any stock that has

Page 64

M. CAIN - 1.8.24

trading data similar to the covered firms are stocks that are trading in an efficient market?

A.   Again, it's the same answer as before. It's their couching it in the language of investor interest and not in the language of a market efficiency report.

Q.   Okay, great.

MS. JACOBSEN:  I think we've been going about an hour, so let's just take a quick break.

THE WITNESS:  Great.

THE VIDEOGRAPHER:  We're now going off the record. The time is 10:28 a.m.

(A recess was had.)

THE VIDEOGRAPHER:  We are back on the record. The time is 10:41 a.m. This is the beginning of the media label number 2.

BY MS. JACOBSEN:

Q.   So reaching your conclusion that common stock traded in an efficient



Page 65

M. CAIN - 1.8.24

market, you looked at what are commonly referred to as the Cammer factors?

A.   Yes, that's correct.

Q.   Are those objective factors?

A.   What do you mean by "are those," I'm not sure what you mean?

Q.   Would you consider that those are objective in that there's not a subjective analysis that applies to them?

MS. WEINRIB:  Objection to the form of the question.

A.   Yes, I think that I would say they are objective in the sense that they're clearly defined by the Cammer court and they rely on data and inputs to evaluate.

I do think that they often require an expert analysis because there are expert decisions on how to actually assess or analyze those inputs to those factors, but I think at a high level I would describe that as, still as an objective analysis even though there are

Page 66

M. CAIN - 1.8.24

expert decisions that go into that analysis.

Q.   And the Krogman factors, would you also describe them similarly?

A.   Yes, I would.

Q.   And do these factors indicate market efficiency or establish market efficiency?

MS. WEINRIB:  Objection to the form of the question.

A.   I've never really broken it down to that level of semantic detail.  So, I guess the way that I understand the factors is that when viewed as a basket of factors, does the overall basket of factors either weigh in favor of market efficiency or weigh against market efficiency?  Or I would also say, does the basket of factors indicate market efficiency or indicate market inefficiency?  And I think that that, that can be done both for the full, the full basket of all the factors.  And some courts, as I understand it, have

Page 67

M. CAIN - 1.8.24

also said that where all of the other factors other than Cammer 5 weigh in favor of market efficiency, that you can just look at those factors without considering Cammer 5 based, again, based on my understanding of what some courts have said.

Q.   And is there any threshold number of factors a stock, a stock needs to satisfy in order to be considered efficient?

MS. WEINRIB:  Objection to the form of the question.

A.   I'm not aware of the courts providing that type of guidance.

Q.   In your opinion do any of those factors have more weight than others in determining market efficiency?

A.   Again, I, my understanding from how courts view it and how I thus apply it is to look at it as a basket.  So again, a basket of all the factors as well as a basket of all the factors excluding Cammer 5.  But beyond that, in

Page 68

M. CAIN - 1.8.24

my mind, I don't have a, I'm not aware of an explicit ranking or weighting of the factors.

Q.   And so is -- would you consider Cammer 5 to be more important than the other factors?

A.   When I carry out the analysis, I don't put more or less weight on any one individual factor but rather reach a conclusion based on looking at the baskets.

Q.   And does your analysis of the factors in the basket vary depending on the security that you're analyzing?

A.   No.  I think if you were to look back across every expert report that I've done on market efficiency, you would see that I've analyzed the same basket of Cammer and Krogman factors.  I also compare those to the MRK Study in every efficiency report, and a number of those have been accepted by the courts and certified.

Q.   Let's turn to Analyst Coverage.



Page 69

M. CAIN - 1.8.24

Paragraph 33.  So is there an objective methodology used to evaluate whether analyst coverage supports market efficiency?

A.   So I think that I would start with the quote from the Cammer court in Paragraph 31, where the objective analysis is just to count up the securities analysts who are following and reporting on a company's stock during a class period.

So that's the objective analysis that the Cammer court described.

Like I said earlier, then I think it's up to the expert to actually carry out and execute the analysis under that objective.

And so the, because the Cammer court did not set a brightline threshold which I think is, was probably wise of the court not to do so because there have been mergers and consolidations across analyst firms, for example, what I point to is a couple of different

Page 70

M. CAIN - 1.8.24

benchmarks within Paragraph 34 for sort of a baseline comparison.

Q.   And what's your definition of "analysts" in this context?

A.   So I guess if you were to turn to exhibit, I think it's Exhibit 3, you can kind of see I look at it from two perspectives in this case.  And again, I think this is where documenting the presence of research analysts is a little bit different for a SPAC than from a company that's been operating for a long period of time and it's similar to like an IPO of a company, that the analyst coverage typically starts after the company is publicly traded.

So for a SPAC, you typically start to see analyst reports after the business combination is closed, and then you see typically an increase in those reports over time.

So in the top panel of Exhibit 3 I just counted up the analyst reports that I've been able to locate.  Again,

Page 71

M. CAIN - 1.8.24

there's a footnote in the report that just explains that some research analysts provide research to institutional investors but don't make that publicly observable to someone like me.

I used to produce analyst research like that myself before going back and getting a Ph.D.  None of that was publicly available.

But in terms of publicly available analyst research, the top part of Exhibit 3 sort of counts up those reports from the different analysts.  And then in the bottom part of Exhibit 3 I'm also demonstrating that analysts were, were paying -- were tracking the company, were tracking PureCycle, were interacting with management because they were participating on earnings calls.  And so I document that during the class period as well.

Q.   Great.  And so in Paragraph 33 of your report you state that (Reading:)

Page 72

M. CAIN - 1.8.24

Analyst reports and call transcripts reflect participation from, quote, large and influential financial firms, such as Oppenheimer, Bank of America, Cowen & Co, and Jefferies.

Do you believe the quality of the analyst is important?

MS. WEINRIB:  Objection to the form of the question.

A.   I guess my question would be how would you define "quality"?

Q.   Well, I'm just looking at your language that you reference that the, your analysis showed (Reading:)  Analyst reports and call transcripts that reflect participation from, quote, large and influential financial firms.

So does the fact that a company is followed by a large and influential financial firm weigh into your analysis?

A.   I think that ultimately my conclusion would be based on comparing the number of analysts that are following PureCycle to the benchmarks in



Page 73

M. CAIN - 1.8.24

Paragraph 34.

I do think that I also consider the fact that some of these are firms that based on my professional experience I know are widely followed by investors, and that's something that I highlight in Paragraph 33 which I think is a useful piece of information.

But ultimately the benchmarks that I give in Paragraph 34 are that almost 20 percent of US firms have no analyst coverage in a given year. And that, from another study, a lot of firms are covered by zero or one, maybe two analyst firms.

And so the fact that PureCycle was covered by multiple firms, that weighs favorably for market efficiency compared to these benchmarks.

Q. So why did you reference the fact that you saw participation by analysts from large and influential financial firms in your report if the quality of the analyst isn't important?

Page 74

M. CAIN - 1.8.24

MS. WEINRIB: Objection to the form of the question.

A. So again, I don't think I said that the quality was unimportant. And also don't think that I'm describing any analysts as either -- I'm not talking about the quality of any of these analysts. Because I think that that's a very, it's actually a very complex question when you ask about the quality of an analyst because that, you could be asking about their forecast accuracy, for example or all star rankings or things of that nature which is a very complicated question. And I don't think that's something that the Cammer court has ever explained needs to be a component of the, the analysis here.

But what I'm explaining in Paragraph 33 is that when I reviewed the coverage by analysts of PureCycle, that it did include some firms that I recognize from my professional experience, and that are widely followed

Page 75

M. CAIN - 1.8.24

by investors.

That's essentially all I'm saying in Paragraph 33.

Q. And is it important that an analyst participate in company conference calls and conferences?

MS. WEINRIB: Objection to the form of the question.

A. Is it important to --

Q. To your analysis on this factor.

A. It's not required. I think that there can be very high quality analyst reports that I've seen that are based on their own internal research or private data that they have access to. But I've also seen cases where analysts do ask very value-relevant questions of management on earnings calls and get very informative answers.

So I think that it's, again, it's something that can be useful to document in terms of just asking the question of are -- really the question is, is this company followed by analysts? That's

Page 76

M. CAIN - 1.8.24

the question.

But there's different ways to try to document that. One is through looking at the analyst reports, looking at price targets, looking at buy-sell recommendations, but also looking at participation on earnings calls.

So I'm not articulating any sort of standard that every analyst has to show up on every earnings call, if that answers your question.

Q. What type of information do analysts disseminate to the market?

MS. WEINRIB: Objection to the form of the question.

A. It really varies widely across different companies and different points in time for those companies. But that could include, it could include participating -- since we're talking about earnings calls, it could include participating on earnings calls, or even if they don't participate just reviewing the transcripts after the calls, and



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
77–80

Page 77

M. CAIN - 1.8.24

then providing reports to investors about what was said on the earnings calls.

They can repeat a lot of the financial results that were just announced by the company and get that out to investors.

They can digest complex information that might be reported in financial results. They might interact that with other nonpublic data that they have or research that they have or other resources that they have that are not widely available and that they can include in their analyst reports. And they might do that after earnings calls but they might do it at other points in time as well.

Q. So let's turn to Exhibit 3. And looking at that, which of these firms listed on Exhibit 3 is widely followed by investors?

A. So I guess I would probably repeat what I said back in the text,

Page 78

M. CAIN - 1.8.24

which includes Oppenheimer, Banc of America Securities and Cowen & Co.

Those would be three of the firms that jump out at me that I recognize from my professional experience.

Q. How about Jefferies?

A. Yes, I would say Jefferies also.

Q. And in Paragraph 35 -- let's stay with Exhibit 3 but in Paragraph 35 you note that (Reading:) PureCycle only hosted three earnings announcements during the class period.

And I'm just trying to understand when -- well, let's look to Exhibit 6.

A. Okay.

Q. So in Exhibit 6 it looks like the first earnings call was on May 7 -- May 20 -- wait, May 17th of 2021. Is that accurate?

A. Yes, that's the market impact date. So I'd have to go back and look at whether these were -- if these were after hours, then it would have been the previous day that they held the earnings

Page 79

M. CAIN - 1.8.24

call. But, yes, that's the market impact date of that first earnings call within the class period.

Q. And so that would have been the first date that any of the analysts participated in the company conference call?

A. That's what I'm pointing to for the earnings calls. There may have been other analysts. Sometimes SPACs will hold analyst calls or investor calls prior to their earnings calls.

But I'm just summarizing their earnings call participation in Exhibit 3.

Q. Okay. And in, in your analysis of the pre-deSPAC period, did you determine whether any conference calls were held by ROCH?

A. I don't recall looking at that question.

Q. Okay. So do you agree that it's important for analysts to publish reports in which they can assess the

Page 80

M. CAIN - 1.8.24

recent company business investments, historical financial performance, and provide forecasts of future operating performance?

MS. WEINRIB: Objection to the form of the question.

A. I do think that's one of the functions of analysts. It's not the only function. That's one of the public-facing functions that we're able to observe. But they also do many things behind the scenes. You know, I think that, for example, I think that my recollection is that Roth Capital and maybe Craig Hallum were involved. You know, they're listed in Exhibit 3. But I believe they were involved prior to their first public reports that were issued in terms of interacting with investors and disseminating information, even though they may not have publicly issued analyst reports during the pre-business combination period.

Q. Did you analyze whether all



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
81–84

Page 81

M. CAIN - 1.8.24

analysts listed in your Exhibit 3 performed these functions?

MS. WEINRIB:  Objection to the form of the question.

A.    In the top part of Exhibit 3, there's 23 analyst reports that I identified during the class period.  So I think that that would be the number of reports.  And those reports would typically include some of the components that you just described.

Q.    And do you have any information in your report that shows when those were, those reports were actually issued?

A.    I don't break down the number, the dates in terms of those numbers in Exhibit 3.

Q.    You wouldn't think that's important?

MS. WEINRIB:  Objection to the form of the question.

A.    Well, like I said earlier when you asked about SPACs, I explained that

Page 82

M. CAIN - 1.8.24

one of the things that I considered is that, for SPACs, the analyst coverage typically starts, in terms of the publicly signed reports that analysts put out in terms of buy-sell recommendations and price targets, that typically starts after the business combination has closed for SPACs.

And my recollection is that that pattern here is consistent with what I generally see for SPACs.

Like I also said, I believe that some of these analysts listed in Exhibit 3 were also involved in discussions with both management and investors prior to the closing of the business combination, even though they did not put out those types of buy-sell recommendation reports prior to the closing of the business combination.

So it is a -- back to your question -- that was something that I looked at when I was compiling Exhibit 3 in the report here.

Page 83

M. CAIN - 1.8.24

Q.    So you indicated that you believe that there were some analysts that were involved with the ROCH prior to the business combination.  Is that reflected anywhere in your data?

A.    Well, I think that I -- I think the complaint talks about some of that.  That's my recollection.  And I think that those analysts are listed in Exhibit 3.

Like I said, my recollection is that that included Roth Capital and possibly Craig Hallum.

And I also, in the documents, consider a -- I list SEC filings so I did look at SEC filings.  You know, there's a lot of then, for example, the ones listed in Exhibit 6 but not only those, as well as there's footnotes in the report about other SEC filings that I excluded for purposes of the no news component of the Cammer 5 test.

So my recollection is that the, some of the SEC documents, my

Page 84

M. CAIN - 1.8.24

recollection is that they referenced some of this as well.

But again, that's -- the point of Exhibit 3 is really just demonstrating that there was analyst coverage over the class period.

Q.    Okay.  I think I already asked you this.  But the first earnings call was May 17th of 2021, that was Q1, correct?

A.    In terms of the market impact date, yes, that's correct.

Q.    Okay.  And so when you list that earnings call participation during the class period and you list Q1 2021, you're referring to May 17th of 2021?

A.    Yes, either the 16th or the 17th, right.

Q.    Now in Footnote 31 of your report you note that the ROCH stock had fewer analysts covering it, just one before the deSPAC transaction --

A.    Mm-hmm.

Q.    Correct?



Case 6:21-cv-00809-PGB-RMN   Document 183-17   Filed 01/23/24   Page 22 of 63
PageID 8444

MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
85–88

Page 85

M. CAIN - 1.8.24

A.  Right.

Q.  And do you know if that firm was BuySellSignals?

A.  I don't recall off the top of my head which of these it was.

Q.  And are you familiar with BuySellSignals?

A.  Yes.

Q.  And would you consider BuySellSignals a large and influential financial firm as you discussed in Paragraph 33?

A.  I don't think that it's followed quite the same way as the other firms that are listed in that paragraph, but it is still a firm that puts out analyst reports on companies.

Q.  And is it a FINRA registered equity analyst?

A.  I don't know about the FINRA registrations of any of the analysts here.

Q.  Did you examine whether the reports published by BuySellSignals

Page 86

M. CAIN - 1.8.24

contained earnings or sales forecasts, BuySellSignals' recommendations or discussions of company fundamentals?

MS. WEINRIB:  Objection to the form of the question.

A.  I don't recall the specific content of any of the analyst reports in Exhibit 3.

Q.  After the deSPAC transaction you indicate that there were 23 firms following with seven separate analysts, but you conducted no analysis of specifically when those reports were issued.  Is that accurate?

MS. WEINRIB:  Objection to the form of the question.

