# CORRECTED EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

WILLIAM C. THEODORE,
individually and on behalf of others similarly situated,
Plaintiffs,

v.

PURECYCLE TECHNOLOGIES, INC., MICHAEL
OTWORTH, MICHAEL E. DEE, DAVID BRENNER,
and BYRON ROTH,
Defendants

Case No. 6:21-cv-809-PGB-GJK

CORRECTED EXPERT REPORT OF RENE M. STULZ, Ph.D.

February 5, 2024

# Table of Contents

I.      Qualifications ................................................................................................. 1

II.     Assignment and Compensation ....................................................................... 2

III.    Summary of Allegations ................................................................................. 3

IV.     Summary of Opinions ..................................................................................... 7

V.      Background on the Business Combination ..................................................... 12

        A.      Background on SPACs ...................................................................... 12

        B.      Overview of ROCH .......................................................................... 15

        C.      Overview of PureCycle ..................................................................... 16

VI.     Background on Market Efficiency and Event Study Analysis ...................... 17

        A.      Market Efficiency in Financial Economics ...................................... 17

        B.      Overview of Event Study Methodology ........................................... 20

        C.      Regression Model Specification ....................................................... 22

VII.    Dr. Cain Fails to Establish that the Markets for the Company's Securities Were
        Efficient ......................................................................................................... 24

        A.      Overview of Dr. Cain's Market Efficiency Analyses ....................... 25

        B.      Dr. Cain's Analyses Ignore the Existence of Two Distinct Sub-Periods during
        the Proposed Class Period ........................................................................... 26

        C.      Dr. Cain Fails to Provide Reliable Evidence of a Cause-and-Effect
        Relationship between Information and Price Response Prior to the de-SPAC .......... 30

                1.      Summary of Dr. Cain's Event Study ................................... 30

                2.      Dr. Cain's Regression Model Is Flawed and Unreliable due to
                Inappropriately Including Data From Prior to the Proposed Class Period ...... 32

                3.      Dr. Cain Fails to Provide Objective Criteria for the Classification of
                News Days ...................................................................................... 37

                4.      Dr. Cain Fails to Provide Reliable Evidence of a Cause-and-Effect
                Relationship prior to the De-SPAC ................................................ 40

        D.      Dr. Cain's Analysis of "Benchmarks Established by Courts" Ignores Factors
        that Are Inconsistent with His Market Efficiency Conclusions in the Proposed Class
        Period, and in Particular the Period Prior to the de-SPAC ......................... 42

                1.      Dr. Cain's Use of "Covered" Firms from the MRK Study as a
                Benchmark Is Misleading and Unreliable ....................................... 42

                2.      Analyst Coverage .............................................................. 44

                3.      Market-makers and Arbitrageurs ...................................... 46

                4.      Market Capitalization ........................................................ 49

                5.      Bid-ask Spreads ................................................................ 49

                6.      Institutional Investors ....................................................... 51

7.    Autocorrelation ..................................................................51

8.    Options Trading ..................................................................53

E.    Dr. Cain's Cursory Analyses of Warrants and Options Fail to Demonstrate that
the Markets for Those Securities Were Efficient..........................................................54

1.    Dr. Cain's Cursory Analysis of the Company's Warrants Is Flawed and
Cannot be Used to Support a Conclusion of Market Efficiency.....................55

2.    Dr. Cain's Cursory Analysis of Options Fails to Show That His
Results, Based on the Most Liquid and Actively-Traded Options, Support a
Conclusion of Market Efficiency for All PureCycle Options..........................56

VIII.    The Alleged Misrepresentations Did Not Increase the Company's Stock Price on the
Four Alleged Misrepresentation Dates ..................................................................59

A.    The Alleged Misrepresentations Were Not Associated with Statistically
Significant Price Increases ..................................................................61

1.    November 16, 2020 ...............................................................62

2.    November 20, 2020 ...............................................................65

3.    February 12, 2021 .................................................................68

4.    April 21, 2021 ......................................................................71

B.    Price Declines on the Alleged Corrective Disclosure Dates Cannot Serve as
Reliable Evidence of Inflation Dissipating ..................................................72

IX.    Dr. Cain Has Failed to Articulate a Damages Methodology That Can Measure
Damages That Are Consistent with the Theory of Liability in This Case..................73

A.    Summary of Dr. Cain's Proposed Approach for Section 10(b) Common Stock
Damages.........................................................................................................74

B.    Dr. Cain Has Not Articulated How He Will Derive a Reliable Measure of
Inflation Throughout the Proposed Class Period ..........................................76

1.    Dr. Cain Has Not Articulated How He Could Reliably Estimate
Inflation at the Start of the Proposed Class Period ........................................77

2.    Dr. Cain Assumes, Without Basis, that Price Declines on the Alleged
Corrective Disclosure Dates Can Be Used to Measure Inflation.....................77

3.    Dr. Cain's Proposed Back-casting Approach Suffers from Multiple
Other Flaws .....................................................................................78

C.    Dr. Cain Has Not Articulated How He Will Isolate Damages Attributable Only
to Plaintiffs' Theory of Liability ..................................................................81

1.    Dr. Cain Has Not Articulated How He Will Isolate the Impact of the
"Truth" Allegedly Revealed by the Hindenburg Report.................................83

2.    Dr. Cain Has Not Articulated How He Will Isolate the Impact of the
"Truth" Allegedly Revealed by Disclosure of the SEC Investigation.............94

D.    Damages for Warrants and Options..................................................99

## I.    Qualifications

1.    I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.    I am a past president of the American Finance Association; a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center; and a past president of the Western Finance Association.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland, an Honorary Doctorate of Laws from University College Dublin, and the Risk Manager of the Year award from the Global Association of Risk Professionals. I have also been recognized by a number of organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker.  I belong to the editorial boards of many academic and practitioner publications.  Further, I am a member of the Asset Pricing and Corporate Finance Programs and was the director of the Risk of Financial Institutions Group of the National Bureau of Economic Research for more than fifteen years. I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (these are two of the top three journals in the field of financial economics).  Thomson Reuters has included me in its list of the world's most influential scientific minds, which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

3.    I have published more than 100 articles in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*.  I am the author of a textbook titled *Risk Management and Derivatives*, a co-author of *The Squam Lake Report: Fixing the Financial System*, and have edited several books, including the *Handbook of the Economics of Finance and International Capital Markets*.

---

[1] *See, e.g.,* "The World's Most Influential Scientific Minds," Thomson Reuters, December 2015, p. 46.

4.      I have taught in executive development programs in North America, Europe, and
Asia, and consulted for major corporations, law firms, the New York Stock Exchange, the
International Monetary Fund, and the World Bank.  I have also served as a member of
advisory boards of the U.S. Treasury and of the Federal Reserve Bank of New York.  I have
belonged to several corporate boards and was the vice-chairman of the board of trustees of
the Global Association of Risk Professionals, where I also chaired the governance committee.

5.      A copy of my curriculum vitae is attached as **Appendix A**, which also includes a list
of my publications over the last 10 years.  **Appendix B** contains a list of my testimony over
the last four years.


## II.      Assignment and Compensation

6.      I understand that this matter regards the business combination ("Business
Combination") between the Special Purpose Acquisition Company ("SPAC") Roth CH
Acquisition I Co. ("ROCH") and PureCycle Technologies, LLC.  At the consummation of the
transaction, PureCycle Technologies, LLC was renamed PureCycle Technologies, Inc.
("PureCycle").[2]

7.      I have been retained by counsel for PureCycle.  I was asked to review and respond to
the expert report of Matthew D. Cain, Ph.D., dated November 30, 2023 ("Cain Report").[3]
Specifically, I was asked to review and respond to the Cain Report's analyses and opinions
with respect to efficiency of the markets for the Company's securities (*i.e.*, common stock,
warrants, and options).  I was also asked to address whether Dr. Cain has put forth a
methodology capable of reliably measuring class-wide damages in a manner consistent with
Plaintiffs' theory of liability.

8.      Additionally, I was asked to address whether the alleged misstatements and omissions
made by ROCH and the private company PureCycle prior to the Business Combination and
the publicly traded PureCycle after it ("Alleged Misrepresentations")[4] caused ROCH and

---

[2] Throughout this report I refer to the at-issue company during the Proposed Class Period (*i.e.*, ROCH prior to the
Business Combination, and the merged company thereafter) as "the Company."  I refer to PureCycle
Technologies, LLC prior to the Proposed Class Period as the "private company PureCycle."  ROCH's stock
traded under the ticker ROCH, while PureCycle's stock traded under the ticker PCT.
[3] Expert Report of Matthew D. Cain, *William C. Theodore, Individually and on Behalf of All Other Similarly
Situated v. PureCycle Technologies, Inc., Michael Otworth, Michael E. Dee, David Brenner, Byron Roth and
Tasmin Ettefagh*, United States District Court Middle District of Florida, Case No. 6:21-cv-809-PGB-GJK, dated
November 30, 2023 ("Cain Report").
[4] Throughout this report I refer to the relevant impact dates associated with the Alleged Misrepresentations as the
"Alleged Misrepresentation Dates."

later PureCycle's stock price to be inflated, in the event that the markets for these stocks are found to be efficient throughout the Proposed Class Period.

9.      The analyses and opinions expressed in this report are my own.  I am compensated for my time and services on this case at my regular hourly rate of $1,325.  I am assisted in this matter by staff of Cornerstone Research, who work under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

10.     A list of the materials that I considered in preparing this report is attached as **Appendix C**.  My work in this matter is ongoing and I reserve the right to supplement my opinions in the event that Plaintiffs or their experts submit additional analyses or information.

## III.     Summary of Allegations

11.     In this section, I provide a summary of my understanding of Plaintiffs' remaining allegations as stated in the Second Amended Complaint,[5] and following the Court's order on June 15, 2023 on Defendants' motion to dismiss ("Motion to Dismiss Order").[6]

12.     The Second Amended Complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 on behalf of all investors who "purchased or otherwise acquired PureCycle securities" during the period from November 16, 2020 through November 10, 2021 ("Proposed Class Period").[7]

13.     The Second Amended Complaint alleges that the securities prices of ROCH and the public company PureCycle were artificially inflated during the Proposed Class Period as a result of Alleged Misrepresentations made by, and public materials issued by, ROCH, the private company PureCycle, Individual Defendants, and/or the public company PureCycle, on four dates.[8]  Specifically:

---

[5] Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws, *William C. Theodore, Individually and on Behalf of All Other Similarly Situated v. PureCycle Technologies, Inc., Michael Otworth, Michael E. Dee, David Brenner, Byron Roth and Tasmin Ettefagh*, United States District Court Middle District of Florida, Case No. 6:21-cv-809-PGB-GJK, August 18, 2022 ("Second Amended Complaint").
[6] Order, *William C. Theodore, Erste Asset Management GMBH and David Tennenbaum v. PureCycle Technologies, Inc., Michael Otworth, Tasmin Ettefagh, Michael E. Dee, David Brenner and Byron Roth*, United States District Court Middle District of Florida Orlando Division, Case No. 6:21-cv-809-PGB-RMN, June 15, 2023 ("Motion to Dismiss Order").
[7] Second Amended Complaint, ¶¶ 1, 113.  I understand that the Second Amended Complaint also alleges violations of Section 14(a) of the Exchange Act but Plaintiffs are not seeking to certify a class under the 14(a) claim.
[8] Second Amended Complaint, ¶ 30.

a. On <u>November 16, 2020</u>, the first day of the Proposed Class Period, the private
company PureCycle and ROCH jointly published a press release announcing
the proposed Business Combination (*i.e.*, "de-SPAC").[9]  The private company
PureCycle provided a link to a webinar presentation regarding the proposed
transaction as part of the press release.[10]  On the same date, ROCH included
the slide deck for that presentation in a filing with the U.S. Securities and
Exchange Commission ("SEC").[11]  Further, ROCH filed the transcript of the
same presentation with the SEC on the same date, as part of a preliminary
proxy statement to schedule a special meeting of shareholders on March 16,
2021.[12]  Plaintiffs allege that these materials included claims that misled
investors about "PureCycle's method to recycle waste polypropylene into
virgin-like resin," with a process that is "more cost-efficient and
environmentally sustainable than the traditional manufacturing process" and
also allegedly misled investors regarding "the experience of PureCycle's
management team."[13]

b. On <u>November 20, 2020</u>, ROCH filed a Form S-4 Registration Statement with
the SEC regarding the proposed Business Combination with the private
company PureCycle.[14]  Plaintiffs allege that the registration statement
misleadingly claimed that PureCycle's technology was "proven" to "convert[]
waste polypropylene feedstock into UPRP pellets with similar characteristics
to virgin polypropylene," that the process had been "validated by independent
technical consultants and many of PCT's strategic partners and initial
customers," and that a "broader range of feedstock" could be used in the
process "suitable for use in almost all polypropylene applications including
high-value, food grade consumer products."[15]

---

[9] Second Amended Complaint, ¶¶ 53, 55; "Roth CH Acquisition I to Combine with PureCycle Technologies,
Accelerating a Revolution in Plastics Recycling Through Impact Investing," PureCycle Press Release, November
16, 2020 ("PureCycle November 2020 Press Release").
[10] Second Amended Complaint, ¶¶ 56, 58; PureCycle November 2020 Press Release.
[11] Second Amended Complaint, ¶¶ 56, 58; Roth CH Acquisition I Co., Form 8-K Exhibit 99.2, filed
November 16, 2020 ("ROCH Form 8-K Exhibit 99.2").
[12] Second Amended Complaint, ¶¶ 60–61; Roth CH Acquisition I Co., Form DEFA14A, filed November 16, 2020
("ROCH Form DEFA14A").
[13] Second Amended Complaint, ¶¶ 53–58.
[14] Second Amended Complaint, ¶¶ 63, 65; Roth CH Acquisition I Co. Parent Corp., Form S-4, filed November 20,
2020 ("ROCH Parent Corp Form S-4").
[15] Second Amended Complaint, ¶¶ 63–66.

     c.   On <u>February 12, 2021</u>, ROCH filed with the SEC an amended proxy statement for the special meeting of shareholders scheduled for March 16, 2021.[16] Plaintiffs allege that the amended proxy statement misleadingly presented "Strong Technology Representing Significant Innovation" as a significant factor for approving the SPAC transaction, misrepresented the output and quality of PureCycle's recycling process and "once again flaunted the extensive experience of PureCycle's management team."[17]

     d.   On <u>April 21, 2021</u>, one month after the Business Combination, the public company PureCycle published a press release entitled "PureCycle's Tamsin Ettefagh Facilitates Plastics Industry Dialogue About Polypropylene Recycling Solutions in Light of U.S. Plastics Pact."[18] Plaintiffs allege that the press release misrepresented the potential of PureCycle's technology.[19]

14.    In the Motion to Dismiss Order, the Court stated that the Alleged Misrepresentations could be organized into "three distinct categories."[20] First, statements about PureCycle "management team's experience;" second, statements about "the value of the patent and the recycled polypropylene;" and third, statements about PureCycle's "future production and financial projections."[21] I understand that the Alleged Misrepresentations in the third category have been ruled non-actionable by the Court.[22]

15.    With respect to the first category of Alleged Misrepresentations, about the PureCycle management team's experience, Plaintiffs allege that the private company PureCycle and ROCH's statements on November 16, 2020 and February 12, 2021 about the management team in SEC filings and investor materials were false and misleading because they "failed to disclose that the management team bringing PureCycle public had previously brought six other failed businesses public only to have each implode thereafter and had no relevant experience with recycling polypropylene."[23]

---

[16] Second Amended Complaint, ¶¶ 67–69, 71; Roth CH Acquisition I Co. Parent Corp., Form 424B3, filed February 12, 2021 ("ROCH Parent Corp Form 424B3").
[17] Second Amended Complaint, ¶¶ 67–71.
[18] Second Amended Complaint, ¶ 73; "PureCycle's Tamsin Ettefagh Facilitates Plastics Industry Dialogue about Polypropylene Recycling Solutions in Light of U.S. Plastics Pact," PureCycle Press Release, April 21, 2021 ("PureCycle April 2021 Press Release").
[19] Second Amended Complaint, ¶ 73–74.
[20] Motion to Dismiss Order, p. 6.
[21] Motion to Dismiss Order, pp. 6–7.
[22] Motion to Dismiss Order, p. 7 ("With respect to the safe harbor provision of the PSLRA, the Court determined that all statements in the third bucket concerning those about PureCycle Inc.'s future production and financial projections were protected and were thus not actionable in Plaintiff's fraud-based claims.").
[23] Second Amended Complaint, ¶ 57.

16.     With respect to the second category of Alleged Misrepresentations, about the value of
the patent and the recycled polypropylene, Plaintiffs allege that the statements on all four of
the Alleged Misrepresentation Dates about PureCycle's patent and technology in SEC filings
and investor materials were false and misleading because "the technology underlying the
process is unproven and presents serious issues even at lab scale, the flammable pressurized
process is not yet functional—especially at scale—and is dangerous, the Company faces
obstacles to obtaining the quantity and quality of feedstock it needs to perform its process, the
economics of conducting the process at commercial scale are cost prohibitive, and the patent
underlying the technology is based on prior discoveries that never reached commercial
scale."[24]  Plaintiffs further contend that "Defendants' statements regarding PureCycle's
current use of a 'broader range of feedstock' to make virgin quality UPRP pellets misled
investors because in reality, its process can only use polypropylene feedstock of high quality
and remove less than 5% contamination for the process to be cost efficient, and Defendants
further failed to disclose the insufficient volume of, and high competition for, high quality
feedstock to currently power PureCycle's recycling process in a cost efficient manner."[25]

17.     Plaintiffs allege that the truth about PureCycle's recycling technology and
management team's experience were revealed upon two alleged corrective disclosure events.

18.     According to Plaintiffs, the first alleged corrective disclosure event was the
publication of a short seller report on May 6, 2021 before the market opened by Hindenburg
Research ("Hindenburg") entitled "PureCycle: The Latest Zero-Revenue ESG SPAC
Charade, Sponsored by the Worst of Wall Street" ("Hindenburg Report").[26]  Plaintiffs
summarize the Hindenburg Report as follows:

> (1) Hindenburg "spoke with multiple former employees of" Defendant
> Otworth's and other PureCycle executives' former companies "who
> said PureCycle's executives based their financial projections on 'wild
> ass guessing,' brought companies public far too early, and had
> 'con[ned]' and deceived investors;" (2) unlike most "leading plastics
> companies [who] publish peer reviewed studies that detail their
> advancements in the field," Hindenburg was "unable to find a single
> peer reviewed study in any scholarly journal citing or reviewing
> PureCycle's licensed process;" (3) "multiple competitors and industry
> experts … explained that PureCycle faces steep competition for high

---

[24] Second Amended Complaint, ¶ 54.
[25] Second Amended Complaint, ¶ 66.
[26] Second Amended Complaint, ¶ 75; "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by
the Worst of Wall Street," Hindenburg Research, May 6, 2021, available at
https://hindenburgresearch.com/purecycle/ ("Hindenburg Report"); Hindenburg Research Twitter Post, May 6,
2021, 9:02 AM, available at https://twitter.com/HindenburgRes/status/1390290802950213633.

quality feedstock, and called the company's financial projections into question;" (4) "a 30-year expert on polymers, with a background in advanced plastics recycling … told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art;" (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale;" and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."[27]

Plaintiffs allege that PureCycle's stock price fell approximately 40% on the publication of the Hindenburg Report.[28]

19.    Plaintiffs allege that the second alleged corrective disclosure event was the filing of PureCycle's 2021 third quarter Form 10-Q with the SEC on <u>November 10, 2021</u> after the market closed.[29]  The 10-Q disclosed that "[o]n or around September 30, 2021, the SEC issued an investigative subpoena to [PureCycle's] Chief Executive Officer requesting testimony in connection with a non-public, fact-finding investigation of the Company.  The investigation pertains to, among other things, statements made in connection with [PureCycle's] technology, financial projections, key supply agreements, and management."[30]  Plaintiffs allege that the disclosure of the SEC investigation "validat[ed] the claims in the Hindenburg report" and that PureCycle's stock price fell approximately 15% on this news.[31]

## IV.    Summary of Opinions

20.    Below is a summary of my opinions.  The bases for my opinions are detailed in the sections that follow.

21.    Dr. Cain's analyses fail to consider market and institutional features that are specific to SPACs, and this failure renders his analyses and opinions pertaining to market efficiency and damages methodology flawed and unreliable.  For example, in his market efficiency analyses, Dr. Cain makes no distinction between the period prior to the de-SPAC, when

---

[27] Second Amended Complaint, ¶ 76; Hindenburg Report.
[28] Second Amended Complaint, ¶ 83.
[29] Second Amended Complaint, ¶ 85.  The Form 10-Q was accepted by the SEC on 2021-11-10 at 17:04:11. *See* "Form 10-Q Filing Detail," U.S. Securities and Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1830033/000183003321000025/0001830033-21-000025-index.htm.
[30] Second Amended Complaint, ¶ 85; PureCycle Technologies, Inc., Form 10-Q for Q3 2021, filed November 10, 2021 ("PureCycle Q3 2021 Form 10-Q"), p. 37.
[31] Second Amended Complaint, ¶ 85.

ROCH was a SPAC (*i.e.*, a blank check company without an operating entity), and the period after the Business Combination, when PureCycle was an operating company whose stock was publicly traded under the ticker PCT. He infers without basis that the common stock for the SPAC traded in an efficient market using analyses based on data from after the Business Combination. Similarly, Dr. Cain's discussion of a potential damages methodology ignores an important feature specific to SPACs, which is that ROCH shareholders had the right to redeem their shares prior to the close of the Business Combination, at approximately $10. Given this redemption option, if the markets for ROCH and PureCycle's common stock are found to be efficient, as Dr. Cain claims, $10 (less transaction costs) should act as a floor for ROCH's stock price before the de-SPAC in the absence of the Alleged Misrepresentations. Two inflation methodologies Dr. Cain proposes ignore, and yield results inconsistent with, this important feature.

22.  Dr. Cain fails to establish that the market for ROCH's common stock was efficient prior to the de-SPAC. To begin, Dr. Cain fails to provide reliable evidence of a cause-and-effect relationship for the period prior to the de-SPAC. His analysis relies on a flawed, ill-specified event study model, which renders his *Cammer* 5 cause-and-effect test unreliable. Specifically, his improper use of the data from the period prior to the start of the Proposed Class Period masks the fundamental change in the economics of the ROCH common stock when the Business Combination was announced at the start of the Proposed Class Period. Indeed, ROCH was a blank check company before the Business Combination announcement whose value was not economically linked to PureCycle or any operating entity. As a result, ROCH's stock return volatility prior to the Proposed Class Period was very low relative to the Proposed Class Period, and using the stock return data from this low-volatility period to calibrate his regression model distorts the statistical significance of residual returns during the early part of the Proposed Class Period.

23.  Dr. Cain's method for testing the cause-and-effect *Cammer* factor is unreliable for the additional reason that he has no reliable objective criteria for choosing his event dates. Indeed, his findings based on a cause-and-effect analysis using days "with news" and days "without news" would be *reversed* when applying a classification of days "with news" shown in his backup materials. Moreover, of the nine "News Days" that Dr. Cain includes in his cause-and-effect analysis, only *one*—the first day of the Proposed Class Period—occurred prior to the de-SPAC. The residual return on this *single* "News Day" that occurred prior to the de-SPAC is not statistically significant under alternative event study regression models

that Dr. Cain has used in previous reports, rather than Dr. Cain's ill-specified regression model in this matter that incorporates data from prior to the announcement of the Business Combination.

24.     Dr. Cain's remaining analyses of market efficiency for the common stock are also unreliable.  He again relies on aggregate data that obscure the fundamental changes of the Company and its market dynamics in distinct sub-periods within the Proposed Class Period, *i.e.*, before and after the de-SPAC.  For example, in his assessment of *Cammer* factor 2, Dr. Cain reports analysis based on the Proposed Class Period as a whole, ignoring the fact that neither ROCH nor the private company PureCycle had *any* analyst coverage before the de-SPAC.  More generally, the period before the de-SPAC differed from the period after the de-SPAC in numerous ways, including in terms of analyst coverage, market capitalization, the average number of institutional investors, autocorrelation, and trading of options.  However, Dr. Cain ignores evidence from the period prior to the de-SPAC that is inconsistent with his conclusion of market efficiency, based on his own criteria.  Given his failure to provide reliable evidence of a cause-and-effect relationship for the period prior to the de-SPAC, he thus has no basis to conclude that the market for the Company's common stock was efficient *throughout* the Proposed Class Period.

25.     With respect to warrants and options, Dr. Cain's cursory analyses fail to demonstrate that the markets for those securities were efficient.  Dr. Cain concludes market efficiency for the warrants and *all* the options *throughout* the Proposed Class Period.  However, this conclusion is based on his observation that the prices of the Company's warrants and a small subset of PureCycle's options moved in the same direction as the common stock on up to two dozen days with large residual stock returns.  Dr. Cain does not conduct an event study or any other analysis of the warrants or options.  He provides no support for why consistency in the direction of price movements on certain dates can be used as reliable evidence in support of a "cause-and-effect" relationship for those securities.  With respect to the warrants, Dr. Cain also fails to address the implications of high trading costs for market efficiency.  Moreover, his findings based on the most actively-traded option series cannot be reliably extrapolated to the vast majority of other PureCycle option series, some of which had sparse trading and wide bid-ask spreads during the Proposed Class Period.

26.     I find that there is no evidence that the Alleged Misrepresentations impacted ROCH or, later, PureCycle's stock price on the dates that the Alleged Misrepresentations were made, *i.e.*, none of the Alleged Misrepresentation Dates are associated with statistically significant

price increases.  Specifically, I understand that Plaintiffs allege that the Alleged
Misrepresentations on November 16, 2020 *created* inflation in ROCH's stock price.  Based
on such allegations, inflation had to enter into ROCH's stock price on the first day of the
Proposed Class Period (the stock of the private company PureCycle was not publicly traded).
This is because prior to the announcement of the Business Combination, information about
the private company PureCycle would not be expected to be reflected in the price of ROCH's
stock.  Moreover, given investors' ability to redeem their shares for approximately $10 prior
to the de-SPAC, as a matter of economics, the stock price would have remained at
approximately $10 in the absence of the Alleged Misrepresentations.  Therefore, the stock
price would need to increase above $10 on the first day of the Proposed Class Period for the
Alleged Misrepresentations to have "artificially inflated the prices of PureCycle securities"
from the start of the Proposed Class Period, as Plaintiffs claim.[32]  In contrast, I show that
information about the Company that came to the market on the first day of the Proposed
Class Period, and on the subsequent Alleged Misrepresentation Dates, was not associated
with a statistically significant residual price increase.  Additionally, given the lack of
evidence that the Alleged Misrepresentations *created* inflation during the Proposed Class
Period, price declines on the alleged corrective disclosure dates cannot serve as reliable
evidence of such inflation dissipating.

27.     With respect to a damages methodology, Dr. Cain has not shown that he can
overcome issues specific to the allegations in this litigation and ultimately develop a damages
model capable of calculating inflation and damages stemming from Plaintiffs' theory of
liability.  To start, Dr. Cain provides a generic description of his proposed damages approach.
He provides *examples* of *potential* approaches to measuring damages.  He fails to specify
*which* approach he believes would be appropriate to estimating damages at a later stage of the
case, let alone explain how he would tailor the generic approaches he describes in order to
reliably address the specific features of the matter at hand in a manner that is consistent with
Plaintiffs' theory of liability.

28.     Dr. Cain's proposed "out-of-pocket" methodology requires a measure of inflation on
each day of the Proposed Class Period, yet Dr. Cain fails to articulate how he will derive a
reliable measure of inflation throughout the Proposed Class Period.  He fails to articulate how
he will reliably measure inflation at the start of the Proposed Class Period, given Plaintiffs'
theory of liability and the lack of a statistically significant price increase on the first day of

---

[32] Second Amended Complaint, ¶ 28.

the Proposed Class Period (or any other dates with Alleged Misrepresentations).  Moreover, as noted above, if the misrepresentations are alleged to have *created* inflation at the start of the Proposed Class Period but there is no evidence that the Alleged Misrepresentations impacted ROCH or, later, PureCycle's stock price on the dates they were made, subsequent price declines cannot serve as evidence of such inflation dissipating.  Dr. Cain thus has no reliable basis to *assume* that the price declines on the alleged corrective disclosure dates can be used to derive inflation.

29.     Dr. Cain's proposed "back-casting" approach using price declines on the alleged corrective disclosure dates to estimate inflation is flawed for multiple additional reasons. First, absent other adjustments, a constant dollar measure, which is one of the alternatives Dr. Cain proposes, implies, implausibly, that ROCH's stock price would have been negative at the start of the Proposed Class Period, but for the Alleged Misrepresentations.  Second, using either a constant dollar or constant percentage inflation measure would imply, absent other adjustments, that ROCH's stock price would have traded substantially below $10 in the early part of the Proposed Class Period, but for the Alleged Misrepresentations.  However, a price substantially below $10 in the absence of misrepresentations is inconsistent with the fact that the shares could be redeemed at a price of approximately $10 at the time of the business consummation.  Third, a constant percentage inflation approach is additionally flawed because it rests on the strong assumption that inflation is proportional to the value of the Company throughout the Proposed Class Period, which Dr. Cain has failed to demonstrate is economically reasonable in this case.  Fourth, Dr. Cain's observation that inflation *could* evolve throughout the Proposed Class Period provides no insight into a methodology he would use to address the specific challenges in this case.

30.     To the extent Dr. Cain asserts that certain challenges with using a back-casting approach can be resolved by accounting for confounding news on the alleged corrective disclosure dates, his claim that any confounding information can be addressed with "various accepted methodologies" is entirely uninformative of how he would, or even whether he can, reliably isolate the impact of the purported "truth" being disclosed on the alleged corrective disclosure dates from other information that may have impacted the Company's stock price on those dates.

## V.     Background on the Business Combination

31.     In this section, I provide background information on SPACs and discuss my understanding of certain background facts about the Business Combination, based on my review of publicly available documents.

### A.     Background on SPACs

32.     SPACs, which are often referred to as publicly traded shell companies or "blank check" companies, are investment vehicles that raise capital through Initial Public Offerings ("IPOs"), with the purpose of finding a target private company to take public.[33]  The typical process for creating and developing SPACs can be summarized as having four stages.[34]

33.     First, SPAC "sponsors"[35] conduct an IPO to raise capital.  Although the SPAC does not have any underlying operating business at this time, the company goes through the process of filing a registration statement with the SEC, conducting a road show, and engaging with underwriters.[36]  In the IPO, the SPAC issues "units," which typically consist of one common share and a derivative security, often a fraction of a warrant.[37]  For almost all SPACs, each unit offered in the IPO is priced at $10—the SPAC does not yet have a target or any operations of its own, so unlike a traditional IPO, the IPO price is not based on the

---

[33] M. Gahng, J. R. Ritter and D. Zhang (2023), "SPACs," *The Review of Financial Studies*, 36(9), pp. 3463–3501 ("Gahng, Ritter and Zhang (2023)") at pp. 3463–3464; "Special Purpose Acquisition Companies: An Introduction," *Harvard Law School Forum on Corporate Governance*, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/.

[34] At deposition, Dr. Cain described the typical features of SPACs in similar terms to the discussion throughout this section.  For example, he described SPACs as "entities that go out and raise capital from investors by typically conducting an initial public offering of the stock which they typically price at $10 per share.  They also usually have warrants that frequently have an exercise price of $11.50 per share, and they will often start out with just units that represent one share of common stock and maybe one warrant or a fractional warrant.  But again, typically it's $10 per share.  They will raise a certain amount of capital based on how many shares they sell to investors.  And then they have a fixed life, typically it's two years, to go out and try to identify [a] private target company to take public.  If they get to the close to the end of that two-year expiration of the SPAC and they've been unable to merge with a private company, then they're typically forced to return their capital to investors, so $10 plus, plus interest, unless the investors grant them an extension. … If a SPAC identifies a target and can get shareholder approval to merge with the private target, then that private target is now merged with the SPAC and is publicly traded once the business combination closes."  *See* Deposition of Matthew D. Cain, Ph.D., January 8, 2024 ("Cain Deposition," attached to Defendant PureCycle Technologies Inc.'s Opposition to Lead Plaintiffs' Motion for Class Certification as Exhibit 14, 33:15–34:25.

[35] A sponsor is typically associated with a private equity firm, or can also be an individual or a group of individuals.  *See* "Choose Your Path to Public: SPAC," New York Stock Exchange, available at https://www.nyse.com/spac.

[36] "Special Purpose Acquisition Companies: An Introduction," *Harvard Law School Forum on Corporate Governance*, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/.

[37] Gahng, Ritter and Zhang (2023), p. 3464.

valuation of any underlying business.[38-39]  The funds raised in the IPO are placed in a risk-free, interest-bearing trust account.[40]

34.     Second, following the IPO, the SPAC typically has a period of 18 to 24 months (the precise length depending on its charter) to identify a target private company and consummate a transaction.[41]  During this time, the management team engages in its search for a company to take public.  The management team will conduct diligence on potential targets and negotiate acquisition agreements.[42]  Before announcing a target, the SPAC may also arrange committed financing.  This financing, referred to as Private Investment in Public Equity ("PIPE"), serves, in part, to address the possibility of funding shortfalls if some public shareholders choose to redeem their shares.[43]  Also during this time (*i.e.*, sometime after the IPO and usually before a business combination target has been identified), the SPAC units can be unbundled so that investors can choose to trade the common stock and warrants separately.[44]  After unbundling, investors can purchase common stock or warrants separately on the open market, but there is still no underlying operating business or publicly announced business combination target that determines the value of the shares.  Research has found that SPAC shares typically trade for around $10 (*i.e.*, approximately their redemption value) in this phase.[45]

35.     Third, once a business combination target is publicly announced, the SPAC will file a preliminary proxy or tender offer agreement detailing the acquisition target and any

---

[38] "What You Need to Know About SPACs – Updated Investors Bulletin," *U.S. Securities and Exchange Commission*, May 25, 2021, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin.

[39] At the time of the IPO, sponsors also receive founders' shares for a nominal amount.  Sponsors also typically purchase private placement warrants or units for approximately their fair market value that can then be sold or exercised after a holding period following a successful de-SPAC transaction.  Sometimes referred to as "founders' warrants," private placement warrants are sold through separate agreements with the sponsor.  Sponsors typically pay $25,000 for 20% of the shares outstanding after the IPO.  Sponsors can also buy warrants at $0.50, $1.00 or $1.50 per warrant, depending on the fraction of a warrant sold with each unit in the IPO.  *See* Gahng, Ritter and Zhang (2023), p. 3464; "Special Purpose Acquisition Companies: An Introduction," *Harvard Law School Forum on Corporate Governance*, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/.

[40] Gahng, Ritter, and Zhang (2023), p. 3464; "What You Need to Know about SPACs- Updated Investor Bulletin," *SEC*, May 25, 2021, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin.

[41] Gahng, Ritter and Zhang (2023), p. 3464.

[42] "Special Purpose Acquisition Companies: An Introduction," *Harvard Law School Forum on Corporate Governance*, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/.

[43] PIPE investors are typically institutional investors such as hedge funds, mutual funds, and/or the sponsors themselves.  *See* Gahng, Ritter and Zhang (2023), pp. 3465, 3490, 3494–3495.

[44] Gahng, Ritter and Zhang (2023), p. 3464.

[45] "A Second Look at SPACs: Is This Time Different?" *Harvard Law School Forum on Corporate Governance*, January 24, 2022, available at https://corpgov.law.harvard.edu/2022/01/24/a-second-look-at-spacs-is-this-time-different/.

committed financing for the transaction.[46]  The management team may meet with SPAC investors to discuss the transaction.  At this stage, the SPAC still has no underlying operating business, but investors may now choose to buy or sell the stock depending on their expectation of the future cash flows of the combined company and their expectation of the likelihood of the SPAC business combination being consummated.

36.    Shortly prior to the de-SPAC, the business combination will typically be subject to a shareholder vote.  A feature specific to SPACs is that shareholders may redeem their common stock in the context of the shareholder meeting prior to the close of the business combination.[47]  Thus, even when a business combination is approved by a majority of shareholders, shareholders who disagree with the business combination can choose to redeem their shares, usually at a price that approximates the share's original value (*i.e.*, the IPO price), plus accrued interest.[48,49]  A study by Professors Gahng, Ritter, and Zhang explains that this effectively means that "there is a money-back guarantee for SPAC IPO investors" and, accordingly, characterizes purchases of SPAC shares in the period before the de-SPAC as an investment "equivalent to default-free convertible bonds."[50,51]  As discussed further below, for this reason, the value of the SPAC shares can be thought of as having a lower bound of approximately $10 in an efficient market:  if the price declines substantially below $10, arbitrageurs would be incentivized to purchase the shares and eventually redeem them for approximately $10, which in turn would push the price higher to eliminate such a profit opportunity.[52]

---

[46] "How Special Purpose Acquisition Companies (SPACs) Work," *PwC*, available at https://www.pwc.com/us/en/services/consulting/deals/library/spac-merger.html; "Special Purpose Acquisition Companies: An Introduction," *Harvard Law School Forum on Corporate Governance*, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/.

[47] Gahng, Ritter and Zhang (2023), p. 3465.

[48] Unit holders are allowed to keep or sell their warrants even if they choose to redeem their shares.  *See* Gahng, Ritter and Zhang (2023), p. 3465.

[49] If no business combination is approved within the designated time frame, all public shares are redeemed for their original value, plus accrued interest.  *See* Gahng, Ritter and Zhang (2023), p. 3464.

[50] Gahng, Ritter and Zhang (2023), pp. 3465, 3481.

[51] Similarly, the Financial Industry Regulatory Authority ("FINRA") has stated that "SPACs allow their IPO investors to benefit from the expertise of a sponsor, with some downside protection as a result of their option to redeem shares prior to any acquisition for the IPO price plus any interest accumulated in the trust account."  *See* "Investing in a SPAC," *FINRA*, March 29, 2021, available at https://www.finra.org/investors/insights/spacs.

[52] This $10 "money-back guarantee" does not account for the potential conversion fee associated with redemption.  For the redemption of ROCH shares specifically, the transfer agent responsible for the conversion process would charge the broker $45 for the processing per shareholder and it would be at the broker's discretion whether or not the fee would be passed on to the converting shareholder.  *See* Roth CH Acquisition I Co., Form 424B4, filed May 6, 2020, p. 11.  Arbitrageurs pursuing the trade described above may also pay borrowing costs if they borrow funds to finance the trade.  As noted above, at the time of redemption shareholders also receive interest accrued in the trust account.

37.    A fourth and final stage is the de-SPAC, when the SPAC and the target company combine into a publicly traded operating company.[53]  In this process, the SPAC merges with the target company and changes from "essentially a trust account into an operating company."[54]  As part of the process, the common stock and warrants begin to trade under new ticker symbols.[55]  Following the de-SPAC, shareholders no longer have a "money-back guarantee" on their investment, and the economic factors that are relevant for the company's future cash flows are fundamentally different from the earlier stages of the SPAC.  Like a traditional publicly traded operating company, the value of the new operating company after the de-SPAC would be expected to be determined by its underlying business and future cash flows.[56]

### B.    Overview of ROCH

38.    Roth CH Acquisition I Co. ("ROCH," as previously defined) was incorporated in Delaware on February 13, 2019 as a SPAC, formed "for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination."[57]

39.    ROCH completed its IPO on May 4, 2020, generating gross proceeds of $75 million.[58]  Roth Capital Partners and Craig-Hallum Capital Group were the sole underwriters in the IPO.[59]  The IPO offering was conducted at $10 per unit, which consisted of one common share and three-quarters of one warrant.[60]  Each whole warrant entitles the holder to purchase one common share at $11.50 per share within five years from the closing date of the Business Combination.[61]

40.    ROCH was required to complete a business combination by November 7, 2021, or else redeem all public shares at $10 per share, plus accrued interest.[62]  Consistent with the

---

[53] "Special Purpose Acquisition Companies:  An Introduction," *Harvard Law School Forum on Corporate Governance*, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/.
[54] "What You Need to Know About SPACs – Updated Investors Bulletin," *U.S. Securities and Exchange Commission*, May 25, 2021, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin.
[55] Gahng, Ritter and Zhang (2023), p. 3465.
[56] R. Brealey, S. Myers, and F. Allen (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin, p. 78.
[57] Roth CH Acquisition I Co., Form 424B4, filed May 6, 2020 ("ROCH Form 424B4"), p. 1.
[58] Roth CH Acquisition I Co., Form 10-K for FY 2020, filed March 9, 2021 ("ROCH Form 10-K"), p. F-7.
[59] ROCH Form 10-K, Exhibit No. 1.1 Schedule A, pp. 1, 32.
[60] ROCH Form 424B4, pp. 10, 59.
[61] ROCH Form 10-K, pp. F-12, F-14.
[62] ROCH Form 10-K, p. F-8.

typical practice for SPACs described above, even if the Business Combination was approved, all holders of public shares were eligible to "redeem all or a portion of their Public Shares" at "$10.00 per Public Share, plus any pro rata interest earned on the funds held in the Trust Account" prior to the closing of the Business Combination.[63]

41.    **Exhibit 1** plots the common stock price for ROCH (prior to the de-SPAC) and PureCycle (subsequent to the de-SPAC).  Consistent with the research discussed above, ROCH's common stock price consistently traded at around $10 prior to the announcement of the proposed Business Combination with the private company PureCycle (*i.e.*, the start of the Proposed Class Period).

### C.    Overview of PureCycle

42.    PureCycle is a plastics recycling company.[64]  Founded in 2015, before the Business Combination, it was a private company that was a subsidiary of Innventure LLC, a firm which partners with multinational corporations to invest in and commercialize technologies.[65] I understand that PureCycle holds the exclusive global license to a chemical process originally developed and patented by the Procter & Gamble Company ("P&G"), which aims to purify waste polypropylene, a type of plastic commonly used in consumer goods.[66]  As of the start of the Proposed Class Period, the private company PureCycle was an early-stage company that relied on its licensed technology, among other things, for future revenue growth, and did not have any revenue.[67]

43.    On November 16, 2020, the start of the Proposed Class Period, ROCH and the private company PureCycle jointly announced an agreement and plan for the Business Combination.[68]  ROCH filed a preliminary registration statement with the SEC on November 20, 2020, describing the anticipated Business Combination.[69]  Among other things, the registration statement identified risk factors associated with PureCycle's business, which

---

[63] ROCH Form 10-K, pp. F-7, F-8.  Holders of ROCH shares eligible to redeem their shares at the close of the Business Combination needed to seek a redemption at least two business days before the special meeting of shareholders on March 16, 2021.  *See* ROCH Parent Corp Form 424B3, pp. 42–43.
[64] ROCH Parent Corp Form S-4.
[65] ROCH Parent Corp Form S-4, p. F-32; "What We Do," Innventure, available at https://www.innventure.com/what-we-do.
[66] PureCycle November 2020 Press Release.
[67] ROCH Parent Corp Form S-4, p. 18.
[68] PureCycle November 2020 Press Release.
[69] ROCH Parent Corp Form S-4.

included the scalability of its technology, establishing access to materials to supply its recycling processes, and the successful management of its human capital.[70]

44.     In connection with the Business Combination agreement, 25 million shares were sold for $10.00 per share, as part of a $250 million PIPE transaction that closed immediately prior to the Business Combination.[71]

45.     Shareholders approved the Business Combination on March 16, 2021, and the Business Combination closed on March 17, 2021.[72,73]  The combined firm's common stock, units, and warrants began trading on the Nasdaq stock exchange on March 18, 2021 under ticker symbols "PCT", "PCTTU", and "PCTTW," respectively.[74,75]

## VI.    Background on Market Efficiency and Event Study Analysis

46.     In **Section VI.A** below I discuss the definition of market efficiency and empirical evidence regarding market efficiency discussed in the academic literature.  In **Section VI.B**, I describe how financial economists typically use an event study methodology to assess whether new information affects the price of a company's securities.  In **Section VI.C**, I describe the implementation of my regression model for ROCH and PureCycle's common stock.

### A.    Market Efficiency in Financial Economics

47.     The question of whether markets are efficient has been investigated in various financial markets over the past fifty years.  The concept of market efficiency in financial economics was introduced in the 1960s by Eugene Fama and Paul Samuelson.  Professor

---

[70] ROCH Parent Corp Form S-4, pp. 22–23, 26–27.

[71] PureCycle Technologies, Inc., Form 8-K, filed March 22, 2021 ("PureCycle March 2021 Form 8-K"), p. 9.  The PIPE shares were registered on March 19, 2021.  See PureCycle Technologies, Inc., Form 424B3, filed March 22, 2021 ("PureCycle March 2021 Form 424B3").

[72] PureCycle March 2021 Form 8-K, p. 1–2.  As of the close of the Business Combination, ROCH had received redemption requests from the holders of an aggregate of 5,100 shares of Common Stock.  See PureCycle March 2021 Form 424B3.

[73] As part of the Business Combination agreement, certain ROCH shareholders, including Craig-Hallum and Roth Capital Partners, agreed to lock-ups of the common stock shares they would receive.  These lock-ups limit the number of shares which can be sold before six months after the Business Combination closing, one year after the Business Combination closing, and the date at which a particular production facility becomes operational.  Craig-Hallum and Roth Capital Partners (including all shares attributed to Byron and Gordon Roth), owned 3.3% and 16.3% of ROCH common stock, respectively.  See ROCH Parent Corp Form S-4, Exhibit 10.11, p. 3; ROCH Parent Corp Form S-4, p. 154; ROCH Parent Corp Form S-4, Exhibit 10.1.

[74] PureCycle March 2021 Form 8-K, pp. 3, 8.

[75] Prior to the de-SPAC, there were 9,828,000 shares of ROCH common stock outstanding.  Following the de-SPAC, there were 118,332,900 shares of PCT common stock outstanding.  Former ROCH shareholders, excluding PIPE investors and former ROCH officers and directors, owned approximately 6.5% of the new combined company's common stock.  See ROCH Form 10-K; PureCycle March 2021 Form 8-K, p. 3.

Fama defined an efficient market as a "market in which prices provide accurate signals for resource allocation:  that is, a market in which firms can make production-investment decisions, and investors can choose among the securities that represent ownership of firms' activities under the assumption that security prices at any time 'fully reflect' *all* available information."[76]

48.    Financial economists recognize three forms of market efficiency:  weak form, semi-strong form, and strong form.[77]  In a weak form efficient market, historical returns or prices cannot be used to predict future price movements.[78]  In a semi-strong form efficient market, security prices react quickly and fully to new, unexpected, value-relevant public information, so that security prices reflect all public information at all times.  As a result, neither historical returns or prices, nor public information, can be used to predict future price movements in a semi-strong form efficient market.[79]  In a strong form efficient market, prices react quickly and fully not only to public information (as in semi-strong form efficient markets), but also to private information.[80]

49.    When referring to market efficiency and efficient markets in this report, I refer to the semi-strong form of market efficiency.  Finance textbooks define the market for a security as being semi-strong form efficient if all public information is rapidly incorporated into the stock price.[81]  In his report, Dr. Cain does not specify which form of market efficiency he is testing, although he refers to an efficient market as one in which stock prices "'reflect public information.'"[82]

50.    In an efficient market, trading by investors will quickly eliminate situations where public information is not incorporated in stock prices because investors will be strongly incentivized to take advantage of such situations.  If, at any given time, some positive public piece of information about the future prospects of a company is not, for whatever reason, yet incorporated in the company's stock price, in an efficient market, traders with access to that

---

[76] E. F. Fama (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, 25(2), pp. 383–417 ("Fama (1970)") at p. 383 (emphasis added).
[77] Fama (1970), p. 388.
[78] Fama (1970), p. 388.
[79] Fama (1970), p. 388.
[80] Fama (1970), p. 388.
[81] S. Ross et al. (2003), *Corporate Finance*, 6th ed., New York, NY: McGraw-Hill/Irwin, p. 346 ("A market is semistrong-form efficient if prices reflect (incorporate) all publicly available information, including information such as published accounting statements for the firm as well as historical price information. … However, if the market is semistrong efficient, the price should rise immediately upon the news release.").
[82] Cain Report, ¶ 20.  At deposition, Dr. Cain clarified that according to his definition, "an efficient market is one in which all widely available public information is quickly priced into and reflected in the securities prices," although only up to the point where "there are no risk-free opportunities for them to profit on that information above and beyond the cost of trading on that information."  *See* Cain Deposition, 44:3–45:14.

information will rapidly choose to buy the stock, driving the price up.  Similarly, traders with access to negative public information about the future prospects of a company that is not yet incorporated in the company's stock price will rapidly choose to sell the stock, driving the price down.  Traders can sell the stock by reducing existing positions or by selling the stock short.[83]

51.    Research has shown, however, that even securities listed on major stock exchanges may not trade in an efficient market at all times.  Since the time when Professor Fama published his seminal work on market efficiency, empirical academic research has studied implications for the efficient market hypothesis for real-world complexities in markets, and in particular, the role of market frictions.  A seminal study published in 1997 by Professors Shleifer and Vishny showed that that there can be limits to the ability of investors to exploit departures from efficiency and these limits (often referred to as "limits to arbitrage") arise because of the existence of market frictions.[84]

52.    Since the article by Professors Shleifer and Vishny, the academic literature has continued to study frictions in the way markets work that may impede market efficiency.  Examples of such frictions include funding constraints,[85] constraints on trading,[86] constraints on investor attention,[87] and frictions due to processing of information.[88]  These frictions can lead to situations where stock prices overreact to, underreact to, or fail to react to new, value-relevant public information.[89]

53.    One example of an arbitrage mechanism that can be impeded by these types of frictions is short selling.  Short selling plays an important role in market efficiency by increasing share supply, providing liquidity, and allowing for rapid incorporation of public

---

[83] A "short seller" is an investor who seeks to profit from a decline in a company's stock price.  According to Brealey et al. (2011), "[t]o sell a stock short, you borrow shares from another investor's portfolio, sell them, and then wait hopefully until the price falls and you can buy the stock back for less than you sold it for."  *See* R. A. Brealey, S. C. Myers and F. Allen (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin, p. 327.

[84] The article prominently focused on the difficulties that arbitrageurs, such as hedge funds, may face in raising funds to exploit market inefficiencies.  *See* A. Shleifer and R. W. Vishny (1997), "The Limits of Arbitrage," *The Journal of Finance*, 52(1), pp. 35–55.

[85] *See, e.g.*, M. Mitchell and T. Pulvino (2012), "Arbitrage Crashes and the Speed of Capital," *Journal of Financial Economics*, 104(3), pp. 469–490.

[86] *See, e.g.*, G. D'Avolio (2002), "The Market for Borrowing Stock," *Journal of Financial Economics*, 66(2), pp. 271–306.

[87] Hirshleifer et al. show that a stock incorporates new earnings-related information more slowly if there are contemporaneous earnings announcements made by other firms on the same day.  *See* D. Hirshleifer, S. S. Lim and S. H. Teoh (2009), "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance*, 64(5), pp. 2289–2325.

[88] *See, e.g.*, L. Cohen and D. Lou (2012), "Complicated Firms," *Journal of Financial Economics*, 104(2), pp. 383–400.

[89] *See, e.g.*, D. W. Diamond and R. E. Verrecchia (1987), "Constraints on Short-Selling and Asset Price Adjustment to Private Information," *Journal of Financial Economics*, 18(2), pp. 277–311 at p. 277 ("Prohibiting traders from shorting reduces the adjustment speed of prices to private information, especially to bad news.").

information into prices.[90]  However, high costs, risks, and uncertainties associated with short selling can limit the ability of arbitrageurs to exploit market inefficiencies.[91]  For example, high borrowing costs can make it difficult for short sellers to profit from their strategy, thereby impeding the ability of investors to short stocks.[92]  Such frictions can reduce the efficiency of the market for a stock by, for example, reducing the speed with which information is incorporated into prices.[93]

54.    Given the evidence of market frictions discussed in the academic literature, even for stocks that trade on major exchanges, it is not sufficient to presume market efficiency, to infer market efficiency from one period to another (as Dr. Cain does here),[94] or to infer market efficiency from the typical characteristics of securities that trade on major exchanges (as Dr. Cain also appears to suggest).[95]  Market efficiency must instead be empirically tested for individual securities during specific periods of time and it is important to account for how market efficiency for a security may change over time as the characteristics of the security evolve.

### B.    Overview of Event Study Methodology

55.    Event studies have been widely used for more than fifty years to measure the impact of new information that enters the marketplace on security prices.  I have employed this technique numerous times in my peer-reviewed research.[96]  Professor Craig MacKinlay

---

[90] E. M. Miller (1977), "Risk, Uncertainty, and Divergence of Opinion," *The Journal of Finance*, 32(4), pp. 1151–1168 ("Miller (1977)") at p. 1160 ("The result is that short sales increase the supply of stock on the market by the amount of the outstanding short position.  On Figure 1 the effect of short sales is to move the vertical supply curve to the right by the amount of the outstanding short position, lowering the price.  This causes the existence of adverse opinions to affect the market value of that stock.").

[91] Miller (1977), p. 1166; O. A. Lamont and R. H. Thaler (2003), "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *Journal of Political Economy*, 111(2), pp. 227–268 ("Lamont and Thaler (2003)"); P. A. C. Saffi and K.Sigurdsson (2011), "Price Efficiency and Short Selling," *The Review of Financial Studies*, 24(3), pp. 821–852 ("Saffi and Sigurdsson (2011)"); D. Duffie, N. Garleanu and L. H. Pedersen (2002), "Securities Lending, Shorting, and Pricing," *Journal of Financial Economics*, 66(2–3), pp. 307–339 ("Duffie, Garleanu and Pedersen (2002)").

[92] Lamont and Thaler (2003), pp. 256–257 ("First, there is the cost of actually finding shares to borrow.  Second, as discussed in Liu and Longstaff (2000) and Mitchell et al. (2002), short sellers are required to post additional collateral if the price of [the shorted stock] rises.  Third, as discussed in Mitchell et al., there is 'buy-in' risk, the fact that the [stock's] lender has the right to recall his loan at any time.  If the [stock's] lender decides to sell his shares after they have risen in price, the short sellers may be forced to close their position at a loss if they are unable to find other shares to borrow.  Fourth, even if the loan is not recalled, the cost of shorting could increase if the rebate changes.").

[93] *See, e.g.*, Saffi and Sigurdsson (2011), pp. 847–849 ("Our main contribution is to present evidence that a high level of equity lending supply and … small loan fees are associated with an increase in the speed with which information is incorporated into prices … Firms with limited lending supply and high loan fees are slower to respond to market-wide shocks, according to measures drawn from Hou and Moskowitz (2005), Bris, Goetzmann, and Zhu (2007), and Griffin, Kelly, and Nardari (2009).").

[94] See discussion in **Section VII**.

[95] Cain Report, ¶ 21.

[96] **Appendix A** lists my publications.  The first event study listed on my CV is Y. C. Kim and R. Stulz (1988), "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics*, 22(2), pp. 189–205.

summarizes the essence of the event study approach as follows: "Using financial market data, an event study measures the impact of a specific event on the value of a firm."[97]  Because of their ability to isolate the impact of firm-specific information, event studies are commonly used in securities litigation.

56.     Typically, event studies use a regression model to isolate the firm-specific stock price change ("return") after controlling for market-wide and/or industry-wide factors.  To properly conduct an event study, a financial economist selects the appropriate market and/or industry indices and typically assumes that there exists a stable linear relationship between the firm's stock return and the returns of the market and/or industry-wide indices.[98]  Such a relationship between the firm's stock return and these indices can be estimated over an "estimation window."[99]

57.     Using this estimated relationship, it is possible to calculate the firm's expected return on any given day based on that day's market and/or industry index returns.  Intuitively, the firm's expected return is the return one would predict on a particular day based on the typical relationship between the stock's return and the market and industry indices.  Because financial economists are interested in the "typical" relationship, they often exclude from the estimation window the events being tested to ensure that the returns on the event dates do not affect the measurement of the typical relationship.[100]

58.     The difference between a stock's actual ("raw" or "observed") return and its expected return estimated from the regression model is called the stock's "residual" return.[101]  The period over which the stock's return is analyzed is called the "event window" (e.g., one day).[102]  Financial economists use statistical measures to determine whether a return is statistically distinguishable from zero, that is, whether the return is greater in magnitude than the typical variation in the residual returns of that stock during the estimation window.  Residual returns that exceed the threshold are "statistically significant."

59.     The statistical significance of a residual return is generally evaluated using a t-statistic.  A t-statistic is defined as the ratio between the residual return on a particular date of

---

[97] A. C. MacKinlay (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), pp. 13–39 ("MacKinlay (1997)") at p. 13.
[98] MacKinlay (1997), p. 15.
[99] MacKinlay (1997), p. 15.
[100] *See, e.g.,* MacKinlay (1997), p. 20.
[101] Dr. Cain calls this the "abnormal" return.  *See* Cain Report, ¶ 55.
[102] *See, e.g.,* Mackinlay (1997), p. 14.

interest and the volatility of that residual return.[103]  A residual return is "statistically significant" using a two-sided test at the 95% confidence level when the absolute value of the t-statistic is greater than 1.96.[104]  Thus, when the t-statistic for a particular date is greater than 1.96 (in absolute value), the residual return is considered statistically significant relative to the typical range of residual returns that one would expect to observe on that date.

60.    In an event study, a statistically significant residual return over a given event window reflects the estimated stock price impact of the total mix of information released during that event window.  The typical null hypothesis being tested is that the residual return over a particular event window is equal to zero.  In other words, in an efficient market, a residual return that is statistically significant on an event date indicates the arrival of new, value-relevant information to the market.

61.    An event study is helpful to assess whether the totality of new information arriving to the market over a specific event window affected the stock price.  However, an event study cannot answer the question of how a specific new piece of information arriving to the market among multiple pieces of new information at the same time caused the stock price to change, as discussed further in **Section IX.C**.

### C.    Regression Model Specification

62.    To assess whether the Alleged Misrepresentations impacted the Company's stock price on the dates that the Alleged Misrepresentations were made, I performed an event study for ROCH/PureCycle's common stock on each of the Alleged Misrepresentation Dates.  According to the academic literature, a regression model used in an event study should be properly specified, which requires, in part, (i) defining the estimation window, and (ii) selecting appropriate market and/or industry indices to account for market- and/or industry-wide factors.[105]

63.    I estimate my regression model in two parts.  As discussed in **Section V.A**, prior to the de-SPAC, ROCH was a "blank check" company that had no business operations and allowed investors to redeem their shares at a price of approximately $10.  As such, the stock

---

[103] Specifically, the volatility of the residual return on a given date is the estimated standard deviation of the residual return for that specific date (also known as the root mean standard error).  *See,* J. H. Stock and M. W. Watson (2015), Introduction to Econometrics, 3rd ed., Global ed., England, UK: Pearson Education, p. 147.
[104] The 95% confidence level is the commonly accepted scientific standard in peer-reviewed journals in finance and economics.  *See, e.g.,* J. H. Stock and M. W. Watson (2015), *Introduction to Econometrics*, 3rd ed., Global ed., England, UK: Pearson Education, pp. 77–79.  Dr. Cain also uses the 95% confidence level to test for statistical significance.  *See* Cain Report, ¶ 58.
[105] *See, e.g.,* MacKinlay (1997), pp. 14–15.

was exposed to limited downside risk.  After the de-SPAC date, the stock reflected
PureCycle's business operations and risks.  Accordingly, for the period before the de-SPAC, I
use a fixed estimation window which begins on the first day of the Proposed Class Period and
ends on the de-SPAC date.[106],[107]  For the period after the de-SPAC, I use a 126 trading-day
forward-rolling estimation window, *i.e.*, for each day starting from the day after the de-SPAC
through the end of the Proposed Class Period, I estimate the residual return for that day using
a 126 trading-day estimation window beginning one day after the date of interest.[108]  Across
both sub-periods (*i.e.*, before and after the de-SPAC date), I exclude dates on which Plaintiffs
allege a misrepresentation or corrective disclosure.[109]

64.     In order to estimate the relationship between the Company's stock return and market
and industry factors, I used the returns from the Nasdaq Composite Index to control for
market movements.  The Nasdaq Composite Index is a value-weighted index of stocks listed
on the Nasdaq stock exchange, the exchange on which PureCycle is listed.[110]  To account for

---

[106] The period from the start of the Proposed Class Period through the de-SPAC date spans roughly 83 trading days.  I use a fixed estimation window for this period, rather than a forward- or backward-rolling regression in order to avoid using data prior to the Proposed Class Period or after the de-SPAC.  As a robustness check, I also present results in **Section VIII** using a 126-day forward-rolling estimation window starting from the first day of the Proposed Class Period ("Alternative Regression Model 1").

[107] In two prior cases involving SPACs, in order to account for the fact that the SPAC was "simply a blank check company" and the operating company merging with it was "not a publicly traded company" prior to the business combination, Dr. Cain likewise uses a fixed estimation window for the period from the start of the class period to the de-SPAC date.  *See* Expert Report of Matthew D. Cain, *Timothy Bond et al. vs. Clover Health Investments Corp., et al.*, United States District Court Middle District of Tennessee, Case No. 3:21-cv-00096, dated September 8, 2022 ("Cain Clover Health Report"), ¶ 49; Expert Report of Matthew D. Cain, *In Re Romeo Power Inc. Securities Litigation*, United States District Court Southern District of New York, Case No. 1:21-cv-03362-LGS, dated March 1, 2023 ("Cain Romeo Power Report"), ¶ 51.

[108] A 126 trading-day window reflects a period of six months, as there are typically around 252 trading days per year in U.S. markets.  For use of rolling regressions when the parameters of the market model may change over time, *see, e.g.*, E. F. Fama and K. R. French (1997), "Industry Costs of Equity," *Journal of Financial Economics*, 43(2), pp. 153–193 at p. 158.

[109] Specifically, the dates excluded from the regression model are the relevant impact dates for each Alleged Misrepresentation and alleged corrective disclosure.  For Alleged Misrepresentations and alleged corrective disclosures that occur after market hours or on weekends, the relevant impact date is the following trading date.  There are 6 trading days excluded from the estimation windows in my regression model.  *See* Second Amended Complaint, ¶¶ 30, 55, 63, 67, 73, 75, 85.

[110] "Nasdaq Index Methodology," Nasdaq, 2020, pp. 1–3, available at https://indexes.nasdaqomx.com/docs/methodology_comp.pdf; PureCycle March 2021 Form 424B3, p. 7.

industry movements, I used the S&P U.S. SPAC index for the period prior to the de-SPAC,[111] and an index of PureCycle's peer companies for the period after the de-SPAC.[112]

65.      **Exhibit 2** provides a summary of my regression model for the period prior to the de-SPAC.  **Exhibit 3** illustrates the coefficients from my regression model over the full Proposed Class Period (*i.e.*, fixed estimation window for the period prior to the de-SPAC and rolling regression model thereafter).  **Exhibit 4** and **Exhibit 5** illustrate the standard errors and adjusted R-squared, respectively, from that regression model.

## VII.    Dr. Cain Fails to Establish that the Markets for the Company's Securities Were Efficient

66.      Dr. Cain expresses his understanding that a market efficiency analysis is relevant with respect to "class-wide" reliance because, "[i]f a market is efficient, then all purchasers of the stock are induced into reliance on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price."[113]  In **Section VII.A** below, I provide an overview of Dr. Cain's market efficiency analyses.  As discussed in **Section VII.B**, Dr. Cain makes no distinction in this analysis between the period prior to the de-SPAC, when the stock could be redeemed for approximately $10, and the period after the Business Combination, when the Company was an operating company.  He infers without basis that the common stock trading under the ticker ROCH traded in an efficient market using data from when the stock traded under the ticker PCT.

67.      Dr. Cain distinguishes between analyses that assess "benchmarks established by courts" from "scientific tests of statistical significance."[114]  In **Section VII.C**, I discuss Dr.

---

[111] The S&P U.S. SPAC Index "is designed to measure the performance of a minimum of 30 common stocks of special purpose acquisition companies (SPACs) listed on U.S. exchanges."  The index universe consists of all SPAC common stocks listed on one of the following U.S. exchanges: NYSE, NYSE Arca, NYSE American, Nasdaq Capital Market, Nasdaq Global Select Market, or Nasdaq Select Market.  Additionally, the SPAC common stock must have traded for at least 30 days prior to the rebalancing reference date and the median of the daily value traded over a given month must be at least $1 million USD (this figure must be greater than zero for current index constituents).  The index is rebalanced monthly, effective after the close on the last business day of each month.  *See* "S&P SPAC Index Methodology," S&P Global, July 2023, pp. 3–4, available at https://www.spglobal.com/spdji/en/documents/methodologies/methodology-sp-spac-index.pdf.  As a robustness check, for the period prior to the de-SPAC I also present results in **Section VIII** using the peer index described below ("Alternative Regression Model 2").

[112] The peer index is an equal-weighted index of the following publicly traded companies discussed as "comparable companies" in ROCH's 2021 proxy statement:  Aerogels, Albemarle Corp., Amyris, Inc., Rogers Corp., TREX Company, Inc., Universal Display Corp., Casella Waste Systems, Inc., Republic Services, Inc., Waste Connections, Inc., and Waste Management, Inc.  *See* Roth CH Acquisition I Co., Form DEFM14A, filed February 12, 2021, pp. 58–59.

[113] Cain Report, ¶ 18.

[114] Cain Report, ¶ 23.

Cain's empirical analysis that purportedly "demonstrates PureCycle's Common Stock exhibited [a] cause-and-effect relationship between company-specific information flow and price movement."[115]  As I discuss in that section, Dr. Cain's event study is flawed and unreliable, and he ultimately fails to show reliable evidence of a cause-and-effect relationship between information and price response in the period prior to the de-SPAC.  I discuss Dr. Cain's analyses of "benchmarks established by courts" (plus tests of autocorrelation) in **Section VII.D**.  By combining data across the whole Proposed Class Period for these analyses, Dr. Cain overlooks evidence, by his own criteria, that does not support his conclusion regarding market efficiency in the period prior to the de-SPAC.

68.    **Section VII.E** discusses Dr. Cain's market efficiency analyses that pertain to PureCycle's warrants and options.

### A.    Overview of Dr. Cain's Market Efficiency Analyses

69.    In his report, Dr. Cain claims to "determine whether the market for the Common Stock of PureCycle Technologies, Inc. … was efficient during the period from November 16, 2020 to November 10, 2021, inclusive" and "assess whether the value impact of any alleged misrepresentations would be reflected in the price of PureCycle's Warrants and Options."[116]

70.    Dr. Cain does not address the different definitions of market efficiency discussed in **Section VI.A** above, nor does he articulate what standard of market efficiency he is testing. Instead, Dr. Cain discusses the debate about the "degree" of efficiency.[117]  He further states that "[a]cademic research thus provides ample support for the concept of market efficiency of public exchange-traded securities"[118] and, as a result, the "fact that PureCycle's Common Stock, Warrants, and Options traded in such a well-developed market … leads to a strong *presumption* of market efficiency."[119]

71.    To support this "presumption," Dr. Cain presents an analysis of "factors [] that allow[] one to reach the conclusion that a market for a security is efficient."[120]  More specifically, Dr. Cain analyzes the five so-called *Cammer* factors (trading volume, analyst coverage, presence of market makers, SEC Form S-3 filing eligibility, and a cause-and-effect

---

[115] Cain Report, ¶ 46.
[116] Cain Report, ¶ 7.
[117] Cain Report, ¶ 20.
[118] Cain Report, ¶ 20.
[119] Cain Report, ¶ 21 (emphasis added).
[120] Cain Report, ¶ 22.

relationship between information and prices)[121] and six "additional" factors (market
capitalization, bid-ask spread, public float, institutional ownership, autocorrelation, and
options trading)[122] in relation to the Company's common stock.

### B.    Dr. Cain's Analyses Ignore the Existence of Two Distinct Sub-Periods during the Proposed Class Period

72.    As discussed in more detail throughout this section, Dr. Cain treats the Proposed
Class Period as a whole in his analyses, examining averages of various statistics of the
Company's stock over the combined period before and after the de-SPAC in order to arrive at
his conclusion that the Company's common stock "traded in an efficient market throughout
the Class Period."[123]  As a matter of economics, however, Dr. Cain fails to explain how
analysis based on the common stock of the operating company PureCycle (*i.e.*, after the de-
SPAC) can be informative about the efficiency of the common stock of ROCH (a SPAC), as
the stock price depends on different economic factors during these two periods.

73.    From the ROCH IPO on May 4, 2020 through to the de-SPAC on March 17, 2021,
PureCycle existed as a private company separate from the SPAC.[124,125]  As discussed above in
**Section V**, during that period of time, ROCH was essentially a financial acquisition vehicle
with no underlying operating business and no assets other than the IPO proceeds, with an aim
of identifying a target and consummating a de-SPAC transaction, which Dr. Cain
acknowledged in deposition.[126]  The lack of assets and operations alone sets the common
stock of ROCH and other SPACs apart from the common stock of operating companies,
whose price in an efficient market should reflect publicly available information about the
underlying business operation's future cash flows.

74.    Another important difference that sets ROCH and other SPACs apart from publicly
traded operating companies is the downside protection on shareholders' investments.  As

---

[121] Cain Report, ¶¶ 27–63.
[122] Cain Report, ¶¶ 64–76.
[123] Cain Report, ¶ 105.
[124] ROCH Form 10-K, p. F-7.  As discussed above, the Business Combination closed on March 17, 2021.
[125] At deposition, Dr. Cain acknowledged that PureCycle existed as a private company separate from the SPAC
prior to the de-SPAC.  *See* Cain Deposition, 141:20–142:8 ("Q. … [I]n this case we know that there was a
deSPAC transaction that caused the company to go public, and, you know, it was then an operational public
company, where prior to the de-SPAC it was a holding company.  A. Right. … prior to day one of the class period
it's essentially a pot of cash worth $10 and investors are waiting for an announcement.").
[126] Dr. Cain acknowledges in his report that "ROCH was a publicly traded blank check company, also known as a
special purpose acquisition company ('SPAC'), formed for the purpose of effecting a merger, share exchange,
asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses."
*See* Cain Report, ¶ 13.  Additionally, at deposition, Dr. Cain agreed that ROCH had no operations.  *See* Cain
Deposition, 31:13–23 ("So prior to this business combination, which I'll also refer to as a de-SPAC transaction,
ROCH was a publicly traded blank check company; is that correct? A. Yes. Q. Did it have any operations? A.
What do you mean by "operations"? Q. Did it produce any products or services? A. I don't believe so.").

discussed in **Section V.A**, a feature unique to SPACs is that shareholders may redeem their shares prior to the close of the de-SPAC, typically at the offer price of $10 plus interest from the investment of the IPO proceeds held in the trust account (which was the case for ROCH). As discussed above, given this redemption option, in an efficient market (and setting aside transaction costs) arbitrageurs could have traded to prevent ROCH from trading substantially below $10.[127] From an investment standpoint, the SPAC as it existed prior to announcing a business combination target has attributes similar to a fixed income investment—investors' money is held in a trust until the de-SPAC (or liquidation), when it then can be redeemed in the context of the business combination vote for its original value plus any interest earned.[128] After the SPAC identifies a potential business combination target but before the close of the de-SPAC, in an efficient market, the stock price will, in part, reflect the expected value of the new operating company via the prospective business combination (adjusted by the likelihood of business combination closing); however, it will still also reflect the fact that SPAC investors are protected from the downside risk given the redemption option.

75.     After the de-SPAC, the Company changed in fundamental ways. First, following the de-SPAC, the private company PureCycle and ROCH were combined into a publicly traded operating company, whose stock traded under the ticker PCT.[129] At this point in time the SPAC was no longer a standalone entity. As Dr. Cain acknowledges, the stock and warrants traded under different trading symbols after the de-SPAC than they had before.[130] Second, in contrast to ROCH as it existed prior to the de-SPAC, with no operating business and limited assets, the Company after the Business Combination was a much larger company and had operations and periodic disclosures related to those operations. Indeed, as shown in Exhibit 8 of the Cain Report and **Exhibit 6**, ROCH had approximately *1/15th* of the market capitalization of PureCycle the day after the transaction.[131] The Company also began holding earnings calls after the de-SPAC.[132] Third, as discussed in **Section V**, following the de-

---

[127] As also noted above, this does not account for the potential conversion fee that can be passed on to stockholders who choose to redeem their shares. This also does not include the potential costs associated with borrowing funds to finance a long position in the stock.
[128] Gahng, Ritter and Zhang (2023), pp. 3464–3465 ("SPACs are structured to provide upside potential for the SPAC period investors by offering an option to become a shareholder of a newly traded company, with a money back guarantee… Given this downside protected nature of the SPAC period investment, a SPAC IPO is equivalent to a *default-free* convertible bond with extra warrants….") (emphasis in original).
[129] In an investor bulletin about SPACs, the SEC describes the de-SPAC transaction as "an important investor consideration as the SPAC changes from essentially a trust account into an operating company." "What You Need to Know About SPACs," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin.
[130] Cain Report, ¶ 13.
[131] Market capitalization on March 16, 2021 compared to March 19, 2021. *See* **Exhibit 6**.
[132] The Company's first earnings call occurred on May 17, 2021. *See* "PureCycle Technologies, Inc. Provides First Quarter 2021 Corporate Update," PureCycle Press Release, May 17, 2021.

SPAC, former ROCH stockholders (now stockholders of the publicly traded company
PureCycle) no longer had any right to redeem their shares for approximately $10, or any
specific amount; like a traditional operating company stock, the value of the stock would
correspond to the present value of the cash flows generated by the operations of the company,
without the "money-back guarantee" of the former SPAC.

76.     An additional reason to distinguish between the periods prior to and subsequent to the
de-SPAC is the potentially unusual trading environment for SPACs in early 2021, which may
have impacted ROCH's stock price prior to the de-SPAC.  ROCH went public and
announced the target of the Business Combination during a period that was characterized by a
notable rise in the number of SPACs.  As shown in **Exhibit 7**, the number of SPAC IPOs on
major U.S. exchanges increased by more than ten times between 2019 and 2021.  Academics
and market commentators described the rise in the number of SPACs in the period of late-
2020 through early-to-mid 2021 as a "boom,"[133] "deal frenzy,"[134] and an "extraordinary
bubble."[135]  The period was characterized by not just a ballooning number of SPACs, but also
trading prices for SPACs above their approximate $10 redemption value, attributed by
researchers to "transitory bubble-related phenomena."[136]  Alongside high prices, equity
research analysts commented on the "speculative nature" of trading in SPACs during this
time.[137,138]  Research analysts noted that SPACs had become "particularly appealing to retail"
and estimated that retail investors represented 46% of SPAC trading volume in January 2021,
compared to an average of 20% of S&P500 trading, noting this as a common feature with the
meme stock phenomenon.[139]

---

[133] "Goldman Chief Executive Says SPAC Boom is Unsustainable," *Financial Times*, January 19, 2021, available
at https://www.ft.com/content/caa33f44-fd08-4049-a20e-3c3fde778b50.
[134] "A Reckoning for SPACs:  Will Regulators Deflate the Boom?" *Financial Times*, May 4, 2021, available at
https://www.ft.com/content/99de2333-e53a-4084-8780-2ba9766c70b7.
[135] "A Second Look at SPACs: Is This Time Different?" *Harvard Law School Forum on Corporate Governance*,
January 24, 2022.
[136] A study by Professor Klausner and coauthors found that during the fourth quarter of 2020 and first quarter of
2021, mean SPAC share prices the day after a business combination announcement were $15.77, compared to
a historical average SPAC trading price of roughly $10 prior to the business combination and post-business
combination prices averaging below $10, behavior the authors attribute to "transitory bubble-related phenomena."
*See* "A Second Look at SPACs:  Is This Time Different?" *Harvard Law School Forum on Corporate Governance*,
January 24, 2022.
[137] "Unusual First-Day Rallies in SPACs Raise Bubble Concern: 'Every Single One of Them Has Gone Up,'"
*CNBC*, February 10, 2021, available at https://www.cnbc.com/2021/02/10/unusual-first-day-rallies-in-spacs-raise-
bubble-concern-every-single-one-of-them-has-gone-up.html.
[138] An article co-authored by Dr. Cain (which he described in deposition as his only research related to SPACs)
also characterized the "boom" in SPAC issuance 2020-2021 as a "craze."  *See* Matthew Cain, et al., "SPACs – A
Primer form Global Economics Group and Some Potential Examinations of SPACs and Investment Returns,"
*Global Economics Group*, available at https://www.globaleconomicsgroup.com/spacs-a-primer-from-global-
economics-group/; Cain Deposition, 38:15–39:5.
[139] Analysts and market commentators noted common features of the SPAC boom and meme stock
phenomenon, and in particular described the increased retail interest in SPACs as similar to that of meme stocks.

77.    At deposition, Dr. Cain acknowledged many differences in a stock's characteristics before and after a de-SPAC.  For example, he acknowledged that there are typically differences before and after the de-SPAC in terms of market capitalization and trading volume (which tend to be lower before the de-SPAC), as well as bid-ask spreads (which tend to be higher before the de-SPAC).[140]  He described the closing of the business combination as an "important change in the information environment" and noted that "once a business combination is completed, the [stock price] volatility tends to increase."[141]  Further, he stated that "earnings announcements [] are also important changes in information environments for companies," and acknowledged that "obviously there are no earnings announcements" prior to a de-SPAC.[142]  Remarkably, despite acknowledging the many differences that would be expected for a SPAC before and after a business combination, Dr. Cain nonetheless does not analyze whether those differences could result in a different conclusion regarding market efficiency in the period prior to the de-SPAC.

78.    Instead, Dr. Cain largely ignores the differences in the companies in the periods before and after the de-SPAC in his analyses.[143]  By combining data across the Proposed Class Period as a whole, he infers market efficiency for the stock in the period prior to the de-SPAC based on analyses spanning the full Proposed Class Period, and fails to address evidence that is inconsistent with his conclusions regarding market efficiency, based on his own criteria, in the period prior to the de-SPAC.  Indeed, as discussed in **Section VII.C** below, Dr. Cain fails to provide reliable evidence of a cause-and-effect relationship between information and ROCH's stock in the period prior to the de-SPAC.  Further, as I discuss in the context of Dr. Cain's analysis of "benchmarks established by Courts" in **Section VII.D**, averaging across the sub-periods masks substantive differences in characteristics and trading behavior between the two, which Dr. Cain fails to address.

---

"The red-hot SPAC market is getting even hotter in 2021, raising concerns about rampant speculation detached from reason that could leave retail investors fresh off the GameStop bust holding the bag."  *See* " Unusual First-Day Rallies in SPACs Raise Bubble Concern: 'Every Single One of Them Has Gone Up,'" *CNBC*, February 10, 2021, available at https://www.cnbc.com/2021/02/10/unusual-first-day-rallies-in-spacs-raise-bubble-concern-every-single-one-of-them-has-gone-up.html; "Short Sellers Are Betting More Against SPACs," *CNBC*, March 16, 2021, available at https://www.cnbc.com/2021/03/16/short-sellers-are-betting-more-against-spacs.html; "Meme Stocks, SPAC Craze and a $100 Million Deli:  It Was a Wild Year in the Market," *CNBC*, December 23, 2021, available at https://www.cnbc.com/2021/12/23/meme-stocks-spac-craze-and-100-million-deli-2021-marks-a-wild-year-in-the-stock-market.html.

[140] Cain Deposition, 50:19–52:3.

[141] Cain Deposition, 50:18–51:2, 142:2–16.

[142] Cain Deposition, 142:16–19, 163:14–18.

[143] For certain factors, Dr. Cain makes note of averages for the "pre-business combination period" specifically but relegates these discussions to footnotes.  Moreover, Dr. Cain does not explain the differences in these sub-period findings from his averages for the Proposed Class Period as a whole and ignores when the averages prior to the de-SPAC fall below the efficiency benchmarks he uses in his analyses.  *See, e.g.*, Cain Report, footnotes 54, 73, 79, 83.

C.    **Dr. Cain Fails to Provide Reliable Evidence of a Cause-and-Effect Relationship between Information and Price Response Prior to the de-SPAC**

79.    From an economic perspective, an analysis of the stock price reaction to new, value-relevant public information—*i.e.*, the cause-and-effect test—is the direct test of the semi-strong form of market efficiency.[144]  Dr. Cain explains that *Cammer* factor 5 "relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information," and acknowledges the *Cammer* court's finding that this is "one of the most convincing ways to demonstrate efficiency."[145,146]  As discussed below, Dr. Cain's cause-and-effect analysis suffers from multiple flaws that render his conclusion regarding market efficiency unreliable.  First, his regression model is flawed and unreliable as a result of incorporating data from prior to the announcement of the Business Combination, when ROCH was a blank check company and had very low stock price volatility.  Second, he fails to reliably establish an objective criterion for news with which to test a cause-and-effect relationship between news and price response, and the findings of his analysis are *reversed* when applying a classification of days "with news" shown in his backup materials.  Third, with respect to the *single* "News Day" that he tests in the period prior to the de-SPAC, he reaches a spurious conclusion as a result of his unreliable regression model.  Dr. Cain thus fails to demonstrate reliable evidence of a cause-and-effect relationship between new information and price response in the period prior to the de-SPAC.

1.    **Summary of Dr. Cain's Event Study**

80.    To purportedly assess cause-and-effect between the disclosure of new, value-relevant Company information and the Company's stock price response, Dr. Cain states that he "compared the stock returns and trading volume of PureCycle's Common Stock on News

---

[144] From an economic perspective, an analysis of stock price reaction to new, value-relevant information—*i.e.*, the cause-and effect test—is the direct test of the semi-strong form of market efficiency.  I do not take issue with the notion that the first four *Cammer* factors, the *Krogman* factors, or the other factors might be considered.  Rather, Dr. Cain has no reliable basis in financial economics to draw an inference that would establish market efficiency based on these factors alone.

[145] Cain Report, ¶ 44.

[146] Moreover, at deposition, Dr. Cain agreed that an efficient market is "one in which all widely available public information is quickly priced into and reflected in the securities prices," which is precisely what a reliably conducted *Cammer* factor 5 analysis tests.  Dr. Cain also agreed that a cause-and-effect analysis is a "direct test of efficiency."  *See* Cain Deposition, 44:16–20, 126:24–127:7.

Days versus those metrics on trading days that contained little or no news."[147,148]  Dr. Cain

defines "News Days" as the set of days with "communications made by ROCH and/or

PureCycle on the identification and status of the business combination," as well as

PureCycle's quarterly earnings announcement days in the period after the de-SPAC.[149]  He

defines "No News Trading Days" as days without Factiva headlines about ROCH/ PureCycle

or SEC filings.[150]  He claims that "[b]ecause PureCycle only hosted three earnings

announcements during the Class Period, [he] extended the analysis period by one year past

the end of the Class Period to cover all earnings announcements between the start of the Class

Period and November 10, 2022 (the 'Analysis Window'),"[151] resulting in a total of nine News

Days.[152]  He states that "[i]f PureCycle's stock prices tend to move more significantly

following News Days than on No News Trading Days, this would support a conclusion of

market efficiency."[153]

81.    To isolate the impact of Company-specific news on the Company's stock and

determine whether the Company's stock prices "move more significantly following News

Days,"[154] Dr. Cain uses a regression model to estimate Company-specific residual stock price

movements of the Company's common stock.[155]  More specifically, Dr. Cain uses data from

the prior 60 trading days, starting from July 14, 2020 (*i.e.*, the first day with a reported

closing price for ROCH),[156] and excluding any News Days and alleged corrective disclosure

---

[147] Cain Report, ¶ 49.

[148] Apart from the issues with Dr. Cain's analysis discussed in this section, I note that the analysis of a cause-and-effect relationship between company information and stock prices he offers is a mechanical exercise, which neither accounts for whether a stock price change would be *expected*, given the news release, nor assesses directional consistency of new information and stock returns.  At deposition, Dr. Cain agreed that his analysis neither accounts for the direction of stock price returns nor evaluates whether the stock price response is consistent with what might be ex-ante expected given the news release.  *See* Cain Deposition, 164:18–20 ("Q. And does your test consider the direction of the price changes? A. No, it does not."), 165:3–9 ("Q. So did you evaluate whether statistically significant stock price reaction is consistent with the direction one would expect, given the content of the information? A. No. This test is not premised upon the information content…").

[149] Cain Report, ¶ 47.

[150] Cain Report, footnote 59, Exhibit 7 footnote.

[151] Cain Report, ¶ 48.  Although Dr. Cain claims that PureCycle "hosted three earnings announcements during the Class Period," the November 11, 2021 earnings call in fact occurred after the Proposed Class Period.  *See* Cain Report, ¶ 48; Exhibit 6.

[152] Cain Report, Exhibit 6.

[153] Cain Report, ¶ 49.

[154] Cain Report, ¶ 49.

[155] Cain Report, ¶¶ 50–52.

[156] Dr. Cain claims that "[b]ecause ROCH has only been listed for 55 days at the start of the Class Period, [he] constructed a regression model using all available trading data prior to each of November 17 – November 23, 2020, excluding any of the News Days.  For each trading day following November 23, 2020, within the Analysis Window, [he] constructed a regression model using data from the prior 60 trading days …."  *See* Cain Report, ¶ 54.  Although ROCH only has 55 days of *Bloomberg* closing price data prior to the start of the Proposed Class Period, starting from July 14, 2020, Dr. Cain is incorrect that ROCH "ha[d] only been listed for 55 days at the start of the Class Period."  ROCH's stock and warrants first began separately trading on Nasdaq on June 11, 2020.  *See* "Roth CH Acquisition I Co. Announces the Separate Trading of its Common Stock and Warrants, Commencing June 11, 2020," Roth CH Acquisition I Press Release, June 4, 2020 ("ROCH June 2020 Press Release").

dates,[157] to estimate the relationship between the Company's stock returns and the market and industry returns for each day.[158] By estimating this relationship, Dr. Cain uses the model to measure the stock price response to Company-specific news, *i.e.*, news that is not captured by changes in the market and/or industry indices. In order to do so, Dr. Cain subtracts the Company's predicted returns from his model from the Company's actual returns to get the "abnormal" or residual return on each day. He tests the statistical significance of residual returns using a t-test.[159]

82.     Using these results, Dr. Cain tests whether his set of nine News Days had a higher proportion of statistically significant residual stock price movements than the No News Trading Days.[160] Dr. Cain also tests whether the trading volume and average absolute magnitude of residual stock price movements in the Company's stock was different on his News Days and No News Trading Days.[161] Based on his results for each of these measures, he concludes that there is "strong evidence of a cause-and-effect relationship between information and PureCycle Common Stock price movements."[162]

### 2.     Dr. Cain's Regression Model Is Flawed and Unreliable due to Inappropriately Including Data From Prior to the Proposed Class Period

83.     By virtue of the construction of his regression model, Dr. Cain includes data from prior to the Proposed Class Period in his study. Specifically, he states that "because ROCH had only been listed for 55 days at the start of the Class Period, [he] constructed a regression model using all available trading data prior to each of November 17 – November 23, 2020, excluding any of the News Days," and for "each trading day following November 23, 2020, within the Analysis Window, [he] constructed a regression model using data from the prior 60 trading days ("Estimation Window"), excluding any News Days."[163] In other words, for the first six trading days of the Proposed Class Period, Dr. Cain evaluates the statistical significance of the residual return for each day based on a regression model using all price data up to and including that day (*i.e.*, using the prior 54, 55, 56, 57, 58, and 59 stock returns,

---

[157] CIECKO001921.py.
[158] Dr. Cain uses log returns in his regression estimation. *See* CIECKO001930.py. Dr. Cain uses the S&P 1500 Composite Total Return Index as his market index and the S&P Small Cap 600 Materials Sector Total Return Index as an industry index. *See* Cain Report, ¶ 54.
[159] Cain Report, ¶¶ 56–58.
[160] Cain Report, ¶ 60, Exhibit 7.
[161] Cain Report, ¶¶ 61–62, Exhibit 7.
[162] Cain Report, ¶ 60.
[163] Cain Report, ¶ 54.

respectively), starting from July 14, 2020.[164]  Thereafter, he evaluates the statistical significance of the residual return for each day on a 60-day "rolling" basis (*i.e.*, a regression using an estimation window of the 60 trading days prior to and including the date being estimated).[165]  Dr. Cain thus relies on data before the Proposed Class Period (and before the de-SPAC target had even been *announced*) to form his estimates and inferences about the events during the Proposed Class Period.  Specifically, his estimates of statistically significant residual returns through February 11, 2021 (*i.e.*, the first 60 days of the Proposed Class Period) all draw on data from prior to the Proposed Class Period.

84.     Dr. Cain's blending of data from prior to the announcement of the Business Combination and during the Proposed Class Period in the way he does obscures fundamental differences in the characteristics of the ROCH common stock before and after the announcement of the Business Combination.  These differences are reflected in how the stock price evolves over time, as shown in **Exhibit 1**.  As shown in the exhibit, ROCH's stock price remained stable around $10 from July 14, 2020 to November 16, 2020,[166] consistent with the fact, as discussed in **Section V**, that ROCH was a "blank check" company without any business operations before the announcement of the Business Combination.[167]  After the announcement of the de-SPAC target—*i.e.*, the start of the Proposed Class Period—while the redemption option remains, ROCH's stock price may increase above $10 (consistent with **Exhibit 1**), for instance because of new information regarding expected future cash flows of the combined post-Business Combination company.  Indeed, statistical analysis demonstrates that the stock price behaved differently prior to and after the announcement of the Business Combination (*i.e.*, start of the Proposed Class Period).[168]

---

[164] Cain Report, ¶ 54; CIECKO000032.xlsx; CIECKO001930.txt.  Although the common stock of ROCH started trading on Nasdaq on June 11, 2020, the first closing price in *Bloomberg* data, which Dr. Cain relies on for his analysis, is on July 14, 2020.  Moreover, some dates between this date and the start of the Proposed Class Period had very low trading volume and no closing prices in the *Bloomberg* data.  Dr. Cain excludes such days from his event study and uses multi-day returns in some instances in the period prior to the Proposed Class Period, resulting in 54 returns calculated from 55 closing prices in this period.

[165] Cain Report, ¶ 54.  As discussed above, Dr. Cain excludes News Days and alleged corrective disclosure dates from his regression estimation.

[166] Between July 14, 2020 and November 15, 2020, ROCH's stock price remained in the range $9.78 - $10.20 based on closing price obtained from *Refinitiv*.

[167] *See also* Cain Deposition, 133:7–12 ("[O]nce a SPAC shares are IPOed they tend to trade very frequently between a fairly narrow range. Because it's essentially a shell company or blank check company that's raised cash at a valuation of $10 per share.").

[168] I use the Chow test to assess whether the stock returns before the Proposed Class Period behave differently from the stock returns during the Proposed Class Period.  The Chow test detects the presence of a structural break in the coefficients of a regression model.  In this case, the Chow test detects whether the relationship between the stock returns and Dr. Cain's market and industry index returns before the Proposed Class Period is statistically different from the relationship within the Proposed Class Period.  In Dr. Cain's event study model, there are 59 estimation windows which span the first day of the Proposed Class Period.  Of these 59 estimation windows, 53 windows contain at least four days before and at least four days after the beginning of the Proposed

85.     The announcement of the de-SPAC target on November 16, 2020 also marks a change
in the stock return volatility.  As an illustration, note that the volatility of ROCH's stock
returns between July 14, 2020 and the start of the Proposed Class Period, as measured by
standard deviation, is approximately *one-seventh* of the volatility of returns during the period
from the start of the Proposed Class Period to the de-SPAC date.[169]  This difference is of
particular importance because the volatility of stock returns during the estimation period sets
the benchmark for determining statistical significance of residual returns in an event study
model.[170]  Statistical analysis demonstrates that Dr. Cain's improper use of the low-volatility
period prior to the start of the Proposed Class Period to calibrate his model thus sets the
benchmark artificially low.[171]  Indeed, such a low benchmark leads to an overstatement of the
statistical significance of residual returns during the early part of the Proposed Class
Period.[172]

86.     A simplified hypothetical example can illustrate how combining data across periods
with different volatilities can lead to inaccurate conclusions regarding statistical significance.
Consider two hypothetical periods: a low volatility period (when residual return volatility is
1%) that is immediately followed by a high volatility period (when residual return volatility is
5%).  Then, consider whether a hypothetical residual return of 3% would be statistically
significant.  During the low volatility period, the 3% residual return would be considered
statistically significant (t-statistic of roughly 3.0, which is greater than 1.96), while the same
3% residual return during the high volatility period would not be statistically significant (t-
statistic of roughly 0.6, which is less than 1.96).  Now, consider the problem that would arise
if one were to analyze the statistical significance of the 3% residual return during the *high*

_____

Class Period.  Four data points is the minimum number of data points required to estimate the coefficients in Dr.
Cain's regression model.  For each of these 53 estimation windows, I estimate the coefficients using the data
from before the Proposed Class Period and compare these coefficients to coefficients estimated using data from
within the Proposed Class Period.  Of the 53 windows, the Chow test indicates that in 19 windows (36%), the
coefficient estimates obtained using these two groups of data are different, and that the difference is statistically
significant at the 95% confidence level.
[169] The stock return volatility is calculated using closing prices obtained from *Refinitiv*.
[170] J. M. Wooldridge (2009), *Introductory Econometrics: A Modern Approach*, 4th ed., Mason, OH: South-Western
Cengage Learning ("Wooldridge (2009)"), p. 130.
[171] I use the Levene test to assess whether the residual return volatility before the Proposed Class Period is
different from the residual return volatility within the Proposed Class Period.  In Dr. Cain's event study model,
there are 59 estimation windows which span the first day of the Proposed Class Period.  For each of these 59
estimation windows, I calculate the residual return volatility for two groups of dates: those which are outside the
Proposed Class Period and those which are within the Proposed Class Period.  Then, I use the Levene test to
assess whether the average residual return volatility between these groups is different in a statistical sense.  Of
the 59 windows, the Levene test indicates that in 47 windows (80%), the residual return volatility is different and
that the difference is statistically significant at the 95% confidence level.
[172] As discussed in **Section VI.B**, statistical significance of a residual return is determined by the absolute value
of the t-statistic, defined as the residual return divided by the residual return volatility.  The lower the residual
return volatility, the higher the t-statistic, and the more likely statistical significance is to be detected given the
same magnitude of the residual return.

volatility period based on the residual return volatility from the *low* volatility period. By relying on the volatility from the low volatility period to calculate the t-statistic, one would incorrectly conclude that the 3% residual return during the high volatility period is statistically significant. This is precisely the issue that arises from Dr. Cain's use of the residual return volatility during the period preceding the Proposed Class Period to calculate the statistical significance of the residual returns in the early part of the Proposed Class Period.

87.    To illustrate Dr. Cain's distorted approach, **Exhibit 8** shows the residual returns from Dr. Cain's regression analysis. The bars represent the residual returns for each day of the Proposed Class Period. The two dashed lines represent the 95% confidence interval for the regression. Residual returns that exceed the confidence interval are statistically significant at the 95% confidence level and are displayed in red. As shown in the exhibit, the confidence interval varies over time, reflecting the rolling estimation windows encompassing periods of varying volatility. Specifically, the 95% confidence interval from Dr. Cain's regression model is relatively narrow at the start of the Proposed Class Period. This is a consequence of the fact that the regression model for the early part of the Proposed Class Period is estimated by inappropriately incorporating pre-Proposed Class Period data with very low volatility, when the stock price would not have reflected any information related to PureCycle (or, indeed, any operating entity) and was largely unchanged around $10, as discussed above.[173,174]

88.    As a result of the artificially narrow confidence interval at the beginning of the Proposed Class Period, Dr. Cain finds that residual returns during the early part of the Proposed Class Period are often statistically significant at the 95% confidence level, despite

---

[173] As noted above, some dates prior to the start of the Proposed Class Period had very low trading volume and no closing prices in the *Bloomberg* data, which Dr. Cain relies on for his analysis. Specifically, the data only show bid and ask prices (and no closing prices or volume) until July 14, 2020 (22 trading days). From July 14, 2020 to the start of the Proposed Class Period on November 16, 2020, there are 88 trading days but only bid and ask prices and low volume with no closing price on 33 days (*i.e.*, Dr. Cain is missing price data on over 37% of the days he uses prior to the start of the Proposed Class Period). Dr. Cain excludes days with no data for closing price from his event study and thus uses multi-day returns in some instances in the period prior to the Proposed Class Period (compared to single-day returns for data during the Proposed Class Period). This further underscores Dr. Cain's problematic use of data from prior to the start of the Proposed Class Period. *See* CIECKO000032.xlsx; CIECKO001930.txt.

[174] The difference in stock price volatility prior to and after the start of the Proposed Class Period, and hence the inappropriateness of combining data from before and after the announcement of the Business Combination, is also illustrated by the R-squared from Dr. Cain's regression model. R-squared is a measure of how well an event study model can explain the observed stock returns. For example, an R-squared of 0.6 indicates that 60% of the variance of stock returns can be explained by the variance in the predictors in the event study model (market and industry indices). An adjusted R-squared is a modified version of R-squared which makes adjustments for the number of predictors used in the model. The adjusted R-squared value allows for a fair comparison of how well different event study models can fit observed data when the different models contain a different number of predictors. *See* Wooldridge (2009), p. 200. The adjusted R-squared from Dr. Cain's model is close to zero (and even negative) in the early part of the Proposed Class Period. *See* CIECKO000322.xlsx. This suggests poor model fit, and again underscores the impact of low volatility in the period prior to the Proposed Class Period when ROCH was a "blank check" company with a stock price consistently trading around $10.

the magnitude of these residual returns being much smaller in magnitude relative to residual returns throughout the Proposed Class Period. Specifically, in total during the Proposed Class Period, Dr. Cain finds 24 dates with statistically significant residual returns. Of these, 37.5% (*i.e.*, nine days) occur within the first 9% of trading days in the Proposed Class Period (*i.e.*, within the first month of the Proposed Class Period), although Dr. Cain classifies only one of these as a News Day.[175]

89.     Without showing that the period prior to the announcement of the Business Combination is representative of the period after the announcement, it is improper for Dr. Cain to include data from prior to the Proposed Class Period in the estimation window for his regression analysis, since the returns represented price responses to a fundamentally different entity before the start of the Proposed Class Period. As discussed above, Dr. Cain's improper use of the period prior to the start of the Proposed Class Period also distorts the statistical significance of residual returns during the early part of the Proposed Class Period, because the stock return volatility of ROCH prior to the Proposed Class Period was very low relative to the Proposed Class Period. Dr. Cain's event study model is thus flawed and unreliable and cannot support reliable conclusions about a cause-and-effect relationship between information and price response.

90.     Dr. Cain's use of an estimation period incorporating data from prior to the Proposed Class Period is also notable because it is inconsistent with his regression model specification in at least four prior matters involving SPACs.[176] In particular, in *none of* his four prior expert reports involving SPACs did Dr. Cain use data from prior to the announcement of the respective business combination as part of the estimation window in his event study. In a prior matter involving a SPAC (AdaptHealth Corp), Dr. Cain *did not* use data from before the SPAC target was announced and used "a fixed Estimation Window for the first 120 days of the Class Period" and a rolling 120-day regression thereafter, asserting, with support from academic literature, that "[i]t is common practice to employ a 120-day Estimation Window."[177] In another prior matter involving a SPAC (QuantumScape), Dr. Cain again

---

[175] Moreover, the nine days that are statistically significant at the 95% confidence level in the first month of Dr. Cain's event study have an average magnitude (absolute value) of 4.3%, compared to an average magnitude (absolute value) of 10.2% for all days in the Proposed Class Period with statistically significant residual returns in his model. *See* CIECKO000322.xlsx; Cain Report, Exhibit 6.

[176] At deposition Dr. Cain was able to recall four previous matters involving SPACs in which he has testified: Romeo Power, AdaptHealth, Clover Health, and QuantumScape. *See* Cain Deposition, 39:10–19, 132:2–4. *See* also Cain Report, Appendix A.

[177] Expert Report of Matthew D. Cain, *Delaware County Employees Retirement System and Bucks County Employees' Retirement System, et al. vs. AdaptHealth Corp, et al.*, United States District Court Eastern District of Pennsylvania, Civ. Action No. 2:21-cv-03382-HB, dated July 26, 2022 ("Cain AdaptHealth Report"), ¶¶ 7, 13, 55.

stated that using a 120-day window is "common practice," but opted for a "fixed Estimation Window for the first 60 days of the Class Period," and a 60-day rolling regression thereafter, due to the "relatively short Class Period."[178]  However, in that case, he also *did not* use data from before the SPAC target was announced.[179]  In two other SPAC matters that he discussed in his deposition (*Clover Health* and *Romeo Power*), Dr. Cain also did not use data from before the start of the class period (when the SPAC target was announced), but rather used fixed estimation windows from the start of the class period to the de-SPAC date and rolling estimation windows thereafter.[180]  In the current matter, Dr. Cain acknowledged at deposition the difference in stock price volatility before and after the announcement of the Business Combination, but failed to reliably justify his use of data from before the Proposed Class Period despite characterizing it as a "different information environment."[181,182]

### 3.     Dr. Cain Fails to Provide Objective Criteria for the Classification of News Days

91.     Dr. Cain's method for testing cause-and-effect is also unreliable, as he has no objective criteria for choosing his event dates.  Dr. Cain's News Days comprise nine total dates, of which seven are earnings announcements.[183]  Dr. Cain does not specify, but by process of elimination, the other two—the first day of the Proposed Class Period and March 18, 2021 (the day after the Business Combination)—are presumably "key dates pertaining to

---

[178] Expert Report of Matthew D. Cain, *In Re QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO, *In Re QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO, dated July 22, 2022 ("Cain QuantumScape Report"), ¶ 54.

[179] Cain QuantumScape Report, ¶¶ 7, 13, 54.

[180] Moreover, in *Clover Health*, Dr. Cain specifically notes that the use of a fixed estimation window prior to the de-SPAC was "[b]ecause Clover was simply a shell company or blank check company prior to the closing of the Business Combination."  *See* Cain Clover Health Report, ¶¶ 7, 12, 49; Cain Romeo Report, ¶¶ 7, 13, 51.

[181] Cain Deposition, 133:7–134:3 ("I know that once a SPAC shares are IPOed they tend to trade very frequently between a fairly narrow range. Because it's essentially a shell company or blank check company that's raised cash at a valuation of $10 per share. And so the volatility of the daily returns tends to be fairly low. Then when they announce a business combination, that is, not for every SPAC but for many SPACs that's the first sort of meaningful announcement of progress towards the ultimate goal of what the SPAC has come into existence for which is to merge with a private target company. After that and certainly after the closing of the business combination, the volatility of the stock prices changes. It tends to increase…"), 142:5–11 ("[P]rior to day one of the class period it's essentially a pot of cash worth $10 and investors are waiting for an announcement. And then you've got an announcement of a target that's been announced. That's a significant change in the information environment.").

[182] Moreover, a consequence of Dr. Cain's relatively short estimation window here (which means that there is less data used to perform the estimation) is that the coefficient estimates from his model appear highly unstable.  Specifically, Exhibit 4 of the Cain Report shows how the coefficients from his event study evolve over time.  As shown in the exhibit, the coefficient on the Market Index ranges from -1.49 to 3.68 throughout the Proposed Class Period.  Counterintuitively, a negative coefficient implies that when the return on the market index *increases*, the predicted return for the Company *decreases*—that is, Company returns move inversely with the overall market.  Moreover, as shown in Cain Report Exhibit 4, the market coefficient swings from positive to negative between May and August 2021, which implies that over the course of approximately three months, Dr. Cain's market index shifts from a positive to a negative correlation with Company stock returns.  I am unaware of any significant changes in the business operations of the Company that could plausibly explain this shift.

[183] Cain Report, Exhibit 6.

communications" about the Business Combination.[184]  Dr. Cain does not offer a reliable

explanation or criteria for what ex-ante constitutes a "key date[] pertaining to

communications" about ROCH or PureCycle.[185]

92.    Dr. Cain does not explain why other potential dates with news about the Company are

not classified in his analysis as News Days.[186]  Only four of Dr. Cain's nine News Days fall

during the Proposed Class Period.[187·188]  However, there are 15 dates during the Proposed

Class Period on which the Company issued 8-Ks (see **Exhibit 9.A**) and 28 dates on which the

Company issued press releases (see **Exhibit 9.B**).[189]  According to Dr. Cain, ROCH filed "37

forms with the SEC throughout the pre-business combination period" and "filed 71 forms

with the SEC during the remainder of the Class Period."[190]  In his analysis of *Cammer* factor

2, Dr. Cain claims that these filings were important to ensuring the Company's stock "traded

in a well-developed and informationally efficient market throughout the Class Period."[191]  Yet

---

[184] Cain Report, ¶ 47, Exhibit 6.

[185] Cain Report, ¶ 47.  At his deposition, Dr. Cain claimed that he uses "objective criteria" in SPAC cases and selects two "key points," which are "[w]hen they announce the target [and] when they announce shareholder approval or successful completion of the business combination."  *See* Cain Deposition, 148:8–149:9. Nonetheless, Dr. Cain does not explain why other dates cannot also be "key points" and acknowledged that in other cases, he has in fact "applied a different criteria for those companies, where [he] felt that [it would be] appropriate..." and that the selection of two "key points" is "a very narrow set of criteria."  *See* Cain Deposition, 153:10–19, 157:9–10.

[186] In his report in *AdaptHealth*, Dr. Cain analyzes quarterly earnings announcements, M&A announcements, and the alleged corrective disclosure dates in his cause-and-effect analysis.  In *QuantumScape*, Dr. Cain analyzes days he identifies as "Product Development and Earnings Announcement Dates," which he specifies as days when the company issued "press releases that reported quarterly financial results or announced test results, new data, or information related to the potential future success of QuantumScape's product."  In *Romeo Health*, Dr. Cain analyzes quarterly earnings announcements, the announcement of the acquisition of the company, and an announcement that the company would withdraw its revenue guidance in his cause-and-effect analysis.  In *Clover Health*, Dr. Cain analyzes the first day of the class period (the SPAC business combination target announcement), the date on which the business combination received shareholder approval, and the date on which the closing of the business combination was announced, which he describes as "key dates pertaining to communications made by SCH and/or Clover on the identification and status of the Business Combination." Here, unlike in *Clover Health*, he considers the first day after the business combination a "key" date but does not consider the announcement of shareholder approval of the business combination as such, further underscoring his ad hoc selection of News Days and his failure to objectively describe at what point news about a proposed business combination becomes "key."  *See* Cain AdaptHealth Report, ¶¶ 49–51; Cain QuantumScape Report, ¶ 48; Cain Romeo Power Report, ¶ 46; Cain Clover Health Report, ¶ 44, Exhibit 6.

[187] As noted above, although Dr. Cain claims that PureCycle "hosted three earnings announcements during the Class Period," the November 11, 2021 earnings call in fact occurred after the Proposed Class Period.  At his deposition, Dr. Cain also erroneously stated that the third quarter 2021 earnings call was November 10, 2021. *See* Cain Deposition, 158:18–22 ("Because the earnings call was held on November 10th, 2021 which is during the class period.  But the market impact date from that is November 11th, 2021.").  *See also* "Edited Transcript Q3 2021 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, November 11, 2021, 4 PM GMT.

[188] Moreover, as discussed below, only *one* of the News Dates is in the period prior to the de-SPAC.

[189] Moreover, at deposition, Dr. Cain acknowledged that he *has* in fact used 8-Ks and press releases as news days in other reports.  *See* Cain Deposition, 153:10–19 ("Again, I have had other cases where I may have looked at every 8-K or every press release … I felt that an appropriate criteria would be to look at every press release.").

[190] Cain Report, footnote 40.

[191] Cain Report, ¶ 35.

Page 38

Dr. Cain provides no reliable explanation why any of these dates would not be "key dates" pertaining to "the identification and status of the business combination."[192]

93.     Dr. Cain's own backup files underscore his unsupported and seemingly inconsistent classification of News Days.  Specifically, in backup files provided for this report, Dr. Cain tabulates regression results on dates "with news."  His backup shows that, by his classification, there are 142 trading days during the 249 trading-day Proposed Class Period with news headlines about PureCycle or SEC filings.[193]  Although Dr. Cain labels these 142 days as being days "with news," he does not explain why he does not classify them as "News Days."  Indeed, he uses only four of 142 trading days in the Proposed Class Period "with news" as "News Days."  The use of this narrow subset of days Dr. Cain himself identifies and labels as "with news" underscores his failure to articulate an ex-ante classification criterion, or even explain what constitutes a "key date[] pertaining to communications" about the Company.[194]

94.     Moreover, Dr. Cain's findings are sensitive to his classification of News Days. Exhibit 6 of the Cain Report shows that *100%* of Dr. Cain's News Days are associated with statistically significant residual returns.[195]  By contrast, his backup file shows that only 13 of the 142 days "with news" in the Proposed Class Period (*i.e.*, only 9.2%) are associated with statistically significant residual returns at the 95% confidence level, raising further questions about how he selected his set of News Days.  Indeed, Dr. Cain's analytical finding regarding the purported "strong evidence of a cause-and-effect relationship between information and PureCycle Common Stock price movements"[196] is *reversed* when using the broader categorization of days "with news" shown in Dr. Cain's backup file.  As shown in **Exhibit 10.A**, there is no statistically significant difference in the proportion of days with statistically significant residual returns in Dr. Cain's model when comparing his days "with news" to his "No News Trading Days."[197]

---

[192] As discussed in **Section VIII.A**, Dr. Cain also does not classify any Alleged Misrepresentation Dates other than the first date of the Proposed Class Period as "key dates pertaining to communications made by ROCH and/or PureCycle on the identification and status of the business combination."  *See* Cain Report, ¶ 47.
[193] CIECKO000322.xlsx.
[194] Cain Report, ¶ 47.
[195] Cain Report, Exhibit 6.
[196] Cain Report, ¶ 60.
[197] As shown in Exhibit 10.B, this finding also holds for Dr. Cain's Analysis Window (*i.e.*, the full period for his analysis incorporating one additional year of data after the end of the Proposed Class Period).

### 4.    Dr. Cain Fails to Provide Reliable Evidence of a Cause-and-Effect Relationship prior to the De-SPAC

95.    For the period prior to the de-SPAC in particular, Dr. Cain fails to provide reliable evidence of a cause-and-effect relationship between information and price response, and the existence of such a relationship cannot be simply inferred from how the stock behaved after the de-SPAC.

96.    Of the nine News Days that Dr. Cain includes in his analysis, only *one*—the first day of the Proposed Class Period—occurs prior to the de-SPAC.[198]  With the exception of that *single day*, Dr. Cain is essentially inferring evidence of a cause-and-effect relationship between news and stock price reaction in the period prior to the de-SPAC based on News Days that occur after the de-SPAC (and, as discussed below, even after the Proposed Class Period).  As discussed below, however, Dr. Cain has not shown that market efficiency for the period prior to the de-SPAC can be inferred from the period after the de-SPAC, and the residual return for the single News Day that occurs prior to the de-SPAC is statistically significant in Dr. Cain's model only as a result of his ill-specified regression model.

97.    As an initial matter, Dr. Cain has not shown that his analysis of earnings dates supports a conclusion of market efficiency for the Company's common stock in the period prior to the de-SPAC.  As noted above, with respect to the earnings announcements that comprise Dr. Cain's News Days, he states that "[b]ecause PureCycle only hosted three earnings announcements during the Class Period," he "extended the analysis period by one year past the end of the Class Period to cover all earnings announcements between the start of the Class Period and November 10, 2022."[199]

98.    However, Dr. Cain has not shown that the one-year period after the end of the Proposed Class Period is representative of the Proposed Class Period, especially given, as I discussed above, that ROCH's stock price in the period before the de-SPAC reflects different fundamental economic factors.  Therefore, he fails to reliably explain why the market response to earnings announcements in that one-year period after the end of the Proposed Class Period is relevant for assessing the response to earnings *during* the Proposed Class Period.[200]  He certainly has not shown that earnings announcements as distant as more than 18

---

[198] Cain Report, Exhibit 6.
[199] Cain Report, ¶ 48.
[200] In fact, as shown in Exhibit 4 of the Cain Report, the coefficients on the market and industry indices in his event study fluctuate dramatically over the course of his Analysis Window, raising questions as to whether the relationship between information and stock price response can be presumed to be the same throughout Dr. Cain's Analysis Window.

months after ROCH no longer existed as a standalone entity provide insight into the period
prior to the de-SPAC, especially given ROCH held *no* earning announcements prior to the
de-SPAC.[201]  By failing to show that his longer "Analysis Window" is representative of the
Proposed Class Period, Dr. Cain cannot apply his conclusion in support of market efficiency
from one period to another.

99.     Dr. Cain also fails to account for the different sub-periods prior and subsequent to the
de-SPAC in his event study.  As discussed in **Section V** and **Section VII.B**, the Proposed
Class Period comprises two distinct sub-periods, and the Company changed in fundamental
ways after the de-SPAC.  Moreover, as I discuss in **Section VII.D** below, the period prior to
the de-SPAC differed from the period after the de-SPAC in numerous ways, including in
terms of analyst coverage, market capitalization, the average number of institutional
investors, autocorrelation, and trading of options.  As a result, Dr. Cain cannot reliably apply
his conclusion in support of market efficiency from the period after the de-SPAC to the
period before.

100.    However, Dr. Cain's conclusion for the *only* News Day in the period prior to the de-
SPAC is based on a fundamentally flawed and unreliable regression model.  As shown in
Cain Report Exhibit 6, Dr. Cain classifies the first day of the Proposed Class Period,
November 16, 2020, as a News Day, and finds that ROCH's residual return is statistically
significant on that date.  Dr. Cain finds the residual return on this date to be statistically
significant despite the fact that the residual return is 4.0%.[202]  Notably, this is the smallest
residual return of all the News Days in Dr. Cain's *Cammer* factor 5 analysis, with the next
smallest residual return of the nine days being associated with a statistically significant
residual return of 9.3%.[203]  Indeed, as an illustration of how Dr. Cain's conclusion for this day
is unreliable and driven by his ill-specified regression model, note that there are six other
dates in Dr. Cain's Analysis Window that have a residual return between 3.9% and 4.1% but
*none* of these residual returns are statistically significant in Dr. Cain's event study.[204]
Moreover, as shown in **Exhibit 11**, the residual return for ROCH's stock price on November
16, 2020 is also found *not* to be statistically significant when using regression specifications

---

[201] PureCycle reported its quarterly earnings for the first time for the first quarter of 2021.  As noted above, the
Company hosted an earnings call and announced its results on May 17, 2021.  *See* "PureCycle Technologies,
Inc. Provides First Quarter 2021 Corporate Update," PureCycle Press Release, May 17, 2021; Cain Report,
Exhibit 6.
[202] Cain Report, Exhibit 6.
[203] Cain Report, Exhibit 6.
[204] These six dates with positive residual returns between 3.9% and 4.1% are: February 11, 2021; September 13,
2021; October 6, 2021; December 22, 2021; February 24, 2022; and June 16, 2022.  *See* CIECKO000322.xlsx.

that Dr. Cain has used in previous reports.[205]  As discussed in **Section VIII.A**, the residual

return for ROCH's stock price on November 16, 2020 *also not* statistically significant

using the regression model I describe in **Section VI.C**.

101.     Thus, the residual return for the single News Day that occurs prior to the de-SPAC is

statistically significant in Dr. Cain's event study only as a result of his ill-specified regression

model.  Dr. Cain thus not only fails to account for the different sub-periods within the

Proposed Class Period, as discussed above, but ultimately fails to show any reliable evidence

of a cause-and-effect relationship between news and price response in the period prior to the

de-SPAC.

> **D.     Dr. Cain's Analysis of "Benchmarks Established by Courts" Ignores
> Factors that Are Inconsistent with His Market Efficiency Conclusions in
> the Proposed Class Period, and in Particular the Period Prior to the de-
> SPAC**

102.     For Dr. Cain's remaining analyses of market efficiency, Dr. Cain's discussion of

several of the factors he analyzes draws on an inappropriate and unreliable comparison to the

MRK Study, as discussed in **Section VII.D.1**.  Moreover, he presents analyses spanning the

Proposed Class Period as a whole and bases his conclusions on these average statistics.  Yet,

averaging data over this full period obscures the distinct sub-periods that arise from the

unique structure of SPACs, as discussed above.  In fact, when examining the sub-periods

separately, there are a number of factors that Dr. Cain analyzes that, by his own criteria,

would be inconsistent with a conclusion of market efficiency in the period prior to the de-

SPAC, as discussed in **Section VII.D.2** through **Section VII.D.8**.

> **1.     Dr. Cain's Use of "Covered" Firms from the MRK Study as a
> Benchmark Is Misleading and Unreliable**

103.     In his discussion of market efficiency, Dr. Cain references a 2013 study by Simona

Mola, P. Raghavendra Rau, and Ajay Khorana ("MRK Study") that uses a sample of U.S.

publicly traded firms that lost analyst coverage for at least one year during the period from

1984 to 2008 to examine the effects of analyst coverage on firm performance and investor

interest.[206]  The study presents results of market performance and investor interest indicia for

---

[205] Cain AdaptHealth Report, ¶ 55; Cain QuantumScape Report, ¶ 54; Cain Clover Health Report, ¶ 49; Cain
Romeo Power Report, ¶ 51.
[206] Cain Report, ¶ 24; S. Mola, P. R. Rau and A. Khorana (2013), "Is There Life after the Complete Loss of
Analyst Coverage?" *The Accounting Review*, 88(2), pp. 667–705 ("MRK Study").

"Covered" firms (those that have analyst coverage) and "Sample" firms (those that do not have analyst coverage in a calendar year, hereafter referred to as "Non-covered" firms).[207]

104.    Specifically, in his analyses of trading volume, analyst coverage, market capitalization, bid-ask spread, and institutional ownership, Dr. Cain benchmarks statistics for the Company's common stock throughout the Proposed Class Period against reported statistics of the Covered firms, "interpret[ing] the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets."[208] Dr. Cain concludes that "PureCycle's characteristics are consistent with the Covered firms in the MRK Study that elicit high investor interest and thus reflect common indicia of efficient markets."[209]

105.    Dr. Cain provides no reliable basis, however, for why the Covered firms in the MRK Study are a reasonable benchmark for his market efficiency analysis: nowhere does the study state a conclusion that the markets for Covered firms' securities are efficient while the markets for Non-covered firms' securities are inefficient.  The study discusses trading indicators for the two groups of companies (Non-covered firms and Covered firms) but does not provide any analysis that shows the securities of the Covered firms (or any firms in the study) traded in efficient markets, which Dr. Cain admitted at deposition.[210]  Instead, the authors simply "document[] the effects on firm performance and investor interest after a complete loss of analyst coverage" and "find that analyst coverage adds value to a firm.…"[211]  As such, Dr. Cain provides no reliable basis for interpreting the MRK Study to be providing benchmarks or thresholds for firms operating in efficient markets.

106.    Moreover, Dr. Cain fails to demonstrate that the companies analyzed in the MRK Study are comparable to the Company.  First, the authors do not discuss whether the sample includes SPACs.  As discussed above, from the perspective of financial economics, the trading behavior and characteristics of a SPAC would likely be different from that of an operating company.  Second, Dr. Cain has not shown that the study's findings from companies between 1984 and 2008 apply to the Proposed Class Period at all, let alone to SPAC companies (and, as shown in **Exhibit 7**, there were relatively few SPACs during that

---

[207] Cain Report, ¶ 24; MRK Study, pp. 667–669.
[208] Cain Report, ¶ 25.
[209] Cain Report, ¶ 25.
[210] Dr. Cain admitted in deposition that the MRK Study does not analyze market efficiency.  *See* Cain Deposition, 63:13–23 ("Q. Does the MRK Study actually conclude that the MRK covered firms all traded in an efficient market during the entire period covered by that study? A. I don't think they use that language. I think that the language they use is more along the lines of investor interest in those companies. But again, as an economist, that's really what we're talking about in terms of a market efficiency report.").
[211] MRK Study, p. 667.

time period compared to the Proposed Class Period).[212]  Third, Dr. Cain ignores the fact that
the MRK Study does not include companies in a similarly early post-IPO stage like the
Company.  Specifically, because the study's empirical design requires two years of data for
companies included in the study,[213] companies in their first year after the IPO (like the
Company) *do not appear in the study at all*.  Thus, Dr. Cain's comparison between the
Company (in its first year) and the firms in MRK Study's Table 3 is an apples-to-oranges
comparison, and Dr. Cain fails to show that the MRK Study findings, and particularly those
in Table 3, provide relevant benchmarks for the Company.

## 2.    Analyst Coverage

107.    For his analysis of *Cammer* factor 2, analyst coverage, Dr. Cain asserts that "[a]nalyst
coverage can be indicative of market efficiency since research analysts ensure that new
important company-specific information is disseminated to investors and thus impounded
into stock prices quickly and efficiently."[214]  He reports that analysts at "7 separate firms"
issued a total of 23 reports over the Proposed Class Period and claims that this degree of
analyst coverage "compares favorably to that documented by academic research," citing the
finding in the MRK Study that 19% of U.S. firms "received no analyst coverage in a given
year," as well as a study by Professors Lee and So that finds on average firms are "covered
by between 0.765 and 7.614 analysts."[215]  Based on this, Dr. Cain concludes that
"PureCycle's analyst coverage is consistent with the MRK Covered firms which elicited high
investor interest" and this coverage "supports the conclusion that PureCycle's Common
Stock traded in an efficient market throughout the Class Period."[216]

108.    With this analysis spanning the whole Proposed Class Period, Dr. Cain fails to
address that the Company had *no* analyst coverage prior to the de-SPAC.  In a footnote, Dr.
Cain asserts that "ROCH was covered in 4 reports by 1 firm for the pre-business combination
period of November 16, 2020 – March 17, 2021."[217]  Dr. Cain does not specify in his report
which firm that is.  The only company I was able to identify that published a report on ROCH
prior to the de-SPAC was BuySellSignals, which describes itself as "an Australia-based

---

[212] I discuss this issue with respect to decimalization and bid-ask spreads in **Section VII.D.5**.
[213] The authors explain that for the data in Table 3 "Year *t* marks the calendar year during which sample firms
receive no analyst coverage.  All performance indicators and investor interest characteristics are determined at
the end of year *t–1*."  *See* MRK Study, p. 678.
[214] Cain Report, ¶ 31.
[215] Cain Report, ¶¶ 33–34.
[216] Cain Report, ¶ 34.
[217] Cain Report, footnote 34.

wholesaler of global financial market news, research and data" that uses "crawlers" to "visit websites" and summarizes company information "[u]sing algorithms based on widely accepted investment measures, combined with artificial intelligence."[218]  Unlike the securities analyst reports that have been studied by established academic research in the past several decades,[219] the reports on ROCH published by BuySellSignals during the Proposed Class Period are unauthored and contain no earnings or sales forecasts or discussions of the Company's business prospects.[220-221]

109.    Moreover, because BuySellSignals does not report company earnings estimates on I/B/E/S, it does not meet the MRK Study's criteria to be considered an analyst.  Specifically, consistent with the definition used in my own research,[222] the MRK study "define[s] a firm as having lost all analyst coverage when the firm, previously covered on I/B/E/S, receives no earnings forecasts during a calendar year."[223]  As a result, contrary to Dr. Cain's finding, by the MRK Study definition (or the definition of analyst I have used in my own research on analysts) the Company did not have *any* analyst coverage before the de-SPAC.

110.    More generally, as shown in **Exhibit 12**, of the seven firms that Dr. Cain classifies as providing "analyst coverage" of the Company during the Proposed Class Period as a whole, only four out of seven report earnings estimates on I/B/E/S.[224]  By comparing his count of seven firms (which includes a combination of some firms that report earnings forecasts on I/B/E/S and some that do not) with the MRK Study's set of analysts (which are limited only to firms reporting earnings estimates on I/B/E/S), Dr. Cain is making an apples-to-oranges comparison.  His claim that "PureCycle's analyst coverage is consistent with the MRK Covered firms"[225] is thus unsupported.

---

[218] "About Us," BuySellSignals, available at https://www.marketdashboard.com/mdash/aboutUs.
[219] *See, e.g.*, M. J. Brennan and A. Subrahmanyam (1995), "Investment Analysis and Price Formation in Securities Markets," *Journal of Financial Economics*, 38(3), pp. 361–381; M. J. Brennan, N. Jegadeesh and B. Swaminathan (1993), "Investment Analysis and the Adjustment of Stock Prices to Common Information," *The Review of Financial Studies*, 6(4), pp. 799–824.
[220] "Roth CH Acquisition I Gains 15% in Past Quarter," *BuySellSignals*, November 25, 2020; "Roth CH Acquisition I Surges 60% in Past Quarter," *BuySellSignals*, December 10, 2020; "Roth CH Acquisition I Soars 212% in Past Quarter; Institutional Ownership Down 75%," *BuySellSignals*, February 24, 2021; "Roth CH Acquisition I in Top 1% Performers of NASDAQ Market in Past Quarter; Institutional Ownership Down 75%," *BuySellSignals*, March 2, 2021.
[221] Indeed, according to Dr. Cain's Exhibit 3, employees from BuySellSignals did not participate in any PureCycle earnings calls during the Proposed Class Period.
[222] R. K. Loh and R. M. Stulz (2011), "When Are Analyst Recommendation Changes Influential?" *The Review of Financial Studies*, 24(2), pp. 593–627.
[223] MRK Study, p. 668.
[224] Of the seven analysts who issued reports during the Proposed Class Period according to Dr. Cain's Exhibit 3, only Roth Capital Partners, Inc., Craig Hallum, Cowen and Company, and Oppenheimer & Co., Inc. report earnings estimates to I/B/E/S and would thus meet the criteria in the MRK Study.  *See* **Exhibit 12**.
[225] Cain Report, ¶ 34.

111.    Moreover, the only two analysts that initiated coverage in the month *after* the de-
SPAC (and before the first alleged corrective disclosure) are Roth Capital and Craig
Hallum.[226]  However, Plaintiffs appear to suggest in the Second Amended Complaint that
these firms were biased, and not impartial commentators on the stock, stating that "Roth
Capital and Craig-Hallum are the only two investment banks covering PureCycle, despite
sponsoring the deal, and put[ting] 'buy' ratings on the Company."[227]

112.    In sum, Dr. Cain's analysis fails to show *any* analyst coverage in the four months of
(*i.e.*, roughly one-third of) the Proposed Class Period prior to the de-SPAC, rendering his
conclusion that "analyst coverage of PureCycle during the Class Period supports the
conclusion that PureCycle's Common Stock traded in an efficient market *throughout* the
Class Period" inaccurate.

### 3.    Market-makers and Arbitrageurs

113.    For his analysis of *Cammer* factor 3, Dr. Cain notes that market makers and
institutional investors aid market efficiency by "supplying trading liquidity and
informationally-efficient and informed trading."[228]  He states that "PureCycle's public listing
on the NASDAQ, a well-developed and established national exchange, satisfies the intent of
this *Cammer* factor" and that moreover, the Company had "at least 78 market makers" over
the Proposed Class Period.[229]  Noting also that the Company's stock was "widely held by
institutional investors," Dr. Cain concludes that this evidence "further support[s] the
efficiency of the market for PureCycle's Common Stock throughout the Class Period."[230]

114.    A substantial flaw in Dr. Cain's discussion, however, is that Dr. Cain limits his
analysis to observing the *presence* of market makers and institutional investors, without
analyzing the conditions for their trading.  Indeed, despite emphasizing the importance of

---

[226] "At The Intersection of Massive Global Unmet Need & Highly-Disruptive Proprietary Tech, With First-Mover
Advantage, Blue-Chip Partners, And Increasingly De-Risked Business Model. Initiating Coverage With A BUY
Rating, $48 Price Target," *Craig Hallum*, March 18, 2021; "PCT: Keeping the World Green with Polypropylene;
Initiate Buy $45 Target," *Roth Capital Partners*, April 21, 2021.
[227] Plaintiffs add: "Roth Capital and Craig Hallum received almost 2 million "founder's shares" in PureCycle for a
little more than a penny each for sponsoring the SPAC deal. True to form, Roth acquired PureCycle through what
is called a 'de-SPAC' transaction and then slapped a 'buy' rating and $45 price target on the stock a week after a
portion of Roth's shares became eligible to dump. Though in a typical IPO, the investment banks sponsoring a
deal have to observe a 'quiet period' for ten days following the IPO so as not to unduly influence the stock price,
this protective measure does not apply to SPAC transactions. Indeed, Craig-Hallum issued a 'buy' rating and $48
price target the same day that PureCycle went public. The resulting increase in PureCycle's stock price triggered
an early share unlock for Craig-Hallum and Roth."  *See* Second Amended Complaint, ¶¶ 36, 92 (emphasis
removed).
[228] Cain Report, ¶ 39.
[229] Cain Report, ¶ 40.
[230] Cain Report, ¶¶ 39, 40.

market makers for the purpose of "supplying trading liquidity and informationally-efficient
and informed trading,"[231] Dr. Cain's analysis of the number of market makers and
institutional holdings during the Proposed Class Period ignores potential constraints on the
ability of market makers or other sophisticated investors to perform arbitrage functions,
which is crucial for the market to function efficiently.

115.    For example, short selling is one form of arbitrage that plays an important role in
efficient stock markets by increasing supply, providing liquidity, and allowing for rapid
incorporation of public information into prices.[232]  However, as documented in the academic
literature, there can be market frictions that limit the ability of short sellers to trade stocks,
such as those arising from high costs of borrowing shares to short, risks, and uncertainties
associated with short selling.[233]  As the literature shows, such frictions can for periods of time
impede the functioning of arbitrage and therefore market efficiency, even for stocks traded on
major national exchanges such as NASDAQ.  It is therefore not sufficient for a financial
economist to infer market efficiency from typical characteristics of securities that trade on
major exchanges.

116.    To the extent the cost of borrowing shares for short positions is high (or the expected
future cost of borrowing is high), that could constrain arbitrageurs' ability to sell the stock
short, which in turn impedes the market's ability to reflect all relevant information into the
stock price.[234]  However, Dr. Cain fails to analyze whether this may have been the case for the
Company.  As shown in **Exhibit 13**, the cost of borrowing to short the Company was as high
as 9% prior to the de-SPAC,[235] well above the 90th percentile of 0.63% cost of borrowing

---

[231] Cain Report, ¶ 39.
[232] See Miller (1977), p. 1160 ("The result is that short sales increase the supply of stock on the market by the amount of the outstanding short position.  On Figure 1 the effect of short sales is to move the vertical supply curve to the right by the amount of the outstanding short position, lowering the price.  This causes the existence of adverse opinions to affect the market value of that stock.").  See also A. V. Reed (2013), "Short Selling," Annual Review of Financial Economics, 5(1), pp. 245–258  at p. 251 ("A wide range of international rules restrict short sales and equity lending.  Several papers use these rules, and changes made to them, to investigate the effect of short sales on overall market efficiency.  Bris, Goetzmann & Zhu (2007) construct measures of price efficacy and relate them to the ability to practice short sales in 46 countries.  They find that markets practicing short selling generally have higher levels of price efficiency.  Similarly, Saffi & Sigurdsson (2011) show that higher short-sale constraints, as measured by lending supply, have lower price efficiency across 26 countries. Daouk & Charoenrook (2005) gather evidence on short-sale restrictions in 111 countries and show that when short selling is possible, returns are less volatile and there is greater liquidity.  Similarly, Chang, Cheng & Yu (2007) use a sample from Hong Kong to show that stocks in which short selling is allowed have greater liquidity and price efficiency.").
[233] Miller (1977), p. 1166; Lamont and Thaler (2003); Saffi and Sigurdsson (2011); Duffie, Garleanu and Pedersen (2002), pp. 307–339.
[234] Saffi and Sigurdsson (2011); A. Bris, W. N. Goetzmann and N. Zhu (2007), "Efficiency and the Bear: Short Sales and Markets around the World," The Journal of Finance, 62(3), pp. 1029–1079.
[235] The cost of borrowing PureCycle common stock was also as high as 18% in the post de-SPAC period and averaged 7% over the approximately eight-month period between the date of the de-SPAC and the end of the Proposed Class Period.

from the academic literature.[236]  Indeed, this is also above the 6% level for borrowing costs for short positions that Dr. Cain has considered "extraordinarily high" in his past research.[237]

117.    At deposition, Dr. Cain appeared to suggest that a conclusion of market efficiency can still be reached even if high borrowing costs prevent information from being quickly incorporated into prices.  In particular, he stated that "an efficient market is one in which all widely available public information is quickly priced into and reflected in the securities prices" but only "[u]p to the point where if someone attempts to trade on the basis of information that's already widely publicly available, there are no risk-free opportunities for them to profit on that information above and beyond the cost of trading information."[238]

118.    He further testified that "if there is a limit to arbitrage, … investors are unable to… actually profit from that type of mispricing.  So it is not actually clear that that would be a violation of market efficiency because investors cannot actually profitably trade after factoring in their trading costs."[239]  As discussed in **Section VI.A**, however, academic literature has discussed how high borrowing costs to short, or other limits to arbitrage, may prevent information from being quickly incorporated into security prices and impede market efficiency.

119.    In fact, a recent report that Dr. Cain co-authored noted that a "large body of literature shows how short selling constraints undermine the efficiency and liquidity of securities markets."[240]  Moreover, Dr. Cain does not address how his viewing a market as efficient even when high borrowing costs lead to a failure for information to be (quickly) reflected in the stock price can be consistent with his statement that "[i]f a market is efficient, then all purchasers of the stock are induced into reliance on any misrepresentations or material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price."[241]

---

[236] D. Muravyev, N. D. Pearson, and J. M. Pollet (2022), "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *Journal of Finance*, 77(3), pp. 1787–1828 at pp. 1801–1803.
[237] J. Mitts et al. (2022), "A Report by the Ad Hoc Academic Committee on Equity and Options Market Structure Conditions in Early 2021," *Working Paper* ("Mitts et al. (2022)"), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4030179, p. 21.
[238] Cain Deposition, 44:16–45:3.
[239] Cain Deposition, 57:14–25.
[240] Mitts et al. (2022), p. 24.
[241] Cain Report, ¶ 18.

### 4. Market Capitalization

120.    Dr. Cain states that "firms with larger market capitalizations tend to trade in more efficient markets"[242] and examines the Company's average market capitalization throughout the Proposed Class Period as an "additional" market efficiency factor.  Citing to the finding from the MRK Study that the "median market capitalization of the MRK Non-covered firms was $27.91 million" while "the MRK Covered firms had a median market capitalization of $243.97 million,"[243] Dr. Cain concludes that the Company's average market capitalization of $1.46 billion is "on a stand-alone basis [] strongly supportive of market efficiency."[244]

121.    Dr. Cain's analysis of the Company's average market capitalization throughout the Proposed Class Period as a whole masks ROCH's low market capitalization during the period before the de-SPAC.  **Exhibit 6** shows that ROCH did not reach a market capitalization of $243.97 million (*i.e.*, Dr. Cain's MRK Covered firms' "benchmark") until February 2021, approximately three months after the start of the Proposed Class Period.  Dr. Cain's observation that the Company's "market capitalization averaged $1.46 billion over the Class Period"[245] masks this heterogeneity within the Proposed Class Period.  In fact, Dr. Cain fails to show that the data from the first three months of the Proposed Class Period (prior to the de-SPAC) support his claim that "market capitalization is consistent with the conclusion that the Common Stock traded in an efficient market *throughout* the Class Period" by his own criteria.[246]

### 5. Bid-ask Spreads

122.    As another "additional" market efficiency factor, Dr. Cain analyzes average bid-ask spreads for the Company's common stock.  He states that a "wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market."[247]

123.    Dr. Cain analyzes the monthly average bid-ask spread as a percentage of the bid-ask midpoint, using daily closing bid and ask quotes to calculate the bid-ask spread.[248]  He finds

---

[242] Cain Report, ¶ 64.
[243] Cain Report, ¶ 64.
[244] Cain Report, ¶ 65.
[245] Cain Report, ¶ 65.
[246] Cain Report, ¶ 65 (emphasis added).
[247] Cain Report, ¶ 66.
[248] Cain Report, ¶ 67.

that this "spread fluctuated between 0.15% and 1.70% from October 2020 through August 2021, and averaged 0.64% over the Class Period."[249]  Dr. Cain offers the comparison that the "MRK [Non-covered] firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%"[250] and concludes that because the Company's average bid-ask spread was lower than the median value of that for the Covered firms, this further "supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period."[251]

124.    Dr. Cain conducts his analysis using *end of day* bid and ask quotes (*i.e.*, at only one point in the trading day), citing a journal article that "compared data using end-of-day prices to intraday data and documented that the spreads were very similar."[252]  However, he does not present any analysis to demonstrate that this finding holds for the Company during the Proposed Class Period.

125.    In fact, Dr. Cain's findings for bid-ask spreads using closing bid and ask quotes overlook *intraday* patterns in the stock, which show much higher bid-ask spreads.  **Exhibit 14** shows summary statistics for common stock bid-ask spreads in the periods prior to and subsequent to the de-SPAC using intraday quotes data.  **Exhibit 15** plots the daily average bid-ask spread using intraday quotes data for the common stock for each trading day of the Proposed Class Period.  As shown in **Exhibit 14**, the median daily bid-ask spread prior to the de-SPAC using intraday quotes was 3.40%, substantially above the median of 1.32% in this period when using closing bid and ask quotes.  Moreover, as shown in **Exhibit 15**, bid-ask spreads using intraday quotes were as high as almost 7% per day on some days prior to the de-SPAC.  Thus, Dr. Cain's use of end of day bid and ask quotes understates transaction costs for the Company's common stock in the period prior to the de-SPAC.[253]

126.    Further, the bid-ask spreads shown for the whole sample period in the MRK Study may reflect a higher median spread than would be found in an equivalent sample today, further calling into question the applicability of this particular "benchmark."  In 2001 (*i.e.*, during the latter part of the time period covered by the MRK Study), U.S. markets changed

---

[249] Cain Report, ¶ 67.
[250] Cain Report, ¶ 68.
[251] Cain Report, ¶ 68.
[252] Cain Report, footnote 77.
[253] Moreover, even after the de-SPAC, the median daily bid-ask spread using intraday data was 2.76%.  *See* **Exhibit 14**.

from quoting prices in fractions to using decimals.  This change led to generally smaller bid-ask spreads for stock prices as the minimum tick size became smaller.[254]

### 6.    Institutional Investors

127.    In addition to referencing institutional investors as part of his discussion of market makers (discussed in **Section VII.D.3.** above), Dr. Cain separately analyzes the number of institutional investors holding positions in the Company during the Proposed Class Period as an "additional" market efficiency factor.  Dr. Cain states that institutional investors "can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices."[255]  Dr. Cain claims that "on average 263 institutions held the stock at some point during the Class Period," compared to the MRK Covered firms' median of 40 institutional investors.[256]  Based on this evidence, Dr. Cain concludes that the "significant institutional ownership base for PureCycle Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period."[257]

128.    Dr. Cain's average analysis for the Proposed Class Period as a whole again masks differences between the period before and after the de-SPAC.  Specifically, Exhibit 10a of the Cain Report shows that only 26 institutions held ROCH stock in the fourth quarter of 2020 (compared to the MRK Covered firms median of 40 institutions).  This figure falls short of his MRK Covered firms "benchmark," and, as a result,  Dr. Cain fails to show that the evidence is consistent with the Company's "Common Stock trad[ing] in an efficient market *throughout* the Class Period" by his own criteria.[258]

### 7.    Autocorrelation

129.    Dr. Cain also analyzes autocorrelation as an "additional" factor.  He notes that evidence of autocorrelation "would imply market inefficiency because publicly available information about prior stock price movements would not be fully reflected in current stock

---

[254] "Testimony Concerning the Effects of Decimalization on the Securities Markets, Before the Subcommittee on Securities and Investment Committee on Banking, Housing, and Urban Affairs," *United States Senate*, May 24, 2001, available at https://www.sec.gov/news/testimony/052401tslu.htm.
[255] Cain Report, ¶ 71.
[256] Cain Report, ¶ 72.
[257] Cain Report, ¶ 72.
[258] Cain Report, ¶ 72 (emphasis added).

prices."[259]  He further clarifies his opinion that autocorrelation "may occur occasionally due to random patterns in aggregate stock return data," but that "if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters and is large enough in magnitude that a trader could earn riskless profits after trading costs and slippage, this would imply market inefficiency."[260]

130.    Using the results of his event study, Dr. Cain states that the "autocorrelation coefficient over the full Class Period was not found to be statistically significant."[261]  Based on this finding and on a comparison of residual returns attributable to autocorrelation to the average trading cost of the Company's common stock, Dr. Cain concludes that "autocorrelation did not present an arbitrage opportunity … support[ing] the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period."[262]

131.    In contrast to this claim, however, Dr. Cain's own analysis, summarized in Exhibit 11 of his report, shows *positive and statistically significant* autocorrelation over both the fourth quarter of 2020 and first quarter of 2021—or approximately 40% of the Proposed Class Period and the whole time prior to the de-SPAC.  Dr. Cain notes that "positive autocorrelation could give rise to 'momentum' trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days,"[263] but disregards evidence of positive autocorrelation in his report by focusing on the average across the Proposed Class Period as a whole.

132.    Moreover, Dr. Cain states that the market for a stock may be inefficient if autocorrelation is "large enough in magnitude that a trader could earn riskless profits after trading costs and slippage," and compares abnormal returns attributable to autocorrelation to PureCycle's bid-ask spreads as an indicator of trading costs for the stock.[264]  However, Dr. Cain fails to acknowledge that a consistent pattern of serial correlation where the market simply cannot correct mispricing due to high transaction costs may prevent information from being quickly incorporated into prices.[265]

---

[259] Cain Report, ¶ 73.
[260] Cain Report, ¶ 73.
[261] Cain Report, ¶ 75.
[262] Cain Report, ¶ 75.
[263] Cain Report, ¶ 73.
[264] Cain Report, ¶¶ 73–74, footnote 88.
[265] *See, e.g.*, Saffi and Sigurdsson (2011), pp. 847–849.

133.    One well-known example of such a pattern of serial correlation was during the dotcom bubble between 1998 through February 2000, when the Internet sector earned over 1,000% returns.  A study by Professors Ofek and Richardson notes that during this time, the market was "overrun by the size and volume of optimistic trading."[266]  Notably, the authors find that high prices persisted because of limits on the number of shares available to short and resulting high borrowing costs.[267]  A recent paper that Dr. Cain co-authored acknowledges such limits to arbitrage in the context of GameStop and other meme stocks,[268] yet he fails to acknowledge the possibility of them here.

### 8.    Options Trading

134.    Dr. Cain also purports to analyze options trading as an "additional" market efficiency factor, stating that "options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading."[269] He finds that "PureCycle's Common Stock had 166,403 call option contracts and 64,176 put option contracts traded during the Class Period," which he claims "supports the conclusion that PureCycle's Common Stock traded in an efficient market throughout the Class Period."[270]

135.    However, in a separate analysis of options trading, Dr. Cain notes that "PureCycle Options commenced trading after the completion of business combination."[271]  In fact, I found data for trading of PureCycle options only subsequent to April 7, 2021 (*i.e.*, around five months into the approximately one-year Proposed Class Period).[272]  Thus, Dr. Cain's conclusion once again obscures differences between the two distinct sub-periods, before and after the de-SPAC.  Indeed, for the period prior to the de-SPAC options trading does not, and *cannot*, support Dr. Cain's conclusion that the "presence of options trading supports the conclusion that PureCycle's Common Stock traded in an efficient market *throughout* the Class Period."[273]

---

[266] E. Ofek and M. Richardson (2003), "DotCom Mania: The Rise and Fall of Internet Stock Prices," *The Journal of Finance*, 58(3), pp. 1113–1137 ("Ofek and Richardson (2003)") at p. 1134.
[267] Ofek and Richardson (2003).
[268] Mitts et al. (2022), p. 25.
[269] Cain Report, ¶ 76.
[270] Cain Report, ¶ 76.
[271] Cain Report, footnote 97.
[272] Options data from *iVolatility*.
[273] Cain Report, ¶ 76 (emphasis added).

> **E.    Dr. Cain's Cursory Analyses of Warrants and Options Fail to
> Demonstrate that the Markets for Those Securities Were Efficient**

136.    In his discussion of "market efficiency for warrants and options," Dr. Cain asserts that because "PureCycle Common Stock was priced efficiently and therefore reflected the value of the alleged misstatements and omissions, [he] also conclude[s] that because options and warrants pricing is dependent on the stock price, the artificial inflation caused by any misrepresentations and omissions that affects the Common Stock price would translate into the value of derivative instruments such as PureCycle Options and Warrants."[274]  Dr. Cain's assertion on such "translation" of inflation, however, relies on the premise of well-functioning and efficient markets for the warrants and options, as well as for the stock.  To begin, given the numerous flaws in Dr. Cain's analysis of market efficiency for the Company's stock, as discussed in **Section VII.C** and **Section VII.D** above, he has no reliable basis to make such a claim.

137.    Dr. Cain further states that, even though he believes he can infer inflation for the Company's warrants and options, he nevertheless conducts a "further analysis to demonstrate the cause-and-effect relationship between PureCycle's Common Stock price and PureCycle Options and Warrants prices throughout the Class Period."[275]  Specifically, as discussed below, for both warrants and options Dr. Cain evaluates whether price movements for a subset of the securities were directionally consistent with the common stock for two dozen days on which the common stock exhibited statistically significant residual returns.  Based on such limited evidence, Dr. Cain then concludes that the warrants and options "co-moved with the PureCycle Common Stock in a manner consistent with that expected in an efficient market during the Class Period."[276]  In essence, Dr. Cain appears to conclude that if the prices of the Company's warrants and a subset of PureCycle's options moved in the same direction as the common stock on days with large residual returns, efficiency can be demonstrated for the warrants and *all* the options *throughout* the Proposed Class Period.[277]

138.    Supposing, for the sake of argument, Dr. Cain had demonstrated market efficiency for certain options on certain dates (although he has not), it still does not mean market efficiency for related securities (*e.g.*, options with the same underlying stock but different strike prices and expiry dates) can be automatically assumed without any empirical analysis.  As I explain

---

[274] Cain Report, ¶ 86.
[275] Cain Report, ¶ 86.
[276] Cain Report, ¶¶ 89, 91.
[277] Cain Report, ¶¶ 89, 91.

below, different options exhibited markedly different trading liquidity and price dynamics.
Therefore, market efficiency cannot be inferred and must be tested for each security in the
relevant time period.  Dr. Cain's cursory analysis for the warrants and options fails to
demonstrate the Company's warrants and options traded in efficient markets throughout the
Proposed Class Period.

> 1.    **Dr. Cain's Cursory Analysis of the Company's Warrants Is
>        Flawed and Cannot be Used to Support a Conclusion of Market
>        Efficiency**

139.    Dr. Cain conducts just *one* analysis of the Company's warrants in order to support his
conclusion that price movement in the warrants is "consistent with that expected in an
efficient market during the Class Period."[278]  In his sole analysis of the efficiency of the
warrants, Dr. Cain purportedly "test[s] for a cause-and-effect relationship between
PureCycle's Common Stock price and Warrant Price throughout the Class Period by
examining whether the price changes in the Warrants are directionally consistent" with the
price changes in the common stock.[279]  Using the results of his event study for the common
stock, Dr. Cain states that of the 24 dates when he finds statistically significant abnormal
stock returns for the common stock, "there were 22 dates (or 91.67%) on which the stock and
the Warrant prices changed in the same direction" and that "4 out of 5 out of the money
Warrant returns were also directionally consistent on the dates with significant abnormal
returns at the 95% level."[280]

140.    Based on this cursory comparison of the *direction* of stock and warrants price returns,
Dr. Cain concludes that the observed "pattern is consistent with the expected price co-
movements that tend to occur in efficient markets."[281]  Dr. Cain does not conduct an event
study or any other analysis of the warrants and provides no reliable support for why
consistency in the *direction* of price movements can be used as reliable evidence in support
of a "cause-and-effect" relationship for the warrants.

141.    Further, Dr. Cain does not analyze bid-ask spreads for the warrants, one of the
"additional" market efficiency factors he considers for the common stock.  As shown in
**Exhibit 16**, when analyzed using intraday data, Dr. Cain would have found that the average

---

[278] Cain Report, ¶ 89.
[279] Cain Report, ¶ 87.
[280] Cain Report, ¶ 88.
[281] Cain Report, ¶ 88.

and median daily bid-ask spreads for the warrants prior to the de-SPAC were 10.0% and
8.0%, respectively.[282]  Moreover, as shown in **Exhibit 17**, some days during the Proposed
Class Period had bid-ask spreads of over 30%.  While Dr. Cain provides no benchmark for
warrants bid-ask spreads (as he concludes efficiency of the warrants without even analyzing
this), he fails to consider whether bid-ask spreads of this size could impede market efficiency.

142.    In summary, Dr. Cain fails to address high trading costs for the warrants and the
potential implications for market efficiency.  His cursory analysis with respect to warrants
fails to reliably establish that the warrants traded in an efficient market throughout the
Proposed Class Period.

> **2.    Dr. Cain's Cursory Analysis of Options Fails to Show That His
> Results, Based on the Most Liquid and Actively-Traded Options,
> Support a Conclusion of Market Efficiency for All PureCycle
> Options**

143.    As with the warrants, Dr. Cain offers a single analysis that he claims demonstrates
that PureCycle options traded in an efficient market throughout the Proposed Class Period.
The sole analysis he conducts for PureCycle options is cursory and merely assesses the
direction of price movements on a handful of days.  For the single analysis Dr. Cain
undertakes with respect to options efficiency, he analyzes the five trading dates on which
PureCycle options traded and his common stock event study shows statistically significant
residual returns.[283]  For these five days he reports "three different option series based on
options that:  a) have strike prices nearest the prior day's closing stock price, and b) are the
nearest to expiration," and finds that "all 30 call and put option series experienced price
movements that are consistent with the underlying stock price movements."[284]  He concludes,
based on this cursory comparison of the direction of stock and options price returns for only
three call options and three put options each on only five dates, that his "finding provides
further support for the conclusion that the Options traded in an efficient market throughout
the Class Period."[285]

144.    Dr. Cain's analysis encompasses only a small sample of option series.  Dr. Cain states
in his report that "PureCycle's Common Stock had 166,403 call option contracts and 64,176

---

[282] The average and median daily bid-ask spread after the de-SPAC were 11.6% and 10.4%, respectively.
[283] Dr. Cain's event study model for PureCycle stock has 24 dates during the Proposed Class Period with
statistically significant residual returns, but only five out of these 24 dates overlap with PureCycle options trading
data, which starts on April 7, 2021 according to data from *iVolatility*.  *See* Cain Report, ¶¶ 88, 91.
[284] Cain Report, ¶ 91.
[285] Cain Report, ¶ 91.

put option contracts traded during the Class Period."[286]  While these numbers represent the
total volume of contracts traded across all option series and all days during the Proposed
Class Period, he only analyzes one day each (out of the more than seven months from the first
day with reported options trading data on April 7, 2021 through the end of the Proposed Class
Period) for 30 option series (out of 260 option series traded during the Proposed Class
Period[287]), which represents only roughly 4% of option contracts traded.[288]  As such, Dr. Cain
fails to show that any conclusion he could potentially reach on market efficiency based on the
small sample of options he analyzes can be extended to the markets for *all* of PureCycle's
options.

145.    Moreover, even for the 30 option series he analyzes, Dr. Cain fails to provide any
reliable support for why consistency in the direction of common stock and option price
movements provides reliable evidence for market efficiency with respect to options.  He does
not conduct an event study or any other analysis to support his conclusion regarding "cause
and effect between PureCycle common stock and option prices."[289]

146.    Dr. Cain also does not show that the 30 option series he focuses on are representative
of the vast majority of option series available to be traded during the Proposed Class Period.
Specifically, his analysis focuses on option series that are closest to the money (*i.e.*, the
current stock prices being closest to the strike prices) and nearest to expiration, which are
generally the most liquid and actively-traded options.[290]

147.    Dr. Cain admitted in deposition that he makes an inference about the efficiency of *all*
PureCycle option series based on the small sample of options he analyzes (in a cursory way)
and irrespective of the trading characteristics of any option series he does not even analyze.[291]
However, his findings based on the most actively-traded option series cannot be reliably
extrapolated to the majority of other PureCycle option series, some of which had only sparse

---

[286] Cain Report, ¶ 76.  I note that according to *iVolatility* data, PureCycle had 166,401 call option contracts and
64,178 put option contracts traded during the Proposed Class Period.
[287] There are 260 option series with a positive trading volume in the *iVolatility* data on at least one trading day
during the Proposed Class Period.  Each distinct option series reflects a unique combination of strike price,
expiration date, and whether the option represents a call or a put.
[288] *iVolatility* data show that a total of 8,754 contracts were traded for the 30 option series on the dates that Dr.
Cain analyzes.  8,754 / (166,403 + 64,176) = 4%.
[289] Cain Report, p. 34.
[290] S. Natenberg (1994), *Option Volatility & Pricing: Advanced Trading Strategies and Techniques*, McGraw-Hill,
p. 197 ("The most liquid options in any market are those which are short-term and which are either at- or slightly
out-of-the-money.").  *See also* M. Brenner, R. Eldor and S. Hauser (2001), "The Price of Options Illiquidity," *The
Journal of Finance*, 56(2), pp. 789–805 at p. 792 ("ATM options are more liquid than away from the money[.]"); T.
G. Andersen, N. Fusari and V. Todorov (2017), "Short-Term Market Risks Implied by Weekly Options," *The
Journal of Finance*, 72(3), pp. 1335–1386 at p. 1335.
[291] Cain Deposition, 232:2–9 ("Q. But your findings, your finding of market efficiency for the options applies to all
options, all option series, regardless of how active -- regardless of differences in how actively each particular
option series were trading? A. That's correct.").

trading and much higher transaction costs in the form of wide bid-ask spreads over the Proposed Class Period.

148.     Dr. Cain does not address the lack of active trading for the majority of PureCycle option series over the Proposed Class Period.  To illustrate this, I calculate for each option series the number of days on which the option was traded (*i.e.*, with a positive volume) as a percentage of days on which it was available to be traded (*i.e.*, with daily data available) over the Proposed Class Period.  **Exhibit 18** summarizes the results.  Of the 260 option series that were traded during the Proposed Class Period, over half were traded for up to 25% of days on which they were available to be traded, indicating that the vast majority of option series available to be traded during the Proposed Class Period were very thinly traded.  In contrast, less than 10% of option series were traded for more than 75% of days on which they were available to be traded.

149.     This point is also relevant for the five days that Dr. Cain focuses on in his analysis. **Exhibit 19** shows that only 42%–85% of PureCycle option series available for trading during the Proposed Class Period were actually traded on each of these dates.  Moreover, of the five days on which Dr. Cain analyzes options trading, two are earnings days he classifies as News Days, *i.e.*, May 17, 2021 and August 12, 2021.[292]  Yet, as shown in **Exhibit 19**, only 42% and 44% of options were traded on these two News Days, respectively.  Therefore, many PureCycle option series were not traded at all on days that Dr. Cain claims to convey "company-specific information flow."[293]  Dr. Cain fails to address the implication of this lack of trading for his market efficiency opinion for such option series.

150.     Dr. Cain also does not analyze the bid-ask spreads for PureCycle option series, one of his "additional" factors for assessing market efficiency.  **Exhibit 20.A** shows the distribution of the bid-ask spread in dollar terms, while **Exhibit 20.B** shows the distribution of the bid-ask spread as a percentage of the mid-price across all option-date observations during the Proposed Class Period.  **Exhibit 20.B** shows that the median bid-ask spread is 11.5%.  In addition, the 90th percentile of the bid-ask spread is 56.9%, indicating that 10% of all options that were traded during the Proposed Class Period had bid-ask spreads higher than 56.9%. Dr. Cain fails to address this evidence or offer any explanation as to how the high transaction costs associated with PureCycle options trading represented by these wide bid-ask spreads

---

[292] Cain Report, Exhibit 6.
[293] Cain Report, ¶ 46.

can be consistent with his conclusion that the markets for all PureCycle option series were
efficient.

151.    In summary, PureCycle options exhibited wide dispersion of trading patterns and bid-
ask spreads.  Dr. Cain does not address this and cannot reliably demonstrate market
efficiency for all the PureCycle options based on his cursory tests that focus on a very small
fraction of the most actively-traded option series.

## VIII.  The Alleged Misrepresentations Did Not Increase the Company's Stock Price on the Four Alleged Misrepresentation Dates

152.    According to the Second Amended Complaint the Proposed Class Period begins
November 16, 2020, when "ROCH and PureCycle announced that PureCycle would become
a publicly traded company via an agreement and plan of merger with ROCH."[294]  My
understanding is that Plaintiffs' liability theory as plead implies that the Alleged
Misrepresentations on November 16, 2020 *created* inflation in ROCH's stock price.  Indeed,
Plaintiffs claim that the allegedly "false statements … artificially inflated the prices of
PureCycle securities during the Class Period."[295]

153.    As a matter of economics, any information about the private company PureCycle
would not be expected to be reflected in the price of ROCH's stock prior to the
announcement of the Business Combination.  Thus, based on my understanding of Plaintiffs'
theory, inflation could not exist in the price of ROCH stock before the Business Combination
announcement and had to enter into the Company's stock price on the first day of the
Proposed Class Period.[296,297]

154.    For purposes of this report, I was asked to assess whether the Alleged
Misrepresentations caused ROCH and, later, PureCycle's stock price to be inflated when the

---

[294] Second Amended Complaint, ¶ 53.
[295] Second Amended Complaint, ¶ 28.
[296] I searched Factiva public press for any mention of a business combination between ROCH and the private company PureCycle prior to the announcement of the Business Combination on November 16, 2020.  I identified one article discussing a potential business combination.  Specifically, on October 30, 2020 a Bloomberg article reported that the private company PureCycle was "in talks to go public through a merger with" ROCH.  *See* "PureCycle Technologies Said in Talks to Go Public Via Roth SPAC," *Bloomberg*, October 30, 2020, available at https://www.bloomberg.com/news/articles/2020-10-30/purecycle-technologies-said-in-talks-to-go-public-via-roth-spac.  The residual return in ROCH's stock price is not statistically significant at the 95% confidence level on October 30, 2020 using Dr. Cain's event study methodology (*i.e.*, a regression using his market and industry indices and data from all trading days up to that date).  Even assuming, for the sake of argument, that the price impact from the news was not immediate, I found that the residual return on ROCH's stock price is also not statistically significant at the 95% confidence level for the five trading days after October 30, 2020.
[297] The transaction terms and proposed financing for the Business Combination were disclosed in the press release and investor presentation on November 16, 2020.  *See* PureCycle November 2020 Press Release; ROCH Form 8-K Exhibit 99.2.

Alleged Misrepresentations were made, in the event that the markets for the stocks are found to be efficient throughout the Proposed Class Period.[298]  As discussed in previous sections, ROCH's stock price could not trade significantly below $10 prior to the de-SPAC if the market for the stock is efficient: if the price declines substantially below $10, arbitrageurs would be incentivized to purchase the shares and eventually redeem them for approximately $10, which in turn would push the price higher to eliminate such a profit opportunity.[299-300] By implication, the but-for price (*i.e.*, the price that would have prevailed if the alleged truth had been disclosed) cannot be significantly below $10 prior to the de-SPAC if the market for the stock is found to be efficient.  Therefore, as a matter of economics, ROCH's stock price would have needed to increase above the but-for price (*i.e.*, above $10) on the first day of the Proposed Class Period for the Alleged Misrepresentations to have "artificially inflated the prices of PureCycle securities" from the start of the Proposed Class Period, as Plaintiffs claim.[301]  From the perspective of a financial economist, evaluating this claim requires evidence of a stock price increase on November 16, 2020 that is statistically significant.

155.    As discussed in **Section VIII.A**, I find that there is no evidence that the Alleged Misrepresentations impacted ROCH's stock price on November 16, 2020 or ROCH/PureCycle's stock price on the other dates that the Alleged Misrepresentations were made (*i.e.*, none of the Alleged Misrepresentation Dates are associated with statistically significant price increases).[302]  As noted in **Section VIII.B**, given the lack of evidence of an impact on ROCH/PureCycle's stock price from the Alleged Misrepresentations that purportedly would have *created* inflation during the Proposed Class Period, price declines on the alleged corrective disclosure dates cannot serve as reliable evidence of such inflation dissipating.

---

[298] As discussed in **Section VII**, Dr. Cain fails to establish market efficiency for ROCH common stock prior to the de-SPAC and fails to demonstrate the markets for the Company's warrants and options was efficient throughout the Proposed Class Period.

[299] As discussed previously, ROCH's stock consistently traded around $10 prior to the announcement of the Business Combination with PureCycle (see **Exhibit 1**).  ROCH's common stock price was $10.10 at the close of trading on November 13, 2020, the last trading day before the announcement of the Business Combination and start of the Proposed Class Period.

[300] Remarkably, despite stating that he has "learned more and more about SPACs with each case that [he's] worked on," Dr. Cain stated at deposition that the downside protection to investors from being able to redeem their shares for $10 prior to the de-SPAC is "not a question that [he's] researched or formed an opinion on generally" and the only analysis in his report that considers the redemption option is his discussion of 14(a) damages.  *See* Cain Deposition, 40:4–24, 154:16–20.

[301] Second Amended Complaint, ¶ 28.

[302] As discussed below, for Alleged Misrepresentations that occur after market hours or on weekends, the relevant impact date is the following trading date.

### A.    The Alleged Misrepresentations Were Not Associated with Statistically Significant Price Increases

156.    To assess whether the Alleged Misrepresentations impacted the price of ROCH/PureCycle's stock on the dates they were made, I performed an event study for the common stock on each date that Plaintiffs allege that misrepresentations were made. Specifically, as discussed below, using the regression model described in **Section VI.C**, I analyzed the ROCH/PureCycle's residual returns on the four Alleged Misrepresentation Dates and found that on all four Alleged Misrepresentation Dates residual returns for the common stock are not statistically significant.[303]

157.    As noted above, I was asked to assess whether the Alleged Misrepresentations caused ROCH or, later, PureCycle's stock price to be inflated, if the markets for the stocks are found to be efficient.  In an efficient market, new, value-relevant information should be reflected fully and quickly in the stock price.[304]  Thus, the impact of the Alleged Misrepresentations, if any, on the stock price can be assessed based on the stock price return by the end of the relevant trading day.  However, even assuming, for the sake of argument, that the price impact from the Alleged Misrepresentations might not have been immediate, I find that for each of the four Alleged Misrepresentation Dates neither the Alleged Misrepresentation Date nor the five subsequent trading dates are associated with statistically significant residual returns.

158.    As discussed below, I also reviewed news about the Company that came to market on each Alleged Misrepresentation Date.  Specifically, for each Alleged Misrepresentation Date: (1) I searched for any ROCH or PureCycle SEC filings and PureCycle press releases; (2) I reviewed public press related to ROCH or PureCycle;[305] and (3) I reviewed available analyst reports (if any).  Based on this review I did not identify negative news that could have

---

[303] I understand that Plaintiffs previously alleged misrepresentations on March 18, 2021 but no longer include this as an Alleged Misrepresentation Date in the Second Amended Complaint.  *See* Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *William C. Theodore, Individually and on Behalf of All Other Similarly Situated v. PureCycle Technologies, Inc., Michael Otworth, Michael E. Dee, David Brenner, Byron Roth and Tasmin Ettefagh*, United States District Court Middle District of Florida, Case No. 6:21-cv-809-PGB-GJK, September 28, 2021, ¶¶ 51–54; Second Amended Complaint, ¶¶ 53–74.

[304] In terms of "quickly," academic evidence suggests that stock prices should react to the information within a trading day.  *See* J. T. Greene and S. G. Watts (1996), "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management*, 25(1), pp. 19–42; J. A. Busse and T. C. Green (2002), "Market Efficiency in Real Time," *Journal of Financial Economics*, 65(3), pp. 415–437.

[305] Based on a Factiva search for press with the words "PureCycle Tech*" or "Roth CH" included, or associated with the company code PCT and the Factiva indexing code for Roth CH Acquisition Co., and with an impact date of the Alleged Misrepresentations (*i.e.*, articles published between market close of the trading day prior to the impact date and market close of the impact date).

confounded a potential statistically significant positive impact of the Alleged
Misrepresentations (if any) on any of the Alleged Misrepresentation Dates.

159.    Therefore, assuming the markets for ROCH and PureCycle's stocks are found to be
efficient during the respective periods, I did not find evidence that the Alleged
Misrepresentations impacted ROCH or PureCycle's stock price on the dates that the Alleged
Misrepresentations were made (*i.e.*, none of the Alleged Misrepresentation Dates are
associated with statistically significant price increases).

### 1.      November 16, 2020

160.    On November 16, 2020, the first day of the Proposed Class Period, Plaintiffs allege
misrepresentations contained in: (1) a press release announcing the Business Combination
between ROCH and the private company PureCycle;[306] (2) a webinar by the private company
PureCycle discussing the proposed transaction;[307] and (3) a preliminary proxy statement filed
with the SEC containing the transcript of the webinar.[308]  The press release and presentation
became public before the start of regular trading hours on November 16, 2020, while the
preliminary proxy statement was filed shortly after the close of regular trading that day.[309]

161.    Plaintiffs allege the following misrepresentations on November 16, 2020 about the
value of PureCycle's patent and recycled polypropylene:

> In the press release, Defendants represented that PureCycle's method
> to recycle waste polypropylene into virgin-like resin "is both more
> cost-efficient and environmentally sustainable than the traditional
> manufacturing process of producing virgin polypropylene, utilizing
> approximately 75% less energy. PureCycle's Ultra-Pure Recycled
> Polypropylene ("UPRP") has nearly identical properties and
> applicability for reuse as virgin polypropylene."[310]
>
> In the presentation, Defendants Otworth, Dee, and Brenner also
> highlighted the purported value of the Company's technology and
> intellectual property rights, stating, in pertinent part that PureCycle's
> process is, "the only proven and economically-viable method of
> recycling polypropylene to virgin-quality" and that "no other

---

[306] Second Amended Complaint, ¶ 55; PureCycle November 2020 Press Release.
[307] Second Amended Complaint, ¶ 56.  A link to the webinar was included in the PureCycle November 2020
Press Release, and the accompanying slide deck was filed on the same date with the SEC as an exhibit to a
Form 8-K.  *See* PureCycle November 2020 Press Release; ROCH Form 8-K Exhibit 99.2.
[308] Second Amended Complaint, ¶¶ 60–61; ROCH Form DEFA14A.
[309] "Form DEFA14A Filing Detail," U.S. Securities and Exchange Commission, available at
https://www.sec.gov/Archives/edgar/data/1796303/000110465920125779/0001104659-20-125779-index.htm;
PureCycle November 2020 Press Release.
[310] Second Amended Complaint, ¶ 53; PureCycle November 2020 Press Release.

technologies can efficiently address polypropylene recycling at scale."[311]

In the presentation, Defendant Otworth stated, in relevant part: "And so, as I said, customers can use our resin, they can use it interchangeably with virgin resin, and they can make, you know, the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today."[312]

162.    Plaintiffs further allege that the November 16, 2020 press release "touted the experience of PureCycle's management team," stating:

PureCycle is retaining its experienced management team, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has over 23 years of experience leading and scaling early-stage companies. Mr. Brenner was PureCycle's first hire and has led PureCycle's commercial expansion over the last four years. Mr. Dee spent nearly three decades in public markets, corporate finance, private equity and M&A in senior roles at Morgan Stanley, Temasek Holdings and the Asian Infrastructure Investment Bank.[313]

163.    According to Plaintiffs, the November 16, 2020 slide presentation "emphasized the purportedly experienced management team":

Mike Otworth: Chief Executive Officer

- 23+ years of experience leading and scaling early-stage companies

- Seasoned entrepreneur with proven track record of founding, capitalizing start-ups

Michael Dee: Chief Financial Officer

- Nearly 3 decades of public markets, corporate finance, private equity and M&A experience

- Former CFO of Graf Industrial

David Brenner: Chief Commercial Officer

- 10+ years of experience leading transformational projects across a wide range of industries

- First PureCycle hire; developed and implemented offtake and feedstock strategy[314]

---

[311] Second Amended Complaint, ¶ 58; ROCH Form 8-K Exhibit 99.2.
[312] Second Amended Complaint, ¶ 60; ROCH Form DEFA14A.
[313] Second Amended Complaint, ¶ 55; PureCycle November 2020 Press Release.
[314] Second Amended Complaint, ¶ 56; ROCH Form 8-K Exhibit 99.2.

164.    As discussed above, my understanding is that Plaintiffs' theory of liability implies that the Alleged Misrepresentations on November 16, 2020 *created* (rather than maintained) inflation in ROCH's stock price.  Indeed, information about PureCycle's recycling technology and management team would not be expected to have been reflected in the price of *ROCH* stock prior to November 16, 2020 (or any other public disclosure that would cause investors to connect ROCH with the private company PureCycle).

165.    Moreover, as discussed above, as a matter of economics, given ROCH's stock price would not have been significantly below $10 in the absence of the Alleged Misrepresentations (*i.e.*, the "but for" price would remain approximately $10), ROCH's stock price would have needed to increase above $10 on the first day of the Proposed Class Period for the Alleged Misrepresentations to have purportedly "artificially inflated the prices of PureCycle securities" from the start of the Proposed Class Period.[315]

166.    Despite this, results from my event study show that information about the Company that came to market on November 16, 2020 was not associated with a statistically significant price increase.  ROCH's stock price increased from a closing price of $10.10 on November 13, 2020 to a closing price of $10.50 on November 16, 2020, an increase of 3.96%.  ROCH's residual return was 1.32%, after controlling for market and industry movements, and was *not* statistically significant at the 95% confidence level, as shown in **Exhibit 21**.[316]  Thus, from an economic perspective, the information released on November 16, 2020, including the Alleged Misrepresentations, did not cause ROCH's stock price to increase.

167.    In an efficient market, new, value-relevant information should be reflected fully and quickly in the stock price.  However, even assuming, for the sake of argument, that the price impact from the Alleged Misrepresentations might not have been immediate, I show in **Exhibit 21** that ROCH's residual return was also not statistically significant at the 95% confidence level using my baseline regression model on November 16, 2020 *or* the five subsequent trading days.  As shown in **Exhibit 22** and **Exhibit 23**, this is also the case using the alternative regression models I described in **Section VI.C**.

168.    I note that Dr. Cain reports that the residual return for ROCH's common stock on November 16, 2020 is statistically significant in his event study.[317]  However, this is an

---

[315] Second Amended Complaint, ¶ 28.
[316] As noted above, the preliminary prospectus was filed after hours on November 16, 2020.  The residual return on November 17, 2020 as well as the two-day return from close on November 15, 2020 to November 17, 2020 were not statistically significant.
[317] Cain Report, Exhibit 6.

artifact of Dr. Cain's mis-specified regression model, which renders his results unreliable.  As
discussed in **Section VII.C**, Dr. Cain's model combines data from prior to the Proposed
Class Period (when ROCH was a blank check company and the Business Combination with
the private company PureCycle had not been announced) with data from the Proposed Class
Period, which results in spurious and unreliable conclusions.  Notably, as shown in **Exhibit
11**, the residual return for ROCH's stock price on November 16, 2020 is *not* statistically
significant at the 95% confidence level using the estimation window that Dr. Cain has
previously described as "common practice" or approaches he has used in cases involving
SPACs.  This underscores how Dr. Cain's result in this matter is driven by his choice of an
ill-specified regression model that is also inconsistent with approaches he used in the past.

169.    Furthermore, I identified no confounding news between market close on November
13, 2020 and market close on November 16, 2020 that would have otherwise obscured a
positive, statistically significant stock price reaction.  Several public press articles reported on
the combination of ROCH and the private company PureCycle on November 16, 2020.[318]  I
did not identify any analyst reports published during this period.

### 2.    November 20, 2020

170.    Plaintiffs allege further misrepresentations by Defendants on November 20, 2020 in
ROCH's Form S-4 Registration Statement.[319]  The filing was submitted after the close of
regular trading on Friday November 20, 2020.[320]

171.    Plaintiffs allege the following misrepresentations on November 20, 2020 about the
value of PureCycle's patent and recycled polypropylene:

> Defendants called PureCycle's technology "proven" to "convert[]
> waste polypropylene feedstock into UPRP pellets with similar
> characteristics to virgin polypropylene." The Registration Statement

---

[318] *See, e.g.*, PureCycle November 2020 Press Release; "Roth CH Adds Recycling Specialist PureCycle," *The Deal*, November 16, 2020; "PureCycle Technologies to Merge with Roth CH Acquisition I," *Financial Deals Tracker*, November 16, 2020.  ROCH filed with the SEC its Form 10-Q for the third quarter of 2020 on November 13, 2020 after the market closed.  Public press did not comment on this filing.  Because the preliminary proxy statement, one source of the Alleged Misrepresentations on November 16, 2020, was filed after the close of regular trading hours that day, I also examined potential negative confounding news on November 17, 2020 and did not identify any that would have otherwise obscured a positive, statistically significant stock price reaction. One public press article that became public on November 17, 2020 reported that ROCH was being investigated by a law firm in relation to its business combination with the private company PureCycle.  Because this article was published at 20:26 ET (01:26 GMT of November 18, 2020) after the market closed, it would not have impacted the daily stock return on November 17, 2020.  *See* "SHAREHOLDER ALERT: WeissLaw LLP Investigates Roth CH Acquisition I Co.," WeissLaw Press Release, November 17, 2020.
[319] Second Amended Complaint, ¶¶ 63, 65; ROCH Parent Corp Form S-4.
[320] "Form S-4 Filing Detail," U.S. Securities and Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1830033/000110465920128027/0001104659-20-128027-index.htm.

went on to say, in relevant part, that: "This patented process was developed by P&G over the course of eight years and has been refined by PCT over the past five years with more than 350 laboratory tests and with over 1,000 pounds of UPRP produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019. In addition, PCT's purification process and UPRP quality have been validated by independent technical consultants and many of PCT's strategic partners and initial customers."[321]

In the Registration Statement, Defendants also touted PureCycle's use of a "broader range of feedstock" to make "virgin-quality UPRP pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products."[322]

172.     Prior to the announcement of the proposed Business Combination with ROCH, the private company PureCycle and P&G had made public statements about its technology. For example, as far back as 2018, P&G Director Dr. John Layman claimed that the at-issue recycling technology "offers the recycling industry a cost-effective method to produce virgin-like recycled polymers without trade-offs in performance."[323,324] Information related to the management team's prior professional experience was also publicly available before the Proposed Class Period.[325] Indeed, as shown in **Exhibit 24**, there were numerous public disclosures by the private company PureCycle, P&G, and third parties prior to the Proposed Class Period related to the statements that Plaintiffs describe in the Second Amended Complaint as Alleged Misrepresentations. As discussed above, any information about the private company PureCycle would not be expected to be reflected in the price of ROCH's stock prior to the announcement of the Business Combination (or any other public disclosure

---

[321] Second Amended Complaint, ¶ 63; ROCH Parent Corp Form S-4.

[322] Second Amended Complaint, ¶ 65; ROCH Parent Corp Form S-4.

[323] Dr. Layman further stated "[t]his technology purifies recycled polypropylene back to a virgin-like polymer. It will remove colorants, odor and other contaminants from the recycled plastic, enabling the recycled plastic to be in nearly virgin-quality—which was not possible before." *See* "P&G's PureCycle Cleans Recycled PP to 'Near Virgin' Quality," *Packaging Digest*, April 18, 2018, available at https://www.packagingdigest.com/sustainability/p-g-s-purecycle-cleans-recycled-pp-to-near-virgin-quality.

[324] In 2017, the private company PureCycle announced that it would "restore used polypropylene (PP) plastic to 'virgin-like' quality with a recycling method that is one of a kind." *See* "PureCycle Technologies and P&G Introduce Technology That Enables Recycled Plastic to Be Nearly-New Quality," PureCycle Press Release, July 20, 2017. In October 2020, the CEO Otworth stated that "even in the most appearance-sensitive applications, you can use our resin interchangeably with virgin." *See* "PureCycle Technologies Raises $250M in Bonds," *Recycling Today*, October 9, 2020, available at https://www.recyclingtoday.com/news/purecycle-technologies-raises-250-million-bonds-ironton-ohio-plant/.

[325] *See, e.g.*, "Can Billion-Dollar Startups Be Created from Big Companies' Unused IP? Ex-Walgreens CEO Bets 'Yes,'" *Forbes*, February 16, 2018, available at https://www.forbes.com/sites/amyfeldman/2018/02/16/can-billion-dollar-startups-be-created-from-big-companies-unused-ip-ex-walgreens-ceo-bets-yes/; Graf Industrial Corp, Form DEF14A, filed March 27, 2020; "Wasson Enterprise and Innventure Form New Joint Venture to Commercialize Innovative Technologies," Innventure Press Release, April 21, 2017.

that would cause investors to connect ROCH with the private company PureCycle), but would be expected to be reflected quickly in the price of ROCH's stock upon announcement of the Business Combination, if ROCH's stock traded in an efficient market. Notably, this would include information that was announced on November 16, 2020 as well as the information that had previously been made public about the topics Plaintiffs claim to be allegedly misrepresented.

173.    In an efficient market the repetition of information that had previously been disclosed would not be expected to be associated with a statistically significant stock price change. Thus, under Plaintiffs' liability theory, one would not expect the Alleged Misrepresentations on November 20, 2020 to impact ROCH's stock price (*i.e.*, be associated with a statistically significant positive increase). Notably, Dr. Cain does not classify November 20, 2020 as a "key date[] pertaining to communications" about ROCH or PureCycle.[326]

174.    Consistent with the Alleged Misrepresentations largely repeating previous statements (including those on November 16, 2020), results from my event study show that information about the Company that came to market on November 20, 2020 was not associated with a statistically significant price increase. ROCH's stock price increased from a closing price of $10.40 on November 20, 2020 to a closing price of $10.46 on November 23, 2020, an increase of 0.58%.[327] ROCH's residual return was -3.22%, after controlling for market and industry movements, and was *not* statistically significant at the 95% confidence level.[328]

175.    Moreover, while new, value-relevant information should be reflected fully and quickly in the stock price in an efficient market, even assuming, for the sake of argument, that the price impact from the Alleged Misrepresentations might not have been immediate, ROCH's residual return was also not statistically significant at the 95% confidence level on the five trading days subsequent to November 23, 2020, as shown in **Exhibit 21** to **Exhibit 23**.

176.    Furthermore, I did not identify confounding news between market close on November 20, 2020 and market close on November 23, 2020 that would have otherwise obscured a positive, statistically significant stock price reaction. Public press during this period reported on the combination of ROCH and the private company PureCycle and the anticipated listing

---

[326] Cain Report, ¶ 47, Exhibit 6.
[327] As noted above, the disclosure at issue was made after the end of regular trading on November 20, 2020, and I thus analyze the stock price return from close on Friday, November 20, 2020 to close on Monday, November 23, 2020.
[328] The residual return on this date is also not statistically significant at the 95% confidence level in Dr. Cain's event study. *See* CIECKO000322.xlsx.

of PureCycle's stock on NASDAQ.[329]  I am not aware of any analyst reports published or any
SEC filings made by ROCH or the private company PureCycle during this period apart from
the Form S-4 Registration Statement filed by ROCH containing the Alleged
Misrepresentations.

### 3.    February 12, 2021

177.    Plaintiffs allege further misrepresentations in the ROCH amended proxy statement
filed on February 12, 2021.[330]  The filing was submitted after the close of regular trading on
February 11, 2021.[331]

178.    Plaintiffs allege the following misrepresentations about the value of PureCycle's
patent and recycled polypropylene on February 12, 2021:

> Describing the ROCH Board's reasons for approval of the business
> combination, the Proxy emphasized the following as a significant
> factor on which the ROCH Board based its decision to recommend the
> SPAC transaction: Strong Technology Representing Significant
> Innovation: PCT's unique, patented process separates colors, odors and
> contaminants through a physical purification process (not involving
> chemical reactions), allowing for a broader range of feedstock than
> traditional recycling. This purification process and resulting product
> quality have been tested and validated by P&G, prospective customers
> and third party engineering specialists.[332]

> The Proxy Statement also touted that the output of its recycling
> process, stating that "UPRP is interchangeable with virgin
> polypropylene…"[333]

---

[329] *See, e.g.*, "PureCycle to Be Listed on NASDAQ," *The Ironton Tribune*, November 21, 2020; "Roth CH &
PureCycle Agree to Combine; Will Establish a New Holding Company," *Company Reports*, November 23, 2020.
Public press also reported on the investigation of ROCH by WeissLaw LLP on November 20, 2020, but this
represented old information already publicly available on November 17, 2020 after the market closed.  *See*
"SHAREHOLDER ALERT: WeissLaw LLP Investigates Roth CH Acquisition I Co.," WeissLaw Press Release,
November 17, 2020; "SHAREHOLDER ALERT: WeissLaw LLP Investigates Roth CH Acquisition I Co.,"
*iCrowdNewswire*, November 20, 2020.  Public press also reported on November 23, 2020 that Koch Modular was
awarded construction of PureCycle's facility, but this also represented old information already publicly available
on November 17, 2020.  *See* "Koch Modular Awarded Design and Construction of Plastics Recycling Plant,"
Koch Modular Press Release, November 17, 2020; "Koch Modular Gets Contract to Build PureCycle's New
Recycled PP Plant," *Company Reports*, November 23, 2020.
[330] Second Amended Complaint, ¶¶ 67–69, 71; ROCH Parent Corp Form 424B3.
[331] "Form 424B3 Filing Detail," U.S. Securities and Exchange Commission, available at
https://www.sec.gov/Archives/edgar/data/1830033/000110465921021011/0001104659-21-021011-index.htm.
[332] Second Amended Complaint, ¶ 67; ROCH Parent Corp Form 424B3.
[333] Second Amended Complaint, ¶ 68; ROCH Parent Corp Form 424B3.

The Proxy Statement further stated that the Company's process uses "significantly less energy and reduce[s] production costs as compared to virgin resin."[334]

179.    According to Plaintiffs the proxy statement also "once again flaunted the extensive experience of PureCycle's management team," stating:

> Strong Management Team: The PCT management team has broad experience across plastics manufacturing, plant development, technology, R&D, sales, marketing, accounting and finance. PCT Chief Executive Officer Mike Otworth has over 23 years' experience leading and scaling early stage companies, holding multiple senior management positions with a proven track record of founding and capitalizing startups. Chief Financial Officer Michael Dee was a senior executive at Morgan Stanley and has over 30 years of public markets, corporate finance, and M&A experience. Chief Science Officer John Scott holds a dual Ph.D. in Physics and Astrophysics, authored over 60 academic papers, and was the CEO of the XL TechGroup, the precursor company of Innventure. Chief Commercial Officer David Brenner brings over 15 years' experience leading transformational projects in a range of industries and was a Senior Manager at Deloitte prior to joining PCT. Director of Technology Jason Vititoe holds two product patents in polystyrene and decades of engineering leadership experience working for Americas Styrenics and Dow Chemical Company. Senior Director of Operations Chris Talarek has over 20 years of operations leadership at BP Oil, P&G, and Timbertech. Combined, the PCT executive team has over 100 years' experience leading operations and over 70 years operating equipment.[335]

180.    As shown in **Exhibit 24**, there were numerous public disclosures by the private company PureCycle, P&G, and third parties prior to the Proposed Class Period related to the statements that Plaintiffs describe in the Second Amended Complaint as Alleged Misrepresentations.  Indeed, with respect to management experience the Second Amended Complaint states that the February 12, 2021 proxy statement also "*once again* flaunted the extensive experience of PureCycle's management team."[336]  As discussed above, upon the announcement of the Business Combination, information about the private company PureCycle, including any information that had previously been made public about the topics Plaintiffs claim to be allegedly misrepresented, would be expected to be quickly reflected in the price of ROCH's stock in an efficient market.  Thereafter, the repetition of information

---

[334] Second Amended Complaint, ¶ 69; ROCH Parent Corp Form 424B3.
[335] Second Amended Complaint, ¶ 71; ROCH Parent Corp Form 424B3.
[336] Second Amended Complaint, ¶ 71 (emphasis added).

that had previously been disclosed, including on earlier Alleged Misrepresentation Dates, would not be expected to be associated with a statistically significant stock price change in an efficient market.  Notably, Dr. Cain does not classify February 12, 2021 as a "key date[] pertaining to communications" about ROCH or PureCycle.[337]

181.    Consistent with the Alleged Misrepresentations largely repeating previous statements (including those on the two earlier Alleged Misrepresentation Dates), results from my event study show that information about the Company that came to market on February 12, 2021 was not associated with a statistically significant price increase.  ROCH's stock price increased from a closing price of $26.73 on February 11, 2021, to a closing price of $29.04 on February 12, 2021, an increase of 8.64%.  The residual return was 6.32%, after controlling for market and industry movements, and was *not* statistically significant at the 95% confidence level.[338]  Thus, from an economic perspective, the information released on February 12, 2021, including the Alleged Misrepresentations, did not cause ROCH's stock price to increase.

182.    Moreover, while new, value-relevant information should be reflected fully and quickly in the stock price in an efficient market, even assuming, for the sake of argument, that the price impact from the Alleged Misrepresentations might not have been immediate, ROCH's residual return was also not statistically significant at the 95% confidence level on the five trading days subsequent to February 12, 2021, as shown in **Exhibit 21** to **Exhibit 23**.

183.    Furthermore, I did not identify negative confounding news between market close on February 11, 2021 and market close on February 12, 2021 that would have otherwise obscured a positive, statistically significant stock price reaction.[339]

---

[337] Cain Report, ¶ 47, Exhibit 6.

[338] The residual return on this date is also not statistically significant at the 95% confidence level in Dr. Cain's event study.  *See* CIECKO000322.xlsx.

[339] Review of Factiva public press shows no public press articles about ROCH or PureCycle published during this period.  One public press article that became public on February 12, 2021 reported that ROCH was being investigated by a law firm in relation to its business combination with the private company PureCycle.  Because this article was published at 21:00 ET (02:00 GMT of February 13, 2021) after the market closed, it would not have impacted the daily stock return on February 12, 2021.  *See* "SHAREHOLDER ALERT: Monteverde & Associates Continues to Investigate the Following Merger," Monteverde & Associates Press Release, February 12, 2021.  I am not aware of any analyst report issued during this period.  PureCycle filed with the SEC a Notice of Effectiveness on February 11, 2021 and a Confidential Treatment Order on February 12, 2021, neither of which appear to contain negative confounding information.  *See* Roth CH Acquisition I Co. Parent Corp., Notice of Effectiveness for from S-4, dated February 11, 2021; Roth CH Acquisition I Co. Parent Corp., Order Granting Confidential Treatment under the Securities Act of 1933, filed February 12, 2021.

4.    **April 21, 2021**

184.    Plaintiffs allege final misrepresentations on April 21, 2021 in a press release issued
after the Business Combination by the new public entity entitled "PureCycle's Tamsin
Ettefagh Facilitates Plastics Industry Dialogue About Polypropylene Recycling Solutions in
Light of U.S. Plastics Pact."[340]  The press release was made public before the start of regular
trading on April 21, 2021.[341]

185.    Plaintiffs allege the following misrepresentations about the value of PureCycle's
patent and recycled polypropylene:

> In this press release, Defendant Ettefagh stated "PureCycle is uniquely
> positioned to reduce the use of non-renewable virgin plastics and
> minimize negative environmental impacts." The press release further
> stated that its technology can "recycle waste PP into virgin-like
> recycled PP for a myriad of applications."[342]

186.    As shown in **Exhibit 24**, there were numerous public disclosures by the private
company PureCycle, P&G, and third parties prior to the Proposed Class Period related to the
statements that Plaintiffs describe in the Second Amended Complaint as Alleged
Misrepresentations.  As discussed above, upon the announcement of the Business
Combination, information about the private company PureCycle, including any information
that had previously been made public about the topics Plaintiffs claim to be allegedly
misrepresented, would be expected to be quickly reflected in the price of ROCH's stock in an
efficient market.  Thereafter, the repetition of information that had previously been disclosed,
including on earlier Alleged Misrepresentation Dates, would not be expected to be associated
with a statistically significant stock price change in an efficient market.  Notably, Dr. Cain
does not classify April 21, 2021 as a "key date[] pertaining to communications" about ROCH
or PureCycle.[343]

187.    Consistent with the Alleged Misrepresentations largely repeating previous statements
(including those on the three earlier Alleged Misrepresentation Dates), results from my event
study show that information about PureCycle that came to market on April 21, 2021 was not
associated with a statistically significant price increase.  PureCycle's stock price increased

---

[340] Second Amended Complaint, ¶ 73; PureCycle April 2021 Press Release.
[341] PureCycle April 2021 Press Release.
[342] Second Amended Complaint, ¶ 73; PureCycle April 2021 Press Release.
[343] Cain Report, ¶ 47, Exhibit 6.

from a closing price of $23.15 on April 20, 2021 to a closing price of $24.60 on April 21, 2021, an increase of 6.26%. PureCycle's residual return was 3.09%, after controlling for market and industry movements, and was *not* statistically significant at the 95% confidence level.[344] Thus, from an economic perspective, the information released on April 21, 2021, including the Alleged Misrepresentations, did not cause PureCycle's stock price to increase.

188.    Moreover, while new, value-relevant information should be reflected fully and quickly in the stock price in an efficient market, even assuming, for the sake of argument, that the price impact from the Alleged Misrepresentations might not have been immediate, PureCycle's residual return was also not statistically significant at the 95% confidence level on the five trading days subsequent to April 21, 2021, as shown in **Exhibit 21** to **Exhibit 23**.

189.    Furthermore, I did not identify any negative confounding news between market close on April 20, 2021 and market close on April 21, 2021 that would have otherwise obscured a positive, statistically significant stock price reaction.[345] A potential piece of *positive* confounding news during this period was that Roth Capital Partners initiated coverage of PureCycle with a Buy rating before the start of regular trading hours on April 21, 2021.[346] However, if anything, this potential positive confounding news would have increased the probability of finding a positive residual return on April 21, 2021. I am not aware of any SEC filing made by PureCycle during this period.

## B.    Price Declines on the Alleged Corrective Disclosure Dates Cannot Serve as Reliable Evidence of Inflation Dissipating

190.    As discussed above, my understanding is that Plaintiffs' liability theory as plead implies that the Alleged Misrepresentations *created* inflation in the Company's stock price. Moreover, as discussed above, as a matter of economics ROCH's stock price would have needed to increase above $10 on the first day of the Proposed Class Period for the Alleged Misrepresentations to have "artificially inflated the prices of PureCycle securities" from the start of the Proposed Class Period, as Plaintiffs claim.[347] Accordingly, one would expect to

---

[344] PureCycle's residual return on this date is also not statistically significant at the 95% confidence level in Dr. Cain's event study. *See* CIECKO000322.xlsx.
[345] Public press reported on PureCycle's press release containing the Alleged Misrepresentations. *See* PureCycle April 2021 Press Release.
[346] "PCT: Keeping the World Green with Polypropylene; Initiate Buy $45 Target," *Roth Capital Partners*, April 21, 2021, p. 1. Public press reported on this initiated coverage. *See* "PureCycle Technologies Initiated at Buy by Roth Capital," *Dow Jones Institutional News*, April 21, 2021; "08:13 EDT PureCycle Technologies Initiated with a Buy at Roth Capital Roth..." *Theflyonthewall.com*, April 21, 2021.
[347] Second Amended Complaint, ¶ 28.

see a direct impact from the Alleged Misrepresentations (if any) on the dates that they were made.

191.    Given my understanding of Plaintiffs' liability theory and the fact that I found no evidence that the Alleged Misrepresentations impacted the Company's stock price on the dates they were made, price declines on subsequent dates discussed in the Second Amended Complaint cannot serve as evidence of such inflation dissipating.  Price declines on the alleged corrective disclosure dates may instead reflect responses to other information that came to market on those dates (see discussion in **Section IX.C**).

## IX.    Dr. Cain Has Failed to Articulate a Damages Methodology That Can Measure Damages That Are Consistent with the Theory of Liability in This Case

192.    I understand that at the class certification stage, securities class action plaintiffs must establish the existence of a methodology for calculating class-wide damages that is consistent with the specific allegations in the case.  Accordingly, it is my understanding that any model that would ultimately be used to estimate damages should have the ability to calculate inflation stemming from the Alleged Misrepresentations and not from any other causes.  As discussed in this section, Dr. Cain has not shown that he can overcome issues specific to the allegations in this litigation and ultimately develop such a damages model.

193.    As discussed in **Section IX.A**, which summarizes Dr. Cain's report with respect to damages, Dr. Cain provides a generic description of his proposed damages approach.  He provides *examples* of potential approaches to measuring damages.  He fails to specify *which* approach he believes would be appropriate for estimating damages at a later stage of the case, let alone explain how he would tailor the generic approaches he describes in order to reliably address the specific features of the matter at hand in a manner that is consistent with Plaintiffs' theory of liability.

194.    As discussed in **Section IX.B**, to use an "out of pocket" measure of damages, as Dr. Cain proposes, he would need a measure of inflation on each day of the Proposed Class Period.  However, Dr. Cain fails to explain how he would reliably estimate inflation at the start of the Proposed Class Period; he assumes, without basis, that inflation could be estimated using price declines on the alleged corrective disclosure dates as part of a "back-casting" approach; and he fails to address additional flaws with his proposed back-casting approach.  As discussed in **Section IX.C**, Dr. Cain has failed to articulate how he will isolate

the impact of the "truth" being disclosed on the alleged corrective disclosure dates from other factors that may have impacted the Company's stock price, and his claim that any "confounding information" can be addressed with "various accepted methodologies" is entirely uninformative.[348]  **Section IX.D** discusses Section 10(b) damages for warrants and options.

### A.    Summary of Dr. Cain's Proposed Approach for Section 10(b) Common Stock Damages

195.    To assess Section 10(b) damages for the Company's common stock, Dr. Cain states that he will use the "out-of-pocket" method, which "calculates damages formulaically as the artificial inflation in the prices of [the Company's] securities at the time of purchase minus the artificial inflation in the prices of [the Company's] securities at the time of sale."[349]  Dr. Cain asserts that this "methodology has been "widely accepted for use across 10(b) matters."[350]  However, while Dr. Cain's discussion of this "out-of-pocket" approach describes what he would use at a later stage of the case as a *measure* of damages (*i.e.*, inflation at purchase less inflation at sale), it does not, in and of itself, describe a *methodology* for estimating damages (*i.e.*, how inflation could be calculated).

196.    With respect to the "quantification of artificial inflation," Dr. Cain asserts that such quantification would be "based on a detailed loss causation analysis" that he has "not been asked to perform … at this time."[351]  However, while I understand that Dr. Cain is not required to *implement* a damages methodology at this time, my understanding is that plaintiffs' experts are required at the class certification stage in securities class actions to articulate *how* they would estimate damages at a later stage of the case.

197.    Instead of articulating how he might be able to reliably estimate inflation in a manner consistent with Plaintiffs' theory of liability and the specific features of this case, Dr. Cain outlines a vague and generic smorgasbord of possible approaches.  As a starting point, while he does not state what methodology he *would* use at a later stage of the case, Dr. Cain states that event studies can "measure security price reactions to corrective disclosures which revealed the relevant truth" and can thereby "back-cast artificial inflation throughout a given

---

[348] Cain Report, ¶ 96.
[349] Cain Report, ¶ 93.  Dr. Cain states that he would apply the PSLRA "lookback" for securities purchased during the Proposed Class Period and retained at the end of the Proposed Class Period.  *See* Cain Report, ¶ 93.
[350] Cain Report, ¶ 93.
[351] Cain Report, ¶ 95.

class period."[352]  I understand Dr. Cain's use of the term "back-cast" to mean using stock price declines on the alleged corrective disclosure dates as a measure of inflation throughout the Proposed Class Period.

198.   To the extent there is information that "may be attributed to non-fraud related factors," Dr. Cain does not explain what methodology he would use but states that the impact of such confounding information "can be determined on a common, class-wide basis *using various accepted methodologies*."[353]  According to Dr. Cain, the "value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation."[354]

199.   Without stating which approach he would use in this matter, or why it would be appropriate given Plaintiffs' theory of liability, Dr. Cain then outlines three diverging alternative approaches that he states can be used to measure inflation over the course of the Proposed Class Period.  First he outlines, "constant dollar inflation," which "assumes that inflation equaled a constant dollar amount above the correct security price over the Class Period."[355]  Second he outlines, "constant percentage inflation," which "assumes that each price was inflated by a constant percentage amount above the correct security price over the Class Period."[356]  Third, without specifying how he would address such a situation, Dr. Cain observes that "[i]n other instances, artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements."[357]  Dr. Cain's assertion that inflation can be measured alternatively in a constant manner (constant dollar or constant percentage) or an unspecified varying manner essentially leaves the door open to *any* inflation approach (*i.e.*, constant or time-varying) and could apply to *any* securities case, and he thus fails to articulate how he would approach the calculation of inflation in *this* case, in a manner consistent Plaintiffs' theory of liability.

200.   To be clear, my understanding is that plaintiff experts need not establish loss causation or calculate damages at this stage of the litigation, and I am not criticizing Dr. Cain for not having done so.  Rather, my point is that his vague and generic references to the standard tools of financial economics and "back-casting" do not represent a methodology capable of reliably measuring damages in a manner consistent with Plaintiffs' theory of liability in this

---

[352] Cain Report, ¶ 96, footnote 100.
[353] Cain Report, ¶ 96 (emphasis added).
[354] Cain Report, ¶ 96.
[355] Cain Report, ¶ 97.
[356] Cain Report, ¶ 97.
[357] Cain Report, ¶ 97.

matter. Dr. Cain fails to show that he has put forth a reliable damages methodology that can adequately address the various complications that I discuss in more detail below.

> **B.    Dr. Cain Has Not Articulated How He Will Derive a Reliable Measure of Inflation Throughout the Proposed Class Period**

201.    Dr. Cain fails to articulate a methodology that demonstrates how he would, at a later stage of the case, construct a reliable measure of inflation, consistent with Plaintiffs' theory of liability, throughout the Proposed Class Period. As noted above, Dr. Cain states that he will use the "out-of-pocket" method, which "calculates damages formulaically as the artificial inflation in the price of PureCycle securities at the time of purchase minus the artificial inflation in the prices of PureCycle securities at the time of sale."[358]

202.    In order to calculate damages as inflation at the time of purchase less inflation at the time of sale (*i.e.*, the "out-of-pocket" method Dr. Cain describes), Dr. Cain would require a measure of inflation *on each day* of the Proposed Class Period. As discussed in **Section IX.B.1**, however, Dr. Cain has failed to articulate how he will reliably measure inflation at the start of the Proposed Class Period, given the lack of statistically significant residual returns at the start of the Proposed Class Period. Moreover, as discussed in **Section IX.B.2**, given my understanding of Plaintiffs' liability theory and the fact that I found no evidence that the Alleged Misrepresentations impacted the Company's stock price on the dates they were made, Dr. Cain lacks a reliable basis to simply assume that inflation can be measured using the price declines observed on the alleged corrective disclosure dates.

203.    In **Section IX.B.3**, I discuss additional flaws with Dr. Cain's proposed back-casting approach. Using a constant dollar measure absent other adjustments implies, implausibly, that ROCH's stock price would have been negative at the start of the Proposed Class Period, but for the Alleged Misrepresentations. Further, using either a constant dollar or constant percentage inflation measure would imply, absent other adjustments, that ROCH's stock price would have traded substantially below $10 in the early part of the Proposed Class Period, but for the Alleged Misrepresentations, which is inconsistent with the fact that the shares could be redeemed at a price of approximately $10 at the time of the business consummation. A constant percentage inflation approach is additionally flawed because it would rest on the strong assumption that the value of the Alleged Misrepresentations was proportional to the value of the Company throughout the Proposed Class Period, yet Dr. Cain

---

[358] Cain Report, ¶ 93.

has failed to demonstrate that such an assumption is economically reasonable in this case. Finally, Dr. Cain's observation that inflation *could* evolve throughout the Proposed Class Period provides no insight into a methodology he would use to address the specific challenges in this case, including those discussed in this section.

### 1.    Dr. Cain Has Not Articulated How He Could Reliably Estimate Inflation at the Start of the Proposed Class Period

204.    As an initial matter, Dr. Cain has not articulated how he will be able to measure inflation consistent with Plaintiffs' theory of liability at the start of the Proposed Class Period. As discussed in **Section III**, Plaintiffs allege that the Proposed Class Period starts on November 16, 2020, when ROCH filed a de-SPAC prospectus with the SEC detailing the proposed Business Combination with the private company PureCycle.[359] Plaintiffs allege that the Company's stock price was inflated after this date as a result of misrepresentations regarding its management team's experience and the value of its patent and technology.[360] As discussed in **Section VIII**, my understanding is that Plaintiffs' liability theory implies that the Alleged Misrepresentations on November 16, 2020 *created* inflation in ROCH's stock. Any such inflationary impact of the Alleged Misrepresentations should have been quickly incorporated into ROCH's stock price if the market for ROCH's common stock was efficient, as Dr. Cain contends.[361] However, as discussed in **Section VIII.A**, the increase in ROCH's common stock price on November 16, 2020 was *not* statistically significant at the 95% confidence level. Moreover, ROCH and PureCycle's residual returns on the subsequent three Alleged Misrepresentation Dates were also not statistically significant. Given this fact pattern, Dr. Cain has not articulated how he would reliably estimate inflation that is consistent with both market efficiency and Plaintiffs' theory of liability.

### 2.    Dr. Cain Assumes, Without Basis, that Price Declines on the Alleged Corrective Disclosure Dates Can Be Used to Measure Inflation

205.    A back-casting approach, which is what Dr. Cain appears to propose to estimate inflation, would obscure the issue of how to estimate inflation at the start of the Proposed Class Period by *assuming* that inflation can be measured using the price declines on alleged

---

[359] Second Amended Complaint, ¶ 53.
[360] Second Amended Complaint, ¶¶ 54, 57, 105–106.
[361] Cain Report, ¶ 10.

corrective disclosure dates.  As discussed in **Section VIII.B**, however, if the misrepresentations are alleged to have *created* inflation at the start of the Proposed Class Period yet there is no evidence that the Alleged Misrepresentations impacted the Company's stock price on the dates they were made, subsequent price declines cannot serve as evidence of such inflation dissipating.  As such, Dr. Cain has no reliable basis to assume that the price declines on the alleged corrective disclosure dates can be used to derive inflation.

### 3.    Dr. Cain's Proposed Back-casting Approach Suffers from Multiple Other Flaws

206.    Even setting aside, for the sake of argument, the *fundamental* problem that price declines on the alleged corrective disclosure dates could not reliably be used to estimate inflation for the reasons discussed above, Dr. Cain's proposed back-casting approach suffers from multiple additional flaws.

207.    First, critically, using a constant dollar approach, absent other adjustments, could imply a negative stock price at the start of the Proposed Class Period.  Constant dollar inflation, which is one of the alternatives Dr. Cain puts forward, would assume "that inflation equaled a constant dollar amount above the correct security price over the Class Period."[362] **Exhibit 25** illustrates the implementation of a constant dollar measure of inflation throughout the Proposed Class Period using the residual price declines from Dr. Cain's event study, in dollar terms, on the alleged corrective disclosure dates.[363]  As shown in the exhibit, an implication of a constant dollar inflation measure using the residual returns from Dr. Cain's event study and absent other adjustments is that ROCH's stock price would be *negative* for the first two weeks of the Proposed Class Period, which is economically non-sensical.[364,365]

208.    Second, in suggesting constant dollar inflation as a potential approach, Dr. Cain fails to address a potential inconsistency between that approach and the economic structure of SPACs.  As shown in **Exhibit 25**, a constant dollar approach implies that, but for the Alleged

---

[362] Cain Report, ¶ 97.

[363] Dr. Cain states that his event study was conducted "to assist with the evaluation of market efficiency" and "not intended to quantify artificial inflation."  Thus, the use of residual returns from his event study in **Exhibit 25** is illustrative.  *See* Cain Report, footnote 99.

[364] This result could also be indicative of misestimated residual price declines in Dr. Cain's event study, due to an ill-specified regression model.

[365] If Dr. Cain would instead assume that inflation would be capped such that the stock price would be $0, and not negative, during this period, he would need to demonstrate that the ROCH's stock would have been *worthless* had the purported "truth" been revealed at the start of the Proposed Class Period.  He has not presented any evidence to support such an assumption.  Moreover, assuming that ROCH's stock price would have been $0 at the start of the Proposed Class Period is inconsistent with the fact that investors could have redeemed their shares at approximately $10 prior to the de-SPAC, as discussed in this section.

Misrepresentations, ROCH's stock price would have traded at a price substantially below $10 in the early part of the Proposed Class Period.  Because of the redemption feature of the SPAC, such an outcome is not possible in an efficient market since it would enable arbitrageurs to earn risk-free profits.  More specifically, as discussed in **Section V**, a feature specific to SPACs is that shareholders have the right to redeem their shares prior to the close of the business combination, typically at the offer price of $10 (which was the case for ROCH).  Given this redemption option, in an efficient market (and setting aside transaction costs), a price of approximately $10 should act as a floor for ROCH's stock price before the de-SPAC.  If the market is found to be efficient, as claimed by Plaintiffs and Dr. Cain, if the stock price dropped substantially below $10, arbitrageurs would have been incentivized to purchase the shares and then redeem them for approximately $10, which in turn would push the price higher to eliminate such a profit opportunity.

209.    Dr. Cain has provided no explanation regarding how the but-for price persistently being substantially below $10 before the de-SPAC (as illustrated in **Exhibit 25**) could be consistent with his own conclusion that the market for the stock was efficient.  In other words, absent the Alleged Misrepresentations, the stock price would have been at least $10 (setting aside transaction costs) before March 12, 2021, if the market for the stock was efficient—which is inconsistent with the stock price implied by a constant dollar inflation approach using the raw price declines on the alleged corrective disclosure dates.[366]  Moreover, absent any other adjustments, Dr. Cain's proposed constant dollar back-casting approach would overstate the level of any alleged inflation prior to March 12, 2021, when investors had the opportunity to redeem each of their shares for approximately $10.

210.    Dr. Cain alternatively proposes using constant percentage inflation, which would assume that "each price was inflated by a constant percentage amount above the correct security price over the Class Period."[367]  Similar to the constant dollar inflation approach, constant percentage inflation would also imply, absent other adjustments, that ROCH's stock price would have traded at a price substantially below $10 in the early part of the Proposed Class Period in the absence of Alleged Misrepresentations.  This is shown for constant percentage inflation in **Exhibit 26**, which uses the residual price declines from Dr. Cain's event study on the alleged corrective disclosure dates in percentage terms as an illustration.

---

[366] Holders of ROCH shares eligible to redeem their shares at the close of the Business Combination needed to seek a redemption at least two business days before the special meeting of shareholders on March 16, 2021. *See* ROCH Parent Corp Form 424B3, pp. 40, 42–43.
[367] Cain Report, ¶ 97.

As discussed above, this is inconsistent, as a matter of economics, with the fact that ROCH investors could have redeemed their shares at the time of the de-SPAC for approximately $10.

211.    Third, Dr. Cain's proposed approach of back-casting using constant percentage inflation is additionally flawed because it rests on an assumption that inflation is proportional to the Company's value.  Specifically, a constant percentage inflation approach would imply that the value of the Alleged Misrepresentations was exactly proportional to the value of the Company on *each day* of the Proposed Class Period.  Dr. Cain fails to articulate why such an assumption is justified, as a matter of economics, in this case, or how such an assumption is consistent with developments and circumstances of the Company, the industry, or the overall market during the Proposed Class Period.

212.    For example, with respect to the Alleged Misrepresentations regarding the value of PureCycle's patent and technology, Plaintiffs allege that the Company "failed to disclose the insufficient volume of, and high competition for, high quality feedstock to currently power PureCycle's recycling process in a cost efficient manner."[368]  A constant percentage inflation approach would imply that allegedly misrepresenting the quality of feedstock that the Company might be able to obtain would have caused the price of the Company's stock to be inflated by the same percentage on each day during the relevant period.  Dr. Cain fails to provide any economic basis or any other justification for such an assumption.  In particular, Dr. Cain has not explained how feedstock quality would impact PureCycle's earnings.  To the extent that high-quality feedstock may be more expensive to obtain and thus may increase the operating expenses of PureCycle, Dr. Cain has not shown why that would impact the value of the Company by *a constant percentage*.  Dr. Cain has also failed to show how potential changes in the market for and price of feedstock over time would map to a specific, constant proportion of Company value.

213.    By the same token, Dr. Cain has not shown how the impact of the Alleged Misrepresentations which purportedly concealed the fact that its technology was "unproven," "dangerous," and "not yet functional" and that "the patent underlying the technology is based on prior discoveries that never reached commercial scale"[369] could be mapped to a constant percentage of the value of the common stock.  Likewise, Dr. Cain has provided no economic basis or any other justification for linking the impact of management's prior experience, or

_____

[368] Second Amended Complaint, ¶ 66.
[369] Second Amended Complaint, ¶ 54.

lack thereof, to a constant percentage of the value of the stock.  In sum, Dr. Cain fails to show

that the value of the Alleged Misrepresentations related to either "management team's

experience" or "the value of the patent and the recycled polypropylene,"[370] in part or in

combination, was exactly or even approximately proportional to the Company's value during

the Proposed Class Period.[371]

214.   Finally, given these flaws with using constant dollar or constant percentage inflation

methods—and again abstracting from the fact that Dr. Cain fundamentally lacks basis for *any*

back-casting approach, as discussed above—Dr. Cain may emphasize that he, in fact,

describes three potential back-casting approaches to estimating inflation in his report.

Specifically, he notes, as an alternative to constant dollar or constant percentage inflation,

that "artificial inflation may have varied and could evolve throughout the Class Period based

on the timing of specific information or statements."[372]  However, Dr. Cain's offhand

observation that inflation *could* evolve throughout the Proposed Class Period provides no

insight into a methodology he would use to address the specific challenges in this case,

including those discussed in this section.  Dr. Cain ultimately fails to articulate how he will

derive a reliable measure of inflation throughout the Proposed Class Period.

### C.    Dr. Cain Has Not Articulated How He Will Isolate Damages Attributable Only to Plaintiffs' Theory of Liability

215.    As discussed above, Dr. Cain appears to suggest he would use a back-casting

approach to measure inflation.  He claims that to the extent there is any "confounding

information" on the alleged corrective disclosure dates that would need to be addressed in

using such an approach, such an adjustment could be made using "various accepted

methodologies."[373]  Dr. Cain does not outline what those "various accepted methodologies"

---

[370] Motion to Dismiss Order, pp. 6–7.

[371] Critically, Dr. Cain does not address how he would account for price declines unrelated to alleged corrective disclosures in his "constant percentage" approach.  Absent other adjustments, such an approach may include in a damages calculation price declines that are not connected to the amount of inflation that was removed due to the alleged corrective disclosures.  In particular, during any period in which the stock price trends downward during the Proposed Class Period, even if the downward movements are unrelated to the allegations, a "constant percentage" method would, by design, treat part of any such declines as damages, including price declines that occur prior to the alleged corrective disclosures.  As an illustration, PureCycle's stock price declined from approximately $26 on June 24, 2021 to $16 on August 12, 2021.  Assuming a constant percentage inflation band of 5%, inflation as of the June date would be $1.30 and inflation as of the August date would be $0.80.  Therefore, absent other adjustments, an investor who purchased at the June date and sold at the August date could be eligible for damages of $0.50 using the out-of-pocket method (*i.e.*, inflation at purchase less inflation at sale), even though Plaintiffs do not allege any price declines related to revelation of the alleged truth during this period.

[372] Cain Report, ¶ 97.

[373] Cain Report, ¶ 96.

are, let alone describe why they are appropriate to address the specific challenges that may arise in estimating damages in this case.[374]

216.    Dr. Cain's failure to articulate the "various accepted methodologies" he might use to account for confounding information is particularly relevant in light of other information that may have impacted the Company's stock price on the alleged corrective disclosure dates, and which Dr. Cain does not address.  In order to estimate damages consistent with Plaintiffs' theory of liability, Dr. Cain would need to isolate damages attributable only to that theory, and not to other factors.  Yet, as discussed in **Section IX.C.1**, Dr. Cain has not articulated how he will account for information that was already public prior to the Hindenburg Report and isolate the price impact, if any, of disclosure of the alleged truth that came to market on May 6, 2021 exclusive of any negative impact from non allegation-related information or discussions that would potentially have weighed negatively on the Company's stock price. Further, as discussed in **Section IX.C.2**, Dr. Cain has failed to articulate how he will isolate the price impact, if any, of the "truth" that Plaintiffs allege was revealed by news of the SEC fact-finding investigation on November 10, 2021 from other information unrelated to the allegations in the 10-Q filing.

217.    A related and additional challenge that Dr. Cain has not addressed is the potential need to estimate damages separately for different theories of liability.  As discussed in **Section III**, I understand that two categories of Alleged Misrepresentations remain actionable in this case, including Alleged Misrepresentations about the "management team's experience" on two of the four Alleged Misrepresentation Dates, and statements about "the value of the patent and the recycled polypropylene" on all four Alleged Misrepresentation Dates.[375]  Dr. Cain has not described a methodology capable of calculating damages for the two categories of misrepresentations separately, if the finder of fact finds liability for only one of the two remaining categories.  As discussed in **Section VI.B**, event studies are commonly used in financial economics and can be used to assess whether the totality of new information arriving to the market over a specific event window affected the stock price.

---

[374] In a separate paragraph of his report discussing the evolution of artificial inflation throughout the Proposed Class Period, Dr. Cain notes that "the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents."  *See* Cain Report, ¶ 97.  While he does not specify in his report, he may claim that these are the "various accepted methodologies" he has in mind for addressing confounding information on alleged corrective disclosure dates as part of a back-casting calculation, and indeed for addressing some of the flaws with back-casting discussed in **Section IX.B.3**.  If so, such vague and generic references to the standard tools of financial economics do not explain how those tools could be used to address the specific challenges in this case and do not represent a methodology capable of reliably measuring damages in a manner consistent with Plaintiffs' theory of liability in this matter.
[375] Motion to Dismiss Order, pp. 6–7.

However, an event study cannot answer the question of how a specific new piece of information arriving to the market among multiple pieces of new information at the same time caused the stock price to change.

       1.      **Dr. Cain Has Not Articulated How He Will Isolate the Impact of the "Truth" Allegedly Revealed by the Hindenburg Report**

218.    On May 6, 2021 shortly before the market opened, Hindenburg Research published a report critical of PureCycle.[376]  Plaintiffs allege that the Hindenburg Report revealed the "truth" about PureCycle management team's experience and the value of its patent and technology that had been concealed as a result of the Alleged Misrepresentations.[377]  As discussed below, the Hindenburg Report reflected, at least in part, information that was public prior to the release of the report, which would not be expected to impact the Company's stock price if the market for the common stock is found to be efficient.  In addition, the Hindenburg Report included excerpts of interviews with third parties, summarized its own negative opinion of the Company, and included discussions of topics that I understand are not alleged to have been misrepresented.

       a)      **The Hindenburg Report Drew on Publicly Available Information**

219.  As acknowledged in the Second Amended Complaint, the Hindenburg Report, in part, "is based on various public sources."[378]  In an efficient market repetition of information that had previously been publicly disclosed would not be expected to impact a company's stock price.  In particular, as discussed in **Section VI.A**, in an efficient market, trading by investors, especially so-called arbitrageurs, will quickly reflect public information because investors will be incentivized to take advantage of and trade on such information.  Notably, in an efficient market, information does not need to be widely disseminated or to be costless in

---

[376] Hindenburg Report.
[377] Second Amended Complaint, ¶¶ 76–82.
[378] Second Amended Complaint, ¶ 9.

order to be impounded into stock prices.  Competition among investors incentivizes arbitrageurs to search for and trade on value-relevant information.[379-380]

220.   I understand that the Court has summarized Plaintiffs' pleadings as alleging that four types of information were disclosed by the Hindenburg Report:

> PureCycle Inc.'s purported experienced management team previously caused six businesses to fail, had previously characterized rank speculation as financial projections to investors, and was only motivated to bring PureCycle Inc. public in order to obtain large bonuses of cash and tradable stock; (2) PureCycle Inc. faced much higher competition for high quality feedstock, a necessary input in the recycling process, than it had led investors to believe; (3) PureCycle Inc.'s patent is nowhere as valuable as it had led investors to believe as the patented process was not yet functional and was incapable of being scaled for commercial production as it had claimed; and (4) PureCycle Inc.'s licensed process could not be found in any peer-reviewed study.[381]

Below I discuss publicly available information for each of the four categories.  This information was publicly accessible during the Proposed Class Period, including to arbitrageurs who, in an efficient market, would have been incentivized to research and trade on any value-relevant information not reflected in the Company's price.[382]

221.   <u>First</u>, with respect to the claim that "PureCycle Inc.'s purported experienced management team previously caused six businesses to fail,"[383] the Hindenburg Report stated:

> PureCycle's Chairman/CEO and other associated executives collectively took 6 companies [(Chromavision Medical Systems, eMerge Interactive, AgCert, TyraTech, Inc., PetroAlgae, and XL TechGroup)] public prior to PureCycle.  All have failed, resulting in 2 bankruptcies, 3 delistings, and 1 acquisition after a ~95% decline.

---

[379] As examples, news articles from the *Wall Street Journal* or *Bloomberg,* academic articles, and securities analyst reports can require subscriptions or other out-of-pocket costs to access them.  To the extent such sources include information about the future prospects of a company not yet, for whatever reason, incorporated in the company's stock price, arbitrageurs have an incentive to access that information and rapidly buy (or sell) the stock (depending on the information), driving the price up (or down), as discussed in **Section VI.A**.
[380] In his discussion of market efficiency, Dr. Cain concludes that "[i]ndividual and institutional investors [] had access to publicly available information about PureCycle from a variety of sources during the Class Period."  *See* Cain Report, ¶ 35.
[381] Motion to Dismiss Order, pp. 4–5.
[382] In his discussion of market efficiency, Dr. Cain concludes that "PureCycle's Common Stock was widely held by institutional investors throughout the Class Period," who provide "similar benefits to market makers by supplying trading liquidity and informationally-efficient and informed trading."  *See* Cain Report, ¶ 39.
[383] Motion to Dismiss Order, pp. 4–5.

Over $760 million in public shareholder capital was incinerated in the process.[384]

222.    This information—which does not relate to PureCycle—had been public before the first Alleged Misrepresentation Date, and thus before the Proposed Class Period. Specifically, AgCert announced a bankruptcy filing on their website, after a vote of the board of directors on June 8, 2012.[385]  eMerge announced a Chapter 11 filing in a Form 8-K, filed on May 23, 2007.[386]  The delistings of Chromavision Medical Systems and PetroAlgae were publicly disclosed in Form 8-K filings with the SEC, filed on November 1, 2004[387] and March 7, 2011,[388] respectively.  XL TechGroup has been an inactive holding company since 2008 as publicly disclosed in a Form S-1 filing with the SEC.[389]  The acquisition of TyraTech, Inc. was publicly announced on November 5, 2018.[390]  Notably, the Hindenburg Report cites public websites to support its discussion of these companies and its view that PureCycle executives had "an uncanny track record of destroying public shareholder capital."[391]

---

[384] Hindenburg Report.

[385] "AgCert – Liquidated," AgCert, available at https://agcert.com/.  This information was publicly accessible at least as early as December 5, 2012.  *See* an archived version of the announcement, available at https://web.archive.org/web/20121205064321/https://agcert.com/.  The Hindenburg Report also noted that Bill Haskell, CEO of PureCycle's parent company, acted as the interim CEO of AgCert, which was publicly disclosed in a public press release prior to the Proposed Class Period.  *See* "AES and AgCert International Create Joint Venture to Reduce Greenhouse Gas Emissions," AES and AgCert Press Release, May 31, 2006.

[386] eMerge Interactive, Inc., Form 8-K, filed May 23, 2007.  The Hindenburg Report also noted that Dr. John Scott, PureCycle's Chief Science Officer and Director served as Chairman at eMerge.  This was publicly disclosed in an eMerge SEC Form 10-K filing prior to the Proposed Class Period.  *See* eMerge Interactive, Inc., Form 10-K, filed April 3, 2000, pp. 34, 39.

[387] ChromaVision Medical Systems, Inc., Form 8-K, filed November 1, 2004.  The Hindenburg Report also noted that Dr. John Scott, PureCycle's Chief Science Officer and Director, served as Chairman at ChromaVision.  This was publicly disclosed in a ChromaVision SEC Form S-1 filing prior to the Proposed Class Period.  *See* ChromaVision Medical Systems, Inc., Form S-1, filed April 30, 1997, p. 49.

[388] PetroAlgae Inc, Form 8-K, filed March 7, 2011.  The Hindenburg Report also noted that Dr. John Scott, PureCycle's Chief Science Officer and Director, served as CEO of PetroAlgae.  This was publicly disclosed in a PetroAlgae press release, issued February 9, 2012.  *See* "PetroAlgae Changes Name to Parabel," PetroAlgae Press Release, February 9, 2012.

[389] PetroAlgae Inc., Form S-1, filed August 11, 2010, p. 6.  The Hindenburg Report also noted that PureCycle Chief Science Office and Director Dr. John Scott served as co-founder and CEO of XL TechGroup and that Bill Haskell, CEO of PureCycle's parent company, served as co-founder and president of Xl TechGroup.  This was publicly disclosed in a PetroAlgae SEC Form S-1 filing prior to the Proposed Class Period.  *See* PetroAlgae Inc., Form S-1, filed August 11, 2010, p. 86.  Note that the PetroAlgae SEC Form S-1 refers to "Gregory W. Haskell", who appears to be the same individual as Bill Haskell, according to an archived version of the XL TechGroup webpage.  *See* "About XL TechGroup," XL TechGroup, available at https://web.archive.org/web/20081113141432/http:/www.xltechgroup.com/html/about/directors.asp.  Finally, the Hindenburg Report claimed that Mike Otworth, PureCycle Chairman and CEO, held a C-level role at XL TechGroup.  Mike Otworth's role as a member of senior management at XL TechGroup and role as Vice President and Founding CEO of multiple start-ups during his time at XL TechGroup was publicly disclosed in a ROCH SEC Form S-1 filing prior to the Hindenburg Report.  *See* PureCycle Technologies, Inc., Form S-1, filed November 30, 2020.

[390] "American Vanguard Announces Acquisition of TyraTech, Inc.," American Vanguard Press Release, November 5, 2018.  The Hindenburg Report also noted that Rick Brenner, PureCycle board member, served as the founding CEO at TyraTech.  This was publicly disclosed as early as May 27, 2020.  *See* "Our Team," Innventure, available at https://www.innventure.com/our-team, and an archived version of this webpage at https://web.archive.org/web/20200527101244/https://innventure.com/team/.  Finally, The Hindenburg Report noted that TyraTech declined approximately 95% from its highs before being acquired.  This is corroborated by historical stock price data from *Refinitiv*, available prior to the beginning of the Proposed Class Period.

[391] Hindenburg Report.

223.  The Hindenburg Report also commented on the PureCycle management team's lack of prior experience in plastics recycling:

> These executives seem to have no background in polypropylene recycling, yet PureCycle is now asking the market to believe that they are the team that has identified – and will commercialize – a miracle solution to one of the most challenging problems in the world of plastics recycling.[392]

224.  As discussed in **Section VIII.A**, information about the management team's prior professional experience was publicly available prior to the Hindenburg Report.  In fact, ROCH disclosed the background of the PureCycle executive team in its Form S-4 registration statement filed with the SEC on November 20, 2020.[393]

225.  With respect to the claim that PureCycle's management team "was only motivated to bring PureCycle Inc. public in order to obtain large bonuses of cash and tradable stock,"[394] the Hindenburg Report made the following statements regarding the executives' cash bonuses, base salary, and share grants:

> The Executives Are Slated to Receive ~$40 Million in Compensation, Before Generating A Single Penny of Revenue … Typically, executives who believe in their business are compensated for key sales, profitability, or stock performance milestones.  PureCycle's CEO and CFO took cash off the table immediately, respectively collecting $5 million and $2 million in bonuses simply for closing PureCycle's SPAC deal.  These lucrative cash bonuses don't include base salaries for the CEO/CFO/CCO, collectively totaling $1.54 million per year.  Nor do they include CFO Michael Dee's 1.2 million in share grants (worth ~$30 million as of this writing) that begin vesting in 6 months until the date a plant is ever deemed operational.[395]

These statements reflected public information that had been disclosed by the Company in the Form S-4 registration statement filed with the SEC on November 20, 2020.[396]

226.  Second, with respect to the assertion that "PureCycle Inc. faced much higher competition for high quality feedstock, a necessary input in the recycling process, than it had led investors to believe,"[397] the Hindenburg Report stated:

---

[392] Hindenburg Report.
[393] ROCH Parent Corp Form S-4, pp. 118–119.
[394] Motion to Dismiss Order, pp. 4–5.
[395] Hindenburg Report.
[396] ROCH Parent Corp Form S-4, pp. 2–3, 122, Exhibit 10.25.
[397] Motion to Dismiss Order, p. 4.

> One of the key challenges (and likely future bottlenecks) of
> PureCycle's proposed process is in securing enough quality feedstock
> to make the process economical.[398]

227.    Prior to the release of the Hindenburg Report, ROCH, the private company

PureCycle, and the post-Business Combination PureCycle had all previously publicly

discussed the business risk related to its feedstock supply.  In fact, the PureCycle website

displays the transcript dated November 1, 2020, prior to the Proposed Class Period, of an

interview with John Layman, R&D Director of Sustainable Materials Development at P&G,

regarding PureCycle's technology.  When asked about the bottleneck of PureCycle's process,

Mr. Layman stated:  "I believe some of the bigger risks with the larger scale will be ensuring

that we have the feedstock and that feedstock is consistent per our partners' agreements … I

think the fact that you have to ensure you have feedstock coming in and I think that'll be a

bottleneck is ensuring the feedstock is of the right quality, at the right quantity, to keep the

larger plants running."[399]  These statements by Mr. Layman from prior to the Proposed Class

Period were cited in the Hindenburg Report.[400]

228.    ROCH also disclosed the business risk associated with feedstock supply in its Form

S-4 filed with the SEC on November 20, 2020:

> PCT's failure to secure waste polypropylene could have a negative
> impact on PCT's business, financial condition, results of operations
> and prospects.  PCT's ability to procure a sufficient quantity and
> quality of post-industrial and post-consumer resin that contains
> polypropylene as feedstock is dependent upon certain factors outside
> of PCT's control including, but not limited to, changes to pricing levels
> for waste polypropylene, recycled polypropylene and non-recycled
> polypropylene, shortages in supply, interruptions affecting suppliers
> (including those due to operational restraints, industrial relations,
> transportation difficulties, accidents or natural disasters), or the
> introduction of new laws or regulations that make access to waste
> polypropylene more difficult or expensive.[401]

229.  In addition, the demand for high-quality feedstock was publicly discussed in industry

forums prior to the Hindenburg Report.  As one example, Keefe Harrison, CEO of The

Recycling Partnership, discussed the topic at an industry roundtable on plastic waste:  "access

---

[398] Hindenburg Report.
[399] "Frequently Asked Questions about PCT's Purification Technology," *PureCycle*, November 1, 2020, available at https://www.purecycle.com/blog/frequently-asked-questions-about-pcts-purification-technology.
[400] Hindenburg Report.
[401] ROCH Parent Corp Form S-4, p. 23.

to good, consistent, high-quality feedstock to make into new products is at the top of the list for manufacturers' needs."[402]

230.  Third, with respect to the claim that "PureCycle Inc.'s patent is nowhere as valuable as it had led investors to believe as the patented process was not yet functional and was incapable of being scaled for commercial production as it had claimed,"[403] the Hindenburg Report quotes the testimony of purported experts regarding the patent (as discussed further below).  PureCycle's recycling processes referenced in Hindenburg's statements, however, were disclosed in the Company's patents, which were publicly available and accessible to arbitrageurs seeking to trade on information about the Company.  Specifically, I understand that these patents are publicly accessible via the U.S. Patent and Trademark Office's "Patent Public Search Basic" tool, using the patent or publication reference numbers provided by PureCycle in their Amended and Restated Patent License Agreement with P&G filed with the SEC on November 20, 2020.[404]

231.  Fourth, the Hindenburg Report asserts that "PureCycle Inc.'s licensed process could not be found in any peer-reviewed study."[405]  This statement reflected a fact that had been publicly available prior to the release of the Hindenburg Report, as peer-reviewed journals are publicly searchable through various publicly available databases or searching engines such as Google Scholar.[406]

232.  In sum, for each of the four categories summarized by the Court, the Hindenburg Report drew on (and directly cited) information that had been public before May 6, 2021, which would not be expected to impact the Company's stock price, if the market for its stock is found to be efficient.

---

[402] "Addressing the Global Plastic Waste Crisis," *Waste360*, December 20, 2018, https://www.waste360.com/plastics/addressing-global-plastic-waste-crisis.

[403] Motion to Dismiss Order, pp. 4–5.

[404] The "Patent Public Search Basic" tool can be used by simply entering any of PureCycle's patent or publication numbers in the "Quick lookup" field.  *See* "Patent Public Search (PPUBS Basic)," United States Patent and Trademark Office, available at https://ppubs.uspto.gov/pubwebapp/static/pages/ppubsbasic.html.  The patent and publication reference numbers are available in the Company's SEC Form S-4, filed on November 20, 2020, Exhibit 10.20, pp. 44–45.  The patents are also easily accessible by searching for the patent number on patents.google.com.  For example, J. M. Layman et al., "Method for Purifying Contaminated Polypropylene," US Patent 9834621B2, filed on June 23, 2016, available at https://patents.google.com/patent/US9834621B2/en.

[405] Motion to Dismiss Order, pp. 4–5; Hindenburg Report ("Many leading plastics companies publish peer reviewed studies that detail their advancements in the field. Contrary to that norm, we were unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process.").  *See* Hindenburg Report.

[406] "Google Scholar," Google, available at https://scholar.google.com/.

## b)      Interviews with Third Parties

233.      In addition to the public sources discussed above, the Hindenburg Report drew on
"interviews with named industry experts as well as former employees of the PureCycle
executives' previous failed companies."[407]  These were not interviews with PureCycle
management or employees.  Instead, they were interviews with individuals who were selected
by Hindenburg because of their purported expertise in the field of plastic recycling or because
they were purportedly former employees of companies previously owned by Innventure, the
parent company of PureCycle prior to the Business Combination.

234.      For example, with respect to the claim that PureCycle executives "had previously
characterized rank speculation as financial projections to investors,"[408] the Hindenburg Report
stated: "We spoke with multiple former employees of these earlier failed companies, who
said PureCycle's executives based their financial projections on 'wild ass guessing,' brought
companies public far too early, and had deceived investors."[409]  The Hindenburg Report
details a series of quotes from interviews with former employees of some of the six "failed
companies":

>        Former senior employee of PetroAlgae: "I think in some aspects they
>        were deceiving to investors… maybe not in their minds but definitely
>        from an engineering and scientific point of view. … I think because of
>        the biofuel boom especially in algae they were forced into the same
>        hype as all the other algae biofuels just to get funding. … [A] lot of
>        salespeople have that mentality where they overpromise and think they
>        can make it happen.  It just didn't at that time."[410]
>
>        Former employee of AgCert: "There was a lot of wild ass guessing
>        going on there, and a warning to investors: this is speculative you
>        could lose all your money so jump in if you want. … In retrospect (the
>        forecasts were) too rosy obviously because we failed.  We fell short of
>        our targets and that's how we got taken over by creditors.  But on the
>        other hand, if they had been too conservative they wouldn't have
>        garnered the interest for high risk investment in the first place."[411]

---

[407] Second Amended Complaint, ¶ 9.
[408] Motion to Dismiss Order, pp. 4–5.
[409] Hindenburg Report.
[410] Hindenburg Report (emphasis removed).
[411] Hindenburg Report.

> Former employee of TyraTech: "… the dossier that Tyratech went to
> market with was really not, I know now, it was not credible."[412]

235.    With respect to the assertion that "PureCycle Inc. faced much higher competition for

high quality feedstock, a necessary input in the recycling process, than it had led investors to

believe,"[413] the Hindenburg Report included, in addition to information from public sources

discussed above, excerpts from interviews with purported industry veterans.  For example:

> Scott Saunders, Former Chairman of the Board of the Association of
> Plastics Recyclers (i.e., companies to which PureCycle was a potential
> competitor):[414] "The problem I see with chemical recycling… [is] there
> is not enough non-contaminated PP scrap to support these processes.
> So you're going to get a wider range of materials that have varying
> degrees of other resin contamination. … And what's stated publicly by
> PureCycle themselves is that the facility works well up to 5 percent
> contamination.  I've been buying PP scrap for 30 years and I'm not
> aware of any PP scrap in volume that has any less than 5%
> contamination in the world."[415]

> Richard Minges, Custom Polymers, Inc.: "We could be competing on
> some raw materials.  I think there will always be a need for mechanical
> recycling and the chemical side is still proving out.  There may be a
> certain level of competition but it's more about the raw materials that
> can be secured."[416]

236.    With respect to the claim that "PureCycle Inc.'s patent is nowhere as valuable as it

had led investors to believe as the patented process was not yet functional and was incapable

of being scaled for commercial production as it had claimed,"[417] the Hindenburg Report also

includes excerpts from interviews with an unidentified "30-year expert on polymers[:]"

> "We consulted with a 30-year expert on polymers, with a background
> in advanced plastics recycling.  He told us the company's patent is
> 'indirect,' 'vague' and a 'regurgitation' of prior art."[418]

---

[412] Hindenburg Report.
[413] Motion to Dismiss Order, pp. 4–5.
[414] The Association of Plastic Recyclers represents "companies that are purchasing postconsumer plastic material and preparing it for new use by two or more of these additional processes: grinding, washing, pelletizing, densifying, or upgrading the materials to be used or sold to an end-use market."  *See* "Membership," The Association of Plastic Recyclers, available at https://plasticsrecycling.org/membership.  The Hindenburg Report quotes Mr. Saunders as being "'not very worried' about PureCycle disrupting the industry."  *See* Hindenburg Report.
[415] Hindenburg Report (emphasis removed).
[416] Hindenburg Report.
[417] Motion to Dismiss Order, pp. 4–5.
[418] Hindenburg Report.

"Our expert also referred to the company's flammable pressurized
process as a 'bomb' and warned about the company forging ahead to
commercial scale despite still having issues at a lab scale."[419]

Further, "[w]hen talking about PureCycle's potential competitive
advantages and what they've been able to achieve at a lab scale,
Saunders [Former Chairman of the Board of the Association of Plastics
Recyclers] told us he was 'not very worried' about PureCycle
disrupting the industry and cast doubt on its potential to scale.[420]

### c)    Hindenburg Conveyed a Negative Opinion Regarding the Company

237.    Hindenburg disclosed in its report on PureCycle that it had "taken a short position in
shares of PureCycle Technologies."[421]  Moreover, the Hindenburg Report conveyed its
negative opinion of PureCycle, in addition to any factual information it may have conveyed
regarding the PureCycle management team's previous experience and the viability of its
recycling technology.  Indeed, in the Second Amended Complaint, Plaintiffs characterize the
Hindenburg Report as a "scathing report."[422]  Hindenburg summarized its assessment of
PureCycle by stating: "In our *opinion*, PureCycle represents the worst qualities of the SPAC
boom; another quintessential example of how executives and SPAC sponsors enrich
themselves while hoisting unproven technology and ridiculous financial projections onto the
public markets, leaving retail investors to face the ultimate consequences."[423]

238.    Importantly, academic studies have found that the publication of a negative short
seller report is often associated with a sharp decline in the shorted company's share price.  A
study of 124 short-sale campaigns in the U.S. between 2006 and 2011 by Professors
Ljungqvist and Qian, for example, shows that "investors respond strongly to the information,
with spikes in SEC filing views, volatility, order imbalances, realized spreads, turnover, and
selling by the longs."[424]  Notably, while the study finds that subsequent events often "prove

---

[419] Hindenburg Report.  The Hindenburg Report also includes excerpts of an interview with an unidentified
"chemist."  *See* Hindenburg Report.
[420] Hindenburg Report.
[421] In other words, Hindenburg publicized to market participants that it expected PureCycle's stock price to
decline in the future, and had taken an investment position that would profit from such a stock price decline.  *See*
Hindenburg Report.
[422] Second Amended Complaint, ¶ 9.
[423] Hindenburg Report (emphasis added).
[424] A. Ljungqvist and W. Qian (2016), "How Constraining Are Limits to Arbitrage?" *The Review of Financial
Studies*, 29(8), pp. 1975–2028 ("Ljungqvist and Qian (2016)") at p. 1975.

the arbs factually right" (as reflected by de-listings or regulatory investigations that "come to similar conclusions as the [short seller] reports," for example), that is not always the case.[425]

        d)      **The Hindenburg Report Includes Commentary on Topics that Plaintiffs Do Not Allege Were Misrepresented**

239.    In addition to discussing PureCycle's technology and management team experience, the Hindenburg report also appears to suggest a potential conflict of interest for ROCH's SPAC sponsors.  The Hindenburg Report asserts that "Roth sponsored the PureCycle transaction, then slapped a "buy" rating and $45 price target on the stock a week after a portion of Roth's shares became eligible to dump."[426]  The report noted that "[i]nvestment banks Roth Capital and Craig Hallum both hold substantial shares in PureCycle through their sponsorship of the SPAC deal," were "the only two investment banks whose 'research' divisions cover PureCycle," and had both placed "Buy" ratings on the stock.[427]  Aside from noting that both banks would benefit from a higher Company stock price, Hindenburg also pointed to two partners in Craig Hallum's research department who individually held founder shares and would personally benefit if the Company's stock price rose.[428]  Hindenburg also commented on Roth's "odious reputation," and noted that Roth was involved in "15 regulatory sanctions and 12 arbitrations," was responsible for several failed IPOs, and was the "subject of numerous investor lawsuits."[429]  Any negative price reaction to this commentary would not reflect the impact of the "truth" that Plaintiffs allege was concealed, given my understanding that these topics do not appear to relate to the two categories that the Court ruled remain actionable in this case.

---

[425] For example, Ljungqvist and Qian (2016) find that for the short-sale campaigns they analyze, "[i]nvestigations by third parties such as the SEC, the Department of Justice, or a stock exchange come to similar conclusions as the reports in fully 90% of the cases."  *See* Ljungqvist and Qian (2016), p. 1978.  As discussed in **Section IX.C.2** the initiation of the SEC fact-finding investigation in this case that Plaintiffs allege "validat[ed] the claims in the Hindenburg Report" was subsequently resolved with no further action.  *See* Second Amended Complaint, ¶ 14; PureCycle Technologies, Inc., Form 8-K, filed April 26, 2022.
[426] Hindenburg Report.
[427] Hindenburg Report.
[428] Hindenburg Report.
[429] Hindenburg Report.

e)    **Dr. Cain Has Not Articulated a Methodology to Isolate Disclosure of the Alleged "Truth" In the Hindenburg Report**

240.    As summarized by Dr. Cain, the Hindenburg Report "expos[ed] significant flaws in PureCycle's polypropylene recycling process and reveal[ed] that the company's purportedly experienced management team previously caused six companies to fail, had no relevant experience in plastics or recycling, and had strong motivations to complete the business combination with ROCH to earn exorbitant compensation."[430]  Apart from describing Plaintiffs' claim as to what the Hindenburg Report allegedly revealed, the Cain Report does not discuss the Hindenburg Report at all.

241.    As discussed above, the Hindenburg Report draws on publicly available information. It was also a short seller's report disclosing a short position in the Company's stock and included Hindenburg's own negative assessment of the Company; "interviews with named industry experts as well as former employees of the PureCycle executives' previous failed companies;" and commentary about the SPAC sponsors' incentives that I understand Plaintiffs do not allege to have revealed information that was allegedly misrepresented.[431]

242.    Dr. Cain fails to provide a damages methodology that can isolate the portion of PureCycle's stock price movement, if any, attributable only to revelation of the facts allegedly misrepresented or omitted, exclusive of any negative impact from non allegation-related information or discussions that would potentially have weighed negatively on the Company's stock price.  Notably, the Company's stock price increased substantially after the Hindenburg Report.[432]

---

[430] Cain Report, ¶ 15.

[431] Second Amended Complaint, ¶ 9.

[432] Closing prices obtained from *Refinitiv* show that within seven weeks of the report the Company's stock price had returned to pre-Hindenburg levels.  Among other developments, this period included the Company's 2021 first quarter earnings announcement on May 17, 2021 and the Company's Investor Day on June 23, 2021.  *See* PureCycle Technologies, Inc., Form 8-K, filed June 23, 2021, Exhibit 99.1; "PCT: Investor Day Demonstrates Progress and Bench Strength, Raise PT to $28," Oppenheimer, June 24, 2021.  Plaintiffs do not allege that misrepresentations were made at either of these events, or indeed on any day subsequent to April 21, 2021.  If Plaintiffs' allegation is that the Alleged Misrepresentations created a distorted sense of the potential upside of PureCycle, and the Hindenburg Report revealed the "truth" about the Company's prospects, Plaintiffs have not explained, and Dr. Cain does not address, why the Company's stock price would have increased to such an extent after the Company's "true" value prospects had been revealed.

## 2.    Dr. Cain Has Not Articulated How He Will Isolate the Impact of the "Truth" Allegedly Revealed by Disclosure of the SEC Investigation

243.    As discussed in **Section III**, after the close of regular trading on November 10, 2021, the Company issued a 10-Q filing that disclosed a "fact-finding investigation of the Company" by the SEC, pertaining to "statements made in connection with PCT's technology, financial projections, key supply agreements, and management."[433] Plaintiffs allege that the disclosure of the SEC investigation "validat[ed] the claims in the Hindenburg report" and further revealed the "truth" regarding the Alleged Misrepresentations.[434]

244.    As discussed below, PureCycle operated with high business risks and regulatory risks. In addition, ROCH also faced heightening risks from increasing scrutiny of SPACs by the SEC during the Proposed Class Period.  Analyst commentary following the disclosure of the SEC fact-finding investigation indicated that the investigation may have reflected the agency's increasing scrutiny of SPACs and that uncertainties created by the investigation had an "overhang" effect that lowered the Company's stock price.[435]  In addition, as discussed below, the November 10, 2021 10-Q filing and related earnings call contained other negative operational information, that is not alleged by Plaintiffs to be the revelation of allegedly concealed information.

### a)    Analysts Commented on the Uncertainty Created by News of the SEC Fact-Finding Investigation

245.    As a general matter, PureCycle disclosed prior to the November 10, 2021 10-Q filing that it operated with a high-reward and high-risk business model, with business scalability being a primary risk.  For example, the Company disclosed in its Form S-4 Registration Statement on November 20, 2020 that "[t]here is no guarantee the Technology is scalable to commercial-scale operation."[436]  PureCycle further disclosed that "PCT is an early commercial stage emerging growth company with no revenue, and may never achieve or sustain profitability."[437]

---

[433] Second Amended Complaint, ¶ 85.
[434] Second Amended Complaint, ¶ 85.
[435] "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021, p. 1; "PCT: Building the Infrastructure to Scale," *Oppenheimer*, November 11, 2021, p. 1.
[436] ROCH Parent Corp Form S-4, p. 22.
[437] ROCH Parent Corp Form S-4, p. 18.

246.    Oppenheimer commented on this business model when initiating coverage of
PureCycle, noting that "[w]ith a $120B TAM [(Total Addressable Market)], no direct
competition, corporate and regulatory drivers for plastics waste reduction, and a technology
that can extract significant economic value from largely untapped feedstocks, we view PCT
as a high-ceiling execution story.  The business model requires the successful scale-up and
continuous operation of a novel process technology and alignment of future plant buildout
with feedstock sourcing, pricing and financing strategies."[438]  Similarly, Cowen remarked that
"the majority of risk [was] primarily located around the scale up of production as opposed to
a risk that the technology itself does not work."[439]

247.    Analyst commentary noted potential regulatory risk for the Company.[440]  Additionally
ROCH also faced regulatory risks concerning the SPAC sector in general.  Beginning in
January 2021, the SEC signaled increased scrutiny of SPACs, partly in response to what it
described as the "unprecedented surge" in SPAC registrations.[441]  For example, soon after the
nomination of Gary Gensler as the SEC Chair in January 2021, it was reported that his
enforcement agenda would include "heightened scrutiny of SPACs."[442]  A series of public
SEC announcements about the SPAC industry's risks and potential regulatory enforcement
followed shortly thereafter.  For example, on March 10, 2021, the SEC cautioned investors
against making SPAC-related investment decisions based solely on celebrity involvement in
SPACs.[443]  Also in March 2021, the SEC sent letters to Wall Street banks seeking voluntary
disclosures on their SPAC dealings, which was remarked on in public press as "the strongest
sign yet that it is stepping up scrutiny of such deals and the Wall Street banks that underwrite
them."[444]  On April 8, 2021, the SEC issued a statement on SPACs and liability risk under the

---

[438] "PCT: Initiating Coverage at Outperform and $24 PT," *Oppenheimer*, May 24, 2021, p. 4.

[439] "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021, p. 1.

[440] For example, Jefferies, in its initiating coverage report, commented that "[t]here is potential further regulations
going forward given incremental consumer focus …"  *See* "Changing the Recycling Game; Initiate at Buy,"
*Jefferies*, August 26, 2021, p. 12.

[441] "SPACs, IPOs and Liability Risk Under Securities Law, Securities and Exchange Commission," *U.S.
Securities and Exchange Commission*, April 8, 2021, available at https://www.sec.gov/news/public-
statement/spacs-ipos-liability-risk-under-securities-laws.

[442] "New SEC Chair Gary Gensler Could Push for SPAC Regulation," *Yahoo Finance*, January 20, 2021,
available at https://finance.yahoo.com/news/sec-chair-gary-gensler-could-202602323.html.

[443] "Celebrity Involvement with SPACs – Investor Alert," U.S. Securities and Exchange Commission, March 10,
2021, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/celebrity-involvement-spacs-investor-
alert.

[444] "Exclusive: U.S. Regulator Opens Inquiry into Wall Street's Blank Check IPO Frenzy – Sources," *Reuters*,
March 25, 2021, available at https://www.reuters.com/article/usa-sec-spacs-idINKBN2BH2QF.

securities laws.[445]  On April 12, 2021, the SEC issued another statement on accounting and
reporting considerations for warrants issued by SPACs.[446]

248.    Against this backdrop, PureCycle filed its 2021 third quarter Form 10-Q with the SEC
on November 10, 2021, in which the Company disclosed that:

> On or around September 30, 2021, the SEC issued an investigative
> subpoena to PCT's Chief Executive Officer requesting testimony in
> connection with a non-public, fact-finding investigation of the
> Company.  The investigation pertains to, among other things,
> statements made in connection with PCT's technology, financial
> projections, key supply agreements, and management.[447]

249.    Notably, this was a fact-finding investigation rather than an SEC enforcement action
based on alleged violations.  Indeed, during the 2021 third quarter earnings call held on
November 11, 2021, PureCycle's Chief Financial Officer Mr. Michael Dee responded to an
analyst's question regarding the investigation and elaborated that:

> This investigation is a non-public fact-finding inquiry.  We are
> disclosing this because we feel it is important to be transparent, and to
> inform our shareholders of the existence of this matter.  It is important
> to note that the fact-finding nature of this investigation does not infer
> any conclusions that any violations have occurred.  The nature of the
> subpoena and the investigation itself is not judgmental, and does not
> indicate a negative opinion of either the recipient or the facts of the
> matter.[448]

250.    Consistent with the backdrop of operational and regulatory risks faced by the
Company during the Proposed Class Period, some analysts indicated that the SEC fact-
finding investigation of PureCycle may have stemmed from its heightening scrutiny of
SPACs in general.  For example, Cowen noted: "The SEC is requesting testimony related to
topics like PureCycle's technology, financial projections, and supply agreements.
Management noted that the existence of such an inquiry is not indicative that a violation has

---

[445] "SPACs, IPOs and Liability Risk under the Securities Laws," *U.S. Securities and Exchange Commission*, April
8, 2021, available at https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.
[446] "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose
Acquisition Companies ('SPACs')," *U.S. Securities and Exchange Commission*, April 12, 2021, available at
https://www.sec.gov/news/public-statement/accounting-reporting-warrants-issued-spacs.
[447] PureCycle Q3 2021 Form 10-Q, p. 37.
[448] "Edited Transcript Q3 2021 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, November 11,
2021.

occurred.  In our view, companies that have gone public via the SPAC process have been under increased scrutiny by regulators."[449-450]

251.    To the extent that market participants anticipate potential negative regulatory actions from an investigation, given the various potential costs involved for the company, it is not surprising that the announcement of such an investigation is associated with a negative stock price reaction.  That does not suggest, however, that the stock price decline necessarily reflects the incorporation of new, factual information concerning the Alleged Misrepresentations.  Consistent with this, analyst commentary observed that the SEC fact-finding investigation created uncertainty that was an overhang on the Company's stock price, although analysts also noted that the uncertainty was partly mitigated by due diligence conducted by various groups of stakeholders.  For example, Oppenheimer noted that: "The SEC investigation disclosed in the 10Q creates an overhang with uncertain resolution/timing."[451]  Cowen noted that "it is inherently difficult to determine when [the SEC investigation] process will be resolved, and management is limited in the commentary that they can make. We believe this will likely keep the stock relatively range bound in the short term."[452]

### b)    Other Information Disclosed in PureCycle's 10-Q Filing

252.    In addition to the uncertainty overhang created by the SEC fact-finding investigation, other information disclosed in PureCycle's 10-Q filing could also potentially have negatively impacted the stock price.  Such information included news disclosed in PureCycle's 2021 third quarter Form 10-Q filed with the SEC on November 10, 2021 and in the associated earnings call held on November 11, 2021 about lower quarterly financial results than the

---

[449] "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021, p. 1.
[450] Craig Hallum noted: "We suspect that this is the result of the SEC's greater scrutiny on SPACs and also note, acknowledging there is no way to know for sure, our view that if this was related to something that was significant PCT would have been required to disclose this prior to the 10Q filing." Roth Capital noted "We believe the fact finding investigation stems from the SEC's recent commentary and signaling by the agency that it has a desire to review high impact, novel and complex transactions, which we believe includes SPACs."  *See* "Important Progress on Multiple Fronts in 3Q Towards Its 2025 PP Recycling Target, Though Filing Disclosure May Drive Shares in the Near-Term. Lowering Price Target To $26, Maintain BUY," *Craig-Hallum Capital Group*, November 12, 2021, p. 2; "PCT: Ironton on Track for 4Q 22; Augusta & Other Initiatives Move Forward Too," *Roth Capital Partners*, November 12, 2021, p. 1.
[451] The report further stated: "As a potential mitigant, we note the in-depth diligence (site visits, process/technology analysis) conducted by a broad ecosystem of stakeholders:  engineering/supply chain partners (e.g., Leidos, KMPS), resin producers/converters/additives suppliers/brands (e.g., Total, Aptar, Milliken, L'Oreal), and potential JV partners (e.g., SK)."  *See* "PCT: Building the Infrastructure to Scale," *Oppenheimer*, November 11, 2021, p. 1.
[452] "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021, p. 1.

market consensus estimate due to increased costs and delayed production ramp up at the Company's facilities.[453]

253.    Specifically, in its quarterly financial updates, PureCycle reported lower adjusted earnings of -$13.9 million, relative to a consensus estimate of -$7.6 million.[454]  In connection with the lower earnings, the Company reported increases across multiple cost categories relative to their quarterly financial results in the previous year, including a more than three-fold increase in total operating costs and expenses.[455]  Analysts commented on the cost increases and earnings miss.  For example, a Cowen report noted the higher-than-expected costs:  "Operating expenses were $24.8mn during the quarter, above our estimate of $7.4mn and the Street at $6.9mn.  This was due to higher than expected SG&A expense of $24.5mn compared to our forecast of $7.2mn."[456]

254.    PureCycle also provided an updated production timeline during their quarterly earnings call.  The new timeline showed that production at two plants would be delayed relative to the timeline discussed on the previous earnings call on August 12, 2021.[457]  Production at the Augusta plant, the facility with the largest planned production capacity, was delayed by a quarter from 2Q23 to 3Q23; production at Plant 3, the facility with the second largest planned production capacity, was delayed by three quarters from 4Q23 to 3Q24.[458]  This production timeline delay was noted by at least one analyst, who wrote:  "The production ramp up of both Augusta and Plant 3 facilities were pushed out.  Augusta's ramp now begins in 3Q23 instead of 2Q23, while Plant 3 slipped from 4Q23 to 3Q24."[459]

---

[453] PureCycle Q3 2021 Form 10-Q; "Edited Transcript Q3 2021 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, November 11, 2021; "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021, p. 3.

[454] "Important Progress on Multiple Fronts in 3Q Towards Its 2025 PP Recycling Target, Though Filing Disclosure May Drive Shares in the Near-Term.  Lowering Price Target To $26, Maintain BUY," *Craig-Hallum Capital Group*, November 12, 2021, p. 1. Earnings are adjusted for interest, taxes, and depreciation.

[455] PureCycle Q3 2021 Form 10-Q, p. 41.

[456] "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021, p. 3.  Craig-Hallum also noted that costs exceeded their expectations: "3Q results trailed estimates on higher SG&A [(selling, general and administrative costs … We are adjusting estimates to reflect higher OpEx …"  *See* "Important Progress on Multiple Fronts in 3Q Towards Its 2025 PP Recycling Target, Though Filing Disclosure May Drive Shares in the Near-Term. Lowering Price Target To $26, Maintain BUY," *Craig-Hallum Capital Group*, November 12, 2021, pp. 1–2.

[457] "Third Quarter 2021 Corporate Update," PureCycle, November 11, 2021, p. 8, available at https://d1io3yog0oux5.cloudfront.net/_380992f1a937d1b6038ee186270786ed/purecycletech/db/1159/10582/pdf/PCT%2BQ321%2BCorporate%2BUpdate_11052021%25281%2529.pdf ("PureCycle 3Q21 Investor Presentation"); "Second Quarter 2021 Corporate Update," PureCycle, August 12, 2021, p. 9, available at https://d1io3yog0oux5.cloudfront.net/_380992f1a937d1b6038ee186270786ed/purecycletech/db/1159/10581/pdf/Q2_2021_PureCycle_Corporate_Update_vFINAL.pdf ("PureCycle 2Q21 Investor Presentation").

[458] PureCycle 3Q21 Investor Presentation, p. 8; PureCycle 2Q21 Investor Presentation, p. 9.

[459] "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021, p. 3.

c)    **Dr. Cain Has Not Articulated a Methodology to Isolate Disclosure of the Alleged "Truth" Related to the SEC Investigation**

255.    As discussed above, analyst commentary following the disclosure of the SEC fact-finding investigation on November 10, 2021 indicated that the investigation may have reflected the agency's increasing scrutiny of SPACs, and that uncertainties created by the investigation had an "overhang" effect that lowered the Company's stock price.  Moreover, the November 10, 2021 10-Q filing and related earnings call contained other negative operational information, that I understand is not alleged by Plaintiffs to be the revelation of allegedly concealed information.  In his report Dr. Cain references "various accepted methodologies" to address confounding news,[460] but has not identified a methodology for how he will isolate the potential impact of the "truth" allegedly revealed by the disclosure of the SEC fact-finding investigation from other information unrelated to the allegations in the 10-Q filing.

256.    Notably, PureCycle's common stock price increased rapidly within days following the November 10, 2021 10-Q announcement,[461] and, subsequent to the Proposed Class Period, the SEC's investigation was concluded without further action.  Specifically, on April 26, 2022, PureCycle filed a Form 8-K with the SEC, in which it disclosed:

> On April 26, 2022, PureCycle Technologies, Inc. … received correspondence from the U.S. Securities and Exchange Commission … notifying the Company that the SEC concluded the SEC's non-public fact-finding investigation without further action at this time.[462]

D.    **Damages for Warrants and Options**

257.    With respect to warrants and options, Dr. Cain states that "[d]amages relating to PureCycle's Options and Warrants can also be calculated in a similar manner utilizing the same techniques as described above."[463]  Specifically, he states that "[o]nce PureCycle Common Stock's artificial inflation is estimated, the embedded inflation contributing to a

---

[460] Cain Report, ¶ 96.
[461] On November 10, 2021 after market hours, PureCycle filed its 2021 third quarter Form 10-Q disclosing the SEC fact-finding investigation.  On November 11, 2021, the Company's stock closed at $9.79, down from $11.50 of the previous day.  On November 16, 2021, PureCycle's stock closed at $12.07.  Closing prices obtained from *Refinitiv*.
[462] PureCycle Technologies, Inc., Form 8-K, filed April 26, 2022.  The return on the relevant impact date was not statistically significant at the 95% confidence level under Dr. Cain's event study model.
[463] Cain Report, ¶ 98.

Warrant or Option's price can change based on a number of factors."[464]  As an example, Dr. Cain states that "[o]ne can employ various options pricing methodologies, such as the widely utilized Black-Scholes pricing model, to infer the damage quantum at the time of each Class member's purchase and sale."[465]

258.   As an initial matter, Dr. Cain's discussion of options and warrants suffers from the same flaw as his discussion for common stock, in that he describes possible general approaches that could apply but does not specify any methodology that would be relevant given the facts at hand and Plaintiffs' theory of liability.  Moreover, given that Dr. Cain states that he will use the inflation estimate for the Company's common stock as an input to measuring damages for warrants and options, the same issues apply as discussed in **Section IX.B** and **Section IX.C** above regarding Dr. Cain's ability to reliably measure inflation throughout the Proposed Class Period, and to isolate price declines attributable only to Plaintiffs' theory of liability.

Executed this 5th of February, 2024

_____
René M. Stulz, Ph.D.

---

[464] Cain Report, ¶ 98.
[465] Cain Report, ¶ 98.

**Appendix A**

**René M. Stulz**

Fisher College of Business                          Home Address:
806 Fisher Hall                                          3419 River Seine Street
2100 Neil Avenue                                      Columbus, OH 43221
Columbus, OH 43210-1144                       Phone: (614) 771-1110
Phone:  (614) 292-1970                            Cell:    (614) 206-0265
Fax:       (614) 292-2359
E-mail: stulz.1@osu.edu
Homepage
Google Scholar

## UNDERGRADUATE STUDIES

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

## GRADUATE STUDIES

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

## ACADEMIC APPOINTMENTS

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

1

**Appendix A**

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.


**OTHER POSITIONS**

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to 2023.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to 2020.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020; vice-chair, 2017-2019.

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Reviewer, London Business School Finance Department, 2005; New York University Finance Department, 2022.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to 2023.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2004 (chair), 2016, 2018.


**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, European Financial Management Association, Financial Management Association, Financial Management Association European Conference, FDIC Annual

**Appendix A**

Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, ECGI Annual Meeting, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop, Asian Pacific Risk and Insurance Association, Institute for Private Capital Annual Research Conference.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2002), President-elect (2003), President (2004), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

**Appendix A**

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.

Special issue of the Journal of Applied Corporate Finance in honor of René M. Stulz, 2022.

Best Paper Award, Southern Finance Association Meeting, 2023.

Honorary Doctor of Laws, University College Dublin, 2023.


**CONGRESSIONAL TESTIMONY**

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives
Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence,"
Subcommittee on Capital Markets and Government Sponsored Enterprises, House of
Representatives Committee on Financial Services, 2011.


**BOOKS**

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and
Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and
Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

## PUBLISHED PAPERS

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, 36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, 9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, 12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, 10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, 38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, 15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, 19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, 16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, 14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, 20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, 41(1), 209-224.

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, 6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, 17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, 3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, 42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, 95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, 20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, 7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, 22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, 8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, 24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, 24(1), 137-154.

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company,1989, 3, 247-262.

**Appendix A**

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, 9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, 45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, 26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, 16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, 29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, 65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, 32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, 32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, 6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, 3(2), 97-114.

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, 25(3), Part 2, 585-601.

**Appendix A**

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, 102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, 37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, 30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, 8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, 8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, 40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, 9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, 20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, 42(2), 159-185, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, 51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

**Appendix A**

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, 46(1), 3-28.

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, 113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, 52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001, 14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, 54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, 12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, 12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, 73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, 8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, 90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, 1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, 29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, 14(1), 215-241.

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, 64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

**Appendix A**

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, 38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, 93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, 70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, 16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, 71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, 86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, 73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, 18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, 2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, 60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, 18(3),795-829.

"The Limits of Financial Globalization," Journal of Finance, 2005, 60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of

Finance, 2006, 61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, 81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, 18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, 20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, 21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, 85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, 86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, 20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008, 88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, 89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, 20(4), 39-48.

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, 64(1), 425-466.

"Has New York Become Less Competitive than London in Global Markets? Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, 91(3), 253-277.

**Appendix A**

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, 22(8), 3171-3209.

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, 92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, 35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, 47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, 64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, 47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, 95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, 97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, 24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, 65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, 65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, 99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, 24(2), 593-627.

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, 105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

13

**Appendix A**

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, 67(4), 1329-1370.

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, 104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, 67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, 110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, 110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, 27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, 116, 219-236.

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, 71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, 29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, 29(7), 1821-1859.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, 22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, 27(1), 8-18).

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, Management Science, 2016, 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

2017, 30(7), 2131-2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, 2017, Journal of Corporate Finance, 46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, The Review of Financial Studies, 2017, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei S. Gonçalves, The Review of Financial Studies, 2018, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, Journal of Applied Corporate Finance, 2018, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, Journal of Finance, 2018, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, Journal of Financial Economics, 2019,133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, Review of Financial Studies, 2019, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," Journal of Applied Corporate Finance, 2019, 31(4), 86-97.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" with Andrea Beltratti, Journal of International Money and Finance, 2019, 99.

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

"Public Versus Private Equity," Oxford Economic Policy Review, 2020, 36(2), 275-290.

"Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, Journal of Financial Economics, 2021, 139(3), 719-749.

**Appendix A**

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Wook Lee and Hyun-Han Shin, Review of Financial Studies, 2021, 24(4), 1867-1906.

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, 2021, 140(3), 699-725.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, 2021, 34(11), 5474-5521.

"Were there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, 2021, 122, 12-37.

"Why Are Corporate Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, 2021, 142 (3), 1359-1380.

"Have Exchange-Listed Firms Become Less Important for the Economy?" with Frederik P. Schlingemann, Journal of Financial Economics, 2022, 143(2), 927-958.

"Are Analyst Short-Term Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Journal of Finance, 2022, 77(3), 1829-1875.

"Leverage and Cash Dynamics" with Harry DeAngelo and Andrei S. Gonçalves, Review of Finance, 2022, 26(5)1101-1144.

"Do Firms with Specialized M&A Staff Make Better Acquisitions?" with Sinan Gokkaya and Xi Liu, Journal of financial Economics, 2023, 147(1), 75-105.

"Crisis Risk and Risk Management," European Financial Management, forthcoming.

"Are Analyst 'Top Picks' Informative?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Review of Financial Studies, forthcoming.

**PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS**

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio
Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio
Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio
Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock
Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen,
Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization
of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the
Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk
Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management,
Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-
publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter
1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April
25, 2000.

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June
27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller,
Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First
Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, 87(3), 86-
94.

**Appendix A**

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.

**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Why has there Been a Secular Decline in Idiosyncratic Risk since 2000?" with Söhnke Bartram and Gregory Brown.

"Who Benefits from Analyst 'Top Picks?" with Justin Birru, Sinan Gokkaya, and Xi Liu.

"Is Financial Globalization in Reverse After the 2008 Global Financial Crisis? Evidence from Corporate Valuations," with Craig Doidge and Andrew Karolyi.

"Why Do Bank Boards Have Risk Committees?" with James Tompkins, Rohan Williamson, and Zhongxia Ye.

"How Important is Moral Hazard for Distressed Banks?" with Itzhak Ben-David and Ajay A. Palvia.

"Why Did Small Business FinTech Lending Dry Up During the COVID-19 Crisis?" with Itzhak Ben-David and Mark Johnson.

"The Determinants of Bank Liquid Asset Holdings," with Alvaro Taboada and Mathijs A. van Dijk.

"The Unicorn Puzzle," with Daria Davydova, Rüdiger Fahlenbrach, and Leandro Sanz.

"Does Greater Public Scrutiny Hurt a Firm's Performance?" with Benjamin Bennett and Zexi Wang.

**EDITORIAL AND REFEREEING ACTIVITIES**

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to 2021.

Advisory Editor, Journal of Financial Services, 1999 to present.

**Appendix A**

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

**Appendix B**

# Deposition and Trial Testimony of René M. Stulz
# During the Past Four Years

| | |
|---|---|
| **Case Name:** | Lord Abbett Affiliated Fund, Inc. et al. v. Navient Corporation et al. |
| **Case No.:** | No. 16-112-MN, United States District Court, District of Delaware |
| **Date of Testimony:** | December 2019 (Deposition), June 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Joseph Prause v. TechnipFMC PLC et al. |
| **Case No.:** | No. 4:17-cv-02368, United States District Court, Southern District of Texas |
| **Date of Testimony:** | February 2020 (Depositions) |

| | |
|---|---|
| **Case Name:** | In Re Volkswagen "Clean Diesel" Marketing Sales Practices, and Products Liability Litigation; BRS v. Volkswagen AG, et al., Case No. 16-cv-3435 ("Bondholders Securities Action") |
| **Case No.:** | MDL No. 2672-CRB (JSC), United States District Court, Northern District of California |
| **Date of Testimony:** | February 2020 (Deposition) |

| | |
|---|---|
| **Case Name:** | Mayagüez S.A. v. Citigroup, Inc., Citibank, N.A. |
| **Case No.:** | No. 1:16-cv-06788-PGG-JLC, United States District Court, Southern District of New York |
| **Date of Testimony:** | May 2020 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re WeWork Litigation |
| **Case No.:** | No. 2020-0258-AGB, Court of Chancery, Delaware |
| **Date of Testimony:** | February 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Envision Healthcare Corporation Securities Litigation |
| **Case No.:** | No. 3:17-cv-01112, United States District Court, Middle District of Tennessee, Nashville Division |
| **Date of Testimony:** | May 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | In Re Navient Corporation Securities Litigation |
| **Case No.:** | No. 17-cv-08373-RBK-AMD, United States District Court, District of New Jersey |
| **Date of Testimony:** | June 2021 (Deposition) |

**Appendix B**

| | |
|---|---|
| **Case Name:** | Evanston Police Pension Fund v. McKesson Corporation et al. |
| **Case No.:** | No. 3:18-cv-06525-CRB, United States District Court, Northern District of California |
| **Date of Testimony:** | July 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Allergan PLC Securities Litigation |
| **Case No.:** | No. 18-cv-12089, United States District Court, Southern District of New York |
| **Date of Testimony:** | September 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Gordon v. Vanda Pharmaceuticals Inc. et al. |
| **Case No.:** | No. 1:19-cv-01108-FB-LB, United States District Court, Eastern District of New York |
| **Date of Testimony:** | October 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Tollen v. Geron Corporation et al |
| **Case No.:** | No. 3:20-cv-00547-WHA, United States District Court, Northern District of California |
| **Date of Testimony:** | October 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Patrick McDermid v. Inovio Pharmaceuticals, Inc. et al. |
| **Case No.:** | No. 2:20-cv-01402-GJP, United States District Court, Eastern District of Pennsylvania |
| **Date of Testimony:** | November 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Strathclyde Pension Fund v. Bank OZK et al. |
| **Case No.:** | No. 4:18-cv-00793-DPM, United States District Court, Eastern District of Arkansas |
| **Date of Testimony:** | December 2021 (Deposition) |

| | |
|---|---|
| **Case Name:** | Boston Retirement System v. Uber Technologies, Inc. et al. |
| **Case No.:** | No. 3:19-cv-06361-RS, United State District Court, Northern District of California |
| **Date of Testimony:** | February 2022 (Deposition) |

| | |
|---|---|
| **Case Name:** | Ahmad Odeh v. Immunomedics, Inc. et al. |
| **Case No.:** | No. 2:18-17645-MCA-ESK, United States District Court, District of New Jersey |
| **Date of Testimony:** | May 2022 (Deposition) |

**Appendix B**

| | |
|---|---|
| **Case Name:** | In re Qualcomm Incorporated Securities Litigation |
| **Case No.:** | No. 3:17-cv-00121-JAH-WVG, United States District Court, Southern District of California |
| **Date of Testimony:** | November 2022 (Deposition) |

| | |
|---|---|
| **Case Name:** | City of Birmingham Relief and Retirement System, et al. v. Acadia Pharmaceuticals Inc., et al. |
| **Case No.:** | No. 3:21-cv-00762-WQH-NLS, United States District Court, Southern District of California |
| **Date of Testimony:** | November 2023 (Deposition) |

| | |
|---|---|
| **Case Names:** | In re Alta Mesa Resources, Inc. Securities Litigation<br>Alyeska Master Fund, L.P., et al. v. Alta Mesa Resources, Inc., et al.<br>Orbis Global Equity LE Fund, et al., v. Alta Mesa Resources, Inc., et al. |
| **Case No.:** | No. 4:22-cv-1189, United States District Court, Southern District of Texas |
| **Date of Testimony:** | November 2023 (Depositions) |

| | |
|---|---|
| **Case Name:** | Carl Shupe and Matthew Pearlman, et al. v. Rocket Companies, Inc., et al. |
| **Case No.:** | No. 21-cv-11528, United States District Court, Eastern District of Michigan, Northern Division |
| **Date of Testimony:** | January 2024 (Deposition) |

**Appendix C**

# Documents Considered List

**Academic Articles**

- A. Bris, W. N. Goetzmann and N. Zhu (2007), "Efficiency and the Bear: Short Sales and Markets around the World," *The Journal of Finance*, 62(3), pp. 1029–1079

- A. C. MacKinlay (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35(1), pp. 13–39

- A. H. Y. Chen (1970), "A Model of Warrant Pricing in a Dynamic Market," *The Journal of Finance*, 25(5), pp. 1041–1059

- A. Ljungqvist and W. Qian (2016), "How Constraining Are Limits to Arbitrage?" *The Review of Financial Studies*, 29(8), pp. 1975–2028

- A. Shleifer and R. W. Vishny (1997), "The Limits of Arbitrage," *The Journal of Finance*, 52(1), pp. 35–55

- A. V. Reed (2013), "Short Selling," *Annual Review of Financial Economics*, 5(1), pp. 245–258

- D. Hirshleifer, S. S. Lim and S. H. Teoh (2009), "Driven to Distraction: Extraneous Events and Underreaction to Earnings News," *The Journal of Finance*, 64(5), pp. 2289–2325

- D. Duffie, N. Garleanu and L. H. Pedersen (2002), "Securities Lending, Shorting, and Pricing," *Journal of Financial Economics*, 66(2–3), pp. 307–339

- D. Galai and M. I. Schneller, "Pricing of Warrants and the Value of the Firm," *The Journal of Finance*, 33(5), pp. 1333–1342

- D. Muravyev, N. D. Pearson and J. M. Pollet (2022), "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *The Journal of Finance*, 77(3), pp. 1787–1828

- D. W. Diamond and R. E. Verrecchia (1987), "Constraints on Short-Selling and Asset Price Adjustment to Private Information," *Journal of Financial Economics*, 18(2), pp. 277–311

- E. F. Fama (1970), "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance*, 25(2), pp. 383–417

- E. F. Fama and K. R. French (1997), "Industry Costs of Equity," *Journal of Financial Economics*, 43(2), pp. 153–193

- E. M. Miller (1977), "Risk, Uncertainty, and Divergence of Opinion," *The Journal of Finance*, 32(4), pp. 1151–1168

- E. Ofek and M. Richardson (2003), "DotCom Mania: The Rise and Fall of Internet Stock Prices," *The Journal of Finance*, 58(3), pp. 1113–1137

**Appendix C**

- G. D'Avolio (2002), "The Market for Borrowing Stock," *Journal of Financial Economics*, 66(2), pp. 271–306

- J. A. Busse and T. C. Green (2002), "Market Efficiency in Real Time," *Journal of Financial Economics*, 65(3), pp. 415–437

- J. Mitts et al. (2022), "A Report by the Ad Hoc Academic Committee on Equity and Options Market Structure Conditions in Early 2021," *Working Paper*, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4030179

- J. T. Greene and S. G. Watts (1996), "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management*, 25(1), pp. 19–42

- L. Cohen and D. Lou (2012), "Complicated Firms," *Journal of Financial Economics*, 104(2), pp. 383–400

- M. Brenner, R. Eldor and S. Hauser (2001), "The Price of Options Illiquidity," *The Journal of Finance*, 56(2), pp. 789–805

- M. Gahng, J. R. Ritter and D. Zhang (2023), "SPACs," *The Review of Financial Studies*, 36(9), pp. 3463–3501

- M. J. Brennan and A. Subrahmanyam (1995), "Investment Analysis and Price Formation in Securities Markets," *Journal of Financial Economics*, 38(3), pp. 361–381

- M. J. Brennan, N. Jegadeesh and B. Swaminathan (1993), "Investment Analysis and the Adjustment of Stock Prices to Common Information," *The Review of Financial Studies*, 6(4), pp. 799–824

- M. Mitchell and T. Pulvino (2012), "Arbitrage Crashes and the Speed of Capital," *Journal of Financial Economics*, 104(3), pp. 469–490

- O. A. Lamont and R. H. Thaler (2003), "Can the Market Add and Subtract? Mispricing in Tech Stock Carve-Outs," *Journal of Political Economy*, 111(2), pp. 227–268

- P. A. C. Saffi and K. Sigurdsson (2011), "Price Efficiency and Short Selling," *The Review of Financial Studies*, 24(3), pp. 821–852

- R. K. Loh and R. M. Stulz (2011), "When Are Analyst Recommendation Changes Influential?" *The Review of Financial Studies*, 24(2), pp. 593–627

- S. Mola, P. R. Rau and A. Khorana (2013), "Is There Life after the Complete Loss of Analyst Coverage?" *The Accounting Review*, 88(2), pp. 667–705

- T. G. Andersen, N. Fusari and V. Todorov (2017), "Short-Term Market Risks Implied by Weekly Options," *The Journal of Finance*, 72(3), pp. 1335–1386

- Y. C. Kim and R. Stulz (1988), "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics*, 22(2), pp. 189–205

**Appendix C**

## Books and Book Chapters

- J. H. Stock and M. W. Watson (2015), *Introduction to Econometrics*, 3rd ed., Global ed., England, UK: Pearson Education

- J. M. Wooldridge (2009), *Introductory Econometrics: A Modern Approach*, 4th ed., Mason, OH: South-Western Cengage Learning

- R. A. Brealey, S. C. Myers and F. Allen (2011), *Principles of Corporate Finance*, 10th ed., New York, NY: McGraw-Hill/Irwin

- S. Ross et al. (2003), *Corporate Finance*, 6th ed., New York, NY: McGraw-Hill/Irwin

## Analyst Reports

- "Roth CH Acquisition I Gains 15% in Past Quarter," *BuySellSignals*, November 25, 2020

- "Roth CH Acquisition I Surges 60% in Past Quarter," *BuySellSignals*, December 10, 2020

- "Roth CH Acquisition I Soars 212% in Past Quarter; Institutional Ownership Down 75%," *BuySellSignals*, February 24, 2021

- "Roth CH Acquisition I in Top 1% Performers of NASDAQ Market in Past Quarter; Institutional Ownership Down 75%," *BuySellSignals*, March 2, 2021

- "At The Intersection Of Massive Global Unmet Need & Highly-Disruptive Proprietary Tech, With First-Mover Advantage, Blue-Chip Partners, And Increasingly De-Risked Business Model. Initiating Coverage With A BUY Rating, $48 Price Target," *Craig Hallum*, March 18, 2021

- "PCT: Keeping the World Green with Polypropylene; Initiate Buy $45 Target," *Roth Capital Partners*, April 21, 2021

- "PCT: The Road to Commercialization – Correcting a Bystander's Poor Directions," *Roth Capital Partners*, May 7, 2021

- "PureCycle is An Important Path Forward For Its Growing List of Strategic Partners To Meet Substantial Polypropylene Recycling Goals. Reiterate BUY Rating." *Craig Hallum*, May 7, 2021

- "PCT: Corporate Update May 17th," *Roth Capital Partners*, May 14, 2021

- "PCT: 1Q 2021 Update Review," *Roth Capital Partners*, May 18, 2021

- "Plant 1 Construction On-Track & Capacity Outlook Reiterated As Build Out of 'No Compromise' Recycling Powerhouse Underway. Reiterate BUY Rating." *Craig Hallum*, May 18, 2021

- "PCT: Initiating Coverage at Outperform and $24 PT," *Oppenheimer*, May 24, 2021

- "Irontron Investor Event Takeaways: Plant 1 & The Forward Plan Remain On Track With The Market Opportunity Continuing To Expand. Reiterate BUY Rating." *Craig Hallum*, June 24, 2021

**Appendix C**

- "PCT: Investor Day Demonstrates Progress and Bench Strength, Raise PT to $28," *Oppenheimer*, June 24, 2021

- "PCT: Investor Day – Deeper & Broader with Management," *Roth Capital Partners*, June 25, 2021

- "PCT: Checking Off the To Do List – First Cluster Site Announced," *Roth Capital Partners*, July 30, 2021

- "Add SK Global Chemical To List Of Top-Tier Partners While Continuing To Move The Ball Forward Commercially, Operationally And On Feedstock. Reiterate BUY Rating." *Craig Hallum*, August 13, 2021

- "PCT: 2Q '21 Executing on a Detailed Blueprint to Commercialization," *Roth Capital Partners*, August 13, 2021

- "PCT: Operational Progress, Catalysts, and Higher Potential ROI Evident; Maintain OP," *Oppenheimer*, August 13, 2021

- "Changing the Recycling Game; Initiate at Buy," *Jefferies*, August 26, 2021

- "Initiation: Differentiated Technology Unlocks Untapped End Markets," *Cowen*, September 23, 2021

- "Feedstock Supply Continues to Develop; Ironton Facility on Track," *Cowen*, November 11, 2021

- "PCT: Building the Infrastructure to Scale," *Oppenheimer*, November 11, 2021

- "3Q21: Continued Progress," *Jefferies*, November 12, 2021

- "Important Progress on Multiple Fronts in 3Q Towards Its 2025 PP Recycling Target, Though Filing Disclosure May Drive Shares in the Near-Term. Lowering Price Target To $26, Maintain BUY," *Craig-Hallum Capital Group*, November 12, 2021

- "PCT: Ironton on Track for 4Q 22; Augusta & Other Initiatives Move Forward Too," *Roth Capital Partners*, November 12, 2021

**Expert Reports**

- Expert Report of Matthew D. Cain, *In re QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO, dated July 22, 2022

- Expert Report of Matthew D. Cain, *Delaware County Employees Retirement System and Bucks County Employees' Retirement System, et al. vs. AdaptHealth Corp, et al.*, United States District Court Eastern District of Pennsylvania, Civ. Action No. 2:21-cv-03382-HB, dated July 26, 2022

- Expert Report of Matthew D. Cain, *Timothy Bond and Jean-Nicolas Tremblay, Individually and on Behalf of All Other Similarly Situated v. Clover Health Investments, Corp., et al.*, United States District Court Middle District of Tennessee, Case No. 3:21-cv-00096, dated September 8, 2022

**Appendix C**

- Expert Report of Matthew D. Cain, *In Re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS, dated March 1, 2023
- Expert Report of Matthew D. Cain, *William C. Theodore, Individually and on Behalf of All Other Similarly Situated v. PureCycle Technologies, Inc., Michael Otworth, Michael E. Dee, David Brenner, Byron Roth and Tasmin Ettefagh,* United States District Court Middle District of Florida, Case No. 6:21-cv-809-PGB-GJK, dated November 30, 2023, with Backup Materials

**Depositions**

- Deposition of Matthew D. Cain, Ph.D., January 8, 2024

**Legal Documents**

- Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws, *William C. Theodore, Individually and on Behalf of All Other Similarly Situated v. PureCycle Technologies, Inc., Michael Otworth, Michael E. Dee, David Brenner, Byron Roth and Tasmin Ettefagh*, United States District Court Middle District of Florida, Case No. 6:21-cv-809-PGB-GJK, September 28, 2021
- Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws, *William C. Theodore, Individually and on Behalf of All Other Similarly Situated v. PureCycle Technologies, Inc., Michael Otworth, Michael E. Dee, David Brenner, Byron Roth and Tasmin Ettefagh*, United States District Court Middle District of Florida, Case No. 6:21-cv-809-PGB-GJK, August 18, 2022
- Order, *William C. Theodore, Erste Asset Management GMBH and David Tennenbaum v. PureCycle Technologies, Inc., Michael Otworth, Tasmin Ettefagh, Michael E. Dee, David Brenner and Byron Roth*, United States District Court Middle District of Florida Orlando Division, Case No. 6:21-cv-809-PGB-RMN, June 15, 2023

**SEC Filings**

PureCycle Technologies, Inc.

- PureCycle Technologies, Inc., Form S-4, filed November 20, 2020, with Exhibits
- PureCycle Technologies, Inc., Form S-1, filed November 30, 2020
- PureCycle Technologies, Inc., Form 424B3, filed March 22, 2021
- PureCycle Technologies, Inc., Form 8-K, filed March 22, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 8-K, filed May 14, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 8-K, filed May 17, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 10-Q for Q1 2021, filed May 19, 2021
- PureCycle Technologies, Inc., Form 8-K, filed June 8, 2021

**Appendix C**

- PureCycle Technologies, Inc., Form 8-K, filed June 21, 2021
- PureCycle Technologies, Inc., Form 8-K, filed June 23, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 8-K, filed June 25, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 424B3, filed July 1, 2021
- PureCycle Technologies, Inc., Form 8-K, filed July 14, 2021
- PureCycle Technologies, Inc., Form 10-Q for Q2 2021, filed August 12, 2021
- PureCycle Technologies, Inc., Form 8-K, filed August 12, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 8-K, filed October 4, 2021
- PureCycle Technologies, Inc., Form 8-K, filed October 27, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 8-K, filed November 4, 2021
- PureCycle Technologies, Inc., Form 10-Q for Q3 2021, filed November 10, 2021
- PureCycle Technologies, Inc., Form 8-K, filed November 10, 2021, with Exhibits
- PureCycle Technologies, Inc., Form 10-K for FY 2021, filed March 29, 2022
- PureCycle Technologies, Inc., Form 8-K, filed April 26, 2022
- PureCycle Technologies, Inc., Form 10-Q for Q1 2022, filed May 12, 2022
- PureCycle Technologies, Inc., Form 10-K for FY 2022, filed March 16, 2023

Roth CH Acquisition I Co.

- Roth CH Acquisition I Co., Form DEFA14A, filed November 16, 2020
- Roth CH Acquisition I Co., Form 8-K, filed November 16, 2020, with Exhibits
- Roth CH Acquisition I Co., Form 424B4, filed May 6, 2020
- Roth CH Acquisition I Co., Form DEFM14A, filed February 12, 2021
- Roth CH Acquisition I Co., Form 10-K for FY 2020, filed March 9, 2021
- Roth CH Acquisition I Co., Form 8-K, filed March 16, 2021

Roth CH Acquisition I Co. Parent Corp.

- Roth CH Acquisition I Co. Parent Corp., Form S-4, filed November 20, 2020, with Exhibits
- Roth CH Acquisition I Co. Parent Corp., Amendment No. 3 to Form S-4, filed February 3, 2021
- Roth CH Acquisition I Co. Parent Corp., Notice of Effectiveness for From S-4, dated February 11, 2021
- Roth CH Acquisition I Co. Parent Corp., Order Granting Confidential Treatment under the Securities Act of 1933, filed February 12, 2021

**Appendix C**

- Roth CH Acquisition I Co. Parent Corp., Form 424B3, filed February 12, 2021
- Roth CH Acquisition I Co. Parent Corp., Amendment No. 3 to Form S-1, filed March 8, 2021

Other

- ChromaVision Medical Systems, Inc., Form S-1, filed April 30, 1997
- ChromaVision Medical Systems, Inc., Form 8-K, filed November 1, 2004
- eMerge Interactive, Inc., Form 10-K, filed April 3, 2000
- eMerge Interactive, Inc., Form 8-K, filed May 23, 2007
- Graf Industrial Corp, Form DEF14A, filed March 27, 2020
- Parabel Inc., Form 10-Q for 2Q 2008, filed on August 6, 2008
- PetroAlgae Inc., Form S-1, filed August 11, 2010
- PetroAlgae Inc., Form 8-K, filed March 7, 2011

**Earnings Call Transcripts and Presentations**

- "First Quarter 2021 Corporate Update," PureCycle, May 17, 2021 available at https://d1io3yog0oux5.cloudfront.net/_e8ad91e15e39bb39fe878c1621a6a9c0/purecyclete ch/db/1159/10580/pdf/PCT_Q121_Corporate_Update_Presentation_vFinal2%281%29.p df
- "Second Quarter 2021 Corporate Update," PureCycle, August 12, 2021, available at https://d1io3yog0oux5.cloudfront.net/_380992f1a937d1b6038ee186270786ed/purecyclet ech/db/1159/10581/pdf/Q2_2021_PureCycle_Corporate_Update_vFINAL.pdf
- "Third Quarter 2021 Corporate Update," PureCycle, November 11, 2021, available at https://d1io3yog0oux5.cloudfront.net/_380992f1a937d1b6038ee186270786ed/purecyclet ech/db/1159/10582/pdf/PCT%2BQ321%2BCorporate%2BUpdate_11052021%25281%2 529.pdf
- "Edited Transcript Q1 2021 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, May 17, 2021
- "Edited Transcript Q2 2021 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, August 12, 2021
- "Edited Transcript Q3 2021 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, November 11, 2021
- "Edited Transcript Q4 2021 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, March 9, 2022
- "Edited Transcript Q1 2022 Purecycle Technologies Inc Earnings Call," Refinitiv Streetevents, May 12, 2022

**Appendix C**

**Press Releases**

- "AES and AgCert International Create Joint Venture to Reduce Greenhouse Gas Emissions," AES and AgCert Press Release, May 31, 2006

- "PetroAlgae Changes Name to Parabel," PetroAlgae Press Release, February 9, 2012

- "Wasson Enterprises and Innventure Form New Joint Venture to Commercialize Innovative Technologies," Innventure Press Release, April 21, 2017

- "PureCycle Technologies and P&G Introduce Technology That Enables Recycled Plastic to Be Nearly-New Quality," PureCycle Press Release, July 20, 2017

- "American Vanguard Announces Acquisition of TyraTech, Inc.," American Vanguard Press Release, November 5, 2018

- "Nestlé Accelerates Action to Tackle Plastic Waste," Nestlé Press Release, January 15, 2019

- "Aptar Enters into Strategic Partnership with PureCycle Technologies," Innventure Press Release, September 4, 2019

- "PureCycle Technologies Celebrates Successful Run of Groundbreaking Recycling Technology," PureCycle Press Release, September 25, 2019

- "Roth CH Acquisition I Co. Announces the Separate Trading of its Common Stock and Warrants, Commencing June 11, 2020," Roth CH Acquisition I Press Release, June 4, 2020

- "Velodyne Lidar and Graf Industrial Corp. Announce Business Combination to Form Leading Publicly-Traded Lidar Technology Company," Velodyne Lidar Press Release, July 2, 2020

- "Roth CH Acquisition I to Combine with PureCycle Technologies, Accelerating a Revolution in Plastics Recycling Through Impact Investing," PureCycle Press Release, November 16, 2020

- "Koch Modular Awarded Design and Construction of Plastics Recycling Plant," Koch Modular Press Release, November 17, 2020

- "SHAREHOLDER ALERT: WeissLaw LLP Investigates Roth CH Acquisition I Co.," WeissLaw Press Release, November 17, 2020

- "PureCycle Technologies Appoints Dustin Olson as Chief Manufacturing Officer," PureCycle Press Release, January 4, 2021

- "SHAREHOLDER ALERT: Monteverde & Associates Continues to Investigate the Following Merger," Monteverde & Associates Press Release, February 13, 2021

- "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021

- "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021

**Appendix C**

- "PureCycle's Tamsin Ettefagh Facilitates Plastics Industry Dialogue about Polypropylene Recycling Solutions in Light of U.S. Plastics Pact," PureCycle Press Release, April 21, 2021

- "PureCycle Technologies Responds to Report from Short-Selling Firm," PureCycle Press Release, May 6, 2021

- "PureCycle Technologies Schedules First Quarter 2021 Corporate Update Conference Call for Monday, May 17, 2021, at 11:00 a.m. ET," PureCycle Press Release, May 11, 2021

- "PureCycle Technologies, Inc. Provides First Quarter 2021 Corporate Update," PureCycle Press Release, May 17, 2021

- "PureCycle Technologies to Host Investor Day Expo 2021," PureCycle Press Release, June 4, 2021

- "PureCycle Kicks Off Inaugural Day of Service, Pure Planet Day," PureCycle Press Release, June 8, 2021

- "Bill Flutie joins PureCycle Technologies as Director of Special Events Procurement," PureCycle Press Release, June 15, 2021

- "Adrianna Sekula Joins PureCycle as Chief of Staff to CEO," PureCycle Press Release, June 17, 2021

- "PureCycle Showcases 'Born-Digital' Facilities at Onsite Event for Stakeholders," PureCycle Press Release, June 28, 2021

- "PureCycle Technologies to Participate in the CJS Securities 21st Annual New Ideas Summer Conference," PureCycle Press Release, July 9, 2021

- "PureCycle to Build New Recycling Facility in Augusta, Georgia," PureCycle Press Release, July 29, 2021

- "PureCycle Technologies Schedules Second Quarter 2021 Corporate Update Conference Call for Thursday, August 12, 2021, at 11:00 a.m. ET," PureCycle Press Release, August 2, 2021

- "PureCycle Technologies to Participate in Jefferies Industrials Conference," PureCycle Press Release, August 2, 2021

- "PureCycle and Gulfspan Partner, Build Foundation to Recycle One Billion Pounds of Plastic by 2025," PureCycle Press Release, August 5, 2021

- "PureCycle Partners with SK Global Chemical to Open Ultra-Pure Recycling Plant in South Korea," PureCycle Press Release, August 12, 2021

- "PureCycle Technologies Provides Second Quarter 2021 Update," PureCycle Press Release, August 12, 2021

- "PureCycle Technologies to Participate in the Bank of America Securities Sustainability and the Circular Economy Investor Summit," PureCycle Press Release, August 31, 2021

**Appendix C**

- "PureCycle Technologies to Present at the 10th Annual Gateway Conference on September 8, 2021," PureCycle Press Release, September 7, 2021

- "PureCycle Announces Partnership with Mitsui to Develop Ultra-Pure Recycled Polypropylene Plant in Japan," PureCycle Press Release, September 13, 2021

- "PureCycle Opens Plastic Waste Prep Facility in Central Florida, Invests in Tackling Plastic Waste Crisis at Home," PureCycle Press Release, October 6, 2021

- "PRESS RELEASE: Synapse Florida Tackles Plastic Waste Crisis with PureCycle as Official Sustainability Partner," PureCycle Press Release, October 12, 2021

- "PureCycle Technologies to Participate in Climate Tech Webinar 'Looking Towards Glasgow - Transitioning from a Fossil Fuel to a Renewable Energy Society,'" PureCycle Press Release, October 26, 2021

- "PureCycle Technologies Schedules Third Quarter 2021 Corporate Update Conference Call for Thursday, November 11, 2021, at 11:00 a.m. ET," PureCycle Press Release, November 3, 2021

- "PureCycle Technologies Appoints Lawrence Somma as Chief Financial Officer," PureCycle Press Release, November 4, 2021

- "The Sustainable Plastic Revolution is Here," PureCycle Press Release, November 5, 2021

- "PureCycle Named the Official Plastic Recycling Partner for the Cleveland Browns," PureCycle Press Release, November 10, 2021

- "PureCycle Technologies Provides Third Quarter 2021 Update," PureCycle Press Release, November 10, 2021

- "PureCycle Adds Top Industry Leaders to Board of Directors," PureCycle Press Release, March 17, 2022

- "PureCycle Process Expected to Use Less Energy, Lower Carbon Emissions than New Plastic Production," PureCycle Press Release, May 18, 2022

**Public Press and Other Online Articles**

- "08:13 EDT PureCycle Technologies Initiated with a Buy at Roth Capital Roth..." *Theflyonthewall.com*, April 21, 2021

- "A Reckoning for SPACs: Will Regulators Deflate the Boom?" *Financial Times*, May 4, 2021, available at https://www.ft.com/content/99de2333-e53a-4084-8780-2ba9766c70b7

- "A Second Look at SPACs: Is This Time Different?" *Harvard Law School Forum on Corporate Governance*, January 24, 2022, available at https://corpgov.law.harvard.edu/2022/01/24/a-second-look-at-spacs-is-this-time-different/

- "Addressing the Global Plastic Waste Crisis," *Waste360*, December 20, 2018, available at https://www.waste360.com/plastics/addressing-global-plastic-waste-crisis

**Appendix C**

- "Can Billion-Dollar Startups Be Created from Big Companies' Unused IP? Ex-Walgreens CEO Bets 'Yes,'" *Forbes*, February 16, 2018, available at https://www.forbes.com/sites/amyfeldman/2018/02/16/can-billion-dollar-startups-be-created-from-big-companies-unused-ip-ex-walgreens-ceo-bets-yes

- "Celebrity Involvement with SPACs – Investor Alert," *U.S. Securities and Exchange Commission*, March 10, 2021, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/celebrity-involvement-spacs-investor-alert

- "Circular Polymers Offers Used Carpet End Market," *Recycling Today*, March 5, 2019, available at https://www.recyclingtoday.com/news/circular-polymers-carpet-recycling-california/

- "Exclusive: U.S. Regulator Opens Inquiry into Wall Street's Blank Check IPO Frenzy – Sources," *Reuters*, March 25, 2021, available at https://www.reuters.com/article/usa-sec-spacs-idINKBN2BH2QF

- "Frequently Asked Questions about PCT's Purification Technology," *PureCycle*, November 1, 2020, available at https://www.purecycle.com/blog/frequently-asked-questions-about-pcts-purification-technology

- "Game-Changing Innovation," *Recycling Today*, October 2017, available at https://www.recyclingtoday.com/article/polypropylene-recycling-game-changing-innovation/

- "Goldman Chief Executive Says SPAC Boom is Unsustainable," *Financial Times*, January 19, 2021, available at https://www.ft.com/content/caa33f44-fd08-4049-a20e-3c3fde778b50

- "How Special Purpose Acquisition Companies (SPACs) Work," *PwC*, available at https://www.pwc.com/us/en/services/consulting/deals/library/spac-merger.html

- "Investing in a SPAC," *FINRA*, March 29, 2021, available at https://www.finra.org/investors/insights/spacs

- "Koch Modular Gets Contract To Build PureCycle's New Recycled PP Plant," *Company Reports*, November 23, 2020

- "Meme Stocks, SPAC Craze and a $100 Million Deli:  It Was a Wild Year in the Market," *CNBC*, December 23, 2021, available at https://www.cnbc.com/2021/12/23/meme-stocks-spac-craze-and-100-million-deli-2021-marks-a-wild-year-in-the-stock-market.html

- "New SEC Chair Gary Gensler Could Push for SPAC Regulation," *Yahoo Finance*, January 20, 2021, available at https://finance.yahoo.com/news/sec-chair-gary-gensler-could-202602323.html

- "P&G's PureCycle Cleans Recycled PP to 'Near Virgin' Quality," *Packaging Digest*, April 19, 2018, available at https://www.packagingdigest.com/sustainability/p-g-s-purecycle-cleans-recycled-pp-to-near-virgin-quality

**Appendix C**

- "PureCycle Technologies Raises $250M in Bonds," *Recycling Today*, October 9, 2020, available at https://www.recyclingtoday.com/news/purecycle-technologies-raises-250-million-bonds-ironton-ohio-plant/

- "PureCycle Technologies Said in Talks to Go Public Via Roth SPAC," *Bloomberg*, October 30, 2020, available at https://www.bloomberg.com/news/articles/2020-10-30/purecycle-technologies-said-in-talks-to-go-public-via-roth-spac

- "PureCycle Technologies Initiated at Buy by Roth Capital," *Dow Jones Institutional News*, April 21, 2021

- "PureCycle Technologies to Merge with Roth CH Acquisition I," *Financial Deals Tracker*, November 16, 2020

- "PureCycle to Be Listed on NASDAQ," *The Ironton Tribune*, November 21, 2020

- "Repurposing Plastic PureCycle," *Time.com*, 2019, available at https://time.com/collection/best-inventions-2019/5733139/purecycle/

- "Roth CH & PureCycle Agree to Combine; Will Establish a New Holding Company," *Company Reports*, November 23, 2020

- "Roth CH Adds Recycling Specialist PureCycle," *The Deal*, November 16, 2020

- "SHAREHOLDER ALERT: WeissLaw LLP Investigates Roth CH Acquisition I Co.," *iCrowdNewswire*, November 20, 2020

- "Short Sellers Are Betting More Against SPACs," *CNBC*, March 16, 2021, available at https://www.cnbc.com/2021/03/16/short-sellers-are-betting-more-against-spacs.html

- "SPACs, IPOs and Liability Risk under the Securities Laws," *U.S. Securities and Exchange Commission*, April 8, 2021, available at https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws

- "Special Purpose Acquisition Companies: An Introduction," *Harvard Law School Forum on Corporate Governance*, July 6, 2018, available at https://corpgov.law.harvard.edu/2018/07/06/special-purpose-acquisition-companies-an-introduction/

- "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ('SPACs')," *U.S. Securities and Exchange Commission*, April 12, 2021, available at https://www.sec.gov/news/public-statement/accounting-reporting-warrants-issued-spacs

- "Testimony Concerning the Effects of Decimalization on the Securities Markets, Before the Subcommittee on Securities and Investment Committee on Banking, Housing, and Urban Affairs," *United States Senate*, May 24, 2001, available at https://www.sec.gov/news/testimony/052401tslu.htm

- "Unusual First-Day Rallies in SPACs Raise Bubble Concern: 'Every Single One of Them Has Gone Up,'" *CNBC*, February 10, 2021, available at https://www.cnbc.com/2021/02/10/unusual-first-day-rallies-in-spacs-raise-bubble-concern-every-single-one-of-them-has-gone-up.html

**Appendix C**

- "What You Need to Know About SPACs – Updated Investors Bulletin," *U.S. Securities and Exchange Commission*, May 25, 2021, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/what-you-need-know-about-spacs-investor-bulletin

- Matthew Cain, et al., "SPACs – A Primer form Global Economics Group and Some Potential Examinations of SPACs and Investment Returns," *Global Economics Group*, available at https://www.globaleconomicsgroup.com/spacs-a-primer-from-global-economics-group

- In addition to the public press above, I considered public press based on a Factiva search for press with the words "PureCycle Tech*" or "Roth CH" included or associated with the company code PCT and the Factiva indexing code for Roth CH Acquisition Co during the Proposed Class Period.

**Websites**

- "About Us," BuySellSignals, available at https://www.marketdashboard.com/mdash/aboutUs

- "About XL TechGroup," XL TechGroup, available at https://web.archive.org/web/20081113141432/http:/www.xltechgroup.com/html/about/directors.asp

- "AgCert – Liquidated," AgCert, available at https://agcert.com/

- "Choose Your Path to Public: SPAC," New York Stock Exchange, available at https://www.nyse.com/spac

- "Form 424B3 Filing Detail," U.S. Securities and Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1830033/000110465921021011/0001104659-21-021011-index.htm

- "Form DEFA14A Filing Detail," U.S. Securities and Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1796303/000110465920125779/0001104659-20-125779-index.htm

- "Form S-4 Filing Detail," U.S. Securities and Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1830033/000110465920128027/0001104659-20-128027-index.htm

- "Google Scholar," Google, available at https://scholar.google.com/

- "Membership," The Association of Plastic Recyclers, available at https://plasticsrecycling.org/membership

- "Patent Public Search Basic (PPUBS Basic)," United States Patent and Trademark Office, available at https://ppubs.uspto.gov/pubwebapp/static/pages/ppubsbasic.html

- "What We Do," Innventure, available at https://www.innventure.com/what-we-do

- "Our Team," Innventure, available at https://www.innventure.com/our-team

**Appendix C**

**Other Public Materials**

- J. M. Layman et al., "Method for Purifying Contaminated Polypropylene," US Patent 9834621B2, filed on June 23, 2016, available at https://patents.google.com/patent/US9834621B2/en

- "Nasdaq Index Methodology," Nasdaq, 2020, available at https://indexes.nasdaqomx.com/docs/methodology_comp.pdf

- "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street," Hindenburg Research, May 6, 2021, available at https://hindenburgresearch.com/purecycle/

- "S&P SPAC Index Methodology," S&P Global, July 2023, available at https://www.spglobal.com/spdji/en/documents/methodologies/methodology-sp-spac-index.pdf

- "S&P U.S. SPAC Index, S&P Global, available at https://www.spglobal.com/spdji/en/indices/dividends-factors/sp-us-spac-index/#overview

- "The World's Most Influential Scientific Minds," Thomson Reuters, December 2015

**Data**

- *Bloomberg*

- *CapIQ*

- *Factiva*

- *I/B/E/S*

- *iVolatility*

- *Refinitiv*

- *S&P*

- *S3*

- *SEC Edgar*

- *Tick Data*

**Note: In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.**

**Exhibit 1**



# Common Stock Price Chart
## 5/4/20 – 2/8/22

Source: *Factiva*; *Refinitiv*; *SEC Edgar*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Second Amended Complaint dated 8/18/22

Note: Chart shows stock price of ROCH from its IPO on 5/4/20 to 3/17/21, the day of the de-SPAC, and PCT thereafter. Stock price data are unavailable for ROCH prior to 7/14/20. All press releases and SEC filings prior to the de-SPAC were made by ROCH and/or the private company PureCycle.

**Exhibit 2**

# Summary of Event Study Model Results
## 11/16/20 – 3/17/21

| Model Parameters | Results[1] |
|---|---|
| Market Coefficient[2] | 1.41 ** |
| *P-Value* | *0.00* |
| SPAC Coefficient[2] | 0.37 |
| *P-Value* | *0.05* |
| Intercept Coefficient[2] | 0.01 |
| *P-Value* | *0.09* |
| Adjusted R-Squared | 0.25 |

Source: *Bloomberg*; *Refinitiv*; *S&P U.S. SPAC Index*; "PureCycle Technologies
Completes Business Combination with Roth CH Acquisition I Co. and Will Begin
Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Second Amended
Complaint dated 8/18/22

Note:
[1]  Coefficients are calculated from a regression of daily returns of ROCH common
stock against daily returns of the NASDAQ Composite Index and the S&P U.S. SPAC
Index.  A fixed estimation window from 11/16/20 to 3/17/21 is used.  The Alleged
Misrepresentation Dates and relevant impact dates for each alleged corrective
disclosure are excluded from the estimation window.
[2]  "*" indicates the coefficient is statistically significant at the 95% level.

**Exhibit 3**



Coefficients from Event Study Model
11/16/20 – 11/10/21

Source:  *Bloomberg*; *Refinitiv*; *S&P U.S. SPAC Index*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Roth CH Acquisition I Co., Form DEFM14A, filed February 12, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note:  For each date before the de-SPAC, coefficients are calculated from a regression of daily returns of ROCH common stock against daily returns of the NASDAQ Composite Index and the S&P U.S. SPAC Index over a fixed estimation window from 11/16/20 to 3/17/21.  The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21.  For each date after the de-SPAC, coefficients are calculated from a regression of daily returns of PureCycle common stock against daily returns of the NASDAQ Composite Index and an equal-weighted industry index over the following 126 trading days.  The industry index is an equal-weighted index of publicly traded companies that ROCH identified in the Roth CH Acquisition I Co., Form DEFM 14A, filed February 12, 2021.  Companies included are Aerogels, Albemarle Corp., Amyris, Inc., Casella Waste Systems, Inc., Republic Services, Inc., Rogers Corp., TREX Company, Inc., Universal Display Corp., Waste Connections, Inc., and Waste Management, Inc.  The Alleged Misrepresentation Dates and relevant impact dates for each alleged corrective disclosure are excluded from the estimation window.

**Exhibit 4**



# RMSEs from Event Study Model
## 11/16/20 – 11/10/21

Source:  *Bloomberg*; *Refinitiv*; *S&P U.S. SPAC Index*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Roth CH Acquisition I Co., Form DEFM14A, filed February 12, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note:  For each date before the de-SPAC, root mean squared errors (RMSEs) are calculated from a regression of daily returns of ROCH common stock against daily returns of the NASDAQ Composite Index and the S&P U.S. SPAC Index over a fixed estimation window from 11/16/20 to 3/17/21.  The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21.  For each date after the de-SPAC, RMSEs are calculated from a regression of daily returns of PureCycle common stock against daily returns of the NASDAQ Composite Index and an equal-weighted industry index over the following 126 trading days.  The industry index is an equal-weighted index of publicly traded companies that ROCH identified in the Roth CH Acquisition I Co., Form DEFM 14A, filed February 12, 2021.  Companies included are Aerogels, Albemarle Corp., Amyris, Inc., Casella Waste Systems, Inc., Republic Services, Inc., Rogers Corp., TREX Company, Inc., Universal Display Corp., Waste Connections, Inc., and Waste Management, Inc.  The Alleged Misrepresentation Dates and relevant impact dates for each alleged corrective disclosure are excluded from the estimation window.

**Exhibit 5**

# Adjusted R-Squared from Event Study Model
## 11/16/20 – 11/10/21



Source: *Bloomberg*; *Refinitiv*; *S&P U.S. SPAC Index*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Roth CH Acquisition I Co., Form DEFM14A, filed February 12, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note: For each date before the de-SPAC, adjusted R-squareds are calculated from a regression of daily returns of ROCH common stock against daily returns of the NASDAQ Composite Index and the S&P U.S. SPAC Index over a fixed estimation window from 11/16/20 to 3/17/21. The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21. For each date after the de-SPAC, adjusted R-squareds are calculated from a regression of daily returns of PureCycle common stock against daily returns of the NASDAQ Composite Index and an equal-weighted industry index over the following 126 trading days. The industry index is an equal-weighted index of publicly traded companies that ROCH identified in the Roth CH Acquisition I Co., Form DEFM 14A, filed February 12, 2021. Companies included are Aerogels, Albemarle Corp., Amyris, Inc., Casella Waste Systems, Inc., Republic Services, Inc., Rogers Corp., TREX Company, Inc., Universal Display Corp., Waste Connections, Inc., and Waste Management, Inc. The Alleged Misrepresentation Dates and relevant impact dates for each alleged corrective disclosure are excluded from the estimation window.

**Exhibit 6**



# Market Capitalization
## 5/4/20 – 2/4/22

Source: *Refinitiv*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Second Amended Complaint dated 8/18/22

Note: Chart shows market capitalization of ROCH from its IPO on 5/4/20 to 3/17/21, the day of the de-SPAC, and PCT thereafter. Market capitalization is calculated as stock price multiplied by shares outstanding. Stock price data are unavailable for ROCH prior to 7/14/20.

**Exhibit 7**

# Number of SPAC IPOs on Major U.S. Exchanges
## 2003 – 2022



Number of SPAC IPOs

Source:  M. Gahng, J. R. Ritter and D. Zhang (2023), "SPACs," The Review of Financial Studies, 36(9), pp. 3463–3501

**Exhibit 8**

# Residual Returns from Dr. Cain's Event Study Model[1][2]
## 11/16/20 – 11/11/21



Source:  Cain Report dated 11/30/23 and Backup Materials; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021

Note:

[1]  Residual returns are calculated as the difference between realized returns and predicted returns using Dr. Cain's event study.  For each date in his Analysis Window, Dr. Cain calculates predicted returns by regressing daily returns of ROCH common stock before 3/17/21, the date of the de-SPAC, and PCT thereafter, against daily returns of the S&P Composite 1500 Total Return Index and the S&P SmallCap 600 Materials Total Return Index using a backward-rolling estimation window over the previous 60 trading days.  For days preceded by fewer than 60 trading days with returns data (11/16/20 – 11/23/20), Dr. Cain uses all available trading days in his estimation window.  Following Dr. Cain's methodology, days associated with News Days in Dr. Cain's Exhibit 6 and alleged corrective disclosure events are excluded from the estimation window.  Dr. Cain's Analysis Window begins on 11/16/20 and ends on 11/10/22.  Results are shown through 11/11/21.  Statistical significance is calculated at the 95% confidence level and represented by the dashed lines.

[2]  The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21.

**Exhibit 9a**

# SEC Form 8-Ks[1]

## 11/16/20 – 11/10/21

| | Filing Date | Time of Filing (ET) | Contents |
|---|---|---|---|
| 1. | **11/16/20** | **8:17** | **Merger Agreement**<br>**Unregistered Sales of Equity Securities**<br>**Press Release**<br>**Investor Presentation** |
| 2. | 3/16/21 | 13:15 | Submission of Matters to a Vote of Security Holders |
| 3. | 3/22/21 | __[2] | Agreement and Plan of Merger<br>Related Filings |
| 4. | 5/14/21 | 17:11 | Executive Severance Agreement<br>Modified Stock Option Agreement |
| 5. | **5/17/21** | **7:28** | **Press Release for Q1 2021**<br>**Investor Presentation** |
| 6. | 6/8/21 | 17:27 | Non Reliance on Financial Statements |
| 7. | 6/21/21 | 16:06 | Unaudited and Revised Financial Statements |
| 8. | 6/23/21 | 9:00 | Executive Summary<br>Feedstock Evaluation Unit Presentation<br>Feedstock Strategy and Research and Development Presentation<br>Operations Update Presentation |
| 9. | 6/25/21 | 16:43 | Management's Discussion and Analysis of Financial Statements for FY 2019 and FY 2020<br>Unaudited and Revised Financial Statements |
| 10. | 7/14/21 | 17:23 | Grant of Stock Awards to Named Executives |
| 11. | **8/12/21** | **16:01** | **Press Release for Q2 2021**<br>**Investor Presentation** |
| 12. | 10/4/21 | 8:45 | Announcement about FDA Letter of No Objection Process |
| 13. | 10/27/21 | 17:07 | Annoucement of Leidos Engineering Report<br>Announcement of Partial Conversion of Convertible Notes |
| 14. | 11/4/21 | 16:07 | CFO Announcement Press Release |
| 15. | 11/10/21 | 16:59 | Press Release for Q3 2021<br>Investor Presentation |

Source:  *SEC Edgar*; Cain Report dated 11/30/23

Note:
[1] Form 8-Ks filed prior to 3/17/21, the date of the de-SPAC, were filed by ROCH, and Form 8-Ks filed after 3/17/21 were filed by the publicly traded company PureCycle.  Bolded rows correspond to News Days Dr. Cain identifies in his report (Exhibit 6).
[2]  Time of filing is unavailable.

**Exhibit 9b**

# Press Releases[1]

## 11/16/20 – 11/10/21

| | Date | Time of Release (ET) | Title |
|---|---|---|---|
| 1. | **11/16/20** | **8:00** | **Roth CH Acquisition I to Combine With PureCycle Technologies, Accelerating a Revolution in Plastics Recycling Through Impact Investing** |
| 2. | 1/4/21 | 4:00 | PureCycle Technologies Appoints Dustin Olson as Chief Manufacturing Officer |
| 3. | 3/17/21 | 16:25 | Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination |
| 4. | **3/18/21** | **8:41** | **PureCycle Technologies completes business combination with Roth CH Acquisition I Co. and will begin trading on Nasdaq** |
| 5. | 4/21/21 | 8:41 | PureCycle's Tamsin Ettefagh facilitates plastics industry dialogue about polypropylene recycling solutions in light of U.S. Plastics Pact |
| 6. | 5/6/21 | 22:22 | PureCycle Technologies responds to report from short-selling firm |
| 7. | 5/11/21 | 17:30 | PureCycle Technologies Schedules First Quarter 2021 Corporate Update Conference Call for Monday, May 17, 2021, at 11:00 a.m. ET |
| 8. | **5/17/21** | **7:00** | **PureCycle Technologies, Inc. Provides First Quarter 2021 Corporate Update** |
| 9. | 6/4/21 | 7:00 | PureCycle Technologies to Host Investor Day Expo 2021 |
| 10. | 6/8/21 | 8:41 | PureCycle kicks off inaugural day of service, Pure Planet Day |
| 11. | 6/15/21 | 8:41 | Bill Flutie joins PureCycle Technologies as director of special events procurement |
| 12. | 6/17/21 | 8:41 | Adrianna Sekula joins PureCycle as chief of staff to CEO |
| 13. | 6/28/21 | 14:30 | PureCycle showcases 'born-digital' facilities at onsite event for stakeholders |
| 14. | 7/9/21 | 8:00 | PureCycle Technologies to Participate in the CJS Securities 21st Annual New Ideas Summer Conference |
| 15. | 7/29/21 | 12:45 | PureCycle to build new recycling facility in Augusta, Georgia |
| 16. | 8/2/21 | 7:00 | PureCycle Technologies Schedules Second Quarter 2021 Corporate Update Conference Call for Thursday, August 12, 2021, at 11:00 a.m. ET |
| 17. | 8/2/21 | 18:45 | PureCycle Technologies to Participate in Jefferies Industrials Conference |
| 18. | 8/5/21 | 13:43 | PureCycle and Gulfspan partner, build foundation to recycle one billion pounds of plastic by 2025 |

**Exhibit 9b**

# Press Releases[1]

## 11/16/20 – 11/10/21

|    | Date | Time of Release (ET) | Title |
|----|------|----------------------|-------|
| **19.** | **8/12/21** | **7:00** | **PureCycle Technologies Provides Second Quarter 2021 Update** |
| **20.** | **8/12/21** | **10:03** | **PureCycle partners with SK Global Chemical to open ultra-pure recycling plant in South Korea** |
| 21. | 8/31/21 | 17:00 | PureCycle Technologies to Participate in the Bank of America Securities Sustainability and the Circular Economy Investor Summit |
| 22. | 9/7/21 | 7:00 | PureCycle Technologies to Present at the 10th Annual Gateway Conference on September 8, 2021 |
| 23. | 9/13/21 | 10:30 | PureCycle announces partnership with Mitsui to develop ultra-pure recycled polypropylene plant in Japan |
| 24. | 10/6/21 | 8:00 | PureCycle opens plastic waste prep facility in Central Florida, invests in tackling plastic waste crisis at home |
| 25. | 10/12/21 | _[2] | PRESS RELEASE: Synapse Florida Tackles Plastic Waste Crisis with PureCycle as Official Sustainability Partner |
| 26. | 10/26/21 | 16:30 | PureCycle Technologies to Participate in Climate Tech Webinar "Looking Towards Glasgow - Transitioning from a Fossil Fuel to a Renewable Energy Society" |
| 27. | 11/3/21 | 8:00 | PureCycle Technologies Schedules Third Quarter 2021 Corporate Update Conference Call for Thursday, November 11, 2021, at 11:00 a.m. ET |
| 28. | 11/4/21 | 16:20 | PureCycle Technologies Appoints Lawrence Somma as Chief Financial Officer |
| 29. | 11/5/21 | 7:00 | The Sustainable Plastic Revolution is Here |
| 30. | 11/10/21 | 14:51 | PureCycle Named the Official Plastic Recycling Partner for the Cleveland Browns |
| 31. | 11/10/21 | 17:00 | PureCycle Technologies Provides Third Quarter 2021 Update |

Source:  *PureCycle*; *Roth CH Acquisition I*; *SEC Edgar*; Cain Report dated 11/30/23

Note:
[1]  Press releases dated prior to and including 3/17/21, the date of the de-SPAC, were issued by ROCH or the private company PureCycle, and press releases dated after 3/17/21 were issued by the publicly traded company PureCycle.  Bolded rows correspond to News Days Dr. Cain identifies in his report (Exhibit 6).
[2]  Time of release is unavailable.

**Exhibit 10a**

# News Days vs. No News Days Using Dr. Cain's Residuals
## 11/16/20 – 11/10/21

| Statistic | Proposed Class Period[1] | | | | |
|---|---|---|---|---|---|
| | Dr. Cain's "News Days"[2] [A] | All Days "With News"[3] [B] | No News Trading Days[4] [C] | P-Value of Difference[5] [A] [C] | P-Value of Difference[5] [B] [C] |
| Count of Days | 4 | 142 | 107 | | |
| Significant Days at 95% Confidence Level | 4 | 13 | 11 | | |
| % Significant Days at 95% Confidence Level | 100% | 9% | 10% | 0.000 | 0.698 |
| Average Absolute Abnormal Return | 11.08% | 4.75% | 3.31% | 0.052 | 0.008 |
| Average Volume | 2.20m | 1.18m | 0.52m | 0.010 | 0.000 |

Source: *Refinitiv*; Cain Report dated 11/30/23 and Backup Materials

Note:
[1]  The Proposed Class Period is from 11/16/20 – 11/10/21.  Daily returns and trading volumes are used for ROCH common stock before 3/17/21, the date of the de-SPAC, and PCT thereafter.
[2]  Dr. Cain's "News Days" are the 9 days listed in Dr. Cain's Exhibit 6.
[3]  All Days "With News" are the trading days "with news" identified in Dr. Cain's backup file.
[4]  No News Trading Days are the trading days during the Proposed Class Period less the trading days "with news" identified in Dr. Cain's backup file.
[5]  The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test.  The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume" are based on a t-test for difference of means.

**Exhibit 10b**

# News Days vs. No News Days Using Dr. Cain's Residuals
## 11/16/20 – 11/10/22

| Statistic | Dr. Cain's "News Days"[2] [A] | All Days "With News"[3] [B] | No News Trading Days[4] [C] | P-Value of Difference[5] [A] [C] | P-Value of Difference[5] [B] [C] |
|---|---|---|---|---|---|
| | *Dr. Cain's Analysis Window*[1] | | | | |
| Count of Days | 9 | 265 | 236 | | |
| Significant Days at 95% Confidence Level | 9 | 26 | 16 | | |
| % Significant Days at 95% Confidence Level | 100% | 10% | 7% | 0.000 | 0.144 |
| Average Absolute Abnormal Return | 12.36% | 4.30% | 3.40% | 0.000 | 0.009 |
| Average Volume | 3.04m | 1.26m | 0.79m | 0.004 | 0.000 |

Source: *Refinitiv*; Cain Report dated 11/30/23 and Backup Materials

Note:
[1]  Dr. Cain's Analysis Window is from 11/16/20 – 11/10/22.  Daily returns and trading volumes are used for ROCH common stock before 3/17/21, the date of the de-SPAC, and PCT thereafter.
[2]  Dr. Cain's "News Days" are the 9 days listed in Dr. Cain's Exhibit 6.
[3]  All Days "With News" are the trading days "with news" identified in Dr. Cain's backup file.
[4]  No News Trading Days are the trading days during Dr. Cain's Analysis Window less the trading days "with news" identified in Dr. Cain's backup file.
[5]  The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test.  The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume" are based on a t-test for difference of means.

**Exhibit 11**

# Residual Returns Using Alternative Cain Regression Models
## 11/16/20:  Business Combination Announcement

| Specification | Residual Returns [1] | | P-Value |
|---|---|---|---|
| Dr. Cain's Specification in This Matter[2] | 3.99% | *** | 0.00 |
| Alternative 1:  Dr. Cain's Specification in the AdaptHealth Matter[3] | 1.31% | | 0.80 |
| Alternative 2:  Dr. Cain's Specification in the QuantumScape Matter[4] | 1.47% | | 0.71 |
| Alternative 3:  Dr. Cain's Specification in the Clover Health and Romeo Power Matters[5] | 0.36% | | 0.94 |
| Alternative 4:  120 Day Estimation Window Including pre-Class Period Data[6] | 3.06% | | 0.33 |

Source:  Cain AdaptHealth Report; Cain Clover Health Report; Cain Deposition; Cain QuantumScape Report; Cain Report dated 11/30/23 and Backup Materials; Cain Romeo Power Report; "Roth CH Acquisition I to Combine With PureCycle Technologies, Accelerating a Revolution in Plastics Recycling Through Impact Investing," PureCycle Press Release, November 16, 2020

Note:
[1]  Residual returns are calculated as the difference between realized returns and predicted returns.  Predicted returns are calculated by regressing daily returns of ROCH common stock before 3/17/21, the date of the de-SPAC, and PCT thereafter against daily returns of the S&P Composite 1500 Total Return Index and the S&P SmallCap 600 Materials Total Return index.  Days associated with News Days in Dr. Cain's Exhibit 6 and alleged corrective disclosure events are excluded from the estimation window.  "*" indicates the residual return is statistically significant at the 90% level, "**" indicates statistical significance at the 95% level, and "***" indicates statistical significance at the 99% level.
[2]  A backwards-rolling estimation window over the previous 60 trading days is used.  For days preceded by fewer than 60 trading days with returns data available (11/16/20 – 11/23/20), the estimation window includes all available returns.  For days preceded by fewer than 60 trading days that fall within the Proposed Class Period, the estimation window includes data from before the Proposed Class Period.
[3]  Similar to Dr. Cain's specification in the AdaptHealth matter, a fixed estimation window is used for the first 120 trading days in the Proposed Class Period (11/16/20 – 5/13/21).  For each subsequent date, a backwards-rolling estimation window over the previous 120 trading days is used.
[4]  Similar to Dr. Cain's specification in the QuantumScape matter, a fixed estimation window is used for the first 60 trading days in the Proposed Class Period (11/16/20 – 2/12/21).  For each subsequent date, a backwards-rolling estimation window over the previous 60 trading days is used.
[5]  Similar to Dr. Cain's specification in the Clover Health and Romeo Power matters, a fixed estimation window is used from the first day of the Proposed Class Period to the de-SPAC date (11/16/20 – 3/17/21).  For each subsequent date, a backwards-rolling estimation window over the previous 60 trading days is used.
[6]  In the four SPAC cases that Dr. Cain discussed in deposition (listed above), he did not use data from before the class period.  Alternative 4 uses an estimation window, unlike those cases but similar to his approach in this matter, that includes data from before the Proposed Class Period, but uses the 120-day window that Dr. Cain has previously described as "common practice."

**Exhibit 12**

# Analyst Coverage by Contributors in Cain's Exhibit 3[1]
# during the Proposed Class Period
## 11/16/20 – 11/10/21

| | Earnings Forecast Reported on I/B/E/S | Earnings Forecast Not Reported on I/B/E/S |
|---|:---:|:---:|
| **Proposed Class Period Before de-SPAC[2]** | | |
| BuySellSignals Research | | ✓ |
| **Proposed Class Period After de-SPAC[3]** | | |
| Craig-Hallum Capital Group LLC | ✓ | |
| Cowen and Company | ✓ | |
| Oppenheimer & Co., Inc. | ✓ | |
| Roth Capital Partners, Inc. | ✓ | |
| Validea | | ✓ |
| ValuEngine, Inc | | ✓ |

Source:  *I/B/E/S*; Cain Report dated 11/30/23; "Changing the Recycling Game; Initiate at Buy," *Jefferies*, August 26, 2021; "Initiation: Differentiated Technology Unlocks Untapped End Markets," *Cowen*, September 23, 2021; PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Second Amended Complaint dated 8/18/22

Note:
[1]  Although Jefferies published an analyst report covering PureCycle on 8/26/21, Jefferies is not listed as having issued any reports during the Proposed Class Period in Dr. Cain's Exhibit 3.  Jefferies' earnings forecast is reported on I/B/E/S.
[2]  The Proposed Class Period before the de-SPAC is from 11/16/20 to 3/17/21.  Analyst coverage during this period was associated with ROCH.
[3]  The Proposed Class Period after the de-SPAC is from 3/18/21 to 11/10/21.  Analyst coverage during this period was associated with the publicly traded company PureCycle.

**Exhibit 13**

# Short Sales Borrowing Cost[1]
## 10/16/20 – 12/10/21



Source:  *S3*; D. Muravyev, N. D. Pearson, and J. M. Pollet (2022), "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *The Journal of Finance*, 77(3), pp. 1787–1828; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note:
[1]  Cost to borrow reflects the "Offer Rate" variable from S3 Partners, which represents the weighted-average borrowing rate paid by short sellers for all existing short positions of ROCH common stock before 3/17/21, the date of the de-SPAC, and PCT thereafter.  The date is adjusted for each observation by two trading days to reflect the difference between trading date and settlement date.
[2]  The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21.
[3]  Muravyev et al. (2022) analyze a large sample of U.S. equities that had exchange-traded options over the period from July 2006 to August 2015 and find that the 90th percentile of borrowing costs was 0.625% and the 99th percentile of borrowing costs was 15.0%.

**Exhibit 14**

# Common Stock Bid-Ask Spread Summary Statistics[1]
## 11/16/20 – 11/10/21

| | *Proposed Class Period Before de-SPAC* [2] | | | | *Proposed Class Period After de-SPAC* [3] | | | |
|---|---|---|---|---|---|---|---|---|
| | **Minimum** | **Median** | **Average** | **Maximum** | **Minimum** | **Median** | **Average** | **Maximum** |
| End-of-Day %[4] | 0.05% | 1.32% | 1.48% | 5.80% | 0.04% | 0.21% | 0.26% | 4.66% |
| Intraday Average %[4] | 0.70% | 3.40% | 3.24% | 6.64% | 1.34% | 2.76% | 3.09% | 9.28% |
| End-of-Day $[5] | $0.01 | $0.21 | $0.28 | $1.33 | $0.01 | $0.03 | $0.06 | $1.49 |
| Intraday Average $[5] | $0.07 | $0.60 | $0.63 | $1.75 | $0.17 | $0.46 | $0.59 | $2.71 |

Source: *Tick Data; Refinitiv*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Second Amended Complaint dated 8/18/22

Note:
[1] Includes only observations within NASDAQ trading hours of 9:30 a.m. to 4:00 p.m. All timestamps are in Eastern Time. Observations with $0.00 bid or ask prices are excluded.
[2] The Proposed Class Period before the de-SPAC is from 11/16/20 to 3/17/21. Bid-ask spreads during this period are reported for ROCH common stock.
[3] The Proposed Class Period after the de-SPAC is from 3/18/21 to 11/10/21. Bid-ask spreads during this period are reported for PCT.
[4] Bid-ask spread percentages are calculated at the quote level as the difference between the bid price and ask price for a security divided by the mid price. Minute-level spreads are calculated as the time-weighted average of second-level spreads, where the second-level spreads are forward filled using the most recent quote available. Intraday averages are calculated as the simple average of minute-level spreads throughout the day.
[5] Dollar bid-ask spread is calculated as the difference between the bid price and ask price for a security. Minute-level spreads are calculated as the time-weighted average of second-level spreads, where the second-level spreads are forward filled using the most recent quote available. Intraday averages are calculated as the simple average of minute-level spreads throughout the day.

**Exhibit 15**

## Common Stock Intraday Average Bid-Ask Spread Percentage
### 11/16/20 – 11/10/21



Source:  *Tick Data*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note:  Bid-ask spreads are reported for ROCH common stock before 3/17/21, the date of the de-SPAC, and PCT thereafter.  Data include only observations within NASDAQ trading hours of 9:30 a.m. to 4:00 p.m.  All timestamps are in Eastern Time.  Observations with $0.00 bid or ask prices are excluded.  Bid-ask spread percentages are calculated at the quote level as the difference between the bid price and ask price for a security divided by the mid price.  Minute-level spreads are calculated as the time-weighted average of second-level spreads, where the second-level spreads are forward filled using the most recent quote available.  Intraday averages are calculated as the simple average of minute-level spreads throughout the day.  The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21.

**Exhibit 16**

# Warrants Bid-Ask Spread Summary Statistics[1]
## 11/16/20 – 11/10/21

| | Proposed Class Period Before de-SPAC[2] | | | | Proposed Class Period After de-SPAC[3] | | | |
|---|---|---|---|---|---|---|---|---|
| | **Minimum** | **Median** | **Average** | **Maximum** | **Minimum** | **Median** | **Average** | **Maximum** |
| End-of-Day %[4] | 0.08% | 3.20% | 4.24% | 29.07% | 0.19% | 2.78% | 3.31% | 10.85% |
| Intraday Average %[4] | 3.84% | 7.95% | 9.99% | 37.85% | 2.93% | 10.38% | 11.62% | 42.24% |
| End-of-Day $[5] | $0.01 | $0.12 | $0.26 | $1.74 | $0.01 | $0.21 | $0.29 | $1.95 |
| Intraday Average $[5] | $0.06 | $0.36 | $0.76 | $6.07 | $0.16 | $0.89 | $1.00 | $4.08 |

Source:  *Tick Data*; *Refinitiv*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; Second Amended Complaint dated 8/18/22

Note:
[1]  Includes only observations within NASDAQ trading hours of 9:30 a.m. to 4:00 p.m.  All timestamps are in Eastern Time.  Observations with $0.00 bid or ask prices are excluded.
[2]  The Proposed Class Period before the de-SPAC is from 11/16/20 to 3/17/21.  Bid-ask spreads during this period are reported for ROCH warrants.
[3]  The Proposed Class Period after the de-SPAC is from 3/18/21 to 11/10/21.  Bid-ask spreads during this period are reported for PureCycle warrants.
[4]  Bid-ask spread percentages are calculated at the quote level as the difference between the bid price and ask price for a security divided by the mid price.  Minute-level spreads are calculated as the time-weighted average of second-level spreads, where the second-level spreads are forward filled using the most recent quote available.  Intraday averages are calculated as the simple average of minute-level spreads throughout the day.
[5]  Dollar bid-ask spread is calculated as the difference between the bid price and ask price for a security.  Minute-level spreads are calculated as the time-weighted average of second-level spreads, where the second-level spreads are forward filled using the most recent quote available.  Intraday averages are calculated as the simple average of minute-level spreads throughout the day.

**Exhibit 17**

# Warrants Intraday Average Bid-Ask Spread Percentage
## 11/16/20 – 11/10/21



Source:  *Tick Data*; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note:  Bid-ask spreads are reported for ROCH warrants before 3/17/21, the date of the de-SPAC, and PureCycle warrants thereafter.  Data include only observations within NASDAQ trading hours of 9:30 a.m. to 4:00 p.m.  All timestamps are in Eastern Time.  Observations with $0.00 bid or ask prices are excluded.  Bid-ask spread percentages are calculated at the quote level as the difference between the bid price and ask price for a security divided by the mid price.  Minute-level spreads are calculated as the time-weighted average of second-level spreads, where the second-level spreads are forward filled using the most recent quote available.  Intraday averages are calculated as the simple average of minute-level spreads throughout the day.  The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21.

**Exhibit 18**

# Percent of Days an Option Series Had Trading Volume

## 4/7/21 – 11/10/21[1]

| | (0%, 25%][2] | (25%, 50]% | (50%, 75%] | (75%, 100%] | Total |
|---|---|---|---|---|---|
| Number of Option Series | 137 | 51 | 48 | 24 | 260 |
| Percent of Option Series | 53% | 20% | 18% | 9% | 100% |

Source: *iVolatility*

Note:
[1]  The Proposed Class Period is from 11/16/20 to 11/10/21.  PureCycle option series data is available starting on 4/7/21.
[2]  Option series with zero trading volume throughout the Proposed Class Period are excluded.

**Exhibit 19**

# Option Series Counts on Dr. Cain's Days of Interest[1]

| Date | Option Series Available for Trading[2] [A] | Option Series with Trading Volume [B] | Percent of Option Series with Trading Volume [C] = [B] / [A] |
|---|---|---|---|
| 5/6/21 | 60 | 51 | 85% |
| 5/10/21 | 95 | 58 | 61% |
| 5/13/21 | 95 | 55 | 58% |
| 5/17/21 | 95 | 40 | 42% |
| 8/12/21 | 118 | 52 | 44% |

Source: *iVolatility*; Cain Report dated 11/30/23

Note:
[1]  The days with PureCycle option series trading and PCT residual returns that are statistically significant at the 95% level according to Dr. Cain's event study are 5/6/21, 5/10/21, 5/13/21, 5/17/21, and 8/21/21.
[2]  Option series with zero trading volume throughout the Proposed Class Period are excluded.  For any option series with non-zero trading for at least some days in the Proposed Class Period, an option series is considered available for trading on a date of interest if it is reported in iVolatility data for that date (irrespective of whether it has positive volume of trading on that date).

**Exhibit 20a**

# End-of-Day Bid-Ask Spread Percentiles[1][2]

## 4/7/21 − 11/10/21[3]

| Percentile | Bid-Ask Spread[4] |
|---|---|
| Minimum | $0.05 |
| 1st | $0.05 |
| 5th | $0.15 |
| 10th | $0.15 |
| 25th | $0.25 |
| 50th | $0.40 |
| 75th | $0.70 |
| 90th | $1.50 |
| 95th | $2.90 |
| 99th | $4.20 |
| Maximum | $5.00 |

Source:  *iVolatility*

Note:
[1]  Bid-ask spread is calculated as the difference between the bid price and ask price at closing for a PureCycle option series on each date.
[2]  Option series with zero trading volume throughout the Proposed Class Period are excluded.
[3]  The Proposed Class Period is from 11/16/20 to 11/10/21.  PureCycle option series data are available starting on 4/7/21.
[4]  Observations with a bid price of $0.00 are excluded.

**Exhibit 20b**

# End-of-Day Bid-Ask Spread Percentage Percentiles[1][2]
## 4/7/21 – 11/10/21[3]

| Percentile | Bid-Ask Spread Percentage[4] |
|---|---|
| Minimum | 0.8% |
| 1st | 1.8% |
| 5th | 2.9% |
| 10th | 3.7% |
| 25th | 6.2% |
| 50th | 11.5% |
| 75th | 26.6% |
| 90th | 56.9% |
| 95th | 90.9% |
| 99th | 150.0% |
| Maximum | 196.0% |

Source: *iVolatility*

Note:
[1]  Bid-ask spread is calculated as the difference between the bid price and ask price at closing for a PureCycle option series on each date.  Bid-ask spread percentage is calculated at the observation level as the spread divided by the mid price.
[2]  Option series with zero trading volume throughout the Proposed Class Period are excluded.
[3]  The Proposed Class Period is from 11/16/20 to 11/10/21.  PureCycle option series data are available starting on 4/7/21.
[4]  Observations with a bid price of $0.00 are excluded.

**Exhibit 21**

## Residual Returns on Alleged Misrepresentation Dates
### Baseline Regression Model

| Alleged Misrepresentation Dates (t)[1] | Residual Returns and P-Values [2][3] | | | | | |
|---|---|---|---|---|---|---|
| | t | t+1 | t+2 | t+3 | t+4 | t+5 |
| Business Combination Announcement (11/16/20) | 1.32% | -1.41% | -1.00% | -3.83% | -1.36% | -3.22% |
| *P-Value* | *0.77* | *0.75* | *0.82* | *0.40* | *0.76* | *0.48* |
| Form S-4 Filed (11/23/20) | -3.22% | -4.17% | 0.19% | -1.67% | -1.16% | 0.87% |
| *P-Value* | *0.48* | *0.36* | *0.97* | *0.71* | *0.80* | *0.85* |
| Form 424(b)(3) Prospectus Filed (2/12/21) | 6.32% | -5.34% | -1.45% | -2.57% | 0.17% | -4.85% |
| *P-Value* | *0.16* | *0.24* | *0.75* | *0.57* | *0.97* | *0.28* |
| Press Release About PCT Technology (4/21/21) | 3.09% | 5.40% | -1.56% | 0.41% | 1.36% | -0.34% |
| *P-Value* | *0.57* | *0.33* | *0.78* | *0.94* | *0.80* | *0.95* |

Source:  *Bloomberg; Refinitiv; S&P U.S. SPAC Index;* "Form 424B3 Filing Detail," U.S. Securities and Exchange Commission; "Form DEFA14A Filing Detail," U.S. Securities and Exchange Commission; "Form S-4 Filing Detail," U.S. Securities and Exchange Commission; "PureCycle's Tamsin Ettefagh Facilitates Plastics Industry Dialogue about Polypropylene Recycling Solutions in Light of U.S. Plastics Pact," PureCycle Press Release, April 21, 2021; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I to Combine With PureCycle Technologies, Accelerating a Revolution in Plastics Recycling Through Impact Investing," PureCycle Press Release, November 16, 2020; Roth CH Acquisition I Co., Form DEFM14A, filed 2/12/21; Second Amended Complaint dated 8/18/22

Note:
[1]  For each Alleged Misrepresentation Date, residual returns are shown on the associated impact date and on the five subsequent trading days.  Impact date is determined by the timing of the event relative to NASDAQ trading hours of 9:30 a.m. to 4:00 p.m.  All timestamps are in Eastern Time.  The next available trading date is selected when the timing of the event falls after market hours.
[2]  Residual returns are calculated as the difference between realized returns and predicted returns.  For each date prior to the de-SPAC, predicted returns are calculated from a regression of daily returns of ROCH common stock against daily returns of the NASDAQ Composite Index and the S&P U.S. SPAC Index over a fixed estimation window from 11/16/20 to 3/17/21.  For each date after the de-SPAC, predicted returns are calculated from a regression of daily returns of PureCycle common stock against daily returns of the NASDAQ Composite Index and an equal-weighted industry index over the following 126 trading days.  The industry index is an equal-weighted index of publicly traded companies which ROCH identified in the ROTH CH Acquisition I CO. 2021 proxy statement.  Companies included are Aerogels, Albemarle Corp., Amyris, Inc., Casella Waste Systems, Inc., Republic Services, Inc., Rogers Corp., TREX Company, Inc., Universal Display Corp., Waste Connections, Inc., and Waste Management, Inc.
[3]  "*" indicates the residual return is statistically significant at the 90% level, "**" indicates statistical significance at the 95% level, and "***" indicates statistical significance at the 99% level.

**Exhibit 22**

# Residual Returns on Alleged Misrepresentation Dates
## Alternative Regression Model 1

| Alleged Misrepresentation Dates (t)[1] | Residual Returns and P-Values [2][3] | | | | | |
|---|---|---|---|---|---|---|
| | t | t+1 | t+2 | t+3 | t+4 | t+5 |
| Business Combination Announcement (11/16/20) | 1.74% | -1.17% | -1.03% | -3.88% | -1.38% | -3.52% |
| *P-Value* | *0.74* | *0.83* | *0.85* | *0.49* | *0.80* | *0.53* |
| Form S-4 Filed (11/23/20) | -3.52% | -3.97% | 0.31% | -2.34% | -1.62% | 2.21% |
| *P-Value* | *0.53* | *0.47* | *0.95* | *0.69* | *0.77* | *0.70* |
| Form 424(b)(3) Prospectus Filed (2/12/21) | 6.21% | -5.82% | -1.49% | -0.73% | 0.70% | -3.67% |
| *P-Value* | *0.30* | *0.33* | *0.80* | *0.90* | *0.91* | *0.55* |
| Press Release About PCT Technology (4/21/21) | 3.09% | 5.40% | -1.56% | 0.41% | 1.36% | -0.34% |
| *P-Value* | *0.57* | *0.33* | *0.78* | *0.94* | *0.80* | *0.95* |

Source: *Bloomberg; Refinitiv; S&P U.S. SPAC Index*; "Form 424B3 Filing Detail," U.S. Securities and Exchange Commission; "Form DEFA14A Filing Detail," U.S. Securities and Exchange Commission; "Form S-4 Filing Detail," U.S. Securities and Exchange Commission; "PureCycle's Tamsin Ettefagh Facilitates Plastics Industry Dialogue about Polypropylene Recycling Solutions in Light of U.S. Plastics Pact," PureCycle Press Release, April 21, 2021; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I to Combine With PureCycle Technologies, Accelerating a Revolution in Plastics Recycling Through Impact Investing," PureCycle Press Release, November 16, 2020; Roth CH Acquisition I Co., Form DEFM14A, filed 2/12/21; Second Amended Complaint dated 8/18/22

Note:
[1]  For each Alleged Misrepresentation Date, residual returns are shown on the associated impact date and on the five subsequent trading days.  Impact date is determined by the timing of the event relative to NASDAQ trading hours of 9:30 a.m. to 4:00 p.m.  All timestamps are in Eastern Time.  The next available trading date is selected when the timing of the event falls after market hours.
[2]  Residual returns are calculated as the difference between realized returns and predicted returns.  For each date prior to the de-SPAC, predicted returns are calculated from a regression of daily returns of ROCH common stock against daily returns of the NASDAQ Composite Index and the S&P U.S. SPAC Index over the following 126 trading days.  For each date after the de-SPAC, predicted returns are calculated from a regression of PureCycle common stock against daily returns of the NASDAQ Composite Index and an equal-weighted industry index over the following 126 trading days.  The industry index is an equal-weighted index of publicly traded companies which ROCH identified in the ROTH CH Acquisition I CO. 2021 proxy statement.  Companies included are Aerogels, Albemarle Corp., Amyris, Inc., Casella Waste Systems, Inc., Republic Services, Inc., Rogers Corp., TREX Company, Inc., Universal Display Corp., Waste Connections, Inc., and Waste Management, Inc.
[3]  "*" indicates the residual return is statistically significant at the 90% level, "**" indicates statistical significance at the 95% level, and "***" indicates statistical significance at the 99% level.

**Exhibit 23**

## Residual Returns on Alleged Misrepresentation Dates
### Alternative Regression Model 2

| | Residual Returns and P-Values [2][3] | | | | | |
|---|---|---|---|---|---|---|
| **Alleged Misrepresentation Dates (t)[1]** | **t** | **t+1** | **t+2** | **t+3** | **t+4** | **t+5** |
| Business Combination Announcement (11/16/20) | 1.29% | -0.93% | 0.06% | -2.06% | -0.68% | -1.11% |
| *P-Value* | *0.78* | *0.84* | *0.99* | *0.66* | *0.88* | *0.81* |
| Form S-4 Filed (11/23/20) | -1.11% | -3.85% | 0.37% | 1.17% | 0.04% | -1.20% |
| *P-Value* | *0.81* | *0.40* | *0.94* | *0.80* | *0.99* | *0.79* |
| Form 424(b)(3) Prospectus Filed (2/12/21) | 6.60% | -4.44% | -0.74% | -2.98% | -0.32% | -4.66% |
| *P-Value* | *0.15* | *0.34* | *0.87* | *0.52* | *0.94* | *0.31* |
| Press Release About PCT Technology (4/21/21) | 3.09% | 5.40% | -1.56% | 0.41% | 1.36% | -0.34% |
| *P-Value* | *0.57* | *0.33* | *0.78* | *0.94* | *0.80* | *0.95* |

Source: *Bloomberg; Refinitiv*; "Form 424B3 Filing Detail," U.S. Securities and Exchange Commission; "Form DEFA14A Filing Detail," U.S. Securities and Exchange Commission; "Form S-4 Filing Detail," U.S. Securities and Exchange Commission; "PureCycle's Tamsin Ettefagh Facilitates Plastics Industry Dialogue about Polypropylene Recycling Solutions in Light of U.S. Plastics Pact," PureCycle Press Release, April 21, 2021; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I to Combine With PureCycle Technologies, Accelerating a Revolution in Plastics Recycling Through Impact Investing," PureCycle Press Release, November 16, 2020; Roth CH Acquisition I Co., Form DEFM14A, filed 2/12/21; Second Amended Complaint dated 8/18/22

Note:
[1] For each Alleged Mispresentation Date, residual returns are shown on the associated impact date and on the five subsequent trading days. Impact date is determined by the timing of the event relative to NASDAQ trading hours of 9:30 a.m. to 4:00 p.m. All timestamps are in Eastern time. The next available trading date is selected when the timing of the event falls after market hours.
[2] Residual returns are calculated as the difference between realized returns and predicted returns. For each date prior to the de-SPAC, predicted returns are calculated from a regression of daily returns of ROCH common stock against daily returns of the NASDAQ Composite Index and an equal-weighted industry index over a fixed estimation window from 11/16/20 to 3/17/21. For each date after the de-SPAC, predicted returns are calculated from a regression of daily returns of PureCycle common stock against daily returns of the NASDAQ Composite Index and an equal-weighted industry index over the following 126 trading days. The industry index is an equal-weighted index of publicly traded companies which ROCH identified in the ROTH CH Acquisition I CO. 2021 proxy statement. Companies included are Aerogels, Albemarle Corp., Amyris, Inc., Casella Waste Systems, Inc., Republic Services, Inc., Rogers Corp., TREX Company, Inc., Universal Display Corp., Waste Connections, Inc., and Waste Management, Inc.
[3] "*" indicates the residual return is statistically significant at the 90% level, "**" indicates statistical significance at the 95% level, and "***" indicates statistical significance at the 99% level.

**Exhibit 24**

## Summary of Alleged Misrepresentations and Prior Disclosures

| Alleged Misrepresentation Statement | Prior Information | Other Prior Information | Other Prior Information |
|---|---|---|---|
| **Monday, November 16, 2020[1][2]** | | | |
| In the press release, Defendants represented that PureCycle's method to recycle waste polypropylene into virgin-like resin "is both more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy." (¶ 53) | 4/19/18: "Layman: This technology offers the recycling industry a cost-effective method to produce virgin-like recycled polymers without trade-offs in performance." <br><br>"[The PureCycle Technology] will help divert plastic otherwise headed for the landfill or into waterways and remove previous limitations on the use of recycled PP because of low quality." <br><br>Dr. Layman: "This technology enables companies to provide more sustainable choices." (Packaging Digest) | 11/1/20: "We want to deliver more environmentally responsible products for our consumer. ... To do that though, it's going to require technologies like the PureCycle process to be able to achieve those really high levels of displacement." <br><br>"I encourage you to look at the comparison between the LCA indicators in terms of energy usage and that sort of thing of our process compared to virgin, and you can see that ours is quite lower." (PureCycle Press Release) | 2019: PureCycle Technologies' purification process "uses only a fraction of the energy involved in making virgin resin." (Time Magazine) |
| "PureCycle's Ultra-Pure Recycled Polypropylene ('UPRP') has nearly identical properties and applicability for reuse as virgin polypropylene." (¶ 53) | 10/9/20: CEO Otworth: "We're providing a resin that can be colored just as virgin resin can and any vertical can make a product out of polypropylene that has the appearance they are looking for. Even in the most appearance-sensitive applications, you can use our resin interchangeably with virgin." (Recycling Today) | 4/19/18: Layman: This technology offers the recycling industry a cost-effective method to produce virgin-like recycled polymers without trade-offs in performance." (Packaging Digest) | |
| In the presentation, Defendants Otworth, Dee, and Brenner also highlighted the purported value of the Company's technology and intellectual property rights, stating, in pertinent part that PureCycle's process is, "the only proven and economically-viable method of recycling polypropylene to virgin-quality" and that "no other technologies can efficiently address polypropylene recycling at scale." (¶ 58) | 9/25/19: "PureCycle transforms waste carpet into Ultra-Pure Recycled Polypropylene, Validating P&G's proven technology at scale" <br><br>"PureCycle Technologies today announced it has successfully completed purified waste carpet from its Feedstock Evaluation Unit (FEU), transforming discarded carpet into clear, odorless, Ultra-Pure Recycled Polypropylene (UPRP) resin through its proprietary plastics recycling technology, developed and invented by Procter & Gamble. The successful scaling of the technology unlocks the value for a wide range of waste polypropylene (PP) that can be restored to its original virgin-like condition." <br><br>CEO Otworth: "This achievement not only proves the technology at scale, but also builds on the momentum of the business as we move closer towards scaling operations beyond our first plant." (PureCycle Press Release) | 11/1/20: "I think that learning that we get from scaling to the FEU is going to be invaluable as we look to scale to the larger units. When it comes to scaling bigger, I just want to reflect on the fact that if you look at all of our individual steps or so-called unit operations, all of those are well-known unitops, extraction columns, extruders, candle filters. All of these pieces of equipment have been known for decades. ... When it comes to scaling, even beyond where our first commercial plant will be, again, back to the fact that all of these unit operations are well-known in the chemical engineering industry. Today, unit operations, are much, much bigger than what we're looking to build even of productivity on a 165 million pound per year scale." <br><br>"I think the only thing to note here that's important is these technologies [other methods of recycling polypropylene] are much more expensive from a capex and opex point of view." <br><br>"However, when you look at [other plastics recycling companies'] technology compared to ours, we're the only ones out there with pictures showing before and after of what we can purify. Meaning we can put black material in our process and bring out clear. We have not seen anybody else who can do that." (PureCycle Press Release) | 7/20/17: "PureCycle Technologies ... hosted the ribbon-cutting for a plant that will restore used polypropylene (PP) plastic to 'virgin-like' quality with a recycling method that is one of a kind." (PureCycle Press Release) |

**Exhibit 24**

| Alleged Misrepresentation Statement | Prior Information | Other Prior Information | Other Prior Information |
|---|---|---|---|
| **Monday, November 16, 2020 Continued[1][2]** | | | |
| In the presentation, Defendant Otworth stated, in relevant part: "And so, as I said, customers can use our resin, they can use it interchangeably with virgin resin, and they can make, you know, the same brand colors with the same appearance in the same degree of hygiene that they expect from virgin resin today." (¶ 60) | 10/9/20: According to company CEO Otworth, "Companies want to use more recycled polypropylene, but they don't want to have to make compromises in terms of appearance or physical properties... we're providing a resin that can be colored just as virgin resin can and any vertical can make a product out of polypropylene that has the appearance they are looking for. Even in the most appearance-sensitive applications, you can use our resin interchangeably with virgin." (Recycling Today) | 4/19/18:  Layman: "This technology purifies recycled polypropylene back to a virgin-like polymer. It will remove colorants, odor and other contaminants from the recycled plastic, enabling the recycled plastic to be in nearly virgin-quality—which was not possible before."<br><br>"Our technology removes virtually all containments and makes virgin-like PP, which enables the material to be used in any applicaion where virgin PP is used today." (Packaging Digest) | 9/25/19:  P&G Chief Research, Development and Innovation Officer:  "Our approach to innovation not only includes products and packaging, but technologies that allow us and others to have a positive impact on our environment. This technology, which can remove virtually all contaminants and colors from used plastic, has the capacity to revolutionize the plastics recycling industry by enabling P&G and companies around the world to tap into sources of recycled plastics that deliver nearly identical performance and properties as virgin materials in a broad range of applications." (PureCycle Press Release) |
| **Friday November 20, 2020[3]** | | | |
| Defendants called PureCycle's technology "proven" to "convert[] waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene." (¶ 63) | 9/25/19:  "PureCycle transforms waste carpet into Ultra-Pure Recycled Polypropylene, Validating P&G's proven technology at scale... PureCycle Technologies today announced it has successfully completed purified waste carpet from its Feedstock Evaluation Unit (FEU), transforming discarded carpet into clear, odorless, Ultra-Pure Recycled Polypropylene (UPRP) resin through its proprietary plastics recycling technology, developed and invented by Procter & Gamble. The successful scaling of the technology unlocks the value for a wide range of waste polypropylene (PP) that can be restored to its original virgin-like condition." (PureCycle Press Release) | 4/19/18:  "This technology purifies recycled polypropylene back to a virgin-like polymer. It will remove colorants, odor and other contaminants from the recycled plastic, enabling the recycled plastic to be in nearly virgin-quality—which was not possible before."<br><br>"Layman: This technology offers the recycling industry a cost-effective method to produce virgin-like recycled polymers without trade-offs in performance." (Packaging Digest) | |
| The Registration Statement went on to say, in relevant part, that: "This patented process was developed by P&G over the course of eight years and has been refined by PCT over the past five years with more than 350 laboratory tests and with over 1,000 pounds of UPRP produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019."  (¶ 63) | 9/25/19:  "PureCycle Technologies today announced it has succesfully completed purified waste carpet from its Feedstock Evaluation Unit (FEU)... The FEU is the first of two phases for PureCycle's plant in Hanging Rock, Ohio... While the FEU is located at the plant's first site, it is a perpetual asset to the company that will allow PureCycle to refine the operation conditions and process waste polypropylene from around the world to help with the sizing for future plants in other geographies."  (PureCycle Press Release) | 10/17:  "P&G patented its technology for recycling PP [polypropylene] in January 2017. The technology was developed in the company's labs by Dr. John Layman, who works in the Materials Science division in P&G's corporate research and development organization. P&G's Global Business Development organization connected the company with Chicago-based Innventure, the parent company of PureCycle Technologies." (Recycling Today) | |
| "In addition, PCT's purification process and UPRP quality have been validated by independent technical consultants and many of PCT's strategic partners and initial customers."  (¶ 63) | 11/1/20:  "The Phasex test is a lab-scale unit at a testing partner called Phasex. They are in Andover, which is in the Boston area, Massachusetts. They have lab-scale equipment that is designed to operate under the conditions of our process, which is at elevated temperature and pressure. That's where all of our development has occurred in terms of developing the initial lab scale process that went into developing our IP portfolio, as well as ongoing lab scale tests that we use daily to continue to  refine the technology, to improve it, optimize it, etc." (PureCycle Press Release) | 9/4/18:  CEO Otworth on Aptar strategic partnership "[t]his is not only a technical validation of our process, but a commercial validation of our model that plastic waste is valuable and we as a society must act now to make plastics recycling a reality." (Innventure Press Release) | |

**Exhibit 24**

| Alleged Misrepresentation Statement | Prior Information | Other Prior Information | Other Prior Information |
|---|---|---|---|
| **Friday November 20, 2020 Continued[3]** | | | |
| In the Registration Statement, Defendants also touted PureCycle's use of a "broader range of feedstock" to make "virgin-quality UPRP pellets that are clear, odorless and contaminant-free" (¶ 65) | 11/1/20: When asked whether the quality of the feedstock is important and whether the process can handle less pure feedstock, P&G Director John Layman responds: "Actually, from a technical point of view, the process and the technology can handle, you know, feedstocks with 1% polypropylene." (PureCycle Press Release) | 10/9/20: CEO Otworth: "We uniquely can use a vast array of feedstocks, some of which have been not desirable for recycling" (Recycling Today) | 4/19/18: Layman: "This technology purifies recycled polypropylene back to a virgin-like polymer. It will remove colorants, odor and other contaminants from the recycled plastic, enabling the recycled plastic to be in nearly virgin-quality—which was not possible before."<br><br>"Layman: This technology offers the recycling industry a cost-effective method to produce virgin-like recycled polymers without trade-offs in performance." |
| "making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products." (¶ 65) | 9/25/19: "The PureCycle process removes color, odor and impurities, producing virgin-like resin. This Ultra-Pure Recycled Polypropylene (UPRP) delivers a consistent product that meets virgin-like specifications to meet the demands of various industries." (PureCycle Press Release) | 1/15/19: "Nestlé initiated a collaboration with PureCycle Technologies to produce food-grade recycled Polypropylene (PP)." (Nestle Press Release) | 4/19/18: "With patents granted and others still pending, the PureCycle technology is capable of making recycled PP suitable even for use in food-contact applications." (Packaging Digest) |
| **Friday, February 12, 2021[2][4]** | | | |
| Describing the ROCH Board's reasons for approval of the business combination, the Proxy emphasized the following as a significant factor on which the ROCH Board based its decision to recommend the SPAC transaction: Strong Technology Representing Significant Innovation: PCT's unique, patented process separates colors, odors and contaminants through a physical purification process (not involving chemical reactions), allowing for a broader range of feedstock than traditional recycling. (¶ 67) | 4/19/18: "This technology purifies recycled polypropylene back to a virgin-like polymer. It will remove colorants, odor and other contaminants from the recycled plastic, enabling the recycled plastic to be in nearly virgin-quality—which was not possible before."<br><br>"Our technology removes virtually all containments and makes virgin-like PP, which enables the material to be used in any applicaion where virgin PP is used today." (Packaging Digest) | 11/1/20: When asked whether the quality of the feedstock is important and whether the process can handle less pure feedstock, Layman responds: "Actually, from a technical point of view, the process and the technology can handle, you know, feedstocks with 1% polypropylene." (PureCycle Press Release) | 9/25/19: P&G Chief Research, Development and Innovation Officer: "Our approach to innovation not only includes products and packaging, but technologies that allow us and others to have a positive impact on our environment. This technology, which can remove virtually all contaminants and colors from used plastic, has the capacity to revolutionize the plastics recycling industry by enabling P&G and companies around the world to tap into sources of recycled plastics that deliver nearly identical performance and properties as virgin materials in a broad range of applications." (PureCycle Press Release) |
| This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists. (¶ 67) | 10/17: "P&G patented its technology for recycling PP [polypropylene] in January 2017. The technology was developed in the company's labs by Dr. John Layman, who works in the Materials Science division in P&G's corporate research and development organization. P&G's Global Business Development organization connected the company with Chicago-based Innventure, the parent company of PureCycle Technologies." (Recycling Today) | 11/1/20: "The Phasex test is a lab-scale unit at a testing partner called Phasex. They are in Andover, which is in the Boston area, Massachusetts. They have lab-scale equipment that is designed to operate under the conditions of our process, which is at elevated temperature and pressure. That's where all of our development has occurred in terms of developing the initial lab scale process that went into developing our IP portfolio, as well as ongoing lab scale tests that we use daily to continue to  refine the technology, to improve it, optimize it, etc." (PureCycle Press Release) | 9/4/19: CEO Otworth on Aptar strategic partnership "This is not only a technical validation of our process, but a commercial validation of our model that plastic waste is valuable and we as a society must act now to make plastics recycling a reality." (Innventure Press Release) |
| The Proxy Statement also touted that the output of its recycling process, stating that "UPRP is interchangeable with virgin polypropylene…" (¶ 68) | 4/19/18: "Layman: This technology offers the recycling industry a cost-effective method to produce virgin-like recycled polymers without trade-offs in performance." (Packaging Digest) | | |

**Exhibit 24**

| Alleged Misrepresentation Statement | Prior Information | Other Prior Information | Other Prior Information |
|---|---|---|---|
| **Friday, February 12, 2021 Continued[2][4]** | | | |
| The Proxy Statement further stated that the Company's process uses "significantly less energy and reduce[s] production costs as compared to virgin resin." (¶ 69) | 11/1/20: "I encourage you to look at the comparison between the LCA indicators in terms of energy usage and that sort of thing of our process compared to virgin, and you can see that ours is quite lower." (PureCycle Press Release) | 4/19/18: "Layman: This technology offers the recycling industry a cost-effective method to produce virgin-like recycled polymers without trade-offs in performance." (Packaging Digest) | |
| **Wednesday, April 21, 2021[5]** | | | |
| In this press release, Defendant Ettefagh stated "PureCycle is uniquely positioned to reduce the use of non-renewable virgin plastics and minimize negative environmental impacts." (¶ 73) | 11/1/20: P&G is "quite confident that our technology is unique, it's novel, it has tremendous utility." (PureCycle Press Release) | 11/1/20: "We want to deliver more environmentally responsible products for our consumer. ... To do that though, it's going to require technologies like the PureCycle process to be able to have virgin like materials so that we can achieve those really high levels of displacement." (PureCycle Press Release) | |
| The press release further stated that its technology can "recycle waste PP into virgin-like recycled PP for a myriad of applications." (¶ 73) | 10/9/20: According to company CEO Otworth, "[e]ven in the most appearance-sensitive applications, you can use our resin interchangeably with virgin."<br><br>"[PureCycle's] recycled PP will be used in consumer goods packaging, home furnishings and other applications that currently have limited options for recycled PP today." (Recycling Today) | 9/25/19: "The PureCycle process removes color, odor and impurities, producing virgin-like resin. This Ultra-Pure Recycled Polypropylene (UPRP) delivers a consistent product that meets virgin-like specifications to meet the demands of various industries." (PureCycle Press Release) | |

Source: Second Amended Complaint; "Aptar Enters into Strategic Partnership with PureCycle Technologies," Innventure Press Release, September 4, 2019; "Frequently Asked Questions about PCT's Purification Technology," PureCycle, November 1, 2020; "Game-Changing Innovation," Recycling Today, October 2017; "Nestlé Accelerates Action to Tackle Plastic Waste," Nestle Press Release, January 15, 2019; "P&G's PureCycle Cleans Recycled PP to 'Near Virgin' Quality," *Packaging Digest*, April 19, 2018; "PureCycle Technologies Raises $250M in Bonds," *Recycling Today*, October 9, 2020; "PureCycle Technologies and P&G Introduce Technology That Enables Recycled Plastic to Be Nearly-New Quality," PureCycle Press Release, July 20, 2017; "PureCycle Technologies Celebrates Successful Run of Groundbreaking Recycling Technology," PureCycle Press Release, September 25, 2019; "Repurposing Plastic PureCycle," *Time.com*, 2019;

Note:
[1] PureCycle November 2020 Press Release; PureCycle November 2020 Investor Presentation.
[2] Information related to the management team's prior professional experience was also publicly available before the Proposed Class Period. *See, e.g.*, "Can Billion-Dollar Startups Be Created from Big Companies' Unused IP? Ex-Walgreens CEO Bets 'Yes,'" Forbes, February 16, 2018, available at https://www.forbes.com/sites/amyfeldman/2018/02/16/can-billion-dollar-startups-be-created-from-big-companies-unused-ip-ex-walgreens-ceo-bets-yes/; Graf Industrial Corp, Form DEF14A, filed March 27, 2020; "Wasson Enterprise and Innventure Form New Joint Venture to Commercialize Innovative Technologies," Innventure Press Release, April 21, 2017.
[3] PureCycle November 2020 SEC Form S-4.
[4] Roth CH Acquisition I Co., Form DEFM14A, filed February 12, 2021.
[5] PureCycle April 2021 Press Release.

Page 31

**Exhibit 25**

# Illustrative Common Stock Price with Dollar Inflation Band
## 10/16/20 – 12/10/21



Source:  *Factiva*; *Refinitiv; SEC Edgar*; Cain Report dated 11/30/23; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note:  Chart shows stock price of ROCH from its IPO on 5/4/20 to 3/17/21, the day of the de-SPAC, and PCT thereafter.  The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21.  The shaded area represents a constant dollar inflation band based on the raw dollar declines on the alleged corrective disclosure days using residual price changes from Dr. Cain's regression model.  The horizontal dotted line represents the approximate price at which investors could have redeemed their shares prior to the de-SPAC.  All press releases and SEC filings prior to the de-SPAC were made by ROCH and/or the private company PureCycle.

**Exhibit 26**



# Illustrative Common Stock Price with Percent Inflation Band
## 10/16/20 – 12/10/21

Source: *Factiva*; *Refinitiv*; *SEC Edgar*; Cain Report dated 11/30/23; "PureCycle Technologies Completes Business Combination with Roth CH Acquisition I Co. and Will Begin Trading on NASDAQ," PureCycle Press Release, March 18, 2021; "Roth CH Acquisition I and PureCycle Technologies Announce Closing of Business Combination," Roth CH Acquisition I Press Release, March 17, 2021; Second Amended Complaint dated 8/18/22

Note: Chart shows stock price of ROCH from its IPO on 5/4/20 to 3/17/21, the day of the de-SPAC, and PCT thereafter. The consummation of the Business Combination was announced after market close on 3/17/21 and the combined company began trading on the NASDAQ on 3/18/21. The shaded area represents a constant percentage inflation band based on the raw percentage declines on the alleged corrective disclosure days using residual price changes from Dr. Cain's regression model. The horizontal dotted line represents the approximate price at which investors could have redeemed their shares prior to the de-SPAC. All press releases and SEC filings prior to the de-SPAC were made by ROCH and/or the private company PureCycle.