**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER, and BYRON ROTH,<br><br>Defendants. | Case No. 6:21-cv-809-PGB-GJK<br><br>**CLASS ACTION** |

**LEAD PLAINTIFFS' REPLY MEMORANDUM OF LAW**

This action warrants class treatment. Defendants do not dispute that Plaintiffs established numerosity, commonality, and adequacy of counsel under Rule 23(a), or superiority under Rule 23(b)(3). Defendants purport to challenge Plaintiffs' typicality and adequacy under Rule 23(a), but do not address, and thus concede, the *only* relevant inquiries: 1) for typicality, whether the claims and defenses of Plaintiffs and the class arise from the same events and are based on the same legal theory (it is undisputed that they do); and 2) for adequacy, whether there are substantial conflicts of interest between the class representatives and the class (there are not). ECF No. 179, at 11-14.

Defendants also purport to challenge predominance under Rule 23(b)(3) via the Expert Report of René M. Stulz, though: 1) Prof. Stulz has *never* analyzed whether a security traded in an efficient market for a securities litigation, has *only* served as a

defense witness, and did not opine that PCT securities traded in an inefficient market during the Class Period, Stulz Tr.[1], 45:2-8, 50:9-14, 51:23-35, 52:2-7; 2) Prof. Stulz's price impact analysis did not provide "direct, more salient" evidence as required[2] to rebut the presumption of reliance; and 3) Prof. Stulz, who has been criticized for "misapprehend[ing] *Comcast*,"[3] conceded that damages could be calculated class-wide following certification.  The Court thus faces no impediment to following the Eleventh Circuit's well supported inclination to certify classes in securities fraud cases.  *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 U.S. Dist. LEXIS 33637, *13 (S.D. Fl. Mar. 2016)[4].

## I.    Typicality and Adequacy are Established

**Typicality is satisfied** where, *as here*, "'the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Monroe Cnty. Emps' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 379 (N.D. Ga. 2019); ECF No. 179, at 11-12.  Defendants do not dispute this. Instead, they offer red herring arguments contradicting black letter law and mischaracterizing deposition testimony.  First, Defendants wrongly argue that Plaintiffs are atypical because of when they bought and sold their shares.  *Monroe*, 332 F.R.D. at 379 (adequacy where plaintiffs purchased stock during the Class Period and were "allegedly injured by the same alleged material misrepresentations and omissions" as

---

[1] "Stulz Tr." is the deposition transcript of René M. Stulz, Ph.D., Weinrib Decl., Ex. B. hereto.
[2] *See Basic, Inc. v. Levinson,* 485 U.S. 224 (1988) ("*Basic*"); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) ("*Halliburton II*").
[3] *See Junge v. Geron Corp.*, 2022 U.S. Dist. LEXIS 61962, *15 (N.D. Cal. Apr. 2, 2022).
[4] All internal citations omitted, and emphasis supplied, unless otherwise noted.

all Class members); *In re Ocwen Fin. Corp. Sec. Litig.*, 2016 U.S. Dist. LEXIS 205181, *12 (S.D. Fl. Nov. 17, 2016) (plaintiffs' "interests are aligned" with other class members despite selling before corrective disclosures); *Thorpe*, 2016 U.S. Dist. LEXIS 33637, *28; *Mazur v. Lampert*, 2007 U.S. Dist. LEXIS 115379, *13-14 (S.D. Fl. Mar. 23, 2007); *In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 621 (M.D. Fla. 2006)[5].

Second, Defendants *falsely* argue, that Plaintiffs are atypical because:

- R. Ciecko "understood the technology may never be commercialized."

  o *But see* ECF No. 183-12 ("Defs. Ex. 11"), 206:19-23, 207:3, 208:22-24, 209:9-10 (Q. "Did you know at the time of your investment that this may never get to the point of scaling to –", A. "I did not know," Q. "-- commercial scale operation?", A. "How could I know;" Q: Did you understand that a risk of this business was such that it might not be scalable to a commercial scale operation, yes or no?," A. "…the risks were substantially higher than what they disclosed.")

