# EXHIBIT A-1

Case 6:21-cv-00809-PGB-RMN     Document 189-2     Filed 02/21/24     Page 1 of 67 PageID 8855

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM C. THEODORE, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER, BYRON ROTH and TASMIN ETTEFAGH,<br><br>　　　　　　　　　　　Defendants. | **Case No.**<br><br>**6:21-cv-809-PGB-GJK**<br><br><br>**CLASS ACTION** |

**EXPERT REBUTTAL REPLY REPORT OF MATTHEW D. CAIN, PH.D.**

**February 21, 2024**

**CONFIDENTIAL**

**Table of Contents**

1.    Introduction...................................................................................................................... 2

2.    Summary of Opinions....................................................................................................... 2

3.    Market Efficiency of PureCycle Common Stock ............................................................ 3

   3.1   Prof. Stulz's Views on Market Efficiency Render His Opinions Irrelevant in this Matter  3
   3.2   Overview of PureCycle Common Stock Market Efficiency................................................ 3
   3.3   Prof. Stulz Incorrectly Claims I Ignore Two Distinct Sub-Periods During the Class Period
         5
   3.4   Prof. Stulz Fails to Properly Consider His Own Characterization of the SPAC as a Fixed
   Income Investment....................................................................................................................... 7
   3.5   *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and
   Stock Prices................................................................................................................................ 8
   3.6   My Analyses of the Remaining Market Efficiency Factors are Reliable ......................... 13
   3.7   Results of Prof. Stulz's Event Study Regression Model Supports Market Efficiency ..... 19
   3.8   Prof. Stulz's Criticism Applies to His Own Event Studies................................................ 20
4.    Market Efficiency of PureCycle Warrants and Options ................................................ 21

5.    Prof. Stulz Fails To Reliably Support His Opinion That The Alleged Misrepresentations Did

Not Increase the Company's Stock Price..................................................................................... 26

   5.1   PureCycle's Common Stock Returns Around Alleged Misrepresentations and Corrective
   Disclosures ............................................................................................................................... 28
6.    Damages Can Be Calculated On A Class-Wide Basis Subject To A Common Methodology

Consistent with Plaintiff's Theory of Liability .......................................................................... 32

   6.1   Prof. Stulz's Criticism of My Damages Methodology Is Misguided .............................. 33
   6.2   Prof. Stulz's Critique of the Back-Casting Approach is Misguided................................. 34
   6.3   Prof. Stulz's Criticism That I Have Failed to Articulate How to Isolate Damages
   Attributable Only to Plaintiff's Theory of Liability is Misguided and Incorrect...................... 36
   6.4   Prof. Stulz's Discussion of Information on Publicly Available Information is Misleading
         38
   6.5   Interviews with Third Parties............................................................................................. 42
   6.6   Prof. Stulz Incorrectly Suggests a Price Rebound Following the Hindenburg Report ..... 43
7.    Conclusion ..................................................................................................................... 44

Appendix A ................................................................................................................................. 46

Appendix B ................................................................................................................................. 54

Exhibit 1...................................................................................................................................... 60

Exhibit 2...................................................................................................................................... 61

Exhibit 3...................................................................................................................................... 62

Exhibit 4...................................................................................................................................... 63

Exhibit 5.......................................................................................................................... 64

## 1. INTRODUCTION

1. On November 30, 2023, I submitted an expert report on market efficiency in this matter ("Efficiency Report"), in which I concluded that: a) the market for shares of PureCycle's Common Stock was efficient throughout the course of the Class Period, b) the value impact of any alleged misstatements or omissions would be reflected in PureCycle's Warrants and Options prices and c) Common Stock, Warrants and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology.[1]

2. Following the submission of my Efficiency Report, Counsel provided me with the January 23, 2024 Expert Report and the February 5, 2024 Corrected Expert Report of Dr. René Stulz ("Stulz Report").[2] I have been asked to review, evaluate, and respond to the opinions in the Stulz Report.

3. My qualifications and rate of compensation for work in this matter are identified in my Efficiency Report, and I attach an updated version of my curriculum vitae as Appendix B. I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process or future rulings from the Court.

4. In formulating my opinions set forth in this Expert Rebuttal Reply Report, I have relied upon the analyses already described in my Efficiency Report, as well as my knowledge, professional experience, and formal training in economics, finance, and statistics, in addition to the allegations and facts in this matter. All of the materials I considered in forming my opinions are identified in Appendix A to this report in addition to Appendix B to my Efficiency Report.

---

[1] Efficiency Report ¶¶ 10-11.

[2] Prof. Stulz corrected his initial report because one of the companies included in his initial industry index had been delisted before the Class Period, and he mistakenly used the last available daily return for this company repeated throughout the Class Period to construct his industry index. *See* Stulz Tr. 19:17-21:09.

i

## 2.  SUMMARY OF OPINIONS

5.  Prof. Stulz disputes the market efficiency of PureCycle's Common Stock, Options, and Warrants. However, he has not conducted any analyses to ascertain whether PureCycle securities traded in an efficient market during the Class Period, and he does not conclude that they traded in an *inefficient* market.  None of Prof. Stulz's critiques disturb my Efficiency Report conclusions, and I reaffirm my market efficiency findings regarding PureCycle's securities.

6.  Prof. Stulz opines that the Alleged Misrepresentations were not associated with statistically significant price increases. I identify multiple flaws in Prof. Stulz's analysis, and I note that my reasonable and reliable Efficiency Report event study analysis documents a statistically significant increase in PureCycle's Common Stock price following the November 16, 2020 Alleged Misrepresentation.

7.  Prof. Stulz opines that PureCycle Common Stock price declines following the alleged corrective disclosures cannot provide evidence of artificial inflation dissipating. His opinion rests on a legal conclusion without any analysis or reliability. Both of the alleged corrective disclosures were followed by statistically significant declines in PureCycle Common Stock prices.

8.  Prof. Stulz critiques my damages methodology for PureCycle Common Stock, Options, and Warrants. His opinions largely relate to specific calculations of the inputs to the formula, not the methodology itself, which is widely-employed across securities cases. None of his critiques disturb my Efficiency Report conclusion that the out-of-pocket methodology represents a reliable methodology to calculate damages and can be applied across Class members.

9.  In summary, none of Prof. Stulz's criticisms disturb my Efficiency Report conclusions, which I reaffirm herein. The following sections explain the various flaws in the Stulz Report.

### 3.  MARKET EFFICIENCY OF PURECYCLE COMMON STOCK

**3.1    Prof. Stulz's Views on Market Efficiency Render His Opinions Irrelevant in this Matter**

10.   Prof. Stulz does not opine that the market for PureCycle securities was inefficient during the Class Period. In fact, he admitted during deposition that ***he did not conduct any analysis to assess whether PureCycle's securities traded in an efficient market*** during the Class Period:

> Q. Did you do any analysis to ascertain whether PureCycle traded in an efficient market during the class period?
>
> A. I was not asked to perform such an analysis, and I did not.
>
> Q. So you have not come to any independent determination as to whether the market was efficient for PureCycle securities during the class period, correct?
>
> A. That was not my assignment. I was not asked to do so, and I did not do so.[3]

11.   Prof. Stulz also rejects the traditional *Cammer* factor analyses as relevant tests of market efficiency. He testified that "The Cammer factor 1 through 4 are not tests of market efficiency."[4] He also testified that "It is not enough for somebody to say that it satisfies Cammer factor 5."[5] Because Prof. Stulz rejects the applicability of the widely-cited *Cammer* factors to an analysis of market efficiency, his opinions and conclusions are ultimately irrelevant in this matter. Nonetheless, in the following sections I explain additional flaws in his critiques of the analyses contained within my Efficiency Report.

**3.2    Overview of PureCycle Common Stock Market Efficiency**

12.   In my Efficiency Report, I conclude that "the market for shares of PureCycle's Common Stock was efficient throughout the course of the Class Period." I base this conclusion on

---

[3] Stulz Tr. 75:25-76:12 (objections omitted).

[4] Stulz Tr. 67:10-11.

[5] Stulz Tr. 70:10-20: "Q. So if a security satisfies Cammer factor 5, would you agree then that that would be sufficient to establish that the market for that security was efficient? MS. JACOBSEN: Objection as to form. A. I agree that if a security incorporates new public information quickly and fully, that security trades in an efficient market. It is not enough for somebody to say that it satisfies Cammer factor 5. Now it has to be that it is an analysis that meets the standard of financial economics."

my evaluation of the *Cammer*, *Krogman*, and additional factors, my consideration of PureCycle as a SPAC from the beginning of the Class Period through the closing of the business combination and as a public operating company for the remainder of the Class Period, and my consideration of the various efficiency factors over both the full Class Period and the portion of the Class Period prior to the closing of the business combination.[6] I explained these analyses and considerations in my Efficiency Report as well as during my deposition. For example:

> Q.    So are there any specific features of SPACs that have factored into your analysis relating to efficiency in this case?
>
> A.    Yes, I would say definitely.
>
> Q.    What are those?
>
> A.    Give me just a second to refresh my recollection so I can try to give you as complete of an answer as possible to that question. So, so there are I think a couple of features of SPACs that I do consider when I carry out a market efficiency report on a SPAC and a deSPAC transaction. One of those features is that the volatility of the SPAC shares before a business combination is announced and also before it's completed, that volatility tends to be lower, the stock prices tend to trade closer to $10 per share. But once a business combination is completed, the volatility tends to increase. So for that reason, I used a shorter estimation window of 60 trading days for my event studies. Another factor that I considered was the analyst coverage for SPACs tends to begin once the business combination is completed. So that was another factor that I considered when evaluating the analyst coverage factor for PureCycle. And then also in conjunction with what I said about the pricing, also the trading volume may be lower in the pre-business combination period, the bid-ask spreads may be wider.  So that's, that's something I looked at. So, for example, if we were to go through the exhibits, I graph out and I've got some footnotes throughout the report where I talk about not only the averages over the full class period but also the subperiod prior to the closing of the business combination. So looking at either trading volume or market cap or bid-ask spreads, things like that.
>
> Q.    We'll walk through those things in a few minutes. Did you find that indicia of market efficiency were stronger after the deSPAC transaction?
>
> A.    I think that my conclusion was that the indicia of market efficiency weighed in favor of -- or let me start over. My conclusion is that the factors that I evaluated supported market efficiency of PureCycle both over the full class

---

[6] Efficiency Report Section 4.

period as well as throughout the class period which includes the period prior to the closing of the business combination. Like I explained earlier, when I evaluate market efficiency it really comes down to a question of whether or not information is reflected in stock prices. So it's not so much about whether a certain factor is stronger or weaker, but rather just a question of does this factor weigh in favor of market efficiency or does it not?[7]

13. As explained in my Efficiency Report and in my testimony quoted above, I considered the unique characteristics of SPACs when conducting my analysis of PureCycle's market efficiency. Furthermore, I considered and incorporated information about PureCycle both before and after completion of the business combination, including differences in volatility and other aspects of the Company's information environment.

14. Prof. Stulz misrepresents my Efficiency Report analyses and testimony by claiming the following:

Dr. Cain's analyses fail to consider market and institutional features that are specific to SPACs, and this failure renders his analyses and opinions pertaining to market efficiency and damages methodology flawed and unreliable. For example, in his market efficiency analyses, Dr. Cain makes no distinction between the period prior to the de-SPAC, when ROCH was a SPAC (*i.e.*, a blank check company without an operating entity), and the period after the Business Combination, when PureCycle was an operating company whose stock was publicly traded under the ticker PCT."[8]

15. As I explain in the following sections, Prof. Stulz's criticisms of my efficiency analyses are flawed and irrelevant because he pretends that I did not consider these distinctions, when in fact I explicitly accounted for them, as explained in both my Efficiency Report and testimony.

**3.3  Prof. Stulz Incorrectly Claims I Ignore Two Distinct Sub-Periods During the Class Period**

16. In my Efficiency Report, I explain that the business combination was completed on March 17, 2021.[9] I also explain that prior to this date, the Company's SPAC shares were

---

[7] Cain Tr. 50:3-53:6 (objections omitted).

[8] Stulz Report ¶ 21.

