# EXHIBIT B

## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

------------------------------------x
WILLIAM C. THEODORE, individually
and on behalf of all others
similarly situated,
          Plaintiffs,
     -against-          Case No.
                        6:21-cv-809-
PURECYCLE TECHNOLOGIES, INC.,    PGB-GJK
MICHAEL OTWORTH, MICHAEL E. DEE,
DAVID BRENNER, BYRON ROTH and
TASMIN ETTEFAGH,

          Defendants.

------------------------------------x

February 9, 2024
9:05 a.m.

Videotaped Deposition of PROFESSOR RENÉ M. STULZ, taken by Plaintiffs, pursuant to Notice, held at the offices of Pomerantz LLP, 600 Third Avenue, New York, New York, before Joseph R. Danyo, a Shorthand Reporter and Notary Public within and for the State of New York.

HUDSON COURT REPORTING & VIDEO    (212) 273-9911

## Page 2

A P P E A R A N C E S :

POMERANTZ LLP
Attorneys for Plaintiffs
   600 Third Avenue, 20th Floor
   New York, New York 10016

By:  TAMAR A. WEINRIB, ESQ. (pro hac vice)

DECHERT LLP
Attorneys for Defendants PureCycle Technologies, Inc., Michael Otworth, Michael E. Dee and David Brenner
   35 West Wacker Drive
   Suite 3400
   Chicago, Illinois 60601-1608
By:  JONI S. JACOBSEN, ESQ.
          -and-
DECHERT LLP
   Three Bryant Park
   1095 Avenue of the Americas
   New York, New York 10036-6797

By:  JULIA MARKHAM CAMERON, ESQ.

DLA PIPER LLP (US)
Attorneys for Defendant Byron Roth
   3203 Hanover Street
   Suite 100
   Palo Alto, California 94304-1123
By:  DAVID PRIEBE, ESQ. (Via Zoom)

Also Present:
PER AXELSON
ADRIENNE CHEMMEL, Videographer
          ~oOo~

## Page 3

Stulz

THE VIDEOGRAPHER:  Good morning.  We are on the record at 9:05 a.m. Eastern Time on Friday, February 9, 2024 for the stenographically reported and videotaped deposition of Dr. René Stulz in the action Theodore, et al., versus PureCycle Technologies, et al.

My name is Adrienne Chemmel, the videographer, and Mr. Joseph Danyo is the court reporter.  We are with Hudson Reporting & Video Nationwide.

This deposition is being held at Pomerantz LLP located at 600 Third Avenue, 20th floor, New York, New York, 10016.

Before swearing in the witness, would all counsel present please introduce yourselves for the record.

MS. WEINRIB:  Tamar Weinrib from Pomerantz LLP on behalf of plaintiffs.

MS. JACOBSEN:  Joni Jacobsen of Dechert on behalf of PureCycle, Otworth, Dee and Brenner, all defendants.

MR. PRIEBE:  David Priebe of DLA Piper on behalf of defendant Byron Roth.

## Page 4

Stulz

MS. MARKHAM-CAMERON:  Julia Markham-Cameron of Dechert LLP on behalf of defendants PureCycle, Otworth, Dee and Brenner.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness, and then counsel may proceed.

PROFESSOR  R E N É   S T U L Z, having been first duly sworn by Joseph R. Danyo, a Notary Public, was called as a witness and testified as follows:

EXAMINATION BY MS. WEINRIB:

Q.  Good morning, Professor Stulz.

A.  Good morning.

Q.  As I stated before, my name is Tamar Weinrib from Pomerantz LLP.  Our firm represents the plaintiffs in this matter.  I know you have been deposed numerous times before and are very well versed in the process, but I'm just going to cover a few ground rules before we begin anyway.

Most importantly is that we get a clear record today, so when I ask you a question, I ask that you let me finish the question even if you are 100 percent confident you know how the question will end, so we have a complete question and a

Page 5

Stulz

complete answer on the transcript.

The other thing I would ask is that if any of my questions are unclear or if you don't understand something that I am asking, to please let me know so that I can clarify it for the record and for you, and to the extent I'm not told that something is unclear that you don't understand something, I will assume it is understood. Is that fair?

A. That is fair.

Q. Okay. Great. Then the last thing I would ask is that you answer all questions verbally. No nods or shaking of the head, so the court reporter can get all of your responses down.

A. Okay.

Q. I will also aim to take a break every hour. If you need a break sooner, please let me know, and as long as there is no question pending, I am happy to take a break at your convenience. Okay?

A. Thank you.

Q. Great. You understand that you are sworn to tell the truth today, correct?

A. Yes.

Page 6

Stulz

Q. Is there any reason at all why you would not be able to tell the truth today?

A. No.

Q. Are you taking any medications or drugs or anything of that sort that would impair your ability to tell the truth today?

A. No.

Q. Please state your name and address for the record.

A. My name is René, R-e-n-é, with an accent on the second E, M. Stulz, S-t-u-l-z. My address is 3419 River Seine, S-e-i-n-e, Columbus, Ohio.

Q. Thank you. I understand that in the appendix to your report, which we will enter into the record shortly, that you list all of your professional background and education, and I won't bore you with making you go through every element of it, but let's go through some of it. What is your highest level of education?

A. A Ph.D.

Q. Where did you receive your Ph.D.?

A. MIT.

Q. When did you receive your Ph.D.?

A. 1980. I have additional degrees, but

Page 7

Stulz

they are honorary degrees.

Q. Okay. What is the nature of your Ph.D.?

A. It is in economics and financial economics.

Q. You mentioned honorary degrees. What honorary degrees did you receive?

A. I have an honorary degree of laws from university college in Dublin and I have a doctorate from the University of Neuchâtel in Switzerland, Honorary Causa of the University of Neuchâtel.

Q. When did you receive those honorary degrees?

A. I don't remember the one from Neuchâtel. The one from Dublin was in December of last year.

Q. December of 2023?

A. Yes.

Q. Thank you. Prior to receiving your Ph.D. from MIT, what other degrees did you receive?

A. I had an undergraduate degree in economics.

Q. Where did you receive that degree from?

A. From the University of Neuchâtel in Switzerland.

Q. What year did you graduate?

Page 8

Stulz

A. I believe that was in 1975, and then I spent one year at the London School of Economics and then I moved to MIT.

Q. So you began your Ph.D. program at the London School of Economics and completed it at MIT?

A. No, I didn't. I spent a year taking graduate courses at LSE.

Q. Are you currently employed?

A. Yes.

Q. Where are you employed?

A. At Ohio State University.

Q. How long have you been employed there?

A. 40 years.

Q. Have you held the same position for the entirety of your time at Ohio State?

A. No.

Q. What is your current position there?

A. I am the Reese Chair in banking and monetary economics, and I am the director of the Dice Center for Financial Economics.

Q. How long have you held that position?

A. Since sometime in the 1990s. I don't quite remember the start. Maybe 1996, but I'm not sure.

Pages 5 to 8

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 9

Stulz

Q. Have your responsibilities been the same in that position since the 1990s or has it evolved over time?

A. I'm not quite sure what you mean by responsibilities.

Q. Okay. Let's break it down. You mentioned that you are the chair in banking and monetary economics. What does that entail?

A. Well, I am a faculty member in the department of finance, so I do a search service and teaching, so that hasn't changed.

Q. What courses do you teach?

A. I teach Ph.D. courses. I teach an advanced Ph.D. course in corporate finance. I teach a yearlong course for students who work on their dissertation. And I also am responsible for a topics course.

Q. How long have you been teaching each of those courses?

MS. JACOBSEN: Objection as to form.

A. I think the yearlong course I have been teaching for since the 1990s. I think the topics course might be less, maybe ten years. I'm not completely sure.

Page 10

Stulz

Q. And the Ph.D. course in finance, how long have you been teaching that one?

A. That one is actually the first year, the corporate finance one, the advanced one, is the first year that I am doing that. I changed my teaching course towards that. My teaching load.

Q. Other than the chair in banking and monetary economics and director of the --

A. Dice.

Q. -- Dice Center for Financial Economics, have you held any other positions at Ohio State?

A. I'm not sure what you mean by position.

Q. Have you had any other titles during your time at Ohio State?

A. This seems a little tricky in the sense that I am responsible for faculty searches, and I am responsible for the Ph.D. program, so that title associated with that. I don't know if that is what you mean.

Q. Have you taught any other courses at Ohio State other than the ones you have mentioned?

A. Yes.

Q. What other courses have you taught?

A. I have taught corporate finance theory.

Page 11

Stulz

I have taught continuous time finance for Ph.D. students. I have taught investments. I have taught corporate finance to MBAs. I have taught risk management. There may be some other things I have taught, but those are the main ones.

Q. How long have you been teaching investments? Let me actually step back. Are you still teaching a course in investments?

A. No. So my yearlong Ph.D. courses will address topics in investments, but for the Ph.D. students, not for undergraduates or MBAs.

Q. When did you teach that course?

MS. JACOBSEN: Objection as to form.

A. I don't remember when is the last time I taught it. I really don't.

Q. Do you still teach corporate finance to MBAs?

A. I haven't done so for a number of years.

Q. When did you do so? When did you teach that course?

A. I think probably the last time is in the 90s. I taught risk management to MBA and master's students, and that has a substantial component of corporate finance as well.

Page 12

Stulz

Q. Do you still teach risk management?

A. I haven't for the last four or five years because I had other duties, so my teaching load was reduced because of those other duties. If those duties go away, I will go back and teach risk management.

Q. Are you employed anywhere else currently aside from Ohio State?

A. No.

Q. Prior to your employment at Ohio State, did you hold other employment?

A. So I was on the faculty at the University of Rochester for three years.

Q. Did you teach courses at the University of Rochester?

A. Yes.

Q. What courses did you teach?

A. I taught Investments.

Q. How long did you teach that course?

A. Three years. I also taught a Ph.D. course. Yes.

Q. So you taught an investments course and a Ph.D. course?

A. Yes.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 13

Stulz

Q. What was the Ph.D. course?

A. It was a finance theory course.

Q. How long did you teach that course for?

A. The three years that I was at Rochester.

Q. Did you hold any employment positions prior to your employment at the University of Rochester?

A. No, I was a student.

Q. You were a student at University of Rochester?

A. No. I was a student at MIT. I went from the Ph.D. program to Rochester.

Q. Thank you. Other than your employment at Ohio State and the University of Rochester, have you ever held any other employment position?

MS. JACOBSEN: Objection as to form.

A. I mean it is a little bit tricky because I have had cases where I had to register as an employee for administrative reasons, but I really wasn't a full-time employee or even a part-time employee. For instance, I did some work for the IMF, and I had to go through all the process for an employee for the work that I was going to do because of confidentiality, but I wasn't paid like

Page 14

Stulz

an employee. So I have had a number of cases like that.

Q. Professor Stulz, when were you first contacted about the PureCycle matter?

A. I think it was mentioned to me in October of last year.

Q. October of 2023?

A. Yes.

Q. Do you recall who contacted you?

A. It was somebody from Cornerstone that talked to me about it.

Q. Was Cornerstone reaching out to you on behalf of anyone else as far as you know?

MS. JACOBSEN: Objection as to form.

A. I mean my recollection is that they had talked to the attorneys involved in the case.

Q. When you say the attorneys involved in this case, which law firm are you referring to?

A. Dechert.

Q. Were you retained directly by Dechert LLP to proffer an expert report in this matter?

A. That is my understanding. Yes.

Q. Do you recall when precisely you were retained by Dechert?

Page 15

Stulz

A. It might have been October. It might have been November.

Q. Do you have a retention agreement with Dechert?

A. I believe so.

Q. What is the date of that agreement?

A. I don't know.

Q. Do you have a retention agreement with Cornerstone with regard to this matter?

A. No.

Q. Were you also retained by DLA Piper to proffer an expert report in this matter?

A. No.

Q. So then I would assume you do not have a retention agreement with DLA Piper, is that correct?

A. That's correct.

Q. What is the scope of your retention in this matter?

A. It is what I describe in my report. It was -- it is to assess the efficiency analysis of Dr. Cain, his damages model presentation in his report, as well as consider the issues of price impact.

Page 16

Stulz

Q. Were you retained for the purpose of criticizing the methodologies Dr. Cain employed to render his opinions in this matter?

MS. JACOBSEN: Objection as to form.

A. I wasn't retained to criticize them, I was retained to evaluate them, and if there were reasons to criticize them, then do it.

Q. Based on your experience, did you understand that had you not found fault with Dr. Cain's analysis, that you would not have been retained in this matter?

MS. JACOBSEN: Objection as to form. Assumes facts not in evidence.

A. I don't think that is correct. I don't think that is based on my experience.

Q. So I will change the question. We will take out the based on your experience part. Is it your understanding that had you not found fault with Dr. Cain's analyses, that you would not have been retained in this matter?

MS. JACOBSEN: Objection as to form. Assumes facts not in evidence.

A. That is not my understanding.

Q. Is it your belief that you would have

Pages 13 to 16

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

been asked to proffer an expert report in this matter had you not found fault with Dr. Cain's methodologies that he employed?

MS. JACOBSEN: Objection as to form.

A. I don't know whether there would have been a report or not had I not found issues with his report. One of the questions I was asked was to consider price impact, so it is possible that the report would have been about price impact only.

Q. Were you asked to opine on the materiality of information released to the market regarding PureCycle during the class period in this case?

MS. JACOBSEN: Objection as to form.

A. I was only retained to address the issues that I already mentioned.

Q. Which did not include materiality. Is that correct?

A. That's correct.

Q. Were you asked to opine on loss causation in this matter?

MS. JACOBSEN: Objection as to form.

A. Again, I was only asked to address the issues that I described earlier.

Stulz

Q. That did not include loss causation, correct?

A. I was not asked to evaluate loss causation.

Q. Were you asked to evaluate damages in this matter?

A. I was not asked to evaluate damages. I was asked to evaluate what Dr. Cain said about how he was going to compute damages or how plaintiffs could compute damages.

Q. Are you aware of whether any other experts were contacted to proffer an opinion in this matter on market efficiency before your retention?

MS. JACOBSEN: Objection as to form.

A. I have no idea.

MS. WEINRIB: Let's mark this as Exhibit 1.

(Plaintiffs' Exhibit 1, Expert Report of René Stulz dated January 23, 2024, was so marked for identification, as of this date.)

Q. You can take your time to look at the document that has been marked Exhibit 1, but after

Stulz

you have taken a look at it, can you please let me know if you recognize this document.

A. It looks like my report.

Q. Is this the first report that you drafted for the defendants in this matter?

A. This is a report I drafted. Yes.

Q. Are you aware that on February 5, 2024 defendants filed a corrected version of your report in this case?

A. I am aware that I have corrected reports that has three minor corrections, yes.

Q. Are you aware of what the minor corrections are?

A. Yes.

Q. What are they?

A. So in two footnotes I think the name of the company was wrong, it got fixed, and then when the data was obtained from Refinitiv for the firms for the industry index, there was an issue with how Refinitiv provided the data. Refinitiv is a data provider that both plaintiff experts as well as defense experts use. It is extremely widely used, but there was a technical issue that ended up leading to a situation where, instead of data not

Stulz

being available for a firm, there was a set of constants for the returns.

So that issue really didn't matter for the report, because a constant doesn't change the results that are relevant to my report, but we fixed that to have a clean report.

Q. Do you know what caused the technical issue?

MS. JACOBSEN: Objection as to form.

Q. When I say technical issue, do you understand that I am referring to the technical issue that you just described?

A. Yes.

Q. Okay. So can you describe, to the best of your knowledge, what caused the technical issue?

MS. JACOBSEN: Objection as to form.

A. So my understanding of the technical issue is that when the data came from Refinitiv into the spreadsheet that was being used, instead of putting in that the data was missing for the company, that it was a company that was no longer listed. The company was I believe Advanced Disposal Services. That company was no longer listed. Instead of putting in missing data, it put

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 21

Stulz

a number that was a constant.  So the technical issue had to do with the connection between Refinitiv and the spreadsheet.  I just want to make clear that the baseline regression that I used for the class period doesn't use that data.

Q.   So is the list of companies that is included in your industry index auto-generated by this system that you were describing?

MS. JACOBSEN:  Objection as to form.

A.   I'm not sure what you mean by auto-generated.

Q.   How does the list of companies included in your industry index get compiled?

A.   So the list of names of companies is based on the disclosures of PureCycle, Inc., and so once we add the list -- we had the list of names, somebody went to Refinitiv to download the returns on those names.

Q.   Who put together that list that was included in your original report?

MS. JACOBSEN:  Objection.  Asked and answered.  Objection as to form.

A.   As I said, the list comes from the disclosures of PureCycle.  So that is how the list

Page 22

Stulz

was put together.

Q.   Who took the names from PureCycle's disclosures and put them into the list for your industry index?

MS. JACOBSEN:  Objection as to form.

A.   I'm sorry, I don't understand the question.

Q.   You said that the companies included in your industry index were lifted from PureCycle's disclosures.  Is that correct?

A.   Right.

Q.   Okay.  So I'm asking who the individual was that reviewed PureCycle's disclosures and took those names and put them into the industry index for your report?

MS. JACOBSEN:  Objection as to form.

A.   Those would be different people.  I reviewed the disclosures and was part of deciding on the list of firms.  Once we had the list of firms, somebody at Cornerstone went to Refinitiv and downloaded from Refinitiv the returns on those companies.  It is in that step that there was a problem with the software of Refinitiv that instead of putting the data was not available for a

Page 23

Stulz

company, it forward-failed with a constant.

Q.   How did it come to your attention that Advanced Disposal Services was no longer trading publicly at the start of the class period?

MS. JACOBSEN:  Objection as to form.

A.   So the problem came to my attention in a discussion with Cornerstone.

Q.   Are you aware of how the issue came to Cornerstone's attention?

MS. JACOBSEN:  Objection as to form.

Q.   Do you understand when I say the issue, I mean the inclusion of Advanced Disposal Services on the list of companies included in the industry index, even though it was no longer trading at the start of the class period?

A.   I understand that --

MS. JACOBSEN:  Don't speculate.

A.   I'm not sure about exactly how it came.  I mean they figured out the exact problem.  I understand that they are to call Refinitiv to understand what went wrong, and Refinitiv was aware of the problem with their software.

Q.   When did it come to your attention that Advanced Disposal Services was no longer trading as

Page 24

Stulz

of the start of the class period and therefore should not have been included in the industry index?

A.   My understanding is that you received the revised report on Monday and that I became aware of the issue sometime during the week before.

Q.   Okay.

MS. WEINRIB:  Let's mark this as Plaintiffs' Exhibit 2.

(Plaintiffs' Exhibit 2, Corrected Expert Report of René Stulz dated February 5, 2024, was so marked for identification, as of this date.)

Q.   Do you recognize the document that has been marked as Plaintiffs' Exhibit 2?

A.   Well, it says corrected report, and I am assuming that it is a corrected report.

Q.   Feel free to take your time to look through it and just assure yourself that this is in fact your corrected report entered in this matter.

A.   It looks like it.

Q.   Can you please turn to paragraph 9 of your corrected report.  And just so the record is clear, as we are going through the rest of the

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 25

Stulz

deposition and I ask you questions about the report, I will be specifically referring to the corrected report from here on out.

A. Okay.

Q. Okay. Does paragraph 9 describe your compensation in this matter?

A. That's correct.

Q. Okay. To date, how much have you been paid by the defense with respect to your work on this case?

A. I don't know.

Q. Do you have an estimate?

MS. JACOBSEN: Objection as to form.

A. I really don't know.

Q. You state here in paragraph 9 that you were assisted in this matter by staff of Cornerstone Research who worked under your direction. Is that accurate?

A. That's correct.

Q. So aside from yourself, how many people at Cornerstone assisted in preparing your report?

A. I don't know.

Q. Is it more than five?

MS. JACOBSEN: Objection as to form.

Page 26

Stulz

A. I would believe so, yes.

Q. More than ten?

A. I don't know.

Q. Do you know what their names are?

A. Some of them.

Q. Which names are you familiar with that worked on the report?

A. Yan Cao, Kyla Wethli, I believe, Eric Bickford, Katie Stair. Those are the people whose names I'm sure of.

Q. Are you aware -- in what way did Cornerstone assist in preparing your report?

MS. JACOBSEN: Objection as to form.

A. They performed the role of research assistant that my research assistant at the university performs when I do research at the university.

Q. What type of research did Cornerstone perform for your report?

MS. JACOBSEN: Objection as to form.

A. They helped me in a wide variety of ways. They obtained the documents that I cite. They helped me with looking at the literature and finding some of the literature. They helped me in

Page 27

Stulz

gathering data and so on.

Q. Did anyone at Cornerstone draft any portion of your report?

MS. JACOBSEN: Objection as to form.

A. They helped me with the drafting.

Q. In what way did Cornerstone help you with the drafting?

A. The report started at my end, I wrote a draft, a first draft of the report, and then they helped me filling in that draft.

Q. In what ways did they help you fill in the draft?

MS. JACOBSEN: Objection as to form.

A. In a number of different ways. In some cases they would write parts of the next draft. In some cases they would get me matter related to parts of the draft that I needed. They would help me in gathering data that I needed for some parts and so on.

Q. Which parts of the next draft? You say you drafted the first draft.

A. Right.

Q. And that they drafted parts -- they wrote parts of the next draft. What parts of the

Page 28

Stulz

next draft did they write?

MS. JACOBSEN: Objection as to form. Mischaracterizes his testimony.

Q. Did I mischaracterize what you said in any way? If so, please clarify for me.

A. Well, I said they helped me. Everything in this is my report, and describing what they drafted versus what I drafted at this point is not really possible in the sense that we went back and forth, and in some cases they would draft something and I would change it. In other cases, I drafted something myself, and then they would make a suggestion or they would fill in.

So it was a collaborative effort, but the report is mine, and I stand by every word of that report.

Q. Did anyone outside of Cornerstone assist in the drafting of your report?

MS. JACOBSEN: Objection.

A. I did not talk to anybody else during the production of the report.

Q. My question is different. I'm not asking if you spoke to anyone else during the production of the report. I am asking if you are

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Stulz

aware whether anyone outside of Cornerstone assisted in the drafting of the report.

MS. JACOBSEN:  Objection.

A.  I only saw what Cornerstone showed me and what changes I made, and I only saw the process between Cornerstone and I.

Q.  So as far as you are aware, nobody outside of Cornerstone assisted in the drafting of the report?

MS. JACOBSEN:  Objection, asked and answered.

A.  I'm not aware of somebody else drafting parts of the report.

Q.  Did anyone outside of Cornerstone as far as you are aware assist in conducting research for your report?

MS. JACOBSEN:  Objection as to form.

A.  It is possible that there might have been legal documents that Cornerstone asked the attorneys to provide, but I just don't know that.

MS. JACOBSEN:  I instruct you not to speculate about anything relating to that could touch on attorney-client privilege.

Q.  Did anyone from Dechert LLP draft any

Stulz

portion of your report?

A.  Not that I know of.

Q.  Did Dechert LLP provide you with an outline to use in putting together your report?

A.  Definitely not.

Q.  Did Dechert provide you with suggested points to cover in your report?

MS. JACOBSEN:  Objection.  This is veering into privilege or potentially into privilege to the extent he has already testified that he had no conversations with Dechert during this time period, but the premise of the question is seeking communications with counsel.

MS. WEINRIB:  I didn't actually ask him what suggestions were made, I am asking if suggestions were provided.  I don't see how that is privileged.

MS. JACOBSEN:  You can answer.

A.  Not that I'm aware of.

Q.  Did you send Dechert drafts of your report prior to executing the final version with your signature?

A.  No.

Stulz

Q.  Are you aware of whether Cornerstone sent drafts to Dechert prior to finalization?

MS. JACOBSEN:  Objection.

A.  I don't know.

Q.  Are you aware of whether anyone from Dechert edited any portions of your report?

MS. JACOBSEN:  Objection.  Asked and answered.

A.  As I said, I had no interactions with Dechert.

Q.  Are you aware of whether Cornerstone had any interactions with Dechert with regard to your report?

MS. JACOBSEN:  Objection.  Asked and answered.

A.  I only know my interactions with Cornerstone.  I don't know anything beyond that.

Q.  So just to make sure the record is clear, so as far as you know, sitting here today, you are not aware of any communications that Cornerstone had with Dechert with regard to the contents of your report.  Is that accurate?

MS. JACOBSEN:  Objection as to form. And you can answer.

Stulz

A.  I don't know about interactions that Cornerstone had with Dechert.  I only know what I did on my report and based on the work I did.

Q.  Let me change the question.  So I understand your testimony to be that you are not aware of the nature of any communications between Cornerstone and Dechert.  I'm asking whether you are aware of any communications regarding your report occurred between Cornerstone and Dechert.

MS. JACOBSEN:  Objection as to form, and objection, asked and answered.

A.  As I already said, I have no -- I don't know about communications from Cornerstone between Cornerstone and Dechert.

Q.  So sitting here today, you are not aware of any communications between Cornerstone and Dechert regarding your report?

MS. JACOBSEN:  Objection.  Asked and answered about four times now.

MS. WEINRIB:  No.  It hasn't been.  What has been answered is whether he is aware of the communications, not whether any communications took place.

MS. JACOBSEN:  No.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 33

Stulz

MS. WEINRIB: There is a distinction between the two.

MS. JACOBSEN: He has answered to the best of his knowledge several times.

Q. To the best of your knowledge to make sure the record is clear because I'm not clear, to the best of your knowledge, sitting here today, you are unaware of whether, I'm not asking you about the contents of the communications, I am asking you about whether any communications as far as you are aware took place between Cornerstone and Dechert with regard to your report.

A. I'm not sure I understand the nuances of your question. My answer has been that I'm not aware of specific communications between Cornerstone and Dechert.

Q. Are you aware of whether Cornerstone communicated anything else?

MS. JACOBSEN: Can you let him answer.

MS. WEINRIB: There appears to be some confusion as to what I am asking. For purposes of getting a clear record, I think it makes sense for me to clarify the question.

Page 34

Stulz

MS. JACOBSEN: I would just ask that you not interrupt the witness.

Q. If there is more that you would like to say in response to what I asked, please.

A. I have already said what I know and what I don't know.

Q. Are you aware of whether anyone from Dechert LLP provided any edits to your report to Cornerstone?

MS. JACOBSEN: Objection. Asked and answered.

A. No.

Q. Did anyone from DLA Piper draft any portion of your report?

MS. JACOBSEN: Objection as to form.

A. I mean I was not retained by DLA Piper. I'm not aware of any communications or anything involving them.

Q. So you have no knowledge sitting here today of any interaction between Cornerstone and DLA Piper with regard to your report. Is that accurate?

MS. JACOBSEN: Objection as to form.

A. I'm not aware of any interactions,

Page 35

Stulz

that's correct.

Q. Have you worked with Dechert LLP on any other litigations prior to this one?

A. I have.

Q. How many?

A. Not many at all. I'm not sure about the right number, but I don't think it is more than five.

Q. Do you recall when -- do you recall during what time period you worked on cases for Dechert LLP?

A. Not any time over the last five years that I can remember. I would think it might be up to ten years ago.

Q. Do you recall whether that retention involved a securities class action litigation?

A. Yes.

Q. And how many of the instances in which Dechert has retained you previously was it for the purpose of opining on matters pertaining to a securities fraud class action litigation?

MS. JACOBSEN: Objection as to form.

A. It is less than five. Just one important caveat, which is that I was involved in a

Page 36

Stulz

number of litigations where the parties on one side were groups of banks, and each of the banks was represented by a law firm, and so it is possible that Dechert was representing banks in those groups, but it wasn't the primary contact.

Q. Have you previously worked for DLA Piper LLP on other litigations?

A. There might be one or two. I'm not sure. I'm really not sure.

Q. Do you recall the nature of any prior work that you may have done for DLA Piper with regard to any litigation?

MS. JACOBSEN: Objection as to form.

A. I recall one, and it wasn't a securities litigation.

Q. Did you do anything to prepare for your deposition today?

A. Yes.

Q. Can you generally describe for me what you did to prepare for your deposition today?

A. I reread a number of materials that I had looked at for the preparation of my report. I reread my report, I talked to folks at Cornerstone, and yesterday I met with the attorneys who are

Pages 33 to 36

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

here.

Q. You said you reviewed materials in preparation for today's deposition. Did you review any materials that are not listed in Appendix C of your report?

A. I don't believe so.

Q. You also mentioned that you met with counsel in preparation for your deposition today. Is that correct?

A. That's correct.

Q. Who did you meet with?

A. The attorneys who are here today.

Q. So just the two attorneys that are present in the room today?

A. Yes.

Q. Did anyone from DLA Piper participate in your preparation for today's deposition?

A. Mr. Priebe was on Zoom.

Q. Other than the two attorneys from Dechert present and Mr. Priebe, were any other attorneys involved in your preparation for today's deposition?

A. Not that I'm aware of.

Q. How many times did you meet with counsel

Stulz

to prepare for your deposition?

A. Just once.

Q. How long was that meeting?

A. Four or five hours.

Q. When did that take place?

A. Yesterday.

Q. Was your meeting with counsel yesterday your first interaction with Dechert LLP?

MS. JACOBSEN: Objection as to form.

Q. Let me clarify. Was your meeting with counsel yesterday your first interaction with Dechert LLP on this case?

A. Yes.

Q. Was your meeting with counsel yesterday your first interaction with DLA Piper on this case?

A. I thought I just answered.

Q. You answered with regard to Dechert LLP.

A. Okay. I missed something. Can you repeat, please.

Q. Sure. Was your meeting with counsel yesterday your first interaction with Dechert LLP on this case, any attorney from Dechert LLP on this case?

A. Yes.

Stulz

Q. And was your meeting yesterday with counsel your first interaction with any attorney from DLA Piper on this case?

A. I am completely confused but.

Q. Would you like me to clarify?

A. Yes.

Q. Okay. Do you understand that there are two defense firms involved in this litigation?

A. Yes.

Q. One of them is Dechert LLP. Is that correct?

A. Right.

Q. Do you understand that Dechert LLP represents PureCycle and three individual defendants with the last names Otworth, Dee and Brenner?

A. Yes.

Q. Do you understand that there is another law firm DLA Piper that is involved in this case?

A. Okay. I thought both of your questions talked about Dechert, so that is why I was confused.

Q. Understood. My second question was with regard to DLA Piper, whether prior to your session

Stulz

with counsel yesterday to prepare for today's deposition, if you had had any prior interaction with any attorney at DLA Piper regarding this case.

A. No.

Q. Are you aware of whether anyone from Cornerstone met with the attorneys at Dechert in preparation for your deposition today?

MS. JACOBSEN: Objection as to form.

A. I have no idea.

Q. Are you aware of whether anyone from Cornerstone interacted with anyone at DLA Piper with regard to your deposition today?

MS. JACOBSEN: Same objection.

A. I have no idea.

Q. Aside from your meeting with counsel yesterday and your interactions with Cornerstone, did you speak to anybody else to prepare for your deposition today?

A. No.

MS. WEINRIB: Let's mark this as Plaintiffs' 3.

(Plaintiffs' Exhibit 3, Expert Report of Matthew D. Cain dated November 30, 2023, was so marked for identification, as of this

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Stulz

date.)

Q.   Before I actually begin my next line of questioning, I see we have been going for an hour. Do you wish to take a brief break before we continue?

A.   That would be good.

THE VIDEOGRAPHER:  Going off the record at 9:58 a.m.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record at 10:11 a.m.

BY MS. WEINRIB:

Q.   Professor Stulz, do you recognize what has been marked as Plaintiffs' Exhibit 3?

A.   It looks like Dr. Cain's report.

Q.   Have you seen Dr. Cain's report prior to today?

A.   Yes.

Q.   When did you first see Dr. Cain's report?

A.   Very shortly after he submitted it. It might have been the next day. I don't remember exactly which day he submitted it.

Q.   Do you recall who sent the report to

Stulz

you?

A.   I believe it came from Cornerstone.

Q.   Have you ever met Dr. Cain?

A.   I could have, but I don't remember. I mean I went to the SEC a number of times when he was working there, so who knows?

Q.   Prior to this litigation, have you authored other expert reports on the subject of market efficiency in a case arising from Section 10(b) of the Securities and Exchange Act of 1934?

MS. JACOBSEN:  Objection as to form.

A.   Yes.

Q.   For how many years have you been authoring such reports?

MS. JACOBSEN:  Objection as to form.

A.   I'm not sure. I'm not sure. I wouldn't be surprised if the first report I had on this issue was about 20 years ago.

Q.   Approximately how many market efficiency expert reports would you say you have drafted?

A.   I don't know.

Q.   Could it be more than ten?

MS. JACOBSEN:  Objection as to form.

Stulz

A.   That is quite possible. That is quite possible. It is even likely.

Q.   Have you previously authored expert reports on the subject of damages in cases arising from Section 10(b) of the Exchange Act?

MS. JACOBSEN:  Objection as to form.

A.   Can you repeat the question.

Q.   Sure. Have you previously authored expert reports on the subject of damages in a case arising from Section 10(b) of the Exchange Act?

A.   I have done it in two ways. Now class cert reports often have a Comcast section, and that section involves a discussion of damages. Your question was about discussions.

Q.   Um-hum.

A.   Then I have done it on the merit stage.

Q.   Approximately how many expert reports would you say you have drafted on the subject of damages in a Section 10(b) case in the category that you just described at the class cert stage where you have authored a section on Comcast?

A.   Since my reports include that discussion or can include that discussion, I have had a fair number. I would think more reports that focus on

Stulz

this Comcast section than reports that focus on efficiency.

Q.   Do you know approximately how many?

A.   No.

Q.   Would you say more than ten such reports?

A.   Definitely.

Q.   Would you say more than 20 such reports?

MS. JACOBSEN:  Objection as to form.

A.   I wouldn't be surprised if it is more than 20, but I don't know.

Q.   Approximately how many expert reports on the subject of damages at the merit stage have you drafted in a case arising from Section 10(b)?

