## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

WILLIAM C. THEODORE,
individually and on behalf of all others
similarly situated,

      Plaintiffs,

      v.

PURECYCLE TECHNOLOGIES,
INC., MICHAEL OTWORTH,
MICHAEL E. DEE, DAVID
BRENNER, and BYRON ROTH,

      Defendants.

Case No. 6:21-cv-809-PGB-GJK

**CLASS ACTION**

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION

**POMERANTZ LLP**
Tamar A. Weinrib (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665

*Lead Counsel*

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Robert Ciecko and Mariusz Ciecko ("Plaintiffs"), individually and on behalf of all Settlement Class Members, respectfully submit this memorandum of law in support of their motion seeking: (i) final approval of the proposed Settlement presented in the Stipulation of Settlement dated May 6, 2024 (ECF No. 201-2) (the "Stipulation"),[1] (ii) final approval of the proposed plan of allocation for the Settlement proceeds (the "Plan of Allocation"), and (iii) final certification of the Settlement Class. Defendants[2] do not oppose this motion.

## I.   PRELIMINARY STATEMENT

After nearly three years of hard-fought litigation, Plaintiffs, through their counsel, obtained a $12,000,000 all cash, non-reversionary settlement (the "Settlement Amount") for the benefit of the Settlement Class. Plaintiffs respectfully submit that the proposed Settlement is fair, reasonable, and adequate and satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure. As described below and in the Weinrib Decl.[3] filed herewith, the proposed Settlement is an outstanding result for the Settlement Class, providing a significant and certain recovery in a case that presented numerous hurdles and risks.

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings set forth in the Stipulation of Settlement, filed on May 7, 2024 ("Stipulation"). ECF No. 201-2.
[2] "Defendants" are PureCycle Technologies, Inc. ("PureCycle"), Michael Otworth ("Otworth"), Michael E. Dee ("Dee"), David Brenner ("Brenner"), and Byron Roth ("Roth").
[3] "Weinrib Decl. refers to the Declaration of Tamar A. Weinrib in Support of Unopposed Motions for (1) Final Approval of Class Action Settlement and Plan of Allocation; and (2) Attorneys' Fees, Expense Reimbursement, and Compensatory Awards to Lead Plaintiffs.

The Settlement results from extensive arm's-length negotiations between experienced counsel that began with an all-day mediation on February 26, 2024 before Jed Melnick, Esq. of JAMS mediation services and continued with settlement negotiations spanning over a month thereafter with Mr. Melnick's assistance. The Settlement is particularly favorable considering the challenges posed in this complex securities class action and potential obstacles to recovering a substantial judgment given PureCycle's financial condition and limits on Defendants' insurance.

When the Parties agreed to settle this Action, Defendants' motion for reconsideration ("Recon. Mot.") of the Court's motion to dismiss ruling and Plaintiffs' motion to certify the class ("Class Cert. Mot."), both hotly contested, remained *sub judice*. In their Recon. Mot., Defendants argued *inter alia* that "recent developments" demonstrated the viability of PureCycle's polypropylene recycling technology and thus undercut allegations of falsity as to alleged misstatements regarding that technology, and further argued that the SEC's decision to close its investigation into Defendant Otworth undercut allegations of scienter. While Plaintiffs opposed the Recon. Mot. and argued that these post-Class Period events do not erase Defendants' liability for statements made during the Class Period, there remained a risk that the Court would grant the Recon. Mot. and dismiss this Action, particularly given that this Court already dismissed this Action on scienter grounds once before.

