1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

. . . . . . . . . . . . . . . .  :
                                 :
WILLIAM THEODORE, et al.,        :
                                 :
                Plaintiffs       :
vs.                              :    Case Number
                                 :    6:21-CV-809-PGB-RMN
                                 :
PURECYCLE TECHNOLOGIES, INC., :
et al.,                          :
                                 :
                Defendants.      :
. . . . . . . . . . . . . . . .  :

THURSDAY, MAY 30, 2024; 10:02 A.M.
TELEPHONIC MOTION HEARING
BEFORE THE HONORABLE PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

PLAINTIFF'S COUNSEL:
  Tamar Weinrib, Esq.

DEFENSE COUNSEL:
  Joni Jacobsen, Esq.
  John Loftus, Esq.

Official Court Reporter:
  K. Stanford
_____
Proceedings recorded by mechanical stenography.
  Transcript produced by computer-aided transcription.

2

PROCEEDINGS

THE COURTROOM DEPUTY:  William Theodore, et al., versus PureCycle Technologies, Inc., et al., Case number 6:21-CV-809.

Counsel, please state your appearances for the record.

MS. WEINRIB:  Tamar Weinrib from Pomerantz, LLP, on behalf of plaintiff.

THE COURT:  Thank you.  Good morning.

MS. WEINRIB:  Good morning.

MS. JACOBSEN:  Good morning, Joni Jacobsen of Dechert, LLP, on behalf of PureCycle, David Brenner, Michael Otworth, and Michael Dee.

THE COURT:  Thank you.

All right.  We have the motion to --

MR. LOFTUS:  Oh, I'm sorry, Your Honor.  One more. John Loftus from DLA Piper, LLP, on behalf of defendant Byron Roth.

THE COURT:  All right.  Thank you very much. Sorry to leave you out of the introductions there.

So we have the proposed preliminary settlement of the class action in this case.  I have a few questions for you all.  Normally, I would do this in person, but I have a few preliminary matters that I thought made sense to take up in this matter.  Bear with me just one second.

3

(Pause in proceedings.)

THE COURT:  There we are.

(Continued pause in proceedings.)

THE COURT:  Just one moment.  I apologize.

I'm just getting my computer to come up here.

(Continued in proceedings.)

THE COURT:  Just give me another second here.

(Continued pause in proceedings.)

There we go.  That took a moment.  I apologize.

All right, folks.

So we have the unopposed motion for settlement at docket entry 201.  I had a few questions for you all.

When I'm looking at the standard issues that arise in a preliminary settlement for a class action before we have the final settlement hearing, I'm always looking at, of course, whether this settlement is in the best interest of the putative class members.

In this case, I went back and I reviewed the various iterations of the complaint leading up to the second-amended complaint filed August 18th of 2022, and I have looked at the status procedure of where we are.

Of course, there was a stay April 26th of this year at docket entry 197, which allowed the parties to discuss potential settlement.

We have some pending motions that were pending prior

4

to the stay, a motion to reconsider, the motion -- order on motion to dismiss.  There's a motion for class certification.

According to the amended Case Management and Scheduling Order, we have not yet gotten to the deadline for Daubert or dispositive motions, such as summary judgment.

So we're -- even though the case is about three years old, we're still fairly early in the life of the case, and the length of the case is due primarily to the number of times it had to be re-pled.  So I have a few concerns, and I'll just get right to it.

The overall settlement in this case that's suggested is $12 million for all potential class members, which represents five percent of the lost -- loss and share price or share value.

So if my math is correct, according to the plaintiff, the drop in share price that occurred after the Hindenburg Research report was released and again after the SEC gave an investigative subpoena requesting testimony to PureCycle, the total drop went from 240 million down to whatever it is today.

The settlement of $12 million represents five percent.  So the loss that's alleged is 240 million.

Of the five percent that is being recovered in the settlement, one-third, potentially, would go to attorneys' fees, leaving about 3.333 percent return for investors by

virtue of the settlement.