A.  I think I said there's 23 reports throughout the class period, not only after the deSPAC.

Q.  And do you know how many analysts were covering the stock between the deSPAC transaction and the first earnings call on May 17th?

A.  Yes.  So again, this, I think

Page 87

M. CAIN - 1.8.24

this is something I talked about earlier, which is that it's actually quite difficult for us to publicly observe all of the functions that analysts actually carry out in terms of interacting with management and investors.

We are typically able to observe that through these snapshots when they participate in an earnings call or when they issue a report.  But for companies including almost all SPACs that I've seen, if not all SPACs that I've seen, we typically are not able to observe those roles and functions that they're carrying out prior to that first earnings call that occurs after the deSPAC combination closes.

So like I said earlier, my recollection is that the complaint references and some of the SEC filings may also reference some roles that Roth Capital and Craig Hallum participated in prior to that first earnings call.

Page 88

M. CAIN - 1.8.24

But I'd want to go back and review all those materials to, you know, fully refresh my recollection.

Q.  Okay.  Let's turn to Market Makers.  Paragraph 40.  You state that (Reading:)  PureCycle had at least 78 market makers and brokers providing similar activity over the class period, correct?

A.  Yes.

Q.  Do you know how many market makers there were during the pre-deSPAC period?

A.  No, I didn't break that down to the pre-deSPAC subperiod.

Q.  And why are market makers relevant to market efficiency?

A.  So one of the things that the Cammer court explained is, is that, if you look at Paragraph 37, if we're looking at a company that's traded over the counter, which means it's not traded on the NASDAQ, it's not traded on the NYSE, and it's only traded over the



Page 89

M. CAIN - 1.8.24

counter, that has sort of lower quality reporting of real time data, like price and volume, then the presence of market makers can help to facilitate trading and liquidity for the company's stock. And the Cammer court said, you know, at least five or ten market makers would be helpful to show.

I think, and this actually goes back to something that we talked about earlier, that what I explain here is that because PureCycle traded on the NASDAQ throughout the class period, that essentially that alone satisfies what the Cammer court has laid out in terms of the market maker consideration.

Because the Cammer court was really explaining that if, if you're talking about a stock that's only traded over the counter. Whereas in Paragraph 38 the Cammer court says we think there should be a presumption that certain markets are developed and efficient for virtually all securities traded there,

Page 90

M. CAIN - 1.8.24

including the New York Stock Exchange and the NASDAQ.

Q. Why are arbitragers relevant to market efficiency?

MS. WEINRIB: Objection to the form of the question.

A. So I think we could very broadly define arbitragers as any sort of investor or trader or market maker who is looking for mispricings in the stock, and if they see, you know, mispricing or if they see an earnings announcement come out and they feel that the stock should go up but it hasn't increased yet, maybe they might be reading it themselves, they might have a computer algorithm that reads it and trades on it in less than a second, they can make a small profit. And then by virtue of their trading, that pushes the price up, pushes it to the correct value that reflects that information.

So that's the way in which, that's sort of the microstructure way in

Page 91

M. CAIN - 1.8.24

which new information makes its way into stock prices.

And so that's, I think, the presence of trading is sort of how -- the presence of investors, or investors paying attention, if we broadly define arbitragers as investors who are paying attention to a stock, that's how information is able to make its way into prices, and that could be institutional investors, it could be hedge funds, it could be high frequency traders, it could even be retail traders as reflected in just aggregate trading volume statistics.

Q. And other than market makers, have you performed any specific analysis on the existence of arbitragers in this case?

A. So I've documented the presence of institutional investors. I've documented the existence of trading volume. I've documented trading volume not only in the stock but also in the

Page 92

M. CAIN - 1.8.24

options which further supports, sort of, pricing efficiency through these types of arbitragers.

So I think the answer is yes.

Q. Would you agree that short sellers are important to arbitragers?

A. I think that short sellers can be helpful as well. I think there are securities that have no short selling and you still tend to see that the prices of those securities still reflect information about the company. So I don't think that there's a requirement for the existence of short sellers. But that's also something that I documented I think in Exhibit 10 of this case, that there was, that there was short interest in the company as well.

Q. And so would that analysis -- did that analysis show the costs of short selling for PureCycle Technologies?

A. No, I did not evaluate the cost of short selling.

Q. And why not?



Page 93

M. CAIN - 1.8.24

A.   Because that's ultimately not necessary.  It's not necessary for there to be very low costs for short sellers in order for a stock to be efficient.  Like I said before, there are plenty of securities that have no short selling whatsoever, so you could think of that as infinite cost.  And yet those securities still trade efficiently, still reflect information in the prices.

Q.   Let's turn to market capitalization.  Is there an objective methodology used to evaluate whether market capitalization supports market efficiency?

A.   So I think in Paragraph 64 I explain that both the Cammer and Krogman courts talk about either market capitalization or I think the Cammer court talked about it in the context of the number of shares traded and the value of the shares outstanding which is essentially market capitalization.

So that's the objective factors

Page 94

M. CAIN - 1.8.24

just looking at the market cap for a company.

Neither one of those decisions provided a baseline or a benchmark.  But if you look at I think it's Exhibit 8, you'll see that, over the full class period, it's just under one and a half billion dollars.  You know, could you compare that also to, there's a separate factor that talks about S3 filing availability where the SEC says a company has to have at least $75 million float in order to be eligible.  So that's one I think, that's one number at least.

I also point to the MRK thresholds over the full class period.

I also considered the fact that this is a SPAC and almost every, I think every SPAC that I've encountered you see a graph somewhat like this that starts out with just the SPAC shares and then the market capitalization increases dramatically once the business

Page 95

M. CAIN - 1.8.24

combination closes and they receive the additional PIPE funding.

Q.   Right.  So in Footnote 73, you indicate that the market capitalization before the deSPAC averaged 180.67 million.

A.   Mm-hmm.

Q.   Which is approximately 1/12 of what it averaged during the class period.

I understand your testimony that that's not surprising given that it's a SPAC.  But how did this factor into your analysis of market efficiency?  Why isn't the period prior to the deSPAC inefficient?

MS. WEINRIB:  Objection to the form of the question.

A.   Yes, so again, I think that I consider the full basket of factors, for example.

So, actually, let me start, before I get to that, let me explain.

Even $180 million is

Page 96

M. CAIN - 1.8.24

significantly higher than that MRK benchmark of just under $28 million for the companies that have much lower investor interest.

So that's one benchmark.

The other benchmark that I already mentioned is the fact that 180 million is much higher, more than double the S3 filing eligibility of having a float of $75 million.

So it's, it's, you know, if it's good enough for the SEC to determine that a company is eligible to file a shortened registration form, then I think it also weighs in favor of efficiency.

But, beyond that, this is where I think it also comes back to the idea of looking at this as a basket of factors.  And I look at the full picture for a company.

So I consider the fact that every SPAC has a much smaller market cap prior to the business combination.



Page 97

M. CAIN - 1.8.24

And they tend to have higher bid-ask spreads and often lower trading volume, although I don't, I'm not sure if that was the case here.

But I also looked at the Cammer 5 results, for example, and saw the price was responding to information that came out, even prior to the closing of the deSPAC transaction.

So all these factors tend to be correlated and work sort of hand in hand in terms of a valuation.

When you want to start to look at individual subperiods, again, the idea before the Cammer and the Krogman factors is that these are averages over the full class period.

But like I've said, I've also got footnotes in here to reflect that I did consider that subperiod before the business combination closed.

Q.   And if you were just analyzing the subperiod before the business combination closed, would you conclude

Page 98

M. CAIN - 1.8.24

that it, that the market was efficient?

MS. WEINRIB:  Objection to the form of the question.

A.   Yeah, I would, because like I have said earlier, that I've concluded that the market was efficient throughout the class period and therefore if we were to look at any subperiod of the class I have the opinion that the stock and the options and the warrants were -- have the same conclusions at any subperiod.

Q.   Looking at Exhibit 8 of your report, PureCycle didn't reach a market capitalization of 243 million until late February, right, three months after the start of the class period?

A.   I think it would probably be in March when the business combination closed.

Q.   And does that impact your conclusion with respect to market efficiency pre-business combination?

A.   Well, so, I think you're

Page 99

M. CAIN - 1.8.24

referring back to the median from the MRK sample firms, right?

Q.   Yes.

A.   So just because that was a little bit below the median, right, doesn't mean that it was inefficient, right. Because the median is just the midpoint of a distribution around that, that median.

So I think if we're looking at that subperiod, the more relevant benchmark would be comparing it to the $28 million market cap of the sample firms or also the $75 million benchmark of S3.

But I do agree that it falls just a little bit below the median of the covered firms, but it would still be within that, that distribution of those covered firms.

Q.   Let's turn to Paragraph 66 of your report.

A.   Okay.

Q.   And focus on bid-ask spread for a

Page 100

M. CAIN - 1.8.24

minute.

You quote the Krogman court as saying (Reading:)  The large bid-ask spread is indicative of inefficient market.

And later in Paragraph 66 you say that (Reading:)  A wider bid-ask spread indicates a less liquid and less efficient market.

How large or how wide does a bid-ask spread have to be in order to be indicative of an inefficient market?

A.   Yes, so this I think again is another, another example of a factor where the court talked about a factor without providing any sort of, any sort of brightline threshold.

So what I refer to is again, in Paragraph 67, the MRK Study as a benchmark because the Krogman court did not provide a benchmark -- sorry, that's in, those benchmarks are given in Paragraph 68 where the sample firms had a bid-ask spread of just over four and a



MATTHEW D. CAIN                                        January 08, 2024
William Theodore vs Purecycle                                   101–104

Page 101

M. CAIN - 1.8.24

half percent.  Then the median of the covered firms was 1.69 percent.

So that's, those are the benchmarks that I have compared to in all of my efficiency reports including this one.

Q.   All right.  In Footnote 79 you note that (Reading:)  The bid-ask spreads prior to the deSPAC were on average 1.36, which seems to be double then the average for the class period which is .64.

Did you take that into account in forming your opinion that the pre-deSPAC period was efficient?

A.   Yes, I did.  That pre-deSPAC period bid-ask spread is still well below that of the, both the sample firms as well as the covered firms in the MRK Study.

And it's, like I said earlier, it's also something that I typically see in SPAC firms as well.  They typically have a higher bid-ask spread in the

Page 102

M. CAIN - 1.8.24

pre-business combination period and then it tends to fall down.  So that's a pattern that we tend to see in SPAC transactions.

Q.   And just because it's a pattern that you see in SPAC transactions, does that somehow negate evidence of inefficiency?

A.   Does it negate?  Well, again, I don't know any evidence of inefficiency here.  So if there was evidence of inefficiency, then I would take a closer look into that question.  But based on these statistics, even in the subperiod, this is still supportive of market efficiency.

Q.   And in analyzing bid-ask spread you use closing spreads, correct?

A.   Yes, I did.

Q.   Does that use of closing bid-ask spreads obscure intraday volatility?

A.   So I don't, I'm not opining on whether it obscures any sort of volatility but rather I have a Footnote

Page 103

M. CAIN - 1.8.24

77 that explains that academic studies have demonstrated that end of day spreads are very similar to the intraday spreads throughout the day.  And also many studies have also shown that a large proportion of trading actually occurs at the end of the day.  And so that's potentially a more relevant period to be focusing on if we're actually approximating trading costs through bid-ask spreads.

Q.   And in other securities cases that you have rendered an opinion, did you use closing spreads?

A.   I've done both.  So I've used closing spreads and I've also used Bloomberg's calculation of the spread, which is often like a five-day rolling average spread that they calculate themselves.  They also provide an end of day calculation.  They also provide end of day bid and ask prices that I can use to calculate the spread myself.

But I've never really noticed

Page 104

M. CAIN - 1.8.24

significant differences across any of those methodologies.

Q.   And how did you, how do you decide -- strike that.

How did you decide what to use in this case?

A.   In this case I just told the staff at Fideres to use the end of day prices.

Q.   Let's talk about institutional investors.  Is there an objective definition of "institutional investors" used in academic literature?

A.   I think there's a gray area between retail and institutional investors that we could talk about.  But separate and apart from that gray area, I think that the academic literature would typically consider individuals to be retail investors, whereas institutions are larger firms that are made up of a group of professionals who may have some sort of formal training and securities licenses and work in a



Page 105

M. CAIN - 1.8.24

larger group to make investment decisions and trading decisions.

So those institutional investors include pension funds, endowments, mutual funds, hedge funds, investment banks, those types of entities.

I do think there's a gray area because it is ultimately it's a continuum where you have retail investors, then you have really wealthy retail investors and then at some point they're managing so much wealth that they may hire someone to help and they'll open up a family office. So when you have family offices, I think that's sort of in a gray area where they are sort of straddling the line between retail and then at some point they frequently really transition across the line into being an institutional investor.

But anyways, I think that's how, you know, that's how academics would describe it.

Page 106

M. CAIN - 1.8.24

And then another way to sort of really more clearly identify this is just by relying on SEC filings. So institutional investors, once they reach a certain threshold of assets under management or ownership percentage in companies, they have to file certain types of SEC forms.

So you'll see 13-F filings made on a quarterly basis and other types of filings. So as a result, yeah, databases like Bloomberg or Capital IQ will report institutional holdings and so I'll typically just rely on, on those databases because they're pulling their data from SEC filings. It may not be complete because they may miss some of these institutions that fall below those reporting thresholds, but that's kind of a brightline way in which we can identify and measure sort of a minimum amount of institutional holdings in a company.

Q.   And let's turn to your Exhibit

Page 107

M. CAIN - 1.8.24

10A of your report. So here it shows that you conclude (Reading:) On average 263 institutions held stock at some point during the class period. Is that accurate?

A.   It's, yes, it's 263 unique separate institutions that held, on those different reporting dates, from December 31st, 2020 through December 31st, 2021. So there's, you know, because we only get those snapshots every quarter, I'll, you know, frequently go to the end of the next quarter at the end of the class period so that I've encompassed the full class period which is what I've done here.

Q.   And then if you just look at the period ending 12/31/2020, there are only 26 institutional investors; is that accurate?

A.   Yes.

Q.   And I think in your footnote you indicate, Footnote 83, you indicate on average, 27 institutional investors held

Page 108

M. CAIN - 1.8.24

the stock before the deSPAC transaction?

A.   Yes, that's correct.

Q.   And so does that -- did you take that into account in forming your opinion that the pre-deSPAC period was, was efficient?

A.   Yes. So one of the things that I explain in Paragraph 72 is that the MRK Study showed that the, there are sample firms that lacked analyst coverage had a meeting of only nine institutional investors. So PureCycle had about three times as many institutional investors during the pre-deSPAC period.

Q.   To clarify, I think earlier you testified that Exhibit 10A included short sellers. But looking at it, it really is just institutional investors, correct, or does it include short sellers?

A.   So if you look at Column 5, that lists out the activity of short sellers in Exhibit 10A.

Q.   And what did you find with



Page 109

M. CAIN - 1.8.24
respect to the pre-deSPAC period for short sellers?

MS. WEINRIB:  Objection to the form of the question.

A.   There was some, there was some short interest.  I didn't separately sort of evaluate any sort of thresholds of short interest.  Like I explained earlier, short interest is not necessary for market efficiency because many securities have no short interest, like many bonds, for example, and yet have been, you know, academics have clearly shown that information is reflected in bond prices despite the fact that many bonds have no short interest.