- R. Ciecko did not hold long term.

  o *But see id.*, 174:23-24, 176:5, 269:7-17 (stated he planned to "keep some PCT long term," called his investment a "good long-term position," Q. "…so you were doing short term trading in PureCycle," A. "No… [c]ompletely, completely disagree…I already stated…I was building up position")

- R. Ciecko stated "it was irrelevant" who took companies public.

  o Appears nowhere in R. Ciecko's deposition testimony.

- R. Ciecko "confirmed that the existence of an SEC investigation does not indicate Defendants committed wrongdoing."

  o *But see id.*, 301:23-304:4 (declining to speculate as to the implications of the SEC opening an investigation).[6]

---

[5] Plaintiffs have §10(b) standing *for the whole Class Period* because they purchased PureCycle securities during the Class Period and held through a corrective disclosure; they need not have purchased before each misstatement. *Luczak v. Nat'l Beverage Corp.*, 400 F. Supp. 3d 1318, 1326 (S.D. Fla. 2019); *In re Catalina Mktg. Corp Sec. Litig.*, 2006 U.S. Dist. LEXIS 113145, *51 (M.D. Fla. 2006).
[6] Defendants also argue atypicality based on the degree to which Plaintiffs reviewed/relied on disclosures, which is irrelevant as Plaintiffs invoke *Basic's* fraud on the market presumption of reliance.

**Adequacy is satisfied** because there are no substantial conflicts between Plaintiffs and the Class, Plaintiffs have "supervised and monitored the progress of the litigation," have discussed case developments with Lead Counsel, "have reviewed Court filings, understand their duty to the Class and are committed to vigorously prosecuting this action to maximize recovery for all Class members." *See Monroe,* 332 F.R.D. at 379; ECF No. 179, at 12-14.  Citing no supporting case law[7], Defendants incorrectly argue that Plaintiffs did not choose counsel and are thus inadequate.  *See* Defs. Ex. 11, 53:1-16 ("Q. Why did you choose Pomerantz as your counsel in this case…A. They were very professional. I was impressed."). *See also Pub. Emps' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 2022 U.S. Dist. LEXIS 232580, *16-17 (N.D. Ga. Nov. 28, 2022) (adequacy met though choice of counsel a "foregone conclusion" because counsel had "significant experience in securities litigation cases").

Defendants also wrongly argue that "Plaintiffs falsely testified" they had §14(a) standing. Plaintiffs *accurately* testified as to the dates of their transactions and made clear they did not have the legal expertise to opine on standing. Defs. Ex. 11, 280:7, 281:7, 282:20-22; ECF No. 183-13 ("Defs. Ex. 12"), 86:7-8, 102:15-16, 102:23-24. *See also Cooper v. Pac. Life Ins. Co.*, 229 F.R.D. 245, 258 (S.D. Ga. 2005) ("A lack of detailed factual knowledge about the case or a lack of understanding regarding the legal theories by the named plaintiffs does not preclude class certification in a complex

---

[7] Defendants inaccurately cite *Spinelli v. Cap. One Bank*, 265 F.R.D. 598, 614 (M.D. Fla. 2009), though the court found plaintiff adequate despite defendants' mischaracterizations of testimony to argue plaintiff lacked understanding of his duties, the claims, and did not regularly speak to counsel.

case."). In any event, there has been no ruling that Plaintiffs lack §14(a) standing and any such inquiry is now irrelevant. *See* ECF No. 174. Defendants concede that "Plaintiffs reviewed all filings," the hallmark of adequacy, but argue they are inadequate for failing to detect discrete errors (which Plaintiffs clarified and remedied). *Mazur*, 2007 U.S. Dist. LEXIS 115379, *15 (rejecting inadequacy argument where plaintiff "certified an incomplete list of his … stock transactions" because there was no "intentional deceit" and plaintiff "attempted to remedy any deficiency or error"); *Cooper*, 229 F.R.D. at 259 (rejecting inadequacy argument that plaintiffs gave counsel "unfettered discretion" because they performed their duties and showed "sound judgment" in relying on experienced counsel).