[9] Efficiency Report ¶ 13.

traded on the NASDAQ under the symbol ROCH, and that after the business combination, starting on March 18, 2021, PureCycle's shares were traded on the NASDAQ under the symbol PCT.[10] In my analysis of the efficiency factors, I considered the average levels over the full Class Period (and longer Analysis Window), the averages during the pre-business combination period of November 16, 2020 through March 17, 2021, and the metrics throughout the Class Period. For example, I noted that the "average weekly turnover of ROCH during the pre-business combination period of November 16, 2020 – March 17, 2021 was 17.11%."[11] I also considered the analyst coverage, number of SEC filings, float, market capitalization, bid-ask spread, insider holdings, and institutional ownership, among other factors, during the pre-business combination period.[12]

17. Prof. Stulz misrepresents my Efficiency Report analyses when he opines that I make "no distinction between the period prior to the de-SPAC, when ROCH was a SPAC (*i.e.*, a blank check company without an operating entity), and the period after the business combination, when PureCycle was an operating company whose stock was publicly traded under the ticker PCT."[13] As explained above and in my Efficiency Report, I do consider this distinction. I have considered this distinction and I conclude that PureCycle's securities traded in an efficient market *throughout* the Class Period, including both sub-periods identified by Prof. Stulz.[14]

18. More generally, I am not aware of any established case law that dictates an economist must break a Class Period into smaller sub-periods and analyze efficiency separately across different sub-periods. Prof. Stulz does not point to any such guidance from courts,

---

[10] *Id.*

[11] Efficiency Report fn. 30.

[12] Efficiency Report fns. 34, 40, 54, 73, 79, 83; Exhibits 2, 3, 6, 8, 9, 10A.

[13] Stulz Report ¶ 21.

[14] Efficiency Report ¶ 10; Cain Tr. 50:3-53:6.

rendering his opinion speculative and unsupported.[15]

19. Furthermore, Prof. Stulz relies on structural break tests to support his opinion that one must evaluate these two sub-periods separately.[16] As I explain in more detail in Section 3.8 below, if one were to run these tests on Prof. Stulz's Baseline Regression Model, they point to multiple additional sub-periods that Prof. Stulz ignores. While I reject the applicability of these tests to my efficiency analyses, as they are irrelevant, if Prof. Stulz intends to rely on them, he has failed to properly apply them and incorporate them into his own purported sub-period analysis. This further undermines any relevance and reliability of Prof. Stulz's efficiency opinions.

### 3.4    Prof. Stulz Fails to Properly Consider His Own Characterization of the SPAC as a Fixed Income Investment

20. Prof. Stulz states the following:

> From an investment standpoint, the SPAC as it existed prior to announcing a business combination target has attributes similar to a fixed income investment—investors' money is held in a trust until the de-SPAC (or liquidation), when it then can be redeemed in the context of the business combination vote for its original value plus any interest earned.[fn 128]
>
> [fn 128]: Gahng, Ritter and Zhang (2023), pp. 3464–3465 ("SPACs are structured to provide upside potential for the SPAC period investors by offering an option to become a shareholder of a newly traded company, with a money back guarantee… Given this downside protected nature of the SPAC period investment, a SPAC IPO is equivalent to a *default-free* convertible bond with extra warrants….") (emphasis in original).[17]

21. I agree that SPACs, including ROCH, share similarities with fixed income investments like corporate bonds. In fact, this is one of the characteristics I considered and explained

---

[15] *See, e.g., Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 91 (S.D.N.Y. 2015) (holding that, although defendant expert notes "stocks that trade efficiently at certain times may not trade efficiently at other times," unless defendant's expert has presented "direct evidence of inefficiency" such arguments are "largely beside the point").

[16] Stulz Report ¶¶ 84-5; fns. 168, 171.

[17] Stulz Report ¶ 74, fn. 128.

in my testimony quoted above.[18] Many corporate bonds are issued in relatively small sizes (market cap and float), trade infrequently, have no bond-specific sell-side analyst coverage, have limited or costly short selling activity, trade at bid-ask spreads that are significantly wider than those on stocks, and are held by a smaller number of investors.[19] And yet, corporate bonds are routinely found to trade in an efficient market.[20] This is because the fundamental question about market efficiency remains the same: whether or not information is reflected in securities' prices. Prof. Stulz fails to properly consider that the similarities between SPAC shares and fixed income investments actually support my conclusion that PureCycle's securities traded in an efficient market throughout the Class Period. I elaborate on this further in the following sections.

### 3.5  *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

22. In my Efficiency Report, I evaluated whether PureCycle's Common Stock prices responded to new information by conducting a *Cammer* Factor 5 analysis.[21] I tested for this relationship by evaluating an objective sample consisting of PureCycle's earnings announcements following completion of the business combination.[22] Prior to completion of the business combination, I evaluated an objective sample consisting of "key dates pertaining to communications made by ROCH and/or PureCycle on the

---

[18] Cain Tr. 50:3-53:6 (explaining different levels of trading volume, volatility, analyst coverage, etc. in the pre-business combination period).

[19] *See e.g.*, Ross, Stephen A., et al. (2003) *Corporate Finance*, 10th Edition, McGraw-Hill, pp. 18, 107; Bessembinder, Hendrik, and William Maxwell (2008), "Markets: Transparency and the Corporate Bond Market," *The Journal of Economic Perspectives* 22 (2): 217–234 at 218; Li, Dan, and Schürhoff, Norman (2019), "Dealer Networks," *The Journal of Finance* 74 (1): 91–144 at 91–92; Bessembinder, Hendrik, et al. (2018), "Capital commitment and illiquidity in corporate bonds," *The Journal of Finance* 73 (4): 1615–1661 at 1636.

[20] See: (1) *In Re: CenturyLink Sales Practice and Securities Litigation*, MDL No. 17-2795 (MJD/KMM); (2) *In Re Tronox, Inc. Securities Litigation*, 1:09-cv-06220 (S.D.N.Y.); (3) *Plumbers & Pipefitters National Pension Fund, et al. v. Burns, et al.*, 3:05-cv-07393-JGC (N.D. Oh.); (4) *In re MGM Mirage Securities Litigation*, 2:09-cv-01558-GMN-LRL (D. Nv.); (5) *Ross v. Bank South, N.A.*, 885 F.2d 723, 728–29 (11th Cir.1989); (6) *Lipton v. Documation, Inc.*, 734 F.2d 740, 745–746 (11th Cir.1984); (7) *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 210–11 (2d Cir. 2008) (affirming district court's use of Cammer factors to conclude bond market is efficient); (8) *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 633–34 (N.D. Ala. 2009).

[21] Efficiency Report ¶¶ 44-63.

[22] *Id*.

identification and status of the business combination."[23] I found that 100% of these announcements were followed by statistically significant abnormal returns,[24] and that there are statistically significant differences between these News Days and PureCycle's No News Trading Days in (i) the percentage of days with abnormal returns significant at the 95% level or better, (ii) the average absolute abnormal returns, and (iii) the average trading volumes.[25]

23. I consistently and objectively consider these dates pertaining to the identification and status of the business combination in all of my efficiency reports that involve SPACs with class periods covering the pre-business combination time period. Prof. Stulz objects to several aspects of my *Cammer* Factor 5 analysis. As I explain below, all of his critiques are flawed. I reiterate the reliability of my event studies and my conclusion that the results of my *Cammer* Factor 5 analysis indicate that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

24. First, Prof. Stulz claims that my event study methodology is inconsistent with the methodology I have employed in prior cases, including those involving SPACs.[26] He cites four matters in which my event study employed a fixed estimation window for some period prior to rolling window, as opposed to employing a rolling window from the first day of a class period (which would by definition rely on daily returns in the months leading up to the start of a class period). As I have explained, each case involves unique facts, circumstances, and characteristics of the subject company's information environment that influences my choice of event study parameters. I also explained this in my testimony:

> Q.    For example, in this case we know that there was a deSPAC transaction that caused the company to go public, and, you know, it was then an operational public company, where prior to the deSPAC it was a holding company.

---

[23] Efficiency Report ¶ 47.

[24] Efficiency Report, Exhibit 6.

[25] Efficiency Report, Exhibit 7.

[26] Stulz Report ¶¶ 83-90.

A.   Right. Yeah, I think that maybe you just described what I've been talking about, where you've got, prior to day one of the class period it's essentially a pot of cash worth $10 and investors are waiting for an announcement. And then you've got an announcement of a target that's been announced. That's a significant change in the information environment.

And then you've got the announcement of the closing of the business combination, which is another important change in the information environment. And then you've got earnings announcements which are also important changes in information environments for companies.

And so, and you've also got alleged corrective disclosures which additionally are important changes in the information environment.

So for that reason I exclude from the estimations the news days as well as the alleged corrective disclosures because those are, those can represent significant shifts in volatility. And that's also the reason that I have used the rolling 60-day window to accommodate those significant potential changes in the information environment and therefore the trading volatility of the stock itself.[27]

25.   Prof. Stulz misrepresents the parameters I have employed in prior cases by cherry-picking only four examples. To illustrate this, I reviewed all of my market efficiency reports submitted to date and the corresponding event study estimation window parameters. In 8 of my prior reports, I utilized a fixed in-sample to rolling estimation window.[28] By contrast, in 15 of my prior reports, I utilized rolling estimation windows that incorporated pre-class daily returns.[29]

---

[27] Cain Tr. 141:20-143:10.

[28] See: (1) *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.); (2) *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.); (3) *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.); (4) *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.); (5) *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.); (6) *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.); (7) *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.); (8) *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.).

[29] See: (1) *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.); (2) *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.); (3) *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.); (4) *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.); (5) *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.); (6) *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.); (7) *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.); (8) *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.); (9) *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.); (10) *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.);

26. Thus, contrary to Prof. Stulz's mischaracterization, the event study parameters I selected for my PureCycle *Cammer* Factor 5 analysis were consistent with the majority of other market efficiency reports I have submitted. Furthermore, as explained below, Prof. Stulz fails to properly consider PureCycle's information environment, which is an important consideration when selecting event study parameters regardless of those chosen in separate, unrelated cases.

27. Prof. Stulz claims that PureCycle's statistically significant abnormal return of 4.0% on November 16, 2020 is small and unreliable because other dates during the Analysis Window had similar returns but were not statistically significant.[30] Because he focuses on this date in his price impact opinions, I explain the flaws in his event studies and his logic when I address that portion of his report separately in Section 5 below. As I explain in that section, Prof. Stulz fails to properly consider PureCycle's information environment when he tests the statistical significance of this date. PureCycle's Common Stock on November 16, 2020 experienced its largest stock return, highest closing stock price, and largest trading volume of any trading day from the IPO through that day of the SPAC's trading. Prof. Stulz thus attempts to improperly compare PureCycle's stock price movement on November 16, 2020 to movements on days many months later, rendering his conclusions flawed and unreliable.

28. Second, Prof. Stulz criticizes my News Day inclusion of the market impact dates in which announcements were made regarding the identification of PureCycle as the business combination target and the successful completion of the business combination and initiation of public trading of the de-SPAC on the NASDAQ.[31] As explained above, I consistently consider these days in my efficiency analyses of SPACs with class periods that include such dates, because these are the two most consequential announcements in

---

(11) *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.); (12) *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca); (13) *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.); (14) *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.); (15) *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.).

[30] Stulz Report ¶¶ 95-101.

[31] Stulz Report ¶¶ 91-94.

the life of a SPAC. The academic publications on SPACs, on which Prof. Stulz relies, also agree.[32]

29. Prof. Stulz's criticism of my News Days is thus flawed and unsupported by the academic research that he himself relies upon.

30. Third, Prof. Stulz presents his own analysis of *Cammer* Factor 5 in which he considers an alternative definition of News Days: blindly counting any trading day that had any type of news article mentioning PureCycle (the "Stulz *Cammer* 5 Test").[33] His analysis has (at least) three critical flaws:

    a. Prof. Stulz includes news articles that clearly provide no meaningful news about PureCycle, for example merely announcing dial-in details for a future conference call.[34] His news sample comingles potentially value-relevant disclosures, such as earnings announcements, with other trading dates that had only trivial news. The Stulz *Cammer* 5 Test thus fails to analyze a reliable sample of disclosures of new company information.

    b. Prof. Stulz makes an important technical error in calculating the proportion of News Days that are statistically significant at the 95% level or better in the Stulz *Cammer* 5 Test. In his event studies, he excludes earnings announcement and business combination dates from the estimations, but he forgets to exclude the news days that he is testing in his analysis. Failure to exclude the dates on which one is evaluating the statistical significance will bias the test against rejecting the null hypothesis, because a regression model by design will predict that only 5% of days are significant at the 95%

---

[32] *See e.g.*, M. Gahng, J. R. Ritter and D. Zhang (2023), "SPACs," *The Review of Financial Studies*, 36(9), pp. 3463-3501. This paper studies various statistics in relation to business combination announcement and completion. For example, this paper shows that "it takes 153 calendar days (5 months) for business combinations from the announcement to completion" (p. 11), "the merger announcement may be greeted positively or negatively by the market" (p. 12) and "during most of our sample period, SPAC period returns are mostly realized at the time of and after SPACs announce business combinations, with minimum price changes before the announcement." (p. 17).