A.   I don't know the number, but I would think it is more than ten.

Q.   Okay. Have you previously drafted expert reports on the subject of loss causation in a Section 10(b) case?

A.   Yes.

Q.   How many such reports would you say you have drafted previously?

A.   I would think it is more than ten, but I don't know the exact number.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

Q.   Okay.  Going back to the question with regard to prior expert reports you have drafted on the subject of market efficiency, what percentage of those reports were drafted at the request of the defendant?

A.   I would think all of them.

Q.   So 100 percent.  Is that correct?

A.   Yes.

Q.   In any of the market efficiency reports that you have drafted on behalf of the defendant in a Section 10(b) case, have you ever concluded that the market for the security at issue was efficient?

MS. JACOBSEN:  Objection as to form.

A.   I just wanted to kind of make sure that we don't get, that we are clear with respect to the language.  Defendants will ask me to look at an expert report and to evaluate that expert report.  Sometimes I will decide that there are issues with the efficiency analysis.  Sometimes I will decide that there are no such issues that are worthwhile mentioning it, and so the defendants typically ask me to look at an expert report and form my own conclusions.  They don't ask me to draft an

Stulz

efficiency report.

Q.   Just reading your testimony back to you, you say "Sometimes I will decide that there are no such issues that are worth mentioning."

Can you identify what cases you worked on on behalf of a defendant where you did not find any such issues that were worthwhile mentioning when assessing the market efficiency report of plaintiff's expert?

A.   Well, I don't have a list in my mind.  I mean I have a number of reports that do not address efficiency.  Some of those reports I was told to consider only the discussion of damages model in the plaintiff's expert report.  In other cases, I was asked to look at the whole report and come to my own conclusions.

Q.   So for the reports where you were asked specifically to address efficiency, are there any reports for any cases that you can identify sitting here today where you did not find any worthwhile -- any issues that were worthwhile mentioning?

MS. JACOBSEN:  Objection as to form.  Asked and answered.

A.   There are certainly such situations, but

Stulz

I certainly couldn't remember them, and I'm not sure it would be appropriate for me to discuss them.

Q.   When you say it would not be appropriate for you to discuss them, why is that?

A.   It would involve conversations between me and attorneys.

Q.   So let me make my question more specific then.  Are there any expert reports that you have drafted on behalf of defendants addressing the issue of market efficiency which have been publicly filed on a court docket and therefore are not confidential where you did not find an issue worthwhile mentioning with regard to plaintiff's expert's analysis of market efficiency?

MS. JACOBSEN:  Objection as to form.

Q.   Did you understand the question?

A.   Not really.

Q.   Okay.  So previously you said that there were situations that would not be appropriate for you to discuss because it would be between you and the attorneys.  I assume you are referring to a privilege?

A.   Well, I'm not going to discuss, I mean

Stulz

I'm not going to discuss issues that I communicated to attorneys.  I mean I don't think that would be appropriate.

Q.   I agree, and that's not what I'm asking.  So let me just be clear.  I'm asking about reports that you have authored that are publicly filed.

So my question is with regard to reports that you have authored which have been publicly filed in other litigations where you were asked to address market efficiency, are there any cases that you can identify sitting here today where you authored such reports?  And again limiting this to publicly available reports that you have authored and which were filed by defendants, are there any such reports where you did not find any issues worthwhile mentioning on the issue of market efficiency?

MS. JACOBSEN:  Objection as to form.  Hold on a second.  I want to read the question.

MS. WEINRIB:  I am happy to clarify if it is still not clear.

MS. JACOBSEN:  I am going to instruct you not to answer.

Stulz

MS. WEINRIB: On what basis?

MS. JACOBSEN: The question creates a situation where if he had discussions on another case about market efficiency and that information was then not in the report that was publicly available, I do think that leads to a conclusion with respect to conversations with counsel.

MS. WEINRIB: That is not my question. I'm not asking him about communications with counsel. I'm asking him about the contents of publicly available reports filed in a court docket. There is absolutely no basis on which to instruct him not to answer with regard to a publicly filed document.

MS. JACOBSEN: Right. He can tell you what is publicly filed and available publicly. However, to the extent you are asking him if he analyzed market efficiency and decided not to include it in the report, that would not be in the publicly filed document.

MS. WEINRIB: To be clear, that is not what I'm asking.

Stulz

MS. JACOBSEN: Okay. You should clarify your question.

MS. WEINRIB: I would be happy to.

Q. I am asking whether there is any publicly filed expert report that you have authored where in that publicly filed report -- let me think about a way to say this where it is not going to invite confusion. Can you identify for me a market efficiency report that you have drafted where you do not criticize the methodologies employed by plaintiff's expert?

MS. JACOBSEN: Objection as to form.

A. I did not say that such a report exists. I said that in some cases there will not be a discussion of market efficiency because I don't think it is worthwhile or because the attorneys thought that it wasn't worthwhile.

Q. Okay. So in any expert report that you have drafted where you do address the subject of market efficiency, there is no such report that exists where you do not criticize the methodologies employed by plaintiff's expert? Am I understanding your testimony?

MS. JACOBSEN: Objection as to form.

Stulz

A. If a report has a section on efficiency, it will be because it is worth the time of the court to be told about the issue.

Q. Okay. So again, just to make sure that the record is clear, so what you are saying then is that if you included a section on market efficiency in a report that has been publicly filed in a prior case that you worked on, that would mean that you found an issue with plaintiff's expert's methodology in analyzing market efficiency. Is that accurate?

MS. JACOBSEN: Objection as to form.

A. I only have an efficiency section in a class cert report if I have something to say about what the plaintiff's expert did.

Q. And in the instances where you have had something to say about what plaintiff's expert did, do you mean criticisms of plaintiff's expert's methodologies or analysis pertaining to market efficiency?

A. Correct.

Q. Okay. Thank you. Have you ever been asked in a Section 10(b) case to do an analysis of your own on whether the market for a particular

Stulz

security was efficient?

MS. JACOBSEN: Objection as to form.

A. If by that you mean was I asked to investigate whether I could present an affirmative opinion on market efficiency and then had that opinion, I'm not aware of a case where I did that.

Q. Do you know what a special purpose acquisition company is?

A. Yes.

Q. If I use the word "SPAC," you understand that those are the same thing, correct?

A. Yes.

Q. Can you explain what a SPAC is?

A. A SPAC is essentially a financing vehicle where some individuals create a company that then goes public with the mandate to find an acquisition that eventually they will make or if they don't make the acquisition, then the company will be dissolved and the investors who invest in that acquisition vehicle will receive their money back if no acquisition is made.

Q. Just turning your attention to Appendix B of your report.

A. Okay.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

Q. This, if I understand correctly based on the title of the appendix, is your list of deposition and trial testimony for the past four years. Is that correct?

A. That's correct.

Q. Did any of the cases listed in Appendix B involve a SPAC?

A. Yes.

Q. Which ones?

A. It is the next to last, Elta Mesa Resources Inc. Securities Litigation.

Q. For what purpose were you retained in the In Re Elta Mesa Resources cases?

A. The deposition that I had, the two depositions I had in November 2023 concerned merits report or reports in the plural.

Q. What aspects of the merits of the case were you asked to opine on?

A. Damages and loss causation.

Q. Were you asked to opine on market efficiency?

A. No.

Q. Do you know if there was an expert market efficiency report proffered in that case by

Stulz

the plaintiffs?

A. There were two reports proffered by the plaintiffs. There were two groups of plaintiffs. There was the securities litigation class, and then there were institutional investors that were suing as well.

Q. Going further back in time more than four years, are there any cases in which you were asked to opine on the subject of market efficiency in a Section 10(b) case involving a SPAC?

MS. JACOBSEN: Objection as to form.

A. Not that I can remember. I am actually sure it didn't happen.

Q. Has your opinion on market efficiency ever been excluded by a court either in whole or in part?

A. No.

Q. Has your approach to market efficiency ever been criticized by a court?

MS. JACOBSEN: Objection as to form.

A. I don't remember. I'm not sure. I don't think so.

Q. Has your opinion on market efficiency ever been rejected by a court in favor of your

Stulz

opposing expert?

A. There are cases where the court sided with my report and cases where it didn't.

Q. In which cases has the court sided with your report?

A. The one I remember is the first one on this list, Navient.

Q. Are there any other cases that you can recall?

MS. JACOBSEN: Objection as to form.

Q. Do you understand what I am asking?

A. I understand what you are asking. I don't specifically remember other cases. Part of the issue is some of the cases where market efficiency was an issue settled before court decisions. Other cases where market efficiency was an issue, I shouldn't say plural, for instance a case where plaintiffs actually withdrew the part of the case that involves the efficiency problems.

Q. Has your opinion on damages ever been excluded by a court?

MS. JACOBSEN: Objection as to form.

A. I mean I'm not aware. I would have been told of an exclusion on Daubert grounds. I'm not

Stulz

aware of that.

Q. Are you aware of any instances in which your approach to assessing damages has ever been criticized by a court?

MS. JACOBSEN: Objection as to form.

A. I mean I have cases where the courts have not followed me on damages. My recollections have to do with summary judgment, and I'm looking at this list here, and a lot of cases settled before summary judgment. The cases where I remember a summary judgment decision were cases where the court actually followed me.

Q. Cases on this list?

A. Yes.

Q. Which cases were those?

A. Allergan. I think most of the other cases are some are McKesson. I mean the issues in those two cases where a decision was made besides legal issues which are beyond my expertise had mostly to do with loss causation rather than damages computation.

Q. Any others that you see?

A. I see a case that didn't go to summary judgment because the part that I was involved with

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Stulz

didn't go past class cert.

Q.  Has your opinion on loss causation ever been excluded by a court?

A.  I don't believe so.

Q.  Has your approach to assess loss causation ever been criticized by a court?

MS. JACOBSEN:  Objection as to form.

A.  I don't believe so, but I obviously don't have all the decisions in my mind right now.

Q.  Has your opinion on damages ever been rejected by a court in favor of your opposing expert?

MS. JACOBSEN:  Objection as to form.

A.  Can you be more precise?

Q.  Have there been cases where you have proffered an expert report criticizing a plaintiff's expert approach to calculating damages where the court sided with plaintiff's expert?

A.  I'm sorry, I still don't quite get the question.

Q.  Has there ever been a case where you have been asked to opine on plaintiff's expert's damages analysis where the court has determined that plaintiff's expert, where the court rejected

Stulz

your criticism of plaintiff's expert and accepted plaintiff's expert's opinion on damages?

MS. JACOBSEN:  Objection as to form.

A.  I mean as I said, in securities litigation issues having to do with the quantification of damages involve decision at summary judgment as opposed to trial, and I discuss the cases I remember at summary judgment that are on this list.

Q.  So let me limit the question to the class certification stage.  Has there ever been a case where you have been asked to opine on damages or plaintiff's expert's opinion on damages at the class certification stage where the court still determined that it would accept plaintiff's expert's opinion?

MS. JACOBSEN:  Objection as to form.

A.  Yes.

Q.  Of the cases listed in your Appendix B, which cases fall under that category?

A.  I don't remember which one.  I mean some of those cases don't have a discussion of plaintiff's damages methodology, and I'm not sure which ones do and which ones do not, so I'm not

Stulz

sure what is the answer to your question.

Q.  In what percentage of cases in which you have opined on the methodologies employed by a plaintiff's expert on damages at the class cert stage has the court still determined to accept plaintiff's expert's opinion on damages?

MS. JACOBSEN:  Objection as to form.

A.  I mean it is often a legal question of whether the plaintiff expert meets the legal burden associated with Comcast, and different judges have different interpretation of that burden and so there are many cases where the judge concludes that the plaintiff met the burden for Comcast, and so that would be my answer.

Q.  Would you say it is more than 50 percent?

MS. JACOBSEN:  Objection as to form.

A.  I would think that the percentage of cases where the court decides that the plaintiff expert meets the standard that the court believes is appropriate exceed 50 percent definitely.

Q.  Would you say it exceeds 75 percent?

MS. JACOBSEN:  Objection as to form.

A.  I mean an obvious issue is that

Stulz

sometimes a court will conclude that the expert met the standard, but at the same time indicate various problems with the argument, so I mean, if we are looking at the percentage where ultimately the class is certified, it would be more than 75 percent.  Yes.

Q.  How would you define market efficiency?

A.  I use the standard definition from Professor Fama, which is a semi-strong form of efficiency.  That form of efficiency means that new public information is incorporated in the stock price quickly and fully.

Q.  Are you familiar with the Supreme Court's 2014 decision in Halliburton Company versus Erica P. John Funds commonly referred to as Halliburton 2?

A.  I'm not an attorney.  I don't have legal expertise.  I have read the decision.

Q.  Are you familiar with the quote from Halliburton 2 where the Supreme Court is talking about its prior holding in another case called Basic versus Levinson, and the quote is "The court instead based the presumption of reliance on the fairly modest premise that market professionals

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 61

Stulz

generally consider most publicly announced material statements about companies thereby affecting stock market prices"? Are you familiar with that quote?

MS. JACOBSEN: Objection as to form.

A. I am familiar with that quote. As I said, I'm not a legal expert, and so I'm not in a position to interpret that quote.

Q. Did the Halliburton 2 decision influence how you define market efficiency in any way?

MS. JACOBSEN: Objection as to form.

A. I am an expert in financial economics. I am here as an expert in financial economics. I am here to offer opinions that rely on my expertise in financial economics. The way I defined market efficiency is the way that I define it as a financial economist.

Q. So the answer is no, it did not influence the way you define market efficiency?

MS. JACOBSEN: Objection as to form.

A. The answer is that my definition of semi-strong form market efficiency has not changed over time. It is a definition that financial economists use. I'm not retained as a legal expert or as somebody who interprets what the Supreme

Page 62

Stulz

Court is saying. I was retained as a financial economist.

Q. Did the Halliburton 2 decision influence how you assess market efficiency in a Section 10(b) case?

MS. JACOBSEN: Objection as to form. Objection, asked and answered.

A. Can you repeat the question.

Q. Sure. Did the Halliburton 2 decision influence how you assess market efficiency in a Section 10(b) case?

MS. JACOBSEN: Same objections.

A. I mean to the extent that it has affected what plaintiff's experts say about market efficiency and it did affect what I say in my report.

Q. Just to make sure that I am understanding correctly, the Halliburton 2 decision only influences how you assess market efficiency insofar as it impacted plaintiff's expert's analyses?

MS. JACOBSEN: Objection as to form.

A. What I am saying is I am asked to respond to assess what plaintiff experts are doing,

Page 63

Stulz

and to the extent that they are doing things differently, then obviously it affects the reports that I am working on.

Q. Did the Halliburton 2 decision influence how you assess what plaintiff's experts are doing?

MS. JACOBSEN: Objection as to form.

Q. I am just quoting back your language when I say what plaintiff's experts are doing, but I am happy to rephrase if it is unclear.

A. All my reports are reports where I use my expertise as a financial economist. Consequently, in all of my reports, I evaluate what plaintiff experts are doing through the lens of financial economics, and as a result I use the same tool, tools, that I used before Halliburton as well as after Halliburton. I use the tools of financial economics.

Q. When you are opining on market efficiency, what factors do you generally consider when you are determining whether a security traded in an efficient market?

MS. JACOBSEN: Objection as to form.

A. We discussed this earlier. I don't believe that I have been asked to determine whether

Page 64

Stulz

a security trades in an efficient market in my work evaluating plaintiff's expert reports.

Q. Are you familiar with what factors financial economists generally consider in the context of a Section 10(b) case when assessing whether the market for a particular security is efficient?

MS. JACOBSEN: Objection as to form.

A. I am aware that plaintiff's experts typically will go through a list of factors. Those factors are not grounded in financial economics, but are grounded in legal decisions.

Q. What is your understanding of which factors plaintiff's experts typically assess?

MS. JACOBSEN: Objection as to form.

A. It is typical for plaintiff experts to use the Cammer factors and to use Krogman factors. Plaintiff experts at times will use additional factors. Dr. Cain in his report uses a couple of additional factors as well.

Q. Do you know what the Cammer factors are?

A. Yes.

Q. What are they?

A. It is a factor having to do with volume,

Pages 61 to 64

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 65

Stulz

a factor having to do with analysts, a factor having to do with whether the firm can use a form S3, a factor having to do with market makers. And the fifth factor which I talk about a lot in my report having to do with whether there is cause and effect relationship between new information in the market and the security price.

Q. And the last factor that you described, do you understand that as commonly being referred to as Cammer 5?

A. That's correct.

Q. What are the Krogman factors?

A. That is a factor having to do with market capitalization, a factor having to do with the float, and a factor having to do with bid/ask spreads.

Q. Other than Cammer 5, would you agree that the other factors are all indirect tests of market efficiency?

MS. JACOBSEN: Objection as to form.

A. I'm not sure what an indirect test is. I mean they are not tests of market efficiency.

Q. Are there certain factors that look at indirect evidence of market efficiency versus

Page 66

Stulz

direct evidence of market efficiency?

MS. JACOBSEN: Objection as to form.

A. There are factors where the courts over time have considered that a stock is more likely to trade in an efficient market if that factor is met. The threshold of that factor is met.

Q. Are you aware of whether a distinction is made among the factors as to whether some are indirect evidence of efficiency and whether others are direct evidence of efficiency?

MS. JACOBSEN: Objection as to form.

A. Could you make your question more precise, please.

Q. Let's limit it to the Cammer factors. I will change the question. Do you consider certain of the Cammer factors more persuasive than others in determining whether a market for a particular security trades in an efficient market, trades efficiently?

MS. JACOBSEN: Objection as to form.

A. I look at market efficiency from the perspective of a financial economist. For a financial economist, a market is efficient if information is -- if new public information is

Page 67

Stulz

incorporated quickly and completely. A test of market efficiency for me is a test that checks whether information is incorporated quickly and fully.

Q. And do you consider any of the Cammer or Krogman factors better equipped to make that assessment?

MS. JACOBSEN: Objection as to form.

A. The Cammer factor 1 through 4 are not tests of market efficiency.

Q. Would you say they are evidence of market efficiency?

MS. JACOBSEN: Objection as to form.

A. A stock would satisfy Cammer factors 1 through 4 and trading in an efficient market. So again they are not tests of market efficiency from the perspective of a financial economist.

Q. I just want to make sure I heard you correctly. Did you say a stock that satisfies Cammer factors 1 through 4 trades in an efficient market? Are trading in an efficient market?

A. What I said is a stock could satisfy Cammer factors 1 through 4 and trade in an efficient market.

Page 68

Stulz

Q. Thank you for clarifying. In your opinion, are Cammer factors 1 through 4 relevant to the determination of whether a security trades in an efficient market?

MS. JACOBSEN: Objection as to form.

A. There are two different considerations here. One consideration is a consideration of the financial economist. A financial economist will focus on whether the stock incorporates information quickly and fully. There is another consideration which is the standard that a court decides to implement in making its decision, and it may choose to use the Cammer factors or it may choose to use some other standard. That is a legal decision on which I have nothing to say. I have no expertise on that legal decision.

Q. I am limiting my question to your opinion. I am asking, in your opinion, are the first four Cammer factors relevant in determining whether a security trades in an efficient market?

MS. JACOBSEN: Objection as to form.

A. I'm not sure what you mean by relevant. I can say the following, which is if a stock does not incorporate information quickly according to

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

the standards that a financial economist would use, then the fact that it satisfies Cammer factors 1 through 4 is not going to change the conclusion for a financial economist that the stock trades in, does not trade in an efficient market.

Q.   So is it your opinion that if Cammer 1, 2, 3 and 4 are met but Cammer 5 is not, that the conclusion is that therefore the security does not trade in an efficient market?

MS. JACOBSEN:  Objection as to form.

A.   As a financial economist, the standard for a stock to trade in an efficient market is that it incorporates information quickly.  If a stock does not incorporate information quickly, as a financial economist, I would have to conclude that it does not trade in an efficient market.

Q.   What about as an expert hired to opine in this case on whether PureCycle securities traded in an efficient market during the class period?

MS. JACOBSEN:  Objection as to form.

A.   I was hired as an expert in financial economics.  I was not hired as a legal expert or an expert that would interpret the standards of the courts.  As a financial economist, my standard is

Stulz

straightforward.  It is one that any financial economist would employ.

Q.   So the straightforward standard that you are referring to, would that be equivalent to Cammer 5?

A.   Cammer factor 5 would be a standard that is closely related to whether information gets incorporated in the stock price quickly and fully.

Q.   So if a security satisfies Cammer factor 5, would you agree then that that would be sufficient to establish that the market for that security was efficient?

MS. JACOBSEN:  Objection as to form.

A.   I agree that if a security incorporates new public information quickly and fully, that security trades in an efficient market.  It is not enough for somebody to say that it satisfies Cammer factor 5.  Now it has to be that it is an analysis that meets the standard of financial economics.

Q.   If a security at issue satisfies Cammer factor 5, does that mean that that security incorporates new public information quickly and fully?

MS. JACOBSEN:  Objection as to form.

Stulz

A.   Many implementations of the Cammer 5 factor are focused on quickly, so it would definitely mean that a security incorporates information quickly and as a result would be trading in an efficient market in the sense of incorporating information quickly.

Q.   Now I understand that you are not an attorney and I understand that you are a financial economist, but is it your understanding that in a Section 10(b) case at the class certification stage, that if a security satisfies Cammer 1 through 4 alone, that that is sufficient to establish that it trades efficiently?

MS. JACOBSEN:  Objection as to form. Objection.  He is not retained for a legal opinion.

A.   Can you repeat the question.

Q.   Sure.  I understand that you are not here as an attorney and that you are not an attorney and that you are a financial economist, but in your experience as having been asked in multiple securities class action litigations to opine on the methodologies employed by a plaintiff's expert in assessing market efficiency,

Stulz

is it your opinion that if a security satisfies Cammer 1 through 4 alone, that that is enough to establish that it trades in an efficient market?

MS. JACOBSEN:  Same objection.

A.   I mean this seems to be a legal issue, and as I said, I'm not a legal expert.  Now there are courts that have been satisfied with factors 1 through 4 and there are courts that haven't.

MS. WEINRIB:  We can take a break now.

THE VIDEOGRAPHER:  We are going off the record at 11:03 a.m.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record at 11:20 a.m.

BY MS. WEINRIB:

Q.   Professor Stulz, as a financial economist, is it your opinion that if a security satisfies Cammer 5, that that is sufficient evidence that that security trades in an efficient market?

MS. JACOBSEN:  Objection.  Asked and answered.

A.   Well, so again we talked about this

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Stulz

before, which is that two separate decisions. One is the perspective of a financial economist. The other one is the decision of the courts and the standard that the court applies.

So to me factor 5 is where the courts and financial economist intersect in the sense that if a security incorporates information quickly, then it would meet a standard of market efficiency that would be consistent with financial economics. Now so that would be my answer to the question.

Obviously as a financial economist, I can help the court with the other factors. To that I mean whether the plaintiff expert has shown that the other factors are met in a way that is supportive of the opinion of the plaintiff expert.

Q. Just to be clear, the answer to my question then is yes, as a financial economist you would say that if a security satisfies Cammer 5, that is sufficient evidence that it trades in an efficient market?

MS. JACOBSEN: Objection as to form. Asked and answered.

Q. I just want to clarify that the answer to the question is yes.

Stulz

MS. JACOBSEN: Same objection.

A. There is obviously an issue as to what it means to satisfy Cammer factor 5 that establishing convincingly that there is a cause and effect relationship between information, and the stock price means that the stock is efficient, and that would satisfy factor 5.

Q. So the answer is yes?

MS. JACOBSEN: Objection.

A. A demonstration that meets the standards of financial economics that there is a relation between cause and effect would be enough to show that the stock is efficient by the standards of financial economics.

Q. By the standards of financial economics, if a security satisfied Cammer 1 through 4 and the Krogman factors, would that be sufficient evidence of market efficiency?

A. That is where a court might reach that conclusion, and I have nothing to say about that. I can help the court by examining whether the plaintiff expert has shown that the firm actually meets those standards, those factors, but as a financial economist I would not be satisfied that a

Stulz

stock trades efficiently if it meets only those factors.

Q. I believe you answered this earlier today, but I just want to be sure that we are clear, and we have a clear record specific to this case. Other than challenging Dr. Cain's methodologies in assessing market efficiency, did you do any independent analysis to ascertain whether PureCycle securities traded in an efficient market during the class period?

MS. JACOBSEN: Objection, mischaracterizes testimony and objection as to form.

Q. If I said anything incorrect, please clarify. I would like to have a clear record, so if I said anything incorrect, then please.

A. My opinion on market efficiency in this litigation is that Dr. Cain has not shown that ROCH before the de-SPAC and PureCycle after the de-SPAC trade in an efficient market for the whole class period. No, he has not shown that the market for the securities is efficient throughout the class period.

Q. Did you do any analysis to ascertain

Stulz

whether PureCycle traded in an efficient market during the class period?

MS. JACOBSEN: Objection as to form.

A. I was not asked to perform such an analysis, and I did not.

Q. So you have not come to any independent determination as to whether the market was efficient for PureCycle securities during the class period, correct?

A. That was not my assignment. I was not asked to do so, and I did not do so.

Q. Would you agree that conducting an event study is the proper way to assess whether Cammer 5 is satisfied?

A. I agree that an event study can be used to show that Cammer 5 is satisfied.

Q. Are you aware of any Supreme Court decision that held that there is a minimum number of events that must be considered for an event study to properly test for market efficiency?

MS. JACOBSEN: Objection as to form.

A. I'm not sure I understand your question.

Q. Are you aware of any Supreme Court case that held that an expert assessing market

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

efficiency and conducting an event study to do so must include a certain number of events in that event study?

MS. JACOBSEN: Objection as to form.

A. Whether an event study meets the standards of financial economics is an issue for a financial economist to decide based on his expertise. I'm not aware of a Supreme Court decision that would have opined the way that you suggest it did, but even if there were such a decision, it obviously wouldn't change financial economics.

Q. Are you aware of any 11th Circuit decision that sets forth a minimum number of events that a financial economist must include in an event study for it to sufficiently establish market efficiency in a Section 10(b) case?

MS. JACOBSEN: Objection as to form.

A. Again, I'm not a legal expert, and I was not retained here to help the attorneys with their understanding of legal decisions. I was retained as a financial economics expert and I was asked to use my expertise as a financial economist to assess the work of Dr. Cain. That is all I have done.

Stulz

In the process of doing that, I looked at all of his report. I looked at how he looked at the various factors that the court use, and I came to the conclusion that he hasn't shown conclusively that the market for ROCH was an efficient market even by the standard that he uses, namely the factors that the courts look at.

Q. Let me go back to my question because I don't think it was answered. I'm not asking for your legal opinion or for a legal interpretation of any cases. I am asking if you are aware of any 11th Circuit Court that has decided that an event study must contain a minimum amount of events before it can be considered sufficient evidence of market efficiency.

MS. JACOBSEN: Objection. Asked and answered.

Q. It is a yes or no question. Are you aware of a 11th Circuit case that holds that?

MS. JACOBSEN: Objection. Asked and answered.

MS. WEINRIB: No, it wasn't.

A. I said I'm not a legal expert. I do not base my analysis of what is an acceptable event

Stulz

study on anything else but financial economics.

Q. So does that mean you are not aware of any cases with such a holding or that you are aware of a case with such a holding?

MS. JACOBSEN: Objection as to form.

A. I'm not aware of such a holding, but my report is not based on legal decisions. It is based on using the tools of financial economics to assess what Dr. Cain has done.

Q. Is it your opinion that there is only one acceptable event study regression model that can be used for a Cammer 5 analysis?

A. It is my opinion that when it comes to event studies, that the regression models are acceptable and there are regression models that are not acceptable.

Q. Is there only one regression model that is acceptable?

MS. JACOBSEN: Objection. Asked and answered.

A. There can be multiple regression models that lead to the same inferences. If you look at my report, I use a baseline model for the ROCH part of the class period, but I also show that

Stulz

alternative models yield the same inferences, and those models differ in a number of ways. And I also show that I reach the same conclusions if I were to use models that Dr. Cain used in previous reports concerning SPACs.

Q. When you talk about the conclusions that you reached when you employed those models, you're not referring to a conclusion as to whether the market for the security was efficient or not efficient. Is that correct?

A. That is correct. You use an event study model to reach conclusions about the significance of the abnormal return on event dates, and when I say that these various models lead to the same conclusion, I am talking about the same conclusion about the significance of the abnormal returns.

Q. So I think we have covered sufficiently that you did not conduct your own analysis to ascertain whether or not PureCycle traded in an efficient market during the class period, but do you have an opinion sitting here today as to whether PureCycle securities traded in an efficient market during the class period?

MS. JACOBSEN: Objection.

Stulz

A.   I was not asked to formulate such an opinion. I was asked to evaluate the analysis of Dr. Cain. That's all I did.

Q.   Understood, but I'm asking if, sitting here today, if you have an opinion on whether PureCycle securities traded in an efficient market during the class period?

MS. JACOBSEN: Objection. Asked and answered.

A.   My opinion is that Dr. Cain has not shown that the securities traded in an efficient market throughout the class period.

Q.   But sitting here today, you don't have an opinion one way or the other on whether PureCycle securities traded in an efficient market during the class period?

MS. JACOBSEN: Objection. Asked and answered several times.

MS. WEINRIB: Not once.

A.   I'm sorry, you just said something.

Q.   I'm just trying to ascertain. I understand what the scope of your engagement is and what you were asked to do. I understand that you were asked to assess Dr. Cain's methodologies and

Stulz

that you were not asked to ascertain whether PureCycle securities traded in an efficient market during the class period.

What I'm asking is whether sitting here today, you have an opinion on whether PureCycle securities traded in an efficient market during the class period?

MS. JACOBSEN: Objection as to form. Asked and answered.

A.   I was not asked to formulate such an opinion, and therefore I did not formulate such an opinion.

Q.   Do you have any evidence that PureCycle securities traded in an inefficient market at any point during the class period?

MS. JACOBSEN: Objection as to form.

A.   As I discuss in my report, I have evidence that the ROCH common stock did not meet a range of factors that are considered by the courts to assess efficiency, and so that's the evidence that I have in my report.

Q.   That's the evidence that you have in your report that PureCycle did not trade in an efficient market during the class period?

Stulz

MS. JACOBSEN: Objection as to form.

A.   That's not what I said.

Q.   So let me clarify my question because I think that perhaps we're talking about two different things. I'm asking whether you have any evidence that PureCycle securities traded in an inefficient market during the class period?

MS. JACOBSEN: Objection as to form.

A.   My answer was that I have evidence in my report that ROCH common stock did not meet some of the factors that the courts considered for assessing efficiency and that Dr. Cain does not show that it meets the fifth Cammer factor, that those securities meet the fifth Cammer factor in his report.

Q.   So is it your opinion that you have provided evidence in your report that PureCycle did not trade in an efficient market prior to the de-SPAC transaction?

MS. JACOBSEN: Objection. Asked and answered. Objection as to form.

A.   As I said, I was asked to assess the report of Dr. Cain, and I reached the conclusion that he has not established that the market for the

Stulz

securities was efficient throughout the class period.

Q.   Again, I'm asking a different question. I'm not asking about your assessment of Dr. Cain, I'm asking if you have provided anywhere in your report evidence that PureCycle securities, either before or after the de-SPAC transaction, traded in an inefficient market?

MS. JACOBSEN: Objection as to form. Asked and answered.

A.   I provide evidence that Dr. Cain has not shown that those securities traded in an efficient market.

Q.   Okay. So the answer, though, is that you have not provided any evidence of inefficiency. Is that accurate?

MS. JACOBSEN: Objection as to form. Asked and answered.

A.   My report assesses the works that Dr. Cain has done, and I show that he has not shown efficiency. I am not providing an affirmative opinion on efficiency. I was not asked to do that, and I'm not doing that.

Q.   Do you disagree with Dr. Cain's

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 85

Stulz

conclusion that PureCycle traded in an efficient market after the de-SPAC transaction?

MS. JACOBSEN: Objection as to form.

A. I assessed his opinion that the securities traded efficiently throughout the class period, and I show that he has not provided support for that opinion.

Q. So you don't -- you're not stating that you disagree with his conclusions, you are stating that you disagree with the methodology he employed to reach those conclusions. Is that accurate?

MS. JACOBSEN: Objection. Mischaracterizes testimony and objection as to form.

Q. Is that accurate?

A. I don't understand the question. Could you repeat it.

Q. Sure. In your report, are you stating anywhere that you disagree with the conclusion that PureCycle securities traded in an efficient market during the class period, or are you simply challenging the methodologies that Dr. Cain employed to reach those conclusions?

MS. JACOBSEN: Same objections.

Page 86

Stulz

A. I definitely disagree with his opinion in that he hasn't provided support for it.

Q. So you disagree that PureCycle securities traded in an efficient market during the class period?

MS. JACOBSEN: Objection as to form.

A. No. What I'm saying is that Dr. Cain has not shown that they traded in an efficient market throughout the class period.

Q. Right, so said differently, you're not disagreeing regarding whether or not it traded in an efficient market. You're disagreeing with whether he has employed methodologies that have established that. Is that correct?

MS. JACOBSEN: Objection. Mischaracterizes testimony. Objection as to form.

MS. WEINRIB: What did I mischaracterize, because I would like it to be clear? If there is something that I mischaracterized, please clarify.

A. I'm not quite sure I understand the question. What I am saying is Dr. Cain has not shown that the securities traded in an efficient

Page 87

Stulz

market throughout the class period. That is the opinion that I have in my report.

Q. Right, so said differently, you're disagreeing with the methodologies that he employed to reach his conclusion, correct?

MS. JACOBSEN: Objection. Mischaracterizes testimony. Objection as to form.

Q. Is the statement I just said incorrect? You're not disagreeing with his methodologies that he employed?

A. I'm not sure what you mean by the methodologies that he employed. He did an analysis, and I am saying that the analysis he did does not show that PureCycle, that the securities traded in an efficient market throughout the class period.