Moreover, in opposing the pending Class Cert. Mot., Defendants argued that: 1) Plaintiffs did not have standing to pursue claims for misstatements issued prior to consummation of the de-SPAC transaction between Roth CH Acquisition I Co. ("ROCH") and PureCycle; 2) Plaintiffs could not establish market efficiency prior to the de-SPAC transaction and thus could not invoke the fraud on the market presumption for that time frame; and 3) Plaintiffs could not establish that either the Hindenburg Report or the disclosure revealing the SEC's investigative subpoena to Otworth qualify as corrective disclosures. While Plaintiffs strenuously disagree with Defendants' arguments, as set forth in the relevant briefing, the risk remained that the Court would adopt Defendants' views and either severely restrict the Class Period or decline to certify the class at all, particularly in light of recent case law[4].

Even if Plaintiffs prevailed in full on both the Recon. Mot. and Class Cert. Mot., they faced a risk of dismissal on Defendants' expected motions for summary judgment, at trial, or on appeal. At trial, Plaintiffs would have to convince a jury that Defendants made actionably false and misleading statements, with either intent or severe recklessness, which caused Plaintiffs' and the Settlement Class's losses upon revelation of the truth when both the Hindenburg short seller report published on

_____

[4] *See Max Royal LLC v. Atieva, Inc. (In re CCIV / LUCID Motors Sec. Litig.)*, 110 F.4th 1181 (9th Cir. 2024).[5] Similarly, the first and fourth *Bennett* factors look at "the likelihood of success at trial," and "the complexity, expense and duration of litigation," respectively. *Bennett*, 737 F.2d at 986; *see also In re Checking Account Overdraft Litig.*, 2013 WL 11319392, at *8 (S.D. Fla. Aug. 5, 2013) (*Checking II*) ("The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.") (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)).

May 6, 2021 and the Company's disclosure of the SEC's issuance of an investigative subpoena to Defendant Otworth came to light. The bar for establishing each element of a Section 10(b) claim at trial—including falsity, scienter, loss causation, reliance, and damages-- is high. While Plaintiffs still believe in the merit of their claims, a significant risk existed that the jury would not agree.

Additionally, even if Plaintiffs achieved a judgment at trial and successfully litigated through any appeal, the risk of collecting on that judgment was considerable. PureCycle has never earned any profit.  The Company has one operation, its polypropylene recycling technology, from which it has yet to earn any material revenue.  According to PureCycle's Form 10-Q filed on August 8, 2024, the Company had only $10,895,000 in cash and cash equivalents as of June 30, 2024, as compared to $73,411,000 as of December 31, 2023, and had $428,142,000 in total liabilities. Moreover, continued litigation would have further exhausted PureCycle's limited and wasting insurance policy.

The Settlement is therefore an excellent result for Class members in a case that presented complex issues with respect to both merits and damages. The Settlement was reached only after Plaintiffs, *inter alia*: (i) conducted a comprehensive investigation into the allegedly wrongful acts, including the retention of a private investigator and consultation with experts; (ii) drafted two amended complaints, including the operative Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws ("SAC"), which cured any deficiencies

upon which the Court had based its dismissal of the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("FAC"); (iii) briefed the PureCycle Defendants' and Defendant Roth's separate motions to dismiss both the FAC and the SAC, as well as two motions to strike; (iv) briefed Defendants' motion for reconsideration; (v) pursued fact discovery, which included serving and responding to party discovery requests; (vi) conducted a targeted review of approximately 200,000 pages of documents produced collectively by Defendants; (vii) moved for class certification; (viii) engaged in expert discovery, including consultation with experts and depositions of experts on the issue of market efficiency; (ix) conducted extensive consultations with experts to evaluate potential damages; (x) drafted a detailed mediation statement, which included relevant exhibits, addressing both liability and damages; (xi) participated in a formal full day in-person mediation session before Jed Melnick, Esq., of JAMS mediation services, and engaged in ongoing settlement discussions for over a month thereafter; (xii) engaged in negotiations regarding the terms of the proposed Settlement; and (xiii) worked with a financial damages expert to craft a plan of allocation that treats Plaintiffs and all other Settlement Class Members fairly. *See* Weinrib Decl., ¶¶16-18, 31, 35, .