The first question would be, Why is that fair, a three percent return on the loss?

And then I have concerns about the notice, the nature of the notice, the burden placed on the individuals filing a claim, et cetera.

So let me start with the first issue, which is the fairness of the settlement itself.

The motion to approve the settlement contains certain boilerplate language, including that -- the following. I want to read to you a quote that you all put in your -- in your papers.

"While plaintiffs believe the merits of the case are strong, the proposed settlement is an excellent result and is in the best interest of the settlement class in light of the risks and costs of litigating this action through trial and post-trial proceedings."

That's it.  That's the full context of why a three percent return on loss is a fair and reasonable outcome. There's no explanation in the papers to justify why the litigation risks are so great that the return is so low. There is no indication that PureCycle is financially in dire straits such that they couldn't pay more.

And so what I am seeing is a negotiated settlement for a very small amount in exchange for a release that would

6

close the books on, potentially, a quarter-billion-dollar litigation.  Help me to understand why that's fair and particularly when we haven't even gotten through class certification, summary judgment, et cetera.  There's lots of words in the motion, but very little explanation.

So let me start with the plaintiff.  Why is this fair, and how do you know that so early in the case?

MS. WEINRIB:  Thank you, Your Honor.

So in our position, the case has gone through multiple very highly-contested stages, including, as Your Honor noted, the drafting and investigation of three complaints, the briefing and --

THE COURT:  Well, let me just interrupt for a second.

MS. WEINRIB:  -- briefing of -- mm-hmm.

THE COURT:  Three complaints were necessary because it wasn't pled properly.  That's not investigative.  That's just drafting.

And so, yes, if you're trying to allege state of mind necessary for the causes of action, you need to develop some discovery to demonstrate that, but that's not heavy lifting by any stretch to simply write your complaint until it's written correctly.

And so what I haven't seen in the motion is, how many depositions were taken?  Who were the depositions of?

What's left to be done?  What risk was identified from the depositions or the expert testimony or the paper discovery?

What I have is, Trust me; it's a really great case, but there's litigation risk.  So we'll take $4 million, the defense will pay a total of 12 and walk away.  That's not very persuasive.

So help me -- other than writing three complaints, which is not uncommon when they're not drafted correctly, what is the basis for a three percent return being reasonable at this stage of the proceedings?

MS. WEINRIB:  So, Your Honor, counsel determined that there were still significant risks that remained in litigating litigation to conclusion, including the fact that they was still a pending motion for reconsideration on the docket; the class certification motion had been filed and was highly contested, involved extensive expert discovery and expert depositions, which were taken on both sides, of plaintiff's expert and of defendant's expert; and there were risks that existed to whether the class would ultimately be certified in this class.

In addition, Your Honor, this is a complex securities litigation that involves very difficult highly-contested issues, including the issues of scienter, including the issue of damages, loss causation, all of which would have involved extensive expert discovery going forward

and which was hotly contested on both sides.

And there simply --

THE COURT:  And where are we in that process? Where are we in the process of actually -- not just identifying potential risks, like certification won't happen or scienter won't be established, what has happened in terms of developing?

Anyone can sit down and say, Here's a litany of potential risks in a securities case and here is always a potential risk in every case that one could lose at a particular juncture.

What matters here is, why are those risks real here? And I have no explanation of that other than, Trust me, and that we mediated.

But a mediator, even an excellent one, has a different job than I do.  The mediator's job is to get the parties to "Yes."  My job is to protect the people who are not here, that is, you know, the putative class members who are going to be left with a take-it-or-leave-it settlement.

So what I don't see is, other than a bullet list of all the things that I could conjure up as risk, what is the actual risk here?  There's nothing in the motion that identifies why, you know, 97 percent of the alleged loss staying with the defendant is a good resolution.

MS. WEINRIB:  Well, Your Honor, for example, with

regard to the class certification motion which was pending, as I indicated, the parties undertook expert discovery and expert depositions on both sides, and one of the issues that was hotly contested was the question of market efficiency.