But even so, there is some amount of short interest prior to the closing of the SPAC.

Q.   And did you evaluate the amount of short interest?

A.   Not beyond just reporting 120,542 shares of short interest reported as of December 31st, 2020.

Page 110

M. CAIN - 1.8.24
Q.   Let's turn to Paragraph 75 of your report.  So you concluded that (Reading:)  Autocorrelation coefficient over the full class period was not found to be statistically significant at the 95 percent level, correct?

A.   Yes.

Q.   And then earlier in Paragraph 73 you write that it's (Reading:)  If statistically significant autocorrelation stock returns persist over a sufficient time period such as several quarters and is large enough in magnitude -- I'm going to skip a little bit -- this would imply market efficiency.

A.   Inefficiency.

Q.   Inefficiency.  Thank you.

So your opinion is that autocorrelation is evidence of market inefficiency?

A.   Well, I think it's more complicated than that.  It includes one of the things that you skipped over,

Page 111

M. CAIN - 1.8.24
which is that it is, it has to be large enough in magnitude that a trader could earn riskless profits after trading costs.

So, it's, it's important to understand that the autocorrelation test that I've shown in, I think, Exhibit 11 is based on the abnormal returns after controlling for the market and the industry indices.

So, number one, I also have a Footnote 88 that explains that if you were to approximate the trading costs, that those would eat up any sort of profits just from making an inference from the autocorrelation coefficient itself.

This also does not consider slippage, which means that when someone tries to trade on this the price may quickly move against them and they may not be able to earn any profits.

And also, I've seen cases, even for very large companies, where there is

Page 112

M. CAIN - 1.8.24
autocorrelation in the abnormal returns but then when I turn to the raw returns that it disappears.

But there was no need to even look at the raw returns here because there was no evidence of persistent autocorrelation for PureCycle.

Q.   In Paragraph 73 you reference (Reading:)  Several quarters is a sufficient time period for autocorrelation.

How did you come up with that calculation?

A.   Yes, so that's just really based on my own explanation of what is autocorrelation.  So the idea is that could an investor study historical data and identify a pattern in the historical data and then attempt to profit from that pattern that was identified in the historical data.

So if you look at academic studies, many academic studies have spanned multiple years, but some may



Page 113

M. CAIN - 1.8.24

have had shorter time periods such as several quarters. So that's kind of what I'm referring to.

Q. So would you agree that autocorrelation violates weak form market efficiency?

A. I think that, again, if there is a persistent autocorrelation over a long period of time in the raw stock returns that presents a risk-free arbitrage opportunity even after encountering all of the trading costs, like the bid-ask spread, the execution costs of trading and any sort of slippage where the price moves against someone who is trying to take advantage of that, if someone factors all of that in and they're still able to profitably trade based purely off of historical data, over a persistent time period, then that would, academics would say that that is a violation of weak form market efficiency.

Q. And would you agree with that?

Page 114

M. CAIN - 1.8.24

A. Yes, I would agree with that.

Q. Looking at Exhibit 11 of your report. And just focusing on Q4 of 2020 and Q1 of 2021, would that show positive and statistically significant autocorrelation in those two periods?

A. Yes.

Q. And did you, did you consider that in reaching your conclusion that the market was efficient during the entire class period?

A. Yes.

Q. And why doesn't that indicate market inefficiency in the pre-deSPAC period?

A. Yeah, so again, we're really talking about something that persists over typically several quarters in order for someone to identify any sort of arbitrage opportunity. And the fact that, like I said earlier today, for most SPACs that are trading in the de -- in the pre-business combination period, including this one, they tend to trade

Page 115

M. CAIN - 1.8.24

between like nine and $11 per share.

So you can, just because of that, sometimes in the data you get these random presentations of these correlations.

So if you analyze large amounts of data, I frequently see one or two quarters that have a statistically significant autocorrelation coefficient. That's something I see in many of my market efficiency reports. So I've done, as we talked about earlier today, I've done many of these and I very frequently see a couple of random quarters of statistically significant coefficients. But that's not the test.

The test for autocorrelation is really looking at a full class period is there evidence of, over a long period of time, a persistent autocorrelation coefficient? And if so, then the next question becomes does it appear to exceed trading costs, and if the answer is yes, then I would look at what does

Page 116

M. CAIN - 1.8.24

it look like on a raw basis without adjusting for the market and the industry.

But like I said here, the answer is no, it does not persist over a long period of time and it does not seem to be, number one, it's not statistically significant at the 95 percent level over the class period.

Number two, the magnitude of the coefficients fluctuates widely from across these different quarters and does not seem to exceed the trading costs.

Q. And so how do you differentiate between your statement in Paragraph 73 referencing several quarters versus two quarters?

A. Yes, so again the test, like I said -- well, let me turn back to Paragraph 73 to make sure that I'm understanding what sentence you're pointing to.

Q. It's the last sentence.

A. Okay. So I'll start with the

Page 117

M. CAIN - 1.8.24

sentence before that which says (Reading:) Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released.

So that's one thing that can give rise to these random occurrences of autocorrelation.

However, what I go on to explain is, (Reading:) If it's statistically significant, if it persists over a sufficient time period such as several quarters and it's large enough in magnitude that a trader could earn riskless profits after trading costs and slippage, this would imply market inefficiency because publicly available information about prior stock movements would not be fully reflected in current stock prices.

So if I were to encounter that, then I would investigate it further.

Page 118

M. CAIN - 1.8.24

There have been times that I have encountered that and investigated it further in other cases.

But again, what I saw in the test here was not sufficiently persistent in order to warrant a further investigation because I did not have any concerns about market inefficiency here.

Q.   Okay. Let's turn to Options Trading, focused on Paragraph 76 of your report. You conclude that (Reading:) The presence of options trading supports the conclusion that PureCycle's common stock traded in an efficient market throughout the class period. Correct?

A.   Yes.

Q.   And if you look at Footnote 97 of your report, you indicate that options, (Reading:) PureCycle options commenced trading after the completion of the business combination. Correct?

A.   Yes.

Q.   So prior to the deSPAC transaction, PureCycle options were not

Page 119

M. CAIN - 1.8.24

trading?

A.   I believe the warrants were trading which is a type of option but not the call and put options that I'm referencing in terms of that footnote.

Q.   Okay. And does this suggest market inefficiency prior to the deSPAC transaction?

A.   No, it doesn't suggest inefficiency. It just, rather what I'm explaining in Paragraph 76 is that they can support a finding of market efficiency, but certainly the lack of options trading does not indicate inefficiency.

So, for example, there have been many classes certified of bonds and notes for companies despite the fact that there are no publicly traded options on those bonds or notes.

So a lack of options does not indicate inefficiency but rather the presence of options can be further support of efficiency.

Page 120

M. CAIN - 1.8.24

MS. JACOBSEN:  Great. Let's go ahead and take a quick break.

THE VIDEOGRAPHER:  We're now going off the record. The time is 11:41 a.m. We're off the record.

(Luncheon recess.)



Page 121

M. CAIN - 1.8.24

AFTERNOON SESSION

(12:35 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:35 p.m.

This is the beginning of the media label number 3.

MATTHEW D. CAIN, Ph.D., resumed, having been previously duly sworn, was examined and testified further, as follows:

CONTINUED EXAMINATION

BY MS. JACOBSEN:

Q.   Let's turn back to Exhibit 10A and 10B.  So this is where you list the institutional holders at some point during the class period.  And my question, and I see that you indicate there's 263 institutions that have owned stock at some point during that class period, correct?

A.   Correct, yes.

Q.   What did you do to assess how large each of these institutions holdings were?

Page 122

M. CAIN - 1.8.24

MS. WEINRIB:  Objection to the form of the question.

A.   I only report the aggregate numbers in Exhibit 10A.

Q.   And in compiling the list of the 263, did you assess -- did you have a threshold for how large the ownership needed to be to be included on the list?

A.   As long as they report over zero, then they're included in the list.

Q.   Okay.  And then how about SEC filings.  Did you look at whether there were SEC filings by any of these institutions relating to this security?

A.   So I just got the data from Bloomberg which pulls their data from SEC filings.  So I did not separately go out and review each of these individual SEC filings each quarter.

Q.   And is it even possible to assess whether any of these institutions were holding for retail investors or not?

A.   Holding for retail investors?

Q.   Mm-hmm.

Page 123

M. CAIN - 1.8.24

A.   Well, based on my professional experience, the majority of institution -- well, let me start over.

Based on my professional experience, many institutions manage funds on behalf of individual retail investors.  I would include myself in that description.  I have a number of different retirement funds that are held with different institutions.  But those institutions bear the responsibility of managing those funds and voting on the shares and executing trades.

But back to your question, I did not ask the question of who were the ultimate beneficial owners of the shares held at any of the institutions.

Q.   Okay.  Let's turn to your testing for market efficiency in Cammer Factor 5.

In Paragraph 44 of your report you quote the Cammer decision as stating that "One of the most convincing ways to demonstrate market efficiency would be

Page 124

M. CAIN - 1.8.24

to illustrate over time a cause and effect relationship between company disclosures and resulting movements in stock price."

Do you agree with that assessment?

A.   Yes.  I think I -- I think at a high level I agree with it.  I think that there are a lot of situations where implementing that can become tricky when you've got short time periods or short class periods, for example, or certain companies that, you know, their earnings announcements may not be particularly meaningful or relevant for investors.

But, in general, I would say I agree at a high level with how the Cammer court described this factor.

Q.   And was there anything tricky with respect to your analysis in this case?

A.   There were a couple of things that I had to consider when I carried out the Cammer 5 analysis here.  Number



Page 125

M. CAIN - 1.8.24

one was the SPAC and the fairly short window from when the common stock began publicly trading to when the first day of the class period occurred on the business combination to also a short time between then and the closing of the deSPAC transaction.

So I will frequently use a 120 trading day estimation window. In this case I used a shorter window of 60 days to accommodate for those dynamics with PureCycle.

And I also looked at the, as I do for every SPAC that I analyze in Cammer 5, I looked at the announcement of the -- at least every SPAC that includes the pre-business combination period like this one, I looked at the announcement of the identification of the target as a news day and also the closing or the announcement of the successful completion of the business combination as a news day. So I do that for every SPAC. To the extent that those fall

Page 126

M. CAIN - 1.8.24

within the class period.

And then I also look for SPACs what other types of information may be meaningful for investors but trying to do so in a very objective way and not in a subjective way.

And I frequently look at earnings announcements for companies. For many companies that have no earnings, I will use a different type of announcement. But for PureCycle, despite the fact that they did not generate positive earnings during the class period, the earnings announcements still, based on my review, each quarter provided corporate updates, updates about their development progress and building out of plants or facilities and presentations, slides by the company.

So I determined that this still represented a reasonable sample to conduct the Cammer 5 test within.

Q. And would you agree that the cause and effect relationship is the

Page 127

M. CAIN - 1.8.24

most direct way to demonstrate efficiency?

A. I don't, I don't know if I would say it's necessarily the most direct way. But I do agree that it is a direct test of efficiency.

Q. If you were to test for market efficiency in an academic study, would you perform this type of event study?

A. I think that this approach is supported by academic peer-reviewed literature some of which I cite in the footnotes in this section.

I've not published an academic study that's directly assessing market efficiency, but I think this, this would be one reasonable way to test for that. But I, beyond that I don't necessarily have an opinion about how I would go about conducting an academic study on efficiency, whether I would exclusively test for Cammer 5 or exclusively test for all of the other factors or test for all of the factors including Cammer 5.

Page 128

M. CAIN - 1.8.24

Q. Okay. Turning to Paragraph 55 of your report in the middle you indicate, (Reading:) As shown in Exhibits 4, the event study model revealed an evolving relation between the company's daily returns and those of the overall stock market and industry throughout the class period, and happy to turn to Exhibit 4 itself.

My question had to do with the words "evolving relation."

Can you explain what you mean by that?

A. Yes. So you can kind of see that if you turn to Exhibit 4.

So what Exhibit 4 does is it's graphing out, you can think of it as graphing out the correlation between PureCycle and the overall market which is the Standard & Poor's 1500 as well as its industry which is the Standard & Poor's 600 materials sector index.

Because I do -- if I only did one long event study over the full time



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
129–132

Page 129

M. CAIN - 1.8.24

period, then there would just be one coefficient, just one number.

But instead, in almost all of my efficiency reports I'm able to do what are called rolling regressions where each day I re-estimate those correlation coefficients within a regression based on the previous 60 trading days, with the caveat at the very beginning of the class period there were, I think they were a little bit less than 60, but basically 60 trading days.

So it's a rolling regression that allows me to re-estimate that correlation between PureCycle and the market and the industry.

And what you can see from Exhibit 4 is that sometimes with each of these, sometimes it was positively correlated and sometimes it was negatively correlated.

Q.   Let's turn to Paragraph 54 of your report.  And you indicate that (Reading:)  Because ROCH had been listed

Page 130

M. CAIN - 1.8.24

for 55 days at the start of the class period, you constructed a regression model using all available trading data prior to each of November 17th through 23rd, excluding any of the news days.

So you used data prior to the start of the class period in your estimation window?

A.   That is correct.

Q.   And this data was from before the deSPAC transaction was announced, correct?

A.   Yes, that's correct.

Q.   And was data available for all 55 of those days?

A.   I'd have to go back and look.  I don't recall off the top of my head whether it was or not.

Q.   Do you recall any issues with the data from those 55 days?

MS. WEINRIB:  Objection to the form of the question.

A.   Nothing comes to the top of my mind.

Page 131

M. CAIN - 1.8.24

Q.   How did you decide to use those 55 days prior to the announcement?

A.   My recollection is that that's when the common started trading apart from the units and therefore had pricing data available and therefore had return, daily return data available.

Q.   And is it common for you to use data before the class period in your estimation window?

A.   I think almost every report that I've done involves the same methodology, unless day one of the class period is like the IPO where there literally is no trading data prior to day one of the class period.

In those cases, I have to use a fixed window that is forward looking from the start of the class period.

But when I have historical data, I will generally start with that historical data in order to estimate the parameters as of day one of the class period.

Page 132

M. CAIN - 1.8.24

Q.   So in QuantumScape, that case involved a SPAC; is that correct?

A.   Yes, that's correct.

Q.   And you used a fixed destination window for the first 60 days of the class period and then rolling regression thereafter?

MS. WEINRIB:  Objection to the form of the question.

A.   I don't recall off the top of my head.  I have to look at the full report and the length of the estimation window as well.

Q.   What was the benefit of using the days prior to the class period in your estimation window?

A.   In this case?

Q.   Uh-huh.

A.   So I guess I would say if you look at Exhibit 6, you can see that the first news day for PureCycle is the market impact date of November 16th, 2020, which I believe kicked off the class period as well around that time,



Case 6:21-cv-00809-PGB-RMN    Document 183-17    Filed 01/23/24    Page 34 of 63
PageID 8456

MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
133–136

Page 133

M. CAIN - 1.8.24

which was the announcement of the business combination target.

And so based on my experience now with working on several cases involving SPACs, my increased familiarity with them, I know that once a SPAC shares are IPOed they tend to trade very frequently between a fairly narrow range. Because it's essentially a shell company or blank check company that's raised cash at a valuation of $10 per share.