## II.    *Basic's* **Fraud on the Market Presumption of Reliance Applies**

Plaintiffs have sufficiently established that PureCycle securities, which trade on the NASDAQ, traded in an efficient market throughout the Class Period.[8] Defendants do not conclude that PureCycle securities traded *in*efficiently but instead rely on Prof. Stulz to ***challenge the methodologies*** Dr. Cain employed to demonstrate efficiency. Prof. Stulz, however, is a defense expert who has only ever been retained to criticize plaintiffs' experts' approaches to analyzing efficiency but has never, *in this case or any other case,* analyzed the *Cammer* factors to test market efficiency for a security or opined that a market is efficient. Stulz Tr., 45:2-8; 50:5-52:7; 75:25-76:12. Where a defense

---

[8] This includes the options and warrants, which are derivative of the common stock. *See* Expert Rebuttal Reply Report of Matthew D. Cain, Ph.D., Weinrib Decl., Ex. A-1 hereto, ("Rebuttal"), ¶¶44-59; *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1329–30 (N.D. Ga. 2007).

expert criticizes plaintiff's expert's analysis but "does not opine that the market...was not efficient," courts in this Circuit "afford[] [the defense expert's] affidavit little weight." *Monroe*, 332 F.R.D. at 387.  Prof. Stulz also testified that he rejects the utility of the *Cammer* factors in establishing market efficiency, rendering his opinions here— or in any securities class action—contrary to black letter precedent and thus irrelevant. Stulz Tr., 67:10-11, 70:10-20.  In any event, Prof. Stulz's analyses are flawed and based on mischaracterizations of Dr. Cain's Report and testimony.

Relying on Prof. Stulz, Defendants argue that Dr. Cain did not consider distinctions between the pre- and post-de-SPAC periods (citing no source requiring an expert to break a class into sub-periods to assess efficiency[9]).  However, Dr. Cain stated in his Report[10] and testified that he factored such distinctions into his analysis and concluded that PureCycle securities traded in an efficient market *throughout the Class Period*. Report, §4, ¶¶ 10,13, fns. 30, 34, 40, 54, 73, 79, 83, Exs. 2, 3, 6, 8, 9, 10A; ECF No. 183-17 ("Defs. Ex. 16"), 50:3-53:6; Rebuttal, ¶¶12-19.  Prof. Stulz also states that investment in a SPAC is akin to a fixed income investment, like a corporate bond, but Dr. Cain testified to that. Defs. Ex. 16, 50:3-53:6.  Prof. Stulz does not acknowledge, however, that corporate bonds are routinely found to trade in an efficient market. Rebuttal, ¶¶20-21, fn. 20. Defendants' remaining criticisms fare no better.

Dr. Cain uses all of *Cammer's* benchmarks, but Prof. Stulz critiques Dr. Cain for

---

[9] Further, Prof. Stulz uses inapplicable structural break tests, which when applied to his own regression model yields multiple additional sub-periods that he ignores. Rebuttal, ¶¶19, 41-43.
[10] "Report" refers to the Expert Report of Matthew D. Cain, Ph.D. (ECF No. 163-1).

otherwise using benchmarks from the MRK Study, arguing that that it covers companies from 1984-2008 and that Dr. Cain does not explain whether the companies are comparable to PCT.  However, MRK studied companies from the *same timeframe* as the *Cammer* and *Krogman* decisions and Prof. Stulz testified that efficiency should not be measured relative to comparable companies, but rather reflects the fundamental question of whether "a security incorporates information quickly," Stulz Tr., 73:8.

*Cammer* **Factors 1 and 4; and Public Float.** Defendants do not dispute, and thus concede, that Plaintiffs established that PureCycle's average weekly trading volume, Form S-3 filing eligibility, and float all support a finding of market efficiency.

*Cammer* **2.** Prof. Stulz ignores analyst reports pre-de-SPAC[11] and any post-de-SPAC with estimates not contained in his review of a separate database or because of affiliation with the transaction.  None of this changes the fact that during the Class Period, 7 firms covered PCT, issued 23 reports, and participated in investor calls, as compared to almost 20% of U.S. firms with no coverage, thus supporting efficiency.

*Cammer* **3.** Prof. Stulz's criticism is irrelevant as he rejects the use of this factor entirely (no surprise given that it overwhelmingly supports efficiency here with 78 market makers and brokers, and national exchange listing), arguing that one must instead consider the cost of borrowing shares for short selling.