[33] Stulz Report ¶ 94.

[34] *See, e.g.*, "PureCycle Technologies Schedules Third Quarter 2022 Corporate Update Conference Call for Thursday, November 10, 2022, at 11:00 a.m. ET," Oct. 17, 2022 (4:05pm ET), *PR Newswire*.

level, on average.[35] If I correct Prof. Stulz's mistake, then over my Analysis Window, the percentage of significant trading days is much higher for News Days than No News Trading Days, and this difference is statistically significant at the 95% level. Correcting this error alone thus would lead one to conclude that the Stulz *Cammer* 5 Test supports market efficiency.

   c.  Prof. Stulz fails to consider, that even in the presence of the two flaws above, the Stulz *Cammer* 5 Test supports market efficiency, because he documents greater average levels of absolute abnormal returns and trading volumes for his news days than for his no news trading days, and these differences are statistically significant at the 99% level.[36]

31. As a result, the Stulz *Cammer* 5 Test is flawed and unreliable. Moreover, even Prof. Stulz's flawed analysis weighs in favor of market efficiency.

**3.6  My Analyses of the Remaining Market Efficiency Factors are Reliable**

32. Prof. Stulz criticizes several of the other factors I analyze to assess market efficiency for PureCycle's Common Stock. Ultimately, none of his opinions disturb my analyses, nor do they disturb my ultimate conclusion that PureCycle securities traded in an efficient market throughout the Class Period.

33. First, I compare my analysis of each factor to the benchmarks articulated by the *Cammer* court, when such benchmarks were explicitly provided by the court. For example, I compare PureCycle's trading volume to the 1% and 2% thresholds set by the court.[37] When the court did not articulate a benchmark, I compare PureCycle's statistics to those from a peer-reviewed academic study published in the journal *Accounting Review* (the "MRK Study"). This study is a useful reference point because it documents clear correlations between the various *Cammer* and *Krogman* efficiency factors and their

---

[35] In the Stulz *Cammer* 5 Test over my Analysis Window, 10% of his News Days are significant at the 95% level because his event study models exclude earnings announcements and the business combination dates. See Stulz Report, Exhibit 10b.

[36] Stulz Report, Exhibit 10b.

[37] Efficiency Report ¶ 28.

indications of investor interest as it relates to how information is incorporated into stock prices. This is the same question of interest in my Efficiency Report for this matter. The MRK Study states:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock... Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[38]

34. The MRK Study finds that firms with no analyst coverage have smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, and that these differences are statistically significant at the 99% level.[39] Thus, the study provides a reasonable benchmark for comparison of the various market efficiency factors, especially when the courts have declined to provide any measurement benchmarks.

35. Prof. Stulz criticizes my Efficiency Report comparisons to the MRK Study. This is perhaps unsurprising given that he explicitly rejects the relevance of the Cammer factors, as noted in Section 3.1 above. He opines that I fail "to demonstrate that the companies analyzed in the MRK Study are comparable to the Company. First, the authors do not discuss whether the sample includes SPACs…Second, Dr. Cain has not shown that the study's findings from companies between 1984 and 2008 apply to the Proposed Class Period at all, let alone to SPAC companies…"[40] Yet, as Prof. Stulz himself admitted in testimony, market efficiency should not be measured relative to comparable companies, but in fact reflects the fundamental question of whether "a

---

[38] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage? *Accounting Review* 88, at 667.

[39] MRK Study at 678, 681-682.

[40] Stulz Report ¶ 106.

security incorporates information quickly…"[41]

36. Moreover, the MRK Study spans a time period that overlaps with those of the *Cammer* court decision in 1989 and the *Krogman* court decision in 2001, including the benchmarks articulated by the courts during those time periods. The MRK Study thus represents a reasonable benchmark for consideration of these factors. If a given level of trading volume, bid-ask spread, analyst coverage, market making, etc. indicated market efficiency at the time of the *Cammer* and *Krogman* court decisions, then that level would also indicate efficiency today. The fundamental question of whether public information is reflected in securities' prices remains constant over time. Prof. Stulz does not propose any alternative benchmarks to the MRK Study. Furthermore, as discussed below, he contradicts his own assertion by comparing PureCycle statistics in sub-periods to those in the MRK Study and drawing inferences. In short, Prof. Stulz attempts to dismiss the MRK Study and these efficiency factors when they are consistent with market efficiency, but he attempts to rely on them when he purports that they indicate inefficiency (though as I explain below, here, they are all consistent with market efficiency).

37. Second, Prof. Stulz improperly attempts to conduct separate efficiency analyses for sub-periods of the Class. As discussed previously and in Section 3.8, his attempt to break the Class Period into sub-periods is flawed, unreliable, and ultimately irrelevant. My opinions regarding the various factors in relation to PureCycle's Common Stock, including flaws in Prof. Stulz's assessments, can be summarized as follows:

a. *Cammer* **Factor 1: Average Weekly Trading Volume**: Prof. Stulz does not dispute my conclusion that this factor indicates market efficiency throughout the Class Period.

b. *Cammer* **Factor 2: Analyst Coverage**: Prof. Stulz attempts to ignore analyst reports during the pre-business combination period.[42] He also attempts to ignore analyst reports in the post-business combination period because their estimates are not contained

---

[41] Stulz Tr. 73:8.

[42] Stulz Report ¶¶ 108-9.

within his review of a separate database (I/B/E/S), or because they were affiliated with the de-SPAC transaction.[43] As noted in my Efficiency Report, in reality PureCycle was covered by 23 reports issued by analysts at 7 separate firms during the Class Period, and also had analyst participation on investor conference calls, including by well-known firms such as Oppenheimer, Bank of America, Cowen, and Jefferies.[44] This compares favorably to the 19% of U.S. firms with no analyst coverage, and to the firms with zero or only one analyst following them in the lowest decile of coverage, thus supporting market efficiency throughout the Class Period.[45]

c.  *Cammer* **Factor 3: Market Makers**: The *Cammer* court held that the presence of five or ten market makers is indicative of market efficiency for firms trading in over the counter markets, implying that firms listed on a national exchange (such as the NASDAQ, for PureCycle) satisfy this criteria. ***Prof. Stulz rejects this factor***, opining that one must consider other factors, despite the fact that these other factors are not routinely considered by courts. For example, Prof. Stulz opines that one must consider the cost of borrowing shares for short selling activities.[46] He opines that the cost of borrowing shares to sell PureCycle short reached as high as 9% at one point prior to the de-SPAC.[47] This is irrelevant, as courts do not require a certain cost threshold for short selling; many bonds have costly/limited/no short selling yet are found to trade efficiently; and investors can trade options as a substitute for short-selling the stock.[48] Moreover, PureCycle had at least 78 market makers and brokers providing similar activity during the Class period, and traded on a national exchange, thus supporting market efficiency.[49]

d.  *Cammer* **Factor 4: SEC Form S-3 Filing Eligibility**: Prof. Stulz does not dispute my

---

[43] Stulz Report ¶¶ 110-1.

[44] Efficiency Report ¶ 33.

[45] Efficiency Report ¶ 34.

[46] Stulz Report ¶¶ 115-119.

[47] Stulz Report ¶ 116.

[48] *See, e.g., Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94 n. 168 (S.D.N.Y. 2015) (holding market was efficient during short sale ban).

[49] Efficiency Report ¶ 40.

conclusion that this factor indicates market efficiency throughout the Class Period.

e. *Cammer* **Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**: As explained in Section 3.5 above, even Prof. Stulz's own flawed analysis indicates market efficiency throughout the Class Period.

f. **Additional Factor 1: Market Capitalization**: Prof. Stulz claims that I fail to demonstrate that PureCycle's smaller market capitalization in the pre-business combination sub-period weighs in favor of market efficiency.[50] However, as noted in my Efficiency Report, PureCycle's market cap during this sub-period averaged $180.67 million.[51] This is over three times higher than the MRK Study's Covered Firms inflation-adjusted average.[52] Additionally, it also exceeds the $75 million minimum under the SEC Form S-3 filing eligibility requirements.[53] Thus, this factor supports market efficiency throughout the Class Period.

g. **Additional Factor 2: Bid-Ask Spread**: Prof. Stulz calculates intraday bid-ask spreads that are higher than the end-of-day spreads I calculate and rely on in my Efficiency Report.[54] This is not surprising, since the majority of companies' stock trades are executed at either market open or at the end of each trading day.[55] Moreover, the intraday quotes that Prof. Stulz relies on have been shown to be wider than actual trading costs due to asynchronous trading.[56] The intraday spreads that Prof. Stulz calculates are thus irrelevant, because they do not reflect the lower trading costs

---

[50] Stulz Report ¶¶ 120-1.

[51] Efficiency Report fn. 73.

[52] Efficiency Report fn. 74.

[53] Efficiency Report ¶ 42, fn. 54: "PureCycle's float averaged $1.00 billion over the full Class Period and $156.59 million for the pre-business combination period from November 16, 2020 – March 17, 2021."

[54] Stulz Report ¶¶ 122-126.

[55] As explained by stock broker Charles Schwab "[o]n a typical day, more shares trade hands in the first hour than during any other, as orders placed when the market was closed are processed. Volume tends to pick back up at the end of the day, as institutional investors look to close out positions or enter new ones […] [h]igher volume is generally good for active traders: More shares are available to trade, and that extra liquidity leads to tighter bid-ask spreads." https://www.schwab.com/learn/story/trading-near-bells.

[56] See *e.g.*, Bessembinder, Hendrik, and Kumar Venkataraman (2010), "Bid-Ask Spreads: Measuring Trade Execution Costs in Financial Markets," *Encyclopedia of Quantitative Finance*.

enjoyed by the majority investors who trade when liquidity is highest. As a result, my analysis of this factor supports market efficiency throughout the Class Period.

h. **<u>Additional Factor 3: Public Float</u>**: Prof. Stulz does not dispute my conclusion that this factor indicates market efficiency throughout the Class Period.

i. **<u>Additional Factor 4: Institutional Ownership:</u>** Prof. Stulz claims that because PureCycle had "only" 26 institutions holding ROCH stock in the fourth quarter of 2020, this figure falls short of the MRK benchmark.[57] However, this is almost ***three times*** the median level of 9 institutional investors holding the MRK Sample firms.[58] As a result, my analysis of this factor supports market efficiency throughout the Class Period.

j. **<u>Additional Factor 5: Autocorrelation</u>**: Prof. Stulz ignores the lack of a meaningful autocorrelation in PureCycle Common Stock returns across the overall Class Period.[59] Instead, he focuses on a temporary positive autocorrelation at the beginning of the Class Period.[60] However, I explained in my Efficiency Report that temporary statistically significant autocorrelation coefficients commonly appear in datasets, due to random patterns or consecutive days with news.[61] Thus, it is not appropriate to focus on short sub-periods when considering this factor, but rather a longer time window during which investors could observe any such patterns and conceivably trade on them. Moreover, performing the same calculation as in my Efficiency Report indicates no persistent profitable arbitrage opportunities even during the pre-business combination sub-period.[62] As a result, my analysis of this factor supports market efficiency throughout

---

[57] Stulz Report ¶¶ 127-8.

[58] Efficiency Report ¶ 72.

[59] Efficiency Report ¶ 75, fn. 88.

[60] Stulz Report ¶¶ 131-132.

[61] Efficiency Report ¶ 73.

[62] I note in the Efficiency Report ¶ 75, fn. 88, that in order to generate profits exceeding the trading costs for PureCycle Common Stock (represented by the average monthly bid-ask spread), the Common Stock would have to exhibit an average daily abnormal return (in absolute value) of at least the proportion of trading costs to the abnormal return generated by autocorrelation over that period. For the pre-business combination period of November 16, 2020 – March 17, 2021 (inclusive), the average abnormal return would have to exceed 4.07% (= |1.48%/0.36|), where 1.48% represents the average bid-ask spread over the pre-business combination period and 0.36 is the autocorrelation coefficient over the pre-business combination period. The average absolute abnormal return of

the Class Period.

   k. **Additional Factor 6: Options Trading**: Prof. Stulz critiques the lack of options trading for PureCycle prior to completion of the business combination.[63] It is standard for newly-listed companies to have their options listed on an exchange several weeks after the public stock listing has been finalized.[64] Thus, Prof. Stulz's criticism would apply to any newly listed company and is thus irrelevant here. As a result, my analysis of this factor supports market efficiency throughout the Class Period.