Q. Right, so said differently, you are disagreeing with his analysis, but you don't have an opinion as you stated previously as to whether PureCycle traded efficiently or not, correct?

MS. JACOBSEN: Objection. This is getting ridiculous in that you've asked the same question again and again and again, and

Page 88

Stulz

your using the word "said differently" is using different words than his testimony.

MS. WEINRIB: Are you instructing him not to answer?

MS. JACOBSEN: You are mischaracterizing his testimony, and this has been asked and answered five times.

MS. WEINRIB: Are you instructing him not to answer?

MS. JACOBSEN: No. He can answer.

Q. Okay. Then would you like me to read the question back because I'm not sure if you can remember it after that.

MS. JACOBSEN: He probably can't.

A. My answer is still the same, which is that Dr. Cain simply has not shown that the securities traded in an efficient market throughout the class period. He has not shown that by his own words which are to look at various factors. He hasn't shown that those factors are met.

Q. So based on your testimony, my understanding is that your issue is with his analysis and not that you have come to a different conclusion than he has, because as you testified

Pages 85 to 88

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

earlier, you didn't conduct an analysis of your own to ascertain whether PureCycle traded in an efficient market during the class period. Is that accurate?

MS. JACOBSEN: Objection. Mischaracterizes testimony once again, trying to put words in the witness's mouth.

MS. WEINRIB: I'm asking him if it is accurate. If it's not, he will say so on the record.

MS. JACOBSEN: Can I finish my objection?

MS. WEINRIB: No. The objection in this jurisdiction is objection to the form of the question. We have heard the speech, now let him answer the question.

MS. JACOBSEN: Objection.

MS. WEINRIB: It's a yes or no question. Either what I said was accurate or what I said was inaccurate.

MS. JACOBSEN: Can you pause for a moment so I can place my objections on the record?

MS. WEINRIB: You have.

Stulz

MS. JACOBSEN: Objection as to form. Objection, mischaracterizes the testimony. You can answer.

A. I don't think that what you said correctly reflects what I have been saying.

Q. Okay.

A. I'm saying that he has no proper support for his opinion that the securities traded efficiently throughout the class period. I'm saying he is not providing support that would justify that opinion.

Q. So then let's break down my question because I'm not seeing where your answer is disagreeing with what I said. So we can break it down.

My question started off as, so based on your testimony, my understanding is that your issue is with his analysis. Is that correct so far? You take issue with Dr. Cain's analysis, correct?

MS. JACOBSEN: Objection as to form. Asked and answered.

A. I take issue with his opinion because he has no support for his opinion.

Q. You don't take issue with his analysis?

Stulz

That statement is incorrect?

MS. JACOBSEN: Objection.

A. Again, he has not provided support for his opinion, which obviously implies that his analysis is insufficient to provide support for his opinion.

Q. So --

MS. JACOBSEN: Objection as to form.

Q. So we can agree that your opinion is that you disagree with his analysis?

MS. JACOBSEN: Objection as to form.

Q. Is that incorrect?

A. My opinion is that he has not shown that the securities trade in an efficient market throughout the class period. That's my opinion.

Q. Do you disagree with his analysis? It's a yes or no question.

MS. JACOBSEN: Objection as to form.

A. Well, what I say in my report is that his analysis does not support his opinion.

Q. So you don't disagree with his analysis, or you do disagree with his analysis?

A. My opinion is that he has not shown that the securities trade in an efficient market, and as

Stulz

a result, his analysis does not show that.

Q. Okay. Did you construct an event study to test market efficiency?

A. I was not asked to develop an opinion on the efficiency of the securities. I was asked to assess the work that Dr. Cain has done. In the process of assessing that work and in the process of working on my report, I did develop an event study, and I used that event study in the price impact section of my report.

Q. So you did not use your event study to opine on the efficiency of the market for PureCycle securities during the class period. Is that correct?

MS. JACOBSEN: Objection as to form.

A. I did work involving estimating event study models in the efficiency part of my report, but what I did there was to show that if I implement the models that Dr. Cain has used in other SPAC cases, then his conclusion about significance for November 16, 2020 does not hold.

Q. So you did not use your event study to reach your own conclusion as to whether PureCycle securities traded in an efficient market during the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

class period, correct?

MS. JACOBSEN: Objection, asked and answered.

A. I used event study models to show that Dr. Cain's conclusion about November 16 does not hold if he had performed the same type of event study analysis that he did in previous SPAC cases.

The only way that his conclusion holds is if he changes his methodology from previous SPAC cases he has worked on.

Q. So you did not use the event study for the purpose that I asked about, correct?

MS. JACOBSEN: Objection, asked and answered. Objection as to form.

A. I think we are going back to what we talked about extensively. I was not asked to opine on the efficiency of the securities during the class period. I was asked to opine as to whether Dr. Cain has shown that the market for the securities was efficient during the class period, and I have concluded that he has not shown that.

Q. Would you agree that in an efficient market, a residual return that is statistically significant on an event date indicates the arrival

Stulz

of new value-relevant information to the market?

A. Can you repeat the question.

Q. Sure. Would you agree that in an efficient market, a residual return that is statistically significant on an event date indicates the arrival of new value-relevant information to the market?

A. This requires the event study to be properly specified, but if the event study is properly specified and there is a significant abnormal return on an event date, that would be consistent with the arrival of new value-relevant information on that date.

Q. So, if a company makes a material affirmative representation with new information in an efficient market, you would expect the stock price to react in a statistically significant manner to that information. Is that accurate?

MS. JACOBSEN: Objection as to form.

A. Can you repeat the question.

Q. Sure. If a company makes an affirmative material representation of new information, in an efficient market, you would expect the stock price to react in a statistically significant manner to

Stulz

that new information. Is that accurate?

MS. JACOBSEN: Same objection.

A. The concept of materiality has a legal meaning, and I'm not opining on legal materiality. What is correct is that if a company makes a statement that is value-relevant and if the market for the security is efficient, you would expect an abnormal return as long as the model, the event study model is properly specified.

Q. And once that happens, would you agree that in an efficient market, that information is thereafter incorporated into the price of the stock?

MS. JACOBSEN: Objection as to form.

A. If that information is incorporated on the event date, it will be in the stock price, and now that may change if there is new information that makes that information irrelevant or negates that information.

Q. If the same information is repeated on a different event date, would you expect the stock to move in a statistically significant manner, again if there is no new information?

MS. JACOBSEN: Objection as to form.

Stulz

A. No new information does a lot of work in the question. I agree that if there's strictly no new information, then repeating the information is not going to lead to a significant abnormal return.

Q. Would you agree that if a company's disclosure conceals important information, the effect of the concealment would generally not result in a statistically significant stock price movement, but would maintain the price at its then current level?

MS. JACOBSEN: Objection as to form.

A. I would agree that if the market didn't expect a firm to make a statement on a specific day and the firm doesn't make a statement about something, then there is not going to be a stock price impact.

Q. So just to be clear, you agree with the statement that I previously made, the question that I just asked?

MS. JACOBSEN: Objection, mischaracterizes testimony. Objection as to form.

Q. Does it mischaracterize your testimony?

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Stulz

You don't agree with the statement I made?

MS. JACOBSEN: Objection as to form.

A. I only agree with the way I formulated the statement in my response, which is I agree that that's a correct way to look at things.

Q. Okay. So is there anything in the statement that I made, and I'm happy to repeat it, that is incorrect?

MS. JACOBSEN: Objection as to form. Mischaracterizes testimony.

A. What I said in my response is that for your statement to be correct, there needs to be additional conditions, and I explained those conditions in my answer.

Q. So the additional condition that would have to be met is that the market is not expecting a disclosure of the information that the company concealed?

MS. JACOBSEN: Objection as to form.

A. It has to be that the market isn't expecting a disclosure by the firm.

Now, if the market is expecting a disclosure and the disclosure doesn't occur, there might still be a stock price reaction.

Stulz

Q. What is your understanding of price impact?

A. My understanding of price impact is that there is no price impact if a new piece of information does not move the price.

Q. Is price impact the same as price inflation?

A. That strikes me as a legal question. As a financial economist, I can assess whether a new piece of information, I mean a piece of information affects the stock price or not. The precise conditions for there to be inflation in a legal sense is beyond what I focus on.

Q. In your opinion, can one demonstrate price impact without analyzing price inflation?

MS. JACOBSEN: Objection as to form.

A. Again, I'm not saying anything about legal requirements. When it comes to price impact from the perspective of financial economics, a financial economist can make an analysis of whether a piece of information affects the stock price when it is disclosed or not, and that type of analysis a financial economist can do, and it is unrelated to the legal requirements for inflation or the legal

Stulz

definition of inflation.

Q. In what ways do you -- in your opinion, in what ways can price impact be demonstrated?

MS. JACOBSEN: Objection as to form.

A. If the question is whether a statement made by a corporation affects the stock price, then the issue becomes one of whether you can use an event study to examine whether that statement affected the stock price.

Q. Is an event study the only way to ascertain if there has been price impact?

MS. JACOBSEN: Objection as to form.

A. The answer is no in the sense that if the market is efficient, there are cases where a statement is not going to have an impact in an efficient market, because that information was already publicly available before the day when it was made that you are looking at.

Q. So what other ways are there to establish price impact, if any?

MS. JACOBSEN: Objection as to form. Are you asking for a legal or financial perspective?

MS. WEINRIB: I'm asking for his

Stulz

opinion.

A. So my opinion is that as a financial economist, you can analyze whether a statement has price impact by looking at all the information that arrives to the market on a specific day, looking at whether the statement you are focused on represents new information, and then using the tools of an event study to investigate whether there is a stock price reaction to the information conveyed to the market that day, and then investigate further whether that reaction is due to the statement as opposed to other pieces of information that arrive to the market that day.

Q. In your opinion, is there any other way to establish price impact?

MS. JACOBSEN: Same objection. Unclear whether you're asking from a legal or financial economics perspective.

MS. WEINRIB: I'm asking for his opinion.

A. If the question is to establish whether the stock price changed as a result of a statement or not, then you want to show that that statement changed the price at some point. It could have

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Case 6:21-cv-00809-PGB-RMN    Document 189-3    Filed 02/21/24    Page 27 of 79 PageID 8948

Page 101

Stulz

changed the price when it was made, or it could change the price when it is revealed to be false.

Q.  When you say it could change the price when it is revealed to be false, are you referring to corrective disclosures?

A.  Well, if you show that if the market concluded that the statement was false and when it does so that there is a significant negative abnormal return that is due solely to the market finding that the statement was false, then that would be a way to establish that the statement affected the price.

Now there are some types of statements where you don't expect them to affect the market when they are made, and there are statements where you expect them to affect the market when they are made.

Q.  And I think we covered that previously, correct, when we were talking about disclosures that don't include new information?  You would not expect those to move the price of the stock, correct?

MS. JACOBSEN:  Objection as to form.

A.  You would not expect that to be -- I

Page 102

Stulz

mean you would not expect repeated disclosures to affect the stock price if the market for the stock is efficient.  That is correct.

THE VIDEOGRAPHER:  We are going off the record at 12:04 p.m.

(Lunch recess:  12:04 p.m.)

Page 103

Stulz

Afternoon Session

12:49 p.m.

THE VIDEOGRAPHER:  We are back on the record at 12:49 p.m.

PROFESSOR R E N É  S T U L Z, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

BY MS. WEINRIB:

Q.  Professor Stulz, I would like to direct your attention to paragraph 164 of your report. You can take your time to review it.

A.  Okay.

Q.  In that paragraph you state "My understanding is that plaintiffs' theory of liability implies that the alleged misrepresentations on November 16, 2020 created (rather than maintained) inflation in ROCH's stock price."  Did I read that accurately?

A.  Yes.

Q.  Okay.  How did you reach that understanding?

A.  The starting point was me trying to understand how the alleged misrepresentations were

Page 104

Stulz

going to affect the stock price.

Now the day before the market didn't know anything about PureCycle being the acquisition target, so the stock price did not have information about PureCycle on I guess the 13th, if I remember correctly, on the previous trading day.  So for information to get into the stock price, it had to be new information, and so I have this economic analysis in the report about the role of the redemption price.

So I didn't see how there could be inflation in the price from the previous trading day given what I read, and then now we had discussions about this.  That's how the understanding developed.

Q.  Okay.  So just to be clear, so your understanding of plaintiffs' theory of liability came from your economic analysis of the trading prices?

MS. JACOBSEN:  Objection as to form.

A.  Obviously I read the complaint, and my understanding from the complaint is that that misrepresentation on November 16, and my understanding from the economics is that those

Pages 101 to 104

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Page 105

Stulz

representations are not already in the stock price on the previous trading day, because the previous trading day the market did not know about PureCycle. The previous trading day is a price that's a price of a money market fund. It's not a price that is related to PureCycle.

So that was a starting point, and then now we had conversations, and I didn't hear any reason why my understanding is wrong, and so I proceeded with that.

Q. Go ahead. You can finish.

A. That's it.

Q. Okay. Was there anything in the complaint itself that led you to the understanding that plaintiffs' theory of liability implies that the alleged misrepresentations on November 16, 2020 created rather than maintained inflation?

MS. JACOBSEN: Objection as to form.

Q. I'm specifically asking about the complaint itself. If there's anything in the complaint itself that led you to that understanding.

MS. JACOBSEN: Same objection.

A. So the concept of maintained inflation

Page 106

Stulz

is that the inflation was already in the price on the previous trading day and it gets maintained. I didn't see anything explicit related to that. I didn't see anything explicit related to the fact that there was already inflation in the price. There is no discussion of that in the complaint as far as I remember. The complaint is not saying that the price was already inflated before then.

Q. Would any of the opinions set forth in your report change if you understood plaintiffs' theory of liability to be one of inflation maintenance?

MS. JACOBSEN: Objection as to form.

A. If my understanding is incorrect and there was already inflation in the stock price before the start of the trading day and that inflation was maintained, then my analysis would obviously be affected, because that's not my understanding.

Q. In what way would your analysis be affected?

A. I would have to think about it. I don't understand how that would interact with the redemption rights, and so I mean I would have to

Page 107

Stulz

see what plaintiffs have to say.

Q. When you say you would have to see what plaintiffs have to say, what do you mean by that?

A. I mean what makes inflation different with a SPAC, I mean from my perspective as a financial economist, that is not a legal statement or anything, but it is that SPACs have a money-back guarantee and that sets a floor to the price. So I would have to understand how the inflation that is maintained is consistent with the existence of that floor.

Q. I would like to direct you to paragraph 191 in your report, and you can take your time to read this paragraph before you answer my question, but you mentioned that if you had understood plaintiffs' liability theory to be one of inflation maintenance, it could have impacted your conclusions.

So my question specifically now is with regard to paragraph 191, if you had understood plaintiffs' theory of liability to be one of inflation maintenance, would that have changed your conclusion as set forth in paragraph 191?

MS. JACOBSEN: Objection as to form.

Page 108

Stulz

A. Now I just want to be precise. I mean this is my understanding of plaintiffs' liability theory. I don't mean in any way to interpret that. I mean that liability theory from a legal standpoint. It is simply the assumptions I am making as a financial economist, and the assumption I am making as a financial economist is that there is no inflation on the previous trading day, but if there was inflation and that inflation is maintained, in that case you would not expect a positive abnormal return on November 16 and you could not establish the lack of price impact by looking at the front end.

Q. I think you testified to this earlier, but can price impact be shown through a price reaction to a corrective disclosure?

MS. JACOBSEN: Objection as to form.

A. When it comes to a misrepresentation, now some types of misrepresentations are going to impact the stock price when they are made, and in that case you can look at what happens to the stock price when the misrepresentations are made. There are cases where the alleged misrepresentations may not impact the stock price when they are made, and

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 109

Stulz

in that case you would want to look at the stock price impact when they were corrected.

Q. And if on a corrective disclosure date there is a disclosure that has material new negative information and the stock price reacts in a way that is consistent with that news, directionally consistent with that news, isn't that evidence of market efficiency?

MS. JACOBSEN: Objection as to form.

A. It depends.

Q. Can you elaborate?

A. You would have to show that the market drops because of the correction of the alleged misstatement as opposed to drops for other reasons.

Q. So if the stock price drop is related to the alleged misstatement, would you agree that that is indicative of market efficiency?

MS. JACOBSEN: Objection as to form.

A. I have two reservations with that. The first one is that you would have to show that some part of the drop is due to the alleged misstatements, which has not been done here.

Now, with my price impact opinion, there would not be an impact at the back end, because

Page 110

Stulz

there wasn't a price impact at the front end. So, if there were an impact at the back end with my opinions, that would be evidence of inefficiency rather than efficiency.

Q. I don't think that responds to my hypothetical. I was asking if the stock price drop is related to the alleged misstatement, would you agree that that is indicative of market efficiency?

MS. JACOBSEN: Objection as to form.

A. My answer was it depends. Now related by itself is not enough. I mean it could be on the same topic. I mean some information related to the misstatements could be disclosed that day, but if the misstatements didn't have a price impact, then the alleged curative disclosure wouldn't have a price impact, I mean caused by the misstatements either.

Q. And is that statement accurate whether it's an inflation maintenance theory case or not?

MS. JACOBSEN: Objection as to form.

A. The statement is accurate if the alleged misrepresentations were expected to inflate the stock price when they were made in the sense of increasing the stock price. It would not be

Page 111

Stulz

accurate if the alleged misrepresentations were not expected to increase the stock price.

Q. Did you opine in your report on whether there was price impact on the dates of the alleged misrepresentations? Sorry. On the dates of the alleged corrective disclosure?

MS. JACOBSEN: Objection as to form.

A. I did.

Q. Where?

A. The paragraph 191 that we just discussed.

Q. Which statement in paragraph 191 conveys your opinion that there was no price impact on the dates of the alleged corrective disclosures?

A. I'm sorry, I may have misunderstood you then. What do you mean by there being no price impact on the days of the alleged disclosures?

Q. The question that I had asked before you directed my attention to paragraph 191 was whether you opine in your report on whether there was price impact on the dates of the alleged corrective disclosures.

MS. JACOBSEN: Objection as to form.

A. I think you will have to define what you

Page 112

Stulz

mean by price impact in that context. I think we were talking at cross purposes here.

Q. How do you understand price impact to be defined in the context of a Section 10(b) securities litigation?

MS. JACOBSEN: Objection as to form.

A. In this context, I would understand price impact to mean that the alleged misrepresentations caused the price to fall upon the disclosures of that alleged curative disclosure day.

Q. So my question is do you opine in your reports, based on your interpretation of price impact that you just gave in your answer, do you opine in your reports on whether there was price impact on the dates of the alleged corrective disclosures?

A. So I do opine with my understanding of the alleged misrepresentations and of the plaintiffs' liability theory that the price declines on the alleged curative disclosure dates are not evidence of price impact.

Q. Okay. Can you point to where in your report you conclude that the price declines on the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 113

Stulz

corrective disclosure dates are not indicative that there is price impact?

MS. JACOBSEN: Objection as to form.

A. In paragraph 191 I say price declines on subsequent dates discussed in the second amended complaint cannot serve as evidence of such inflation dissipating.

Q. Correct me if I'm wrong, but that was the second half of the sentence, and the first half of the sentence assumes that plaintiffs' theory of liability is not one of inflation maintenance. Is that correct?

MS. JACOBSEN: Objection as to form.

A. That's correct. So there must be some part of your question that escapes me.

Q. In your opinion, why did the price of PureCycle's securities decline on May 6, 2021?

A. I was not asked to explain why the price dropped on that date, but in my report I have an extensive discussion of all the information that was conveyed on that date. Some of that information is completely unrelated to -- is unrelated to the allegations, and so there is other information on that day besides information that is

Page 114

Stulz

related to the misrepresentations.

Q. So sitting here today, do you have any opinion on why the price declined on May 6, 2021?

MS. JACOBSEN: Objection as to form.

A. If the market for the securities is efficient and given my understanding of plaintiffs' liability theory, then the price declined for other reasons than reasons related to the misrepresentations.

Q. Do you have an opinion sitting here today as to what other reasons could have caused the price decline on May 6, 2021 in PureCycle securities?

MS. JACOBSEN: Objection as to form.

A. I was not asked to quantify the impact of the other pieces of information disclosed on that day, but as I mentioned, there are a number of pieces of information coming out on that day including the fact that a short seller had taken positions in the stock.

Q. So which pieces of information released that day do you opine impacted the price of the stock on May 6, 2021?

MS. JACOBSEN: Objection as to form.

Page 115

Stulz

A. Well, we know that information that a short seller has taken a position and is publicizing that position will have an impact on the stock price in general, but I don't have an opinion as to how much that explains of the price drop.

My opinion is, given the plaintiffs' liability theory and given my evidence that there was no price impact from the alleged misrepresentations, given that understanding, then the price drop on May 6 is not caused by the alleged misrepresentations.

Q. So your opinion is based on the assumption that plaintiffs' theory of liability is not one of inflation maintenance, correct?

MS. JACOBSEN: Objection as to form.

A. My answer is based on the understanding that on November 16, the alleged misrepresentations were going to cause an increase in the stock price that would correspond to inflation.

Q. Was the decline on May 6, 2021 statistically significant?

MS. JACOBSEN: Objection as to form.

A. I haven't computed that abnormal return

Page 116

Stulz

and investigated with my model whether it is statistically significant, but I mean there is no doubt that there is a very large abnormal return and that that abnormal return is going to be significant irrespective of the model one uses.

Q. Is it your opinion that the Hindenburg report was not corrective of the alleged misrepresentations in this case?

MS. JACOBSEN: Objection as to form. Asked and answered.

A. It is not for me to decide whether it is corrective or not in a legal sense. That is a legal decision. It has nothing to do with my expertise. All I can say is that if my understanding of plaintiffs' liability is correct, then the alleged misrepresentations did not cause a decrease in the stock price on May 6.

Q. And again your understanding comes from your economic analysis of the stock price on November 16, 2020, correct?

MS. JACOBSEN: Objection as to form.

A. Discussions about the complaint with my team and making sure that we understood the complaint and that we understood the implications

Pages 113 to 116

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

of the complaint for how inflation entered the stock price. Inflation has to come from somewhere.

Q. Did someone at Cornerstone provide you with the understanding as to what plaintiffs' theory of liability is in this case?

MS. JACOBSEN: Objection as to form.

A. Well, as I explained, the starting point was understanding the economics of the SPAC and the role of the redemption rates, and if that understanding of the SPAC is correct, then now there is a floor to the price of the SPAC, and so the but-for price during the SPAC period can't be below $10. That was the starting point.

Then we had discussions, and based on all of this together, I formulated an opinion that is based on that understanding.

Q. When you say we had discussions, who are you referring to?

A. To me and my team.

Q. Your team at Cornerstone?

A. Right.

Q. So based on your understanding of SPACs and the floor to the price of SPACs and your conversations with Cornerstone, collectively those

Stulz

formed your opinion as to what the theory of liability is in this case?

MS. JACOBSEN: Objection as to form.

A. So I talked with them about their understanding of the plaintiffs' liability theory and whether it was consistent with the way I was looking at it, and if that understanding was incorrect, then the analysis would have proceeded differently.

Q. Do you have any awareness of how Cornerstone came to their understanding as to plaintiffs' theory of liability in this case?

MS. JACOBSEN: Objection as to form.

A. I don't have any direct understanding. I would assume that they had discussions with attorneys, but I mean that is an assumption.

Q. Is it your opinion that the Hindenburg report does not reveal any new information?

A. That's not my opinion.

Q. Did you review any analyst commentary to come to any understanding of the contents of the Hindenburg report?

MS. JACOBSEN: Objection as to form.

A. I reviewed all of the analyst reports

Stulz

that we were able to get about the securities that are a part of this litigation. My recollection is that the analyst reports that exist before the Hindenburg report are by analysts that are being questioned in the complaint, but I did look at the analyst reports.

Q. Did you review any analyst reports that discuss the Hindenburg report?

MS. JACOBSEN: Objection as to form.

A. I reviewed all of the analyst reports that exist, and so my recollection is that there are reports that follow the Hindenburg report and that make statements about them. I don't remember the details of those reports. I would be happy to refresh my memory.

Q. Do you recall if the content of any analyst report discussing the Hindenburg report influenced your opinion as to whether the Hindenburg report was corrective of any of the alleged misrepresentations?

MS. JACOBSEN: Objection as to form. Mischaracterizes testimony.

MS. WEINRIB: I'm not characterizing any testimony, I'm asking him a question.

Stulz

MS. JACOBSEN: Objection as to form.

A. I don't have an opinion as to whether the Hindenburg is corrective in a legal sense. My opinion is that if my understanding of the plaintiffs' liability theory is correct, so that the alleged misrepresentations introduced inflation in the stock price, then I have shown that these alleged misrepresentations did not have a stock price impact when made, and therefore, if the market for PureCycle, Inc. is efficient, those misrepresentations could not have a price impact when the Hindenburg report was disclosed.

Q. You state in your report that the Hindenburg report does not include interviews with PureCycle employees or management. Is that correct?

A. If I remember correctly, I discuss the interviews concerning the management of PureCycle that are in the Hindenburg report. Those interviews are by former employees. I mean employees of the former companies that some members of management were involved with.

Q. Is it your opinion that only interviews with PureCycle management and employees can be

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 121

Stulz

corrective?

MS. JACOBSEN: Objection as to form.

A. I'm not an attorney, I cannot tell you what can or not be, cannot be corrective from a legal standpoint. I can as an economist investigate price impact, and I can do that.

Q. Is it your opinion that the interviews set forth in the Hindenburg report are not relevant to the alleged misrepresentations?

MS. JACOBSEN: Objection as to form.

A. I'm not quite sure how you define relevant. Before you used related. The fact that they are related to the allegations does not mean that those disclosures had a price impact.

Q. Just to be clear, you are not opining nor did you opine in your report that the interviews are irrelevant to the alleged misrepresentations. Is that correct?

MS. JACOBSEN: Objection as to form.

A. I am saying I think quite precisely in my report that if the alleged misrepresentations didn't have a price impact at the front end, then there is no price impact to be corrected at the back end.

Page 122

Stulz

Q. So my question is different. I'm asking you whether it is your opinion that the interviews in the report are not relevant to the alleged misrepresentations?

MS. JACOBSEN: Objection as to form.

Q. If you want to use the word "related" or "relevant," I am using them interchangeably. If you have a different understanding of those two words, then I'm happy to clarify.

MS. JACOBSEN: Objection as to form. Asked and answered.

A. To me "related" would mean that they address a topic that is similar to issues raised in the misrepresentation, and the fact that they address a topic that addresses issues that are raised in the misrepresentations does not mean that there is a price impact.

Q. Is it your position that any of Hindenburg's opinions as set forth in the Hindenburg report were publicly available prior to May 6, 2021?

MS. JACOBSEN: Objection as to form.

A. I don't think that that's correct. It certainly is not my opinion. The market didn't

Page 123

Stulz

know before May 6 that Hindenburg had a short position and had an extremely negative opinion of PureCycle, Inc.

Q. Are you aware of any other opinion of Hindenburg with regard to PureCycle that was public prior to May 6, 2021?

MS. JACOBSEN: Objection as to form.

A. I'm sorry, I just said that the market wasn't aware of that before May 6.

Q. Okay.

A. So I'm not sure I understand your subsequent question.

Q. That's okay. I think you were clear. Do you have an opinion regarding whether Hindenburg's negative conclusions regarding PureCycle are related to the alleged misrepresentations?

MS. JACOBSEN: Objection as to form.

A. I can't answer the question to the extent that it would require a legal opinion. I can answer it to the extent that topics of the Hindenburg report are related to the allegations, to the alleged misrepresentations, about statements about management, about the value of the patent and

Page 124

Stulz

so on.

The issue that I address in my report is whether the statements that relate directly to the misrepresentations had a price impact on that day.

Q. I direct your attention to paragraphs 226 through 229 in your report.

A. Okay.

Q. Are you opining in these paragraphs that PureCycle's disclosures of hypothetical risk are corrective?

MS. JACOBSEN: Objection as to form.

A. I do not have such an opinion in my report. All I'm doing here is to say that one of the issues that Hindenburg addresses has to do with whether there is enough quality feedstock, and I'm pointing out that there were discussions of that issue before the Hindenburg report. That's all I'm doing.

Q. Is it your opinion that disclosing a hypothetical risk is the same as disclosing that a risk has already come to pass?

MS. JACOBSEN: Objection as to form.

A. Can you repeat the question.

Pages 121 to 124

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 125

Stulz

Q. Sure. Is it your opinion that disclosing a hypothetical risk is the same as disclosing that a risk has already come to pass?

MS. JACOBSEN: You're asking him as a financial economist?

MS. WEINRIB: I'm asking for his opinion.

MS. JACOBSEN: Objection as to form.

A. I'm not a disclosure expert. I'm not an expert on whether something is curative or corrective. I mean I certainly can see differences between the two statements in some cases, and in other cases maybe not, it would depend on the specifics, but again I have no legal expertise, and so it is not an issue on which I could resolve any kind of legal consideration.

Q. Just to be clear, I wasn't asking for a legal opinion, I'm simply asking your personal opinion as to whether a hypothetical risk is the same as a risk that has already materialized, and I think you answered that in some cases there are differences and in some cases there are not.

So my follow-up question is in what instances would you say there is no difference

Page 126

Stulz

between a hypothetical risk and a materialized risk?

MS. JACOBSEN: Objection as to form. He already said he's not a legal expert.

You can answer.

MS. WEINRIB: Again, to be clear, I'm not asking for a legal opinion.

A. I mean it depends on the precise nature of the risk, I would think, and what is known about that risk. Now, if it is something that one is absolutely sure has not happened based on disclosures while it actually has, then that would be a case where the two disclosures would be very different.

Q. As a financial economist, would you assume that investors would react differently to disclosure of a risk that is purely hypothetical as opposed to disclosure of a risk that has already materialized?

MS. JACOBSEN: Objection as to form.

A. I mean with a risk you have always the issues that you need to know the probability distribution of the risk, and so if a risk is sufficiently likely to materialize, then the

Page 127

Stulz

difference between it having materialized and being highly likely to materialize may not be that big.

If it is a risk that is quite unlikely to materialize, then there can be a big difference between it having already materialized and maybe materializing in the future, but you need to know the distribution of the risk.

Q. In your opinion, prior to May 6, 2021, was it public knowledge that throughout the class period, PureCycle's recycling process was not yet functional and was incapable of being scaled for commercial production?

MS. JACOBSEN: Objection as to form. Assumes facts that have not been established.

A. What I'm saying in my report is that before May 6, there was no guarantee that the process would be scalable, that whether it would be scalable was one of the risk factors.

Q. That's different than what I'm asking. I'm not asking whether the company made hypothetical risk disclosures about those topics, I'm asking whether it was public knowledge before May 6 that they could not scale the process for

Page 128

Stulz

commercial production and that the process was not yet functional?

MS. JACOBSEN: Objection as to form. It assumes facts that have not been established.

A. For my report, I had no reason to conduct an investigation of what was public knowledge and what wasn't. What I'm saying in this section of my report is that there is a lot of information that is disclosed ahead of the Hindenburg report and the issues raised by the Hindenburg report.

For market efficiency, you don't need something to be widely known to affect the price, and so it being known by some people can be enough for it to be incorporated in the price.

Q. Aside from the company's boilerplate risk disclosures, what other public document can you point me to that discuss the topics set forth in the Hindenburg report?

MS. JACOBSEN: Objection as to form.

A. Well, I cite a number of documents. Not every citation has to do with risk disclosures in public filings.

Pages 125 to 128

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Stulz

Q. Can you point me to a single document that you cite to that states that PureCycle's recycling process was not yet functional and could not be scaled for commercial production prior to May 6, 2021?

MS. JACOBSEN: Same objection. Objection as to form. Assumes facts that have not been established.

A. I mean this is beyond my report. All I do in this section of my report is raise the issue that it will be challenging for the plaintiffs' damages expert to deal with the Hindenburg report because it includes information that is already public, and if the market for PCT is efficient, that already public information will already have been incorporated in the stock price.

Q. So what I'm focused on is the portion of your answer where you say that it includes information that is already public, and then I will refer back to my prior question where I ask if you can point to where in the public domain that information about PureCycle's recycling process not yet being functional and not being scalable at that time is located.

Stulz

MS. JACOBSEN: Objection as to form. Asked and answered.

A. What I do in my report is provide a number of citations about information being public, about some aspects of the Hindenburg report. I don't think that there is a citation in my report that says that the process is not scalable and will never be scalable.

Q. In your report, you reference the fact that PureCycle's patents are publicly available. Do you recall that?

A. Right.

Q. Have you reviewed PureCycle's patents?

A. Well, I have looked at them. I'm not sure that that qualifies as reviewing them. I don't have the expertise to assess the patents.

Q. Do you have any background at all relevant to understanding PureCycle's patents?

A. Well, I have an understanding of a number of issues concerning patents, but I have no expertise in plastics, and so I certainly could not assess those patents in any way, and I don't claim in my report that I am assessing them in any way.

Q. Can I turn your attention to paragraph

Stulz

230 of your report.

A. Yes.

Q. Can you explain how the publication of PureCycle's patents would have informed investors during the class period that the company's patent was nowhere near as valuable as the company had led investors to believe given that the patent in process was not yet functional and could not be scaled for commercial production?

MS. JACOBSEN: Objection as to form. Assumes facts that have not been established.

A. What you are asking goes beyond what I have expertise on and what I was asked to investigate. The point I make here is straightforward, which is that the Hindenburg report quotes people criticizing the patent and saying that the patent has kind of limitations or is not as useful as claimed. All I am saying here is that that patent was easily available, and so investors could look at it. In an efficient market you don't need all investors to look at it. You don't need all investors to be aware of it. You need that arbitrageurs that have a stake in

Stulz

exploiting information concerning the company can look at it.