The proposed $12 million Settlement is fair, reasonable, and adequate, representing a minimum of over 5% of estimated damages under Plaintiffs' best case scenario. *Behrens v. Wometco Enters.*, 118 F.R.D. 534, 542-43 (S.D. Fla. 1988)*In re Charter Commc'ns, Inc. Sec. Litig.)*, 2005 WL 4045741, at *6 (E.D. Mo. June 30, 2005).

*See* Weinrib Decl. ¶22. However, had Defendants succeeded in convincing the Court to narrow the Class Period and adopt its calculation of damages, the $12 million Settlement would represent 32% of estimated total damages. *Id.* Pursuant to the Court's Preliminary Approval Order, over 31,595 notice and claim packets were mailed or emailed to potential Settlement Class Members and nominees. *See* Declaration of Sarah Evans Concerning: (A) Mailing of The Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Evans Decl.") ¶¶ 2-8, attached to the Weinrib Decl. as Ex. 1. To date, no class members have objected to the settlement and only one class members has opted out. Evans Decl. ¶¶ 12-13. The deadline to seek exclusion from the Settlement was September 12, 2024. *Id*. The deadline to object to the Settlement was September 17, 2024. *Id.*

For these reasons and those set forth below, Plaintiffs respectfully submit that the Court should approve the Settlement because it is fair, reasonable and adequate.

## II.     THE SETTLEMENT SHOULD BE FINALLY APPROVED

### A.     Standards

The Eleventh Circuit has recognized that public and judicial policy favor the settlement of disputed claims among private litigants, particularly in class actions. *See In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors the pretrial settlement of class action lawsuits.") (quoting *Wald v. Wolfson (In re U.S. Oil & Gas Litig.)*, 967 F.2d 489, 493 (11th Cir. 1992)); *Bennett v.*

*Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011) (*Checking I*) (the Court's "Rule 23(e) analysis should be 'informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement'") (quoting *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982)).

As the Eleventh Circuit has noted:

> Complex litigation—like the instant [class action] case—can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules of Civil Procedure authorize district courts to facilitate settlements . . . .

*U.S. Oil & Gas*, 967 F.2d at 493.

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e). To approve a settlement under Federal Rule of Civil Procedure 23(e), a district court must "make a two part determination that: 1) there is no fraud or collusion in reaching the settlement, and 2) the settlement is fair, adequate and reasonable." *Warren v. City of Tampa*, 693 F. Supp. 1051, 1054 (M.D. Fla. 1988), *aff'd*, 893 F.2d 347 (11th Cir. 1989). A court can determine that a class-action settlement is "fair, reasonable, and adequate," after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method

of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Eleventh Circuit has held that in determining whether a proposed settlement is "fair, adequate and reasonable," a court should look to the following *Bennett* factors:

> (1) the likelihood of success at trial; (2) the range of possible recovery, (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) advisory committee notes to 2018 amendments.

Accordingly, Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative *Bennett* factors. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 (N.D. Ga. Mar.

9

17, 2020) (reviewing final approval of class action settlement under both the Rule 23(e)(2) factors and *Bennett* factors), *aff'd in part, rev'd and remanded in part on other grounds*, 999 F.3d 1247 (11th Cir. 2021).

Approval of a class action settlement "is committed to the sound discretion of the district court." *U.S. Oil & Gas*, 967 F.2d at 493. Moreover, in evaluating a settlement, a court is "entitled to rely upon the judgment of experienced counsel for the parties." *Canupp v. Sheldon*, 2009 WL 4042928, at *5 (M.D. Fla. Nov. 23, 2009) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)), *aff'd sub nom. Canupp v. Liberty Behav. Health Corp.*, 417 F. App'x 843 (11th Cir. 2011), *and Canupp v. Liberty Behav. Health Corp.*, 447 F. App'x 976 (11th Cir. 2011); *see also Warren*, 693 F. Supp. at 1060 (affording "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation"). Indeed, "absent fraud, collusion, or the like," a trial judge "should be hesitant to substitute its own judgment for that of counsel." *Cotton*, 559 F.2d at 1330; *accord In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991).