And while plaintiffs contend that the market was efficient, defendants have put their own expert report and conducted their own depositions to establish that the market was not efficient.

If we're unable to establish if the market was efficient for the entirety of the class period, then the class can't get certified in this case.

Defendants have also brought up questions with regard to standing and the length of the class period, all of which were substantial risks as to whether this case could continue as a class action going forward.

Additionally, in Section C of the preliminary approval brief, which I believe begins on page 16, we set forth some of those risks, including the risk for class certification, including the risk of establishing all of the elements of the securities fraud claim, which are, again, highly complex and highly contested in this case.

Plaintiffs would have had to prove what defendants knew during the class period with regard to the status of PureCycle's polypropylene recycling technology, whether or not it was capable of producing virgin-like resin, whether or not

they could do it more cost effectively than --

THE COURT:  Just a little bit slower, please.

Ma'am, a little bit slower; a little bit slower.

I can keep up, but the court reporter is going to have, you know, difficult time with that.

MS. WEINRIB:  I apologize.

THE COURT:  That's okay.

MS. WEINRIB:  Would you like me to go back or should I continue on?

THE COURT:  Koretta, how are you?

THE COURT REPORTER:  She can continue.

THE COURT:  Okay, please continue, just a little bit slower, please.

MS. WEINRIB:  Sure.

So we would have to establish and defendants have contested that management knew or should have known during the class period that the company's polypropylene recycling technology, whether it could produce virgin-like resin and whether it could do so more cost effectively than other available methods, whether it could do so using a broader range of feed stock than other traditional methods.

Defendants have argued that recent developments, including the fact that one of its facilities has begun producing pellets, establishes that we don't have a case.

Now, while all of those issues are contested and

11

while we take a different position, these all present risks as to the litigation continuing and the plaintiffs being able to get through both summary judgment and trial.

So there is a risk to the class of getting nothing at the end of the day, and the risks were substantial enough that the parties determined that it made sense to settle the action at this juncture following the four motions to dismiss, two motions to strike, the motion for reconsideration, the highly-contested motion for class certification.

Additionally, we were well into the discovery process.  While we had not gotten to the point of taking fact depositions yet because discovery was not yet complete, as far as production of documents, defendants did produce and plaintiffs reviewed over 200,000 pages of documents.

THE COURT:  Right.  I understand that.  But if you're talking about the state of mind of the defendants at the relevant time, you would think that you would at least take a deposition of somebody to inquire into that before you say, you know, a three percent return across the board -- and for some shareholders, obviously, it's as high as 20 cents on the dollar, and others, it's as low as three cents on the dollar, but it averages to about a three percent return.  But you think there would have been some fact deposition taken at this point.  The case has been going on since 2021.

I mean, nothing stops --

12

MS. WEINRIB:  Your Honor, we're not in a position to take depositions because this -- production of documents had not been complete.  So we can't take depositions until that process is over.  And while it is certainly possible and, you know, plaintiffs were hopeful that they would be able to establish all the elements of the claim, it was uncertain, and there were risks involved in establishing each element of the claim.  And defendants have, you know, put in their arguments thus far as to why we have not met each element of the claim and, in fact, requested reconsideration of the dismissal order -- of the denial of the dismissal motion.

So given that the road to trial was still a long and risky one and even to the extent plaintiffs were able to achieve judgment at trial, likely appeals would follow.

So given the inherent cost, delays, and risks of continued litigation and the very real chance that settlement class members could end up with nothing at the end of the day, counsel has determined that this was in the best interest of the class, on top of which the defendants, Your Honor --

THE COURT:  I do appreciate that, but they're ending up with almost nothing now, right?  Three percent is just a touch over nothing, which begs the question of, Why on earth would that would be worth $4 million in fee?  Why shouldn't there be more money freed up to the people so they don't get three percent, they get three-point something, at least.