And so the volatility of the daily returns tends to be fairly low.

Then when they announce a business combination, that is, not for every SPAC but for many SPACs that's the first sort of meaningful announcement of progress towards the ultimate goal of what the SPAC has come into existence for which is to merge with a private target company.

After that and certainly after the closing of the business combination, the volatility of the stock prices

Page 134

M. CAIN - 1.8.24

changes. It tends to increase after the closing of the business combination.

So as a result, if I've got a fairly long estimation window and I use a fixed window that starts on day one of the class period and it's looking forward over the next six months, that volatility base reflects the earnings announcements, the operations of the deSPAC transaction that may be up to six months in the future.

And I found that, frequently, a more appropriate benchmark of volatility for measuring abnormal returns and their statistical significance is the volatility of those SPAC shares that IPOed that were trading around $10 per share.

That's, investors are looking each day at a pot of cash that's worth $10 and then suddenly there's an announcement about a business combination that gives them new information and therefore that, when

Page 135

M. CAIN - 1.8.24

feasible, that backwards looking estimate of volatility is the more appropriate baseline for a rolling regression that looks at a date like we have here with November 16th, 2020.

Q.   And so did you test whether the data prior to the announcement on November 16th was similar to stock price behavior after, like during the class period?

A.   Well, I think you can see like if we were to look at, if we were to look at Exhibit 5, you can see that the pattern that I just described for most SPACs is also present here, where that -- this is that volatility. It's the standard deviation of the error, also known as the root-mean-squared error of the regression. And you can see at the very beginning of the class period, using that historical estimate, it's fairly low. And then it increases as we move forward into the class period because it becomes more volatile as

Page 136

M. CAIN - 1.8.24

investors are now digesting and reacting to the information about the business combination itself.

So that's a pattern that we typically see in SPACs. And it's actually a pattern that is not at all surprising to me in a market that is efficient because when information comes out and investors react to that and they move the price around, that increases the volatility of the actual stock prices, so it actually makes sense in a market that is efficient.

Q.   And does the use of the data prior to November 16 where there's hardly any volatility, does that skew the results of the volatility during the class period?

A.   So I never said there was hardly any volatility. There was certainly still changes in the stock price in the, even prior to the start of the class period.

But what I explained was that in



Page 137

M. CAIN - 1.8.24

my professional experience, again something that I've learned and observed after working on several cases involving SPACs, is that the most appropriate baseline of volatility for most SPACs, when you are evaluating the announcement of a business combination is that volatility in the share prices before the business combination was announced. Because again, investors are looking at a pot of cash that's worth roughly $10 per share. And then the first big announcement about a business combination comes out and the stock price may move if investors think it's a good deal or bad deal, could go up, could go down. It might not move at all if investors think it's worth $10 per share.

But that's, in my view that's the most appropriate benchmark of volatility when you're evaluating that first news day that I've got in Exhibit 6.

Q.   Turning to the length of your

Page 138

M. CAIN - 1.8.24

estimation window, you mentioned that you have used the 120 day approach before, and I believe that you have said in other reports that that was the common approach, was to use 120 day estimation window.

Why did you not use it here?

A.   Yes, so I've used 120 trading days in a lot of reports but I've also used 60 days in some reports. I've used even shorter windows in other reports.

When I approach a Cammer 5 test with a rolling regression like this, I'm looking at various factors. So, for example, I've looked at some companies that are, where the class period is, it starts before March of 2020, for example, and it goes after March of 2020. And in March of 2020 we had a tremendous spike in volatility because of Covid.

And so the volatility of stock returns was changing very rapidly during that time period. And so that often

Page 139

M. CAIN - 1.8.24

pushes me to use a shorter estimation window because that more quickly reacts to those rapid changes in volatility.

In other cases like this, and I think I talked about this a little bit earlier, there were changes in volatility for PureCycle because we've got a SPAC pot of money worth roughly $10 per share, then they announce a business combination shortly after the common stock started publicly trading. Not long after that the business combination closed and the stock was even more volatile because of the completion of the business combination.

So the longer your estimation window the more you are just taking an average volatility over a longer period of time.

And in this case, a longer estimation window would have forced me into a forward looking volatility estimate. And it's my preference generally to use a historical looking

Page 140

M. CAIN - 1.8.24

volatility baseline when possible.

Again, sometimes that's not possible or it's more appropriate to use a fixed window that does include a forward looking volatility base.

But given the deSPAC transaction and the relative, relatively short timing of that, after the SPAC IPO common stock started trading and the deal was announced, that allows the regression to be a little bit more nimble and quick in adjusting for those quick changes in volatility for PureCycle.

Q.   And in deciding which, the length of the estimation window, did you conduct any tests or analyses before making that decision, or did you just look at the dates of the deSPAC and the fact that it was a SPAC transaction?

MS. WEINRIB:  Objection to the form of the question.

A.   Off the top of my head, I don't recall what the sort of the process was



Page 141

M. CAIN - 1.8.24

in my mind, but rather just the opinion that I formed after doing the research into the company.

Q.   Okay.  And so your backup data wouldn't have any analysis or tests with respect to using a longer regression window or any other parameters?

MS. WEINRIB:  Objection to the form of the question.

A.   I don't know.  I'd have to see what was turned over in that backup data.

Q.   Okay.  Do you typically test for structural breaks when you're considering different possible model specifications?

A.   Can you explain what you mean by structural break?

Q.   For example, in this case we know that there was a deSPAC transaction that caused the company to go public, and, you know, it was then an operational public company, where prior to the deSPAC it was a holding company.

Page 142

M. CAIN - 1.8.24

A.   Right.  Yeah, I think that maybe you just described what I've been talking about, where you've got, prior to day one of the class period it's essentially a pot of cash worth $10 and investors are waiting for an announcement.  And then you've got an announcement of a target that's been announced.  That's a significant change in the information environment.

And then you've got the announcement of the closing of the business combination, which is another important change in the information environment.  And then you've got earnings announcements which are also important changes in information environments for companies.

And so, and you've also got alleged corrective disclosures which additionally are important changes in the information environment.

So for that reason I exclude from the estimations the news days as well as

Page 143

M. CAIN - 1.8.24

the alleged corrective disclosures because those are, those can represent significant shifts in volatility.  And that's also the reason that I have used the rolling 60-day window to accommodate those significant potential changes in the information environment and therefore the trading volatility of the stock itself.

Q.   And did you, in fact, conduct any test to determine if there were structural breaks in this class period?

A.   Well, because these are rolling regressions, there's no, there's really no concept or need to do a formal test of a structural break.  Because you tend to do those if you -- if I were just to do one regression over the full class period or even the full analysis period that I have here, then I think it would be appropriate to ask, Are these parameter estimates stable over time?  Is there a structural break where there was a real shift in the relationships?

Page 144

M. CAIN - 1.8.24

But what you can see is this actually illustrates the power of the rolling regression because each day you're re-estimating them.

So if I were to just do one event study over the full class period and I found that there was a structural break when, on day one of the class period or when the business combination closed, then I might say, well, okay, maybe because these parameter estimates really changed, I should run a regression pre versus a separate regression post.  That would be two regressions.

But instead I've got a new regression every single day during the class period, so it's actually going to be several hundred regressions.

So that, the power of the rolling regression is that each day you're actually explicitly accounting for any structural breaks that would have taken place.

And going back to what we talked



Page 145

M. CAIN - 1.8.24

about with Exhibit 4, you can see that the parameter estimates change over time.

In Exhibit 5 you can see that the volatility changes over time because every single day I'm re-estimating those relationships and the volatility baseline which would fully account for any structural breaks that occurred at any point during this analysis.

Q.   Let's talk about the identification of dates for the study.

So you state that you (Reading:) Analyzed key dates pertaining to communications by ROCH and/or PureCycle on the identification and status of the business combination.  Sorry, I'm quoting from Paragraph 47 of your report.

A.   Okay.

Q.   For context.

So what constitutes a key date?

A.   So like I said earlier, I approached this identification

Page 146

M. CAIN - 1.8.24

objectively the same way that I approach it in every SPAC efficiency analysis, which is, again, to the extent that those fall within the class period. Because some SPAC efficiency reports that I've worked on day one of the class period is right after the business combination closes.

So but to the extent that it spans back before the closing of the business combination like this one, I always look at when did the parties announce the identification of the target for the SPAC?  So when did ROCH announce, and PureCycle announce this, which was day one of the class period?

And then number two is, do the parties announce the successful, the shareholder approval or successful completion of the merger itself, or do they announce that they've abandoned the transaction and decided to walk away?

So those would be the key dates that I'm referring to.

Page 147

M. CAIN - 1.8.24

Q.   So what is your criteria for determining which days related to the identification and status of the business combination?

A.   Yes, it would be what I just answered before.

Q.   Can you give me a little bit more on that?  I mean I understand that you include when it was announced.  I understand you include any announcement of the completion of the merger.

Anything else?

A.   No.  It's -- so identification is identifying the target of PureCycle which is the first news day.  And then communications about the status of the business combination would be either that it has completed successful shareholder vote or abandoned, walking away, which is the second news day in Exhibit 6, the announcement of the completion.

Q.   Okay.  Were there any pre-deSPAC transaction -- strike that.

Page 148

M. CAIN - 1.8.24

Were there any pre-deSPAC dates that contained communications by ROCH and/or PureCycle relating to the identification and status of the business combination that you did not count?

A.   None that fell within my sort of objective framework that I apply to every SPAC case.

Obviously, they were sending out proxy statements and amendments to the proxy statements and prospectuses and presentation slides and things like that.

So I'm certainly not opining that those were unimportant to investors by failing to include them in the Cammer 5 analysis here.  I'm not giving that sort of opinion.

But rather, like I said, my, my goal in every market efficiency report is to take an objective criteria and apply it to the case.

And so when I evaluate the Cammer



MATTHEW D. CAIN                                              January 08, 2024
William Theodore vs Purecycle                                      149–152

Page 149

M. CAIN - 1.8.24

5 within SPACs that start with the announcement of the business combination, these are the two sort of key points that I focus on. When they announce the target, when they announce shareholder approval or successful completion of the business combination.

Q.    Okay. I think my confusion lies in the word the status of the business combination.

So you are defining that as the announcement of a merger not an update on the status or document relating to the status.

A.    So the identification is the announcement of the target, and the status is, either it's you got shareholder approval, you're completing the deal or you're abandoning it and walking away.

And if I, you know, if I encountered a SPAC where there were similar sort of status updates in terms of we're going to walk away and then

Page 150

M. CAIN - 1.8.24

we're coming back to the table, then I would evaluate whether those would fit within that criteria.

But I don't recall seeing those types of announcements here.

Q.    And so looking at other cases, for example, in AdaptHealth you analyze earnings days, the M&A announcements and the alleged corrective disclosure days in your cause and effect.

Why not include those categories here?

MS. WEINRIB: Objection to the form of the question.

A.    I don't recall the specific nuances of the AdaptHealth case at this point in time, so I can't really speak to sort of the characteristics of that case that led me to focus on, on those criteria.

Certainly it would not be unreasonable for me to also include the alleged corrective disclosures in this case.

Page 151

M. CAIN - 1.8.24

I think that one of the alleged corrective disclosures coincided with an earnings announcement in this case. So let me just go back and refresh my recollection to make sure I'm saying that correctly.

Q.    I think the corrective disclosures were on May 6.

A.    The second one was on November, after hours, November 10th, 2021. And so if we were to turn to Exhibit 6. You see that the market impact date, the next trading day, November 11, 2021 is included in Exhibit 6 not because it's an alleged corrective disclosure but rather because it was an earnings call.

So that one, you know, there are times in cases where the alleged corrective disclosures overlap, where the elements of those overlap quite significantly with the earnings announcement criteria.

For example, a company may announce an inability to file its

Page 152

M. CAIN - 1.8.24

quarterly or annual report on a timely basis because of material weaknesses in internal controls, for example. So those can be times where that's so closely related to the earnings announcement information itself that I may include those alleged corrective disclosures because they're very, very closely tied into the earnings call.

Like I said, it would not be inappropriate. That would only strengthen the conclusions of my Cammer 5 analysis if I added in the alleged corrective disclosure, the first alleged corrective disclosure, I'd have an additional statistically significant news day.

But again in this report I'm sticking to the objective criteria that I've laid out.

Q.    And why not include the dates on which the company issued press releases?

A.    Well, I think they did issue press releases around all of the dates



Page 153

M. CAIN - 1.8.24

that are in Exhibit 6.

Q.   But there are many more press releases, right, that were issued during the class period.  Why would those not be included?

A.   Because those didn't fall within the objective criteria that I laid out for this Cammer 5.

Again, I have had other cases where I may have looked at every 8-K or every press release because I felt that, for example, the earnings announcements may have not been meaningful for those companies and so I just applied a different criteria for those companies, where I felt that an appropriate criteria would be to look at every press release.  And I'm not saying that that's an inappropriate criteria here, but rather I stuck with, for PureCycle, based on my review of the earnings announcements, even though they were not announcing earnings results, they were giving corporate updates and slides,

Page 154

M. CAIN - 1.8.24

presentations and manufacturing and facilities updates to investors and I felt that that fulfilled the requirement for testing for evidence of a cause and effect relationship between new information or new disclosures and movements in the company's stock prices.

Q.   So you testified earlier that in SPAC cases that include a period before the deSPAC transaction, you would include the announcement date and the business combination, those would be included in your analysis.

Which cases are you referring to?

A.   Basically what I'm referring to is right now when I test SPACs that's how I do it because I've learned more and more about SPACs with each case that I've worked on.

So I'm not necessarily relying on any previous reports but rather my professional knowledge and experience based on working on a variety of cases that involve SPACs.

Page 155

M. CAIN - 1.8.24

Q.   And have you utilized that knowledge and experience in other cases?

A.   I believe so, yes.

Q.   And what cases have you used that?

A.   I'd have to go back and review specific reports because I don't have those memorized off the top of my head.

Q.   Turning to the November 16th, 2020 press release which obviously announces the deSPAC transaction.  Are you aware of any news regarding a merger between PureCycle and ROCH prior to this date?

A.   That's not a question that I've researched or investigated at this point in time.

Q.   And this is the only news day that you identified in the pre-deSPAC period, correct?

A.   I believe that is correct.  I think March 18th kind of straddles the actual completion of the deSPAC.  But other than March 18th, November 16th

Page 156

M. CAIN - 1.8.24

would be the only other date, yes.

Q.   And let's move on to November 20th.  ROCH and PureCycle filed registration statement on Form S-4 and your opinion is that this is not key information relating to communications made by ROCH or PureCycle on identification and status of the business combination?

MS. WEINRIB:  Objection to the form of the question.

A.   I'm not really sure which part of my report you're pointing to with November 20th.  Can you explain?

Q.   Yes, it's, let's see.  Well, it's one of the alleged misrepresentations and I was just trying to understand why that date, which is a registration statement that relates to the business combination, wouldn't be included as a news day.

MS. WEINRIB:  Objection to the form of the question.

A.   Okay.  Yes.  So the reason is



Case 6:21-cv-00809-PGB-RMN    Document 183-17    Filed 01/23/24    Page 40 of 63
PageID 8462

MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
157–160

Page 157

M. CAIN - 1.8.24

that the criteria that I've articulated for the news dates is that either it's an earnings announcement or it's the announcement that the SPAC has identified a target company, or it's an announcement that they've either successfully completed the deal or terminated the deal. But it's a very narrow set of criteria.