*Cammer* **5.** Dr. Cain evaluated PCT stock's price responsiveness to new information by scrutinizing an objective sample including earnings announcements

---

[11] Dr. Cain testified that with SPACs, analyst coverage starts post-de-SPAC. Defs. Ex. 16, 70:9-22.

post-merger and key dates with communications by ROCH and/or PCT pre-merger. Statistically significant abnormal returns followed 100% of these announcements, with statistically significant differences in abnormal returns, absolute returns, and trading volumes between News Days and No News Trading Days, thus demonstrating market efficiency. Prof. Stulz does not argue that PCT traded inefficiently.  Rather, he criticizes Dr. Cain's *methodologies*, claiming they differ from other reports Dr. Cain authored. However, Dr. Cain consistently integrates pre-merger disclosure dates in efficiency reports involving SPACs that cover the pre-merger period and stated in his Report *and* testimony that he considers the unique circumstances and the information environment in determining what method to employ.  Indeed, the parameters Dr. Cain employs in his Report align with *a majority* of his efficiency reports. Defendants also criticize the number and type of event dates Dr. Cain selects, despite explanations of his objective criteria and basis for event date selection. *Pub. Emps.' Ret. Sys. of Miss.*, 2022 U.S. Dist. LEXIS 232580, *26-27 (finding efficiency where sample of 10 out of 500 news days that appropriately included earnings announcements showed stock reacted quickly to news, and "Defendants do not show that inclusion of different or additional news days would have yielded a different result").

Moreover, while Prof. Stulz claims that the statistically significant abnormal return of 4.0% on November 16, 2020 is small and unreliable because other dates many months later had similar returns but were not statistically significant, he overlooks PureCycle's information environment dynamics, rendering his critique flawed and unreliable. Rebuttal, ¶27. Prof. Stulz also criticizes Dr. Cain for including market

impact dates pertaining to the business combination as News Days, though Dr. Cain routinely includes such disclosures in his efficiency analysis for SPACs, which is well supported by the academic literature on which Prof. Stulz himself relies. *Id.* at 28.

Further, Prof. Stulz's *Cammer* 5 Test is flawed and unreliable, because it includes irrelevant news articles with no meaningful news. *Id.*, ¶30a. Prof. Stulz also commits a critical error by failing to exclude news dates that he's testing for statistical significance from his event study thus biasing the test against rejecting the null hypothesis. *Id.*, ¶30b. Correcting that mistake alone *leads to a finding of market efficiency using Prof. Stulz's own test*. *Id.* However, *even with those two flaws, Stulz's test supports market efficiency,* because he documents greater average levels of absolute abnormal returns and trading volumes for his news days than for his no news trading days, and these differences are statistically significant at the 99% level. *Id.*, ¶¶30c, 39-40.[12]

**Market Capitalization.** Prof. Stulz criticizes Dr. Cain for not separately assessing the pre-de-SPAC period. However, even pre-de-SPAC PureCycle's market cap. averaged $180.67 million, over 3X higher than the MRK Study benchmark and more than 2X the threshold for S-3 eligibility, supporting efficiency. Rebuttal, ¶37f.

**Institutional Ownership.** Prof. Stulz again points to distinctions in the pre- and post-de-SPAC period, failing to acknowledge that even pre-de-SPAC, the 26 institutions holding ROCH exceeds the median level of 9 institutions holding MRK

---

[12] In any event, though *Cammer* 5 demonstrates efficiency here, it is not essential to satisfy *Cammer* 5 to find market efficiency. *Pub. Employees' Ret. Sys. of Miss.*, 2022 U.S. Dist. LEXIS 232580, *27; *Monroe Cty. Emps.' Ret. Sys.*, 332 F.R.D. at 384, 387.

Sample firms by 3X, and thus still supports efficiency. *Id.*, ¶37i.

**Autocorrelation and Options Trading.** Dr. Cain shows a lack of meaningful autocorrelation in PCT stock returns across the whole Class Period and explains that temporary positive autocorrelation (which Prof. Stulz selectively and inappropriately points to) commonly appears in data sets due to random patterns or consecutive days with news.  Moreover, even pre-de-SPAC Dr. Cain's analysis shows no persistent profitable arbitrage opportunities, supporting efficiency. *Id.*, ¶37j. Prof. Stulz also criticizes the lack of options trading pre-de-SPAC, though the same is true of every newly listed company, which typically lists their options weeks after stock listing. ¶37k.