38. In summary, Prof. Stulz's opinions regarding market efficiency are premised upon his explicit rejection of the relevance of the *Cammer* factors. Moreover, his criticisms of my analyses are flawed and irrelevant, and ultimately do not disturb any of my opinions. Ultimately, my Efficiency Report analyses clearly establish that PureCycle's Common Stock traded in an efficient market throughout the Class Period.

## 3.7   Results of Prof. Stulz's Event Study Regression Model Supports Market Efficiency

39. As detailed above, Prof. Stulz's critique of my event study regression is unfounded. Nevertheless, I also perform my Cammer 5 analysis using his Baseline Regression Model.[65] As with my Efficiency Report, I subtracted the return predicted by Prof. Stulz's alternative Baseline Regression Model from the actual return to get the abnormal return and calculated the statistical significance of the abnormal return.

40. As with my Efficiency Report, I compare the stock returns and trading volume of PureCycle's Common Stock on News Days versus those metrics on No News Trading Days. **Exhibit 1** demonstrates the outcomes of this analysis. As shown in the exhibit, 77.78% of the 9 earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to 2.54% of the No News Trading Days with

---

PureCycle's Common Stock over the pre-business combination period was 3.40%, thus indicating no persistent profitable arbitrage opportunities.

[63] Stulz Report ¶ 135.

[64] As noted by stock broker Robinhood "[o]ptions aren't available for at least 3 business days after a company goes public. Sometimes, it takes much longer (30 – 60 days) before a stock is eligible for options." https://robinhood.com/us/en/support/articles/ipo-access/

[65] Stulz Report ¶ 166.

statistically significant stock price movements. The difference between these two percentages is statistically significant at the 99% level. Consistent with my Efficiency Report, this provides strong evidence of a cause-and-effect relationship between information and PureCycle Common Stock price movements.

### 3.8   Prof. Stulz's Criticism Applies to His Own Event Studies

41.   In his report, Prof. Stulz contends that my event study analysis "obscures fundamental differences in the characteristics of the ROCH common stock before and after the announcement of the Business Combination."[66] To support his opinion, Prof. Stulz employs two statistical tests, namely the Chow test and the Levene test. He utilizes the Chow test to assess "whether the relationship between the stock returns and [my] market and industry index returns before the Proposed Class Period is statistically different from the relationship within the Proposed Class Period,"[67] and the Levene test to assess "whether the residual return volatility before the Proposed Class Period is different from the residual return volatility within the Proposed Class Period."[68] In reaching his opinion, Prof. Stulz appears to assume that for an event study to be meaningful, it is *necessary* to pass the Chow test and the Levene test he applies.

42.   As detailed above, Prof. Stulz's criticism of my event study regression is flawed and unreliable. Furthermore, Prof. Stulz's opinion is also unreliable because his own Baseline Regression Model fails the same statistical tests he applies to evaluate my event study.[69]

43.   **Exhibit 2** below demonstrates the results of the Chow test and the Levene test applied to Prof. Stulz's Baseline Regression Model for the days prior to the de-SPAC (*i.e.*, using

---

[66] Stulz Report ¶ 84.

[67] Stulz Report fn. 168.

[68] Stulz Report fn. 171.

[69] In addition, Prof. Stulz also incorporates PureCycle's stock price prior to the business combination announcement in his regressions. This is due to the fact that, by design, the calculation of the daily stock return on the business combination announcement is performed relative to the closing price on the trading day prior to this announcement.

data from November 16, 2020 to March 17, 2021).[70] The exhibit shows 25 days (or 34%) with statistically significant changes at the 95% confidence level for the Chow test and 57 days (or 74%) with statistically significant changes at the 95% confidence level for the Levene test. Therefore, according to Prof. Stulz's own logic, these results demonstrate that his Baseline Regression Model fails to properly address fundamental differences in the characteristics of the ROCH Common Stock during the period from November 16, 2020 to March 17, 2021. His event study results therefore fail to address the criticisms he himself raises (which, as discussed previously are irrelevant to my event study).

### 4. MARKET EFFICIENCY OF PURECYCLE WARRANTS AND OPTIONS

44. In my Efficiency Report, I conclude that PureCycle Warrants and Options traded in an efficient market throughout the Class Period.[71] This conclusion is supported by my finding of market efficiency for the PureCycle Common Stock, commonly held views by practitioners, as well as court decisions regarding the efficiency of derivative securities flowing from the efficiency of common stock.[72] As one court has explained: "where the underlying stock trades in an efficient market," academics consider market efficiency of options to be an "essentially settled" matter.[73]

45. My opinion is further supported by the results of my additional cause-and-effect analysis, which demonstrates that price changes in PureCycle Warrants and Options are "directionally consistent with what would typically be observed in an efficient market given PureCycle's stock price changes."[74]

46. As with his analysis of PureCycle Common Stock, Prof. Stulz does not affirmatively prove or opine that the markets for PureCycle Warrants and Options were inefficient at any point in time. Instead, he opines that "given the numerous flaws in Dr. Cain's

---

[70] Stulz Report Exhibit 21.

[71] Efficiency Report ¶¶ 88, 91.

[72] Efficiency Report ¶ 92.

[73] *In re Apple Inc. Sec. Litig.*, 2023 WL 2763952 (N.D. Cal. Mar. 28, 2023).

[74] Efficiency Report ¶ 87.

analysis of market efficiency for the Company stock," I have "no reliable basis to make such claim."[75] Prof. Stulz's opinion is flawed and unsupported because as demonstrated in my Efficiency Report and Section 3 above, PureCycle Common Stock traded in an efficient market throughout the Class Period.

47. Prof. Stulz does not prove or opine that the results of my additional cause-and-effect analysis are incorrect. Instead, he opines that the results of my additional cause-and-effect analysis form "limited evidence" for market efficiency because "different options exhibited markedly different trading liquidity and price dynamics" and "market efficiency cannot be inferred and must be tested for each security in the relevant time period."[76] Prof. Stulz ignores and contradicts commonly-held views by practitioners and previous court decisions.[77] Moreover, as demonstrated below, Prof. Stulz's analysis of PureCycle Warrants and Options is irrelevant for the evaluation of market efficiency.

48. First, Prof. Stulz appears to opine that it is necessary to conduct an event study or analysis *in addition to* my additional cause-and-effect analysis to evaluate market efficiency for Warrants and Options.[78] Prof. Stulz does not explain at all how he would construct his event study for analyzing Warrants and Options and what other analyses he considers to be more appropriate. He also fails to provide support why my additional cause-and-effect analysis is insufficient. In reaching his opinion, Prof. Stulz ignores the fact that academic literature "strongly supports the presumption that options prices quicky reflect value relevant information that is also reflected in common stock prices."[79]

49. Furthermore, Prof. Stulz's requirement for event study or analysis *in addition to* my additional cause-and-effect analysis to evaluate market efficiency for Warrants and

---

[75] Stulz Report ¶ 136.

[76] Stulz Report ¶ 139.

[77] *See*, *In re Apple Inc. Sec. Litig*., 2023 WL 2763952 (N.D. Cal. Mar. 28, 2023); *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100 (D. Conn. 2006); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007); *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 41-42 (D.D.C. 2008); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.,* 2023 WL 4981716, at *5 (D.N.J. Aug. 3, 2023) (collecting cases).

[78] Stulz Report ¶¶ 140, 145

[79] Efficiency Report ¶ 84.

Options directly contradicts numerous court rulings. As explained in my Efficiency Report, I understand that "courts have presumed that when a market for common stock is found to be informationally efficient, reliance on misstatement efficient, reliance on misstatements or omissions can be presumed for the options, since their prices are derivative of the market prices for common stock."[80] Because I have demonstrated that PureCycle Common stock traded in an efficient market, conducting further analysis as proposed by Prof. Stulz is *unnecessary*.

50. Prof. Stulz's opinion also ignores and contradicts commonly-held views by practitioners. For example, in a securities class action in which the court found that options traded in an efficient market, leading expert Don Chance, who has published numerous books on options and derivatives, stated:[81]

> While there was some modest academic literature in the 1970's through the early 1990's that studied options market efficiency […] the issue is essentially settled and academics rarely, if ever, test this matter anymore. Simply stated, the options market must reflect the information provided in the price of the stock, and it must do it rapidly. Otherwise, traders doing transactions at stale prices will lose money. Option traders who do not price the option correctly and rapidly absorb new information into the price will be exploited. This exploitation, referred to as arbitrage, is the glue that connects the options market to the stock market.

51. Second, Prof. Stulz appears to opine that a bid-ask spread analysis similar to the one I conducted on PureCycle Common Stock in my Efficiency Report is required to evaluate market efficiency of PureCycle Warrants and Options. He calculates PureCycle Warrants and Options' bid-ask spreads, associates PureCycle Warrants and some PureCycle Options with high trading costs and appears to opine that the level of bid-ask spreads that he calculated may impede or is not consistent with market efficiency.[82]

52. As an initial matter, as explained above, Prof. Stulz's requirement for bid-ask spread analysis when evaluating warrants and options market efficiency directly contradicts a

---

[80] Efficiency Report ¶ 85.

[81] *In re Apple Inc. Securities Litigation*, No. 4:19-cv-02033-YGR (N.D. Cal.), Dkt. 239-2

[82] *Id.*

wide-range of academic literature and numerous court rulings.

53. Prof. Stulz's opinion is also flawed and unreliable because he fails to acknowledge the fact that warrants and options are commonly priced much lower than stocks, so the same bid-ask spread in dollar terms can be much larger in percentage terms. For example, his analysis includes many options with bid and ask prices of $0.10 and $0.30 per contract, respectively, which equates to a spread of 100% despite the fact that this spread is only $0.20 per contract.[83] Bid-ask spread for warrants and options can also be higher than common stock because they are often traded less frequently, and the trading is facilitated by professional investors and market makers with fixed service provider costs. Frequent trading is not required for options to be considered "efficient" because their pricing is derived from the underlying stock regardless of when a trade is executed. In fact, Prof. Stulz fails to appreciate that every option series for every company exists for only a matter of months; prior to the introduction of each new option series for any company, there is no trading in that particular options series. His conjectures about trading frequency thus reflect a fundamental lack of understanding about the economics of option securities generally.

54. I illustrate the flaws in Prof. Stulz's logic by applying it to one of the largest and well-known companies in the world – Apple.[84] Apple's common stock and options were found to trade in an efficient market over the period of November 2, 2018 – January 2, 2019 (inclusive).[85] During this period, Apple's common stock had an average bid-ask spread of 0.01%.[86] By contrast, as illustrated in **Table 1** below, the bid-ask spreads on Apple options ranged from 0.2% to 199% during the same time period. At the median, the bid-ask spread for Apple's options is over 500 times greater than the bid-ask spread for its common stock, illustrating how these spreads are not comparable across different securities:

---

[83] Source: Efficiency Report backup materials; Stulz Report backup materials.

[84] *See, e.g.* https://companiesmarketcap.com/usa/largest-companies-in-the-usa-by-market-cap.

[85] *In re Apple Inc. Securities Litigation*, No. 4:19-cv-02033-YGR (N.D. Cal.), Dkt. 352.

[86] Source: Bloomberg.

**Table 1**

| Percentile | Bid-Ask Spread |
|---|---|
| Minimum | 0.2% |
| 1st | 0.4% |
| 5th | 0.9% |
| 10th | 1.3% |
| 25th | 2.5% |
| 50th | 5.3% |
| 75th | 13.5% |
| 90th | 47.6% |
| 95th | 85.7% |
| 99th | 155.6% |
| Maximum | 199.2% |

55. As explained previously, it is well-known and understood that options generally have wider bid-ask spreads than stocks, but that this does not impede efficiency. This further demonstrates how Prof. Stulz's views regarding PureCycle's options bid-ask spreads are irrelevant.

56. Finally, Prof. Stulz calculates the trading frequencies of certain PureCycle option series. He asserts that I "failed to address the implication of this lack of trading for [my] market efficiency opinion for such option series."[87]

57. As an initial matter, my additional cause-and-effect analysis includes three different option series that "a) have strike prices nearest the prior day's closing stock price and b) are the nearest to expiration."[88] This is because "out-of-the-money options may still expire worthless despite underlying stock price swings."[89] As confirmed by Prof. Stulz, my analysis covered "the most liquid and actively-traded options."[90]

58. At each point in time, option exchanges offer investors a wide range of standardized call and put option contracts with different strike prices and expiries. In this matter,

---

[87] Stulz Report ¶ 148. I note that he does not opine that lack of active trading is inconsistent with market efficiency.