Q. Just to make sure I'm understanding correctly, in paragraph 230 when you reference the fact that PureCycle's patents are public, you're not suggesting that the negative information regarding those patents was public?

MS. JACOBSEN: Objection as to form.

Q. Just the patent itself, correct?

A. I'm saying here that investors could access the patents and could look at the patents, and investors that had skills at assessing those patents could look at them. There was nothing hidden about those patents.

Q. But the patent itself, the information that was public about the patent itself was not the same information that the Hindenburg report described in criticizing the patent, is that correct?

MS. JACOBSEN: Objection as to form.

A. The Hindenburg report quoted experts that had negative opinions about those patents. The patents themselves don't have negative opinions about themselves. Now people who have expertise in

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 133

Stulz

plastics and recycling could look at those patents and assess them for themselves.

Q. I think we are agreeing then that what you are stating in your report is simply that the patent itself was publicly available, but nothing further than that.

MS. JACOBSEN: Objection. Mischaracterizes testimony. Objection as to form.

Q. You're stating that the patent itself was publicly available, but not that the negative criticisms of the patent could have been ascertained by looking at the publicly available patents, correct?

MS. JACOBSEN: Mischaracterizes testimony. Objection as to form.

A. I think the way you summarized what I said isn't correct. I am saying that the patents were publicly available and consequently investors who had expertise in evaluating those types of patents could do it on their own.

Q. So --

A. And I'm not saying that the specific criticisms by people who are quoted in the

Page 134

Stulz

Hindenburg report, that those specific criticisms were public information before those criticisms were made in the Hindenburg report, but it is perfectly possible that investors could have reached those conclusions on their own who had expertise in that type of patent.

Q. On what basis are you opining that investors could have reached the conclusion that PureCycle's patent was nowhere near as valuable as the company had led investors to believe given that the patented process was not yet functional and could not be scaled for commercial production simply by looking at the publicly available patent?

MS. JACOBSEN: Objection as to form. Mischaracterizes testimony. Assumes facts that have not been established.

You can answer.

A. I am just saying that investors who are concerned about the value of the patent could look at the patent and could get help in assessing the patent.

Q. And based on what publicly available document would investors have concerned about the value of the patent?

Page 135

Stulz

MS. JACOBSEN: Objection as to form.

A. Investors who wanted to understand better the business model of PureCycle to make an investment in the company, depending on the type of investors, could look at the patent and reach their own assessment. All I am saying is there was public information.

Q. Right, and my question that I have been asking is whether there is public information prior to May 6 that the patent was not as valuable as the company led investors to believe, given that the process was not yet functional and couldn't be scaled for commercial production. A very specific fact. I'm asking if there was a public document including the patent that would have alerted any investor to those facts?

MS. JACOBSEN: Objection as to form. Assumes facts that have not been established.

You can answer.

A. Investors knew at that point in time that there were risks concerning the ability to scale, as I discuss earlier in my report. If the precise statement is that the process could never

Page 136

Stulz

be scaled, that precise statement is not in the documents that I have seen.

Q. Okay. So that brings me back to my earlier question again. Aside from the risk disclosures, is there any other document that you can point to that was publicly available before May 6 that would have led investors to question the value of the patent given scalability issues and the fact that the process was not yet functional?

MS. JACOBSEN: Objection. Same objections as before. Asked and answered.

A. This again is beyond my expertise and beyond what I was asked to look at. All I am doing in this section of my report is to point to the existence of a lot of information that was public.

Q. Again, just to be clear, that public information you are referring to is the patent itself and the risk disclosures, correct?

MS. JACOBSEN: Objection as to form. Mischaracterizes testimony.

You can answer.

A. I also mention other documents besides the risk disclosures.

Pages 133 to 136

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Stulz

Q. Aside from the patent and the risk disclosures, what other publicly available documents do you opine alerted investors to the fact that the patent was not as valuable as the company had led investors to believe?

MS. JACOBSEN: Same objections.

A. Again, you are asking me to opine on issues that are not part of my report. My report in this section discusses information that is available, and that information outside of the risk disclosures discusses issues with availability of feedstock and issues having to do with risks to scalability.

Q. So, with regard to the value of the patents, I had asked you whether you were only referencing the patent itself and the risk disclosures as publicly available documents, and then you said "I also mention other documents aside the risk disclosures."

So I was simply asking you to identify those other documents, and your response was "Again you are asking me to opine on issues that are not part of my report."

So I just want to clarify. Are there

Stulz

other documents mentioned in your reports that you contend are publicly available prior to May 6 that would have alerted investors to the fact that PureCycle's patent was not as valuable as they claimed?

MS. JACOBSEN: Same objections. Asked and answered.

A. I mean I discuss various documents having to do with the patent and having to do with the business model of PureCycle that were available to investors. I discuss an interview with Dr. Lehman that precedes the class period and has lots of details about the process and so on.

So I discuss the fact that there is a lot of information. That's all I'm trying to do in this part of my report.

Q. Does the interview with Dr. Lehman discuss the value of the patents?

MS. JACOBSEN: Objection as to form.

A. It discusses various aspects of the process and the risks involved in the process. That bears to the value of the patent.

Q. Is there any portion of Dr. Lehman's report that you can point to that would have

Stulz

alerted investors to the fact that the patent was not as valuable as the company led investors to believe because it was not yet functional and not scalable at that point in time?

MS. JACOBSEN: Asked and answered. Same objections.

A. This is not, I mean this is not what I was asked to opine on, and this is not what I have an opinion on. I have an opinion that there was a lot of the information that was in Hindenburg that was already public. Hindenburg itself says that it relies on public information for its report. That opinions in the Hindenburg report about the patent, those opinions are by those individuals who were not public before, so those are new opinions.

Q. In your opinion, why did the price of PureCycle securities decline on November 11, 2021?

MS. JACOBSEN: Objection as to form.

A. It declined because of the information that was revealed to the market over that day. That information included both information that there was an investigation by the SEC as well as information about the previous quarter, and there was additional information about delays in plants.

Stulz

Q. So is it your opinion sitting here today that those were the only causes of the stock price decline on November 11, 2021?

MS. JACOBSEN: Objection as to form.

A. I was not asked to parse the abnormal return attributed to various causes. I discuss the impact of the announcement of an SEC investigation.

Q. Is the decline on November 11, 2021 statistically significant?

MS. JACOBSEN: Objection as to form.

A. I mean I have not done an analysis -- I would have to check. I may have done it indirectly, but the drop was about 15 percent. The abnormal return is going to be large on that day, so I would expect it to be significant. I wouldn't question that it was significant.

Q. Have you ever calculated classwide damages for a security?

A. In securities litigation, I have typically been in a rebuttal role for 10(b)(5) litigations, and as a result what I have done is computed damages under various sets of assumptions that would differ from what were the assumptions that plaintiffs were making.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 141

Stulz

Q.   What methodologies -- do you have any criticism of the out-of-pocket methodology for calculating damages aside from taking issue with the specific value of the inputs that Dr. Cain used?

MS. JACOBSEN:  Objection as to form.

A.   I don't have any objection to the out-of-pocket approach as a method to compute damages, meaning that you look at the difference between the price paid and the price absent the alleged misrepresentations, but that is a very general approach to compute damages that may be legally appropriate in some cases, but it is not a methodology.  It doesn't tell us how you are going to compute damages, it just tells us how damages are defined.

Q.   Have you ever parsed a price decline to account for different company-specific events or disclosures?

MS. JACOBSEN:  Objection as to form.

A.   I have dealt with issues of confounding information in a number of different ways.

Q.   How have you parsed the decline to account for different company-specific disclosures?

Page 142

Stulz

A.   Well, one approach is to investigate whether the different pieces of information came to the market at different times during the day, and so I have done that.  And another approach has been to estimate the economic impact using a valuation model, and I have done that using that to put an upper bound on the damages.  I have done that.

Q.   Is it your opinion that damages cannot be calculated classwide in this case?

MS. JACOBSEN:  Objection as to form.

A.   There is an issue in this case that market efficiency hasn't been demonstrated.  So in the absence of market efficiency, I don't think you would be able to compute damages classwide.  If market efficiency is established, then my report doesn't show that damages couldn't be computed classwide, but that is subject to market efficiency being established, which it is not at this point.

Q.   Why do you say that that is subject to market efficiency being established?

A.   Well, you have market efficiencies and different investors are situated similarly that bought at the same price that had the same information that was information in the price.  If

Page 143

Stulz

information about the allegations is not necessarily in the price, then you cannot establish that investors relied, you cannot establish reliance, and you will have to look, I mean inquire from investors individually.

Q.   So if the class were certified in this case, you believe that damages could be calculated classwide?

MS. JACOBSEN:  Objection as to form.

A.   What I would say is that my report at this time doesn't raise issues about a classwide computation of damages if the market is efficient.

Q.   Is it your understanding that plaintiffs are required to present a detailed damages model at this stage of the litigation?

A.   I don't know what you mean by a detailed model.  My understanding is that plaintiffs have to show that there is an approach that allows them to compute damages that is consistent with their liability model.

Q.   I think we covered this earlier, but you did not conduct a loss causation analysis here, correct, to discern whether price declines on the corrective disclosure dates reflect responses to

Page 144

Stulz

other information that came to market on those dates?

MS. JACOBSEN:  Objection.  Asked and answered.

A.   I did not conduct a loss causation analysis, but I did conduct a price impact analysis.

Q.   In your opinion, is the question of what caused the price declines on the corrective disclosure dates common to all class members?

A.   If a class is certified, then my report would not suggest otherwise.

Q.   Would you agree that price inflation can be measured by analyzing the change in a security's price caused by a corrective disclosure and/or a materialization of a concealed risk?

A.   If one were to establish that the market for the securities is efficient, then an approach to measure damages could under some circumstances be to look at the price drop, but lots of caveats with that, because a price drop may reflect a lot of other things besides what is related to the allegations, but if the market, I should add, if the market is efficient and if my understanding of

Pages 141 to 144

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 145

Stulz

the plaintiffs' liability theory is correct, then I have already addressed the issue of price impact, and I have shown that there is no price impact up front and that therefore the drop at the end of the class or on May 6 cannot be evidence of price impact.

Q. In your opinion, is it possible to have an estimate of price inflation that is based upon the decline in the stock price in response to a corrective disclosure that also parses out confounding information?

MS. JACOBSEN: Objection to form.

Q. Confounding effects.

A. I don't think I understand the question.

Q. In your opinion, is it possible to have an estimate of price inflation that is based upon the decline in a stock price in response to a corrective disclosure that also parses out confounding effects?

MS. JACOBSEN: Objection as to form.

A. The way the sentence is structured, I don't understand what the "that" refers to.

Q. "That" refers to the estimate of price inflation. Is it your opinion that an estimate --

Page 146

Stulz

okay, let me start again then. Is it possible to have an estimate of price inflation based on the decline in a stock price in response to a corrective disclosure that also parses out confounding effects?

MS. JACOBSEN: Objection to form.

A. I'm sorry, the sentence doesn't make sense as stated to me. I don't know what parses out. I mean I'm comfortable saying that there are circumstances where the part of the drop in the stock price that is attributed to correction of alleged misstatements can serve as a basis for damages.

Q. In your opinion, is it possible to have an estimate of price inflation based upon the decline in the stock price in response to a corrective disclosure that also accounts for changes in the class period over time?

MS. JACOBSEN: Objection as to form.

A. Can you repeat the question.

Q. Sure. In your opinion, is it possible to have an estimate of price inflation based upon the decline in the stock price in response to a corrective disclosure that also accounts for

Page 147

Stulz

changes in the class period over time?

MS. JACOBSEN: Objection as to form.

A. I must say I have a huge amount of trouble in figuring out what the "that" in those various sentences refers to. It is extremely confusing to me.

Q. Is it possible to estimate price inflation based upon a stock price decline that follows a corrective disclosure where that estimate also takes into account changes in the class period over time?

MS. JACOBSEN: Objection as to form.

A. It is possible to compute inflation under some circumstances based on the drop and an alleged curative disclosure after having taken into account potentially, I mean confounding factors, and that drop at that time is going to take into account information available at that point in time.

So for that drop to provide an inflation band throughout the class period, it would have to be that information doesn't change in such a way that inflation itself changes during the class period.

Page 148

Stulz

THE VIDEOGRAPHER: Going off the record at 2:07 p.m.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record at 2:24 p.m.

BY MS. WEINRIB:

Q. Professor Stulz, are you familiar with the concept of materialization of the risk in the context of securities litigation?

A. Yes.

Q. What is your understanding of that concept?

A. So I'm most familiar with it in the context of the computation of inflation, and in that case, if we are thinking of risks that materializes, the amount of inflation is not measured by the drop in the stock price because the realization of the risk means that it occurred with probability 1, whereas before you are not sure whether it will occur or not, and therefore inflation would need to be adjusted to reflect the fact that it wasn't certain that it would be materializing in the future.

So that's one context in which

Pages 145 to 148

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

materialization of the risk is used. I understand that it can also be used by attorneys in pleading for loss causation. One way to show loss causation is to look at the materialization of the risk under some circumstances.

Q. Would you agree with the statement that if a defendant's misconduct raises a risk of regulatory scrutiny that later materializes, that the materialized risk is related to the prior misconduct?

MS. JACOBSEN: Objection as to form. Are you asking for his legal or financial opinion here?

MS. WEINRIB: At no point today either prior to this question or after this question am I asking for a legal opinion from Professor Stulz, just to be clear. I'm asking for his understanding and his opinions.

MS. JACOBSEN: Objection as to form.

Q. Would you like me to repeat the question?

A. Yes, please.

Q. Would you agree that when a defendant's

Stulz

misconduct raises a risk of regulatory scrutiny that later materializes, that the materialized risk, meaning the regulatory scrutiny, is related to the prior misconduct?

MS. JACOBSEN: Objection as to form.

A. I do think that you have in mind an acquisition chain that requires legal training to assess. You are making assumptions that seem to be critical here, so I'm not sure I can answer the question. Maybe you can restate it in a way that makes it clear for me.

Q. Sure. I'm not asking for a legal conclusion or a legal interpretation, I'm asking you simply whether it is logical to state that if a company's misconduct leads to a regulatory investigation, that means the regulatory investigation is related to that misconduct.

MS. JACOBSEN: Objection as to form. It does call for some sort of legal conclusion.

MS. WEINRIB: No, it doesn't. I'm asking if there is logic behind the statement. Not a legal basis for it.

MS. JACOBSEN: Objection as to form. You can answer if you have an opinion.

Stulz

A. I don't think I understand the question well enough to have an opinion. Your question seems to assume that it has been established that there was misconduct and that the regulatory agency assumes that there was misconduct.

Q. So let's take the word "misconduct" out of the hypothetical then. Is it reasonable to assume that certain activities that led to a regulatory investigation -- let me rephrase. Is it reasonable to assume that when certain activities by a company cause a regulatory agency to investigate, that its investigation is therefore related to those activities?

MS. JACOBSEN: Objection as to form. Same objection as before with respect to it seems to be calling for a legal opinion.

Q. Let me restate it again. Is it reasonable to state that the subject of an investigation is relevant to the investigation?

MS. JACOBSEN: Objection as to form.

A. I'm not sure what you mean by the subject.

Q. The matter that is being investigated. Would you agree that the matter being investigated

Stulz

is related to the investigation?

MS. JACOBSEN: Objection as to form.

A. It seems to be a tautology, so I'm not sure what the question is.

Q. Let me see if I can rephrase it again. If a company engages in certain activities and the SEC determines that it is going to investigate the company based on those activities, is the investigation therefore logically related to those activities?

MS. JACOBSEN: Same objections as before. Asked and answered. Seems to call for a legal opinion.

You can answer if you have an opinion.

A. I'm not quite sure how it relates to what we have here. The SEC can have lots of different reasons to investigate firms. It might decide to investigate SPACs that have a big drop in the stock price just as a matter of course. I don't know.

Q. If the SEC is investigating a SPAC because of the drop in a stock price, would you agree that the investigation is related to the drop in the stock price?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

MS. JACOBSEN: Objection as to form.

A. If the SEC had a rule that is going to investigate large drops in the stock price, then it would be related, but remember that in this case the SEC ended up finding nothing to complain about.

Q. That is a mischaracterization of facts in the record and not a response to my question, but we will move on from there. Is it your opinion -- I will rephrase again. Regarding the SEC investigation in this case, is it your opinion that the disclosure of the subject of the investigation and the related uncertainty surrounding the investigation were two separate confounding events?

MS. JACOBSEN: Objection as to form.

You can answer if you formed that opinion.

A. I said in my reports that an investigation by the SEC can lead to a drop in the stock price in part because of the uncertainty it creates about the company.

Q. Alright, so that is not an answer to my question though. My question is whether regarding the SEC investigation in this case, is it your

Stulz

opinion that the uncertainty surrounding -- the uncertainty created by the announcement of the investigation and the subject of the investigation are separate confounding events?

MS. JACOBSEN: Objection as to form. Asked and answered. You're asking about his opinion. He answered what his opinion was.

MS. WEINRIB: He didn't answer the question, which is why I restated it.

MS. JACOBSEN: But you're asking about his opinion, and he told you what his opinion was.

MS. WEINRIB: Not on the question I asked though. He can answer the question unless you're instructing.

MS. JACOBSEN: You can answer if that's part of your opinion.

Q. Okay. So let me restate the question then. Do you have an opinion regarding whether the disclosure of the subject of the SEC investigation in this case and the related uncertainty surrounding the investigation were two separate confounding events?

MS. JACOBSEN: Same objections.

Stulz

A. If it were possible to decompose the two effects that you're talking about, Dr. Cain hasn't shown how he would do that or how he would think about that.

Q. That's not my question. My question is do you, Professor Stulz, have an opinion on whether the subject matter of the investigation and the uncertainty surrounding the investigation are two separate confounding events? I'm not asking you about what Dr. Cain did, I'm asking for your opinion if you have one.

MS. JACOBSEN: Objection as to form. Asked and answered.

You can answer if you have an opinion.

A. I mean you are saying that there are confounding events, and then the question is exactly, I mean can they be distinguished analytically. So my answer I thought was on point, which is it is not my role to distinguish them analytically. It is Dr. Cain who has to show that they can be distinguished.

Q. So you have not reached an opinion one way or the other as to whether they are confounding events?

Stulz

MS. JACOBSEN: Objection as to form. Asked and answered.

Q. Is that correct?

A. I really am confused in this context with you mentioning them as confounding events.

Q. Well, I'm asking whether you have an opinion as to whether they are confounding events. I'm asking whether you have an opinion, whether you have formed an opinion as to whether the subject matter of the investigation and the uncertainty surrounding the investigation are two separate confounding events.

MS. JACOBSEN: Objection as to form.

A. We go back to what I say in my report, which is that the uncertainty created by the investigation can lead to a drop in the stock price. So that by itself can be a cause of the drop in the stock price that is unrelated to the underlying allegations.

Q. So to rephrase and to make sure that I understand, you are saying that they are confounding events?

MS. JACOBSEN: Objection. Asked and answered. Mischaracterizes testimony.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Page 157

Stulz

Q.   I can restate it again if it would help.

A.   Okay.

Q.   So I understand that you state in your report that the uncertainty surrounding the investigation caused at least a portion of the stock price drop.  Is that correct?

A.   That's correct.

Q.   Okay.  So what I'm asking, now that we understand that you've stated this in your report, what I am next asking as a follow-up question is whether you have an opinion as to whether that uncertainty and the subject matter of the investigation are confounding events?

MS. JACOBSEN:  Objection. Asked and answered.

A.   What I don't understand in the question and doesn't make sense in the question for me is the notion of confounding events with respect to all of this.  Confounding of what?

Q.   What is your understanding of what it means, what the term "confounding event" means?

A.   A confounding event would be a situation where you are looking at new information that you claim caused a drop in the stock price and there is

Page 158

Stulz

some other information on that day that also contributes to the drop in the stock price.

In that case you would have to use tools available, if they are available, to separate out the confounding information.

Q.   Okay.  So based on your description of what confounding events are, do you have an opinion as to whether the subject matter of the investigation and the uncertainty surrounding the investigation are two separate confounding events?

MS. JACOBSEN:  Same objections.

A.   I believe that the increase in uncertainty resulting from the SEC announcement, the announcement of the SEC investigation, explains part of the drop in the stock price.

I also believe that other new information on that day that is unrelated to the allegation explains part of the drop in the stock price.

Q.   Okay.  I still don't think that answered my question.  It is really a yes or no question whether the uncertainty and the subject matter are separate events or related to one another.

MS. JACOBSEN:  Objection. Asked and

Page 159

Stulz

answered.  Objection as to form.

A.   The uncertainty in and of itself can explain part of the drop in the stock price.  Now the mere fact that you are being investigated can have an adverse effect on the stock price irrespective of the reason.

Then the reason itself might have an impact on the stock price depending on the circumstances.

Q.   Did you conduct any analysis to ascertain whether the subject matter of the investigation here had any part in the stock price drop?

A.   I was not asked to do so, and I did not do so.  With my price impact opinion, then the allegations, the alleged misrepresentations do not explain the price drop on November 11.

Q.   And what is your basis for that opinion?

MS. JACOBSEN:  Objection as to form.

A.   The basis for the opinion is that the alleged misrepresentation with my price impact opinion did not have a price impact initially, and therefore they did not create inflation at the time that they were made.

Page 160

Stulz

Q.   So your opinion is not based on -- you're not basing your opinion on the assumption that the subject matter of the investigation was unrelated to the misrepresentations.  Is that correct?

MS. JACOBSEN:  Objection as to form.

A.   My statement is more limited, which is that if my opinion about price impact holds, then any drop associated with the SEC announcement would not have a price impact because of the alleged misrepresentations.

Q.   Okay, and that brings us back to your opinion being entirely contingent on the fact that you believe this was not an inflation maintenance case.  Is that correct?

MS. JACOBSEN:  Objection as to form.

A.   I mean saying I believe may not be quite right.  I discuss the economics of the SPACs which are quite different from the economics of a common stock of an operational company.  There is a redemption right, so there is a money-back guarantee that makes it hard for me to understand how we can have price maintenance on the first day that an acquisition plan is announced.  Given

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 161

Stulz

that's a day before, nobody knew that the acquisition was going to be of PureCycle. I mean the market didn't know.

So there is no inflation the day before, but there is inflation maintained on the day of, even though the price cannot go below $10. So I don't know how you square that circle as a matter of economics.

Q. Okay. So your opinion is limited to -- your opinion is based on whether or not on November 16, 2020 specifically inflation was maintained or entered into the stock price on that day, is that correct?

MS. JACOBSEN: Objection as to form. Mischaracterizes testimony.

A. The question to me is how inflation entered the stock price, yes.

Q. Are you familiar with the Supreme Court's 2013 decision in Comcast versus Behrend?

A. I have read it, but I'm not an attorney.

Q. What is your understanding of the holding in that case, and I understand that you are not an attorney and I'm not asking for your legal opinion. I am asking for your opinion as to -- I

Page 162

Stulz

am asking for your understanding, if any, as to the holding in that case?

MS. JACOBSEN: Objection as to form.
To the extent you have an understanding.

A. My recollection which obviously has a big caveat which I haven't looked at the decision for a very long time, is that plaintiffs had multiple theories of liability, if I remember it correctly, and the damages model wasn't able to distinguish between those theories.

Q. Do you recall whether the court concluded in that case that damages could be calculated classwide?

MS. JACOBSEN: Objection as to form.
Objection to the extent you're calling for a legal opinion.

A. I don't think I recollect more than what I just said.

Q. Did you provide an expert report in 2022 for defendants in a case called Junge versus Geron Corp.?

A. I did.

Q. Is that case listed on your Appendix B?

A. I hope so. If it is not, it is an

Page 163

Stulz

unfortunate mistake. It has a different name in my case. It is Tollen versus Geron. I'm not sure why the names differ, but I've done only one case involving Geron. I don't know how you pronounce it.

Q. What was the subject matter of your expert report in that case? When I say subject matter, I mean was it market efficiency, damages, loss causation?

A. My report was a class cert. It had no discussion of market efficiency that I remember. I don't believe it had a price impact opinion. I believe that it had only a Comcast discussion, but I may be wrong.

Q. Have you done any further work on this matter after submitting your report in January?

A. No.

Q. Have any of the opinions in your report changed or been modified in any way since your report was filed in January?

A. No.

MS. WEINRIB: I have nothing further.

MS. JACOBSEN: Can we take ten minutes?

MS. WEINRIB: Sure.

Page 164

Stulz

THE VIDEOGRAPHER: We are going off the record at 2:48 p.m.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record at 3:07 p.m.

MS. JACOBSEN: Thank you.

EXAMINATION BY MS. JACOBSEN:

Q. Professor Stulz, I just have a few questions. In analyzing whether Dr. Cain established that the market was efficient throughout the class period, did your analysis include the Cammer, Krogman and other factors mentioned in Cain's report?

MS. WEINRIB: Objection to the form of the question.

Q. You can answer.

A. I looked at all of those factors, and I concluded that he has not established market efficiency within the context of those factors.

Q. Did you analyze Cain's model under Cammer 5?

MS. WEINRIB: Objection to the form of the question.

A. Yes, I did, and I concluded that the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Stulz

model was not appropriate to evaluate the abnormal returns for ROCH. The problem with the model is that he is looking at the period before the announcement of the planned acquisition, and so prior to that announcement ROCH is essentially a money market mutual fund, and therefore that period cannot be used to estimate the sensitivity of ROCH to the market and to the industry of the planned acquisition because the market doesn't know what industry the planned acquisition is going to go in. So it is a completely inappropriate model.

Q. If plaintiffs are able to establish the factual predicate to assert an inflation maintenance theory, does that impact your opinion on whether Dr. Cain has offered a damage methodology that is consistent with plaintiffs' theory of liability?

MS. WEINRIB: Objection to the form of the question.

A. I mean I don't know what forms that price maintenance theory would have. My understanding is to maintain inflation, you have to have inflation. I don't know how inflation could have entered the price before November 16 when the

Stulz

market didn't know what the acquisition was going to be about, but none of that would affect my analysis in the Comcast section of my report. The analysis of Dr. Cain is at such a level of generality, that issues of inflation maintenance don't seem to be addressed in his report.

Q. Lastly, if plaintiffs were able to establish the factual predicate for an inflation maintenance theory, how would that impact your conclusion with respect to whether the alleged misrepresentations had a price impact on the stock?

MS. WEINRIB: Objection to the form of the question.

A. If they have such a theory, I would have to look at it. As I just said, I don't know where the inflation would have come from, and because of the nature of the SPAC and the nature of the announcement on November 16 that starts a class period, it's extremely difficult to see how inflation could have been there before, but if they were to have such a theory, I would need to look at it. I don't know what the implications would be. I don't know what I would conclude.

MS. JACOBSEN: Nothing further at this

Stulz

time.

MS. WEINRIB: Nothing further.

MR. PRIEBE: No questions from Mr. Roth.

THE VIDEOGRAPHER: This marks the end of the deposition. We are going off the record at 3:11 p.m.

(Time noted: 3:11 p.m.)

_____

Subscribed and sworn to before me this____day of_____, 2024.

_____

C E R T I F I C A T I O N

I, JOSEPH R. DANYO, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2024.

_____

JOSEPH R. DANYO
STATE OF NEW YORK
My Commission Expires 2/20/2027

Page 169

I N D E X

Witness                                    Page
PROFESSOR RENÉ M. STULZ                       4


E X H I B I T S

Plaintiffs'                                Page
    Exhibit 1  Expert Report              18
              of René Stulz dated January 23,
              2024
    Exhibit 2  Corrected Expert Report of René   24
              Stulz dated February 5, 2024

    Exhibit 3  Expert Report of Matthew D.    40
              Cain dated November 30, 2023

~oOo~

Page 170

ERRATA SHEET

I wish to make the following changes, for the

following reasons:

Page    Line

____    ____  CHANGE _____

        REASON _____

____    ____  CHANGE _____

        REASON _____

____    ____  CHANGE _____

        REASON _____

____    ____  CHANGE _____

        REASON _____

____    ____  CHANGE _____

        REASON _____

____    ____  CHANGE _____

        REASON _____

____    ____  CHANGE _____

        REASON _____

____    ____  CHANGE _____

        REASON _____

_____

PROFESSOR RENÉ M. STULZ

Sworn to before me

this ____ day of _____, 2024.

_____

Notary Public

Pages 169 to 170

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

| A | | | | |
|---|---|---|---|---|
| **a.m** 1:13 3:3 | 34:23 | **addressing** | **ahead** 105:12 | **allows** |
| 41:9,12 | 51:12 | 47:11 | 128:11 | 143:19 |
| 72:13,16 | 84:17 | **adjusted** | **aim** 5:17 | **Alright** |
| **ability** 6:7 | 85:12,16 | 148:22 | **al** 3:7,8 | 153:23 |
| 135:23 | 89:5,10,20 | **administ...** | **alerted** | **alternative** |
| **able** 6:3 | 94:19 95:2 | 13:20 | 135:16 | 80:2 |
| 119:2 | 110:19,22 | **Adrienne** | 137:4 | **Alto** 2:19 |
| 142:15 | 111:2 | 2:24 3:9 | 138:4 | **amended** |
| 162:10 | **accurately** | **advanced** | 139:2 | 113:6 |
| 165:13 | 103:20 | 9:15 10:5 | **allegation** | **Americas** |
| 166:8 | **acquisition** | 20:23 23:4 | 158:19 | 2:14 |
| **abnormal** | 52:9,18,19 | 23:13,25 | **allegations** | **amount** 78:14 |
| 80:14,17 | 52:21,22 | **adverse** | 113:24 | 147:4 |
| 94:12 95:9 | 104:4 | 159:6 | 121:14 | 148:17 |
| 96:5 | 150:8 | **affect** 62:16 | 123:23 | **analyses** |
| 101:10 | 160:25 | 101:15,17 | 143:2 | 16:20 |
| 108:12 | 161:3 | 102:3 | 144:24 | 62:22 |
| 115:25 | 165:5,10 | 104:2 | 156:20 | **analysis** |
| 116:4,5 | 165:11 | 128:15 | 159:17 | 15:22 |
| 140:6,15 | 166:2 | 166:3 | **alleged** | 16:11 |
| 165:2 | **Act** 42:11 | **affirmative** | 103:17,25 | 45:21 |
| **absence** | 43:6,11 | 52:5 84:22 | 105:17 | 47:16 |
| 142:14 | **action** 3:6 | 94:16,22 | 108:24 | 51:20,24 |
| **absent** | 35:17,22 | **Afternoon** | 109:14,17 | 57:24 |
| 141:11 | 71:23 | 103:2 | 109:22 | 70:19 75:9 |
| **absolutely** | **activities** | **against-** 1:7 | 110:8,16 | 75:25 76:6 |
| 49:14 | 151:9,11 | **agency** 151:5 | 110:22 | 78:25 |
| 126:12 | 151:14 | 151:12 | 111:2,5,7 | 79:13 |
| **accent** 6:11 | 152:7,9,11 | **ago** 35:15 | 111:15,18 | 80:19 81:3 |
| **accept** 58:16 | **add** 21:17 | 42:20 | 111:22 | 87:15,15 |
| 59:6 | 144:24 | **agree** 48:5 | 112:9,11 | 87:20 |
| **acceptable** | **additional** | 65:18 | 112:17,20 | 88:24 89:2 |
| 78:25 | 6:25 64:19 | 70:11,15 | 112:22 | 90:19,20 |
| 79:12,16 | 64:21 | 76:13,16 | 115:10,13 | 90:25 91:6 |
| 79:17,19 | 97:14,16 | 91:10 | 115:19 | 91:11,17 |
| **accepted** | 139:25 | 93:23 94:4 | 116:8,17 | 91:21,22 |
| 58:2 | **address** 6:9 | 95:11 96:3 | 119:21 | 91:23 92:2 |
| **access** | 6:12 11:11 | 96:7,14,19 | 120:7,9 | 93:8 98:21 |
| 132:12 | 17:16,24 | 97:2,4,5 | 121:10,18 | 98:23 |
| **account** | 46:12,19 | 109:17 | 121:22 | 104:10,19 |
| 141:19,25 | 48:11 | 110:9 | 122:4 | 106:18,21 |
| 147:11,17 | 50:20 | 144:14 | 123:17,24 | 116:20 |
| 147:19 | 122:14,16 | 149:7,25 | 141:12 | 118:9 |
| **accounts** | 124:3 | 151:25 | 146:13 | 140:12 |
| 146:18,25 | **addressed** | 152:24 | 147:16 | 143:23 |
| **accurate** | 145:3 | **agreeing** | 159:17,22 | 144:7,8 |
| 25:19 | 166:7 | 133:4 | 160:11 | 159:11 |
| 31:23 | **addresses** | **agreement** | 166:11 | 164:12 |
| | 122:16 | 15:4,7,9 | **Allergan** | 166:4,5 |
| | 124:16 | 15:16 | 56:17 | **analyst** |

| | | | | |
|---|---|---|---|---|
| 118:21,25 | 112:15 | **anybody** | 133:14 | 122:12 |
| 119:4,7,8 | 115:18 | 28:21 | **aside** 12:9 | 130:3 |
| 119:11,18 | 123:20,22 | 40:18 | 25:21 | 131:15 |
| **analysts** | 126:6 | **anyway** 4:20 | 40:16 | 136:12,14 |
| 65:2 119:5 | 129:19 | **appears** | 128:18 | 137:16 |
| **analytic...** | 134:18 | 33:21 | 136:5 | 138:7 |
| 155:19,21 | 135:21 | **appendix** | 137:2,19 | 139:6,9 |
| **analyze** | 136:23 | 6:15 37:5 | 141:4 | 140:6 |
| 100:4 | 150:10,25 | 52:24 53:3 | **asked** 17:2,8 | 144:4 |
| 164:21 | 152:15 | 53:8 58:20 | 17:11,21 | 152:13 |
| **analyzed** | 153:17,23 | 162:24 | 17:24 18:4 | 154:7,15 |
| 49:20 | 154:9,15 | **applies** 73:5 | 18:6,8,9 | 155:14 |
| **analyzing** | 154:17 | **approach** | 21:22 | 156:3,24 |
| 51:11 | 155:15,19 | 54:19 56:4 | 29:11,20 | 157:15 |
| 98:16 | 164:17 | 57:6,18 | 31:8,15 | 158:25 |
| 144:15 | **answered** | 141:9,13 | 32:12,19 | 159:15 |
| 164:10 | 21:23 | 142:2,5 | 34:5,11 | **asking** 5:5 |
| **and-** 2:12 | 29:12 31:9 | 143:19 | 46:16,18 | 22:13 |
| **and/or** | 31:16 | 144:19 | 46:24 | 28:24,25 |
| 144:16 | 32:12,20 | **appropriate** | 48:10 | 30:17 32:8 |
| **announced** | 32:22 33:4 | 47:3,5,21 | 51:24 52:4 | 33:9,10,22 |
| 61:2 | 34:12 | 48:4 59:22 | 53:19,21 | 48:5,6 |
| 160:25 | 38:17,18 | 141:14 | 54:10 | 49:11,12 |
| **announce...** | 46:24 62:8 | 165:2 | 57:23 | 49:20,25 |
| 140:8 | 72:24 | **approxim...** | 58:13 62:8 | 50:5 55:12 |
| 154:3 | 73:23 75:4 | 42:21 | 62:24 | 55:13 |
| 158:14,15 | 78:10,18 | 43:18 44:4 | 63:25 | 68:19 |
| 160:10 | 78:22 | 44:13 | 71:22 | 78:10,12 |
| 165:5,6 | 79:21 | **arbitrag...** | 72:23 | 81:5 82:5 |
| 166:19 | 81:10,19 | 131:25 | 73:23 76:5 | 83:6 84:4 |
| **answer** 5:2 | 82:10 | **argument** | 76:12 | 84:5,6 |
| 5:13 30:20 | 83:22 | 60:4 | 77:23 | 89:9 99:23 |
| 31:25 | 84:11,19 | **arising** | 78:17,21 | 99:25 |
| 33:15,20 | 88:8 90:22 | 42:10 43:5 | 79:20 81:2 | 100:18,20 |
| 48:25 | 93:4,15 | 43:11 | 81:3,9,18 | 105:20 |
| 49:15 59:2 | 116:11 | 44:15 | 81:24,25 | 110:7 |
| 59:15 | 122:12 | **arrival** | 82:2,10,11 | 119:25 |
| 61:18,21 | 125:22 | 93:25 94:7 | 83:21,23 | 122:2 |
| 73:11,17 | 130:3 | 94:13 | 84:11,19 | 125:5,7,18 |
| 73:24 74:9 | 136:12 | **arrive** | 84:23 | 125:19 |
| 83:10 | 138:8 | 100:13 | 87:24 88:7 | 126:8 |
| 84:15 88:5 | 139:6 | **arrives** | 90:22 92:5 | 127:21,22 |
| 88:10,11 | 144:5 | 100:6 | 92:6 93:3 | 127:24 |
| 88:16 | 152:13 | **ascertain** | 93:13,14 | 131:14 |
| 89:17 90:4 | 154:7,8 | 75:9,25 | 93:17,19 | 135:10,15 |
| 90:14 | 155:14 | 80:20 | 96:21 | 137:8,21 |
| 97:15 | 156:3,25 | 81:22 82:2 | 111:19 | 137:23 |
| 99:14 | 157:16 | 89:3 99:12 | 113:19 | 149:13,17 |
| 107:15 | 158:21 | 159:12 | 114:16 | 149:19 |
| 110:11 | 159:2 | **ascertained** | 116:11 | 150:13,14 |