All of the applicable factors support approval of the Settlement here.

**B.    The Settlement is Fair, Adequate, and Reasonable under Rule 23 and *Bennett***

### 1.    Plaintiffs and Lead Counsel have Adequately Represented the Settlement Class

In evaluating a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class." Fed.

R. Civ. P. 23(e)(2)(A). Courts consider: (1) whether class representatives have interests antagonistic to the interests of other class members; and (2) whether class counsel has the necessary qualifications and experience to lead the litigation. *See, e.g., Kirkpatrick v. J.C. Bradford Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *Equifax*, 2020 WL 256132, at *5.

Here, there is no antagonism or conflict between Plaintiffs and the proposed Settlement Class. Plaintiffs' claims are typical of and coextensive with those of other Settlement Class Members. Plaintiffs have no interests antagonistic to the interests of other members of the Settlement Class. Plaintiffs and the other Settlement Class Members all purchased PureCycle securities during the Class Period and were allegedly damaged by the same misstatements. If Plaintiffs proved their claims at trial, they would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, Plaintiffs and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action and in the negotiation and achievement of the Settlement. Lead Counsel, Pomerantz LLP, is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 2 to the Weinrib Decl.) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement. Accordingly, the Settlement Class was adequately represented.

## 2.     Settlement Negotiations Were at Arm's Length

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). "[C]ourts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." Herbert S. Newberg & Alba Conte, Newberg on Class Actions § 11.51 (3d ed. 1992). There is no hint of collusion in this Settlement, which was achieved only after three years of hard-fought litigation, which, as noted, included the filing of two amended complaints, briefing on four motions to dismiss, two motions to strike, a motion for reconsideration, and a hotly contested class certification motion, a full day mediation overseen by an impartial mediator that included extensive analysis of the Parties' legal positions, damage estimates, as well as Defendants' ability to pay, followed by a month of continued negotiations. The proposed Settlement is the result of a mediator's recommendation.

Thus, there was no fraud or collusion, and negotiations were at arm's length. This factor weighs heavily in favor of approval. *See Berman v. Gen. Motors LLC*, 2019 WL 6163798, at *4 (S.D. Fla. Nov. 18, 2019) ("[T]he Settlement was reached with the assistance of a neutral mediator with substantial experience mediating class actions, which further demonstrates the absence of collusion."); *Equifax*, 2020 WL 256132, at *6 ("readily conclud[ing]" that a settlement was negotiated at arm's-length where mediation was conducted by an experienced mediator); *Yang v. Focus Media*

*Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 675 (S.D. Fla. 2006) (settlement reached after mediation was "the product of good-faith, arm's length negotiations rather than collusion or overreaching by the parties"); *Checking I*, 830 F. Supp. 2d at 1345.

### 3.    The Relief Provided for the Class is Adequate

#### a)    The Costs, Risks, and Delay of Trial and Appeal

In evaluating a settlement under Rule 23(e)(2)(C), courts also consider "the costs, risks, and delay of trial and appeal."[5] The Court "can limit its inquiry to determining whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of settlement." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697-98 (M.D. Fla. 2005); *Checking I*, 830 F. Supp. 2d at 1345 (court need not determine if settlement "is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial") (quoting *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000)).

---

[5] Similarly, the first and fourth *Bennett* factors look at "the likelihood of success at trial," and "the complexity, expense and duration of litigation," respectively. *Bennett*, 737 F.2d at 986; *see also In re Checking Account Overdraft Litig.*, 2013 WL 11319392, at *8 (S.D. Fla. Aug. 5, 2013) (*Checking II*) ("The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.") (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)).