13

And if undertaking the case was such a bad idea because the risk is so high and the hurdles of proof are so severe, then why should a lawyer be rewarded with a third of the take?  That's another issue, which I'll cross that bridge at a later date.

Let me turn -- I'll go back and I'll look at the motion -- the response on the motion for class certification, because it seems to outline a lot of what you've said, and that could be very helpful.

Let's talk about notice -- well, I have one other question before I do that.

Let's assume if there is 8- to $10 million available for investors and a notice is sent out -- I have issues with the notice, by the way -- but if the notice is sent out and there is 8- to $10 million available for these folks to collect from, if 12 percent respond -- so 1.2 million claim -- actually seek compensation, where does the balance go?

MS. WEINRIB:  Well, the settlement amount is distributed pro rata to the settlement class members that respond and properly fill out the proof of claim form and prove that they are valid class members.

Once the deadline passes and all of the claim forms are processed, the settlement amount is distributed pro rata to the percentage of class members that actually responded, which was actually one of the points I was going to raise

14

before, which is that --

THE COURT:  Let's assume that -- you know what I'm asking.  Let's assume that not all of the money is used, because we all know that even with a very clear and unambiguous notice to class members -- I had a case where the class were each going to receive $90 for, you know, a data breach or something that didn't particularly impact their lives, and notwithstanding you just fill out the form or click on the website to get paid, the response was still under 15 percent, which is the norm.

So in this case, let's assume the norm continues and with a very complicated notice, you have a very meager response.  Then what happens to the balance of the money that's not paid out?  You haven't used it all.  You've paid everyone in full who does make a claim.  And if there is money left over, does it go back to PureCycle?

MS. WEINRIB:  No, Your Honor.

So the way that it works is that the entirety of the amount would be distributed pro rata to the percentage of class members that respond and who are valid.  And to the extent there is a de minimis amount left over, there's (feedback) -- but it wouldn't go back to PureCycle.

So the way that it works, if only 15 percent of potential settlement class members file valid proofs of claim, then the entirety of the settlement amount would be

15

distributed pro rata to that 15 percent.

THE COURT:  Right.  But let's assume -- and I may be -- we may be saying the same thing and I'm just not appreciating your response.  But let's assume that of the 15 percent -- or whatever the number is -- of the individuals who file a claim, let's assume their loss does not result in consumption of all of the money set aside to pay claims, however that math works out.

What happens to the balance?  If there's a million left over or two million, five million, where does it go?

MS. WEINRIB:  It would be distributed pro rata to the other class members that filed valid proofs of claims.

THE COURT:  Right.  But you're not -- either you're not understanding my question or you're just not answering it.

The question is this:  What if the number of people who filed claims, their pro rata share does not consume the amount of money left over.  There's a surplus.

Regardless of how we get there, is it reversionary?  Does it revert to PureCycle?

MS. WEINRIB:  No.  The amount does not revert to PureCycle.

THE COURT:  Where does it go?

MS. WEINRIB:  So I've never actually seen a situation in which this has happened (feedback) Your Honor.  However, to the extent there is an amount left over in the

16

settlement fund that is not distributed pro rata to all class members, usually class members are getting a percentage of their damage.  So it's an almost impossible scenario where there would be a surplus of funds left over (feedback).  But to the extent there was a surplus, there would be (feedback) designation.  It would not go back to PureCycle--

THE COURT:  All right.

MS. WEINRIB:  -- nor would it go to the attorneys or any other party in this case.

THE COURT:  All right.  Very good.  That's what I was curious about.  I didn't see that in there.  It may have been in the notice.  I just didn't pick up on that.

Let's talk about the notice just for a second.  The notice -- and, again, this may be my lack of familiarity with how these shares were sent out, but there's a few concerns I have.

It appears to me that the only mechanism for providing notice of settlement is by mailing a postcard to individuals who you know and the defendant know had acquired the shares, as well as posting once on a website called Globe Newswire and once in print on Investor's Business Daily.