Like I said earlier, I'm not opining that all of these other announcements or press releases or filings were unimportant to investors. They very likely had large amounts of information that investors would have found important.

But rather, the Cammer 5 test is designed to test for a relationship between new disclosures and movements in the stock price. So there can be times where, for example, alleged misstatements may be a repetition of previous statements and therefore they may still be value relevant for

Page 158

M. CAIN - 1.8.24

investors but they might not be new and they may not therefore provide the best context within which to test for that very specific Cammer 5 relationship.

Q. Okay. Let's talk about the earnings calls.

You state in your report that PureCycle only hosted three earnings announcements during the class period. And I'm, I just want to clarify. If you turn to Exhibit 6, I see the May 17th, 2021, August 12th of 2021, and November 11th of 2021 which is after the class period ends.

Is that -- did you include that in this counting?

A. Yes. Because the earnings call was held on November 10th, 2021 which is during the class period. But the market impact date from that is November 11th, 2021.

Q. And you also state that you extended, because there was only three earnings announcements during the class

Page 159

M. CAIN - 1.8.24

period, you extended the analysis period by one year past the end of the class period to cover all earnings announcements between the start of the class period and November 10th, 2022.

That's Paragraph 48.

A. Yes.

Q. So I just wanted to understand how the one-year period after the end of the proposed class period is representative of the proposed class period itself.

A. Sure. So the idea is that, with the Cammer 5 test, there's this, there's this trade-off between wanting to have a large enough sample in order to construct a powerful statistical test and analyze a sufficient number of days in order to have a powerful test statistic, versus limiting only today's within a class period.

So when you've got a case that has a fairly short class period, we don't expect companies to come out with

Page 160

M. CAIN - 1.8.24

brand new value-relevant information for investors every day. There's no companies out there that come out with statistically significant value-relevant disclosures every single trading day, right?

So when you have a fairly short class period like this, in order to have a sufficient number of observations, I will extend an analysis period and I'll often start before the class period and go beyond the class period.

But in a case like this where you've got a SPAC or an IPO, we don't have earnings announcements before the start of the class period so therefore I'll just extend the analysis to go, like I did here, one year before the end of the class period so that there's a larger sample in order to construct that type of statistical test.

Q. And how does that one period, one-year period after the class period provide insight into the period,



Page 161

M. CAIN - 1.8.24

especially during the deSPAC transaction?  Aren't they very different companies at that point?

MS. WEINRIB:  Objection to the form of the question.

A.    So I think the way that I would explain it is that the Cammer 5 test is designed to look and evaluate over a long period of time do we tend to see the securities prices reacting to information that comes out?

And therefore we have to look at that question over a long period of time.

And then when we get a result like we have in Exhibit 7, we can say that there is a statistically significant result which evidences or supports market efficiency or supports the finding of a relationship, a cause and effect relationship between new information and stock price movements.

There's no statistical way to actually break that down into some short

Page 162

M. CAIN - 1.8.24

period like a week or a day or a month because the whole idea behind Cammer 5 is, is there a tendency of, when new information comes out that we would expect to be important to investors, that we see stock price movements?

There's no way to answer that on a micro level of one day or one week or one month.

So the idea is that if it's -- if this weighs in favor of market efficiency over a two-year period and that two-year period goes one year beyond the end of the class period, that the result applies throughout the entire analysis period.

So to the extent that there's evidence of the price reacting to information over the two-year period, then it supports the conclusion of efficiency during the one year class period that falls inside of that analysis window.

Q.    And does that hold true just

Page 163

M. CAIN - 1.8.24

looking at the data and your analysis with respect to the pre-deSPAC period?

A.    Well, I think, for example, you can see that the first two announcements are statistically significant at the 99 percent level.  The first one being the identification of the target and the next one being that the deal completed.

So I do think that that is consistent with the overall conclusion, even what we see within the pre-deSPAC period.

But beyond that, obviously there are no earnings announcements prior to that so we have to start with the first available earnings announcement which occurs after the deSPAC transaction.

Q.    So would you agree that when you're constructing a study for a SPAC case, you'll generally have just two news days, the announcement of the target and potential merger, and then the announcement of a successful closing or, as you indicated, perhaps a not

Page 164

M. CAIN - 1.8.24

successful closing?

A.    I frequently have two or three news days.  Sometimes at the end there will be a couple of subsequent announcements about the shareholder vote and then the completion.

But beyond that, I don't, I don't have any general opinions.  It's again, every Cammer 5 analysis is unique to the individual case itself.  So I'm not opining that it's always going to have only two or three news days in the pre-deSPAC period.  But I think in general that's what I'm seeing in the majority of SPAC cases I'm working on right now.

Q.    And does your test consider the direction of the price changes?

A.    No, it does not.

Q.    So if the stock decreased in response to positive news, that would not change your test result?

A.    I'm not really sure what you mean by "positive news" within like Exhibit 6



MATTHEW D. CAIN                                    January 08, 2024
William Theodore vs Purecycle                                165–168

Page 165

M. CAIN - 1.8.24

here.

Q.   So did you evaluate whether statistically significant stock price reaction is consistent with the direction one would expect, given the content of the information?

A.   No.  This test is not premised upon the information content because we don't have a very clear ex-ante prediction on any of these announcements, whether it is clear, clearly and unambiguously positive versus negative information.

It's very possible that there could be a mix of both positive and negative information.  Different investors may have different valuation models for the company itself.

And as a result, it's not appropriate and it's not necessary to form an ex-ante prediction about whether any of these are unambiguously positive or negative and therefore whether the direction of the price return is

Page 166

M. CAIN - 1.8.24

consistent with that ex-ante prediction.

Q.   Are you aware that following the Hindenburg report -- well, let me strike that.

What is your understanding of the Hindenburg report in the context of this litigation?

A.   My recollection is that that is the first alleged corrective disclosure.  I think it was May of 2021, May 6, 2021.

Q.   And are you aware that following the Hindenburg report the common stock price recovered roughly within seven weeks?

MS. WEINRIB:  Objection to the form of the question.

A.   I don't really see the relevance whatsoever of what the stock price did seven weeks after an alleged corrective disclosure.

Q.   I guess my question is just, are you aware of it?  We can turn to Exhibit 1 in your report.

A.   Sure, I'll turn to it.

Page 167

M. CAIN - 1.8.24

Q.   And are you aware of any new relevant positive information that was released during those seven weeks?

MS. WEINRIB:  Objection to the form of the question.

A.   That's not an analysis that I've conducted at this point in time.

Q.   Are you aware that following the disclosure of the SEC fact-finding investigation the common stock recovered within three days?

MS. WEINRIB:  Objection to the form of the question.

A.   No, that's not something that I've evaluated.

Q.   And so you're not aware of whether there was any relevant positive information that was released during those three days?

MS. WEINRIB:  Objection to the form of the question.

A.   Again, it's not something that I've researched at this point.

Q.   And so do you have an opinion on

Page 168

M. CAIN - 1.8.24

if, given the allegations of the complaint, and assuming no new relevant information was released, why the stock would have recovered in both of those instances?

MS. WEINRIB:  Objection to the form of the question.

A.   Again, it's not a question that I've researched or formed any opinions on at this point in time.

Q.   During the course of your event study did you create a hypothesis as to what you would expect to have happened with the stock price?

MS. WEINRIB:  Objection to the form of the question.

A.   For purposes of Cammer 5 or for purposes of the alleged corrective disclosures that you're asking about?

Q.   Cammer 5.

A.   In the Cammer 5 context, the null hypothesis is ultimately that there's no difference between the price movements on news days versus the price movements



Page 169

M. CAIN - 1.8.24

on the no news days.  So that's the null hypothesis.

So a statistically significant result means that we reject the null, and it means that there is evidence of a statistically significant difference in the volatility of the abnormal returns on the news days versus the no news days which is evidence in favor of market efficiency.

MS. JACOBSEN:  Let's take a break.

David, if you want to resume questioning after the break.

THE VIDEOGRAPHER:  Do you want to go off the record?  I thought you wanted him to answer.

MS. JACOBSEN:  Let's go off the record.

THE VIDEOGRAPHER:  We're going off the record.  The time is 1:27 p.m.

(A recess was had.)

THE VIDEOGRAPHER:  We are back on

Page 170

M. CAIN - 1.8.24

the record.  The time is 1:44 p.m. This is the beginning of the media label number 4.

EXAMINATION BY MR. PRIEBE:

Q.   Good afternoon, Dr. Cain.  Can you hear me?

A.   Good afternoon, yes.

Q.   We should be doing this in Berkley.  So I have a few questions, Dr. Cain.  If you could turn to your report, I'll be asking some questions based on the report.

(Reporter clarification.)

Q.   Dr. Cain, if you could turn to Paragraph 11 on page 3 of your report. You write, "I have also formed the opinion that common stock warrants and options damages in this matter can be calculated on a class-wide basis subject to a common methodology."

Have you ever given an expert opinion in a Section 10(b) class action that it would not be possible to calculate damages on a class-wide basis?

Page 171

M. CAIN - 1.8.24

A.   I don't believe that I've reached that opinion in any of my reports that have proceeded to the stage of the public disclosure and signing of a report.

Q.   Thank you.

If you know, what factors, if any, would make it not possible to calculate damages on a class-wide basis in a Section 10(b) case?

A.   Well, I think if there were factors that led me to believe that the calculation of damages would, would differ based on the identities of the class members in a way that goes well beyond just plugging in the inputs to the formula, like the out-of-pocket formula that I have laid out, or if the theory of the case was one in which I could not fit the theory of the case with, for example, the out-of-pocket methodology where essentially we've got alleged misstatements or omissions at the beginning of the class period and

Page 172

M. CAIN - 1.8.24

then alleged corrective disclosures later on in the class period such that I can construct an artificial inflation ribbon.

Q.   I'd like to ask some questions on the scope of your opinion.  If you turn, again, not meaning to limit -- I don't mean to limit your answers to text from your report that I'll read.  It's what I thought might be helpful.

If you turn to Paragraph 99 on page 38.

A.   Okay.

Q.   You can read the paragraph or I'll read the paragraph.  "To summarize, I have not been asked to calculate damages or loss causation in this matter, and do not do so in this report. However, based on my experience and qualifications and my understanding of the nature of the claims in this matter, I conclude that common stock, options, and warrants Section 10(b) damages in this case can, however, be calculated



MATTHEW D. CAIN                                           January 08, 2024
William Theodore vs Purecycle                                    173–176

Page 173

M. CAIN - 1.8.24

using a standard and well-established methodology, and can be applied on a class-wide basis."

So, Doctor, is it your opinion that you or another person with your experience and qualifications would be able to calculate Section 10(b) damages in this case?

A.   Yes, it is.

Q.   Is it accurate to say that your report does not actually calculate Section 10(b) damages in this case?

A.   Yes, that's correct.

Q.   Thank you.

Now going to the same clause, the final clause of the paragraph that I just read, "I conclude that common stock, options, and warrants Section 10(b) damages in this case can, however, be calculated using a standard and well-established methodology."

Would you use the out-of-pocket method as described on paragraph -- in Paragraph 93 of your report to calculate

Page 174

M. CAIN - 1.8.24

damages on a class-wide basis?

A.   Yes.

Q.   And just to be certain to close the loop, in stating in Paragraph 99 that (Reading:)  damages can be calculated using a standard and well-established methodology, and can be applied on a class-wide basis, are you referring to any methodology other than the out-of-pocket method?

A.   No, I'm not, with the caveat that I do explain in Paragraph 98 that when you apply the out-of-pocket method to the options and the warrants, that this also typically requires an option pricing formula that takes into consideration the characteristics of each option and each warrant, which are obviously different from the common stock.

So the formula itself is tailored to the security, but it is still the out-of-pocket methodology.

Q.   Thank you.

Page 175

M. CAIN - 1.8.24

In calculating damages using the out-of-pocket method, is it necessary to perform a loss causation analysis?

A.   Typically, yes.

Q.   And I'm referring to Paragraph 95 of your report would you -- but not limiting it to that.

Would you use -- would you or a person who is going to calculate damages in this case, would that person perform a loss causation analysis in order to calculate artificial inflation?

MS. WEINRIB:  Objection to the form of the question.

A.   Typically some sort of loss caution analysis is required and conducted in order to estimate artificial inflation, yes.

Q.   In calculating damages in this case using an out-of-pocket method, would it be necessary to conduct an event study?

A.   It may or may not be a step in calculating artificial inflation.  So

Page 176

M. CAIN - 1.8.24

what I explain in Paragraph 96 is that event studies are widely employed to calculate artificial inflation.  And I've done that in other loss causation and damages reports.

But that there are other methodologies such as, for example, a discounted cash flow analysis that could be done as a replacement for event study methodologies in a loss causation analysis.

But the most common method, or one of the most common steps that is employed in that process of a loss causation report is to conduct an event study around the alleged corrective disclosures.

Q.   Well, in order to calculate damages, Section 10(b) damages in this case, if the class is certified, would it be necessary to use an event study?

MS. WEINRIB:  Objection to the form of the question.

A.   I've not provided an opinion on



Page 177

M. CAIN - 1.8.24

the exact steps that I would carry out or that would be necessary for me to carry out in order to calculate artificial inflation. So it's possible an event study would be one of those steps, but I have not provided an opinion that it would necessarily be one of those steps.

Q. To close the loop on this, in paragraph -- pardon me -- Footnote 99 on the same page 36 of your report, you write, "In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation."

So the question is, in the event that you or another person would calculate damages and would use an event study -- no, if you were going to calculate damages and if you were going to use an event study, would you use the same event study that is in this report?

Page 178

M. CAIN - 1.8.24

MS. WEINRIB: Objection to the form of the question.

A. I've not formed an opinion on that question at this point in time.

Q. If you have an opinion or can answer, how would the hypothetical event study that one would conduct to calculate damages differ from the event study that is in this report?

MS. WEINRIB: Objection to the form of the question.

A. Well, in this report the event study is being conducted for purposes of a Cammer 5 analysis, so I'm really doing it to compare the news days versus the no news days. And so there's a -- that's a very particular, unique focus of the event study here in the efficiency report.

In contrast, in a loss causation report, the purpose of an event study is to estimate artificial inflation that was dissipated by alleged corrective disclosures that were -- that can be

Page 179

M. CAIN - 1.8.24

tied back to the alleged misstatements or omissions at the beginning of a class period.

And so, when I carry out an event study in a loss causation in a damages report, I'm really taking into consideration the full information environment as it relates to plaintiffs' allegations, the alleged corrective disclosures and it really just depends on the particular circumstances of a given case whether that warrants any difference of the parameters or the actual steps in carrying out the event study analysis for those purposes.

Q. On the aforementioned Paragraph 96 on page 36, you write that "To the extent a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to nonfraud related factors, the impact of such 'confounding information' on the price of PureCycle's securities can be

Page 180

M. CAIN - 1.8.24

determined on a common, class-wide basis using various accepted methodologies."

What accepted methodologies would one use to determine the impact of confounding information?

MS. WEINRIB: Objection to the form of the question.

A. Yes, that's something that I've had to deal with and calculate in other loss causation reports, and I describe those methodologies at the end of Paragraph 97.