## III.   Defendants Fail to Rebut the Presumption of Reliance

The Supreme Court made clear in *Basic* and *Halliburton II* that defendants must *prove* a lack of price impact using "direct, more salient" evidence than that presented by Plaintiffs, which completely "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price..." Defendants fail to achieve the "daunting task" of rebutting a presumption that several Supreme Court Justices called "virtually irrebuttable in practice." *Halliburton II*, 573 U.S. at 288; *Monroe*, 332 F.R.D. at 393.

### A.   Plaintiffs' Theory of Liability Supports Price Impact

Relying solely on Prof. Stulz, Defendants argue there is no price impact because the misstatements did not cause statistically significant price increases.[13]  However: 1)

---

[13] They also take the untenable position that there can never be price impact in cases involving a reverse merger where misstatements are made both pre and post-merger.

Prof. Stulz bases his opinion on a legal understanding of Plaintiffs' liability theory for which he is unqualified; 2) Prof. Stulz conceded that if his understanding is wrong, and the theory is price maintenance, his conclusion is undermined; 3) Prof. Stulz agreed that misstatements that do not reveal new information but maintain artificial inflation would not cause a statistically significant price movement.  ECF No. 183-2 ("Defs. Ex. 1"), ¶¶190-91; Stulz Tr., at 107:13-108:14, 117:23-118:17.

Under Plaintiffs' liability theory, the November 16, 2020 misstatements both *created* and *maintained* inflation. *See In re Vivendi Universal, S.A. Sec. Litig.,* 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011). As Dr. Cain demonstrates, the misleading November 16, 2020 disclosures, which included the press release announcing the business combination and the preliminary proxy containing misstatements regarding PCT management and its recycling technology-- caused a statistically significant price movement, consistent with price impact. Rebuttal, ¶77. The regression models Prof. Stulz employs to argue that the stock price reaction is not statistically significant are fundamentally flawed in multiple respects because, *inter alia*, he calculates the statistical significance of one day's abnormal return relative to the volatility of abnormal returns up to six months in the future, an approach that is both novel and contradicted by the academic publications Prof. Stulz himself relies upon and which disregards why PCT's volatility increased after November 16, 2020. Rebuttal, ¶¶66-77. Indeed, even a simple analysis demonstrates the significance of the announcement— ROCH stock soared 4%, marking the largest single-day price movement post-IPO, almost 2X the second-largest movement, and trading volume surged to 2.73 million

shares, over 8X higher than the second-largest post-IPO single-day volume. *Id.*, ¶71.

However, the November 16, 2020 misstatements also maintained inflation. SPACs are created to combine with a target.  SPAC investors thus presume that the SPAC will endeavor to combine with a credible business.  The November 16, 2020 announcement maintained inflation as it confirmed investors' understanding that ROCH would combine with a business that had a viable business model.  Moreover, each subsequent disclosure repeating the same statements regarding PureCycle's management and recycling process, and concealing information, *maintained* inflation. Thus, as both Dr. Cain and Prof. Stulz agree, the three subsequent disclosures would not have been expected to move the market.  Stulz Tr., 96:3-18; Report at ¶57.

**B.    The Corrective Disclosures Demonstrate Price Impact**

Defendants also argue that there is no price impact on the corrective disclosure dates, though they do not dispute the statistically significant declines following each corrective disclosure-- evidence of inflation dissipating. Rebuttal, ¶76.  To rebut price impact, "Defendants must demonstrate that the corrective disclosures played no part in the decline in the Company's share price," a hefty burden they have not met. *Thorpe*, 2016 U.S. Dist. LEXIS 33637, at *42. Indeed, "a statistically significant price decline following an alleged corrective disclosure *means one cannot rule out price impact*." *Monroe*, 332 F.R.D. at 393, 395-97. As the *Monroe* court held:

> [statistically significant price declines] doom[] Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage.