[88] Stulz Report ¶ 91.

[89] Stulz Report ¶ 90.

[90] Stulz Report ¶ 145.

PureCycle's Common Stock had 318 unique option series available to be traded in the Class Period. The low trading volume or lack of active trading of certain option series, especially for options that are deep in-the-money or deep out-of-the-money, is expected in options markets and thus not indicative of market inefficiency.

59. To illustrate, when Prof. Stulz's calculation is applied to the Apple options described above, which were found to trade in an efficient market, of the 2,351 option series that were available to be traded, as many as one fifth were traded on fewer than 25% of trading days.

**Table 2**

**Percent of Days an Option Series had Trading Volume**

| | [0%, 25%] | (25%, 50%] | (50%, 75%] | (75%, 100%] | TOTAL |
|---|---|---|---|---|---|
| Number of Option Series | 419 | 349 | 335 | 1,248 | 2,351 |
| Percent of Option Series | 18% | 15% | 14% | 53% | 100% |

## 5. PROF. STULZ FAILS TO RELIABLY SUPPORT HIS OPINION THAT THE ALLEGED MISREPRESENTATIONS DID NOT INCREASE THE COMPANY'S STOCK PRICE

60. Prof. Stulz opines that the Alleged Misrepresentations did not increase the Company's Stock Price on the four Alleged Misrepresentation dates.[91]

61. As discussed above, using a flawed event study setup, he argues that there was a lack of a statistically significant price reaction on November 16, 2020, which he takes as support for his claim that no new artificial inflation was created on this date. Moreover, because in his "understanding," Plaintiff's theory of liability dictates that the alleged November 16, 2020 misrepresentation created (as opposed to maintained) inflation, he offers the opinion that the alleged corrective disclosures "cannot serve as evidence of such inflation dissipating":

Given my understanding of Plaintiffs' liability theory and the fact that I found no evidence that the Alleged Misrepresentations impacted the Company's stock

---

[91] Stulz Report ¶¶ 152-189.

price on the dates they were made, price declines on subsequent dates discussed in the Second Amended Complaint cannot serve as evidence of such inflation dissipating. Price declines on the alleged corrective disclosure dates may instead reflect responses to other information that came to market on those dates…[92]

62. Prof. Stulz's analysis is flawed for several reasons. First, in offering his opinion on the lack of a price impact and the irrelevance of the alleged corrective disclosures, Prof. Stulz does not conduct any economic analysis, but rather relies on his *legal understanding* of Plaintiff's theory of liability:

Q. I would like to direct you to paragraph 191 in your report, and you can take your time to read this paragraph before you answer my question, but you mentioned that if you had understood plaintiffs' liability theory to be one of inflation maintenance, it could have impacted your conclusions. So my question specifically now is with regard to paragraph 191, if you had understood plaintiffs' theory of liability to be one of inflation maintenance, would that have changed your conclusion as set forth in paragraph 191?

A. Now I just want to be precise. *I mean this is my understanding of plaintiffs' liability theory. I don't mean in any way to interpret that. I mean that liability theory from a legal standpoint*. It is simply the assumptions I am making as a financial economist, and the assumption I am making as a financial economist is that there is no inflation on the previous trading day, but if there was inflation and that inflation is maintained, in that case you would not expect a positive abnormal return on November 16 and you could not establish the lack of price impact by looking at the front end.[93]

…

Q. So based on your understanding of SPACs and the floor to the price of SPACs and your conversations with Cornerstone, collectively those formed your opinion as to what the theory of liability is in this case?

A. So I talked with them about their understanding of the plaintiffs' liability theory and whether it was consistent with the way I was looking at it, and if that understanding was incorrect, then the analysis would have proceeded differently.

Q. Do you have any awareness of how Cornerstone came to their understanding as to plaintiffs' theory of liability in this case?

---

[92] Stulz Report ¶ 191.

[93] Stulz Tr. 107:13-108:14 (objections omitted).

A. ***I don't have any direct understanding. I would assume that they had
discussions with attorneys***, but I mean that is an assumption.[94]

63. While Prof. Stulz points to his legal understanding of Plaintiff's theory of liability as the
basis for his opinions in his paragraphs 190-191 and elsewhere in the Stulz Report,
Defendants point to these same paragraphs in the Stulz Report in arguing that the alleged
corrective disclosures cannot dissipate artificial inflation:

> Given the lack of inflationary increase following the alleged
> misrepresentations, Ex. 1, Stulz ¶¶ 156-59, the price declines following the
> alleged corrective disclosures are not reliable evidence of inflation dissipating.
> *Id.* ¶¶ 190-91, 202, 205, 238…[95]

64. Prof. Stulz thus engages in circular logic, as well as legal speculation, to form the entire
basis of his price impact opinions.

65. Moreover, Prof. Stulz fails to acknowledge the full scope of Plaintiff's allegations when
discussing his "understanding" of Plaintiff's theory of liability. For example, the
Complaint states that "[b]ecause of their positions with the Company and their access
to material non-public information available to them but not to the public, the Individual
***Defendants knew that the adverse facts specified herein had not been disclosed to and
were being concealed from the public*** and that the positive representations being made
were then materially false and misleading."[96] Further, the Complaint refers to "alleged
*omissions* of material fact" multiple times.[97] Prof. Stulz thus fails to explain how he has
reached his legal "understanding" of Plaintiff's theory of liability in this case.

## 5.1 PureCycle's Common Stock Returns Around Alleged Misrepresentations and Corrective Disclosures

66. As discussed in Section 3, Prof. Stulz's *Cammer* 5 event study is flawed. Moreover, as
explained below, Prof. Stulz's baseline and alternative event studies are also flawed,

---

[94] Stulz Tr. 117:23-118:17 (objections omitted).

[95] Defendants' Memorandum of Law in Opposition to Lead Plaintiffs' Amended Motion for Class Certification and Appointment as Class Representatives (Doc. 183), p. 24.

[96] Complaint ¶ 28.

[97] Complaint ¶¶ 15, 20, 100, 102-3, 107, 110, 126-8, 136-8.

undermining his conclusion about PureCycle's Common Stock return following the November 16, 2020 Alleged Misrepresentation. His regression models are flawed for the following reasons.

67. First, in the Stulz Report Exhibit 11, Prof. Stulz presents alternative event study results based on event study models I employed in four prior reports. As explained in Section 3 above, I utilized a fixed in-sample window in 8 of my prior reports, whereas I used a rolling estimation window (as in my Efficiency Report in this matter) in 15 of my prior reports. Prof. Stulz thus cherry-picks from a minority of my prior reports. Moreover, my event study methodology approach is unique in each case and depends on the information environment for each company; I do not blindly adopt event study methodologies from prior reports without consideration of the relevant facts and circumstances of a given case.

68. Second, in the Stulz Report Exhibits 21, 22, and 23, Prof. Stulz presents a baseline regression model and two alternative models. Each of these regression models relies on a forward-looking estimation window to evaluate PureCycle's abnormal return following the November 16, 2020 Alleged Misrepresentation. In other words, Prof. Stulz calculates the statistical significance of one day's abnormal return relative to the volatility of abnormal returns up to six months in the future. This approach is novel and contradicted by the academic publications that Prof. Stulz himself relies on. For example, Prof. Stulz repeatedly cites and relies on the event study methodology described in an academic study published by A. Craig MacKinlay, titled "Event Studies in Economics and Finance."[98] Twice, Prof. Stulz cites to that study for his explanation of a regression's "estimation window."[99] Yet he fails to consider this academic publication's actual description of the "estimation window":

> Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, *is using the period prior to the event window for the estimation window*. For example, in

---

[98] Stulz Report ¶¶ 55-62, fn. 97-100, 102, 105. *See* A. C. MacKinlay (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35.

[99] Stulz Report ¶ 56, 62, fn. 99, 105.

an event study using daily data and the market model, the market model parameters could be estimated over the 120 days *prior to the event*. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.[100]

69.  Third, as explained in Section 3 above, Prof. Stulz motivates his novel forward-looking estimation window approach by opining that his Levene test and Chow test identified structural breaks in the pre- versus post-business combination time periods.[101] Yet, as explained in Section 3 and **Exhibit 2**, those same tests identify many structural breaks during the estimation windows of Prof. Stulz's baseline regression model. Thus, his event study models fail the same tests that he himself relies on.

70.  Fourth, Prof. Stulz fails to properly understand *why* PureCycle's volatility increased following the November 16, 2020 business combination announcement. It increased in direct response to the new information provided to investors, including the identification of PureCycle as the SPAC's business combination target. This alone illustrates the importance of the business combination announcement to investors, as detailed further below. It also violates the MacKinlay study's recommendation (quoted above) to set a *prior* estimation window when the event itself may influence the regression estimates.

71.  Even a simple analysis demonstrates the importance to investors of PureCycle's November 16, 2020 business combination announcement. On this date, the ROCH stock price surged by 4%, reaching its post-IPO peak of $10.50 per share. This represented the largest post-IPO single day price movement to date, nearly twice the second-largest post-IPO single-day price movement. Additionally, the trading volume on November 16, 2020 was 2.73 million shares, over eight times greater than the second-largest post-IPO single-day trading volume.[102] These magnitudes are illustrated in **Exhibits 3** and **4**.

72.  Moreover, in reaching his opinion, Prof. Stulz fails to adequately consider direct evidence suggesting that the Alleged Misrepresentations were relied upon by market professionals and other outside parties. For example, an academic paper published on

---

[100] A. C. MacKinlay (1997), "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35, at p. 15.

[101] Stulz Report ¶¶ 84-5, fn. 168, 171.

[102] Source: Bloomberg.

November 20, 2020 – four days into the Class Period – described PureCycle's technology as "a prominent example of commercial-scale solvent-based polymer recycling"[103] This assessment mirrors the Alleged Misrepresentations in this matter.

73. As another example, an Oppenheimer report published on May 24, 2021 discussed the potential for PureCycle's technology to be scaled for commercial production. It stated:

> PureCycle is commercializing a novel purification technology. ***Though all unit operations and process equipment are known/commercially available at larger scale***, PureCycle's use of recycled feedstocks and choice of solvent are novel. PureCycle has invested six years and $100M in refining the process, testing at pilot scale, and building an ecosystem of domain experts, partners, suppliers and offtakers to validate the technology.[104]

74. Likewise, Cowen's September 23, 2021 analyst report stated that:

> ***Importantly, we believe the company's technology is scalable*** as the individual operating processes used to produce the UPRP resin is well-understood and commercially available at industrial scale beyond what PureCycle is looking to achieve over the near to mid-term.[105]

75. The same analyst report also discusses the availability of feedstock, mirroring the Alleged Misrepresentations:

> Building out this feedstock network will take considerable effort on PureCycle's part. However, we believe time is on management's side. Its current manufacturing roadmap calls for ~500mn pound of capacity by the end of 2023, which we see as **achievable**. [106]

76. Finally, Prof. Stulz's opinions are contradicted by the statistically significant declines in PureCycle's Common Stock following the alleged corrective disclosures. My Efficiency Report event study as well as *all* of Prof. Stulz's event studies document statistically significant declines following both of the alleged corrective disclosures, with both price drops significant at greater than the 99% level. These results are

---

[103] Walker, Theodore W et al. "Recycling of multilayer plastic packaging materials by solvent-targeted recovery and precipitation." *Science advances* vol. 6,47 eaba7599. 20 Nov. 2020, doi:10.1126/sciadv.aba7599

[104] "PCT: Initiating Coverage at Outperform and $24 PT," *Oppenheimer*, May 24, 2021 (emphasis added).

[105] "Initiation: Differentiated Technology Unlocks Untapped End Markets," *Cowen*, September 23, 2021 (emphasis added).

[106] *Id*.

summarized in Table 3 below[107]:

**Table 3**

| Alleged Corrective Disclosure: | May 6, 2021 | | November 11, 2021 | |
|---|---|---|---|---|
| PureCycle Common Stock | Abnormal Return | p-Value | Abnormal Return | p-Value |
| Cain Event Study | -40.83% | 0.000 | -15.76% | 0.000 |
| Stulz Event Studies | -36.51% | 0.000 | -16.62% | 0.001 |

77. Thus, as documented above, my reasonable and reliable event study documents a statistically significant stock price increase following the November 16, 2020 Alleged Misrepresentation. Moreover, both my event study and all of Prof. Stulz's alternative event studies document statistically significant declines following both of the alleged corrective disclosures.