154:7,11
155:10,11
156:7,9
157:9,11
161:24,25
162:2
**aspects**
53:18
130:6
138:21
**assert**
165:14
**assess** 15:22
57:6 62:5
62:11,20
62:25 63:6
64:15
76:14
77:24
79:10
81:25
82:21
83:23 92:7
98:10
130:17,23
133:3
150:9
**assessed**
85:5
**assesses**
84:20
**assessing**
46:9 56:4
64:6 71:25
75:8 76:25
83:13 92:8
130:24
132:13
134:21
**assessment**
67:8 84:5
135:7
**assignment**
76:11
**assist** 26:13
28:18
29:16
**assistant**
26:16,16
**assisted**

25:17,22
29:3,9
**associated**
10:19
59:11
160:10
**assume** 5:9
15:15
47:23
118:16
126:17
151:4,9,11
**assumes**
16:14,23
113:11
127:15
128:5
129:8
131:12
134:16
135:19
151:6
**assuming**
24:18
**assumption**
108:7
115:15
118:17
160:3
**assumptions**
108:6
140:23,24
150:9
**assure** 24:20
**attention**
23:3,7,10
23:24
52:23
103:12
111:20
124:7
130:25
**attorney**
38:23 39:3
40:4 60:18
71:9,20,21
121:4
161:21,24
**attorney...**
29:24

**attorneys**
2:3,7,17
14:17,18
29:21
36:25
37:13,14
37:20,22
40:7 47:8
47:23 48:3
50:17
77:21
118:17
149:3
**attributed**
140:7
146:12
**authored**
42:9 43:4
43:9,22
48:7,9,13
48:14 50:6
**authoring**
42:16
**auto-gen...**
21:8,12
**availabi...**
137:12
**available**
20:2 22:25
48:14 49:7
49:13,18
99:18
122:21
130:11
131:21
133:6,12
133:14,20
134:14,23
136:7
137:3,11
137:18
138:3,11
147:19
158:5,5
**Avenue** 1:19
2:4,14
3:14
**aware** 18:12
19:8,11,13
23:9,22

24:7 26:12
29:2,8,13
29:16
30:21 31:2
31:6,12,21
32:7,9,16
32:22
33:12,16
33:18 34:8
34:18,25
37:24 40:6
40:11 52:7
55:24 56:2
56:3 64:10
66:8 76:18
76:24 77:9
77:14
78:12,20
79:3,4,7
123:5,10
131:24
**awareness**
118:11
**AXELSON** 2:23

---

**B**

**B** 52:24 53:8
58:20
162:24
169:6
**back** 11:8
12:6 28:10
41:11 45:2
46:3 52:22
54:8 63:8
72:15 78:9
88:13
93:16
103:4
109:25
110:3
121:25
129:21
136:4
148:5
156:15
160:13
164:5
**background**
6:17

130:18
**band** 147:22
**banking** 8:19
9:8 10:8
**banks** 36:3,3
36:5
**base** 78:25
**based** 16:9
16:16,18
21:16 32:4
53:2 60:24
77:8 79:8
79:9 88:22
90:17
112:14
115:14,18
117:15,17
117:23
126:12
134:23
145:9,17
146:3,16
146:23
147:9,15
152:9
158:7
160:2
161:11
**baseline**
21:5 79:24
**Basic** 60:23
**basing** 160:3
**basis** 49:2
49:14
134:8
146:13
150:23
159:19,21
**bears** 138:23
**began** 8:5
**behalf** 1:4
3:20,22,25
4:3 14:14
45:11 46:7
47:11
**Behrend**
161:20
**belief** 16:25
**believe** 8:2
15:6 20:23

26:2,9
37:7 42:3
57:5,9
63:25 75:4
131:8
134:11
135:12
137:6
139:4
143:8
158:13,17
160:15,18
163:13,14
**believes**
59:21
**best** 20:15
33:5,6,8
**better** 67:7
135:4
**beyond** 31:18
56:20
98:14
129:10
131:14
136:13,14
**Bickford**
26:10
**bid/ask**
65:16
**big** 127:3,5
152:19
162:7
**bit** 13:18
**blood** 168:11
**boilerplate**
128:18
**bore** 6:18
**bought**
142:24
**bound** 142:8
**break** 5:17
5:18,20
9:7 41:5
72:11
90:13,15
**Brenner** 1:9
2:8 3:23
4:5 39:17
**brief** 41:5
**brings** 136:4

160:13
**Bryant** 2:13
**burden** 59:10
59:12,14
**business**
135:4
138:11
**but-for**
117:13
**Byron** 1:9
2:17 3:25

_____

**C**
_____

**C** 1:4 2:1
37:5 168:2
168:2
**Cain** 15:23
16:3 18:9
40:24 42:4
64:20
75:19
77:25
79:10 80:5
81:4,11
83:13,24
84:5,12,21
85:23 86:8
86:24
88:17 92:7
92:20
93:20
141:5
155:3,11
155:21
164:10
165:16
166:5
169:12
**Cain's** 16:11
16:20 17:3
41:16,17
41:20 75:7
81:25
84:25
90:20 93:6
164:14,21
**calculated**
140:18
142:10
143:8

162:14
**calculating**
57:18
141:4
**California**
2:19
**call** 23:21
150:20
152:13
**called** 4:11
60:22
162:21
**calling**
151:17
162:16
**CAMERON** 2:15
**Cammer** 64:18
64:22
65:11,18
66:15,17
67:6,10,15
67:21,24
68:3,14,20
69:3,7,8
70:6,7,10
70:18,21
71:2,12
72:3,20
73:19 74:4
74:17
76:14,17
79:13
83:14,15
164:13,22
**Cao** 26:9
**capitali...**
65:15
**case** 1:7
14:17,19
17:14
19:10
25:11
38:13,16
38:23,24
39:4,20
40:4 42:10
43:10,20
44:15,20
45:12 49:5
51:9,24

52:7 53:18
53:25
54:11
55:19,20
56:24
57:22
58:13
60:22 62:6
62:12 64:6
69:19
71:11 75:7
76:24
77:18
78:20 79:5
108:11,22
109:2
110:20
116:9
117:6
118:3,13
126:14
142:10,12
143:8
148:16
153:5,11
153:25
154:22
158:4
160:16
161:23
162:3,13
162:21,24
163:3,4,8
**cases** 13:19
14:2 27:16
27:17
28:11,12
35:11 43:5
46:6,15,20
48:11
50:15 53:7
53:14 54:9
55:3,4,5,9
55:14,15
55:17 56:7
56:10,11
56:12,14
56:16,18
56:19
57:16 58:9

58:20,21
58:23 59:3
59:13,20
78:12 79:4
92:21 93:8
93:11
99:15
108:24
125:13,14
125:22,23
141:14
**category**
43:20
58:21
**Causa** 7:11
**causation**
17:22 18:2
18:5 44:19
53:20
56:21 57:3
57:7
143:23
144:6
149:4,4
163:10
**cause** 65:6
74:5,13
115:20
116:17
151:12
156:18
**caused** 20:8
20:16
110:17
112:10
114:12
115:12
144:10,16
157:6,25
**causes** 140:3
140:7
**caveat** 35:25
162:7
**caveats**
144:21
**Center** 8:21
10:11
**cert** 43:13
43:21
51:15 57:2

59:5
163:11
**certain**
65:24
66:16 77:3
148:23
151:9,11
152:7
**certainly**
46:25 47:2
122:25
125:12
130:22
**certific...**
58:12,15
71:11
**certified**
60:6 143:7
144:12
**certify**
168:6,10
**chain** 150:8
**chair** 8:19
9:8 10:8
**challenging**
75:7 85:23
129:12
**change** 16:17
20:5 28:12
32:5 66:16
69:4 77:12
95:18
101:3,4
106:11
144:15
147:23
170:5,7,9
170:11,13
170:15,17
170:19
**changed** 9:12
10:6 61:22
100:23,25
101:2
107:23
163:20
**changes** 29:6
93:10
146:19
147:2,11

147:24
170:2
**characte...**
119:24
**check** 140:13
**checks** 67:3
**Chemmel** 2:24
3:9
**Chicago** 2:10
**choose** 68:13
68:14
**circle** 161:8
**Circuit**
77:14
78:13,20
**circumst...**
144:20
146:11
147:15
149:6
159:10
**citation**
128:24
130:7
**citations**
130:5
**cite** 26:23
128:23
129:3
**claim** 130:23
157:25
**claimed**
131:20
138:6
**clarify** 5:6
28:6 33:24
38:11 39:6
48:22 50:2
73:24
75:16 83:4
86:22
122:10
137:25
**clarifying**
68:2
**class** 17:13
21:6 23:5
23:16 24:2
35:17,22
43:12,21

51:15 54:5
57:2 58:12
58:15 59:5
60:6 69:20
71:11,23
75:11,21
75:23 76:3
76:9 79:25
80:21,24
81:8,13,17
82:4,8,16
82:25 83:8
84:2 85:6
85:22 86:6
86:10 87:2
87:17
88:19 89:4
90:10
91:16
92:14 93:2
93:19,21
127:10
131:6
138:13
143:7
144:11,12
145:6
146:19
147:2,11
147:22,24
163:11
164:12
166:19
**classwide**
140:18
142:10,15
142:18
143:9,12
162:14
**clean** 20:7
**clear** 4:21
21:5 24:25
31:20 33:7
33:7,23
45:17 48:6
48:23
49:24 51:6
73:17 75:6
75:6,16
86:21

96:19
104:17
121:16
123:14
125:18
126:7
136:18
149:18
150:12
**closely** 70:8
**collabor...**
28:15
**collecti...**
117:25
**college** 7:9
**Columbus**
6:13
**Comcast**
43:13,22
44:2 59:11
59:14
161:20
163:14
166:4
**come** 23:3,24
46:16 76:7
88:24
117:3
118:22
124:23
125:4
166:17
**comes** 21:24
79:14
98:19
108:19
116:19
**comfortable**
146:10
**coming**
114:19
**commentary**
118:21
**commercial**
127:13
128:2
129:5
131:10
134:13
135:14

**Commission**
168:20
**common** 82:19
83:11
144:11
160:20
**commonly**
60:16
65:10
**communic...**
33:19 48:2
**communic...**
30:15
31:21 32:7
32:9,14,17
32:23,24
33:10,11
33:16
34:18
49:11
**companies**
21:7,13,15
22:9,23
23:14 61:3
120:22
**company**
19:18
20:22,22
20:23,24
23:2 52:9
52:16,19
60:15
94:15,22
95:6 97:18
127:22
131:7
132:2
134:11
135:5,12
137:6
139:3
151:12
152:7,9
153:22
160:21
**company's**
96:7
128:18
131:6
150:16

| | | | | |
|---|---|---|---|---|
| company-... | concept 95:4 | 97:16 | 63:20 64:5 | continue |
| 141:19,25 | 105:25 | conditions | 66:16 67:6 | 41:6 |
| compensa... | 148:9,13 | 97:14,15 | consider... | Continued |
| 25:7 | concerned | 98:13 | 68:8,8,11 | 103:9 |
| compiled | 53:16 | conduct | 125:17 | continuous |
| 21:14 | 134:20,24 | 80:19 89:2 | consider... | 11:2 |
| complain | concerning | 128:8 | 68:7 | contributes |
| 153:6 | 80:6 | 143:23 | considered | 158:3 |
| complaint | 120:19 | 144:6,7 | 66:5 76:20 | convenience |
| 104:22,23 | 130:21 | 159:11 | 78:15 | 5:20 |
| 105:15,21 | 132:2 | conducting | 82:20 | conversa... |
| 105:22 | 135:23 | 29:16 | 83:12 | 30:12 47:7 |
| 106:7,8 | conclude | 76:13 77:2 | consistent | 49:9 105:9 |
| 113:7 | 60:2 69:16 | confident | 73:10 | 117:25 |
| 116:23,25 | 112:25 | 4:24 | 94:13 | conveyed |
| 117:2 | 166:24 | confiden... | 107:11 | 100:10 |
| 119:6 | concluded | 47:14 | 109:7,8 | 113:22 |
| complete | 45:12 | confiden... | 118:7 | conveys |
| 4:25 5:2 | 93:22 | 13:25 | 143:20 | 111:13 |
| completed | 101:8 | confounding | 165:17 | convinci... |
| 8:6 | 162:13 | 141:22 | constant | 74:5 |
| completely | 164:19,25 | 145:12,14 | 20:5 21:2 | Cornerstone |
| 9:25 39:5 | concludes | 145:20 | 23:2 | 14:11,13 |
| 67:2 | 59:13 | 146:6 | constants | 15:10 |
| 113:23 | conclusion | 147:17 | 20:3 | 22:21 23:8 |
| 165:12 | 49:8 69:4 | 153:15 | construct | 25:18,22 |
| component | 69:9 74:21 | 154:5,24 | 92:3 | 26:13,19 |
| 11:24 | 78:5 80:9 | 155:10,17 | contact 36:6 | 27:3,7 |
| computation | 80:16,16 | 155:24 | contacted | 28:18 29:2 |
| 56:22 | 83:24 85:2 | 156:6,8,13 | 14:5,10 | 29:5,7,9 |
| 143:13 | 85:20 87:6 | 156:23 | 18:13 | 29:15,20 |
| 148:15 | 88:25 | 157:14,19 | contain | 31:2,12,18 |
| compute | 92:21,24 | 157:20,22 | 78:14 | 31:22 32:3 |
| 18:10,11 | 93:6,9 | 157:23 | contend | 32:8,10,14 |
| 141:9,13 | 107:24 | 158:6,8,11 | 138:3 | 32:15,17 |
| 141:16 | 134:9 | confused | content | 33:12,17 |
| 142:15 | 150:14,20 | 39:5,23 | 119:17 | 33:18 |
| 143:20 | 166:11 | 156:5 | contents | 34:10,21 |
| 147:14 | conclusions | confusing | 31:23 | 36:24 40:7 |
| computed | 45:25 | 147:7 | 33:10 | 40:12,17 |
| 115:25 | 46:17 80:4 | confusion | 49:12 | 42:3 117:4 |
| 140:23 | 80:7,13 | 33:22 50:9 | 118:22 | 117:21,25 |
| 142:17 | 85:10,12 | connection | context 64:6 | 118:12 |
| concealed | 85:24 | 21:3 | 112:2,5,8 | Cornerst... |
| 97:19 | 107:19 | conseque... | 148:10,15 | 23:10 |
| 144:17 | 123:16 | 63:13 | 148:25 | Corp 162:22 |
| concealment | 134:6 | 133:20 | 156:5 | corporate |
| 96:9 | conclusi... | consider | 164:20 | 9:15 10:5 |
| conceals | 78:5 | 15:24 17:9 | contingent | 10:25 11:4 |
| 96:8 | condition | 46:14 61:2 | 160:14 | 11:17,25 |

**corporation**
99:7
**correct** 5:24
15:17,18
16:15
17:19,20
18:3 22:11
25:8,20
35:2 37:10
37:11
39:12 45:8
51:22
52:12 53:5
53:6 65:12
76:10
80:11,12
86:15 87:6
87:22
90:19,20
92:15 93:2
93:13 95:6
97:6,13
101:20,23
102:4
113:9,13
113:15
115:16
116:16,21
117:11
120:6,17
121:19
122:24
132:10,20
133:15,19
136:20
143:24
145:2
156:4
157:7,8
160:6,16
161:14
**corrected**
19:9,11
24:11,17
24:18,21
24:24 25:4
109:3
121:24
169:10
**correction**

109:14
146:12
**corrections**
19:12,14
**corrective**
101:6
108:17
109:4
111:7,15
111:22
112:17
113:2
116:8,13
119:20
120:4
121:2,5
124:12
125:12
143:25
144:10,16
145:11,19
146:5,18
146:25
147:10
**correctly**
53:2 62:19
67:20 90:6
104:7
120:18
132:5
162:10
**correspond**
115:21
**counsel** 3:17
4:8 30:15
37:9,25
38:8,12,15
38:21 39:3
40:2,16
49:9,12
**couple** 64:20
**course** 9:15
9:16,18,22
9:24 10:2
10:7 11:9
11:13,21
12:20,22
12:23,24
13:2,3,4
152:20

**courses** 8:8
9:13,14,20
10:21,24
11:10
12:15,18
**court** 1:1,25
3:11 4:6
5:15 47:13
49:14 51:4
54:16,20
54:25 55:3
55:5,16,22
56:5,13
57:4,7,12
57:19,24
57:25
58:15 59:6
59:20,21
60:2,21,23
62:2 68:12
73:5,13
74:20,22
76:18,24
77:9 78:4
78:13
162:12
**Court's**
60:15
161:20
**courts** 56:7
66:4 69:25
72:9,10
73:4,6
78:8 82:20
83:12
**cover** 4:20
30:8
**covered**
80:18
101:19
143:22
**create** 52:16
159:24
**created**
103:18
105:18
154:3
156:16
**creates** 49:3
153:22

**critical**
150:10
**criticism**
58:2 141:3
**criticisms**
51:19
133:13,25
134:2,3
**criticize**
16:6,8
50:11,22
**criticized**
54:20 56:5
57:7
**criticizing**
16:3 57:17
131:18
132:19
**cross** 112:3
**curative**
110:16
112:11,22
125:11
147:16
**current** 8:18
96:12
**currently**
8:9 12:8

———————
D
———————
**D** 40:24
169:2,11
**damage**
165:16
**damages**
15:23 18:6
18:8,10,11
43:5,10,14
43:20
44:14
46:14
53:20
55:21 56:4
56:8,22
57:11,18
57:24 58:3
58:7,13,14
58:24 59:5
59:7
129:13

140:19,23
141:4,10
141:13,16
141:16
142:8,9,15
142:17
143:8,13
143:15,20
144:20
146:14
162:10,13
163:9
**Danyo** 1:20
3:10 4:10
168:4,18
**data** 19:19
19:21,21
19:25
20:19,21
20:25 21:6
22:25 27:2
27:19
**date** 15:7
18:23
24:14 25:9
41:2 93:25
94:6,12,14
95:17,22
109:4
113:20,22
**dated** 18:21
24:12
40:24
169:8,10
169:12
**dates** 80:14
111:5,6,15
111:22
112:17,22
113:2,6
143:25
144:3,11
**Daubert**
55:25
**David** 1:9
2:8,20
3:24
**day** 41:23,24
96:15
99:18

| | | | | |
|---|---|---|---|---|
| 100:6,11 | **decide** 45:20 | **decompose** | **demonstr...** | 63:25 |
| 100:14 | 45:21 46:4 | 155:2 | 99:4 | **determined** |
| 104:3,7,14 | 77:8 | **decrease** | 142:13 | 57:24 |
| 105:3,4,5 | 116:12 | 116:18 | **demonstr...** | 58:16 59:6 |
| 106:3,17 | 152:19 | **Dee** 1:8 2:8 | 74:11 | **determines** |
| 108:9 | **decided** | 3:22 4:4 | **department** | 152:8 |
| 110:14 | 49:21 | 39:16 | 9:11 | **determining** |
| 112:12 | 78:13 | **defendant** | **depend** | 63:21 |
| 113:25 | **decides** | 2:17 3:25 | 125:14 | 66:18 |
| 114:18,19 | 59:20 | 45:6,11 | **depending** | 68:20 |
| 114:23 | 68:12 | 46:7 | 135:5 | **develop** 92:5 |
| 124:6 | **deciding** | **defendant's** | 159:9 | 92:9 |
| 139:21 | 22:19 | 149:8,25 | **depends** | **developed** |
| 140:15 | **decision** | **defendants** | 109:11 | 104:16 |
| 142:4 | 56:12,19 | 1:10 2:7 | 110:11 | **Dice** 8:21 |
| 158:2,18 | 58:7 60:15 | 3:23 4:4 | 126:9 | 10:10,11 |
| 160:24 | 60:19 61:9 | 19:6,9 | **deposed** 4:18 | **differ** 80:3 |
| 161:2,5,6 | 62:4,10,19 | 39:16 | **deposition** | 140:24 |
| 161:14 | 63:5 68:13 | 45:18,23 | 1:16 3:6 | 163:4 |
| 167:13 | 68:15,17 | 47:11 | 3:13 25:2 | **difference** |
| 168:15 | 73:4 76:19 | 48:15 | 36:18,21 | 125:25 |
| 170:23 | 77:10,12 | 162:21 | 37:4,9,18 | 127:2,5 |
| **days** 111:18 | 77:15 | **defense** | 37:23 38:2 | 141:10 |
| **de-SPAC** | 116:14 | 19:23 | 40:3,8,13 | **differences** |
| 75:20,20 | 161:20 | 25:10 39:9 | 40:19 53:4 | 125:12,23 |
| 83:20 84:8 | 162:7 | **define** 60:8 | 53:15 | **different** |
| 85:3 | **decisions** | 61:10,16 | 167:7 | 22:18 |
| **deal** 129:13 | 55:17 | 61:19 | **depositions** | 27:15 |
| **dealt** 141:22 | 57:10 | 111:25 | 53:16 | 28:23 |
| **December** | 64:13 73:2 | 121:12 | **describe** | 59:11,12 |
| 7:15,16 | 77:22 79:8 | **defined** | 15:21 | 68:7 83:6 |
| **Dechert** 2:7 | **decline** | 61:15 | 20:15 25:6 | 84:4 88:3 |
| 2:13 3:21 | 113:18 | 112:5 | 36:20 | 88:24 |
| 4:3 14:20 | 114:13 | 141:17 | **described** | 95:22 |
| 14:21,25 | 115:22 | **definitely** | 17:25 | 107:5 |
| 15:5 29:25 | 139:18 | 30:6 44:8 | 20:13 | 122:2,9 |
| 30:4,7,13 | 140:4,9 | 59:22 71:4 | 43:21 65:9 | 126:15 |
| 30:22 31:3 | 141:18,24 | 86:2 | 132:19 | 127:21 |
| 31:7,11,13 | 145:10,18 | **definition** | **describing** | 141:19,23 |
| 31:22 32:3 | 146:4,17 | 60:9 61:21 | 21:9 28:8 | 141:25 |
| 32:8,10,15 | 146:24 | 61:23 99:2 | **description** | 142:3,4,23 |
| 32:18 | 147:9 | **degree** 7:8 | 158:7 | 152:18 |
| 33:12,17 | **declined** | 7:20,22 | **detailed** | 160:20 |
| 34:9 35:3 | 114:4,8 | **degrees** 6:25 | 143:15,17 | 163:2 |
| 35:12,20 | 139:20 | 7:2,6,7,13 | **details** | **differently** |
| 36:5 37:21 | **declines** | 7:19 | 119:15 | 63:3 86:11 |
| 38:9,13,18 | 112:22,25 | **delays** | 138:14 | 87:4,19 |
| 38:22,23 | 113:5 | 139:25 | **determin...** | 88:2 |
| 39:11,14 | 143:24 | **demonstrate** | 68:4 76:8 | 118:10 |
| 39:22 40:7 | 144:10 | 98:15 | **determine** | 126:17 |

| | | | | |
|---|---|---|---|---|
| **difficult** | 113:2 | 119:18 | **doctorate** | 93:20 |
| 166:20 | 125:10 | **discussion** | 7:9 | 138:12,18 |
| **direct** 66:2 | 126:18,19 | 23:8 43:14 | **document** | 138:24 |
| 66:11 | 143:25 | 43:23,24 | 18:25 19:3 | 141:5 |
| 103:11 | 144:11,16 | 46:14 | 24:15 | 155:3,11 |
| 107:13 | 145:11,19 | 50:16 | 49:16,23 | 155:21 |
| 118:15 | 146:5,18 | 58:23 | 128:19 | 164:10 |
| 124:7 | 146:25 | 106:7 | 129:2 | 165:16 |
| **directed** | 147:10,16 | 113:21 | 134:24 | 166:5 |
| 111:20 | 153:12 | 163:12,14 | 135:15 | **draft** 27:3 |
| **direction** | 154:21 | **discussions** | 136:6 | 27:10,10 |
| 25:19 | **disclosures** | 43:15 49:4 | **documents** | 27:11,13 |
| **directio...** | 21:16,25 | 104:15 | 26:23 | 27:16,18 |
| 109:8 | 22:4,11,14 | 116:23 | 29:20 | 27:21,22 |
| **directly** | 22:19 | 117:15,18 | 128:23 | 27:25 28:2 |
| 14:21 | 101:6,20 | 118:16 | 136:3,24 | 28:11 |
| 124:4 | 102:2 | 124:18 | 137:4,18 | 29:25 |
| **director** | 111:15,18 | **Disposal** | 137:19,22 | 34:14 |
| 8:20 10:9 | 111:23 | 20:24 23:4 | 138:2,9 | 45:25 |
| **disagree** | 112:11,18 | 23:13,25 | **doing** 10:6 | **drafted** 19:6 |
| 84:25 | 121:15 | **disserta...** | 62:25 63:2 | 19:7 27:22 |
| 85:10,11 | 124:11 | 9:17 | 63:6,9,14 | 27:24 28:9 |
| 85:20 86:2 | 126:13,14 | **dissipating** | 78:2 84:24 | 28:9,12 |
| 86:4 91:11 | 127:23 | 113:8 | 124:15,20 | 42:22 |
| 91:17,22 | 128:19,24 | **dissolved** | 136:15 | 43:19 |
| 91:23 | 136:6,20 | 52:20 | **domain** | 44:15,18 |
| **disagreeing** | 136:25 | **distinction** | 129:22 | 44:23 45:3 |
| 86:12,13 | 137:3,12 | 33:2 66:8 | **doubt** 116:4 | 45:5,11 |
| 87:5,11,20 | 137:18,20 | **distinguish** | **download** | 47:11 |
| 90:15 | 141:20,25 | 155:20 | 21:18 | 50:10,20 |
| **discern** | **discuss** 47:3 | 162:11 | **downloaded** | **drafting** |
| 143:24 | 47:6,22,25 | **distingu...** | 22:22 | 27:6,8 |
| **disclosed** | 48:2 58:8 | 155:18,22 | **Dr** 3:6 15:23 | 28:19 29:3 |
| 98:23 | 82:18 | **distribu...** | 16:3,10,20 | 29:9,13 |
| 110:14 | 119:9 | 126:24 | 17:3 18:9 | **drafts** 30:22 |
| 114:17 | 120:18 | 127:8 | 41:16,17 | 31:3 |
| 120:13 | 128:20 | **DISTRICT** 1:1 | 41:20 42:4 | **Drive** 2:9 |
| 128:11 | 135:24 | 1:1 | 64:20 75:7 | **drop** 109:16 |
| **disclosing** | 138:9,12 | **DLA** 2:17 | 75:19 | 109:22 |
| 124:21,22 | 138:15,19 | 3:24 15:12 | 77:25 | 110:7 |
| 125:3,4 | 140:7 | 15:16 | 79:10 80:5 | 115:7,12 |
| **disclosure** | 160:19 | 34:14,17 | 81:4,11,25 | 140:14 |
| 96:8 97:18 | **discussed** | 34:22 36:7 | 83:13,24 | 144:21,22 |
| 97:22,24 | 63:24 | 36:12 | 84:5,12,20 | 145:5 |
| 97:24 | 111:12 | 37:17 | 84:25 | 146:11 |
| 108:17 | 113:6 | 38:16 39:4 | 85:23 86:8 | 147:15,18 |
| 109:4,5 | **discusses** | 39:20,25 | 86:24 | 147:21 |
| 110:16 | 137:10,12 | 40:4,12 | 88:17 | 148:18 |
| 111:7 | 138:21 | **docket** 47:13 | 90:20 92:7 | 152:19,23 |
| 112:11,22 | **discussing** | 49:14 | 92:20 93:6 | 152:24 |

153:20
156:17,19
157:7,25
158:3,16
158:19
159:4,14
159:18
160:10
**dropped**
113:20
**drops** 109:14
109:15
153:4
**drugs** 6:5
**Dublin** 7:9
7:15
**due** 100:12
101:10
109:22
**duly** 4:10
103:7
**duties** 12:4
12:5,6

——————
**E**
——————
**E** 1:8 2:1,1
2:8 4:9
6:12 103:6
168:2
169:2,6
**earlier**
17:25
63:24 75:4
89:2
108:15
135:24
136:5
143:22
**easily**
131:21
**Eastern** 3:3
**economic**
104:9,19
116:20
142:6
**economics**
7:4,5,21
8:3,6,20
8:21 9:9
10:9,11

61:12,13
61:15
63:15,18
64:12
69:23
70:20
73:10
74:12,15
74:16 77:7
77:13,23
79:2,9
98:20
100:19
104:25
117:9
160:19,20
161:9
**economist**
61:17 62:3
63:12
66:23,24
67:18 68:9
68:9 69:2
69:5,12,16
69:25 70:3
71:10,21
72:19 73:3
73:7,12,18
74:25 77:8
77:16,24
98:10,21
98:24
100:4
107:7
108:7,8
121:6
125:6
126:16
**economists**
61:24 64:5
**edited** 31:7
**edits** 34:9
**education**
6:17,20
**effect** 65:7
74:6,13
96:9 159:6
**effects**
145:14,20
146:6

155:3
**efficien...**
142:22
**efficiency**
15:22
18:14
42:10,21
44:3 45:4
45:10,21
46:2,9,13
46:19
47:12,16
48:11,18
49:5,20
50:10,16
50:21 51:2
51:7,11,14
51:21 52:6
53:22,25
54:10,15
54:19,24
55:16,17
55:20 60:8
60:11,11
61:10,16
61:19,22
62:5,11,16
62:20
63:20
65:20,23
65:25 66:2
66:10,11
66:22 67:3
67:11,13
67:17
71:25 73:9
74:19 75:8
75:18
76:21 77:2
77:18
78:16
82:21
83:13
84:22,23
92:4,6,13
92:18
93:18
109:9,18
110:5,9
128:14

142:13,14
142:16,18
142:21
163:9,12
164:20
**efficient**
45:14 52:2
63:22 64:2
64:8 66:6
66:19,24
67:16,21
67:22,25
68:5,21
69:6,10,13
69:17,20
70:13,17
71:6 72:4
72:21
73:21 74:7
74:14
75:10,21
75:23 76:2
76:9 78:6
80:10,11
80:21,23
81:7,12,16
82:3,7,25
83:19 84:2
84:13 85:2
85:21 86:5
86:9,13,25
87:17
88:18 89:4
91:15,25
92:25
93:21,23
94:5,17,24
95:8,12
99:15,17
102:4
114:7
120:11
129:15
131:22
143:13
144:19,25
164:11
**efficiently**
66:20
71:14 75:2