Continued litigation here would have been costly, risky, and protracted. Courts have repeatedly noted that "stockholder litigation is notably difficult and notoriously uncertain." *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 11336122, at *9 (N.D. Ga. Oct. 20, 2008) (quoting *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 529 (E.D. Pa. 1990)). Indeed, Plaintiffs would have to obtain class certification and prove their claims at trial. Overcoming the hurdles of obtaining class certification, prevailing on the pending motion for reconsideration, prevailing on anticipated summary judgment motions, proving every element of their claims at trial, prevailing on any subsequent appeals, and then collecting a judgment from a Company with no profits, immaterial revenues, hundreds of millions in liabilities, and a wasting insurance policy would be no small task. Plaintiffs and Lead Counsel recognized the significant risk, time, and expense involved in in continuing to prosecute Plaintiffs' claims.

As set forth above, when the Parties agreed to settle this Action, Defendants' Recon. Mot. of the Court's motion to dismiss ruling remained *sub judice.* In their Recon. Mot., Defendants argued *inter alia* that "recent developments" demonstrated the viability of PureCycle's polypropylene recycling technology and thus undercut allegations of falsity as to alleged misstatements regarding that technology, and further argued that the SEC's decision to close its investigation into Defendant Otworth undercut allegations of scienter. While Plaintiffs stand by the merits of their

claims and argued that these post-Class Period events do not negate liability for Class Period misstatements, the risk of dismissal remained.

Moreover, Plaintiffs' fully briefed Class Cert. Mot. also remained *sub judice.* In opposition to the Class Cert. Mot., Defendants argued that: 1) Plaintiffs did not have standing to pursue claims for misstatements issued prior to consummation of the de-SPAC transaction between ROCH and PureCycle (while the Eleventh Circuit has yet to rule on whether investors in an acquiring company can sue the target company for pre-merger statements, the Second Circuit and Ninth Circuit have held they often cannot[6]); 2) Plaintiffs could not establish market efficiency prior to the de-SPAC transaction and thus could not invoke the fraud on the market presumption for that time frame; and 3) Plaintiffs could not establish that either the Hindenburg Report or the disclosure revealing the SEC's investigative subpoena to Otworth qualify as corrective disclosures. While Plaintiffs and Lead Counsel are confident that the Settlement Class meets the requirements for certification, the risk remained that the Court would adopt Defendants' views and either severely restrict the Class Period or decline to certify the class at all.

Even if Plaintiffs prevailed in full on both the Recon. Mot. and Class Cert. Mot., the risk of dismissal remained on Defendants' expected motions for summary judgment, at trial, or on appeal. At trial, Plaintiffs would have to convince a jury that

---

[6] *See Max Royal LLC*, 110 F.4th at 1181; *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 88 (2d Cir. 2022).

Defendants made actionably false and misleading statements, with either intent or severe recklessness, which caused Plaintiffs' and the Settlement Class's losses upon revelation of the truth when both the Hindenburg short seller report published on May 6, 2021 and the Company's disclosure of the SEC's issuance of an investigative subpoena to Defendant Otworth came to light.

The bar for establishing each element of a Section 10(b) claim at trial — including falsity, scienter, loss causation, reliance, and damages — is high. While Plaintiffs still believe in the merit of their claims, a significant risk existed that the jury would not agree. *See Saccoccio v. JPMorgan Chase Bank, N.A.*, 297 F.R.D. 683, 693 (S.D. Fla. 2014) (mere fact of potential loss at trial weighed in favor of settlement); *Behrens*, 118 F.R.D. at 540 (approving class action settlement because "[i]f the plaintiff pursued this cause through trial, the likelihood of achieving any success would be at risk"); *Beavers v. Am. Cast Iron Pipe Co.*, 164 F. Supp. 2d 1290, 1298 (N.D. Ala. 2001) ("[T]here are both strengths and weaknesses in each party's position[;] [t]his uncertainty of outcome is another factor favoring approval of the settlement.").