Is that correct?

MS. WEINRIB:  Yes, Your Honor, in addition to which all of the documentation, including the notice, the proof of claim, the release form, and the settlement stipulation would

17

be posted to the claims administrator's website.  And this is a very typical manner in which notice is given in these cases.

Notice is usually mailed out.  It is mailed out to any person who falls within the definition of the settlement class whose names and addresses have been or can be identified through PureCycle's transfer records and the nominees that commonly hold securities and (feedback) for the benefit of their customers who are the beneficial purchasers of the securities.

THE COURT:  Right.

MS. WEINRIB:  So again, that's very typical in class actions of this kind that settle as far as how the potential settlement class members are identified.

THE COURT:  Right.

MS. WEINRIB:  And then, notice would be sent to each one of those within 12 days of entry of a preliminary approval order.  But again, because most people tend to access the Internet and it's the most -- it's a medium most frequently used by investors, that's why (feedback) in Investor's Business Daily and also on Globe Newswire in addition to posting it to the claims administrator's website.

THE COURT:  Okay.  So PureCycle -- through the claims administrator, PureCycle will provide the names and addresses of individuals they know purchased their shares as well as third parties, Morgan Stanley, whoever your broker is,

18

who may be purchasing on behalf of clients.

Is that fair enough?

MS. WEINRIB:  Yes.  Correct.

THE COURT:  The notice requires -- and let me just follow up on that one more time.

If you get a return of address, you know, a sender has moved, is there a skip-tracing provision where you're going to have some third party identify where they've moved to, to try again, or is it a one and done?

MS. WEINRIB:  I don't believe it's a one and done. I think the claims administrator makes an effort to determine the correct address for anything that's returned.  I have to -- I believe that's indicated in the papers, but I can go (feedback).  But, yes, I believe that (feedback) --

And to the extent there is an incorrect address or if anything is returned from sender, there is an effort made to contact those settlement class members.

THE COURT:  Okay.  Very good.

Again, I'm sorry, but slow down just a little bit. It's always trickier on the phone for a court reporter.  In person, it's a lot easier, but there can be some static and it's a little bit tougher.  So I'm speaking about half my normal speed as well.

So I noticed with the claim that each claim must contain the month, day, and year of each share purchase, the

19

purchase price and total cost, excluding commission, taxes, and fees.

Why is that level of specificity required? Meaning that PureCycle will know who bought their shares, I would assume, on what day, or at least the claimant can provide -- I'm trying to find the easiest way for them to satisfy their obligation, because my concern is always that the more burden placed on a claimant, the more things the claimant must do -- dig up books and papers and records -- the more likely we're discouraging submission of claims. And we want to encourage that.

So is this unduly complicated? Is there an easier way to -- you know, you have a finite period of time. It's a one-year window within which the shares were purchased to be part of the class. So asking for the month, day, and year, that makes sense. I don't know if the date matters or the month, other than, you know, please indicate if it was after November 1st of X year and before whatever the close date is.

It just seems like we're asking a lot of detail that could be obtained from either PureCycle's records or the third party that purchased. I don't know how many people are day-trading and buying this on their own. But the more obligation we put on the consumer, the less likely they're going to respond.

Is there an easier way to do it?

20

MS. WEINRIB:  Well, unfortunately, this is the simplest way to do it and the way that it is typically done in settlements of securities class action across the board.

THE COURT:  Typically doesn't --

MS. WEINRIB:  And the reason that --

THE COURT:  I'm sorry, but "typically done" doesn't move the needle for me because a lot of judges just sign off on settlements because the case is gone, and I just firmly believe that.  They don't really care.  I believe that, because I've seen some settlements approved that I would have issue with.

So I don't really care about "typically done."

I'm asking, Is there an easier way?