So that can include valuation techniques, such as discounted cash flow analysis or multiples analysis or other valuation techniques. It could include event studies, published academic research studies, analyst reports or other case-specific documents.

Q. On the bottom -- in the sentence starting in the bottom of the same page, states "The value of any confounding information can then be subtracted from the price impact of corrective



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
181–184

Page 181

M. CAIN - 1.8.24

disclosures in calculating inflation."

My question is, if and when you calculate inflation, will you use the same corrective disclosures that are alleged in this operative complaint?

MS. WEINRIB:  Objection to the form of the question.

A.    That's not a question that I've formed an opinion on at this point in time.

Q.    How would you -- then how would you determine what corrective -- what corrective disclosures to use in calculating damages?

MS. WEINRIB:  Objection to the form of the question.

A.    When I carry out loss causation and damages reports, I evaluate the information environment for a company. There have been times when plaintiffs alleged a corrective disclosure, and I determined that a given date did not actually dissipate any artificial inflation that was connected to alleged

Page 182

M. CAIN - 1.8.24

misstatements or omissions.  And there could be other times when I've identified additional dates that dissipated artificial inflation that were related to the alleged misstatements or omissions.

So the starting point for me in a loss causation and damages report is really evaluating the information environment for a given company.

Q.    Turning to the next paragraph, 97, it states, in its, in the middle, near the end of the paragraph, "In other instances artificial inflation may have varied and could evolve throughout the class period based on the timing of specific information or statements."

How would one determine -- how would one determine whether artificial inflation varied and evolved throughout the class period in this case?

MS. WEINRIB:  Objection to the form of the question.

A.    So in terms of this case, that's

Page 183

M. CAIN - 1.8.24

not an opinion that I've formed yet or an analysis that I've conducted.  But more generally, in other cases, in reviewing the information environment, there have been times when I evaluated alleged misstatements and I determined that those statements caused the stock price to increase by a statistically significant amount.

And so I identified those as inflation creating events, for example.

So instead of the artificial inflation being back cast from the end of the class period all the way to the beginning of the class period, some portion of that artificial inflation may only be back cast to a later date that occurs after the start of the class period.

So that would be one example.

So again, it's sort of a similar answer to the previous one, which is that it starts with an evaluation of the information environment for a given

Page 184

M. CAIN - 1.8.24

company.

Q.    That paragraph I believe describes a model or a method called constant dollar inflation as well as constant percentage inflation.

Can you -- do you have an opinion at this time which if either of those methods would be appropriate to use in this case?

MS. WEINRIB:  Objection to the form of the question.

Q.    In calculating -- I'll add in calculating damages?

MS. WEINRIB:  Objection to the form of the question.

A.    No, I've not formed an opinion on the evolution of artificial inflation over the class period at this point in time.

Q.    In the next paragraph you write, it states that (Reading:)  Once one has estimated inflation in the common stock, the embedded inflation contributing to a warrant or options' price can change



Page 185

M. CAIN - 1.8.24
based on a number of factors that include the level of the stock price in relation to the strike price, time to maturity of the contract and other factors.

Does this mean that a damages analysis for, let's say, for warrants purchases would calculate the artificial inflation on each day of the class period?

MS. WEINRIB:  Objection to the form of the question.

A.   I've not formed an opinion on the evolution of artificial inflation in this case at this point in time.  But what I can tell you is more generally, when I form an artificial inflation ribbon, for any security that ribbon explains the amount or the level of artificial inflation in that security on every day during the class period.  So that would apply to common stock, that would apply to options, that would apply to warrants more generally speaking.

Page 186

M. CAIN - 1.8.24
Q.   Are the methods that you describe in this Paragraph 98 of the opinion, are they -- do they constitute a standard and well established methodology for calculating warrants and options damages?

MS. WEINRIB:  Objection to the form of the question.

A.   Yes, I believe they do.

Q.   Have you calculated damages for warrants or options in another securities case using these methods?

A.   I have, but not in any cases or reports that are -- have been publicly disclosed at this point in time.

Q.   Is it possible that the price, the price of a warrant would respond in a different way to a corrective disclosure than would the common stock price, to how the common stock price would react to the same disclosure?

A.   I would actually expect the pricing to, to be different because these are different securities.  But if

Page 187

M. CAIN - 1.8.24
I were to carry out an actual damages calculation or report, I would separately calculate the artificial inflation for common stock versus the artificial inflation for options or warrants.  I would not simply use the same number from common stock and apply that to, blindly to the options and warrants, but I would calculate each of those separately.

Q.   Do you have an opinion as to whether the price of the common stock, the ROCH common stock, R-O-C-H, the premerger SPAC Roth CH Acquisition 1 Co.

Do you have an opinion as to whether that price was artificially inflated as of the start of the class period?

MS. WEINRIB:  Objection to the form of the question.

A.   I've not formed any opinions one way or another at this point in time.

Q.   If and when you conducted one -- you or another qualified person would

Page 188

M. CAIN - 1.8.24
conduct a damages analysis, are there any specific features of SPACs that would factor into your damages analysis?

MS. WEINRIB:  Objection to the form of the question.

A.   Well, I think that to the extent that there are warrants that trade separate and apart from the common stock, I would evaluate those separately, like I mentioned earlier.  And for every case that I look at, I look at the actual information environment and the unique circumstances for a given company and I ask whether, you know, what is the most appropriate methodology for back casting of the artificial inflation all the way to the start of the class period.

So that process in terms of looking at the information environment would also include looking at the, the SPAC, the deSPAC merger, the information environment and how that evolved from the beginning of the class period to the



Page 189

M. CAIN - 1.8.24

closing of the deSPAC transaction to the end of the class period.

So I do think that the unique characteristics of the SPAC itself would be included within the specific details of any case that I consider when I conduct a loss causation and damages report.

Q.   I recall you testified earlier that you have come to learn more information about SPACs over time. Would you consider yourself an expert on SPACs, for example, as to what their purposes are?

MS. WEINRIB:  Objection to the form of the question.

A.   I would, I would describe myself as an expert in financial economics.  I do not put myself forward as a specific industry expert.  So I think that to the extent that every market efficiency report that I work on involves a company that operates in a certain industry, I do not put myself forward as an industry

Page 190

M. CAIN - 1.8.24

expert, and I think that would include the, you know, the particulars of SPACs themselves.  I don't put myself forward as an expert who is opining on the inner workings of SPACs themselves.

But rather, my expertise falls under the broader umbrella of financial economics as it relates to things like just generally market efficiency of securities and carrying out valuation analysis, calculating damages for companies across a wide variety of industries, including both SPACs and companies that are not SPACs.

Q.   Could you please turn to Paragraph 15 of your report on page 5.

Does the first sentence of this paragraph set forth your understanding of the information about PureCycle the plaintiffs allege was disclosed by the Hindenburg report and partially revealed the truth and in connection with, I use that phrase because one of the clauses in this paragraph is "the complaint

Page 191

M. CAIN - 1.8.24

alleges that a partial revelation of the truth occurred."

MS. WEINRIB:  Objection to the form of the question.

A.   I think this is, this is a very, very concise summary of both the complaint as well as the Hindenburg report itself which is obviously much more detailed and lengthy than the very concise summary here.

But I do think that my summary here is accurate to the best of my knowledge.

Q.   Do you know whether the information described in this paragraph already had been publicly available prior to the publication of the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question.

A.   That's not a question that I've researched or formed an opinion on at this point in time.

Q.   If a piece of information in the

Page 192

M. CAIN - 1.8.24

Hindenburg report that allegedly partially revealed the truth already had been publicly available, assuming that PureCycle common stock traded in an efficient market, would that information already have been reflected into the stock price?

MS. WEINRIB:  Objection to the form of the question.

A.   I don't, I don't think that that would necessarily be the case.

Q.   Why not?

A.   Because there's a wide variety of reasons that I've seen in my own professional experience.  So that could include sometimes company denials.  So a piece of information can be made public and the company denies it, and then subsequently that information comes out and investors attach more weight to the information subsequently after a denial. Or you could simply have, even without denials, just repeated misstatements or omissions in company presentations or



Page 193

M. CAIN - 1.8.24
remarks made by executives or SEC filings by executives, and therefore investors are relying on those which sort of overrides what information may have previously been put out there in the marketplace.

So again, this, I think comes back to something I mentioned earlier which is really in order to evaluate that question, you really have to look at the full information environment for a given company and it would not be correct to just say that if you can find some prior instance of this information that it is mathematically accurate to say that that information would thus be reflected in the stock price, particularly when you've got misrepresentations or omissions that may have been made by defendants in a case.

Q.   Dr. Cain, are you familiar with the phrase "price impact" as it's used in securities class action cases?

A.   Yes.

Page 194

M. CAIN - 1.8.24
Q.   Is one -- would one understand, or an understanding be that a defendant may rebut the Basic versus Levinson presumption of reliance by showing that an alleged misrepresentation or omission did not actually affect the stock price? Is that one -- is that an understanding of, one of your understandings of what price impact would be --

MS. WEINRIB:  Objection to the form of the question.

Q.   -- as used in the context here?

MS. WEINRIB:  Objection to the form of the question.

A.   I would say that is consistent with my understanding, yes.

Q.   Does your report give an opinion on price impact?

A.   No, it does not.

Q.   Okay.  Hypothetically, if defendants challenge price impact in a class certification --

(Reporter clarification.)

Q.   If defendants challenge price

Page 195

M. CAIN - 1.8.24
impact in opposing class certification, will you provide a rebuttal report?

MS. WEINRIB:  Objection to the form of the question.

A.   That's not a question that I have been asked at this point in time and it's not something that I've yet formed an opinion on.

Q.   Turning to page 22, Paragraph 57, there is a sentence near the end, "Further, if a company's disclosure conceals important information, the effect of the concealment would generally not result in a significant stock price movement but would maintain the price at its current level."

Do you have an opinion at this time as to whether this price maintenance effect that's described here occurred with respect to any disclosure or omission alleged in the complaint?

MS. WEINRIB:  Objection to the form of the question.

A.   No, I've not formed any opinions

Page 196

M. CAIN - 1.8.24
one way or the other at this point in time.

Q.   Do you -- Dr. Cain, do you understand that the complaint alleges that the truth of defendants' alleged misrepresentations was disclosed to the market by corrective disclosures?

A.   Yes.

Q.   And are the alleged corrective disclosures, I mean the ones alleged in the complaint, are they summarized in Paragraph 15 of your report which is on page 5?

A.   Yes.

Q.   Does your report offer an opinion as to what constitutes a corrective disclosure in a securities fraud case?

A.   No.

Q.   Do you have an opinion as to what constitutes a corrective disclosure?

MS. WEINRIB:  Objection to the form of the question.

Q.   In other words, what characteristics a disclosure must have



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
197–200

Page 197

M. CAIN - 1.8.24

in order to be corrective?

MS. WEINRIB: Objection to the form of the question.

A. So I think there's a legal component to your question which is there may be different legal standards in terms of what can be upheld as an alleged corrective disclosure.

In terms of that legal component, I do not have any legal opinions.

As a financial economist, when I carry out loss causation and damages reports, when I look at artificial inflation that is dissipated by corrective disclosures, what I'm looking for is a disclosure of information that is connected to alleged misstatements or omissions and which caused the price of the securities to change.

So that's, that's how I would view corrective disclosures from the perspective of a financial economist within a loss causation or a damages report.

Page 198

M. CAIN - 1.8.24

Q. If you have an opinion from a financial economist standpoint, I believe your answer said that the -- you would look to see whether the information is connected to the alleged misstatements.

As a financial economist, in order for a disclosure to be corrective, does the information have to contradict the -- the information in a corrective disclosure have to contradict the information in the earlier alleged misstatement in order for the disclosure to be corrective?

MS. WEINRIB: Objection to the form of the question.

A. I don't think I've really ever asked that particular question to that level of specificity, so I don't necessarily have an opinion one way or another on that question.

Q. Are you familiar with Hindenburg's research?

MS. WEINRIB: Objection to the

Page 199

M. CAIN - 1.8.24

form of the question.

MR. PRIEBE: I'll strike that question. It was a bad question. It's a good objection.

Q. I believe you testified that you know that the complaint alleges that Hindenburg Research issued a report that was a partial corrective disclosure or at a minimum the complaint alleges that Hindenburg Research issued a report and that's alleged in the complaint.

Are you aware that Hindenburg stated that it had a short position in PureCycle Technologies?

A. That would not surprise me given my general familiarity with short sellers and these types of research firms. But I don't recall one way or another whether, whether I saw that particular piece of information.

MR. PRIEBE: Can we mark an exhibit. I would like to mark an exhibit. Julia, are you in charge of exhibits?

Page 200

M. CAIN - 1.8.24

MS. MARKHAM-CAMERON: Yes, Exhibit 2.

MR. PRIEBE: Can that be marked as Exhibit 2, the Hindenburg report.

Q. First of all, Dr. Cain, have you ever seen this document?

(Exhibit 2, Hindenburg Report was marked for identification.)

A. I don't believe that I've reviewed the full document, every detail of it, but I do believe at some point I may have seen part of it as I was working on my report.

Q. That's fair. That's fair.

Turn to the second page, 2/32 there is a statement above the work, the heading "Introduction. Initial disclosure: After extensive research, we have taken a short position in shares of PureCycle Technologies. This report represents our opinion, and we encourage every reader to do their own due diligence. Please see our full disclaimer at the bottom of the report."



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
201–204

Page 201

M. CAIN - 1.8.24

Does this disclosure refresh your recollection as to whether Hindenburg stated that it had a short position in PureCycle?

MS. WEINRIB:  Objection to the form of the question.

A.   Again, I don't recall one way or another whether I saw that before, but it does seem clear to me that they disclose on page 2 as you read that they have a short position in PureCycle.

Q.   If Hindenburg Research had a short position in PureCycle, would it have an economic incentive to drive down the stock price?

MS. WEINRIB:  Objection to the form of the question.

A.   Ultimately, I think that's a complicated question with a lot of additional pieces of evidence that would be necessary in order to really evaluate and try to reach an answer.  So at this point in time, I don't have an opinion one way or another.

Page 202

M. CAIN - 1.8.24

Q.   What factors would one have to look at to determine whether a short seller had an economic incentive to drive down the price of a stock in which it had a short position?

MS. WEINRIB:  Objection to the form of the question.  These are all outside the scope of his report.  I don't know what the point of this is.

A.   Well, so I think one of the things, if I were to ask that question, which I haven't, but if I were, I would look at the -- would want to know all of the positions because sometimes individuals may have a short position but they may also have a long position which is not disclosed so they could be fully hedged, for example, and therefore might not actually have the same economic exposure that's implied by only one part of the position.

Also, I think that to the extent that if short -- there have been academic research put out by individuals

Page 203

M. CAIN - 1.8.24

that shows that when certain short sellers put out reports that people don't believe as being credible, then the stock price ultimately, it might dip very temporarily but then rebound back and therefore if that happens and a short seller does not actually sell out during that temporary dip, they may not actually profit after the report is released.

So I think there's different, some different components that could be relevant to answering that type of question.

But like I said, ultimately that's not a question that I've asked at this point in time.