*Id. See also Pub. Emps.' Ret. Sys. of Miss.*, 2022 U.S. Dist. LEXIS 232580, *29-30 (same). Similarly raising loss causation arguments with no place here[14], *Halliburton I*, 563 U.S. at 813, Defendants argue that neither disclosure "corrected" the alleged misrepresentations. Defendants did not dispute loss causation in their motions to dismiss the SAC. A class certification motion is not the proper forum in which to seek reconsideration of rejected or waived loss causation arguments.

**The Hindenburg Report.** Regurgitating arguments that the Court rejected in the FAC Order, ECF No. 112, at 37-40. Defendants argue that the Hindenburg Report was not corrective because it contains public information. This Court explicitly held that it, "already ruled on the Hindenburg Report as having met 'the standard for a corrective disclosure' for loss causation." SAC Order, ECF No. 144, at 29.[15]

**The SEC Investigation.** Defendants newly argue that the SEC investigation is not corrective and ask the Court to end the Class Period May 6*, 2021. Monroe*, 332 F.R.D. 370, 395-96 (courts refuse to shorten class periods based on what caused a price decline of a subsequent disclosure)[16]. The SEC investigation, which the market knew

---

[14] Defendants rely on Prof. Stulz who testified he did not opine on loss causation. Stulz Tr., 18:4-5

[15] Defendants' remaining arguments are nonsensical, *e.g.*, that the Hindenburg Report is not corrective because it identifies the six failed IPOs whereas the Solicitation Materials broadly touted PCT management's experience scaling early stage companies; because the anonymous witnesses did not have access to PCT's information though their statements concerned the industry generally and defendants' *former* companies; and because it does not correct any misrepresentations about Roth himself though Roth made the same misstatements as the PCT Defendants which the Report corrects.

[16] Defendants ask to shorten the Class Period with a misplaced merits argument based on the PSLRA's damages limitation. *See, In re Zillow Grp., Inc. Sec. Litig.*, 2020 U.S. Dist. LEXIS 201015, *4-9 (W.D. Wash. Oct. 28, 2020); *In re Terayon Commc'ns Sys., Inc.*, 2003 U.S. Dist. LEXIS 2852, at *1–8 (N.D. Cal. Feb. 24, 2003). Defendants' cases are inapposite; *Mego* discusses a plan of distribution; *Lumen* doesn't address the limitation; *CV Sciences* ruled that the limitation is inapplicable on a 12(b)(6) motion.

nothing about prior to November 10, 2021, was a materialization of the risk caused by Defendants' misconduct and validated the contents of the Hindenburg Report. Indeed, the SEC's subpoena to Defendant Otworth covered the same subjects at issue here. Defendants awkwardly try to disentangle the uncertainty created by the SEC investigation from the subject of the investigation, though the two are inextricably intertwined. In any event, the precise cause of the stock price decline on November 11, 2021 is a merits-based loss causation argument that is not appropriate here.[17]

## IV.    Damages Can Be Calculated Class-Wide

The only relevant inquiry for predominance is whether damages are calculable class wide. There is no dispute that they are. Dr. Cain opines that the out of pocket methodology, commonly employed in securities cases, can be applied class wide. Prof. Stulz conceded, "I don't have any objection to the out-of-pocket approach as a method to compute damages," Stulz Tr., 141:2-10, and testified twice that he does not opine that Plaintiffs cannot compute damages class wide once a class is certified. *Id.* at 142:15-18, 143:7-13. Instead, his critiques focus on the calculations of the inputs to Dr. Cain's formula, which are irrelevant to assessing predominance. Rebuttal, ¶¶78-108; *Monroe*, 332 F.R.D. 370, 397-99 (damage issues did not predominate where defense expert did not opine that damages could not be calculated class wide but merely critiqued the model; specification of the inputs to the model not required at this stage because it "depends on development of the fact record on the merits").

---

[17] Moreover, the closure of the investigation is irrelevant because Defendants concede it is not akin to an exoneration, ECF No. 149, at 12 fn. 5, and two Defendants left PCT within weeks thereafter.

14

Dated: February 21, 2024

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Tamar A. Weinrib*
Tamar A. Weinrib (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (646) 581-9973
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

*Lead Counsel for Plaintiffs*