## 6. DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS SUBJECT TO A COMMON METHODOLOGY CONSISTENT WITH PLAINTIFF'S THEORY OF LIABILITY

78. Prof. Stulz opines that my Efficiency Report has "failed to articulate a damages methodology that can measure damages that are consistent with the theory of liability in this case."[108] He bases this opinion on four main arguments. First, Prof. Stulz states that I have not "articulated how [I] would reliably estimate inflation that is consistent with both market efficiency and Plaintiffs' theory of liability."[109] Second, he claims that I "assume, without basis, that price declines on the alleged corrective disclosure dates can be used to measure inflation."[110] As I explain below, both of these critiques are misguided because they are based on a mischaracterization of Plaintiff's theory of

---

[107] Prof. Stulz's event studies calculate abnormal returns while my event study calculates abnormal log returns. I have converted the abnormal log returns from my event study into the equivalent abnormal returns in the table.

[108] Stulz Report, page 73.

[109] Stulz Report ¶ 204.

[110] Stulz Report, page 77.

liability.

79. Third, Prof. Stulz argues that certain approaches to inflation estimation (in particular, constant dollar or constant percentage back-casting) based on the price reaction to corrective disclosures would, if implemented in certain ways, lead to "non-sensical" results. However, I understand that I am not obligated to, and in fact I have not, committed to using any of these approaches, or how to implement them if I were to use them. I have not put forward any of the specific artificial inflation ribbons proposed by Prof. Stulz. Prof. Stulz's opinions on specific artificial inflation ribbons are therefore speculative and irrelevant.

80. Fourth, Prof. Stulz argues that I have not specified with sufficient granularity "how [I] will isolate damages attributable only to Plaintiff's theory of liability."[111] As I explain below, my understanding again is that I am not obligated to provide the level of granularity that Prof. Stulz demands, and in fact one could not do so without reviewing the information environment and evidentiary record in this matter – a process that occurs at a later loss causation and merits phase of a case.

81. To summarize, Prof. Stulz's damages methodology critiques are speculative, misguided and irrelevant to the question of whether I have shown that class-wide damages can be calculated consistently with Plaintiff's theory of liability and according to a common methodology. I reiterate my Efficiency Report conclusion that "Common Stock, Warrants, and Options damages in this matter can be calculated on a class-wide basis subject to a common methodology."[112]

**6.1    Prof. Stulz's Criticism of My Damages Methodology Is Misguided**

82. Prof. Stulz claims that I have not "articulated how [I] would reliably estimate inflation that is consistent with both market efficiency and Plaintiffs' theory of liability."[113] As explained above, his opinion is based on his legal understanding of Plaintiff's theory of

---

[111] Stulz Report, p. 81.

[112] Efficiency Report ¶ 11.

[113] Stulz Report ¶ 204.

liability in this case. As further described above, my reasonable and reliable event study methodology documents a statistically significant increase in PureCycle's Common Stock price following the November 16, 2020 Alleged Misrepresentation, and statistically significant declines in PureCycle's Common Stock prices following both of the alleged corrective disclosures.

83. In testimony, Prof. Stulz conceded that an inquiry into price impact can focus on back-end disclosures and their impacts on stock prices:

> If the question is to establish whether the stock price changed as a result of a statement or not, then you want to show that that statement changed the price at some point. It could have changed the price when it was made, or it could change the price when it is revealed to be false… [I]f you show that if the market concluded that the statement was false and when it does so that there is a significant negative abnormal return that is due solely to the market finding that the statement was false, then that would be a way to establish that the statement affected the price.[114]

84. Thus, a relevant question – and one that Prof. Stulz has failed to consider – is whether PureCycle's Common Stock experienced statistically significant declines following the alleged corrective disclosures. As explained above, my reasonable and reliable event study documents both front-end and back-end statistically significant impacts on PureCycle's Common Stock prices.

**6.2    Prof. Stulz's Critique of the Back-Casting Approach is Misguided**

85. Prof. Stulz criticizes the constant dollar approach – one of several approaches to estimating inflation that I mention in the Efficiency Report – because under Prof. Stulz's implementation of this approach, and "absent other adjustments," "ROCH's stock price would be negative for the first two weeks of the Proposed Class Period, which is economically non-sensical."[115] Prof. Stulz also observes that his own implementation of the constant dollar approach results in but-for prices "substantially below $10 in the

---

[114] Stulz Tr. 100:22-101:13.

[115] Stulz Report ¶ 207.

early part of the Proposed Class Period."[116]

86. I agree that a negative but-for stock price is something that must be properly addressed and accounted for in a hypothetical artificial inflation ribbon. Prof. Stulz's criticism is nevertheless misplaced. First, I have not committed to using a constant dollar approach, nor have I yet committed to how exactly I would implement this approach and make further refinements to it, if I were to use it.[117] Second, if I were to use the constant dollar approach, I could implement "other adjustments," as needed, based on the economic facts of this case. As I note in my Efficiency Report, "[t]this process […] will be based on the specific set of facts and circumstances in a given case."[118] At this stage of litigation, however, I understand that I am not obligated to provide this level of granularity.[119] At this point in time, I have not put forward any specific artificial inflation ribbon; thus, Prof. Stulz's criticisms of the inflation ribbons that he proposes are irrelevant.

87. The same counterarguments apply to Prof. Stulz's critique of an alternative approach I mentioned in my Efficiency Report, constant percentage inflation. Dr. Stultz further criticizes this approach on the grounds that I "fail[] to articulate why such an assumption is justified, as a matter of economics, in this case, or how such an assumption is consistent with developments and circumstances of the Company, the industry, or the

---

[116] Stulz Report ¶ 208.

[117] As I note in my Efficiency Report "I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation." Efficiency Report fn. 99.

[118] Efficiency Report ¶ 96. *See also* ¶ 97: "[a] loss causation analysis must also document how artificial inflation evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case," "[i]n any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case."

[119] *In re Acuity Brands, Inc. Sec. Litig.*, No. 1:18-CV-2140-MHC, 2020 WL 5088092, at *10 (N.D. Ga. Aug. 25, 2020) ("Any argument that Plaintiffs' damages model fails to accurately account for inflation or is otherwise inaccurate is an argument that goes to the merits of Plaintiffs' claims regarding damages and is not a part of this Court's inquiry on Plaintiffs' Motion for Class Certification."); *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 399 (N.D. Ga. 2019) (holding it is not required at class certification to specify "how [the expert] will calculate inflation") (quoting *Wilson v. LSB Indus., Inc.*, No. 15CIV7614RAGWG, 2018 WL 3913115, at *16 (S.D.N.Y. Aug. 13, 2018)); *Bahr v. NCL (Bahamas) Ltd.*, No. 19-CV-22973, 2021 WL 4845789, at *16 (S.D. Fla. Oct. 18, 2021) ("Rule 26(a)(2) reports do not need to contain a complete discussion of the expert's methodology because the reports cannot realistically explore all the nuances of an expert's methodology")

overall market during the Proposed Class Period."[120] First, I have not committed to using the constant percentage approach in a subsequent damages report. Second, I understand that I am not obligated to determine exactly which method I will use to calculate inflation, exactly how I will implement it, or what adjustments I will make to the calculations, at this stage of litigation. Once again, at this point in time, I have not put forward any specific artificial inflation ribbon; thus, Prof. Stulz's criticisms of the inflation ribbons that he proposes are irrelevant.

**6.3    Prof. Stulz's Criticism That I Have Failed to Articulate How to Isolate Damages Attributable Only to Plaintiff's Theory of Liability is Misguided and Incorrect**

88.  Prof. Stulz claims that I have not articulated how I will isolate damages attributable only to Plaintiff's theory of liability.[121] He states that I have not "articulated how I will account for information that was already public prior to the Hindenburg Report and isolate the price impact, if any, of disclosure of the alleged truth that came to market on May 6, 2021 exclusive of any negative impact from non-allegation-related information or discussions that would potentially have weighted negatively on the Company's stock price."[122] Similarly, he claims that I have "failed to articulate how [I] will isolate the price impact, if any, of the 'truth' that Plaintiffs allege was revealed by news of the SEC fact-finding investigation on November 10, 2021 from other information unrelated to the allegations in the 10-Q filing."[123]

89.  With respect to his claim that certain allegedly corrective information may have been known prior to the alleged corrective disclosures in this case, Prof. Stulz claims that "[i]n an efficient market repetition of information that had previously been publicly disclosed would not be expected to impact a company's stock price."[124] Prof. Stulz's opinion here does not invalidate the damages methodology I described in my Efficiency Report. To the extent that I find, upon reviewing further materials, that the alleged

---

[120] Stulz Report ¶ 211.

[121] Stulz Report ¶ 216.

[122] Stulz Report ¶ 216.

[123] Stulz Report ¶ 216.

[124] Stulz Report ¶ 219.

36

corrective disclosures had in part been fully priced into PureCycle's Common Stock prior to the corrective disclosures, I can simply make adjustments when calculating inflation dissipation. Moreover, if they were already priced into the Common Stock, it is plausible that no further adjustments could be required. Regardless, Prof. Stulz's opinions relate to the calculation of the *inputs* of the out-of-pocket damages formula, not to the validity of the methodology itself.

90. With regards to confounding information, I have described a methodology to address this issue in my Efficiency Report:

> To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of PureCycle's securities can be determined on a common, class-wide basis using various accepted methodologies... This process may rely upon additional information learned during the discovery process and will be based on the specific set of facts and circumstances in a given case.[125]

91. I understand that it is premature to specify exactly which confounding factors are relevant in this matter, or how to measure their price impact, if any. I further understand that I am not required to do so at this stage of the litigation process.[126]

92. Prof. Stulz opines that I do not adequately describe the "various accepted methodologies" for evaluating confounding information in my Efficiency Report.[127] As explained above, it is premature to settle on any such methodologies that are appropriate in this matter, as this is a decision that depends on specific case details, which I have not yet been asked to review. There are multiple such approaches, as Prof. Stulz himself concedes:

---

[125] Efficiency Report ¶ 96.

[126] *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 398 n. 35 (N.D. Ga. 2019) (expert does not need to specify valuation tools at class certification stage); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1341–43 (N.D. Ga. 2007) (certifying class despite the fact plaintiffs did not provide a damages model); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-06 (S.D.N.Y. 2016) (certifying class even though plaintiffs expert stated generally that they would use an 'out-of-pocket' theory of damages).

[127] Stulz Report ¶ 216.

Q. How have you parsed the decline to account for different company-specific disclosures?

A. Well, one approach is to investigate whether the ***different pieces of information came to the market at different times during the day***, and so I have done that. And another approach has been to estimate the economic impact using a ***valuation model***, and I have done that using that to put an upper bound on the damages. I have done that.[128]

93. To summarize, Prof. Stulz's critiques are misguided and irrelevant to the question of whether I have shown that class-wide damages can be calculated class-wide in a manner consistent with Plaintiff's theory of liability. In the following Sections, I nevertheless address Prof. Stulz's additional criticisms.

## 6.4   Prof. Stulz's Discussion of Information on Publicly Available Information is Misleading

94. As I discuss above, the damages methodology I describe in my Efficiency Report can take into account the possibility that certain alleged corrective disclosures were already publicly known. In this section, I nevertheless discuss additional critiques made by Prof. Stulz, demonstrating that he has failed to provide reliable evidence that certain alleged corrective disclosures were publicly known in advance of the dates as alleged in this matter.

95. Prof. Stulz appears to indicate that the publication of PureCycle's recycling processes corrected, before the alleged corrective disclosures, Plaintiff's Alleged Misrepresentation that "PureCycle Inc.'s patent is nowhere as valuable as it had led investors to believe as the patented process was not yet functional and was incapable of being scaled for commercial production as it had claimed."[129] Prof. Stulz provides no economic support for his opinion and he makes an unrealistic assumption that the market fully inferred the ***value*** of PureCycle's patent simply by reviewing the published patent itself. Even in an efficient market, I understand that courts have recognized that it is plausible that complex "data understandable only through expert analysis may not be

---

[128] Stulz Tr. 141:24-142:8 (emphasis added).

[129] Stulz Report ¶ 230.

readily digestible by the marketplace."[130] Prof. Stulz ignores the possibility that the value of PureCycle's patent was "complex and understandable only through expert analysis."