85:6 87:22
90:10
**effort** 28:15
**either** 54:16
84:7 89:20
110:18
149:15
**elaborate**
109:12
**element** 6:18
**Elta** 53:11
53:14
**employ** 70:3
**employed** 8:9
8:11,13
12:8 16:3
17:4 50:11
50:23 59:4
71:24 80:8
85:11,24
86:14 87:5
87:12,14
**employee**
13:20,21
13:22,24
14:2
**employees**
120:16,21
120:22,25
**employment**
12:11,12
13:6,7,14
13:16
**ended** 19:24
153:6
**engagement**
81:23
**engages**
152:7
**entail** 9:9
**enter** 6:15
**entered**
24:21
117:2
161:13,18
165:25
**entirely**
160:14
**entirety**
8:16

| | | | | |
|---|---|---|---|---|
| **entitled** | 147:8,10 | 66:10,11 | 41:15 | 61:24 64:3 |
| 168:8 | 165:8 | 67:12 | 169:8,10 | 69:18,22 |
| **equipped** | **estimating** | 72:21 | 169:11 | 69:23,24 |
| 67:7 | 92:17 | 73:20 | **exist** 119:4 | 71:25 72:8 |
| **equivalent** | **et** 3:7,8 | 74:18 | 119:12 | 73:14,16 |
| 70:5 | **ETTEFAGH** 1:9 | 78:15 | **existence** | 74:23 |
| **Eric** 26:9 | **evaluate** | 82:14,19 | 107:11 | 76:25 |
| **Erica** 60:16 | 16:7 18:4 | 82:21,23 | 136:16 | 77:20,23 |
| **ERRATA** 170:1 | 18:6,8,9 | 83:7,10,18 | **exists** 50:14 | 78:24 |
| **escapes** | 45:19 | 84:7,12,16 | 50:22 | 125:10,11 |
| 113:16 | 63:13 81:3 | 109:9 | **expect** 94:17 | 126:5 |
| **ESQ** 2:5,11 | 165:2 | 110:4 | 94:24 95:8 | 129:13 |
| 2:15,20 | **evaluating** | 112:23 | 95:22 | 162:20 |
| **essentially** | 64:3 | 113:7 | 96:15 | 163:8 |
| 52:15 | 133:21 | 115:9 | 101:15,17 | 169:8,10 |
| 165:6 | **event** 76:13 | 145:6 | 101:22,25 | 169:11 |
| **establish** | 76:16,20 | **evolved** 9:3 | 102:2 | **expert's** |
| 70:12 | 77:2,4,6 | **exact** 23:20 | 108:11 | 47:16 |
| 71:14 72:4 | 77:16 | 44:25 | 140:16 | 51:10,19 |
| 77:17 | 78:13,25 | **exactly** | **expected** | 57:23 58:3 |
| 99:21 | 79:12,15 | 23:19 | 110:23 | 58:14,17 |
| 100:16,22 | 80:12,14 | 41:24 | 111:3 | 59:7 62:21 |
| 101:12 | 92:3,9,10 | 155:18 | **expecting** | **expertise** |
| 108:13 | 92:12,17 | **EXAMINATION** | 97:17,22 | 56:20 |
| 143:3,4 | 92:23 93:5 | 4:12 103:9 | 97:23 | 60:19 |
| 144:18 | 93:7,12,25 | 164:8 | **experience** | 61:14 |
| 165:13 | 94:6,9,10 | **examine** 99:9 | 16:9,16,18 | 63:12 |
| 166:9 | 94:12 95:9 | **examined** | 71:22 | 68:16 77:9 |
| **established** | 95:17,22 | 103:7 | **expert** 14:22 | 77:24 |
| 83:25 | 99:9,11 | **examining** | 15:13 17:2 | 116:15 |
| 86:15 | 100:9 | 74:22 | 18:20 | 125:15 |
| 127:16 | 157:22,23 | **exceed** 59:22 | 24:11 | 130:17,22 |
| 128:6 | **events** 76:20 | **exceeds** | 40:23 42:9 | 131:15 |
| 129:9 | 77:3,15 | 59:23 | 42:22 43:4 | 132:25 |
| 131:13 | 78:14 | **Exchange** | 43:10,18 | 133:21 |
| 134:17 | 141:19 | 42:11 43:6 | 44:13,19 | 134:7 |
| 135:20 | 153:15 | 43:11 | 45:3,19,19 | 136:13 |
| 142:16,19 | 154:5,24 | **excluded** | 45:24 | **experts** |
| 142:21 | 155:10,17 | 54:16 | 46:10,15 | 18:13 |
| 151:4 | 155:25 | 55:22 57:4 | 47:10 50:6 | 19:22,23 |
| 164:11,19 | 156:6,8,13 | **exclusion** | 50:12,19 | 62:15,25 |
| **establis...** | 156:23 | 55:25 | 50:23 | 63:6,9,14 |
| 74:5 | 157:14,19 | **executing** | 51:16,18 | 64:10,15 |
| **estimate** | 158:8,11 | 30:23 | 53:24 55:2 | 64:17,19 |
| 25:13 | 158:24 | **Exhibit** | 57:13,17 | 132:22 |
| 142:6 | **eventually** | 18:18,20 | 57:18,19 | **Expires** |
| 145:9,17 | 52:18 | 18:25 | 57:25 58:2 | 168:20 |
| 145:24,25 | **evidence** | 24:10,11 | 59:5,10,21 | **explain** |
| 146:3,16 | 16:14,23 | 24:16 | 60:2 61:7 | 52:14 |
| 146:23 | 65:25 66:2 | 40:23 | 61:12,13 | 113:19 |

| | | | | |
|---|---|---|---|---|
| 131:4 | 70:7,10,19 | **Fama** 60:10 | 9:15 10:2 | 105:12 |
| 159:4,18 | 70:22 71:3 | **familiar** | 10:5,25 | **firm** 4:16 |
| **explained** | 73:6 74:4 | 26:7 60:14 | 11:2,4,17 | 14:19 20:2 |
| 97:14 | 74:8 83:14 | 60:20 61:4 | 11:25 13:3 | 36:4 39:20 |
| 117:8 | 83:15 | 61:6 64:4 | **financial** | 65:3 74:23 |
| **explains** | **factors** | 148:8,14 | 7:4 8:21 | 96:15,16 |
| 115:6 | 63:20 64:4 | 161:19 | 10:11 | 97:22 |
| 158:15,19 | 64:11,12 | **far** 14:14 | 61:12,13 | **firms** 19:19 |
| **explicit** | 64:15,18 | 29:8,15 | 61:15,17 | 22:20,21 |
| 106:4,5 | 64:18,20 | 31:20 | 61:23 62:2 | 39:9 |
| **exploiting** | 64:21,22 | 33:11 | 63:12,15 | 152:18 |
| 132:2 | 65:13,19 | 90:19 | 63:17 64:5 | **first** 4:9 |
| **extensive** | 65:24 66:4 | 106:8 | 64:12 | 10:4,6 |
| 113:21 | 66:9,15,17 | **fault** 16:10 | 66:23,24 | 14:4 19:5 |
| **extensively** | 67:7,15,21 | 16:19 17:3 | 67:18 68:9 | 27:10,22 |
| 93:17 | 67:24 68:3 | **favor** 54:25 | 68:9 69:2 | 38:9,12,16 |
| **extent** 5:7 | 68:14,20 | 57:12 | 69:5,12,16 | 38:22 39:3 |
| 30:11 | 69:3 72:9 | **February** | 69:22,25 | 41:20 |
| 49:19 | 73:13,15 | 1:13 3:4 | 70:2,20 | 42:19 55:7 |
| 62:14 63:2 | 74:18,24 | 19:8 24:12 | 71:9,21 | 68:20 |
| 123:21,22 | 75:3 78:4 | 168:15 | 72:18 73:3 | 109:21 |
| 162:5,16 | 78:8 82:20 | 169:10 | 73:7,10,12 | 113:10 |
| **extremely** | 83:12 | **feedstock** | 73:18 | 160:24 |
| 19:23 | 88:20,21 | 124:17 | 74:12,15 | **five** 12:3 |
| 123:3 | 127:20 | 137:13 | 74:16,25 | 25:24 35:9 |
| 147:6 | 147:17 | **Feel** 24:19 | 77:7,8,12 | 35:13,24 |
| 166:20 | 164:13,18 | **fifth** 65:5 | 77:16,23 | 38:5 88:8 |
| | 164:20 | 83:14,15 | 77:24 79:2 | **fixed** 19:18 |
| **F** | **facts** 16:14 | **figured** | 79:9 98:10 | 20:7 |
| **F** 168:2 | 16:23 | 23:20 | 98:20,21 | **float** 65:16 |
| **fact** 24:21 | 127:15 | **figuring** | 98:24 | **floor** 2:4 |
| 69:3 106:5 | 128:5 | 147:5 | 99:23 | 3:15 107:9 |
| 114:20 | 129:8 | **filed** 19:9 | 100:3,19 | 107:12 |
| 121:13 | 131:12 | 47:13 48:7 | 107:7 | 117:12,24 |
| 122:15 | 134:16 | 48:10,15 | 108:7,8 | **FLORIDA** 1:1 |
| 130:10 | 135:17,19 | 49:13,16 | 125:6 | **focus** 43:25 |
| 132:6 | 153:7 | 49:18,22 | 126:16 | 44:2 68:10 |
| 135:15 | **factual** | 50:6,7 | 149:13 | 98:14 |
| 136:10 | 165:14 | 51:8 | **financing** | **focused** 71:3 |
| 137:5 | 166:9 | 163:21 | 52:15 | 100:7 |
| 138:4,15 | **faculty** 9:10 | **filings** | **find** 46:7,21 | 129:18 |
| 139:2 | 10:17 | 128:25 | 47:14 | **folks** 36:24 |
| 148:23 | 12:13 | **fill** 27:12 | 48:16 | **follow** |
| 159:5 | **fair** 5:10,11 | 28:14 | 52:17 | 119:13 |
| 160:14 | 43:24 | **filling** | **finding** | **follow-up** |
| **factor** 64:25 | **fairly** 60:25 | 27:11 | 26:25 | 125:24 |
| 65:2,2,4,5 | **fall** 58:21 | **final** 30:23 | 101:11 | 157:11 |
| 65:9,14,15 | 112:10 | **finaliza...** | 153:6 | **followed** |
| 65:16 66:6 | **false** 101:3 | 31:3 | **finish** 4:23 | 56:8,13 |
| 66:7 67:10 | 101:5,8,11 | **finance** 9:11 | 89:12 | **following** |

68:24
170:2,3
**follows** 4:11
103:8
147:10
**footnotes**
19:17
**form** 9:21
11:14
13:17
14:15 16:5
16:13,22
17:5,15,23
18:16
20:10,17
21:10,23
22:6,17
23:6,11
25:14,25
26:14,21
27:5,14
28:3 29:18
31:24
32:11
34:16,24
35:23
36:14
38:10 40:9
42:13,17
42:25 43:7
44:10
45:15,24
46:23
47:17
48:19
50:13,25
51:13 52:3
54:12,21
55:11,23
56:6 57:8
57:14 58:4
58:18 59:8
59:18,24
60:10,11
61:5,11,20
61:22 62:7
62:23 63:7
63:23 64:9
64:16 65:3
65:21 66:3

66:12,21
67:9,14
68:6,22
69:11,21
70:14,25
71:15
73:22
75:14 76:4
76:22 77:5
77:19 79:6
82:9,17
83:2,9,22
84:10,18
85:4,15
86:7,18
87:9 89:15
90:2,21
91:9,12,19
92:16
93:15
94:20
95:15,25
96:13,24
97:3,10,20
98:17 99:5
99:13,22
101:24
104:21
105:19
106:14
107:25
108:18
109:10,19
110:10,21
111:8,24
112:7
113:4,14
114:5,15
114:25
115:17,24
116:10,22
117:7
118:4,14
118:24
119:10,22
120:2
121:3,11
121:20
122:6,11
122:23

123:8,19
124:13,24
125:9
126:4,21
127:14
128:4,22
129:8
130:2
131:11
132:9,21
133:10,17
134:15
135:2,18
136:21
138:20
139:19
140:5,11
141:7,21
142:11
143:10
145:13,21
146:7,20
147:3,13
149:12,21
150:6,19
150:24
151:15,21
152:3
153:2,16
154:6
155:13
156:2,14
159:2,20
160:7,17
161:15
162:4,15
164:15,23
165:19
166:13
**formed** 118:2
153:17
156:10
**former**
120:21,22
**forms** 165:21
**formulate**
81:2 82:11
82:12
**formulated**
97:4

117:16
**forth** 28:11
77:15
106:10
107:24
121:9
122:20
128:20
**forward-...**
23:2
**found** 16:10
16:19 17:3
17:7 51:10
**four** 12:3
32:20 38:5
53:4 54:9
68:20
**fraud** 35:22
**free** 24:19
**Friday** 3:4
**front** 108:14
110:2
121:23
145:5
**full-time**
13:21
**fully** 60:13
67:5 68:11
70:9,16,24
**functional**
127:12
128:3
129:4,24
131:9
134:12
135:13
136:10
139:4
**fund** 105:6
165:7
**Funds** 60:16
**further** 54:8
100:11
103:8
133:7
163:16,23
166:25
167:3
168:10
**future** 127:7

148:24

_____

**G**

**gathering**
27:2,19
**general**
115:5
141:13
**generality**
166:6
**generally**
36:20 61:2
63:20 64:5
96:9
**Geron** 162:21
163:3,5
**getting**
33:23
87:24
**given** 104:14
114:7
115:8,9,11
131:8
134:11
135:12
136:9
160:25
**go** 6:18,19
12:6,6
13:23
56:24 57:2
64:11 78:9
105:12
156:15
161:7
165:11
**goes** 52:17
131:14
**going** 4:19
13:24
18:10
24:25 41:4
41:8 45:2
47:25 48:2
48:24 50:8
54:8 69:4
72:12
93:16 96:5
96:17
99:16

| | | | | |
|---|---|---|---|---|
| 104:2 | **happens** | 131:17 | 2:10 | **implicat...** |
| 108:20 | 95:11 | 132:18,22 | **IMF** 13:23 | 116:25 |
| 115:20 | 108:22 | 134:2,4 | **impact** 15:25 | 166:23 |
| 116:5 | **happy** 5:20 | 139:11,12 | 17:9,10 | **implies** 91:5 |
| 140:15 | 48:22 50:4 | 139:14 | 92:11 | 103:17 |
| 141:15 | 63:10 97:8 | **Hindenbu...** | 96:18 98:3 | 105:16 |
| 147:18 | 119:15 | 122:20 | 98:4,5,7 | **important** |
| 148:2 | 122:10 | 123:16 | 98:16,19 | 35:25 96:8 |
| 152:8 | **hard** 160:23 | **hired** 69:18 | 99:4,12,16 | **importantly** |
| 153:3 | **head** 5:14 | 69:22,23 | 99:21 | 4:21 |
| 161:3 | **hear** 105:9 | **hold** 12:12 | 100:5,16 | **inaccurate** |
| 164:2 | **heard** 67:19 | 13:6 48:20 | 108:13,16 | 89:21 |
| 165:11 | 89:16 | 92:22 93:7 | 108:21,25 | **inapprop...** |
| 166:2 | **held** 1:18 | **holding** | 109:3,24 | 165:12 |
| 167:7 | 3:13 8:15 | 60:22 79:4 | 109:25 | **incapable** |
| **good** 3:2 | 8:22 10:12 | 79:5,7 | 110:2,3,15 | 127:12 |
| 4:13,14 | 13:16 | 161:23 | 110:17 | **include** |
| 41:7 | 76:19,25 | 162:3 | 111:5,14 | 17:18 18:2 |
| **graduate** | **help** 27:7,12 | **holds** 78:20 | 111:18,22 | 43:23,24 |
| 7:25 8:8 | 27:18 | 93:9 160:9 | 112:2,4,9 | 49:21 77:3 |
| **Great** 5:12 | 73:13 | **honorary** 7:2 | 112:15,17 | 77:16 |
| 5:23 | 74:22 | 7:6,7,8,11 | 112:23 | 101:21 |
| **ground** 4:20 | 77:21 | 7:12 | 113:3 | 120:15 |
| **grounded** | 134:21 | **hope** 162:25 | 114:16 | 164:13 |
| 64:12,13 | 157:2 | **hour** 5:18 | 115:4,10 | **included** |
| **grounds** | **helped** 26:22 | 41:4 | 120:10,12 | 21:8,13,21 |
| 55:25 | 26:24,25 | **hours** 38:5 | 121:7,15 | 22:9 23:14 |
| **groups** 36:3 | 27:6,11 | **Hudson** 1:25 | 121:23,24 | 24:3 51:7 |
| 36:6 54:4 | 28:7 | 3:11 | 122:18 | 139:22 |
| **guarantee** | **hereunto** | **huge** 147:4 | 124:5 | **includes** |
| 107:9 | 168:14 | **hypothet...** | 140:8 | 129:14,19 |
| 127:18 | **hidden** | 110:7 | 142:6 | **including** |
| 160:23 | 132:15 | 124:11,22 | 144:7 | 114:20 |
| **guess** 104:6 | **highest** 6:20 | 125:3,20 | 145:3,4,7 | 135:16 |
| | **highly** 127:3 | 126:2,18 | 159:9,16 | **inclusion** |
| **H** | **Hindenburg** | 127:23 | 159:22,23 | 23:13 |
| **H** 169:6 | 116:7 | 151:8 | 160:9,11 | **incorporate** |
| **hac** 2:5 | 118:18,23 | | 163:13 | 68:25 |
| **half** 113:10 | 119:5,9,13 | **I** | 165:15 | 69:15 |
| 113:10 | 119:18,20 | **idea** 18:17 | 166:10,12 | **incorpor...** |
| **Halliburton** | 120:4,13 | 40:10,15 | **impacted** | 60:12 67:2 |
| 60:15,17 | 120:15,20 | **identifi...** | 62:21 | 67:4 70:9 |
| 60:21 61:9 | 121:9 | 18:22 | 107:18 | 95:13,16 |
| 62:4,10,19 | 122:21 | 24:13 | 114:23 | 128:17 |
| 63:5,16,17 | 123:2,6,23 | 40:25 | **impair** 6:6 | 129:17 |
| **hand** 168:15 | 124:16,19 | **identify** | **implement** | **incorpor...** |
| **Hanover** 2:18 | 128:12,13 | 46:6,20 | 68:13 | 68:10 |
| **happen** 54:14 | 128:21 | 48:12 50:9 | 92:20 | 69:14 |
| **happened** | 129:13 | 137:21 | **implemen...** | 70:15,23 |
| 126:12 | 130:6 | **Illinois** | 71:2 | 71:4 73:8 |

**incorpor...**
 71:7
**incorrect**
 75:15,17
 87:10 91:2
 91:13 97:9
 106:15
 118:9
**increase**
 111:3
 115:20
 158:13
**increasing**
 110:25
**independent**
 75:9 76:7
**index** 19:20
 21:8,14
 22:5,10,15
 23:15 24:4
**indicate**
 60:3
**indicates**
 93:25 94:7
**indicative**
 109:18
 110:9
 113:2
**indirect**
 65:19,22
 65:25
 66:10
**indirectly**
 140:14
**individual**
 22:13
 39:15
**individu...**
 1:4 143:6
**individuals**
 52:16
 139:15
**industry**
 19:20 21:8
 21:14 22:5
 22:10,15
 23:14 24:3
 165:9,11
**ineffici...**
 84:16

 110:4
**inefficient**
 82:15 83:8
 84:9
**inferences**
 79:23 80:2
**inflate**
 110:23
**inflated**
 106:9
**inflation**
 98:8,13,16
 98:25 99:2
 103:19
 104:13
 105:18,25
 106:2,6,12
 106:16,18
 107:5,10
 107:17,23
 108:9,10
 108:10
 110:20
 113:8,12
 115:16,21
 117:2,3
 120:7
 144:14
 145:9,17
 145:25
 146:3,16
 146:23
 147:9,14
 147:21,24
 148:15,17
 148:22
 159:24
 160:15
 161:5,6,12
 161:17
 165:14,23
 165:24,24
 166:6,9,17
 166:21
**influence**
 61:9,19
 62:4,11
 63:5
**influenced**
 119:19

**influences**
 62:20
**information**
 17:12 49:6
 60:12 65:7
 66:25,25
 67:4 68:10
 68:25
 69:14,15
 70:8,16,23
 71:5,7
 73:8 74:6
 94:2,8,14
 94:16,19
 94:23 95:2
 95:12,16
 95:18,19
 95:20,21
 95:24 96:2
 96:4,4,8
 97:18 98:6
 98:11,11
 98:22
 99:17
 100:5,8,10
 100:13
 101:21
 104:5,8,9
 109:6
 110:13
 113:21,23
 113:25,25
 114:17,19
 114:22
 115:2
 118:19
 128:11
 129:14,16
 129:20,23
 130:5
 132:2,7,16
 132:18
 134:3
 135:8,10
 136:16,19
 137:10,11
 138:16
 139:11,13
 139:20,22
 139:22,24

 139:25
 141:23
 142:3,25
 142:25
 143:2
 144:2
 145:12
 147:19,23
 157:24
 158:2,6,18
**informed**
 131:5
**initially**
 159:23
**inputs** 141:5
**inquire**
 143:5
**insofar**
 62:21
**instance**
 13:22
 55:18
**instances**
 35:19
 51:17 56:3
 125:25
**institut...**
 54:6
**instruct**
 29:22
 48:24
 49:15
**instructing**
 88:4,9
 154:16
**insuffic...**
 91:6
**interact**
 106:24
**interacted**
 40:12
**interaction**
 34:21 38:9
 38:12,16
 38:22 39:3
 40:3
**interact...**
 31:10,13
 31:17 32:2
 34:25

 40:17
**intercha...**
 122:8
**interested**
 168:12
**interpret**
 61:8 69:24
 108:4
**interpre...**
 59:12
 78:11
 112:14
 150:14
**interprets**
 61:25
**interrupt**
 34:3
**intersect**
 73:7
**interview**
 138:12,18
**interviews**
 120:15,19
 120:21,24
 121:8,18
 122:3
**introduce**
 3:17
**introduced**
 120:7
**invest** 52:20
**investigate**
 52:5 100:9
 100:11
 121:7
 131:16
 142:2
 151:13
 152:8,18
 152:19
 153:4
**investig...**
 116:2
 151:24,25
 159:5
**investig...**
 152:22
**investig...**
 128:8
 139:23

140:8
150:17,18
151:10,13
151:20,20
152:2,10
152:24
153:11,13
153:14,20
153:25
154:4,4,21
154:23
155:8,9
156:11,12
156:17
157:6,14
158:10,11
158:15
159:13
160:4

**investment**
135:5

**investments**
11:3,8,9
11:11
12:19,23

**investor**
135:17

**investors**
52:20 54:6
126:17
131:5,8,22
131:23,24
132:11,13
133:20
134:5,9,11
134:19,24
135:3,6,12
135:22
136:8
137:4,6
138:4,12
139:2,3
142:23
143:4,6

**invite** 50:9

**involve** 47:7
53:8 58:7

**involved**
14:17,18
35:17,25

37:22 39:9
39:20
56:25
120:23
138:22

**involves**
43:14
55:20

**involving**
34:19
54:11
92:17
163:5

**irrelevant**
95:19
121:18

**irrespec...**
116:6
159:7

**issue** 19:20
19:24 20:4
20:9,11,13
20:16,19
21:3 23:9
23:12 24:7
42:20
45:13
47:12,14
48:17 51:4
51:10
55:15,16
55:18
59:25
70:21 72:7
74:3 77:7
88:23
90:18,20
90:23,25
99:8 124:3
124:19
125:16
129:11
141:4
142:12
145:3

**issues** 15:24
17:7,17,25
45:20,22
46:5,8,22
48:2,16

56:18,20
58:6
122:14,16
124:16
126:23
128:12
130:21
136:9
137:9,12
137:13,23
141:22
143:12
166:6

---
**J**
---

**Jacobsen**
2:11 3:21
3:21 9:21
11:14
13:17
14:15 16:5
16:13,22
17:5,15,23
18:16
20:10,17
21:10,22
22:6,17
23:6,11,18
25:14,25
26:14,21
27:5,14
28:3,20
29:4,11,18
29:22 30:9
30:20 31:4
31:8,15,24
32:11,19
32:25 33:4
33:20 34:2
34:11,16
34:24
35:23
36:14
38:10 40:9
40:14
42:13,17
42:25 43:7
44:10
45:15
46:23

47:17
48:19,24
49:3,17
50:2,13,25
51:13 52:3
54:12,21
55:11,23
56:6 57:8
57:14 58:4
58:18 59:8
59:18,24
61:5,11,20
62:7,13,23
63:7,23
64:9,16
65:21 66:3
66:12,21
67:9,14
68:6,22
69:11,21
70:14,25
71:15 72:6
72:23
73:22 74:2
74:10
75:12 76:4
76:22 77:5
77:19
78:17,21
79:6,20
80:25 81:9
81:18 82:9
82:17 83:2
83:9,21
84:10,18
85:4,13,25
86:7,16
87:7,23
88:6,11,15
89:6,12,18
89:22 90:2
90:21 91:3
91:9,12,19
92:16 93:3
93:14
94:20 95:3
95:15,25
96:13,22
97:3,10,20
98:17 99:5

99:13,22
100:17
101:24
104:21
105:19,24
106:14
107:25
108:18
109:10,19
110:10,21
111:8,24
112:7
113:4,14
114:5,15
114:25
115:17,24
116:10,22
117:7
118:4,14
118:24
119:10,22
120:2
121:3,11
121:20
122:6,11
122:23
123:8,19
124:13,24
125:5,9
126:4,21
127:14
128:4,22
129:7
130:2
131:11
132:9,21
133:8,16
134:15
135:2,18
136:11,21
137:7
138:7,20
139:6,19
140:5,11
141:7,21
142:11
143:10
144:4
145:13,21
146:7,20

147:3,13
149:12,21
150:6,19
150:24
151:15,21
152:3,12
153:2,16
154:6,11
154:17,25
155:13
156:2,14
156:24
157:15
158:12,25
159:20
160:7,17
161:15
162:4,15
163:24
164:7,8
166:25
**January**
18:21
163:17,21
169:8
**John** 60:16
**Joni** 2:11
3:21
**Joseph** 1:19
3:10 4:10
168:4,18
**judge** 59:13
**judges** 59:11
**judgment**
56:9,11,12
56:25 58:8
58:9
**Julia** 2:15
4:2
**Junge** 162:21
**jurisdic...**
89:15
**justify**
90:12

**K**

**Katie** 26:10
**kind** 45:16
125:17
131:19

**knew** 135:22
161:2
**know** 4:17,24
5:6,19
10:19
14:14 15:8
17:6 19:3
20:8 25:12
25:15,23
26:4,5
29:21 30:3
31:5,17,18
31:20 32:2
32:3,14
34:6,7
42:23 44:4
44:12,16
44:25 52:8
53:24
64:22
104:4
105:4
115:2
123:2
126:23
127:7
143:17
146:9
152:21
161:4,8
163:5
165:10,21
165:24
166:2,16
166:23,24
**knowledge**
20:16 33:5
33:6,8
34:20
127:10,24
128:9
**known** 126:10
128:15,16
**knows** 42:7
**Krogman**
64:18
65:13 67:7
74:18
164:13
**Kyla** 26:9

**L**

**L** 4:9 103:6
**lack** 108:13
**language**
45:18 63:8
**large** 116:4
140:15
153:4
**Lastly** 166:8
**law** 14:19
36:4 39:20
**laws** 7:8
**lead** 79:23
80:15 96:5
153:20
156:17
**leading**
19:25
**leads** 49:8
150:16
**led** 105:15
105:22
131:7
134:11
135:12
136:8
137:6
139:3
151:9
**legal** 29:20
56:20 59:9
59:10
60:18 61:7
61:24
64:13
68:15,17
69:23
71:16 72:7
72:8 77:20
77:22
78:11,11
78:24 79:8
95:4,5
98:9,13,19
98:25,25
99:23
100:18
107:7
108:5

116:13,14
120:4
121:6
123:21
125:15,17
125:19
126:5,8
149:13,17
150:8,13
150:14,20
150:23
151:17
152:14
161:24
162:17
**legally**
141:14
**Lehman**
138:13,18
**Lehman's**
138:24
**lens** 63:14
**let's** 6:19
9:7 18:18
24:9 40:21
66:15
90:13
151:7
**level** 6:20
96:12
166:5
**Levinson**
60:23
**liability**
103:17
104:18
105:16
106:12
107:17,22
108:3,5
112:21
113:12
114:8
115:9,15
116:16
117:6
118:3,6,13
120:6
143:21
145:2

162:9
165:18
**lifted** 22:10
**limit** 58:11
66:15
**limitations**
131:19
**limited**
160:8
161:10
**limiting**
48:13
68:18
**line** 41:3
170:4
**list** 6:16
21:7,13,15
21:17,17
21:20,24
21:25 22:4
22:20,20
23:14
46:11 53:3
55:8 56:10
56:14
58:10
64:11
**listed** 20:23
20:25 37:5
53:7 58:20
162:24
**literature**
26:24,25
**litigation**
35:17,22
36:13,16
39:9 42:8
53:12 54:5
58:6 75:19
112:6
119:3
140:20
143:16
148:10
**litigations**
35:4 36:2
36:8 48:10
71:23
140:22
**little** 10:16

13:18
**LLP** 1:18 2:3
  2:7,13,17
  3:14,20
  4:3,16
  14:22
  29:25 30:4
  34:9 35:3
  35:12 36:8
  38:9,13,18
  38:22,23
  39:11,14
**load** 10:7
  12:5
**located** 3:14
  129:25
**logic** 150:22
**logical**
  150:15
**logically**
  152:10
**London** 8:3,6
**long** 5:19
  8:13,22
  9:19 10:3
  11:7 12:20
  13:4 38:4
  95:9 162:8
**longer** 20:22
  20:24 23:4
  23:15,25
**look** 18:24
  19:2 24:19
  45:18,24
  46:16
  65:24
  66:22 78:8
  79:23
  88:20 97:6
  108:22
  109:2
  119:6
  131:22,23
  132:3,12
  132:14
  133:2
  134:20
  135:6
  136:14
  141:10

143:5
144:21
149:5
166:16,22
**looked** 36:23
  78:2,3,3
  130:15
  162:7
  164:18
**looking**
  26:24 56:9
  60:5 99:19
  100:5,6
  108:14
  118:8
  133:14
  134:14
  157:24
  165:4
**looks** 19:4
  24:22
  41:16
**loss** 17:21
  18:2,4
  44:19
  53:20
  56:21 57:3
  57:6
  143:23
  144:6
  149:4,4
  163:10
**lot** 56:10
  65:5 96:2
  128:10
  136:16
  138:16
  139:11
  144:22
**lots** 138:13
  144:21
  152:17
**LSE** 8:8
**Lunch** 102:7

—————
**M**
—————
**M** 1:16 6:12
  169:4
  170:22
**main** 11:6

**maintain**
  96:11
  165:23
**maintained**
  103:19
  105:18,25
  106:3,18
  107:11
  108:11
  161:6,13
**maintenance**
  106:13
  107:18,23
  110:20
  113:12
  115:16
  160:15,24
  165:15,22
  166:6,10
**makers** 65:4
**making** 6:18
  68:13
  108:7,8
  116:24
  140:25
  150:9
**management**
  11:5,23
  12:2,7
  120:16,19
  120:23,25
  123:25
**mandate**
  52:17
**manner** 94:19
  94:25
  95:23
**mark** 18:18
  24:9 40:21
**marked** 18:22
  18:25
  24:13,16
  40:25
  41:15
**market** 17:12
  18:14
  42:10,21
  45:4,10,13
  46:9 47:12
  47:16

48:11,17
49:5,20
50:9,16,21
51:7,11,20
51:25 52:6
53:21,25
54:10,15
54:19,24
55:15,17
60:8,25
61:4,10,15
61:19,22
62:5,11,15
62:20
63:19,22
64:2,7
65:4,8,15
65:20,23
65:25 66:2
66:6,18,19
66:22,24
67:3,11,13
67:16,17
67:22,22
67:25 68:5
68:21 69:6
69:10,13
69:17,20
70:12,17
71:6,25
72:5,22
73:9,21
74:19 75:8
75:11,18
75:21,22
76:2,8,21
76:25
77:17 78:6
78:6,16
80:10,21
80:24 81:7
81:13,16
82:3,7,15
82:25 83:8
83:19,25
84:9,14
85:3,21
86:5,10,13
87:2,17
88:18 89:4

91:15,25
92:4,13,25
93:20,24
94:2,5,8
94:17,24
95:7,12
96:14
97:17,21
97:23
99:15,17
100:6,11
100:14
101:7,10
101:15,17
102:3
104:3
105:4,6
109:9,13
109:18
110:9
114:6
120:11
122:25
123:9
128:14
129:15
131:22
139:21
142:4,13
142:14,16
142:18,21
142:22
143:13
144:2,18
144:24,25
161:4
163:9,12
164:11,19
165:7,9,10
166:2
**MARKHAM** 2:15
**Markham-...**
  4:2,3
**marks** 167:6
**marriage**
  168:11
**master's**
  11:23
**material**
  61:2 94:15

94:23
109:5
**materiality**
17:12,18
95:4,5
**material...**
144:17
148:9
149:2,5
**materialize**
126:25
127:3,5
**material...**
125:21
126:2,20
127:2,6
149:10
150:3
**material...**
148:17
149:9
150:3
**material...**
127:7
148:24
**materials**
36:22 37:3
37:5
**matter** 4:17
14:5,22
15:10,13
15:20 16:4
16:12,21
17:3,22
18:7,14
19:6 20:4
24:21 25:7
25:17
27:17
151:24,25
152:20
155:8
156:11
157:13
158:9,23
159:12
160:4
161:8
163:7,9,17
168:8,12