Additionally, even if Plaintiffs achieved a judgment at trial and successfully litigated through any appeal, the risk of collecting on that judgment was considerable. PureCycle has never earned any profit.  The Company has one operation, its polypropylene recycling technology, from which it has yet to earn any material revenue.  According to PureCycle's Form 10-Q filed on August 8, 2024, the Company had only $10,895,000 in cash and cash equivalents as of June 30, 2024, as

compared to $73,411,000 as of December 31, 2023, and had $428,142,000 in total liabilities. Moreover, continued litigation would have further exhausted PureCycle's limited and wasting insurance policy.

The Settlement, which provides an immediate $12 million cash payment for the benefit of the Settlement Class, avoids these risks and further costs and delays. The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiff prevailed at trial, which was far from certain. This factor thus weighs in favor of settlement approval.

### b) Other Factors Established by Rule 23(e)(2)(C) Support Final Approval

Under Rule 23(e)(2)(C), courts also must consider whether the relief provided for the class is adequate in light of: (1) "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," (2) "the terms of any proposed award of [attorneys'] fees, including timing of payment," and (3) "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). Each of these factors militates in favor of the Settlement's final approval or is neutral.

First, the method for processing Settlement Class Members' claims and distributing relief to eligible claimants includes well-established procedures for processing claims submitted by potential Settlement Class Members and efficiently distributing the Net Settlement Fund. Here, Strategic Claims Services ("SCS"), the Claims Administrator, will process claims under the guidance of Lead Counsel,

provide claimants with an opportunity to cure any deficiency in their claim or request review of any denial of their claim, and, ultimately, mail or wire Authorized Claimants their pro rata share of the Net Settlement Fund as calculated under the Plan of Allocation, after submission and Court-approval of Plaintiffs' distribution motion.

This type of claims processing is standard in securities class action settlements, and it is effective, as well as necessary, insofar as neither Plaintiffs nor Defendants possess the individual investor trading data required for a claims-free process to distribute the Net Settlement Fund. *See N.Y. State Tchrs.' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 233-34, 242 (E.D. Mich. 2016) (approving settlement with a nearly identical distribution process), *aff'd*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017).

Second, Lead Counsel is applying for a percentage of the common fund fee award in the amount of 33.3% to compensate Lead Counsel for their services rendered on behalf of the Settlement Class. As discussed in detail in the accompanying memorandum in support of Lead Counsel's request for award of attorneys' fees, reimbursement of litigation expenses, and compensatory awards to Plaintiffs, the proposed fee award of 33.3% of the Settlement Fund (which, by definition, includes interest earned on the Settlement Amount) is reasonable in light of the substantial work and efforts of Lead Counsel undertaken on a contingency basis, the risks that they faced in the litigation, the results achieved, and awards in similar complex cases. *See, e.g.*, *Reyes v. AT&T Mobility Servs., LLC*, 2013 WL

12219252, at *3 (S.D. Fla. June 21, 2013) ("Class Counsel's request for one-third of the settlement fund is also consistent with the trend in this Circuit."); *Atkinson v. Wal-Mart Stores, Inc.*, 2011 WL 6846747, at *7 (M.D. Fla. Dec. 29, 2011) (awarding "customary fee" of 33.3% of $2,020,000); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294-95 (11th Cir. 1999) (affirming 33⅓% award of $40 million).

Third, with respect to Rule 23(e)(2)(C)(iv), the Parties have entered into a confidential agreement that establishes certain conditions under which Defendants may terminate the Settlement if Settlement Class Members, who collectively purchased a specific number of shares of the Company's common stock, request exclusion (or "opt out") from the Settlement. This type of agreement is standard in securities class action settlements and has no negative impact on the fairness of the Settlement. *See In re Healthsouth Corp. Sec. Litig.*, 334 F. App'x 248, 250 n.4 (11th Cir. 2009); *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (granting final approval of class action settlement and observing that such "opt-out deals are not uncommon as they are designed to ensure that an objector cannot try to hijack a settlement in his or her own self-interest").