MS. WEINRIB:  Sure.  Unfortunately, it does not appear that there is.  The level of specificity that we require is because it is determined -- or the claims administrator will need to determine with certainty whether each claimant is, in fact, a valid member of the settlement class, and those details are necessary in order to make that determination and to apply the plan of allocation that's set forth in the -- in the long notice.

And, you know, my understanding is that the level of specificity that we're asking for [static] also uniquely within the possession of each claimant.

You know, the -- certain information may be in

PureCycle's possession, but the specific details that -- all the specific details that are set forth that we are requesting from each claimant are uniquely within the possession of the claimant -- the claimant itself.

THE COURT:  Have the plaintiffs and yourself, as class counsel, have you become aware of any information that causes you to believe that PureCycle is financially unable to pay a greater amount?

I know you've discussed the risk-benefit analysis and the risks of litigation and prevailing.

And I'm always -- I'm asking that because, you know, I was a plaintiff's lawyer once upon a time, and if I received a three percent recovery on a claim for my client, I'd consider that a dismal failure -- so why -- unless the defendant has the inability to pay, in which case, that's obviously a legitimate factor.  We've all had cases where the damages far exceed recoverability, so you -- you know, you get what you get, and that's a relevant factor.

But when we're talking about litigation risk -- I will just be transparent here -- defense has one objective. It's a vigorous release and the earnest belief that this case will be over at the end of this because virtually no one will opt out and very few people will probably respond.  So they're buying finality.

Plaintiff's counsel, they're getting a fee.  That's

22

how class actions work.  We all know it.  Everyone pretends it's something else, but that's what I perceive it as.  And my job is to make sure that there is an impartial third party looking at it.  The mediator is not that party.  Their job is just to get it done, and they don't have to worry about the rest of this.

So again, you know, I will look at the opposition of class certification, but was there a financial component that you're aware of that dictates that 12 million is what they can afford, or is this a company that has substantial resources and, if pressed harder and if you prevail, would pay more or could?

MS. WEINRIB:  So, Your Honor, that's uncertain.

There was a -- (static) -- the litigation has been going on for three years, and the insurance proceeds were certainly depleting, in addition to which PureCycle has one product.  It has this polypropylene recycling product, which we allege is not able to do what they say it is able to do.  Whether at some point in time that changes or whether that has currently changed, as they purport it has, is unclear.

But at the point in time where we litigate this through to trial -- and again, this is making the assumption that we have the class certified, that we prevail on summary judgment, that we prevail at trial, and then make it through all the appeals with a judgment in hand -- it's unclear what

23

their position will be at that point in time to pay a judgment.

THE COURT:  Whether they go bankrupt or fold up the company or what have you?

MS. WEINRIB:  That's just uncertain.  It's uncertain to know what their financial position will be.

(Feedback-static) that as the litigation ensues, the amount of insurance available will continue to deplete.

THE COURT:  Right.

All right.  So the insurance has been depleted through litigation cost, which is -- I'm not aware of a policy that allows all the money to be spent on attorneys' fees, but perhaps that's a thing.

This didn't come up in mediation?  There was no discussion of financial ability?  Sometimes that's an issue, a bargaining point that, you know, We can't pay more than X.

MS. WEINRIB:  You know, it might be better for defense counsel to jump in here and to give their overview of that situation.  But, yes, that was discussed during the mediation.  And the amount of insurance available and how much of that had already been depleted was certainly under discussion, in addition to which there was a derivative action that -- simultaneously litigating on the same set of facts with regard to the same time frame that they were attempting to settle at the same time.  So that was a factor as well.

24

THE COURT:  And there are no other class actions pending?  You're the only one?

MS. WEINRIB:  There are no other class actions pending with regard to this class period and this set of facts.  The only other action I'm aware of that's related is the derivative action.

THE COURT:  Okay.

MS. JACOBSEN:  And, Your Honor, if I may -- this is Joni Jacobsen from Dechert -- just to clarify, there is another securities fraud class action that is pending for a different class period, a later class period, and that is in briefing motions to dismiss right now.