Q.   Do you know whether Hindenburg actually had a short position in PureCycle Technologies at this time?

A.   No, I don't.

Q.   Apologize if you've answered this already.

Would you expect an issuer's

Page 204

M. CAIN - 1.8.24

stock price to react negatively to the disclosure that a short seller firm had taken a short position in the stock?

MS. WEINRIB:  Objection to the form of the question.

A.   Not necessarily.  I think, first of all, that's not a question that I've asked in my report.  I've not formed an opinion.  But I think one of the things you can see just from Exhibit 10 of my report is that the short interest does change throughout the class period. That's the case for any company.

So just the fact that short interest or the presence of short sellers changes does not necessarily lead to a conclusion that the mere existence of short sellers would cause the price to change.

Q.   If you would turn to page 30, 30/32 of Exhibit 2, there's a sentence, about the third sentence down, "You should assume that as of the publication date of any short-biased report or



MATTHEW D. CAIN                                January 08, 2024
William Theodore vs Purecycle                            205–208

Page 205

M. CAIN - 1.8.24

letter, Hindenburg Research possibly along with or through our members, partners, affiliates, employees and/or consultants, along with our clients and/or investors, has a short position in all stocks and/or options of the stock covered herein, and therefore stands to realize significant gains in the event that the price of any stock covered herein declines."

Do you recall ever seeing that disclosure, that statement in this report?

MS. WEINRIB: Objection to the form of the question, and I'm also going to object to this exhibit generally because it doesn't appear to be complete and there appears to be a significant amount of language that is either deleted or redacted off of this page.

MR. PRIEBE: That's certainly not our fault, not our intention, not our intention.

Page 206

M. CAIN - 1.8.24

MS. WEINRIB: Nevertheless, if you're questioning him about this exhibit he doesn't have the complete language that you're reading in front of him.

MR. PRIEBE: Well, no, the language I have is quote, I quoted it right from the document.

MS. WEINRIB: But it's not the document he has in front of him. That language isn't there.

MR. PRIEBE: We'll have to go back to that because that's the one that was sent to me.

MS. JACOBSEN: Is the one that's in the record complete?

MS. MARKHAM-CAMERON: We will make sure that one is complete.

MS. WEINRIB: You can take your time to make sure the way he read the language is accurate.

THE WITNESS: I've got another copy of it. I'm just going to take a quick look at it.

Page 207

M. CAIN - 1.8.24

A.   Okay. I've looked at it. I don't really have an opinion one way or another whether or not I've seen this particular sentence within this particular report before.

Q.   Fair enough.
Are you aware of any pending government investigation, say, by the Department of Justice or the Securities and Exchange Commission on short sellers, about short sellers?

MS. WEINRIB: Objection to the form of the question. Again, outside the scope.

A.   To the extent that your question asks for my knowledge that may have come about through privileged or confidential discussions, I cannot answer the question.

Q.   Not saying that you have any knowledge from confidential conversations which I do not want to know about, not assuming one way or another, do you have any knowledge of

Page 208

M. CAIN - 1.8.24

any such investigation other than through what may pretend theoretical discussion with counsel?

A.   Separate and apart from any sort of confidential conversations, I'm not aware of any public information that reveals ongoing government investigations into any particular short sellers.

Q.   Again, turning again in Paragraph 15 again which I believe you testified is a summary of the complaints, allegations about the Hindenburg Research report.
Have you conducted -- have you conducted any analysis of the accuracy of the information in the Hindenburg report that's described here?

MS. WEINRIB: Objection to the form of the question.

A.   At this point in time, I have not conducted any sort of investigation along those lines.

Q.   If you were asked to calculate



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
209–212

Page 209

M. CAIN - 1.8.24

damages, would you analyze the accuracy of those allegations?

MS. WEINRIB:  Objection to the form of the question.

A.   At this point in time, I don't have an opinion one way or another on that question.

Q.   But would it be necessary?  Would it be -- in calculating -- no, strike that.

In a loss causation analysis, would it be necessary to determine whether the allegations or all of them were accurate?

MS. WEINRIB:  Objection to the form of the question.

A.   Not necessarily.  Because what I would say just generally speaking about my work on loss causation and damages reports is that many cases involve complex topics, such as complicated scientific procedures or drug development or manufacturing processes or other very complex specific topic

Page 210

M. CAIN - 1.8.24

areas that might require certain type of industry expertise.

And it's not my role as a financial economist to prove plaintiffs' case and to prove the truth of the allegations.

Ultimately, one of the things I explain in a loss causation analysis is that the damages that I'm presenting are based on the presumption that plaintiffs will be able to prove their case.

And so if plaintiffs prove their case, then here's the damages number, and if they do not prove their case, then damages can go down to zero, right.

So, so for that reason, it's typically not my burden to prove plaintiffs' case.

Again, just even talking about this case I'm not putting myself forward as an expert on polypropylene plastic recycling technologies.

So but beyond that, I don't have any opinions one way or another in terms

Page 211

M. CAIN - 1.8.24

of your question as it pertains to this case.

Q.   Looking at the first clause of this paragraph, "The complaint alleges that a partial revelation of the truth occurred before markets opened on May 6, 2021, when Hindenburg Research published a report" etc.

Do you have an opinion today as to whether the revelation of the truth was partial?

MS. WEINRIB:  Objection to the form of the question.

A.   That's --

Q.   As used in this sentence, as used in this paragraph which states "a partial revolution of the truth," do you have an opinion as to whether the Hindenburg Research report constituted a partial revelation of the truth?

MS. WEINRIB:  Objection to the form of the question.

A.   I've not formed an opinion one way or another at this point in time.

Page 212

M. CAIN - 1.8.24

Q.   And to follow through.  Do you have an opinion as to this time as to what alleged truths remained unrevealed after the Hindenburg Research report?

MS. WEINRIB:  Objection to the form of the question.

A.   Not beyond just what I've summarized in Paragraph 15.

MR. PRIEBE:  So I'd like to mark another exhibit.  Julia, can you mark the second amended complaint as Exhibit 3.

(Exhibit 3, Consolidated Second Amended Class Action Complaint for violations of the federal securities laws was marked for identification.)

Q.   Now that you have it in front of you, could you please go down to Paragraph 13 of the complaint.

A.   Okay.

Q.   Which states "PureCycle's May 6, 2021 press release, issued in response to the report, fails to challenge, much less negate, any of the report's



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
213–216

Page 213

M. CAIN - 1.8.24
specific underlying factual allegations" and then it continues about what the press release allegedly said.

Sitting here today, do you have an opinion as to the accuracy of the allegation that the press release failed to challenge, much less negate, the report's specific underlying factual allegation?

MS. WEINRIB:  Objection to the form of the question.

A.   I've not formed any opinions one way or another at this point in time.

Q.   If the allegation is accurate, would it mean that in the immediate aftermath of the publication of the Hindenburg Research report, that the market was not told that the allegations were wrong --

(Reporter clarification.)

Q.   -- that the allegations of the report were wrong?

MS. WEINRIB:  Objection to the form of the question.

Page 214

M. CAIN - 1.8.24
A.   I've ultimately not researched that question and have not formed an opinion one way or another at this point in time.

Q.   So going back to Paragraph 15, the second sentence begins, "The complaint also alleges that the relevant truth was further revealed after hours on November 10, 2021 via a press release," and then it goes on to describe a press release about an SEC investigation, investigative subpoena.

MS. WEINRIB:  Objection to the form of the question.

MR. PRIEBE:  I haven't asked the question yet.

MS. WEINRIB:  Didn't think so.

Q.   My question is, do you understand that the complaint alleges that the revelation -- no -- yes, that -- that when PureCycle announced that the SEC had issued an investigative subpoena to defendant Otwort, that it was a corrective, that this was a corrective

Page 215

M. CAIN - 1.8.24
disclosure?

MS. WEINRIB:  Objection to the form of the question.

A.   That is consistent with my understanding of the second alleged corrective disclosure.

Q.   Do you have any opinion whether the disclosure was corrective?

MS. WEINRIB:  Objection to the form of the question.

A.   That's not an opinion that I have formed one way or another at this point in time.

Q.   Would it be necessary to form an opinion whether the disclosure was corrective in order to conduct a loss causation analysis?

MS. WEINRIB:  Objection to the form of the question.

A.   I do think that I would, if I were to carry out a loss causation and damages report, it would be necessary for me to determine whether that disclosure dissipated any artificial

Page 216

M. CAIN - 1.8.24
inflation.  So I think that's how I, as a financial economist, would describe it as being corrective.

Q.   Turning to Exhibit 3, the complaint, please read -- in Paragraph 14 talks about -- it talks about the same day, November 10, 2021 disclosure. There is as sentence about three sentences down, "On this news, further validating the claims in the Hindenburg report, PureCycle's stock fell" and then it continues.

My question is, do you have an opinion -- sitting here today, do you have an opinion as to whether the disclosure of an SEC investigative subpoena further validated the claims in the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question.

A.   At this point in time I've not formed an opinion one way or another.

Q.   Would it be -- if you conduct a loss causation damages analysis, would



Page 217

M. CAIN - 1.8.24

it be necessary to determine whether the disclosure of the SEC investigation further validated the claims in the Hindenburg report?

MS. WEINRIB:  Objection to the form of the question.

A.  Ultimately, at this point in time I don't have an opinion one way or another on that particular question.

Q.  Do you have any opinion today as to whether the market, the stock -- the market reacted adversely to the disclosure of the SEC investigation?

MS. WEINRIB:  Objection to the form of the question.

MR. PRIEBE:  I'll rephrase it.

Q.  Do you have an opinion today whether the disclosure of the investigation, SEC investigation caused, in whole or in part, a decline in the price of PureCycle's stock?

MS. WEINRIB:  Objection to the form of the question.

A.  At this point in time I've not

Page 218

M. CAIN - 1.8.24

formed an opinion one way or another.

Q.  Are you aware that PureCycle later allows that the SEC had closed its investigation without any adverse findings or enforcement action?

MS. WEINRIB:  Objection to the form of the question.

A.  I'm not aware one way or another.

Q.  If it is -- if the -- if it -- if the SEC did, in fact, later close its investigation of PureCycle without any adverse findings or enforcement action, would that make any -- would that matter to a loss causation analysis?

MS. WEINRIB:  Objection to the form of the question.

A.  Ultimately, I'd have to look at the actual information environment and the loss causation analysis in order to assess whether I would consider that information to be relevant.

Q.  So it could be, just the theory, hypothetically, theoretically, it may be irrelevant, in your opinion it may be

Page 219

M. CAIN - 1.8.24

irrelevant to a loss causation analysis that the SEC closed an investigation without further action?

MS. WEINRIB:  Objection to the form of the question.

A.  It could be irrelevant.  But again, it's not an opinion that I have formed one way or another at this point in time.

Q.  Just to close the loop, one of my questions referred to a government -- a government investigation of the short seller -- of short sellers by the Department of Justice or the SEC.

Have you been retained by either the Department of Justice or the SEC in any short seller -- in any investigation of short sellers?

MS. WEINRIB:  Objection to the form of the question.

A.  Investigation of short sellers? No, I've not.

Q.  Dr. Cain, I'd like to turn to Paragraph 86 on page 32.  The second

Page 220

M. CAIN - 1.8.24

sentence states "Because I have concluded that PureCycle common stock is priced efficiently and therefore reflected the value of the alleged misstatements and omissions, I also conclude that because options and warrants pricing is dependent on the stock price, the artificial inflation caused by any misrepresentations and omissions that affects the stock price -- common stock price, pardon me -- would translate into the value of derivative instruments such as PureCycle options and warrants."

The question is, to clarify, is it your opinion that any artificial inflation would be reflected in the prices of PureCycle warrants and options because the market for PureCycle common stock is efficient?

A.  That's what I'm saying in that paragraph.  I'm explaining that, because the Cammer and the Krogman factors weigh in favor of market efficiency for the



Page 221

M. CAIN - 1.8.24

common stock, that that also supports a finding for the derivative securities. And I also go on in the subsequent paragraphs to actually evaluate their pricing as well, and then I reiterate the opinion based not only on Paragraph 86 but also on the pricing analysis that I carry out in the following paragraphs.

Q.   Do you have a -- do you have a -- do you conduct a Cammer analysis about, to evaluate the efficiency of the market of warrants just standing alone, apart from, apart from the Cammer analysis of the common stock?

A.   Apart -- I would say that the -- that there is a Cammer, there is a Cammer 5 style analysis of the warrants and the options in Sections 5.2 and 5.3. But I do not evaluate the other Cammer or Krogman factors for the options or the warrants because those factors are not applicable to derivative securities.

Q.   If the court finds that you did not publish market efficiency for

Page 222

M. CAIN - 1.8.24

PureCycle common stock, then would you agree that there would be no basis for your opinions with respect to market efficiency for warrants and options?

MS. WEINRIB:  Objection to the form of the question.

A.   Yes, I would agree with that.

Q.   In your opinion and expertise, is it possible for a company's common stock to trade in an efficient market but not all of its derivative securities?

A.   I've never seen an example of that that I can think of.  So it's, I'm not able to come up with a scenario where that would be the case off the top of my head.

Q.   What if a particular derivative security does not trade at high volume?

A.   That would not, that would not move the needle for my opinion.

Q.   Have you been retained by any short seller or short seller research firm in connection with any government investigation of short sellers?

Page 223

M. CAIN - 1.8.24

A.   No.

Q.   Turning to Paragraph 87.  On the same page, you write that you (Reading:) performed a test by examining whether the price changes in the warrants are directionally consistent with what would typically be observed in an efficient market given PureCycle's stock changing.

And in the next paragraph, Paragraph 88 on the next page, one of the things you report is, I believe, is that, quote, "During the class period there were 24 days when the absolute abnormal stock price returns, i.e., magnitude of the stock price movement without regard to direction, were significant at the 95 percent level or greater according to the event study conducted in Section 4.5.

So first the question is, what proportion of the class period does these 24 days reflect?  Is it 10 percent of the class period, 10 percent of the class period, 20 or, if you know?

Page 224

M. CAIN - 1.8.24

MS. WEINRIB:  Objection to the form of the question.

A.   That's not a statistic that I've calculated.  Rather, I've taken all of the abnormal returns from my event study that were statistically significant at the 95 percent level or greater, without regard to the timing of those dates.

Q.   Is it possible that the warrant or warrants would have a price movement in the same direction as the common stock, yet still not reflect all information that was reflected in the common stock price?

A.   Is it possible?  I'm not able to come up with a scenario that would fit that description off the top of my head.

Q.   Continuing in Paragraph 88, of these 24 days, there were 22 dates, or 91.67 percent, on which the stock and the warrant prices changed in the direction.

For the other two dates, where the warrant price -- warrants price did



Case 6:21-cv-00809-PGB-RMN    Document 183-17    Filed 01/23/24    Page 57 of 63
PageID 8479

MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
225–228

Page 225

M. CAIN - 1.8.24

not move in the same direction as the common stock price, do you know why would that be? What would explain that?

A. Yes. So one of the things that I explain is that -- let me see. So at the end of Paragraph 90 I explain that (Reading:) If the implied volatility of the underlying stock price changes at the same time as a large stock return, this volatility input to option pricing may result in a movement in the option price that differs from the prediction based only on the underlying stock price input.