96. Furthermore, I reviewed available news and analyst reports about PureCycle before the alleged corrective disclosures. Based on this review, I did not identify any source that disclosed the Alleged Misrepresentation that "PureCycle Inc.'s patent is nowhere as valuable as it had led investors to believe as the patented process was not yet functional and was incapable of being scaled for commercial production as it had claimed."[131]

97. Prof. Stulz also points to certain risk disclosures that he claims to be relevant to the Alleged Misrepresentations:

a. In relation to the Alleged Misrepresentation that "PureCycle Inc. faced much higher competition for high quality feedstock, a necessary input in the recycling process, than it had led investors to believe," Prof. Stulz states that "[p]rior to the release of Hindenburg Report, ROCH, the private company PureCycle, and the post-business combination PureCycle had all previously publicly discussed the business risk related to its feedstock supply."[132] Prof. Stulz also appears to opine that an industry roundtable commentary made by the CEO of a different company also disclosed PureCycle's

---

[130] See: (1) *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015) (quoting *Pub. Empls. Ret. Sys. of Miss., Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014)) (internal quotation marks omitted); (2) *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1053-54 (9th Cir. 2008) (rejecting argument that complex disclosure was understood by the market when "it is not unreasonable . . . the public failed to appreciate its significance"); (3) *In re BofI Hldg., Inc. Sec. Litig.*, 2017 WL 5973340, at *3 (S.D. Cal. Dec. 1, 2017) ("The Ninth Circuit has held, however, that a corrective disclosure may be adequate even if it relies solely on previously disclosed information so long as the new corrective disclosure brought to light an implication of the previously disclosed information of which the market was not aware... For example, a discussion of public information may be adequate to support loss causation if it interprets 'complex economic data understandable only through expert analysis [that was not previously] readily digestible by the marketplace.'... By explaining the implications of these otherwise non-digestible data, this 'interpretive corrective disclosure' reveals to the public *for the first time* information that impacts the value of the stock."); (4) *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *6–7 (D. Mass. Nov. 14, 2017) (recognizing same principle); (5) *Hall v. Johnson & Johnson*, 2023 WL 9017023, *15 (D.N.J. Dec. 29, 2023) (same).

[131] Stulz Report ¶ 230.

[132] Stulz Report ¶ 227.

business risk related to its feedstock supply.[133]

    b.  In relation to the Alleged Misrepresentation that "PureCycle Inc.'s patent is nowhere as valuable as it had led investors to believe as the patented process was not yet functional and was incapable of being scaled for commercial production as it had claimed," Prof. Stulz states that "PureCycle disclosed prior to the November 10, 2021 10-Q filing that it operated with a high-reward and high-risk business model, with business scalability being a primary risk."[134]

    c.  In relation to the SEC Investigation, Prof. Stulz states that "[a]nalyst commentary noted potential regulatory risk for the Company," and "ROCH also faced regulatory risks concerning the SPAC sector in general."

98. To the extent that Prof. Stulz opines that these risk disclosures corrected, before the alleged corrective disclosures, certain Alleged Misrepresentations, his opinion is flawed because the disclosure of a general risk is not the same as the disclosure of an issue that Defendants know has already occurred. In his testimony, Prof. Stulz agreed with this fact:

> Q. Sure. Is it your opinion that disclosing a hypothetical risk is the same as disclosing that a risk has already come to pass?
>
> A. I'm not a disclosure expert. I'm not an expert on whether something is curative or corrective. I mean *I certainly can see differences between the two statements in some cases*, and in other cases maybe not, it would depend on the specifics, but again I have no legal expertise, and so it is not an issue on which I could resolve any kind of legal consideration.
>
> Q. Just to be clear, I wasn't asking for a legal opinion, I'm simply asking your personal opinion as to whether a hypothetical risk is the same as a risk that has already materialized, and I think you answered that in some cases there are differences and in some cases there are not.
>
> So my follow-up question is in what instances would you say there is no difference between a hypothetical risk and a materialized risk?

---

[133] Stulz Report ¶¶ 227-229.

[134] Stulz Report ¶ 245.

A. I mean it depends on the precise nature of the risk, I would think, and what is known about that risk. Now, if it is something that one is absolutely sure has not happened based on disclosures while it actually has, then that would be a case where ***the two disclosures would be very different***.[135]

99. Furthermore, Prof. Stulz also fails to consider direct evidence showing that despite the risks surrounding the scalability of the process being disclosed, analysts still indicated that they believed in the scalability of the process. In Oppenheimer's May 24, 2021 report, the analysts indicated their confidence in the ability of PureCycle to scale its process:

Despite these risks, we note key suppliers and partners to PureCycle on Plant 1 have all ***voiced confidence in PureCycle's ability to scale***. Given that PureCycle's process utilizes well-known, commercially available, modular equipment, we believe PureCycle should be able to procure key equipment and systems for future plants from a global roster of preferred vendors. Moreover, in scaling from PhaseX testing to the FEU, we believe PureCycle gained critical process learnings related to [parts of the process].[136]

100. Similarly, in Oppenheimer's August 13, 2021 report, the analysts stated:

The business model requires the successful scaling of novel process technology and alignment of future plant buildout with feedstock sourcing, pricing and financing strategies. ***We believe PureCycle and its partners, suppliers and offtakers are approaching these challenges thoughtfully with a viable blueprint***.[137]

101. Prof. Stulz also fails to consider direct evidence suggesting that the alleged corrective disclosures provided new information to investors. A review of news following each of the alleged corrective disclosures reveals information connecting drops in PureCycle's Common Stock price to the information purportedly contained within the alleged corrective disclosures. For example, following the publication of the Hindenburg Report on May 6, 2021, a news article stated:

Shares of PureCycle Technologies are down…after short selling research firm Hindenburg Research called the company a "zero-revenue ESG SPAC

---

[135] Stulz Tr. 125:2-126:15 (objections omitted, emphasis added)

[136] "PCT: Initiating Coverage at Outperform and $24 PT," Oppenheimer, May 24, 2021.

[137] "PCT: Operational Progress, Catalysts, and Higher Potential ROI Evident; Maintain OP," Oppenheimer, August 13, 2021.

charade"…PureCycle's Chairman/CEO and other associated executives *"collectively took 6 companies public prior to PureCycle. All have failed…"* said Hindenburg, which claims that former employees of earlier "failed companies" said PureCycle's executives "based their financial projections on 'wild ass guessing', brought companies public far too early, and had deceived investors." Multiple competitors and industry experts argue that PureCycle *"faces steep competition for high quality feedstock, and called the company's financial projections into question,"* according to Hindenburg.[138]

102. Similarly, an article published by Forbes on May 7, 2021, titled "A Plastics Recycling Firm With No Revenues Plunged More Than 40% This Week – Here's Why," stated:

> *Shares of PureCycle Technologies … has plummeted more than 40% in value this week amid allegations by a research firm that it committed fraud by misleading investors about its technology* and making wild revenue forecasts.[139]

103. Additionally, following the alleged corrective disclosure on November 10, 2021, an analyst report by Craig-Hallum stated:

> While the update was positive, this was clearly *overshadowed by the 10Q disclosure of the CEO's receipt of a subpoena from the SEC (non-public, request for testimony, PCT will fully cooperate) which will most certainly weigh on shares in the near-term* with little clarity available at this point…"[140]

## 6.5   Interviews with Third Parties

104. In Section IX.C.1.b) of his report, Prof. Stulz states that "the Hindenburg Report drew on 'interviews with named industry experts as well as former employees of the PureCycle executives' previous failed companies,'" and "these were not interviews with PureCycle management or employees."[141] Prof. Stulz fails to provide any economic analysis or explanation of why these interviews with third parties cannot be corrective of the Alleged Misrepresentations, or why it is necessary for an interview to be with

---

[138] "09:28 EDT PureCycle sinks after called 'ESG SPAC charade' by short-seller Hindenburg," *The Fly On The Wall*, May 6, 2021

[139] "A Plastics Recycling Firm With No Revenues Plunged More Than 40% This Week – Here's Why," *Forbes*, May 7, 2021.

[140] "Important Progress On Multiple Fronts In 3Q Towards Its 2025 PP Recycling Target, Though Filing Disclosure May Drive Shares In The Near-Term. Lowering Price Target To $26, Maintain BUY," *Craig-Hallum*, November 12, 2021.

[141] Stulz Report ¶ 233.

"PureCycle [current] management or employees" for the information to be corrective. In his testimony, Prof. Stulz confirmed that he does not provide any economic analysis or opinion on whether the Hindenburg Report's interviews could be corrective.

> Q. Is it your opinion that only interviews with PureCycle management and employees can be corrective?
>
> A. I'm not an attorney, I cannot tell you what can or not be, cannot be corrective from a legal standpoint. I can as an economist investigate price impact, and I can do that.[142]

105. As a result, Prof. Stulz fails to provide any economic analysis or explanation of why the interviews with third parties cited in the Hindenburg Report cannot be corrective of the Alleged Misrepresentations.

## 6.6   Prof. Stulz Incorrectly Suggests a Price Rebound Following the Hindenburg Report

106. Finally, Prof. Stulz suggests that the Hindenburg Report may not have revealed the "truth" about PureCycle's prospects because after the initial drop following the Hindenburg Report's publication, the Company's stock price gradually increased over the subsequent seven weeks.[143] Prof. Stulz's opinion is irrelevant as this question relates to a loss causation and merits inquiry, which I understand may occur at a later phase of the case. Nonetheless, his suggestion of a price rebound is contradicted by the evidence, as well as academic research on short sellers.

107. A research study published by Professor Mitts analyzed potentially distortive stock price impacts from the publication of short reports by pseudo-anonymous short sellers. He documented a pattern of a short-term drop in stock price that is quickly reversed over the next five trading days.[144] That study illustrates this pattern for an example company in its Figure 1, reproduced as **Figure 1** below:[145]

---

[142] Stulz Tr. 120:24-121:25.

[143] Stulz Report ¶ 242, fn. 432.

[144] Joshua Mitts, Short and Distort, *Journal of Legal Studies*, 2020 ("Mitts Study"). Mitts Study, at p. 306: "However, returns of firms targeted by pseudonymous articles decline further on the day of publication ($t_0$) and display a sharp pattern of reversal…from day 1 to day 5 following publication." *See also*: pp. 302-310; Figure 3; Table 4.

[145] Mitts Study, Figure 1.

**Figure 1**



108. However, as shown in **Exhibit 5**, this short-term reversal pattern was not present in PureCycle's Common Stock following the publication of the Hindenburg Report. As can be seen, rather than reversing over the next five trading days, PureCycle's Common Stock price continued to decline in the subsequent days following the publication of the Hindenburg Report. This pattern is inconsistent with Prof. Stulz's suggestion that the Hindenburg Report may not have revealed the "truth" about PureCycle's prospects as evidenced by a purported rebound in the Company's Common Stock price.

## 7. CONCLUSION

109. Prof. Stulz disputes the market efficiency of PureCycle's Common Stock, Options, and Warrants. However, he has not conducted any analyses to ascertain whether PureCycle securities traded in an efficient market during the Class Period, nor does he conclude that they traded in an *inefficient* market.  None of Dr. Stulz's critiques disturb my Efficiency Report conclusions, and I reaffirm my market efficiency findings regarding PureCycle's securities.

110. Prof. Stulz opines that the Alleged Misrepresentations were not associated with statistically significant price increases. I identify multiple flaws in Prof. Stulz's analysis, and I note that my reasonable and reliable Efficiency Report event study analysis documents a statistically significant increase in PureCycle's Common Stock price following the November 16, 2020 Alleged Misrepresentation.

111. Prof. Stulz opines that PureCycle Common Stock price declines following the alleged

corrective disclosures cannot provide evidence of artificial inflation dissipating. His opinion rests on a legal conclusion without any analysis or reliability. Both of the alleged corrective disclosures were followed by statistically significant declines in PureCycle Common Stock prices.

112. Prof. Stulz critiques my damages methodology for PureCycle Common Stock, Options, and Warrants. His opinions largely relate to specific calculations of the inputs to the formula, not the methodology itself, which is widely-employed across securities cases. None of his critiques disturb my Efficiency Report conclusion that the out-of-pocket methodology represents a reliable methodology to calculate damages and can be applied across Class members.

113. In summary, none of Prof. Stulz's criticisms disturb my Efficiency Report conclusions, which I reaffirm herein.

I declare under penalty of perjury that the foregoing is true and correct.

RESPECTFULLY SUBMITTED

Matthew D. Cain, Ph.D.