168:13
**matters**
35:21
**Matthew**
40:24
169:11
**MBA** 11:23
**MBAs** 11:4,12
11:18
**McKesson**
56:18
**mean** 9:5
10:13,20
13:18
14:16
21:11
23:13,20
34:17 42:6
46:12
47:25 48:3
51:9,19
52:4 55:24
56:7,18
58:5,22
59:9,25
60:4 62:14
65:23
68:23
70:22 71:4
72:7 73:14
79:3 87:13
98:11
102:2
106:25
107:4,5,6
108:2,4,5
110:12,13
110:17
111:17
112:2,9
116:3
118:17
120:21
121:14
122:13,17
125:12
126:9,22
129:10
138:9
139:8

140:12
143:5,17
146:10
147:17
151:22
155:16,18
160:18
161:3
163:9
165:21
**meaning** 95:5
141:10
150:4
**means** 60:11
74:4,7
148:19
150:17
157:22,22
**measure**
144:20
**measured**
144:15
148:18
**medications**
6:5
**meet** 37:12
37:25 73:9
82:19
83:11,15
**meeting** 38:4
38:8,11,15
38:21 39:2
40:16
**meets** 59:10
59:21
70:20
74:11,24
75:2 77:6
83:14
**member** 9:10
**members**
120:22
144:11
**memory**
119:16
**mention**
136:24
137:19
**mentioned**
7:6 9:8

10:22 14:6
17:17 37:8
107:16
114:18
138:2
164:14
**mentioning**
45:23 46:5
46:8,22
47:15
48:17
156:6
**mere** 159:5
**merit** 43:17
44:14
**merits** 53:16
53:18
**Mesa** 53:11
53:14
**met** 36:25
37:8 40:7
42:4 59:14
60:2 66:6
66:7 69:8
73:15
88:21
97:17
**method** 141:9
**methodol...**
16:3 17:4
50:11,22
51:20 59:4
71:24 75:8
81:25
85:23
86:14 87:5
87:11,14
141:2
**methodology**
51:11
58:24
85:11
93:10
141:3,15
165:17
**Michael** 1:8
1:8 2:8,8
**MIDDLE** 1:1
**mind** 46:11
57:10

150:7
**mine** 28:16
**minimum**
76:19
77:15
78:14
**minor** 19:12
19:13
**minutes**
163:24
**mischara...**
153:7
**mischara...**
28:5 86:20
96:25
**mischara...**
86:22
**mischara...**
28:4 75:13
85:14
86:17 87:8
89:7 90:3
96:23
97:11
119:23
133:9,16
134:16
136:22
156:25
161:16
**mischara...**
88:6
**misconduct**
149:8,11
150:2,5,16
150:18
151:5,6,7
**misrepre...**
104:24
108:19
122:15
159:22
**misrepre...**
103:18,25
105:17
108:20,23
108:24
110:23
111:2,6
112:10,20

114:2,10
115:11,13
115:19
116:9,17
119:21
120:7,9,12
121:10,19
121:22
122:5,17
123:18,24
124:5
141:12
159:17
160:5,12
166:12
missed 38:19
missing
  20:21,25
misstate...
  109:15,17
  110:8
misstate...
  109:23
  110:14,15
  110:17
  146:13
mistake
  163:2
misunder...
  111:16
MIT 6:23
  7:19 8:4,6
  13:12
model 15:23
  46:14
  79:12,18
  79:24
  80:13 95:9
  95:10
  116:2,6
  135:4
  138:11
  142:7
  143:15,18
  143:21
  162:10
  164:21
  165:2,3,12
models 79:15
  79:16,22

80:2,3,5,8
80:15
92:18,20
93:5
modest 60:25
modified
  163:20
moment 89:23
Monday 24:6
monetary
  8:20 9:9
  10:9
money 52:21
  105:6
  165:7
money-back
  107:8
  160:22
morning 3:2
  4:13,14
mouth 89:8
move 95:23
  98:6
  101:22
  153:9
moved 8:4
movement
  96:11
multiple
  71:23
  79:22
  162:9
mutual 165:7

——————
N
——————
N 2:1 4:9
  103:6
  168:2
  169:2
name 3:9
  4:15 6:9
  6:11 19:17
  163:2
names 21:15
  21:17,19
  22:3,15
  26:5,7,11
  39:16
  163:4
Nationwide

3:12
nature 7:3
  32:7 36:11
  126:9
  166:18,18
Navient 55:8
near 131:7
  134:10
necessarily
  143:3
need 5:18
  126:23
  127:7
  128:14
  131:23,24
  131:25
  148:22
  166:22
needed 27:18
  27:19
needs 97:13
negates
  95:19
negative
  101:9
  109:6
  123:3,16
  132:7,23
  132:24
  133:12
Neuchâtel
  7:10,11,14
  7:23
never 130:9
  135:25
new 1:19,19
  1:21 2:4,4
  2:14,14
  3:15,15
  60:11 65:7
  66:25
  70:16,23
  94:2,7,13
  94:16,23
  95:2,18,24
  96:2,4
  98:5,10
  100:8
  101:21
  104:9

109:5
118:19
139:16
157:24
158:17
168:5,19
news 109:7,8
nods 5:14
Notary 1:20
  4:10 168:5
  170:25
noted 167:9
Notice 1:17
notion
  157:19
November
  15:3 40:24
  53:16
  92:22 93:6
  103:18
  104:24
  105:17
  108:12
  115:19
  116:21
  139:18
  140:4,9
  159:18
  161:12
  165:25
  166:19
  169:12
nuances
  33:14
number 11:19
  14:2 21:2
  27:15 35:8
  36:2,22
  42:6 43:25
  44:16,25
  46:12
  76:19 77:3
  77:15 80:3
  114:18
  128:23
  130:5,21
  141:23
numerous
  4:18

——————
O
——————
O 168:2
objection
  9:21 11:14
  13:17
  14:15 16:5
  16:13,22
  17:5,15,23
  18:16
  20:10,17
  21:10,22
  21:23 22:6
  22:17 23:6
  23:11
  25:14,25
  26:14,21
  27:5,14
  28:3,20
  29:4,11,18
  30:9 31:4
  31:8,15,24
  32:11,12
  32:19
  34:11,16
  34:24
  35:23
  36:14
  38:10 40:9
  40:14
  42:13,17
  42:25 43:7
  44:10
  45:15
  46:23
  47:17
  48:19
  50:13,25
  51:13 52:3
  54:12,21
  55:11,23
  56:6 57:8
  57:14 58:4
  58:18 59:8
  59:18,24
  61:5,11,20
  62:7,8,23
  63:7,23
  64:9,16
  65:21 66:3

| | | | | |
|---|---|---|---|---|
| 66:12,21 | 115:17,24 | 161:15 | 25:5,6,9 | 137:4,8,23 |
| 67:9,14 | 116:10,22 | 162:4,15 | 38:19 39:8 | 139:9 |
| 68:6,22 | 117:7 | 162:16 | 39:21 | **opined** 59:4 |
| 69:11,21 | 118:4,14 | 164:15,23 | 44:18 45:2 | 77:10 |
| 70:14,25 | 118:24 | 165:19 | 47:20 50:2 | **opining** |
| 71:15,16 | 119:10,22 | 166:13 | 50:19 51:5 | 35:21 |
| 72:6,23 | 120:2 | **objections** | 51:23 | 63:19 95:5 |
| 73:22 74:2 | 121:3,11 | 62:13 | 52:25 | 121:16 |
| 74:10 | 121:20 | 85:25 | 84:15 | 124:10 |
| 75:12,13 | 122:6,11 | 89:23 | 88:12 90:7 | 134:8 |
| 76:4,22 | 122:23 | 136:12 | 92:3 97:7 | **opinion** |
| 77:5,19 | 123:8,19 | 137:7 | 103:14,22 | 18:13 52:6 |
| 78:17,21 | 124:13,24 | 138:7 | 104:17 | 52:7 54:15 |
| 79:6,20 | 125:9 | 139:7 | 105:14 | 54:24 |
| 80:25 81:9 | 126:4,21 | 152:12 | 112:24 | 55:21 57:3 |
| 81:18 82:9 | 127:14 | 154:25 | 123:11,14 | 57:11 58:3 |
| 82:17 83:2 | 128:4,22 | 158:12 | 124:9 | 58:14,17 |
| 83:9,21,22 | 129:7,8 | **obtained** | 136:4 | 59:7 68:3 |
| 84:10,18 | 130:2 | 19:19 | 146:2 | 68:19,19 |
| 85:4,13,14 | 131:11 | 26:23 | 154:19 | 69:7 71:17 |
| 86:7,16,17 | 132:9,21 | **obvious** | 157:3,9 | 72:2,19 |
| 87:7,8,23 | 133:8,9,17 | 59:25 | 158:7,21 | 73:16 |
| 89:6,13,14 | 134:15 | **obviously** | 160:13 | 75:18 |
| 89:15,18 | 135:2,18 | 57:9 63:3 | 161:10 | 78:11 |
| 90:2,3,21 | 136:11,21 | 73:12 74:3 | **once** 21:17 | 79:11,14 |
| 91:3,9,12 | 138:20 | 77:12 91:5 | 22:20 38:3 | 80:22 81:3 |
| 91:19 | 139:19 | 104:22 | 81:20 89:7 | 81:6,11,15 |
| 92:16 93:3 | 140:5,11 | 106:19 | 95:11 | 82:6,12,13 |
| 93:14,15 | 141:7,8,21 | 162:6 | **ones** 10:22 | 83:17 |
| 94:20 95:3 | 142:11 | **occur** 97:24 | 11:6 53:10 | 84:23 85:5 |
| 95:15,25 | 143:10 | 148:21 | 58:25,25 | 85:8 86:2 |
| 96:13,22 | 144:4 | **occurred** | **oOo** 2:25 | 87:3,21 |
| 96:23 97:3 | 145:13,21 | 32:10 | 169:13 | 90:9,12,23 |
| 97:10,20 | 146:7,20 | 148:19 | **operational** | 90:24 91:5 |
| 98:17 99:5 | 147:3,13 | **October** 14:7 | 160:21 | 91:7,10,14 |
| 99:13,22 | 149:12,21 | 14:8 15:2 | **opine** 17:11 | 91:16,21 |
| 100:17 | 150:6,19 | **offer** 61:14 | 17:21 | 91:24 92:5 |
| 101:24 | 150:24 | **offered** | 53:19,21 | 98:15 99:3 |
| 104:21 | 151:15,16 | 165:16 | 54:10 | 100:2,3,15 |
| 105:19,24 | 151:21 | **offices** 1:18 | 57:23 | 100:21 |
| 106:14 | 152:3 | **Ohio** 6:13 | 58:13 | 109:24 |
| 107:25 | 153:2,16 | 8:12,16 | 69:18 | 111:14 |
| 108:18 | 154:6 | 10:12,15 | 71:24 | 113:17 |
| 109:10,19 | 155:13 | 10:22 12:9 | 92:13 | 114:4,11 |
| 110:10,21 | 156:2,14 | 12:11 | 93:17,19 | 115:6,8,14 |
| 111:8,24 | 156:24 | 13:15 | 111:4,21 | 116:7 |
| 112:7 | 157:15 | **okay** 5:12,16 | 112:13,16 | 117:16 |
| 113:4,14 | 158:25 | 5:21 7:3 | 112:19 | 118:2,18 |
| 114:5,15 | 159:2,20 | 9:7 20:15 | 114:23 | 118:20 |
| 114:25 | 160:7,17 | 22:13 24:8 | 121:17 | 119:19 |

| | | | | |
|---|---|---|---|---|
| 120:3,5,24 | 163:19 | **parse** 140:6 | 134:25 | 21:6 23:5 |
| 121:8 | **opposed** 58:8 | **parsed** | 135:6,11 | 23:16 24:2 |
| 122:3,25 | 100:13 | 141:18,24 | 135:16 | 30:13 |
| 123:3,5,15 | 109:15 | **parses** | 136:9,19 | 35:11 |
| 123:21 | 126:19 | 145:11,19 | 137:2,5,17 | 69:20 |
| 124:14,21 | **opposing** | 146:5,9 | 138:5,10 | 75:11,22 |
| 125:2,8,19 | 55:2 57:12 | **part** 16:18 | 138:23 | 75:24 76:3 |
| 125:20 | **original** | 22:19 | 139:2,14 | 76:10 |
| 126:8 | 21:21 | 54:17 | **patented** | 79:25 |
| 127:9 | **Otworth** 1:8 | 55:14,19 | 134:12 | 80:21,24 |
| 139:10,10 | 2:8 3:22 | 56:25 | **patents** | 81:8,13,17 |
| 139:17 | 4:4 39:16 | 79:24 | 130:11,14 | 82:4,8,16 |
| 140:2 | **out-of-p...** | 92:18 | 130:17,19 | 82:25 83:8 |
| 142:9 | 141:3,9 | 109:22 | 130:21,23 | 84:3 85:7 |
| 144:9 | **outcome** | 113:16 | 131:5 | 85:22 86:6 |
| 145:8,16 | 168:13 | 119:3 | 132:6,8,12 | 86:10 87:2 |
| 145:25 | **outline** 30:5 | 137:9,24 | 132:12,14 | 87:18 |
| 146:15,22 | **outside** | 138:17 | 132:15,23 | 88:19 89:4 |
| 149:14,17 | 28:18 29:2 | 146:11 | 132:24 | 90:10 |
| 150:25 | 29:9,15 | 153:21 | 133:2,15 | 91:16 |
| 151:3,17 | 137:11 | 154:18 | 133:19,22 | 92:14 93:2 |
| 152:14,15 | | 158:16,19 | 137:16 | 93:19,21 |
| 153:10,11 | **P** | 159:4,13 | 138:19 | 117:13 |
| 153:18 | **P** 2:1,1 | **part-time** | **pause** 89:22 | 127:11 |
| 154:2,8,8 | 60:16 | 13:21 | **PCT** 129:15 | 131:6 |
| 154:12,13 | **p.m** 102:6,7 | **participate** | **pending** 5:19 | 138:13 |
| 154:18,20 | 103:3,5 | 37:17 | **people** 22:18 | 146:19 |
| 155:7,12 | 148:3,6 | **particular** | 25:21 | 147:2,11 |
| 155:15,23 | 164:3,6 | 51:25 64:7 | 26:10 | 147:22,25 |
| 156:8,9,10 | 167:8,9 | 66:18 | 128:16 | 164:12 |
| 157:12 | **Page** 169:3,7 | **parties** 36:2 | 131:18 | 165:4,7 |
| 158:8 | 170:4 | 168:11 | 132:25 | 166:20 |
| 159:16,19 | **paid** 13:25 | **parts** 27:16 | 133:25 | **personal** |
| 159:21,23 | 25:10 | 27:18,19 | **percent** 4:24 | 125:19 |
| 160:2,3,9 | 141:11 | 27:21,24 | 45:8 59:17 | **perspective** |
| 160:14 | **Palo** 2:19 | 27:25,25 | 59:22,23 | 66:23 |
| 161:10,11 | **paragraph** | 29:14 | 60:7 | 67:18 73:3 |
| 161:25,25 | 24:23 25:6 | **pass** 124:23 | 140:14 | 98:20 |
| 162:17 | 25:16 | 125:4 | **percentage** | 99:24 |
| 163:13 | 103:12,15 | **patent** | 45:4 59:3 | 100:19 |
| 165:15 | 107:13,15 | 123:25 | 59:19 60:5 | 107:6 |
| **opinions** | 107:21,24 | 131:6,8,18 | **perfectly** | **persuasive** |
| 16:4 61:14 | 111:11,13 | 131:19,21 | 134:5 | 66:17 |
| 106:10 | 111:20 | 132:10,16 | **perform** | **pertaining** |
| 110:4 | 113:5 | 132:17,19 | 26:20 76:5 | 35:21 |
| 122:20 | 130:25 | 133:6,11 | **performed** | 51:20 |
| 132:23,24 | 132:5 | 133:13 | 26:15 93:7 | **PGB-GJK** 1:8 |
| 139:14,15 | **paragraphs** | 134:7,10 | **performs** | **Ph.D** 6:21,22 |
| 139:16 | 124:7,10 | 134:14,20 | 26:17 | 6:24 7:3 |
| 149:20 | **Park** 2:13 | 134:21,22 | **period** 17:13 | 7:19 8:5 |

| | | | | |
|---|---|---|---|---|
| 9:14,15 | **plaintiffs** | 34:5 38:20 | 108:12 | **presumption** |
| 10:2,18 | 1:6,17 2:3 | 66:14 | **possible** | 60:24 |
| 11:2,10,11 | 3:20 4:17 | 75:15,17 | 17:9 28:10 | **previous** |
| 12:21,24 | 18:10 54:2 | 86:22 | 29:19 36:4 | 80:5 93:8 |
| 13:2,13 | 54:4,4 | 149:24 | 43:2,3 | 93:10 |
| **piece** 98:5 | 55:19 | **plural** 53:17 | 134:5 | 104:7,13 |
| 98:11,11 | 107:2,4 | 55:18 | 145:8,16 | 105:3,3,5 |
| 98:22 | 140:25 | **point** 28:9 | 146:2,15 | 106:3 |
| **pieces** | 143:14,18 | 82:16 | 146:22 | 108:9 |
| 100:13 | 162:8 | 100:25 | 147:8,14 | 139:24 |
| 114:17,19 | 165:13 | 103:24 | 155:2 | **previously** |
| 114:22 | 166:8 | 105:8 | **potentially** | 35:20 36:7 |
| 142:3 | **plaintiffs'** | 112:24 | 30:10 | 43:4,9 |
| **Piper** 2:17 | 18:20 | 117:8,14 | 147:17 | 44:18,23 |
| 3:24 15:12 | 24:10,11 | 128:20 | **precedes** | 47:20 |
| 15:16 | 24:16 | 129:2,22 | 138:13 | 87:21 |
| 34:14,17 | 40:22,23 | 131:16 | **precise** | 96:20 |
| 34:22 36:7 | 41:15 | 135:22 | 57:15 | 101:19 |
| 36:12 | 103:16 | 136:7,15 | 66:14 | 103:7 |
| 37:17 | 104:18 | 138:25 | 98:12 | **price** 15:24 |
| 38:16 39:4 | 105:16 | 139:5 | 108:2 | 17:9,10 |
| 39:20,25 | 106:11 | 142:19 | 126:9 | 60:13 65:8 |
| 40:4,12 | 107:17,22 | 147:19 | 135:25 | 70:9 74:7 |
| **place** 32:24 | 108:3 | 149:15 | 136:2 | 92:10 |
| 33:12 38:6 | 112:21 | 155:19 | **precisely** | 94:18,24 |
| 89:23 | 113:11 | **pointing** | 14:24 | 95:13,17 |
| **plaintiff** | 114:7 | 124:18 | 121:21 | 96:10,11 |
| 19:22 | 115:8,15 | **points** 30:8 | **predicate** | 96:18 |
| 59:10,14 | 116:16 | **Pomerantz** | 165:14 | 97:25 98:2 |
| 59:20 | 117:5 | 1:18 2:3 | 166:9 | 98:4,5,6,7 |
| 62:25 | 118:6,13 | 3:14,20 | **premise** | 98:7,12,16 |
| 63:14 | 120:6 | 4:16 | 30:14 | 98:16,19 |
| 64:17,19 | 129:12 | **portion** 27:4 | 60:25 | 98:22 99:4 |
| 73:14,16 | 145:2 | 30:2 34:15 | **preparation** | 99:7,10,12 |
| 74:23 | 165:17 | 129:18 | 36:23 37:4 | 99:21 |
| **plaintiff's** | 169:7 | 138:24 | 37:9,18,22 | 100:5,10 |
| 46:10,15 | **plan** 160:25 | 157:6 | 40:8 | 100:16,23 |
| 47:15 | **planned** | **portions** | **prepare** | 100:25 |
| 50:12,23 | 165:5,9,11 | 31:7 | 36:17,21 | 101:2,3,4 |
| 51:10,16 | **plants** | **position** | 38:2 40:2 | 101:13,22 |
| 51:18,19 | 139:25 | 8:15,18,22 | 40:18 | 102:3 |
| 57:18,19 | **plastics** | 9:3 10:13 | **preparing** | 103:20 |
| 57:23,25 | 130:22 | 13:16 61:8 | 25:22 | 104:2,5,8 |
| 58:2,3,14 | 133:2 | 115:3,4 | 26:13 | 104:11,13 |
| 58:16,24 | **pleading** | 122:19 | **present** 2:22 | 105:2,5,6 |
| 59:5,7 | 149:3 | 123:3 | 3:17 37:15 | 105:7 |
| 62:15,21 | **please** 3:17 | **positions** | 37:21 52:5 | 106:2,6,9 |
| 63:6,9 | 4:7 5:5,18 | 10:12 13:6 | 143:15 | 106:16 |
| 64:3,10,15 | 6:9 19:2 | 114:21 | **presenta...** | 107:9 |
| 71:25 | 24:23 28:6 | **positive** | 15:23 | 108:13,16 |

| | | | | |
|---|---|---|---|---|
| 108:16,21 | 153:4,21 | 148:20 | 148:8 | 128:25 |
| 108:23,25 | 156:18,19 | **probably** | 149:18 | 129:15,16 |
| 109:3,6,16 | 157:7,25 | 11:22 | 155:7 | 129:20,22 |
| 109:24 | 158:3,16 | 88:15 | 164:9 | 130:5 |
| 110:2,7,15 | 158:20 | **problem** | 169:4 | 132:6,8,17 |
| 110:17,24 | 159:4,6,9 | 22:24 23:7 | 170:22 | 134:3 |
| 110:25 | 159:13,16 | 23:20,23 | **proffer** | 135:8,10 |
| 111:3,5,14 | 159:18,22 | 165:3 | 14:22 | 135:15 |
| 111:17,21 | 159:23 | **problems** | 15:13 17:2 | 136:17,18 |
| 112:2,4,9 | 160:9,11 | 55:20 60:4 | 18:13 | 139:12,13 |
| 112:10,14 | 160:24 | **proceed** 4:8 | **proffered** | 139:16 |
| 112:16,21 | 161:7,13 | **proceeded** | 53:25 54:3 | 168:5 |
| 112:23,25 | 161:18 | 105:11 | 57:17 | 170:25 |
| 113:3,5,17 | 163:13 | 118:9 | **program** 8:5 | **publication** |
| 113:19 | 165:22,25 | **proceedings** | 10:18 | 131:4 |
| 114:4,8,13 | 166:12 | 168:7,9 | 13:13 | **publicizing** |
| 114:23 | **prices** 61:4 | **process** 4:19 | **pronounce** | 115:4 |
| 115:5,6,10 | 104:20 | 13:23 29:6 | 163:5 | **publicly** |
| 115:12,20 | **Priebe** 2:20 | 78:2 92:8 | **proper** 76:14 | 23:5 47:12 |
| 116:18,20 | 3:24,24 | 92:8 | 90:8 | 48:7,9,14 |
| 117:3,12 | 37:19,21 | 127:11,19 | **properly** | 49:7,13,16 |
| 117:13,24 | 167:4 | 127:25 | 76:21 | 49:18,19 |
| 120:8,10 | **primary** 36:6 | 128:2 | 94:10,11 | 49:22 50:6 |
| 120:12 | **prior** 7:18 | 129:4,23 | 95:10 | 50:7 51:8 |
| 121:7,15 | 12:11 13:7 | 130:8 | **provide** | 61:2 99:18 |
| 121:23,24 | 30:23 31:3 | 131:9 | 29:21 30:4 | 122:21 |
| 122:18 | 35:4 36:11 | 134:12 | 30:7 84:12 | 130:11 |
| 124:5 | 39:25 40:3 | 135:13,25 | 91:6 117:4 | 133:6,12 |
| 128:15,17 | 41:17 42:8 | 136:10 | 130:4 | 133:14,20 |
| 129:17 | 45:3 51:8 | 138:14,22 | 147:21 | 134:14,23 |
| 139:17 | 60:22 | 138:22 | 162:20 | 136:7 |
| 140:3 | 83:19 | **production** | **provided** | 137:3,18 |
| 141:11,11 | 122:21 | 28:22,25 | 19:21 | 138:3 |
| 141:18 | 123:7 | 127:13 | 30:18 34:9 | **PureCycle** |
| 142:24,25 | 127:9 | 128:2 | 83:18 84:6 | 1:8 2:7 |
| 143:3,24 | 129:5,21 | 129:5 | 84:16 85:7 | 3:7,22 4:4 |
| 144:7,10 | 135:10 | 131:10 | 86:3 91:4 | 14:5 17:13 |
| 144:14,16 | 138:3 | 134:13 | **provider** | 21:16,25 |
| 144:21,22 | 149:10,16 | 135:14 | 19:22 | 39:15 |
| 145:3,4,6 | 150:5 | **professi...** | **providing** | 69:19 |
| 145:9,10 | 165:6 | 6:17 | 84:22 | 75:10,20 |
| 145:17,18 | **privilege** | **professi...** | 90:11 | 76:2,9 |
| 145:24 | 29:24 | 60:25 | **public** 1:20 | 80:20,23 |
| 146:3,4,12 | 30:10,11 | **Professor** | 4:10 52:17 | 81:7,16 |
| 146:16,17 | 47:24 | 1:16 4:9 | 60:12 | 82:3,6,14 |
| 146:23,24 | **privileged** | 4:13 14:4 | 66:25 | 82:24 83:7 |
| 147:8,9 | 30:19 | 41:14 | 70:16,23 | 83:18 84:7 |
| 148:18 | **pro** 2:5 | 60:10 | 123:6 | 85:2,21 |
| 152:20,23 | **probability** | 72:18 | 127:10,24 | 86:4 87:16 |
| 152:25 | 126:23 | 103:6,11 | 128:8,19 | 87:22 89:3 |

92:13,24
104:4,6
105:5,7
114:13
120:11,16
120:19,25
123:4,6,17
135:4
138:11
139:18
161:3
**PureCycle's**
22:3,10,14
113:18
124:11
127:11
129:3,23
130:11,14
130:19
131:5
132:6
134:10
138:5
**purely**
126:18
**purpose** 16:2
35:21 52:8
53:13
93:13
**purposes**
33:23
112:3
**pursuant**
1:17
**put** 20:25
21:20 22:2
22:4,15
89:8 142:7
**putting**
20:21,25
22:25 30:5

――――――
Q
――――――
**qualifies**
130:16
**quality**
124:17
**quantifi...**
58:7
**quantify**

114:16
**quarter**
139:24
**question**
4:22,23,24
4:25 5:19
16:17 22:8
28:23
30:14 32:5
33:15,25
39:24 43:8
43:15 45:2
47:9,18
48:8,21
49:3,10
50:3 57:21
58:11 59:2
59:9 62:9
66:13,16
68:18
71:18
73:11,18
73:25
76:23 78:9
78:19 83:4
84:4 85:17
86:24
87:25
88:13
89:16,17
89:19
90:13,17
91:18 94:3
94:21 96:3
96:20 98:9
99:6
100:22
107:15,20
111:19
112:13
113:16
119:25
122:2
123:13,20
124:25
125:24
129:21
135:9
136:5,8
140:17

144:9
145:15
146:21
149:16,17
149:23
150:11
151:2,3
152:5
153:8,24
153:24
154:10,14
154:15,19
155:6,6,17
157:11,17
157:18
158:22,22
161:17
164:16,24
165:20
166:14
**questioned**
119:6
**questioning**
41:4
**questions**
5:4,13
17:8 25:2
39:21
164:10
167:4
**quickly**
60:13 67:2
67:4 68:11
68:25
69:14,15
70:9,16,23
71:3,5,7
73:8
**quite** 8:24
9:5 43:2,2
57:20
86:23
121:12,21
127:4
152:16
160:18,20
**quote** 60:20
60:23 61:4
61:6,8
**quoted**

132:22
133:25
**quotes**
131:18
**quoting** 63:8

――――――
R
――――――
**R** 1:19 2:1
4:9,10
103:6
168:2,4,18
**R-e-n-** 6:11
**raise** 129:11
143:12
**raised**
122:14,17
128:12
**raises** 149:8
150:2
**range** 82:20
**rates** 117:10
**reach** 74:20
80:4,13
85:12,24
87:6 92:24
103:22
135:6
**reached** 80:8
83:24
134:6,9
155:23
**reaching**
14:13
**react** 94:18
94:25
126:17
**reaction**
97:25
100:10,12
108:17
**reacts** 109:6
**read** 48:20
60:19
88:12
103:20
104:14,22
107:15
161:21
**reading** 46:3
**realization**

148:19
**really** 11:16
13:20 20:4
25:15
28:10
36:10
47:19
156:5
158:22
**reason** 6:2
105:10
128:7
159:7,8
170:6,8,10
170:12,14
170:16,18
170:20
**reasonable**
151:8,11
151:19
**reasons**
13:20 16:8
109:15
114:9,9,12
152:18
170:3
**rebuttal**
140:21
**recall** 14:10
14:24
35:10,10
35:16
36:11,15
41:25
55:10
119:17
130:12
162:12
**receive** 6:22
6:24 7:7
7:12,19,22
52:21
**received**
24:5
**receiving**
7:18
**recess** 41:10
72:14
102:7
148:4

164:4
**recognize**
 19:3 24:15
 41:14
**recollect**
 162:18
**recollec...**
 14:16
 119:3,12
 162:6
**recollec...**
 56:8
**record** 3:3
 3:18 4:22
 5:6 6:10
 6:16 24:24
 31:19 33:7
 33:23 41:8
 41:12 51:6
 72:13,16
 75:6,16
 89:11,24
 102:6
 103:5
 148:2,6
 153:8
 164:3,6
 167:7
 168:9
**recycling**
 127:11
 129:4,23
 133:2
**redemption**
 104:11
 106:25
 117:10
 160:22
**reduced** 12:5
**Reese** 8:19
**refer** 129:21
**reference**
 130:10
 132:5
**referencing**
 137:17
**referred**
 60:16
 65:10
**referring**

14:19
20:12 25:3
47:23 70:5
80:9 101:5
117:19
136:19
**refers**
 145:23,24
 147:6
**Refinitiv**
 19:19,21
 19:21
 20:19 21:4
 21:18
 22:21,22
 22:24
 23:21,22
**reflect**
 143:25
 144:22
 148:22
**reflects**
 90:6
**refresh**
 119:16
**regard** 15:10
 31:13,22
 33:13
 34:22
 36:13
 38:18
 39:25
 40:13 45:3
 47:15 48:8
 49:16
 107:21
 123:6
 137:15
**regarding**
 17:13 32:9
 32:18 40:4
 86:12
 123:15,16
 132:8
 153:10,24
 154:20
**register**
 13:19
**regression**
 21:5 79:12

79:15,16
79:18,22
**regulatory**
 149:9
 150:2,4,16
 150:17
 151:5,10
 151:12
**rejected**
 54:25
 57:12,25
**relate** 124:4
**related**
 27:17 70:8
 105:7
 106:4,5
 109:16
 110:8,11
 110:13
 114:2,9
 121:13,14
 122:7,13
 123:17,23
 144:23
 149:10
 150:4,18
 151:14
 152:2,10
 152:24
 153:5,13
 154:22
 158:24
 168:10
**relates**
 152:16
**relating**
 29:23
**relation**
 74:12
**relation...**
 65:7 74:6
**released**
 17:12
 114:22
**relevant**
 20:6 68:3
 68:20,23
 121:9,13
 122:4,8
 130:19

151:20
**reliance**
 60:24
 143:5
**relied** 143:4
**relies**
 139:13
**rely** 61:14
**remember**
 7:14 8:24
 11:15
 35:14
 41:23 42:5
 47:2 54:13
 54:22 55:7
 55:14
 56:12 58:9
 58:22
 88:14
 104:6
 106:8
 119:14
 120:18
 153:5
 162:9
 163:12
**Ren** 1:16 3:6
 6:11 18:21
 24:12
 169:4,8,10
 170:22
**render** 16:4
**repeat** 38:20
 43:8 62:9
 71:18
 85:18 94:3
 94:21 97:8
 124:25
 146:21
 149:22
**repeated**
 95:21
 102:2
**repeating**
 96:4
**rephrase**
 63:10
 151:10
 152:6
 153:10