### 4.   The Proposal Treats Class Members Equitably

The proposed Settlement treats members of the Settlement Class equitably relative to one another. As discussed below, pursuant to the Plan of Allocation, eligible claimants will receive their *pro rata* share of the recovery based on their purchases or acquisitions of PureCycle and/or ROCH securities during the Class

Period. Lead Plaintiffs will receive the same level of *pro rata* recovery under the Plan of Allocation as all other Settlement Class Members.

### 5.    The Settlement Is Within the Range of Reasonableness

The second and third *Bennet* factors, which are usually combined (and do not overlap with Rule 23(e)(2), require the Court to determine the possible range of recovery and then determine the minimum fair, reasonable, and adequate settlement within that range. *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1322 (S.D. Fla. 2005). The Court must evaluate the settlement "in light of the attendant risks with litigation." *Checking I*, 830 F. Supp. 2d at 1350 (citation omitted). Courts in this district emphasize that settlement is compromise and requires "an abandoning of highest hopes." *Id.* (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)).

Plaintiffs' damages expert opined that their "best case" damages recovery, based on the disclosures on May 6, 2021 and November 11, 2021, was $230 million. The Settlement thus represents over 5% of this best-case scenario, which assumes prevailing on every single loss causation / stock drop allegation at trial, which is highly unlikely. Defendants vigorously disputed Plaintiffs' damages estimates and, under their analysis, assert Class-wide damages to be zero, or at least much less. At minimum, if Defendants succeeded in convincing the Court to shorten the Class Period based on their standing, market efficiency, and loss causation arguments, to begin when PureCycle starts trading post merger on April 21, 2021 and to end on

May 5, 2021, the "best case" damages estimate goes down to $37.33 million. Under that scenario, the Settlement represents over 32% of damages.

The percentage of damages substantiates the reasonableness and fairness of the Settlement Amount, which represents an excellent recovery for investors in a complex litigation with an uncertain outcome. *See also Charter Commc'ns*, 2005 WL 4045741, at *6 (average settlements since 1995 were for 5.5% to 6.2% of estimated losses); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1332 (S.D. Fla. 2001) (approving settlement for 10.7% of damages); *Behrens*, 118 F.R.D. at 542-43 (finding a 5.7% recovery to be well within the range of appropriate settlements). The Settlement provides for payment to Settlement Class Members now, without delay, rather than the speculative hope of a potentially larger amount years down the road. "[M]uch of the value of a settlement lies in the ability to make funds available promptly." *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985), *aff'd in part, rev'd and remanded in part on other grounds*, 818 F.2d 179 (2d Cir. 1987). Thus, this factor strongly favors approval.

### 6.   The Reaction of the Class

The fifth *Bennett* factor also supports final approval. The overwhelmingly positive reaction of class members to a proposed settlement is a significant factor, and the absence of objections "is excellent evidence of the settlement's fairness and adequacy." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1556 (M.D. Fla. 1992); *Access Now,*

*Inc. v. Claire's Stores, Inc.*, 2002 WL 1162422, at *7 (S.D. Fla. May 7, 2002) ("The fact that no objections have been filed strongly favors approval of the settlement.").

Over 31,500 notice claim packets were mailed to potential Class Members and nominees. *See* Evans Decl., ¶ 8. The Notice apprised Settlement Class Members of their right to object to the Settlement, the Plan of Allocation, or to Lead Counsel's application for attorneys' fees and expenses, and the procedure to object or seek exclusion. *Id.*, Ex. A. To date, there have been no objections to the Settlement, the Plan of Allocation, or Lead Counsel's request for fees and expenses. *Id.* ¶ 13. The deadline to object was September 17, 2024. *Id.* To date, only one Class Member has requested exclusion. *Id.* ¶ 12. The deadline to opt out was September 12, 2024. *Id.*

### 7. The Stage of Proceedings

The purpose of considering the stage of the proceedings, the sixth *Bennett* factor, is to ensure that Plaintiffs had sufficient information to evaluate the case and to determine the adequacy of the settlement. *Behrens*, 118 F.R.D. at 544. "[T]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Checking I*, 830 F. Supp. 2d at 1349 (quoting *Ressler*, 822 F. Supp. at 1555).