THE COURT:  Okay.  And is the -- I don't want to pry too, too much, but does the insurance that's available, is it covering both of these actions, meaning that it has to be -- you know how they are.  There can be claims made or whatever the term of the insurance was, that the policy that was in effect during the other class may be very different than the policy in effect at the time of this class.

I'm just wondering --

MS. JACOBSEN:  Yes.  My under--

THE COURT:  Go ahead.  I'm sorry.

MS. JACOBSEN:  Sorry to interrupt.

My understanding is that this current security class action that's pending before you, as well as three additional

derivative cases, too -- there were originally five derivative cases. Some have been consolidated, but right now we have three pending derivative cases that relate to this same set of facts, and all of those are covered under the same D&L policy.

THE COURT: Okay. Thank you very much.

And, Ms. Jacobsen, I'm assuming that you believe this settlement is fair and reasonable because you wouldn't have signed off on the motion otherwise?

MS. JACOBSEN: Correct, Your Honor. And I would just -- if I can, emphasize one point. You know, our class certification motion, we believe that the class should not be certified at all.

THE COURT: Yeah.

MS. JACOBSEN: But as Ms. Weinrib pointed out, at the very least, we think that there is significant issues with respect to a large portion of the beginning of the class where plaintiffs are unable to establish market efficiency prior to the date of the merger transaction, the (indistinct) transaction. And we also think they have huge issues with respect to the last half of the class period.

And so if you -- and this was, obviously, briefed in the motion for class certification and, more particularly, our opposition to class certification. But it was also discussed at great length in mediation as well because the total available damages, if they were able to prove everything, in

26

our position, is not 250 million.  It is closer to 60 million on their best day, and we have issues even with that.

And so I do think that that colors the total fairness of the settlement, because we don't believe that they could ever obtain $250 million in damages.

THE COURT:  Okay.  So if I went with your analysis, assuming you're correct, then that basically quadruples the percentage from five to 20 percent of the total amount owed, something like that.  I could be wrong on the math.  I'm just doing it on the fly.

MS. JACOBSEN:  Yes.  Yes.

THE COURT:  All right.  So here's what I'm going to do, folks.  And I didn't -- please don't take away from this as meant to be contentious by me.  I have an obligation to make sure I vet this and I have pointed questions, and there's no reason to sugarcoat them so I just say it.

But I will go back and look at the motion on class certification and the response in opposition, which I think will help me to understand the challenges that went into litigation risk, and then I will take a closer look again at the notice.

I didn't think the notice was particularly cumbersome, other than the month, day, year, share price, et cetera, that was required, but I take Ms. Weinrib at her word that that's necessary to process the claim.

27

And I don't think there will be a need for a further hearing.  I'll issue an order.  I'll either adopt the order you've recommended, that you've submitted.  I believe you submitted a proposed order.  And if I do think there's further clarification I need, I'll be sure to set a telephone hearing. I don't want to rule without having the benefit of your insight.  But these are the concerns I had.  I just wanted to make sure they were discussed and that I understood the position of the parties, and I will get back to you quickly.

I have a trial starting Tuesday.  So hopefully, I'll get this done before then.  But if not, then -- it's a short trial -- I'll get it right afterwards.

All right.  Well, I thank you all very much for being available to discuss this.  I know it's hard to do on the phone, and I appreciate your cooperation.

MS. WEINRIB:  Thank you, Your Honor.

MS. JACOBSEN:  Thank you, Your Honor.

THE COURT:  Thank you.  We'll be in recess.

MR. LOFTUS:  Thank you, Your Honor.

THE COURT:  Thank you.

(Adjourned at 10:38 a.m.)

*      *      *      *

28

Certificate of Official Reporter

I certify that the foregoing telephonic motion hearing is an accurate transcript of the record of proceedings held in the above-entitled matter, to the best of my ability.

s/Koretta Stanford_____
Official Court Reporter
United States District Court
Middle District of Florida          Date:  10/07/2024