So that can be one reason for why both options and warrants prices can move differently from the underlying stock prices, is because if you look at a Black-Scholes option pricing model, for example, there are other inputs, there are like five inputs to the model. The stock price is one of those inputs. But you're also looking at the risk free rate and the implied volatility and the

Page 226

M. CAIN - 1.8.24

time to expiration, so how far in the money or out of the money the option is.

So because these other factors can also change at the same time, that can cause the prices to move in a way that's, that's different.

Q. Thank you.

Going back to Paragraph 87 there's a sentence starting in the bottom of page 32, "In order to avoid any potential bias introduced due to bid-ask bounce or due to nonsynchronous trading between PureCycle's common stock and warrants, I use the mid-point of the bid and ask quotes as a proxy for price for both the common stock and warrants."

My question is what do you mean by "nonsynchronous trading"?

A. So nonsynchronous trading just means that you can have trades that occur at different points during the day. And when we look at the last price at the end of the day, that can be the last executed price which may have

Page 227

M. CAIN - 1.8.24

executed at either the bid or the ask. And so it can give rise to different, different patterns in both stock price and option behavior, particularly for options or warrants that trade somewhat less frequently.

So one way to try to alleviate some of those, that artificial noise that can be in the pricing patterns is to just use the midpoint. Because when you use the midpoint of a bid and an ask quote, you throw out the issue of whether the last trade was a buy or a sell transaction.

Q. Going back to Paragraph 88, on the next page, 33, it states "Four out of five out of the money warrant returns were also directionally consistent on the dates with significant abnormal returns at the 95 percent level." And then states, "This pattern is consistent with the expected price co-movements that tend to occur in efficient markets."

Page 228

M. CAIN - 1.8.24

Question is, did you conduct any analysis of the efficiency of the market for warrants other than as set forth in your report to conclude that the price behavior is consistent with that expected in an efficient market?

A. Nothing beyond the two things that I point out in my report, the first being this price behavior analysis, and the second being what I explained earlier which is that when the Cammer and the Krogman factors weigh in favor of market efficiency for the common stock, then that supports a finding of efficiency for the derivative securities.

Q. Did you, in analyzing market efficiency for warrants, did you consider transaction cost?

A. No.

Q. For example, whether there may be -- whether there may be high transaction costs caused by wider bid-ask spreads?

Page 229

M. CAIN - 1.8.24

A.   So one of the things I said earlier is that the Cammer and the Krogman factors were designed for common stock and they are not directly applicable to derivative securities.  So one of the things that we know in general is that the trading costs are much, much higher for derivative securities like options and warrants relative to common stock.  That's the case across the vast majority of companies out there.

And so that's one of the reasons why it's not appropriate to directly apply the Cammer or the Krogman factors to derivative securities.

So the short answer is no, I did not evaluate the bid-ask spread or the trading costs of the options or the warrants.

Q.   Turning to Paragraph 90 on page 34.  And you may have answered this in talking about warrants, warrants and derivative securities, but just in case

Page 230

M. CAIN - 1.8.24

I want to ask again since this section is about options and derivative securities.

You write "One would expect call option prices to move in the same direction as underlying stock prices and put options prices to move in the opposite direction as the underlying stock prices."

Is there, to your knowledge, is there any scenario in which the market for a call option would be inefficient if the market for the common stock is efficient?

A.   There's no scenarios that come to mind at this point.

Q.   Same question for put options?

A.   Yes, same answer for the put options as well.

Q.   In the next paragraph, Paragraph 91, and there's also, I guess it includes Table 2, it appears that with respect to -- is it correct, I don't want to be wrong, that with respect to

Page 231

M. CAIN - 1.8.24

PureCycle options, you analyzed five trading days on which options traded?

A.   Yes, that is correct.

Q.   And the second -- the paragraph, the second sentence of the paragraph starts (Reading:)  For each trading day I report three different options series based on options that have -- that A, have strike prices nearest the prior day's closing stock price, and B, are the nearest to expiration, as seen, as can be seen in Table 2, all 30 call and put option series experience price movements that are consistent with the underlying stock price movement.  This finding provides further support for the conclusion that the options traded in an efficient market throughout the class period.

So my question is, does that conclusion apply to all series of options for PureCycle stock that were traded at any time during the class period?

Page 232

M. CAIN - 1.8.24

A.   Yeah, my conclusion of market efficiency for the options applies to all option series, and that's based on two things.

Number one would be the previous paragraph explaining all of the market efficiency factors weighed in favor of efficiency for the common stock and therefore by definition the underlying derivative securities that are tied to the common stock would also trade efficiently.

As well as testing this cause and effect relationship in a sort of a clear testing ground when there's large statistically significant stock price movements looking at the options series that are closest to being in the money.

Q.   And so, and I apologize if you answered this directly or indirectly earlier.  Well, if you know, were some of the option series more actively traded than others?

A.   I believe so, yes.



Page 233

M. CAIN - 1.8.24

Q.   But your findings, your finding of market efficiency for the options applies to all options, all option series, regardless of how active -- regardless of differences in how actively each particular option series were trading?

A.   That's correct.

MR. PRIEBE:  How long have we been going, court reporter?

THE VIDEOGRAPHER:  An hour and 21 minutes, sir.

MR. PRIEBE:  I suggest we take a break.  I have maybe one, perhaps one more thing.

THE VIDEOGRAPHER:  We're now going off the record.  The time is 3:06 p.m.

(A recess was had.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:22 p.m. This is the beginning of the media label number 5.

MS. JACOBSEN:  David, do you have

Page 234

M. CAIN - 1.8.24

any other questions?

MR. PRIEBE:  Who asked that?  Oh, other than, other than on Section 14(a), the answer is no.

MS. JACOBSEN:  Okay.  So based on discussions that are underway between counsel, plaintiffs are potentially considering withdrawing the motion to certify the 14(a) class.  So to the extent that class remains in plaintiffs' motion for class certification, defendants reserve the right to reopen the deposition.

With respect --

MR. PRIEBE:  Thank you very much, Dr. Cain.

THE WITNESS:  Thank you.

MS. WEINRIB:  I have some questions.

MS. JACOBSEN:  One more thing before I turn it over to Ms. Weinrib.

The Exhibit 2 which was the Hindenburg report, it looked like there was some errors in the copying

Page 235

M. CAIN - 1.8.24

and so I want the record to reflect that we have corrected it with an accurate copy of the Hindenburg report that is being marked Exhibit 2A.

(Exhibit 2A, Accurate copy of Hindenburg report was marked for identification.)

MR. PRIEBE:  It caused the printer to crash and burn and the nearby lifeboats.

MS. JACOBSEN:  Nothing further from me.

MS. WEINRIB:  Just a few short questions.  I know it's been a long day, but I won't take much of your time.

EXAMINATION BY MS. WEINRIB:

Q.   Good afternoon, Dr. Cain.  You know who I am, but I'll state it again on the record.  Tamar Weinrib from Pomerantz LLP on behalf of plaintiffs, as you know.

You were asked a number of

Page 236

M. CAIN - 1.8.24

questions this afternoon.  I'm just going to cover a few of those topics very briefly.

Were you asked in this matter to construct a damages model?

A.   No.  I was asked to put forward a damages methodology, but I was not asked to calculate the amount of damages at this point in time.

Q.   Would it have been necessary to do so in order to opine on whether damages could be calculated class-wide?

A.   It is not necessary to actually calculate damages in order for me to reach the opinion that damages can be calculated class-wide under the methodology that I've put forward.

Q.   To date, have you been asked in this matter to analyze loss causation?

A.   No, I have not.

Q.   Was that within the scope of the expert report you submitted on market efficiency?

A.   No, it was not.



Page 237

M. CAIN - 1.8.24

Q.   So did you conduct any sort of loss causation analysis as part of your methodology in putting together your market efficiency report?

A.   No.

Q.   Have you assessed at this point in time how you would conduct a loss causation analysis in this case should you be asked to do so?

A.   No, I have not, beyond just again explaining the methodology as I've explained in this report.  But I've not put forward any of the steps that I would intend to actually carry out in conducting the loss causation analysis.

Q.   To date, have you been asked in this case to determine whether and when artificial inflation entered into the price of PureCycle securities?

A.   No, I've not.

Q.   Same question with regard to ROCH securities?

A.   I have not.

Q.   So would you say that's outside

Page 238

M. CAIN - 1.8.24

the scope of your engagement currently?

A.   Yes, that's outside the scope of my current engagement.

Q.   Is whether Hindenburg had an incentive to drive down the price of PureCycle securities part of the scope of your engagement?

A.   No, that's not part of the scope of my engagement.

Q.   Does whether Hindenburg had such incentive have any relevance to your determination of whether the market for PureCycle securities was efficient during the class period?

A.   No, that has no bearing on my analysis or opinions to date.

Q.   Does whether Hindenburg had such an incentive have any relevance to whether or not damages can be calculated in this case on a class-wide basis?

A.   No, it does not have any bearing on that opinion either.

Q.   Going back in time to some questions that you were asked this

Page 239

M. CAIN - 1.8.24

morning.

Do you recall giving testimony earlier today with regard to the MRK Study that you rely upon in your report?

A.   Yes, I do.

Q.   Have you cited the MRK Study in other market efficiency expert reports that you've drafted for other securities litigations?

A.   Yes, I've actually cited to that study in every single market efficiency report that I've done.

Q.   And I think you testified earlier today that none of your market efficiency reports have been excluded by a court on grounds other than procedural; is that accurate?

A.   That is correct, yes.

Q.   Has any court ever stated that it disagreed with your reliance on the MRK Study for purposes of conducting a market efficiency analysis?

A.   No, I don't believe so.

Q.   You also testified earlier today

Page 240

M. CAIN - 1.8.24

that you used a shorter estimation period than you commonly use.  Is that accurate?

A.   Yes, 60-day estimation window which I have used in other cases.

Q.   Would you say that using a shorter estimation period impacts the reliability of your analysis?

A.   No.  I think that it's a reliable analysis whether I use 120 days or 60 days.  But I felt that in this case 60-day estimation was the most appropriate period to use for the Cammer 5 event studies.

Q.   Speaking of Cammer 5, and again I think you testified to this earlier so I apologize for covering the same ground but I just want to make sure the record is clear.

In your expert opinion, is it possible to make a finding of market efficiency without Cammer 5?

A.   Yes, absolutely.

Q.   Earlier today you were pointed to



Page 241

M. CAIN - 1.8.24

a quote from the Cammer case in which it said that one of the most convincing ways to show market efficiency is using Cammer 5 and that's not a precise quote and you're welcome to go back and look at the precise quote if it would help you answer the question.

But how do you square that statement with your opinion that Cammer 5 is not necessary in order to show market efficiency?

A.   Yes.  So some courts have said that Cammer 5 is a direct test of market efficiency or, like you said, one of the most convincing tests.  But other courts have also said that when all of the other factors weigh in favor of market efficiency, it is unnecessary to even look at a Cammer 5 analysis.

And so because of that, what I can say in this case, number one, my Cammer 5 analysis does strongly support market efficiency, but number two, all of my other analyses also support market

Page 242

M. CAIN - 1.8.24

efficiency.

So when I look at the full basket of factors they all weigh in favor of market efficiency.  But also just looking at the basket of factors excluding Cammer 5, that remaining basket of factors weigh in favor of market efficiency.  And like I said, some courts have opined that it is unnecessary to even get into Cammer 5 when all the other factors weigh in favor of market efficiency.

Q.   Does Cammer 5 -- strike that.

Does the Cammer court dictate how many events are necessary in order to conduct an event study reliably?

A.   No, it does not.

Q.   Are you aware of any academic literature that sets forth a minimum amount of events that should be included in an event study?

A.   No.  I don't think that there is a brightline threshold for that.  I've published research with fewer than 20

Page 243

M. CAIN - 1.8.24

events, I believe.  And if you look at tables of statistical significant, those distributions that report statistical significance report all the way down to probably just three events, for example.

So more events increases statistical power of the test so when you have more events, it's easier to detect a statistically significant impact from something.  But there's certainly nothing wrong with having a smaller sample and still getting a statistically significant result.

Q.   You were also asked earlier today about your decision not to include press releases, aside from those that coincide with earnings releases in your event study.  Do you recall that?

A.   Yes.

Q.   You testified that the reason you excluded those is simply because you had set up an objective criteria and those did not fall within the objective criteria; is that accurate?

Page 244

M. CAIN - 1.8.24

A.   That is correct, yes.

Q.   Did you exclude press releases other than those that coincided with earnings releases from your analysis because including them would have changed the outcome of your opinion on market efficiency here?

A.   No, absolutely not.

Q.   Did you, for purposes of your event study, did you set up the parameters for the event study prior to looking at what happened on those dates?

A.   Yes, I did.

Q.   And after completing your analysis, what did you conclude with regard to the efficiency of the market for PureCycle securities during the class period?

A.   I concluded that every single factor that I evaluated supports a finding of market efficiency for PureCycle.

Q.   Was it a close call?

A.   Not even close.  Every factor



Page 245

M. CAIN - 1.8.24
weighed in favor of market efficiency.
        MS. WEINRIB:  I have nothing
further.
        MS. JACOBSEN:  I have no further
questions.
        THE VIDEOGRAPHER:  Anybody here
on Zoom?
        We are now going off the record.
The time is 3:33 p.m.
        This is the end of the media
labeled number 5 to this video
recorded deposition.
        (Time noted: 3:34 p.m.)
_____

MATTHEW D. CAIN

_____

Subscribed and sworn to
before me this _____
day of _____,2024.

_____

    Notary Public

Page 247

                 I N D E X

WITNESS        EXAMINATION BY          PAGE
DR. CAIN


            MS. JACOBSEN            6


            MR. PRIEBE             170


            MS. WEINRIB            235

            REQUESTS

            Page

            NONE

Page 246

            E X H I B I T S
 NUMBER      DESCRIPTION              PAGE
EXHIBIT 1    Expert Report of Matthew D.    8
             Cain, Ph.D.
EXHIBIT 2    Hindenburg Report        200
EXHIBIT 3    Consolidated Second Amended   212
             Class Action Complaint for
             violations of the federal
             securities laws
EXHIBIT 2A   Accurate copy of Hindenburg   235
             report


        PREVIOUSLY MARKED EXHIBITS
NONE

Page 248

                CERTIFICATION
STATE OF NEW YORK   )
                    : ss.
COUNTY OF NEW YORK  )
    I, MARK RICHMAN, Certified Shorthand
Reporter, Certified Court Reporter,
Registered Professional Reporter and Notary
Public for and within the State of New York,
do hereby certify:
    That the witness whose testimony is
herein set forth, was duly sworn by me; and
that the within transcript is a true record
of the testimony given by said witness.
    I further certify that I am not related
to any of the parties to this action by
blood or marriage, and that I am in no way
interested in the outcome of this matter.
    IN WITNESS WHEREOF, I have hereunto set
my hand this 8th day of January, 2024.

*Mark Richman*
MARK RICHMAN, CSR, CRR, RPR, CM
        *     *     *



MATTHEW D. CAIN
William Theodore vs Purecycle

January 08, 2024
249

Page 249

ERRATA SHEET
CASE NAME:
DATE OF DEPOSITION:
WITNESS' NAME:
PAGE/LINE(S)/    CHANGE         REASON
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____

_____

SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2024.

_____
     NOTARY PUBLIC
MY COMMISSION EXPIRES_____