_Matthew D. Cain_

## APPENDIX A

Documents Considered

**Court Documents**

- *Bahr v. NCL (Bahamas) Ltd.*, No. 19-CV-22973, 2021 WL 4845789, at *16 (S.D. Fla. Oct. 18, 2021)

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca)

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.)

- *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 91 (S.D.N.Y. 2015)

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.)

- *Hall v. Johnson & Johnson*, 2023 WL 9017023, *15 (D.N.J. Dec. 29, 2023)

- *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2023 WL 4981716, at *5 (D.N.J. Aug. 3, 2023)

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.)

- *In re Acuity Brands, Inc. Sec. Litig.*, No. 1:18-CV-2140-MHC, 2020 WL 5088092, at *10 (N.D. Ga. Aug. 25, 2020)

- *In re Apple Inc. Securities Litigation*, No. 4:19-cv-02033-YGR (N.D. Cal.)

- *In re AVEO Pharms., Inc. Sec. Litig.*, 2017 WL 5484672, at *6–7 (D. Mass. Nov. 14, 2017)

- *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-06 (S.D.N.Y. 2016)

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM

46

(D.D.C.)

- *In re BofI Hldg., Inc. Sec. Litig.*, 2017 WL 5973340, at \*3 (S.D. Cal. Dec. 1, 2017)

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.)

- *In Re: CenturyLink Sales Practice and Securities Litigatio*n, MDL No. 17-2795 (MJD/KMM)

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.)

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.)

- *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 41-42 (D.D.C. 2008)

- *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1053-54 (9th Cir. 2008)

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.)

- *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 633–34 (N.D. Ala. 2009)

- *In re MGM MIRAGE SECURITIES LITIGATION*, 2:09-cv-01558-GMN-LRL (D. Nev.)

- *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 100 (D. Conn. 2006)

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.)

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.)

- *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1330 (N.D. Ga. 2007)

- *IN RE Tronox, INC. Securities Litigation*, 1:09-cv-06220 (S.D. N.Y.)

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.)

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.)

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.)

- *In re Vaxart, Inc. Securities Litigation,* Case No. 3:20-cv-05949-VC (N.D. Ca.)

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.)

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.)

- *John Alberici, et al. v. Recro Pharma, Inc.*, et al., Case No. 2:18-cv-02279-MMB (E.D. Pa.)

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343

- *Lipton v. Documation, Inc.*, 734 F.2d 740, 745–746 (11th Cir.1984) (N.D. Ca.)

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.)

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.)

- *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 399 (N.D. Ga. 2019)

- *Plumbers & Pipefitters National Pension Fund, et al v. Burns, et al*, 3:05-cv-07393-JGC (N.D. Oh.)

- *Pub. Empls. Ret. Sys. of Miss., Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014)

- *Robert Lematta et al. v. Casper Sleep, Inc.*, et al., Case No. 1:20-cv-02744 (E.D. N.Y.)

- *Ross v. Bank South, N.A.*, 885 F.2d 723, 728–29 (11th Cir.1989)

- *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 210–11 (2d Cir. 2008)

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.)

- *Sapssov v. Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015)

- *Wilson v. LSB Indus., Inc.*, No. 15CIV7614RAGWG, 2018 WL 3913115, at *16 (S.D.N.Y. Aug. 13, 2018)

**Depositions**

- Deposition of Matthew D. Cain, Ph.D., January 8, 2024.

- Deposition of René M. Stulz, Ph.D., February 9, 2024.

**Academic Articles**

- Bessembinder, Hendrik, and William Maxwell (2008), "Markets: Transparency and the Corporate Bond Market," *Journal of Economic Perspectives* 22.

- Bessembinder, Hendrik, and Kumar Venkataraman (2010), "Bid-Ask Spreads: Measuring Trade Execution Costs in Financial Markets," *Encyclopedia of Quantitative Finance*.

- Bessembinder, Hendrik, et al. (2018), "Capital Commitment and Illiquidity in Corporate Bonds," *Journal of Finance* 73.

- Gahng, M., J. R. Ritter and D. Zhang (2023), "SPACs," *Review of Financial Studies*, 36.

- Li, Dan, and Schürhoff, Norman (2019), "Dealer Networks," *Journal of Finance* 74.

- MacKinlay A. C. (1997), "Event Studies in Economics and Finance," *Journal of Economic*

*Literature*, 35.

- Mitts, J. (2020), "Short and Distort," *Journal of Legal Studies* 49.

- Ross, Stephen A., et al. (2003), Corporate Finance, 10th Ed., McGraw-Hill.

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, "Is There Life After the Complete Loss of Analyst Coverage?," *Accounting Review* 88.

**Analyst Reports**

- "Roth CH Acquisition I Surges 60% in Past Quarter," BuySellSignals, December 10, 2020.

- "Roth CH Acquisition I Soars 212% in Past Quarter; Institutional Ownership Down 75%," BuySellSignals, February 24, 2021.

- "Roth CH Acquisition I in Top 1% Performers of NASDAQ Market in Past Quarter; Institutional Ownership Down 75%," BuySellSignals, March 2, 2021.

- "At The Intersection Of Massive Global Unmet Need & Highly-Disruptive Proprietary Tech, With First-Mover Advantage, Blue-Chip Partners, And Increasingly De-Risked Business Model. Initiating Coverage With A BUY Rating, $48 Price Target," Craig Hallum, March 18, 2021.

- "PCT: Keeping the World Green with Polypropylene; Initiate Buy $45 Target," Roth Capital Partners, April 21, 2021.

- "PCT: Initiating Coverage at Outperform and $24 PT," Oppenheimer, May 24, 2021.

- "PureCycle is An Important Path Forward For Its Growing List of Strategic Partners To Meet Substantial Polypropylene Recycling Goals. Reiterate BUY Rating." Craig Hallum, May 7, 2021.

- "PCT: The Road to Commercialization – Correcting a Bystander's Poor Directions," Roth Capital Partners, May 7, 2021.

- "PCT: Corporate Update May 17th," Roth Capital Partners, May 14, 2021.

- "Plant 1 Construction On-Track & Capacity Outlook Reiterated As Build Out of 'No Compromise' Recycling Powerhouse Underway. Reiterate BUY Rating." Craig Hallum, May 18, 2021.

- "PCT: 1Q 2021 Update Review," Roth Capital Partners, May 18, 2021.

- "Irontron Investor Event Takeaways: Plant 1 & The Forward Plan Remain On Track With The Market Opportunity Continuing To Expand. Reiterate BUY Rating." Craig Hallum, June 24, 2021.

- "PCT: Investor Day Demonstrates Progress and Bench Strength, Raise PT to $28," Oppenheimer, June 24, 2021.

- "PCT: Investor Day – Deeper & Broader with Management," Roth Capital Partners, June 25, 2021.

- "PCT: Checking Off the To Do List – First Cluster Site Announced," Roth Capital Partners, July 30, 2021.

- "Add SK Global Chemical To List Of Top-Tier Partners While Continuing To Move The Ball Forward Commercially, Operationally And On Feedstock. Reiterate BUY Rating." Craig Hallum, August 13, 2021.

- "PCT: Operational Progress, Catalysts, and Higher Potential ROI Evident; Maintain OP," Oppenheimer, August 13, 2021.

- "PCT: 2Q '21 Executing on a Detailed Blueprint to Commercialization," Roth Capital Partners, August 13, 2021.

- "Changing the Recycling Game; Initiate at Buy," Jefferies, August 26, 2021.

- "Initiation: Differentiated Technology Unlocks Untapped End Markets," Cowen, September 23, 2021.

- "Feedstock Supply Continues to Develop; Ironton Facility on Track," Cowen, November 11, 2021.

- "PCT: Building the Infrastructure to Scale," Oppenheimer, November 11, 2021.

- "Important Progress on Multiple Fronts in 3Q Towards Its 2025 PP Recycling Target, Though Filing Disclosure May Drive Shares in the Near-Term. Lowering Price Target To $26, Maintain BUY," Craig-Hallum Capital Group, November 12, 2021.

- "3Q21: Continued Progress," Jefferies, November 12, 2021.

- "PCT: Ironton on Track for 4Q 22; Augusta & Other Initiatives Move Forward Too," Roth Capital Partners, November 12, 2021.

- "Roth CH Acquisition I Gains 15% in Past Quarter," BuySellSignals, November 25, 2020.

**News**

- "A Plastics Recycling Firm With No Revenues Plunged More Than 40% This Week – Here's Why," Forbes, May 7, 2021.

- "09:28 EDT PureCycle sinks after called 'ESG SPAC charade' by short-seller Hindenburg," The Fly On The Wall, May 6, 2021

**Data Sources**

- Bloomberg

- Factiva

- Investext

- OptionMetrics

- Refinitiv

- SEC Edgar

- Stulz Report Backup Materials

- TickData

**Other**

- All other data and documents cited or referred to within this report

## APPENDIX B

## Matthew D. Cain, Ph.D.                                    February 2024

E-mail: mdcain@outlook.com                                                Homepage
Mobile: 574-485-8065                                                          SSRN

### Education

Ph.D., Finance, August 2007                Purdue University, West Lafayette, IN
B.S., Finance, May 2001                     Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics* 66, 535-555 (2023).

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

**Presentations**

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden
- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group

- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Peregrine Economics
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**: *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *Journal of Banking and Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law

    LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2024

    LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023

University of Notre Dame, Mendoza College of Business

    FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

    FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management

    MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

    MGMT 610: Financial Management I (MBA Core), Fall: 2007

## Expert Witness Experience

- *In re Bed Bath & Beyond Corporate Securities Litigation*, Case No. 1:22-cv-02541-TNM (D.D.C.). Report February 2024.

- *In the Matter of Joshua Abrahams*, File No. 3-21214, (SEC Admin. Proc.). Rebuttal Report February 2024.

- *In re Emergent Biosolutions Inc. Securities Litigation*, Case No. 8:21-cv-00955-PWG (D. Md.). Report February 2024.

- *In re Upstart Holdings, Inc. Securities Litigation*, Case No. 2:22-cv-02935-ALM-EPD (S.D. Oh.). Report January 2024.

- *Jed Lemen, et al. v. Redwire Corporation, et al.*, Case No. 3:21-cv-01254-TJC-PDB (M.D. Fl.). Report January 2024.

- *In re Exxon Mobil Corp. Securities Litigation*, Case No. 3:21-cv-00194-N (N.D. Tx.). Report January 2024.

- *In re Grand Canyon Education, Inc. Securities Litigation*, Case No. 1:20-cv-00639-MN-CJB (D. Del.). Report January 2024.

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023. Deposition January 2024.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023. Deposition January 2024.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023. Rebuttal Report January 2024.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y.). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

**EXHIBIT 1**

Comparison of Statistical Significance and Abnormal Returns for PureCycle News Days vs. No News Trading Days During the Analysis Window for PureCycle Common Stock Using Prof. Stulz's Baseline Regression

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 9 | 236 | |
| Significant Days at 95% Confidence Level | 7 | 6 | |
| % Significant Days at 95% Confidence Level | 77.78% | 2.54% | 0.000 |
| Average Absolute Abnormal Return | 12.58% | 3.37% | 0.001 |
| Average Volume (Millions) | 3.04 | 0.79 | 0.004 |

Data Sources: Bloomberg, Factiva, SEC Edgar

Note: The nine News Days are listed in the Efficiency Report. No News Days were identified as dates with no Factiva headlines and no SEC filings during the Analysis Window. The statistical comparison of "% Significant Days at the 95% Confidence Level" is based on a Fisher's Exact Test. The statistical comparisons of "Average Absolute Abnormal Return" and "Average Volume (Millions)" are based on t-tests for difference of means.

**Exhibit 2**

Structural Volatility Breaks in Prof. Stulz's Baseline Regression

During the Pre-Business Combination Period of November 16, 2020 – March 17, 2021

| Test Statistic | Chow Test | Levene Test |
|---|---|---|
| Number of Breakpoint Dates | 25 | 57 |
| Percentage of Days Within the Pre-Business Combination Period | 34% | 74% |

Data Source: Bloomberg, Refinitiv, Stulz Report Backup Materials.

**EXHIBIT 3**

PureCycle Common Stock Daily Returns, IPO Through November 16, 2020



Data Source: Bloomberg.

**EXHIBIT 4**

PureCycle Common Stock Daily Trading Volume, IPO Through November 16, 2020



Data Source: Bloomberg.

**EXHIBIT 5**



Data Source: Bloomberg