156:21
**report** 6:15
 14:22
 15:13,21
 15:24 17:2
 17:7,8,10
 18:20 19:4
 19:5,7,9
 20:5,6,7
 21:21
 22:16 24:6
 24:12,17
 24:18,21
 24:24 25:3
 25:4,22
 26:8,13,20
 27:4,9,10
 28:8,16,17
 28:19,22
 28:25 29:3
 29:10,14
 29:17 30:2
 30:5,8,23
 31:7,14,23
 32:4,10,18
 33:13 34:9
 34:15,22
 36:23,24
 37:6 40:23
 41:16,17
 41:21,25
 42:19
 45:19,19
 45:24 46:2
 46:9,15,16
 49:6,21
 50:6,7,10
 50:14,19
 50:21 51:2
 51:8,15
 52:24
 53:17,25
 55:4,6
 57:17
 62:17
 64:20 65:6
 78:3 79:8
 79:24
 82:18,22
 82:24

| | | | | |
|---|---|---|---|---|
| 83:11,16 | 163:17,19 | 100:7 | 10:18 | **revealed** |
| 83:18,24 | 163:21 | **request** 45:5 | **rest** 24:25 | 101:3,5 |
| 84:7,20 | 164:14 | **require** | **restate** | 139:21 |
| 85:19 87:3 | 166:4,7 | 123:21 | 150:11 | **review** 37:4 |
| 91:20 92:9 | 169:8,10 | **required** | 151:18 | 103:13 |
| 92:11,18 | 169:11 | 143:15 | 154:19 | 118:21 |
| 103:12 | **reported** 3:5 | **requirem...** | 157:2 | 119:8 |
| 104:10 | 168:7 | 98:19,25 | **restated** | **reviewed** |
| 106:11 | **reporter** | **requires** | 154:10 | 22:14,19 |
| 107:14 | 1:20 3:11 | 94:9 150:8 | **result** 63:15 | 37:3 |
| 111:4,21 | 4:7 5:15 | **reread** 36:22 | 71:5 92:2 | 118:25 |
| 112:25 | 168:4 | 36:24 | 96:10 | 119:11 |
| 113:20 | **Reporting** | **research** | 100:23 | 130:14 |
| 116:8 | 1:25 3:12 | 25:18 | 140:22 | **reviewing** |
| 118:19,23 | **reports** | 26:15,16 | **resulting** | 130:16 |
| 119:5,9,13 | 19:11 42:9 | 26:17,19 | 158:14 | **revised** 24:6 |
| 119:18,18 | 42:16,22 | 29:16 | **results** 20:6 | **ridiculous** |
| 119:20 | 43:5,10,13 | **reservat...** | **retained** | 87:24 |
| 120:13,14 | 43:18,23 | 109:20 | 14:21,25 | **right** 22:12 |
| 120:15,20 | 43:25 44:2 | **residual** | 15:12 16:2 | 27:23 35:8 |
| 121:9,17 | 44:7,9,13 | 93:24 94:5 | 16:6,7,12 | 39:13 |
| 121:22 | 44:19,22 | **resolve** | 16:21 | 49:17 |
| 122:4,21 | 45:3,5,10 | 125:16 | 17:16 | 57:10 |
| 123:23 | 46:12,13 | **Resources** | 34:17 | 86:11 87:4 |
| 124:3,8,15 | 46:18,20 | 53:12,14 | 35:20 | 87:19 |
| 124:19 | 47:10 48:6 | **respect** | 53:13 | 117:22 |
| 127:17 | 48:8,13,14 | 25:10 | 61:24 62:2 | 130:13 |
| 128:7,10 | 48:16 | 45:17 49:8 | 71:16 | 135:9 |
| 128:12,13 | 49:13 | 151:16 | 77:21,22 | 160:19,22 |
| 128:21 | 53:17 54:3 | 157:19 | **retention** | **rights** |
| 129:10,11 | 63:3,11,11 | 166:11 | 15:4,9,16 | 106:25 |
| 129:13 | 63:13 64:3 | **respond** | 15:19 | **risk** 11:5,23 |
| 130:4,6,7 | 80:6 | 62:25 | 18:15 | 12:2,6 |
| 130:10,24 | 112:14,16 | **responds** | 35:16 | 124:11,22 |
| 131:2,18 | 118:25 | 110:6 | **return** 80:14 | 124:23 |
| 132:18,22 | 119:4,7,8 | **response** | 93:24 94:5 | 125:3,4,20 |
| 133:5 | 119:11,13 | 34:5 97:5 | 94:12 95:9 | 125:21 |
| 134:2,4 | 119:15 | 97:12 | 96:6 | 126:2,3,10 |
| 135:24 | 138:2 | 137:22 | 101:10 | 126:11,18 |
| 136:15 | 153:19 | 145:10,18 | 108:12 | 126:19,22 |
| 137:9,9,24 | **represen...** | 146:4,17 | 115:25 | 126:24,24 |
| 138:17,25 | 94:16,23 | 146:24 | 116:4,5 | 127:4,8,20 |
| 139:13,14 | **represen...** | 153:8 | 140:7,15 | 127:23 |
| 142:16 | 105:2 | **responses** | **returns** 20:3 | 128:19,24 |
| 143:11 | **represented** | 5:15 | 21:18 | 136:5,20 |
| 144:12 | 36:4 | 143:25 | 22:22 | 136:25 |
| 156:15 | **represen...** | **responsi...** | 80:17 | 137:2,11 |
| 157:5,10 | 36:5 | 9:2,6 | 165:3 | 137:17,20 |
| 162:20 | **represents** | **responsible** | **reveal** | 144:17 |
| 163:8,11 | 4:16 39:15 | 9:17 10:17 | 118:19 | 148:9,19 |

149:2,5,8
149:10
150:2,4
**risks** 135:23
137:13
138:22
148:16
**River** 6:13
**ROCH** 75:19
78:6 79:24
82:19
83:11
165:3,6,8
**ROCH's**
103:19
**Rochester**
12:14,16
13:5,8,11
13:13,15
**role** 26:15
104:10
117:10
140:21
155:20
**room** 37:15
**Roth** 1:9
2:17 3:25
167:5
**rule** 153:3
**rules** 4:20

**S**

**S** 2:1,11 4:9
103:6
169:6
**S-e-i-n-e**
6:13
**S-t-u-l-z**
6:12
**S3** 65:4
**satisfied**
72:9 74:17
74:25
76:15,17
**satisfies**
67:20 69:3
70:10,18
70:21
71:12 72:2
72:20

73:19
**satisfy**
67:15,23
74:4,8
**saw** 29:5,6
**saying** 51:6
62:2,24
86:8,24
87:15 90:6
90:8,11
98:18
106:8
121:21
127:17
128:9
131:19,20
132:11
133:19,24
134:19
135:7
146:10
155:16
156:22
160:18
**says** 24:17
130:8
139:12
**scalability**
136:9
137:14
**scalable**
127:19,20
129:24
130:8,9
139:5
**scale** 127:25
135:24
**scaled**
127:12
129:5
131:10
134:13
135:14
136:2
**School** 8:3,6
**scope** 15:19
81:23
**scrutiny**
149:9
150:2,4

**search** 9:11
**searches**
10:17
**SEC** 42:6
139:23
140:8
152:8,17
152:22
153:3,6,11
153:20,25
154:21
158:14,15
160:10
**second** 6:12
39:24
48:20
113:6,10
**section**
42:11 43:6
43:11,13
43:14,20
43:22 44:2
44:15,20
45:12 51:2
51:7,14,24
54:11 62:5
62:12 64:6
71:11
77:18
92:11
112:5
128:10
129:11
136:15
137:10
166:4
**securities**
35:17,22
36:15
42:11
53:12 54:5
58:5 69:19
71:23
75:10,23
76:9 80:23
81:7,12,16
82:3,7,15
83:7,15
84:2,7,13
85:6,21

86:5,25
87:16
88:18 90:9
91:15,25
92:6,14,25
93:18,21
112:6
113:18
114:6,14
119:2
139:18
140:20
144:19
148:10
**security**
45:13 52:2
63:21 64:2
64:7 65:8
66:19 68:4
68:21 69:9
70:10,13
70:15,17
70:21,22
71:4,12
72:2,19,21
73:8,19
74:17
80:10 95:8
140:19
**security's**
144:15
**see** 30:18
41:4,20
56:23,24
104:12
106:4,5
107:2,3
125:12
152:6
166:20
**seeing** 90:14
**seeking**
30:14
**seen** 41:17
136:3
**Seine** 6:13
**seller**
114:20
115:3
**semi-strong**

60:10
61:22
**send** 30:22
**sense** 10:16
28:10
33:24 71:6
73:7 98:14
99:14
110:24
116:13
120:4
146:9
157:18
**sensitivity**
165:8
**sent** 31:3
41:25
**sentence**
113:10,11
145:22
146:8
**sentences**
147:6
**separate**
73:2
153:14
154:5,23
155:10
156:12
158:5,11
158:24
**serve** 113:7
146:13
**service** 9:11
**Services**
20:24 23:4
23:13,25
**session**
39:25
103:2
**set** 20:2
106:10
107:24
121:9
122:20
128:20
168:14
**sets** 77:15
107:9
140:23

settled
  55:16
  56:10
shaking 5:14
SHEET 170:1
short 114:20
  115:3
  123:2
Shorthand
  1:20 168:4
shortly 6:16
  41:22
show 74:13
  76:17
  79:25 80:4
  83:14
  84:21 85:7
  87:16 92:2
  92:19 93:5
  100:24
  101:7
  109:13,21
  142:17
  143:19
  149:4
  155:21
showed 29:5
shown 73:14
  74:23
  75:19,22
  78:5 81:12
  84:13,21
  86:9,25
  88:17,19
  88:21
  91:14,24
  93:20,22
  108:16
  120:8
  145:4
  155:4
side 36:2
sided 55:3,5
  57:19
signature
  30:24
signific...
  80:13,17
  92:22
significant

93:25 94:6
94:11,18
94:25
95:23 96:5
96:10
101:9
115:23
116:3,6
140:10,16
140:17
similar
  122:14
similarly
  1:5 142:23
simply 85:22
  88:17
  108:6
  125:19
  133:5
  134:14
  137:21
  150:15
single 129:2
sitting
  31:20
  32:16 33:8
  34:20
  46:20
  48:12
  80:22 81:5
  81:14 82:5
  114:3,11
  140:2
situated 1:5
  142:23
situation
  19:25 49:4
  157:23
situations
  46:25
  47:21
skills
  132:13
software
  22:24
  23:23
solely
  101:10
somebody
  14:11

21:18
22:21
29:13
61:25
70:18
sooner 5:18
sorry 22:7
  57:20
  81:21
  111:6,16
  123:9
  146:8
sort 6:6
  150:20
SPAC 52:11
  52:14,15
  53:8 54:11
  92:21 93:8
  93:10
  107:6
  117:9,11
  117:12,13
  152:22
  166:18
SPACs 80:6
  107:8
  117:23,24
  152:19
  160:19
speak 40:18
special 52:8
specific
  33:16 47:9
  75:6 96:15
  100:6
  133:24
  134:2
  135:14
  141:5
specific...
  25:3 46:19
  55:14
  105:20
  107:20
  161:12
specifics
  125:15
specified
  94:10,11
  95:10

speculate
  23:18
  29:23
speech 89:16
spent 8:3,7
spoke 28:24
spreads
  65:17
spreadsheet
  20:20 21:4
square 161:8
staff 25:17
stage 43:17
  43:21
  44:14
  58:12,15
  59:6 71:12
  143:16
Stair 26:10
stake 131:25
stand 28:16
standard
  59:21 60:3
  60:9 68:12
  68:15
  69:12,25
  70:4,7,20
  73:5,9
  78:7
standards
  69:2,24
  74:11,14
  74:16,24
  77:7
standpoint
  108:6
  121:6
start 8:24
  23:5,16
  24:2
  106:17
  146:2
started 27:9
  90:17
starting
  103:24
  105:8
  117:8,14
starts
  166:19

state 1:21
  6:9 8:12
  8:16 10:12
  10:15,22
  12:9,11
  13:15
  25:16
  103:15
  120:14
  150:15
  151:19
  157:4
  168:5,19
stated 4:15
  87:21
  146:9
  157:10
statement
  87:10 91:2
  95:7 96:15
  96:16,20
  97:2,5,8
  97:13 99:6
  99:9,16
  100:4,7,12
  100:23,24
  101:8,11
  101:12
  107:7
  110:19,22
  111:13
  135:25
  136:2
  149:7
  150:23
  160:8
statements
  61:3
  101:14,16
  119:14
  123:24
  124:4
  125:13
states 1:1
  129:3
stating 85:9
  85:10,19
  133:5,11
statisti...
  93:24 94:6

| | | | | |
|---|---|---|---|---|
| 94:18,25 | 147:9 | 10:1 11:1 | 103:1,11 | 153:1 |
| 95:23 | 148:18 | 12:1 13:1 | 104:1 | 154:1 |
| 96:10 | 152:20,23 | 14:1,4 | 105:1 | 155:1,7 |
| 115:23 | 152:25 | 15:1 16:1 | 106:1 | 156:1 |
| 116:3 | 153:4,21 | 17:1 18:1 | 107:1 | 157:1 |
| 140:10 | 156:17,19 | 18:21 19:1 | 108:1 | 158:1 |
| **stenogra...** | 157:7,25 | 20:1 21:1 | 109:1 | 159:1 |
| 3:5 | 158:3,16 | 22:1 23:1 | 110:1 | 160:1 |
| **step** 11:8 | 158:19 | 24:1,12 | 111:1 | 161:1 |
| 22:23 | 159:4,6,9 | 25:1 26:1 | 112:1 | 162:1 |
| **stock** 60:12 | 159:13 | 27:1 28:1 | 113:1 | 163:1 |
| 61:3 66:5 | 160:21 | 29:1 30:1 | 114:1 | 164:1,9 |
| 67:15,20 | 161:13,18 | 31:1 32:1 | 115:1 | 165:1 |
| 67:23 | 166:12 | 33:1 34:1 | 116:1 | 166:1 |
| 68:10,24 | **straight...** | 35:1 36:1 | 117:1 | 167:1 |
| 69:5,13,14 | 70:2,4 | 37:1 38:1 | 118:1 | 169:4,8,10 |
| 70:9 74:7 | 131:17 | 39:1 40:1 | 119:1 | 170:22 |
| 74:7,14 | **Street** 2:18 | 41:1,14 | 120:1 | **subject** 42:9 |
| 75:2 82:19 | **strictly** | 42:1 43:1 | 121:1 | 43:5,10,19 |
| 83:11 | 96:3 | 44:1 45:1 | 122:1 | 44:14,19 |
| 94:17,24 | **strikes** 98:9 | 46:1 47:1 | 123:1 | 45:4 50:20 |
| 95:14,17 | **structured** | 48:1 49:1 | 124:1 | 54:10 |
| 95:22 | 145:22 | 50:1 51:1 | 125:1 | 142:18,20 |
| 96:10,17 | **student** 13:9 | 52:1 53:1 | 126:1 | 151:19,23 |
| 97:25 | 13:10,12 | 54:1 55:1 | 127:1 | 153:12 |
| 98:12,22 | **students** | 56:1 57:1 | 128:1 | 154:4,21 |
| 99:7,10 | 9:16 11:3 | 58:1 59:1 | 129:1 | 155:8 |
| 100:9,23 | 11:12,24 | 60:1 61:1 | 130:1 | 156:10 |
| 101:22 | **studies** | 62:1 63:1 | 131:1 | 157:13 |
| 102:3,3 | 79:15 | 64:1 65:1 | 132:1 | 158:9,23 |
| 103:19 | **study** 76:14 | 66:1 67:1 | 133:1 | 159:12 |
| 104:2,5,8 | 76:16,21 | 68:1 69:1 | 134:1 | 160:4 |
| 105:2 | 77:2,4,6 | 70:1 71:1 | 135:1 | 163:7,8 |
| 106:16 | 77:17 | 72:1,18 | 136:1 | **submitted** |
| 108:21,22 | 78:14 79:2 | 73:1 74:1 | 137:1 | 41:22,24 |
| 108:25 | 79:12 | 75:1 76:1 | 138:1 | **submitting** |
| 109:2,6,16 | 80:12 92:3 | 77:1 78:1 | 139:1 | 163:17 |
| 110:7,24 | 92:10,10 | 79:1 80:1 | 140:1 | **Subscribed** |
| 110:25 | 92:12,18 | 81:1 82:1 | 141:1 | 167:12 |
| 111:3 | 92:23 93:5 | 83:1 84:1 | 142:1 | **subsequent** |
| 114:21,24 | 93:8,12 | 85:1 86:1 | 143:1 | 113:6 |
| 115:5,20 | 94:9,10 | 87:1 88:1 | 144:1 | 123:13 |
| 116:18,20 | 95:10 99:9 | 89:1 90:1 | 145:1 | **substantial** |
| 117:3 | 99:11 | 91:1 92:1 | 146:1 | 11:24 |
| 120:8,9 | 100:9 | 93:1 94:1 | 147:1 | **sufficient** |
| 129:17 | **Stulz** 1:17 | 95:1 96:1 | 148:1,8 | 70:12 |
| 140:3 | 3:1,6 4:1 | 97:1 98:1 | 149:1,18 | 71:13 |
| 145:10,18 | 4:13 5:1 | 99:1 100:1 | 150:1 | 72:20 |
| 146:4,12 | 6:1,12 7:1 | 101:1 | 151:1 | 73:20 |
| 146:17,24 | 8:1 9:1 | 102:1 | 152:1 | 74:18 |

78:15
**sufficie...**
77:17
80:18
126:25
**suggest**
77:11
144:13
**suggested**
30:7
**suggesting**
132:7
**suggestion**
28:14
**suggestions**
30:17,18
**suing** 54:6
**Suite** 2:9,18
**summarized**
133:18
**summary** 56:9
56:11,12
56:24 58:8
58:9
**support** 85:7
86:3 90:8
90:11,24
91:4,6,21
**supportive**
73:16
**Supreme**
60:14,21
61:25
76:18,24
77:9
161:19
**sure** 8:25
9:5,25
10:13
21:11
23:19
26:11
31:19 33:7
33:14 35:7
36:10,10
38:21
42:18,18
43:9 45:16
47:3 51:5
54:14,22

58:24 59:2
62:10,18
65:22
67:19
68:23
71:19 75:5
76:23
85:19
86:23
87:13
88:13 94:4
94:22
116:24
121:12
123:12
125:2
126:12
130:16
132:4
146:22
148:20
150:10,13
151:22
152:5,16
156:21
163:3,25
**surprised**
42:19
44:11
**surrounding**
153:14
154:2,23
155:9
156:12
157:5
158:10
**swear** 4:7
**swearing**
3:16
**Switzerland**
7:10,24
**sworn** 4:10
5:24 103:7
167:12
170:23
**system** 21:9

———— **T** ————

**T** 4:9 103:6
168:2,2

169:6
**take** 5:17,20
16:18
18:24
24:19 38:6
41:5 72:11
90:20,23
90:25
103:13
107:14
147:18
151:7
163:24
**taken** 1:17
19:2 41:10
72:14
114:20
115:3
147:16
148:4
164:4
**takes** 147:11
**talk** 28:21
65:5 80:7
**talked** 14:12
14:17
36:24
39:22
72:25
93:17
118:5
**talking**
60:21
80:16 83:5
101:20
112:3
155:3
**Tamar** 2:5
3:19 4:15
**target** 104:5
**TASMIN** 1:9
**taught** 10:21
10:24,25
11:2,3,4,4
11:6,16,23
12:19,21
12:23
**tautology**
152:4
**teach** 9:13

9:14,14,16
11:13,17
11:20 12:2
12:6,15,18
12:20 13:4
**teaching**
9:12,19,23
10:3,7,7
11:7,9
12:4
**team** 116:24
117:20,21
**technical**
19:24 20:8
20:11,12
20:16,18
21:2
**Technolo...**
1:8 2:7
3:8
**tell** 5:24
6:3,7
49:17
121:4
141:15
**tells** 141:16
**ten** 9:24
26:3 35:15
42:24 44:6
44:17,24
163:24
**term** 157:22
**test** 65:22
67:2,3
76:21 92:4
**testified**
4:11 30:12
88:25
103:7
108:15
**testimony**
28:4 32:6
46:3 50:24
53:4 75:13
85:14
86:17 87:8
88:3,7,22
89:7 90:3
90:18
96:23,25

97:11
119:23,25
133:9,17
134:16
136:22
156:25
161:16
**tests** 65:19
65:23
67:11,17
**Thank** 5:22
6:14 7:18
13:14
51:23 68:2
164:7
**Theodore** 1:4
3:7
**theories**
162:9,11
**theory** 10:25
13:3
103:16
104:18
105:16
106:12
107:17,22
108:4,5
110:20
112:21
113:11
114:8
115:9,15
117:6
118:2,6,13
120:6
145:2
165:15,18
165:22
166:10,15
166:22
**thing** 5:3,12
52:12
**things** 11:5
63:2 83:6
97:6
144:23
**think** 9:22
9:23 11:22
14:6 16:15
16:16

| | | | | |
|---|---|---|---|---|
| 19:17 | **time** 3:3 | 40:2 | 23:15,25 | 134:7 |
| 33:23 35:8 | 8:16 9:4 | **told** 5:7 | 67:16,22 | 135:5 |
| 35:14 | 10:15 11:2 | 46:13 51:4 | 71:6 104:7 | **types** 101:14 |
| 43:25 | 11:15,22 | 55:25 | 104:13,19 | 108:20 |
| 44:17,24 | 18:24 | 154:12 | 105:3,4,5 | 133:21 |
| 45:7 48:3 | 24:19 | **Tollen** 163:3 | 106:3,17 | **typical** |
| 49:7 50:7 | 30:13 | **tool** 63:16 | 108:9 | 64:17 |
| 50:17 | 35:11,13 | **tools** 63:16 | **training** | **typically** |
| 54:23 | 51:3 54:8 | 63:17 79:9 | 150:8 | 45:23 |
| 56:17 | 60:3 61:23 | 100:8 | **transaction** | 64:11,15 |
| 59:19 | 66:5 | 158:4 | 83:20 84:8 | 140:21 |
| 78:10 | 103:13 | **topic** 110:13 | 85:3 | |
| 80:18 83:5 | 107:14 | 122:14,16 | **transcript** | **U** |
| 90:5 93:16 | 129:25 | **topics** 9:18 | 5:2 168:8 | **U** 4:9 103:6 |
| 101:19 | 135:22 | 9:23 11:11 | **trial** 53:4 | **ultimately** |
| 106:23 | 139:5 | 123:22 | 58:8 | 60:5 |
| 108:15 | 143:12 | 127:23 | **tricky** 10:16 | **Um-hum** 43:16 |
| 110:6 | 146:19 | 128:20 | 13:18 | **unaware** 33:9 |
| 111:25 | 147:2,12 | **touch** 29:24 | **trouble** | **uncertainty** |
| 112:2 | 147:18,20 | **trade** 66:6 | 147:5 | 153:13,21 |
| 121:21 | 159:24 | 67:24 69:6 | **true** 168:9 | 154:2,3,22 |
| 122:24 | 162:8 | 69:10,13 | **truth** 5:24 | 155:9 |
| 123:14 | 167:2,9 | 69:17 | 6:3,7 | 156:11,16 |
| 125:22 | **times** 4:18 | 75:21 | **trying** 81:22 | 157:5,13 |
| 126:10 | 32:20 33:5 | 82:24 | 89:8 | 158:10,14 |
| 130:7 | 37:25 42:6 | 83:19 | 103:24 | 158:23 |
| 133:4,18 | 64:19 | 91:15,25 | 138:16 | 159:3 |
| 142:14 | 81:19 88:8 | **traded** 63:21 | **turn** 24:23 | **unclear** 5:4 |
| 143:22 | 142:4 | 69:19 | 130:25 | 5:8 63:10 |
| 145:15 | **title** 10:18 | 75:10 76:2 | **turning** | 100:17 |
| 150:7 | 53:3 | 80:20,23 | 52:23 | **undergra...** |
| 151:2 | **titles** 10:14 | 81:7,12,16 | **two** 19:17 | 7:20 |
| 155:4 | **today** 4:22 | 82:3,7,15 | 33:3 36:9 | **undergra...** |
| 158:21 | 5:24 6:3,7 | 83:7 84:8 | 37:14,20 | 11:12 |
| 162:18 | 31:20 | 84:13 85:2 | 39:9 43:12 | **underlying** |
| **thinking** | 32:16 33:8 | 85:6,21 | 53:15 54:3 | 156:20 |
| 148:16 | 34:21 | 86:5,9,12 | 54:4 56:19 | **understand** |
| **Third** 1:18 | 36:18,21 | 86:25 | 68:7 73:2 | 5:5,8,23 |
| 2:4 3:14 | 37:9,13,15 | 87:17,22 | 83:5 | 6:14 16:10 |
| **thought** | 40:8,13,19 | 88:18 89:3 | 109:20 | 20:12 22:7 |
| 38:17 | 41:18 | 90:9 92:25 | 122:9 | 23:12,17 |
| 39:21 | 46:21 | **trades** 64:2 | 125:13 | 23:21,22 |
| 50:18 | 48:12 75:5 | 66:19,19 | 126:14 | 32:6 33:14 |
| 155:19 | 80:22 81:6 | 67:21 68:4 | 153:14 | 39:8,14,19 |
| **three** 2:13 | 81:14 82:6 | 68:21 69:5 | 154:23 | 47:18 |
| 12:14,21 | 114:3,12 | 70:17 | 155:2,9 | 52:11 53:2 |
| 13:5 19:12 | 140:2 | 71:14 72:4 | 156:12 | 55:12,13 |
| 39:15 | 149:15 | 72:21 | 158:11 | 65:10 71:8 |
| **threshold** | **today's** 37:4 | 73:20 75:2 | **type** 26:19 | 71:9,19 |
| 66:7 | 37:18,22 | **trading** 23:4 | 93:7 98:23 | 76:23 |

81:23,24
85:17
86:23
103:25
106:24
107:10
112:4,8
123:12
135:3
145:15,23
149:2
151:2
156:22
157:4,10
157:17
160:23
161:23

**understa...**
14:23
16:19,24
20:18  24:5
50:23
62:19
64:14
71:10
77:22
88:23
90:18  98:2
98:4
103:16,23
104:16,18
104:23,25
105:10,15
105:23
106:15,20
108:3
112:19
114:7
115:11,18
116:16,19
117:5,9,11
117:17,23
118:6,8,12
118:15,22
120:5
122:9
130:19,20
132:4
143:14,18
144:25

148:12
149:19
157:21
161:22
162:2,5
165:23

**understood**
5:9 39:24
81:5
106:11
107:16,21
116:24,25

**unfortunate**
163:2

**UNITED** 1:1

**university**
7:9,10,11
7:23 8:12
12:14,15
13:7,10,15
26:17,18

**unrelated**
98:24
113:23,24
156:19
158:18
160:5

**upper** 142:8

**use** 19:23
21:6 30:5
52:11 60:9
61:24
63:11,15
63:17
64:18,18
64:19 65:3
68:14,14
69:2 77:24
78:4 79:24
80:5,12
92:12,23
93:12 99:8
122:7
158:4

**useful**
131:20

**uses** 64:20
78:7 116:6

---
**V**
---

**valuable**
131:7
134:10
135:11
137:5
138:5
139:3

**valuation**
142:6

**value** 123:25
134:20,25
136:9
137:15
138:19,23
141:5

**value-re...**
94:2,7,13
95:7

**variety**
26:22

**various** 60:3
78:4 80:15
88:20
138:9,21
140:7,23
147:6

**veering**
30:10

**vehicle**
52:16,21

**verbally**
5:14

**versed** 4:19

**version** 19:9
30:23

**versus** 3:7
28:9 60:15
60:23
65:25
161:20
162:21
163:3

**vice** 2:5

**Video** 1:25
3:12

**videogra...**
2:24 3:2
3:10 4:6
41:8,11
72:12,15

102:5
103:4
148:2,5
164:2,5
167:6

**videotaped**
1:16 3:5

**volume** 64:25

---
**W**
---

**Wacker** 2:9

**want** 21:4
48:20
67:19
73:24 75:5
100:24
108:2
109:2
122:7
137:25

**wanted** 45:16
135:3

**wasn't** 13:21
13:25 16:6
36:6,15
50:18
78:23
110:2
123:10
125:18
128:9
148:23
162:10

**way** 26:12
27:7 28:6
50:8 61:10
61:15,16
61:19
73:15
76:14
77:10
81:15 93:9
97:4,6
99:11
100:15
101:12
106:21
108:4
109:7
118:7

130:23,24
133:18
145:22
147:23
149:4
150:11
155:24
163:20
168:12

**ways** 26:23
27:12,15
43:12 80:3
99:3,4,20
141:23

**we're** 83:5

**week** 24:7

**Weinrib** 2:5
3:19,19
4:12,16
18:18 24:9
30:16
32:21 33:2
33:21
40:21
41:13
48:22 49:2
49:10,24
50:4 72:11
72:17
78:23
81:20
86:19 88:4
88:9 89:9
89:14,19
89:25
99:25
100:20
103:10
119:24
125:7
126:7
148:7
149:15
150:21
154:9,14
163:23,25
164:15,23
165:19
166:13
167:3

| | | | | |
|---|---|---|---|---|
| **went** 13:12 | 45:22 46:8 | 168:6,19 | **12:04** 102:6 | 105:17 |
| 21:18 | 46:21,22 | | 102:7 | 116:21 |
| 22:21 | 47:15 | **Z** | **12:49** 103:3 | 161:12 |
| 23:22 | 48:17 | **Z** 4:9 103:6 | 103:5 | **2021** 113:18 |
| 28:10 42:6 | 50:17,18 | **Zoom** 2:20 | **13th** 104:6 | 114:4,13 |
| **West** 2:9 | **wouldn't** | 37:19 | **15** 140:14 | 114:24 |
| **Wethli** 26:9 | 42:18 | | **16** 92:22 | 115:22 |
| **WHEREOF** | 44:11 | **0** | 93:6 | 122:22 |
| 168:14 | 77:12 | | 103:18 | 123:7 |
| **wide** 26:22 | 110:16 | **1** | 104:24 | 127:9 |
| **widely** 19:23 | 140:16 | **1** 18:19,20 | 105:17 | 129:6 |
| 128:15 | **write** 27:16 | 18:25 | 108:12 | 139:18 |
| **WILLIAM** 1:4 | 28:2 | 67:10,15 | 115:19 | 140:4,9 |
| **wish** 41:5 | **wrong** 19:18 | 67:21,24 | 116:21 | **2022** 162:20 |
| 170:2 | 23:22 | 68:3 69:3 | 161:12 | **2023** 7:16 |
| **withdrew** | 105:10 | 69:7 71:12 | 165:25 | 14:8 40:24 |
| 55:19 | 113:9 | 72:3,9 | 166:19 | 53:16 |
| **witness** 3:16 | 163:15 | 74:17 | **164** 103:12 | 169:12 |
| 4:7,11 | **wrote** 27:9 | 148:20 | **18** 169:8 | **2024** 1:13 |
| 34:3 | 27:25 | 169:8 | **191** 107:14 | 3:4 18:21 |
| 168:14 | | **10** 117:14 | 107:21,24 | 19:8 24:12 |
| 169:3 | **X** | 161:7 | 111:11,13 | 167:13 |
| **witness's** | **x** 1:3,11 | **10(b)** 42:11 | 111:20 | 168:15 |
| 89:8 | 169:2,6 | 43:6,11,20 | 113:5 | 169:9,10 |
| **word** 28:16 | | 44:15,20 | **1934** 42:12 | 170:23 |
| 52:11 88:2 | **Y** | 45:12 | **1975** 8:2 | **20th** 2:4 |
| 122:7 | **Yan** 26:9 | 51:24 | **1980** 6:25 | 3:15 |
| 151:7 | **year** 7:15,25 | 54:11 62:5 | **1990s** 8:23 | **212** 1:25 |
| **words** 88:3 | 8:3,7 10:4 | 62:12 64:6 | 9:3,23 | **226** 124:8 |
| 88:20 89:8 | 10:6 14:7 | 71:11 | **1996** 8:24 | **229** 124:8 |
| 122:10 | **yearlong** | 77:18 | | **23** 18:21 |
| **work** 9:16 | 9:16,22 | 112:5 | **2** | 169:8 |
| 13:22,24 | 11:10 | **10(b)(5)** | **2** 24:10,11 | **230** 131:2 |
| 25:10 32:4 | **years** 8:14 | 140:21 | 24:16 | 132:5 |
| 36:12 64:2 | 9:24 11:19 | **10:11** 41:12 | 60:17,21 | **24** 169:10 |
| 77:25 92:7 | 12:4,14,21 | **100** 2:18 | 61:9 62:4 | **273-9911** |
| 92:8,17 | 13:5 35:13 | 4:24 45:8 | 62:10,19 | 1:25 |
| 96:2 | 35:15 | **10016** 2:4 | 63:5 69:8 | |
| 163:16 | 42:15,20 | 3:15 | 169:10 | **3** |
| **worked** 25:18 | 53:5 54:9 | **10036-6797** | **2/20/2027** | **3** 40:22,23 |
| 26:8 35:3 | **yesterday** | 2:14 | 168:20 | 41:15 69:8 |
| 35:11 36:7 | 36:25 38:7 | **1095** 2:14 | **2:07** 148:3 | 169:11 |
| 46:6 51:9 | 38:8,12,15 | **10th** 168:15 | **2:24** 148:6 | **3:07** 164:6 |
| 93:11 | 38:22 39:2 | **11** 139:18 | **2:48** 164:3 | **3:11** 167:8,9 |
| **working** 42:7 | 40:2,17 | 140:4,9 | **20** 42:20 | **30** 40:24 |
| 63:4 92:9 | **yield** 80:2 | 159:18 | 44:9,12 | 169:12 |
| **works** 84:20 | **York** 1:19,19 | **11:03** 72:13 | **2013** 161:20 | **3203** 2:18 |
| **worth** 46:5 | 1:21 2:4,4 | **11:20** 72:16 | **2014** 60:15 | **3400** 2:9 |
| 51:3 | 2:14,14 | **11th** 77:14 | **2020** 92:22 | **3419** 6:13 |
| **worthwhile** | 3:15,15 | 78:13,20 | 103:18 | **35** 2:9 |

**4**
**4** 67:10,16
  67:21,24
  68:3  69:4
  69:8  71:13
  72:3,10
  74:17
  169:4
**40** 8:14
  169:11

**5**
**5** 19:8  24:12
  65:11,18
  69:8  70:6
  70:7,11,19
  70:22  71:2
  72:20  73:6
  73:19  74:4
  74:8  76:14
  76:17
  79:13
  164:22
  169:10
**50** 59:17,22

**6**
**6** 113:18
  114:4,13
  114:24
  115:12,22
  116:18
  122:22
  123:2,7,10
  127:9,18
  127:25
  129:6
  135:11
  136:8
  138:3
  145:6
**6:21-cv-...**
  1:7
**600** 1:18  2:4
  3:14
**60601-1608**
  2:10

**7**
**75** 59:23

60:7

**8**

**9**
**9** 1:13  3:4
  24:23  25:6
  25:16
**9:05** 1:13
  3:3
**9:58** 41:9
**90s** 11:23
**94304-1123**
  2:19