Here, Plaintiffs had a strong understanding of the strengths and weaknesses of their case, and thus have an ample basis for making an informed judgment that the settlement is fair and reasonable. Based on substantial investigation and research, Plaintiffs drafted two amended complaints. Plaintiffs defeated Defendants' motion to

dismiss the SAC, and fully briefed both the Recon. Mot. and Plaintiffs' Class Cert. Mot. Plaintiffs received and reviewed 200,000 pages of documents from Defendants collectively in discovery, and thus had a sold grasp of the factual merits of the case. Plaintiffs took the deposition of Defendants' financial expert and, while confident in their ability to obtain class certification, had a full understanding of the challenges they faced in doing so, maintaining class certification through trial, and in proving loss causation and damages. Moreover, Plaintiffs understood that they could potentially face a substantial standing hurdle in light of recent case law in the Second and Ninth Circuits (*see supra* note 5), though Plaintiffs disagree with the holdings in those cases and the Eleventh Circuit has yet to weigh in on the matter.

The Parties also participated in a full day mediation with a well-regarded mediator, which included extensive discussion of the available evidence with each Party comprehensively setting forth their positions on the facts and the application of the law to the evidence. Moreover, the discussion included Defendants' ability to pay in light of the wasting insurance policy and the Company's cash burn.

Thus, this factor favors approval. *See Sunbeam*, 176 F. Supp. 2d at 1332 (because the "case had progressed to a point where each side was well aware of the other side's position and the merits thereof[,] [t]his factor weighs in favor of the Court finding the proposed settlement to be fair, adequate, and reasonable"); *Behrens*, 118 F.R.D. at 544.

### C.    The Recommendation of Experienced Counsel Supports Approval

The Court is entitled to rely on the judgment of counsel, and, indeed, "should be hesitant to substitute its own judgment for that of counsel." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 703 (M.D. Fla. 2005) (quoting *Cotton*, 559 F.2d at 1330); *see also In re Smith*, 926 F.2d at 1028. Pomerantz LLP, the oldest law firm in the world dedicated to representing defrauded investors, has served as lead or co-lead counsel in countless successful securities class actions and believes the Settlement is fair, reasonable, and adequate. Weinrib Decl., ¶¶20-25, 54. Accordingly, as in *Strube*, "counsel's informed recommendation of the agreement is persuasive that approval is appropriate." 226 F.R.D. at 703.

## III.   THE PLAN OF ALLOCATION SHOULD BE APPROVED

The standard for approval of a plan of allocation is the same as for a settlement: whether it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Chicken Antitrust*, 669 F.2d at 238 (quoting *Cotton*, 559 F.2d at 1330). Courts give great weight to the opinion of experienced counsel in evaluating plans of allocation. *See Yang*, 2014 WL 4401280, at *9.

The Plan of Allocation was formulated with the aid of Plaintiffs' financial experts and designed to reimburse class members to the extent of their damages under the securities laws. "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994). The Plan of Allocation does not discriminate between Class Members in the same position. The Net Cash Settlement

24

Fund is distributed on a pro rata basis depending on Class Members' recognized losses. Accordingly, the Plan of Allocation is fair and adequate and should be approved.

## IV.    CONCLUSION

Accordingly Plaintiffs respectfully request that the Court finally approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: September 17, 2024                          Respectfully submitted,

**POMERANTZ LLP**

/s/ *Tamar A. Weinrib*

Tamar A. Weinrib (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 917-463-1044

***Lead Counsel for Plaintiffs***